RECEIVED

JAN 1 8 2019

U.S. District Court
Eastern District of MO

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| JEFFERY WEISMAN, ) | **4:19-cv-00075-JAR** |
| ) | |
| Plaintiff, ) | |
| v. ) | Jury Demanded |
| ) | |
| ) | |
| BARNES JEWISH HOSPITAL, ) | |
| BJC HEALTHCARE, ) | |
| WASHINGTON UNIVERSITY MEDICAL ) | |
| CENTER, WASHINGTON UNIVERSITY, ) | |
| WASHINGTON UNIVERSITY ) | |
| SCHOOL OF MEDICINE IN ST. LOUIS, ) | |
| THOMAS COX, RICHARD BENZINGER, ) | |
| RUSSELL GROENER, CHRISTINE ) | |
| RAMATOWSKI, and ALEX EVERS, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

Plaintiff, JEFFERY WEISMAN, complaining of BARNES JEWISH HOSPITAL, BJC HEALTHCARE, WASHINGTON UNIVERSITY MEDICAL CENTER, WASHINGTON UNIVERSITY, WASHINGTON UNIVERSITY SCHOOL OF MEDICINE IN ST. LOUIS, THOMAS COX, RICHARD BENZINGER, RUSSELL GROENER, CHRISTINE RAMATOWSKI and ALEX EVERS, states as follows for his Complaint at Law:

1.     This is an action for breach of contract, fraud, defamation and the intentional infliction of emotional distress.

### Jurisdiction and Venue

2.     Jurisdiction over this case is conferred on the Court by 28 U.S.C. § 1332. Plaintiff is a citizen of the State of Illinois and the Defendants are all citizens of the State of Missouri.

3.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Plaintiff resides in another state and the acts alleged herein were committed in the District.

**Parties**

4.     Jeffery Weisman ("Plaintiff") currently resides in the City of Buffalo Grove, Illinois. Plaintiff is an adult male, and at all relevant times was a Resident in the Washington University School of Medicine in St. Louis Department of Anesthesiology Academic Scholars Advancement Program June 2016 and June 2018.

5.     Defendants BJC Healthcare and/or Barnes Jewish Hospital (hereinafter "Barnes Jewish Hospital") is a hospital authorized to do business in Missouri, and which does business in this District.  It participates in administering the residency programs offered by the Washington University Medical Center, Washington University, and/or Washington University School of Medicine in St. Louis.

6.     Defendants Washington University Medical Center, Washington University, and/or Washington University School of Medicine in St. Louis (hereinafter referred to as "Washington University") are a private university that operate a medical school and administer a graduate education program with Barnes Jewish Hospital in this District.

7.     Defendant Thomas Cox is a citizen of the State of Missouri.  At all relevant times he was employed by affiliates of Washington University and supervised residents in Barnes Jewish Hospital and/or  St. Louis Children's Hospital.

8.     Defendant Richard Benzinger is a citizen of the State of Missouri. At all relevant times he was employed by affiliates of Washington University and supervised residents in Barnes Jewish Hospital and/or  St. Louis Children's Hospital.

2

9.     Defendant Russell Groener is a citizen of the State of Missouri. At all relevant times he was employed by affiliates of Washington University and supervised residents in Barnes Jewish Hospital and/or St. Louis Children's Hospital.

10.     Defendant Christine Ramatowski is a citizen of the State of Missouri. At all relevant times she was employed by Barnes Jewish Hospital.

11.     Defendant Alex Evers is a citizen of the State of Missouri. At all relevant times he was employed by affiliates of Washington University and supervised residents in Barnes Jewish Hospital and/or St. Louis Children's Hospital.

## General Allegations

12.     Plaintiff is an attorney, as well as an MD and PhD in Biomedical Engineering who graduated from medical school in May of 2016.

13.     Plaintiff has won multiple awards, honors, made international news and received grant funding based on his unique research and academic background. Plaintiff is exceptionally talented academically and graduated in six years from an MD/PhD program that normally takes eight years to complete. Plaintiff had his own grant funded research lab and spin-off biotechnology company while a medical student. All of this placed Plaintiff as among the most accomplished medical school graduates in the county on his year of graduation.

14.     Plaintiff was heavily recruited by Defendant Alex Evers to move to Washington University and Barnes Jewish Hospital to continue his graduate medical education (GME) and training by conducting a medical residency at the Washington University School of Medicine in St. Louis Department of Anesthesiology.

3

15.     Plaintiff began his research track graduate medical education residency program in the Department of Anesthesiology at Washington University and Barnes Jewish Hospital in June of 2016.

16.     Plaintiff was in his graduate medical educational residency program from June of 2016 to June of 2018 when he was forced to resign due to the actions of Defendants, as alleged below.

17.     All other MD/PhD medical residents in Plaintiff's class year of his research track medical residency education program were discriminated and harassed against until they were also forced to resign in a breach of the educational policies and work contracts they had agreed to.

18.     Plaintiff attempted to transfer to other medical educational programs to finish his education but was prevented from doing so by Defendants.

19.     In summary, Plaintiff was defamed, harassed and discriminated against while attempting to honor his education and employment contract.   Plaintiff complained to administrators at Washington University in St. Louis and Barnes Jewish Hospital who then, during his entire course of study, and without his knowledge, engaged in a conspiracy to penalize him, discredit his reputation, cast him in a false light and ultimately force him to withdraw from the educational program in violation of his contract with Defendants.  In the course of this harassment, the Plaintiff attempted to transfer to a different graduate medical education program to mitigate the situation and Defendant's agreed to help Plaintiff to do so in a fraudulent inducement to resign. Administrators sabotaged this transfer by contacting faculty at the new graduate medical education programs and telling them to black list the Plaintiff.  Faculty regularly harassed Plaintiff related to his attempts to follow his contract, his disabilities and claiming that these attributes were unprofessional and did not show dedication to the practice of medicine.   The harassment,

4

discrimination and retaliation described herein was intentional, outrageous, caused Plaintiff actual physical harm, actual mental distress, and was based solely on Plaintiff's complaints about honoring his contract.

20. The course of study to become a doctor begins after completing four years of undergraduate studies. It generally takes four years to complete a medical doctorate degree (MD). There are physician scientist medical school programs where one can earn both an MD and PhD (MD, PhD). The physician scientist programs generally take eight years to complete and are highly competitive. Only 1% to 2% of graduating Physicians are MD, PhDs.

21. Medical students during their studies take four national licensing tests to demonstrate a progression of skills during the four years of medical school. The exams are called the United States Medical Licensing Exams (USMLE) and are taken at specialized testing centers. The USMLE Step 1 exam is taken after the first two years of class room study to show basic medical knowledge. The third year of medical school involves clinical rotations. After the third year, students take the USMLE Step 2 Clinical Knowledge exam and also the USMLE Step 2 Clinical Skills exam at one of a five national testing centers. A United States medical student could not graduate from medical school without passing both Step 2 exams. After completing the fourth year and graduating, a new doctor can take the USMLE Step 3 knowledge exam. These exams are required for national licensing and passing them demonstrates an objective national benchmark of physician skill level.

22. After graduating medical school, a new doctor cannot practice medicine in the United States without completing a medical residency education program. The Accreditation Council for Graduate Medical Education ("ACGME"), is supposed to accredit and monitor

5

medical residency education programs.  These programs are for such fields as Anesthesiology, General Surgery, Internal Medicine and Psychology.  The programs can run from three to six years.

23.     The ACGME has policies which are called "Common Program Requirements" that all programs must follow to maintain accreditation.  There is an official ACGME policy book.  One core policy is V.A.2.b).(1) which states "The Program Must: provide objective assessments of competence in patient care and procedural skills, medical knowledge, practice based learning and improvement, interpersonal and communication skills, professionalism, and systems-based practice based on the specialty-specific Milestones."  The policy further states under V.A.2.b).(3) that a program must "document progressive resident performance improvement."  Additionally, under V.A.2.c) the ACGME states that "The evaluations of resident performance must be accessible for review by the resident."

24.     The ACGME policies are included in all graduate medical education training contracts or agreements that students agree to in furthering their training.  The 2016 Barnes Jewish Hospital/Washington University Memorandum of Appointment specifically notes under section 16.b. that the parties will "comply with all applicable state, federal and local laws, as well as standards required to maintain accreditation by the ACGME...."

25.     The 2016 Barnes Jewish Hospital/Washington University Memorandum of Appointment has a policy against harassment, section 22 is titled "Policies Against Harassment."  Section 22 notes "Barnes-Jewish is committed to providing a work environment in which its employees are treated with courtesy, respect and dignity.... Harassment includes verbal, physical or visual conduct that creates an intimidating, offensive or hostile work environment or that unreasonably interferes with job performance..."

6

26.     After completing a medical residency education program, a physician is considered to be Board Eligible in their field and can be licensed in all 50 states.

27.     There is further "fellowship" training available that is also accredited by the ACGME. Fellowships can only be completed after a primary residency. Anesthesiologists for example could complete a fellowship in Pain medicine or Regional Anesthesia. Internal Medicine physicians for example could complete a fellowship in Cardiology, Gastroenterology or Oncology.

28.     To obtain entrance to a graduate medical education residency program there is a national medical residency match program (NRMP). In July of their final year, fourth year medical students fill out a computer application and submit it to several of the thousands of nationwide residency programs in September. Then, students spend the year traveling around the country interviewing at residency programs while doing their elective rotations. These students rank the programs they interviewed at by February and an electronic matching algorithm assigns students to programs at the end of March. In March, medical students get an email telling them what city and program to go to for the next several years.

29.     The field of Anesthesiology has 1,600 possible training seats in any given year and there are roughly 150 active training programs.

30.     Only twenty to thirty graduating new MD, PhDs go into Anesthesiology training programs in any given year and they tend to be highly sought-after residents for both the research capabilities and money they bring to a program. There are roughly five to ten programs that most of the MD, PhD residents end up at which includes the likes of Washington University in St. Louis, Harvard-MGH, Duke and the University of Pittsburgh etc... These programs each tend to recruit a few MD, PhD residents a year by offering special research opportunities for them.

7

31.     It would be rare or non-existent that an entire MD, PhD resident class would leave a training program. It would be rare or non-existent that several MD, PhD residents would struggle to transfer to a new residency program.

32.     Washington University in St. Louis uniquely has a research residency that takes two MD, PhD residents per year that they call Academic Scholars Advancement Program (ASAP Program). This is a five-year combined residency/fellowship/research track that has two seats open in the match for MD, PhDs per year.

33.     This program is the only one like it in the country and possibly the most competitive two seats out of the entire 1,600 in the entire anesthesiology match. In fact, Washington University has special permission from both the ACGME and the American Board of Anesthesiology to run this program as a new experimental training pathway. Plaintiff's class was only the fifth class to enter this program and at entry there had been no graduates.

34.     The Washington University in St. Louis Department of Anesthesiology has a yearly special research residency track interview weekend that might include over half of all available graduating MD, PhDs going into the field. The Anesthesiology department will pay to fly both medical students and spouses to St. Louis for the events. There are all day events for both the medical students and their families. In general, residency programs never pay for student candidates to fly out interview.

35.     In December of 2015 Plaintiff, Jeff Weisman, was flown out to interview for the MD, PhD resident interview weekend with his significant other. The Defendant was heavily recruited since he not only would be a "MD, PhD, JD" but had won grants, had his own research lab and biotechnology company as a medical student.

8

36.     The ASAP residency program is desirable since it allows for a resident to complete their Anesthesiology residency education in eighteen months instead of three years. The program allows residents to pick any fellowship to train in without going through the fellowship match. The program then allows physician scientist residents roughly their final two years to conduct research and fellowship duties on a 80/20 time split that allows for nearly two years of full time research.

37.     The ASAP residency program while advertised as a fast track program "is designed to be a more personalized and innovative educational experience." Per the creator Defendant Thomas Cox, progression through the program is competency based. This means that the residency education portion could take longer than eighteen months. It could take the standard three years. The previous classes in this experimental program have all been progressed through the residency education in eighteen months.

38.     Many faculty members at Washington University in St. Louis have stated that they disapprove of the program and feel it is unfair that the MD, PhDs get preferential treatment. Defendant had no knowledge of this internal hostile faculty sentiment prior to starting the program.

39.     Prior to starting the ASAP research track program there were only one or two MD, PhD anesthesiology residents at Washington University in St. Louis at any given time. Since starting the program there are generally a dozen MD, PhD research residents in the department at any given time.

40.     Defendant Alex Evers has repeatedly stated that the ACGME or American Board of Anesthesiology could revoke permission to run this program and accept new ASAP program residents at any time. Plaintiff had no knowledge of these conditions on the program prior to acceptance to the program.

9

41.     Attracting the MD, PhD residents is a business opportunity for the Anesthesiology department. The department won over twelve million dollars in NIH grants in 2017.

42.     The MD, PhD residents are a specialized research labor force to work on the grants, win the grants and a pipeline for future NIH funding.

43.     In February of 2016 just before the deadline to submit a list of ranked programs for the national match, Defendant received an unsolicited phone call from Plaintiff Alex Evers offering him an ASAP research track education seat and to rank them number first. This was in violation of the National Residency Match Program rules that prevented unsolicited phone calls to recruit medical students to training programs.

44.     In March of 2016 Plaintiff, Jeff Weisman, matched into the ASAP residency educational program through the NRMP computer system on match day.

45.     In May of 2016, Plaintiff, Jeff Weisman, moved to St. Louis and began the training program in June of 2016.

46.     The structure of the Washington University in St. Louis Department of Anesthesiology in June of 2016 was as follows. The Chairman of the Department was Alex Evers. The Vice-Chair for Education of the department was Thomas Cox. The Program Director for the anesthesiology graduate medical education residency program was Richard Benzinger. The Associate Program Director for the anesthesiology graduate medical education residency program was Russell Groener.

47.     Plaintiff's first year of study and training was to last 44 weeks instead of the usual standard 52. The ASAP track would allow the Plaintiff to start his second year early. Plaintiff was to complete eleven educational and training rotation blocks that would last four weeks each. Plaintiff's rotations would be 1) Emergency Medicine 2) The Surgical Intensive Care Unit 3)

10

Cardiology 4) Emergency Medicine 5) The Cardiothoracic Intensive Care Unit 6) Internal Medicine Wards 7) Internal Medicine Wards 8) Pre-operative Clinic 9) Simulation Lab and Self-Study 10) Thoracic Surgery and 11) Acute and Critical Care Surgery.

48.     Plaintiff would receive grade evaluations on the different four week rotation blocks. Many departments used different grading system scales or even electronic systems for storing their evaluations. All evaluations per contract were supposed to comply with ACGME and Barnes-Jewish Hospital Graduate Medical Education policies. All evaluations would be submitted to Department of Anesthesiology and submitted to Plaintiff's training file for review by Richard Benzinger and Russell Groener.

49.     The week of August 8th of 2016, the Plaintiff received a phone call from the Chair of the Anesthesiology Department, Alex Evers, asking for information about Plaintiff's company. Plaintiff's company had signed a lease agreement with a third party private entity, the St. Louis College of Pharmacy, for lab space. Alex Evers requested a copy of the lease agreements and other corporate contracts from Plaintiff since the Department of Anesthesiology was hoping to enter into research and lease agreements with the St. Louis College of Pharmacy.

50.     Plaintiff contacted the St. Louis College of Pharmacy's General Counsel about the request. Plaintiff was informed that giving the documents to Alex Evers would give him an edge in business negotiations. Plaintiff also spoke to his company's CEO and investors who felt that it would be a breach of fiduciary duty to hand all documents over to the anesthesiology department. Plaintiff let his company's CEO communicate further with Alex Evers. The documents were not sent.

11

51.     On August 25th, 2016 at 4:00 pm the Plaintiff was scheduled for a meeting with Richard Benzinger the Program Director.  The Program Director told plaintiff that there were serious concerns about his academic performance.

52.     Plaintiff had not personally been told of negative performance or serious concerns about his performance by the Emergency Medicine department, which was the only education rotation he had completed by the middle of August.  In fact, the Emergency Medicine Department filled out daily paper evaluation forms in front of medical residents and attendings reviewed them with the medical residents at the end of every shift.

53.     Every six months the Washington University Department of Anesthesiology Residency Program has a Curriculum Competency Committee (CCC) meeting.  All residents are evaluated by this faculty committee to ensure they are meeting their educational milestones. This is an ACGME and American Board of Anesthesiology requirement for the education program. All residents must then meet with the Program Director to discuss their performance.

54.     The Plaintiff was informed that he had a meeting scheduled January 19th.  At the meeting the Plaintiff was told that nearly all of his reviews were negative from all rotations. Plaintiff was given a document dated January 19th with a summary of these allegations.  It was requested that Plaintiff step down from the ASAP program or even consider leaving his training program.

55.     This document was drafted by the Department of Anesthesiology with assistance from Barnes Jewish Hospital attorney Christine Ramatowski.

56.     Plaintiff was told that he had failed both of his emergency medicine education rotation blocks.  The document stated that "Your performance on the emergency medicine rotation was summarized as 'not as good as I would expect of a resident in this PGY level (3/9)' and was

accompanies by a note from their rotation coordinator that described your performance as 'at the 2nd year medical student level' and 'completely unprofessional.'"

57.     The grading scale that the emergency medicine department used was from one to nine and had a 2/9 as "passable." Plaintiff received a 3/9 on his first rotation month and a 5/9 on his second rotation month. None of the alleged bad comments given to Plaintiff by Defendants were in his formal evaluations. The actual comments on one evaluation read "Great to work with. Enthusiastic, Eager to follow up on things. Great job picking up multiple pts and team player. Reliable and hardworking. Solid attention to detail. Very thorough job. Good H&Ps. Motivated to see pts and has good initial plans..."

58.     Plaintiff met with the rotation coordinator for emergency medicine, Reuben Johnson in January and was told the emergency medicine department did not have or could not show him the alleged negative comments.

59.     Plaintiff was told that he had failed his two months of internal medicine rotations. The comment specifically stated, "The department of internal medicine does not provide single summative scores in its assessments, but your performance on those rotations was below average in every category from every reviewer in those rotations."

60.     Plaintiff had only received verbal positive feedback from his internal medicine rotation. Plaintiff was never presented with internal medicine reviews in violation of ACGME policy despite requesting them. In May of 2017, Plaintiff was told by a resident that the internal medicine department had their own computer system called myevaluations.com which would have records of his evaluations. Plaintiff met with a secretary for the internal medicine department and learned there was a computer evaluation system storing his evaluations.

61.     Plaintiff acquired access and had three evaluations from faculty for his internal medicine wards rotations. All the internal medicine wards evaluations were positive. Plaintiff was evaluated in eleven categories and every reviewer stated that plaintiff was at the "Expected PGY-1 level" of his level of training. Plaintiff had only two faculty write long comments. Dr. Janet McGill wrote, "Dr. Weisman was a capable intern and team member. He performed well with a variety of patient situations, utilized resources when needed. As most interns, he is still on the learning curve but has a high level of curiosity and interest. I enjoyed working with Dr. Weisman." Dr. Amy Loden wrote, "I enjoyed working with Jeff on inpatient medicine. He was a hard worker and took excellent care of his patients. Appreciated his dry sense of humor..."

62.     Plaintiff had multiple meetings in January and February of 2017 with the Department Administration. Plaintiff even stated his concerns that his grades were related to the prior incident involving his company. Based on the meetings, the Plaintiff was told that he would not be placed on probation but he would be forced to repeat an internal medicine rotation and Intensive Care Unit rotation. This would take him off cycle for the ASAP residency track.

63.     Plaintiff learned in January that this entire MD/PhD ASAP class was receiving similar harassment and that several other MD/PhD residents in different class years had been harassed. The other MD/PhD resident in his research residency class had received similar inaccurate evaluations and was being harassed related to his status as a disabled military veteran.

64.     Plaintiff as an attorney and colleague helped the other MD/PhD resident in his class to protect his educational and training status. The department administration was upset about this.

65.     Immediately after the January 19th meeting, Plaintiff had spoken to other medical residents in the educational program to find out more information. Several senior residents told Plaintiff that the program had an unofficial policy of "gaslighting" or harassing student trainees.

14

Plaintiff was informed that every year several residents were forced out or departed the program. These departures were not due to skill deficiencies or failing the program but simply because a single faculty member might decide they did not like a resident.  Plaintiff was told that two residents in the class above him including an MD/PhD resident had recently left.

66.     From 2000-2009 one academic study by Kennedy Et Al showed an annual attrition rate of 3.6% in the field of anesthesiology education. Washington University, St. Louis had an annual attrition rate the past several years at over 3X that attrition rate per class.  In fact, the ASAP residency track attrition rate for the starting class of 2016 would later become 100%.

67.     Plaintiff was also told that residents forced from the program seemed to be many times minorities, females or other protected classes of individuals.

68.     Plaintiff also learned that this "gaslighting" or harassing of medical residents could be used as a tool to prevent residents from making reports about patient safety violations that violated state/federal laws or faculty behaving inappropriately to patients or staff.

69.     Unknown to Plaintiff at this time, Defendant's Richard Benzinger and Russell Groener were secretly contacting faculty that Plaintiff would be working with to warn them about Plaintiff and request they conspire to fail Plaintiff.  Unknown to Plaintiff at this time was that defendants had conspired with attorney and defendant Christine Ramatowski to find a way to remove Plaintiff from his residency seat in violation of his educational program contract.

70.     One example of this activity was that Richard Benzinger e-mailed his secretary Sharon Stark and told her to remind him every time that Plaintiff started a new educational rotation so that he could talk to the educational coordinator in advance about Plaintiff.

71.     Plaintiff performed well and passed all his rotations on the second six-month period of the 2016-2017 academic year. Defendant Richard Benzinger refused to have Plaintiff's required

15

July six month educational review meeting with him in violation of Barnes Jewish Hospital and ACGME policies.

72.     In May 2017, Plaintiff's home medical school sent out a survey to every residency program that their graduating class of 2016 had a member at. Plaintiff was a highly accomplished medical student in his graduating class. The multiple choice survey asked the Program Director to rank where they stood in their residency class as either top ¼, top ½ , bottom ½, or bottom ¼. Defendant Richard Benzinger received a copy of this survey. There was a comment question that asked "11. Please list particular strengths you believe that that this house officer displays which would likely be based on his/her medical school education and training." Defendant, Richard Benzinger wrote "Dr. Weisman is by a substantial margin the least competent intern that I have ever supervised. His MSPE [Medical Student Performance Evaluation/A Deans Letter] reported weak clinical performance, so I acknowledge the risk we took in matching him. Nonetheless, I am surprised that you allowed him to graduate. He seems to me to lack most of the most essential skills of a new physician. We will support him as much as we can, but I believe that he will struggle to complete clinical residency training."

73.     Plaintiff had a strong MSPE Deans letter and was an accomplished medical student.

74.     Plaintiff began his second year of training July 1 of 2017. This year was all anesthesiology rotations and plaintiff would eventually complete thirteen four-week educational blocks of training that would be 1) Tutorial, 2) Tutorial, 3) Ambulatory Anesthesiology, 4) Pediatric Anesthesiology, 5) ENT Anesthesiology, 6) Hepatic/Transplant/Vascular Anesthesiology, 7) OBGYN/Colorectal Anesthesiology, 8) Orthopedic Surgery Anesthesiology, 9) Orthopedic Surgery Anesthesiology, 10) Surgical Intensive Care Unit, 11) Research, 12) Research, 13) Research.

16

75.    Defendants Richard Benzinger and Russell Groener told the Program Coordinator, Sharon Stark, to email them reminders, so they could contact and warn faculty about Plaintiff before he started every educational rotation. As an example, on September 20, 2017 Program Coordinator Sharon Stark wrote to Defendants Richard Benzinger and Russell Groener that "This is a reminder that [other MD/PhD] is going into Pod 2 & Weisman is going into Peds on Monday September 25th." The Defendants would then contact and falsely warn faculty. As an example, on October 31, 2017 before Plaintiff started his ENT Anesthesiology rotation, Defendant Russell Groener wrote to the rotation education coordinator "Hi, just a heads up. You have Jeff Weisman rotating in ENT his next block. His performance in Pediatrics Block 4 was concerning to say the least.  I think we need to be meticulous going forward about documenting any issues that arise with him, the feedback he is given, and his summative end-of-rotation assessment."

76.    Defendants created a constant stream of harassment against Plaintiff.  When Plaintiff started one of his first days on the Ambulatory Anesthesiology educational rotation after his tutorial he was placed with the attending Joseph Kras.  While Plaintiff was setting up for his cases in the morning, Joseph Kras slammed open the door to the operating room and screamed at plaintiff "I have heard about you!"  Joseph Kras then walked around the Operating Room and pulled up the blinds on all windows and doors to the outside hallway.  When Plaintiff rolled back his first female patient of the day, Plaintiff told the patient to take a deep and big breath of oxygen. Joseph Kras then started yelling "Why are you talking about her breasts… Big breasts! Don't you think big breaths sounds like big breasts?"  The female patient appeared scared and this event occurred while she was being given propofol to induce her to sleep and midazolam to cause her to have no memory of the incident.  Joseph Kras was a senior faculty member that also served as the Ethics Director for the department of anesthesiology. Plaintiff observed Joseph Kras do this to

17

multiple female patients. Plaintiff would later learn that Joseph Kras had been accused of something sexually improper with patients multiple times and kept blaming it on females hearing everyone say breaths as big breasts. Joseph Kras would stand behind plaintiff with a clip board during the cases verbally harassing him and trying to write down any small mistake he could find. Joseph Kras would then taunt Plaintiff that he was going to email in a daily report to the administration instead of the rotation coordinator.

77.     On Plaintiff's second rotation post tutorial he was on a Pediatric anesthesiology rotation at St. Louis Children's Hospital. Defendant Russell Groener was the education coordinator for the pediatrics education rotation. Plaintiff worked with nearly a dozen faculty members who almost unanimously stated that he did a positive job. Russell Groener then ignored all of Plaintiff's positive comments from the rotation and filled out a fake and fraudulent review.

78.     In the middle of the rotation, Russell Groener met with the plaintiff to conduct a mid-rotation informal evaluation. He told plaintiff that he was concerned about Plaintiff's communications since Plaintiff had a stutter. Plaintiff explained that he had been in speech therapy as a child for his stutter and that it always existed to some extent. Russell Groener acknowledged the comment and seemed to let it go. In Plaintiff's final evaluation, plaintiff was written up for poor OR communication since he had a stutter. Plaintiff met with Defendant Russell Groener and asked him to change the evaluation. Plaintiff told Defendant: I am an attorney and a stutter is protected under the Americans with Disabilities Act, you cannot legally write me up for it. Defendant responded that he could and the evaluation stands.

79.     In another incident, Plaintiff was working with a senior pediatric anesthesiology faculty member. The faculty member had to handle another task briefly and told Plaintiff to call the floating attending if he needed anything in his operating room. The case was going well when

Russell Groener suddenly entered the room and demanded that Plaintiff improperly give a high dose of epinephrine to the child. The Plaintiff was concerned since there was no need for this drug to be administered. The Plaintiff took a picture of the patients monitors and texted it to Russell Groener to create a record as a precaution. The Plaintiff then told Russell Groener he had texted an image of the patient monitors to Defendant Groener's cell phone. Russell Groener then told Plaintiff not to give the injection and then left the room. Plaintiff scheduled a meeting with the Vice-Chair for education. After hearing the situation Defendant Thomas Cox threatened Plaintiff and stated: I believe you but if you say anything it woln't work out well for you.

80.     Plaintiff became highly concerned since faculty members that were harassing him had suddenly crossed a line to actively trying to create patient harm events.

81.     Throughout the Fall and Winter of 2017 Plaintiff had faculty members privately come up to him and warn him that administrators were asking them to write fake reviews or to cast plaintiff in a false light. Faculty apologized to Plaintiff about his situation and some privately suggested he hire legal counsel.

82.     In January of 2018, Plaintiff met with administrators and stated he intended to resign in the very near future based on the above events and wanted support to transfer. Defendants Alex Evers, Thomas Cox and Richard Benzinger agreed to support Plaintiff in a transfer.

83.     Even after this meeting, the Defendants still harassed Plaintiff. For example, Plaintiff received an odd and negative evaluation from Thomas Davis. Plaintiff called Dr. Davis to ask why his written evaluation was negative while he was verbally told he was doing well. Dr. Davis told Plaintiff it was because "you are on probation." Plaintiff noted that he was not on any form of probation. Then Dr. Davis told Plaintiff that administrators were trying to remove him from the program and that this was just how things go.

19

84.    In January of 2018, the other MD/PhD in Plaintiff's ASAP program was sent to the Missouri Physician's Health Program after requesting a vacation week related to fatigue from his sleep apnea medical condition.   The Physician's Health Program is supposed to be meant for Physicians with drug addiction or mental health issues.   This was a harassing action for requesting disability accommodations.   A physicians health program is affiliated with a state medical board and can take away a physicians medical license and prevent them from working while they are investigated.

85.    On February 22nd 2018 Plaintiff met for his six month evaluation with Defendants Thomas Cox and Richard Benzinger.   Defendant Thomas Cox started pressuring Plaintiff for his formal letter of resignation and noted he had concern for Plaintiff's mental health. Plaintiff felt he was being threatened for a fake Physicians Health Program Referral and could lose his medical license if he did not formally resign in the near future.

86.    Plaintiff has never had and does not have a mental health condition.

87.    Plaintiff personally scheduled a March 20th meeting with the Missouri State Physicians Health Program.   Plaintiff brought documents and showed what was occurring at Washington University St. Louis/Barnes Jewish Hospital.   Robert Bondurant the Physicians Health Program Executive Director was at the meeting.   Plaintiff was informed that the information that he brought was concerning and that the Physicians Health Program would clearly have no reason to investigate Plaintiff.   Plaintiff was then informed that the Washington University Department of Anesthesiology had recently called them to say that they had another MD/PhD anesthesiology resident to refer.   Robert Bondurant recommended that Plaintiff transfer to another program to avoid the harassment he was experiencing.   Plaintiff learned in the Summer of 2018

that the Missouri Physicians Health Program had opened some form of an investigation of Washington University St. Louis/Barns Jewish Hospital for sending false and coercive referrals.

88.     Washington University faculty had apparently been using Barnes Jewish Hospital Attorneys to coverup and suppress medical faculty bad actions such as harassment, discrimination, and fake health program referrals. This appeared to be in an effort to hide incidents from the Washington University in St. Louis legal counsel and University regulation such as diversity offices.

89.     Plaintiff was working in the Surgical ICU in April of 2018 when he received a late-night phone call at home from a surgery faculty attending, that he did research with, who warned him that there was an anesthesiology faculty member by the name of Daniel Emmert that was meeting with other surgery faculty members and discussing coming up with a way to harass/fail Plaintiff. Daniel Emmert generally does not work in the surgical ICU and was covering a shift for surgery faculty members.  Plaintiff went back to the hospital at 11pm at night to meet with Daniel Emmert who denied saying anything negative about him or working with him in the Surgical ICU. Plaintiff then contacted the rotation coordinator, an anesthesiologist Justin Knittle, and was told that Daniel Emmert had sent a negative evaluation into him despite not working with Plaintiff.

90.     Plaintiff emailed his assigned faculty advisor and advocate Thomas Graetz to ask for help April 2, 2018 stating "I received a phone call from a surgery attending I know.  I know several senior faculty here more personally since I do research with them.  They told me an anesthesiology faculty member was in the surgical ICU gossiping to critical care faculty that I was a terrible doctor, should be remediated, was harmful to patients….. I was told this faculty member, who stated I had not worked with him and that he could not review me had emailed a very negative review about me in…..Creating fake reviews is fraudulent.  Reporting fake reviews to outside

accrediting agencies is fraudulent..." Plaintiff's advisor and advocate did not respond to him. Plaintiff saw Defendant Richard Benzinger a few days later at a training seminar and asked what was going on with this situation and Plaintiff was told that he should not expect a response from Thomas Graetz since the situation was being reviewed by the legal department.

91.     Plaintiff was assigned to work for a month with Daniel Emmert and other affiliated faculty in the anesthesiology run Cardiothoracic ICU starting April 9th.   Plaintiff was also beginning to have constant gastroenterology symptoms, ulcerative colitis flares, based upon the stress and harassment of the situation.  Plaintiff finally resigned after negotiating that he 1) would not work with the Cardiothracic ICU anesthesiology faculty and would instead do other rotations 2) would receive proper assistance to transfer to a new program.

92.     Defendant has searched to transfer to a new residency program for nearly a year with no success.  Defendant has been out of a residency program for six months.

93.     The Defendant has interviewed with several residency programs who were very enthusiastic about his MD, PhD resident status.  Multiple programs have implied Defendant would have a job offer after they got Defendant's educational transcripts.  All job opportunities have vanished after potential employers have spoken to Washington University in St. Louis faculty.

94.     Defendant was told in confidence by one perspective employer that Washington University faculty were backlisting him and preventing him from working in the field.  They stated they could not employ Defendant after what they heard.

95.     As a result of being prevented from completing a residency, Plaintiff will not be able to become a Board Certified anesthesiologist. Dr. Jeff Weisman will be directly damaged in at least the following ways:

a. Plaintiff will never receive or will be delayed years of attending physician income that is needed after the investment of nearly a decade of school and training

b. Plaintiff will not be able to pursue an academic physician career pathway which was Plaintiff's entire reason for pursuing the extra years to complete a MD/PhD program. Academic hospitals do not hire non-boarded anesthesiology physicians to provide patient care.

## COUNT I
## Breach of Contract: Failure of Washington University and Barnes Jewish Hospital To Comply With ACGME Requirements

96. Plaintiff adopts paragraphs 1 – 95 above as paragraphs 1 – 95 of Count I, as if fully set forth herein.

97. The ACGME Requirements were incorporated by reference into the Residency Agreements entered into by Dr. Jeff Weisman with Washington University and/or Barnes Jewish Hospital. (Exhibit A, Barnes Jewish Hospital Employment Contract).

98. Defendants Washington University and Barnes Jewish Hospital had a duty to comply with the ACGME Requirements and the other terms and conditions of the Employment Contract.

99. Washington University and/or Barnes Jewish Hospital failed to comply with, and breached their duty to comply with the ACGME Requirements in the following respects:

a. By harassing Plaintiff and failing to engage in an "objective assessment" of Plaintiff's "competence" in violation of ACGME Common Core Requirement §V.A.2.b(1), and instead relying on hearsay, gossip, and false information;

b. By harassing Plaintiff and failing to provide objective assessments of competence in patient care and procedural skills, medical knowledge, practice based learning and improvement, interpersonal and communication skills, professionalism, in violation of ACGME utilize multiple evaluators to assess Dr. Weisman's performance, instead essentially deferring to the evaluation by a few administrators, in violation of ACGME Common Core Requirements §§ V.A.2.b(1) and VI.B.6;

c. By failing to timely and fairly evaluate Plaintiff's performance during each rotation and also by failing to document such evaluations at the end of each rotation, in violation of ACGME Common Core Requirement §V.A.2.a;

d. By engaging in retaliation against Dr. Jeff Weisman for advocating for himself, other residents, patient safety, requesting specific information regarding his alleged deficiencies, and raising concerns about his treatment in violation of ACGME Common Core Requirements §§ II.A.4, II.B.1b, and VI.B.6;

e. By harassing Plaintiff and failing to provide a "a professional, respectful, and civil environment that is free from mistreatment, abuse, or coercion of students, residents, faculty, and staff" in violation of ACGME Common Core Requirement § VI.B.6;

f. By failing to comply with the Employment Contract which required that Defendants "[c]omply with all applicable state, federal and local laws as well as the standards required to maintain accreditation by the ACGME, RRC, Joint Commission and any other relevant accrediting, certifying or licensing organization. . . [including]. . . compliance with BJC's code of conduct"; and

g. By failing to comply with the Employment Contract which prohibited harassment for "any reason" where harassment was defined as including "verbal, physical or visual conduct that creates an intimidating, offensive or hostile work environment or that unreasonably interfere with job performance. Harassment may also include unwelcome, offensive slurs, jokes, or other similar conduct. . ." (Exhibit A, ¶ 22 and 22a).

100.     The actions of Defendants in violating the above mentioned ACGME standards and other express terms in the Employment Contract was a breach of contract and a failure to perform the duties imposed upon them.

24

101.    As a direct and proximate result of Defendants' breach, Plaintiff has suffered injury, and damages, including but not limited to, monetary damages, loss of his ability to use his MD degree, loss of time and resources, career opportunities and earning capacity.

WHEREFORE, Plaintiff, JEFFERY WEISMAN by counsel, respectfully prays that the Court enter Judgment in his favor and against Defendants, BARNES JEWISH HOSPITAL, BJC HEALTHCARE, WASHINGTON UNIVERSITY MEDICAL CENTER, WASHINGTON UNIVERSITY, and WASHINGTON UNIVERSITY SCHOOL OF MEDICINE IN ST. LOUIS, in the amount of $1,000,000 and award consequential damages in an amount to be determined at trial, and for any further and other relief that this Court deems just and appropriate under the circumstances.

Plaintiff demands trial by jury.

### COUNT II
### Breach of Contract: Breach of The Duty of Good Faith and Fair Dealing by Washington University and Barnes Jewish Hospital

102.    Plaintiff adopts paragraphs 1 – 101 above as paragraphs 1 – 101 of Count II, as if fully set forth herein.

103.    An implied term of every contract is that the parties will perform and/or exercise their discretion in good faith and that they will deal fairly with each other.

104.    Exhibit A was an employment contract between Plaintiff and Defendants Washington University and Barnes Jewish Hospital which governed Plaintiff's residency with Defendants.

105.    The false allegations alleged above and the harassment alleged above were performed in bad faith and were not fair dealing and rose to a breach of the Employment Contract.

106.    As a direct and proximate result of Defendants' breach, Plaintiff has suffered injury, and damages, including but not limited to, monetary damages, loss of his ability to use his MD degree, loss of time and resources, career opportunities and earning capacity.

WHEREFORE, Plaintiff, JEFFERY WEISMAN by counsel, respectfully prays that the Court enter Judgment in his favor and against Defendants, BARNES JEWISH HOSPITAL, BJC HEALTHCARE, WASHINGTON UNIVERSITY MEDICAL CENTER, WASHINGTON UNIVERSITY, and WASHINGTON UNIVERSITY SCHOOL OF MEDICINE IN ST. LOUIS, in the amount of $1,000,000 and award consequential damages in an amount to be determined at trial, and for any further and other relief that this Court deems just and appropriate under the circumstances.

Plaintiff demands trial by jury.

### COUNT III
### Fraudulent Inducement to Resign
### (Benzinger, Washington University, Barnes Jewish Hospital)

107.    Plaintiff adopts paragraphs 1 – 106 above as paragraphs 1 – 106 of Count II, as if fully set forth herein.

108.    After the Defendants harassed Plaintiff as alleged above, made the false statements alleged above, after Plaintiff learned that the Defendants wanted to terminate him, and after Defendant Cox threatened to have the Plaintiff subjected to a psychiatric evaluation, Plaintiff asked to leave the program and was assured by Benzinger, who had been plotting to push the Plaintiff out of the program, that Benzinger would write a recommendation letter that "would do the most good" for Plaintiff.

109. Benzinger never intended to write a good letter for Plaintiff, his statement was false when made, and Benzinger knew it but intended to induce the Plaintiff's reliance on the false statement.

110. Plaintiff, threatened with a baseless psychiatric examination and aware that Alex Evers, Thomas Cox, Richard Benzinger, Russell Groener and Christine Ramatowski wanted to drive him out of the residency program, agreed to resign in reliance upon the statements of Benzinger, the Program Director, that a good reference letter would be written.

111. Benzinger never wrote a good letter and when Plaintiff applied to every anesthesia residency program in the United States, over 140, he was rejected by them all. Plaintiff later learned that Defendants were answering inquiries from other residency programs by stating that no reference could be given and that all inquiries had to be answered by Barnes Jewish Hospital legal counsel, Defendant Christine Ramatowski.

112. Plaintiff's reliance on Benzinger's false statements was reasonable.

113. As a direct and proximate result of Defendants Benzinger, Washington University and Barnes Jewish Hospital's false statements Plaintiff has suffered injury, and damages, including but not limited to, monetary damages, loss of his ability to use his MD degree, loss of time and resources, career opportunities and earning capacity, emotional distress and humiliation.

WHEREFORE, Plaintiff, JEFFERY WEISMAN by counsel, respectfully prays that the Court enter Judgment in his favor and against Defendants, RICHARD BENZINGER, BARNES JEWISH HOSPITAL, BJC HEALTHCARE, WASHINGTON UNIVERSITY MEDICAL CENTER, WASHINGTON UNIVERSITY, and WASHINGTON UNIVERSITY SCHOOL OF MEDICINE IN ST. LOUIS, in the amount of $1,000,000 and award punitive damages in an

amount to be determined at trial, and for any further and other relief that this Court deems just and appropriate under the circumstances.

Plaintiff demands trial by jury.

## COUNT IV
### Defamation
### (Benzinger, Groener, Washington University, Barnes Jewish Hospital)

114.   Plaintiff adopts paragraphs 1 – 113 above as paragraphs 1 – 113 of Count IV, as if fully set forth herein.

115.   As alleged above, on January 19, 2017 Defendant Benzinger and Defendant Groener published a series of false statements about Plaintiff in a letter which was sent to several Deans at Washington University School of Medicine.

116.   The letter falsely claimed that Plaintiff has performed unsatisfactorily on several rotations.

117.   The letter falsely stated that Plaintiff's performance on every internal medicine rotation was below average in every category by every reviewer.

118.   The letter falsely stated that the rotation coordinator on the emergency medicine rotation stated that Plaintiff's performance on the rotation was "at the 2nd year medical student level" and was "completely unprofessional."

119.   The false statements in the January 19, 2017 letter were made with knowledge that they were false.

120.   In May or June 2017, Benzinger falsely told Louisiana State University Health Science Center, Shreveport, in a survey response that Plaintiff's performance in Defendant's

residency was "the least competent intern that I have supervised"; and that Plaintiff's Medical Student Performance Evaluation reported weak clinical performance.

121.    The statements in the May or June 2017 survey response were false and were made by Benzinger with knowledge that they were false.

122.    After Plaintiff was forced to resign from the Defendants' residency program, Benzinger, Washington University and Barnes Jewish Hospital falsely told representatives of other residency programs to which Plaintiff had submitted applications that Plaintiff's information could not be released without talking to Defendants' attorney.  The statement was false when made because information indicating Plaintiff's resignation could have been released and the effect of the statement was universally to chill any interest in accepting the Plaintiff into another program.

123.    As a direct and proximate result of the false statements made by Defendants Benzinger, Washington University and Barnes Jewish Hospital Plaintiff has suffered injury, and damages, including but not limited to, monetary damages, loss of his ability to use his MD degree, loss of time and resources, career opportunities and earning capacity, emotional distress and humiliation.

WHEREFORE, Plaintiff, JEFFERY WEISMAN by counsel, respectfully prays that the Court enter Judgment in his favor and against Defendants, RICHARD BENZINGER, RUSSELL GROENER, BARNES JEWISH HOSPITAL, BJC HEALTHCARE, WASHINGTON UNIVERSITY MEDICAL CENTER, WASHINGTON UNIVERSITY, and WASHINGTON UNIVERSITY SCHOOL OF MEDICINE IN ST. LOUIS, in the amount of $1,000,000 and award punitive damages in an amount to be determined at trial, and for any further and other relief that this Court deems just and appropriate under the circumstances.

Plaintiff demands trial by jury.

## COUNT V
### False Light Invasion of Privacy
### (Benzinger, Groener, Washington University, Barnes Jewish Hospital)

124.    Plaintiff adopts paragraphs 1 – 123 above as paragraphs 1 – 123 of Count V, as if fully set forth herein.

125.    The false information alleged above that was distributed about Plaintiff portrayed Plaintiff in a false light within Defendants' residency program and to other residency programs after the Plaintiff was forced to resign.

126.    The false information was unreasonably highly offensive because it was false and because it falsely reflected on Plaintiff's capacity to perform as a medical doctor.

127.    The Defendants knew that the information that they were publishing was false.

128.    As a direct and proximate result of the false information published by Defendants Benzinger, Washington University and Barnes Jewish Hospital Plaintiff has suffered injury, and damages, including but not limited to, monetary damages, loss of his ability to use his MD degree, loss of time and resources, career opportunities and earning capacity, emotional distress and humiliation.

WHEREFORE, Plaintiff, JEFFERY WEISMAN by counsel, respectfully prays that the Court enter Judgment in his favor and against Defendants, RICHARD BENZINGER, RUSSELL GROENER, BARNES JEWISH HOSPITAL, BJC HEALTHCARE, WASHINGTON UNIVERSITY MEDICAL CENTER, WASHINGTON UNIVERSITY, and WASHINGTON UNIVERSITY SCHOOL OF MEDICINE IN ST. LOUIS, in the amount of $1,000,000 and award punitive damages in an amount to be determined at trial, and for any further and other relief that this Court deems just and appropriate under the circumstances.

Plaintiff demands trial by jury.

## COUNT VI
### Tortious Interference with Contract
### (Cox, Benzinger, Groener, Ramatowski, Evers)

129.    Plaintiff adopts paragraphs 1 – 128 above as paragraphs 1 – 128 of Count VI, as if fully set forth herein.

130.    Plaintiff had a contract with Defendants Washington University and Barnes Jewish Hospital to be a resident in their Graduate Medical Education program.

131.    The Plaintiff had invested large sums of money in being educated to be able to contract with the Defendants Washington University and Barnes Jewish Hospital, and at all relevant times Plaintiff performed under the contract.

132.    Alex Evers, Thomas Cox, Richard Benzinger, Russell Groener, and Christine Ramatowski knew that Plaintiff had a contract with Washington University and Barnes Jewish Hospital.

133.    Alex Evers, Thomas Cox, Richard Benzinger, Russell Groener, and Christine Ramatowski intentionally interfered with Plaintiff's contract with Washington University and Barnes Jewish Hospital by falsely claiming that he was not suited to be an anesthesiology resident.

134.    The interference by Alex Evers, Thomas Cox, Richard Benzinger, Russell Groener, and Christine Ramatowski led Washington University and Barnes Jewish Hospital to breach Plaintiff's contract.

135.    Alex Evers, Thomas Cox, Richard Benzinger, Russell Groener, and Christine Ramatowski had no justification to interfere with Plaintiff's contract with Washington University and Barnes Jewish Hospital to breach Plaintiff's contract.

136.    As a proximate result of Defendants Evers, Cox, Benzinger, Groener, and Ramatowski intentional interference with Plaintiff's contract with Washington University and

31

Barnes Jewish Hospital Plaintiff has suffered injury, and damages, including but not limited to, monetary damages, loss of his ability to use his MD degree, loss of time and resources, career opportunities and earning capacity, emotional distress and humiliation.

WHEREFORE, Plaintiff, JEFFERY WEISMAN by counsel, respectfully prays that the Court enter Judgment in his favor and against Defendants, THOMAS COX, RICHARD BENZINGER, RUSSELL GROENER, CHRISTINE RAMATOWSKI, ALEX EVERS, BARNES JEWISH HOSPITAL, BJC HEALTHCARE, WASHINGTON UNIVERSITY MEDICAL CENTER, WASHINGTON UNIVERSITY, and WASHINGTON UNIVERSITY SCHOOL OF MEDICINE IN ST. LOUIS, in the amount of $1,000,000 and award punitive damages in an amount to be determined at trial, and for any further and other relief that this Court deems just and appropriate under the circumstances.

Plaintiff demands trial by jury.

## COUNT VII
### Civil Conspiracy
### (Cox, Benzinger, Groener, Ramatowski, Evers, Washington University, Barnes Jewish Hospital)

137.     Plaintiff adopts paragraphs 1 – 136 above as paragraphs 1 – 136 of Count VII, as if fully set forth herein.

138.     As a result of Alex Evers seeking to punish Plaintiff for not sharing his lease with St. Louis College of Pharmacy, Alex Evers told Thomas Cox, Richard Benzinger, Russell Groener, and Christine Ramatowski to get rid of the Plaintiff, in violation of the Employment Contract, the standards in the Employment Contract, and the AGCME standards adopted by the Employment Contract.

139. All the Defendants agreed to drive Plaintiff out of the program in violation of his Employment Contract, the standards in the Employment Contract, and the AGCME standards adopted by the Employment Contract.

140. The Defendants acted in concert to fabricate false complaints about, and false records concerning, the Plaintiff to achieve their purpose in driving him out of the Defendants' residency program.

141. The Defendants knew that their plan to drive the Plaintiff out violated his contractual rights, and the rights afforded to him by the

142. As a proximate result of the civil conspiracy between Defendants Evers, Cox, Benzinger, Groener, Ramatowski, Washington University and Barnes Jewish Hospital Plaintiff has suffered injury, and damages, including but not limited to, monetary damages, loss of his ability to use his MD degree, loss of time and resources, career opportunities and earning capacity, emotional distress and humiliation.

WHEREFORE, Plaintiff, JEFFERY WEISMAN, by counsel, respectfully prays that the Court enter Judgment in his favor and against Defendants, THOMAS COX, RICHARD BENZINGER, RUSSELL GROENER, CHRISTINE RAMATOWSKI, ALEX EVERS, BARNES JEWISH HOSPITAL, BJC HEALTHCARE, WASHINGTON UNIVERSITY MEDICAL CENTER, WASHINGTON UNIVERSITY, and WASHINGTON UNIVERSITY SCHOOL OF MEDICINE IN ST. LOUIS, in the amount of $1,000,000 and award punitive damages in an amount to be determined at trial, and for any further and other relief that this Court deems just and appropriate under the circumstances.

Plaintiff demands trial by jury.

/s/  Jeffery Weisman
*Pro se* Plaintiff

Jeffery Weisman
301 Lakeview Drive
Buffalo Grove, Illinois 60089
847-727-8675