**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| JEFFERY WEISMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:19-cv-00075-JAR |
| | ) | |
| BARNES JEWISH HOSPITAL, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Motions to Dismiss filed by Defendants Washington University[1] ("WashU"); Dr. Alex Evers, Chair of Anesthesiology; and Drs. Richard Benzinger and Thomas Cox, Anesthesiology Residency Program Supervisors (Doc. 41); and by Barnes-Jewish Hospital ("BJH"); and BJC Healthcare  (Doc. 43).  Plaintiff Jeffery Weisman, MD, has responded in opposition (Doc. 53), and Defendants have replied (Docs. 56, 58).    Thereafter, the Court granted requests from both sides to supplement their arguments with additional authority. (Docs. 63, 64, 65, 67.)  Also pending is Plaintiff's Motion to Strike Certain Exhibits (Doc. 52), to which Defendants have responded (Doc. 59).

### Plaintiff's Motion to Strike

 Because it affects the factual basis on which the Court will evaluate Defendants' Motions to Dismiss, the Court will first resolve Plaintiff's Motion to Strike.  (Doc. 52).  Plaintiff

---

[1] Defendants assert, and Plaintiff does not dispute, that additional named defendant Washington University Medical Center is an uninvolved real estate holding company and that additional named defendant Washington University School of Medicine in St. Louis is not legally separate from WashU.

asks the Court to strike three exhibits attached to one of Defendants' motions to dismiss, which he describes as "private academic records . . . on file at the university." (*Id.* at 1.)  He argues that the exhibits are not admissible on a motion to dismiss under Rule 12(b) and that their contents are "immaterial and impertinent." (*Id.* at 2.)

Defendants respond that motions to strike exhibits as immaterial or impertinent may only be directed at pleadings and not motions to dismiss. (Doc. 59 at 1-2.)  Further, they argue that the exhibits are central to Plaintiff's claims and are necessarily embraced by Plaintiff's Amended Complaint. (*Id.* at 2-3); *see Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012).

The Court agrees with Defendants.  The exhibits at issue are an internal letter excerpting several negative reviews of Plaintiff's performance during his residency; a survey response sent to Plaintiff's medical school rating him poorly; and a confidential review of Plaintiff's medical school performance.[2]  (Docs. 42-1, 42-2, 42-3.)  Plaintiff concedes in his motion to strike that he "describes generally, but does not disclose" the first two documents in his Amended Complaint. (Doc. 52 at 2.)  The Amended Complaint describes the letter under his claim for defamation, asserting that it contained "a series of false statements about Plaintiff" and "was sent to several Deans at Washington University." (Doc. 35 at ¶ 116.) The survey response is also included as factual support for his defamation claim. (*Id.* at ¶ 121.)  Defendants argue that the Amended Complaint referenced the third document by stating that "Benzinger falsely told Louisiana State University Health Science Center, Shreveport . . . that Plaintiff's Medical Student Performance Evaluation reported weak clinical performance." (*See* Doc. 35 at ¶ 121.)

---

[2] The Court is not entirely clear as to who prepared the third exhibit.  It appears to be on WashU letterhead but includes statements that the Court understands to be from faculty at Plaintiff's medical school. (*See* Doc. 42-3.)

Plaintiff quotes directly from the first two documents in his Amended Complaint.  The Court concludes from that fact alone that the Amended Complaint necessarily embraces those documents.  Further, the Court concludes that the Amended Complaint also embraced the third document when Plaintiff specifically referenced it as part of Benzinger's allegedly defamatory response to the survey.

Accordingly, the Court will deny Plaintiff's motion to strike those documents.

## Background

The following facts acts are taken from Plaintiff's Amended Complaint (Doc. 35), and documents necessarily embraced by the Amended Complaint.  *See Ashanti*, 666 F.3d at 1151. Plaintiff is an accomplished individual.  He holds master's degrees in finance and cellular biology, a juris doctorate, a Ph.D. in biomedical engineering, and, after graduating from Louisiana State University ("LSU") in 2016, an M.D.  While in medical school, Plaintiff started and directed a research laboratory that he affiliated with LSU and Louisiana Tech University and staffed with two biomedical engineering students and one of his medical school classmates.  The lab focused on biomedical applications of 3D-printing and generated valuable intellectual property while drawing a significant amount of research funding.  Its research was widely published.

Plaintiff's medical school grades were not outstanding, but LSU faculty agreed that his formal grades did not sufficiently reflect Plaintiff's substantial dedication and focus on his extracurricular achievements.  The Dean of the LSU medical school wrote that Plaintiff possessed "a level of intellectual curiosity that I had not encountered previously" and predicted that he "will be an outstanding physician-scientist [who] will make a tremendously important

contribution, not only to his training program but also in the scientific community."  (Doc. 25-3 at 4.)

In late 2015, as he neared his final semester of medical school, Plaintiff joined tens of thousands of other students in the National Resident Matching Program ("NRMP") to match with a residency program that would lead to being licensed and board certified.  Out of the blue, Dr. Evers contacted Plaintiff and asked him to consider relocating to St. Louis to enter WashU's specialized five-year "ASAP" program at BJH, which would prepare Plaintiff to be board-certified in anesthesiology while allowing him to continue his aggressive research schedule.  Evers suggested that Plaintiff also move his lab to St. Louis to conduct research for the WashU Anesthesiology Department at BJH while he completed his residency.

Although it was against the rules, Evers and Plaintiff agreed to list each other as their top choice in the NRMP.  Unsurprisingly, Plaintiff matched with WashU's ASAP program.  He moved to St. Louis in 2016 and relocated the lab to a space in the St. Louis College of Pharmacy, across the street from BJH.  The lab's biomedical engineers moved, too, including Plaintiff's medical school classmate, who joined the WashU residency program in BJH's Radiology Department.  As do all residents at BJH, Plaintiff accepted the terms of a "Memorandum of Appointment to House Staff" distributed by BJH's Chief Medical Officer.  (Doc. 35 at 39-56.) The Memorandum of Appointment expressly references the standards for accreditation by the Accreditation Council for Graduate Medical Education ("ACGME").  (*Id.* at 47.)

Plaintiff's residency began in July 2016 with a four-week rotation in emergency medicine.  By the first week of August, Plaintiff's relationship with Evers had begun to sour.  By February 2017, Plaintiff was out of the ASAP program, and in April 2018, Plaintiff ended his affiliation with WashU and BJH.

Plaintiff alleges that things began to go south early on, when Plaintiff refused to tell Evers the rates for renting lab space at the St. Louis College of Pharmacy.  When the lab began conducting research projects on behalf of the Radiology Department in conjunction with Plaintiff's former classmate, Plaintiff alleges that Evers became jealous.  Plaintiff further alleges that Evers, Benzinger, and Cox conspired to falsify evaluations and negative reviews that ultimately drove Plaintiff to quit the program so that WashU and BJH could seize control of his research lab.  Defendants assert that Plaintiff's performance was, in fact, substandard and that he was failing to meet the basic requirements to continue in their elite ASAP program.

In August 2016, after only six weeks at BJH, Benzinger told Plaintiff that his supervisors had "serious concerns" about Plaintiff's performance.  (Doc. 35 at ¶ 61.)  Plaintiff told Benzinger that his emergency medicine supervisors had not given him any significant negative feedback in his daily reviews and asked for more information but Benzinger refused.  Around the same time, the Anesthesiology Department stopped collaborating with Plaintiff's research lab, and the lab's primary investor pulled out.  BJH's Radiology Department assumed the operational costs and the lab's staff ultimately became BJH or WashU employees.

In January 2017, at Plaintiff's first six-month evaluation, Benzinger told Plaintiff that "nearly all of his reviews were negative" and that he had failed multiple four-week rotations in both Emergency Medicine and Internal Medicine.  (*Id.* at ¶ 65.)  Benzinger refused to provide written proof of either assertion but Plaintiff later "gained access to computer records" and discovered that his reviews were largely positive and that he had not failed any rotations.  (*Id.* 35 at ¶ 66.)  Nevertheless, Plaintiff was forced to repeat two rotations, which precluded him from completing the ASAP program's aggressive five-year schedule.  As a result, he was dropped

from the program and began pursuing a basic anesthesiology residency.  Six months later, in July 2017, Benzinger refused Plaintiff's requests to meet for a second evaluation.

According to Plaintiff, Defendants' plot against him intensified during his third six-month residency period.  Benzinger and another member of the faculty "pre-arranged negative evaluations . . . by secretly contacting and prejudicing the faculty and staff with whom [Plaintiff] would be working."  (*Id.* at ¶ 71.)  In addition, a faculty member harassed Plaintiff by following him around and recording purported mistakes.  Plaintiff alleges that Benzinger and others falsified the six one-month rotation evaluations on which his cumulative evaluation would be based.

Plaintiff was presented with the allegedly false evaluations in February 2017, at his third six-month review.  During that meeting, Plaintiff was told that he would be referred to the Physician's Health Program, the state medical board's program for assisting doctors with drug addictions or mental health crises.  He alleges that such referrals are a well-documented tactic used by Evers and others in the Anesthesiology Department to threaten or damage a practitioner's reputation and career by implying that the he or she was unstable.  Faculty asked him to withdraw from the residency program.

By April 2018, Plaintiff had had enough.  He agreed to resign but first asked for assurances that Evers, WashU, and BJH would help him find another program.  Plaintiff alleges that Evers and Benzinger both agreed, expressly promising to "cooperate with other programs" and provide "a good recommendation letter."  (Doc. 35 at ¶ 76-77.)  Plaintiff stayed at BJC through June 2018, completing two full years of residency.

After resigning, Plaintiff was unable to transfer to a new residency program.  He asserts that he contacted "every anesthesiology program in the United States" and applied to more than

100 of them but that, despite his credentials, only a small few showed any interest.  (*Id.* at ¶¶ 83, 92.)  He reached the final stages of transferring to three programs but all three suddenly stopped communicating with him after contacting Evers.  Plaintiff alleges that an LSU official told him that one of those programs decided not to offer Plaintiff a spot because of a negative reference from WashU and BJH.

Plaintiff alleges that Defendants were simultaneously publishing defamatory statements about him, both internally and externally.  WashU and BJH told other residency programs that they could not release Plaintiff's educational records without their attorney's consent.  Benzinger told LSU that Plaintiff was "by a substantial margin, the least competent [new doctor] I have supervised" and that he was "surprised that [LSU] allowed him to graduate" because he "lack[s] most of the essential skills of a new physician."  (Doc. 42-2 at 2.)

As a result, Plaintiff alleges that his resignation from the WashU-BJC residency program effectively ended his medical career.  Because of the idiosyncratic funding of medical residencies, his two years of credit make him a bigger expense than first year residents, meaning there is little chance of finding an institution willing to let him restart his residency.  At the same time, he has been unable to secure a transfer to a program where he could begin his third year of residency.  The lab Plaintiff started is now controlled entirely by WashU and BJH and continues to produce research and publications, as well as generate significant profits for both institutions.  Plaintiff now practices law.

On January 18, 2019, Plaintiff filed suit, advancing eight claims for relief:

**Count I** – Breach of Contract by WashU and BJC;

**Count II** – Tortious Interference with Contract and Business Expectancy by Evers and Benzinger;

**Count III** – Fraudulent Inducement by WashU, BJH, Evers, and Benzinger;

**Count IV** – Defamation by WashU, BJH, Evers, and Benzinger;

**Count V** – Conversion by WashU, BJH, Evers, and Benzinger;

**Count VI** – Quantum Meruit against WashU and BJH;

**Count VII** – Unjust Enrichment by WashU and BJH; and

**Count VIII** – Civil Conspiracy against all defendants.

(Doc. 35.)   Defendants respond that Plaintiff's claims allege non-cognizable educational malpractice, that his contract claims are barred by the statute of frauds or otherwise fail, and that his tort claims are preempted by the Missouri Human Rights Act ("MHRA"), are barred by the economic loss doctrine, or fail on their merits.  (Docs. 42-43.)

## Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (alteration in original) (citations omitted).  "When ruling on a motion to dismiss [under Rule 12(b)(6)], the district court must accept the allegations contained in the complaint as true and all reasonable inferences from the complaint must be drawn in favor of the nonmoving party." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001).

## Discussion

### *Educational Malpractice*

Defendants argue at the outset that all of Plaintiff's claims are non-cognizable allegations of educational malpractice.  (Doc. 45 at 5-8.)  "Generally, courts have refrained from recognizing educational malpractice claims, either in tort or contract, on the premise that '[u]niversities must be allowed the flexibility to manage themselves and correct their own mistakes.'"  *Gillis v. Principia Corp.*, 832 F.3d 865, 872 (8th Cir. 2016) (quoting *Lucero v. Curators of Univ. of Missouri*, 400 S.W.3d 1, 8 (Mo. Ct. App. 2013)).  "In refusing to recognize a claim for educational malpractice, [Missouri courts have] emphasized that it is not [the court's] place to micromanage a university's daily operations."  *Gillis*, 832 F.3d at 872 (quoting *Lucero*, 400 S.W.3d at 8).

To determine whether a contract or tort claim is actually a disguised claim of educational malpractice, courts ask whether examining the truthfulness of the allegations involves "inquiry into the nuances of educational processes and theories."  *Roe v. Saint Louis Univ.*, No. 4:08CV1474 HEA, 2012 WL 6757558, at *10 (E.D. Mo. Dec. 31, 2012), *aff'd sub nom. Roe v. St. Louis Univ.*, 746 F.3d 874 (8th Cir. 2014) (quoting *Blake v. Career Educ. Corp.*, 2009 WL 2567011, at *3 (8th Cir. 2009)).

The Court concludes Plaintiff is alleging more than educational malpractice.  Educational malpractice claims typically allege some form of negligence, either in the teaching of essential skills, failure to diagnose a learning disability, or negligent supervision.  *Dallas Airmotive, Inc. v. FlightSafety Int'l, Inc.*, 277 S.W.3d 696, 699 (Mo. Ct. App. 2008) (quoting *Moore v. Vanderloo*, 386 N.W.2d 108, 113 (Iowa 1986)).  At the very least, Plaintiff's allegations that Defendants maliciously falsified performance reviews and lied to potential transfer destinations go beyond negligent training, diagnosis, or supervision.

In addition, Plaintiff alleges that his negative performance evaluations contained objectively false information.  As such, the truth of those allegations may be tested without inquiring into the nuances of educational processes and theories as to how to define and quantify a resident's competency.

Accordingly, the Court does not believe at this early stage that Plaintiff's claims should be dismissed as non-cognizable educational malpractice.

### *Contracts Claims*

### a.  <u>Count I – Breach of Contract</u>

In his first count, Plaintiff alleges that WashU and BJH breached three contracts with him:  a "Lab-Residency Contract"; the Memorandum of Appointment; and a "Separation Agreement."  (Doc. 35 at 29.)  Defendants argue that none of those are enforceable contracts because they are barred by the statute of frauds or for lack of an essential element, that some of the Defendants are not parties to the alleged contracts, and that Plaintiff's assertions, even if true, fail to allege a breach.

To prove a breach of contract in Missouri, a plaintiff must plead four things: "(1) the existence of a contract or agreement and the terms of that agreement; (2) that the plaintiff performed or tendered performance; (3) that the defendant did not perform; and (4) that the defendant's failure to perform caused damage to the plaintiff."  *W. Cent. Mo. Reg'l Lodge No. 50 v. Bd. of Police Comm'rs of Kansas City, Mo.*, 939 S.W.2d 565, 567 (Mo. Ct. App. 1997) (citing *Venable v. Hickerson, Phelps, Kirtley & Assoc., Inc.*, 903 S.W.2d 659, 664 (Mo. Ct. App. 1995)).  The elements of an enforceable contract are well-known:  offer; acceptance; and bargained-for consideration.  *Id.*  Consideration requires "a promise (to do or refrain from doing something) or the transfer or giving up of something of value to the other party."  *Morrow v. Hallmark Cards, Inc.*, 273 S.W.3d 15, 25 (Mo. Ct. App. 2008).

10

### Lab-Residency Contract

Plaintiff alleges that he, WashU, and BJH "entered into a multi-faceted contract that was in part written and in part verbal," which related to his relocation from Louisiana to participate in the ASAP program and to run his lab from St. Louis.  (Doc. 35 at ¶ 39.)  He alleges that the Lab-Residency Contract was "modified by amendment over the course of time" but that its basic terms were that Plaintiff "would move his lab and its resources to St. Louis, and affiliate the lab with [WashU] and/or BJH," where  Plaintiff, WashU, and BJH "would perform the obligations, and receive the benefits, normally involved in such research affiliations."  (*Id.* at ¶ 39.)  In exchange, WashU and BJH would enroll Plaintiff in the ASAP program and train him for five years.

Plaintiff does not clearly indicate in his Amended Complaint which actions by WashU and BJH violated the Lab-Residency Contract (*see id.* at ¶¶ 99-100), but in his response opposing dismissal, he identifies six alleged breaches:  the Anesthesiology Department's failure to conduct "extensive joint research" with the lab; the improper takeover of ownership and control of the lab; the refusal to share revenue generated by the lab; the failure to "train [Plaintiff] in the Anesthesiology [D]epartment's ASAP position for five years"; failing to provide truthful evaluations and free access to Plaintiff's educational file; and "acute[] and unceasing[]" harassment.  (Doc. 53 at 8.)  Plaintiff argues that this conduct breached the express terms of the Lab-Residency Contract and the duty of good faith and fair dealing implied in every contract under Missouri law.  (*Id.* (citing *HM Compounding Servs., LLC v. Express Scripts, Inc.*, No. 4:14-CV-1858, 2017 WL 2118012, at *2 (E.D. Mo. May 16, 2017)).

Defendants first argue that the statute of frauds bars the enforcement of any unwritten obligation because the Lab-Residency Contract allegedly spans five years.  Contracts that cannot

be completed in less than one year must be reduced to writing.  Mo. Rev. Stat. § 432.010.
Plaintiff expressly alleges that the Lab-Residency Contract included a promise by WashU and
BJH to train him as a medical resident for five years and lists their failure to do so as a breach.
(Doc. 35 at ¶¶ 39, 49; Doc. 53 at 8.)  As such, Defendants argue, their alleged verbal promises
are unenforceable.

The Court agrees with Defendants that the statute of frauds applies to the Lab-Residency
Contract.  As noted, Plaintiff alleges that Defendants forced him out of the ASAP program—a
five-year residency program that cannot possibly be completed in less than one year.  Plaintiff
himself lists the five years of training as the essential consideration for moving his lab to St.
Louis and affiliating it with WashU and BJH and lists the failure to provide all five years as a
breach.  Accordingly, those promises are unenforceable unless reduced to writing.  Likewise,
because the statute of frauds applies, there is no enforceable contract into which the Court could
read any implied duty of good faith and fair dealing.

Plaintiff responds that the statute of frauds does not apply because the parties formed a
partnership to engage in "conducting research, operating the lab, commercializing results, and
sharing in the proceeds."  (Doc. 53 at 10.)  Plaintiff cites *Downey v. McKee*, 218 S.W.3d 492,
496 (Mo. Ct. App. 2007), for the proposition that oral partnership agreements are enforceable in
some cases.  Defendants reply that Plaintiff did not allege the existence of any partnership in his
Amended Complaint and could not rely on an argument raised in his response to their Motions to
Dismiss.  (Doc. 59 at 7-8.)  Further, they argue that the alleged promises are too vague to form a
partnership, lacking any formula for dividing profits or losses or otherwise define the so-called
partners' rights and obligations.  (*Id.*)

The Court is not persuaded that a partnership relationship would save Plaintiff's claim. *Downey*—the case on which Plaintiff relies—turned on the fact that the partnership had no definite term:  "A partnership agreement with no specific time limit is a partnership at will and may be dissolved at any time" and therefore "the statute of frauds does not apply because the agreement was terminable within one year."  218 S.W.3d at 496 (citing *Gaty v. Tyler*, 33 Mo. App. 494, 496-97 (1888)).  As noted, Plaintiff expressly alleges that WashU and BJH promised to train him for five years, eliminating the possibility that their verbal communications with Plaintiff gave rise to an at-will partnership.

Accordingly, the Court concludes that Plaintiff has not pleaded sufficient factual content from which the Court could reasonably infer that Defendants are in breach of the alleged Lab-Residency Contract.  *Iqbal*, 556 U.S. at 678.

### Memorandum of Appointment

Plaintiff also argues that Defendant's promises were incorporated into the written Memorandum of Appointment he signed when he joined the residency program, which he describes as a binding "Employment Contract."  (Doc.  53 at 6.)  Plaintiff's argument relies on the fact that educational and medical institutions promise to enter into a binding contract with their matched residents when they register to participate in the NRMP.  Plaintiff alleges that the Memorandum of Appointment is the binding contract required by the NRMP.

In his Amended Complaint, Plaintiff describes the Memorandum of Appointment as "a boilerplate employment contract," but also alleges that it established the "[d]etailed terms of [the parties'] agreement."  (Doc. 35 at ¶ 50.)  Specifically, Plaintiff asserts that the Memorandum of Appointment binds Defendants to comply with "the standards of the Essentials of Accredited Residency as approved by the [ACGME]," which, according to Plaintiff, include the obligations

13

to truthfully and transparently evaluate Plaintiff during his residency.  (*Id.* at 39.)  Thus, he argues, Defendants' fraudulent evaluations and harassment—intended to force him out of residency so they could seize control of his profitable medical research—violated the terms of the Memorandum of Appointment.  (Doc. 53 at 6-8.)

Defendants argue that the Memorandum of Appointment is not an enforceable contract. (Doc. 45 at 11-12.)  First, they argue that there is no "clear and definite" intent to offer Plaintiff an enforceable contract.  (*Id.* at 12.)   Instead, Defendants assert that the Memorandum of Appointment is merely a collection of the hospital's general policies; more akin to an employee handbook than an enforceable contract.  (Doc.  45 at 11-12 (citing *Johnson v. McDonnell Douglas Corp.*, 745 S.W.2d 661, 662 (Mo. 1988) ("McDonnell's unilateral act of publishing its handbook was not a contractual offer to its employees.")).) Defendants specifically argue that none of the express provisions of the Memorandum of Appointment relate to Plaintiff's compensation, lab, or the ASAP residency program.  (Doc.  45 at 14; *see also* Doc. 35 at 39-56.)

The Court is not persuaded by Defendants' argument on this point.  As noted, Plaintiff has pleaded that participation in the NRMP requires institutions and residents to form a binding contract.  He has pleaded that the Memorandum of Appointment is that binding contract.  No other written document purporting to set out the parties' legal relationship is before the Court and the Memorandum of Appointment does include language that appears to obligate both sides. For example, Sections 19 and 20 devote the better part of four pages on the hospital's obligations when a staff member objects to performance review or disciplinary action.  (Doc. 35 at 49-52.) Lastly, unlike the handbook in *Johnson v. McDonnell Douglas*, which the court described as "a nonexclusive list of acts for which an employee might be subject to discipline" unilaterally published to all employees, 745 S.W.2d at 662, the Memorandum of Appointment includes

14

obligations relating to both parties and requires residents to sign an "Acceptance Letter" to indicate "agreement to the terms."  (Doc. 35 at 56.)

Likewise, the Court finds Defendants' argument that Plaintiff never accepted the terms of the Memorandum of Appointment unavailing.  It may be true that Plaintiff "did not sign the page confirming his receipt and acceptance of the Memorandum of Appointment," as Defendants assert, but his conduct—pulling up stakes in Louisiana and moving his family and laboratory to St. Louis—clearly demonstrates his intent to accept the terms of a residency at BJH.  *See Major v. McCallister*, 302 S.W.3d 227, 231 (Mo. Ct. App. 2009) ("When one party accepts the other party's performance, it gives validity to an agreement even if unsigned, and imposes on the accepting party the obligations thereunder.")  Therefore, at this early stage, the Court concludes that Plaintiff has pleaded sufficient factual content to support a finding that the Memorandum of Appointment is an enforceable contract.

That said, the Court notes that only one of the six alleged breaches—the obligation not to engage in harassment—is expressly precluded by the language of the Memorandum of Appointment.  (*Compare* Doc. 53 at 8 *with* Doc. 35 at 39-56.)  Defendants correctly argue that "[a] promise to do that which one is already legally obligated to do cannot serve as consideration for a contract," *Doran v. Chand*, 284 S.W.3d 659, 665 (Mo. Ct. App. 2009) (quoting *Zipper v. Health Midwest*, 978 S.W.2d 398, 416 (Mo. Ct. App. 1998)), and assert that because federal and state law already prohibit harassment, there is no consideration for a contractual obligation not to do so.  However, Defendants' cited cases relate to harassment based on protected characteristics like race and gender.  Plaintiff does not allege such discrimination here, so the Court will not dismiss on that basis.

The remaining alleged breaches—not teaming up with Plaintiff's lab to conduct research, seizing ownership of the lab, refusing to split profits, failing to allow Plaintiff to complete his five-year residency, writing false reviews, and refusing to grant Plaintiff access to his file—rely on the Memorandum of Appointment's two mentions of the ACGME.  However, even if the Court accepts Plaintiff's assertion that ACGME standards bind Defendants, those general standards certainly do not relate to Defendants' specific—and by all accounts unique—collaboration with Plaintiff's lab or the sharing of derived revenue.  Nor could the ACGME prohibit Defendants from terminating Plaintiff's participation in the ASAP program before he completed all five years; a promise to retain and advance every resident—even residents who lack the basic skills necessary to provide adequate medical care—would be fatal to the effective management of such programs' educational objectives.

The Court therefore concludes that the Memorandum of Appointment applies, if at all, only to Defendants' alleged harassment and their failure to truthfully evaluate Plaintiff and grant him access to his file.  To the extent Plaintiff argues that losing his lab and getting pushed out of the ASAP program are the result of Defendants' falsified negative reviews, those facts relate to damages rather than setting out independent breaches of the ACGME standards.

Next, the Court must determine whether WashU is bound by the Memorandum of Appointment.  Defendants argue that WashU was not a party to the Memorandum of Appointment.  (Doc. 42 at 6-8.)  Plaintiff concedes that he did not explicitly allege that WashU was a party to the Memorandum of Appointment but argues that the document "refers to WU in several of its provisions."  (Doc. 53 at 12.)

Although the Memorandum of Appointment does mention WashU at various points, all of those mentions are informational and none of them could be read to impose any contractual

16

obligation on the school.  Further, Plaintiff's conclusory assertion that "BJH and WU overlap and are largely indistinguishable from one another with respect to their jointly operated residency programs and research activities" (Doc. 35 at ¶ 13), is not enough to impose liability on the school.  The Court therefore concludes that WashU is not a party to the Memorandum of Appointment and will dismiss Plaintiff's claims against it without prejudice.

Accordingly, the Court concludes that Plaintiff has pleaded sufficient factual content from which the Court could reasonably infer that Defendants breached the Memorandum of Agreement by harassing him, falsifying evaluations, and denying him free access to his records. The Court will dismiss Plaintiff's claims that Defendants' conduct relating to the lab's research, revenue, or profits, or Plaintiff's failure to complete all five years of his residency amounted to a breach of the Memorandum of Agreement as well as those against WashU.

### *Separation Agreement*

Plaintiff's final breach-of-contract claim relies on an alleged verbal contract made by Evers and Benzinger on behalf of WashU and BJH when Plaintiff indicated his willingness to resign.  (Doc. 35 at ¶¶ 76-77.)  According to Plaintiff, he told both supervisors that he would not voluntarily withdraw until he secured their promises to assist in his transfer to another residency program.  (*Id.* at ¶ 77.)  He asserts that the doctors "repeatedly told [him] they 'wanted him to succeed,' that they would 'cooperate with other programs' on his transfer, and would provide him with 'a good recommendation letter.'"  (*Id.*)  Instead, Plaintiff alleges, "Dr. Evers and Dr. Benzinger falsely told other institutions that [Plaintiff] had failed rotations, was an incompetent physician, and was uncooperative and disruptive."

Defendants argue that the alleged Separation Agreement is unenforceable for two reasons.  (Doc. 45 at 21-22.)  First, they argue that the asserted terms are too vague to form an

enforceable contract:  "Plaintiff does not allege exactly how the defendants were supposed to 'assist' him in transferring to another institution . . . [or] what would constitute a 'good' recommendation letter."  (*Id.* at 21.)  Plaintiff responds that "[t]he only relevant question is whether the words [Evers and Benzinger] chose, coupled with the implied duty of good faith and fair dealing, ***precluded*** them from ***actively interfering*** with [Plaintiff's] efforts to transfer." (Doc. 53 at 14.)  In other words, Plaintiff argues that, even if the promises in the agreement were vague, his supervisors' conduct breached any rational understanding of those promises.  (Doc. 53 at 13-14.)

Defendants reply that certainty of terms is essential to the validity of a contract before the Court even considers the alleged breach.  (Doc. 56 at 10.)  They argue that the Court cannot determine whether the alleged conduct breached the contract until it determines what obligations the contract imposes.  (*Id.*)

The Court agrees with Defendants that "assist" is too vague a term to support an enforceable promise.  "It is essential to a contract that the nature and the extent of the obligations be certain," and that, "[i]f an offer is so indefinite as to make it impossible for a court to decide just what it means, and to fix exactly the legal liability of the parties, its acceptance cannot result in an enforceable agreement."  *Damon Alarm Corp. v. Econ. Dev. Corp.*, 555 S.W.2d 694, 695 (Mo. App. 1977).  The universe of possible "assistance" is nearly limitless and far too indefinite to make it possible to fix Defendants' legal liability; it is completely unclear what Defendants allegedly promised to do (or even could have done).

That said, the Court finds that a promise to provide a "good" reference is sufficiently specific and concrete to allow the Court to decide whether Defendants are legally liable.  Courts routinely interpret vague and ambiguous contract terms; that "good" is not precisely defined does

not so hobble the Court that it is unable to deduce the nature and the extent of the alleged obligations. Here, Plaintiff alleges the opposite of a good reference; he alleges that Defendants not only refused to provide a good reference but in fact made negative remarks. Accepting those allegations as true, the Court could reasonably infer the existence of an enforceable contractual obligation under the Separation Agreement to provide a good reference and a breach of that obligation.

Defendants also argue that there was insufficient consideration to support an enforceable contract because Plaintiff did not give up anything of value by offering to resign when he had already been "forced" to leave. (*Id.*) Plaintiff responds that his use of "forced" was not literal but intended to convey the significant pressure put on him by Defendants' alleged misconduct. (*Id.*)

The Court finds that Plaintiff's use of "forced" does not render the contract devoid of consideration. As Defendants state, every contract must include sufficient consideration, which is "a promise (to do or refrain from doing something)." (Doc. 45 at 21 (quoting *Miller v. Dombek*, 390 S.W.3d 204, 207 (Mo. Ct. App. 2012)).) Here, Plaintiff clearly alleges that he promised to *voluntarily* resign. His use of "forced" notwithstanding, the Court accepts Plaintiff's allegation that he promised to do something he did not have to do, and believes that his promise is sufficient consideration to support a contract.

Accordingly, the Court concludes that Plaintiff has pleaded sufficient facts from which the Court could reasonably infer that Defendants are in breach of the obligation under the Separation Agreement to provide a good reference but will dismiss without prejudice Plaintiff's claim relating to "assistance." *Iqbal*, 556 U.S. at 678.

### b.  <u>Count VI – Quantum Meruit and Count VII – Unjust Enrichment</u>

In Counts VI and VII, Plaintiff alleges that Defendants robbed him of the fair value of his lab by forcing him out of his residency.  (Doc. 35 at ¶¶ 130-133.)  Plaintiff alleges that the lab was highly profitable and generated significant value in academic prestige and that WashU and BJH unjustly seized control of the lab without compensating Plaintiff.  (Doc. 35 at ¶¶ 132-133.)

Quantum meruit and unjust enrichment are claims in quasi-contract intended to compensate the plaintiff for the defendant's unfair retention of value.  "While the lines are often blurred with regard to quantum meruit and unjust enrichment, we recognize these as separate causes of action."  *Holliday Investments, Inc. v. Hawthorn Bank*, 476 S.W.3d 291, 295 (Mo. Ct. App. 2015) (collecting cases).  Still, both require the same general proof:

> 1) that the plaintiff provided to the defendant materials or services at the defendant's request or with the acquiescence of the defendant; 2) that the materials or services had reasonable value; and 3) that—despite the demands of the plaintiff—the defendant has failed and refused to pay the reasonable value of such materials or services.

*Downing v. Goldman Phipps PLLC*, No. 4:13 CV 206 CDP, 2017 WL 1050980, at *3 (E.D. Mo. Mar. 20, 2017) (citing *County Asphalt Paving Co. v. Mosley Constr., Inc.*, 239 S.W.3d 704, 710 (Mo. Ct. App. 2007)); *see also Flowshare, LLC v. TNS, US, LLC*, No. 4:16-cv-00300-JAR, 2017 WL 3174321, at *6 (E.D. Mo. July 26, 2017) (listing the elements of unjust enrichment as the defendant's acceptance of a benefit at the plaintiff's expense which would be unjust to keep). The primary difference is the method and amount of recovery; in quantum meruit, the plaintiff is entitled to the reasonable value of the improperly retained materials or services while in unjust enrichment, the plaintiff is entitled to repayment only of the amount that would be unjust for the defendants to retain.  *Johnson Grp., Inc. v. Grasso Bros.*, 939 S.W.2d 28, 30 (Mo. Ct. App. 1997)

Defendants first argue that these claims should be dismissed because Plaintiff offers only bare assertions that will not support the claim. (Doc. 45 at 22-23.) The Court disagrees. Plaintiff's Amended Complaint describes the valuable materials and services the lab provides, including marketable intellectual property, government funding, and published research that, in many ways, is the coin of the realm for educational research institutions. (*See* Doc. 35 at ¶¶ 40-45.) This is sufficiently precise to survive dismissal.

Next, Defendants argue that Plaintiff's quasi-contract claims are barred because they merely restate a breach-of-contract claim that is itself barred by the statute of frauds. (Doc. 45 at 23.) Defendants assert that Plaintiff alleges quantum meruit and unjust enrichment arising from Defendants' failure to satisfy their obligations under the Lab-Residency Agreement, which the Court has already found to be an unenforceable verbal contract. (*Id.*)

Plaintiff responds that his quasi-contract claims are pleaded in the alternative to his contract claims and therefore expressly survive in the absence of an enforceable contract. (Doc. 53 at 33.) He argues that Defendants' cited case law deals with promissory estoppel, which relates to implied-in-fact contracts based on a party's affirmative promise to do something, rather than an implied-in-law contract like quantum meruit or unjust enrichment. (*Id.* at 34.)

The Court agrees with Plaintiff. By their very nature, quasi-contract claims exist in the absence of an enforceable contract and are not subject to the statute of frauds. *See Boswell v. Panera Bread Co.*, No. 4:14-CV-01833-AGF, 2016 WL 1161573, at *17 (E.D. Mo. Mar. 24, 2016) (citing *Consol. Products Co. v. Blue Valley Creamery Co.*, 97 F.2d 23, 27 (8th Cir. 1938)) ("[The statute of frauds] does not apply to quasi-contract claims like unjust enrichment."). The Court distinguishes Plaintiff's equitable claims, which seek only reimbursement for benefits enjoyed by Defendants, from promissory estoppel, where a plaintiff seeks to force a defendant to

fulfill some allegedly agreed-to obligation.  Unlike the latter, which is at the core of Defendants' cited authority, the former necessarily fills the gap when a defendant has benefitted in the absence of an enforceable promise, oral or otherwise.

Lastly, Defendants argue that Plaintiff has not pleaded facts sufficient to allow the Court to infer that Defendants have inequitably benefitted from their relationships with Plaintiff's lab. (Doc. 45 at 24-26.)  Defendants specifically argue that Plaintiff cannot show that they "failed and refused to pay the reasonable value of [the lab's] materials or services despite the demands of [P]laintiff."  (*Id.* at 25 (citing *Cty. Asphalt Paving Co. v. Mosely Const., Inc.*, 239 S.W.3d 704, 710 Mo. Ct. App. 2007).)  They note that BJH's Radiology Department stepped in to cover the lab's expenses when its primary investor withdrew and that all of the lab's research assistants have since become BJH or WashU employees.  (*Id.* at 24.)  Defendants maintain that this financial support amounts to a payment of the lab's reasonable value and that their retention of any residual benefits was therefore just, especially in light of the inherent risk of funding a research lab.  (*Id.*)

The Court finds that "reasonable value" is a fact question that cannot be answered without evidence and that the answer to that question necessarily bears on whether WashU and BJH's retention of the lab's work product was unjust.  Accepting Plaintiff's allegations as to the significant immediate and residual value to the lab's controller, the Court finds that Plaintiff has pleaded sufficient facts to survive dismissal as to Counts VI and VII.

### *Tort Claims*

### a.  **MHRA Preemption**

Defendants argue that the MHRA preempts all of Plaintiff's tort claims.  (Doc. 42 at 2.) Under Missouri law, the MHRA "shall provide the exclusive remedy for any and all claims for injury or damages arising out of an employment relationship."  Mo. Rev. Stat. 213.070.2.

Because Plaintiff's claims arose while he was employed by BJH, Defendants assert, his tort claims must be dismissed and he must seek relief under the statute.  (*Id.* at 8-11.)

Plaintiff responds that the MHRA applies to discrimination on the basis of an employee's membership in a protected class.  (Doc. 53 at 39-41.)  He asserts that Defendants' cited case law deals only with alleged violations of civil-rights statutes rather than the common-law torts he is advancing.  (*Id.* at 40-41.)  In addition, he argues that the MHRA language Defendants rely upon was added after he resigned, making it inapplicable to his claims.  (*Id.*)

Defendants reply that this District routinely applies § 213.070.2 to bar common-law tort claims.  (Doc. 58 at 6.)  In support, they offer *State ex rel. Church & Dwight Co. v. Collins*, 543 S.W.3d 22, 28 (Mo. 2018), which dismissed the plaintiff's negligence claim, arising from her 2016 employment, because "the MHRA fully provides for all remedies available at common law," as well as a number of other cases.

The Court has reviewed Defendants' cited case law and has searched for other cases dismissing tort claims as preempted by the MHRA.  The Court has been unable to find any such case that compels dismissal of the specific claims Plaintiff brings here.  Cases in which courts have found common-law torts preempted by the MHRA involve allegations of discrimination or retaliation.  *See Ritter v. Delta Sch. Dist.*, No. 1:18 CV 170 ACL, 2019 WL 2027725, at *2–3 (E.D. Mo. May 8, 2019) (dismissing as preempted claims that school district was negligent in failing to instruct, supervise, control, or discipline other employees **to protect teacher from illegal age discrimination** and wrongfully terminated him) (emphasis added); *Hoaglin v. HyVee Inc.*, No. 6:18-03262-CV-RK, 2019 WL 1928536, at *1 (W.D. Mo. Apr. 30, 2019) ("Here, Plaintiff bases her tort claims on **the same facts as those that form the basis of her [MHRA] claims**, and she seeks the same remedies.") (emphasis added); *Huskey v. Petsmart, Inc.*, No. 18-

00813-CV-W-NKL, 2019 WL 122873, at *2 (W.D. Mo. Jan. 7, 2019) ("Huskey attempts to sidestep this statutory bar by framing her claim against Polly not as a claim under the MHRA, but as one for **civil conspiracy to violate Huskey's rights under the MHRA**.") (emphasis added); *Church*, 543 S.W.3d at 27 ("[Plaintiff] alleges Church negligently failed to train, supervise, and prevent its employees from **acting in a discriminatory manner**.") (emphasis added).  Plaintiff does not allege discrimination or retaliation based on any protected status; his tort claims are rooted in breach of contract and fraud.  Nor has the Court found a case dismissing a claim of tortious interference, fraudulent inducement, defamation, or conversion as preempted by the MHRA.

Defendant's recent supplemental authority, *Winfrey v. Ford Motor Co.*, No. 4:19-CV-00889-DGK, 2020 WL 1558117 (W.D. Mo Apr. 1, 2020), deals with claims of  negligence and intentional or negligent infliction of emotional distress, caused by alleged discrimination based on the plaintiff's disability.  As Plaintiff argues in his supplement (Doc. 65), and for the reasons discussed by the Court, a disability-discrimination case is of limited value to the Court in resolving Plaintiff's tort claims here.

Accordingly, the Court will consider the merits of Plaintiff's tort claims.

### b. <u>Count II – Tortious Interference with Contract and Business Expectancies</u>

Plaintiff argues that Evans and Bezinger interfered with his contractual relationships with WashU and BJH, specifically the so-called Lab-Residency and Separation Agreements.[3]  (Doc.

---

[3] The Court notes that Plaintiff's Amended Complaint asserts that Evers and Benzinger "tortiously interfered with all three contracts" (Doc. 35 at ¶ 104), but that, in his response opposing dismissal, he alleges that "[t]he contracts interfered with were the Lab-Residency and Separation [A]greements" (Doc. 53 at 15).  The Court construes Plaintiff's response as narrowing the scope of his claim and will therefore treat it as including only the two contracts mentioned therein.

35 at ¶¶ 101- 108.)  Because the Court has already decided that the Lab-Residency Agreement was not a valid contract, the Court will consider Plaintiff's allegations only to the extent they relate to the enforceable obligation of the Separation Agreement to provide a good reference.

Plaintiff asserts that Evers and Benzinger's failure to provide a good reference interfered with his ability to transfer to another residency program and resulted in significant economic and professional losses.  (*Id.*)  To prove tortious interference, Plaintiff must show:  "(1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages."  *Bishop & Assocs., LLC v. Ameren Corp.*, 520 S.W.3d 463, 472 (Mo. 2017).

Defendants first argue that Plaintiff had no valid business expectancy.  "The valid business expectancy requirement involves more than a mere subjective expectancy—it must be a *reasonable* expectancy."  *Stehno v. Sprint Spectrum, L.P.*, 186 S.W.3d 247, 250 (Mo. 2006).  A "mere hope" is insufficient.  *Id.* (citing *Misischia v. St. John's Mercy Med. Ctr.*, 30 S.W.3d 848, 863 (Mo. Ct.  App. 2000) (abrogated on other grounds)).  Defendants argue that Plaintiff had nothing more than a mere hope of transferring to another residency program and that he therefore fails to plead facts showing a "concrete" or "specific" expectation.  (Doc. 42 at 14 (quoting *Vilcek v. Uber USA, LLC*, No. 4:15-cv-01900, 2017 WL 3116155, at *4 (E.D. Mo. July 21, 2017))).

Plaintiff responds that, given his credentials, "there is no reason to think that [he] would not have been widely courted by any program" as a potential transfer.  (Doc. 53 at 18.)  The Court concludes that a fact issue exists as to the reasonableness of Plaintiff's expectation that his resume was so impressive that he could have easily transferred to another residency program. Factual disputes are not appropriately resolved at this early stage.

25

Next, Defendants argue that they cannot be held liable for interfering with the alleged Separation Agreement because they are not third parties.  Generally, "[a]n action for tortious interference with a business expectancy will lie against a third party only," and because employees are agents of their employers, they cannot ordinarily be held liable for interfering with a contract to which their employer is a party.  *Farrow v. Saint Francis Med. Ctr.*, 407 S.W.3d 579, 602 (Mo. 2013) (quoting *Zipper v. Health Midwest*, 978 S.W.2d 398, 419 (Mo. Ct. App. 1998)).  Defendants argue that they are employees of WashU and BJH and therefore cannot be liable for the alleged interference.

Plaintiff responds that employees can be held liable when "they directly participate in the tort and are not merely acting in the official capacities and use improper means to induce a breach."  (Doc. 53 (citing *Zipper v. Health Midwest*, 978 S.W.2d 398, 419 (Mo. Ct. App. 1998).)  Asserting that Evers and Benzinger's coordinated harassment was malicious, "did not further their employer's interest[,] and was not in the scope of their employment" (*id.*), Plaintiff argues that his claim falls outside the general rule barring intra-corporate interference.

Defendants reply that Plaintiff expressly alleged in his Amended Complaint that Evers and Benzinger were agents of WashU or BJH, and they argue that reviewing Plaintiff's performance was one of their primary responsibilities as residency program supervisors.  (Doc. 58 at 6-7.)  They argue that responding to other programs' requests for information was well within the scope of their employment.  (*Id.*)

The Court agrees that, as supervisors for the residency program, Evers and Benzinger's job necessarily includes reviewing residents' performance and communicating with other programs when a resident seeks to transfer.  That said, the Court concludes that a fact question exists as to whether allegedly erroneous and malicious evaluations fall within the scope of that

26

position.  At this juncture, accepting as true Plaintiff's allegations that Defendants lied about his performance, the Court cannot say that Evers and Benzinger were acting within the scope of their employment as agents of WashU or BJH.

Next, Defendants argue that their actions were justified.  (Doc. 58 at 8-9.)  A plaintiff cannot maintain a claim of tortious interference against a defendant who had a legal right to take the allegedly tortious action.  *Farrow v. Saint Francis Med. Ctr.*, 407 S.W.3d 579, 602 (Mo. 2013) (citing *W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 20 (Mo. 2012)).  Defendants assert that Evers and Benzinger were legally entitled to evaluate Plaintiff and to share his allegedly sub-par performance with other programs considering Plaintiff's transfer.  (Doc. 58 at 8-9.)  For the same reasons just discussed, the Court concludes that the justification of Evers and Benzinger's actions is a question of fact that relies on the truth of their evaluations of Plaintiff's performance.  As such, the Court cannot dismiss this claim on that basis at this time.

Defendants next argue that Plaintiff's tortious-interference claim is an improper restatement of his breach-of-contract claim.  (Doc. 42 at 15-16.)  Defendants cite *Ingrassia v. OneBeacon Ins. Grp.*, No. 4:14 CV 1216 CDP, 2014 WL 4639171, at *2 (E.D. Mo. Sept. 16, 2014), a case involving an insurance contract, for the proposition that "the facts that form the basis for the tort claim must be independent from the facts underlying the contract . . . claim[s] in order for the tort claim to survive a motion to dismiss."  Asserting that Plaintiff alleges the same facts to support his contract and tort claims, Defendants argue that the interference claim must be dismissed.

Plaintiff responds that the alleged tortious interference is "related to" his contract claim but is "an independent tort."  (Doc. 53 at 19.)  He asserts that Evers and Benzinger "set out to

27

sink [him] personally, and in the process tortiously interfered in all three contracts by falsifying [Plaintiff's] reviews and lying to other institutions." (*Id.*)

The Court concludes that Plaintiff alleges the same facts in support of both his breach-of-contract claim and his tortious-interference claim. Both rely on allegations that Defendants intentionally falsified Plaintiff's evaluations and lied to torpedo his transfer attempt. That the alleged breach of the Separation Agreement was also (allegedly) tortious does not give rise to a separate cause of action. The claim is therefore subject to dismissal.

Lastly, Defendants argue that Plaintiff's claim is barred by the economic loss doctrine. "The economic loss doctrine prohibits a plaintiff from seeking to recover in tort for economic losses that are contractual in nature." *Self v. Equilon Enterprises, LLC*, No. 4:00CV1903TA, 2005 WL 3763533, at *8 (E.D. Mo. Mar. 30, 2005). "Missouri prohibits a cause of action in tort where the losses are purely economic." *Rockport Pharmacy, Inc. v. Digital Simplistics, Inc.*, 53 F.3d 195, 198 (8th Cir. 1995) (quoting *R.W. Murray Co. v. Shatterproof Glass Corp.*, 697 F.2d 818, 828-29 (8th Cir. 1983)).

Missouri courts have been hesitant to apply the economic loss doctrine to claims of tortious interference with business relations, especially when the interference can be distinguished from the parties' contractual obligations. *See Hogan Logistics, Inc. v. Davis Transfer Co., Inc.*, No. 4:16-CV-1541 (CEJ), 2017 WL 1508603, at *5 (E.D. Mo. Apr. 27, 2017) (citing *Hanover Ins. Co. v. Hermosa Const. Grp., LLC*, 57 F. Supp. 3d 1389, 1396 (N.D. Ga. 2014) (holding that claims based on an independent duty not to interfere with another's business are outside the contractual relationship and not barred by the economic loss doctrine); *see also Zoltek Corp. v. Structural Polymer Grp., Ltd.*, No. 4:08-CV-460 (CEJ), 2008 WL 4921611, at *4 (E.D. Mo. Nov. 13, 2008), *aff'd sub nom. Zoltek Corp. v. Structural Polymer Grp.*, 592 F.3d 893

(8th Cir. 2010) (declining to apply the economic loss doctrine to claims that the defendant's interference was "collateral to the parties' contract) (citing *Adbar Co. v. PCCA Missouri, LLC,* No. 4:06–CV–1689JCH, 2008 WL68858 (E.D. Mo. Jan. 4, 2008) (finding claims for unfair competition and tortious interference arose from duties arising outside the parties' lease agreement and thus were not barred by the economic loss doctrine).  However, having already found that that Plaintiff's allegations of tortious interference essentially restate his breach-of-contract claims, the Court concludes that this tort claim is one to which the economic loss doctrine applies.

Accordingly, the Court concludes that Plaintiff has not pleaded sufficient facts from which the Court could reasonably infer that Defendants are liable for the misconduct alleged in Count II.

### c.   Count III - Fraudulent Inducement

In Count III, Plaintiff alleges that WashU, BJH, Evers, and Benzinger fraudulently induced him to enter into the Separation Agreement[4] when they "falsely stated that they would assist Plaintiff obtain a residency at another institution."  (Doc. 35 at ¶ 113.)  Plaintiff further asserts that he is entitled to punitive damages in light of Defendants' alleged "complete indifference and conscious disregard."  (*Id.* at ¶ 114.)

To prove a claim of fraudulent inducement, Plaintiff must show:  (1) a defendant made a material representation; (2) with knowledge of its falsity; (3) with intent that plaintiff rely on that representation; (4) that the plaintiff was ignorant of the falsity; (5) that the plaintiff justifiably

---

[4] In his Amended Complaint, Plaintiff references "all three contracts" in Count III but in his response in opposition, he mentions only the Separation Agreement.  (*Compare* Doc. 35 at ¶¶ 109-114 *with* Doc. 53 at 20-21.)  The Court construes Plaintiff's response as narrowing the scope of his claim and will therefore treat it as including only the Separation Agreement.

relied upon the representation; and (6) that plaintiff was damaged by that representation." *Cole v. Homier Distrib. Co.*, 599 F.3d 856, 862 (8th Cir. 2010) (citing *Ryann Spencer Group, Inc. v. Assurance Co. of Am.*, 275 S.W.3d 284, 287 (Mo. Ct. App. 2008)).  Like all allegations of fraud or mistake, Federal Rule of Civil Procedure 9(b) requires that "a party must state with particularity the circumstances constituting fraud or mistake."

Defendants first argue that Plaintiff has not pleaded his allegations with sufficient particularity.  (Doc. 42 at 18-19.)  Specifically, they assert that "Plaintiff fails to allege with any particularity how any representation was material or reasonably relied upon."  (*Id.* at 19.)

Plaintiff responds that he expressly told his supervisors that he would not resign until they promised to assist him in transferring to another program and that both promised multiple times to help.  (Doc. 53 at 20-22.)  In his complaint, Plaintiff alleges that "he offered to resign . . . [h]owever, he conditioned that offer on a promise that Dr. Evers, Dr. Benzinger, [WashU] and BJH would assist him in transferring."  (Doc. 35 at ¶ 76.)  He further alleges:

> [Plaintiff] had told Dr. Evers and Dr. Benzinger that he would not willingly resign unless he would be able to finish his half-completed training elsewhere.  To induce him to resign, Dr. Evers and Dr. Benzinger repeatedly told [Plaintiff] they "wanted him to succeed," that they would "cooperate with other programs" on his transfer, and would provide him with "a good recommendation letter."  [Plaintiff] relied on those representations, and without them he would not have resigned.

(*Id.* at ¶ 77.)

The Court concludes that Plaintiff has sufficiently plead the particulars of his fraud claim.  The Amended Complaint includes "the 'who, what, where, when, and how' of the alleged fraud," *U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006) (quoting *U.S. ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003)), and expressly alleges that Plaintiff chose to resign based on his supervisors' promises to help him transfer.

Next, Defendants argue that Plaintiff's Amended Complaint will not support the inference that Evers and Benzingers' alleged promises were false or that Plaintiff was unaware of their falsity. (Doc. 42 at 19.) They assert that Plaintiff failed to allege that his supervisors "did not in fact 'want him to succeed,' would not 'cooperate with others,' or did not 'write a recommendation letter.'" (*Id.*)

The Court finds this argument unpersuasive in light of the allegations in Plaintiff's Amended Complaint. Plaintiff alleges that Defendants engaged in a series of targeted harassment to drive him out of the residency program, primarily by falsifying his performance evaluations. In addition, he alleges that Defendants intentionally maligned him to potential transfer institutions. Accepting those allegations as true, there are sufficient facts to infer that the promises were not true. Plaintiff's assertion that he resigned based on those promises is sufficient at this stage to show that he did not know the promises were false.

Defendants also argue that Plaintiff has failed to allege "how or why he could justifiably rely on the alleged representations." (Doc. 42 at 19.) Whether Plaintiff's alleged reliance was justified is a factual matter to be decided at a later juncture.

Next, Defendants argue that the alleged misrepresentations are not actionable because they relate to a future promise. (*Id.* at 20.) They argue that fraudulent misrepresentation may be based only on statements that "relate to a past or existing fact." (*Id.* (quoting *Bohac v. Walsh*, 223 S.W.3d 858, 863 (Mo. Ct. App. 2007).) In addition, they argue that Plaintiff could not justifiably rely on the promises because his transfer required the involvement of a third party. (*Id.*)

Plaintiff responds by citing *O'Neal v. Stifel, Nicolaus & Co.*, 996 S.W.2d 700, 703 (Mo. Ct. App. 1999), a case involving a fraudulent misrepresentation relating to a future offer of

employment.  Plaintiff argues that *O'Neal* supports the proposition that fraudulent promises to do something in the future are actionable.  (Doc. 53 at 21.)

However, the *O'Neal* court went on to clarify that, as Defendants in this case argue, "statements and representations as to expectations and predictions for the future are insufficient to authorize recovery for fraudulent misrepresentation."  996 S.W.2d at 703-04 (quoting *Arnold v. Erkmann,*934 S.W.2d 621, 627 (Mo. Ct. App. 1996)).  The court expressly noted that the defendant's agents "were of present intent to allow O'Neal to enter the corporation as a branch manager" but "had no intent to make O'Neal an employee at the time [the defendant] made the alleged representations."  *Id.* at 704.  This allegation of present—not future—intent was dispositive. *Id.*

This Court concludes that Plaintiff's cited case law is insufficient to overcome the well-settled rule barring fraudulent misrepresentation claims based on future promises.  Plaintiff's complaint alleges that Evers and Benzinger promised to assist him in the future, after he resigned, as transfer opportunities arose.  These "statements and representations as to expectations and predictions for the future are insufficient to authorize recovery for fraudulent misrepresentation."  *O'Neal*, 996 S.W.2d at 703-04.  Accordingly, the Court will  grant Defendants' motion to dismiss Count III on the ground that he alleges non-actionable future promises.

### d.  Count IV – Defamation

Plaintiff argues that Defendants defamed him when they "published a series of false statements about Plaintiff in a letter which was sent to several Deans at Washington University School of Medicine," claiming that "Plaintiff has performed unsatisfactorily on several rotations," "Plaintiff's performance on every internal medicine rotation was below average in

every category by every reviewer," and "Plaintiff's performance on the rotation was 'at the 2nd year medical student level' and was 'completely unprofessional.'"   (Doc. 35 at ¶¶ 116-119.) Plaintiff alleges that Benzinger again defamed him when he responded to an LSU survey by stating that Plaintiff was "the least competent intern that I have supervised."   (*Id.* at 121.) Plaintiff alleges one final instance of defamation, when WashU and BJH:

> falsely told representatives of other residency programs to which Plaintiff had submitted applications that Plaintiff's information could not be released without talking to Defendants' attorney, falsely stated that he had failed rotations, falsely stated that he was an incompetent physician, and falsely stated that he was uncooperative with the [WashU]-BJH Residency program.

(*Id.* at ¶ 123.)  Plaintiff alleges that these false statements are to blame for his failure to transfer to another residency program.  (*Id.* at ¶ 124.)

"The elements of defamation in Missouri are:  1) publication, 2) of a defamatory statement, 3) that identifies the plaintiff, 4) that is false, 5) that is published with the requisite degree of fault, and 6) damages the plaintiff's reputation."  *Nigro v. St. Joseph Med. Ctr.*, 371 S.W.3d 808, 818 (Mo. Ct. App. 2012) (quoting *Overcast v. Billings Mut. Ins. Co.*, 11 S.W.3d 62, 70 (Mo. banc 2000)).

Defendants first argue that the allegedly defamatory statements are "non-actionable opinion."  (Doc. 42 at 22.)  Because opinions are not provably false, they cannot support a claim for defamation.  *Smith v. Humane Soc'y of United States*, 519 S.W.3d 789, 798 (Mo. 2017). Defendants assert that their opinion of Plaintiff's performance therefore could not be defamatory. (Doc. 42 at 22.)

Plaintiff responds that opinions are still actionable when they "necessarily impl[y] the existence of undisclosed defamatory facts."  (Doc. 53 at 23 (quoting *McKay v. City of St. Louis*, No. 4:15-CV-01315-JAR, 2016 WL 4594142, at *11 (E.D. Mo. Sept. 2, 2016)).)  Courts must therefore determine "whether a reasonable factfinder could conclude that the statement implies

an assertion of objective fact." *Castle Rock Remodeling, LLC v. Better Bus. Bureau of Greater St. Louis, Inc.*, 354 S.W.3d 234, 241 (Mo. Ct. App. 2011) (quoting *Ribaudo v. Bauer*, 982 S.W.2d 701, 705 (Mo. Ct. App. 1998)).

Reviewing the alleged statements, the Court finds that some, but not all, are opinion: that Plaintiff "performed unsatisfactorily"; that his "performance on the rotation was 'at the 2nd year medical student level' and was 'completely unprofessional'"; that Plaintiff was "the least competent intern that [Benzinger has] supervised"'; that he was "an incompetent physician"; and that "he was uncooperative with the [WashU]-BJH Residency program" are opinions.  In addition, Defendants' statement "that Plaintiff's information could not be released without talking to Defendants' attorney" is a non-actionable opinion by Defendants' legal team.

That said, the Court believes that a reasonable factfinder could conclude that two of those opinions imply the assertion of objective fact:  that Plaintiff performed unsatisfactorily implies that he failed to meet the requirements of the residency program; and that WashU could not release Plaintiff's academic records without consulting its attorney implies that Plaintiff was in active litigation against Defendants.  Accordingly, those statements may yet support a defamation claim.

In addition, the remaining alleged statements assert measurable statements that can be proved objectively false:  that "Plaintiff's performance on every internal medicine rotation was below average in every category by every reviewer" and that Plaintiff "had failed rotations" can be proved or disproved by objective evidence such as Plaintiff's academic record relative to program averages and supervisors' written evaluations.

Still, Defendants argue that the alleged statements contained in the letter to the WashU deans are non-actionable intra-corporate communications.  (Doc. 42 at 23-24.)  "It is well settled

in Missouri that intra-corporate communications do not constitute actionable publication for purposes of libel suits." *Washington v. Thomas*, 778 S.W.2d 792, 797 (Mo. Ct. App. 1989) (collecting cases). "[C]ommunication of employee personnel files, containing required evaluation material, to supervisory personnel within the hospital itself does not constitute actionable publication." *Ellis v. Jewish Hosp. of St. Louis*, 581 S.W.2d 850, 851 (Mo. Ct. App. 1979).

Plaintiff responds that intra-corporate communications are actionable when made in bad faith or malice, citing *Murrell v. Allstate Ins. Co.*, No. 4:12-CV-1707 JAR, 2014 WL 3858204, at *16 (E.D. Mo. Aug. 6, 2014). (Doc. 53 at 22.) The Court finds *Murrell* unhelpful because it also involved a publication of the allegedly defamatory statements to unrelated third parties and therefore does not assist the Court in determining whether bad faith or malicious falsehoods are exceptions to the general rule surrounding intra-corporate publications.

Moreover, Plaintiff's cited authority relates to the qualified privilege that applies to statements "made in good-faith upon a subject matter which the declarant has an interest or in reference to which he has a duty, to a person having a corresponding interest or duty, even though it contains matter which absent such privilege would be actionable." *Allen v. ASRC Commc'n*, No. 4:08CV1575 HEA, 2010 WL 1404179, at *2 (E.D. Mo. Apr. 8, 2010). Defendants do not argue that they are entitled to this qualified privilege; they argue that intra-corporate communications do not satisfy the publication element. The Court agrees and will therefore grant Defendants' motion to dismiss Plaintiff's defamation claim as to the statements made in the letter to the WashU deans, which were non-actionable intra-corporate communications.

Accordingly, the only alleged defamatory statements of non-opinion published to a third party were that Plaintiff had "failed rotations" and that Defendants could not release his records without consulting counsel.  Defendants argue that the first statement was true and that they have already provided documentary evidence as proof.  (Doc. 42 at 25-27.)  Plaintiff responds that he was made to "repeat" rotations but argues that repeating is factually different from failing.  (Doc. 53 at 25.)  The Court concludes the truth of that statement is a fact issue better addressed at a later stage.

As to the statement that Defendants needed counsel's permission to release Plaintiff's records, Defendants argue that because it "is capable of a non-defamatory meaning, and can be reasonably construed in an innocent sense," the Court must find that it is not defamatory.  (Doc. 42 at 27 (quoting *Mandel v. O'Connor*, 99 S.W.3d 33, 36 (Mo. Ct. App. 2003)).)  Plaintiff does not directly respond to this argument.  (*See* Doc. 53 at 22-29.)  In any event, at this early stage of the proceedings, the Court concludes that Defendants' statement that they cannot release Plaintiff's records without consulting their attorney "is capable of having a defamatory meaning" and that therefore "the question of whether it was actually understood as defamatory [should be] submitted to the jury."  *Pape v. Reither*, 918 S.W.2d 376, 379 (Mo. Ct. App. 1996).  Put simply, the Court believes that "taken in their most obvious and natural sense, according to the idea they are calculated to convey to whom they are addressed," *Ribaudo v. Bauer*, 982 S.W.2d 701, 704 (Mo. Ct. App. 1998), the words suggest some difficulty in Plaintiff's residency program and "cast aspersions on [Plaintiff's] reputation so as 'to lower him in the estimation of the community or to deter third persons from associating with him,'" *Pape*, 918 S.W.2d at 380 (quoting *Henry v. Halliburton,* 690 S.W.2d 775, 779 (Mo. banc 1985)).

Accordingly, the Court will grant Defendants' motion to dismiss Plaintiff's defamation claim as to all statements except those made to other residency programs stating that Plaintiff had failed rotations and that his records could not be released without their attorney's permission.

### e.  <u>Count V – Conversion</u>

In Count V, Plaintiff alleges that Defendants "converted [his] research lab equipment, including 3D printers that Plaintiff had purchase[d], Plaintiff's work process papers, and related intellectual property as recording in drawings, specifications, and memos."  (Doc. 35 at ¶ 128.) In Missouri, "[c]onversion requires proof of three elements: '(1) the plaintiff owned the property or was entitled to possess it; (2) the defendant took possession of the property with the intent to exercise some control over it; and (3) the defendant thereby deprived the plaintiff of the right to possession.'"  *Massood v. Fedynich*, 530 S.W.3d 49, 57 (Mo. Ct. App. 2017) (quoting *Herron v. Barnard*, 390 S.W.3d 901, 909 (Mo. App. W.D. 2013)).

Defendants argue that Plaintiff's conversion claim fails for numerous reasons.  (Doc. 42 at 29-30.)  First, they argue that "Plaintiff did not own or have the right to possession of the allegedly converted lab and intellectual property."  (*Id.*)  Citing the Amended Complaint, Defendants assert that Plaintiff conducted research through a separate corporate entity, which owned the property Defendants allegedly converted.  (*Id.* at 30 (citing Doc. 35 at ¶¶ 20, 53).) What is more, Defendants assert that WashU and BJH gained an ownership interest when the hospital took over the lab's operational expenses with Plaintiff's consent.  (*Id.*)  Because conversion is "the unauthorized assumption of the right of ownership over the personal property of another," *Dean Mach. Co. v. Union Bank*, 106 S.W.3d 510, 522 (Mo. Ct. App. 2003),

Defendants argue that they cannot be liable for converting property they own from someone who does not, or for assuming possession with the property owner's consent, (Doc. 42 at 31.)

Plaintiff responds that he clearly stated in his Amended Complaint that the corporate entities were "his companies," and that "the lab, and its work product, were his."  (Doc. 53 at 29 (citing ¶¶ 20, 45, 28, 53).)  As to whether he consented to the takeover of the lab's ownership, Plaintiff argues that such a conclusion is a fact question better answered after discovery and suggests that any consent was obtained through duress.  (*Id.* at 30.)

The Court agrees with Plaintiff that ownership of the lab and his alleged consent are fact issues best reserved for a later stage of litigation.  At the very least, Plaintiff's allegations, taken as true, are sufficient to survive dismissal on these issues.

Next, Defendants argue that "intellectual property and ideas cannot be the basis of a conversion claim."  (Doc. 42 at 30.)  They cite *Schaefer v. Spence*, 813 S.W.2d 92, 96 (Mo. Ct. App. 1991), for the proposition that conversion does not lie for the appropriation of an idea.  (Doc. 42 at 33.)   Plaintiff responds that he specified the taking of "memos, drawings, specification, work papers, and his lab"—ideas and concepts captured in tangible property that can be converted.  (Doc. 53 at 30.)   He asserts that such documents are protected from unauthorized dispossession under both Missouri law and long-established concepts of tort law.  (*Id.* at 30-31 (citing *Colton, McMichael, Lester, Auman, Visnovske, Inc. v. Mueller*, 896 S.W.2d 741, 743 (Mo. Ct. App. 1995); Restatement (Second) of Torts § 242 (1965)).)  Defendants reply that Plaintiff has not sufficiently identified what documents might fall under the *Colton* rule.  (Doc. 58 at 24.)

At this early stage, the Court believes Plaintiff has alleged with sufficient specificity that Defendants are now in sole possession of documents containing ideas and concepts to which the

lab's owner is entitled.  While Plaintiff does not provide a list of each and every such item, the Court concludes that he has pleaded enough to state the existence of arguably convertible property.

Next, Defendants again argue that Plaintiff advances a tort claim that relies on an earlier contract claim.  (Doc. 42 at 34.)  Specifically, they argue that Plaintiff has merely recast his allegation that Defendants breached the so-called Lab-Residency Contract.  (*Id.*)

As previously discussed, "the facts that form the basis for the tort claim must be independent from the facts underlying the contract . . . claim[s] in order for the tort claim to survive a motion to dismiss."  *Ingrassia*, 2014 WL 4639171, at *2.  However, the Court concludes that this is not the case for Plaintiff's conversion claim for two reasons:  first, the Court has already determined that the Lab-Residency Contract is not enforceable, meaning there is no underlying breach-of-contract claim with which to overlap; and second, Plaintiff's allegations that Defendants' robbed him of possession of his lab and its property is wholly independent of his claim that they failed to meet their contractual obligations to affiliate with the lab while Plaintiff completed his residency.

Defendants finally argue that Plaintiff's conversion claim is barred by the economic loss doctrine.  (Doc. 42 at 34-35.)  This Court and others in the Eastern and Western Districts have held that the doctrine does not necessarily bar conversion claims.  *See, e.g.*, *Jacobson Warehouse Co., Inc. v. Schnuck Markets, Inc.*, No. 4:17-CV-00764 JAR, 2017 WL 5885669, at *9 (E.D. Mo. Nov. 29, 2017); *Vogt v. State Farm Life Ins. Co.*, No. 2:16-CV-04170-NKL, 2017 WL 1498073, at *2 (W.D. Mo. Apr. 26, 2017); *Web Innovations & Tech. Servs., Inc. v. Bridges to Digital Excellence, Inc.*, 69 F. Supp. 3d 928, 929 (E.D. Mo. 2014).

Accordingly, the Court concludes that Plaintiff has pleaded sufficient facts to allow it to infer that Defendants may be liable for conversion and will therefore deny Defendants' motion to dismiss Count V.

### f.   <u>Count VII – Civil Conspiracy</u>

Finally, Plaintiff alleges that Defendants conspired to commit the alleged torts and "to threaten him with a mental health examination."  (Doc. 35 at ¶ 139.)  "A civil conspiracy is an agreement between at least two persons to do an unlawful act, or to use unlawful means to do an act which is lawful."  *Hibbs v. Berger*, 430 S.W.3d 296, 320 (Mo. Ct. App. 2014) (quoting *Blaine v. J.E. Jones Constr. Co.,* 841 S.W.2d 703, 713 (Mo. Ct. App. 1992)).

Defendants first argue that Count VIII fails because all of Plaintiff's underlying torts fail. (Doc. 42 at 35.)  To be actionable, the conspiracy must have resulted in at least one underlying right of action.  *Gettings v. Farr*, 41 S.W.3d 539, 541–42 (Mo. Ct. App.2001).  However, because the Court has already determined that Plaintiff's defamation and conversion claims survive, at least in part, the Court finds this argument unavailing.

Defendants next argue that Plaintiff's conspiracy claim is improperly based on their alleged failure to perform a contract and barred by the economic loss doctrine.  (Doc. 42 at 37.) Again, because the Court has already found that the underlying torts survive these arguments, it concludes that the attendant allegation that Defendants conspired to commit those torts does also.

Accordingly, the Court finds that Plaintiff has pleaded sufficient facts from which it could infer that Defendants collaborated to defame Plaintiff or convert material from his lab.

## Conclusion

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Strike (Doc. 52), is **DENIED.**

**IT IS FURTHER ORDERED** that Defendants' Motions to Dismiss (Docs. 41, 43), are **GRANTED in part** and **DENIED in part**:  Count I is dismissed without prejudice as to the Lab-Residency Contract, as to all claims arising under the Memorandum of Agreement as against WashU and as against all other defendants except regarding false evaluations and access to records, and as to the alleged obligation under the Separation Agreement to "assist" Plaintiff in his transfer; Counts II and III are dismissed without prejudice; Count IV is dismissed without prejudice as to all statements except those made to other residency programs stating that Plaintiff had failed rotations and that his records could not be released without their attorney's permission; and Count VIII is consequently limited to the extent the underlying claims survive dismissal.  The motion is **DENIED** in all other respects.

A Rule 16 Scheduling Conference will be set by separate order.

Dated this 29th day of May, 2020.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE