UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JEFFERY WEISMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:19-cv-00075-JAR |
| | ) |
| BARNES JEWISH-HOSPITAL, | ) |
| BJC HEALTHCARE, WASHINGTON | ) |
| UNIVERSITY MEDICAL CENTER, | ) |
| WASHINGTON UNIVERSITY, | ) |
| WASHINGTON UNIVERSITY SCHOOL | ) |
| OF MEDICINE IN ST. LOUIS, DR. ALEX | ) |
| EVERS, DR. RICHARD BENZINGER, and | ) |
| DR. THOMAS COX | ) |
| | ) |
| Defendants. | ) |

## BARNES-JEWISH HOSPITAL'S ANSWER & AFFIRMATIVE DEFENSES TO PLAINTIFF'S AMENDED COMPLAINT

Defendant Barnes-Jewish Hospital ("BJH") submits the following answer and affirmative

defenses to Plaintiff's Amended Complaint, filed on August 1, 2019 (Doc. 35). BJH has included

Plaintiff's allegations from the Amended Complaint for ease of reference.

## I.      NATURE OF THE CASE

1.      This is not a case brought based on discrimination or harassment in employment,

or school, based on race, color, religion, national origin, sex, ancestry, age or disability.  Rather,

it is a case brought by a citizen of another state against citizens of Missouri for breach of

contract, tortious interference, fraudulent inducement, defamation, tortious conversion, quantum

meruit, unjust enrichment, and civil conspiracy in relation to the Defendants luring Plaintiff from

Louisiana State University to St. Louis only to deprive him of his ongoing medical laboratory

business and his opportunity to ever complete a residency anywhere in the U.S., as alleged

below.

**ANSWER: This paragraph sets forth legal conclusions to which no response is required.  To the extent a response is required, and as to Plaintiff's characterizations of the type of case this is and any remaining allegations within this paragraph, BJH denies the allegations set forth in paragraph 1.**

2.    Dr. Weisman was a pioneer in researching and developing medical uses for three-dimensional (3D) printing technology.  The Anesthesiology department of WU-BJH persuaded  Dr. Weisman to relocate his laboratory and activities to St. Louis and affiliate with WU-BJH.  Among other things, Anesthesiology offered Dr. Weisman a residency position that would make  him eligible for board certification.  Dr. Weisman accepted the deal and started in July 2016.

**ANSWER: BJH admits only so much of this paragraph as alleges that Plaintiff was a resident in the Anesthesiology program Graduate Medical Education Consortium run by the Washington University, Barnes-Jewish Hospital and St. Louis Children's Hospital ("GME Consortium"), and that he began his residency program in or about June 2016. BJH denies the remaining allegations set forth in paragraph 2.**

3.    Within a few months, Anesthesiology learned that *de jure* control over Dr. Weisman as a medical resident did not translate into *de facto* control over him as a business partner.  He had agreed to train as a medical resident and affiliate with WU-BJH as the parties saw fit on an ongoing basis.  He had not agreed to give Anesthesiology exclusivity or control over his lab and its activities.  Dr. Weisman directed his lab to do surgery planning and modeling projects for the Radiology department of WU-BJH, and to engage in joint research projects with Radiology in addition to Anesthesiology.

**ANSWER: BJH is without sufficient information to admit or deny whether or what**

**Plaintiff directed his lab to do, and therefore denies the same. BJH denies the remaining allegations set forth in paragraph 3.**

4.        Anesthesiology thereafter stopped working with Dr. Weisman and his lab.  It also acted aggressively to "take back" its residency position, even though Dr. Weisman was performing satisfactorily and fully performing his obligations.  Among other things, Anesthesiology harassed Dr. Weisman unrelentingly to try to make him quit.  It also systematically falsified his performance evaluations to try to justify firing him.  Dr. Weisman survived this mistreatment for two years. WU-BJH begrudgingly gave him full credit for that period toward his certification requirements.  Dr. Weisman's lab survived for those two years by continuing to do work and research projects with Radiology instead of Anesthesiology.

**ANSWER:  BJH denies the allegations set forth in paragraph 4.**

5.        By mid-2018, Dr. Weisman felt compelled to leave WU-BJH.  His investor in the lab had terminated its financial support once Anesthesiology's withdrawal became clear and Dr. Weisman's position at WU-BJH was under siege.  With no new academic affiliation or investor, Dr. Weisman was not in a position to relocate his lab or research activities a second time.  In order to save the jobs of his two Ph.D. research assistants, Dr. Weisman was forced to turn control of his lab over to Radiology.  The lab has continued to flourish for Radiology, generating revenue and frequently publishing studies by Dr. Weisman's former assistants and others at WU and BJH on medical applications for 3D printing technology.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 5 and therefore denies the same.**

6.        Dr. Weisman offered to resign as of June 28, 2018, but only on the condition that WU-BJH as a whole, and Anesthesiology in particular, assist and cooperate in his effort to

transfer to a different institution to finish his two remaining years of training.  WU-BJH agreed, and Dr. Weisman correspondingly resigned.  However, WU and BJH subsequently breached this separation agreement.  Among other things, they falsely disparaged Dr. Weisman to other institutions; alarmed other institutions by insisting that routine communications regarding Dr. Weisman go through the WU and/or BJH legal departments; and improperly delayed or refused to forward Dr. Weisman's academic records.

**ANSWER:  BJH admits Plaintiff resigned from the Anesthesiology residency program, which resignation was effective in June 2018. BJH denies the remaining allegations set forth in paragraph 6.**

7.      As a result of this retaliatory "blacklisting," Dr. Weisman has been unable to enroll in another anesthesiology residency program or resume his residency training.  He has also been unable to recruit any new investors; reestablish a lab; acquire new equipment; find talented new assistants; or otherwise recreate the lab and business venture that he had carefully built but lost in its entirety to WU and BJH.  Dr. Weisman now brings this action for breaches of contract and related claims to recover from Defendants for his injury.

**ANSWER:  Paragraph 7 states legal conclusions and argument requiring no response.  To the extent a response is required, BJH denies the allegations set forth in paragraph 7.**

## II.      JURISDICTION AND VENUE

8.      This Court has diversity jurisdiction under 28 U.S.C. § 1332.  Dr. Weisman is a citizen of the State of Illinois.  All Defendants are citizens of the State of Missouri.

**ANSWER:  Paragraph 8 sets forth legal conclusions to which no response is required.  To the extent a response is required, BJH admits it has operations in the State of Missouri. To the extent a response is required, BJH is without sufficient information to**

admit or deny the remaining allegations set forth in paragraph 8 and therefore denies the same.

9.      Venue is proper in this District under 31 U.S.C. § 1391(b).  A substantial part of the events giving rise to the claims asserted herein occurred in this District.

**ANSWER: This paragraph sets forth legal conclusions to which no response is required.  To the extent a response is required, BJH denies the allegations set forth in paragraph 9.**

### III.     PARTIES

10.      Plaintiff JEFFERY WEISMAN, M.D. is a citizen of the State of Illinois.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 10 and therefore denies the same.**

11.      Defendants BARNES-JEWISH HOSPITAL and BJC HEALTHCARE (collectively "BJH") are private Missouri nonprofit corporations with their respective principal offices at 4901 Forest Park Avenue, #1200, St. Louis, MO 63108, and One Barnes-Jewish Hospital Plaza, St. Louis, MO 63110.

**ANSWER:  BJH admits it is a non-profit corporation with operations at 4901 Forest Park Avenue, #1200, St. Louis, MO 63108 and at One Barnes-Jewish Hospital Plaza, St. Louis, MO 63110. This paragraph otherwise sets forth legal conclusions to which no response is required.  To the extent a response is required, BJH denies the allegations set forth in paragraph 11.**

12.      Defendants THE WASHINGTON UNIVERSITY and WASHINGTON UNIVERSITY MEDICAL CENTER, a/k/a Washington University School of Medicine in St. Louis (collectively "WU"), are private Missouri nonprofit corporations with their respective principal offices at 4400 Chouteau Ave., 1st Floor, St. Louis, MO 63110.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 12 and therefore denies the same.**

13.    BJH and WU overlap and are largely indistinguishable from one another with respect to their jointly operated residency programs and research activities.  In all actions alleged below, the individuals involved either acted on behalf of BJH formally and as an agent or representative of WU, or acted on behalf of WU formally and as an agent or representative of BJH.  For example, BJH enters into the written contracts with residents and pays their salaries, but WU faculty physicians supervise the residents.

**ANSWER: BJH admits that BJH pays the salaries of certain residents and that WU faculty physicians supervise certain residents. BJH denies any remaining allegations set forth in paragraph 13.**

14.    Defendant ALEX EVERS is a citizen of the State of Missouri.  At all relevant times he was employed by Washington University and its affiliates and supervised residents in Barnes Jewish Hospital for Defendants WU and BJH.

**ANSWER:  BJH admits that Dr. Alex Evers is employed by WU and supervised certain residents. BJH is without sufficient information to admit or deny the remaining allegations set forth in paragraph 14 and therefore denies the same.**

15.    Defendant RICHARD BENZINGER is a citizen of the State of Missouri.  At all relevant times he was employed by Washington University and its affiliates and supervised residents in Barnes Jewish Hospital for Defendants WU and BJH.

**ANSWER:  BJH admits that Dr. Richard Benzinger is employed by WU and supervised certain residents. BJH is without sufficient information to admit or deny the remaining allegations set forth in paragraph 15 and therefore denies the same.**

16.      Defendant THOMAS COX is a citizen of the State of Missouri. At all relevant times he was employed by Washington University and its affiliates and supervised residents in Barnes Jewish Hospital for Defendants WU and BJH, and/or St. Louis Children's Hospital.

**ANSWER:  BJH admits that Dr. Thomas Cox is employed by WU and supervised certain residents working. BJH is without sufficient information to admit or deny the remaining allegations set forth in paragraph 16 and therefore denies the same.**

## IV.    FACTS

### A.      Dr. Weisman And His Research Laboratory

17.      Dr. Weisman was an accomplished pioneer in the use of three-dimensional (3D) printing technology for medical purposes.  His work received media attention internationally and he appeared on television several times.  Dr. Weisman directed his own research laboratory and staff in affiliation with Louisiana State University (LSU) and Louisiana Tech University (LTU), conducting research and commercializing its results.  He holds master's degrees in finance (MFA) and molecular and cellular biology (MS), and doctorate degrees in law (JD), medicine (MD), and biomedical engineering (PhD).  Dr. Weisman was an expert not only in designing and conducting advanced medical research, but also in patenting, licensing, and otherwise commercializing its results.  His lab and research were very valuable to LSU-LTU, both in terms of tangible benefits like intellectual property rights and revenue and intangible benefits like enhancing its research credentials and prestige.

**ANSWER:  Upon information and belief, BJH admits that Plaintiff holds the degrees referenced in paragraph 17.  BJH is without sufficient information to admit or deny the remaining allegations set forth in paragraph 17 and therefore denies the same.**

18.      3D printing technology is relatively new.  It uses digital files to create objects through successive layering of material in a predetermined pattern.  Prior to Dr. Weisman's

pioneering research, the only real medical application for 3D printing was modeling and planning for surgeries.  Dr. Weisman's research involved entirely new applications, for example creating bioactive implants.  Bioactive substances are those having a chemical effect on organisms, for example antibiotics.  Dr. Weisman invented using 3D printing technology to produce surgical implants that would dissolve slowly over time to release cancer drugs or other medications to the surrounding area of a patient's body.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 18 and therefore denies the same.**

19.    Dr. Weisman achieved much of his success while still in the dual-degree MD-PhD ("physician-scientist") program at LSU and LTU.  By the time he graduated in June 2016, Dr. Weisman had designed and conducted several important research projects.  He was responsible for several studies that had been published in national and international scientific and medical journals.  Their titles reflected the very new and specialized area of research he was spearheading, for example "Antibiotic and Chemotherapeutic Enhanced Three-Dimensional Printer Filaments and Constructs for Biomedical Applications," "3D Printing Antibiotic and Chemotherapeutic Eluting Catheters and Constructs," and "Three-Dimensional Printing of Chemotherapeutic and Antibiotic Eluting Fibers, Seeds, and Discs for Localized Drug Delivery in Cutaneous Disease."

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 19 and therefore denies the same.**

20.    Dr. Weisman conducted research through his Louisiana startup biotech company, first named Southern Biomedical Products, LLC and later Strategic Biomedical Inc. (collectively SBP).  Dr. Weisman and SBP obtained grants and funding from investors; located and

transported special equipment from New Zealand; and employed assistant researchers who conducted research under Dr. Weisman's direction.  His assistants included two fellow PhDs in biomedical engineering at LTU, namely Dr. Uday Jammalamadaka and Dr. Karthik Tappa. Another research assistant was his friend and fellow medical student, David Ballard.  SBP's facility was located in Shreveport, Louisiana.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 20 and therefore denies the same.**

21.     Dr. Weisman was well educated and experienced in all aspects of his business, not only in designing and conducting research, but also in patenting, licensing and otherwise commercializing its results.  He held two master's degrees (MS and MFA) and three doctorate degrees (MD, JD, and PhD).  He had been a patent attorney and general counsel at a biotech startup, and himself had six patents or pending patent applications.

**ANSWER:  Upon information and belief, BJH admits that Plaintiff holds the degrees referenced in paragraph 21.  BJH is without sufficient information to admit or deny the remaining allegations set forth in paragraph 21 and therefore denies the same.**

22.     What Dr. Weisman did not have, but needed in order to continue his steep career trajectory, was board certification in a medical specialty and subspecialty.  For that, he needed to complete three to five years of training in a medical residency program and one or two years in a fellowship program.  Given his credentials and accomplishments, however, virtually any residency program in the United States would have been happy to enroll him.  Among other things, only two to three percent (2-3%) of all medical students are physician-scientists like Dr. Weisman, *i.e.* graduates of dual degree MD-PhD programs offered by select medical schools. Such graduates are widely considered the elite of medical schools.  The MD-PhD program

offered by LSU/LTU normally required eight (8) years of study.  Dr. Weisman completed it in six (6) years.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 22 and therefore denies the same.**

23.    As a graduating MD-PhD with his own lab, Dr. Weisman was highly recruited by residency programs throughout the United States.  Among other institutions expressing particular interest in his lab and research work were Stanford University, Vanderbilt University, and the University of Florida.  Dr. Weisman's lab and SBP operation was portable, and he had prepared his investor and his professional researchers for relocation of the lab to whatever geographic location became necessary.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 23 and therefore denies the same.**

24.    Dr. Weisman's departure was a significant loss for LSU and LTU.  They were greatly disappointed and wanted him to stay.  For example, the future Chancellor of the LSU medical center, Dr. G.E. Ghali, had asked Dr. Weisman to train in his department and offered to make the lab his personal research facility.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 24 and therefore denies the same.**

25.    By the time he left LSU-LTU in mid-2016, Dr. Weisman had developed an impressive portfolio of intellectual property as a result of research conducted in his lab.  As his affiliate, LSU-LTU had a financial interest in that intellectual property.  Accordingly, LSU-LTU expected compensation from whatever institution Dr. Weisman relocated to because it would be receiving the benefit of that intellectual property.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in this paragraph and therefore denies the same.**

B.      WU and BJH

26.      WU promotes itself as being one of the leading medical research institutions in the United States.  In addition to enhancing its visibility and prestige to attract faculty and students, research is big business that generates huge revenues for WU.  For example, WU in 2018 alone reportedly received $514 million in grants from the National Institutes of Health (NIH).

**ANSWER:  BJH is without sufficient information to admit or deny the remaining allegations set forth in paragraph 26 and therefore denies the same.**

27.      While WU ranks in the top 10 universities nationwide in obtaining NIH research grants, it ranks near the bottom in generating revenue for itself by commercializing research results through patents, licensing, and startup ventures.  Contrastingly, LSU-LTU ranks far lower than WU in obtaining NIH grants, but far higher in commercialization.  WU was rich in underlying research, but poor in precisely what Dr. Weisman offered—knowledge and experience in harnessing the benefit of research through commercialization.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 27 and therefore denies the same.**

28.      WU and BJH jointly operate several medical residency programs, one of which is  Anesthesiology's four-year program that makes its participants eligible for certification by the American Board of Anesthesiology (ABA).  The WU-BJH anesthesiology program offers dozens of positions annually.  WU and BJH also jointly operate several medical fellowship programs, which follow basic residency and offer one to two years of additional training that make

participants eligible for ABA certification in a subspecialty.

**ANSWER:  BJH admits it is part of the GME Consortium and that the GME Consortium operates medical residency and fellowship programs.  BJH further admits that the Anesthesiology residency program is a four-year program, completion of which can make participants eligible for certification by the American Board of Anesthesiology ("ABA"). BJH also admits that the Anesthesiology fellowship program is one year and makes participants eligible for ABA certification in a sub-specialty.  BJH denies any remaining allegations set forth in paragraph 28.**

29.    Of the dozens of positions offered by the WU-BJH anesthesiology program annually, only two positions are on the special track it calls the Academic Scholars Advancement Program (ASAP).   These five-year ASAP positions were one year longer than the standard position, but have numerous advantages.  ASAP positions consist of eighteen months of research plus three and one-half years of core anesthesiology training.  Upon completing the program, ASAP participants often have research accomplishments in addition to eligibility for board certification in anesthesiology and a subspecialty of his or her choice (which normally takes one to two years of fellowship training in addition to four-years of core anesthesiology training).  The ASAP positions are very valuable to many medical student applicants.  WU-BJH created the positions to attract the top MD-PhD candidates like Dr. Weisman.

**ANSWER: BJH admits that the Anesthesiology program includes a track it calls the Academic Scholars Advancement Program (ASAP), that generally two ASAP positions are available each year and that upon completion of the program, ASAP participants often have research accomplishments in addition to eligibility for board  certification in anesthesiology and a sub-specialty. BJH denies any remaining allegations set forth in**

**paragraph 29.**

30.     The federal government pays BJH to train medical residents, and BJH in turn pays WU to assist in that process.  The Centers for Medicare and Medicaid Services (CMS) pays BJH approximately $30 million annually in Direct Graduate Medical Education (DGME) funding and  approximately $60 million annually in Indirect Medical Education funding (IME). DGME is a  flat rate paid per resident that varies by hospital, normally between $100,000 and $150,000.

**ANSWER:  BJH admits that it receives Direct Graduate Medical Education ("DGME") and Indirect Medical Education funding through the federal government tied to its training of medical residents, and that BJH pays WU to assist with this training.  BJH denies any remaining allegations set forth in paragraph 30.**

31.     At all times relevant to this action, the WU-BJH official with ultimate authority over medical residents in the ASAP and standard anesthesiology programs was Dr. Alex Evers, Chair of the Anesthesiology department.  However, he had responsibilities and authority over a broad range of matters relating to anesthesiology, and graduate medical education was just one small piece.  Dr. Evers seldom had official contact with medical residents directly, which instead occurred through subordinates reporting to him.  In descending order, those persons were at all relevant times Vice-Chair for Education Dr. Thomas Cox; Program Director Dr. Richard Benzinger; and Assistant Program Director Dr. Russell Groener.

**ANSWER:  BJH admits Dr. Alex Evers was the Chair of WU's Anesthesiology department at the time Plaintiff was a resident and that Dr. Evers had general supervisory authority over the program. BJH admits that Dr. Thomas Cox was Vice Chair for Education, Dr. Benzinger was the Program Director, and Dr. Groener was the Assistant**

**Program Director, during the same time period. BJH denies any remaining allegations set forth in paragraph 31.**

32.      Dr. Evers' personal involvement with Dr. Weisman, both before and after his arrival at WU-BJH, was highly unusual.  Dr. Evers was ultimately responsible for the care provided to tens of thousands of patients annually; for the supervision of more than 100 senior physicians; and for everything else related to anesthesiology at WU-BJH.  There were several layers that would normally insulate him from direct contact with any of the program's 80 residents. Dr. Evers was not interested in Dr. Weisman because he would be a good trainee in a residency program, but because his talent and lab were a lucrative business opportunity for WU-BJH in general and for Dr. Evers and his department in particular.

**ANSWER: BJH admits that Dr. Evers had general supervisory authority over the Anesthesiology program when he was the Chair of WU's Anesthesiology department. BJH denies the remaining allegations in paragraph 32.**

33.      Dr. Evers did poorly in generating NIH grants for WU.  The Anesthesiology department as a whole was very strong, ranking in the top five nationally and receiving over $10 million annually.  But even though Dr. Evers was the department Chair, with all the formal and informal advantages that position entails, he struggled to account for even five percent (5%) of Anesthesiology's total NIH grants.  Nearly ten (10) of his departmental colleagues did better, many by a substantial margin.

**ANSWER: BJH is without sufficient information to admit or deny the allegations set forth in paragraph 33 and therefore denies the same.**

34.      Even though Anesthesiology did well compared to its counterparts at other institutions, it did not do that well compared to other departments within WU.  Although

Anesthesiology earned more than $10 million in NIH grants annually, WU's Department of Radiology earned more than $20 million in NIH grants annually.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 34 and therefore denies the same.**

35.   Like virtually all residency programs, the WU-BJH anesthesiology program filled its positions through the National Resident Matching Program (NRMP).  Both WU and BJH were subject to the terms of their contract with the NRMP.  Under that system, thousands of residency programs and tens of thousands of medical school graduate applicants submit preference lists to the NRMP, which annually in March "matches" applicants to positions available for the upcoming July-June academic year.

**ANSWER:  BJH admits the Anesthesiology program participated in the National Resident Matching Program ("NRMP"), but denies it had a contract with the NRMP. BJH otherwise admits the remaining allegations set forth in paragraph 35.**

36.   The NRMP process results in a written and enforceable contract between institutions and the applicants assigned to them.  The contract is formed in two stages.  First, each participating institution and the applicant contracts with NRMP to accept the results of the Match.  In other words, each institution agrees to offer a position its assigned applicants, and each applicant agrees to accept the position assigned to him or her.  This is a condition of registering for, and participating in, the Match.

**ANSWER:  BJH denies the allegations set forth in paragraph 36.**

37.   Second, their contract with NRMP requires institutions to later send a Memorandum of Appointment or similar written document to their assigned residents that confirms and adds details to their contract with the resident.  For example, such materials

commonly include a specific salary, specific disciplinary and due process procedures, and incorporate by reference other details set forth in resident handbooks.

**ANSWER:  BJH admits that it provides a Memorandum of Appointment to residents.  BJH denies the remaining allegations set forth in paragraph 37.**

38.     Having a contract with its assigned residents is not optional for an institution; it is required by the NRMP and agreed to by each institution before it is assigned such residents. The WU-BJH anesthesiology program registered for the Match in 2016, and agreed to contract with any residents assigned to it by the Match.

**ANSWER:  BJH admits the Anesthesiology program registered for the NRMP match in 2016 and that BJH provides a Memorandum of Appointment to residents. BJH denies the remaining allegations set forth in paragraph 38.**

### C.     The Parties' Lab-Residency Contract

39.     Dr. Weisman, WU, and BJH entered into a multi-faceted contract that was in part written and in part verbal.  It was also modified by amendment over the course of time. Fundamentally, the parties agreed that (a) Dr. Weisman would move his lab and its resources to St. Louis, and affiliate the lab with WU and/or BJH; (b) Dr. Weisman and his lab would engage in research; (c) WU and BJH would perform the obligations, and receive the benefits, normally involved in such research affiliations; (d) Dr. Weisman would perform the obligations, and receive the benefits, normally involved in such research affiliations; and (e) WU and BJH would also enroll Dr. Weisman in one of the WU-BJH anesthesiology program's ASAP positions, and train him for five years and make him eligible for board certification in anesthesiology and a subspecialty.

**ANSWER:  BJH denies the allegations set forth in paragraph 39.**

40.     Dr. Weisman had initiated no contact with WU or BJH, and he was somewhat surprised to be contacted in late 2015 by the Chair of Anesthesiology himself, Dr. Evers. Dr. Evers solicited Dr. Weisman to relocate to St. Louis with his lab and to affiliate with WU-BJH rather than LSU/LTU.  Among other areas of responsibility and authority, Dr. Evers supervised his department's research activities and revenues.  Anesthesiology had been generating approximately $10 million in NIH research grants for WU, but Dr. Evers aspired to do better.

**ANSWER: BJH admits that Dr. Evers was the Chair of WU's Anesthesiology department in 2015 and that Dr. Evers had general supervisory authority over WU's Anesthesiology department. BJH is without sufficient information to admit or deny the remaining allegations set forth in paragraph 40 and therefore denies the same.**

41.     Shortly after initiating department communications with Dr. Weisman, Dr. Evers paid for Dr. Weisman and his fiancé to visit WU from Louisiana.  This was highly unusual because institutions rarely if ever pay to interview medical students.  A few months later, Dr. Evers proposed to Dr. Weisman that each of them list the other as first choice to ensure Dr. Weisman was assigned to WU-BJH via the National Residency Matching Program (NRMP). This was highly unusual because NRMP prohibits institutions from communicating with applicants that late in the process, and also prohibits institutions from "gaming" the system by such pre-arrangements.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 41 and therefore denies the same.**

42.     By recruiting Dr. Weisman and his lab, WU and BJH would potentially benefit from research grants, patents, licensing fees, and an enhanced image as a cutting-edge research institution.  Of course, Dr. Evers would also benefit personally by attaching his name to studies

published by Dr. Weisman and the lab. Dr. Evers had no significant innovative research credentials of his own, but had arranged to be listed as a co-author on many studies conducted and published by his subordinates or others. He was almost always listed as fifth or sixth author, or lower, consistent with the professional practice of listing authors in order of contribution.

**ANSWER: BJH denies the allegations set forth in the first sentence of paragraph 42. BJH is without sufficient information to admit or deny the remaining allegations set forth in paragraph 42 and therefore denies the same.**

43.     In exchange, Dr. Evers offered the affiliation of WU and BJH and collaboration of Anesthesiology on research contemplated and already underway. Such research included bioactive implant research and other high-value research projects being conducted and planned by Dr. Weisman. Dr. Evers also offered to share with Dr. Weisman and SBP the lucrative proceeds that would potentially be generated by commercializing their joint research results.

**ANSWER: BJH denies the allegations set forth in the first sentence of paragraph 43. BJH is without sufficient information to admit or deny the remaining allegations set forth in paragraph 43 and therefore denies the same.**

44.     Research institutions typically attract, retain and motivate their researchers by sharing a portion of any resulting intellectual property rights and/or revenues. Institutions normally have standing policies and procedures as to the respective percentages and other terms of sharing.

**ANSWER: BJH is without sufficient information to admit or deny the allegations set forth in paragraph 44 and therefore denies the same.**

45.     Dr. Weisman understood that WU and/or BJH would be conveying to him personally a substantial portion of any intellectual property or revenues arising from research

conducted by Dr. Weisman or others in his lab.  The research to be conducted at WU and/or BJH would not only be using Dr. Weisman's equipment, personnel, and other tangible resources, but would also be using and building on the intellectual property developed earlier by Dr. Weisman at LSU-LTU.

**ANSWER:  BJH denies the allegations set forth in paragraph 45.**

46.    Dr. Evers did not propose that he, or Anesthesiology, WU or BJH would take control of Dr. Weisman's lab or its activities.  Nor did Dr. Evers propose that he, or Anesthesiology, or WU or BJH would have exclusive use of the lab or a monopoly on any research or other activities.  Instead, Dr. Evers proposed an affiliation by which the parties would consider and engage in joint research (or not) on a case-by-case basis.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 46 and therefore denies the same.**

47.    Dr. Evers also offered Dr. Weisman one of the two valuable residency positions in ASAP.  He knew that Dr. Weisman would welcome the opportunity to continue his research activities while at the same time becoming eligible for board certification in a medical specialty and subspecialty.  ASAP would be his third dual-degree program, his first being the JD-MFA program at the University of Illinois-Champaign and his second being the MD-PhD program at LSU-LTU.

**ANSWER:  Upon information and belief, BJH admits that Plaintiff held the degrees identified in paragraph 47.  BJH is without sufficient information to admit or deny the remaining allegations set forth in paragraph 47 and therefore denies the same.**

48.    In early 2016, Dr. Weisman on behalf of himself and SBP accepted these offers and communicated that acceptance to Dr. Evers, who made the offers on behalf of himself and

WU-BJH.  For the March 2016 Match, Dr. Weisman listed the WU-BJH anesthesiology program as his first choice.  WU-BJH similarly ranked Dr. Weisman high on its preference list.  The NRMP then predictably matched Dr. Weisman to one of the two ASAP positions at WU-BJH.

**ANSWER:  BJH admits that Plaintiff was matched with the Department of Anesthesiology ASAP program through NRMP. BJH denies the remaining allegations set forth in paragraph 48.**

49.     Both WU-BJH and Dr. Weisman registered for, and participated in, the NRMP Match.  As a requirement of registration, the parties contracted with NRMP to accept their Match results.  That contractual obligation to NRMP created a fundamental contractual obligation to each other upon matching.

**ANSWER:  BJH admits that Plaintiff and the Anesthesiology department participated in the NRMP match. BJH denies any remaining allegations set forth in paragraph 49.**

50.     Detailed terms of their agreement were later established directly between them.  Dr. Weisman signed a boilerplate employment contract with WU-BJH in 2016.  (Exhibit A).  Among other things, the employment contract explicitly obligated the program to: (a) evaluate Dr. Weisman truthfully; (b) give him access to a central file of all his evaluations; (c) refrain from any harassment; and (d) provide residency training in compliance with standards of the Accreditation Council for Graduate Medical Education (ACGME), which were incorporated by reference and repeated the foregoing obligations.  Dr. Weisman, *inter alia*, was obligated to have a medical license, follow all program rules and regulations, comply with applicable state and federal laws, participate fully in the educational aspects of the program, fulfill the educational requirements of the program, provide safe effective and compassionate patient care, and provide

clinical care.

**ANSWER:  BJH specifically denies it entered into an employment contract with Plaintiff.  BJH states that Exhibit A, the Memorandum of Appointment, speaks for itself. BJH further denies any remaining allegations set forth in paragraph 50.**

51.      The employment agreement also obligated WU-BJH to "comply with all applicable state, federal and local laws, as well as standards required to maintain accreditation by the ACGME . . ."  (Ex. A, Employment agreement, Section 16.b).  Those standards include the official ACGME Common Program Requirements, which required WU-BJH to "provide objective assessments of performance" for Dr. Weisman and other residents (Section V.A.2.b).(1), emphasis added); "document progressive resident performance improvement" (V.A.2.b).(3)); and make "the evaluations of resident performance . . . accessible for review by the resident" (V.A.2.c)).

**ANSWER:  BJH denies it entered into an employment contract with Plaintiff, and that Exhibit A, the Memorandum of Appointment, speaks for itself. BJH denies any remaining allegations set forth in paragraph 51.**

52.      Dr. Evers continued his unusually personal and attentive contact with Dr. Weisman after the Match and upon Dr. Weisman's arrival in St. Louis.  Among other things, Dr. Evers put Dr. Weisman in touch with Dr. Evan Kharasch, a high-level WU official in charge of all research, to assist in moving the lab to St. Louis from Louisiana and to help Dr. Weisman's fiancé find a job at WU.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 52 and therefore denies the same.**

**D.      WU-BJH Breaches of the Lab-Residency Contract**

53.     In late spring of 2016, Dr. Weisman relocated his company, equipment, assistant researchers Dr. Uday Jammalamadaka and Dr. Karthik Tappa, and the remainder of his lab operations to St. Louis.  Coincidentally, Dr. Weisman's former assistant at LSU-LTU, David Ballard, had become a resident in the WU-BJH radiology program.  Dr. Ballard discussed the arrival of Dr. Weisman and his lab with faculty members and officials of WU's Department of Radiology.

**ANSWER: BJH is without sufficient information to admit or deny the allegations set forth in paragraph 53 and therefore denies the same.**

54.     Almost immediately after his arrival in St. Louis, Radiology proposed to Dr. Weisman that the department collaborate with his lab on practical projects as well as research. Dr. Weisman agreed and directed the lab to do 3D printing projects for Radiology that involved modeling and planning for surgeries.  He also agreed to collaborate with Radiology on research projects.  Dr. Weisman did not anticipate that collaborating with Radiology would interfere in any way with his activities with Anesthesiology, both being departments in the same institution.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 54 and therefore denies the same.**

55.     In July 2016, Dr. Weisman started training as a medical resident in the WU-BJH anesthesiology program.  He trained in the same way as other anesthesiology residents, and visited his lab and directed its research activities during his off-duty hours.  In all ways, Dr. Weisman performed satisfactorily all duties and training required by the anesthesiology program.

**ANSWER:  BJH admits Plaintiff started training as a resident in the Department of Anesthesiology around July 2016. BJH denies that Plaintiff performed satisfactorily all duties and training required by the Anesthesiology program. BJH is without sufficient**

**information to admit or deny the remaining allegations set forth in paragraph 55 and
therefore denies the same.**

56.    More broadly, Dr. Weisman performed fully and completely under all aspects of
his lab-residency contract with WU and BJH.  He performed fully and completely from the
inception of those agreements in early 2016 through his resignation on June 28, 2018.

**ANSWER:  BJH states that in its order dated May 29, 2020 (Doc. 69), the Court
dismissed Plaintiff's claim that he had a "lab residency contract" with Defendants, and
therefore no response is required to the allegations in paragraph 56. To the extent a
response is required, BJH denies the allegations set forth in paragraph 56.**

57.    Dr. Weisman's first training assignment as a resident was a four-week rotation in
the Emergency Medicine department, essentially for the month of July 2016.  He worked with
several attending physicians in EM to provide patient care.  They filled out evaluation forms in
his presence and reviewed them with Dr. Weisman.  The evaluations were routine and gave him
tips and pointers as expected.  None of the evaluations expressed any significant concern or
objection to his performance.  Dr. Weisman had done two years of similar clinical rotations
during medical school, and they were simple compared to the many rigorous aspects of earning
his five graduate degrees.

**ANSWER:  BJH admits that Plaintiff performed a four-week rotation in the
Emergency Medicine Division and that he worked with attending physicians who evaluated
his performance.  BJH denies the remaining allegations set forth in paragraph 57.**

58.    That same month, Dr. Weisman began collaborating with Radiology to do 3D
printing projects in his lab for surgical planning and modeling.  He did not discuss this with Dr.
Evers or anyone else in Anesthesiology because there was no contractual or practical reason to

do so.  It never occurred to Dr. Weisman that Dr. Evers and Anesthesiology intended to monopolize his lab for themselves, or insist on being associated with its research successes to the exclusion of other WU-BJH faculty or other WU-BJH departments like Radiology.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 58 and therefore denies the same.**

59.    During the week of August 8, 2016, Dr. Evers telephoned Dr. Weisman and questioned him about the lab's activities.  Dr. Weisman said he had already begun collaborating with Radiology for short-term projects.  Dr. Evers was very unhappy with this news, apparently believing that enrolling Dr. Weisman in ASAP also entitled Dr. Evers and Anesthesiology to control the lab and its research.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 59 and therefore denies the same.**

60.    Dr. Evers also demanded a copy of the lease for workspace that Dr. Weisman's lab had negotiated with the St. Louis College of Pharmacy (SLCP).  Dr. Evers hoped to enter into a similar lease with SLCP to obtain additional space for the department.  He wanted to know what compensation SLCP had accepted.  However, the lease and its terms were confidential. SLCP's attorney declined Dr. Weisman's request to waive confidentiality, apparently not wanting Dr. Evers to have the upper hand in any future lease negotiations.  Dr. Weisman thus declined to disclose the lease or its terms, but had the CEO of his lab's company deliver the bad news to Dr. Evers.  Dr. Evers was again very unhappy.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 60 and therefore denies the same.**

61.    That was the beginning of the end for Dr. Weisman at WU-BJH.  On August 25,

2016, he was called into the office of the Program Director. Dr. Benzinger abruptly advised him of "serious concerns about your academic performance," but provided no details of who had purportedly voiced such concerns or why. This meeting occurred only six weeks into his residency training. He had completed only one four-week rotation, and no one during that rotation in EM had voiced any concerns to him about his performance.

**ANSWER: BJH is without sufficient information to admit or deny the allegations set forth in paragraph 61 and therefore denies the same.**

62. Additionally, Anesthesiology at this time stopped collaborating with Dr. Weisman and his lab and stopped considering joint research. This led Dr. Weisman's investor to pull out of SBP because he had counted on a formal and active affiliation and collaboration between the lab and Anesthesiology.

**ANSWER: BJH is without sufficient information to admit or deny the allegations set forth in paragraph 62 and therefore denies the same.**

63. In addition to stopping its collaboration, Anesthesiology also began a systematic and unrelenting campaign to drive Dr. Weisman out of its residency program. This campaign was orchestrated by Dr. Evers and carried out by program officials reporting to him, including Dr. Cox, Dr. Benzinger and Dr. Groener. One method of pursing this goal was falsely evaluating Dr. Weisman's performance in the residency program, and preventing him from seeing those evaluations or correcting the record. Another method was severe public harassment and humiliation. All of this misconduct was tortious, and breached Dr. Weisman's lab-residency contract.

**ANSWER: BJH is without sufficient information to admit or deny the allegations set forth in paragraph 63 and therefore denies the same.**

64.     For example, WU-BJH was required to conduct a formal evaluation of each resident's overall performance every six months.  This "summary evaluation" was to be based on underlying performance evaluations prepared for each four-week rotation by faculty members who had worked with the resident on that rotation.  WU-BJH program directors were also required to meet with each resident to review their summary evaluation, and were further required to disclose to the resident all underlying rotation evaluations on which it was based.

**ANSWER:  BJH admits the allegations set forth in paragraph 64.**

65.     Dr. Benzinger met with Dr. Weisman on January 19, 2017 to review his performance during the first six-month period of his residency, namely July through December of 2016.  Dr. Benzinger told him that "nearly all of his reviews were negative from all rotations." Dr. Benzinger also falsely stated that Plaintiff had failed two four-week rotations in Emergency Medicine and had failed two four-week rotations in Internal Medicine.  Dr. Benzinger asked Dr. Weisman to step down from the ASAP program or even consider leaving the anesthesiology program altogether.  However, he did not provide Dr. Weisman with any of the underlying rotation evaluations despite requests.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 65 and therefore denies the same.**

66.     Dr. Weisman later discovered that Dr. Benzinger's statements and summary evaluation was grossly inaccurate and intentionally false.  Both the Emergency Medicine and Internal Medicine departments refused to share with Dr. Weisman the rotation evaluations on which Dr. Benzinger's summary was purportedly based.  However, Dr. Weisman gained access to computer records and learned that the vast majority of faculty comments on his performance were positive; that he had not failed either of the two Emergency Medicine rotations; and that he

had not failed either of the two Internal Medicine rotations.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 66 and therefore denies the same.**

67.      Anesthesiology went back and forth with Dr. Weisman in January and February of 2017 over the implications and consequences of his summary evaluation.  Ultimately, the department advised him that he would be required to repeat one four-week Internal Medicine rotation and one four-week ICU rotation.  This effectively forced on him what Dr. Benzinger had requested in their January 19, 2017 meeting, namely stepping down from the coveted ASAP position for physician-scientists to a standard anesthesiology residency position.  Repeating two rotations would take Plaintiff irreversibly off the fast-track ASAP schedule.

**ANSWER:  BJH admits that Plaintiff repeated a four-week Internal Medicine rotation and a four-week ICU rotation. BJH is without sufficient information to admit or deny the remaining allegations set forth in paragraph 67 and therefore denies the same.**

68.      Thus, the situation that greeted Dr. Weisman in mid-2016 had changed drastically  by the end of 2016.  Anesthesiology had promised to collaborate with his lab, but was not doing  so.  This led SBP's investor to end his funding of the venture because Plaintiff's residency was under attack.  SBP had been paying the lab's costs throughout 2016, including the salaries of Dr. Jammalamadaka and Dr. Tappa.  SBP was no longer in a position to pay the lab's costs.  Moreover, WU-BJH had kicked Dr. Weisman off the ASAP track, which meant he would never have the promised 18-months of program-approved and funded research in his own lab. WU-  BJH also consumed so much of Dr. Weisman's time and effort with false performance evaluations and demands to "remedy deficiencies" that he had little time to direct his lab's activities on the Radiology projects.

**ANSWER:  BJH specifically denies that it promised to collaborate with Plaintiff's lab. BJH is without sufficient information to admit or deny the allegations set forth in paragraph 68 regarding SBP.  BJH denies all remaining allegations set forth in paragraph 68.**

69.     Whether pre-arranged or not, Radiology and Dr. Ballard stepped in to fill the void engineered by Anesthesiology.  Radiology took over paying the costs of the lab, including the salaries of Dr. Jammalamadaka and Dr. Tappa.  Indeed, Dr. Weisman's former assistants eventually became employees of WU and/or BJH with the title of research scientists in Radiology.  The lab's physical location was also moved in time over to Radiology's area.  Dr. Ballard became, and continues to be, a principal researcher in the lab.  In fact, Radiology promoted him from a standard residency position onto a research track, *i.e.* that department's version of Anesthesiology's ASAP track, so that he can spend time in the lab rather than standard training rotations.  In short, the lab and intellectual property that WU and BJH collected from Dr. Weisman through Anesthesiology is now operated to benefit WU and BJH by their Radiology Department and Dr. Ballard.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 69 and therefore denies the same.**

70.     Anesthesiology's campaign to drive Dr. Weisman from ASAP succeeded by the end of 2016, but it also undertook to drive him from its residency program entirely.  For example, Dr. Weisman's second summary evaluation was due in July 2017 for the six-month period of January through June 2017.  However, Dr. Benzinger simply refused to meet with him despite Dr. Weisman's requests.  It is questionable whether a summary evaluation was prepared for Dr. Weisman at all for his second 6-month period, because WU-BJH seemed reluctant to document

that he performed well and passed all of his rotations.

**ANSWER:  BJH denies the allegations set forth in paragraph 70.**

71.    Dr. Weisman's adversaries used a more sophisticated scheme to falsify the cumulative performance evaluation for his third six-month period of July through December 2017.  This time, they falsified the six individual one-month rotation evaluations on which the cumulative evaluation was based.  Dr. Benzinger and Dr. Groener essentially pre-arranged negative evaluations of Dr. Weisman's performance by secretly contacting and prejudicing the faculty and staff with whom he would be working.  In fact, Dr. Benzinger instructed his Program Coordinator, Sharon Stark, to remind him each time Dr. Weisman was starting a new rotation so that he and Dr. Groener could poison the well in that manner.

**ANSWER:  BJH denies the allegations set forth in paragraph 71.**

72.    For example, Dr. Weisman was scheduled for an anesthesiology rotation in the Otolaryngology department for November 2017.  On October 31, 2017, Dr. Groener emailed that department's rotation education coordinator: "Hi, just a heads up.  You have Jeff Weisman rotating in ENT his next block.  His performance in Pediatrics Block 4 was concerning to say the least.  I think we need to be meticulous going forward about documenting any issues that arise with him, the feedback he is given, and his summative end-of-rotation assessment."  As a result, Dr. Weisman thereafter had no real chance of an objective evaluation for that rotation.

**ANSWER:  BJH states that any email Dr. Groener sent on October 31, 2017 speaks for itself. BJH is otherwise without sufficient information to admit or deny the allegations set forth in paragraph 72 and therefore denies the same.**

73.    Anesthesiology coupled false evaluations with near-constant harassment by faculty members who reported to Dr. Evers.  For example, Dr. Weisman on one rotation was

assigned to work with faculty member Dr. Joseph Kras.  Dr. Kras stood behind Dr. Weisman with a clip-board, verbally harassing and screaming at him and writing down any purported "mistake" he could find.  Dr. Kras also taunted Dr. Weisman by saying he would email his daily report to Dr. Weisman's known persecutors.  Dr. Weisman was very uncomfortable working with Dr. Kras, who had reportedly been accused of sexually improper conduct on several occasions. In the presence of Dr. Weisman, for example, Dr. Kras exposed a drugged patient's  bare breasts to passersby through a window between the examination room and a hallway.  When  Dr. Weisman objected, Dr. Kras feigned a misunderstanding and incongruently shouted "big breasts" several times.

**ANSWER:  BJH denies the allegations set forth in the first sentence of paragraph 74.  BJH is without sufficient information to admit or deny the remaining allegations set forth in paragraph 74 and therefore denies the same.**

74.      WU-BJH's false evaluation summaries continued for Dr. Weisman's third 6-month period.  On February 22, 2018 Plaintiff met for his July-December 2017 evaluation with Dr. Cox and Dr. Benzinger.  Dr. Cox again pressured Dr. Weisman for a formal letter of resignation, this time threatening to order Dr. Weisman to report to the Physician's Health Program (PHP) affiliated with the Missouri medical board falsely stating that Plaintiff had a mental health issue.  Physicians are ordered to PHP when an institution has evidence of drug addiction or mental health issues. Based on PHP recommendations, the state medical board may suspend a physician's medical license and prevent them from working while they are investigated.  Dr. Cox's threat of a sham PHP referral was intentionally made to force Dr. Weisman's resignation.

**ANSWER:  BJH admits only so much of paragraph 74 as alleges that Plaintiff**

**received an evaluation in or about February 2018.  BJH denies the remaining allegations set forth in paragraph 74.**

75.     Dr. Weisman later learned that Dr. Evers and Anesthesiology had a pattern of threatening and following through with sham PHP referrals to force resignations. The St. Louis News Station KSDK investigated and in 2019 aired two investigative reports on this subject.  Dr. James Fehr, a faculty member of Anesthesiology and the Ombudsman for all of WU, recently resigned, reportedly because he objected to the pattern of sham PHP referrals.  Moreover, the PHP itself has reportedly opened an investigation into sham referrals by WU and/or BJH.

**ANSWER:  BJH denies the allegations set forth in paragraph 75.**

**E.     The Separation Contract**

76.      Dr. Weisman had reached the limit of his tolerance by April 2018.  As a result of false evaluations and harassment by WU and BJH, he offered to resign from his residency position.  However, he conditioned that offer on a promise that Dr. Evers, Dr. Benzinger, WU and BJH would assist him in transferring to another institution and residency program where he could complete his training and become board-eligible.  Dr. Evers and Dr. Benzinger, on behalf of themselves and WU and BJH, agreed to this condition.  Relying on their representations, Dr. Weisman resigned from the WU-BJH anesthesiology program.  Dr. Weisman negotiated a departure for June 2018, which would allow him two full years of residency training and thus make him eligible for a medical license in most states.

**ANSWER:  BJH admits that Plaintiff resigned from the Anesthesiology residency program, effective in June 2018 upon completing 24 months of training. BJH denies any remaining allegations set forth in paragraph 76.**

77.     The WU-BJH offer to help Dr. Weisman transfer in exchange for resigning was

explicit, and came initially from Dr. Benzinger.  He knew Dr. Weisman was an attorney and that terminating him would be problematic.  Dr. Weisman had told Dr. Evers and Dr. Benzinger that he would not willingly resign unless he would be able to finish his half-completed training elsewhere.  To induce him to resign, Dr. Evers and Dr. Benzinger repeatedly told Dr. Weisman they "wanted him to succeed," that they would "cooperate with other programs" on his transfer, and would provide him with "a good recommendation letter."  Dr. Weisman relied on those representations, and without them he would not have resigned.  Inability to transfer would mean losing future board certification, which would in turn mean losing the career in advanced medical research that he had pursued full-time for more than a decade.

**ANSWER:  BJH denies the allegations set forth in the first sentence of paragraph 77.  BJH is without sufficient information to admit or deny the remaining allegations set forth in paragraph 77 and therefore denies the same.**

### F.      WU-BJH Breaches Of The Separation Contract

78.      Dr. Weisman resigned as of June 28, 2018.  (WU-BJH later scheduled his final day as June 23, which would have left him five days short of two full years, but he caught the "mistake" and rescued his career to that degree by having the final day documented as June 28.  Most states require at least two years of residency training in order to qualify for a medical license).

**ANSWER:  BJH admits Plaintiff resigned from the residency program effective June 28, 2018. BJH denies any remaining allegations set forth in paragraph 78.**

79.      After Dr. Weisman's resignation, however, Dr. Evers, Dr. Benzinger, WU and BJH not only failed to assist him in transferring to another institution, but actively and intentionally impeded his efforts and prevented his transfer.  For example, WU and BJH delayed

or failed to respond at all to the requests by other institutions for copies of Dr. Weisman's academic records. They also made highly negative and false comments to other institutions about Dr. Weisman. Dr. Evers and Dr. Benzinger falsely told other institutions that Dr. Weisman had failed rotations, was an incompetent physician, and was uncooperative and disruptive. As a result of these false statements and interference, Dr. Weisman has been unable to transfer to any other institution's Anesthesia Department and has been unable to resume his training.

**ANSWER:  BJH denies the allegations set forth in paragraph 79.**

80.    For example, Dr. Weisman reached the very final stages of enrolling in the anesthesiology residency programs of the University of Chicago, Cook County Hospital, and LSU. But all of those institutions simply stopped speaking with him, without explanation, after having communications with WU and/or BJH.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 80 and therefore denies the same.**

81.    Dr. Alan Kaye, Chair of LSU Health New Orleans, contacted Dr. Weisman in May 2019 to advise that he had encountered a Cook County Hospital faculty member at a convention. When Dr. Weisman's name came up in their conversation, the Cook County faculty member told Dr. Kaye that his institution had not hired Dr. Weisman due to negative information conveyed to Cook County Hospital by WU and/or BJH.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 81 and therefore denies the same.**

82.    WU-BJH could have easily complied with its promises under the separation agreement without violating any ACGME policies or procedures, which require only that very basic information be exchanged between institutions regarding transfers. The only relevant and

required information regarding Dr. Weisman was that: (a) he satisfactorily completed his first year of residency and was thus promoted to his second year on time; (b) he satisfactorily completed his second year of residency on time, and full credit for it would be reported by WU-BJH to the American Board of Anesthesiology (ABA); (c) he was never on probation or other compromised status; (d) he passed the In-Training Exam administered by ABA; and (e) he passed the BASIC Exam administered by ABA after his second year (both tests measure whether a resident is making satisfactory progress toward board certification objectives).

**ANSWER:  BJH denies the allegations set forth in paragraph 82.**

83.    Dr. Weisman applied to over 100 anesthesiology residency programs for a transfer, but was ultimately not offered a position anywhere.  This is completely inexplicable given his credentials and accomplishments.  In many instances, the programs were highly interested initially but lost interest entirely after communicating with WU and/or BJH.  It is very unlikely that any institution would accept Dr. Weisman for anesthesiology residency training in the future, and without such training it is impossible to become board-certified in a competitive medical specialty.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 83 and therefore denies the same.**

84.    At one point, Dr. Weisman and his research colleagues in the WU-BJH Radiology department discussed the possibility of him transferring to the Radiology residency program, but  Radiology never made an offer.  Dr. Weisman would not necessarily have a full-time career in  patient care, and the medical specialty in which he became certified was of less concern than  usual.  However, Dr. Benzinger told others in Anesthesiology that he would block any transfer of Dr. Weisman to Radiology, and that he had taken steps already to do so.  Dr.

Weisman understood that Dr. Benzinger meant he had recruited his wife, Dr. Tammie Benzinger, to object and oppose any transfer to Radiology.  Dr. Tammie Benzinger, who was far more accomplished than her husband, was an influential faculty member and research scientist in the WU-BJH Radiology department.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 84 and therefore denies the same.**

## V.    DAMAGES AND UNFAIR ENRICHMENT

85.    WU and BJH acquired Dr. Weisman's lab in June 2016, and all of its tangible and intangible assets, by forcing him to resign.  Their acquisition included, but was not limited to, Dr. Weisman's equipment, revenue streams, active research projects, impending research projects, intellectual property, research legacy, professional relationships, and research assistants Dr. Jammalamadaka and Dr. Tappa.  Indeed, there have been ongoing financial transactions between LTU and WU and/or BJH regarding the intellectual property arising from Dr. Weisman's work and his lab.

**ANSWER:  BJH denies the allegations set forth in paragraph 85.**

86.    Dr. Weisman also lost tens of thousands of dollars relocating himself, his lab, and his activities to St. Louis from Louisiana, only to be forced out of the WU-BJH anesthesiology program shortly thereafter and unable to continue his lab and related business operation effectively.

**ANSWER:  BJH denies the allegations set forth in paragraph 86.**

87.    WU and BJH have actively and continuously operated the lab since its acquisition in June 2016.  The lab is promoted as a research support facility of the Radiology department, specifically the "3-D Printing Lab" or "3DP".  The lab not only conducts ongoing research, but also generates immediate revenue on a steady basis.  As described by WU, the lab

"produces life-sized anatomical models from MRI or CT scans of the patient with high dimensional  accuracy" and sells them to patients or healthcare providers for perioperative planning, patient education, molding customized implants, or biomedical device purposes.

**ANSWER:  BJH denies the allegations set forth in paragraph 88.**

88.    In addition to revenue from practical projects, the lab generates benefits for WU and BJH in the form of NIH grants, private investments, patents, licensing fees, intellectual property, and/or published research studies.  Publishing is a currency highly valued in academia to bolster credentials and enhance prestige, both of which can increase grants and lead to other more quantifiable benefits.

**ANSWER:  BJH admits that publishing is valued in academia. BJH denies the remaining allegations set forth in paragraph 88.**

89.    Dr. Jammalamadaka and Dr. Tappa still work full-time in the lab and are now employed by WU as research scientists reporting to the Radiology department.  Supervising the lab is Dr. Pamela Woodard, a faculty member of Radiology and Sr. Vice-Chair of Radiology's research facilities.  Also assigned to the lab is Dr. David Ballard, a resident in the WU-BJH radiology residency program.  After WU-BJH dismissed Dr. Weisman from Anesthesiology's ASAP research track, it promoted Dr. Ballard to Radiology's TOP-TIER program, *i.e.* its specialized track that involves substantial opportunity for research in addition to core training for board eligibility.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 89 and therefore denies the same.**

90.    The lab continues to be a prolific source of published studies, many of which are co-authored by Dr. Woodard, Dr. Jammalamadaka, Dr. Tappa, and Dr. Ballard.  Radiology has

also extended the lab's benefits to other co-authors from Radiology, for example Dr. Christopher Egbulefu and Dr. Samuel Achilefu, as well as co-authors from other WU and BJH departments and schools, for example Dr. Cecilia Pascual-Garrido (orthopedic surgery) and J. Mark Meacham (WU School of Engineering).

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 90 and therefore denies the same.**

91.    Dr. Weisman originated the lab and his research legacy was of ongoing importance to its success for WU and BJH.  For example, he was listed as a co-author on more than one-half dozen studies published after he had resigned from WU-BJH and left the lab.  In fact, he was acknowledged as first author and principal contributor on one study published earlier this year, specifically "3D Printed Antibiotic And Chemotherapeutic Eluting Catheters For Potential Use In Interventional Radiology: In Vitro Proof Of Concept Study," Academic Radiology, v. 26, 2 at 270-274 (February 1, 2019).

**ANSWER:  BJH denies the first sentence of paragraph 91.  BJH is without sufficient information to admit or deny the remaining allegations set forth in paragraph 91 and therefore denies the same.**

92.    In addition to losing his lab, Dr. Weisman has lost his ability to become board certified.  After resigning from WU-BJH, Dr. Weisman contacted every anesthesiology program in the United States—more than 150 in all—and was unable to obtain a position anywhere to complete his residency training.  That would be an impossible result for a resident with Dr. Weisman's credentials, experience and success, absent systematic and coordinated "blacklisting" by Dr. Evers, Dr. Benzinger, WU, and BJH.  Their improper interference has prevented Dr. Weisman from becoming board-certified.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 92 and therefore denies the same.**

93.    Setting aside his inability to resume the half-completed anesthesiology training, Dr. Weisman has little chance of starting over as a first year resident in any specialty.  The financial incentive to enroll him has been cut in half.  Under the federal government's Direct Graduate Medical Education funding program (DGME), institutions are paid between $100,000 and $150,000 annually for each resident they train. However, DGME rules limit the funding allotted to any individual to the number of years needed for certification in the first specialty they choose.  Anesthesiology normally takes four years of training, so the remaining DGME allotted to Dr. Weisman is only two years.  WU-BJH received his first two years of DGME.  Enrolling candidates other than Dr. Weisman would net programs the full DGME of $400,000 to $600,000 rather than one-half of that amount.

**ANSWER:  BJH admits that DGME funding is limited to the number of years needed to complete residency training in a resident's first-selected specialty, that anesthesiology takes four years of training, and that plaintiff would have two years of DGME funding available, and otherwise deny the remaining allegations in paragraph 93.**

94.    Moreover, Dr. Weisman's inability to complete his residency training has effectively ended the career that he built class-by-class and project-by-project for more than a decade.  He has lost several hundred thousand dollars invested in his education, as well as many millions of dollars in future income that he would have earned in designing, conducting and commercializing advanced medical research.  Without board certification, his steep trajectory in the field simply stopped and is unlikely to ever resume.

**ANSWER:  BJH denies the allegations set forth in paragraph 94.**

## COUNT I
## BREACH OF CONTRACT
### (WU and BJH)

95.    Plaintiff realleges and incorporates herein by reference all foregoing paragraphs.

**ANSWER:  BJH incorporates by reference the foregoing answers and responses to all preceding paragraphs as if fully set forth herein.**

96.    This Count is alleged against Defendants WU and BJH.

**ANSWER:  BJH states that the Court dismissed part of this Count I, and therefore to the extent this claim relates to dismissed facts or law, no response is required. BJH otherwise denies any allegations set forth in paragraph 96.**

97.    Dr. Weisman and WU and BJH entered into three contracts relevant to this claim, namely the employment, lab and separation agreements.

**ANSWER:  BJH denies the allegations set forth in paragraph 97.**

98.    Dr. Weisman performed all he was required to do under the three contracts:  he brought his laboratory to WU-BJH, he worked as a resident and complied with all terms and conditions of the agreement, and he did tender his resignation as required in the separation agreement.

**ANSWER:  BJH denies the allegations set forth in paragraph 98.**

99.    By the actions and in the ways alleged above, WU and BJH breached all three contracts.

**ANSWER:  BJH denies the allegations set forth in paragraph 99.**

100.    As a proximate result of Defendant WU and BJH's breach of the contracts, Plaintiff has been damaged and suffered the loss of his laboratory equipment, intellectual property, and lost profits.

**ANSWER:  BJH denies the allegations set forth in paragraph 100.**

**COUNT II**
**TORTIOUS INTERFERENCE WITH CONTRACT AND BUSINESS EXPECTANCIES**
**(Evers and Benzinger)**

101.    Plaintiff realleges and incorporates herein by reference all foregoing paragraphs.

**ANSWER:  BJH incorporates by reference the foregoing answers and responses to all preceding paragraphs as if fully set forth herein.**

102.    This Count is alleged against Defendants Dr. Evers and Dr. Benzinger.

**ANSWER:  BJH states that the Court dismissed this Count II in its entirety, and therefore no response is required. To the extent any response is required, BJH denies the allegations in this paragraph.**

103.    Dr. Weisman and WU and BJH entered into three contracts relevant to this claim,  namely the employment, lab and separation agreements.

**ANSWER:  BJH states that the Court dismissed this Count II in its entirety, and therefore no response is required. To the extent any response is required, BJH denies the allegations in this paragraph.**

104.    By the actions and in the ways alleged above, Dr. Evers and Dr. Benzinger tortiously interfered with all three contracts.

**ANSWER:  BJH states that the Court dismissed this Count II in its entirety, and therefore no response is required. To the extent any response is required, BJH denies the allegations in this paragraph.**

105.    Dr. Evers and Dr. Benzinger knew that Plaintiff had the employment, lab and separation contracts, as alleged above.

**ANSWER:  BJH states that the Court dismissed this Count II in its entirety, and**

**therefore no response is required. To the extent any response is required, BJH denies the**

**allegations in this paragraph.**

106.    Dr. Evers and Dr. Benzinger intentionally interfered with the three contracts, and with Plaintiff's business expectancy of obtaining a residency at another institution, as alleged above, and said interference was without justification because it was motivated by ill will, malice and bad faith.

**ANSWER:  BJH states that the Court dismissed this Count II in its entirety, and therefore no response is required. To the extent any response is required, BJH denies the allegations in this paragraph.**

107.    As a proximate result of Defendants' intentional interference with his contract and  business expectancies, Plaintiff suffered great economic loss.

**ANSWER:  BJH states that the Court dismissed this Count II in its entirety, and therefore no response is required. To the extent any response is required, BJH denies the allegations in this paragraph.**

108.    The Defendants showed complete indifference and conscious disregard for the well being of Dr. Weisman and are liable for punitive damages.

**ANSWER:  BJH states that the Court dismissed this Count II in its entirety, and therefore no response is required. To the extent any response is required, BJH denies the allegations in this paragraph.**

**COUNT III**
**FRAUDULENT INDUCEMENT**
**(WU, BJH, Evers and Benzinger)**

109.    Plaintiff realleges and incorporates herein by reference all foregoing paragraphs.

**ANSWER:  BJH incorporates by reference the foregoing answers and responses to**

**all preceding paragraphs as if fully set forth herein.**

110.   This Count is alleged against Defendants WU, BJH, Dr. Evers, and Dr. Benzinger.

**ANSWER:  BJH states that the Court dismissed this Count III in its entirety, and therefore no response is required. To the extent any response is required, BJH denies the allegations in this paragraph.**

111.   Dr. Weisman and WU and BJH entered into three contracts relevant to this claim, namely the employment, lab and separation agreements.

**ANSWER:  BJH states that the Court dismissed this Count III in its entirety, and therefore no response is required. To the extent any response is required, BJH denies the allegations in this paragraph.**

112.   By the actions and in the ways alleged above, WU, BJH, Dr. Evers, and Dr. Benzinger fraudulently induced Plaintiff to enter the separation contract.

**ANSWER:  BJH states that the Court dismissed this Count III in its entirety, and therefore no response is required. To the extent any response is required, BJH denies the allegations in this paragraph.**

113.   WU, BJH, Evers and Benzinger falsely stated that they would assist Plaintiff obtain a residency at another institution.  The representation was false and was material to Plaintiff agreeing to resign from the WU-BJH residency program.  Defendants knew that their representations, alleged above, were false and intended Plaintiff to rely on them.  Plaintiff did rely, and the right to rely, and was damaged as a proximate result of the fraudulent statements.

**ANSWER:  BJH states that the Court dismissed this Count III in its entirety, and therefore no response is required. To the extent any response is required, BJH denies the**

**allegations in this paragraph.**

114.    The Defendants showed complete indifference and conscious disregard for the right of Dr. Weisman and are liable for punitive damages.

**ANSWER:  BJH states that the Court dismissed this Count III in its entirety, and therefore no response is required. To the extent any response is required, BJH denies the allegations in this paragraph.**

**COUNT IV**
**DEFAMATION**
**(WU, BJH, Evers and Benzinger)**

115.    Plaintiff realleges and incorporates by reference all foregoing paragraphs.

**ANSWER:  BJH incorporates by reference the foregoing answers and responses to all preceding paragraphs as if fully set forth herein.**

116.    This Count is alleged against Defendants WU, BJH, Dr. Evers, and Dr. Benzinger.

**ANSWER:  BJH states that the Court dismissed this Count IV concerning allegations made in paragraphs 116 through 122, and therefore no response is required. To the extent any response is required, BJH denies the allegations in this paragraph.**

117.    By the actions and in the ways alleged above, WU, BJH, Dr. Evers, and Dr. Benzinger defamed Dr. Weisman.

**ANSWER:  BJH states that the Court dismissed this Count IV concerning allegations made in paragraphs 116 through 122, and therefore no response is required. To the extent any response is required, BJH denies the allegations in this paragraph.**

118.    As alleged above, on January 19, 2017 Defendant Benzinger and Defendant Groener published a series of false statements about Plaintiff in a letter which was sent to several

Deans at Washington University School of Medicine.

**ANSWER:  BJH states that the Court dismissed this Count IV concerning allegations made in paragraphs 116 through 122, and therefore no response is required. To the extent any response is required, BJH denies the allegations in this paragraph.**

119.    The letter falsely claimed that Plaintiff has performed unsatisfactorily on several rotations.

**ANSWER:  BJH states that the Court dismissed this Count IV concerning allegations made in paragraphs 116 through 122, and therefore no response is required. To the extent any response is required, BJH denies the allegations in this paragraph.**

120.    The letter falsely stated that Plaintiff's performance on every internal medicine rotation was below average in every category by every reviewer.

**ANSWER:  BJH states that the Court dismissed this Count IV concerning allegations made in paragraphs 116 through 122, and therefore no response is required. To the extent any response is required, BJH denies the allegations in this paragraph.**

121.    The letter falsely stated that the rotation coordinator on the emergency medicine rotation stated that Plaintiff's performance on the rotation was "at the 2nd year medical student level" and was "completely unprofessional."

**ANSWER:  BJH states that the Court dismissed this Count IV concerning allegations made in paragraphs 116 through 122, and therefore no response is required. To the extent any response is required, BJH denies the allegations in this paragraph.**

122.    The false statements in the January 19, 2017 letter were made with knowledge that they were false and were made in bad faith.

**ANSWER:  BJH states that the Court dismissed this Count IV concerning allegations made in paragraphs 116 through 122, and therefore no response is required. To**

**the extent any response is required, BJH denies the allegations in this paragraph.**

123.    In May or June 2017, Benzinger falsely told Louisiana State University Health Science Center, Shreveport, in a survey response that Plaintiff's performance in Defendant's residency was "the least competent intern that I have supervised"; and that Plaintiff's Medical Student Performance Evaluation reported weak clinical performance.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 123 and therefore denies the same.**

124.    The statements in the May or June 2017 survey response were false and were made by Benzinger with knowledge that they were false and were made in bad faith.

**ANSWER:  BJH is without sufficient information to admit or deny the allegations set forth in paragraph 124 and therefore denies the same.**

125.    After Plaintiff was forced to resign from the Defendants' residency program, Benzinger, Washington University and Barnes Jewish Hospital falsely told representatives of other residency programs to which Plaintiff had submitted applications that Plaintiff's information could not be released without talking to Defendants' attorney, falsely stated that he had failed rotations, falsely stated that he was an incompetent physician, and falsely stated that he was uncooperative with the WU-BJH Residency program.  The statements were false when made and were made in bad faith.

**ANSWER:  BJH denies the allegations set forth in paragraph 125.**

126.    As a direct and proximate result of the false statements made by Defendants Benzinger, Washington University and Barnes Jewish Hospital Plaintiff has suffered injury, and damages, including but not limited to, monetary damages, loss of his ability to use his MD degree, loss of time and resources, career opportunities and earning capacity, emotional distress

and humiliation.

**ANSWER: BJH denies the allegations set forth in paragraph 126.**

127.    The Defendants showed complete indifference and conscious disregard for the well being of Dr. Weisman and are liable for punitive damages.

**ANSWER: BJH denies the allegations set forth in paragraph 127.**

## COUNT V
### TORTIOUS CONVERSION OF
### LAB AND INTELLECTUAL PROPERTY
### (WU, BJH, Evers and Benzinger)

128.    Plaintiff realleges and incorporates by reference all foregoing paragraphs.

**ANSWER: BJH incorporates by reference the foregoing answers and responses to all preceding paragraphs as if fully set forth herein.**

129.    This Count is alleged against Defendants BJH, WU, Dr. Evers, and Dr. Benzinger.

**ANSWER: BJH denies the allegations set forth in paragraph 129.**

130.    By the actions and in the ways alleged above, WU, BJH, Dr. Evers, and Dr. Benzinger tortiously converted Dr. Weisman's research lab equipment, including 3D printers that Plaintiff had purchase, Plaintiff's work process papers, and related intellectual property as recorded in drawings, specifications, and memos.

**ANSWER: BJH denies the allegations set forth in paragraph 130.**

131.    The Defendants showed complete indifference and conscious disregard for the well being of Dr. Weisman and are liable for punitive damages.

**ANSWER: BJH denies the allegations set forth in paragraph 131.**

## COUNT VI
### QUANTUM MERUIT
### (WU and BJH)

132.    Plaintiff realleges and incorporates by reference all foregoing paragraphs.

**ANSWER:  BJH incorporates by reference the foregoing answers and responses to all preceding paragraphs as if fully set forth herein.**

133.    This Count is alleged against Defendants WU and BJH.

**ANSWER:  BJH denies the allegations set forth in paragraph 133.**

134.    By the actions and in the ways alleged above, Dr. Weisman conferred substantial benefits on Defendants and is entitled to reasonable compensation as measured by the value of benefits conferred by Dr. Weisman.

**ANSWER:  BJH denies the allegations set forth in paragraph 134.**

135.    The Defendants have not shared the profits generated by Plaintiff's lab despite demand and have not returned Plaintiff's laboratory equipment and property.

**ANSWER:  BJH denies the allegations set forth in paragraph 135.**

**COUNT VII**
**UNJUST ENRICHMENT**
**(WU and BJH)**

136.    Plaintiff realleges and incorporates by reference all foregoing paragraphs.

**ANSWER:  BJH incorporates by reference the foregoing answers and responses to all preceding paragraphs as if fully set forth herein.**

137.    This Count is alleged against Defendants WU and BJH.

**ANSWER:  BJH denies the allegations set forth in paragraph 137.**

138.    By the actions and in the ways alleged above, each Defendant received substantial benefits from Dr. Weisman, and he is entitled to reasonable compensation as measured by the value of benefits received by each Defendant.

**ANSWER:  BJH denies the allegations set forth in paragraph 138.**

**COUNT VIII**
**CIVIL CONSPIRACY**
**(All Defendants)**

139.    Plaintiff realleges and incorporates by reference all foregoing paragraphs.

**ANSWER:  BJH incorporates by reference the foregoing answers and responses to all preceding paragraphs as if fully set forth herein.**

140.    This Count is alleged against Defendants BJH, WU, Dr. Evers, Dr. Benzinger, and Dr. Cox.

**ANSWER:  BJH denies the allegations set forth in paragraph 140.**

141.    By the actions and in the ways alleged above, when Evers learned that he was not the sole focus of Plaintiff's laboratory project, he solicited that agreement of each Defendant to conspire with the others to tortiously interfere with the employment, lab and/or separation contracts and their respective business expectancies; to fraudulently induce and/or negligently misrepresent each of those contracts; to defame Dr. Weisman; to threaten him with a mental health examination, and to tortiously convert his research lab and related intellectual property.

**ANSWER:  BJH denies the allegations set forth in paragraph 141.**

142.    The Defendants showed complete indifference and conscious disregard for the well being of Dr. Weisman and are liable for punitive damages.

**ANSWER:  BJH denies the allegations set forth in paragraph 142.**

**DEFENSES**

**GENERAL DENIAL**

BJH denies any and all allegations set forth herein unless specifically admitted in this Answer, including that Plaintiff is entitled to any of the legal or equitable relief set forth in his Prayers for Relief.

## AFFIRMATIVE AND OTHER DEFENSES

1.      As set forth in Defendants' motions to dismiss and memoranda in support, Plaintiff's Complaint fails in whole or in part to state a claim upon which relief can be granted against BJH.

2.      Plaintiff's claims are barred in whole or in part by the doctrines of estoppel, laches, waiver, and/or unclean hands.

3.      Plaintiff's claims against BJH are barred in whole or in part by the applicable regulatory filing periods, by the applicable statutes of limitations, or by both.

4.      Plaintiff's claims are barred and preempted by the exclusive remedy provision of the Missouri Human Rights Act ("MHRA") (R.S.Mo. § 213.070).

5.      Plaintiff's claims are barred because they are claims for educational malpractice, which are not cognizable under Missouri law.

6.      Plaintiff's claims fail because plaintiff failed to exhaust internal administrative remedies available to him.

7.      Plaintiff's breach of contract claim fails for the reasons stated in BJH's motion to dismiss, including for lack of consideration and because it is barred by the statute of frauds.

8.      Plaintiff's breach of contract, quantum meruit, and unjust enrichment claims are barred by waiver and estoppel.

9.      Plaintiff's defamation claim fails because none of the allegations pertain to BJH or any employee or agent of BJH.

10.     Plaintiff's defamation claim fails because any alleged statements made by any defendant were and are true, not defamatory, capable of a non-defamatory meaning, privileged, or made in good faith in performance of a duty and with the fair and reasonable purpose of

protecting the interests of defendants, and the interests of the persons to whom the statements were made, and were made without malice by a former employer to a prospective employer.

11.     Plaintiff's defamation claim fails because any alleged statements made by any defendants were and are statements of opinion, and were made because they have a legal right to comment on and criticize plaintiff's performance as a resident.

12.     Plaintiff's defamation claim fails because Plaintiff himself requested the publication of the alleged statements made by defendants and thus consented to the statements and waived and released all defendants from any liability for having made the statements.

13.     Plaintiff's conversion claim fails because Plaintiff did not own or have the right to possession of the allegedly converted property, defendants had an ownership interest in and right to possession of the allegedly converted property, and Plaintiff consented to, acquiesced in, or ratified defendants' acquisition of the allegedly converted property.

14.     Plaintiff's conversion claim fails because Plaintiff made no effort to retrieve the allegedly converted property and abandoned the allegedly converted property.

15.     Plaintiff's conversion claim fails as a matter of law because intellectual property and ideas cannot be converted.

16.     Plaintiff's conversion and civil conspiracy claims are barred by the economic loss doctrine.

17.     Plaintiff's conversion and civil conspiracy claims are not cognizable because they are dependent on the failure to perform a contract.

18.     Plaintiff's quantum meruit and unjust enrichment claims fail because plaintiff made no demand for payment.

19.     Plaintiff's quantum meruit and unjust enrichment claims are barred by accord and

satisfaction.

20.     Plaintiff is not entitled to recover on his quantum meruit and unjust enrichment claims because any business venture he entered was voluntary, with known risks and with a mere expectation of a future profit.

21.     Plaintiff's civil conspiracy claim fails against BJH because Plaintiff has alleged no tortious acts taken by BJH or any employee or agent of BJH.

22.     Plaintiff's civil conspiracy claim fails because no underlying or tortious acts occurred to support such a claim.

23.     Plaintiff is not entitled to any relief or damages, including, without limitation, equitable relief, compensatory, economic or consequential damages, punitive damages, emotional distress damages, costs or attorneys' fees.

24.     Plaintiff is not entitled to a jury trial on the claims and remedies sought in the Complaint.

25.     Plaintiff's claims are duplicative and seek multiple recoveries for the same alleged injuries.

26.     Any actions taken by BJH were taken in good faith.

27.     Any law purporting to permit the recovery of punitive damages in this case is unconstitutional, in violation of the Due Process and Equal Protection clauses of the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Sections 2 and 10 of the Missouri Constitution in that said law: (1) lacks constitutionally sufficient standards to guide and restrain the jury's discretion in determining whether to award punitive damages and in determining the amount of any punitive damages award, (2) unconstitutionally permits a jury to award punitive damages merely upon proof by a preponderance of the evidence instead of

requiring a heightened burden of proof, (3) unconstitutionally may permit jury consideration of BJH's net worth, (4) is void for vagueness in that it fails to afford constitutionally sufficient advance notice as to what conduct will result in punitive sanctions, (5) lacks constitutionally sufficient standards to be applied by the trial court in post-verdict review of a punitive award, (6) lacks constitutionally sufficient standards for appellate review of a punitive award, and (7) otherwise fails to satisfy constitutional requirements under applicable law.

28.     BJH incorporates, as if fully stated herein, all applicable defenses raised by any other defendant to the extent that they are not inconsistent or do not conflict with the defenses set forth herein.

29.     Upon information and belief, Plaintiff has failed to mitigate his claimed damages, the existence of which damages BJH specifically denies. Thus, if Plaintiff recovers any damages based on his claims against BJH, BJH is entitled to a set-off or credit as a result of Plaintiff's failure to mitigate his claimed damages.

30.     BJH reserves the right to assert additional defenses as they become evident through discovery or investigation, including but not limited to the defense of after-acquired evidence.

WHEREFORE, having fully answered Plaintiff's Complaint, BJH requests that this Court dismiss Plaintiff's Complaint in its entirety and award BJH its costs, attorneys' fees, and any additional relief this Court deems just and proper.

Respectfully submitted,

HUSCH BLACKWELL, LLP

/s/ Carrie Claiborne
Kate M. Leveque, No. 58822MO
Carrie Claiborne, No. 62801MO
190 Carondelet Plaza, Suite 600

St. Louis, MO 63105
Tel. 314-480-1500
Fax 314-480-1505
Kate.Leveque@huschblackwell.com
Carrie.claiborne@huschblackwell.com

*Counsel for Defendants Barnes-Jewish Hospital and BJC Healthcare*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and accurate copy of the foregoing was filed via the Court's CM/ECF system on this 13th day of July 2020 and thereby electronically served upon all counsel of record.


/s/  Carrie Claiborne