IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JEFFERY A. WEISMAN, and<br>STRATEGIC BIOMEDICAL, INC., | )<br>)<br>) | No. 4:19-cv-75-JAR |
| Plaintiffs, | )<br>) | The Honorable John A. Ross |
| v. | )<br>) | |
| BARNES JEWISH HOSPITAL,<br>BJC HEALTHCARE,<br>WASHINGTON UNIVERSITY,<br>ALEX EVERS, RICHARD BENZINGER,<br>And THOMAS COX, | )<br>)<br>)<br>)<br>)<br>) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF HIS MOTION TO COMPEL PRODUCTION**

Plaintiff, Jeffery A. Weisman, by counsel, respectfully states as follows in support of his Motion to Compel the Defendants Barnes Jewish Hospital, BJC Healthcare, (collectively "BJH" or "BJH Defendants") Washington University, Alex Evers, Richard Benzinger, and Thomas Cox, (collectively "WU" or "WU Defendants") to produce material in their possession, or accessible to them, responsive to certain requests to produce, within fourteen (14) days pursuant to F.R.Civ.P. 37(a)(3)(B) and L.R. 37 – 3.04:

**I.    FACTS**

    **A.    The Request for Relevant Emails and Text Messages**

On July 14, 2021 Plaintiff's Counsel sent L.R. 37 - 3.04 letters to the Defendants.  (Ex. 1, July 14, 2021 letter to counsel for the WU Defendants; Ex. 2, July 14, 2021 letter to counsel for BJH (misdated November 10, 2017)).  A conference was held on July 16, 2021 and the conference

was memorialized in letter dates July 16, 2021. (Ex. 3, July 16, 2021 letter to counsel for the WU Defendants; Ex. 4, July 16, 2021 letter to counsel for BJH).

The first issued raised was the fact the despite Plaintiff's discovery calling for the production of all relevant email, Washington University only searched the email accounts of *seven* persons, specifically Dr. Evers, Dr. Benzinger and Dr. Cox and the email of Dr. Douglas Thompson, Dr. Richard Groener, Dr. Thomas Graetz and Dr. Pamela Woodward.  Similarly, BJH searched the emails of the email accounts of Dr. Katherine Henderson, Terra Mouser and Nicole Erter.  Plaintiff's request to produce to each Defendant defined the word "document" as including email and text messages.  (Ex. 5, Plaintiff's Initial Rule 34 Request to Produce to all Defendants at pp. 2-3).  The Plaintiff had disclosed sixty-three persons employed by Washington University with knowledge in his Rule 26(a)(1) disclosure and interrogatory answers.  (Ex. 6, Plaintiff Rule 26(a)(1) Disclosure, Ex. 7, Plaintiff's Answers Washington University Interrogatories and Exhibit 8, Plaintiff's Answers to BJH Interrogatories).

    i.  **Factual Basis for Searching More than 7 Custodians**

Plaintiff Jeffery Weisman was enrolled in Washington University's Residency/Research track program and also employed by Barnes Jewish Hospital through their Graduate Medical Education Consortium Program with Washington University from June 2016, until on or around June 28, 2018. (Dkt. 131 at ¶ 6 and Ex. A thereto at ¶ 1; Ex. 9, Weisman Declaration at ¶1).  At all relevant times herein, the Defendants had more than one-hundred (100) attending anesthesiologists and eighty (80) anesthesiology residents available to work in the hospital facility in which Plaintiff Jeffery Weisman performed his residency duties and tasks, and Plaintiff worked with almost all of them. (Ex. 9, Declaration at ¶ 6).  As part of the residency program and per the American Board of Anesthesia ("ABA") requirements, Plaintiff Jeffery

Weisman was evaluated by dozens of attendings, faculty members, chief residents and co-residents in the Program.  *Id.* at ¶¶ 6-7.  These evaluations were used by the rotation coordinator to fill out a "rotation evaluation."  *Id.* a ¶ 7.  Plaintiff alleges that in Defendants' effort to drive him from the Anesthesia program (Dkt. 34 at 63-67), attending physicians, faculty members and even residents were asked to collect information or write evaluations that could be used to drive him from the program,  (Ex. 9, Weisman, at ¶¶ 8-12), and was specifically told that the faculty were discussing him in this manner by email.  *Id.* at ¶¶ 10, 11.  Plaintiff's Rule 26(a)(1) Disclosure and interrogatory answers identified many of these people, (*see* Ex. 6, 7 and 8) who are also listed in Exhibit 9.

Beyond rotation evaluations, other WU and BJH actors have factual knowledge of other issues, making their email concerning the Plaintiff relevant.  Plaintiff was recruited to the WU Program by physicians whose names are not among the seven custodians that WU did search. (Ex. 9, Declaration, at ¶ 3).   The Plaintiff's Lab was staffed by persons who are not among the seven custodians Washington University searched or the few that BJH searched.  *Id.* at ¶ 4.  The Lab was used by WU faculty who were not among the seven custodians WU searched.  *Id.* at ¶ 5.  WU did not produce email between Plaintiff and Gary Hammen, both M.D-PhD.'s that alleged they were harassed by Defendants. *Id.* at ¶ 13.   The ombudspersons for the medical school, to whom Plaintiff complained, *Id.*  at ¶ 15, were not among the custodians searched though Plaintiff's counsel had specifically asked that James Fehr's emails be preserved when he left the school.  (Ex. 10, email of 5-28-19).   Further, when he was forced to resign from the WU/BJH program, Plaintiff applied to other programs and other Washington University staff were involved in exchanging email about his applications, including Lauren Gibson, who is not

3

among the seven persons that WU either solicited email from or conducted a search on. (Ex. 11, Thompson email to Gibson).

In this case, Plaintiff alleges, as refined by the Court in ruling on the motions to dismiss (Dkt. 69), that BJH breached the Memorandum of Appointment by harassing him, generating false evaluations and failing to grant him access to his file; that both Defendants breached an oral contract to provide Plaintiff as good reference in his efforts to transfer to a new residency program; that both Defendants falsely published statements that he failed rotations and falsely told new residency programs to which the Plaintiff applied that they could not release records without consulting counsel; that Defendants converted Plaintiff's laboratory equipment, work process paper, and intellectual property recorded in drawings, specifications and memos; that Plaintiff conferred benefits on Defendants (Quantum Meruit) relative to the Lab, that WU and BJH were unjustly enriched relative to the Lab; and that the Defendants conspired as to the defamation and conversion claims.

### ii. The Email was Called for in Plaintiff's Production Requests

With the term "document" defined broadly enough to include email and text messages, (Ex. 5, at pp. 2-3), the following requests called for the production of email on the matters at issue in the case:

> Request 8 asked for: "All email, correspondence, memorandums, notes, text messages, instant messages, voicemails, reports, or other communication received from or sent by other Washington University and/or Barnes attending physicians, staff, employees or students concerning or relating to either Plaintiff's laboratory, his being offered a position as a resident or his performance as a resident.
>
>> Washington University claimed to have produced responsive documents (Ex. 12, WU Response to Plaintiff's Production Request at p. 4 ¶ 8), even though at conference it stated that it had only searched (or asked the custodians to do the search themselves, it is not clear), the email accounts of *seven* custodians. BJH claimed that that it produced responsive documents on the basis of a search of *three* custodians, (Ex. 13, BJH Response to Plaintiff's Production Reqest at p. 3.

4

¶ 8), even though the residency program is run by a "GME ['Graduate Medical Education] Consortium between Washington University and BJH (Dkt. 34 at Ex. A) *and see* "Graduate Medical Education Consortium Operating Principles, Document For WUSM/BJH/SLCH GME Consortium Sponsored Training Programs" https://gme.wustl.edu/wp-content/uploads/2021/10/COPD-Revised-030121.pdf (last accessed September 17, 2021).

Request 19 sought: "All Documents concerning any evaluation of Plaintiff in the residency program(s) operated or managed, in any way, by You."

Washington University responded stating that it would produce all "formal evaluations" even though the request also called for the production of emails and text messages, and, in any event, it only search the email accounts of *seven* custodians and produced one text messages from one Defendant. (Ex. 12, at p. 7, ¶ 19, and see Ex. 14, Benzinger's Text Messages WU3101-3102). BJH produced nothing. (Ex. 13, at p. 5, ¶ 19).

Request 20 sought: "All Documents concerning any evaluation of Plaintiff in the rotations operated or managed, in any way, by You."

Washington University again responded stating that it would produce all "formal evaluations" even though the request also called for the production of emails and text messages, and, in any event, it only search the email accounts of *seven* custodians and produced one text messages from one Defendant. (*See* Ex. 12, at p. 8, ¶ 20, and see Ex. 14, Benzinger's Text Messages WU3101-3102). BJH produced nothing. (Ex. 13, at p. 5, ¶ 20). BJH responsed "none" even though it is part of the GME Consortium that ran the Plaintiff's residency program. (Dkt. 34 at Ex. A) *and see* "Graduate Medical Education Consortium Operating Principles, Document For WUSM/BJH/SLCH GME Consortium Sponsored Training Programs" https://gme.wustl.edu/wp-content/uploads/2021/10/COPD-Revised-030121.pdf (last accessed September 17, 2021).

Request 27 sought: "All Documents concerning any investigation made by You in response to Plaintiff's complaints of harassment and/or unfair treatment."

Washington University responded by stating that had "and will produce emails from Plaintiff referencing unfair treatment and will produce emails between *individual Defendants* relating to Plaintiff's references to unfair treatment." (Ex. 12, at p. 10, ¶ 27). BJH stated that it would produce documents related to a meeting between Plaintiff and Nicole Erter, the H.R. representative for BJH on one date and related follow up communications. (Ex. 13, at p. 7, ¶ 27). Both of these responses incorrectly assume that the only *four* persons employed by the Defendants have documents responsive to the request.

Requests 33 to 43 sought various Documents concerning the Lab both before and after Plaintiff was involved in it.

>Washington University either responded that it would produce documents from a few persons or that plaintiff would have these documents. (Ex. 12, at pp. 12-16, ¶¶ 33-43). BJH responded that it had no documents. (Ex. 13, at pp. 8-9, ¶¶ 33-43).

Request 11 asked for: "All Documents containing communications between You and any other medical school, hospital, or residency program about or concerning Plaintiff at any time."

>Washington Universities' response improperly limited the response to "letters" between program directors. (Ex. 12, p. 5, ¶11). BJH claimed to have no documents. (Ex. 13, at p. 3, ¶ 11).

### iii.     Defendants' Efforts as to Searching the Server Were Inadequate

First, it is not clear that either defendant "searched the server." Production from Douglas Thompson shows that he merely forwarded email to Lauren Gibson, the WU Business Director. (Ex. 11, excerpt from Thompson production, *and see* https://www.linkedin.com/in/lauren-gibson-83218213 (last accessed December 17, 2021). Nor were Gibson's emails concerning Plaintiff produced in this case, which would have been responsive to a search across the server.

Counsel for Washington University's initial response to Plaintiff's query as to why only *seven* custodians had been searched (or material otherwise collected from them) was to state that he had to consult his client about whether search terms like "Jeffery Weisman" could be searched across the server. Counsel for Washington University responded on August 6, 2021, at the second of the five meet and confer sessions, that searches could *not* be conducted across their Microsoft Outlook server and that Defendants needed the names of the custodians that Plaintiff wanted him to search, so on September 3, 2021, Plaintiff tendered counsel a list of 172 custodians. (Ex. 15, email of 9-3-21 with attachment). Then, on September 14, 2021, at the third of the five meet and confer sessions the Defendants stated that they "needed to know" who the people on Plaintiff's list worked for and their positions, even though sixty three of the

6

persons on the list were listed in Plaintiff's Rule 26(a)(1) Disclosures (Ex. 6 at pp. 1-19) and in the answers to Defendants' interrogatories, where information about each witness was disclosed. (Ex. 7, at pp. 8-19 and Ex. 8, at pp. 4-15.)  In response to Defendants' *continuing* representation that their Microsoft Outlook server could not be searched across but that searches could only be done within individual email accounts, Plaintiff tendered, on October 1, 2021, a modified list of 172 custodians with their employer and titles or roles listed. (Ex. 16, 10-1-21 email with attachment). Then at a conference on October 13, 2021 between the parties, counsel for Washington University announced that he *could* search across the medical school's server in lots of up to 1000 custodians at once. (Ex. 17, 11-9-21 email summarizing history of conferences). Defendants still insisted on specific custodians being named, however, and still insisted that they would not search 172 names. Plaintiff tendered, on November 9, 1921, a list culled down to 102 persons. (*Id.*) On November 12, 2021 the last meet and confer was held and Defendants stated that they would neither just search across the medical school server, or search the 102 names. When, out of desperation, Plaintiff offered to stick with the 62 WU/BJH employees and residents originally listed in the 26(a)(1) disclosure, Defendants refused to search even those custodians. (Ex. 18, 11-15-21 email).

      B.      **The Non-Email Related Issues**

           i.      **The Telegram App**

The Chief residents, residents and some physicians at WU used an "app" called "Telegram" to message each other back and forth. The Plaintiff is aware that there were posts about him and another M.D.-Ph.D. student, Garry Hammen, who also alleged that he was harassed by the Defendants, on the Telegram app. (Ex. I at ¶ 12). In the meet and confer on July 16, 2021, counsel for WU stated that WU did not control over the telegram messages and a

subpoena should be issued. (Ex. 3, 7-16-21 letter).  When Plaintiff issued a subpoena to Bruno Marahao, one of the Plaintiff's Chief Residents who used the program (Ex. I at ¶ 12), Defendant objected that the subpoena was improper and should be withdrawn because Marahano was still employed by WU.  WU has produced no Telegram posts or messages about Plaintiff, or Gary Hammen, at all.

      ii.      **Knittle-Emmert Email Concerning Plaintiff**

Plaintiff raised, in the July 16, 2021 initial conference, the failure of the Defendants to produce any email between Dr. Daniel Emmert and Dr. Justin Knittle concerning the Plaintiff. (Ex. 3).   Emmert falsely claimed that Plaintiff had worked with him and emailed a false evaluation to the surgical ICU rotation coordinator, Dr. Knittle, who told Plaintiff about the email. (Ex. I at ¶ 11).   Neither Emmert or Knittle were among the seven custodians from whom email was collected.  Defendant has failed to produce any email between Emmert and Knittle.  A search across the WU server would have turned this email up.

      iii.      **NIH**

Plaintiff raised, in the July 16, 2021 initial conference, the failure of the Defendants to produce any reports on Plaintiff to the National Institute of Health. (Ex. 3).  Plaintiff was aware that the NIH evaluated the M.D.-Ph.D. residents at WU in connection with NIH grants and grant applications.  (Ex. I at ¶ 20).  Defendants have failed to produce any from the NIH relative to Plaintiff.

      iv.      **WU School of Medicine Ombudsman**

Plaintiff alleged that the Ombudsman during his tenure resigned because he protested the manner that the administration treated residents.  (Dkt. 34 at ¶ 75).  No email to or from the ombudspersons was produced by WU other than two email in which James Fehr was one among

8

about 30 persons cc'd.  Email and texts concerning the Plaintiff to or from the ombudspersons for the medical school, James Fehr and Karen O'Malley, to whom Plaintiff complained,  (Ex. 9 at ¶ 15), was not produced. Further, in the conference Plaintiff's counsel specifically raised the issue the ombudspersons had separate Gmail accounts for purposes of maintaining the privacy of persons who approached them with issued, (Ex. 1 at p. 2),  and requested that the Gmail accounts of the relevant ombudsperson be searched.  WU failed to produce any email, texts or Gmail to or form the ombudspersons concerning Plaintiff.

> v. **Summative Evaluations**

WU certified to the Federation Credentials Verification Service ("FCVS") that Plaintiff completed two years of residency between 2016 and 2018 at the WU/BJH Consortium without issue (Ex. 19, FCVS subpoena response at p. JW43491-92) and told the American Board of Anesthesiology that the Plaintiff had completed two years of residency "satisfactorily," (Ex. 20, ABA response at pp. JW63852).   WU also has told programs to which Plaintiff has applied that there is no summative evaluation, (Ex. 21, Thompson email to University of Illinois, JW64629), even though the ACGME Program *requires* an annual summative evaluation (Ex. 22, 2018 ACGME Common Program Requirements at p. 27 of 52 §§ V.A.1.e and V.A.2.a), and programs into which a resident seeks to transfer are required to obtain a summative evaluation from the old program. *Id.* at p. 16 of 22 at § III.C.   Though Thompson, as Program Director, did write letters to the new programs (Ex. 23), they were not "summative evaluations." (Ex. 21).

In this case, at the conference WU represented that the summative evaluations to other programs had been produced.  They have not, and if none exist WU should specifically certify that such is the case.

### vi. GME

In the conferences, counsel demanded the hand written notes that the GME officers had kept in their meetings with Plaintiff when he met to address claims of harassment. (Ex. 3, at p. 2). WU stated it would look. On December 1, 2021 WU produced one typed written note from one meeting. Plaintiff had multiple meetings (Ex. 9 at ¶ 16), and no hand written notes were produced. Plaintiff met with Tia Drake and Dean Rebecca McAlister (Ex. 9 at ¶ 16) from whom no material was produced.

### vii. MPHP

WU threatened to report Plaintiff to the Missouri Physicians Health Program in its effort to force Plaintiff out of the program. (Dkt. 34 at ¶ 74, and Ex. 9 at ¶ 21). Plaintiff was not mentally ill, and met with the MPHP who confirmed that there was a referral and who stated that the referral was baseless. *Id.* WU has failed to produce any documentation on its referral of Plaintiff to the MPHP despite request. (Ex. 3 at p. 2).

### viii. The Lab

Apart from some email sent to or received from Pamela Woodward, Chair of the Radiology Department, WU produced one piece of paper on the Lab, a spreadsheet of income and expenses between 2017 and 2020. Nothing was produced concerning the equipment or supplies of the Lab as of March 2017 (Ex. 5 and Ex. 12 at Request 35), even though "all documents concerning or relating to Plaintiff's Lab" were requested. Ex. 5 and Ex. 12 at Request 33). No documents recording or reflecting the drawings, specifications, work process papers or other Intellectual Property of the Lab as of March 2017 were produced. (Ex. 5 and Ex. 12 at Request 36). No documents reflecting who paid the wages or salaries of persons employed in the Lab from March 2017 and through the present. (Ex. 5 and Ex. 12 at Request 37). No grant

applications submitted for work or projects to be conducted or that are being conducted in the Lab since the spring of 2016 through the present were produced. (Ex. 5 and Ex. 12 at Request 38). No records indicating monetary payments to the Lab received since the spring of 2016 were produced, other than the summary spreadsheet. (Ex. 5 and Ex. 12 at Request 39). No documents concerning or reflecting the names, and earnings of all persons employed in or contracted to work with, the Lab between the spring of 2016 and the present were produced. (Ex. 5 and Ex. 12 at Request 41). No documents related to research performed by the Lab or its employees for the period from January 1, 2016 to the present were produced. (Ex. 5 and Ex. 12 at Request 42). No research conducted by Plaintiff was produced. (Ex. 5 and Ex. 12 at Request 43).

      **C.    The Conclusion of the Meet and Confer Sessions**

The initial L.R. 37-3.04 letters, Ex. 1 and 2, were followed up by letters on July 16, 2021 (Ex. 3 and 4), and by emails on July 21, 2021 (Ex. 24), September 3, 2021 (Ex. 15), October 1, 2021 (Ex. 16), and November 9, 2021 (Ex. 17). As stated above, on November 15, counsel for WU refused to search even the email accounts of the 62 WU employees listed in Plaintiff's Rule 26(a)(1) Disclosures. (Ex. 18). The parties had agreed that all supplemental production in response to the meet and confer conferences would be done by November 30, 2021.

Meetings between counsel were held on July 16, August 6, September 14, October 13, and November 12, 2021.

Search terms for a search across the server were proposed (Ex. 15) and rejected with no alternatives proposed.

On December 1, 2021, BJH produced no additional documents, did not amend any interrogatory or production response, and did not produce a privilege log.

On December 1, 2021, WU produced a handful of documents, put at issue above, did supplement interrogatory answers but did not amend any production response, did not certify that production was complete, and did not produce a privilege log.

## II.   ARGUMENT

The Defendants have stonewalled and mislead Plaintiff. They did not search their servers for responsive email, or the phones of faculty, attending physicians and residents for text messages, relating to the plaintiff when they answered discovery initially though required to by F.R.Civ.P. 26 and 34. They only collected email from a handful of people. When challenged, they claimed for months that they could not search across the email server, when in fact they could. When they finally announced that they could search across the server, they still insisted on a list of names, and then refused to search the email accounts of those the Plaintiff named. This is bad faith. It is beyond dispute that persons other than Dr. Evers, Dr. Benzinger, Dr. Cox, Dr. Douglas Thompson, Dr. Richard Groener, Dr. Thomas Graetz, Dr. Pamela Woodward, Dr. Katherine Henderson, Terra Mouser and Nicole Erter are likely to have generated or received relevant emails and text messages related to the Plaintiff. (Ex. I at ¶¶ 8-18).

The other material is similar. They have refused to even try to look for Telegram messages. They have failed to produce material submitted to the NIH. They have refused to produce material from the ombudspersons, including from their Gmail accounts. They claim to have produced Plaintiff's final summative evaluation but told others that it does not exist (though it must per the ACGME Guidelines), and have failed to produce it. They referred Plaintiff to the MPHP and have failed to produce one document related to that event. They have completely failed to produce relevant material on the Lab as stated above.

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Rule 26 does not give any party "the unilateral ability to dictate the scope of discovery based on their own view of the parties' respective theories of the case," because [l]itigation in general and discovery in particular . . .are not one sided. *Liguria Foods, Inc. v. Griffith Labs., Inc.,* 320 F.R.D. 168, 183 (N.D. Iowa 2017)(*quoting Sentis Grp., Inc. v. Shell Oil Co.*, 763 F.3d 919, 925 (8th Cir. 2014)).

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).

A "relevant" matter is "any matter that bears on, or that reasonably could lead to other matters that could bear on," any party's claim or defense. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S. Ct. 2380, 57 L. Ed. 2d 253 (1978). The category of matters that are relevant for discovery purposes is broader than the category of matters relevant for admissibility purposes at trial, but discovery is not a fishing expedition and some threshold showing of relevance must be made before a party will be compelled to comply with discovery requests. *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992). Here, the Plaintiff is not "fishing" but has clearly alleged, and shown, that the discovery requested is relevant to the claims.

By refusing to perform a term search of custodial accounts, Defendants' have failed to comply with their obligations under Fed. R. Civ. P. 26(e):

> (1) *In General.* A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response:
> (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or
> (B) as ordered by the court.

Through Plaintiff's Initial Rule 26 disclosures, Defendants were put on notice that dozens of individuals beyond the named Defendants were likely have relevant and discoverable information and/or documentation, and their Rule 26 disclosures were incomplete and/or incorrect. As of September 25, 2020, Defendants had an affirmative duty under Rule 26(e) to conduct a search of those individuals custodial accounts to determine if a supplementation to their Rule 26 disclosures were necessary. Defendants further had a duty to amend/supplement their Rule 26 responses to mirror Plaintiff's list (if not add to Plaintiff's list of sixty individuals) as well as an identification of the subject matter of discoverable information that those individuals possess.  The persons identified by Plaintiff were individuals whom either supervised, worked with, and/or evaluated Plaintiff's performance as a resident during the course of his residency, and likely communicated and/or received communications concerning Plaintiff's performance and/or his research laboratory.

A mere statement that the request is "overly broad, burdensome, oppressive and irrelevant is not adequate to voice a successful objection"; instead, the objecting party must prove that the requested documents do not fall within the broad scope of relevance defined pursuant to Rule 26(b)(1). *Nachurs Alpine Solutions Corp. v. Banks*, No. 15-CV-4015-LTS, 2017 U.S. Dist. LEXIS 104778, at *10 (N.D. Iowa July 7, 2017); *see also* Fed. R. Civ. P. 26(b)(1)

14

advisory committee's note (noting that parties are not permitted "to refuse discovery simply by making a boilerplate objection that it is not proportional.").

Plaintiffs respectfully request that Defendants be ordered to conduct a search of Plaintiff Jeffery Weisman's first and last name ("Weisman, Jeffery" and "Jeff Weisman" and "Jeff Wiseman")[1] and "Gary Hammen" in the electronic mailboxes of the custodians identified in Plaintiff's November 9, 2021 list. By their own admission, Defendants have not even attempted to conduct these searches, but instead merely rely on a blanket assertion that the search would be "too burdensome" and would "yield too many results."

Finally, the appropriate temporal time scope of these term searches spans from July 2015[2] up to and including present date as there is a factual basis to believe that Defendants defamatory acts have continued well beyond June of 2018 when Plaintiff left the Washington University and Barnes Jewish Hospital Consortium residency program.

WHEREFORE, the Plaintiff, Jeffery Weisman, by counsel, respectfully requests that this Court enter an order, pursuant to F.R.Civ.P. 37(a)(3)(B) and L.R. 37 – 3.04 order Defendants Washington University, Barnes Jewish Hospital, and BJC Healthcare to supplement their production in the ways sought above within fourteen (14) days and certify their production is complete and produce a privilege log. Plaintiff further prays for any other relief that this Court deems just.

                                      Respectfully submitted,

                                      MOOR LAW OFFICE, P.C.
                                      /s/ *Edward R. Moor*
                                      Edward R. Moor
                                      Bar No.: 6205169IL

---

[1] On several occasions during his residency, Plaintiff personally observed many attendings, faculty members and co-residents misspelling his first name and last name as "Jeffrey" and "Wiseman", and therefore searches for the terms of "Jeffery", "Jeffrey", "Weisman" and "Wiseman" are appropriate.

[2] Defendant Washington University began recruiting Plaintiff to its residency program beginning in July 2015.

15

53 W. Jackson Blvd., Suite 1527
Chicago, IL 60604
(312) 726-6207
erm@moorlaw.net

David R. Bohm
DANNA MCKITRICK, P.C.
7701 Forsyth Blvd.
St. Louis, MO 63105-3907
(314) 726-1000
dbohm@dmfirm.com

**Counsel for Plaintiffs**

### CERTIFICATION

Under penalties as provided by law pursuant, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

s/ Edward R. Moor

### CERTIFICATE OF SERVICE BY ELECTRONIC MEANS

I, Edward R. Moor, certify that on December 17, 2021, service of this document was accomplished pursuant to the Court's CM/ECF as to Filing Users and thereby served on all counsel of record.

/s/ Edward R. Moor
