**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JEFFERY A. WEISMAN, and | ) | |
| STRATEGIC BIOMEDICAL, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 4:19-cv-75-JAR |
| v. | ) | |
| | ) | |
| BARNES JEWISH HOSPITAL, | ) | The Honorable John A. Ross |
| BJC HEALTHCARE, | ) | |
| WASHINGTON UNIVERSITY, | ) | |
| ALEX EVERS, RICHARD BENZINGER, | ) | |
| And THOMAS COX, | ) | |
| | ) | |
| Defendants. | ) | |

**EXPERT WITNESS DISCLOSURE UNDER RULE 26(a)(2)**

This Expert Report is submitted pursuant to requirements of Rule 26(a)(2) of the Federal

Rules of Civil Procedure.

1

**EXHIBIT C**

**EXPERT WITNESS REPORT OF ALAN KAYE, M.D. Ph.D, .A.B.A, D.A.B.P.M., DAB.IPP, FASA**

1.      I am Alan D. Kaye, M.D., Ph.D,, D.A.B.A., D.A.B.P.M., DABIPP, FASA. Currently, I hold the following positions with the Louisiana State University School of Medicine: Vice Chancellor of Academic Affairs, Chief Academic Officer, Provost, Pain Program Fellowship Director, tenured Professor of the Departments of Anesthesiology and Pharmacology, Toxicology, and Neurosciences, and Vice Chairman of Research, Department of Anesthesiology. In addition, I am also an Adjunct Professor of Anesthesia at the Tulane School of Medicine and an Adjunct Professor of Anesthesia and Pharmacology at LSU School of Medicine in New Orleans. I am a licensed as a physician and surgeon in the following states: Louisiana, Arizona, Texas, Florida, and California. A copy of my full Curriculum Vitae which is current and up to date as of September 30, 2022 is attached as Exhibit 1.

I have expertise in supervising, teaching, and evaluating resident physicians enrolled in and training in ACGME accredited anesthesiology residency programs. I also have expertise and extensive knowledge and training in complying with industry wide standards, practices, and protocols with regards to supervising and operating ACGME governed anesthesiology residency training programs and anesthesiology programs housed in academic teaching hospitals and facilities. As recently as June of 2022, I was awarded the honor and designation of "Teacher of the Year" in the LSUHC Shreveport's Department of Anesthesiology. As the Vice Chancellor of Academic Affair, Chief Academic Officer, and Provost, I have worked closely with our institutions Graduate Medical Education department. Further, in my role as Anesthesia Program Director currently and dating back to 1993 at multiple institutions, e.g., Tulane School of Medicine, Texas Tech School of Medicine, and LSU School of Medicine, I have worked closely

with multiple Graduate Medical Education departments. In this regard, at present I serve as a Pain Fellowship Program Director and continue to attend GME meetings and work closely with the LSU Graduate Medical Education department.  I have worked closely for nearly three decades regularly training, educating, and responsible for knowing and following ACGME protocols and ensuring that our resident and fellow physicians are evaluated and trained according to and in compliance with those national industry standards. I am regularly trained and educated by the Designated Institutional Official ("DIO") and the Graduate Medical Education Office on these standards, requirements and protocols that are required while training and evaluating resident physicians. I also regularly attend educational seminars and required conferences that educate faculty members and program directors on industry standards and ACGME protocols and requirements. Further, having worked as a professor of Anesthesiology in the academic setting since 1993, and therefore, I am extremely knowledgeable and familiar with interviewing, evaluating, and selecting physician applicants for academic residency training programs. In this regard, I served as the Director of Anesthesia Resident Recruitment concurrently from 1993 until November 2019. Through my decades of experience in interviewing and selecting applicants for residency positions, I have substantial experience in evaluating and determining the qualifications, capabilities, and likelihood of success of a candidate in anesthesiology residency training programs. Finally, I have professional knowledge and expertise on what is required for a resident physician to be able to successfully transfer from one ACGME accredited residency program to another. Throughout my professional career, I have been involved in several resident transfers as a high-ranking faculty member of an ACGME (Accreditation Council for Graduate Medicine) accredited residency training program.

3

I possess technical and specialized knowledge that will assist a judge or jury to understand the evidence and issues in this case. I state my opinions with a reasonable degree of medical, academic and anesthesiology certainty. For the reasons set forth herein, and as illustrated in my curriculum vitae, I am qualified to give these opinions based on my knowledge, skill, experience, training, and education. My testimony is based on the facts and data mentioned below and in the attached Exhibit 2, as well as other materials that have been exchanged between the parties during the course of discovery and shared with me by Plaintiff's counsel. My testimony is also based on my review of Washington University's Graduate Medical Education department's policies and procedures, as well as the ACGME Manual of Policies and Procedures and the bylaws, which can be accessed at "acgme.org." The ACGME sets the industry standard for US graduate medical education (residency and fellowship) programs and the institutions that sponsor them and renders accreditation decisions based on compliance with these standards. In order to maintain accredited status, residency and fellowship programs must follow the policies, procedures and industry standards set, mandated and enforced by the ACGME. My opinions are the product of reliable principles and methods and are consistent with the opinions of other anesthesiologists, particularly those in academic and institutional settings whom are employed in faculty positions. I have reliably applied these principles and methods to the fact of the case. My opinions are also reliable for at least the following reasons: I ruled out alternative explanations (e.g., that Dr. Weisman is an incapable or unqualified physician), I have sufficiently connected the testimony with the facts of the case, and my opinions flow naturally from my own experience and background.

My business address is 1501 Kings Hwy, Shreveport, LA 71103

**Assignment**

4

2.      I have been retained by Plaintiff Dr. Jeffery Weisman principally to review and evaluate the conduct and actions of the administration and program leadership of the Washington University St. Louis and Barnes Jewish Hospital Consortium's Anesthesiology Residency Program ("The Program"), the current average income for a board-certified anesthesiologist in the United Sates, but for the conduct of The Program towards Dr. Weisman, whether or not Dr. Weisman would be practicing medicine as a board certified anesthesiologist today, whether or not it was reasonable for The Program to expect Dr. Weisman to perform all of his obligations as a training resident physician and run and operate his laboratory, whether or not Dr. Weisman was blacklisted and disparaged by The Program in his efforts to transfer to another residency training program after he left The Program, whether it is profitable for The Program to be associated with Dr. Weisman's laboratory, and whether or not The Program's ASAP anesthesiology training program's pace of training is dangerous.

**Summary of Opinion (a)**

a.      My overall opinion in this matter is that Dr. Weisman would currently be earning an income of $500,000.00-$750,000.00 if he were working as a board-certified anesthesiologist. Through my current position as Vice Chancellor of Academic Affairs, Chief Academic Officer, and Provost in the Louisiana State University School of Medicine's Department of Anesthesiology, I am extremely familiar with the current industry patterns for income of practicing anesthesiologists. The income of an anesthesiologist depends on a number of factors, including: experience, geography, academic setting, private setting, public setting, number of hours worked and the particular healthcare facility in question. This amount fluctuates over time and can vary. Pay increases frequently occur. Additionally, Anesthesiologists in an academic

5

setting receive comparable pay to anesthesiologists in a hospital or more traditional medical setting. Finally, I conclude to a reasonable degree of certainty, based on my knowledge of the medical profession and the industry standard of board-certified specialties, Dr. Weisman's earning potential as a board-certified occupational medicine specialist is lower than it would be if he were a board-certified anesthesiologist.

**Qualifications**

I have substantial experience, familiarity, and knowledge regarding the pay rates for board certified anesthesiologists, as well as other board-certified specialists across the United States. I have substantial experience and knowledge as a result of tracking industry patterns and standards for compensating anesthesiologists through a number of tracking mechanisms. Further, through my attendance at continuing medical education conferences and attending national and regional events discussing the practice of anesthesiology, I am very familiar with the compensation trends for board certified anesthesiologists and other specialists nationwide. I am providing with this report trusted and verified authority upon which I have relied in making my opinion. Exhibit 4. Further, through my membership in the Association of University Anesthesiologists and the American Society of Anesthesiologists, I am well apprised on the industry standards and trends for compensating board-certified anesthesiologists.

**Summary of Opinion (b)**

b.      My overall opinion in this matter is that but for The Program's conduct, Dr. Weisman would currently be employed and practicing as a board-certified anesthesiologist. Dr. Weisman, given his educational background, employment history and research experience, would be a

6

highly desired and sought-after resident physician for any ACGME accredited anesthesiology program. Dr. Weisman's research experience, expertise and his MD/PhD status makes him a highly competitive candidate to all residency training programs. It was a violation of the academic residency program industry standard and ACGME standards for members of program leadership (Drs. Benzinger, Cox, Thompson Evers and Groener, others) to front run Dr. Weisman while he was training, and to organize a campaign for evaluating faculty members to fraudulently issue Dr. Weisman poor rotation evaluation scores. At an ACGME accredited residency training program, the evaluation process should be objective and should not be motivated by harassment, retaliation, or performed in an effort to pressure a resident physician to resign. It was also a violation of industry standards and ACGME procedures and requirements for The Program to lie to Dr. Weisman that he failed certain rotations, and to refuse to show Dr. Weisman his evaluation scores. An ACGME accredited program's purpose and their duty is to provide training and fair learning opportunities to its resident physicians. The Program denied Dr. Weisman the opportunity to receive fair training and objective evaluations in his pursuit of becoming a board-certified anesthesiologist in violation of ACGME policies and procedures, as well as the industry standard for ACGME accredited residency training programs.

Further, program leadership and various faculty members failed to objectively and appropriately evaluate Dr. Weisman in accordance with industry standard. Upon review of Dr. Weisman's rotation evaluations created by The Program during Dr. Weisman's training, I found several comments and instances of scores assigned to Dr. Weisman's performance that demonstrate that Dr. Weisman was graded unfairly, incorrectly, and subjectively in violation of industry standard and ACGME protocol and requirements. For example, in many instances, certain evaluators assigned Dr. Weisman favorable scores and comments, while another faculty

7

members assigned Dr. Weisman negative or poor scores and comments when assessing the same instances of performance. This demonstrates that Dr. Weisman was denied fair and objective evaluations.  Finally, upon review of the materials, I can conclude based on a reasonable degree of certainty that Dr. Weisman was never placed on probation or issued any disciplinary action during his training with The Program, and he successfully completed two (2) years of training before leaving The Program in June of 2018.

**Qualifications**

Through my current position as Vice Chancellor of Academic Affairs, Chief Academic Office and Provost in the Louisiana State University School of Medicine's Department of Anesthesiology, as well as my years of experience working as a professor of Anesthesiology, I am extremely familiar with whether or not an individual physician has the skill set and knowledge requisite to complete residency training and obtain his or her board certification in anesthesiology. I have interacted with, taught, supervised, trained, graded, and evaluated hundreds of resident physicians, and I base my conclusions on this experience with evaluating and supervising resident physicians in the academic training arena.

I have reviewed Dr. Weisman's background, qualifications and reviewed all of the information provided to me by counsel. I have also had an opportunity to know Dr. Weisman and communicate with him about the practice of medicine, his academic training history, and his employment history. It is my opinion that, to a reasonable degree of certainty (medical or otherwise), he would be practicing as a board-certified anesthesiologist if he were granted admission and continued his anesthesiology residency training at any of the more than one-hundred and fifty (150) institutions to which he applied after leaving The Program. Accordingly, it is my opinion that but for Washington University's, Barnes-Jewish Hospital's and program

8

leadership's interference and obstruction with Dr. Weisman's attempts to transfer to another residency program, Dr. Weisman would have completed a residency training program in anesthesiology and would today be practicing medicine as a board-certified anesthesiologist, likely in an academic setting. I have personally supervised and evaluated individuals significantly less capable and qualified than Dr. Weisman that have gone on to become board-certified practicing anesthesiologists, both in academic and private practice settings. As the Vice Chancellor of Academic Affair, Chief Academic Officer, and Provost of an ACGME accredited residency training program, I am regularly trained, educated, and responsible for knowing and following ACGME protocols and ensuring that our resident physicians are evaluated and trained according to and in compliance with those industry standards. I am regularly trained and educated by Designated Institutional Officials ("DIO") and the Graduate Medical Education Office on these standards, requirements and protocols that are required while training and evaluating resident physicians. Further, having worked as a professor of Anesthesiology in the academic setting since the late 1990's (1997—present day), I am extremely knowledgeable and familiar with interviewing, evaluating and selecting physician applicants for academic training programs. Through my decades of experience in interviewing and selecting applicants for residency positions, I have substantial experience in evaluating and determining the qualifications, capabilities, skills and likelihood of success of the candidate in anesthesiology residency training programs. Finally, I have professional knowledge and expertise on what is required for a resident physician to transfer from one ACGME accredited residency program to another.

**Summary of Opinion (c)**

9

c.    My overall opinion in this matter is that it was unreasonable for The Program to expect Dr. Weisman to perform all of his obligations as a resident physician in training while simultaneously running and operating the Strategic Biomedical Inc., laboratory.

**Qualifications**

Through my current position as Vice Chancellor of Academic Affairs, Chief Academic Office and Provost in the Louisiana State University School of Medicine's Department of Anesthesiology, as well as my years of experience working as a professor of Anesthesiology and Pharmacology, I have substantial experience in medical research, training, as a faculty member at an ACGME accredited academic anesthesiology residency program and practicing as a board-certified anesthesiologist. In addition, while I attended my residency training program, I was also simultaneously engaged in research and therefore understand the impracticability and difficulty of meeting residency training obligations in addition to research obligations. Through my experience and training as a faculty member at an ACGME accredited training program, I can confirm with a reasonable degree of certainty that it is unreasonable and improper for faculty members of an ACGME residency training program like Washington University/BJH to expect a resident to simultaneously meet the obligations of being a resident physician in training and the operator of a laboratory venture such as Strategic Biomedical, Inc. In my opinion, it was a form of "harassment" and imposed an undue, impossible burden upon Dr. Weisman for WU and BJH to expect Dr. Weisman to train in the ASAP program while also running and operating Strategic Biomedical, Inc. because The Program was aware that it would be extremely difficult for Dr. Weisman, or any resident for that matter, to be able to successfully balance and manage both obligations.

As the Vice Chancellor of Academic Affair, Chief Academic Officer, and Provost of an ACGME accredited residency training program, I am regularly trained, educated, and responsible

10

for knowing and following ACGME protocols and ensuring that our resident physicians are evaluated and trained according to and in compliance with those industry standards. I am regularly trained and educated by Designated Institutional Officials ("DIO") and the Graduate Medical Education Office on these standards, requirements and protocols that are required while training and evaluating resident physicians. Further, having worked as a professor of Anesthesiology in the academic setting since the late 1990's (1997—present day), I am extremely knowledgeable and familiar with interviewing, evaluating, and selecting physician applicants for academic training programs. Through my decades of experience in interviewing and selecting applicants for residency positions, I have substantial experience in evaluating and determining the qualifications, capabilities, and likelihood of success of the candidate in anesthesiology residency training programs. Finally, I have professional knowledge and expertise on what is required for a resident physician to transfer from one ACGME accredited residency program to another.

**Summary of Opinion (d)**

d.      It was a violation of ACGME standards, practices and protocols, as well as obstructive and inappropriate for The Program to prevent the release of, and not cooperate in providing Dr. Weisman's residency training records, including but not limited to his ACGME Summative Evaluation Transcript. This is a form of "harassment" and is in violation of what is expected, required, and known as the industry standard for ACGME accredited anesthesiology programs. Individuals attend residency programs to obtain certifications and transcripts, and a program's failure to provide those records upon a resident physician's departure from the program defeats and frustrates the purpose of the programs and the training, and it violates numerous policies and procedures, including but not limited to ACGME policies and protocols. In fact, it is my opinion,

11

based on the training that I have been provided and experienced through Graduate Medical Education training and from interactions with Designated Institutional Officials of ACGME accredited programs, that the members of program leadership at The Program had a responsibility to ensure that Dr. Weisman was able to succeed under the circumstances by cooperating in his efforts to transfer, and by giving him a good reference to inquiring programs. Instead, they "encouraged" him to resign. In addition to encouraging him to resign, they actively engaged in behavior that was clearly intended to interfere with and obstruct his ability to continue his anesthesiology training with another program, in effect, ruining his career as a board-certified anesthesiologist. The Program actively engaged in behavior that was clearly intended to interfere with and obstruct Dr. Weisman's ability to continue his anesthesiology training with another program, in effect, ruining his career as a board-certified anesthesiologist. The Program leaderships' (Drs. Evers, Benzinger, Cox, Groener and Thompson) actions of not responding to inquiries or providing Dr. Weisman's training records, ACGME summative evaluation transcript and other materials when requested, telling other program directors to "just say no" and making negative comments about Dr. Weisman directly inhibited Dr. Weisman from securing a spot with interested residency programs.  It was unreasonable, inappropriate and a violation of industry standard and ACGME protocol and procedure for The Program to prevent the release of, and not cooperate in providing, Dr Weisman's residency records. It was also inappropriate for members of program leadership to actively interfere with Dr. Weisman's attempts to obtain a resident physician position with other anesthesiology residency training programs by falsely disparaging Dr. Weisman, making negative comments about Dr. Weisman, telling program directors to "just say no" and telling them that Dr. Weisman would not succeed in an anesthesia training program. It is widely known and accepted in the industry and profession

12

that a program will not take a transfer resident if their previous program leadership speaks negatively of them.  These are all forms of "harassment" in my opinion. Further, it was insufficient for The Program to provide Dr. Weisman's rotation evaluations when it actually did provide his training records to other programs. It is widely known and accepted, i.e. the industry standard in academic residency training programs, that a resident physician must be provided their ACGME summative evaluation transcript, and that it must be timely sent upon request from either the resident physician, or the request of another residency training program. I conclude with a reasonable degree of certainty that without their ACGME summative evaluation transcript, a resident physician cannot continue their residency training and cannot become credentialed as a board-certified physician, and ultimately cannot secure employment as a practicing physician.

**Qualifications**

Through my current position as Vice Chancellor of Academic Affairs, Chief Academic Officer, and Provost in the Louisiana State University School of Medicine's Department of Anesthesiology, as well as my years of experience working in academia as a professor of Anesthesiology, I am extremely familiar with, and required to know and follow ACGME policies, procedures, and protocols. I have been personally involved in the transfer of dozens of resident physicians during the course of my career as a faculty member of an ACGME accredited program. I am very familiar with the industry standards, ACGME requirements, and appropriate standards of behavior and conduct of members of program leadership involved in the facilitation of resident physician transfers from one program to another. I am very familiar with and

13

responsible for following protocols and standards of conduct for assisting resident physicians, and what is communicated and understood about resident physicians attempting to transfer. I am knowledgeable of, through my experience as a faculty member of an ACGME accredited residency training program that one program will not grant the transfer of a resident physician unless his or her previous program provides a good reference. I am also able to testify with a reasonable degree of certainty regarding what is, and what is not considered a good reference in this specific industry. Finally, I am able to testify with a reasonable degree of certainty that based on Dr. Weisman's education, employment and training history, he would be considered an extremely competitive and desirable candidate to any residency training program unless The Program denied him a good reference by disparaging him to other programs.

As the Vice Chancellor of Academic Affair, Chief Academic Officer, and Provost of an ACGME accredited residency training program, I am regularly trained, educated, and responsible for knowing and following ACGME protocols and ensuring that our resident physicians are evaluated and trained according to and in compliance with those industry standards. I am regularly trained and educated by Designated Institutional Officials ("DIO") and the Graduate Medical Education Office on these standards, requirements and protocols that are required while training and evaluating resident physicians. Further, having worked as a professor of Anesthesiology in the academic setting since the late 1990's (1997—present day), I am extremely knowledgeable and familiar with interviewing, evaluating, and selecting physician applicants for academic training programs. Through my decades of experience in interviewing and selecting applicants for residency positions, I have substantial experience in evaluating and determining the qualifications, capabilities, and likelihood of success of the candidate in anesthesiology residency training programs. Finally, I have professional knowledge and

14

expertise on what is required for a resident physician to transfer from one ACGME accredited residency program to another, and what practices will block a resident physician from transferring to another program.

**Summary of Opinion (e)**

e.       It is my opinion that Dr. Alex Evers, as the program director of an academic residency training program, had the potential to benefit greatly from being associated with Dr. Weisman's laboratory. By their association with Strategic Biomedical, Inc., Dr. Alex Evers, and The Program are benefited through incentives and profitability from any patents that the lab has secured since its establishment in St. Louis in 2016. It is extremely lucrative for academic training programs to secure patents through research laboratories. I am able to conclude, based on a reasonable degree of certainty, based on my training and experience in both research and academia, that WU and BJH have access to patents and financial incentives that they would not otherwise have access to without their association and involvement with Strategic Biomedical, Inc. The commercialization of the research results from a research lab like Strategic Biomedical, Inc,'s is likely to be profitable to a residency training program like WU and BJH, and depending on the research project, can bring in millions of dollars of funding and grants to a department and medical center.

I conclude with a reasonable degree of certainty that it has been lucrative for WU/BJH to be associated with Dr. Weisman's laboratory because through association with the laboratory, they have access to a wealth of funding generated by grants, industry collaborations and funding, publications, and their ability to recruit additional faculty members based on the existence of Dr. Weisman's laboratory in St. Louis. By having Dr. Weisman and his lab, the Program was able to add value to the academic anesthesia department of up to, but not limited to, $1,000,000.00.

15

**Qualifications**

Through my current position as Vice Chancellor of Academic Affairs, Chief Academic Officer, and Provost in the Louisiana State University School of Medicine's Department of Anesthesiology, as well as my years of experience working in academia and as a professor of Anesthesiology, and my experience of completing a Ph.D. program, I am extremely familiar with the profitability of patents, research labs, research projects and the numerous financial incentives of commercializing research results. In particular, The Program stood to profit immensely from association with Dr. Weisman's laboratory because prior to Dr. Weisman's arrival to St. Louis, they had no association with any similar laboratory or research opportunity. I have personally experienced and have had direct involvement with laboratories and research projects associated with academic residency training programs that have brought in millions of dollars of funding to a specific department and medical center.

**Summary of Opinion (f)**

f.      The structure of The Program's ASAP anesthesiology residency training program, i.e., the program design of moving MD/PhD resident physicians through the anesthesia training at an accelerated pace (roughly twice as fast as other programs) is extremely dangerous. Based on my knowledge and experience obtained from working in academia, I conclude with a reasonable degree of certainty that this accelerated pace of training is motivated by the additional funding distributed to the program by NIH grants.

**Qualifications**

Through my current position as Vice Chancellor of Academic Affairs, Chief Academic Officer, and Provost in the Louisiana State University School of Medicine's Department of Anesthesiology, as well as my years of experience working in academia and as a professor of Anesthesiology, I am extremely familiar with the industry standards and the importance of safe training of resident physicians. Based on my extensive experience and expertise in training and evaluating the performance of resident physicians, I can confirm with a reasonable degree of certainty that it is extremely dangerous to accelerate their training schedule.

As the Vice Chancellor of Academic Affair, Chief Academic Officer, and Provost of an ACGME accredited residency training program, I am regularly trained, educated, and responsible for knowing and following ACGME protocols and ensuring that our resident physicians are evaluated and trained according to and in compliance with those industry standards. I am regularly trained and educated by Designated Institutional Officials ("DIO") and the Graduate Medical Education Office on these standards, requirements and protocols that are required while training and evaluating resident physicians. Further, having worked as a professor of Anesthesiology in the academic setting since the late 1990's (1997—present day), I am extremely knowledgeable and familiar with interviewing, evaluating and selecting physician applicants for academic training programs. Through my decades of experience in interviewing and selecting applicants for residency positions, I have substantial experience in evaluating and determining the qualifications, capabilities and likelihood of success of the candidate in anesthesiology residency training programs.

3. I have lectured and presented on various research issues on a wide range of topics involving neuropathy and the effects of anesthesia and the practice of medical pain management.

17

A full, comprehensive list of the presentations, lectures and peer-reviewed journals that I have participated can be found in my provided Curriculum Vitae. A complete list of the trials and depositions in which I have testified as an expert witness within the last four (4) years is attached hereto as Exhibit 3.

4.      I am being compensated for my services in the matter at my usual rate of $200/hour.

5.      It is my belief that I possess technical, professional and specialized knowledge that will assist a judge or jury to understand the evidence and issues in this case. I state my opinions with a reasonable degree of medical and anesthesiology certainty. For the reasons set forth herein, and as illustrated in my Curriculum Vitae, I am qualified to give these opinions based on my knowledge, skill, experience, training and education. My testimony is based on the facts and data mentioned below and contained in materials listed in the attached Exhibit 2. My opinions are the product of reliable principles and methods and are consistent with the opinions of other anesthesiologists, particularly those in academic, research and institutional settings. I have reliably applied these principles and methods to the fact of the case. My opinions are also reliable for at least the following reasons: I ruled out alternative explanations (e.g., that Dr. Weisman is an incapable physician), I have sufficiently connected the testimony with the facts of the case, and my opinions flow naturally from my own experience and background.

6.      I continue to review the materials and documents related to this case and reserve the right to supplement this expert report based on any additional work that I may be asked to do.

**Documents Reviewed**

7.      As part of my assignment, I have reviewed several documents, email communication records, Dr. Weisman's evaluations generated and created by The Program, as well as communications and records related to Dr. Weisman's attempts to apply to subsequent training programs. I have also had the opportunity to review: the Second Amended Complaint filed in this lawsuit and Dr. Jeffery Weisman's Motion for Sanctions filed on or around August 18, 2022. Additionally, I have reviewed a number of background documents provided to me by counsel. A complete list of the documents reviewed by me is reflected in Exhibit 2.  The foregoing documents relate generally to Dr. Weisman's recruitment to Washington University/Barnes-Jewish Hospital, evaluations, and information pertaining to Strategic Biomedical Incorporated.

In reviewing this information, I have assumed that the documentation is authentic and all of the other facts and data I have been presented are accurate and otherwise truthful. In addition to reviewing documents provided to me, I have also reviewed a factual summary upon which I have relied in reaching my conclusions.

**Background**

I have examined the case of Dr. Jeffery Weisman and created an expert report. This assessment is based upon the history provided by information obtained from Dr. Jeffery Weisman, review of provided records, my knowledge of anesthesiology and the medical field in general, my experience as a faculty member at multiple medical schools and ACGME accredited anesthesiology residency training programs and the medical literature and data collected from other sources. It is my understanding that discovery is still ongoing, and that my report can and will be supplemented under the Federal Rules of Civil Procedure to ensure that the information provided for purposes of my disclosure is complete and correct.

**History:**

1.      Dr. Jeffery Weisman, MD, PhD, JD is a physician who completed the joint MD/PhD program between Louisiana Tech University and LSU Health Sciences Center in Shreveport in 2016.  He graduated what is normally an 8-year degree program at an advanced rate, and after only 6 years earned both a medical doctorate (MD) degree and PhD in Biomedical Engineering. While completing the degree programs he started his own research lab, biotechnology company, was well published and was awarded several patents for the work he completed.

2.      Prior to Dr. Weisman's medical training he worked as a patent attorney and biotech venture attorney in Chicago.  He graduated from the University of Illinois Urbana-Champaign with a Juris Doctorate (JD) degree and Master's degree in Finance. He completed those joint degrees in 2.5 years.

3.      Dr. Weisman completed his undergraduate training at the University of Illinois Urbana Champaign in 2004 earning a bachelor's of science degree in Molecular Biology and a bachelor's of arts degree in Philosophy in 3 years. He then completed a Master's of Science Degree in Molecular Biology from the University of Illinois in 2005. He then graduated from the University of Illinois Urbana-Champaign with a Juris Doctorate degree and master's degree in finance in December of 2007. He completed those joint degrees in 2.5 years.  He notes that to his knowledge he was the only law student to ever finish law school at the University of Illinois in under 3 years. Dr. Weisman completed the joint MD/PhD program between Louisiana Tech University and LSU Health Sciences Center in Shreveport in 2016.  As mentioned, he graduated this 8-year degree program in 6 years and earned both a medical doctorate degree and PhD in Biomedical Engineering. During his residency training in Occupational Medicine he earned a Master's degree in Public Health from the University of Illinois Chicago. Dr. Weisman managed to complete a dual educational program yet again, graduating with a 3.9 GPA.  He states that he would have received a 4.0 but he lost participation points in a single class for stepping outside the class for nearly an entire period. He notes that he did so because he was called by a medical resident who was raped by a senior doctor and who was being sent to a Physicians Health Program by her residency training program administration. Dr. Weisman states that he frequently

20

took selfless actions like this which at times could bring down his GPA or test scores but that he felt doing the right thing was always more important than grades.

4.      Dr. Weisman has taken official tests in a wide range of academic fields and licensing. He has taken admissions test including the following: SAT, ACT, GME, GMAT, LSAT, MCAT. He has taken licensing tests which include the Illinois bar examination, the United States Patent Bar examination, the United States Medical Licensing Examination Step 1, The United States Medical Licensing Examination Step 2 Clinical Skills, The United States Medical Licensing Examination Step 2 Clinical Knowledge, The United States Medical Licensing Examination Step 3. He passed all of these official licensing examinations on the first attempt. He has taken the following medical board examinations: The American Board of Preventive Medicine's board examination in Occupational and Environmental Medicine and the American Board of Anesthesia's basic board examination.  He passed all of these official licensing examinations on the first attempt. Before being awarded his PhD in biomedical engineering, Dr. Weisman was required to take an official qualifying examination and conduct a dissertation defense. Dr. Weisman passed his official PhD examinations on the first attempt.

5.      Dr. Weisman notes that he was the first student to enter the joint MD/PhD program between LSU Health Sciences Center in Shreveport and Louisiana Tech University's engineering department. He also notes that he was one of the first MD/PhD students to graduate from LSU Health Sciences Center in Shreveport.

6.      Dr. Weisman notes that an MD/PhD program is typically an 8-year program. Typically, a student completes the first two years of medical school, then the 4 years of the PhD program and finally the final two years of medical school. Dr. Weisman finished the 4-year PhD portion of the program in around 2 years.  Even on his accelerated track Dr. Weisman found time to start a research group and biotechnology company.  Dr. Weisman notes that his bioactive 3D printing project led to the most cited press release of a new technology in Louisiana Tech University's history.  He notes that to date he has been awarded three patents from his research at Louisiana Tech University and LSU Health Sciences Center in Shreveport. He also notes that he helped the

21

technology development offices at both institutions in writing the patents to save them patent prosecution costs.

7.      Dr. Weisman notes that in the final two years of medical school he had two (2) 1,000 sq foot research lab spaces in the Shreveport Louisiana biotechnology incubator park. He had two PhD students working with him full time.  He has numerous publications, abstracts, and has been a feature speaker/lecturer at national conferences. He notes that while located in Louisiana, he had several news stations reporting on his technology and grant awards from the Biomedical research foundation of Louisiana.  He was even interviewed by National Public Radio (NPR) regarding his research.  The Chancellor or LSU Health Sciences Center in Shreveport held a press conference for his bioactive 3D printing work and wrote him a letter of reference for residency. Dr. Weisman notes that he was conducting research with the Chairs of most major departments at LSU Health including anesthesiology, radiology, general surgery, urology, oral surgery, orthopedic surgery and "ENT" (ear, nose, throat).   While he was in the process of applying for residency, he notes that, Ghali Ghali the Chair of Oral and Maxillofacial Surgery and future Chancellor asked him to stay and do a residency in Oral Surgery at the LSU Health Sciences Center which would have required him to complete an accelerated 2-3 year dental degree.  Dr. Weisman helped create a 3D printing lab for Chancellor Ghali and find another PhD student from his Louisiana Tech laboratory group to run it in his place when he left Shreveport for medical residency training.

8.      Dr. Weisman states that he was widely recruited to complete a medical residency at top ranked institutions across the country.  During the application process, Dr. Weisman interviewed at Stanford, Vanderbilt, Washington University St. Louis and other elite institutions eager to recruit a MD/PhD who was also a patent attorney and had a research lab. He notes that to his knowledge, there were no other residents with his background or even a MD/PhD with a research lab when he was interviewing. Dr. Weisman notes that generally 1% of less of physicians are MD/PhDs and even less have a PhD in engineering.

9.      Dr. Weisman notes that Washington University in St. Louis ("Washington University") called him in September or October of 2015 to invite him to a special research interview day.

22

They paid to fly he and his spouse out to interview and paid for their accommodations while visiting St. Louis. Dr. Weisman notes that this was highly unusual.  Dr. Weisman also notes how the administrative leadership at Washington University in St. Louis recruited him to come to Washington University in St. Louis to train in the anesthesiology residency program, and to bring his lab with him.  This leadership included Evan Kharasch the Vice Chancellor for research for Washington University in St. Louis who was an anesthesiology faculty member and Peter Naegle who would later become the Chair of Anesthesiology at the University of Chicago.

10.     On February 14th of 2016 Dr. Weisman notes that Alex Evers called him on Valentine's Day in an effort to speak with him and his wife about an offer to attend Washington University's anesthesiology residency ASAP program. Dr. Weisman and Alex Evers agreed that they would rank each other highly and Dr. Weisman would move his lab to St. Louis when he matched with Washington University. Dr. Weisman did rank Washington University highly and he ultimately matched with Washington University through the NRMP match process.

11.     Dr. Weisman notes that he matched into the experimental "ASAP Program."  This program was an experimental program that Washington University was granted special permission to have. No other training program in the country had a similar program. This program allowed for accelerated training and was targeted exclusively to MD/PhD residents to allow Washington University to recruit them.  Before this program there were none to a rare MD/PhD enrolled in Washington University residency training. After this program Washington University was able to recruit 3-4 MD/PhDs per year. This amounted to nearly 20% of the 20-25 MD/PhD residents who went into anesthesiology each year.

12.     Dr. Weisman states that the ASAP program allowed MD/PhDs to complete their anesthesia training in roughly half the time as a regular resident training at Washington University or any other accredited program in the country.   A regular anesthesiology residency program takes three (3) years of training after an intern year for four years total. Completing a fellowship takes an extra year. A typical anesthesiology resident takes five (5) years to complete a residency plus fellowship.  Dr. Weisman notes that the ASAP program allowed you to begin fellowship training in the middle of your third year of training. Dr. Weisman notes that in the

23

ASAP Program, residents are able to begin the fellowship portion of training by the end of the 3rd year. Essentially, ASAP resident physicians spend the last two years of the five (5) years training program conducting research 80% of the time.  This constitutes a substantial reduction in critical training. Dr. Weisman notes that he was unaware of the deficiencies of the program and that many other MD/PhDs had trouble completing the residency in half of the typical training time allotted and that many regular faculty opposed the program as unfair. Many faculty felt it was not fair that they had to train for 5 years when MD/PhDs could basically do it in 3 years and then spend the remaining two years working one day a week clinically and the remainder of the week performing research.

13.     Dr. Weisman states that upon matching to Washington University in St. Louis in early 2016, that he was introduced to the St. Louis College of Pharmacy ("STLCOP") and their Center For Clinical and Translational Pharmacology. This was a joint venture between Washington University and STLCOP.  Alex Evers, Evan Kharasch and the President of STLCOP, John Pieper, were involved in this center.  There was an agreement that Dr. Weisman would move his biotechnology company called Strategic Biomedical, Inc. into a roughly 1,000 sq foot lab in this space. Dr. Weisman and his company negotiated this agreement and moved the lab, company, Post-Doctoral employees and equipment from Shreveport, LA to St. Louis.

14.     Upon arrival in St. Louis, Dr. Weisman states that he did not receive the help that he was promised to transition and establish the lab there. He notes that Alex Evers, the Chair of Anesthesiology contacted him in August of 2016 and requested all of his company's private corporate documents.  Alex Evers asked for this so he could get the lease agreement that Dr. Weisman had signed with the St. Louis College of Pharmacy. Dr. Weisman had been contacted by the president and general counsel of the St. Louis College of Pharmacy who requested that he not give those documents to Alex Evers because they anticipatorily feared that Alex Evers wanted the documents for advantages in lease negotiations with the STLCOP in their joint venture

15.     Dr. Weisman notes that his refusal to breach fiduciary duty and behave unethically caused him to have a falling out with Alex Evers and the anesthesiology department

24

administration.  He states after he refused to provide Alex Evers with privileged business documents, that program leadership attempted to drive him out of his residency program by giving him bad evaluations and lying about where his real evaluations were. He notes that Richard Benzinger, the Program Director joined in the campaign to drive him out of the residency training program.

16.     Dr. Weisman notes that in January of 2017, he and the other MD/PhD resident, Gary Hammen, were called in to meet with anesthesia department administration. Dr. Weisman states they were both told they were failing rotations, but no evidence was provided to them, despite requests to view their evaluations. Dr. Weisman states that during this meeting he was asked by program leadership to resign from the ASAP program.

17.     Dr. Weisman had multiple meetings with Alex Evers, Thomas Cox, Russell Groener and Richard Benzinger concerning his future in anesthesiology residency training. It was eventually agreed that instead of beginning his ASAP program anesthesiology training on time that he would repeat rotations they alleged he failed.  Dr. Weisman notes that he was told that he failed all of his internal medicine rotations by every attending he worked with and had to repeat a rotation in it.  He states that he later found out that the representation that he failed the internal medicine rotations was a lie and that all of his evaluations in internal medicine were positive. He states he got his real evaluations from the internal medicine department in the Spring of 2016.

18.     Dr. Weisman also states that he was told by Alex Evers to shut down his company and lab that he was coerced to move to St. Louis. He was told to give the lab to Washington University. Dr. Weisman states that he directed the lab to Washington University where it became a core research facility in the department of radiology. He states this was against his wishes and that he did not want to give up his lab and company, but felt that he had no other choice if he wanted to continue his residency training and protect his career as a physician.

19.     Dr. Weisman states that in his first year he was harassed in rotations in which he had contact with anesthesiology faculty members. He notes that he in general did well in rotations away from anesthesiology faculty members.

20.     Dr. Weisman notes that he and Dr. Gary Hammen were the only anesthesiology residents to not get to do a month or two of training in anesthesiology during their first year.  To Dr. Weisman's knowledge, all other residents received this experience opportunity,  so they were ready and prepared for the second year of anesthesiology education.

21.     Dr. Weisman notes that he began his second year of anesthesiology tutorial training and was immediately harassed by attending physicians. He notes that he and Dr. Gary Hammen were the only residents forced to extend their tutorial periods. He notes that several faculty members were approaching him and apologizing for the harassment and stating they were not involved in the sham evaluation campaign.

22.     He states that he was involved in several concerning situations where attending faculty compromised patient safety in an effort to target him. One particular incident Dr. Weisman mentioned occurred when Russell Groener walked into a case he was doing for another attending and demanded that Dr. Weisman give an injection of epinephrine for no legitimate reason. When Dr. Weisman took a picture of the monitors and texted it to Russell Groener, Russell Groener then stormed out of the operating room.  He also notes that he was written up for inappropriate reasons such as regular breaking of equipment that was not his fault.  One example he gives is that he had a disposable laryngoscope battery die.  He asked for a new one and replaced it in seconds.  The attending wrote up several paragraphs about the battery expiring.  He gives another example of a Dr. Joseph Kras screaming at him the first time they met, slamming a door and opening up the blinds on the window to an operating room. He also notes that Dr. Kras harassed him and sexually harassed and assaulted anesthetized patients. One example he gave was Dr. Kras yelling "big breasts" when he told the patient to take a big breath.

23.     Dr. Weisman notes that there was gas lighting and something he described as "front running" going on.  He states that every time he started a new rotation that the anesthesiology administration emailed his rotation coordinators.  This was to direct them to evaluate Dr. Weisman improperly.

24.     Dr. Weisman states the harassment and his concerns for patient safety got so bad that he went to meet with Human Resources in the winter of 2017. In early 2018, Dr. Weisman told the program leadership that he would resign after negotiating for considerations including, help going to a new program, a positive reference and timely access to his files and an assurance that letters of reference and transcripts being sent timely.

25.     Dr. Weisman notes that his final two anesthesiology rotation evaluations reflected that his performance met expectations.  He also notes that his written evaluations at this point were a point of contention between groups of evaluating faculty members. A normal evaluation might have a few written sentences of comments. He notes that his could be pages with warring factions of faculty involved.

26.     Dr. Weisman ended his affiliation with the Washington University department of anesthesiology in June of 2018.  He notes that he also took and passed his anesthesiology board examinations in this time.

27.     Dr. Weisman states that after he resigned from Washington University, he was blacklisted from training at other programs, not just by anesthesiology programs, but all programs to which he applied.  He gave examples of some notable cases of blacklisting and interference with his career.  He was supposed to follow the incoming chair, Peter Naegle to the University of Chicago anesthesiology department.  Dr. Weisman was asked by Dr. Naegle to run Dr. Naegle's biotech startup up out of his STLCOP company lab. Dr. Weisman complied and helped Dr. Nagle with Nagle's patents. Dr. Nagle said he would take Dr. Weisman with him to the University of Chicago. Dr. Naegle attended Dr. Weisman's wedding in July of 2018 and then suddenly ignored him. Dr. Weisman would later learn in his lawsuit that Thomas Cox had secretly met with Jerome Klafta, the Vice Chair of the University of Chicago anesthesiology department to interfere with Dr. Weisman's ability to secure the job promised by Naegle.  Dr. Weisman notes that his application was rejected by Cook County Stroger.  Dr. Nasr gave the open third year position to someone with no anesthesiology training despite Weisman having years of training and passing the first part of his boards.

28.    Dr. Weisman moved to Shreveport, Louisiana to return to the medical school he graduated from. Dr. Weisman notes that he spoke with Dr. Charles Fox in August of 2018 and was offered a residency position. He moved to Shreveport in October of 2018 and started working at LSU Health in the anesthesiology department.  He notes that Douglas Thompson the new program director at Washington University told Dr. Weisman that he sent all his transcripts and credentialing material.  Dr. Weisman notes that in November of 2018 he was called in to Dr. Patil's office and told that they could not keep him there since Washington University would not send the required training materials and said they had to talk to lawyers to get any materials about him.  Dr. Weisman states he had already rented an apartment and spent thousands of dollars on his move.

29.    Dr. Weisman notes that he then applied to every single anesthesiology program in the country and was unable to get into a single program.  He notes that he later found out that Washington University was interfering with his efforts to obtain a subsequent residency training position. He gave an example of Yale emailing internally that they were "salivating" at the prospect of a JD, MD, PhD who could rebuild their research programs.  He later found out that Dr. Evers told Yale not to hire him.

30.    Dr. Weisman was not in a residency training program for the 2018-2019 academic year, which delayed the completion of his residency training.

31.    Dr. Weisman notes that he eventually applied to residency training programs in the field of Occupational Medicine. He states that it was a boarded field but was unknown to him and many others in medicine.  He notes that the University of Illinois at Chicago made him an offer. He accepted and started at the program in June of 2019.  He notes he was made Chief resident for his second year.  However, he notes that Washington University found ways to harass him there.  He states that they never sent his ACGME transcript to the University of Illinois. This caused him to fear he would be kicked out of the program for not having a transcript. Despite this, Dr. Weisman graduated from the program in June of 2021.

28

32.     Upon graduation in June of 2021, and passing his board examinations, Dr. Weisman was still not able to find a job the entire first year post residency training completion.  Dr. Weisman notes he was unemployed in medicine from July 1st of 2021 to July 4th of 2022.  He was not able to find work in the field of occupational medicine. Dr. Weisman notes that the largest employee in Occupational medicine, Concentra, where many University of Illinois graduates go would not hire him. The reason given for not hiring Dr. Weisman was that, "they heard something about him."  Dr. Weisman believes this to be an instance of interference with his job search in Occupational Medicine by Washington University.  One example he gives is that he applied to Duke University for an occupational medicine job.  He found out that they contacted Washington University for credentialing and reference purposes.  Duke was told to speak with the lawyers if they wanted any information on Dr. Weisman. Duke reported to Dr. Weisman that Washington University's response and mention of lawyers was a red flag.

33.     Dr. Weisman finally found a job as an Occupational Medicine physician after a year of unemployment.  Dr. Weisman has applied to numerous academic and private sector jobs but is consistently suddenly taken out of consideration and employers abruptly stop speaking with him without explanation.

**Conclusion**

I thank you for the opportunity to provide input in this matter. I have not created any exhibits to summarize my opinions, though I did create a now outdated summary listing physician compensation rates as of 2019-2020. *See* Exhibit 4. Exhibit 1 contains a list of publications within the past ten (10) years. I have included an Exhibit 3, identifying the cases in which I have testified as an expert in the prior four (4) years. All of the facts and data I have considered in forming my opinion are referenced above or attached in Exhibit 2. My hourly rate for my expert testimony in this matter is $200. My typical hourly rate, which I am not utilizing in this matter, is contained in Exhibit 5.

29

Dated: September 30, 2022
_____

*Alan Kaye*

_____
ALAN D. KAYE, MD, PhD