UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JEFFERY WEISMAN and STRATEGIC BIOMEDICAL, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4:19-cv-00075-JAR |
| BARNES JEWISH-HOSPITAL, BJC HEALTHCARE, WASHINGTON UNIVERSITY, DR. ALEX EVERS, DR. RICHARD BENZINGER, and DR. THOMAS COX, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**WASHINGTON UNIVERSITY DEFENDANTS' MEMORANDUM IN
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**SHANDS, ELBERT, GIANOULAKIS &
GILJUM, LLP**
Mark J. Bremer #24696MO
Kevin Anthony Sullivan #55140MO
8235 Forsyth Blvd., Suite 700
St. Louis, MO 63105
(314) 241-3963
(314) 241-2509 (fax)
mbremer@shandselbert.com
ksullivan@shandselbert.com

Attorneys for defendants Washington University,
Thomas Cox, Richard Benzinger, and Alex Evers

## TABLE OF CONTENTS

Page

Introduction and Summary ................................................................................1

Factual Background ........................................................................3

Summary Judgment Standard ............................................................20

ARGUMENT .....................................................................21

    I.   There Is No Cognizable Claim for Breach of Contact Based on the Alleged
Verbal Separation Agreement.............................................................21

        A.  There Was No Offer and Acceptance of the Purported Terms of the
Separation Contract...........................................................22

        B.  There Was No Bargained-For Consideration for the Alleged "Separation
Agreement" .......................................................23

        C.  Based on the Binding Admissions of Weisman, the Separation Contract Is
Barred by the Statute of Frauds. ...................................24

    II.  Weisman Cannot Prove Any Actionable Claim of Defamation for Numerous
Reasons. ..........................................................25

        A.  Plaintiff Cannot Proffer Any Probative, Admissible Evidence that
Defamatory Statements Were Made to Other Residency Programs.............25

        B.  Even if the Statements Relating to Weisman Failing Rotations or Needing
to Consult with Counsel Before Releasing Records Were Made, They
Would Have Been True. ................................................26

        C.  By Requesting that Letters and Materials Be Sent to Other Residency
Programs, Weisman Consented to the Publication of the Statements. ............28

        D.  Any Statements to Other Residency Programs Were Privileged in That They
Were Made to Protect the Interests of the Other Programs and Were Made
in Good Faith and Without Actual Malice....................................29

        E.  The Alleged Statements to Other Residency Programs About Needing to
Talk to Lawyers Before Providing Information, if in Fact Made, Were
Facially Innocuous and Non-Defamatory and Not Actionable......................31

F.  Weisman Cannot Prove that Any Alleged Statement that He Failed Rotations or His Records Could Not Be Released without Consulting Counsel Caused Any Damage.. .........................................................33

III. Plaintiffs' Conversion Claim Is Completely Meritless Based on Settled Law and Plaintiffs' Own Binding Admissions. .............................................34

A.  Plaintiffs Consented to the Transfer of the 3-D Printing Lab Property, Which Is a Complete Defense to a Conversion Claim. ...................................34

B.  Plaintiffs Abandoned the 3-D Printing Lab Property, Further Foreclosing Their Conversion Claim .................................................................................36

C.  Plaintiffs' Conversion Claim Based on Ideas or Intellectual Property Found in Working Papers or Notebooks Also Fails Because Plaintiffs Have Not Identified the Ideas or Intellectual Property Contained in Those Documents or Established Who Owned Them. ................................................................38

IV. Plaintiffs' Quasi-Contract Claims for Quantum Meruit and Unjust Enrichment Fail as a Matter of Law for Multiple Reasons. .....................................................39

A.  The University Did Not Accept and Retain the 3-D Printing Lab Property Under Inequitable or Unjust Circumstances Because Plaintiffs Donated or Voluntarily Transferred the Property. ...........................................................40

B.  Plaintiffs received the value and benefit they intended to obtain by voluntarily transferring the property. ...........................................................42

C.  The University Has Not Benefitted from Receiving the 3-D Printing Lab Equipment. ....................................................................................................43

D.  Plaintiffs Never Demanded Payment. .........................................................44

V.  The Civil Conspiracy Claim Is Likewise Not Actionable as a Matter of Law and Undisputed Fact. .....................................................................................................45

A.  Plaintiffs Have Failed to Prove the Elements of Civil Conspiracy with Any Probative Evidence. .....................................................................................45

B.  The Civil Conspiracy Claim Is Also Barred Because There Are No Actionable Torts .............................................................................................46

C.  The Individual Defendants Are Not Proper Parties to the Civil Conspiracy Claim. ............................................................................................................47

Conclusion ............................................................................................................47

## Introduction and Summary

Based on this Court's May 29, 2020 Memorandum and Order granting in part and denying in part Defendants' Motions to Dismiss (Dkt. #69), Plaintiffs Jeffery Weisman ("Weisman") and Strategic Biomedical, Inc. ("SBI") have the following remaining claims pending against Defendants The Washington University ("University"), Dr. Alex Evers ("Evers"), Thomas Cox ("Cox"), and Richard Benzinger ("Benzinger") (collectively "University Defendants"): (1) Weisman's breach of contract claim against the University based on the so-called "separation agreement" promise to provide a "good" recommendation letter (Count I); (2) Weisman's defamation claim against the University, Evers, and Benzinger based on alleged statements made to third-party residency programs that Weisman failed rotations and that his records could not be released without counsel's permission (Count IV); (3) Weisman's and SBI's conversion claim against the University, Evers, and Benzinger based on the alleged possession of Plaintiffs' research lab equipment (Count V); (4) Weisman's and SBI's quantum meruit and unjust enrichment claims against the University based on the alleged possession of the research lab property (Counts VI and VII); and (5) civil conspiracy against the University Defendants (Count VIII).  As shown herein, each of these claims fail as a matter of law and undisputed facts (including Plaintiffs' own binding admissions).

There is no enforceable "separation agreement" because there was no offer and acceptance of Weisman's resignation in return for a "good" recommendation letter and because the obligations are too uncertain and indefinite to be enforceable.  There was no consideration in that the University received nothing by Weisman's resignation, which in fact was to its detriment.  In any event, the alleged verbal separation agreement could not be performed within one year and is therefore barred by the statute of frauds.

Weisman's defamation claim fails for multiple reasons.  There is no probative evidence that anyone made a statement to a third-party residency program that Weisman failed rotations or that records could not be released without first talking to lawyers.  Even if such statements were made, they would have been undeniably true.  Moreover, Weisman requested the publication of the statements to third-party residency programs and therefore consented to the statements and cannot complain about any statements made.  Additionally, any such statements were privileged in that they would have been made to protect the interests of other residency programs and were made in good faith and without malice, and not defamatory.   Also, any statement about needing to speak with lawyers before releasing records is capable of an innocuous, non-defamatory meaning and thus not actionable.  Lastly, Weisman cannot demonstrate that any of the alleged statements caused any damage.

Plaintiffs' conversion claim is likewise meritless for multiple reasons.  Based on numerous binding admissions, Plaintiffs consented to, assented to, and ratified the Department of Radiology taking possession of the research lab's property in that: (a) Weisman, in his words, donated the lab and its property; and (b) SBI's own employees moved the lab's property to the Department of Radiology with the full knowledge and approval of Plaintiffs.  Plaintiffs also abandoned the property and never made any attempt to retrieve the property.  Furthermore, Plaintiffs have not shown they owned or were deprived of the right to possession over any idea or intellectual property contained in working papers.

Plaintiffs' quasi-contract claims of quantum meruit and unjust enrichment also fail as a matter of law.  Plaintiffs donated or voluntarily transferred the 3-D printing lab property to the University, demonstrating there was no inequitable or unjust circumstances in the University's retention of the property. Plaintiffs obtained what they expected in transferring the lab property

by the University's hiring of SBI's employees, which excused Plaintiffs of their contractual obligations to pay SBI's employees, and by Weisman being "thought of well." Moreover, the University has not received or retained any benefit by owning the lab equipment – in fact, the Department of Radiology has lost money in operating the 3-D printing lab. Additionally, Plaintiffs never demanded the return of the property.

The civil conspiracy claim is equally groundless. Plaintiffs cannot prove the essential elements of civil conspiracy, in particular a meeting of the minds among Defendants to commit a tort. Also, the civil conspiracy claim cannot proceed because, as shown, there is no viable underlying tort. And the Individual Defendants are not proper parties to this claim.

**Factual Background**

**A.      Weisman Is Accepted into the Anesthesiology Residency Program**

Faculty in the University's Department of Anesthesiology ("Department") trained and supervised resident physicians in the Anesthesiology Residency Program operated by the Graduate Medical Education Consortium between the University, Barnes-Jewish Hospital, and St. Louis Children's Hospital ("Residency Program"). (University Defendants' Statement of Uncontroverted Material Facts ("UDSF") ¶1.) Defendants Dr. Evers (Department Chair), Dr. Cox (Vice-Chair of Education), and Dr. Benzinger (Program Director) were the physician faculty members in the Department with responsibility for the training and supervision of residents. (UDSF ¶¶2-4.) In late 2015, Weisman applied for a position in the Residency Program, specifically for a position in the Academic Scholars Advancement Program (ASAP), which was a unique training program whereby a resident would complete clinical residency training in an accelerated fashion, receive training as a fellow in a sub-specialty, and have up to 18 months of dedicated research time. (UDSF ¶¶5-6.) Weisman was selected for an interview for an ASAP

3

spot and was interviewed by several Department faculty, including Drs. Cox and Benzinger. (UDSF ¶7.)  The Residency Program participated in the National Residency Matching Program ("NRMP"), whereby the program ranks applicants on a list and the applicants rank programs, and the NRMP matches applicants to programs, thus requiring the program to accept a resident into the program. (UDSF ¶8.)   Dr. Cox believed Weisman was below average due to his very average test score, being ranked in the bottom half of his class in a lower-tier medical school, and noted struggles in his clinical performance.  (UDSF ¶9.)  Dr. Benzinger advocated against ranking Weisman due to concerns about his clinical performance.  (UDSF ¶10.)  Other faculty, including Dr. Evan Kharasch and Dr. Evers, advocated for Weisman because of his research potential, and Drs. Cox and Benzinger were overruled, resulting in Weisman matching with the Residency Program with a start date in June 2016. (UDSF ¶¶12-13.)  As a resident, Weisman was an employee of BJH, not the University. (UDSF ¶13.)

Unbeknownst to Drs. Evers and Benzinger, Weisman planned to bring his company, SBI, and its research lab with him to St. Louis and to run that business while doing his residency training. (UDSF ¶¶14-15.)  Through Dr. Kharasch (Anesthesiology professor), Weisman was put in contact with the leadership of St. Louis College of Pharmacy ("STLCOP") to rent lab space, and SBI entered into a lease with STLCOP and gave STLCOP a 5% equity interest in the company as rent. (UDSF ¶16.)  The University had no involvement in this transaction, and there was no nexus between SBI and its lab and the University. (UDSF ¶18.)  STLCOP is not affiliated with and is completely independent from the University. (UDSF ¶17.)

**B.    Weisman's Early Performance as a Resident**

In the Residency Program, residents spend their first year as interns with rotations through a variety of medical specialties, which is then followed by clinical anesthesia rotations.

4

(UDSF ¶19.)  Rotations generally last four weeks where residents work with several faculty physicians.  (UDSF ¶20.) At the end of the rotation, a faculty rotation coordinator completes an evaluation of the resident based on the feedback and evaluations from the faculty. (UDSF ¶20.) Resident evaluations have both subjective and objective components and can vary significantly among faculty evaluators depending on things such as the complexity of a procedure or the volume of procedures. (UDSF ¶21.)  Faculty evaluators are expected to communicate an assessment of a resident's competence and any concerns with performance because the Residency Program has an obligation to patients to ensure that residents become competent anesthesiologists and an obligation to residents to train them. (UDSF ¶¶22-23.)  In the Residency Program, it was unusual for a resident to have even one highly negative rotation evaluation during their training. (UDSF ¶24.)

Weisman's first rotation was in Emergency Medicine in June-July 2016, and his overall rotation evaluation was unsatisfactory and reported as follows: "trouble identifying salient issues and prioritizing relevant issues"; "Presentations not appropriate for intern level"; "trouble executing tasks as discussed and multi-tasking"; "Below average understanding of workup and medical knowledge."; and "Performed at level of MS4-3 [medical student]." (UDSF ¶25.)  On August 15, 2016, during Weisman's rotation in the ICU, Dr. T.J. Graetz (an Anesthesiology faculty member) sent an email to Dr. Benzinger and Dr. Jessica Zenga (the ICU rotation coordinator) which raised concerns about Weisman's performance and noted: he had "lots of room to improve on prioritization, time management . . . and medical knowledge"; "got the sense he was overwhelmed in general"; "he's performing very far below expectations for an intern"; "our medical students are doing much better than him"; "doesn't know anything about any of his patients"; and "multiple complaints from every resident on the team that they receive essentially

no relevant sign out from Jeff because he has no idea what happened with his patients." (UDSF ¶26.) Weisman's overall evaluation for the ICU rotation was "below expectations" and reported: "behind his peers in medical knowledge, efficiency and procedural skills"; "[b]elow the curve" on medical knowledge; "his presentation skills and subsequently management plans were all over the place"; and "didn't really have an idea at all where to take all the data and apply it to the patient." (UDSF ¶27.)  Due to these two early unsatisfactory and concerning evaluations, Dr. Benzinger and Dr. Russell Groener (Assistant Program Director) met with Weisman on or about August 25, 2016, in order to determine the cause of his difficulties and provide feedback on his clinical performance. (UDSF ¶28.)

Despite this early intervention, Weisman continued to struggle in his first year.  His evaluation in his next rotation, Cardiology-Internal Medicine, was "[m]ore of the same." (UDSF ¶29.)  One evaluation had low ratings, especially when compared to the evaluator's and his peers' average ratings, and, while noting some positive performance, stated Weisman "had trouble setting priorities and efficiently dealing with competing priorities" and "[p]resentations were not well organized, and not complete." (UDSF ¶30.)  Another evaluation noted that Weisman "was well below the level I would expect for an intern" and had "deficits . . . in gathering data, assimilating the data, and presenting a treatment plan," leading the evaluator to "doubt his appreciation of what was truly going on." (UDSF ¶31.)

After receiving an acceptable evaluation in a second Emergency Medicine rotation, Weisman did a rotation in the Cardiothoracic ICU from October 17 to November 13, 2016. (UDSF ¶¶32-33.)  During the rotation, two faculty evaluators emailed Dr. Benzinger with concerns about Weisman's performance in the rotation. (UDSF ¶33.)  Dr. Julianne Donnelly reported that Weisman's "notes and his conversation demonstrated a complete lack of basic

understanding" with specific examples, that "[o]n several occasions, he left without giving report to the oncoming [nurse practitioner] about patients for which he cared for overnight," and that she needed to go over basic presentations with him. (*Id.*)  Dr. Diego Casali reported that Weisman "functions at best at the level of a second year medical student," that he spent "multiple hours talking with him and trying to understand why he is so disorganized and unable to follow up on and complete even basic tasks," that Weisman's "deficiencies are profound," and that "he's one of the worst residents I've ever worked with and I honestly don't think he should work in a high acuity setting like Anesthesiology or Critical Care." (*Id.*)  Prior to the rotation evaluation being finalized, Dr. Groener met with Weisman and gave him feedback on the CT ICU rotation, including his inability to present patient cases coherently and lack of professionalism in not doing patient handovers. (UDSF ¶34.)  Weisman's CT ICU rotation evaluation had an overall "unsatisfactory," which incorporated the comments of Drs. Donnelly and Casali and further noted that Weisman's "organizational skills have to be at least at a basic level before we can focus on how to improve his medical knowledge" and that "[w]e believe he should not work in a high acuity setting." (UDSF ¶35.)

Weisman then did two rotations in Internal Medicine in November-December 2016. (UDSF ¶36.)  In one rotation evaluation, Weisman's performance was well below the evaluator's average assessment and the average assessment given to his peers. (UDSF ¶38.)  Another evaluation was what Dr. Benzinger described as "one of the worst evaluations of an intern on internal medicine that I've seen" because Weisman was graded at 60% of the performance of his peers and far below the average grades that the evaluator gave. (UDSF ¶37.)

**C.      Weisman Is Placed on Probation within the Program**

The Residency Program's Clinical Competence Committee ("CCC") reviews the performance of residents every 6 months and determines whether a resident's progress is satisfactory and, if not, what actions need to be taken to address the performance deficiencies. (UDSF ¶40.)  The CCC met on January 11, 2017, and determined that Weisman's performance in his first 6 months was unsatisfactory. (UDSF ¶41.)  It was decided that Weisman would need to receive satisfactory evaluations for the next 6 months of rotations and to repeat two rotations in internal medicine and the ICU. (UDSF ¶42.)  If he did not, an official report of unsatisfactory would be made to the American Board of Anesthesiology ("ABA"), which would require re-doing 6 months of his residency. (UDSF ¶44.)  On January 19, 2017, Drs. Benzinger and Groener met with Weisman for his 6-month evaluation and gave Weisman a detailed letter explaining that his performance was not meeting the Residency Program's expectations with examples from his rotation evaluations, that he was being placed on probation within the Residency Program, what he needed to do to remediate his performance in the next 6 months, the consequences of not remediating his performance, and advising Weisman to switch from the ASAP track to the traditional residency track.  (UDSF ¶45.)  In this meeting, Weisman blamed his performance on external factors, including the distraction of running his imploding company and the BJH electronic medical record system. (UDSF ¶47.)  Dr. Benzinger's impression was that Weisman was considering leaving the Residency Program and asked Dr. Evers to meet with Weisman and provide career advice. (UDSF ¶48.)

On or about February 16, 2017, Dr. Evers and Weisman met to discuss how Weisman could improve and succeed.  In particular, Dr. Evers counselled Weisman that he needed to focus on his residency training and that his company could be a distraction. (UDSF ¶50.)  After that meeting, Weisman emailed Dr. Evers, thanking him for setting up the meeting, and stated that he

was shutting down participating in outside research and businesses, that he would regularly consult with Dr. Groener and rotation coordinators, that he would talk to other research residents about their paths to success, and that he agreed to redo the two rotations as part of remediating his performance. (UDSF ¶51.)

**D.      The Donation of SBI's Lab Property to the Department of Radiology.**

SBI had moved its lab and equipment to STLCOP in June 2016. (UDSF ¶52.)  Apart from 3-D printing equipment, SBI owned licensing rights to a patent application developed by Weisman that was owned and controlled by Louisiana Tech University. (UDSF ¶53.)  SBI had two employee/independent contractor researchers, Drs. Uday Jammalamadaka and Karthik Tappa, who moved to St. Louis. (UDSF ¶52.)  SBI and Weisman did not collaborate with STLCOP on research, grants, or education. (UDSF ¶54.)  SBI had no grants and did not receive any grants. (UDSF ¶55.)  Other than Weisman, SBI had one investor, David Sinow, who put money into the company, and it was not able to obtain any other investors or venture capital. (UDSF ¶56.)  In December 2016, Sinow decided he would not put any additional money into SBI. (UDSF ¶67.)

In July-August 2016, SBI and Weisman had proposed collaborating on 3-D printing research with the University's Department of Radiology. (UDSF ¶57.)  The Chair of the Department of Radiology, Dr. Richard Wahl, asked Dr. Evers about a rumored financial arrangement that the Department of Anesthesiology had regarding 3-D printing that involved a venture capitalist and STLCOP. (UDSF ¶58.) No such arrangement existed, and Dr. Evers responded he knew nothing about it. (UDSF ¶¶58-59.) Dr. Evers contacted Dr. Kharasch, who informed Dr. Evers that he introduced Weisman to the STLCOP leadership, that Weisman had reached an arrangement with STLCOP for lab space, and that neither the Department nor the

University had anything to do with the arrangement. (UDSF ¶59.)  This was the first Dr. Evers had learned that Weisman had been running a company or lab in St. Louis. (UDSF ¶60.)  Dr. Kharasch further informed Weisman that his statement in a proposal to Radiology that the SBI was housed in the Center for Clinical Pharmacology was "totally incorrect, if not also misleading," and Weisman agreed to remove the statement from further business proposals. (UDSF ¶61.) Dr. Evers was concerned about a potential conflict of interest – that the Department should not have a business interest in or be a partner with a resident because the Department should be solely focused on training residents – and he wanted to make sure that the arrangement was an arm's length transaction without any involvement with the Department. (UDSF ¶62.)  Dr. Evers met with both Weisman and Sinow regarding SBI's relationship with STLCOP and was satisfied that no conflict of interest existed, and Dr. Evers made it clear that the Department did not object to Weisman's outside business activities so long as they did not interfere with his residency training. (UDSF ¶¶63-64.)

At the end of 2016, SBI had no revenues and was spending $8,000-$10,000 per month, mostly relating to the researchers' compensation. (UDSF ¶65.)  SBI could no longer pay the lab's operating costs and the researchers' salaries. (UDSF ¶68.)   Sinow was not going to put any more money to protect his interest. (UDSF ¶67.)  SBI proposed a research agreement to the Department of Radiology whereby a Center for Perioperative Services, 3-D Medical Printing and Rapid Prototyping would be housed in the Department of Radiology with the Department being responsible for personnel salaries. (UDSF ¶71.) The agreement was never finalized. (*Id*.)  On January 25, 2017, Weisman emailed Dr. Pamela Woodard (Radiology professor) about "an improved change of plans for both you and David Ballard [a Radiology resident at the time and now a Radiology faculty member] to keep things fully academic." (UDSF ¶70.)  On February 3,

2017, SBI proposed that it be acquired by the Department of Radiology with SBI's 3-D printing lab property and employees relocated to Radiology. (UDSF ¶71.) The proposal requested no payment of money, only that Radiology take over the expenses of operating a new 3-D printing lab and paying SBI's two employees. (*Id.*) An agreement was not reached. (*Id.*)

On February 19, 2017, Dr. Woodard offered to cover the researchers' salaries, and Weisman was grateful. (UDSF ¶72.) SBI, through Weisman and Sinow, "made a decision to move its equipment so that the radiology department could establish a lab." (UDSF ¶73.) This decision to voluntary transfer the 3-D printing lab property was motivated by several factors:

(1)   They wanted Weisman to be "well thought of" and "improve his position," wanted to "protected the technology," and believed it was "far more laudable use" for Radiology to have the lab property.  (UDSF ¶74.a.)

(2)   Weisman believed there was the potential that he could operate the 3-D printing facility as a co-director with Dr. Ballard after he finished his residency. (UDSF ¶74.b.)

(3)   SBI could not cover the salaries of its researchers, whose immigration status required that they be employed, and it was important that they be employed by the University. (UDSF ¶74.c.)

(4)   Weisman and Sinow agreed that it was in "the best interests of the company to transfer" SBI's equipment to Radiology. (UDSF ¶74.d.)

(5)   It was Weisman's "choice" between dedicating his time to his residency training or continuing to operate SBI, and he chose to focus on his residency training and completing it, which was important to Weisman and Sinow. (UDSF ¶74.e.)

On or about March 21, 2017, SBI employees moved the company's property over to the Radiology 3-D printing facility with the full knowledge of and without objection from Weisman and Sinow. (UDSF ¶75.)  In fact, Weisman worked to "facilitate what was going on, what was being taken over to Radiology" and "assisted with the transition." (UDSF ¶76.) Neither SBI nor Weisman ever demanded that SBI's property be returned or that any payment be made for the equipment.  (UDSF ¶77.) To the contrary, on numerous occasions, Weisman stated in writing

and even in CVs sent to other residency programs that he donated SBI's lab to the Department of Radiology. (UDSF ¶¶78-79.)  Weisman likewise admitted to Dr. Alan Kaye (a mentor and one of Weisman's proposed expert witnesses) and Ken Fleischmann (General Counsel for STLCOP) that he donated the lab to Radiology. (UDSF ¶¶80-81.)  SBI's researchers became employees of the Department of Radiology, which SBI admitted cured its "burn rate" of $8,000-$10,000 per month and relieved SBI of its contractual obligations to pay their salaries, which was beneficial to it. (UDSF ¶¶69, 82.)

The Radiology 3-D printing facility remains in operation with Dr. Ballard as director. (UDSF ¶84.) Some of the equipment that SBI transferred to Radiology is still in use, while some is no longer used. (*Id*.) Radiology has purchased $50,000 in additional 3-D printing equipment for the lab. (*Id.*)  The Radiology 3-D printing facility has operated at a loss for every year since it was founded – $40,776 in FY2017, $116,688 in FY2018, $93,171 in FY2019, $68,107 in FY2020, $29,852 in FY2021, and $82,798 in FY2022 – and the Department of Radiology has covered these deficits. (UDSF ¶85.)

**E.    Weisman's Performance in His Second Year of Residency Training.**

In the second half of his internship year, Weisman's rotation evaluations improved some. In his CPAP (Continuous Positive Airway Pressure) rotation, he received a "below expectations," but it was noted he improved in the last third or quarter of the rotation. (UDSF ¶86.a.)  He received "meeting expectations" in his Simulation rotation and in two surgery rotations. (UDSF ¶86.b.)  Weisman received "below expectations" in his ICU rotation with comments that "he is unable to apply book knowledge to clinical care" and that "[w]e are truly concerned about his competency to take care of patients and have reservations about advancing him to his next year of residency." (UDSF ¶86.c.)  The CCC met on June 21, 2017, and, while

12

noting Weisman needed feedback on his lack of performance, determined that Weisman's entire class satisfactorily met the competency requirements. (UDSF ¶87.)  Weisman was therefore no longer on probation within the Residency Program at the end of his first year. (UDSF ¶88.)  However, in order to provide Weisman with additional support, the Residency Program gave Weisman an academic advisor, Dr. Graetz, in June 2017, earlier than the rest of his residency class (which would get an advisor mid-way through the second year). (UDSF ¶89.)

Weisman's performance in his second year of training – clinical anesthesia – was concerning.  In his Tutorial Rotation, 4 out of 6 faculty evaluators found that Weisman was not capable of moving on to independent, less supervised care. (UDSF ¶90.)  Common concerns with respect to his performance included acting slowly, problems with focusing on the important aspect of the case, lack of vigilance, and poor medical knowledge. (*Id.*)

Weisman scored in the bottom 5 percentile on the Anesthesia Knowledge Test-1 Pre-Test, which he took on July 5, 2017. (UDSF ¶91.)  He likewise scored in the bottom 5 percentile on the Anesthesia Knowledge Test-6 Post-Test, which he took on January 24, 2018.  These tests determine the level of knowledge of residents. (*Id.*)

Weisman had 4 clinical anesthesia rotations to start his second year of training and received either an unsatisfactory or below expectations overall evaluation in each one. (UDSF ¶92.)  In his initial clinical anesthesia rotation in POD-4 CAM, Weisman received a below expectations overall evaluation with comments that he was "[s]till lagging behind his peers," although improving.  (UDSF ¶93.)

During Weisman's next clinical rotation in Pediatric Anesthesiology, Dr. Groener, the rotation coordinator, received numerous written comments from faculty evaluators. (UDSF ¶94.)  Some were positive, but the consensus was that "his performance reached the level of deeply

troubling, with serious concern for patient safety." (*Id.*)  For example, Dr. Douglas Thompson, who at the time was an Assistant Program Director, reported: "The last time I worked with him when I left him alone for no more than 10 minutes. When I returned I noticed he had re-filled the sevo vaporizer (nothing wrong with that), however he failed to realize the vaporizer wasn't properly engaged with the machine and therefore NO anesthetic agent was being delivered to the patient! When I returned to the room I quickly noticed the end-tidal concentration of sevo had fallen to 0.5%. It is not clear to me when or if Jeff would have noticed this." (UDSF ¶95.)  Dr. Thompson testified that this was a "big deal" and a "big incident" because it put the child patient at risk of having recall (having awareness or waking up during the procedure), and it could have been avoided by properly operating the equipment or looking at the monitors.  (UDSF ¶96.)

Another faculty evaluator reported:  "After mask induction, ready for intubation, patient apneic [temporarily not breathing]. Resident decides to abandon patient and go back to cart to fumble around for a nasal temp probe. . . .  When I asked why he prioritized something that trivial over breathing for a paralyzed patient, he said (I kid you not) 'some attendings are particular about things like that.'  I was speechless.  Once intubated, I stepped out for a few minutes. When I returned, noticed the $ETCO_2$ was 89 and bellows were not moving. I asked if he was intentionally hypoventilating for some reason I was unaware of (biting my tongue at this point). Didn't have a plan of attack for how to remedy, check for leak in system, etc. Not sure he was even aware of the hypercarbia [increased carbon dioxide]." (UDSF ¶97.)  By way of further example, Dr, Groener himself noted an 8-year old patient's blood pressure had dropped significantly while he was out of the room, and Weisman "had taken no action, not even a fluid bolus." (UDSF ¶98.)  Similarly, yet another faculty evaluator reported:  "I was following along in Metavision outside of the room and noted the blood pressure dip to systolics in the 40s. After

14

not receiving a phone call, and concerned, I went into the room. There had been blood loss, hypotension, and tachycardia and Dr. Weisman had turned UP the anesthetic agent (sevoflurane from 2 to 3%). This was in the setting of a functional epidural that had been providing most of the analgesia for the case at this point. When asked about his decision Dr. Weisman implied he thought the patient was becoming light or experiencing pain. I decreased the anesthetic, bolused albumin and the patient improved. This event lead me to be concerned about basic diagnostic decision making and a lack of insight into when to call for help." (UDSF ¶74.a.)  Other comments from evaluators commonly noted a lack of vigilance, deficiencies in medical knowledge, struggles with clinical skills, lack of prioritization, and unwillingness to accept feedback.  (UDSF ¶100.)  For his overall evaluation on the Pediatric rotation, Weisman received an overall "unsatisfactory," with the rotation evaluation noting many of these examples and performance deficiencies. (UDSF ¶101.)

Early in his next clinical rotation, POD-2 ENT, the rotation coordinator expressed concern to Dr. Benzinger about the necessary level of supervision for Weisman's level of ability and noted that a faculty member was concerned that Weisman posed a risk to patient safety. (UDSF ¶102.)  Weisman received an overall evaluation of below expectations on this rotation, with comments noting a failure to recognize priorities, to remember to turn on equipment, to manage equipment and monitors, to know proper dosages, and to accurately fill out medical charts, and also including positive comments about his performance. (UDSF ¶103.)

In his fourth clinical rotation of the first half of his second year, Weisman's overall evaluation was "below expectations" by Dr. Benzinger, the rotation coordinator, based on discussion with the rotation's faculty. (UDSF ¶104.)  The rotation evaluation noted that Weisman's "clinical care is significantly below expectations," that he "fails to notice

15

abnormalities on monitors, and is inconsistent in synthesizing these abnormalities into differential diagnoses and plans of action," and that he "is certainly making an effort, but the end result is still short of expectations." (*Id.*)

## F.   Weisman's Decision to Voluntarily Resign from the Residency Program.

Weisman and Dr. Benzinger spoke several times in late 2017 about whether Weisman should stay at the Residency Program. (UDSF ¶105.)  In mid-December 2017, Weisman and Dr. Benzinger discussed Weisman's performance and the idea of him leaving the Residency Program at the end of the year. (UDSF ¶106.)  Weisman asked Dr. Benzinger whether, if he resigned with a certain effective date, the CCC would consider issuing an unofficial warning instead of an official report of unsatisfactory to the ABA, which would have long-lasting negative effects. (*Id.*) Dr. Benzinger believed this would be acceptable and would not compromise the Program's integrity in that saying "everything was fine" was not acceptable, but that not taking a formal action after a semester of anesthesia training was justifiable. (*Id.*)  Drs Cox agreed. (*Id.*)

On or about January 2, 2018, Weisman met with Dr. Evers to discuss career advice, and Weisman informed Dr. Evers: "I did not feel the clinical programs here were the right fit for me. My plan is to look at some other options and depart by July 1st." (UDSF ¶107.)  Weisman met with Dr. Benzinger about a week later and informed him of the very same thing. (UDSF ¶108.) The CCC met on January 10, 2018, and decided not to report an official unsatisfactory to the ABA on the basis that there was no need to damage his career if he was leaving. (UDSF ¶109.) The CCC decided that a letter of concern would be issued and career counseling be given because Weisman was leaving anesthesiology.  (*Id.*)

A letter dated January 11, 2018, was drafted summarizing Weisman's recent performance and clinical difficulties and warning him that similar clinical performance in the next 6 months

16

would result in a formal report of unsatisfactory to the ABA. (UDSF ¶110.)  The letter further summarized what Weisman had told the Program's leaders – that Anesthesiology was not a good fit and that he was going to change specialties.  (UDSF ¶111.)  The letter, however, emphasized that the decision to resign was Weisman's to make and that, if Weisman stayed, the Program would support his efforts to become an anesthesiologist. (*Id.*)  In response to Weisman's request that his clinical schedule be modified, the letter clarified that he would remain in the standard anesthesiology training up to the point that he formally resigned from the Residency Program, at which time modifications could be made to his training schedule, and further emphasized that the decision to resign was his to make. (UDSF ¶112.)  On or about February 22, 2018, Drs. Benzinger and Cox met with Weisman, gave him the January 11 letter, and informed him that his rotation schedule could be changed if he resigned, but, if he did not, the schedule would stand under the assumption that Weisman would continue training.  (UDSF ¶113.)

On April 5, 2018, Weisman emailed Dr. Benzinger and requested that his rotation schedule be modified for the remainder of the academic year in order to allow him to focus exclusively on research to help the Department of Radiology on 3-D printing research projects instead of performing clinical rotations. (UDSF ¶114.)  On that same day, Dr. Benzinger reinforced that Weisman needed to decide whether he would remain in the Residency Program or leave because, if he stayed, taking research time before obtaining basic skills and knowledge as an anesthesiologist would not be appropriate. (UDSF ¶115.)  Dr. Benzinger advised Weisman that, if he had decided to leave, he should submit a resignation letter with whatever effective date he wanted and that his training could be modified so long as it was consistent with the governing rules.  (UDSF ¶115.)  Dr. Benzinger further expressly stated:  "I saw that you perceive some sort of tie between your submission of a resignation letter and our provision of a recommendation

17

letter.  These are really independent events.  Our department will provide you or any other resident the strongest letter of recommendation that we can.  It's an obligation of any residency program." (UDSF ¶116.)  Dr. Benzinger concluded by advising Weisman that he should consider staying in the Residency Program because his recent rotations "have gone reasonably well" and that research time could be accommodated in future schedules after his second clinical year of training. (*Id*.)

Also on April 5, Weisman emailed Dr. Benzinger "to ask for a positive program director letter" that he could send directly to other programs and commented that he "honestly enjoyed working" with Dr. Benzinger. (UDSF ¶118.)  On the morning of April 6, Dr. Benzinger responded that he understood that Weisman "would like this to be an iterated or negotiated process, but that's simply not the way these letters are produced" and stated he will "write the letter that I think can do the most good for you in your search." (UDSF ¶119.)

In the evening of April 6, 2018, Weisman submitted his formal resignation from the Residency Program effective the end of June, which is when he would have completed 24 months of training. (UDSF ¶120.)  Weisman further made a formal request to modify his training schedule so that he could finish the academic year doing research in the Radiology 3-D printing facility. (*Id.*)  On April 7, 2018, Dr. Benzinger sent two emails to Dr. Weisman.  The first confirmed that the effective date of his resignation would be June 30 and stated he would discuss his training schedule modification with others. (UDSF ¶121.)  The second email from Dr. Benzinger informed Weisman that the Residency Program approved his request for research time through the effective date of his resignation with some general call duty. (UDSF ¶122.)

**G.     Letters to and Communications with Other Programs.**

18

In June 2018, at the request of Weisman, Dr. Benzinger sent virtually identical recommendation letters to the University of Chicago and Cook County Hospital. (UDSF ¶125.) Weisman has admitted that there was nothing false in Dr. Benzinger's letters.  (UDSF ¶126.)  Dr. Cox believed the letters were accurate and generously described Weisman's difficulties in a positive way, and Dr. Thompson believed the letters were positive under the circumstances. (UDSF ¶¶127-128.)  Dr. Benzinger subsequently spoke with Dr. Ned Nasr at Cook County Hospital and stated that his letter was accurate and that Weisman was likely to be successful with clinical training that was not compressed like in the Residency Program's ASAP program. (UDSF ¶129.)  Dr. Cox spoke briefly with Dr. Jerome Klafta with the University of Chicago at a conference. (UDSF ¶130.)  In response to Dr. Klafta's statement that it looked like Weisman struggled and that anesthesiology was not a good fit and his question of whether Weisman would finish the year in good standing, Dr. Cox stated that he believed he was going to finish in good standing and that he was doing research. (*Id.*)

After Weisman left the Residency Program on June 30, 2018, and after Dr. Thompson became the Program Director (Dr. Benzinger left the role on June 30 after 7 years), the Residency Program received requests from other residency programs and from Dr. Weisman to provide information relating to his training. (UDSF ¶132.)  The Residency Program complied with all of these requests and sent the letters or materials, except for a request from Weisman to send his entire file to LSU-Shreveport, which Dr. Thompson viewed as unnecessary and burdensome. (UDSF ¶133.) Instead, and with Weisman's knowledge, Dr. Thompson provided a recommendation letter and official milestone reports.  (*Id.*)  The letter Dr. Thompson sent to other programs was a revised version of Dr. Benzinger's letter, and Weisman's own proposed expert testified that it was a "good reference letter."  (UDSF ¶134.) No residency program to

which Weisman inquired about a spot ever requested a "summative evaluation" from the Residency Program. (UDSF ¶135.)

In December 2018, Dr. Evers spoke with Dr. Roberta Hines with Yale University about Weisman. (UDSF ¶136.)  Dr. Evers told Dr. Hines that Weisman was a resident and that he voluntarily resigned and that was all he wanted to say. (*Id.*)  When Dr. Hines continued to press for additional information, Dr. Evers merely stated that if she wished to "read between the lines" she could do so, but that he was not going to provide further details. (*Id.*)  Dr. Evers believed that a fully transparent and candid evaluation would have been damaging to Weisman. (UDSF ¶137.)

Weisman ended up completing a residency in occupational and environmental medicine at the University of Illinois Chicago and is currently employed by the Hampton Veteran Affairs Medical Center as Director of Employee Health with a salary of $237,000. (UDSF ¶¶147-148.)

## Summary Judgment Standard

Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (citations omitted).  "To survive a motion for summary judgment, the nonmoving party must substantiate his allegations with sufficient probative evidence [that] would permit a finding in his favor based on more than mere speculation, conjecture, or fantasy."  *Barber v. C1 Truck Driver Training*, 656 F.3d 782, 801 (8th Cir. 2011).  Plaintiff cannot rely on his own self-serving testimony, conclusions, or unsupported allegations to defeat summary judgment.  *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007) ("Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment.");  *Shaver v.*

*Independent Stave Co.*, 350 F.3d 716, 723 (8th Cir. 2003) (holding no issue of fact created where plaintiff "cites to speculations in his own deposition about the motives and actions of his supervisors, without any foundation suggesting that [plaintiff] had personal knowledge of the matters that he was discussing"); *Dees v. Iron Mountain, Inc.*, No. 4:20-CV-01791-SEP, 2022 WL 4598539, at *6-7 (E.D. Mo. Sept. 30, 2022) (holding Plaintiff "own deposition testimony, together with speculation and legal conclusions" was "not be sufficient to generate a genuine dispute of material fact").

On a motion for summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Torgerson*, 643 F.3d at 1042 (citations omitted).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law." *Grey v. City of Oak Grove*, 396 F.3d 1031, 1034 (8th Cir. 2005); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material only if its resolution affects the outcome of the case).

## ARGUMENT

Plaintiffs' surviving claims are completely meritless.  Each claim is fatally deficient because it fails as a matter of controlling law, is precluded by the admitted, undisputed facts and/or is unsupported by any competent, probative evidence.   As shown herein, summary judgment is warranted on each remaining claim for any number of independently sufficient reasons.

**I.      There Is No Cognizable Claim for Breach of Contact Based on the Alleged Verbal Separation Agreement.**

Pursuant to this Court's May 29, 2020 Memorandum and Order (Dkt. #69 at 17-19), the only pending breach of contract claim against the University is based on the alleged breach of a purported verbal separation agreement whereby Weisman allegedly agreed to resign from the Residency Program in exchange for a "good" reference or recommendation letter.  This breach of contract claim fails as a matter of law and undisputed fact for three distinct reasons.

### A.    There Was No Offer and Acceptance of the Purported Terms of the Separation Contract.

It is axiomatic that in order to assert a valid claim for breach of contract, Weisman must establish, among other things, the existence of a contract – i.e., an offer, acceptance, and bargained-for consideration.  *W. Cent. Mo. Regional Lodge v. Board of Police Comm'rs of Kansas City*, 939 S.W.2d 565, 567 (Mo. App. W.D. 1997).  Here, it is undeniably established by the record that no verbal separation contract was formed to provide Weisman a reference letter, let alone a "good" reference letter, in exchange for his resignation.  On April 5, 2018, Dr. Benzinger expressly told Weisman that there was no "tie" between Weisman's resignation and providing a reference letter and that the two were "really independent events."  (UDSF ¶116.)  On the following day, Dr. Benzinger reiterated this by explicitly informing Weisman that providing the reference letter was not "an iterated or negotiated process."  (UDSF ¶118.) And Dr. Benzinger repeatedly told Weisman that the decision to resign was his to make without placing any conditions on it.  (UDSF ¶¶111, 115.)

Moreover, the record is clear that no one ever promised to provide Weisman with a "good" reference letter.  Dr. Benzinger offered only to provide him with "the strongest letter of recommendation *that we can*" and to "write the letter *that I think* can do the most good for you in your search." (UDSF ¶¶ 116, 118.)  The content of the letter was left to the Residency Program's judgment of what it could honestly represent under the circumstances of Weisman's checkered

performance and to what the director deemed would aid his search for other programs. There simply was no offer and acceptance (i.e., no meeting of the minds) forming a "separation agreement."

Additionally, for a contract to be valid and enforceable, "the nature and extent of its obligations must be *certain*." *West Cent. Mo. Regional Lodge v. Board of Police Commr's*, 939 S.W.2d 565, 568 (Mo. Ct. App. 1997) (affirming dismissal for failure to state claim) (emphasis added); *Around the World Importing, Inc. v. Mercantile Trust Co*., 795 S.W.2d 85, 90 (Mo. Ct. App. 1990) ("If the content of an agreement is unduly uncertain and indefinite, *no contract is formed.")* (emphasis added); *Damon Alarm Corp. v. Economic Dev. Corp.*, 555 S.W.2d 694, 695 (Mo. Ct. App. 1977) ("It is essential to a contract that the nature and the extent of the obligations be *certain*.  If an offer is so indefinite as to make it impossible for a court to decide just what it means, and to *fix exactly* the legal liability of the parties, its acceptance cannot result in an enforceable agreement.") (emphasis added).  At most, there was merely an uncertain and indefinite offer to provide a recommendation letter that was subject to the judgment and discretion of the Program and Dr. Benzinger in light of the circumstances ("the strongest letter of recommendation *that we can*" and "*that I think* can do the most good").  This offer left it completely open as to what the nature of the recommendation would be or what it would state. As such, the University's obligations were not certain, and it would be impossible for the Court to "fix exactly" what the offer meant and what the resulting legal liabilities were.  For this further reason, no enforceable "separation agreement" was ever formed.

### B.     There Was No Bargained-For Consideration for the Alleged "Separation Agreement."

Under Missouri law, consideration is defined as "a promise (to do or refrain from doing something) or the transfer or giving up of something of value to the other party."  *Morrow v.*

*Hallmark Cards, Inc.*, 273 S.W.3d 15, 25 (Mo. App. W.D. 2008).  Again, Dr. Benzinger clearly told Weisman: "Our department will provide you or any other resident the strongest letter of recommendation that we can.  It's an obligation of any residency program." (UDSF ¶116.)  The Residency Program was offering nothing more than what it believed it was already obligated to provide to Weisman, regardless of his resignation. Therefore, the offer could not be consideration for the verbal separation contract.  Furthermore, Weisman's resignation was not valid consideration.  Weisman's resignation did not provide any benefit to the Residency Program; to the contrary, it was a detriment to the Program because it left the Department short-staffed and placed an undue burden on the other residents. (UDSF ¶120.)  Further evidencing the lack of value to the University in Weisman's resignation is the undisputed fact that the Residency Program expressly told Weisman that he should consider remaining in the Program and not resign. (UDSF ¶117.)  The breach of contract claim thus fails due to a lack of consideration.

### C. Based on the Binding Admissions of Weisman, the Separation Contract Is Barred by the Statute of Frauds.

Missouri's statute of frauds provides that: "No action shall be brought . . . upon any agreement that is not to be performed within one year from the making thereof, unless the agreement upon which the action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith . . . ."  R.S.Mo. § 432.010.  At his deposition on September 13, 2022, Weisman explicitly admitted that he expected the University to "honor the agreement of giving me a good reference" up to the present day. (UDSF ¶149.) Therefore, the purported "separation agreement" could not be performed within one year of its alleged making in April 2018, was legally required to have been in writing, and is barred by the Missouri statute of frauds.

## II.     Weisman Cannot Prove Any Actionable Claim of Defamation for Numerous Reasons.

The elements of a defamation claim require evidence of : "(1) publication, (2) of a defamatory statement, (3) that identifies the plaintiff, (4) that is false, (5) that is published with the requisite degree of fault, and (6) damages the plaintiff's reputation." *Porter v. City of Lake Lotawana*, No. 07-00461-CV-W-REL, 2009 WL 10441610, at *58 (W.D. Mo. Mar. 31, 2009), *aff'd,* 651 F.3d 894 (8th Cir. 2011) (citing *State ex rel. BP Prods. N. Am. Inc. v. Ross,* 163 S.W.3d 922, 929 (Mo. banc 2005)); *Nigro v. St. Joseph Medical Center*, 371 S.W.3d 808, 818 (Mo. App. W.D. 2012).  Weisman's claim for defamation, per the Court's May 29, 2020 Memorandum and Order, is limited to alleged statements made to other residency programs that Weisman failed rotations and that his records could not be released without consulting attorneys. Weisman cannot meet the elements of defamation for numerous independently sufficient reasons.

### A.     Plaintiff Cannot Proffer Any Probative, Admissible Evidence that Defamatory Statements Were Made to Other Residency Programs.

To state a claim under Missouri, Weisman must specifically plead and prove "the words for which the plaintiff claims damages . . ., [which] should be laid in the declaration as they were uttered. . . ., [and] [a] general allegation of circulating false and untruthful reports reflecting upon his (plaintiff's) integrity is insufficient*." Bremson v. Kinder-Care Learning Ctrs., Inc.*, 651 S.W.2d 159, 160 (Mo. App. W.D. 1983) (citations omitted).  The Second Amended Complaint failed to allege the specific defamatory statements made to any other residency program.  Nor has discovery produced any evidence of what statements were actually made.

None of the recommendation letters sent to other programs by Dr. Benzinger or anyone else even came close to making a statement that Weisman failed rotations. (UDSF ¶¶125-128,

134.)  Nor is there probative evidence that Dr. Evers, Dr. Benzinger or anyone ever stated that he failed rotations to another program. (UDSF ¶¶ 129, 130, 136.)  At deposition, Weisman could not point to any such statement about failing rotations or even in some cases who it was said to, but again speculated and stated his subjective belief or understanding about what was said based on what he heard from people who did not even witness such statements. (UDSF ¶¶ 131, 142, 145, 146.)  This speculation, conjecture, and self-serving testimony based on hearsay is not probative evidence of any defamation.

Likewise, at deposition Weisman could not identify any statement about anyone needing to speak with lawyers before releasing records.  Relying on hearsay, Weisman merely speculated that negative or "terrible" things were said about him and stated his belief that lawyers were mentioned, but he was unable to offer any actual evidence of what was allegedly said. (UDSF ¶142.)  Weisman testified about a conversation he had with Dr. Patil at LSU Shreveport, which he could not remember word for word, in which Dr. Patil was not forthcoming and referenced what Weisman believed was a conversation with Dr. Thompson where he referenced lawyers. (*Id.*)  That is not only inadmissible hearsay and based on Weisman's subjective belief, it also does not even indicate what was actually said to Dr. Patil.

Without probative evidence of what was said and who said it, Weisman cannot meet the essential element of his claim that a defamatory statement was made, and summary judgment is warranted on this basis alone.  *Porter*, 2009 WL 10441610, at *59 (granting summary judgment where no evidence that a statement was made to a third party).

**B.     Even if the Statements Relating to Weisman Failing Rotations or Needing to Consult with Counsel Before Releasing Records Were Made, They Would Have Been True.**

Truth is an absolute defense to a defamation claim. *Rice v. Hodapp*, 919 S.W.2d 240, 243 (Mo. banc 1996); *Capobianco v. Pulitzer Pub. Co*., 812 S.W.2d 852, 859 (Mo. App. E.D. 1991) ("Truth is an absolute defense to a publication, even if the publication appears to erroneously suggest some connection to illegal or improper conduct."). "It is not necessary that the precise facts disclosed be literally true. Slight inaccuracies are immaterial if the allegedly defamatory charge is true in substance." *Nigro*, 371 S.W.3d at 818. Even if Dr. Benzinger, Dr. Evers, or the University had made a statement to other residency programs that Weisman failed rotations or that his records could not be released without first consulting with counsel, these statements are demonstrably true and accurate and thus not actionable.

After his first 6 months of residency, Weisman was notified that he needed to remediate his performance in two rotations (internal medicine and ICU) in which he received unsatisfactory evaluations – one of which Dr. Benzinger stated was among the worst he had ever seen. (UDSF ¶¶33, 35, 37, 38, 42, 43.) This necessarily means that he did in fact fail those two rotations or else there would have no reason to repeat them. Also, it cannot be disputed that Weisman received evaluations of "unsatisfactory" and "below expectations" in 12 of his rotations during his first 18 months of his training. (UDSF ¶¶25, 27, 30-31, 35, 37, 38, 86.a, 86.c, 90, 93, 101, 103, 104.) The rotation evaluations and comments from faculty consistently raised common concerns about Weisman's vigilance, organization, medical knowledge, ability to prioritize, ability to act quickly, presenting patients and communicating to oncoming providers, and ability to become an anesthesiologist. Some, like Pediatrics, expressly raised concerns about patient safety. (UDSF ¶¶94-101.) To make a statement that Weisman failed rotations would have been undeniably true. Additionally, even if Weisman were able to show that his rotation evaluations were inaccurate (which he has not and cannot), statements that he failed rotations are "deemed

true" even if the rotation evaluations were erroneous or without just cause.  *See Nigro*, 371

S.W.3d at 818-19 (affirming summary judgment where letter accurately reported the findings of

an investigation and discipline of plaintiff and holding that plaintiff's dispute of the accuracy of

the investigation did not alter the truthfulness of the what the letter reported); *Rice,* 919 S.W.2d

at 244-45 (affirming summary judgment where statements that plaintiff was investigated for

sexual harassment and management concluded that plaintiff had committed harassment were

accurate, despite plaintiff's denial that he engaged in the conduct).

Any statement made regarding consulting with attorneys before releasing Weisman's

records also would have been true.  Dr. Thompson, as Program Director, would have needed to,

and in fact did, consult with counsel about residency issues and releasing residency records.

(UDSF ¶ 144.)  Therefore, if such a statement had been made to another residency program, it

would have been true.

### C.   By Requesting that Letters and Materials Be Sent to Other Residency Programs, Weisman Consented to the Publication of the Statements.

Under Missouri law, "any publication made with the consent of the plaintiff is absolutely

privileged.  This privilege remains absolute even if the statements made are false, and even if

they were made with actual malice.  The rationale for this privilege is self-evident: one cannot

invite the publication of material and then complain of the resulting damage." *Willman v.

Dooner*, 770 S.W.2d 275, 280 (Mo. App. W.D. 1989)

In seeking a position in another residency program, Weisman requested that the

Residency Program send recommendation letters and certain records to other programs.  (UDSF

¶¶ 125, 132.)  Weisman consented to any statements made in the communications with the other

programs and cannot complain about statements that he invited.  Therefore, as a matter of law,

any statement made by Dr. Benzinger, Dr. Evers, or anyone else in responding to these requests

are absolutely privileged and cannot be the basis of a defamation claim. *See Johnson v. City of Buckner*, 610 S.W.2d 406, 411-12 (Mo. App. W.D. 1980) (affirming summary judgment where plaintiff "requested a statement of the reasons for his termination in the presence of a number of people" and holding that statement by mayor was absolutely privileged and "not destroyed even by the existence of actual malice"); *Williams v. Sch. Dist. of Springfield R-12*, 447 S.W.2d 256, 269 (Mo. 1969) (affirming dismissal where teacher asked superintendent for reasons for termination at school board meeting and holding that "[o]ne who has invited or instigated the publication of defamatory words can not be heard to complain of the resulting damage to his reputation"), *abrogated on other grounds by Bass v. Nooney Co.*, 646 S.W.2d 765 (Mo. banc 1983).

**D.**  **Any Statements to Other Residency Programs Were Privileged in That They Were Made to Protect the Interests of the Other Programs and Were Made in Good Faith and Without Actual Malice.**

"Providing information at the request of the recipient in order to protect an interest of the recipient establishes a qualified privilege." *Willman v. Dooner*, 770 S.W.2d 275, 281 (Mo. App. W.D. 1989). This "qualified privilege covers a communication made in good faith upon a subject-matter in which the person making the communication has an interest or a duty to a person having a corresponding interest or duty," which includes communications made in good faith regarding the performance of a former employee. *Washington v. Thomas*, 778 S.W.2d 792, 798 (Mo. App. E.D. 1989) (citing *Estes v. Lawton–Byrne–Bruner Ins. Agency Co.,* 437 S.W.2d 685, 690 (Mo. App. 1969)) (reversing jury verdict based on the qualified privilege). "'Good faith' in this context refers to the actual and express malice which is required to overcome and destroy the privilege." *Id.* "Actual malice is defined as actual knowledge of the falsity of the statements or reckless disregard for the truth in making the statements." *Willman*, 770 S.W.2d at

29

281 (citation omitted). "The applicability of the defense of qualified privilege is a matter of law to be decided by the court." *Washington*, 778 S.W.2d at 798.

Here, the Residency Program and the University Defendants had a duty to patients, to other residency programs, and to the general public and an interest in making sure residents can safely practice anesthesiology. (UDSF ¶23.) Any other residency program has a corresponding interest and duty. Therefore, any communication made by Dr. Benzinger, Dr. Evers, or the University regarding Weisman's performance and clinical ability in response to a request or inquiry from another residency program would have been made to protect their own duty and that program's corresponding interest.

Any communications with other residency programs would accordingly have been made in good faith and without actual malice. If University Defendants had communicated that Weisman failed rotations (and again there is no evidence of such a statement being made), that statement would have a direct bearing on Weisman's performance and ability to be an anesthesiologist in an honest effort to ensure the other residency programs had necessary information to protect their interests and those of patients. Weisman cannot demonstrate that such a statement was made with actual knowledge of falsity or with reckless disregard for the truth because Dr. Evers, Dr. Benzinger, Dr. Cox, and Dr. Thompson were each aware of Weisman's unsatisfactory performance and had no reason to believe that the rotation evaluations were in any way inaccurate. Further demonstrating good faith is the fact that Dr. Benzinger and Dr. Thompson both sent recommendation letters that were as strong as they could be or even generous. (UDSF ¶¶125-128, 134.) And, in fact, each of those faculty physicians attempted to support Weisman and not damage his career. There is simply no probative evidence in the record that Dr. Benzinger, Dr. Evers, or any other University employee acted with actual malice

30

in communicating with other residency programs.  As a result, the qualified privilege applies, and summary judgment is warranted on this additional ground.  *Willman*, 770 S.W.2d at 281.

### E. The Alleged Statements to Other Residency Programs About Needing to Talk to Lawyers Before Providing Information, if in Fact Made, Were Facially Innocuous and Non-Defamatory and Not Actionable.

"Whether a statement is defamatory is a question of law."  *Mandel v. O'Connor*, 99 S.W.3d 33, 36 (Mo. App. E.D. 2003) (citation omitted).  "Courts are empowered to decide as a matter of law that a statement claimed to be libelous is not reasonably capable of a defamatory meaning."  *Ampleman v. Scheweppe*, 972 S.W.2d 329, 332 (Mo. App. E.D. 1998).  "Defamatory words must be of such a nature that we can presume, as a matter of law, that they will tend to disgrace and degrade the person or expose him to public hatred, contempt, or ridicule or cause him to be shunned or avoided."  *Mandel*, 99 S.W.3d at 36.  "To determine if a statement is defamatory, the words themselves must first be stripped of any pleaded innuendo and construed in their most innocent sense."  *Id.* (citation and internal quotations omitted).  Further, "the words are to be taken in the sense which is most obvious and natural and according to the ideas they are calculated to convey to those to whom they are addressed" and "must be considered in context, giving them their plain and ordinarily understood meaning."  *Ampleman*, 972 S.W.2d at 332.  "If a statement is capable of a nondefamatory meaning, and can be reasonably construed in an innocent sense, [the court] must hold the statement nonactionable as a matter of law."  *Mandel*, 99 S.W.3d at 36; *see also Chastain v. Kansas City Star*, 50 S.W.3d 286, 288 (Mo. App. W.D. 2001) ("if a statement is capable of two meanings (one defamatory and one non-defamatory) and can be *reasonably* construed in an innocent sense, the court must hold the statement nonactionable as a matter of law") (emphasis original; citation omitted); *Capobianco*, 812

31

S.W.2d at 857 (statement is nonactionable unless defamatory meaning is the "sole []or a compelling inference").

Here, the Second Amended Complaint alleges that University Defendants told "representatives of other residency programs to which Plaintiff had submitted applications that Plaintiff's information could not be released without talking to Defendants' attorney." Yet throughout discovery Weisman was unable to identify any actual probative evidence to support that allegation. Regardless, this purported statement is not defamatory because it is not "of and concerning" Weisman in that it merely references an internal and routine compliance procedure. *See Chastain*, 50 S.W.3d at 289 (affirming dismissal where statements ridiculing a plan written by plaintiff were not "of and concerning" plaintiff).

Furthermore, in construing the words in their most innocent sense, in giving them their plain and ordinary meaning in context, and stripping them of any innuendo, the alleged statement about talking to lawyers simply refers to the routine compliance process of confirming that confidential residency information may lawfully be released, and it does not "disgrace and degrade" plaintiff or "expose him to public hatred, contempt, or ridicule." *Mandel*, 99 S.W.3d at 36. Furthermore, a statement that counsel would need to be consulted before information could be released to a third-party in no way suggests that there is pending litigation, and even if it did, that implication is not in of itself defamatory. And the most innocent and plain construction of the statement likewise does not imply that Weisman was somehow a bad actor or that his performance was unsatisfactory. Rather, the most innocent and ordinary construction, in a conversation between two program directors, is that the Residency Program needed to ensure that the release of confidential residency information and the extent of the requested disclosure was appropriate, especially in light of Missouri's right of privacy in personnel records. *State ex*

32

*rel. Delmar Gardens N. Operating, LLC v. Gaertner*, 239 S.W.3d 608, 611 (Mo. banc 2007). This innocuous and legally appropriate response to a third-party request for employment records is not defamatory and is not actionable.

**F.   Weisman Cannot Prove that Any Alleged Statement that He Failed Rotations or His Records Could Not Be Released without Consulting Counsel Caused Any Damage.**

As to the final element of defamation, Weisman "must prove actual damages" – i.e., that "he sustained any damage as a result of the publication of any of the allegedly defamatory statements." *Nazeri v. Missouri Valley Coll.*, 860 S.W.2d 303, 313 (Mo. banc 1993); *Washington*, 778 S.W.2d at 799. There is no probative evidence in the record showing that any actual statement about Weisman failing rotations or consulting lawyers resulted in Weisman not getting another position in a residency program or prevented him from becoming an anesthesiologist. In fact, the evidence in the record does not reflect that Weisman was rejected by any other residency program because of what was communicated by the University Defendants. (UDSF ¶¶139-141.)

On the contrary, the record reflects that Weisman was not accepted by other residency programs for reasons having nothing to do with any statement allegedly made by any of the University Defendants. Dr. Peter Nagele from the University of Chicago called Weisman and told him that the graduate education office had denied adding another resident seat. (UDSF ¶139.) Dr. Ned Nasr with Cook County Hospital emailed Weisman that the program "elected to go with a CA-1 resident yesterday instead of an advanced position for various reasons." (UDSF ¶140.) Weisman himself characterized LSU Shreveport as not giving him a promised seat without referencing any statement by the Residency Program and stated he had been burned twice by that program. (UDSF ¶141.) There is a complete dearth of probative evidence proving

that anything communicated by the University Defendants resulted in any damage, and summary judgment is warranted due to Weisman's inability to meet the essential element of damages.

### III.   Plaintiffs' Conversion Claim Is Completely Meritless Based on Settled Law and Plaintiffs' Own Binding Admissions.

"To prevail on a claim for conversion, the plaintiff must show: (1) he owned the property or was entitled to possess it; (2) the defendant took possession of the property with the intent to exercise some control over it; and (3) the defendant thereby deprived the plaintiff of the right to possession." *Hunt v. Estate of Hunt*, 348 S.W.3d 103, 113 (Mo. App. W.D. 2011). Plaintiffs, as a matter of law and based on their binding admissions, cannot meet these elements of conversion of Plaintiffs' 3-D printing lab property because they consented to and ratified the transfer of the property to the Department of Radiology, abandoned the property, and cannot show that they owned documents or notebooks containing ideas or intellectual property or that they were deprived of possession.

### A.   Plaintiffs Consented to the Transfer of the 3-D Printing Lab Property, Which Is a Complete Defense to a Conversion Claim.

"Consent is a complete defense to a conversion claim." *Dean Machinery Co. v. Union Bank*, 106 S.W.3d 510, 523 (Mo. App. W.D. 2003). "When an owner expressly or impliedly assents or ratifies the disposition of his property, there can be no recovery for conversion, as there was no unauthorized conduct regarding the property of the owner." *Weicht v. Sub. Newspapers of Greater St. Louis, Inc.*, 32 S.W.3d 592, 597 (Mo. App. E.D. 2000) (quoting *Graves v. Stewart*, 642 S.W.2d 649. 650-51 (Mo. banc 1982)). A plaintiff "impliedly assent[s] to [defendants'] continued possession of the [property] by allowing them to retain possession" without making "efforts to retrieve" the property. *Dean Machinery Co.*, 106 S.W.3d at 523. "Obviously, if the owner consents, there is no unauthorized taking. That consent can either be

express or implied.  'Implied' means necessary deduction from the circumstances, general language or conduct of the parties.  'Implied consent' is that manifested by signs, actions or facts, or by inaction or silence which creates an inference that consent has been given." *Maples v. United Sav. & Loan Ass'n*, 686 S.W.2d 525, 527 (Mo. App. S.D. 1985) (citations omitted).

By Plaintiffs' own written and verbal admissions, they donated and voluntarily transferred the 3-D printing lab property to the Department of Radiology.  Weisman put it in writing to University employees, including Dr. Benzinger, that: "The most unique thing I did here was donating the medical 3D printing lab to the radiology department"; "The lab was donated to the radiology department, primarily the vice chair, Pam Woodard, to be a core facility to set up a central 3D printing group on the medical campus"; and "donated one of the top medical 3D printing groups in the country to the radiology department." (UDSF ¶78.)  In CVs that Weisman sent to other residency programs, under the heading research and "Founder and medical 3DP lab, Washington University, Mallinckrodt Institute of Radiology," Weisman wrote: "Donated laboratory equipment and expertise from Strategic Biomedical, Inc." (UDSF ¶79.) Moreover, Weisman told Dr. Kaye (his own witness) and Ken Fleischmann (STLCOP general counsel) that he "donated" Plaintiffs' 3-D printing lab to the Department of Radiology.  (UDSF ¶¶ 80-81.)  Plaintiffs agreed to voluntarily transfer the 3-D printing lab property to Radiology because it was in "the best interests of the company [SBI]." (UDSF ¶74.d.)  Plaintiffs made the "choice" to donate the 3-D printing lab property to Radiology in order to allow Weisman to focus on and complete his residency, "to make certain [Weisman] was well thought of at Wash U" and "improve his position," to give Weisman the potential to run the Radiology lab in the future, and to make sure the property went to someone who knew how to use it to protect the technology. (UDSF ¶74.)  These binding admissions unequivocally demonstrate that Plaintiffs

35

voluntarily gave the 3-D printing lab property to the Department of Radiology, and this is reinforced by the indisputable fact that SBI proposed transferring its property and employees to the Department of Radiology for no payment of money because SBI's sole investor was pulling out, SBI had no other investors or revenue, and SBI could not pay its employees or expenses. (UDSF ¶¶55, 56, 65, 67, 68, 71.)

Further admissions demonstrate that Plaintiffs expressly and impliedly assented to and ratified the transfer of the 3-D printing lab property to the Department of Radiology. SBI "made a decision to move its equipment so that the radiology department could establish a lab" in March 2017. (UDSF ¶73.) SBI, not University employees, moved all of the equipment and property over to Radiology, and Plaintiffs were aware that SBI employees were doing this and did not object to the transfer. (UDSF ¶75.) Instead, Weisman "worked to facilitate" the transfer, "agreed to the transfer," "assisted with the transition," and asked for involvement and access and was even offered a key to the lab. (UDSF ¶¶76-77.) Nor did Plaintiffs ever attempt to retrieve the equipment, demand its return, or assert their right to possession, even while Weisman was working in the Radiology 3-D printing facility during his last 3 months in the Residency Program. (UDSF ¶77.) These express admissions, coupled with Plaintiffs' inaction and silence before and after the 3-D printing property was transferred to Radiology, establish that Plaintiffs consented to and ratified the transfer and conclusively foreclose Plaintiffs from establishing that the University, Dr. Evers, or Dr. Benzinger deprived Plaintiffs of possession.[1]

    **B.**    **Plaintiffs Abandoned the 3-D Printing Lab Property, Further Foreclosing Their Conversion Claim.**

---

[1] There is absolutely no evidence in the record that Drs. Evers and Benzinger ever took possession of or had control over Plaintiffs' property, thus warranting summary judgment in their favor for this additional reason.

Similar to consent, "[a]bandonment is a complete defense to a conversion action and precludes recovery." *City of St. Peters v. Hill*, 9 S.W.3d 652, 655–56 (Mo. App. E.D. 1999) (reversing jury verdict based on abandonment); *Herron v. Whiteside,* 782 S.W.2d 414, 416-17 (Mo. App. W.D. 1989) ("Abandonment of personalty constitutes a complete defense to conversion and likewise to any cause of action in which the plaintiff's ownership is essential.") "Abandonment requires intent coupled with an act. . . .  An act is sufficient if it 'manifests a conscious purpose and intention of the owner of personal property neither to use nor to retake the property into his possession.' . . . [and intent] may be demonstrated by conduct clearly inconsistent with any intention to retain and continue the use or ownership of the property.'" *City of St. Peters*, 9 S.W.3d at 655–56 (quoting *Herron,* 782 S.W.2d at 416-17).  "Once proved, as here, abandonment divests the former owner of title to the property so that it becomes as to him as if he had never had any right to interest in it."  *Herron,* 782 S.W.2d at 417 (affirming summary judgment).

The record unquestionably establishes that Plaintiffs abandoned the 3-D printing lab property.  The actions and admissions detailed above in Argument III.A manifest a conscious decision and intent to give the 3-D printing lab property to Radiology where it remained without any attempt to retrieve it.  Similarly, this conduct was palpably inconsistent with any intent to retain and own the property.  Plaintiffs had previously offered the property to Radiology for no payment, voluntarily moved all the property to Radiology, and never asserted a right to ownership or demanded the return of the property, even while Weisman worked with the Radiology 3-D printing facility.  Instead, Weisman left the Residency Program without even asking for the return of any single item of property.  Plaintiffs clearly abandoned the property, and the conversion claim fails for this additional reason.

C. **Plaintiffs' Conversion Claim Based on Ideas or Intellectual Property Found in Working Papers or Notebooks Also Fails Because Plaintiffs Have Not Identified the Ideas or Intellectual Property Contained in Those Documents or Established Who Owned Them.**

"[U]nder any theory of conversion, [plaintiff] must show he had title to, or right of property in, and right to immediate possession of, [the] property concerned at the alleged date of the conversion." *Aldridge v. Francis*, 503 S.W.3d 314, 317 (Mo. App. E.D. 2016) (affirming dismissal); *Kingfisher Hospitality, Inc. v. Behmani*, 335 S.W.3d 486, 498 (Mo. App. S.D. 2011) (same); *see also Mickelson v. Airmen, Inc.*, 712 S.W.2d 714, 717 (Mo. App. W.D. 1986) ("Since conversion is a possessory action, ownership alone is not enough to support the action. The plaintiff must have had or been entitled to immediate possession at the time of conversion and when the suit is brought."). As a result, if Plaintiffs cannot show they owned the allegedly converted property, a "claim for conversion cannot lie." *Dean Machinery Co. v. Union Bank*, 106 S.W.3d 510, 523 (Mo. App. W.D. 2003); *see also Int'l Motor Co. v. Boghosian Motor Co.*, 914 S.W.2d 5, 8 (Mo. App. E.D. 1995) (affirming dismissal where plaintiff "is no longer the owner"). It is settled law that "conversion does not lie for the appropriation of an idea." *Schaefer v. Spence*, 813 S.W.2d 92, 96 (Mo. App. S.D. 1991) (conversion claim could not be brought where plaintiff sought to recover for the taking of a formula). However, "where intangible rights are merged in or identified with some document, conversion may be maintained." *Colton, McMichael, Lester, Auman, Visnovske, Inc. v. Mueller*, 896 S.W.2d 741, 743 (Mo. App. E.D. 1995).

Here, Plaintiffs contend that the 3-D printing lab working papers and notebooks containing ideas and intellectual property were converted. (UDSF ¶83.) However, Plaintiffs, despite being asked, have never identified any intellectual property or ideas that are purportedly located in those papers. In answer to an interrogatory on what property was converted, Plaintiffs

each identified lab property and equipment, but did not reference any specific papers or what was idea or intellectual property was contained therein. (UDSF ¶83.)  This failure to even identify what was allegedly converted justifies summary judgment on this basis alone.

Moreover, because there is no identification of what papers or what ideas or concepts were allegedly converted, there is no way to establish whether Plaintiffs actually owned or had the right to possess them.  For instance, SBI researcher employees moved to the Radiology 3-D printing facility with Plaintiffs' consent and support and presumably brought their working papers with them, and they very well could have owned any ideas or concepts contained in those papers.  Likewise, Dr. David Ballard, a University employee, was a frequent research collaborator with Weisman, and it is possible that his own ideas and concepts are contained within these unidentified papers.  Plaintiffs have simply failed to allege or prove that they owned any idea or intellectual property that was merged into or identified in any tangible document, and this part of the conversion claim fails for this additional reason.

## IV.   Plaintiffs' Quasi-Contract Claims for Quantum Meruit and Unjust Enrichment Fail as a Matter of Law for Multiple Reasons.

Plaintiffs' Count VI claim for quantum meruit alleges that they conferred a substantial benefit on the University and BJH by transferring Plaintiffs' 3-D printing lab property and are entitled to reasonable compensation as measured by the value of the benefit conferred.  (Dkt. #86 ¶¶ 132-133.)  In the same vein, the Count VII claim for unjust enrichment alleges that the University and BJH received substantial benefits from Plaintiffs, and they are entitled to reasonable compensation as measured by the value of the benefits received.  (*Id.* ¶ 136.)

"While the lines are often blurred with regard to quantum meruit and unjust enrichment, we recognize these as separate causes of action."  *Holliday Invs., Inc. v. Hawthorn Bank*, 476 S.W.3d 291, 295 (Mo. App. W.D. 2015).  The elements of these claims are generally the same,

39

and "both generally require that a benefit be conferred and inequitably retained." *Id.* The

elements required for quantum meruit are:

> (1) that the plaintiff provided to the defendant materials or services at the
> defendant's request or with the acquiescence of the defendant, (2) that the
> materials or services had reasonable value, and (3) that the defendant has failed
> and refused to pay the reasonable value of such materials or services despite the
> demands of plaintiff.

*Id.* (citation omitted).  "The principal function of this type of implied contract is the prevention

of unjust enrichment." *County Asphalt Paving, Co. v. Mosley Const., Inc.*, 239 S.W.3d 704, 710

(Mo. App. E.D. 2007). "'To establish the elements of an unjust enrichment claim, the plaintiff

must prove that (1) he conferred a benefit on the defendant; (2) the defendant appreciated the

benefit; and (3) the defendant accepted and retained the benefit under inequitable and/or unjust

circumstances.'" *Wegmann v. Ethicon, Inc.*, No. 4:20-CV-00704 JAR, 2020 WL 5814475, at *12

(E.D. Mo. Sept. 30, 2020) (quoting *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. App. W.D.

2010)).

Plaintiffs have failed to prove the essential elements of these quasi-contract claims and

entry of summary judgment is warranted on them because: (a) the University did not accept or

retain any benefit under inequitable or unjust circumstances because Plaintiff knowingly donated

or voluntarily transferred the 3-D printing lab property to the Department of Radiology; (b)

Plaintiffs received the value and benefit they intended to receive by voluntarily transferring the

property; (c) the University has not benefitted by receiving and retaining the property because

the Radiology 3-D printing facility has operated at a loss; and (4) Plaintiffs never made any

demand for payment before or after transferring the property.

    **A.**    **The University Did Not Accept and Retain the 3-D Printing Lab Property Under Inequitable or Unjust Circumstances Because Plaintiffs Donated or Voluntarily Transferred the Property.**

"Even if a benefit is 'conferred' and 'appreciated,' if no injustice results from the defendant's retention of the benefit, then no cause of action for unjust enrichment will lie." *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. App. E.D. 2010) (citing *White v. Pruiett,* 39 S.W.3d 857, 863 (Mo.App. W.D.2001)); *see also Graves v. Berkowitz,* 15 S.W.3d 59, 61 (Mo. App. W.D. 2000) ("'Mere receipt of benefits'" is not enough when there is no showing that it would be unjust for defendant to retain the benefit received."). "Failure to compensate for a retained benefit is not always inequitable or unjust. 'Unjust retention of benefits only occurs when the benefits were 'conferred (a) in misreliance on a right or duty; or (b) through dutiful intervention in another's affairs; or (c) under constraint.'" *Lanzarini v. Berkadia Com. Mortg., LLC*, No. 4:12CV2153(JCH), 2014 WL 12787824, at *5 (E.D. Mo. Mar. 31, 2014) (quoting *Howard*, 316 S.W.3d at 436). Where "any benefit was conferred 'voluntarily, deliberately, and without complaint,' . . . . the retention of a benefit by the defendants would not have been inequitable." *Howard*, 316 S.W.3d at 438.

As shown above in Argument III.A, Plaintiffs conclusively admitted that they donated the 3-D printing lab property to the Department of Radiology. Plaintiffs deliberately decided to voluntarily transfer the property to Radiology in order to curry favor for Weisman, in order to avoid paying the salaries of SBI's employees and not affect their immigration status, and in order for the Department of Radiology to do 3-D printing research with Weisman involved. This knowing decision and transfer did not involve any misreliance on a right or duty, had nothing to do with a dutiful intervention into the University's affairs, and was not done under constraint because Plaintiffs could have sold the property or kept operating the SBI lab. Because Plaintiffs chose to voluntarily give the 3-D printing lab property to Radiology, the retention of the property

by Radiology is in no way unjust or inequitable, thereby defeating any claim for quantum meruit or unjust enrichment.

**B.      Plaintiffs received the value and benefit they intended to obtain by voluntarily transferring the property.**

"When the plaintiff receives what he intended to obtain, there is no unjust enrichment." *Wegmann*, 2020 WL 5814475, at *12 (citing *Howard*, 316 S.W.3d at 436); *US Bank N.A. v. Cox*, 341 S.W.3d 846, 853 (Mo. App. W.D. 2011) ("[T]here can be no unjust enrichment if the parties receive what they intended to obtain.").  In order to meet the elements of a quasi-contract claim, "the person benefited must do something from which his promise to pay may be fairly inferred." *Kujawa v. Billboard Cafe at Lucas Plaza, Inc.*, 10 S.W.3d 584, 588 (Mo. App. W.D. 2000)

 In *Graves*, a contractor did construction work for a tenant, who defaulted on payment, and sued the landlord for unjust enrichment for retaining the improvements. 15 S.W.3d at 60.  In affirming summary judgment, the court held that "there was no implicit or express understanding that the [landlord] would guarantee payment. The trial court properly decided as a matter of law that it was not unjust for the landlord to retain any benefit from the construction without paying for it." *Id.* at 64.  In *Kujawa*, a contractor did construction for a tenant and received the allotted tenant improvement allowance from the landlord, but sued the landlord for quantum meruit for the additional amounts due.  10 S.W.3d at 586-87.  The court affirmed summary judgment because "[t]here is no evidence to support a finding that Kujawa had any expectation of payment from defendants beyond the 'tenant finish allowance' provisions under the leases before he did the works or during performance. Retention of the improvements by [landlord], under these circumstances, is neither unjust nor inequitable." *Id.* at 589.

Here, the evidence demonstrates that there was no implicit or express understanding that Plaintiffs would be paid money for the 3-D printing lab property and that Plaintiffs had no

expectation of payment.  First, as noted above, Plaintiffs admitted that they "donated" the 3-D printing lab property and could not have expected to receive payment in return.  Also, just weeks before transferring the property to Radiology, SBI proposed that Radiology acquire SBI in exchange for no payment of money. (UDSF ¶71.)  Rather, SBI proposed that Radiology hire its employees, pay their salaries, and pay the lab expenses.  (*Id.*)  Although no agreement was reached to acquire SBI, this is basically what occurred – SBI gave its property to Radiology, and Radiology hired the two researchers.  There was simply no understanding, implied or otherwise, and no expectation that Plaintiffs would receive a monetary payment for the lab equipment.

Additionally, Plaintiffs did receive what they intended to obtain by voluntarily transferring the property to Radiology.  SBI was contractually obligated to pay its two researchers and would no longer be required to pay their salaries once they were hired by Radiology, which SBI admitted resulted in a benefit to it. (UDSF ¶82.)  Moreover, Plaintiffs believed that donating the property to Radiology would result in Weisman "being well thought of" and would improve his position.  (UDSF ¶74.a.)  And, finally, Plaintiffs wanted Weisman to be involved in the 3-D printing research with Weisman understanding that he would be co-director of the Radiology 3-D printing lab when he finished his residency (which did not occur because he resigned).  (UDSF ¶74.)  In fact, Weisman remained involved and spent the last 3 months in the Residency Program doing research there. (UDSF ¶122.)

For these reasons, summary judgment on the claims for quantum meruit and unjust enrichment is further warranted.

### C.     The University Has Not Benefitted from Receiving the 3-D Printing Lab Equipment.

To have a submissible claim for quantum meruit or unjust enrichment, there must be a benefit conferred on the University.  The undisputed evidence shows the opposite – running the

3-D printing facility has been a financial detriment.  The Radiology 3-D printing facility has operated at a loss or deficit since it was established in 2017, and the Department of Radiology has used funds to make up those deficits for each year.  (UDSF ¶85.)  From fiscal year 2017 through fiscal year 2022, the total operating deficit of the 3-D printing facility has totaled over $431,000, which has been paid by Department funds to continue to operate the lab. (*Id.*)  With no benefit received by the University, this key element of a quantum meruit or unjust enrichment claim cannot be met.

### D.     Plaintiffs Never Demanded Payment.

An essential element of a quantum meruit claim is "defendant has failed and refused to pay the reasonable value of such materials or services *despite the demands of plaintiff*."  *Holliday Invs., Inc.*, 476 S.W.3d at 295 (emphasis added).  Plaintiffs have admitted that, prior to filing this lawsuit, they never asked for or made a demand for payment for the purported benefits and services provided to the University. (UDSF ¶77.)  Based on this fact alone, the elements of quantum meruit cannot be proven.

The failure to demand payment is likewise dispositive of Plaintiffs' unjust enrichment claim.  In *Graves*, the court affirmed summary judgment on the basis that defendant did not unjustly retain any benefit and specifically pointed to the fact that "[t]here is also no indication that [plaintiff] ever looked to the [defendant] for payment. This is reflected in the fact that [plaintiff] never even made any demand on the [defendant] prior to filing a formal action."  15 S.W.3d at 64.  So too, here, Plaintiffs never looked to the University for payment and never demanded payment prior to filing this lawsuit, which demonstrates that there was never any unjust or inequitable retention of the benefit.

For these four reasons, summary judgment is warranted on Plaintiffs' quasi-contract claims.

## V. The Civil Conspiracy Claim Is Likewise Not Actionable as a Matter of Law and Undisputed Fact.

Plaintiffs Count VIII claim for civil conspiracy likewise fails based on the evidence and settled law. There is no probative evidence to prove the elements of such a claim. Plaintiffs' defamation and conversion claims fail as a matter of law, which bars the civil conspiracy claim. And the individual defendants are not proper parties to this civil conspiracy claim.

### A. Plaintiffs Have Failed to Prove the Elements of Civil Conspiracy with Any Probative Evidence.

The elements of a civil conspiracy claim are: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful acts; and, (5) damages." *Envirotech, Inc. v. Thomas*, 259 S.W.3d 577, 586 (Mo. App. E.D. 2008) (citation omitted). The Second Amended Complaint alleges that "when Evers learned that he was not the sole focus of Plaintiffs' laboratory project, he solicited the agreement of each Defendant to conspire with the others" to defame Weisman and convert Plaintiffs' 3-D printing lab property. (Dkt. #86 ¶139.) There is simply no probative evidence in the record that Dr. Evers, after learning about Weisman's lab project, solicited any other defendant to do anything. To the contrary, the only probative evidence in the record shows that Dr. Evers had no problem with Weisman's outside business activities as long they did not interfere with his residency training. (UDSF ¶64.) Nor is there any evidence in the record that Defendants had a meeting of the minds to defame Weisman or convert any property. At the threshold, Plaintiffs cannot prove the second and third elements of a civil conspiracy claim, warranting summary judgment on this basis alone.

**B.      The Civil Conspiracy Claim Is Also Barred Because There Are No Actionable Torts.**

"Any conspiracy among defendants bears merely on their liability as joint tortfeasors. Conspiracy, in and of itself, is not actionable in the absence of an underlying wrongful act or tort." *Xavier v. Bumbarner & Hubbell Anesthesiologists*, 923 S.W.2d 428, 432-33 (Mo. App. W.D. 1996) (citations omitted).  Rather, it must be based on "one or more unlawful acts," which "can be found in either the ends sought or the means used." *Envirotech*, 259 S.W.3d at 586. As such, "plaintiff must allege and prove that he was damaged as a result of the tortious act of one or more of the alleged conspirators and that the tortious act occurred in pursuance of the conspiracy." *Gettings v. Farr*, 41 S.W.3d 539, 542 (Mo. App. E.D. 2001).  "In Missouri, if tortious acts alleged as elements of a civil conspiracy claim fail to state a cause of action, then the conspiracy claim fails as well." *Rice*, 919 S.W.2d at 245; *see also Williams v. Mercantile Bank of St. Louis NA*, 845 S.W.2d 78, 85 (Mo. App. E.D. 1993) ("Conspiracy is not itself actionable in the absence of an underlying wrongful act or tort.  Since the underlying fraud counts do not state a cause of action, the allegations that the acts constituting fraud were the result of a conspiracy cannot 'breathe life into a cause of action which was otherwise nonexistent.'") (citations omitted).

As shown above in Arguments II and III, the defamation and conversion claims fail as a matter of law for a variety of reasons, and thus there is no remaining underlying tort claim that could support Plaintiffs' civil conspiracy claim.  As a result, the civil conspiracy cannot survive and must be dismissed.

**C.      The Individual Defendants Are Not Proper Parties to the Civil Conspiracy Claim.**

Under Missouri law, "a principal cannot conspire with its own agents," except if "the agent acts out of a self-interest which goes beyond the agency relationship" *Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 871 (8th Cir. 2002) (citing *Macke v. Laundry Serv., LP*, 931 S.W.2d 166, 176 (Mo. App. W.D. 1996)).  There is neither allegation nor proof that Drs. Evers, Cox, and Benzinger acted out of self-interest beyond the scope of their employment with the University or of any agency with BJH with respect to any actions they took relating to Plaintiffs.  Therefore, the civil conspiracy claim cannot stand against Drs. Evers, Benzinger and Cox where the principals (the University and BJH) are alleged conspirators.

With respect to Dr. Cox, he is named as a defendant only in the civil conspiracy claim. No other claim, yet alone a tort claim, is directed to Dr. Cox, and thus he cannot be, as a matter of law and logic, a joint tortfeasor under a civil conspiracy theory.  Also, the only allegation referencing him at all is that he "threatened" to refer plaintiff to the Missouri Physician's Health Program (Dkt. #86 ¶¶74, 137).  But that alleged threat is neither tortious nor otherwise unlawful. Because civil conspiracy is not actionable without an underlying tort and because no unlawful conduct by Dr. Cox is alleged, he should be dismissed from this action for this further reason.

## Conclusion

For the foregoing reasons, Plaintiffs' remaining claims are without legal or factual support, and summary judgment should be granted.

Respectfully submitted,

SHANDS, ELBERT, GIANOULAKIS
  & GILJUM, LLP

/s/ *Kevin Anthony Sullivan*
Mark J. Bremer #24696MO
Kevin Anthony Sullivan #55140MO
8235 Forsyth Blvd., Suite 700
St. Louis, MO  63105
(314) 241-3963
(314) 241-2509 (fax)
mbremer@shandselbert.com
ksullivan@shandselbert.com

Attorneys for Defendants Washington University, Thomas
Cox, Richard Benzinger, and Alex Evers

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 17th day of February, 2023, the foregoing
was filed electronically with the Clerk of the Court to be served by operation of the Court's
electronic filing system on all counsel of record.

/s/ *Kevin Anthony Sullivan*

48