# DR. JEFFERY WEISMAN  9/13/2022

## Page 1

1  UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
2  EASTERN DIVISION
3
4
5
6
7
JEFFERY WEISMAN and STRATEGIC BIOMEDICAL, INC.
8  vs.
BARNES JEWISH-HOSPITAL, BJC HEALTHCARE, WASHINGTON
9  UNIVERSITY, DR. ALEX EVERS, DR. RICHARD BENZINGER, and
DR. THOMAS COX
10
Cause No. 4:19-cv-00075-JAR
11
12
13
14
15
16  VIDEOTAPED DEPOSITION OF DR. JEFFERY WEISMAN
17  TAKEN ON BEHALF OF THE DEFENDANTS
18  SEPTEMBER 13, 2022
19
20
21
22
23
24
25  (Starting time of deposition: 9:04 a.m.)

## Page 2

1  INDEX
2  PAGE
3  Index                                     2
Deposition Information            3
4  Appearance Page                    4
Direct Examination by Mr. Sullivan    10
5  Notarial Certificate                   343
6
7
8  DEFENDANT'S EXHIBITS
9  EXHIBIT    DESCRIPTION              PAGE MKD.
10 NUMBER
11 A      Second Amended Complaint    37
   A2     Complaint                        58
12 A5     Dean letter from Mark Platt    59
   A6     E-mail 1/25/18 AKT 6mth    61
13        Results
14 A14    EM Off Service Resident     74
          Evaluation by attending
15 A7     E-mail 8/11/16 from David    81
          Sinow Re: 3D Printing
16 A8     E-mail 8/15/16 from Jeffery    84
          Weisman Re: 3D Printing
          company
17 A9     E-mail 8/16/16 from Jeffery    93
          Weisman Re: 3D Printing
18        company
19 A10    E-mail 8/17/16 from Jeffery    109
          Weisman Re: SBIR/STTR
          training
20 A11    E-mail 9/9/16 from David    111
          Sinow re: Introduction
21        Strategic Biomedical 3D
          printing
22 A12    E-mail 9/13/16 from David    112
          Sinow Subject Our
23        conversation yesterday
   A15    E-mail 3/20/17 from Richard    133
24        Schaefer re: 3D Move to 6th
          floor Barnard
25

## Page 3

1  A16    E-mail 3/21/17 from Karthik    136
          Tappa re: 3D Move to 6th
2         floor Barnard
3  A17    E-mail 1/16/18 from Jeffery    149
          Weisman re: T32 grant
4         renewal information
   A18    E-mail 4/5/18 from Jeffery    151
5         Weisman Subject Weisman CV
          ERAS pdf
6  A19    E-mail 4/10/18 from Jeffery    154
          Weisman Subject Weisman
7         non-clinical activities at
          WashU
   A20    Stanford-Confidential    156
8  A21    e-mail 12/8/18 from Jeffery    158
          Weisman re: CA-2 Transfer
9         Question
   A13    Wash U. Letter 1/19/17 Re:    164
10        Jeffery Weisman Action:
          Probation
11 A103   e-mail 2/21/18 from George    172
          Benzinger re: Weisman 6
12        month meeting
13 A28    e-mail 9/7/17 from Jeffery    178
          Weisman Subject: Week 1
14        Harassment Incident Records
          Copy
   A29    2/18/19 Text    203
15 A101   E-mail 2/19/17 from Jeffery    214
          Weisman Subject: Plan for
16        success from Weisman ASAP
          meeting
17 A72    E-mail 4/9/18 from Jeffery    219
          Weisman Subject: Weisman CV
18        and CV Addendum
   A92    E-mail 3/17/17 from Jeffery    220
19        Weisman Subject: Optimal
          rough reorganization on 3D
20        printing screws and
          mechanical test data
21 A93    E-mail 3/8/17 from Jeffery    221
          Weisman Subject: Catheter
22        paper JVIR
   A94    E-mail 3/9/17 from Jeffery    222
23        Weisman Subject: Additional
          OB-GYN 3D printing papers
24
25

## Page 4

1  A95    E-mail 8/8/17 from Patrick    223
          Mills Subject: Semi-final
2         draft on 3D printing Billing
          Paper
3  A96    E-mail 7/28/17 from Jeffery    226
          Weisman Re: JOVE Paper
4  A97    E-mail 7/12/17 from PLOS ONE    226
          Subject: PLOS ONE
5         Notification: Your PDF has
          been built
6  A98    E-mail 3/30/17 from Jeffery    228
          Weisman Subject: Final
7         e-mail on 3D Print Lab
          transition to MIR and
8         funding analysis
   A63    E-mail 1/2/18 from Jeffery    239
9         Weisman Subject:
          Weisman-Norris Meeting
10 A65    E-mail 1/12/18 from Jeffery    242
          Weisman Re: Weisman
11        Scheduling till end of
          academic year and next
12        rotation
   A64    1/11/18 CA-1 first six month    243
13        CCC evaluation
   A67    E-mail 4/5/18 from George    246
14        Benzinger Re: Weisman
          Research Opportunity
15 A68    E-mail 4/6/18 from Jeffery    251
          Weisman Subject: Fwd
16        Program Director Letter
   A69    E-mail 4/6/18 from Jeffery    253
17        Weisman Subject: Weisman
          Resignation Letter & Weisman
18        Research Request Letters
          Below
19 A70    E-mail 4/7/18 from George    254
          Benzinger Subject:
20        Rotations between now and
          June 30th
21 A71    E-mail 4/7/18 from Alex    256
          Evers Re: Weisman
22        Resignation Letter & Weisman
          Research Request Letters
23        Below
24
25

1 (Pages 1 to 4)

# DR. JEFFERY WEISMAN  9/13/2022

## Page 5

| | | |
|---|---|---|
| 1 | A73 | E-mail 4/10/18 from Jeffery   257 |
| 2 | | Weisman Subject: Weisman Program Director Letter Decision |
| 3 | A75 | E-mail 5/14/18 from George   258 Benzinger Re: Personal Re: |
| 4 | | Updates |
| 5 | A77 | E-mail 6/6/18 from George   261 Benzinger Subject: Jeff Weisman |
| 6 | A3 | Jeffery Weisman's Answers   266 and Objections to Defendant |
| 7 | | Washington University's Interrogatories |
| 8 | A80 | E-mail 6/21/18 from Jeffery   277 Weisman Subject: Weisman |
| 9 | | Letter Cook County |
| 10 | A83 | E-mail 8/4/18 from Ned Nasr   280 Re: Jeff Weisman New Contact Information and Question |
| 11 | A85 | Letter 8/13/18 to Dr.   292 Weisman from J. Mark Meacham |
| 12 | | Mechanical Engineering & Materials Science |
| 13 | A89 | E-mail 9/12/18 from Douglas  295 Thompson Re: Sending |
| 14 | | Residency Verification, etc. Question |
| 15 | A91 | E-mail 11/28/18 from Alan   297 Kaye Subject: Rotation |
| 16 | | schedule-Jeff Weisman.docx;ATT00001.htm; |
| 17 | A30 | E-mail 4/14/16 from Jeffery   303 Weisman Subject: |
| 18 | | IMPORTANT-Lab and Project Finances |
| 19 | | |
| 20 | A48 | E-mail 2/4/17 from David   309 Ballard Subject: 3D Printing Lab MIR Acquisition Document |
| 21 | A104 | E-mail 4/6/17 from Jeffery   328 Weisman Subject: Benzinger |
| 22 | | survey |
| 23 | | |
| 24 | | (Original exhibits were retained by the Court Reporter and will be copied and attached to copies of the |
| 25 | | transcript.) |

## Page 6

```
1              UNITED STATES DISTRICT COURT
2        FOR THE EASTERN DISTRICT OF MISSOURI
                   EASTERN DIVISION
3   JEFFERY WEISMAN and        )
    STRATEGIC BIOMEDICAL,      )
4   INC.,                      )
                               )
5           Plaintiffs,        ) Cause No.
                               ) 4:19-cv-00075-JAR
6        vs.                   )
                               )
7   BARNES JEWISH-HOSPITAL,    )
    BJC HEALTHCARE,            )
8   WASHINGTON UNIVERSITY,     )
    DR. ALEX EVERS, DR.        )
9   RICHARD BENZINGER, and     )
    DR. THOMAS COX,            )
10                             )
            Defendants.        )
11
12       VIDEOTAPED DEPOSITION OF DR. JEFFERY
13  WEISMAN, produced, sworn and examined on
14  September 13, 2022, between the hours of eight o'clock
15  in the forenoon and six o'clock in the afternoon of
16  that day, at Sheraton Westport Chalet Hotel, 191 West
17  Port Plaza Drive, St. Louis, Missouri, 63146, before
18  Amy A. Victoria, Certified Court Reporter, in a
19  certain cause now pending in the United States
20  District Court, Eastern District of Missouri, Eastern
21  Division, wherein JEFFERY WEISMAN and STRATEGIC
22  BIOMEDICAL, INC. Are the Plaintiffs and BARNES
23  JEWISH-HOSPITAL, BJC HEALTHCARE, WASHINGTON
24  UNIVERSITY, DR. ALEX EVERS, DR. RICHARD BENZINGER, and
25  DR. THOMAS COX are the Defendants.
```

## Page 7

```
1              A P P E A R A N C E S
2   For the Plaintiffs:
3        ELSTER LAW OFFICE, LLC
         By:  Henry Elster
4        225 South Meramec Avenue
         Suite 325
5        Clayton, MO  63105
         (314)727-0868
6        henry@elsterlaw.com
7
8        MAREK WEISMAN, LLC
         By:  Rachel Rutter
9             Sherman Marek
         55 East Monroe Street
10       Suite 3800
         Chicago, IL  60603
11       rrutter@marekweisman.com
12
13  For the Defendants Washington University
    Thomas Cox, Richard Benzinger & Alex Evers:
14
15       SHANDS, ELBERT, GIANOULAKIS
         & GILJUM, LLP
16       By:  Kevin Anthony Sullivan
         8235 Forsyth Boulevard
17       Suite 700
         St. Louis, MO  63105
18       (314)241-3963
         ksullivan@shandselbert.com
19
20  For the Defendants BJH & BJC:
21       HUSCH BLACKWELL LLP
         By:  Michael P. Nolan
22            Christine Ramatowski
         190 Carondelet Plaza
23       Suite 600
         St. Louis, MO 63105
24       (314) 480-1770
         Michael.Nolan@huschblackwell.com
25
```

## Page 8

```
1   Also present: Lisa Wood
                  In-house counsel
2                 Washington University
3                 Marissa Israel
4
5
         Court Reporter:
6
7        Amy A. Victoria, CCR MO #556
         Lexitas Legal Services
8        711 North Eleventh Street
         St. Louis, MO  63101
9        (314) 644-2191
10       1-800-280-3376
11  Videographer:
12       John Niehaus
         Lexitas Legal Services
13       711 North Eleventh Street
         St. Louis, MO  63101
14       (314) 644-2191
         1-800-280-3376
15
16
17
18
19
20
21
22
23
24
25
```

## DR. JEFFERY WEISMAN  9/13/2022

### Page 9

1     IT IS HEREBY STIPULATED AND AGREED, by and
2 between counsel for the Plaintiffs and counsel for the
3 Defendants that this deposition may be taken in
4 shorthand by Amy A. Victoria, Certified Court
5 Reporter, and afterwards transcribed into typewriting;
6 and the signature of the witness is expressly
7 reserved.
8     *   *   *   *   *
9
10     THE VIDEOGRAPHER:  We're on the record.
11 Today's date is September 13th, 2022, and the time is,
12 approximately, 9:04 a.m.
13     This is the video recorded deposition of
14 Jeffery Weisman, M.D. in the matter of Jeffery
15 Weisman, M.D., et al versus Barnes-Jewish Hospital, et
16 al, Case Number 419-CV-00075-JAR in the United States
17 District Court for the Eastern District of Missouri,
18 Eastern Division.
19     This deposition is being held at Sheraton
20 Westport Hotel in St. Louis, Missouri.
21     The reporter's name is Amy Victoria.  My
22 name is John Niehaus.  I am the legal videographer.
23 We are with Lexitas Legal.
24     Will counsel please introduce yourself for
25 the record.

### Page 10

1     MR. SULLIVAN:  Kevin Sullivan counsel for
2 Defendants Washington, Dr. Alex Evers, Dr. Thomas
3 Cox, and Dr. Richard Benzinger.
4     MR. NOLAN:  Mike Nolan for Defendants BJC
5 and BJH.
6     MR. ELSTER:  Henry Elster for the
7 Plaintiffs, Dr. Jeffery Weisman and Strategic
8 Biomedical, Inc.
9     MS. RUTTER:  Rachel Rutter for Plaintiffs
10 Dr. Jeffery Weisman and Strategic Biomedical, Inc.
11     MR. MAREK:  Sherman Marek on behalf of
12 plaintiffs.
13     THE VIDEOGRAPHER:  Will you please swear in
14 the deponent.
15     *   *   *   *   *
16     DR. JEFFERY WEISMAN,
17 of lawful age, produced, sworn and examined on behalf
18 of the Defendants, deposes and says:
19
20     DIRECT EXAMINATION
21 QUESTIONS BY MR. SULLIVAN:
22     Q.  Dr. Weisman, we haven't had an opportunity
23 to meet.  My name is Kevin Sullivan and you understand
24 I represent what I'll call the university defendants
25 in this case.

### Page 11

1     A.  Yes, I do.
2     Q.  Okay.  Can you state your name and address
3 for the record, please.
4     A.  My name is Jeffery Weisman.  I currently
5 live at 719 East Ocean View Avenue in Norfolk,
6 Virginia.
7     Q.  Are you on any medications today that would
8 prevent you from answering any questions or giving
9 truthful testimony?
10     A.  No.
11     Q.  You've had your deposition taken before,
12 correct, in a worker's compensation case?
13     A.  That is correct.
14     Q.  Have you ever had your deposition taken in
15 any other case?
16     A.  I don't believe so.
17     Q.  Okay.  Let's just go over a few ground
18 rules to start off with the deposition.
19     One thing is we can't talk over each other
20 or Amy can't get an accurate record.  So it's a tough
21 rule to follow but I'll ask that you wait for me to
22 give a full question and then I'll wait for you to
23 give your full answer.  Is that fair?
24     A.  That is understood.
25     Q.  Okay.  I need a verbal response.  No head

### Page 12

1 nods or no head shakes.  Also try to avoid using yeah
2 or nah.
3     And if I ask you whether your answer was a
4 yes or a no, I'm not trying to be confrontational or
5 anything.  I'm just trying to make sure we have an
6 accurate record.  Is that fair?
7     A.  Understood.
8     Q.  Your counsel may lodge objections during
9 the deposition.  Unless they instruct you not to
10 answer, you are to go forward and give your answer
11 subject to their objections.  Okay?
12     A.  Okay.
13     Q.  And if you don't understand a question
14 or -- or you need it to be repeated, just go ahead and
15 ask me and I'll do that.  Okay?
16     A.  Okay.
17     Q.  And then finally, you're free to ask for a
18 break any time that you want.  With the one exception
19 that you can't ask for a break when there's a question
20 pending.  Is that fair?
21     A.  Okay.  Understood.
22     Q.  Are you married?
23     A.  Yes, I am married.
24     Q.  Okay.  What's your wife's name?
25     A.  Marissa Israel.

3 (Pages 9 to 12)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 25

1    you said was truthful or anything like that.
2         I'm just trying to say are those recordings
3    an accurate reflection of what was said in the
4    meetings?  Like, you haven't edited these recordings
5    or anything like that?
6         A.  I don't believe those have been edited.  I
7    gave everything to my attorneys.
8         Q.  Okay.  So what was said during that meeting
9    would be accurately reflected in the recordings?
10        A.  The words themselves in the recordings are
11   what they are.
12        Q.  Are what they are.  Okay.  Thank you.
13        You recorded conversations with Dr. Alex
14   Evers, correct?
15        A.  That is correct.
16        Q.  You recorded conversations with Dr. Rich
17   Benzinger?
18        A.  That is correct.
19        Q.  You recorded conversations with Dr. Russell
20   Groener?
21        A.  That is correct.
22        Q.  You recorded conversa -- conversation --
23   conversations with the ACGME?
24        A.  That is correct.
25        Q.  With the American Board of Anesthesiology?

### Page 26

1         A.  I believe I -- I -- I'm trying to think.  I
2    might have done that.
3         Again, I gave all the recordings to my
4    attorney and I've not looked at them in -- in a deal
5    of time.  So I'm -- I'm just saying I might have
6    recorded the -- the American Board of Anesthesia, I
7    believe.
8         Q.  Do you recall recording any other
9    conversations with university faculty members?
10        A.  Yes.  And it would depend on the faculty
11   member I was working with that day.  And if I felt
12   there was going to be an incident of bullying or
13   harassment or something inappropriate going on.
14        Q.  Did you record any conversations with
15   Dr. Cathleen Krucylak?
16        A.  Yes, I did.
17        Q.  Did you record conversations with
18   Dr. Martha Szabo?
19        A.  I might have recorded with Dr. Szabo.
20   Again, I'd have to have a list of the recordings to --
21   you know, again, it would depend on -- again, it would
22   depend on what was being said and what the situation
23   and context was where I might feel that I need to
24   record this to protect myself.
25        Q.  Did you record conversations with

### Page 27

1    Dr. Douglas Thompson?
2         A.  I believe I did.
3         Q.  In that -- in any of those conversations,
4    did you tell Dr. Thompson that you felt that you were
5    below average clinically?
6         A.  I'd have to see the specific conversation.
7    Again, I haven't looked at these in a long period of
8    time.
9         Q.  So in an academic medical residency
10   training program, would you agree that it's the
11   faculty physicians who evaluate the residents?
12        MR. ELSTER:  Objection.  Form.
13   Speculation.
14        A.  Well, so -- so -- so to answer the
15   question, in an academic medical center residency, the
16   attending physicians create evaluations of the
17   residents.  And they're suppose to do those fairly,
18   objectively, accurately and per ACGME standards.
19        Q.  (Mr. Sullivan)  So it's -- it's the
20   faculty who evaluates the residents, correct?
21        A.  In -- in general, it's the faculty that
22   evaluate the residents.
23        Q.  And that would be because faculty
24   physicians have the knowledge, experience and training
25   to both evaluate and train residents --

### Page 28

1         MR. ELSTER:  Object.
2         Q.  -- is that a fair statement?
3         MR. ELSTER:  Objection.  Assumes facts not
4    in evidence.
5         A.  Well, in -- in general, and in an ACGME
6    residency program, the faculty have training and
7    they're boarded in that field and that's why they're
8    doing the evaluations.
9         That said, there's a very wide variety of
10   faculty there.  And, you know, again, are they giving
11   a fair objective evaluation?  I've seen scenarios
12   where faculty do not give very subjective or an
13   accurate or false evaluations.  And I've seen
14   situations where faculty lie and change facts in an
15   evaluation.
16        So without knowing what the specific
17   evaluation or situation is, I can't tell you if it's
18   accurate or if there's a problem with it.  If it's
19   objective --
20        Q.  (Mr. Sullivan)  I wasn't asking about
21   accuracy.  I was -- I was just asking about generally
22   your understanding.
23        Would you agree that very -- that
24   evaluations can, like you said, they can -- they can
25   vary amongst faculty physicians?

7 (Pages 25 to 28)

**DR. JEFFERY WEISMAN  9/13/2022**

Page 29

1    MR. ELSTER:  Objection.  Speculation.
2    A.  It would depend on the -- it would depend
3  on the situation but different faculty can have
4  different opinions.
5    Q.  (Mr. Sullivan) Okay.  And, you know, some
6  evaluators could be tougher than others.  Is that a
7  fair statement?
8    A.  You know, I -- that I'll say I don't think
9  it's a fair statement because I think all
10  evaluators -- everybody that's evaluating you in a
11  residency like Washington University St. Louis, in
12  general, they are all board certified physicians.
13  They all know what it takes to be a board certified
14  physician, and they're all suppose to give accurate,
15  objective ACGME evaluations.
16    Q.  But -- but -- but their professional
17  opinion on performance can -- can differ.  I think
18  we're in agreement on that, right?
19    A.  Well, if -- if the question you're asking,
20  and I just want to make sure I understand is, can two
21  different faculty member -- can one faculty member say
22  X and one faculty member say Y?  Yes.
23    Q.  That's -- that's exactly what I meant.
24    A.  If --
25    Q.  Let me -- let me rephrase.

Page 30

1    A.  Okay.
2    Q.  So one physician evaluator could say,
3  he's -- this resident is performing satisfactorily.
4  Another might have the opinion that the resident is
5  performing unsatisfactorily.  Is that a fair
6  statement?
7    A.  So what I would say is I've seen that
8  occur.  But in general, if this is an honest, accurate
9  and objective evaluation, they should all be the same.
10    So again, people can have differing
11  opinions, but if the question is to judge something
12  objective such as skills, then those faculty should
13  have a similar opinion.
14    Q.  So probably speaking, in this case, you're
15  claiming that the anesthesiology residency program --
16  and I'll just refer to the program, is that okay?  So
17  that we understand.
18    A.  That's fine.
19    Q.  Okay.  Did not accurately evaluate your
20  performance as a resident.  Is that fair?
21    A.  That is correct.
22    Q.  And you're aware that numerous
23  anesthesiology faculty members put concerns that they
24  had about your performance in writing.  Is that true?
25    A.  My understanding is that faculty members,

Page 31

1  some faculty members put concerns down that were
2  friends with Alex Evers and Tom Cox and Rich Benzinger
3  to try to drive me out of the program.  And many of
4  those comments were not accurate, not objective.
5    Q.  So are you claiming that all concerns and
6  criticisms of the anesthesiology faculty are
7  inaccurate and unfair?
8    MR. ELSTER:  Objection.  Overly broad.
9  Form.
10    A.  I would have to know the specific
11  situation.  One thing to note, and I think it's
12  important to bring up right now.  When you're in a
13  residency training program, everybody is there to
14  learn.
15    A program like Washington University
16  St. Louis takes people from all over the country.  And
17  they -- they interview, for example, the internal
18  medicine department, I believe they interview 500
19  people from coast to coast.  And they come in there to
20  learn and be trained to be competent and good doctors
21  to help patients.  That's what every resident school
22  is, is to go there to train to be a good doctor.
23    Now, as you're asking, can different
24  faculty members have different opinions in general?
25  There are faculty members that can have differing

Page 32

1  opinions.  But that said, those opinions and
2  evaluations should be within a standardized range or a
3  standard deviation.  Because it's very -- in my
4  experience, it's very odd to have -- and this is just
5  a general, non-specific situation but it's very odd to
6  have one faculty member that says, this guy is a great
7  doctor or this girl is a great doctor and another
8  faculty member say, oh, my God, this person shouldn't
9  be practicing.  There shouldn't be that type of a
10  discrepancy.  There should be a rough middle ground.
11    There can be -- there can be a variance,
12  for example, when you look at performance where you
13  say, hey, this resident, you know, about -- about X,
14  and, you know, somebody else thinks they're X plus 10
15  or 20 percent, or plus or minus 20 percent.  But in
16  general, the evaluation should all be accur -- if
17  they're objective, then evaluations should all be
18  similar.
19    Q.  (Mr. Sullivan) Okay.  I'm going to move to
20  strike as nonresponsive and as a narrative answer.
21    If you could just answer the question that
22  I ask, this is going to go a lot -- a lot quicker.
23  Okay.
24    You're going to have ever opportunity to
25  answer questions posed by your lawyers, but you

8 (Pages 29 to 32)

**DR. JEFFERY WEISMAN**  9/13/2022

---

Page 33

1 understand this is my opportunity to ask questions.
2 Okay.  So --
3      A.  Okay.
4      Q.  -- I'd like you to answer the question and
5 not provide narrative answers unless I -- unless one
6 is called for.  Okay?
7      A.  Okay.
8      Q.  Thank you.
9           Did you complete your residency in
10 occupational and environmental medicine at the
11 University of Illinois Chicago?
12      A.  Yes, I did.
13      Q.  When did you complete that?
14      A.  I finished and graduated that residency
15 program in June of 2021.
16      Q.  And who was the program director while you
17 were at the University of Illinois Chicago?
18      A.  The program director when I was there was
19 Dan Ba -- was Dr. Dan Baxton.  He was the program
20 director for the occupational and environmental
21 medicine residency program at the University of
22 Illinois Chicago.
23      Q.  Okay.  Is Strategic Biomedical, Inc -- and
24 I'm going to shorten that to SBI, if that's okay.
25      A.  Oh, that's fine.

---

Page 34

1      Q.  Is Strategic Biomedical, Inc. still in
2 existence?
3      A.  Yes.  The corporation is still in
4 existence.
5      Q.  Who are the officers of the corporation?
6      A.  Right now it would just be myself.
7      Q.  So you'd be president/secretary?
8      A.  I, you know, I don't believe that there's
9 any formal officers that are -- I'd have to take a
10 look right now to be quite honest.  I haven't looked
11 at the status of the documents on it.
12           I can tell you the corporation still
13 exists.  And right now, the corporation is what I
14 would call in hibernation.  There's not -- it's not
15 doing any activities.  So aside from it existing on --
16 aside from it just existing, is a -- is a -- I don't
17 know what term of art to use, living corporation or
18 live corporation, that -- that's what it stands right
19 now.
20      Q.  So it's -- it's in existence but SBI as a
21 business is not operating.  Is that fair?
22      A.  Correct.  Yeah.
23      Q.  And who are the directors of SBI?
24      A.  I would have to -- I would have to take a
25 look.  I have not looked at the corporate

---

Page 35

1 documentation for a while.
2      Q.  Do you have annual minutes required by the
3 State of Delaware with respect to appointing directors
4 and officers?
5      A.  I'm sure -- I believe we have annual
6 meeting minutes and everything like that.  I'd have to
7 go see where those are and find them.
8      Q.  Does David Sinow still have a position with
9 SBI either as an officer or director?
10      A.  Right now I would -- so I would have to
11 check the paperwork.  David Sinow at this point is not
12 actively involved, but I would have to check the
13 paperwork to see if it still lists him as an officer
14 or board member.
15      Q.  And you went to medical school at the LSU
16 Shreveport Medical Center, correct?
17      A.  That is correct.
18      Q.  Did you ever complain to anyone about your
19 education and training while you were at LSU
20 Shreveport?
21      A.  I don't believe I made any formal
22 complaints there.  I was thinking.  I did very well
23 and enjoyed my time there.
24      Q.  What about just making general com --
25 general complaints to any other faculty members while

---

Page 36

1 you were there?
2           MR. ELSTER:  Objection.  Form.
3      Q.  -- about your education and training?
4           MR. ELSTER:  Same objection.
5      A.  I didn't make any -- I don't believe I made
6 any formal complaints.
7           I will say -- and not to go on narrative --
8 but I will say medical students just like law
9 students, we always complain after a test.  We -- we
10 always just, you know, oh, my gosh, this test was
11 hard.  Oh, my gosh, this rotation is a lot of hours.
12 But I never thought -- I don't believe I have ever
13 filed a formal complaint.
14           I can ask if it counts that I -- I helped
15 with --
16      Q.  (Mr. Sullivan) I'm going to -- I'm going
17 to --
18      A.  Okay.
19      Q.  My question has been answered.
20      A.  All right.
21           (Plaintiff's Deposition Exhibit A, Second
22 Amended Complaint.)
23      Q.  Thank you.  All right.  I'm going to hand
24 you, Doctor, what's been marked Exhibit A.  And this
25 is the second amended complaints that was filed on

---

9 (Pages 33 to 36)

## DR. JEFFERY WEISMAN  9/13/2022

**Page 37**

1     your behalf by your former counsel in this case?
2        A.  It -- it appears to be the Second Amended
3     Complaint but I'd have to read the entire document and
4     go through it to make sure it is.  I'm, you know,
5     looking at the cover page.  It appears to be that.
6        Q.  Okay.  Do you want to go off the record so
7     you can read it or can we agree that there's the
8     header across the top showing that it was
9     electronically filed in the Eastern District of
10    Missouri?
11       A.  Normally I'd want to read a document to
12    make sure, but I -- I'll -- I'll take your word for it
13    that this is the document.
14       Q.  Okay.  And this would be a full statement
15    of your current claims and allegations in this case.
16       A.  So this document has some of the claims
17    bullying, harassment and things that have occurred.
18    There's other incidents -- there's actually many
19    incidents that are not included in this and we're
20    still investigating incidents that are uncov -- that
21    are being uncovered right now as we speak while we go
22    through discovery.
23       Q.  Okay.  Well, what are those incidents?
24       A.  Well, one of the most recent incidents that
25    we discovered was that my ACGME transcript had been

**Page 38**

1     hidden by Washington University and Barnes-Jewish
2     counsel for the past four years.  And it -- and
3     despite repeated requests by myself and my attorneys
4     for it, they refused to give it, which prevented me
5     from obtaining many jobs.  And this situation went all
6     the way up from the program director to General
7     Counsel Ramatowski who was -- who was helping them to
8     hide my transcript.
9       Q.  So you reviewed what were marked attorney
10    client communications in the course of
11    investigating --
12       MR. ELSTER:  Objection --
13       Q.  -- claim --
14       MR. ELSTER:  Hold on.  Objection.  Calls
15    for the extent -- or it calls for a legal conclusion
16    as to attorney client privilege.  And form as to which
17    documents you're referring to.
18       A.  Yeah.  Could you tell me what documents
19    you're referring to?
20       Q.  (Mr. Sullivan) I'm referring to e-mails
21    that were inadvertently produced but that had
22    Christine Ramatowski and Joseph Sklansky as senders
23    and recipients of those.
24       MR. ELSTER:  Same object -- sorry.
25       MR. SULLIVAN:  Can you just let me -- let

**Page 39**

1     me finish.
2       Q.  (Mr. Sullivan) Did you review those
3     e-mails?
4       MR. ELSTER:  Same objection.  Legal
5     conclusion and form.
6       A.  I read some of those e-mails.  I did --
7     I -- I can't tell you I've read every document in
8     discovery.  I saw some of those e-mails and I saw the
9     draft of the sanctions motion.
10       Q.  Okay.  With respect to the ACGME, you're
11    not currently applying for residencies; is that
12    correct?
13       A.  Well, I -- I actually have -- I actually --
14    so right now I actually asked for an ERAS token from
15    LSU Health.  I've always been trying to actively see
16    if a seat can open up that I can get into for
17    anesthesia to get back into things.
18       Q.  So you're still seeking to -- to go back
19    into it for an anesthesiology residence -- residency
20    program?
21       A.  I would like to resume training and finish,
22    you know, complete my career goals.
23       Q.  Have you provided a waiver or a request to
24    the program with respect to your summative evaluation?
25       A.  I have made multiple requests in the past

**Page 40**

1     both verbal and written to Douglas Thompson, Richard
2     Benzinger.  And I've even gone to the former GME Dean,
3     Christine -- or Rebecca McAllister, my apologies
4     there, and Tia Drake in the past asking them for my
5     transcripts.  And I even had a meeting with them where
6     I told them that they -- that I was concerned that
7     they might be hiding my records.
8       Q.  What's the difference between a transcript
9     and a summative evaluation?
10       A.  In -- so when you say summative evaluation,
11    are you referring to an ACGME summative evaluation
12    transcript, the only -- that is a true transcript of
13    your ACGME training.
14       And to -- and my -- in my opinion, and in
15    fact, an ACGME summative evaluation transcript is no
16    different than a law school transcript.  It is the
17    documents you need to be able to train in residency.
18       Q.  And -- but every program -- and you've been
19    provided the six month summative evaluation that was
20    submitted by the program to the ACGME; is that right?
21       A.  So the ACGME has -- so the ACGME has
22    milestones that are submitted to them on a six month
23    interval, and the ACGME has a website where they
24    maintain those milestones.  Those are -- those --
25    that's not a formal ACGME summit evaluation

LEXITAS LEGAL
www.lexitaslegal.com    Phone: 1.800.280.3376    Fax: 314.644.1334

## DR. JEFFERY WEISMAN  9/13/2022

Page 49

1 before it moved.
2    Q.  So it was generating revenues?
3    A.  So it -- so as far as -- as far as one of
4 our revenue streams for grants it was.
5    Q.  What about -- there's kind of distinction.
6 There's also your -- what I'll refer to as your lab.
7 Is your lab and SBI one in the same or are they
8 separate?
9    A.  So as far -- so SBI, at that point, was the
10 lab -- was the lab group.
11    Q.  When you moved here?
12    A.  When I moved to St. Louis, SBI was the lab
13 group.
14    Q.  Okay.  And was SBI the lab group, let's
15 say, while your last six months at LSU?
16    A.  So I -- to make sure I'm accurate.  So you
17 would have to back up a little bit.  So S -- so SBI
18 was incorporated in, I believe, I'd have to check the
19 documents.  I believe it was October, fall 2015.  So
20 SBI was -- so SBI was incorporated then.  So...
21    Q.  So it was -- so SBI and your lab were one
22 in the same maybe in the last -- the last several
23 months that you were at LSU.  Is that fair?
24    A.  That -- that is -- I think that would
25 probably be a fair comment.  I just want to make sure

Page 50

1 I understand what you're asking on it but...
2    Q.  I just want to know is there a difference
3 when we're talking about -- about it in this case
4 between your lab and SBI?
5    A.  Okay.  I -- I believe at that point in
6 time, we had -- the -- what we had decided to do after
7 meeting with David Sinow and looking at venture
8 capital options, the decision was to spin off the
9 technology and the lab as a company Strategic
10 Biomedical that we could raise funds yet still have --
11 but still have University affiliations as needed to
12 put in for academic grants and IHMSF, etc.
13    Q.  Okay.  And so that would always be under
14 the umbrella of SBI then, if you're applying for
15 grants and funding in the academic setting as well?
16    A.  Yes.  And just to be accurate on that, when
17 you're applying for grants in the academic setting --
18    Q.  That's individually, right?
19    A.  Yeah.  So you can -- there's actually a
20 couple of different ways it's done.  You can either
21 apply for an NIH or NSF type grant individually but
22 there are -- there are grants called SBIR grants,
23 small business innovation grants.  And there's --
24 there's a couple of different types of them where they
25 can be between the government and a private company or

Page 51

1 there's a variant called STTR, I believe, where it can
2 be between academic center and the government and a
3 private company is kind of a three-way situation.
4    Q.  If you could turn, Dr. Weisman, to page 5,
5 paragraph 17.
6    A.  Okay.
7    Q.  And what I want to ask you about is that
8 your -- you say your lab and research staff that you
9 directed had an affiliation with Louisiana State
10 University and Louisiana Tech University.  What was
11 the relationship with Dr. David Mills with respect to
12 those?
13    A.  Okay.  So doctor -- Dr. David Mills, he was
14 my PI for doing a Ph.D.  And to make -- PI would
15 typically be principle investigator.
16       So I was a Ph.D. student that was in his
17 lab group when I developed the technologies.  And once
18 I had finished the Ph.D. work was when -- once I
19 finished the Ph.D. work, then David Mills was not
20 really fully -- Mills wasn't involved in the lab
21 groups since it was not an academic -- a fully
22 academic situation at that point.  It was, you know,
23 we were start -- launching a private spinoff company
24 and licensing technology to do it.
25       That said, David Mills was still doing

Page 52

1 substantial academic research with us and we were
2 working together on many projects.
3    Q.  And -- and did you guys share equipment?
4    A.  I would say the answer is -- is -- I'm
5 trying to think on the equipment that we were using.
6 We -- we did use some of -- some of his equipment but
7 we also rapidly were purchasing our own equipment.
8    Q.  And did Louisiana Tech own a patent that
9 had been developed by you, David Mills and others
10 while you were there?
11    A.  Yes.  And the way that works is if a Ph.D.
12 student or anybody works at a university if you
13 develop technology while you're at the university,
14 then typically the general scenario is the university
15 or the university's research corporation arm owns --
16 will own the patent because you're using their lab
17 space, their equipment, and it's very standard.  And,
18 I think, Wash U. does that a lot.
19       But what ends up happening is then once you
20 file an invention disclosure or intellectual property
21 disclosure, they might then go file for a patent.  But
22 once it's filed, you can -- you can very readily
23 approach the university and more or less request to
24 license the technology or buy the patent technology
25 from them.

13 (Pages 49 to 52)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 53

1      In general, in doing licensing work,
2 they -- most universities like to continue to have
3 ownership of the patent and they'll license it to you.
4      So you -- you might have an exclusive
5 license to use and develop new tech, but they want to
6 have control.  And most universities, that's how they
7 operate.  There's -- there's a smaller number that
8 might sell or consider selling at some point to allow
9 the company to have, you know, an easier way to be
10 sold, if that's necessary.
11    Q.  But that's what happened with -- with
12 with your patent is that Louisiana Tech licensed it?
13    A.  To us.
14    Q.  To you, correct?
15    A.  That is correct.
16    Q.  Okay.  Did SBI, other than Dr. David Sinow,
17 get funding from any other investors?
18    A.  So -- so SBI, aside from David Sinow, I --
19 I put -- I've been covering lab -- I've been covering
20 lab and research expenses personally.  I put a lot of
21 money out.  If I had to estimate it, I probably spent
22 on lab supplies and equipment between, I would
23 estimate at least 80 to a hundred thousand dollars, if
24 not more, on equipment and supplies.  And some of the
25 equipment that we had was -- was also very customized

### Page 54

1 where we -- anyway --
2    Q.  I'm going to -- I'm going to move to
3 strike.  All I asked was other than you and David
4 Sinow, were there any other investors in SBI?
5    A.  There were other investors that were
6 interested.  David --
7    Q.  Did anybody put -- did anybody invest money
8 in SBI, other than you and David Sinow?
9    A.  We -- we -- we did not.  I do not believe
10 we closed the round of funding that we were working
11 on.
12    Q.  Can you look at paragraph 22 on page 7.
13    A.  Okay.
14    Q.  And the third sentence there you say -- it
15 states:  Given his credentials and accomplishments
16 however virtually any residency in the program would
17 have been happy to enroll him.  Meaning you?
18    A.  Yes.  I'm reading that right now.  Do you
19 mind if I just read the paragraph for context for a
20 moment?  All right.
21    Q.  Yeah.
22    A.  So paragraph 22.  Would you prefer I read
23 it out loud or just to myself?
24    Q.  You can just read it to yourself.
25    A.  Okay.  Okay.  I have -- I have finished

### Page 55

1 reading the paragraph.
2    Q.  And you mentioned before how in your last
3 year at LSU you would have started the application
4 process for residents -- residency programs in, like,
5 the fall of 2015.  Is that fair?
6    A.  Yes.  That is correct.
7    Q.  Roughly, how many residency programs did
8 you file applications with?
9    A.  You know, I don't recall the exact number.
10 I'd have to go through notes.  I -- I'd be guessing.
11 I would say I -- I applied to -- I applied -- I
12 applied at that time to what I thought was a
13 reasonable number.  I don't recall the exact.  I could
14 try to find -- go through notes and find out.
15    Q.  Would it -- would you say 50, more or less?
16 More than 50?
17    A.  I -- I don't recall -- and I apologize I
18 just dont --
19    Q.  That's fine.
20    A.  -- what the exact --
21    Q.  That's fine.
22    A.  -- number on it.  In general, LSU
23 recommended applying to at least 20 or 30 programs.
24    Q.  Okay.
25    A.  But -- but -- and I apologize.  I just

### Page 56

1 haven't looked at that since 2015, 2016.
2    Q.  Do you recall whether the majority of the
3 programs that you applied to declined to offer you an
4 interview -- an interview?
5    A.  So I -- I don't remember the stats -- the
6 stats on that.  I didn't -- I apologize.  I didn't
7 calculate the stats.
8    In -- from what I saw, the majority -- it
9 seemed that the majority of programs that I spoke with
10 wanted to grant me an interview.  And it -- and it
11 also seemed that even if a program hadn't granted me
12 an interview, if I let them know I was an M.D. Ph.D.
13 that was a patent attorney, they would offer me one.
14    And the example I would give is I called up
15 the medical college of Wisconsin, which has a research
16 track for M.D. Ph.D.s, and they didn't offer me an
17 interview.  And I called up and just said, Hey, I'm an
18 M.D. Ph.D., and I got a call back immediately from the
19 program director.  Who said, Oh, you're an M.D. Ph.D.
20 For some reason I didn't see it.  I had to go fish you
21 out of the -- the application pool, but we'd like you
22 to come in and we're really interested.  So just...
23    Q.  So they might have rejected you at first,
24 but based on a telephone call that you had then they
25 decided to interview you?

LEXITAS LEGAL
www.lexitaslegal.com     Phone: 1.800.280.3376     Fax: 314.644.1334

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 57

1        MR. ELSTER: Objection. Misstates
2    testimony.
3        A.  Yeah.  So -- so, I guess, what I -- what I
4    was just saying on that is most of the programs that I
5    spoke with, if I -- if -- once they saw what my
6    background was, they were very interested in having
7    the interview.
8        And -- and just the over -- the overarching
9    just because I, you know, I want to be -- I want to
10   make sure that I explain how this works for those that
11   aren't in -- in the field.  But in general, programs
12   can get a lot of applications.
13       So, for example, again, Wash U's. internal
14   med department might interview 500 people, but they
15   might have to go through just thousands of
16   applications to look at it.
17       Q.  Right.
18       A.  So depending on, you know, who, you know,
19   they -- they probably -- I don't know how Wash U. Does
20   it, but most places might divvy that up and, you know,
21   tell different faculty, here, you look at this stack.
22   You look at that stack.  So it's -- it's possible for
23   one faculty member that's not in the research track to
24   say, Oh, you know, I didn't notice this guy was an
25   M.D. Ph.D. or vice versa.

Page 58

1        (Defendant's Deposition Exhibit A2,
2    Complaint.)
3        Q.  If -- if you could just kind of put Exhibit
4    A to the side there, Doctor, because we're going to go
5    back to it.  Handing you what's been marked Exhibit
6    A2.  If you want to familiarize yourself on this but I
7    can direct you to page 34.
8        A.  Okay.  Let me just -- so...
9        Q.  Is this -- is this the initial complaint
10   that you filed as a pro se plaintiff in this case?
11       A.  Yeah.  So -- so this document appears to be
12   the initial plaintiff [sic] that I filed January 18th
13   and the Eastern District of Missouri so...
14       Q.  And if you go to page 34, the last -- it
15   should be the last page of this exhibit, that would be
16   your -- there's an electronic signature and what
17   appears to be either your signature or initials?
18       A.  Yes.  I see my signature on there.
19       Q.  Okay.  Can you go to page 3 of this
20   exhibit, paragraph 13.
21       A.  Okay.
22       Q.  If you just want to --
23       MR. ELSTER:  I just want to make an
24   objection. This is an abandoned pleading. It's not
25   the current operative complaint.  Just make a running

Page 59

1    objection to this document and it's being superceded
2    by the second document.
3        MR. SULLIVAN:  I understand, but I can
4    still ask questions about it.
5        MR. ELSTER:  And I want to make -- right.
6        Q.  (Mr. Sullivan) If you just want read
7    paragraph 13 to yourself, Doctor, and then I'll have a
8    question there.
9        A.  Okay.  Plain --
10       Q.  Oh, you don't have to read it -- you don't
11   have to read it out loud.
12       A.  Okay.  I've read that paragraph.
13       Q.  Okay.  Okay.  And -- and you stated in this
14   that winning multiple awards and everything, all this
15   placed plaintiff amongst the most accomplished medical
16   school graduates in the -- should be, I guess, country
17   on the year of his graduation?
18       A.  Yes.  That's -- that's what's in the
19   pleading.
20       (Defendant's Deposition Exhibit A5, Dean
21   letter from Mark Platt.)
22       Q.  Let me hand you what's been marked Exhibit
23   A5.
24       A.  Okay.
25       Q.  Can you identify this document?

Page 60

1        A.  All right.  This document appears to be a
2    dean's letter from Mark Platt, the Dean of Students at
3    LSU Health Science Center in Shreveport.
4        Q.  And this would be part of the ERAS
5    application process?
6        A.  Yes.  In ERAS the deans of medical
7    schools -- or sorry -- the deans of students will
8    upload a letter outlining your background and it's
9    very similar to an ACGME transcript.  You need one of
10   these letters to go into residency.
11       Q.  Okay.  In the middle of the page under Jeff
12   Weisman, do you see summary?  And it states:
13   Mr. Weisman has a GPA of 3.111 and a class rank of
14   81st out of 110?
15       A.  Yes.  I see that right now.
16       Q.  So you would have been, roughly, in the
17   bottom 30 percent of your class at LSU?
18       A.  Well, I'd have -- I'd want to calculate
19   what 81 out of 110 would be percentage wise, but,
20   what -- you know, I was -- I was number 81 if you
21   ranked by GPA.
22       Q.  That's what I'm -- that's all -- that's all
23   it states and that's all I'm asking.  Right?
24       A.  Okay.
25       Q.  Would you agree that this might have

15 (Pages 57 to 60)

DR. JEFFERY WEISMAN  9/13/2022

Page 61

1  indicated that your medical knowledge was less than
2  your peers at LSU?
3       MR. ELSTER: Objection form. Speculation.
4       A. And I -- I -- I wouldn't agree with that
5  for the following reason: The -- this -- this is
6  looking at class rank based on taking tests and that's
7  it.
8       At LSU, I was conducting research with
9  almost every department chair from literally the chair
10  of radiology, chair of surgery, the chair of oral
11  surgery. My -- according to them, my medical
12  knowledge was at the very top.
13       If it's a question of is my class rank 81
14  out of 110 because I was doing other things than just
15  studying to take a test, then that's true. My class
16  rank is my class rank.
17       Q. (Mr. Sullivan) Okay.
18       A. But my -- my medical knowledge was
19  appropriate.
20       (Defendant's Deposition Exhibit A6, E-mail
21  1/25/18 AKT 6mth Results.)
22       Q. Let me hand you what's been marked as
23  Exhibit A6.
24       A. Okay. And this was --
25       Q. What -- what is the AKT test?

Page 62

1       A. So Richard Benzinger and Washington
2  University, they have -- there's -- there's exams, I
3  believe it stands for the anesthesia knowledge test,
4  and it's an informal test that you can take to see
5  what your knowledge is in relationship to peers or
6  your other people in your program or nationwide, I
7  believe.
8       Q. So it's, like, an inner -- kind of inner
9  hospital, inner program test, correct?
10       A. That -- that is my understanding of it.
11       Q. And that's -- and -- and it's -- and it's
12  to determine the level of knowledge of trainees?
13       A. That is correct.
14       Q. Do you recall that you got a raw score of
15  77 in a standard score of 309 on the PKT -- AKT. I'm
16  sorry.
17       A. Yes. I believe this is -- yes.
18       Q. And if you look at page 2 on the -- the
19  table, the standard score of 309, that would have put
20  you in the bottom five percent, if you look at the
21  table and the percentile, of those taking the test.
22       A. Yes.
23       Q. Okay.
24       A. And let me just --
25       Q. Thanks.

Page 63

1       A. Well, no, I want to finish my answer. And
2  the reason for that is because instead of studying
3  like my peers did, I was having to go around and tape
4  record people that were harassing me and spend time
5  talking to people. Instead of going home at the end
6  of the day to go study and relax, I had to go sit
7  around the hospital to check what my, you know, that
8  did I do a good job today? Are you happy with me?
9  Are there any issues?
10       So I think this was probably accurate
11  because, as far as scoring on this test, because I
12  didn't have time to study for it.
13       And I would also note that this test
14  doesn't relate to board certification, which I passed.
15       Q. But -- so the lack of knowledge shown in
16  those results isn't your fault, it's -- it's -- it's
17  the fault of evaluations that were given to you?
18       MR. ELSTER: Objection. Argumentative.
19  Assumes facts not in evidence and form.
20       A. Well, no, I'm -- I'm just saying that
21  this -- this was a test on anesthesia knowledge, just
22  general anesthesia knowledge taken in January 25th,
23  2018. There were -- I believe there was an anesthesia
24  one -- they do one at, like, one month or a couple of
25  months out, and you have to continue studying. It's

Page 64

1  just -- it's suppose to be a proxy for the boards,
2  that's what the point is, to see if you'll pass the
3  boards.
4       And I would -- I would highly assert that
5  my score on this was lower than my peers because my
6  peers were able to study and had extra time. Whereas,
7  in my situation, I was trying to stop people from
8  harassing me and giving me a hard time.
9       Q. (Mr. Sullivan) Doctor, can you go back to
10  Exhibit A, which is the second amended complaint.
11       A. Yep. Okay.
12       Q. So talking about what -- you understand
13  what I mean when I talk about the match, correct?
14  Meaning --
15       A. The -- the match would be the national
16  residency matching program, the economic's algorithm
17  that matches everybody around the country with
18  residency programs and they won a Nobel Prize for it.
19  Yes. I'm familiar with that.
20       Q. Okay. And -- and when -- that's -- I mean,
21  it's binding upon the -- the match. So if you match,
22  you know, you match with Washington University. So
23  that meant that you were going to be going into the
24  anesthesiology program as a resident and they were
25  going to accept you a resident, correct?

LEXITAS LEGAL
www.lexitaslegal.com     Phone: 1.800.280.3376     Fax: 314.644.1334

## DR. JEFFERY WEISMAN  9/13/2022

Page 65

1    A.  That is correct.
2    Q.  Okay.  Can you go to page 12 of Exhibit A,
3  please.
4    A.  Okay.
5    Q.  And paragraph 39.
6    A.  Okay.  I see that.
7    Q.  This describes a -- a multi-facetted
8  contract.  Who -- who specifically -- when was the
9  offer made to you, as alleged in your petition, that
10  you would get a residency spot if you moved your lab
11  and its resources to the university?  Or sorry.  To
12  the program, to St. Louis?
13    A.  Okay.  Let me read paragraph 39.
14    Q.  Yeah.
15    A.  And then I'll answer the question.
16    Q.  Sure.
17    A.  Okay.  So I've read paragraph 39.  And just
18  to make sure I understand your question.  You were
19  asking me who's involved -- who was involved in making
20  this contract with me?
21    Q.  Yeah.  Who -- who -- who was involved?
22    A.  Okay.  I -- so who was involved was the
23  leadership for the anesthesia department.  It was Alex
24  Evers.  I spoke with -- I spoke with him about moving
25  my lab.  I spoke with and during the interview day and

Page 66

1  other correspondence, I had spoken with Richard
2  Benzinger, with Evan Kharasch, the former Vice
3  Chancellor for Technology for Washington University,
4  and I had spoken with Rob Gereau and many other
5  faculty about bringing my lab over and coming there as
6  a resident.
7    Q.  And paragraph 40.  You were contacted you
8  say by Dr. Evers in late 2015 about relocating to
9  St. Louis?
10    A.  Let me just read that and then I'll answer.
11    Q.  Yeah.
12    A.  Yes.  I've, you know, read that paragraph.
13  So yeah -- yes.  Alex Evers had contacted me and
14  most --
15    Q.  Would that have been after the interview
16  weekend that you came into St. Louis?
17    A.  Yes.  It was after the interview weekend.
18  And his -- the final contact that I had with him
19  before we submitted rank lists.
20         He called on February 14th in the evening
21  during Valentine's Day, which, I was -- which, I
22  guess, I later found out he -- he likes -- he wanted
23  to do because he figured I'd be with my wife and could
24  discuss everything with her there.  And he had called,
25  left a voice message.  I messaged him and then called

Page 67

1  him back.  And then he had said that we really want
2  you here.  We want your lab here.  We want you to
3  bring everything up.  And we're very interested in you
4  for an ASAP seat.  And, you know, then -- you know, I
5  spoke with him on that.
6    Q.  Okay.  And he didn't -- did he indicate in
7  that conversation that he was going to rank you first
8  or was it just a general conversation -- talking about
9  the February 14th, 2016 -- just we would really like
10  to come -- for you to come here and we think you'd be
11  a good with the ASAP program?
12    A.  So to my memory of the conversation, he had
13  said that they -- that if I wanted -- that they would
14  rank me at the very top.  They wanted me to come here
15  and that that was -- that was the conversation.
16         And, again, I apologize, that conversation
17  was a number of years ago but...
18    Q.  No, that's okay.  I understand.
19         And paragraph 41, I think you already
20  touched about this, but just -- just the first
21  sentence:  Shortly after initiating department
22  communications with Weisman, Evers paid for Weisman
23  and his fiancé' to visit Washington University from
24  Louisiana.
25         That was part of the interview weekend and

Page 68

1  that was done for all the interviewees and potential
2  residents, correct?
3    A.  So that -- that was only done for the M.D.
4  Ph.D.s that they invited that weekend.  So they --
5  what they do that weekend is they, Alex Evers selects
6  a very specific number of M.D. Ph.D.s that he wants to
7  recruit.  There's only -- every year there's only
8  about 20 to 30 M.D. Ph.D.s that go into anesthesia.
9  And about -- from when I was there about four or five
10  years ago, they really didn't have, from that point,
11  they didn't really have any M.D. Ph.D.s at Wash U. So
12  they had decided to start a special research track and
13  heavily recruit with a goal of increasing research
14  dollars.  So what they --
15    Q.  But let me --
16    A.  Oh, sure.
17    Q.  But you weren't the only one who -- who was
18  flown into St. Louis with either your significant
19  other.  Every other M.D. Ph.D. who was brought in for
20  that interview weekend received the -- the same
21  treatment, correct?
22    A.  Yes.  I believe -- I believe they had flown
23  in everybody.  But I would say that they were -- I had
24  a -- I felt compared to other M.D. Ph.D.s there was a
25  lot more conversations with myself and other faculty

17 (Pages 65 to 68)

**DR. JEFFERY WEISMAN  9/13/2022**

Page 69

1 because I had the lab that they wanted me come there
2 and bring.  But -- and what I will say is, again, this
3 was only that one weekend where they do that.  Every
4 other group that comes in --
5     Q.  Okay.  Yeah.  I understand.  So just with
6 the M.D. Ph.D.s that were interviewed, they all got
7 their -- an all expense paid trip to St. Louis to
8 interview for that weekend?
9     A.  Yes.  And a limo ride through the city.
10     Q.  Thank you.
11        THE COURT REPORTER:  And what?
12        THE WITNESS:  And they also for recruitment
13 did a limo tour of the city for --
14     Q.  For everybody?
15     A.  For the M.D. Ph.D.s that were there and
16 their spouses.
17     Q.  Can you go to paragraph 52 of Exhibit A,
18 please.
19     A.  Okay.  I'm here.
20     Q.  Okay.  You can just read that to yourself.
21 Let me know...
22     A.  Okay.  Thank you.  I'm reading it right
23 now, 52.  Okay.
24     Q.  And hadn't Dr. Evan Kharasch already been
25 communicating with you prior to the match?

Page 70

1     A.  I had -- that -- I'm just trying to think
2 about when we first talked.  I would have to check.  I
3 had been talking with Evan Kharasch during the
4 interview weekend.  I believe, I'm just trying -- I'd
5 have to look to see when we first spoke because it was
6 a while ago but...
7     Q.  But I mean, and then didn't you contact and
8 e-mail Dr. Kharasch about moving the lab; is that
9 right?
10     A.  Yes.  I did contact him and I was put in
11 touch with him during the interview weekend as him
12 being the Vice Chancellor for research and someone
13 that would be able to help with moving the lab and
14 everything up.
15     Q.  So this would have been unlike what you say
16 in the first sentence, Dr. Evers put you in contact
17 with Dr. Kharasch on the interview weekend in
18 December 2015?
19     A.  Well, he also put me -- well, it was -- it
20 was multiple times I was directed to Evan Kharasch.
21     I was -- I just want to make sure I
22 understand the question.  Are you -- are you asking
23 when I was first introduced to Evan Kharasch or there
24 are different times --
25     Q.  I was just saying whether it was Dr. Evers

Page 71

1 who put you in contact with him or you already had an
2 open line of communication with him?
3     A.  I -- I believe that I -- I believe
4 Dr. Evers had recommended that I speak with him.  I
5 would have to check as far as, you know, this is a
6 while ago, but, I believe, Dr. Evers had directed me
7 to speak with him about the lab and moving the lab up.
8     Q.  Can you go to 54, please, on page 16.
9     A.  Okay.  All right.  I'm at paragraph 54.
10     Q.  Paragraph 54.
11     A.  All right.  Let me read that right now.
12 Okay.
13     Q.  And didn't you seek out radiology via your
14 friend David Ballard who had a conversation with Pam
15 Woodard about it?
16     A.  We had -- so just give me a moment to just
17 refresh my memory on this.  I -- I believe that we
18 had -- I believe that we had scheduled a meeting with
19 Pamela Woodard about research at the very beginning
20 of -- the very beginning when we had started the move
21 down here.
22     I -- I had -- by any chance, do you have
23 those e-mails so I could refresh myself?  I apologize.
24 I haven't looked at the dates of that in a long time.
25     Q.  We might look at it later.  But I'm just

Page 72

1 saying that it wasn't necessarily radiology that
2 proposed to Weisman that a department collaborate?
3     A.  Well, I -- what I -- I guess what I would
4 say from my experience is we wanted to meet with them
5 to tell them about the technologies and what
6 capabilities were.  And radiology very much proposed
7 that there was a lot that we could do.  I -- we...
8     Q.  But you made proposals to radiology, right?
9     A.  Well, I -- I would say --
10     Q.  You or SBI or David Ballard?
11     A.  Well, we -- what I would say when we first
12 met with them, we talked about the technologies and
13 they talked about ways that we could collaborate as
14 well.
15     We kept it as a -- I guess what I would say
16 is we kept it as a lighter meeting in terms of here's
17 what we're working on.  There could be opportunities.
18 And they said, yes, these are good opportunities.  We
19 should work on this.
20     So -- so not to -- I just want to make sure
21 that -- that it, you know, it's understood that I
22 think, you know, there were proposals from both sides
23 for different types of projects and different ideas in
24 radiol -- you know, that's why I just want to make
25 sure I go -- I cover that.

18 (Pages 69 to 72)

**DR. JEFFERY WEISMAN  9/13/2022**

Page 73

1      Q.  And you did end up telling Dr. Evers about
2   the collaboration with radiology, correct?
3      A.  So I don't -- I'd have to think on that.  I
4   don't recall if I met with him to talk about the
5   radiology proposal.  I know that STLCOP and David
6   Kharasch were aware of the collaborations that were --
7   that we were working on.  And by no means was this
8   meant to be an exclusive collaboration that I would
9   only work with radiology and not anesthesia.
10         It is -- in general, as Wash U. does, you
11   collaborate between different departments and it's
12   team work that gets big projects to work.
13      Q.  Have you look at exhibit -- or sorry.
14   Paragraph 57 on 16.  If you want to read that to
15   yourself, let me know when you're ready.
16      A.  Okay.  I'm reading that right now.
17         MR. ELSTER:  I'm sorry, Kevin.  What
18   paragraph?
19         MR. SULLIVAN:  57.
20      A.  Okay.  I've read paragraph 57.
21      Q.  (Mr. Sullivan) And do you see the sentence
22   that states:  None of the evaluations expressed any
23   significant concern or objection to his performance?
24      A.  Yes.  I see that sentence.
25      Q.  And that's referring to evaluations from

Page 74

1   emergency medicine in July '16?
2      A.  That -- that is correct.  And the way that
3   emergency medicine department --
4      Q.  I'll move to --
5      A.  Oh, sorry.
6         (Defendant's Deposition Exhibit A14, EM Off
7   Service Resident Evaluation by attending.)
8      Q.  I'll -- there's no pending question.  You
9   answered my question.
10         Let me hand you what's been marked Exhibit
11   A14.
12      A.  Okay.
13      Q.  This is a -- I'll represent to you this is
14   a document produced by your lawyers in this case
15   starting with Bates number JW-63759.
16      A.  Okay.
17      Q.  Does this appear to be an Emergency
18   Medicine Off Service Resident Evaluation by attending.
19   Filled out by evaluator Reuben Johnson?
20      A.  This appears to be that document.
21      Q.  Can you turn to the fourth page of this
22   exhibit.
23      A.  Okay.  I've turned to the last page.  I
24   assume you mean Bates stamp JW-63761?
25      Q.  That's correct.

Page 75

1      A.  Okay.
2      Q.  Do you see at the bottom overall comments?
3      A.  Yes.
4      Q.  "Had trouble identifying salient issues and
5   prioritizing relevant issues, as well as eliciting
6   thorough information and HPI.  Presentations not
7   appropriate for intern level.  Had trouble executing
8   tasks as discussed and multi-tasking.  Below average
9   understanding of workup and medical knowledge.  Shows
10   some interest but poor patient flow on this rotation.
11   Performed at level of MS4-3."  Did I read that
12   correctly?
13      A.  Let me read it through.  Yes.  That is
14   what's written in the evaluation.
15      Q.  So that would have been an evaluation that
16   expresses, I would say, concern with respect to your
17   performance?
18      A.  Well, I -- I had evaluations on a daily
19   basis in the emergency department.
20      Q.  I'm asking about this evaluation.
21      A.  This -- this evaluation doesn't match what
22   I was told in person, and when they were filling forms
23   out about me.
24      Q.  But this evaluation does express concern
25   with respect to your performance, correct?

Page 76

1      A.  I -- I can read what's written.  You know,
2   again, as you've -- as you've said, what's written is
3   what's written, but that wasn't what was told to me
4   when I was working with the --
5      Q.  And performed at the level of MS4-3.  Does
6   that mean performing at the level of a medical
7   student?
8      A.  Yes.  Of which I was just a few weeks
9   previous.
10      Q.  Okay.  All right.  You can put that exhibit
11   to the side.  And if you could, let's go back to
12   Exhibit A.
13         MR. SULLIVAN:  Or is now a good time?
14   We've been going about an --
15         MR. ELSTER:  We've been going about an hour
16   and a half.
17         MR. SULLIVAN:  Hour and a half.
18         THE WITNESS:  Want to do a water break?
19         MR. SULLIVAN:  Yeah, yeah, that's what I
20   wanted to say.
21         (An off-the-record discussion was held.)
22         THE VIDEOGRAPHER:  We're going off the
23   record at, approximately, 10:23 a.m.
24         (A short break was then taken.)
25         THE VIDEOGRAPHER:  We're back on the record

19 (Pages 73 to 76)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 81

1   Evers but what I can say is that when I spoke to him
2   it wasn't just -- it was not a ask or a request.  It
3   was -- it was that I needed to give him --
4       Q.  (Mr. Sullivan) Did you --
5       A.  -- the tone and structure of the
6   conversation.
7          MS. RUTTER:  Let him finish his answer,
8   please.
9       A.  The tone and structure of the conversation
10  was that I needed to give him the lease.  And I -- I
11  remember that very well, the -- the general tone of
12  that call because I was very, very concerned that such
13  a high level person had wanted the documents.  And I
14  had a fiduciary obligation to the company and
15  St. Louis College of Pharmacy had made a request on
16  us.  So I -- it wasn't just a, can you give this to
17  me.  It was, I need to get this and you need to give
18  it to me.
19         (Defendant's Deposition Exhibit A7, E-mail
20  8/11/16 from David Sinow Re: 3D Printing.)
21      Q.  (Mr. Sullivan) Hand you what's been marked
22  as Exhibit A7.
23      A.  Okay.  One second.
24      Q.  Can you identify this document for me?
25      A.  Okay.  I am reading this document right

### Page 82

1   now.  This is an e-mail from David Sinow to me, Jeff
2   Weisman, entitled re: 3D Printing, sent August 11th,
3   9:37 p.m.
4       Q.  And it says:  Jeff, pretty innocuous
5   e-mails.  And then there's an e-mail exchange between
6   Dr. Kharasch and Dr. Evers, correct?
7       A.  I'm reading the exchange right now.  So, I
8   think, I'm reading the exchange.  I think that this is
9   missing some portions of it.  I know I sent -- or
10  anyways.  I don't see how it was forwarded to me.  I
11  know --
12      Q.  I'm curious about that myself but...
13      A.  Yeah.  Yeah.  I believe I might -- I would
14  have to check.  I believe what likely happened was
15  that Evan Kharasch forwarded or responded to Alex
16  Evers and forwarded it to me or something along those
17  lines would have been what occurred.  I can't -- I
18  don't know exactly.  But I -- I probably just copy and
19  pasted the message -- the part of the message that I
20  had received and put it in an e-mail and forwarded it
21  to David Sinow since I was -- I was pretty concerned.
22      Q.  Okay.  And in it, Dr. Kharasch wrote:  One
23  of our interns, Jeff Weisman, has a small 3D printing
24  company.  I introduced them to the College of
25  Pharmacy, which is providing them a small amount of

### Page 83

1   space.  Do not know anything more.  Nothing involving
2   anesthesiology or WUSTL.  Is that correct?
3       A.  I see that's what Evan wrote.
4       Q.  And is that an accurate summary of
5   Dr. Kharasch's involvement with respect to the lease
6   that SBI had?
7          MR. ELSTER:  Objection.  Speculation and
8   legal conclusion.
9       A.  So -- so again, I -- I can't tell you
10  what -- so -- so can you repeat the question?  I'm
11  sorry.
12      Q.  (Mr. Sullivan) Is what Dr. Kharasch wrote
13  here an accurate summary of his involvement, to your
14  knowledge, with respect to introducing you to the --
15  to the folks at the College of Pharmacy and you
16  getting a lease for SBI?
17      A.  So I -- I can't, you know, I can't speak to
18  what was going through Evan Kharasch's mind.  I know
19  he's got an e-mail here.  But I will say that Evan
20  Kharasch was aware of much more going on there because
21  we -- I had spoken with Evan Kharasch about the
22  company.  I believe I had sent Evan Kharasch some of
23  our business plans in the past.  And I -- and I had
24  met with Evan Kharasch because at that point in time
25  he had an office in the St. Louis College of Pharmacy.

### Page 84

1   He had moved over there.  So I -- I would say reading
2   what he wrote, I was a little surprised at the time
3   and am a little surprised now because he knew -- he --
4   he knew what we were doing and he had -- he had taken,
5   from my opinion, you know, effort to introduce me to
6   the St. Louis College of Pharmacy.  Made sure that
7   everybody knew who I was and to allow this to move
8   forward.
9          (Defendant's Deposition Exhibit A8, E-mail
10  8/15/16 from Jeffery Weisman Re: 3D Printing company.)
11      Q.  Which is what he states there as well,
12  right, that he introduced you to the College of
13  Pharmacy?
14         Hand you what's been marked Exhibit A8.
15      A.  Okay.  I see Exhibit A8.
16      Q.  Can you identify this document for me?
17      A.  This is an e-mail from me to Evan Kharasch
18  from Monday, August 15th, is what it appears to be,
19  and it appears to have two attachments.
20      Q.  There's also an e-mail from Evan Kharasch
21  to you on -- on the same date, correct?
22      A.  Hold on one second.  Yeah.  Sorry.  This
23  appears to be an e-mail chain.  I guess there's
24  multiple e-mails.  There's an e-mail from Evan to me
25  on Monday at 5:11 p.m. that cc'd Alex Evers, John

## DR. JEFFERY WEISMAN  9/13/2022

### Page 85

1 Pieper, the president of the St. Louis College of
2 Pharmacy, and Richard Wahl, the chair of the radiology
3 department and current chair.  Okay.  Okay.
4     Q.   Okay.  Let's start with the e-mail from
5 Evan Kharasch to you on the 15th at 5:11 p.m.
6     A.   Okay.
7     Q.   Do you recall if Dr. Kharasch suggested
8 Cortex, Biogenerator or the College of Pharmacy as
9 possibilities for relocating SBI's 3D printing lab?
10     A.   Well, let me read this full e-mail then
11 just so I -- try to refresh my memory.
12     Q.   No, that's -- yes.
13     A.   Apologies for the delay.
14     Q.   No problem.
15     A.   So all right.  Okay.  I've read that.
16     Q.   Okay.  So Dr. Kharasch e-mailed you and
17 explained why he was contacting you because Dr. Evers
18 had -- had asked Dr. Kharasch what's going on with the
19 financial arrangement that anesthesiology has
20 regarding three day -- 3D printing, which was raised
21 by the -- the chair of radiology.  Is that your
22 understanding of how this arose?
23         MS. RUTTER:  Objection calls for
24 speculation about the conversations between Dr. Evers
25 and Dr. Kharasch.

### Page 86

1     A.   So -- yeah.  So, again, I can't -- I don't
2 know what was going on behind the scenes between them.
3 But I -- I did receive this e-mail from Evan Kharasch
4 that references Alex Evers, you know, John Pieper and
5 Richard Wahl.
6     Q.   (Mr. Sullivan) And -- and Dr. Kharasch was
7 aware that you had entered into some type agreement or
8 lease with the College of Pharmacy, but that he
9 wouldn't have known any further details with respect
10 to what that entailed?
11         MR. ELSTER:  Objection speculation.
12     A.   So -- so I can't say what -- what Evan
13 Kharasch -- what his thought process was, but I can
14 say that I was surprised to see this e-mail because I
15 had been in touch with Evan Kharasch, and he was very
16 aware of what we were doing with the lab and that we
17 were moving it to the St. Louis College of Pharmacy as
18 our goal.
19     Q.   (Mr. Sullivan) But he didn't have any -- he
20 had no knowledge of the terms of the lease or any
21 other agreement, correct?
22         MR. ELSTER:  Objection.  Speculation.
23     A.   I -- I don't know if he had terms of the
24 knowledge or not.  But -- but what I would say is when
25 I -- when I first matched, I -- I was very sure -- I

### Page 87

1 mean, he wanted me to go to the St. Louis College of
2 Pharmacy and be right in the center.
3         Because the first thing he did when I
4 matched was he e-mailed me.  I'd have to check -- I
5 want to check the e-mails and dates, but I remember
6 receiving an e-mail from him either right when I
7 matched or very shortly thereof where he e-mailed me,
8 and the e-mail basically had an attachment about
9 St. Louis College of Pharmacy partnering with the
10 Center for Clinical Pharmacology.
11     Q.   So you saw that as an offer to -- to go
12 into the Center of Pharmacology?
13     A.   I -- personally I saw that as an offer and
14 I also -- we spoke with him and he seemed excited for
15 that opt -- for that fact.
16         The other thing about this e-mail, I'm sure
17 you'll get --
18     Q.   Okay.  Let me -- let me ask a question.
19     A.   Okay.  Sorry.
20     Q.   There's none pending.
21         On the -- the -- page 2, Dr. Kharasch
22 states to you that he saw a document that stated your
23 company SBI has a bioactive 3D printing division that
24 creates medical implants for drug delivery systems.
25 This division is currently housed in a lab space at

### Page 88

1 the Center of Clinical Pharmacology under the facility
2 director Evan Kharasch, M.D. Ph.D.  Did I read that
3 correctly?
4     A.   That is what the document says.
5     Q.   Okay.  And Dr. Kharasch writes to you:
6 Jeff, this statement is totally incorrect, if not
7 misleading.  Did he state that to you?
8     A.   That was what's stated in the e-mail.
9     Q.   And it's also -- he also states to you your
10 group is housed in a lab space in the College of
11 Pharmacy belonging to the College of Pharmacy and not
12 spaced at the Center for Clinical Pharmacology.  He
13 relayed to you, correct?
14     A.   That's what's in the e-mail.
15     Q.   And then he also says:  Please remove all
16 references to the Center of Clinical Pharmacology, me,
17 anesthesiology and/or Wash U.  Please do the same in
18 your business dealings and please instruct your
19 business partners likewise.  He told you that,
20 correct?
21     A.   That is in e-mail.
22     Q.   Did you do that going forward?
23     A.   I believe we did.  I -- I also sent an
24 e-mail to him where I --
25     Q.   Okay.

## DR. JEFFERY WEISMAN  9/13/2022

### Page 85

1  Pieper, the president of the St. Louis College of
2  Pharmacy, and Richard Wahl, the chair of the radiology
3  department and current chair.  Okay.  Okay.
4      Q.  Okay.  Let's start with the e-mail from
5  Evan Kharasch to you on the 15th at 5:11 p.m.
6      A.  Okay.
7      Q.  Do you recall if Dr. Kharasch suggested
8  Cortex, Biogenerator or the College of Pharmacy as
9  possibilities for relocating SBI's 3D printing lab?
10     A.  Well, let me read this full e-mail then
11 just so I -- try to refresh my memory.
12     Q.  No, that's -- yes.
13     A.  Apologies for the delay.
14     Q.  No problem.
15     A.  So all right.  Okay.  I've read that.
16     Q.  Okay.  So Dr. Kharasch e-mailed you and
17 explained why he was contacting you because Dr. Evers
18 had -- had asked Dr. Kharasch what's going on with the
19 financial arrangement that anesthesiology has
20 regarding three day -- 3D printing, which was raised
21 by the -- the chair of radiology.  Is that your
22 understanding of how this arose?
23         MS. RUTTER:  Objection calls for
24 speculation about the conversations between Dr. Evers
25 and Dr. Kharasch.

### Page 86

1      A.  So -- yeah.  So, again, I can't -- I don't
2  know what was going on behind the scenes between them.
3  But I -- I did receive this e-mail from Evan Kharasch
4  that references Alex Evers, you know, John Pieper and
5  Richard Wahl.
6      Q.  (Mr. Sullivan) And -- and Dr. Kharasch was
7  aware that you had entered into some type agreement or
8  lease with the College of Pharmacy, but that he
9  wouldn't have known any further details with respect
10 to what that entailed?
11         MR. ELSTER:  Objection speculation.
12     A.  So -- so I can't say what -- what Evan
13 Kharasch -- what his thought process was, but I can
14 say that I was surprised to see this e-mail because I
15 had been in touch with Evan Kharasch, and he was very
16 aware of what we were doing with the lab and that we
17 were moving it to the St. Louis College of Pharmacy as
18 our goal.
19     Q.  (Mr. Sullivan) But he didn't have any -- he
20 had no knowledge of the terms of the lease or any
21 other agreement, correct?
22         MR. ELSTER:  Objection.  Speculation.
23     A.  I -- I don't know if he had terms of the
24 knowledge or not.  But -- but what I would say is when
25 I -- when I first matched, I -- I was very sure -- I

### Page 87

1  mean, he wanted me to go to the St. Louis College of
2  Pharmacy and be right in the center.
3      Because the first thing he did when I
4  matched was he e-mailed me.  I'd have to check -- I
5  want to check the e-mails and dates, but I remember
6  receiving an e-mail from him either right when I
7  matched or very shortly thereof where he e-mailed me,
8  and the e-mail basically had an attachment about
9  St. Louis College of Pharmacy partnering with the
10 Center for Clinical Pharmacology.
11     Q.  So you saw that as an offer to -- to go
12 into the Center of Pharmacology?
13     A.  I -- personally I saw that as an offer and
14 I also -- we spoke with him and he seemed excited for
15 that opt -- for that fact.
16     The other thing about this e-mail, I'm sure
17 you'll get --
18     Q.  Okay.  Let me -- let me ask a question.
19     A.  Okay.  Sorry.
20     Q.  There's none pending.
21     On the -- the -- page 2, Dr. Kharasch
22 states to you that he saw a document that stated your
23 company SBI has a bioactive 3D printing division that
24 creates medical implants for drug delivery systems.
25 This division is currently housed in a lab space at

### Page 88

1  the Center of Clinical Pharmacology under the facility
2  director Evan Kharasch, M.D. Ph.D.  Did I read that
3  correctly?
4      A.  That is what the document says.
5      Q.  Okay.  And Dr. Kharasch writes to you:
6  Jeff, this statement is totally incorrect, if not
7  misleading.  Did he state that to you?
8      A.  That was what's stated in the e-mail.
9      Q.  And it's also -- he also states to you your
10 group is housed in a lab space in the College of
11 Pharmacy belonging to the College of Pharmacy and not
12 spaced at the Center for Clinical Pharmacology.  He
13 relayed to you, correct?
14     A.  That's what's in the e-mail.
15     Q.  And then he also says:  Please remove all
16 references to the Center of Clinical Pharmacology, me,
17 anesthesiology and/or Wash U.  Please do the same in
18 your business dealings and please instruct your
19 business partners likewise.  He told you that,
20 correct?
21     A.  That is in e-mail.
22     Q.  Did you do that going forward?
23     A.  I believe we did.  I -- I also sent an
24 e-mail to him where I --
25     Q.  Okay.

22 (Pages 85 to 88)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 89

1      A.  Where I attached -- I just want to explain.
2  Where --
3      Q.  No. I --
4      A.  -- I attached the --
5      Q.  There's no pending question.
6      A.  Well, I attached --
7          MR. ELSTER:  Let him answer your question.
8          MR. SULLIVAN:  He's not answering my
9  question.
10         MR. ELSTER:  Wait, hold on.  Hold on.
11         MR. SULLIVAN:  He's talking about his
12  attachments.  There's no question pending.
13     A.  Well, no, I'm just saying --
14         MR. ELSTER:  Let him finish.
15         THE COURT REPORTER:  Wait a second.
16         MR. ELSTER:  Okay.  Sorry.
17         THE COURT REPORTER:  One at a time.
18         MR. SULLIVAN:  Sorry.
19         MR. ELSTER:  You cut him off.
20     Q.  (Mr. Sullivan)  No.  My question had to do
21  whether he did that going forward, not what he
22  attached to this e-mail.
23         MR. ELSTER:  Okay.  And that might be
24  responsive.  Let him answer.
25     A.  No. I was just saying that going forward we

### Page 90

1  removed everything.
2      Q.  (Mr. Sullivan)  Okay.
3      A.  And I was very -- I was very surprised to
4  receive that from him because Evan Kharasch knew of
5  everything we were doing.
6          And, in fact, in e-mails in May, we were
7  cc-ing him in communications with the president of the
8  St. Louis College of Pharmacy, the general counsel and
9  the Dean Bruce Canaday.  So he was very aware of what
10  was going on --
11     Q.  He was --
12     A.  -- and wanted to be a part --
13     Q.  He was aware of what was going on with the
14  College of Pharmacy but --
15     A.  Yeah.
16     Q.  -- the -- but the Center of -- for
17  pharma -- the Center of Pharmacology wasn't
18  necessarily involved --
19     A.  Well, it --
20     Q.  -- correct?
21     A.  It -- it was because -- and it, I think, a
22  picture of this cause would be worth a thousand words.
23  The St. Louis College of Pharmacy, their lab space on
24  the sixth floor is one giant -- it's a several
25  thousand square foot facility that's open.  It's

### Page 91

1  not -- it's not a standard incubator space.
2          For example -- and this, I think, helps to
3  really explain what it is.  And so if you go to the
4  sixth floor, it's very, big open lab space over there.
5  So they've got multiple rows of lab -- of just lab
6  benches.
7          So there's some venture groups or incubator
8  places where you can get a thousand square foot lab
9  that has a door and wet lab space.  Theirs, they
10  had -- that entire space was basically the St. Louis
11  College of Pharmacy Center for Clinical Pharmacology
12  and we were right in there.  So we literally had a lab
13  bench where if you turned your back, there was another
14  lab bench and that was considered Center for Clinical
15  Pharmacology space as well.
16         So that -- so and we -- so anyways, but the
17  bottom line is, the question is, yes, he put that down
18  but I was very surprised.
19     Q.  Okay.  Who was the lease with?
20     A.  The lease was with the St. Louis College of
21  Pharmacy.
22     Q.  Okay.  And who -- you dealt with -- would
23  you have dealt with Dean Canaday, Ken Fleischmann and
24  John Pieper at the College of Pharmacy with respect to
25  the terms of those lease -- of that lease?

### Page 92

1      A.  That is correct.
2      Q.  You understood that SBI was leasing space
3  from the College of Pharmacy?
4      A.  Yes.  We were leasing space from the
5  College of Pharmacy.
6      Q.  And -- and -- and I want to get back.  The
7  e-mail on page 1 of Exhibit 8, you apologize to
8  Dr. Kharasch.  And then you state:  I mistakenly and
9  honestly thought that while the lease would run
10  through the college there was a relationship with the
11  center based on the proposal submitted May 14th.
12  Correct, that's what you stated to him?
13     A.  That's what I stated.
14     Q.  If you go to page 3, which is the, I think
15  what you attached?
16     A.  Uh-huh.
17     Q.  Referencing the e-mail?
18     A.  Yes.
19     Q.  And that's an e-mail that you sent to
20  Dr. Canaday, Dr. Seibert, and Attorney Fleischmann?
21     A.  Yes, that appears -- let me read this.
22  This is May 14th.  This is an e-mail from me at my LSU
23  account to Bruce Canaday, Karen Seibert, who was, I
24  believe, the co-director who passed away recently, Ken
25  Fleischmann, the general counsel, David Sinow and Evan

23 (Pages 89 to 92)

**DR. JEFFERY WEISMAN  9/13/2022**

Page 93

1    Kharasch.
2         Q.  And you state in that e-mail:  As a result
3    of those meetings, I feel very confident that the
4    center and our team can rapidly enter into a letter of
5    agreement.  Was there ever any type of agreement
6    entered with the center?
7         A.  Well, I -- I don't believe there was an
8    agreement entered into a center --
9         Q.  Okay.  Thank you.
10        A.  -- but my understanding was we were
11   partnered with the St. Louis College of Pharmacy and
12   the center because we were talking about it, everybody
13   together.
14        THE COURT REPORTER:  Everybody what?
15        THE WITNESS:  Everybody together.
16        (Defendant's Deposition Exhibit A9, E-mail
17   8/16/16 from Jeffery Weisman Re: 3D Printing company.)
18        Q.  Hand you what's been marked Exhibit A9.
19   Can you identify this document?
20        A.  I can identify the document.  It is -- it
21   appears to be an e-mail between myself to Alex Evers
22   and I believe I cc'd Sue Kinder, who I believed was
23   his admin.
24        Q.  It's an e-mail exchange between you and
25   Dr. Evers on August 16th, 2016, correct?

Page 94

1         A.  Yes.  I'm trying to -- Okay.  I'm sorry.
2    Yeah.  There's -- there's two e-mails on here.  One
3    from Alex Evers to me and one from me responding.  He
4    sent his at 2:24 p.m. on the 16th of August.  I
5    responded at 4:46 on the 16th of August.
6         Q.  Okay.  And did -- Dr. Evers wrote to you:
7    Sorry about this fuss.  I just wanted to make sure
8    we/you are steering clear of conflict of interest
9    issues.  Let's find a time to discuss for 15 minutes
10   perhaps sometimes next -- sometime next week would
11   work.  Did I read that correctly?
12        A.  That -- that appears to be what he wrote.
13        Q.  And you likewise replied at 4:46 that you
14   apologize for causing this fuss but that -- and you
15   thank him for being available to meet since it's very
16   important to me that everything is done properly and
17   any conflict of interest is avoided.
18        A.  That -- that is what I wrote in the e-mail.
19        Q.  And you -- and you met with Dr. Evers,
20   correct?
21        A.  I believe I met with Dr. Evers about this.
22        Q.  Did you have a telephone call or just a
23   meeting with Dr. Evers?
24        A.  You know, I'm trying to think right now
25   back to that.  If we -- if we ended up meeting in

Page 95

1    person or if it was a phone call.  I -- I know we had
2    a meeting.  Let me try and refresh my memory for a
3    moment on that.
4         Q.  Okay.  But in any event, let's -- let's --
5    let's talk about the meeting.  Okay.
6         A.  Okay.
7         Q.  You likely set up -- and we could -- we
8    could pull the records -- but set up a meeting with
9    Dr. Evers at his office just the two of you to
10   discuss -- well, we'll call it the issues with the
11   College of Pharmacy, correct?
12        A.  I believe I had a meeting with him.  I
13   don't -- I'm trying to think of the exact date and
14   time.  I need to see the records to refresh memory.
15   I -- I don't --
16        Q.  Fair enough to say --
17        A.  I don't know if Sue Kinder, you have her
18   meeting records, but I know that we did talk about
19   this.
20        Q.  Yeah.  I mean, Dr. Evers says perhaps
21   sometime next week would work.  So --
22        A.  Right.
23        Q.  -- likely in -- it probably would have
24   occurred within a week or ten days maybe after the
25   e-mail was exchanged.  Okay.  And we can nail down the

Page 96

1    date later.
2         A.  Again, I don't remember the exact date.
3         Q.  Okay.  That's fine.
4         A.  I do know that I spoke with him.
5         Q.  Okay.  Would you have met for about
6    20 minutes?
7         A.  I -- you know, right now I don't recall the
8    length of the meeting.  I'm trying to refresh my
9    memory on it.  I apologize.
10        Q.  And the meeting would have been in person
11   in his office, correct?
12        A.  I -- I would have to think.  I -- I don't
13   recall if we ended up meeting in his office or if we
14   had had a phone call, but I do remember meeting with
15   him to talk about this.
16        Q.  That meeting, was it in his office?
17        MR. ELSTER:  Objection.  Asked and
18   answered.
19        A.  You know, again, I -- I don't recall.
20   It may -- as I said, it may have been in his office,
21   it may have been by phone.  I'm -- I'm just trying to
22   think where and how we did the meeting and dates.
23        Q.  (Mr. Sullivan) And did you record that
24   conversation that you had with Dr. Evers?
25        A.  I don't recall if I recorded that

24 (Pages 93 to 96)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 109

1      A.  You know, again, I don't recall the
2   word-for-word of the meeting, but I'm happy to listen
3   to the audio recording and provide context.
4         (Defendant's Deposition Exhibit A10, E-mail
5   8/17/16 from Jeffery Weisman Re: SBIR/STTR training.)
6      Q.  Hand you what's been marked Exhibit A10.
7      A.  Okay.
8      Q.  What I'm really interested in are the --
9   the e-mails between you and Dr. Richard Wahl on
10   page 1.
11      A.  Okay.
12      Q.  Can you identify this document for me?
13      A.  This appears to be an e-mail sent from me
14   on Wednesday, August 17th, 2016, at 10:57 a.m. to
15   Richard Wahl cc-ing David Ballard and Pamela Woodard
16   talking about SBIR's TT training and SBIR's small
17   business renovation research grants, and STTR's, and I
18   forget the acronym, but those are government grants
19   where it's either between the government and a private
20   company or a three party between the government and
21   academic institution and a private company.
22      Q.  Okay.  And -- and Dr. Wahl e-mailed you
23   that we and MIR, and that's the Mallinckrodt Institute
24   of Radiology, correct?
25      A.  Yes, that -- that is MIR.

### Page 110

1      Q.  Okay.  He stated remain interested in
2   further discussions but obviously want to manage
3   properly any potential conflicts of interest.  He
4   stated that to you?
5      A.  That is what the e-mail -- that's the text
6   in e-mail.
7      Q.  And then you reply to him that it was
8   important to you and to SBI that everything done
9   properly and we avoid potential perceived or conflicts
10   of interest.  Right?
11      A.  I'm just reading the -- reading the text
12   right now.  And that is what I wrote -- and I wrote
13   that in the e-mail message to Dr. Wahl on August 17th,
14   2016.
15      Q.  And what were the potential or perceived
16   conflicts of interest to your recollection?
17      A.  You know, at this time, I don't remember
18   but I -- I do remember that we had already -- that we
19   had done substantial conflict checks.  And I had
20   talked with David Sinow on structuring and working
21   with different universities, and he's -- he's truly a
22   stand-up guy and has been in academia and done -- done
23   these things before.  We had already talked about how
24   to structure and do everything properly.
25      Q.  And -- and did it have to do because you

### Page 111

1   were a current resident/intern and then you would be
2   entering into some kind of agreement with the
3   Department of Radiology, is that -- was that the
4   potential conflict of interest?
5      A.  I mean -- I mean, I'd -- I'd have to go
6   through my notes or through the documents to refresh
7   my memory on it, but I -- I wasn't -- I -- I know that
8   we had looked at doing this from the very get-go and
9   didn't see any conflict of interests as I was anes --
10   as I was an anesthesiology resident and this was the,
11   you know, radiology, Mallinckrodt Institute of
12   Radiology.
13         (Defendant's Deposition Exhibit No. A11,
14   E-mail 9/9/16 from David Sinow re: Introduction
15   Strategic Biomedical 3D printing.)
16      Q.  Okay.  Can you take a look at Exhibit A11
17   that I just handed to you.
18      A.  Okay.
19      Q.  And can you identify this document for me?
20   Does it appear to be an e-mail at the bottom that you
21   wrote to David Sinow and Alex Evers and David Sinow's
22   response?
23      A.  This appears to be David Sinow getting back
24   in touch.  I think his mom's almost resolved at that
25   point.  But David Sinow on Friday, September 9th,

### Page 112

1   2016, at 9:05 a.m. E-mailing me, Alex Evers, Sue
2   Kinder and cc-ing himself.
3      Q.  And then at -- at the bottom you write to
4   Dr. Sinow and Dr. Evers introducing themselves --
5   introducing them to each other, correct, making the
6   connection?  Was that based on a conversation that you
7   had with Dr. Evers?
8      A.  Yes.  On Wednesday, September 7th, 2016,
9   5:11 p.m. I wrote an email:  David, I want to
10   introduce you to Dr. Alex Evers.  He's the chair of
11   the Department of Anesthesiology here at Washington
12   University.
13      Q.  I just need -- yeah.  But you wrote that to
14   introduce them to each other per something you had
15   discussed with Dr. Evers?
16      A.  Yes.  And Dr. Evers, I believe, had called
17   to follow-up to see why David Sinow had not gotten in
18   touch with him, that was where he was in Florida with
19   his mother.  And, I guess, Dr. Evers wanted to talk
20   with him sooner and ask me to -- to get in touch with
21   him, I believe.
22         (Defendant's Deposition Exhibit No. A12,
23   E-mail 9/13/16 from David Sinow Subject Our
24   conversation yesterday.)
25      Q.  Hand you what's been marked Exhibit 12.  In

28 (Pages 109 to 112)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 113

1  Exhibit A12 -- let me ask you this. Have you seen
2  this e-mail before?
3      A. You know, I -- I don't recall when I've
4  last seen this e-mail or if I've -- or -- I don't
5  recall if I've seen this one before or when I've last
6  seen it just because there's so many documents here.
7  I -- I know that David Sinow had told me that he had
8  spoken with Alex Evers and that he sent an e-mail to
9  follow-up at one point. And --
10     Q. So -- so after David Sinow and Dr. Evers
11 had their conversation, then you had a conversation
12 with David Sinow about what he had discussed with
13 Dr. Evers?
14     A. I know I spoke to -- so I had spoken to
15 David Sinow at some point after he had spoke with Alex
16 Evers, and yeah, I had a conversation with him.
17     Q. Okay. Did David Sinow tell you that there
18 was no objection to you participating in your
19 entrepreneurship activities with SBI so long as you
20 were meeting your residency requirements?
21     A. So -- and I have to think on what exactly
22 that conversation was with David Sinow. I -- I do
23 know -- I do remember very clearly that David Sinow
24 only called me after talking to Alex Evers and said,
25 Alex just -- you know, this is clearly, you know, the

### Page 114

1  bigwigs. Something along the lines of these are the
2  bigwigs at the medical center wanting to -- wanting to
3  do different types of deals and they're working with
4  the St. Louis College of Pharmacy now and they clearly
5  want to know what's going on with -- with your lease
6  space, and, you know, for their negotiations. And
7  they want to know what you're doing. So I remember
8  having that conversation with him or having a
9  conversation with him about that. I'd have to think
10 on everything else that -- anything or everything else
11 that would have been said.
12     Q. Okay. And did Dr. Sinow relate to you that
13 he had discussed with Dr. Evers that SBI was not part
14 of the Center for Clinical Pharmacology?
15     A. You know, I -- I -- you know, I don't
16 remember exactly what David Sinow had told me right
17 now. I'd have to think on it. But I -- and this --
18 and this is just -- and again, this would just be --
19 what you're asking is him reiterating his conversation
20 with Alex Evers to me. So I -- I wasn't a party of
21 this conversation.
22     Q. No, that's what I'm asking you about. What
23 was your -- I mean...
24     A. Yeah. No. I was just thinking. I'd have
25 to really -- I'd have to think on that, that was a,

### Page 115

1  you know, brief conversation.
2      Q. So you don't recall one way or another at
3  this point unless you can refresh your recollection
4  somehow?
5      A. Right now I -- like right now at this
6  moment, I don't recall. But I'm -- I'm happy to look
7  at documents and, you know, refresh my memory on it.
8      Q. Okay. Can we go back to Exhibit A, please,
9  Doctor. And if you could turn to page 36.
10     A. Okay.
11     Q. And you see paragraph 139?
12     A. Yes.
13     Q. You want to read it to refamiliarize
14 yourself with it.
15     A. Okay. Let me read that right now. One
16 moment. Okay. I've read paragraph 139 under the
17 civil conspiracy count.
18     Q. So are -- are all of the torts that you
19 ref -- that are referenced in paragraph 139 based on
20 your theory that Dr. Evers was unhappy about what was
21 going on with your lab and SBI?
22     MR. ELSTER: Objection to form.
23     A. So I just want to make -- make sure I
24 understand the question. So -- so could -- could you
25 just repeat that one more time?

### Page 116

1      Q. (Mr. Sullivan) Okay. Are all of the torts
2  that are set forth in paragraph 139 based on your
3  theory that Dr. Evers was unhappy about your lab's
4  arrangement or SBI's arrangement?
5      MR. ELSTER: Objection. Form and legal
6  conclusion.
7      A. Yeah, I mean, it -- it -- I mean, this
8  seems -- this seems to be asking me to -- to make a
9  conclusion on a le -- our legal theory here, I mean.
10     Q. (Mr. Sullivan) Well, it says: When Evers
11 learned that he was not the sole focus of plaintiff's
12 laboratory project, he solicited the agreement of each
13 defendant to conspire with others to, and then it sets
14 out various claims, correct?
15     A. The -- the text of it states that, and --
16 and I personally believe that Alex Evers was -- was
17 upset about -- about the agreement with the MIR
18 radiology department and with what was going on with
19 the lab.
20     Q. Okay. Let's turn back to page 18,
21 paragraph 62.
22     A. Okay.
23     Q. You state: Additionally, anesthesiology at
24 this time stopped collaborating with Weisman and
25 plaintiff's lab and stopped considering joint

29 (Pages 113 to 116)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 117

1 research. Did I read that correctly?
2     A. Let me read this paragraph so...
3     Q. Yeah.
4     A. Yes. There's that sentence and then one
5 after it.
6     THE COURT REPORTER: Yes, at that time?
7     THE WITNESS: Yes. There's one sentence
8 and then there's one -- and then there's another one
9 after it. But yes, that was the --
10     Q. What about -- what about Dr. Peter Nagele,
11 did he stop collaborating with you in August,
12 September 2016?
13     A. Well, I think that's a good -- I think
14 that's a great question to ask. Dr. Peter Nagele
15 didn't collaborate with me openly in the
16 anesthesiology department. He kept it very quiet that
17 he was doing collaborations with me in the St. Louis
18 College of Pharmacy space.
19     Q. In this time frame or at a later time
20 frame?
21     A. What -- what time frame are you referring
22 to right now so I understand?
23     Q. I'm talking about because you said at this
24 time, and so we're talking about August, September
25 2016.

### Page 118

1     A. So at that point in August and September
2 of 2016 -- in August and September of 2016, my warm
3 welcome all of a sudden became very chilled. Evan
4 Kharasch who was -- who welcomed me with open arms
5 suddenly stopped really talking with me.
6     Q. I'm just asking about Peter Nagele. Am I
7 pronouncing that correctly?
8     A. That's -- that's fine for that purpose.
9     So -- but Peter -- so -- so Peter, you
10 know, Peter was working with me with his private
11 biotech company startup idea in the St. Louis College
12 of Pharmacy space.
13     Q. In this time, in August, September 2016?
14     A. He had -- I -- I'm just trying to think
15 when he -- when he officially started working. I'd
16 have to check. I've got e-mails and text messages
17 from Peter when he wanted to start working. He -- he
18 wanted to work with the post docs. There were e-mail
19 chains on that. And he also wanted -- he also needed
20 an engineer, and I introduced him to one of our
21 engineers that we worked with in Ruston, Louisiana
22 that he flew up and who worked for him for several
23 months and --
24     Q. Did you continue collaborating with
25 Dr. Martha Szabo?

### Page 119

1     A. At that point in time, I don't believe I
2 knew Martha Szabo back in August or --
3     Q. But you collaborated with her at a later
4 time?
5     A. At a later time, I believe I did some
6 collab -- I believe I tried to do some collaborating
7 with Martha Szabo and Helga Coleman (phonetic). Tried
8 to start something up, again, at some point. But --
9 but clearly the -- the main people that I'd come there
10 to work with Evan Kharasch, Alex Evers and even Rob
11 Gereau had gone very cold on me.
12     And I don't believe -- and just so you
13 know, Martha Szabo doesn't have a lab group and isn't
14 research faculty there. She actually left because she
15 was unhappy with the way the department was behaving.
16     Q. Doctor, could you turn to page 26 of your
17 complaint and can you read paragraph 85, please.
18     A. Okay. Eighty-five (85), I'm reading that
19 right now. Okay. So I've read paragraph 85.
20     Q. Okay. Does this have to do with your --
21 your claim of conversion, which is, you know, the
22 unlawful taking of property?
23     A. Well, the -- the paragraph talks about them
24 taking my property.
25     Q. Okay. It says: WU and BJH acquired

### Page 120

1 plaintiff's lab in June 2016 and all of its tangible
2 assets -- tangible and intangible assets by forcing
3 Weisman to resign. Is that -- that June 16 time --
4 date there isn't correct?
5     A. I -- I believe that was meant to, you know,
6 again, I -- I would have to see the original draft of
7 this, but I believe that was meant to say June of 2018
8 since that was the time that I resigned. But again,
9 I'd have to --
10     Q. Okay.
11     A. -- see the draft.
12     Q. But let's say it was June eight -- 2018,
13 radiology had been running it's 3D printing lab for --
14 for about a year, correct?
15     A. I'm just trying to think when -- I'm not
16 sure what they would say would be the -- the official
17 start date on that. What -- what -- when -- what
18 radiology would say would be was their official start
19 date on running the 3D printing core facility they had
20 in Mallinckrodt.
21     Q. Would it have been when your research
22 assistants moved everything over into the -- the
23 Mallinckrodt Institute of Radiology?
24     A. I -- I believe they started moving things
25 in -- I -- I would have to see e-mails to fully

LEXITAS LEGAL
www.lexitaslegal.com      Phone: 1.800.280.3376      Fax: 314.644.1334

## DR. JEFFERY WEISMAN  9/13/2022

### Page 121

1  refresh my memory, but I -- I believe it was March
2  of 2017 that they had -- they were in the moving
3  process around that time period.  But I'd have to see
4  e-mails to --
5       Q.  I think -- I think, like, in the March --
6  March 2017 time frame until we see something
7  different -- further things, which we will.  Is that
8  fair to -- fair to agree?
9       A.  Well -- well, I -- I just need to see the
10  documents.
11      Q.  Okay.
12      A.  We can --
13      Q.  Fair enough.
14      A.  -- you know.
15      Q.  And you're -- you're claiming here that
16  Wash U. and BJH acquired plaintiff's equipment,
17  revenue streams, active research projects, impending
18  research projects, intellectual property, research
19  legacy, professional relationships, and research
20  assistants Jammalamadaka and Tappa.  Did I read that
21  correctly?
22      A.  I'm very impressed.  You did a reasonable
23  job in Uday Jammalamadaka's name.
24      Q.  Thank you.  And is that the entire universe
25  of what you're claiming that was acquired in -- in or

### Page 122

1  about March 2017?
2       A.  Let me just read this one more time.  I
3  know we say:  Their acquisition was included but not
4  limited to equipment, revenue streams, active research
5  projects, impending research projects, professional
6  relationships, research assistants.  These definitely
7  include things.  I know there's other things that may
8  be missing.  For example, I don't -- I believe I left
9  lab notebooks there.
10      Q.  Okay.  We'll get -- yeah.
11      A.  There's other things that I believe were
12  in -- that were there.
13      Q.  Okay.  Let's put -- put a pin in that
14  because we're going to go to another paragraph.
15          What were the revenue streams that were
16  acquired?
17      A.  All right.  Well, the -- the revenue
18  streams were -- were several.  Strategic Biomedical
19  had a couple of different product lines and revenue
20  streams at that point.
21          The first and foremost was -- was working
22  with grants to put in for grants?  SBIRs, STTR, NIA --
23      THE COURT REPORTER:  Wait, wait, wait.
24      THE WITNESS:  I apologize.
25      THE COURT REPORTER:  After grants.  Put in

### Page 123

1  for grants and you started the acronyms.
2       A.  Okay.  So there were several types of
3  grants that we were putting in for, SBIR grants, STTR
4  grants, NIH grants, and NSF grants, as well as -- as
5  well as collaborating with other faculty members that
6  had grant funding that could pay to do specific
7  projects.
8       Q.  Let me ask you this.  Was there any money
9  coming in from these grants or specific projects?
10      A.  I would have to go -- go through and check
11  the books and documents.  We were in the process of
12  negotiating them and setting them up.  One thing
13  that's unique about bio techs and the same thing with
14  Google or Facebook or tech companies in general,
15  you're in the proc -- so you may setup revenue streams
16  and it may take a time period for them to come in and
17  that's very common knowledge for -- for this type of
18  technology.
19      Q.  Yeah.  I just wanted to know --
20      A.  Yeah.
21      Q.  -- whether or not there was actually any
22  revenue coming in or whether there was just the
23  potential for revenue?
24      A.  So I -- so I'm -- I'm just trying to think
25  to refresh my memory.  I believe that there were some

### Page 124

1  radiology departments that had been paying for molds
2  or imaging at that point.  I -- I'd have to check the
3  exact dates and a lot of that information was not my
4  business anymore and was not being forwarded to me.
5  But I believe that as it was being transitioned over
6  there were different departments that were asking
7  about different projects, modeling projects or molds
8  for pathology, or things like that that they were
9  starting -- that was starting to -- to get online.
10      Q.  So this would have been after March 2017
11  when radiology opened up its 3D printing lab?
12      A.  I'd -- I'd have to check on the dates to --
13  to put that together, but I -- but I know a lot of
14  these revenue streams we were building and were in the
15  process of.  And in -- in addition to that, for
16  revenue streams, I would also say that revenue streams
17  for -- for a bio tech company like that or a
18  technology company in general, one revenue stream is
19  getting additional investment, which we were in the
20  process of doing, and we -- we had hundreds of
21  thousands of dollars that was being pledged that --
22  so...
23      Q.  Who pledged that hundreds of thousands of
24  dollars?
25      A.  David Sinow was working with some of the

31 (Pages 121 to 124)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 125

1  venture funds he had worked with in Illinois
2  previously.  I'm trying to think of the name of the
3  funds.  I'd have to check.  I believe one was Sierra
4  Ventures.  We -- we also had -- so -- so I'd have to
5  go check to see what the name is with him.  I haven't
6  thought about this in a while.  But he was, with his
7  background as a venture capitalist he was handling
8  fundraising and working on those -- on those aspects.
9      Q.  Ultimately the -- the fundraising didn't
10  come through, correct?
11      A.  That -- that is correct.  After --
12      Q.  Okay.
13      A.  After the investors --
14      Q.  Okay.
15      A.  -- were upset about Alex Evers wanting the
16  corporate documents, then me not participating in --
17  in the lab, you know, when he told me he wanted me to
18  not participate in January, February area of -- sorry
19  of 2017, that that kind of put the kibosh on a lot of
20  this.
21      Q.  But the problems with the lab were already
22  ongoing before Alex Evers had a conversation with you
23  in February of 2017 that he thought that you should
24  focus 100 percent on your clinical training, right?
25      MR. ELSTER:  Objection.  Mischaracterizes

### Page 126

1  his testimony.
2      A.  Well, I -- I thought the lab was doing
3  quite well.
4      Q.  (Mr. Sullivan) You were running out of
5  money, right?
6      MR. ELSTER:  Objection.  Foundation.
7      Q.  (Mr. Sullivan) You couldn't pay -- you
8  couldn't pay Uday and Karthik --
9      MR. ELSTER:  Same objection.
10      Q.  -- right?
11      A.  We -- we were -- before Alex Evers got
12  involved, we had no problems with money.  We were able
13  to pay Uday and Karthik.  After Alex Evers got
14  involved, the issue was that David Sinow and the
15  investors didn't want to put additional funds in
16  because they were concerned at Alex Evers' behavior.
17      And I remember having a conversation with
18  David Sinow around that time period where he said,
19  This is going to be a problem.  They're -- they want
20  to get involved with the company and you're -- you're
21  an employee and they have a big influence over you.
22  This is probably not going to end well.
23      So as -- as a seasoned venture capitalist
24  and investor, someone with more experience than me, he
25  saw that this was going -- to him he saw that this was

### Page 127

1  going to be a problem eventually, and he was able to
2  predict the future quite well actually.  Because he
3  seemed to guess that this is what was a very likely
4  outcome that we would all be sitting here around this
5  table today.
6      Q.  (Mr. Sullivan) So before Alex Evers got
7  involved, the company was doing fine and had the
8  revenues to -- to pay the salaries.  Is that your
9  testimony?
10      A.  Well, that's -- that's a
11  mischaracterization.  A bio tech company or tech
12  company doesn't have traditional revenues in the sense
13  of you're selling a product, but in terms of
14  investment capital coming in and grants, yes.
15      Q.  It had the funds -- it had the funds.  What
16  grants did it have?  What grants did it have when
17  you -- in August of 2016, what grants were ongoing?
18      A.  Well, we had pledge from the bio medical
19  research foundation.
20      Q.  A pledge or a grant?  Was there money
21  coming in?
22      A.  Well, they -- I -- I would have to check to
23  see what the term of art would be, but we had an
24  agreement at that point where they would have put in
25  $60,000 for a 2.5 percent equity in the company.

### Page 128

1      Q.  Did they put that in?
2      A.  They did not put it in --
3      Q.  Okay.
4      A.  -- since we did not take that funding
5  because David Sinow advised to turn it down and work
6  with the Midwest based fund since we were relocating
7  from the southern region to -- to the midwest region.
8      Q.  Okay.  Any other -- any other grants that
9  were -- or other monies that were received by SBI?
10      A.  Let's see, I had invested in -- I had
11  purchased or put money into the company.  As I said, I
12  had --
13      Q.  I'm talking about grants.  I was talking
14  about -- you talked about grants and pledges and you
15  mentioned grants.  What grants?  Were there any -- was
16  there any grant money coming into SBI from June 2016
17  to December 2016?
18      A.  I -- I would want to double check but I
19  don't believe there was --
20      Q.  Okay.
21      A.  -- at that point in time.
22      Q.  You reference in paragraph 85 there have
23  been ongoing financial transactions between LTU and WU
24  and/or BJH regarding the intellectual property arising
25  from Weisman's work and plaintiff's lab.  What are you

32 (Pages 125 to 128)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 129

1  referencing there?
2      A.  David Ballard and Pamela Woodard were in
3  communications with Louisiana Tech University and
4  their research corporation as well as Richard Cordell.
5  And Richard Cordell is the head of licensing and
6  intellectual property for Louisiana Tech University.
7  And they were in communications about acquiring the
8  patents and licensing agreements -- any licensing
9  agreements or patterns, they were communications with
10  him about acquiring.
11         I wasn't privileged to all of those
12  communications as -- as things occurred as they
13  occurred.  But the most -- but, I believe, I was
14  forwarded a most -- one of the most recent e-mails
15  that I can remember I remember in 2019 receiving an
16  e-mail chain from David Ballard asking for help on
17  licensing with Louisiana Tech.  And in that chain,
18  Pamela Woodard had been paying for licensing fees with
19  Louisiana Tech and -- and had been working to continue
20  to develop the technology.
21      Q.  Okay.  And do you know whether the
22  Department of Radiology ultimately acquired the -- the
23  patent?
24      A.  You know, I -- I wasn't privileged to -- to
25  those communication -- to all those communications.

### Page 130

1  So I'm -- I'm just, you know, unfortunately I'm not
2  privileged to what -- what occurred behind those
3  closed doors.  I -- I was -- once I left, I was taken
4  off the website immediately and my e-mail was taken
5  away.  And which was really odd because mechanical
6  engineering gave me a visiting research position.
7      Q.  And it -- it had -- previously it had been
8  yours or SBI's obligation to pay Louisiana Tech
9  certain licensing fees including fees relating to the
10  patent prosecution?
11      A.  Yes.  So either myself, David Sinow,
12  Strategic Biomedical, Southern Biomedical that -- that
13  entity that we were working with had been paying for
14  the patent prosecution for it, as well -- as well as
15  the licensing fees.  And we had -- and I'd actually
16  written that omnibus patent myself to cut costs down
17  when working with Louisiana Tech, and, I believe, the
18  Jones Walker Law Firm there.
19      Q.  And you had been substantially past due on
20  the payment of those, correct?
21      A.  I would have to check on the e-mails at
22  what point in time.  Towards the -- I -- I would need
23  to see those e-mails to see about the time and billing
24  of it.  There were times when we were -- when we were
25  completely up to date.  At the very -- at the very end

### Page 131

1  when my funding -- my funders pulled out because of
2  what occurred with Alex, then, you know, I mean, it
3  was --
4      Q.  So by the time you left LSU, you were up to
5  date on paying all of those fees and licensing fees to
6  Louisiana Tech?
7      A.  I -- I would have to check.  I believe -- I
8  believe at one point we delayed a little bit because
9  we were going to have investor money to go pay with
10  and we had wanted to use some of the investor funds to
11  pay.
12         So -- so I'm more than happy to take a look
13  at the documents from the negotiations with Richard
14  Cordell but we were regularly paying Richard Cordell
15  for the patent prosecution work done by Jones Walker
16  as well as the licensing fees.
17      Q.  And those records will speak for
18  themselves.  Can you turn to page 128 of Exhibit A.
19  I'm sorry.  Paragraph 128 on page 34.
20      A.  Thank you.  I was hoping it wasn't
21  page 128.  Okay.  Looking at page 128 -- or I'm
22  sorry --
23      Q.  You want to read that.
24      A.  -- paragraph 128.
25      Q.  Okay.  Have you read it?

### Page 132

1      A.  All right.  I'm just finishing up.  Okay.
2  I've read paragraph 128 as of now.
3      Q.  Okay.  And is paragraph 128 an accurate
4  list of the items that you claim the university, BJH,
5  Dr. Evers and Dr. Benzinger tortiously converted from
6  you and SBI?
7         MS. RUTTER:  Objection.  Misstates Exhibit
8  A.
9      A.  Well--
10         MS. RUTTER:  And allegations contained
11  therein.
12      A.  Well, what I was going to say is that
13  exhibit -- and so paragraph 128 includes many things
14  that were taken from the lab and there's also other
15  things that -- that were taken as well including
16  reagents, my lab notebooks.
17      Q.  (Mr. Sullivan) That would be -- would that
18  be included in work process papers, your lab
19  notebooks?
20      A.  I -- I believe work process papers would
21  have meant academic papers in process.
22      Q.  Okay.  Would -- would your notebooks be
23  included in intellectual property as recorded, then
24  drawing, specification and memos?
25      A.  That would -- I mean, that would include

33 (Pages 129 to 132)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 133

1  intellectual property, portions of lab notebooks.
2  There would also be general experimental lab
3  notebooks.  Think when you took Chem 101 and they gave
4  you big, wooden -- I'm sorry -- big, paper notebook
5  that you write in and put down possible experiments or
6  information.
7      Q.  How many notebooks do you allege were
8  taken?
9      A.  I -- I had a couple.  I -- I remember
10  having at least two or three notebooks that were -- I
11  remember having at least two or three notebooks that I
12  had kept with the lab.  There may have been more.
13  We -- I'd have to check.  We -- we ordered several of
14  them at one point when I was doing my Ph.D. at
15  Louisiana Tech and -- to buy in bulk.  So I would have
16  to check to see how many, you know, which ones went to
17  Uday and Karthik, which you ones went to me, and which
18  ones -- what they were used for.
19      (Defendant's Deposition Exhibit A15, E-mail
20  3/20/17 from Richard Schaefer re: 3D Move to 6th floor
21  Barnard.)
22      Q.  Let me hand you, Doctor, what's been marked
23  as Exhibit A15.
24      A.  Okay.  I have this document.
25      Q.  And represent to you that this was produced

### Page 134

1  by your counsel in this case as JW-53006 through
2  53009.  And it appears to be an e-mail chain between
3  Richard Schaefer, Karthik Tappa, Pamela Woodard,
4  Jeffery Weisman, David Ballard, Uday Jammalamadaka,
5  Robert Boles, David Smugala, Janine Wuebbles and
6  Jennifer Kiphart.  Can you identify this for me?  Is
7  this an e-mail chain about moving things from SBI's
8  lab over to Mallinckrodt?
9      A.  This appears to be an e-mail talking about
10  the move from SBI's lab in the St. Louis College of
11  Pharmacy to Mallinckrodt.
12      Q.  And if you look at the first page, there's
13  an e-mail from Karthik Tappa to everybody,
14  specifically to Pam Woodard, and it's dated
15  March 20th, 2017.  And he says:  We can move any time
16  on Tuesday or Wednesday, 21st and 22nd of March.
17      A.  Okay.  I'm reading that right now.  We can
18  move any time Tuesday or Wednesday.  Please let us
19  know the time to come pick the keys to the lab up.
20  STLCOP has some carts and dollies that we can borrow.
21  We'll let you --
22      THE COURT REPORTER:  What was that last
23  part?
24      THE WITNESS:  Sorry.  STLCOP has some carts
25  and dollies that we can borrow and we'll let you know

### Page 135

1  if help is needed -- or it says help needed.  Thanks
2  Karthik.
3      Q.  So they were -- was it Karthik and Uday,
4  were they moving everything from the College of
5  Pharmacy lab over to radiology?
6      A.  That -- that -- that appears to be what
7  this e-mail is referencing.
8      Q.  And then up above, Rich Schaefer, is he,
9  like, the director of operations or something to that
10  affect?  Or I'm sorry, Director of Department of
11  Planning and Capital Projects?
12      A.  You know, I -- I wasn't very -- I -- I
13  don't really know anything about Rick Schaefer or much
14  about him.
15      Q.  But he got -- he gave you, Uday and Karthik
16  keys to the radiology lab over at Mallinckrodt, right?
17      A.  You know, I -- I didn't pick up any keys,
18  or I don't recall picking up any keys.  I --
19      Q.  Did you have a key?
20      A.  I, you know, I'm thinking about it right
21  now.  And I -- I don't recall -- I'm trying to think
22  right now if I had a key.
23      Q.  Do you want to look on the last page of
24  this, which is radiology key lock request form.
25      A.  Okay.  I'm reading this right now.  All

### Page 136

1  right.  I'm reading -- so it says:  Key recipient's
2  names:  Jeff Weisman, David Ballard, Karthik Tappa,
3  Uday Jammalamadaka.
4      Q.  And then the building name and room number
5  would have been Barnard Hospital sixth floor?
6      A.  Yeah.  Do you -- do you have additional
7  records?  I -- I don't recall if I picked up a key for
8  the lab or not.  I don't --
9      Q.  So you don't know if you had keys to the
10  lab?
11      A.  I -- I don't recall if I had keys to the
12  lab at this point on -- you know, I'd want to check on
13  that.  I remember not being able to get into the lab
14  multiple times when I was going to visit Uday and
15  Karthik but I don't -- I'd have to go see if I signed
16  to pick up a key.
17      Q.  Okay.
18      A.  Because I -- you know, I don't recall right
19  now.
20      (Defendant's Deposition Exhibit A16, E-mail
21  3/21/17 from Karthik Tappa re: 3D Move to 6th floor
22  Barnard.)
23      Q.  Let me hand you what's been marked
24  Exhibit 16.  Really on this one I'm just interested in
25  the first page, but for the sake of completeness

34 (Pages 133 to 136)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 137

1    there's other pages.
2           And again, this is an e-mail from Karthik
3    Tappa to Rich Schaefer, copying you and others.  And
4    in it on March 21st, 2017, Karthik states that we
5    thank you for the keys and the cart.  We moved our
6    stuff and left the cart in the lab.
7           So to the best of your recollection and
8    based on this e-mail, was all of the property -- was
9    all of SBI's lab property moved over to radiology by
10   Karthik and Uday by March 21st, 2017?
11       A.  You know, I -- I don't recall the exact
12   date that they had moved all the property over.  I --
13   I recall that they were -- they were in the process of
14   moving for a time period.  I know part of that was in
15   March.  I -- I was rotating and working in the
16   hospital.  So I -- I wasn't moving equipment across
17   campus.
18       Q.  I wasn't -- yeah.  I said --
19       A.  So...
20       Q.  My -- my question was specifically about
21   Uday and Karthik.
22       A.  Could you repeat the question, please.
23       Q.  Yeah.  I was just saying had Uday -- Uday
24   and Karthik moved all of the SBI lab equipment to the
25   radiology printing lab on March -- by March 21st,

### Page 138

1    2017?
2        A.  You know, I know that they moved -- I -- I
3    know they moved the equipment over.  I don't remember
4    the exact date of it going over.  I know it was around
5    this time period.
6        Q.  Right.
7        A.  I -- I know that I didn't retain any of the
8    equipment from the lab that they had moved.
9        Q.  They moved it all over?
10       A.  They moved -- my -- my memory is they
11   removed everything.
12       Q.  At any point after March 2017, did you ever
13   demand any of your property or SBI's property be
14   returned?
15       A.  Well, as far as that goes, I -- I think
16   it's important to note that I was in an untenable
17   position where Alex had told me to shut everything
18   down.
19       Q.  I'm going to move that as -- to strike as
20   nonresponsive.
21           Did you demand that any of your property or
22   SBI's property be returned after March 2017?  Yes or
23   no.
24       A.  You know, I'd -- I'd have to think on that.
25   I -- I know that I wanted to stay participating in the

### Page 139

1    lab group after March and I was removed from the
2    website.
3        Q.  I'm not asking about that.  I'm
4    specifically asking -- you're a lawyer you know what a
5    demand is, to demand something back from somebody.
6    Did you make a demand after March 2017 that any of
7    your property or SBI's property be returned to you?
8           MR. ELSTER:  Objection.  Asked and
9    answered.
10       A.  I don't --
11       Q.  (Mr. Sullivan)  Yes or no?
12       A.  I -- I would have to think on that, and,
13   you know -- I'd have to think on it.
14       Q.  Do you have to think on it?  You don't
15   recall?
16           MR. ELSTER:  Objection.  Asked and answered
17   misstates testimony.
18       A.  You know, again, I -- so...
19       Q.  (Mr. Sullivan)  No.  What's the -- I mean,
20   is it -- is it that you don't recall whether you
21   demanded or you just need to think about it more?
22       A.  No.  I -- I stated what I stated.  I would
23   have to think through -- I would have to think about
24   my conversations with Pamela Woodard, David Ballard
25   and -- and what my specific requests were.  But right

### Page 140

1    now, I -- I would have to --
2        Q.  Do you recall sitting here right now if you
3    demanded from Dr. Ballard or Dr. Woodard that they
4    return any of your or SBI's property after March 2017?
5           MR. ELSTER:  Same objection.
6        A.  You know, again, I would have to think -- I
7    would have to think on it.  But I mean, I know -- I
8    know at portions of it I did request to have -- to
9    have continued involvement and access and they locked
10   me out as of, you know, June 2018 ended, which was
11   very surprising because mechanical engineering let me
12   be a visiting -- a visiting researcher.  But the Mai
13   --
14       Q.  That was in August of 2018?
15       A.  That was in August of 2018.
16       Q.  Okay.
17       A.  But after --
18       Q.  And your residency ended, right?
19       A.  My residency affiliation ended after June
20   of 2018 but it was very -- I was very shocked that I
21   was unable -- that I was taken off the website.  My --
22   my e-mail --
23       Q.  Okay.  I'm going --
24       A.  -- accounts -- well, wait.  My e-mail
25   accounts were cancelled.  I had talked to David

35 (Pages 137 to 140)

# DR. JEFFERY WEISMAN  9/13/2022

## Page 141

1  Ballard and Pam Woodard about keeping my Wash U.
2  E-mail to be able to continue doing research.
3      Q.  But that wasn't your property though,
4  right, the e-mail?  I'm talking about SBI and your
5  property that you're claiming was converted in this
6  case.  Did you ever demand that it be returned by
7  Dr. Woodard or Dr. Ballard --
8          MR. ELSTER:  Object --
9      Q.  -- after March of 2017?
10         MR. ELSTER:  Objection.  Asked and answered
11  again.
12     A.  You know, again, I would have to think
13  about -- about a specific conversation and see if I
14  sent any e-mails or text in that regard.
15     Q.  (Mr. Sullivan) Okay.
16     A.  But I -- but I, I mean, I will definitively
17  say that I was very upset that I'd been put into an
18  untenable situation where Alex told me he wanted me to
19  shut down my lab and, you know, give it to -- you
20  know, basically he told me to shut things down.  When
21  he -- when there was the whole thing at the six month
22  review about getting -- having fake evaluations.  He
23  wanted me to shut down my lab and he suggested I give
24  the lab to, you know Wash U.
25     Q.  You -- you worked in the radiology 3D

## Page 142

1  printing lab with Dr. Ballard and Dr. Woodard during
2  the last three or so months of your residency,
3  correct?
4      A.  Yes.  I did -- I did research.  I did a lot
5  of working on papers remotely.
6      Q.  Were you ever in the lab though in that
7  time frame?
8      A.  I -- I had -- I had set foot in the lab
9  during that time frame but I was primarily working on
10  wrapping up papers that we had -- that we had in -- in
11  press and progress.
12     Q.  While you were there, did you take back any
13  of your or SBI's property?
14     A.  Just thinking if I -- I don't believe I
15  took anything from -- from the lab at that point.
16     Q.  Did you -- did you say to anyone when you
17  were in the lab, hey, these are my work papers or my
18  lab notebooks and I'm taking them with me?
19     A.  We -- I mean, we -- we all discussed how
20  unfair the situation was that I was being pushed out,
21  that, you know, that I basically built a core research
22  facility at a top five medical center, something no
23  med student has probably ever done, and, you know, I
24  was basically being pushed out and left with nothing
25  after the actions by Alex and his team.

## Page 143

1      Q.  But you didn't say to -- you didn't say to
2  anyone, these are my -- these are my notebooks, I'm
3  taking them with me?  Yes, did you say that?
4      A.  You know, I -- I don't recall at this
5  point.  I'll have to -- I'll think on it.
6      Q.  Okay.
7      A.  But I -- but I definitely recall that I was
8  terrified that they were going to blacklist me from
9  working in medicine, and, you know, hide my
10  transcripts, not give a program director letter or do
11  something to prevent me from working, which would, you
12  know --
13     Q.  You were --
14     A.  -- which put me in a very untenable
15  position.
16     Q.  You were aware that -- that Karthik and
17  Uday were moving everything from the College of
18  Pharmacy lab to the radiology lab, right?
19     A.  I -- I was aware that they were moving
20  equipment.
21     Q.  Did you object to that?
22     A.  I didn't object to that because, again,
23  Alex Evers put me in an untenable position.  My -- my
24  job was at risk.  I needed to go along with whatever
25  the powers that be wanted.

## Page 144

1      Q.  You didn't state to anyone that, hey, this
2  property shouldn't be taken over to the -- to the
3  radiology printing lab?
4      A.  I -- I know that I had conversations
5  with -- I know I had conversations with David Sinow
6  and my wife about what was going on and how this was
7  completely untenable and unfair.
8      Q.  Okay.  Well, I'm -- I'm talking about
9  anybody at the university, at the hospital, Dr. Evers
10  or Dr. Benzinger, you never stated to them, you know,
11  I object to this property being taken over to the
12  Department of Radiology?
13     A.  I -- I would want to think on that.  I
14  know -- I know I had similar conversations in private
15  with David Ballard and Uday and Karthik on the
16  situation, but...
17     Q.  So, I mean -- I mean, you -- you acquiesced
18  then the property and the equipment being -- being
19  moved over --
20         MR. ELSTER:  Objection.
21     Q.  -- is that a fair statement?
22         MR. ELSTER:  Objection.
23     A.  I would --
24         MR. ELSTER:  Wait.  Hold on.  Objection
25  vague and to the extent that calls for a legal

36 (Pages 141 to 144)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 145

1  conclusion, acquiescence.
2      A.  I -- I mean, I -- I would say that I -- I
3  mean, very bluntly, I did not want to give up my lab.
4  I did not want to give up what I had spent -- I -- I
5  mean, I spent six weeks in Louisiana building that up.
6  I had done something that no med student should have
7  been able to do because I was a patent attorney and I
8  used that resource, you know, that as a resource.  And
9  I basically was in a position where it was either my
10  career.  I'd never practice clinically again.  I might
11  be blacklisted.  I might never work again as a doctor
12  or come -- or being in that untenable position where I
13  had to give everything to them or face the
14  consequences.
15      Q.  (Mr. Sullivan) Did you ever demand payment
16  from the university or the hospital for your and SBI's
17  lab equipment and property?
18      A.  I'm thinking right now.  I -- I don't
19  recall right now but I'll -- I'm happy to think if I
20  had asked for -- asked for it.  I -- I know I did -- I
21  know I did demand that there was some payments made to
22  Strategic Biomedical for Uday and Karthik.
23      Q.  That was to cover their -- that was -- that
24  was -- that was to cover their salaries because SBI
25  couldn't, right, until they were able to be hired

### Page 146

1  as -- in the Department of Radiology?
2      A.  Well, SBI wasn't going to be able to cover
3  their salaries because of what happened with Alex
4  Evers.
5      Q.  No, no, no.  I'm asking you.  But that's
6  why -- but that's why the invoices were --
7      A.  The invoices
8      Q.  -- submitted to -- to radiology --
9      A.  Those invoices --
10      Q.  Hold on.  We can't talk over each other.
11      Those were for -- that was because Pam
12  Woodard wouldn't be able hire them in enough time for
13  them to be paid, right?  So you submitted invoices so
14  that -- so that Karthik and Uday could be paid?
15      MR. ELSTER:  Objection.  Argumentative.
16  Assumes facts not in evidence.
17      A.  So, I mean, I -- would -- I -- can I see
18  the specific invoices just to --
19      Q.  Well, you brought up the --
20      A.  -- comment on them --
21      Q.  You brought up the invoices.
22      A.  I know.  I'd love to see them so I could
23  comment on what they were for.
24      Q.  We'll look at them.  We'll look at them.
25      A.  Okay.

### Page 147

1      Q.  We'll look at them in a little bit.
2      But otherwise, you didn't submit any
3  invoice or demand any payment for equipment, lab
4  notebooks, intellectual property, work process papers,
5  memos, anything of the like to the university or to
6  the hospital?
7      A.  I will think on it more.  I don't believe
8  so at this time but I'll look at it.
9      And again, I will say as -- as a med
10  student, earning, you know, like a resident salary --
11  or I'm sorry.  As a resident earning a resident salary
12  of 15, $16,000, that was my entire life, my entire
13  assets was starting this company up.  I had spent, you
14  know, as I said, 80 to a hundred thousand dollars
15  personally to get this equipment.  I had searched for
16  stuff all over the globe.  Literally shipping in 3D
17  scanners from New Zealand and refurbishing them.
18      Q.  Okay.  But --
19      A.  No.  But I'm just saying so the -- the
20  whole thing was I'm not wealthy.  I don't have a trust
21  fund.  I don't have substantial assets.  This is what
22  I had put everything into and I was in a position
23  where I literally had to make a choice, an untenable
24  selfish choice of my career based on what was going on
25  with Alex to try to get the heat off on this or -- or

### Page 148

1  my lab and my research career.  And that's what I was
2  faced with at that point.
3      I -- I mean, the truth -- I -- I had no
4  desire to give up my lab, to give up my life's work,
5  what I had stepped away from law to go do something to
6  try to make an impact on society to develop tech.
7      Q.  Let's -- let's keep it to what my question
8  is.  Okay.  Let me ask this question:  Did you ever
9  demand that the university or the hospital share
10  profits from the radiology 3D printing lab with you?
11  Yes or no or I don't recall.
12      A.  So I -- I would say I need to think on it.
13  And the reason -- the reason I'll say I -- I don't
14  recall I can't think on it right now is we were in
15  talks about doing private tech development even at
16  later points.  And there -- there were talks about
17  that because Dave -- because, again, David Ballard had
18  been -- because David Ballard had been, you know,
19  e-mailing me about helping with -- David Ballard had
20  been e-mailing me about helping --
21      Q.  Okay.  Again, we're going off was there
22  ever a demand?  I know that there were proposals and
23  agreements.  Did you ever make a demand from the
24  university or the hospital that they share profits
25  from the radiology 3D printing lab?

37 (Pages 145 to 148)

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 149

1    MR. ELSTER:  Objection --
2    Q.  Yes, no, I don't recall.
3    MR. ELSTER:  Make an objection.  Objection.
4  Asked and answered and to the extent the lawsuit
5  itself is a demand.  If you can answer.
6    A.  I mean, going -- I mean, yeah, I -- I
7  would -- going on that, I think -- I think they were
8  on -- I guess I would just say this to -- to give a
9  final answer on this.  I think everybody was on notice
10  that I was upset with what had occurred as of January
11  of 2019 when I filed a lawsuit over it.
12    (Defendant's Deposition Exhibit No. A17,
13  E-mail 1/16/18 from Jeffery Weisman re: T32 grant
14  renewal information.)
15    Q.  (Mr. Sullivan) Okay.  I've handed you
16  what's been marked as Exhibit A17.  Is this an e-mail
17  sent from you at the top to Jon Bucher dated
18  January 16th, 2018?
19    A.  I believe it is.
20    Q.  Did you state in this e-mail that I hope he
21  knows that as a resident I moved my lab here with two
22  post-docs, ended up with no support and donated one of
23  the top medical 3D printing groups in the country to
24  the radiology department?
25    A.  Well, let me read this e-mail right now.

---

Page 150

1  And I -- I just want to verify -- let me ask one
2  question.  So this e-mail is from me, Tuesday,
3  January 16th, 2018, to Jon Bucher, and its subject T32
4  grant renewal information.  So this is the e-mail I --
5  so just -- just to make sure I understand.  You're
6  asking the question about the e-mail about the --
7  the --
8    Q.  The second paragraph your statement is in.
9  Did you --
10    A.  Oh.
11    Q.  Did you -- did you write that?
12    A.  Let me read this.  And hold on.  I'm just
13  reading this right now.  Correct nine publications in
14  Pubmed but please see below on additional publications
15  and my comment before you relay that.
16    I am going to meet with Dr. Avidan to do an
17  exit interview since it looks like I'm leaving in
18  July, but in advance, I hope he knows that as a
19  resident I moved my lab here with two post-docs, ended
20  up with no support and donated one of the top medical
21  3D printing labs in the country to the radiology
22  department.
23    Q.  Okay.
24    A.  I have not had the time --
25    Q.  Wait, wait, wait.

---

Page 151

1    A.  -- to track the status of a dozen projects
2  and several national and international collaborations
3  that are still ongoing since I am just a mere
4  workhorse resident.
5    Q.  Okay.  You wrote that?
6    A.  I wrote this e-mail.
7    (Defendant's Deposition Exhibit No. A18,
8  E-mail 4/5/18 from Jeffery Weisman Subject Weisman CV
9  ERAS.pdf.)
10    Q.  Okay.  Let me hand you Exhibit A18.  Can
11  you identify this for me?
12    A.  Yes.
13    Q.  It's an e-mail to Dr. Catherine Krucylak?
14    A.  Yes.  This is -- this is an e-mail from me,
15  Jeffery Weisman, Thursday, April 5th, 2018, to
16  Dr. Catherine Krucylak, Weisman CV and info.
17    Q.  Okay.
18    A.  Attachments my CV for ERAS.
19    Q.  Okay.
20    THE COURT REPORT:  CV what?
21    THE WITNESS:  Weisman CV for ERAS purposes.
22  E-R-A-S.
23    Q.  And Dr. Krucylak had agreed to write you a
24  letter of recommendation?
25    A.  Yes.  And I --

---

Page 152

1    Q.  Did she -- would she have had favorable
2  things to say about your performance as a resident?
3    MR. ELSTER:  Objection.  Speculation.
4    A.  I saw the letter that Dr. Catherine
5  Krucylak wrote and it was a positive letter.
6    Q.  (Mr. Sullivan) Oh, Okay.  And did you write
7  to Dr. Krucylak:  The most unique thing I did here was
8  donating the medical 3D printing lab to the radiology
9  department?
10    A.  Let me read this e-mail.  Yes.  And I see
11  that I wrote:  The most unique thing I did here was
12  donating the medical 3D printing lab to radiology.
13  And I think the most important thing to note and the
14  reason that I read the previous exhibit --
15    Q.  I'll hand you what we'll --
16    A.  Well, the reason I read the previous --
17    Q.  Your lawyer -- no.  You've answered my
18  question.
19    A.  The reason -- the reason I read the
20  previous A17 is because --
21    Q.  Please look at A19, sir.
22    A.  -- it's a very --
23    Q.  Sir --
24    A.  -- sarcastic comment to say that I'm just a
25  mere workhorse resident.  And I have donated --

38 (Pages 149 to 152)

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 153

1      Q.  -- can you look at --
2          MR. ELSTER:  Hold on.  Hold on.
3          THE COURT REPORTER:  I can take one person
4   at a time.
5          MR. SULLIVAN:  This is -- this is not
6   responsive --
7          MR. MAREK:  Not recognizing that's he's --
8          MR. SULLIVAN:  He's giving long -- he's
9   going -- he's giving long, narrative answers.
10         MR. MAREK:  -- trying to finish --
11         MR. ELSTER:  Just let him finish.
12         MR. SULLIVAN:  He's not responding to any
13  questions.
14         MR. ELSTER:  Hold on.  Just let him --
15         MR. MAREK:  That you don't want to hear.
16         MR. SULLIVAN:  You guys can ask the
17  questions that you want to.  I was asking about
18  Exhibit A18.  He answered my question.  And we're
19  moving on.
20         MS. RUTTER:  Dr. Weisman, please finish
21  your answer.
22         MR. SULLIVAN:  No.
23     A.  I said donated --
24         MR. SULLIVAN:  No.  This is my deposition.
25     A.  I said donated very --

---

Page 154

1          MR. SULLIVAN:  You guys can follow up
2   with --
3      A.  I said donated very sarcastically here
4   because I was being taken advantage of.  I was a mere
5   workhorse resident.
6      Q.  (Mr. Sullivan)  Okay.  You stated donated
7   and I was asking about A18.  You stated that to
8   Dr. Krucylak?
9      A.  A18 I stated donated -- Yes.
10     Q.  Okay.
11     A.  And the reason I stated donated --
12     Q.  Okay.
13     A.  -- I had a long talk with David Sinow on
14  how I should be talking about this situation.  And he
15  advised me that I should not be saying radiology --
16  anesthesia stole my lab because if I said that, I
17  would be blacklisted and never work.  And the thing
18  that I was to do was to just say politely, yes, I
19  donated the lab, and I want to move on and try
20  something else.  It wasn't a good fit.
21     Q.  Okay.
22     A.  Because that was the polite thing to say.
23         (Defendant's Deposition Exhibit A19, E-mail
24  4/10/18 from Jeffery Weisman Subject Weisman
25  non-clinical activities at WashU.)

---

Page 155

1      Q.  Let's go to Exhibit A19.
2      A.  Okay.
3      Q.  Can you identify this e-mail for me?
4      A.  This e-mail is from Jeffery Weisman sent
5   Tuesday, April 10th, 2018, at 10:54 a.m. to Rich -- to
6   George Benzinger, cc-ing Thomas Graetz, noting Weisman
7   non-clinical activities at Wash U.
8      Q.  Okay.  And in this e-mail, was this e-mail
9   sent from Dr. Benzinger wanting more information with
10  respect to your non-clinical activities so he could
11  write you a reference letter, to your recollection?
12  There might be documents showing that.
13     A.  To the best of my memory, and I believe
14  there are some documents that show Richard Benzinger
15  was asking for an update on activities I had -- I'd
16  done there.  I believe this was from when we were
17  negotiating my resignation around that time period.
18     Q.  Okay.  And you state in what I'll call
19  under bullet point one:  There was also a corporate
20  component, Strategic Biomedical, Inc. to commercialize
21  the University licensed technologies.  This was led by
22  a VC and mentor, David Sinow, JD, Ph.D., and located
23  off -- in an off campus incubator lab space.  Long
24  story short, it didn't work out.  The lab was donated
25  to the radiology department, primarily the vice chair,

---

Page 156

1   Pam Woodard, to be a core facility to set up a
2   central -- central 3D printing group on the medical
3   campus.
4          Did I read that correctly and did you put
5   that in that e-mail to Dr. Benzinger?
6      A.  Let me read through this.  All right.  So
7   that is what -- what you read is what's in the e-mail
8   and it's what I wrote in that e-mail.  And it's about
9   as snarky as I could be without creating a problem for
10  myself.
11         (Defendant's Deposition Exhibit A20,
12  Stanford-Confidential.)
13     Q.  Okay.  Let me hand you what's been marked
14  Exhibit A20.
15         MR. SULLIVAN:  I'll note that this was
16  produced by, I believe, Stanford University to you
17  guys and it's marked confidential.  I don't know why
18  because we didn't have dealings with Stanford but, I
19  guess, to just -- since they've marked it
20  confidential, we'll have it confidential for purposes
21  of the deposition.
22         MR. ELSTER:  Okay.
23         MR. SULLIVAN:  Is that fine?
24         MR. ELSTER:  That's fine.
25     Q.  (Mr. Sullivan)  Okay.  Dr. Weisman, can you

---

39 (Pages 153 to 156)

DR. JEFFERY WEISMAN  9/13/2022

## Page 157

1 identify this for me?
2     MR. NOLAN:  Do you have a copy for me?
3     MR. SULLIVAN:  Oh, sorry, Mike.
4     Q.  (Mr. Sullivan) Can you identify Exhibit
5 A20?  Does it appear to be you sending your CV to a
6 Dr. Alex Macario at Stanford University?
7     A.  Yes.  I am reading it right now.  It's from
8 Jeffrey Weisman, Wednesday, December 5th, 2018, 12:01
9 p.m. to Alex Macario with Stanford, cc-ing Janine
10 Roberts, CA-2 transfer question, Jeff Weisman, M.D.,
11 Ph.D., attachment Jeff Weisman CV.
12     Q.  Okay.  Can you look at the -- the CV.  And
13 flipping through it, would it appear to be what would
14 have been a -- your CV as of December 5th, 2018?
15     A.  This appears to be a -- this appears to be
16 my CV that I've attached and I'm looking at it right
17 now on page 4 of 12.
18     Q.  On page 4 of 12, under research labs?
19     A.  Yes.
20     Q.  2017 it states:  Founder.  Do you see that
21 there?
22     A.  Yep.  It says:  Founder and medical 3DP
23 lab, Washington University, Mallinckrodt Institute of
24 Radiology.
25     Q.  Radiology.  And then it says under the

## Page 158

1 bullet point:  Donated laboratory equipment and
2 expertise from Strategic Biomedical, Inc., correct?
3     A.  That is what I wrote in there as was
4 advised.
5     And actually, at this point, I was advised
6 by Allen Kaye (phonetic) the chair of anesthesia at
7 LSU New Orleans to put down that -- that comment
8 because he had advised me against telling anybody what
9 had occurred at Wash U. and that it would likely lead
10 to my blacklisting.
11     Any other questions on A20?
12     (Defendant's Deposition Exhibit A21, e-mail
13 12/6/18 from Jeffery Weisman re: CA-2 Transfer
14 Question.)
15     Q.  No.  A21.  Can you identify this document?
16 Does it appear to be you also sending on December 5th,
17 2018, a copy of your CV to a Dr. Tatiana Jamroz at
18 Cleveland Clinic?
19     A.  Yes.  And I -- I believe this may be a
20 Cleveland Clinic branch location and not the actual
21 Cleveland Clinic.
22     Q.  Okay.  So a Cleveland Clinic related
23 entity?
24     A.  Correct.  So this appears to be an e-mail
25 on December 5th, 2018, at 2:59 p.m.  Jeff Weisman

## Page 159

1 wrote:  Dr. Jamroz, I'm looking to transfer to a new
2 residency program --
3     Q.  Yeah.
4     A.  -- and wanted to know --
5     Q.  So you -- you sent this e-mail to
6 Dr. Jamroz?
7     A.  Yes.  It appears when I applied to every
8 anesthesia program in the country under the suggestion
9 of Chuck Fox and Allen Kaye when I had done that.
10     Q.  And you attached your CV.  Does it appear
11 to be an accurate copy of your CV as of December 5th?
12     A.  Yes, it appears to be an accurate copy.
13 And I followed their advice of trying to be polite and
14 proper and just putting down --
15     Q.  And state that you donated laboratory
16 equipment and expertise from Strategic Biomedical,
17 Inc. on page 4?
18     A.  That is what's written down but that was
19 not what occurred in that situation.
20     Q.  Okay.  But you stated it to various people,
21 put it in writing?
22     A.  It was put down there because it would have
23 been quite impolite in academic circles to say Wash U.
24 stole my lab.  And being a medical --
25     Q.  Could you have used a different term than

## Page 160

1 donated?
2     A.  I was advised by my mentors to put that
3 term down and that was the easiest way to go forward
4 to be able to get into another residency and complete
5 my training.
6     Q.  So you said that you donated it so that you
7 could -- you thought it would help you --
8     A.  Well --
9     Q.  -- be able to get another position?
10     A.  -- when I was talking with -- when I was
11 talking with LSU, for example, one of their big
12 questions was they knew me.  I went to LSU Health
13 Science and Center in Shreveport.  I knew the
14 anesthesia chair there, and I also knew the chair at
15 New Orleans.
16     They were very surprised after I took the
17 lab with me and moved it from LSU to Wash U. that I --
18 they were very shocked that I would suddenly abandon
19 things and they wanted to know what had really
20 happened there.  And I told them exactly what had
21 happened.  I told them the truth and what had
22 occurred, that things had gone sideways.  It was not a
23 good situation.  It was not a safe environment.  The
24 bullying and harassment was getting to the point the
25 patients were being endangered.

40 (Pages 157 to 160)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 161

1  So when that fell through -- when my
2  transfer to LSU fell through because Douglas Thompson
3  refused to give my transcripts and said something to
4  Dr. Patil, the program director there, they helped me
5  to put together my CV and revamp it and send it out to
6  all other departments.
7  And their strong advice to me was do not
8  write down all the details of what happened with Wash
9  U.  They said just put down something that would be
10  politically correct or polite and try to move forward
11  with your career.  Because if you can't work as a
12  doctor, you can't build your career and you're done.
13  So I followed their advice.
14  MR. SULLIVAN:  Okay.  Should we break for
15  lunch.
16  MR. ELSTER:  Yep.
17  THE VIDEOGRAPHER:  We're going off the
18  record at, approximately, 12:22 p.m.
19  (A short break was then taken.)
20  THE VIDEOGRAPHER:  We're on back on the
21  record at, approximately, 1:30 p.m.
22  Q.  (Mr. Sullivan) Doctor, we just got back
23  from lunch and just wanted to remind you you're still
24  under oath.  You understand that?
25  A.  Understood.

### Page 162

1  Q.  Okay.  Can you pull back Exhibit A, which
2  is the second amended complaint.
3  A.  Okay.  I'm getting that right now.
4  Q.  And can I point your attention to page 14,
5  paragraph 46.
6  A.  Okay.
7  Q.  And if you want to read paragraph 46 and
8  then I'll have a couple of questions for you on it.
9  A.  Okay.  Great.  Let me just do that real
10  fast.  Okay.  I'm just double checking the con --
11  where this is in the complaint to make sure I fully
12  understand context.  Okay.
13  Q.  Okay.  And in paragraph 46, you allege that
14  Dr. Evers proposed an affiliation by which the parties
15  would consider and engage in joint research,
16  parentheses, or not, close parentheses, on a
17  case-by-case basis.
18  Does that mean that there was no formal
19  agreement either by you and SBI on one hand or by
20  Dr. Evers on the other, that there would be a -- a
21  locked in collaboration between you?
22  MR. ELSTER:  Objection.  Form.  Vague and
23  potentially calling for a legal conclusion.
24  A.  So -- well, all that -- all that I would
25  say is when -- I assume -- I'm going to assume this is

### Page 163

1  from when we were interviewing and deciding that I
2  would come to Wash U.  I spoke with Alex Evers that
3  we -- that if I were to come, I would -- we would --
4  there could be collaborations and they -- they would
5  bring me into the program and I'd do my technology
6  development activities.
7  Q.  (Mr. Sullivan) And that it would be up to
8  anesthesiology or you whether to collaborate on a
9  case-by-case basis based on the project.  Fair enough?
10  A.  I -- I would say that it -- that, you know,
11  we had an agreement that I would go there to do
12  research.  And there was no -- there was nothing
13  definitive on, you know, which project would go to who
14  or what.  But there was an over -- there was an
15  overarching agreement that I would be in Wash U.
16  St. Louis to do research at Wash U. St. Louis because
17  there's -- there's very little reason to come to
18  St. Louis to do research unless you're going to
19  participate with Wash U. St. Louis.
20  Q.  But that, it wasn't that anesthesiology
21  would not have a, you know, a monopoly over your
22  research activities?
23  A.  There -- there was no agreement that
24  anesth -- there's no agreement that I recall that
25  anesthesia would have a monopoly on research activity.

### Page 164

1  Q.  Okay.  Let me point you to paragraph 65 on
2  page 19 of Exhibit A.
3  A.  Okay.  I'm at paragraph 65 of Exhibit A.
4  Q.  And my -- my question for you is:  You met
5  with Dr. Benzinger and -- on January 19th, 2017, to --
6  to review your first six months of residency, correct?
7  A.  That is -- that is correct.  I had a
8  meeting with him.
9  Q.  And did he also give you a letter from him?
10  A.  Yes.  He did give me a letter that he
11  wanted me to read and then sign in front of him.
12  (Defendant's Deposition Exhibit A13, Wash
13  U. Letter 1/19/17 Re: Jeffery Weisman Action:
14  Probation.)
15  Q.  Okay.  Can I hand you Exhibit A13.
16  A.  Okay.
17  Q.  And is that the letter that Dr. Benzinger
18  gave to you in the meeting on January 19th, 2017?
19  A.  This appears to be a copy of the letter.
20  Q.  Okay.
21  A.  I know there were multiple drafts that, I
22  guess, he was circulating around.  But this --
23  this appear -- this appears to be a copy of the letter
24  he gave.
25  Q.  And as part of the remediation with respect

41 (Pages 161 to 164)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 165

1  to your performance, you were asked to repeat two
2  rotations; is that correct?
3      A.  They had asked me to repeat rotations.  So
4  I had met with them to discuss this, and there were
5  multiple discussions, both myself and Gary Hammen had
6  met with -- with the administration out of concern.
7  And -- and the end result of this, they did not place
8  me on probation.  They did not place Gary Hammen but
9  they asked us each to redo an internal medical
10  rotation and a ICU rotation.
11      Q.  And at -- at this point, you were not --
12  you were not kicked out of the ASAP program, correct?
13      A.  Well, so to answer that question, and I
14  want to make sure I do it properly.  The ASAP program
15  required you to start your anesthesia tutorial after
16  doing, it was 11 blocks.  It would -- it
17  would be helpful to see the ASAP schedule in front of
18  me to -- to fully recollect.  I don't know if we've
19  got that here.  But by doing this what they did is
20  they cycled myself and Gary from starting -- starting
21  block 12 and 13 in anesthesia tutorial.  The two of us
22  would then start anesthesia tutorial with everybody
23  else.  So in effect, it would push us to the standard
24  track kind of de facto.
25      Q.  Would you -- would you still have the --

### Page 166

1  the 18 months of dedicated research that was part of
2  the ASAP program?
3      A.  So in -- so if they allowed us to continue
4  forward, we would be able -- so if they allowed us to
5  continue forward, then you would do the -- then you
6  would do remaining clinical months.  Although you
7  would have had two extra months tacked on.  And then
8  you would have done the remaining anesthesia clinical
9  months, which I -- I wouldn't -- to give an exact
10  number, I believe, it was something between 18 to
11  20 blocks.  And then you would do, I believe, it
12  was -- I'd have to -- it would be helpful to see, but,
13  I believe, it was, roughly, nine blocks of fellowship.
14  And then, I believe, they had, roughly, 23 blocks.
15  And these blocks are four week blocks, not monthly.
16  So it's 13 four week blocks make a year.
17          And then you do -- the final part of this
18  was you would be on an 80/20 split where you do
19  research basically -- you do -- you'd be clinical one
20  day a week and you do research, roughly, four days a
21  week for the remaining 23 blocks.  And that would
22  be -- that would be how this -- the ASAP program would
23  work there.
24      Q.  So you -- this would have just resulted in
25  you having a couple more months added onto your

### Page 167

1  program; is -- is that fair?  They weren't pulling
2  your 23 blocks of research, correct?
3      A.  So if -- if they had honored -- if they had
4  honored our agreement to just do an extra two months,
5  it would have just been an extra two months.  But it
6  was very clear -- I remember talking with Gary Hammen
7  when we did this, and I -- and I -- I literally told
8  him that day, I'm like, this is the end of ASAP for us
9  because we're not -- now that we're not on the track
10  and we're just doing this with everybody else, they're
11  not going to let us get accelerated and just do our
12  remain -- our anesthesia training shorter than anyone
13  else.
14      Q.  But that's speculation though, correct,
15  because you never got that far.  You -- you resigned
16  before you were going to -- to hit that, correct?
17      A.  Oh, I -- so -- how many months did I do
18  there?  So I resigned having done --
19      Q.  Your intern year and one year.
20      A.  Yeah.  Thirteen (13) blocks anesthesia
21  training.  So, I believe, I would have needed
22  another -- another few blocks of anesthesia training.
23          I'm trying to -- it would be very helpful
24  to have that in front of me to refresh.  But I would
25  have needed a certain number of new blocks of

### Page 168

1  anesthesia training to then jump from anesthesia to
2  the fellowship that I was planning to do in pain
3  medicine.
4      Q.  But you were never officially removed from
5  the ASAP program, correct?
6      A.  So I -- so as far as that goes, I viewed us
7  as being removed from the ASAP program because they
8  weren't -- they -- they -- they were holding us back
9  and creating issues.
10          The -- the -- the best example of being
11  held back was -- where -- where -- where we knew this
12  wasn't going to happen is Gary Hammen and I both did
13  tutorial, and tutorial is the second year for
14  anesthesia.
15          You -- you do tutorial for four to
16  six weeks where you're -- it's just training for
17  anesthesia.  Where they -- they have you paired up
18  with somebody.  You're not officially doing cases
19  completely by yourself with attending supervising you.
20  And at the end of tutorial, Gary Hammen and I were the
21  only two people that were told the two of you need to
22  do an extra several weeks of tutorial and we're going
23  to have somebody baby-sit you.
24          And they had Marco Todorovic watch me.
25      Q.  Okay.

## DR. JEFFERY WEISMAN  9/13/2022

### Page 189

1  Plaintiff felt he was being threatened for a fake
2  Physician's Health Program referral and could lose his
3  medical license if he did not formally resign in the
4  near future.  Is that accurate?
5      A.  That's what's written in the complaint.
6      Q.  Okay.  Thank you.  Going back to Exhibit A.
7      A.  Okay.  One second.  Let's flip back to
8  that.
9      Q.  Yes, sir.
10     A.  And what page?
11     Q.  We're going to look at page 23, and this is
12  under the heading of The Separation Contract.
13     A.  Okay.  Do you need me to keep the other
14  complaint open?
15     Q.  Not for now.
16     A.  Okay.
17     Q.  So I -- I have this 76 and 77 here just for
18  your reference.  But what I want to know is what the
19  terms of what you called the separation agreement
20  were.  And you agreed to resign from the residency,
21  correct?
22     A.  That -- that is correct.  I created an
23  agreement with them that I would assign -- that I
24  would resign from the residency for consideration.
25     Q.  And then your theory is that that

### Page 190

1  consideration would be providing a good recommendation
2  letter, assisting you in -- in transferring to another
3  program, and cooperating with other programs with
4  respect to the transfer?
5      MR. ELSTER:  Objection to the extent it's
6  a legal --
7      Q.  Is that fair?
8      MR. ELSTER:  Legal conclusion on
9  consideration.
10     A.  My -- my terms for me to -- for me to
11  resign, my basic terms were I would need a good
12  reference, and I would need assistance in
13  transferring, and that's -- that's -- those are some
14  of the terms I was asking for.
15     Q.  (Mr. Sullivan)  Not -- so I want to know
16  what all of the terms.  And did you ask for them or
17  were they agreed to?
18     A.  Every -- everything --
19     Q.  What was agreed to?
20     A.  So we reached an agreement in April
21  of 2018, and other terms and things that we were
22  discussing at that point was that it would -- I would
23  get a good reference, it would be accurate, it would
24  be objective, it would fulfill all ACGME policies and
25  meet all ACGME policies and protocols.  They would

### Page 191

1  assist me and my -- and the understanding is they
2  would not try to harm me, that -- that was the terms
3  of an agreement that I had been negotiating with them.
4  And it was -- it started as a verbal agreement.
5      Q.  I don't want to know your understanding.  I
6  just want to know what the terms are.
7      A.  Well, those -- those are some of the terms
8  of the agreement.
9      Q.  So let me -- let me -- terms are they
10 provide you a good reference or a good recommendation.
11 Okay.  That's one.  Two, they -- they're going to
12 assist you in transferring to another program, right?
13     A.  Correct.
14     Q.  Okay.  So those are the two main terms?
15     A.  Those are two of the main terms.
16     Q.  Okay.  Okay.  Are those the two only terms?
17     A.  I -- there were --
18     MR. ELSTER:  Objection to the extent it
19 mischaracterizes his prior testimony but you can
20 answer.
21     MR. SULLIVAN:  Well, he gets talking about
22 his understanding.  And I'm just asking -- I just want
23 to know what the terms are.
24     MR. MAREK:  All he has is his understanding
25 of the terms.  They're indistinguishable.

### Page 192

1      A.  You know, again--
2      MR. NOLAN:  I'm going to object, that's not
3  a valid objection.
4      THE WITNESS:  Yeah, that's not a valid
5  objection.  That's coaching.
6      MR. NOLAN:  Are you asking me a question?
7      THE COURT REPORTER:  Wait one second.
8      THE WITNESS:  I didn't ask you a question.
9      MR. MAREK:  Okay.  All right.  Did you say
10 something.
11     MR. ELSTER:  I said please stop your
12 speaking objection.
13     THE WITNESS:  Yeah.
14     MR. MAREK:  All right.  So do you have
15 another question for him?
16     MR. SULLIVAN:  No.  I've asked my question.
17     MR. MAREK:  Okay.
18     A.  All right.  Okay.
19     Q.  (Mr. Sullivan)  Let me ask you this:  You
20 stated before that you're still looking into possibly
21 finishing up an anesthesiology residency; is that
22 right?
23     A.  Yes, that's correct.
24     Q.  How long is Wash U. and Barnes-Jewish
25 Hospital obligated to assist you in -- in finding a

48 (Pages 189 to 192)

DR. JEFFERY WEISMAN  9/13/2022

## Page 193

1  new program and -- and providing you a good reference?
2      A.  Well, the terms of the agreement were that
3  they would assist -- they would provide a good
4  reference and they would assist me.
5          As far as -- as far as how long that --
6  that lasts for, they were -- by providing a good
7  reference, they were to generate the proper, accurate
8  and objective documents.  My ACGME transcript, my
9  program director letter.
10         So the -- so as far as a time period for
11  that, they would create those records and those would
12  be in my file.  So those would always be there and
13  available and I would have my good reference sitting
14  there.
15         So as far as a time period, it's not, you
16  know, how -- how long would they do it.  It's -- well,
17  it's -- once it's done, it's done.  The reference and
18  everything is there for the documents.
19         As far as assisting me, the only -- that --
20  at that point, they would provide my transfer
21  materials to another program.
22      Q.  And -- and if you -- and if you were
23  seeking to apply to another program, they would do
24  that same thing?  Well, you were -- let's say you file
25  an application for a program tomorrow for an

## Page 194

1  anesthesiology program, and then would the program
2  then have to follow the terms of this agreement and
3  send -- okay.  Well, we have this request.  We're
4  going to assist Jeffery Weisman by providing his good
5  reference letter and other materials in his file?
6      MS. RUTTER:  Objection.  Misstates prior
7  testimony and assumes facts not in evidence.
8      A.  I mean, I would -- I would want to think on
9  our full conversations and terms of this, but, you
10  know, my understanding was that they would honor the
11  agreement.
12      Q.  (Mr. Sullivan) And that if -- and that they
13  would continue to do that to this day?
14      A.  I mean, I -- I would assume that they would
15  honor the agreement of giving me a good reference and
16  helping me to transfer.
17      Q.  Okay.  Thank you.  Can you turn -- and I'm
18  looking at Exhibit A again, page 24, 79.
19      A.  Okay.
20      Q.  In paragraph 79, you state that WU and BJH
21  delayed or failed to respond at all to the request by
22  other institutions for copy of Weisman's academic
23  records.  Which institutions did they delay or fail to
24  respond to?
25      A.  Okay.  Let me read this paragraph.  One

## Page 195

1  moment.  Okay.  So I've read the paragraph.  And I
2  believe your question was:  What institutions have
3  they done this to.  We've been uncovering this --
4  unfortunately, we've been uncovering what they've been
5  doing month by month over the past four years.  Right
6  now we know several that they've done this too.
7      Q.  Can I -- can you name those institutions,
8  that's all I'm asking for.
9      A.  Okay.  Right now, and I'm going to try to
10  go in a chronological order.  So forgive me without
11  having lists in front of me.  I believe -- so the
12  first institution would have been -- or the first two
13  institutions was when I was first leaving, I intended
14  to go back home to Chicago.  Since I had some health
15  issues and wanted to be by family, that was University
16  of Chicago in Hyde Park, that was where Peter Nagele
17  went.  He was the -- he was the incoming chair that
18  had just left Wash U.  To go take over.  He had invited
19  me to go and -- to go with him.  And he even met with
20  Alex Evers to -- to more or less, he said he had to
21  notify Alex he was planning to take me.  And he said
22  Alex said that was okay.  I don't believe my ACGME
23  transcript was ever sent there.
24         And I believe Tom -- Thomas Cox had a
25  secret meeting at a conference with Jerome Klafta --

## Page 196

1      Q.  Hold on.
2      A.  -- that's the first one.
3      Q.  Hold on.  Hold on.  Hold on.  I'm just
4  talking about what I had asked you questions was about
5  the statement here:  Delayed or failed to respond at
6  all to requests by other institutions.
7      A.  Okay.
8      Q.  Okay.
9      A.  So that -- so -- fine.  So materials were
10  not sent to University of Chicago.
11     Q.  University of Chicago?
12     A.  Yes.  The next one for anesthesia that I
13  know of right now was Cook County Stroger.  I don't
14  believe my ACGME transcript was ever sent because we
15  know that it didn't exist at that point.  So it
16  couldn't have been sent.
17         After that point, I believe -- I believe,
18  at that point in time, I con -- or after -- after
19  those fell apart, I had reached out to LSU Health in
20  Shreveport, and I was informed by them that Wash U.
21  did not send the materials they requested.  There were
22  multiple e-mails of me asking, the program asking, I
23  believe, and there were multiple phone calls.  I
24  believe some of those are recorded where I asked
25  Tom -- Douglas Thompson to send things and he doesn't.

LEXITAS LEGAL
www.lexitaslegal.com    Phone: 1.800.280.3376    Fax: 314.644.1334

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 197

1      Around that time period, I need to check on
2  timing to be sure, I think it might have been a little
3  bit before LSU, but I -- I'd need to check e-mails.
4  At my wedding, my -- my Godfather asked me said, said
5  he was going to help and he was very good friends
6  with -- or extremely close friends with -- with a
7  Dr. Troianos who was the chair of anesthesia at
8  Cleveland Clinic.  So materials were suppose to be
9  sent there as well.
10     I, as -- as a side note on that, I also
11  at -- Pete Nagele was also at my wedding because I was
12  suppose to be starting work with him.  And it was --
13  anyways.
14     After LSU, and I'm just trying to think
15  around time period with LSU I applied to -- I applied
16  to every anesthesia program that I could find.  I went
17  through ACGME portal, and I -- I believe I sent -- I
18  believe I sent an e-mail to every residency program
19  out there.  There was several that wanted to talk to
20  me that were interested and they'd start talking to me
21  and then they'd stop.
22     Q.  Okay.  Wait.  Which ones?  Names.  That's
23  what I'm looking for is names.
24     A.  All right.  Without my -- without my
25  documents, I believe I received an e-mail from

---

Page 198

1  University of Minnesota, I believe.  I'd have to
2  check.  One of the Pennsylvania programs had e-mailed
3  me.  They had some interest.  Mount Sinai in Miami
4  Beach had contacted me.  So that was going on around
5  that time period.
6     I also had asked -- since I was -- since I
7  was worried about what I would be doing next year, I
8  also asked them -- I also asked for materials to be
9  sent to some occupational medicine programs.  I know
10  that I asked for Harvard's Occupational Medical
11  Program, to send my transcripts, and Douglas Thompson
12  said, yes, he would.  I e-mailed him that and he
13  e-mailed back he would.  And we now know that was
14  never sent because the transcript never existed.
15     And I -- I'm trying to think.  I know there
16  was some -- there was -- I'd -- I'd have to look at
17  all the responses I got.  There were other programs
18  that were interested.  I -- I spoke to Mississippi's
19  medical center -- academic medical center in Jackson.
20  They were very interested in me and said they were
21  going to reach out to my program.
22     I also know that there were several
23  programs that did not let me know that they were
24  investigating me.  Yale, for example, was highly
25  interested in talking to them and reached out to Alex

---

Page 199

1  Evers to -- I believe that -- I believe Yale said
2  something about, you know, that I could -- that they
3  were salivating at the thought of a J.D. M.D. Ph.D.,
4  and that it could -- you know, I could be the one to
5  revamp -- roughly, to revamp their -- their research
6  divisions.  And they called -- they called Alex Evers
7  and Alex Evers told them, quote, just say no, and
8  didn't even send forms.  Just said, say no, and
9  nothing was sent.
10     I know that Stanford, I believe, tried to
11  reach out at one point.  And I know there was some
12  phone calls going on.
13     As we've been doing discovery, we've found
14  that there were phone calls going on between a lot of
15  these -- phone calls and texts likely going on.  We're
16  still in the middle of discovery trying to get those
17  text messages because I -- from what I've heard,
18  people were texting or trying to get ahold of, like,
19  Alex Evers, Douglas Thompson, Richard Benzinger to get
20  my background.
21     Q.  Who -- who was in contact with them trying
22  to get their backgrounds?
23     A.  My -- it would -- it would help to see some
24  of the discovery documents to refresh, but there's
25  e-mails where, I believe, I can't remember if it was

---

Page 200

1  Stanford or Cleveland Clinic that were both -- that
2  both text -- that both e-mailed that they were trying
3  to get a hold of him to call to get documents.  And
4  that -- so that's what was going on.
5     Then, of course, because I can't forget,
6  there was the University of Illinois that had -- that,
7  I believe, they had told me they had requested
8  documents that were -- and they were told that there
9  was no ACGME transcript.  And that was exceptionally
10  scary because I'd already completed a year of training
11  and was made their chief resident, which would be,
12  like, transferring law schools after first year.  And
13  it's like, oh, you don't have a transcript.  There
14  was -- you know, we haven't gotten it.  We don't know
15  if you can stay here type of a scenario where it's
16  terrifying and you don't know what's going to happen.
17     I'm -- I'm sure there's others that are out
18  there that had interest in me that I'm just trying to
19  think because there was a lot of conversations and
20  communications.
21     So I don't forget I was also trying to get
22  into LSU New Orleans where Allen Kaye was chair.  And
23  after the incident with Douglas Thompson calling
24  Patil, Chuck Fox met with me and he apologized for --
25  he -- he just said he felt terrible for what had

---

50 (Pages 197 to 200)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 201

1  occurred with Douglas Thompson talking to the program
2  director and saying things about lawyers.  And Patil
3  said something like she was so nervous after what he
4  told her about me that she almost fainted.  That he
5  tried to help me to get into Tulane.  So when I was in
6  the room with him, I believe, he called the program
7  director of Tulane that was suppose to be requesting
8  information from me.  And he -- he sent me a text
9  message that Gary Haynes the program director for --
10  I'm sorry -- not program director.  Gary Haynes the
11  chair of anesthesia at Tulane University would contact
12  me.
13       So I -- I made an exceptional effort to
14  transfer with all these -- there's -- there's nobody
15  that I know of that would have been, like, they're
16  just a regular anesthesia resident that would have had
17  all these connections to all these chairs to be in
18  contact with them and ask for materials to be sent,
19  and then just one after another, bridge after bridge
20  was burnt.
21       Q.  And so you think that was the result of
22  communications or statements made by Dr. Evers or
23  Dr. Benzinger?
24       A.  Or doc -- or Dr. Cox or Dr. Thompson.
25       Q.  Okay.

### Page 202

1       A.  And Dr. Groener.
2            And -- and actually, in fact, I -- I forgot
3  to mention the -- the one -- the e-mail from Allen
4  Kaye.  Allen Kaye ran into Cook County Stroger's
5  program director, Ned Nasr, at a conference about a
6  year after I applied.  And he talked to Ned Nasr
7  because I -- because I had spoken -- I had spoken to
8  Alan Kaye about the situation.  And Ned Nasr didn't
9  take me as a transfer because there was an opening
10  they had.  He took somebody with zero anesthesia
11  experience, which would be unheard of where I had done
12  a year and passed my boards -- part of my boards or
13  half my boards, and he took somebody with zero
14  experience.  So Allen Kaye e-mailed, and I've got that
15  message where Kaye told me, I spoke to Ned Nasr.  He
16  said that he'll take you.  He just heard some things
17  from Wash U. about you.  So he said he'd take you but
18  with a few months less credits.  I believe it was six
19  months less credits.  And e-mail him right away.  And
20  I e-mailed him and then he just politely said, I'm
21  sorry.  I thought we were going to have a seat but
22  there is none and he wouldn't talk to me.  So it was
23  just bridge after bridge, opportunity after
24  opportunity.
25       Q.  Is that com -- is that communication with

### Page 203

1  Dr. Kaye referenced in paragraph 81 of Exhibit A?
2       A.  Let me read that.  Yes.  That information,
3  I believe -- I was just reading that now.  Yes.  This
4  is the incident that was referenced.
5       Q.  And so that communication with Kaye would
6  have been in May of 2019?
7       A.  Yes, it would have been.
8       Q.  Okay.  So that would have been well after
9  Cook County had declined to offer you a position,
10  correct?
11       A.  That -- that conversation -- that
12  conversation he had was after Cook County declined to
13  offer me the seat.
14       (Defendant's Deposition Exhibit A29,
15       2/18/19 Text.)
16       Q.  Okay.  Hand you Exhibit A29.  Represent to
17  you that this was something produced by your lawyers
18  in this case.  Appears to be text messages with an AK,
19  Alan.  JW-64604 and 64605.
20       A.  Okay.
21       Q.  Are these text messages with Dr. Alan Kaye?
22       A.  This appears to be a screen shot of a text
23  message.  Let me read it.  One moment.  Okay.  I
24  read -- I've read the text message that I sent to Alan
25  Kaye.

### Page 204

1       Q.  And in the text message refers to Dr. Fox
2  and Dr. Patil both said they felt bad about the whole
3  making me move down to Louisiana but not giving me the
4  offered seat; is that accurate?
5       A.  Yes, that's what I wrote down there.
6       Q.  And that Patil said she would let me start
7  as a CA-2 at Shreveport but there would be no research
8  tracks?
9       A.  That's what I put down there.
10       Q.  And you further stated that you were
11  ignored for a month.
12       A.  So after being burned twice by LSU
13  Shreveport and Patil, I have no respect for her or her
14  department anymore.  I would appreciate it if you
15  would not talk about me with them since.  That appears
16  to be what I texted Alan Kaye.
17       Q.  Okay.  So you thought they were being
18  burned by Dr. Patil at LSU Shreveport and that
19  happened twice?
20       A.  Well, they -- the -- the -- so the reason I
21  say it happened twice there is that I was told to move
22  down there in October to start a residency there.  I
23  packed up and I moved down to Shreveport.  I was
24  living out of hotels while I was waiting for the
25  apartment that I leased to be available.  And they

LEXITAS LEGAL
www.lexitaslegal.com        Phone: 1.800.280.3376        Fax: 314.644.1334

## DR. JEFFERY WEISMAN  9/13/2022

### Page 205

1   called me in in November at one point and said, I
2   spoke with Wash U., Douglas Thompson, basically
3   what -- and they said that there were all these
4   issues.  They -- they explained -- that they
5   wouldn't -- it's, roughly, what she told me was that
6   they wouldn't give my documents.  They wouldn't give
7   my transcripts, and they said talk to the lawyers if
8   you want any information.  She said they told her
9   something that was so terrible that she almost
10  fainted, which was really scary to hear because she's
11  an anesthesiologist and see's, you know, open surgical
12  sites all day long.  And, you know, that she just
13  couldn't -- they just couldn't take me.
14         And they try -- even with that said, they
15  tried desperately to get me into a seat at Tulane or
16  something else in Louisiana.  I had known them for my
17  undergraduate training.  I had done research with
18  Chuck Fox.  I'd worked with Chuck Fox.  He, in fact,
19  introduced me to -- he -- I didn't even, I guess,
20  realize but, I guess, he sent an e-mail or contacted
21  Evan Kharasch about me when it -- to -- to be a scout,
22  etc.
23         And then the second time as you said for
24  getting burned with Patil at the very end said -- very
25  end said, you know, maybe we can try to do something

### Page 206

1   if there wasn't -- if we didn't do a research track
2   with you.  And it -- it wasn't just a research track
3   that it came down to with her.  She was saying to just
4   start all over as if I had zero anesthesia experience.
5         So even though I had done a year in good
6   standing and had credit and I had passed half the
7   boards, I would just start over and I agreed to that.
8   So the ball was moved multiple times because, I think,
9   they weren't really sure what to do -- do with it.  So
10  they basically said, oh, well, maybe you won't do
11  a research track.  Will that be okay?  Yes.  Would --
12  what if you started over.  Yes.  Just please let me
13  start.  I have nothing.  I -- you know, I -- I don't
14  know what to do.  I've lost everything.  I -- my
15  career seems to be over and they just weren't able to
16  help any further because of what Wash U. told them and
17  the -- the situation.
18         Alan Kaye at one point told me that
19  they'd -- that just the department was so concerned
20  over what -- what Washington St. Louis had told them
21  that they just didn't know what to do and didn't feel
22  they could take me so...
23  Q.   What did -- what did Wash U. Department of
24  Anesthesiology tell Dr. Kaye?
25  A.   I don't know what -- so I -- so I wasn't a

### Page 207

1   party to the conversation that -- any conversations
2   that Alan Kaye had with Washington University.
3   Q.   What did Dr. Kaye tell you that -- what --
4   that -- that Wash U. had -- Wash U. faculty had -- had
5   reported to Dr. Kaye that was so alarming?
6   A.   Well, again, so Alan Kaye had told me that
7   he had -- so Alan Kaye had forwarded me the letter, at
8   one point, the letter that they sent, a reference
9   letter about me.  But he had told me that he -- he had
10  told me that he spoke with Chuck Fox who was a
11  colleague and friend of hers -- his and basically that
12  they were extremely concerned because they couldn't --
13  they didn't understand why they wouldn't release my
14  transcript.  What had occurred that was so bad.
15  Q.   So it wasn't anything that Wash U -- that
16  Wash U. stated to Dr. Kaye?
17  A.   I'm -- I'm --
18         MS. RUTTER:  Objection.  Calls for
19  speculation.
20  A.   Oh, I -- I wasn't a part of any
21  conversations that Alan Kaye had with Wash U.  I don't
22  fully know about any conversations Alan Kaye had with
23  Wash U.
24         I -- I do know that -- that Alan Kaye had
25  considered trying to get me to transfer to LSU New

### Page 208

1   Orleans, but he had said that LSU New Orleans
2   wasn't -- didn't have availability due to policies
3   right now -- right at that point in time to accept a
4   transfer.  They weren't accepting transfers at that
5   medical center.
6         So I -- I do know that there was
7   conversation -- I know because I was told by Dr. Patil
8   that there were conversations with Wash U. and e-mails
9   and things like that.  I -- I don't know on the Alan
10  Kaye end of things if he was also talking to Wash U.
11  or what was going on.
12  Q.   (Mr. Sullivan) Who did Dr. Patil talk to?
13         MS. RUTTER:  Objection.  Calls for
14  speculation.
15  A.   So -- so again, I -- I wasn't in the room
16  when Dr. Patil talked with anybody.
17  Q.   (Mr. Sullivan) What -- who -- what --
18  but -- but you just referenced that Dr. Patil had
19  these alarming conversations with Wash U. and what
20  they told him -- what they told her almost made her
21  faint.  When you had that conversation with Dr. Patil,
22  did you ask her who she spoke to?
23  A.   You know, I don't -- I -- I don't recall exactly
24  what I said word-for-word.  In that conversation,
25  she -- she was not very forthcoming, that was the

52 (Pages 205 to 208)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 213

1  least those four, Melvin, Gina, Amy and Janet McGill.
2      Q.  But there could have been more, you just
3  don't recall --
4      A.  I --
5      Q.  The schedule -- the schedule would show
6  that?
7      A.  The -- the schedule would show.  I -- I
8  mean, I believe those were the -- the four primary.
9  I --
10     Q.  Okay.  And then you mentioned -- do you
11  recall meeting with Dr. Alex Evers in February
12  of 2017?
13     A.  I know I met with Dr. Evers, especially --
14  especially after myself and Gary had met with
15  everybody.  And after Hammen -- Gary Hammen and I had
16  met with everybody, I -- I believe, we had -- we had a
17  final meeting in February where it was Alex Evers --
18  if -- if you're referring to the big meeting.  There
19  was a meeting with Alex Evers, Tom Cox, Richard
20  Benzinger and Russell Groener all in Alex Evers'
21  office.  And they called myself in for a meeting and
22  then they called Gary in for a meeting with everyone
23  to try to reach a resolution about the -- the concerns
24  that both of us had about our evaluations.
25         (Defendant's Deposition Exhibit A101,

### Page 214

1  E-mail 2/19/17 from Jeffery Weisman Subject: Plan for
2  success from Weisman ASAP meeting.)
3      Q.  And I've handed you what's been marked
4  Exhibit A101.
5      A.  Okay.
6      Q.  E-mail from you to Alex Evers on
7  February 19th, 2017.  Subject:  Plan for success from
8  Weisman ASAP meeting.  Is that the meeting that you're
9  referencing to where it was with Dr. Evers, Doctors
10  Groener, Cox and Benzinger?
11     A.  It -- it appears to be.  Again, I need --
12  if I had a -- if I had the schedules, I would know for
13  certain on the date, but it appears that this was
14  likely.
15     Q.  So it said:  I greatly appreciated you
16  taking the time to set up the meeting on Thursday
17  about my performance in the ASAP program and putting
18  together pathways to success.
19         So that meeting probably would have
20  occurred on or about February 16th, 2017?
21     A.  So I -- I don't know exact dates but -- but
22  it would -- it would have been -- if I wrote this
23  e-mail, it would have been in relation to --
24     Q.  If you wrote it on Sunday the -- the 19th,
25  then fair to say it was probably on or about the 16th,

### Page 215

1  which would have been Thursday, if we just go
2  backwards, right?
3      A.  Sometime in -- sometime in a -- in a
4  reasonable time to that.
5      Q.  Okay.  Can you just review this e-mail very
6  quickly, and I just want to know if it's a -- if it's
7  a fair summary of what was discussed and what was
8  agreed to at that meeting?
9      A.  Okay.  Let me read that.  Okay.  All right.
10  I've read -- I've read what I e-mailed to Alex Evers.
11  My very, you know, my e-mail after I met with him.
12     Q.  And was this a -- a fair summary of -- of
13  what was discussed and what you agreed to as a -- as a
14  pathways to success?
15     A.  So I -- I -- it's a summary of -- it's --
16  it's a summary but it doesn't tell the whole story.
17  You know, again, I --
18     Q.  Okay.  Well --
19     A.  Yeah.  I didn't agree with part four, like
20  part four that I'll do the two new months and be nice.
21  It's just the same way that I've lost the friends that
22  leave jobs and they don't like it but they still at
23  the end of the day say, thank you so much for the
24  opportunity to work here because they're trying to be
25  polite and cordial.  But that's -- that's not at all

### Page 216

1  what I was feeling there so...
2      Q.  Well, I mean, but -- but you agreed to that
3  over -- you didn't -- you might not have agreed with
4  the underlying reason, but you said, yes, I'll -- I'll
5  do the two additional months of intern year and begin
6  CA-1 training in July with the rest of the CA-1 class.
7  You agreed to that?
8      A.  At that time, I agreed to it.  And the key
9  thing --
10     Q.  Okay.
11     A.  Just the one -- the one key thing I would
12  just note and I'll keep it very brief on this one.
13  The reason I agreed to it is because I didn't have any
14  proof at that point.  They said I failed my internal
15  medicine evaluation.
16     Q.  Okay.
17     A.  About a couple of months later in May.
18     Q.  Okay.  I'm going to strike it --
19     A.  One of the chief residents, Hawa Abubakar
20  came to me and said, hey, I heard what's going on with
21  you.  It turns out there's a separate system where
22  they keep the internal med evals.  I went to the
23  internal medicine department.  I got the evaluations.
24  I passed all of my internal med rotations.  I had
25  glowing reviews from the faculty members there and it

54 (Pages 213 to 216)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 217

1  was a complete lie.  If I knew about those documents
2  then, I would have not agreed to repeat internal
3  medicine.
4      Q.  Okay.  I just want to know what was
5  discussed at that meeting and what was agreed to.
6  Okay.
7          So you -- you stated that you were going to
8  check in regularly with Dr. Groener.  Did you do this?
9  Did you do that?
10     A.  I believe that I was in touch with
11 Dr. Groener.
12     Q.  Okay.  Did you speak to other senior
13 residents about their pathways to success?
14     A.  I spoke to other senior residents in the
15 M.D. Ph.D. program, Kate Meacham.  I talked to Lock
16 (phonetic).  I talked to Broc Burden (phonetic).
17     Q.  I'm sorry.  What was the second one?
18     A.  Lock.
19     Q.  Okay.
20     A.  And -- and Broc Burden.
21     Q.  Okay.
22     A.  I -- I believe I talked to Aaron Norris and
23 I -- I talked to -- I talked to several other of the
24 M.D. Ph.D. research residents about what had been
25 going on with -- with them and their experience.

### Page 218

1      Q.  Okay.  And you also stated:  I have shut
2  down my active participation in research projects and
3  outside businesses to focus entirely on residency,
4  education and training.  That's what you state there?
5      A.  That's what I wrote down there per Alex --
6  per Dr. Evers' request.
7      Q.  Okay.  Did you do that?
8      A.  I shut down the majority of my active
9  research and projects and I just worked to
10 facilitate -- at that point, I worked to facilitate
11 what was going on, what was being taken over to
12 radiology and I didn't -- I -- I was not actively
13 going over there and doing research projects really.
14     Q.  Were you still working on research projects
15 after February 19th, 2017?
16     A.  I would say -- I would say that I was not
17 actively working on them since I was just cleaning up
18 any -- any odds and ends that needed to be done to
19 just -- to -- to have a smoother transition or
20 handoff.
21     Q.  So -- so you weren't writing -- you weren't
22 writing papers or editing papers that you were working
23 on with maybe Dr. David Mills's lab or Uday and
24 Karthik or David Ballard?
25     A.  If -- if I was doing any work at that

### Page 219

1  point, it was very de minimis.  I was not spending
2  days writing papers.  I was not spending evenings
3  writing papers.  I wasn't spending weekends.  I was,
4  you know -- if somebody sent me a draft and said --
5  you know, and I haven't thought about this in a while,
6  but if somebody sent me a draft and said, hey, you
7  know, we submit -- we're submitting this.  Can you
8  just read it real fast.  Okay.  You know, it's a quick
9  five page paper.  I'll read it on the weekend, or
10 evenings, or whatever and I'll say, yeah, it's cool.
11 Send it in.
12     Q.  So you weren't direct -- you weren't
13 directing any type of research?
14     A.  I -- I -- I'm trying to think.  To the best
15 of my memory, I wasn't doing any extensive directing
16 as I was transitioning things out.
17          There was a time period when I was
18 transitioning things to let -- to have a smooth
19 transition and takeover because I didn't want things
20 to collapse and, you know, have Uday and Karthik lose
21 their jobs and their Visas because that would have
22 been terrible for them trying to live the American
23 dream.
24          (Defendant's Deposition Exhibit A72, E-mail
25 4/9/18 from Jeffery Weisman Subject: Weisman CV and CV

### Page 220

1  Addendum.)
2      Q.  Hand you what's been marked Exhibit A72.
3      A.  Okay.
4      Q.  This is an e-mail between -- sent from you
5  to Dr. Rich Benzinger on April 9th, 2018.  And it
6  appears you state in the second paragraph:  Please
7  note I have honestly not participated in any projects
8  since we spoke last year.  You stated that to
9  Dr. Benzinger?
10     A.  That -- that's what's written right there.
11     Q.  And then you say that:  I handed everything
12 off and collaborators were overly generous and
13 continuing to recognize my early contributions?
14     A.  That's what I wrote there.
15          (Defendant's Deposition Exhibit A92, E-mail
16 3/17/17 from Jeffery Weisman Subject: Optimal rough
17 reorganization on 3D printing screws and mechanical
18 test data.)
19     Q.  Hand you Exhibit 92.
20     A.  Yes.
21     Q.  I just want you to identify this document
22 produced by your attorneys as JW-52994.  Is this an
23 e-mail that you sent on March 17th, 2017, to
24 UdayaBhanu Murthy, Karthik Tappa and David Mills?
25     A.  This is an e-mail from me, March 17th, to

55 (Pages 217 to 220)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 229

1    A.  Let me -- give me just one moment, I
2  apologize, to take a look at this.  This was, I
3  think -- sorry.  If you'll give me just one moment
4  while I read this.
5    Q.  Yeah.
6    A.  Okay.  So I've read this e-mail.
7    Q.  And in part B here you state:  My
8  department clearly doesn't want to support me in
9  giving me time to do these things right now.  That was
10  talking about doing research and running the -- the
11  lab company; is that fair?
12    A.  That -- that seems to be a very fair and
13  accurate statement we're all in agreement on.
14    Q.  Okay.  And Vanderbilt and Stanford offered
15  me days off when necessary.  Did Vanderbilt and
16  Stanford do that when you were discussing their
17  programs?
18    A.  Yes.  The -- the Vanderbilt chair, when I
19  was leaving -- when the interview day was over,
20  grabbed me and said, not you, don't go, and took me on
21  a two hour tour of campus.  And said, I want your 3D
22  printing lab here.  I'll give you any time off you
23  need to work on this.  We want you and the tech.
24    Q.  You state here:  I thought Alex Evers made
25  the same offer.  Clearly there were some crossed wires

### Page 230

1  or conditions changed.  You stated that to David, Uday
2  and Karthik?
3    A.  That's what I wrote there.
4    Q.  Okay.  Thank you.  After February 19th,
5  2017, did you continue to try to seek to get
6  investments and grants for the -- for SBI and the lab?
7    A.  I would have to think and see the materials
8  that were coming in.  Anything that I had agreed to do
9  I, I believe, I probably passively met my obligations.
10    If there -- if there was somebody that had
11  planned -- if there was an executive at a biotech or
12  somebody that had planned to come in and book tickets
13  or made a schedule, I, of course, would stop by to say
14  hi, but I was not -- I was not acting in the same way
15  that I had where I was -- we were -- I would just
16  say -- I don't have -- I don't want to use the word --
17  the term active and actively to cause confusion.  But
18  I was not actively spending substantial time working
19  on these projects.  I would passively fulfill any
20  obligations as I, you know, as I handed things off.
21  No different than an attorney departing to a new firm
22  or something like that.
23    Q.  And the same way with transitioning the
24  SBI's lab to -- to radiology, you continued to do that
25  until it was done?

### Page 231

1    A.  I -- I -- I assisted with the transition.
2  I -- I, you know, made sure that I was as professional
3  as possible on that.  And I -- I -- you know, that --
4  that is what it is.  I -- I tried to be as
5  professional as possible to hand off.  If somebody had
6  a question, you know, where's this item, where's this
7  document, here's where it is.  But -- but I -- I
8  certainly was not going to the lab to work evenings or
9  weekends or during my residency.  That was --
10    Q.  Let -- let me ask -- let me ask you this:
11  Prior to -- how's the phrase withdrawing from active
12  par -- participation in -- in research in your
13  company.  How many hours per week during your
14  residency on average did you spend on research or the
15  business of SBI?
16    A.  So the answer that I would give on that
17  was -- was highly variable.  I -- I always -- I always
18  put my clinical duties first, but certainly in
19  evenings or weekends before -- before this transition
20  occurred, I would spend any time that I could.
21    I mean, in all sincerity, I only -- I mean,
22  I'm a normal human being.  I only agreed to move the
23  lab here and do this because I -- I was suppose to be
24  offered the ability to -- to do this properly, to have
25  research time protected, and that didn't occur.

### Page 232

1    I would -- I know your question is how many
2  hours.  It would be -- it would really vary by week.
3  If I, you know, if I had a weekend, I might go into
4  the lab for a couple of hours Saturday and Sunday or
5  work on some stuff in the evening, but it wasn't -- it
6  wasn't a full time job.
7    Q.  Oh, I know.  I was just -- I was just
8  trying to get an idea of, like, an average, but I
9  understand it probably depended on the intensity of
10  the rotation?
11    A.  Yeah.  I mean, in all -- in all sincerity,
12  it just depended on my time.  I -- I needed to -- I
13  needed to get -- I needed to sleep.  I needed to eat.
14  I needed to shower.  I, you know, if I had free time,
15  instead of watching TV, I would -- I would do this to
16  try to help.  You know, I wasn't exercising or, you
17  know, going to the gym, watching TV, going to the
18  movies.  I -- I was -- this was my activity.
19    Q.  And you talked about dedicated research
20  time.  Is that part of the ASAP program or did someone
21  tell you that you would have a dedicated amount of
22  time per week to -- to do research?
23    A.  When I -- when I spoke -- when I spoke with
24  Alex Evers and Peter and everyone during the research
25  day and I told them I have the lab, they -- they told

58 (Pages 229 to 232)

**DR. JEFFERY WEISMAN  9/13/2022**

## Page 233

1  me that I would be able to transition it over and I
2  would have time to run it.  And they had a good
3  work/life balance and it was collegial and everything
4  along those lines.
5      Q.  Do you recall having a meeting with --
6  well, let me back up.  Strike that.
7          Did you finish up the -- the second half of
8  your -- of your inter -- internship year and ended up
9  not being placed on probation, correct?
10     A.  Correct.
11     Q.  Okay.  Thank you.  And do you recall
12 getting a faculty advisor, Dr. T.J. Graetz before
13 other residents had received their advisors?
14     A.  Yes, it was -- it was -- it was odd.  I was
15 assigned T.J. Graetz and Gary Hammen was assigned
16 Dr. Donnely.  Everybody -- every other resident got to
17 pick their advisor and mentor and advocate, and we
18 were just given two people that didn't like us and
19 were friends with Alex.
20     Q.  So they were -- it was your understanding
21 that residents picked advisors?
22     A.  My understanding, and, you know, you -- you
23 can talk to everyone else there, but every other
24 resident I spoke to picked their advisor, and I --
25 and, I believe, I saw in some of the documents they

## Page 234

1  were all picking their own advisors.
2          I was -- myself and Gary Hammen were the
3  only two assigned people that we didn't get along
4  with.  Hammen actually moved to work with James Fair
5  because he was -- he -- he was trying to find somebody
6  who would be an advocate for him and not try to
7  secretly sink him.
8      Q.  And did you meet with Dr. Graetz regularly?
9      A.  I -- I met with Dr. Graetz on a regular
10 basis.  I -- I'd have to look at calendars to see how
11 often but --
12     Q.  I was just --
13     A.  I stayed -- I stayed in touch with him.
14     Q.  Okay.  Was he helpful with respect to your
15 performance as a resident?
16     A.  I -- I didn't feel that he was very helpful
17 as a mentor.  I -- I tried to be as polite as possible
18 but he wasn't really -- he wasn't someone that was
19 really advocating or -- or helping me.  I -- I felt he
20 was just trying -- he was just an ear to tell the
21 department whatever I was planning or doing.
22 I told him about -- I -- I would -- I would
23 make sure to tell him what was going on in every
24 rotation.  I would meet with him and share every
25 evaluation I got.  I -- I believe I e-mailed many of

## Page 235

1  the evaluations to him and I explained what happened.
2  And he would -- he would often tell me to let things
3  go and try to stay, you know, stay under the radar.
4  If somebody put information in that you don't feel is
5  accurate, don't -- don't say anything.  Just try to
6  get through.  So...
7      Q.  And -- and that's because -- and I -- I
8  know that your -- you claim that these evaluations
9  were -- were false or unfair.  But you received
10 further bad rotation evaluations in the fall of 2017,
11 correct?
12     A.  The fall of 2017, I would have been -- that
13 was when we started -- the -- the first year was --
14 the first year we're interns.  We rotate through
15 different departments.  The second year, that would --
16 that would have been past anesthesia tutorial.
17     Q.  So the first six -- let's -- let's -- let's
18 knock it down to the -- the CA-1 first six months, you
19 received some pretty bad rotation evaluations,
20 correct?
21     A.  I -- I wouldn't say they -- they were bad
22 because they didn't -- they -- they didn't accurately
23 reflect what was being told to me.
24     Q.  Okay.  But on -- on the -- on paper, they
25 were -- they were bad, what was being submitted.  They

## Page 236

1  were not favorable with respect to your performance?
2      A.  They -- they passed me.  So what I would
3  say is they passed me in the rotations aside from
4  pediatrics but they were not -- they -- they -- they,
5  I believe, the term of art was they were passing me
6  but saying below expectations.  It would help if I
7  could see them to refresh memory.  But they would say
8  passed but below expectations.
9      Q.  Okay.
10     A.  And then they'd have a lot of comments that
11 individual faculty members had submitted.
12     Q.  And -- and many of -- you know, some of
13 them might have been favorable, others might have been
14 highly critical of your performance?
15     A.  There -- there was quite the -- the gamut
16 on that, which was -- which was odd because, again,
17 normally there's -- there's some consistency, but mine
18 were people either seemed to be liking me or just --
19 just hating me.
20     Q.  Do you recall speaking with Dr. Benzinger
21 in the December 2017 time frame about your -- your
22 clinical performance and your situation in the
23 program?
24     A.  I know I had several conversations with
25 Dr. Benzinger in the fall about what I was planning to

59 (Pages 233 to 236)

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 237

1   do and moving forward.  And we'd had
2   several conversations -- there -- there were a few
3   where he said that my performance was a couple
4   rotation blocks behind where, in his opinion, I was a
5   couple months or a couple rotation blocks behind where
6   peers would be.  But I -- I believe, he said nothing
7   disastrous, just that you were -- you were moving
8   slower than other people were at Wash U.
9        Q.   And do you recall in December 2017
10  discussing with Dr. Benzinger leaving the program?
11       A.   I -- I -- I would have to recollect on
12  that.  I know I was talking that I had thoughts of
13  should I stay or should I go.  And what I was -- through --
14  throughout the 2017, twenty [sic] academic year, we --
15  we had many conversations.  Would it be best for me to
16  stay at this program?  Would it be best for me to go
17  somewhere elsewhere where it was a better fit?
18            I mean, it was -- it was very clear at that
19  point, that the -- the warm reception that I initially
20  had was gone, and I -- I was looking to leave and go
21  elsewhere.  If -- if -- if possible, if it was one
22  consideration so...
23       Q.   Did you float the idea to Dr. Benzinger
24  that you would submit a resignation letter and in
25  exchange the Clinical Competency Committee would give

---

Page 238

1   you an unofficial warning rather than report you as an
2   official unsatisfactory to the ABA after your first
3   six months in CA-1?
4        MR. ELSTER:  Objection.  Form.
5        A.   So -- so there was no -- there was no deal
6   that occurred that anything but accurate and honest
7   evaluations would occur, as far as that went.  I --
8        Q.   (Mr. Sullivan) I was just saying --
9        A.   Yeah.
10       Q.   -- did you float that idea to
11  Dr. Benzinger?
12       A.   I -- I don't recall having that.  I -- I
13  know we had lots of conversations, but
14  Dr. Benzinger was -- was very --
15       Q.   I just want to know --
16       A.   -- clear --
17       Q.   -- if you floated that idea to him?
18  That -- that was my -- that was my question, and I
19  think you said you don't recall?
20       A.   I -- I -- I don't recall.  I -- I mean, you
21  know, there were lots of talk going on about -- about
22  resignation or staying at that point in time and the
23  details on it.
24       Q.   Do you recall meeting with Dr. Alex Evers
25  on or about January 2nd, 2018?

---

Page 239

1        A.   I -- I met with -- I -- I do recall that I
2   met with Dr. Evers in early January of 2018.
3        Q.   And did you tell Dr. Evers at that time
4   that -- that you -- you didn't feel that the clinical
5   programs in the anesthesiology department were the
6   right fit for you and your plan was to look for some
7   other options and leave by July 1st of 2018?
8        A.   I -- I believe that was the meeting.
9   Again, it would be helpful to see the related
10  documents, but I --
11            (Defendant's Deposition Exhibit A63, E-mail
12  1/2/18 from Jeffery Weisman Subject: Weisman-Norris
13  Meeting.)
14       Q.   Yeah.  Well, here, let me --
15       A.   I believe that -- I believe that was the
16  meeting when --
17       Q.   Let me give you one.
18       A.   Thank you.
19       Q.   I know this is a -- is this an e-mail to
20  Aaron Norris dated January 2nd, 2018?
21       A.   Yes.  That's to Aaron Norris, one of the
22  other M.D. Ph.D.s that was becoming a faculty member,
23  and they were giving him kind of a weird -- or a -- or
24  a role of, like, an additional assistant program
25  director for the M.D. Ph.D.

---

Page 240

1        Q.   Okay.  And -- and this Exhibit A63 is -- is
2   such an e-mail that you sent to -- to Dr. Norris on
3   January 2nd, 2018?
4        A.   Yes.  I -- I sent that e-mail.  And I sent
5   that e-mail in part because I wanted Dr. Evers to see
6   that I was looking at how to frame a departure because
7   I was -- I was nervous about what was going on, the
8   bullying, the harassment, the safety issues.
9        Q.   What -- I just want to know, the -- does
10  this refresh your recollection that you would have met
11  with Dr. Evers on January 2nd, 2018?
12       A.   This does help to refresh my recollection.
13       Q.   Okay.  What did you and Dr. Evers discuss
14  at that January 2nd, 2018, meeting?
15       A.   Let's see, that meeting was a -- that
16  meeting was a long time ago.  So I'm trying to --
17  trying to remember the details of it.  But I -- I
18  think I -- I think I thumbed up the core of it, that I
19  told him that it seemed that things were not going
20  well here, and it looked like it may be a better idea
21  to look at some other options.
22            I -- I believe, I -- I'm trying to think.
23  I used -- I used -- I used a specific phrase and I'm
24  trying to recall how I phrased it.  But I, you know,
25  I -- I think I told him something along the lines of

---

60 (Pages 237 to 240)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 241

1  it seems like -- I think, I -- I said something
2  relatively politely along the lines of it seems
3  like -- it was something, roughly, it seems like this
4  may not be a right fit and I haven't been listening to
5  the message you're trying to tell me.  Because it was
6  very clear that he -- the relationship at that point
7  had -- had frayed.  I don't think he wanted me there
8  at all and there was no -- you know, there's no -- in
9  my opinion, it was -- it was very challenging to be
10  somewhere that they don't like you.
11       Q.  Dr. Evers didn't say that to you though in
12  the January 2nd, 2018, meeting, that he didn't want
13  you in the program?
14       A.  I don't remember the exact words of that.
15  Alex Evers, and as I'm sure in one -- in one or more
16  recordings I have of him is generally cordial.  But
17  I -- as I -- I was warned by Lauren Gibson once when I
18  was trying to figure out what to do who told me Evers
19  is a snake.  You know, you can't trust what he says
20  from day to day.  So...
21       Q.  Okay.  But Dr. Evers in those recorded
22  conversations never said, I, you know, I want you to
23  leave and I want you out of here?
24       A.  I -- I don't recall the full text.  I -- I
25  know some of these meetings were quick.  Some were a

### Page 242

1  longer period.  So I -- I don't recall word for word
2  what was said.  I've got some recordings.  If -- if I
3  had the recording of that particular meeting, it's
4  always helpful to just have a, you know, a record of
5  at least what was said.
6       Q.  The recording would be a record of what was
7  said, correct?
8       A.  Yes.
9       Q.  All right.  Thanks.
10       A.  The recording would be a record of what's
11  said.
12          (Defendant's Deposition Exhibit A65, E-mail
13  1/12/18 from Jeffery Weisman Re: Weisman Scheduling
14  till end of academic year and next rotation.)
15       Q.  Let me give you A65.  So -- identify it as
16  WU-2366.  Can you identify these e-mails for me,
17  Dr. Weisman?
18       A.  All right.  This is an e-mail from me on
19  January 12th, Friday, of 2018, at 8:39 a.m. to George
20  Benzinger titled Weisman scheduling till end of
21  academic year.
22       Q.  And then there's some e-mails below --
23       A.  Yeah.
24       Q.  -- on the proceeding page?
25       A.  See if there's anything -- yes.  And it --

### Page 243

1  it appears that I e-mailed two of the chief residents,
2  Jacob McDowell and Dr. Rao and Dr. Benzinger.  Weisman
3  scheduling till end of academic year.  Let me just
4  read that.  Okay.  I've -- I've -- I've read the
5  e-mail and there --  there's a lot of subtext in
6  leaving the pain rotation.
7       Q.  Okay.  Well, I -- I'm not asking about the
8  subtext.  I'm just asking about the text.  You wrote
9  to -- to Jake and Janavi that you had met with
10  Dr. Benzinger and let him know that you didn't feel
11  the residency program was the right fit for you and
12  that you were looking at other options of planning to
13  depart by July 1st, correct?
14       A.  That's what I wrote in this e-mail.
15       Q.  And then you further requested a -- a
16  change to the rotation schedule, correct?
17       A.  That -- that is correct.  I asked for a
18  change in the rotation schedule.
19       Q.  And -- and Dr. Benzinger said that it made
20  sense to move you out of the pain rotation and that
21  you would probably go in somewhere in the -- the
22  operating rooms, correct?
23       A.  That -- that's correct.
24          (Defendant's Deposition Exhibit A64,
25  1/11/18 CA-1 first six month CCC evaluation.)

### Page 244

1       Q.  Okay.  Hand you what's been marked Exhibit
2  A64.  Can you identify this document for me?
3       A.  This was the third, six month CCC meeting,
4  I believe, the letter that they had put together after
5  it.
6       Q.  Okay.  So this would have been the --
7  the -- the CA-1 first six month CCC evaluation, so to
8  speak?
9       A.  Yes, that would appear to be what it is.
10  I -- I haven't read this in a little bit.
11       Q.  Okay.  Do you want to take time to read it
12  or you just want to answer questions?
13       A.  Let me skim -- I'll try to go very quickly.
14  I just want to make sure I can --
15       Q.  If you want to look at it closely, we can
16  go off the record real quick and no one can -- you
17  know, can leave if you'd prefer.  Just let me know.
18       A.  Oh, I'll -- I'll -- I'll read this
19  relatively quickly.  It's not a very dense one.  Okay.
20  I've taken a chance to read this.  I know there's a
21  lot of discussion in here.
22       Q.  And -- and you received this and would have
23  discussed it with -- with Dr. Benzinger and likely
24  Dr. Cox as well?
25       A.  I likely would have.  I -- I don't recall

61 (Pages 241 to 244)

**DR. JEFFERY WEISMAN  9/13/2022**

## Page 245

1  specifically every single person that I spoke with but
2  I -- I, of course, had a discussion with them on this.
3       Q.  Okay.  And -- and you understood that this
4  was not the subject of any form of formal disciplinary
5  action, correct?
6       A.  That is correct.
7       Q.  And in it the program stated its
8  understanding that -- that you were likely to go and
9  seek to change specialties away from anesthesia?
10      A.  Hold on a second.  Let me just pull that
11  up.
12      Q.  That would be on page 2 of the third full
13  paragraph.
14      A.  During that first six weeks period I was
15  discussing with Rich Benzinger if I wanted to stay in
16  the anesthesia field, if I wanted to try to stay
17  there, go into anesthesia elsewhere or switch fields.
18  And that was why I know he said nothing would give us
19  more pleasure than to see your clinical performance
20  improve.  So that there were discussions on what I
21  should do for my future given the current situation
22  here.
23      Q.  Right.  And -- and that's what they said
24  is:  We emphasize that the decision is yours.  Said --
25  should you decide to redouble your efforts to become

## Page 246

1  an anesthesiologist, we will support those efforts
2  strongly.  Correct?
3       A.  That's -- that's what he wrote there.
4       Q.  Next paragraph, the last sentence says:  We
5  again emphasize this choice is yours.  While you
6  remain in this department, we will support your
7  training fully.  That's what they wrote there?
8       A.  Yes, that is what they wrote.
9            (Defendant's Deposition Exhibit A67, E-mail
10  4/5/18 from George Benzinger Re: Weisman Research
11  Opportunity.)
12      Q.  Okay.  Hand you what's been marked A67.
13  Would you identify this e-mail for me.
14      A.  This is an e-mail -- well, this is an
15  e-mail chain started by myself to Richard Benzinger on
16  April 5th, 2018.  And I wrote:  Weisman research
17  opportunity for any research time coming up, 3D
18  printing lab updates and fantastic opportunities.
19      Q.  And then Dr. Benzinger replied on that same
20  day copying Doctors Cox, Thompson and Graetz, correct?
21      A.  Yes.  He appeared to cc Dr. Cox,
22  Dr. Thompson and Dr. Graetz.
23      Q.  So on A67, you updated Dr. Benzinger with
24  respect to what Dr. Ballard was doing in the -- the 3D
25  printing lab and requested whether you could transfer

## Page 247

1  to research immediately to complete those projects.
2  Is that a fair summary of what you wrote?
3       A.  That is -- let me just read that one
4  second.  Okay.  I've read what Dr. Benzinger wrote
5  back.
6       Q.  Okay.  And basically Dr. Benzinger was
7  stating to you that you needed to decide whether you
8  were going to stay in the program or -- or resign from
9  the program, right?
10      A.  Yes.  Dr. Benzinger --
11      Q.  Okay.  Let me --
12      A.  Oh, sorry.
13      Q.  Let me -- let me follow-up here.  Because
14  he said:  If you were to go, it would be easier and
15  within the guideline to allow you to go on two to
16  three months of research?
17      A.  Yes.  He -- he stated in here that if I --
18  that if I wanted to do a big research block or
19  several -- or a research block, that he would prefer
20  that I was looking to leave their program to allow
21  that.  And he did say that he would assist me to
22  leave.  And he said, you know -- he basically said our
23  department will provide you or any other resident the
24  strongest letter of recommendation --
25      Q.  Right.

## Page 248

1       A.  -- that we can.
2       Q.  Okay.  I'll ask about that.  And he also
3  said you should consider staying in the program
4  because of your recent performance had -- had improved
5  and you would then be able to do further research down
6  the road, correct?
7       A.  Correct.  He -- he told me that because the
8  last two rotations I had completed, the -- the faculty
9  for ortho spine, I did two of those rota -- two blocks
10  of that, and they said that I -- my skills had reached
11  what they felt to be on par with all Wash U. residents
12  in my class at that point.  So --
13      Q.  Okay.
14      A.  -- I --
15      Q.  That's -- that's what he -- that's what
16  Dr. Benzinger says?
17      A.  Yeah.
18      Q.  He also says:  In our discussion last
19  night, I -- I saw that you received some sort of tie
20  between your submission of a resignation letter and
21  our provision of a letter of recommendation.  These
22  are really independent events.  Our department will
23  provide you or any other resident the strongest letter
24  of recommendation that we can --
25           So you understood that the -- that the

**LEXITAS LEGAL**
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

# DR. JEFFERY WEISMAN  9/13/2022

## Page 249

1  program's position was that any resignation and any
2  recommendation letter were independent of each other
3  and not tied together?
4      A.  That was what he wrote at this point, but I
5  didn't understand that to be the case since I kept
6  talking to them and I -- I didn't resign until we had
7  an agreement.  I didn't want anything changed.  I
8  wanted just the truth.  I just wanted my objective
9  ACGME evaluations and them to send them honestly and
10  accurately.
11      Q.  And you wanted --
12      A.  And positively.
13      Q.  And you wanted a -- a recommendation or a
14  reference letter from the program director?
15      A.  Yeah.  And -- and one -- one thing to note
16  with -- this is a term of art in this field.  So the
17  program director --
18      Q.  Actually, there's no pend -- there's no
19  question pending.
20      A.  Okay.
21      Q.  Thanks.
22      MR. MAREK:  Well, if he needs to finish an
23  answer.
24      A.  Well, it's ok, Sherman.
25      MR. SULLIVAN:  It wasn't -- it wasn't --

## Page 250

1      MR. MAREK:  -- accurate -- is that
2  permitted or not?
3      A.  I had no --
4      MS. RUTTER:  And if he needs to explain
5  something so that the questions are accurate.
6      A.  I didn't -- I didn't -- all I was -- I was
7  just -- all that I was just saying is there's no pro
8  -- there's no letters of recommendations here.  The
9  program director letters and the ACGME document that
10  comes out, the program director has to write a program
11  director letter.  It doesn't mean if they love you, if
12  they hate you, if you agree to leave or not to leave.
13      Q.  (Mr. Sullivan) There should be a letter
14  from the program director?
15      A.  Director letter.  But it's not a letter of
16  reference.  According to the ACGME, it's part of your
17  transcript.  It's suppose to accurately state that --
18  the bare minimum for this letter is the resident has
19  been there for a certain number of years and if they
20  have been on probation or not.  So it's suppose to be
21  an accurate ACGME document, that's what a program
22  director letter is.
23      Q.  But Dr. Benzinger, you also wanted him to
24  write you an actual letter, right, not just something
25  that stated he was here for two years and in good

## Page 251

1  standing?
2      A.  Well, in -- in general, a program director
3  letter will have more information than just that.
4      Q.  Right.
5      A.  That -- that -- that could be the bare
6  minimum that could be acceptable for another program
7  to follow ACGME transfer protocols.
8      The same way a law school would say, you
9  need bare minimum.  You get your transcripts and the
10  dean says, you know, John Doe was at our law school.
11  He was here for two -- for a year in good standing is
12  a one out, a bare minimum.
13      Normally a dean of law school will write
14  something better.  You know, my -- my friend, you
15  know, Ben Rotman, is transferring from Northwestern to
16  the University of Illinois.  He's a great student and,
17  you know, all these other things.
18      Q.  Okay.
19      A.  But there's a -- but there's a base level.
20      (Defendant's Deposition Exhibit A68, E-mail
21  4/6/18 from Jeffery Weisman Subject: Fwd: Program
22  Director Letter.)
23      Q.  Okay.  Okay.  Thank you.  Can you identify
24  Exhibit A68?
25      A.  Right.  This is from me, April 6th, 2018,

## Page 252

1  at 10:30 a.m., and this is to myself and Marissa
2  Israel, misrael08@gmail.com.  Subject, forward program
3  director letter.  And this is a forward from -- and, I
4  assume, this is from my Wash U. e-mail to my Gmail
5  account.  And this was a forward from Richard
6  Benzinger to me, Tom Cox, Douglas Thompson, T.J.
7  Graetz, April 6th, 2018, titled re: Program director
8  letter.
9      Q.  Okay.  Let's work backwards here.  On
10  page 2, you see the e-mail that you sent to
11  Dr. Benzinger on April 5th, and you said you would
12  like to ask for a positive program director letter
13  from Dr. Benzinger, right?
14      A.  That is what I wrote in the text here.
15      Q.  And then you further wrote:  Quote, I
16  honestly enjoyed working with you one-on-one and wish
17  the faculty here were as training oriented as you are.
18  Did you write that?
19      A.  That's what I wrote.
20      Q.  Did Dr. Benzinger write back to you that:
21  He understood that you would like this to be an
22  iterated or negotiated process but that's simply not
23  the way these letters are produced?
24      A.  Let me read this.  April 6th.  Okay.  I
25  have read the letter that he wrote, or the e-mail that

63 (Pages 249 to 252)

# DR. JEFFERY WEISMAN  9/13/2022

## Page 253

1  he wrote.
2      Q.  And -- and he lets you know that the -- the
3  letter was not going to be an iterated or negotiated
4  process, correct?
5      A.  He put that in the letter there.
6      Q.  Okay.  And he said also:  I'll write you
7  the letter that I think can do the most good for you
8  in your search, correct?
9      A.  I mean, he wrote that there in that -- in
10  that e-mail.
11      Q.  Okay.
12      A.  It's right there.
13      (Defendant's Deposition Exhibit A69, E-mail
14  4/6/18 from Jeffery Weisman Subject:  Weisman
15  Resignation Letter & Weisman Research Request Letters
16  Below.)
17      Q.  All right.  Let me give you Exhibit A69.
18  And can you identify Exhibit A69 for me, Dr. Weisman?
19      A.  All right.  That's from me, Friday, April
20  6th, 2018, 11:16 p.m. to Richard Benzinger, Thomas
21  Graetz, Thomas -- T.J. Graetz, Thomas Cox, Douglas
22  Thompson.  Subject:  Weisman resignation letter and
23  Weisman request letters below.
24      And let me read that real fast.  Okay.
25  I've read this.

## Page 254

1      Q.  And this is your official resignation from
2  the -- the anesthesiology ASAP residency program?
3      A.  This appears to be my official resignation
4  letter sent Friday, April 6th at 11:16 p.m.
5      Q.  And then you also requested that you be
6  able to modify your training schedule to -- to do
7  research with the folks over at the radiology 3D
8  printing lab; is that correct?
9      A.  That -- that is what I put in this letter.
10      Q.  And do you recall whether that request was
11  quickly approved the next day by Dr. Benzinger and
12  others?
13      A.  I recall that Dr. Benzinger sent a letter
14  back to me, or an e-mail back to me.  I would have to
15  see it to be able to state the exact comments of it.
16  I'm sure it's coming up next.
17      (Defendant's Deposition Exhibit A70, E-mail
18  4/7/18 from George Benzinger Subject:  Rotations
19  between now and June 30th.)
20      Q.  Taking my pitches.  Dr. Weisman, I've
21  handed you Exhibit A70.  Can you identify it for the
22  record?
23      A.  Yes.  This is a letter from Richard
24  Benzinger sent April 7th at 10:45 a.m., so the next
25  morning, my resignation letter:  Dr. Weisman, I spoke

## Page 255

1  with some others in the department.  The res -- I'm
2  reading it right now -- the residents will approve
3  your request for research time in blocks 11 to 13 of
4  this academic year, the end of which would coincide
5  with your resignation at the end of the academic year.
6      We will modify the block schedule
7  accordingly.  It is normal for residents in research
8  rotations to participate to some degree in the general
9  OR or call pool and the chief residents may assign
10  some calls to you in that context.
11      Residents will be --
12      Q.  Okay.  Yeah.
13      A.  I was just finishing up.
14      Q.  Yeah.  I don't need you to read the whole
15  thing.
16      So he -- Dr. Benzinger was telling you it's
17  approved, right, the research time, that you might
18  have to be on call, an OR call pool every once in a
19  while, right?
20      A.  That's -- that's what's in this letter.
21      Q.  Okay.
22      A.  Take call.
23      Q.  That you need to get a faculty advisor and
24  a research plan?
25      A.  That it -- that is what's in the letter.

## Page 256

1      Q.  Okay.  And then he also says:  The program
2  will continue to support you in any other way as
3  necessary as you settle on your path for next year,
4  correct?
5      A.  That is -- yes, that is the final sentence
6  that he put in here.
7      (Defendant's Deposition Exhibit A71, E-mail
8  4/7/18 from Alex Evers Re: Weisman Resignation Letter
9  & Weisman Research Request Letters Below.)
10      Q.  A71.  Dr. Weisman, A71, I'd like you to
11  identify at the top two e-mails between you and Alex
12  Evers on April 7th, 2018?
13      A.  Okay.  So the top e-mail is from Alex Evers
14  to me, Saturday, April 7th, 4:46 p.m. to Jeffery
15  Weisman.  Weisman resignation letter and Weisman
16  research request letters below.
17      And you want -- so that was the e-mail to
18  me where he said:  I'm sorry that your training in our
19  department has not worked out as well as we both hoped
20  it would.  Please let me know if I can be helpful in
21  your future career plans.  Sincerely, Alex Evers.
22      And then I responded to him.  From Jeffery
23  Weisman --
24      Q.  Oh, I think you -- you would have sent that
25  first.

64 (Pages 253 to 256)

**DR. JEFFERY WEISMAN  9/13/2022**

## Page 257

1    A.  Oh, did I send that first?
2    Q.  Yes.
3    A.  All right.  Sorry.  I -- my apologies.  Let
4 me read through this a little slower.
5       So before I -- before I -- he sent that to
6 me, I forwarded him a letter, or an e-mail, Saturday
7 April 7th, 2018, at 10:22 a.m. to Alex Evers, Weisman
8 resignation letter and research request below.  Thank
9 you for giving me the opportunity.  And, I believe, I
10 forwarded the same exact letter that I had sent to
11 Richard Benzinger, Graetz and --
12    Q.  That's correct.
13    A.  -- Tom Cox.
14       (Defendant's Deposition Exhibit A73, E-mail
15 4/10/18 from Jeffery Weisman Subject: Weisman Program
16 Director Letter Decision.)
17    Q.  Okay.  A73.  Can you identify what's been
18 marked as Exhibit A73?  Is this an e-mail from you to
19 Dr. Benzinger on Tuesday, April 10th, 2018?
20    A.  Right.  That was from me April 10th, 2018,
21 at 11:39 a.m. to Richard Benzinger.  Weisman program
22 director letter decision.  Let me read that.
23    Q.  Just let me know when you've had an
24 opportunity to read it.  And have you finished reading
25 your e-mail?

## Page 258

1    A.  Okay.  I've read the e-mail that I sent to
2 Richard Benzinger.
3    Q.  Okay.  And -- and you sent that e-mail in
4 Exhibit A73?
5    A.  Yes.  That appears to be what I sent to
6 him.
7       (Defendant's Deposition Exhibit A75, E-mail
8 5/14/18 from George Benzinger Re: Personal Re:
9 Updates.)
10    Q.  Okay.  Thank you.  Hand you Exhibit 75.
11    A.  I have Exhibit 75 in front of me.
12    Q.  So before we look at this, you asked Pam
13 Woodard to be your research advisor?
14    A.  That is correct.
15    Q.  And -- and Dr. Woodard agreed to do that?
16    A.  Yes.  I remember Dr. Woodard and David
17 Ballard agreed that I would work on -- would resume
18 work on projects.
19    Q.  And then -- and then Dr. Benzinger thought
20 that was a -- that idea was fine, right?
21    A.  They -- to my -- to my memory they agreed
22 that was a good plan of moving forward.
23    Q.  Okay.  Okay.  And so can you identify --
24 are these e-mails exchanged -- Exhibit A75, e-mails
25 exchanged between you and Dr. Benzinger from

## Page 259

1 April 27th of 2018 through May 14th, 2018?
2    A.  Okay.  So I'm just looking at this right
3 now.  So -- so this seems to be a -- this seems to be
4 an e-mail chain.  I'm just reading.  The first one was
5 April 27th, 2018, to Richard Benzinger -- sorry --
6 sorry.  I apologize.  Rich Benzinger wrote to me.
7 And -- okay.  Let me just read this.
8       Okay.  I've read the one he sent to me.
9 And then I re -- I responded to Richard Benzinger
10 Saturday, April 28th, a few hours later.  And I'm
11 reading that right now.
12       Okay.  So I've read -- I've read the e-mail
13 that I sent to Benzinger that I just got some pretty
14 bad news with my medical labs.
15       Okay.  I'm reading.  Richard Benzinger then
16 sent a response e-mail, Thursday, May 3rd to me.  So
17 that was a few days later.  Asking me how I'm back
18 from my IARS, the International Anesthesia Research
19 Society and hoping I'm feeling okay.  Then that was on
20 the third.
21       Then over a week later on Monday, May 4th I
22 contacted Dr. Benzinger.
23    Q.  May -- May 14th.
24    A.  Or sorry, May 14th.
25    Q.  Yeah.

## Page 260

1    A.  My apologies.  May 14th.  I let
2 Dr. Benzinger know that I had a colonoscopy and was
3 diagnosed with severe ulcerative colitis.  And -- and
4 I let him know that -- that -- that was when I let him
5 know that I was moving back to Chicago to be near
6 family as I now had a very serious medical condition.
7 And I asked him to please send program director
8 letters to Pete Nagele, Jerome Klafta and that I
9 wanted my transfer process to start working, and, I
10 believe, I had talked to him at that time about it as
11 well.
12       And then Richard Benzinger responded to me
13 Monday, May 14th, 2018, at 3:52 p.m., and he said:  I
14 suppose it's good to have a diagnosis.  And gave me
15 his sense of ulcerative colitis.
16    Q.  Okay.  And so this -- this exhibit
17 accurately reflects what you and Dr. Benzinger wrote
18 to each other on the dates noted, correct?
19    A.  I -- I believe these were our e-mail
20 exchanges.
21    Q.  Okay.
22       MR. SULLIVAN:  Want to take a break?
23       THE WITNESS:  I'm -- do you guys need --
24       MR. ELSTER:  I don't need a break.
25       THE WITNESS:  I mean, I'm -- I'm good to

65 (Pages 257 to 260)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 261

1  keep powering through if... Whatever -- whatever
2  works.  How much time do we have remaining?
3      MR. MAREK:  It might have been a rhetorical
4  question.  Do you want to take a break?  I'm okay with
5  taking a break, or are you --
6      MR. SULLIVAN:  Yeah.  I mean, I think we've
7  been going about a little over an hour.
8      MR. MAREK:  Yeah, little over an hour.
9      MR. SULLIVAN:  Hour and 15 minutes.
10     THE WITNESS:  Okay.  That's perfectly fine.
11     MR. SULLIVAN:  Okay.  Okay.
12     THE VIDEOGRAPHER:  Going off the record at,
13  approximately, 3:57 p.m.
14     (A short break was then taken.)
15     THE VIDEOGRAPHER:  We're back on the record
16  at, approximately, 4:10 p.m.
17     (Defendant's Deposition Exhibit A77, E-mail
18  6/6/18 from George Benzinger Subject: Jeff Weisman.)
19     Q.  (Mr. Sullivan) Dr. Weisman, let me hand you
20  what's been marked as Exhibit A77.
21     A.  Okay.
22     Q.  I'll represent to you that this is an
23  e-mail from Dr. Benzinger to Peter Nagele at
24  University of Chicago.  Subject:  Jeff Weisman.
25  Contains a cover e-mail as well as a letter.  Have you

### Page 262

1  reviewed this document before?
2      A.  You know, I don't recall.  Do you mind if I
3  read it just since there's been a lot of productions
4  or a lot of documents produced in discovery.  This is
5  from Richard Benzinger sent June 6th, Wednesday, 2018,
6  2 --
7      Q.  And you can just read it.
8      A.  Okay.
9      Q.  Yeah, yeah.  You can just read it to
10  yourself because I'm not asking you -- you didn't
11  write it.  So I'm just asking you whether you've seen
12  it before.  So you can familiarize yourself with it.
13     A.  Okay.  So I've -- I've read the e-mail that
14  he put here and I'm just reading the program director
15  letter he wrote.  Okay.  I've read this document.
16     Q.  And paragraph five of the -- the program
17  director letter --
18     A.  Okay.  One, two, three, four, five.
19     Q.  States that -- that you joined your
20  research track as a PGY1 in June 2016, and he is now a
21  CA-1 PGY2 resident in good standing, correct?
22     A.  That appears to be what's written there.
23     Q.  Okay.  And that would meet the -- the bare
24  minimum of what a program director letter should --
25  should state according to your previous testimony,

### Page 263

1  correct?
2      A.  You know, I'm not a DIO or GME team, but --
3      THE COURT REPORTER:  Or a what team, G?
4      THE WITNESS:  GME, graduate medical
5  education for GME dean.
6      A.  But this would be -- this would be the bare
7  minimum of what would be required to document training
8  time.
9      I -- I -- hold on.  Let me just read this
10  one more time.  And I -- I think the records might
11  also need to show something like he was here for two
12  years as opposed to letting it be just picked up on by
13  the fall that he came here and now he's at this level.
14     Q.  Well, yeah, I mean, but you hadn't finished
15  your two years yet as of June 6th, 2018, right?
16     A.  Yeah.  I was still having a couple weeks to
17  go.
18     Q.  Right.
19     A.  But this -- this is -- this is part of the
20  critical information, to my understanding --
21     Q.  Okay.
22     A.  -- that's required.
23     Q.  And then there's an expansion on -- on
24  this, and it's -- it's complimentary to you to the
25  effect that it states -- thinks that you can become an

### Page 264

1  effective physician and make substantial contributions
2  to biomedical innovation?
3      A.  Which paragraph?
4      Q.  Paragraph one.
5      A.  Okay.  So that's -- that's what it says
6  right there.
7      Q.  And having read this, is there anything
8  false that is stated in this letter by Dr. Benzinger
9  to Dr. Nagele?
10     A.  Well, I'd -- I'd want to go through it with
11  a much more fine tooth comb to see if there's any --
12  anything false --
13     Q.  We can go off the record if you want to do
14  that.
15     MR. ELSTER:  No.  We're going to stay on
16  the record.
17     A.  Well, no, but my --
18     MR. SULLIVAN:  No.  I mean, I've got
19  limited time and if he wants to go through it with a
20  fine tooth comb.
21     MR. ELSTER:  And if you want to use your
22  time to have him look at documents.
23     A.  Well, my -- the -- the biggest -- the
24  biggest issue with this letter where there's a problem
25  is this is dated June 6th, 2018, and Thomas Cox

66 (Pages 261 to 264)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 265

1  already had a secret meeting with Jerome Klafta to say
2  not to take me and have an off the record talk of me.
3  　　　Q.　(Mr. Sullivan) Okay.  Now, what did --
4  　　　A.　So what's in here is not necessarily true.
5  　　　Q.　What did Tom Cox state to Jerry Klafta?
6  　　　A.　I wasn't a part of that meeting.  But
7  there's an e-mail where he says that the IARS
8  convention, which is International Anesthesia Research
9  Society, that we were talking about in Exhibit A75.  I
10  was at that meeting and Thomas Cox goes and tells all
11  the other coconspirators that I had a -- I had a
12  meeting with Jerome Klafta, Peter Nagele's second in
13  command, about Jeff Weisman.  I -- I don't have it in
14  front of me so I'm just going from memory, but it was
15  something about, you know, the real story on Jeff or
16  the off-the-record on Jeff.  So anything in here would
17  be completely undermined by that game and they all
18  knew that -- that Thomas Cox had done that.
19  　　　Q.　What did so what did -- what did Thomas Cox
20  say that was untrue to either Jerry Klafta or Peter
21  Nagele?
22  　　　A.　Well, I wasn't in that meeting.
23  　　　Q.　I'm not -- I'm not -- but what did -- what
24  did he say?  You're claiming -- one of your claims
25  here is defamation, correct?  And this is part of the

### Page 266

1  defamation claim, that -- that -- that the university,
2  the hospital, Dr. Benzinger and Dr. Evers made false
3  statements about you to other programs, correct,
4  that's a claim in the case?
5  　　　A.　There -- there is a defamation claim in the
6  case.
7  　　　Q.　Okay.  And that's -- and part of it is that
8  people -- that there were false statements made to
9  Jerry Klafta and Pete Nagele?
10  　　　A.　I'd -- I'd have to look at the complaint.
11  I -- I don't recall the details on if that was in the
12  complaint because those were found in discovery at a
13  later date, I believe.
14  　　　But I -- I guess, what I would just say is
15  if I -- if I refer a graduating law student to Sham
16  Zellburg (phonetic) and I call you up and I say,
17  Mr. Sullivan, I got to tell you the real story about,
18  you know, Joey that I'm referring.  Well, you're going
19  to wonder what's going on here if there's letters that
20  could be positive.  What -- what's happening behind
21  the scenes.  And nobody asked -- nobody asked Dr. Cox
22  to do this.
23  　　　(Defendant's Deposition Exhibit A3, Jeffery
24  Weisman's Answers and Objections to Defendant
25  Washington University's Interrogatories.)

### Page 267

1  　　　Q.　What -- what I'm asking you is -- here,
2  let's try to short circuit this.  I'm going to give
3  you what's been marked as Exhibit A3.
4  　　　A.　Okay.  Okay.  All right.  Sorry.  This is
5  getting a little messy here.
6  　　　Q.　That's all right.
7  　　　A.　That's okay.
8  　　　Q.　So I'll represent to you that Exhibit A3
9  are your answers and objections to defendant
10  Washington University's interrogatories.  If you want
11  to turn to the second to last page, which is page 29,
12  I believe that contains your verification with respect
13  to these interrogatories.
14  　　　A.　I did sign one of the interrogatories.
15  What date are these from?
16  　　　Q.　If you look at the last page, March 31st,
17  2021.
18  　　　A.　Okay.
19  　　　Q.　And, I believe, these have -- these have
20  been supplemented quite recently with respect to
21  employment information and things like that, just to
22  state that this is a -- the original version of the --
23  of the answers.  Just to make it clear.
24  　　　A.　Okay.
25  　　　Q.　Okay.  Can you look on page 27.  And do you

### Page 268

1  see the interrogatory numbered 13?
2  　　　A.　Thirteen (13).  With respect to the
3  allegations in the complaint the Benzinger, Washington
4  University and Barnes Jewish Hospital falsely told
5  representatives of other residency programs to which
6  plaintiff had submitted applications that plaintiff's
7  information could not be released without talking to
8  defendant's attorney and falsely stated that he had
9  failed rotations for each alleged statement.
10  　　　Q.　Okay.
11  　　　A.　Identify the representatives of the other
12  residency programs to whom each alleged statement was
13  made.
14  　　　State the date of each alleged statement.
15  　　　Identify the person who made each alleged
16  statement and identify all documents relating to the
17  information sought by this interrogatory.
18  　　　Q.　Okay.  So -- and you see there in your
19  answer:  University of Chicago, Douglas Thompson had a
20  phone call with Peter Nagele.
21  　　　What did Douglas Thompson say in that phone
22  call to Pete Nagele that would have been false or
23  defamatory with respect to you?
24  　　　A.　Well --
25  　　　MS. RUTTER:  Objection.  Calls for legal

67 (Pages 265 to 268)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 269

1  conclusion.
2      A.  Well, no, I'd -- I'd like to answer this
3  question.  Just say that I wasn't a party to this
4  conversation, and we're still investigating, and we're
5  still in the middle of discovery, and we're still
6  doing depositions.
7      Q.  (Mr. Sullivan) So you don't know whether
8  there was any false statement made by Douglas Thompson
9  to Dr. Nagele?
10     A.  Based on my experience with Douglas
11 Thompson talking to other people that have come
12 forward to me, I am relatively certain that something
13 negative occurred.
14     Q.  Okay.  That's -- that's speculation though.
15 What -- what statement that was false did Dr. Thompson
16 make in a phone call with Dr. Nagele in April of 2018?
17 Do you know any right now?
18     A.  We're still investigating it right now.
19     Q.  You don't know right now?
20     A.  We're -- we're still investigating.
21     Q.  Okay.
22     A.  To know something is a certainty, we are
23 investigating right now.
24     Q.  But you're not -- you're not aware at this
25 moment, investigation is ongoing, you're not aware at

### Page 270

1  this moment of any false statement made by
2  Dr. Thompson to Peter Nagele, correct?
3      A.  We're -- we're still investigating and
4  based on his past behaviors, we strongly suspect that
5  there were negatives statements made.
6      Q.  You understand that past behaviors doesn't
7  mean that -- is -- is not relevant as evidence of any
8  other type of conduct, right?
9          MR. ELSTER:  Objection.  Legal conclusion.
10 Argumentative.
11     A.  In my experience, everything that they have
12 done was to bully and harass me and --
13     Q.  (Mr. Sullivan) Okay.  How about Dr. Cox,
14 his conversation with Jerry Klafta and Pete Nagele in
15 Chicago in April of 2018, what was the false statement
16 made about you in that conversation?
17     A.  We're currently still investigating that
18 situation in discovery.
19     Q.  Okay.  How about the Benzinger e-mail to
20 Nagele on June 6th, 2018, setting up a call.  What
21 was -- I think we just looked at that, didn't we?
22     A.  Well --
23     Q.  What was --
24     A.  -- that was A77, correct?
25     Q.  A77.  Was there anything false that was

### Page 271

1  stated in A77, the e-mail from Dr. Benzinger?
2      A.  Let me go through.  I believe that there
3  are many things that are inaccurate in here.  Well,
4  just to go in no particular order.
5      Q.  I'm talking about the -- the e-mail that
6  you're referencing.
7      A.  This -- the e-mail or the attachment?
8      Q.  The e-mail because that's what you
9  reference in your interrogatory answer, right?
10     A.  Well, is it -- the e-mail is Wash U. 549 --
11     Q.  Well, you say, Benzinger e-mail to Nagele
12 on June 6th, 2018, setting up a call.
13     A.  Hold on one second.  Do we have document
14 Wash U. 549 to 551?  This is Wash U. 198 --
15     Q.  I don't -- I -- I -- that's not part of the
16 exhibit, but I want to know if there's anything false
17 in the e-mail that Benzinger says?
18     A.  I -- I would have to -- I -- I apologize
19 but I'd have to see the e-mail to let you know --
20     Q.  I'm talking about A77, the e-mail, is there
21 anything false in there?
22     A.  So okay.  So we're not talking about Wash
23 U. 549 on here.
24     Q.  I'm talking about A77.
25     A.  Okay.  Let me read this.  Well, I think the

### Page 272

1  first issue is the -- he's calling this a letter of
2  recommendation when this is a program director letter.
3  So that's the first issue there.
4      Q.  Is that -- is that false or is that just a
5  matter of -- of nomenclature?  It's not --
6      A.  It's -- well, it's an inaccuracy.  There's
7  a very big difference between a program director
8  letter and ACGME transcript --
9      Q.  It's false and defamatory, him saying it
10 was a recommendation rather than a program director,
11 is that what you're claiming in the case?
12         MR. ELSTER:  Objection.  Legal conclusion.
13 Form.
14     Q.  (Mr. Sullivan) Can you answer my question?
15     A.  Hold on just one second.  You said --
16     Q.  No.  Can you answer my question, please.
17 Then we can move along.
18     A.  Well, you're asking me if there's anything
19 defamatory in this e-mail --
20     Q.  No.  I was asking you based on -- that
21 you're -- you're saying because he called it a
22 recommendation letter instead of a program director
23 letter, that's somehow false and defamed you, hurt
24 your reputation?
25     A.  Well, this -- well, first, this letter does

68 (Pages 269 to 272)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 277

1  classifying anything until we formally go and
2  investigate and figure out what's going on.
3          And -- and again, I apologize. I don't
4  want to sound -- sound over, you know, sound
5  unburdensome --
6      Q.  So you found --
7      A.  -- but I want to do things properly.
8      Q.  But you found out about University of
9  Chicago not accepting you before your wedding,
10 correct?  Your wedding was in July of 2018.
11     A.  The wedding was July 1st, although I would
12 say if anybody asked me June 31st, because June
13 weddings are clearly critical.
14         (Defendant's Deposition Exhibit A80, E-mail
15 6/21/18 from Jeffery Weisman Subject: Weisman Letter
16 Cook County.)
17     Q.  Let me hand you what's marked as Exhibit
18 A80. Can you identify this for me?
19     A.  This is June 21st, Thursday, June 21st,
20 2018, to Martha Szabo.  Weisman letter Cook County.
21 Peter called just to say GME denied adding a seat.
22         I just called someone I know at Cook County
23 General in Chicago since they were advertising a seat
24 in anesthesia.  If possible, could you send Edrape
25 (phonetic) my letter of rec to Ned Nasr, vice chair

### Page 278

1  and program director chair, Division of
2  Neuroanesthesia.
3      Q.  Okay.  So Peter Nagele called you to say
4  that the graduate med -- med -- medical education
5  office at the University of Chicago had denied adding
6  a -- a residency seat; is that correct?
7      A.  Peter told me they had denied adding a
8  seat --
9      Q.  Okay.  Thank you.
10     A.  -- but that didn't mean that I wouldn't be
11 able to go there.
12     Q.  And that occurred before your wedding,
13 right?
14     A.  But it didn't mean that he couldn't take me
15 there as a researcher and then transfer me in or make
16 something happen.  It was just GME denied having a
17 seat.  And it's suspicious --
18     Q.  Okay.  So then --
19     A.  Of course, after the Thomas Cox talking to
20 Jerome Klafta.
21     Q.  Okay.  But it was before -- this was before
22 your wedding?
23     A.  This was before the wedding.
24     Q.  Okay.  Thank you.  Let's go back to your
25 interrogatory answers.  Let's stay on that same answer

### Page 279

1  there.
2      A.  Okay.
3      Q.  Which is page 28.  Yale, Alex Evers sent
4  e-mails and phone calls to Roberta Hines and Jeffery
5  Schwartz in December 2018.  Is that something you're
6  still investigating or can you point me to what false
7  statements Alex Evers would have made to Roberta Hines
8  and Jeffery Schwartz at Yale?
9      A.  I -- I believe we're still investigating.
10 We're --
11     Q.  Okay.
12     A.  We're still -- and -- and again, we're --
13 we're going to do a thorough investigation and talk
14 with everyone and get all the documents that exist.
15     Q.  Okay.  LSU Shreveport.  Dr. Thompson spoke
16 with Dr. Shildpadevi Patil on or around
17 September 11th, 2018.  Is that something that is being
18 investigated or -- or can you identify what false
19 statements were made to LSU Shreveport?
20     A.  We're still investigating right now, but I
21 can identify some of the false statements that
22 Dr. Patil told me.  Dr. Patil told me that, one, they
23 were refusing to send my documents and that was an
24 issue.
25     Q.  Is that a false statement?  I'm -- I'm just

### Page 280

1  talking because this -- this answer --
2      A.  Well, well --
3      Q.  Hold on.  Hold on.  What I'm -- what I'm
4  seeking here is with respect to the defamation claim
5  and that Benzinger, Washington University and
6  Barnes-Jewish Hospital falsely told representatives of
7  other residency programs to which plaintiff had
8  submitted applications, that plaintiff's information
9  could not be released without talking to defendant's
10 attorney and falsely stated he had failed rotations.
11         So what was -- what was said by
12 Dr. Thompson to Dr. Patil in those conversations that
13 would fall into one of those two --
14     A.  And which -- which complaint was that in?
15 Was that Exhibit A or...
16     Q.  No.  I'm looking at -- I'm reading this
17 from A4.
18     A.  I'm sorry.  Which document?
19     Q.  We're looking at -- we're looking.  I'm
20 sorry.  We're looking at A3, the answers to the
21 interrogatories.
22     A.  Okay.
23     Q.  Page twenty -- page 28, your answer.
24 We're -- we're going through what you're claiming is
25 were false statements falling within those categories.

70 (Pages 277 to 280)

DR. JEFFERY WEISMAN  9/13/2022

Page 281

1    A.  All right.  I'm just reading this -- this
2  one that I have says LSU Shreveport, Thompson spoke
3  with --
4    Q.  Right.
5    A.  -- to Patil.  On or around November he
6  spoke with Charles Fox and Alan Kaye.  Is that the
7  same -- maybe I misheard, but I thought that you had
8  just read a longer statement.
9    Q.  Yeah.  I -- I read the interrogatory, which
10  is on the previous page, 13, you read it as well when
11  we started this.
12    A.  Okay.  My apology for losing place.  Could
13  you please re-ask that question again.
14    Q.  Sure.  With respect to Dr. Thompson's
15  conversation with Dr. Patil on or around
16  September 11th, 2018, what did Dr. Thompson falsely
17  tell Dr. Patil about not being able to release your
18  information without talking to an attorney or falsely
19  stating that you had failed rotations?
20    A.  My understanding, and, as again, we're
21  still investigating, my understanding is that from --
22  per Dr. Patil he had stated that I failed rotations.
23    I'm just reading through this because that
24  was a compound question and I want to answer it fully.
25  As far as the question -- your question, I think, was

Page 282

1  compound and asked did -- asked both defamatory and
2  false statements.
3    I believe it was defamatory to say that
4  they couldn't release my -- they couldn't release my
5  transcripts or my training documents and to talk to
6  the lawyers when there had been no lawsuit at that
7  point, I believe, and there was no reason for them to
8  be doing that.
9    Q.  Okay.  So doctor -- so Dr. Thompson --
10  you're saying that Dr. Thompson said to Dr. Patil, we
11  can't release certain information until we talk to the
12  lawyers?
13    A.  That was my understanding of what --
14    Q.  Okay.
15    A.  -- he told Dr. Patil.
16    Q.  What about with respect to the note --
17  November conversation with Dr. Charles Fox and
18  Dr. Alan Kaye?
19    A.  Which conversation in November?
20    Q.  The one that's referenced in your answer,
21  LSU Shreveport.
22    A.  As far as that November conversation
23  goes -- could I see the documents Wash U. 3591 to 594
24  and 598 to 604?  And I just want to make sure I'm
25  thinking of the right conversation.

Page 283

1    Q.  I'm just going off what's your -- in your
2  interrogatory.  I don't have those documents right in
3  front of me.
4    A.  All right.  All right.  I apologize.  I
5  haven't looked at this and I need to refresh my memory
6  on it.  I'm happy to go through and talk but it would
7  be very helpful to look at the documents to put
8  everything into context.
9    Q.  Okay.  Cook County Health, the next one.
10  Richard Benzinger sent an e-mail to Ned Nasr on June
11  26th soliciting a call.
12    A.  Well, again, we're still investigating what
13  was going on with Cook County and Ned Nasr.
14    Q.  Was it -- were -- were you saying that
15  the -- the false statement was Dr. Benzinger offering
16  to have a phone conversation with Dr. Nasr?
17    A.  In this case, there's another document that
18  relates to this.  And, I believe -- I don't believe --
19  let me see if I've been given it.  Hold on.  Let me
20  read this document first just to make sure that I
21  understand what it is.  This is an e-mail from George
22  Benzinger, Tuesday, June 26th, 2018, 2:27 p.m.
23    Q.  Okay.  I don't need you to -- that's
24  Exhibit A79.
25    A.  A79.

Page 284

1    Q.  And I'll represent to you that it's a --
2  it's an e-mail to nnasr@cookcountyhhs.org, Jeff
3  Weisman recommendation.  And attached to it is a
4  letter dated June 26th, 2018, signed by Richard
5  Benzinger, which is in form and substance the same as
6  the letter attached to A77.
7    A.  Okay.  I just want to make sure because --
8  I just want to make sure these are identical because
9  the dates are different and the names are different.
10    Okay.  My -- all right.  It looks like
11  there are some changes to the text here.  In the one
12  to Peter Nagele, in the first paragraph on there --
13  unless I'm reading this -- he says:  The second year
14  resident Dr. Weisman has continued to work hard to
15  improve both his judgement and his knowledge base.
16  His assessments from clinical supervising --
17    THE COURT REPORTER:  One second.  You need
18  to speak up and...
19    THE WITNESS:  My apologies.
20    A.  His assessments from clin -- clinical
21  supervising faculty has been mixed.  Some felt that he
22  continued to lag behind his peers and many others felt
23  his -- that his performance was appropriate for his
24  level.
25    The one from the sixth says:  In hindsight,

71 (Pages 281 to 284)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 285

1  I think that the accelerated clinical schedule or
2  research track was a poor fit.  For his clinical
3  background, I believe that his skills are likely to
4  continue to improve with further training.
5       And this one says:  Overall his clinical
6  performance has steadily improved over his CA-1 year,
7  and I believe that his skills are likely to improve
8  with further training.
9       And so there are some differences.  I've
10  skimmed both.  So I -- you know, I'd want to
11  line-by-line it as appropriate but...
12       Q.  Do you know of any false statement in a
13  telephone call that Dr. Benzinger made to Dr. Nasr?
14       A.  I received an e-mail from Alan Kaye, and I
15  called -- or he talked with me about the fact that he
16  had a meeting with Ned Nasr at a conference and asked
17  him why he wouldn't take me.  And Ned Nasr told Alan
18  Kaye that he heard negative things.
19       Q.  What negative -- what negative things?
20  What did -- what did Nasr tell Kaye?  What negative
21  things did Benzinger say?
22       A.  I'm trying to think about the conversation
23  I had with -- with Alan Kaye.  There's an e-mail where
24  Alan Kaye states that after talking -- there's an
25  e-mail where Alan Kaye states that Ned Nasr told me

### Page 286

1  that after talking with Richard Benzinger he would
2  take you but with six months of, you know, six months
3  of time not credited because of things he heard about
4  you, I believe.  I'd -- I'd have to see the e-mail to
5  my full memory.  And then I spoke with him and, I
6  believe, that what Dr. Kaye had told me was that Ned
7  Nasr had been told just the standard types of things
8  that we're hearing.
9       Q.  What's -- can you be specific?  I mean,
10  what statement did Dr. Benzinger state to Dr. Nasr
11  that was false --
12       A.  My --
13       Q.  -- in this case?
14       A.  You know, again, I'd want to think on this
15  because it's been awhile since I had this
16  conversation.  But my understanding was that, you
17  know, that -- that I was told that I failed rotations,
18  that they couldn't necessarily give all my documents,
19  my ACGME transcript was never sent to Ned Nasr.  So I
20  was trying to transfer to another training program
21  with no transcript.
22       Q.  Did you ever request the transcript?
23       A.  I -- I requested my transcript and all
24  documents be sent.  I --
25       Q.  Do you know --

### Page 287

1       A.  I told them --
2       Q.  Do you know if Cook County requested a
3  specific transcript or whether they thought that the
4  program director letter was sufficient?
5       MS. RUTTER:  Calls for speculation.
6  Objection.
7       A.  Yeah.  I -- I would have to look at this --
8  I would have to look at the documents again.  I wasn't
9  there.  But I -- so we would have to investigate to
10  see if they did or, you know, to find out that
11  information.  But --
12       Q.  (Mr. Sullivan) Can we look back at Exhibit
13  A3.
14       A.  Okay.
15       Q.  And this was the answer on page 28 that we
16  were looking at, the answer to interrogatory --
17       A.  Twenty-eight (28)?
18       Q.  -- interrogatory 13.  28.
19       A.  Okay.  One second.
20       Q.  Okay.  So we've talked about -- we've
21  talked about Yale.  We've talked about the University
22  of Chicago, LSU Shreveport, Cook County.  Last one is
23  Cleveland Clinic.
24       It says:  Alex Evers exchanged e-mails with
25  Maged Argalious on August 3rd, 2018, indicating an

### Page 288

1  oral conversation.
2       Are you aware of any false statements that
3  Alex Evers made to Dr. Argalious in any type of
4  conversation?
5       A.  In that case, I'm actually aware of some of
6  the conversation that occurred.  I asked my very good,
7  you know, family friends, Louis and Vickie Hofstein
8  (phonetic) to call Troianos to find out what occurred.
9  And they called him and asked what had roughly
10  occurred.  And they called me back.  I guess they said
11  they had called him.  I -- I'd have to look at the --
12  I'd have to look at either text messages or e-mails to
13  see the exact dates and times but around the time they
14  stopped talking to me.  They told me that they had
15  talked to Troianos, the chair, I believe, when he was
16  flying back from a conference or some sort.  He was at
17  an airport and he spoke with them, and he explained
18  that they had been told -- they had been told very
19  negative things about me.  That he told them that he
20  had been told negative things about me, that he was
21  unable to take me, and that I would probably never
22  work in medicine.  And --
23       Q.  And this was a conversation with Troianos
24  or with Argalious?
25       A.  I believe they had that conver -- I'd have

72 (Pages 285 to 288)

DR. JEFFERY WEISMAN  9/13/2022

Page 289

1  to go through my notes again to refresh my memory.  I
2  apologize.  I -- I don't know Troianos or Argalious.
3  One's the chair of Cleveland Clinic Anesthesia.  One
4  is the program director.  So I'd -- I'd have to
5  refresh.  I -- I believed that Argalious is the
6  program director, but I was able to get information on
7  those exchanges and we are -- we are investigating.
8      Q.  And what did -- what did Alex Evers say to
9  either Argalious or Troianos about you that was false
10 based on your report back from the Hofsteins?
11     A.  So again, I'd want to refresh my memory and
12 think on it.  But my understanding is that there seems
13 to be a trend of this resident failed rotations.
14 There seemed to be trend of this resident is
15 dangerous.  There seemed to be a trend of don't hire
16 this person.  So again, I'd want to think on the
17 specifics of it, but that seemed to be what was being
18 told to me.
19         And I -- I was -- I was pretty concerned
20 because I was at my parents' house.  And, like, I
21 was -- I believe I was on my mother's phone and we
22 were outside when she was saying this.  And there -- I
23 was literally told you're probably never going to work
24 in medicine again.
25         So something that would have a chair that

Page 290

1  was a friend of one my parents' best friends that had
2  known me growing up, that was my Godfather is
3  literally being told I'm probably not going to ever be
4  able to work in medicine because of what's being told
5  to these individuals.
6      (Defendant's Deposition Exhibit A83, E-mail
7  8/4/18 from Ned Nasr Re: Jeff Weisman New Contact
8  Information and Question.)
9      Q.  Exhibit A83.  I'll represent to you that
10 this is an e-mail exchange produced by your lawyers in
11 this case, JW-57849.  Can you identify this for me?
12     A.  All right.  This is an e-mail that Ned Nasr
13 sent to me August 4th of 2018.  And I'm reading it
14 right now.  All right.  And that was a follow-up to my
15 e-mail where I just notified him that in August 3rd,
16 that I wanted to know about my consideration and I was
17 very frantically trying to get ahold of him for my
18 consideration since my wife and I cancelled our
19 honeymoon because he had said they wanted to take me.
20 So we didn't go anywhere because we thought I was
21 getting a letter to report to start working with them
22 ASAP.  So I'm looking at this -- so I'm looking at the
23 document right now.  So please let me know what the
24 question is.
25     Q.  I just wanted you to identify it.  Does

Page 291

1  this accur -- accurately reflect your e-mail with
2  Dr. Nasr on August 3rd and August 4th, 2018?
3      A.  This is the text that's in the document but
4  I -- I personally think there's some inaccuracies
5  here.
6      Q.  I was just asking whether you wrote that
7  and you received the e-mail from Dr. Nasr where he
8  replied to your e-mail?
9      A.  Okay.  Is the -- the question is e-mail
10 exchange.  This is an e-mail sent but I think there's
11 fake --
12     Q.  Okay.  Thank you.
13     A.  -- or bad information in here.
14     Q.  Did you enroll in a -- in a class at the
15 University College at Washington University in early
16 August of 2018?
17     A.  Yes, I believe I did.
18     Q.  Okay.  Why did you do that?
19     A.  I believe that was an adult learning class
20 that I was able to take.
21     MR. ELSTER:  What did you say?
22     A.  I believe that was -- I'm trying to think
23 the course it was, that was a long time ago.
24     Q.  (Mr. Sullivan)  Was it pharmacology for
25 clinical research, that ring a bell?

Page 292

1      A.  I -- I would have to see the documents but,
2  I believe, I have enrolled in a -- I believe I
3  enrolled in a course.
4      Q.  Were you trying to get access to your
5  Washington University e-mail?
6      A.  Well, I was trying to stay enrolled and be
7  a part of the campus community because I literally
8  lived in the Central West End, blocks from campus, and
9  I wanted to be able to be on campus and participate
10 in --
11     Q.  And you wanted your -- but -- and you also
12 wanted access to your e-mail account, right?
13     A.  I did want to make sure I was able to
14 maintain my Washington University e-mail account for
15 research and other -- for research and purposes.
16     (Defendant's Deposition Exhibit A85, Letter
17 8/13/18 to Dr. Weisman from J. Mark Meacham Mechanical
18 Engineering & Materials Science.)
19     Q.  And then did Dr. Meacham give you a
20 visiting research associate position in the Department
21 of Mechanical Engineering?
22     A.  All right.  I have the document here.
23     Q.  I've handed you what's been marked Exhibit
24 A85.
25     A.  Let me read that real fast.  That was from

73 (Pages 289 to 292)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 301

1  the --
2      Q.  Okay.
3      A.  -- largest issue.
4      Q.  What's -- you're seeking damages for the --
5  for the equipment and other property of SBI's that you
6  allege was converted by the university, the hospital,
7  Dr. Evers and Dr. Benzinger, correct?
8      A.  I believe we are.
9      Q.  Okay.  Do you -- what is the value of that
10  equipment that you're claiming was converted?
11      MR. ELSTER:  Objection.  Form.  Vague as to
12  which equipment.
13      A.  Well, is --
14      Q.  (Mr. Sullivan) If you want to look at
15  Exhibit A -- Exhibit A3, which is your interrogatory
16  answers, we can look at that equipment right there.
17  I'll point you to the right one.
18      A.  I'm sorry.  Yeah.  If you -- if you could
19  help.
20      Q.  Yeah.  I'm --
21      A.  Like everything, this is a very verbose...
22      Q.  We can agree to that.  I think it's 12,
23  yeah.
24      A.  Page 12.
25      Q.  Page 27, interrogatory number 12 and your

### Page 302

1  answer.
2      A.  Okay.  Twenty-seven (27).  It's coming
3  right up.  Okay.  Page 27, 12.  Okay.  I've got that
4  pulled up right now.  And what was the question again?
5      Q.  So my question is:  You identify certain
6  equipment and other materials in the answer to 12.
7  What is the -- what is the value of the items that
8  you're -- that you've listed there?
9      A.  So the lab items that I had purchased alone
10  I had put 80 to a hundred thousand dollars of my own
11  funds into getting equipment.  David Sinow had put
12  funds into purchasing, I believe, equipment.  And we
13  had won some grants and some entrepreneurship and
14  economic and development grants in Louisiana that had
15  been put into equipment and supplies.
16      Part of the equipment here, for example,
17  the Extrisopm bot was custom.  We met the owner of the
18  company that had done a custom development of it.  I
19  believe the Cyberware 3D scanners that we got from New
20  Zealand were -- were technology that we were able to
21  repurpose that was --
22      Q.  Those were, like, a thousand dollars,
23  $1,500?
24      A.  So we -- I don't remember the exact cost
25  that we spent on them as well as the -- as well as the

### Page 303

1  re -- as well as flying them in from New Zealand, but
2  that 3D scanner -- those 3D scanners were specialized
3  equipment that I scoured the globe to find something
4  for a solution for --
5      Q.  I'm just talking about what the val -- what
6  did you pay for them?
7      A.  I -- I don't recall exactly what we paid.
8  I know there was a shipping cost and an initial cost,
9  but I know that they served the purpose of providing
10  us from needing to buy 50 to a hundred thousand
11  dollars worth of scanning equipment in the US.
12      Q.  How much did the Makerbot 5th generation 3D
13  printer cost, do you recall?
14      A.  I don't recall what that was.  I'd need to
15  see a receipt.  I know that we've got some of those
16  floating around.
17      (Defendant's Deposition Exhibit A30, E-mail
18  4/14/16 from Jeffery Weisman Subject:  IMPORTANT-Lab
19  and Project Finances.)
20      Q.  And can you identify Exhibit A30 for me?
21  Does this appear to be an e-mail that you sent to
22  Dr. David Mills with a blind copy to Patrick Mills on
23  April 14th, 2016?
24      A.  This is an e-mail to Dr. Mills from me,
25  April 14th, 2016.

### Page 304

1      Q.  And in it you state:  You've been
2  supporting Uday and Karthik off the $20,000 innovation
3  fund grant the past 18 months and paying their
4  housing, tuition and living expenses.
5      A.  Let me read this e-mail.  Okay.  So I'm
6  looking at this document.  This is a document that I
7  sent to David Mills.  And this is a great example of
8  your first question as being of your deposition of if
9  a doc -- if something is written, does that mean it's
10  accurate?  And in this case, it means it's not
11  accurate.  I needed to get Uday and Karthik out of
12  Louisiana Tech.  I needed Mills to go let them defend
13  and graduate or he would have kept them down there as
14  Ph.D. students to get publications and research out.
15  I was pushing the narrative.  He also -- Mills also
16  took one of my grants and used it and wanted more from
17  us.  At this point in the game, we had David Sinow on
18  Board.  We had our own venture capitalist.  Funding
19  was no issue as far as anything going forward as of
20  April 2016.  I needed Mills to assume that there was
21  no reason to keep us.
22      Q.  So -- so you made false statements in able
23  to induce David Mills to let you leave and to let Uday
24  and Karthik defend their thesis and leave with you?
25      A.  Well --

76 (Pages 301 to 304)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 309

1  A91.  I apologize.
2      Q.  (Mr. Sullivan) I'm -- I'm talking about
3  specific items of equipment here listed with a -- with
4  a value next to them.  Okay?
5      A.  The, I believe, to the best of my
6  knowledge, all of these items and supplies went to the
7  St. Louis College of Pharmacy.
8      Q.  They were SBI's.  They went to the College
9  of Pharmacy lab, and then they were seamlessly -- what
10  was it -- integrated into the Department of Radiology
11  3D printing lab?
12      A.  To -- to quote Thompson and Benzinger, he
13  said:  And he integrated it seamlessly as a core
14  facility of the Department of Radiology.
15          (Defendant's Deposition Exhibit A48, E-mail
16  2/4/17 from David Ballard Subject: 3D Printing Lab MIR
17  Acquisition Document.)
18      Q.  Okay.  Hand you what's been marked Exhibit
19  48.
20      A.  Okay.  Let me read this.  And this is an
21  e-mail from David Ballard, February 3rd, 2017, to Pam
22  Woodard, cc-ing me, Jeffery Weisman, Uday and Karthik,
23  3D printing lab MIR acquisition document.
24          So, I guess, they're saying seamless
25  integration.  David Ballard is saying acquisition.

### Page 310

1      Q.  Okay.
2      A.  Dear Pam, I hope this finds you well.  I'm
3  just reading.  I've attached a working document and
4  summarized the goals, assists, ongoing projects,
5  requested space/facilities, and other variables in
6  this document.
7          As you review at your leisure, please let
8  me know what you think.  We're happy to revise.
9          Thank you for everything and have a great
10  time in DC.
11      Q.  And on the -- the next page, which is the
12  proposal.  Do you see the goal there:  Strategic
13  Biomedical, Inc. Seeks to be acquired by Mallinckrodt
14  Institute of Radiology?
15      A.  I'm reading this right now.  I'm trying to
16  refresh myself right now by reading this.  I -- this
17  appears to be a document that David Ballard generated
18  using a good portion of the Strategic Biomedical
19  business plan that he said, it's been modified.  I
20  don't recall if I fully read this document.  And if I
21  did -- did read it, I don't recall full details.
22      Q.  Okay.  Can -- can I just ask you, there's a
23  list of equipment here on what's page 3 of the
24  proposal, which is JW-52347.
25      A.  Okay.  I'm looking at it right now.

### Page 311

1      Q.  And does that accurately reflect the
2  equipment that was housed in the current STLCOP
3  location and would be transferred to a new lab at MRI?
4      A.  I'm just reading this.  A Hyrel system
5  9,500, Cyberware scanners, two for 35,000 at 70,000.
6  I -- I believe this includes information that was
7  sent, but I don't -- but, I believe, there's also
8  other equipment and supplies that were sent over that
9  were not listed.  So, I believe, there's some
10  omissions of items that went over.
11      Q.  Okay.  And, you know, but you have no
12  reason to dispute that as of February 3rd, 2017, this
13  would reflect the equipment that was in the College of
14  Pharmacy location?
15      A.  Well, I -- I would just make sure to
16  dispute and say that this -- this is included but
17  there were other items.  So this would include a
18  portion of it but there were -- there -- to the best
19  memory, there are other items there.
20          I'd need to compare exhibit -- whatever the
21  last exhibit was that we -- A30, I believe, I'd want
22  to -- I'd have to compare all items.
23          I -- and I also don't recall and I need to
24  look and refresh myself, if there -- if there was a
25  list for the move.  I thought we'd done a list at --

### Page 312

1  at some point.  I don't know if it was an electronic
2  or paper list, but I thought there was a list we had
3  done for the move from LS -- from Louisiana to
4  St. Louis where we had listed everything.
5      Q.  But would you stand behind your -- the --
6  the items listed in A3 as being the items that you're
7  claiming that you're alleging in this case that were
8  converted by defendants?
9      A.  These would include items that were
10  converted.
11      Q.  Okay.
12      A.  But also, I -- I haven't checked that
13  receipts match and other things like that.
14      Q.  Okay.  And you're claiming here that the
15  Cyberware scanners were worth -- or SBI or the
16  document reflects that the Cyberware scanners were
17  worth $70,000?
18      A.  I -- I don't recall who created the
19  document.
20      Q.  Okay.
21      A.  I was -- I was claiming they -- they were
22  expensive and they served -- we were very lucky to
23  find them and be -- able acquire them because to --
24  to buy these types of items new, these types of
25  scanners were very expensive at that point in time.

78 (Pages 309 to 312)

JEFFERY WEISMAN, JD, M.D., VOLUME II  9/14/2022

### Page 344

```
 1        IN THE UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF MISSOURI
 2                EASTERN DIVISION
 3   JEFFERY WEISMAN AND
     STRATEGIC BIOMEDICAL, INC.,
 4
       Plaintiffs,
 5                      Cause No. 4:19-CV-00075-JAR
 6   vs.
 7   BARNES JEWISH-HOSPITAL, BJC
     HEALTHCARE, WASHINGTON
 8   UNIVERSITY, DR. ALEX EVERS,
     DR. RICHARD BENZINGER, AND
 9   DR. THOMAS COX,
10     Defendants.
11              VOLUME II
     VIDEOTAPED DEPOSITION OF JEFFERY WEISMAN, JD, M.D.
12       Taken on behalf of the Defendants
              September 14, 2022
13
            Jo Ann Dickson, CCR 1085
14
15   (Whereupon, the deposition commenced at 9:06 a.m.)
16
17
18
19
20
21
22
23
24
25
```

### Page 346

```
 1        IN THE UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF MISSOURI
 2                EASTERN DIVISION
 3
     JEFFERY WEISMAN AND
 4   STRATEGIC BIOMEDICAL, INC.,
 5     Plaintiffs,
 6                      Cause No. 4:19-CV-00075-JAR
 7   vs.
 8   BARNES JEWISH-HOSPITAL, BJC
     HEALTHCARE, WASHINGTON
 9   UNIVERSITY, DR. ALEX EVERS,
     DR. RICHARD BENZINGER, AND
10   DR. THOMAS COX,
11     Defendants.
12
13          CONTINUED VIDEOTAPED DEPOSITION OF WITNESS,
14   JEFFERY WEISMAN, JD, M.D., produced, sworn, and examined on
15   the 14th day of September, 2022, between the hours of 9:06
16   a.m. and 3.25 p.m. of that day, at 191 West Port Plaza
17   Drive, St. Louis, Missouri, before JO ANN DICKSON,
18   Certified Court Reporter within and for the State of
19   Missouri, in a certain cause now pending before the United
20   States District Court, Eastern District of Missouri,
21   Eastern Division, wherein Jeffery Weisman, et al. are the
22   Plaintiffs, and Barnes Jewish-Hospital, et al. are the
23   Defendants.
24
25
```

### Page 345

```
 1   QUESTIONS BY:                           PAGE NO.
 2   Cross-Examination by Mr. Nolan              349
     Cross-Examination by Ms. Rutter            590
 3
 4           INDEX OF EXHIBITS
 5   DEFENDANT'S                            PAGE MKD.
     NO.
 6   Exhibit  B1 Interrogatories                389
     Exhibit B2 Supplemental                    402
 7   interrogatories
     Exhibit B3 JPEG images                     451
 8   Exhibit B4 Brief                           504
     Exhibit B5 Memorandum of appointment           515
 9   Exhibit B6 Acceptance of memorandum            524
     of appointment
10   Exhibit B7 Email                       531
     Exhibit B8 Email from NRMP                     537
11   Exhibit B9 Email from NRMP                     538
     Exhibit B10 NRMP application                   541
12
13       (Exhibits were attached to the transcript.)
14
15
16
17
18
19
20
21
22
23
24
25
```

### Page 347

```
 1            A P P E A R A N C E S
 2   For the Plaintiffs:
     Henry P. Elster, Esquire
 3   Elster Law Office, LLC
     225 South Meramec Avenue, Suite 325
 4   St. Louis, Missouri  63105
     (314) 727-0868
 5   Henry@elsterlawfirm.com
 6
     For the Plaintiffs:
 7
     Rachel Rutter, Esquire
 8   Sherman Marek, Esquire
     Marek Weisman, LLC
 9   55 East Monroe Street, Suite 3800
     Chicago, Illinois  60603
10   Rrutter@marekweisman.com
     Smarek@marekweisman.com
11
     For Defendants Washington University, Evers,
12               Benzinger & Cox:
13   Kevin Anthony Sullivan, Esquire
     Shands, Elbert, Gianoulakis & Gillum, LLP
14   8235 Forsyth Boulevard, Suite 700
     St. Louis, Missouri  63105
15   (314) 241-3963
     Ksullivan@shandselbert.com
16
     For Defendants Barnes-Jewish Hospital
17            and BJC Healthcare:
18   Michael P. Nolan, Esquire
     Husch Blackwell, LLP
19   190 Carondelet Plaza, Suite 600
     St. Louis, Missouri  63105
20   (314) 480-1500
     Michael.nolan@huschblackwell.com
21
22
23
24
25
```

1 (Pages 344 to 347)

JEFFERY WEISMAN, JD, M.D., VOLUME II  9/14/2022

## Page 348

```
 1              A P P E A R A N C E S
 2    The Court Reporter:
 3    Ms. Jo Ann Dickson
      Lexitas Legal
 4    711 North Eleventh Street
      St. Louis, Missouri  63101
 5    (314) 644-2191
 6    The Videographer:
 7    John Niehaus
      Lexitas Legal
 8    711 North Eleventh Street
      St. Louis, Missouri  63101
 9    (314) 644-2191
10    ALSO PRESENT:
11    CHRISTINE RAMATOWSKI
      LISA WOOD
12    MARISSA ISRAEL
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 349

```
 1         IT IS HEREBY STIPULATED AND AGREED, by and
 2    between counsel for Plaintiffs and counsel for Defendants,
 3    that the continued videotaped deposition of JEFFERY
 4    WEISMAN, JD, M.D. may be taken in shorthand by Jo Ann
 5    Dickson, a certified shorthand reporter, and afterwards
 6    transcribed into typewriting; and the signature of the
 7    witness is expressly reserved.
 8              * * * * *
 9         THE VIDEOGRAPHER:  We're on the record.
10    Today's date is September 14th, 2022 and the time is
11    approximately 9:06 a.m.  This is the continued video
12    recorded deposition of Jeffery Weisman, M.D. in the matter
13    of Jeffery Weisman, et al. versus Barnes-Jewish Hospital,
14    et al, Case Number 4:19-CV-00075-JAR, in the United States
15    District Court of the Eastern District of Missouri, Eastern
16    Division.
17         This deposition is being held at Sheraton
18    Westport Hotel in Saint Louis, Missouri.  The reporter's
19    name is Jo Ann Dickson.  My name is John Niehaus.  I am the
20    legal videographer.  We are with Lexitas Legal.
21         Would you please swear in the deponent.
22              JEFFERY WEISMAN,
23    of lawful age, being produced, sworn and examined on
24    behalf of the Defendants, deposes and says:
25              CROSS-EXAMINATION
```

## Page 350

```
 1    BY MR. NOLAN:
 2         Q   Would you please state your name.
 3         A   Jeffery Weisman.
 4         Q   Mr. Weisman, we met yesterday for the first
 5    time.  You understand I'm an attorney representing BJC
 6    Healthcare and Barnes-Jewish Hospital in the lawsuit that
 7    you filed against them and other defendants, correct?
 8         A   Correct.
 9         Q   Okay.  You're an attorney, correct?
10         A   I am an attorney.
11         Q   You went through law school?
12         A   Yes, I did.
13         Q   Graduated?
14         A   I graduated law school.
15         Q   And you practice as an attorney, don't you?
16         A   Well, at the moment I do some medical/legal
17    consulting work.
18         Q   So you understand that this deposition is my
19    opportunity to ask you about the facts upon which you base
20    your claims, right?
21         A   I understand that's the purpose of a
22    deposition is to ask and answer questions.
23         Q   Right.  It's my only opportunity to ask you
24    directly about the facts upon which you base your claims,
25    right?
```

## Page 351

```
 1         MR. MAREK:  Objection, leading.
 2         MR. RUTTER:  Objection, calls for -- calls for
 3    a legal conclusion.
 4         MR. MAREK:  Yeah, interrogatories too.
 5         But you can answer subject to that.
 6         THE WITNESS:  Okay.  You know, you'll have to
 7    talk to my attorneys on the times and dates to be able to
 8    talk with me and things like.
 9    BY MR. NOLAN:
10         Q   Right.  But you filed the lawsuit, right?
11    It's filed in your name, correct?
12         A   My -- I'm sorry, can -- what -- what is
13    the question?
14         Q   You're a plaintiff in a lawsuit, yes?
15         A   Yes, I am a plaintiff in a lawsuit.
16         Q   As an attorney you know what that involves,
17    right?
18         MR. RUTTER:  Objection, calls for a legal
19    conclusion.
20         THE WITNESS:  Can -- can -- can you please
21    specify what you're looking at?  It's a very open-ended
22    question.
23    BY MR. NOLAN:
24         Q   Well, you understand that when you file a
25    lawsuit like this, the other side's attorneys get to ask
```

2 (Pages 348 to 351)

### JEFFERY WEISMAN, JD, M.D., VOLUME II 9/14/2022

**Page 480**

1  over my life, my destiny, my ability to be a doctor.
2       So I wanted to make sure that -- that if
3  there -- if there was a problem or if my career was
4  attacked, that I would have some evidence about this.
5       **Q   So Dr. Evers asked you for some corporate**
6  **documents and you were scared?**
7       A   Yes, I was very scared that my supervisor said
8  he wanted the lease agreements with the Saint Louis College
9  of Pharmacy as well as corporate documents from a private
10 corporation so that he can -- I was very nervous,
11 especially when the general counsel of the Saint Louis
12 College of Pharmacy said that he wanted them to gain an
13 upper hand in the lease negotiations and other negotiations
14 with them and to please not give them.
15      It put me, a lowly intern, between the
16 president and general counsel of the Saint Louis College of
17 Pharmacy and the chair of anesthesia at Washington
18 University Saint Louis.  So I would think most people would
19 be very nervous and scared with that situation.
20      **Q   So you decided to secretly record your**
21 **conversation with Dr. Evers?**
22      MR. MAREK:  Objection, asked and answered at
23 length yesterday in addition to today.
24      THE WITNESS:  I -- I recorded my conversation
25 with Alex Evers.

**Page 481**

1  BY MR. NOLAN:
2       **Q   Because you were scared?**
3       A   That was -- that was one of the reasons.  I
4  was scared of -- of him and his potential impact on my
5  career.
6       **Q   Did Dr. Evers demand the documents or did he**
7  **ask for them?**
8       A   Dr. Evers, in my -- in my opinion and my
9  experience, Dr. Evers both demanded and asked for those
10 documents.  His ask -- his ask was a demand.  He wanted
11 those documents and he wanted that information.
12      **Q   His ask was a demand?**
13      A   He demanded --
14      MR. RUTTER:  Hang on, Jeff.  There's no
15 question pending.
16 BY MR. NOLAN:
17      **Q   Did he say hey, could I have those documents,**
18 **or did he say you better give me those documents?**
19      A   I believe he told me that he needed those
20 documents.  It wasn't -- this was not -- this was not
21 somebody saying hey, please can I borrow this.  This was I
22 need to see these documents.  To me that's a demand.
23      **Q   I need to see these documents, and that scared**
24 **you?**
25      MR. ELSTER:  Objection, asked and answered.

**Page 482**

1       THE WITNESS:  Yes, that -- that -- that scared
2  me.  Again, I had one of the most powerful people in the
3  anesthesia world and at Wash U/Barnes asking me for
4  corporate documents so he can secretly gain an advantage
5  negotiation over the Saint Louis College of Pharmacy or do
6  whatever he was planning to do, yes, I think that would
7  really scare a lot of people and make them very nervous
8  about what they're supposed to answer.
9       Because, again, if the Saint Louis College of
10 Pharmacy please, give him a copy of it, but I had the
11 general counsel and president of -- of a, you know, of a
12 college university telling me do not give these documents
13 to him.  That put me in the middle of a very tenuous
14 situation as a lowly in term.  It was -- and in all
15 sincerity, I was terrified of this.
16 BY MR. NOLAN:
17      **Q   Did Dr. Evers tell you why he wanted the**
18 **documents?**
19      A   I believe when I spoke to Dr. Evers -- and
20 I -- I had met with him on this and there were some phone
21 calls and some emails.  I believe he said that he just
22 needed -- so I believe at first he said he just wanted to
23 see them.  And I believe then he said that he might need to
24 see them for a conflict check.
25      He seemed to give a variety of reasons of

**Page 483**

1  wanting to see them, wanting a conflict check.  My reaction
2  was to try to politely refer him to David Sinow, the
3  president of the company.
4       (Reporter clarification.)
5       THE WITNESS:  David Sinow, S-I-N-O-W.
6  BY MR. NOLAN:
7       **Q   Okay.  So anywhere in there did he tell you**
8  **that he was trying to gain -- gain some secret advantage in**
9  **his negotiations with the Saint Louis College of Pharmacy?**
10      A   I don't believe he framed it like that, but
11 the Saint Louis College of Pharmacy told me --
12      **Q   That's what you told me a minute ago in your**
13 **answer, right?**
14      A   Well, my -- my answer was that he wanted -- he
15 wanted the documents.
16      **Q   But then you speculated as to his reasons and**
17 **said because he wanted to gain some secret advantage,**
18 **right?**
19      A   Well, it was very clear from talking to him
20 that what he really cared about was the lease agreement.
21 When I spoke to him on this, what he really wanted was he
22 wanted all the corporate documents, and he particularly
23 wanted the lease agreement because he wanted it and it
24 would give him an unfair advantage in the negotiations.  It
25 was very clear what he was doing.

35 (Pages 480 to 483)

## JEFFERY WEISMAN, JD, M.D., VOLUME II  9/14/2022

### Page 484

1  Q   But he never told you that, and yet you're
2  saying that under oath like it's true, and you're just
3  lying about it, aren't you?
4      MR. ELSTER:  Objection, form, argumentative,
5  badgering the witness.
6      THE WITNESS:  I am not lying.  It, in fact, is
7  true.  He wanted to get a copy of my lease agreement and
8  contract with the Saint Louis College of Pharmacy to gain
9  an advantage in those negotiations.  That is fact.  That is
10  why he was doing that.
11  BY MR. NOLAN:
12      Q   Did he tell you that?  Did he tell you that, I
13  want to gain an advantage in my negotiations?
14      A   The way he asked the question, his body
15  language, the way he kept following up with it
16  persistently, it was very clear why he wanted those
17  documents.  There is no question that was why he wanted
18  those documents.
19      Q   Can you get up and show us how his body moved
20  that would convey his purpose in asking for the lease
21  documents?  Can you show us?
22      MR. MAREK:  Objection.  That's harassing.
23      MR. ELSTER:  Objection.  That's not a
24  question.  That's not even discoverable --
25

### Page 485

1  BY MR. NOLAN:
2      Q   I'd liked you to show us how he moved his
3  body --
4      MR. RUTTER:  No, he's not doing that,
5  absolutely not.
6      MR. NOLAN:  -- such that you could understand
7  what he was thinking.
8      THE WITNESS:  As I said before, from the
9  number of communications, the type of communications,
10  everything around that circumstance, eh was very clear he
11  wanted those corporate documents.  He wanted the lease
12  agreement.
13      Everybody told me not to give him the lease
14  agreement because he was asking about it and he wanted it.
15  And I believe he was -- and actually, to even further
16  answer your question, and I'd need to go through the
17  documents because I want to be accurate, but I believe
18  there's emails where he's asking the Saint Louis College of
19  Pharmacy president, I believe there's emails where he's
20  asking their leadership for copies of those contracts, and
21  they direct him to go contact me about it.
22      So if he's emailing the president and general
23  counsel of the Saint Louis College of Pharmacy asking for
24  contracts and they say go talk to Jeff, and then he
25  immediately contacts me I need to go get all your corporate

### Page 486

1  documents, well, he just asked the president and general
2  counsel of the Saint Louis College of Pharmacy for it.
3      There's no question that that was exactly what
4  he wanted.  He wanted contracts to have a competitive
5  advantage, and he did so unethically and abusing his use
6  power to do so.
7      Q   How many of these secret recordings did you
8  make while you were in the program?
9      MR. RUTTER:  Objection, asked and answered.
10  Discussed at length yesterday.  Cumulative.
11      THE WITNESS:  You know, I don't recall the
12  exact number.  I gave all the recordings that I had to --
13  you know, I gave all the recordings that I had over, you
14  know.
15  BY MR. NOLAN:
16      Q   This first recording that you made of
17  Dr. Evers, roughly how far into your term at the program
18  did that start?
19      A   Could you please let me know the date of it?
20      Q   What's that?
21      A   Could you please let me know the date of the
22  first recording.  I don't have them in front of me.
23      Q   No, I don't have it.  I'm just asking for you,
24  what's your best recollection of how far into the program
25  you were when you first started making these secret

### Page 487

1  recordings.
2      A   I believe I was probably in my second four
3  week block.  I would have to check a date to be accurate,
4  but my recollection right now, without looking at anything,
5  is I was in my second four week block.
6      Q   So within a couple of weeks after starting the
7  program, you were already secretly recording conversations
8  with people?
9      A   I was recording conversations because they
10  were behaving in a manner that made me scared for my --
11  for -- I was scared because the type of harassment and
12  bullying and what was going on, and I felt the need to have
13  an independent record because these were powerful
14  individuals.  They me in a bad situation.  I felt the need
15  to protect myself.
16      Q   Did you feel like Dr. Evers was harassing and
17  bullying you when he said those documents?
18      A   Yes.  I felt that he was using his power and
19  influence because he was my boss' boss' boss' boss.  I
20  mean, you know, Groener, Benzinger, Cox, him, that he
21  wanted them.  That -- that's like a CEO of a company asking
22  for something from a low level worker.
23      Q   And was that the first time you felt harassed
24  and bullied when Dr. Evers asked for those documents?
25      A   From him, that was probably, I'm thinking if

36 (Pages 484 to 487)

## JEFFERY WEISMAN, JD, M.D., VOLUME II  9/14/2022

### Page 488

1  there were any other interactions earlier, but I think that
2  was the first time -- I think that was probably the first
3  time from Dr. Evers Alex that I felt particularly scared
4  and nervous around that time period.
5      Q   Were you scared for your physical well-being?
6      A   Well, I was scared -- at that point I was
7  nervous and scared for my career. I was worried that
8  something like what happened now, what happened and we're
9  dealing with today, that this was going to be the end
10  result of him going after me and blacklisting me.
11      Or let me rephrase. I was scared at that
12  point in time that something like this was going to happen
13  and that he would go after me for not giving him what he
14  wanted and I would lose my career in medicine.
15      Q   So within two weeks of starting the program,
16  you were already scared that the head of the program was
17  going to blacklist you and harass you and bully you?
18      MR. RUTTER: Objection to the form of the
19  question, misstates the deponent's testimony, and also
20  misstates facts of the record.
21      THE WITNESS: All that I'm saying is that
22  based on his interactions towards me, I was very scared and
23  nervous about what he would do to me for not cooperating
24  and giving him any documents he wanted or doing whatever he
25  wanted. Again, Alex Evers is a very powerful individual.

### Page 489

1  BY MR. NOLAN:
2      Q   But two weeks into the program you were
3  already scared that you were going to get harassed, bullied
4  and blacklisted?
5      A   All that I am saying is I was very -- what I
6  am saying is the following, Alex Evers wanted corporate
7  documents and contracts from me and I denied it. And I was
8  in a position where I was told to deny him, and I did, in
9  fact, deny him.
10      And I was very scared that he was going to do
11  something to retaliate against me. And I was worried that
12  it could be anything from pushing me out of the program,
13  not letting me work in anesthesia anymore, just giving me a
14  really rough several years. I -- I was honestly and
15  sincerely nervous about this.
16      Q   So within two weeks of starting the program,
17  you already think that the program director is out to get
18  you and you start secretly recording your conversations
19  with him to capture evidence of his wrongdoing. Is that
20  fair?
21      MR. RUTTER: Objection to the form of the
22  question. It's compound and it misstates prior testimony,
23  and it's been asked and answered at least twice.
24      THE WITNESS: As I said, as of -- in -- I
25  believe that first recording was in August. Around that

### Page 490

1  time period in August, I was very concerned with his
2  behavior towards me. And I was honestly scared that he
3  would do something, and I needed to have proof of what was
4  occurring in case it became an issue, which it clearly has.
5  BY MR. NOLAN:
6      Q   So you could file a lawsuit, right?
7      A   I had no intention of filing a lawsuit at that
8  point. I was very concerned for -- you know, I was very
9  concerned that he was powerful individual and that he may
10  retaliate and harm me. As I said, I was scared and wanted
11  to protect myself. And I want -- I wanted a record of what
12  was being said so he couldn't say else and be believed over
13  me.
14      Q   Did you disclose to Dr. Evers that you were
15  recording that conversation?
16      A   I did not disclose to Dr. Evers that I was
17  recording that conversation.
18      Q   In any of the recordings that you've -- that
19  you have, did you ever disclose to the person that you were
20  conversing with that you were recording the conversation?
21      A   I don't believe I did.
22      Q   Did you ever tell them off the recording?
23      A   I don't believe that I did.
24      Q   Why was it is important to you to keep secret
25  the fact that you were recording those conversations?

### Page 491

1      MR. RUTTER: Objection to the form of the
2  question. It's argumentative and misstates the witness'
3  testimony.
4      THE WITNESS: It was -- it was important to me
5  to make these conversations -- to record these
6  conversations so there was evidence of what was occurring
7  to me while I was at the program. And I, you know, I
8  was -- you know, that's -- that's what it was. I wanted to
9  have evidence of what was occurring to me when there was
10  bullying or harassment.
11      And, in fact, it turned out to be necessary
12  because the bullying and harassment and improper activities
13  to me and even to Gary Hammen did not stop. It just
14  continued to pick up.
15  BY MR. NOLAN:
16      Q   When did you stop making the recordings,
17  secret recordings of conversations with people at the
18  program?
19      A   I'm trying to remember the exact date. Once I
20  left the program, after June of 2018, I didn't have much
21  interaction with them, but I did have some interactions, I
22  believe phone calls and meetings, with Douglas Thompson,
23  the new program director, and the GME office. There may
24  have been others. Again, I don't have the list of the
25  recordings in front of me.

37 (Pages 488 to 491)

## JEFFERY WEISMAN, JD, M.D., VOLUME II  9/14/2022

### Page 492

1   But so I would say into the fall of 2018 to,
2  you know, I documented their interactions.  And it turned
3  out that it was very necessary, because I asked them to
4  send my ACGME transcripts to other institutions.  They said
5  they would.  And there's evidence of them hiding my -- my
6  transcripts my, training file and not sending it.
7       Q   I just asked for when.
8       A   Yes.
9       Q   Okay.  Do you remember?
10      A   I believe I continued recording, as I said,
11  until the fall of 2018.
12      Q   Thank you.
13          Any of those telephone calls that you made did
14  you disclose during those conversations that you were
15  recording them?
16      A   I don't recall.  I'd have to think on it, but
17  I don't believe I did.
18      Q   Where were you during those telephone
19  conversations?
20      A   It would depend on the date.  Possibly
21  Missouri or possibly Louisiana.
22      Q   How about Illinois?
23      A   Again, I'd -- I'd have to see the recordings
24  and the dates to -- to give a statement on that.
25      Q   Okay.  Who else did you record other than

### Page 493

1  Dr. Evers?
2       A   You know again it would be very helpful to
3  have a list in front of me or to see the recordings, but
4  I -- I believe I recorded, aside from Dr. Evers, I believe
5  I recorded Thomas Cox.  I believe I recorded Richard
6  Benzinger.  I believe I recorded Russell Groener.
7          I believe I recorded -- I'm trying to think
8  who else I recorded.  I mean, I don't have a list in front
9  of me and it depended on the interaction and the faculty
10  that I was with.  If there was a meeting or something that
11  was being said to me that seem inappropriate, I wanted to
12  have documentation in instances.  And it varied from time
13  to time.
14          And the other thing was I couldn't
15  necessarily -- you know, I'm not able to record every
16  single thing going on.  I'm still working.  I'm, you know,
17  holding things in my hands and unable to record things at
18  different times.  So, as I said, you asked who I recorded.
19  You know, I recorded many people I interacted with.  I
20  need to see the list, because, again, I haven't looked at
21  these in a long time.
22      Q   Did you record all of these conversations with
23  your iPhone?
24      A   I believe these were all recorded with the
25  iPhone.

### Page 494

1       Q   Was that the iPhone that we talked about
2  earlier, the old one that you got rid of?
3       A   That is correct.
4       Q   How did you preserve the audio files from the
5  recordings?
6       A   I -- I gave the -- I -- I have them on my
7  device, and I gave my device over to my counsel, and
8  that -- that's what I did.
9       Q   When you got your old phone back, did it still
10  have those audio recordings on it?
11      A   I don't recall if we -- I -- I don't recall at
12  this point.
13      Q   Did you download the audio recordings to a
14  computer or upload them to an i-Cloud or something like
15  that?
16      A   I didn't download to a computer or put into an
17  i-Cloud.
18      Q   Did you do anything to preserve the original
19  audio files?
20      A   I believe we -- I believe me giving them over
21  was preserving them.
22      Q   I'm talking about the original ones.
23          MR. ELSTER:  Objection, vague as to original.
24          THE WITNESS:  What -- what do you mean by the
25  original files?

### Page 495

1  BY MR. NOLAN:
2       Q   The original audio files that were on your
3  iPhone.
4       A   Oh, I --
5          MR. ELSTER:  Same objection.
6          THE WITNESS:  I -- I mean, the honest answer
7  is I don't have that iPhone any longer.
8  BY MR. NOLAN:
9       Q   Did anyone tell you to delete them?
10      A   I don't believe anybody told me to delete
11  them.
12      Q   Other than giving your old iPhone to your
13  counsel, presumably so they could transfer the files, did
14  you do anything else with those audio recordings?
15      A   I don't believe I did.
16      Q   Did you send them to anyone else?
17      A   I don't believe I sent them to anyone else.
18      Q   Did you discuss them with anyone other than
19  your attorneys?
20      A   I don't believe I discussed them with anyone
21  other than my attorneys.
22      Q   Did you ever disclose to BJC or Wash U that
23  you had secret recordings of conversations with people at
24  the program?
25      A   I don't believe that I told BJC or Wash U that

JEFFERY WEISMAN, JD, M.D., VOLUME II  9/14/2022

Page 516

1      Q   All right.  So at that point were -- were you
2  already a house officer when you received this?
3      A   I was a medical student in 2016, graduating in
4  May.  And I believe I -- I don't recall exactly how the
5  contract was sent to us to sign, but the National Residency
6  Matching Program, you go through the match and they have an
7  agreement that you agree that you will enter into contracts
8  after the match occurs.  All medical students sign it and
9  all medical centers sign it.
10         And then once you match, you're under an
11 obligation to then sign a contract and then become
12 appointed.  I don't remember the specifics of the date
13 right now.  I'd have to think on it.  I don't remember the
14 specifics of the exact date it was signed, but that --
15 that's roughly how the process works.
16     Q   Okay.  Let's break this down.  So you filled
17 out an NRMP application?
18     A   Yes, I registered for ERAS, E-R-A-S, the
19 Electronic Residency Application System.  And I also
20 registered for the NRMP, the National Residency Matching
21 Program.  I registered with both of those.  I submitted my
22 applications in September of --
23     Q   I just asked you if you --
24     A   Yeah.
25     Q   Okay.  So you filled out that application to

Page 517

1  be part of the matching program, right?
2      A   That is correct.
3      Q   And you understood that that meant that if you
4  were selected for a match, that you were bound to commit to
5  that program, right?
6      A   That -- that is what the NRMP contract is.
7      Q   Okay.  So that's -- it was a binding
8  commitment, right?
9          MR. ELSTER:  Objection to the extent that's a
10 legal conclusion on a contract.
11         THE WITNESS:  Yeah.  You know, again, I'm
12 not -- you know, I signed the NRMP agreement.
13 BY MR. NOLAN:
14     Q   Okay.  Well, at that point did the N -- did
15 that NRMP agreement detail what the terms of any contract
16 that you might enter with the residency program would
17 entail?
18     A   I haven't looked at the NRMP agreement in a
19 long time.  I believe I looked at it -- I might have looked
20 at it briefly when I signed up.
21     Q   Did you produce a copy of it in the lawsuit?
22     A   I don't recall if one of the 60,000 pages was
23 the NRMP agreement.  Do we -- do we have that here?
24     Q   What's that?
25     A   Do we have a copy of that here?  I don't

Page 518

1  recall if --
2      Q   We've got some documents, but I don't know if
3  it's what you're calling the NRMP agreement.
4      A   Okay.  Well, I know that there's a National
5  Residency Matching Program agreement.
6      Q   Have you produced it?
7      A   I produced all documents that I had to my -- I
8  produced all documents that I had to my counsel.
9      Q   Did you give that one to your counsel?
10     A   I -- from memory right now I wouldn't be able
11 to tell you.  I would have to think about it or go through
12 the 60,000 pages of documents.
13     Q   Let's look at, what is that, Exhibit B5?
14     A   B5.
15     Q   Okay.  So at the point at which you would have
16 received B5, the memorandum of appointment, you had already
17 entered into a contract through the NRMP program, right?
18         MR. ELSTER:  Objection, foundation, legal
19 conclusion as to the existence of a contract.
20         THE WITNESS:  I would have to see the
21 contract.  I would have to see the NRMP that we signed to
22 be able to comment on it.
23 BY MR. NOLAN:
24     Q   Okay.  Well, in other words, this is your
25 claim.  It's your -- you've got a claim for a contract.  Is

Page 519

1  it based on this NRMP agreement?
2          MR. ELSTER:  Same objections.
3          THE WITNESS:  Well, again, I'd -- I'd have to
4  see the NRMP contract to answer questions on it.  I believe
5  I signed an NRMP match agreement and then I signed the
6  Barnes-Jewish Hospital consortium of Wash U, Barnes and
7  Saint Louis Children's memorandum of appointment to health
8  staff.
9  BY MR. NOLAN:
10     Q   Okay.  So it was your understanding that once
11 you were selected, once you received the match for the
12 BJH/Wash U residency, anesthesia residency program, you
13 were bound to it, you -- you had to enter that program
14 contractually?
15         MR. ELSTER:  Objection, legal conclusion.
16         THE WITNESS:  Yeah.  Again, I -- I can't
17 comment on the legal nature of the contract, but my
18 understanding was you signed up for the match, and once
19 you're assigned to a program, you then enter into a
20 contract with them, which I believe I did with the
21 Barnes/Wash U/Saint Louis Children's Hospital consortium.
22 BY MR. NOLAN:
23     Q   Well, when you became contractually obligated
24 to enter into the residency program, what was the term,
25 what was the duration of that agreement?  How long did you

44 (Pages 516 to 519)

## JEFFERY WEISMAN, JD, M.D., VOLUME II  9/14/2022

### Page 520

1  have to be a part of that program?
2        MR. ELSTER:  Objection, foundation.
3        THE WITNESS:  I'm a little confused what
4  you're asking with that.
5  BY MR. NOLAN:
6     Q   Was it -- were you obligated for five years or
7  six years or as long as the program took?
8        MR. ELSTER:  Objection, legal conclusion.
9        THE WITNESS:  Well, my -- you know, legally,
10  again, I can't state the terms of the contract.  My
11  understanding with match was you were assigned to the
12  residency program to complete it.
13        If you matched into internal medicine, you
14  would do three years of internal medicine.  If you matched
15  into plastic surgery, you would do six years of training.
16  If you matched into dermatology, you'd do four years of
17  training.
18  BY MR. NOLAN:
19     Q   How about if you matched into anesthesiology?
20     A   Well, in general if you matched into
21  anesthesiology, you would do four years of training.
22     Q   How about your program?
23     A   I believe my participation my program, my
24  program was a combined residency fellowship program.  I
25  believe, and I -- I don't have the full document in front

### Page 521

1  of me, but I believe you did a portion of time as a Barnes
2  resident and then did another portion of time as a
3  Washington University Saint Louis fellow.
4     Q   Okay.  And how long would that take?
5     A   I believe -- I would need to see the ASAP
6  program.  I believe the residency training -- the component
7  of time when you were viewed to be a resident, I believe
8  that was roughly -- I'm sorry, it would be very helpful to
9  see the ASAP outline.
10        (Reporter clarification.)
11        THE WITNESS:  Sorry.  It would be very helpful
12  to see the ASAP outline.  But basically -- but I believe it
13  was something in the two to two and-a-half year period that
14  you would be a Barnes-Jewish Hospital resident.
15        And I believe -- and I -- I was talking to one
16  of the senior MD Ph.D.'s that had gone through the program,
17  and when they were transitioning over, they then, I guess,
18  were transitioned over to being a Washington University
19  Saint Louis fellow in the consortium was the way that their
20  pay would go.
21        But -- but my understanding was at all times
22  you were a part of the consortium.  You were going -- you
23  were going there to be educated at the Barnes/Wash U/Saint
24  Louis Children's Hospital consortium.
25        And the -- the way you were paid or the way

### Page 522

1  they did things was dependent on different circumstances,
2  but you were a member of the consortium.
3  BY MR. NOLAN:
4     Q   Well, you would agree whatever it was, it was
5  going to take longer than a year, right?
6     A   Well, in general, all residency training takes
7  longer than one year.  That is in general how it works.
8     Q   Okay.  Did you get a signed writing to any
9  contract from BJH relative to the residency program?
10     A   I believe I did receive a contract or
11  memorandum of appointment at one point.  I don't recall if
12  it was something that was emailed or given to us in person
13  once we were there.
14     Q   I said a signed contract from BJH.
15     A   I haven't looked at the contracts and don't
16  recall the exact process.  I -- I could go through the
17  emails from that time period.  I believe Sharon Stark was
18  sending us information.
19     Q   Well, the memorandum agreement which you
20  attached to your second amended complaint, that doesn't
21  have a signature from anyone at BJH, does it?
22     A   I'm reading it right now.  Give me one second.
23        I believe this says your -- the very last page
24  says, your signature on the house staff memorandum of
25  appointment:  Acceptance letter mailed to you indicates

### Page 523

1  acknowledgment and agreement to the terms of the
2  Barnes-Jewish Hospital memorandum of appointment to the
3  house officers and the GME consortium operating principles
4  as described herein.
5     Q   Okay.  Do you remember my question?
6     A   What was your question again?
7     Q   Is it signed by anyone at BJH?
8     A   I do not see a signature on this particular
9  document.
10     Q   Okay.  Do you have any other copy which has a
11  signature from somebody at BJH?
12     A   I would have to check to see if any of the 60
13  plus thousand pages of discovery has a signature.  I mean,
14  it's very -- it's very clear that we've entered into a
15  contract and acted upon it by me going there working, them
16  paying me, and it was the same contract that everybody else
17  entered into, the hundreds of residents that started.
18     Q   Did you ever sign anything in relation to that
19  memorandum of appointment?
20     A   When I started the residency program, and
21  before I started the residency program, we were given
22  dozens of documents to sign.  I believe I signed and
23  returned the documents that were given to me.
24     Q   Do you have a copy of a memorandum agreement
25  with your signature on it?

JEFFERY WEISMAN, JD, M.D., VOLUME II  9/14/2022

Page 536

1  high enough to match unless you had come to an agreement
2  that you wanted to be there.  So if that -- and I hope I'm
3  explaining that well.
4        But that was -- there -- you know, you could
5  talk to programs and negotiate different aspects, you know,
6  learn and negotiate what was going on there and you would
7  not rank them unless that program met your expectations.
8        And then once you matched, you would go there,
9  but certainly through any prior agreements, those would be
10  honored.
11  BY MR. NOLAN:
12      Q   I'm not talking about that.  I'm talking about
13  if you list a program and you're then matched with that
14  program, according to your understanding of the terms of
15  the agreement, you had to go there no matter what, yes?
16      A   Well, the answer to that is actually no.  The
17  answer to that is actually no in a sense because, well,
18  yes, in general you're obligated to go there.  You could
19  always file an appeal to not go there with the NRMP if
20  there was an issue or something going on I suppose.
21        So there were -- there were theoretical safety
22  valves in different directions in terms of ranking somebody
23  one, which -- ranking somebody highly, which both parties
24  would have to do, or in terms of being able to request that
25  they agree -- that the NRMP contract to sign your

Page 537

1  memorandum of appointment be revoked if there was something
2  seriously inappropriate going on.  And I've -- I've seen or
3  heard of situations that that would fit those types of
4  categories.
5      Q   Okay.  Would you agree with me that the moment
6  you were matched with the anesthesiology program, you had
7  to go there no matter what unless you filed an appeal?
8      A   Well, I would say -- I would say that I would
9  have had to go there unless I filed an appeal.  Or if I
10  didn't file an appeal and I didn't want to go there, I
11  would risk being within breach of the NRMP, so I would have
12  to make a decision on that type of situation on how to
13  handle it.
14      Q   All right.
15      A   As any other resident would do in those
16  situations.
17      Q   When did you receive your match to the
18  anesthesiology program?
19      A   I don't recall the exact date.  I believe
20  match date was in March of 2016.  Most medical schools do a
21  match day or event.  Wash U does as well.  You go up on
22  stage, you open an envelope.  They invite family and
23  friends.  It's a big happy event.
24        (Thereupon, Defendant Exhibit B8 was marked
25  for identification.)

Page 538

1  BY MR. NOLAN:
2      Q   Handing you what's been marked B8.  That's an
3  email from the NRMP.  It's to you.  Do you recognize that
4  document?
5      A   I'm reading it right now.  It's from the
6  National Residency Matching Program, February 25th, 2016 to
7  me.  It is confirmation of a certified rank order list.
8        And the way that the National Residency Match
9  Program operated, you would -- you could get access to
10  their website, but you would have to certify your match
11  order list by a certain day and time.  And after that time,
12  you were unable to change the rank order list for the
13  certification of it.
14        (Thereupon, Defendant Exhibit B9 was marked
15  for identification.)
16  BY MR. NOLAN:
17      Q   Handing you what's been marked as B9.  Is that
18  another email from the NRMP to you?
19      A   I believe that is an email from the NRMP to
20  me, Monday, February 20th, 2017, confirmation of a
21  certified rank order list.  And it says that I certified a
22  list on Monday, February 20th, 2017 at 1:0 --
23        (Reporter clarification.)
24        THE WITNESS:  On Monday, February 20th, 2017
25  at 1:09 p.m. Eastern Standard time.

Page 539

1  BY MR. NOLAN:
2      Q   So at what point did you become obligated to
3  join the anesthesiology program?
4        MR. ELSTER:  Objection, legal conclusion.
5        THE WITNESS:  Well, I -- I think there's a
6  confusion in your question, and I'm going to explain it.
7  So when you become -- so the way the process works is you
8  can log into the National Residency Matching Program and
9  certify your rank order list, and you can also log in
10  another time and certify your rank order list.  It's an
11  electronic system.  You can go in.
12        If you ranked, you know, University of
13  Pittsburgh Number 19 and you want to move them up to 18 or
14  Number 20, you can log in later and do that.  There's a
15  certain deadline where you're unable to change anything.
16  And once that deadline happens, the system locks out.
17        My understanding -- again, I'm not an expert
18  in the NRMP, but my understanding is once the system is
19  closed and the medical students and the medical centers
20  have put in their rank order list, the system doesn't let
21  anybody in.
22        And the National Residency Matching Program
23  runs an algorithm and they certify the algorithm and the
24  match.  And at point in March let you know when you
25  match.

49 (Pages 536 to 539)

## JEFFERY WEISMAN, JD, M.D., VOLUME II  9/14/2022

### Page 576

1  but I -- I believe it was, I think at that point I believe
2  it was something nominal at that point.  But I apologize,
3  I -- I believe there is a share sale or document agreement.
4  Either we should have it here or I'm happy to try to find
5  that from him.
6      Q   The reason that you transferred the equipment
7  to Mallinckrodt is because your investor, Mr. Sinow, pulled
8  out, right?
9      A   Well, that was one of the reasons in the chain
10  of events.  The transfer occurred since -- since we no
11  longer had our venture capital funding come in, and David
12  Sinow was an investor, and that occurred because David
13  Sinow saw what was going on with my employment status and
14  didn't feel comfortable continuing to support the operation
15  since he felt that, he was very concerned that there was a
16  high probability that we would end up at this table today
17  or something would happen.
18          Clearly he is -- he is very good at predicting
19  the future and protecting his interests, because that's
20  what he was worried about, and he -- he called it.
21      Q   No one physically threatened you with regards
22  to the transfer of the equipment, fair?
23      A   I was never physically threatened, but I at
24  all times was very scared for my career in being
25  blacklisted and prevented from working in medicine.

### Page 577

1      Q   You agreed to transfer the equipment to
2  Mallinckrodt, yes?
3      A   I -- I agreed to the transfer, but I thought I
4  was in an untenable position and it was done under duress.
5      Q   You could have sold the equipment to someone,
6  yes?
7          MR. RUTTER:  Objection, calls for speculation.
8          THE WITNESS:  You know, again, I would have to
9  speculate on that.  You know, that wasn't something that
10  occurred.
11  BY MR. NOLAN:
12      Q   The equipment had value when you transferred
13  it, didn't it?
14      A   The equipment did have value.
15      Q   So couldn't you have sold it to someone?
16          MR. RUTTER:  Objection, calls for speculation.
17          THE WITNESS:  You know, again, I'd have to
18  speculate on it.  That wasn't -- that wasn't something that
19  occurred.
20  BY MR. NOLAN:
21      Q   If you were feeling threatened, why just give
22  the equipment to Mallinckrodt?
23          MR. RUTTER:  Objection to the form of the
24  question.
25          THE WITNESS:  I believe, to make sure I

### Page 578

1  understand the question, the question is if you were
2  threatened, why did you give the equipment to Mallinckrodt?
3          MR. NOLAN:  Yeah.
4          THE WITNESS:  And --
5          MR. RUTTER:  Same objection.
6          THE WITNESS:  You know, and -- and I guess
7  what I would say is yes, I was feeling threatened, and I
8  ended up -- and it ended up that the equipment was -- the
9  equipment and lab was directed to Mallinckrodt.
10          There were -- there were other possibilities.
11  I believe I had a meeting or two with Rob Jarrow.  I
12  believe his -- I believe he had a high level administrative
13  research position even though he's a Ph.D.  And he was also
14  talking about potential transfers of the lab to either
15  anesthesiology or other colleagues of his at Washington
16  University Saint Louis as a potential landing point.
17          I -- I believe there's an email or two in
18  discovery with Rob Jarrow discussing these things.  It was
19  directed to Mallinckrodt is what appeared to be at that
20  point the best option.
21  BY MR. NOLAN:
22      Q   Why?
23      A   It -- you know, I had -- based on a variety of
24  of factors I would say it seemed like it was the best
25  option for it to be directed to Mallinckrodt and, you know,

### Page 579

1  one of those -- one of these factors was that the radiology
2  department was not harassing me and bullying me.  So, you
3  know, I would rather -- I didn't want Alex Evers to kind of
4  win top 3D printing core lab from his actions.
5          And -- and I guess I would just say just from
6  a personal, moral standpoint, I felt that I could direct,
7  which I was able to do slightly, that I would -- that I
8  would direct that it go towards, to his -- towards control
9  by the radiology department at that point.
10      Q   Did you ask anyone at the radiology department
11  if they would purchase it from you?
12      A   I didn't -- I don't believe at that point I
13  asked them about purchasing it from me.  I was following
14  Alex Evers' directions to immediately stop research and get
15  rid of the lab, shut it all down and you, know, just give
16  it to Wash U, to someone, and just focus on your studies.
17      Q   Which you -- you voluntarily did, yes?
18      A   You know, again, I followed those
19  instructions, but I thought I did so under duress.  I
20  didn't want to do it.  I just felt like I was in an
21  untenable position.  And I -- I didn't want to lose my
22  career.  I just wanted to be able to move forward.
23          And the other -- the other aspect is that I
24  talked with Pamela Woodard in radiology and David Ballard.
25  And I talked with her, and one aspect of it going over to

59 (Pages 576 to 579)

## JEFFERY WEISMAN, JD, M.D., VOLUME II  9/14/2022

### Page 580

1  radiology would that be potentially, or what I thought in
2  fact would occur is once I finished my residency, myself
3  and David, we would be able to run that lab facility, and
4  would likely run that lab facility together.
5        And that in fact did occur for David Ballard.
6  I was -- I was very surprised at the very end when I was
7  leaving when they -- when I -- I asked, I can't remember if
8  I asked just David or Dr. Woodard, but to see if radiology
9  would -- would give -- would make me like a visiting
10 researcher like mechanical engineering did, or, you know,
11 transfer me over as a visiting researcher and I emailed and
12 things like that.
13        And the answer was no, they couldn't do it
14 because of anesthesia and the anesthesia department didn't
15 want it to occur.  So instead, they just took my name off
16 the website, from the core lab on the Mallinckrodt website.
17     Q   Let me switch gears a little bit and talk
18 about your employment after you left the program.  When did
19 you start working at Marek Weisman?
20     A   I believe that we -- I believe that we
21 formally incorporated in 2019.  I believe it was in the
22 spring of 2019.  Or was it -- sorry.  I just want to make
23 sure I give an accurate answer on this.  And that was
24 when -- that was when I began doing some work with the
25 Marek Weisman firm, and it was just, you know,

### Page 581

1  just -- just incorporated the law firm then.
2     Q   Okay.  In terms of your -- are you a
3  part-owner in Marek Weisman, LLC?
4     A   Yes, sir.  I have an ownership interest in the
5  Marek Weisman Law Firm, LLC.  It's an Illinois LLC, I
6  believe.
7     Q   Okay.  Are you a member?
8     A   I -- I believe as an LLC, having ownership
9  would be considered to have a membership share, if I'm
10 articulating that properly.  I believe an LLC would be a
11 membership share as opposed to a corporation that would be
12 a stock ownership share.
13     Q   Yeah.  So what percentage of Marek Weisman do
14 you own?
15     A   I believe that percentage right now is 50
16 percent of the company.
17     Q   And do you receive dividends or distributions
18 from Marek Weisman relative to your ownership interest?
19     A   I do not receive dividends relative to the
20 ownership interest.  I don't believe anybody does.  The --
21 the firm, again, represents medical residents mainly and
22 medical students doing civil rights work.
23        As you can imagine, those are not really high
24 paying clients.  There's not a lot of funds that come in
25 overall related to that type of work for clients in those

### Page 582

1  positions.
2     Q   Are you also employed by Marek Weisman?
3     A   I would say that I do work for them, but I
4  don't receive any funds for some of the work that I do.
5  What I would note, we found -- I believe the firm was
6  incorporated in spring or early summer of 2019.  At that
7  point in time in 2019 I was also starting full-time
8  employment at the University of Illinois, Chicago campus,
9  occupational and environmental medicine residency program,
10 which was a full-time job and residency program.  So that
11 was the, around the start of the firm.
12     Q   Have you ever been compensated by Marek
13 Weisman for the work that you do for it?
14     A   I have not been compensated for the work that
15 I've done for Marek Weisman.
16     Q   Your 50 percent ownership in the LLC, what is
17 that worth?
18        MR. RUTTER:  Objection, calls for speculation.
19        THE WITNESS:  You know -- you know, again,
20 I -- I wouldn't be able to speculate on it, on the value of
21 it.  So, I mean, you know, as -- as I stated before, the
22 Marek Weisman law firm is a small firm that's a startup
23 representing primarily medical residents and medical
24 students.

### Page 583

1  BY MR. NOLAN:
2     Q   Well, it has value, right?
3        MR. RUTTER:  Objection, calls for speculation.
4        THE WITNESS:  You know, again, I don't know
5  the value of it.  But as -- as -- as I said, and as you are
6  probably familiar with from -- from your background doing
7  defense work, you know, the typical types of clients that
8  would hire a law firm, their capabilities.
9        And that's all -- that's what I would just say
10 as far as the firm goes, that's really, you know, it is
11 what it is as far as trying to have the firm set up and --
12 and earn revenue.
13 BY MR. NOLAN:
14     Q   Well, how much did it make last year?
15        MR. RUTTER:  Objection, calls for speculation.
16        THE WITNESS:  So I don't know how much it made
17 last year.  That's also kind of a vague question in terms
18 of, you know, how much revenue or how much net profits,
19 because I know there's a lot of companies that have
20 revenues, but net -- net profits are relatively
21 nonexistent.
22        The firm itself, the structure is we have a
23 managing partner who's the other owner, who's the other
24 name on the firm, and they handle all finances and firm
25 management and everything along those lines.

60 (Pages 580 to 583)