**Deposition of:**

## Douglas Thompson, M.D.

**Case:**

## Jeffery A. Weisman, et al.

## vs

## Barnes-Jewish Hospital, et al.

**Date:**

## 11-03-2022



**360 Litigation Services**
10097 Manchester Rd, Ste 102
St. Louis, Missouri  63122
360LitigationServices.com
314-394-2206

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JEFFERY A. WEISMAN, et al.,        )
                                   )
     Plaintiffs,                   )
                                   )
vs.                                ) NO. 4:19-cv-75-JAR
                                   )
BARNES JEWISH HOSPITAL, et al.,    )
                                   )
     Defendants.                   )

CERTIFIED TRANSCRIPT

Deposition of DOUGLAS THOMPSON, M.D., taken on

Behalf of the Plaintiffs.

November 3, 2022

Reported by Sandra Meintrup, CCR, CSR

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF MISSOURI
 2                       EASTERN DIVISION

 3
    JEFFERY A. WEISMAN, et al.,        )
 4                                     )
         Plaintiffs,                   )
 5                                     )
    vs.                                ) NO. 4:19-cv-75-JAR
 6                                     )
    BARNES JEWISH HOSPITAL, et al., )
 7                                     )
         Defendants.                   )
 8

 9           Deposition of DOUGLAS THOMPSON, M.D.,

10    produced, sworn and examined on the 3rd day of

11    November, 2022, between the hours of nine o'clock in

12    the forenoon and three o'clock in the afternoon of that

13    day in the law offices of Shands, Elbert, Gianoulakis &

14    Giljum, LLP, 8235 Forsyth Boulevard, Suite 700, in the

15    County of St. Louis, State of Missouri, before Sandra

16    Meintrup, CCR #614, in a certain cause now pending in

17    the United States District Court for the Eastern

18    District of Missouri, Eastern Division, between JEFFERY

19    A. WEISMAN, et AL., Plaintiffs, vs. BARNES JEWISH

20    HOSPITAL, et al., Defendants; on behalf of the

21    Plaintiffs.

22

23

24

25
```

```
 1                    CERTIFIED QUESTIONS

 2    QUESTION NO. 1:                    PAGE 162  LINE 23

 3         Q.  What was that person's name?

 4

 5    QUESTION NO. 2:                    PAGE 163  LINE 24

 6         Q.  Okay.  And you know the person's name and

 7    you're going to decline to provide it; is that right?

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        INDEX

 2   Direct Examination by Mr. Elster        Page    7

 3

 4

 5                   INDEX OF EXHIBITS

 6   Plaintiff's Exhibit:

 7    1, LinkedIn page                        Page   10

 8    2, e-mail                               Page   85

 9    3, e-mails                              Page   91

10    4, e-mail                               Page   95

11    5, e-mails                              Page   98

12    6, e-mail warning document             Page  105

13    7, e-mails                              Page  109

14    8, e-mails                              Page  119

15    9, e-mail transfer recommendation      Page  121

16   10, e-mails                             Page  122

17   11, e-mails Stanford U.                 Page  131

18   12, Letter of Recommendation and e-mails   Page  136

19   13, e-mails                             Page  141

20   14, ABA documents                       Page  141

21   15, e-mails                             Page  146

22   16, e-mails and Weisman documents       Page

23   17, e-mails and LoR                     Page

24   18, e-mails                             Page  146

25   19, e-mails                             Page  151
```

Case: 4:19-cv-00075-JAR   Doc. #: 268-6   Filed: 02/17/23   Page: 6 of 167 PageID #: 5066

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
1              INDEX OF EXHIBITS -- continued

2    Plaintiff's Exhibit:

3    20, e-mail with authorization and release    Page   71

4    21, e-mails                                   Page  154

5    22, e-mail                                    Page  155

6    23, e-mail                                    Page  156

7    24, e-mails                                   Page  157

8    25, e-mails                                   Page  164

9

10

11                    APPEARANCES

12

13   For Plaintiffs:   The Elster Law Office, LLC

14                     Attorneys at Law

15                     225 South Meramec, Suite 325

16                     St. Louis, Missouri 63105

17                     By:  Mr. Henry P. Elster

18                     henry@elsterlaw.com

19

20                     Marek Weisman LLC

21                     Attorneys At Law

22                     55 East Monroe Street, Suite 3800

23                     Chicago, Illinois 60603

24                     By:  Ms. Rachel C. Rutter

25                     rrutter@marekweisman.com
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1                    APPEARANCES CONTINUED

 2

 3   For Washington University Defendants:

 4                    Shands, Elbert, Gianoulakis &

 5                      Giljum, LLP

 6                    Attorneys at Law

 7                    8235 Forsyth Boulevard, Suite 700

 8                    St. Louis, Missouri 63105

 9                    By:  Mr. Kevin Anthony Sullivan

10                    ksullivan@shandselbert.com

11

12   For Defendants BJC and BJH:

13                    Husch Blackwell

14                    Attorneys at Law

15                    190 Carondelet Plaza, Suite 600

16                    St. Louis, Missouri 63105

17                    By:  Ms. Theresa Mullineaux

18                    theresa.mullineaux@huschblackwell.com

19

20   Videographer:    360 Litigation Services

21                    Curt Shaw

22

23   Also present:    Jeffery A. Weisman

24

25
```

1          VIDEOGRAPHER:  We're on the record at 9:31

2     a.m.  Today's date is November 3rd, 2022.  We're here

3     today for deposition of Dr. Douglas Thompson to be

4     taken in the matter of Jeffery A. Weisman, et al.,

5     versus Barnes Jewish Hospital, currently pending in the

6     United States District Court for the Eastern District

7     of Missouri, Eastern Division.  Cause No.

8     4:19-CV-75-JAR.

9          At this time I would ask Counsel to give their

10    appearances for the record, beginning with the taking

11    party.

12          MR. ELSTER:  Henry Elster for the Plaintiffs

13          MS. RUTTER:  Rachel Rutter for the Plaintiffs.

14          MR. SULLIVAN:  Kevin Sullivan for the

15    Washington University defendants.

16          MS. MULLINEAUX:  Theresa Mullineaux for

17    Defendants BJC and BJH.

18          VIDEOGRAPHER:  Very good.  Will the reporter

19    please swear in the witness.

20               DOUGLAS THOMPSON, M.D.,

21    of lawful age, being duly sworn to tell the truth, the

22    whole truth, and nothing but the truth, deposes and

23    says on behalf of the Plaintiffs, as follows:

24               DIRECT EXAMINATION

25    BY MR. ELSTER:

1      Q.  Please state your name.

2      A.  Douglas Royce Thompson.

3      Q.  Dr. Thompson, what is your address?

4      A.  1400 Fawnvalley Drive, St. Louis.

5      Q.  Have you ever had your deposition taken

6  before?

7      A.  No.

8      Q.  Have you ever testified in court before?

9      A.  No.

10     Q.  Have you ever been listed as an expert witness

11 in any court proceeding?

12     A.  No.

13     Q.  Have you ever been a party to a lawsuit

14 before?

15     A.  No.

16     Q.  What did you do to prepare for the deposition

17 today other than talking to your attorney?

18     A.  I'm sorry, what was the question?

19     Q.  What did you do to prepare for the deposition

20 today?

21     A.  Spoke with the attorney.  And then I reviewed

22 documents that were supplied to me.

23     Q.  What documents did you review?

24     A.  Mostly e-mails.

25     Q.  What types of e-mails?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1        A.  E-mails between myself, Dr. Benzinger.

 2   E-mails that were forwarded to me from Dr. Benzinger,

 3   Dr. Cox.  That's most of it.

 4        Q.  Anything else?

 5        A.  Not that I can think of off the top of my

 6   head.

 7        Q.  How long did you prepare for the deposition

 8   today?

 9        A.  You mean how much time did I spend with Kevin

10   Sullivan?

11        Q.  That in addition to any other preparation you

12   did.

13        A.  I think Mr. Sullivan and I spent about two and

14   a half hours together on Tuesday.  And then I reviewed

15   some documents this morning for maybe a half hour.

16        Q.  Was anyone else present for the meeting

17   earlier this week with Mr. Sullivan?

18        A.  Joe Sklansky was there for about an hour.  He

19   left after about an hour.

20        Q.  Any other prep before Tuesday?

21        A.  I think I looked at some of the documents in

22   the e-mail when I first got the e-mail from Mr.

23   Sullivan.

24        Q.  When was that?

25        A.  I don't recall the date.  It would have been
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    whatever day the e-mail was sent to me.

2         Q.  Do you remember roughly what week it was?

3         A.  I could look in my phone and retrieve the

4    e-mail.

5         Q.  Was it this month; do you know?

6         A.  It was -- well, it's November, right?  So I'm

7    not sure if it was this month or the end of October.

8         Q.  Okay.  Okay.  If you can look at Exhibit No.

9    1, what is that?

10        A.  Looks like my LinkedIn page.

11        Q.  I want to go through some of the information

12   on it.  Did you create your LinkedIn page?

13        A.  Yes.

14        Q.  Okay.  If you can flip to page 3 of that.  And

15   four.

16        A.  Uh-huh.

17        Q.  Is your educational background accurate

18   beginning on pages -- on page 4?

19        A.  Yep.

20        Q.  Okay.  And that would include the Indiana

21   University, the Children's Memorial Hospital-

22   Northwestern, University of Colorado, and University of

23   California, San Diego?

24        A.  Yep.  Yes.

25        Q.  Okay.  You became the associate residency

1  program director at Washington University in the

2  Department of Radiology in August of 2017?

3          MR. SULLIVAN:  Radiology or anesthesiology?

4      Q.  (By Mr. Elster)  Sorry.

5      A.  In 2017, correct.

6      Q.  What does that job entail?

7      A.  I was new to the institution so mostly that

8  job was getting the lay of the land before I took over

9  as residency program director.

10      Q.  So was it primarily a training position to be

11  residency director?

12      A.  I'm not sure that I would describe it as

13  training.  It was mostly gaining a familiarity.

14      Q.  And that would take about a year to gain

15  familiarity?

16      A.  I think a year was the planned transition time

17  between myself and Dr. Benzinger.

18      Q.  Was Dr. Benzinger the head of the department

19  before you were?

20      A.  No, Dr. Evers was the head of the department.

21  Dr. Benzinger was the residency program direct.

22      Q.  So Dr. Benzinger occupied that position.  You

23  were kind of the heir apparent for that position?

24      A.  Correct.

25      Q.  All right.  What does it mean when you say

1   getting the lay of the land?

2       A.  So as it's defined on that page, I started my

3   career at Seattle Children's, which is a completely

4   separate institution in a completely separate state.

5   So getting the lay of the land, what I mean by that is

6   getting to know the people that are involved in the

7   program.  Getting to know the residents.  Getting to

8   know the clinical environment as well, because I'm

9   still a clinician.

10      Q.  Was it a full-time position?

11      A.  Can you clarify what you mean?  I mean, I am a

12  1.0 FTE.  I'm a full-time employer -- or employee.  But

13  the administrative job is not full time.

14      Q.  Okay.  So I guess can you explain, and I'm

15  focused on August 2017 to July 2018.

16      A.  Uh-huh.

17      Q.  You were a clinician during that time period?

18      A.  Yes.

19      Q.  And in addition to that, focus on what the

20  function of the associate residency program director

21  was.

22      A.  Correct.

23      Q.  And other than getting familiarity with people

24  and gaining familiarity with the program, what other

25  responsibilities did that include?

1    A.  With regards to the associate program

2  director?

3    Q.  Yes.

4    A.  Understanding more about the logistics of how

5  their particular program works.

6    Q.  Okay.  Did you have any supervising

7  responsibility?

8    A.  As a clinician?  Or as a....

9    Q.  First as an associate residency program

10 director.

11   A.  That's not the way I would characterize it.  I

12 mean, the supervising role would have fallen to Dr.

13 Benzinger.

14   Q.  Okay.  Did you do any oversight of residents?

15   A.  Again, if you're -- if you're asking as the

16 associate residency program director, did I do

17 oversight, it gets a little complicated.  Because I do

18 oversight as a clinician and so those two do overlap.

19   Q.  As a clinician did you do any supervising or

20 oversight during this time period?

21   A.  Of course.

22   Q.  Did any of that supervising or oversight

23 extend to Dr. Jeffery Weisman?

24   A.  During that time I don't recall.

25   Q.  What about during the time period after that

1  ending in July of 2018, was there any supervising or

2  oversight that you personally did with Dr. Weisman?

3        A.  I don't recall.  I think that's around the

4  time that Dr. Weisman left.

5        Q.  Which specific time period?

6        A.  Around July of 2018.

7        Q.  Did you ever work with him?

8        A.  I did.

9        Q.  As a clinician?

10       A.  I did.

11       Q.  How many times?

12       A.  I would guess a handful of times.

13       Q.  Do you have any recollection when the first

14  one was?

15       A.  I don't have any recollection of the first

16  time I worked with him, no.

17       Q.  What about the second time?

18       A.  I don't recall the second time I worked with

19  him.  If your question is do I recall specific

20  instances where I worked with him, yes.  Can I

21  characterize those as first or second, no.

22       Q.  What specific instances do you recall?

23       A.  There was an instance where we were at the

24  Children's Hospital 'cause that's where I worked

25  primarily.  I believe my assignment was just with Dr.

1   Weisman, meaning I didn't have any other rooms to

2   supervise.  I believe the patient was an orthopedic

3   patient.  The patient was asleep.  The surgery was in

4   progress.  I left briefly, maybe to use the rest room

5   or for some other reason.

6           When I came back it became apparent that Dr.

7   Weisman had tried to refill the vaporizer, which is

8   essentially the mechanism that supplies gas or volatile

9   anesthetic to a patient to keep them asleep.  He was

10  successful in refilling the vaporizer; however, he was

11  not successful in reengaging the vaporizer with the

12  machine.  So the patient was not receiving a continuous

13  supply of gas anesthetic, which would have put the

14  patient at risk for what we call recall, which is

15  awareness under anesthesia or waking up in the middle

16  of the procedure.

17      Q.  Was this the first -- one of the first times

18  you worked with him?

19      A.  I don't recall if it was the first, second,

20  third time I worked with him.  It's just an incident

21  that stuck in my mind for obvious reasons.

22      Q.  This was at Children's Hospital?

23      A.  Correct.

24      Q.  Was anyone else working with you and Dr.

25  Weisman at the time?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1        A.  I don't believe so, no.  You mean from an

2   anesthesia perspective?

3        Q.  Correct.

4        A.  No.

5        Q.  Do you recall any other specific instances in

6   which --

7        A.  -- Working with Dr. Weisman?

8        Q.  Right.

9        A.  No.

10       Q.  Do you recall generally that you may have

11   worked with him on other occasions?

12       A.  It's possible but I don't recall any details.

13       Q.  Do you know if Dr. Weisman ever received any

14   formal disciplinary action from the anesthesiology

15   department at Washington University?

16       A.  I do not know any details about that, no.

17       Q.  You don't know one way or the other?

18       A.  I don't know one way or another.

19       Q.  Do you know if there were any discussions

20   about him?

21       A.  Discussions about him?

22       Q.  Receiving formal disciplinary action.

23       A.  I believe there were, yes.

24       Q.  What do you know about that?

25       A.  I think before Dr. Weisman left there was

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1  discussions about what would be the most appropriate

2  way to sort of go forward with the American Board of

3  Anesthesiology.  Yeah.

4      Q.  Who were parties to those discussions?

5      A.  Dr. Benzinger.  I believe Dr. Cox was looped

6  into that conversation.  It's possible that Dr. Groener

7  was as well.  Myself.

8      Q.  And to be clear, you don't know if there was

9  ever any formal disciplinary action that was proposed?

10     A.  So, I did ask that question at some point of

11  Dr. Benzinger.  Because after Dr. Weisman left I had to

12  fill out some regulatory documents.  And in that

13  communication I was led to believe that no formal

14  disciplinary action had been taken.

15     Q.  Okay.  Other than that one incident you

16  specifically recall, do you have any other specific

17  memories of personally observing Dr. Weisman working as

18  a clinician and a medical provider?

19     A.  That's really the only instance that comes to

20  mind.

21     Q.  Do you have any views about his capabilities

22  as an anesthesiologist?

23     A.  Can you clarify what you mean?  I mean, he

24  never finished a residency so I wouldn't think that

25  he'd be qualified to practice anesthesiology.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1      Q.  Outside of a rigid completing the

2   anesthesiologist program, I guess -- I'll rephrase it.

3          Do you have any views about his capabilities

4   as an anesthesiology resident?

5      A.  I think -- I think the general consensus of

6   his performance was that he was probably behind where

7   many of his peers were.  I think there was a discussion

8   about whether or not he would ever catch up to where

9   his peers were or where he should be.

10         I think, you know, there were some reviews of

11  him that were poor, meaning the reviewer felt that he

12  was performing poorly.  I think there were other

13  reviews where it seemed to indicate that he was perhaps

14  on par with where he should be.

15         So in general I'd say it was a mix -- mixed

16  bag.

17     Q.  When you say general consensus, general

18  consensus between who?

19     A.  Between those that were conducting reviews.

20     Q.  And who would that be?

21     A.  I'm sorry?

22     Q.  Who would that be?

23     A.  Well, I mean, in general the clinicians that

24  were working with him.  And also the rotation

25  coordinators for the various rotations that he

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

 1  completed.

 2      Q.  Were you ever -- did you ever do any reviews

 3  of Dr. Weisman?

 4      A.  I -- I don't recall.  If I worked with him in

 5  a clinician oversight capacity, I probably filled out

 6  an evaluation.  But I don't have any details.

 7      Q.  Were you ever rotation coordinator for him?

 8      A.  I was not.

 9      Q.  When you say the general consensus, was that

10  also your belief?

11      A.  Well, certainly the instance that I recall

12  where he forgot to fill the vaporizer is concerning.

13  And, yes, I would say that that would be concerning for

14  being below par with his peers, yes.

15      Q.  Have you ever communicated with anyone else in

16  another residency program in the United States about

17  Dr. Weisman?

18      A.  So, I know because I've looked at documents

19  that I had a phone call with Dr. Macario, who I believe

20  is at Stanford.  But I do not recall any details of

21  that phone call.

22          I believe I've also communicated via e-mail

23  with somebody from Duke, but I never spoke with her on

24  the phone.

25      Q.  Who was the individual at Duke?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1        A.  I don't recall her name.  Epling perhaps, Dr.
 2   Epling.  I'm not confident of that name.
 3        Q.  Outside of people at Washington University,
 4   have you ever expressed what you term the general
 5   consensus about Dr. Weisman to anybody else?
 6            MR. SULLIVAN:  Object to form.  Vague.
 7            Go ahead and answer.
 8        A.  Outside of Wash U., other than the instances
 9   that you just elucidated?
10        Q.  (By Mr. Elster)  Correct.
11        A.  I don't recall.
12            Specific to the common general consensus?
13        Q.  Correct.
14        A.  I don't recall, no.
15        Q.  What about otherwise, any communications about
16   Dr. Weisman with anyone else?
17        A.  On the request of Dr. Weisman documents were
18   sent to Chicago, Dr. -- and Louisiana.  I think those
19   were Dr. Fox and Dr. Kaye, K-a-y-e.
20        Q.  Anyone else outside of those people?
21        A.  I mean, there was a Dr. Patil, P-a-t-i-l.
22        Q.  Anyone else?
23        A.  Not that I recall off the top of my head.
24        Q.  When you became residency program director in
25   July of 2018, what were your responsibilities?
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1        A.   That's a pretty broad question.  I mean,
 2   responsibilities to make sure that the program stays in
 3   the good graces of ACGME.  You're responsible for
 4   resident recruitment.  The oversight of the various
 5   fellowships there are at Wash U. also fall under the
 6   program director.  You have oversight over the 80 plus
 7   residents that are in the program.
 8        Q.   When you say good graces of the ACGME, what
 9   does that stand for?
10        A.   Well, there's a lot of regulatory requirements
11   that the ACGME puts forth.  And so try to navigate all
12   the requirements and make sure that you're meeting
13   their benchmarks.
14        Q.   Are you familiar with any requirements from
15   the ACGME as it relates to a residency's training
16   file -- resident's training file?
17        A.   Can you be more specific?
18        Q.   Sure.  Is there any documentation that you're
19   aware of that the ACGME requires to keep in connection
20   with the residents training at a particular institute?
21        A.   The ACGME requires that we submit milestones.
22        Q.   What do you mean by milestones?
23        A.   I mean, the best way I would describe it is
24   you're trying to judge as best you can as a trainee
25   progresses through the program whether or not they're
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

 1  reaching certain benchmarks in what is deemed an

 2  appropriate time so that they can complete the training

 3  program on time with their peers.

 4      Q.  When you say submit them, submit to who?

 5      A.  Submit to the ACGME.

 6      Q.  So as far as you're aware, outside of those

 7  milestones, is there any other documents that needed to

 8  be submitted to the ACGME?

 9      A.  Are you asking at the time that I was the

10  residency director or are you asking now?

11      Q.  Well, I'll ask both.  So at the time you were

12  the residency director what needed to be submitted?

13  And then I'll ask now.

14      A.  So at the time I was the residency, in

15  addition to the milestones we also submitted whether or

16  not a resident completed the program.  And I think that

17  that was the extent of my knowledge at the time.

18      Q.  Okay.  What about now?

19      A.  So subsequent I believe I -- subsequent to me

20  being the program director there was this question at

21  the ACGME meeting raised about a summative evaluation

22  of the residents.

23      Q.  So you said subsequent.  When did you stop?

24  Because your -- at least the LinkedIn page says present

25  as program director.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1      A.  So I would have stopped, I believe it was
2  September of last year.
3      Q.  Okay.  So I'll just -- so September of 2021
4  would be the end date when you were the program
5  director?
6      A.  That sounds right.
7      Q.  And I'll ask, at that time you became vice
8  chair for education?
9      A.  Correct.
10      Q.  I'll get to that in a second.
11          So subsequent to September of 2021 you learned
12  that there was something called an ACGME summative
13  evaluation?
14      A.  I believe it was subsequent to me leaving the
15  role of residency program director, correct.
16      Q.  What is an ACGME summative evaluation?
17      A.  So traditionally what the program did was once
18  the resident finished training, we would put together a
19  fairly standardized letter that listed the various
20  competencies put forth by the ACGME, which I won't be
21  able to sum all but there's five.  So like
22  professionalism, medical knowledge, system based
23  practice.  There's a couple others.
24          So the document kind of reviews those
25  competencies and states that the resident met those

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    competencies.  It also talks about a quality

2    improvement project that they were involved in.  And it

3    talks about a research project that they were involved

4    in.  And then sort of the concluding paragraph is that

5    the resident met all of these requirements and is

6    competent to practice anesthesiology.

7              So that is what we felt as a program was meant

8    by a summative evaluation.

9        Q.  Okay.  And that was supposed to be submitted

10   when?

11       A.  So -- I don't believe I knew that specifically

12   when I was the program director.  But subsequently I

13   found out that it's 30 days after the graduation.

14       Q.  So it's your understanding currently that the

15   ACGME requirements mean that you have to submit a

16   summative evaluation 30 days after someone matriculates

17   from the residency program?

18       A.  After someone finishes the program, yes.

19       Q.  Finishes the program?

20       A.  Correct.

21       Q.  Okay.  And that doesn't necessarily mean they

22   graduate?

23       A.  Those are different things, yes.

24       Q.  Right.  So it's a 30 day from cessation, from

25   when it stops?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1        A.  It's 30 days from completing the program.
 2        Q.  Okay.  So it's -- so when you say completing
 3   the program, so that would be completing the entire
 4   residency program?
 5        A.  Correct.
 6        Q.  So if someone were to leave before the
 7   completion of the residency program would there be a
 8   requirement for a summative evaluation?
 9        A.  So again, if you're asking what my
10   understanding was when I was the program director?
11        Q.  Right.
12        A.  I did not know that there was such a
13   requirement.
14        Q.  Okay.  So subsequent to September of 2021 is
15   it now your belief there is a requirement for that?
16        A.  It's now my understanding the ACGME requires
17   that, yes.
18        Q.  So if someone were to leave, it's a four- or a
19   five-year residency program?
20        A.  Four years.
21        Q.  Four years.  If someone were to leave for any
22   reason six months in, it is your current understanding
23   there is a summative evaluation required within 30 days
24   of departure?
25        A.  Correct.
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1      Q.  Okay.  And the summative evaluation would

2    consist of essentially an assessment for all of those

3    five knowledge areas?

4      A.  Correct.

5      Q.  Okay.  Who -- who completes the summative

6    evaluation now?

7      A.  So are you asking when a -- when a resident

8    finishes the program?

9      Q.  Correct.

10     A.  Graduates?

11     Q.  What's the process for compliance?

12     A.  So program director, which is Dr. Mitchell,

13   would complete that.

14     Q.  Dr. Mitchell exclusively?

15     A.  Yes, I believe so.  I mean, she might have

16   some administrative help but it's Dr. Mitchell that

17   completes them.

18     Q.  Okay.

19     A.  It may not be Dr. Mitchell that submits them

20   to the ACGME.

21     Q.  Okay.

22     A.  But she's the one that fills out the....

23     Q.  And what information is relied upon?  Because

24   if the head doesn't supervise the physician or the

25   resident, how are they to complete the summative

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1  evaluation?

2      A.  They review the resident's file and they

3  also -- we meet with the residents twice a year.  And

4  so part of that biannual discussion is covering things

5  like what was their research project, what was their QI

6  project, who was their mentor.

7      Q.  Okay.  What changed subsequent to you leaving

8  as program director to where you now believe the --

9  it's required 30 days from departure?

10     A.  Well, it was brought to our attention by the

11 ACGME.

12     Q.  The ACGME.  And how did they do that?

13     A.  The communications via e-mail.

14     Q.  Do you remember when approximately that was

15 received?

16     A.  I don't.

17     Q.  Was it directed to you?

18     A.  I don't think the initial outreach from the

19 ACGME was distributed to me but I could be wrong.

20     Q.  If not you, do you have any understanding of

21 who it would have been directed to?

22     A.  It might have been directed to Tia Drake,

23 who's the DIO, which is essentially the University's

24 liaison with the ACGME.

25     Q.  Okay.  So is it fair to say that after

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1   September of 2021 the practice of the Department of
 2   Anesthesiology is 30 days of when a resident leaves
 3   there is now a summative evaluation?
 4           MR. SULLIVAN:  I'll object to form.  Vague.
 5           Go ahead and answer.
 6           (Discussion was held off the record.)
 7       A.  So I would argue that we were already in
 8   compliance with that in that it's unusual for a
 9   resident to leave the program before completing the
10   program.  So what we were doing was in compliance.
11   It's in the instance where we have somebody leave the
12   program early we were unaware of this requirement for a
13   summative evaluation.
14       Q.  (By Mr. Elster)  Okay.  So I'll try to come at
15   it a different way.
16           So when you were program director and
17   subsequent to that, is it -- to the present, is it your
18   understanding that upon graduation or matriculation
19   there was always a summative evaluation created?  The
20   instance -- well, is that right?
21       A.  If the resident completed training, yes.
22       Q.  Okay.  But in the instances in which the
23   training was not completed there and the resident left
24   for other reasons, there was not necessarily a
25   summative evaluation created?
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1        A.  You're asking me my knowledge as the program

 2   director?

 3        Q.  Correct.

 4        A.  At that time?

 5        Q.  Correct.

 6        A.  So sorry.  What was the question?

 7        Q.  Okay.

 8        A.  When I was the program director.

 9        Q.  When you were the program director --

10        A.  Yes.

11        Q.  -- if someone did not complete the four-year

12   residency program?

13        A.  Yes.  It was not my understanding that there

14   was a summative evaluation that was needed.

15        Q.  Okay.  And in conjuncture with that

16   understanding would one be created if someone left?

17             MR. SULLIVAN:  Object to form.

18        A.  Well, so in Dr. Weisman's instance, once the

19   ACGME brought this requirement to our attention, we

20   created one.

21        Q.  (By Mr. Elster)  And that would have been

22   after September of 2021?

23        A.  I believe so, yes.

24        Q.  Okay.  So he did not have one until sometime

25   after September of 2021?
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1        A.  Correct.

 2             Well, he did not have what the ACGME considers

 3   a summative evaluation, yes.

 4        Q.  Are you saying Washington University had what

 5   they considered to be a summative evaluation?

 6        A.  Well, what we were using was a summary of his

 7   progress along the milestones.  Since he had left the

 8   program early that's what we had thought would suffice

 9   as a summative evaluation, was tracking his milestones

10   before he left the program.

11        Q.  And the ACGME has since informed the

12   department that that is not a summative evaluation?

13        A.  Correct.

14        Q.  When you were program director would residents

15   sometimes transfer to Washington University?

16        A.  To Washington University?

17        Q.  Correct.

18        A.  I don't believe when I was program director I

19   had anybody transfer into the program.  I don't believe

20   so.

21        Q.  What about transfer out?

22        A.  So we -- we had a resident leave the program

23   because he felt anesthesiology was a poor fit, and we

24   had a resident that was fired.  But I don't -- other

25   than those two instances, when I was program director I
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1   can't recall residents transferring out.

2        Q.  Okay.  Or transferring in?

3        A.  Yeah, I don't believe we had anybody transfer

4   in.  Now, sometimes in -- when we do recruitment

5   through the ERAS system we'll sometimes take a resident

6   that may have done a year of training already, like an

7   internship, and then transferred directly into the

8   anesthesia training.  It's possible that that occurred

9   when I was the program director but I don't recall.

10       Q.  Do you have an understanding of what type of

11  documentation the department would need to effectuate

12  an incoming transfer?

13       A.  Are you asking me as the program director did

14  I know that?

15       Q.  Yeah.  No, I'm asking -- yes.  Yes.

16       A.  So as the program director, no, I don't think

17  I had any idea what kind of documentation was required.

18       Q.  Independent of being the program director?

19       A.  Are you asking my knowledge now?

20       Q.  Yes.

21       A.  So, now, yes, I understand that there is

22  documentation required.

23       Q.  And what is understanding of what's required?

24       A.  I -- I think one of the things that they need

25  is a summative evaluation.  That's due at the time that

1    the transfer is taking place.  And there's probably

2    something else but that's the one that sticks in my

3    mind.

4         Q.  So your understanding now is that the

5    department needs an ACGME summative evaluation to

6    accept a transfer in an anesthesiology resident.

7         A.  The department needs a summative evaluation.

8         Q.  A summative evaluation?

9         A.  Correct.

10        Q.  Okay.

11        A.  At the time of transfer.

12        Q.  At the time of transfer?

13        A.  Right.

14        Q.  Without that can they accept a resident?

15        A.  I don't know specifically.  I just know

16   that -- that -- my understanding is now that the

17   ACGME -- that is one of the things that the ACGME

18   requires, is a summative evaluation at the time of

19   transfer.

20        Q.  A summative evaluation is -- is that something

21   that's defined by the ACGME?

22        A.  I think the wording around what comprises a

23   summative evaluation by the ACGME is pretty nebulous.

24   But what we came up with is something similar to what

25   we would do if the resident had finished the program.

1   We try to speak to how they performed in those medical

2   competencies.  So medical knowledge, professionalism,

3   etc., etc.

4        Q.  What was the difference between what the ACGME

5   considered a summative evaluation and the milestones

6   that were previously being provided?

7        A.  Well, I guess the milestones, if you look at

8   the actual form that the milestones are tracked on,

9   it's really just sort of -- there's five columns and

10  you're basically trying to place where the resident is

11  on those five columns as they progress through

12  training.  And that -- for reasons that remain to be

13  elucidated by the ACGME, if the ACGME didn't feel that

14  that met the -- met the requirement.

15       Q.  Are you familiar with any anesthesiology

16  program in the United States that would take a resident

17  from another anesthesiology program without a summative

18  evaluation?

19       A.  I don't have knowledge about that one way or

20  another.

21       Q.  Similarly, are you aware of any anesthesiology

22  program which would accept a transfer of a resident

23  without any sort of transcripts or records from the

24  prior institution?

25            MR. SULLIVAN:  Object to form.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1      A.  I don't have knowledge one way or another but

2   that would seem unlikely.

3      Q.  (By Mr. Elster)  Why would it seem unlikely?

4      A.  Well, I think any program would want to know,

5   you know, what it is that they're getting.  What kind

6   of applicant they're getting and what kind of resident

7   they're getting.

8      Q.  Okay.  So, just so I'm certain, the first time

9   that a summative evaluation was created for Dr. Weisman

10  from Washington University was after September of 2021?

11         MR. SULLIVAN:  Object to form.

12  Mischaracterizes his testimony.

13         Go ahead and answer.

14     A.  I believe that that date matches, yes.

15     Q.  (By Mr. Elster)  Okay.  Do you consider it a

16  mistake that there wasn't one created before that time

17  period?

18         MR. SULLIVAN:  Object.

19     A.  No, we didn't know the requirement.

20     Q.  (By Mr. Elster)  Okay.

21     A.  And again, we don't usually have residents

22  leave so it's an unusual circumstance.

23     Q.  Okay.  Separate from your not knowing the

24  requirement, was it in compliance with ACGME

25  guidelines?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1        A.  It's hard to be in compliance with guidelines
 2   if you don't know what the guidelines are.
 3        Q.  But aren't -- isn't Wash U. an ACGME an
 4   accredited institute?
 5        A.  Sure.
 6        Q.  Okay.
 7        A.  That doesn't mean that every single
 8   requirement that the ACGMe puts forth is met.
 9        Q.  Okay.
10        A.  That's why they have reviews.
11        Q.  So you think because you didn't know of the
12   specific requirement, it doesn't?
13        A.  No, that's not what I said.
14        Q.  Okay.
15        A.  I said that the ACGME puts forth a lot of
16   rules and regulations.  Just because your infraction of
17   one rule or regulation doesn't mean that you're not
18   going to be in compliance with the overall gestalt that
19   the ACGME is submitting, right?  So if I have a
20   resident that breaks an IDL work week, that doesn't
21   mean that the ACGME is going to come down and say, oh,
22   you're no longer ACGME certified.
23        Q.  And I'm not saying that they're going to pull
24   the certification based on that.
25        A.  Okay.
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1      Q.  But do you agree with me that as you

2  understand it now that the failure to create a

3  summative evaluation before September of 2021 was a

4  violation of the --

5      A.  -- As I understand it now, yes.

6      Q.  It was a violation?

7      A.  Yes.

8      Q.  Okay.  You mentioned Tia Drake would have been

9  notified of that or communicated with someone at the

10  ACGME about that?

11      A.  I believe that there was an ombudsman or a

12  lawyer or both from the ACGME that contacted Tia Drake,

13  yes.

14      Q.  Do have an understanding of how this came on

15  their radar?

16      A.  Because there was allegations that the program

17  was not being responsive to Dr. Weisman's request for

18  documentation.

19      Q.  Was it common for you as when you were the

20  program director to communicate your opinions about

21  residents to other medical institutes?

22          MR. SULLIVAN:  I'm going to object -- let

23  me -- just let me -- give me the time to insert

24  objections.  Sometimes it's just -- just object.  It

25  calls for speculation.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
1              Go ahead and answer.
2         A.  If your question is was it common, no, it's
3    not common.
4         Q.  (By Mr. Elster)  Did it happen?
5         A.  Yes, it happened.
6         Q.  In what types of instances?
7         A.  Well, specifically with Dr. Weisman it
8    happened.  I don't -- I don't recall an instance like
9    that as a program director.  Certainly I fielded
10   inquiries from, you know, fellowship programs that were
11   asking about residents and whether they would, you
12   know, be good trainees as a fellow.  I probably
13   entertained communications about, you know, whether or
14   not a resident would be a good employee in a practice
15   but I don't recall specific details.
16        Q.  Okay.  Do you believe that when you're
17   expressing your opinion and when you were the program
18   director that was -- that carried weight and was
19   valuable?
20             MR. SULLIVAN:  Object to form.  Calls for
21   speculation.
22             Go ahead and answer.
23        A.  I don't know whether it carries weight or not.
24        Q.  (By Mr. Elster)  Okay.  If you were
25   communicating with another program director when you
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1  were program director and they gave a negative opinion

2  about a resident transferring in, would that be

3  important to you?

4           MR. SULLIVAN:  I'm going to object.  Improper

5  hypothetical.

6           Go ahead and answer.

7      A.  I think it's unlikely.  So I don't -- I don't

8  recall any specific instances where I called a

9  resident -- another residency program director

10  inquiring about a resident.  But I think it would be

11  unlikely for a residency program not to try to color a

12  resident in the most positive light possible.

13     Q.  (By Mr. Elster)  You're saying it's unlikely

14  that that would happen?

15     A.  Yeah.

16     Q.  Okay.  If -- if another residency program

17  director communicated to you there were significant red

18  flags around a resident, would you take that resident

19  transfer?

20          MR. SULLIVAN:  Object to form.  Calls for

21  speculation.  Improper hypothetical.

22          Go ahead and answer.

23     A.  It depends on what their concerns were.

24     Q.  (By Mr. Elster)  Okay.  If that's all they

25  said was red flags.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1      A.  It would be unlikely that they would leave the

2   conversation like that.

3      Q.  Well, what if they did, how would you -- what

4   would you do?

5      A.  If they told me that there was red flags, I

6   would be concerned.  Sure.

7      Q.  Okay.  Why?

8      A.  Well, I mean, for one, I would want to know

9   what the red flags are.  For two, you worry about

10  whether or not the resident's going to be able to

11  complete training.

12     Q.  It would call into question the resident's

13  competence and capabilities?

14          MR. SULLIVAN:  Object to form.  Calls for

15  speculation.

16          Go ahead and answer.

17     A.  So for me it just -- it calls into question

18  whether or not they're going to be able to complete the

19  training of the program.

20     Q.  (By Mr. Elster)  What if a residency director

21  told you just say no with respect to a resident?

22          MR. SULLIVAN:  Object to form.  Calls for

23  speculation.  Improper hypothetical.

24          Go ahead and answer.

25     A.  It would be very unlikely for another

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    residency program director to say that.

2        Q.  (By Mr. Elster)  Okay.  And I'm asking if that

3    happened, would you take that resident?

4        A.  It depends.

5        Q.  Okay.  If that's all they said, just say no?

6        A.  Again, in real life it's unlikely that that

7    would happen.  If it did, it would depend.

8        Q.  Okay.  Do you know if Dr. Evers said that to

9    someone at Yale about Dr. Weisman?

10       A.  I have no idea what Dr. Evers said.

11       Q.  Okay.  Similarly, if a residency director

12   communicates to you about a perspective transferring

13   resident, read between the lines, that's all they said,

14   how would you interpret that?

15           MR. SULLIVAN:  I'm going to object to form.

16   Improper hypothetical.  Calls for speculation.

17           Go ahead and answer.

18       A.  So as the residency program director, I do not

19   recall any instances where I received a call from

20   another program director telling me about a resident

21   that wanted to transfer into the program.

22       Q.  (By Mr. Elster)  And you told me that.  But

23   I'm saying what would have been your reaction if you

24   were the program director and another program director

25   communicated to you, quote, read between the lines?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1            MR. SULLIVAN:  Same --
 2       Q.  (By Mr. Elster)  -- About this resident?
 3            MR. SULLIVAN:  Same objection.
 4            Go ahead and answer.
 5       A.  Again, it would depend on what the concerns
 6  are.
 7       Q.  (By Mr. Elster)  And if there was nothing more
 8  voiced beyond that?
 9       A.  If there was nothing more voiced beyond that,
10  then yeah, I would have trepidations about accepting
11  the resident.
12       Q.  What is diversion in the anesthesiology
13  context?
14       A.  Diversion usually refers to taking drugs away
15  from their intended purpose, which is usually given to
16  a patient, and using it for personal use.
17       Q.  To your understanding is that a problem in the
18  practice of anesthesiology?
19       A.  Yeah.  Yes.
20       Q.  Okay.  Why do you say yes?
21       A.  Because I think that's fairly well known.
22       Q.  If there was a suggestion that a potential
23  resident -- I guess it would be called diverting -- was
24  diverting drugs, would you take that potential
25  perspective resident as you were the program director?
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
1            MR. SULLIVAN:  I'm going to object to form.

2    Calls for speculation and improper hypothetical.

3            Go ahead and answer.

4       A.  If -- is your question if I had information or

5    was led to believe that there was a resident diverting

6    drugs, would I have concerns about accepting the

7    resident?

8       Q.  (By Mr. Elster)  Right.

9       A.  Yes.

10      Q.  Is there a situation when you would accept

11   such a resident if you were certain about him diverting

12   drugs or her?

13           MR. SULLIVAN:  Objection.  Calls for

14   speculation.  Improper hypothetical.

15           Go ahead and answer.

16      A.  It would depend.  So, you know, there are

17   residents that are successfully rehabilitated from

18   illicit drug use.  Unfortunately, our discipline has a

19   high rate of recidivism.  So it would depend on the

20   particulars.

21      Q.  (By Mr. Elster)  Do you know who Dr. Alan Kaye

22   is?

23      A.  I know the name.  I don't believe I've ever

24   met Dr. Kaye.  I don't know him personally.

25      Q.  Have you ever spoken to him?
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

 1      A.  I don't believe I've ever spoken to Dr. Kaye,

 2   no.

 3      Q.  Okay.  Have you ever communicated with him in

 4   writing?

 5      A.  I have e-mailed him, yes.

 6      Q.  What do you remember about those?

 7      A.  I believe I forwarded a letter of

 8   recommendation on behalf of Dr. Weisman.  I may have

 9   forwarded something else as well.

10      Q.  What's the something else?

11      A.  I don't recall.  I might have forwarded a

12   rotation schedule but I don't recall.

13      Q.  Outside of those communications, any other

14   interactions with Dr. Kaye?

15      A.  I don't believe so.

16      Q.  Do you know anything about his background?

17      A.  I believe he is the chair of the department

18   but, no, I don't know anything about his background.

19      Q.  Okay.  Are you familiar that's he's written an

20   expert report in this case?

21      A.  In what case?

22      Q.  In this particular -- this case that we're

23   here on today for your deposition.

24      A.  No, did not know that.

25      Q.  Okay.  So you don't know if he gave a number

1    of -- you don't know whether or not he gave a number of

2    opinions in an expert report?

3         A.   No.

4         Q.   Okay.  I want to ask you about some of his

5    opinions.  He gave an opinion that anesthesiologists

6    approximately make around the United States half a

7    million dollars, $750,000 as a board certified

8    anesthesiologist.  Do you agree with that opinion?

9         A.   That seems a little high.

10        Q.   What range would you give?

11        A.   So it depends.  There's a difference in pay

12   scale if you're an academic, such as myself, or if

13   you're in what we call private practice.  If you're in

14   private practice, that pay range might be more

15   realistic.  But if you're in academics, I would --

16   without knowing particulars, I would guess you'd be

17   more in the range of 250- to 400,000.  Unless maybe if

18   you're in a position like a chair, maybe that would be

19   half a million.

20        Q.   Private practice, do you have an opinion on

21   what a pay range would be?

22        A.   It might be similar to what Dr. Kaye is

23   saying, 500- to 750-.

24        Q.   So you would agree with his opinion as to the

25   range of compensation as it relates to private

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

 1  practice?

 2       A.  Without knowing particulars if you're asking

 3  my opinion?

 4       Q.  Right.

 5       A.  That sounds about right, yes.

 6       Q.  Okay.  But less if there was an academic --

 7  academic settings make less?

 8       A.  Correct.

 9       Q.  Okay.  Do you know what Strategic Biomedical,

10  Inc., is?

11       A.  No.

12       Q.  Do you know if that was a lab that Jeff -- Dr.

13  Weisman operated while at Washington University?

14       A.  I don't know what it is so I don't know.

15       Q.  Have you ever heard of that before?

16       A.  I have not.

17       Q.  Do you know if he ever had a lab?

18       A.  I know he had a lab, yes.

19       Q.  And what do you know about that?

20       A.  So as the program director I don't think I

21  knew anything about it.  But subsequently I believe it

22  was a lab that had to do with 3D printing.

23       Q.  How did you come to that understanding?

24       A.  Some of the documents that I was given to

25  review.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1        Q.  Outside of reading those documents did you

2   have any other way of knowing that?

3        A.  Outside of those documents, no, I don't

4   believe so.

5        Q.  Okay.  Dr. Kaye gave an additional opinion.  I

6   want to read it to you.  It says, quote, My overall

7   opinion in this matter is that it was unreasonable for

8   the program -- referring to Washington University -- to

9   expect Dr. Weisman to perform all of his obligations as

10   a resident physician of training while simultaneously

11   running and operating his lab, close quote.  Do you

12   agree with his opinion?

13              MR. SULLIVAN:  Object to form.

14              Go ahead and answer.

15        A.  The way I interpret that statement is that

16   it's his opinion that we would ask someone to run a lab

17   and to complete clinical training.  So if his statement

18   is speaking to, you know, having a lot of demands on

19   your time, I can see that being factual.

20        Q.  (By Mr. Elster)  So if it's -- what do you

21   mean you can see that being factual?  I don't follow

22   you.

23        A.  Well, I guess what I'm trying to say is that

24   as a residency program director we would not require

25   someone to run a lab.  It wouldn't be -- it wouldn't be

1   something that we would recommend, for someone to run a

2   lab and try to complete a residency training program.

3   Just like we wouldn't advocate for somebody to have a

4   second job and try to complete a residency training

5   program.

6       Q.  If someone is operating a research lab do you

7   think that the department had any responsibilities to

8   accommodate that?

9           MR. SULLIVAN:  Object to form.  Calls for

10  speculation.

11          Go ahead and answer.

12      A.  I believe the residency program's obligation

13  is to try to produce a clinically competent

14  anesthesiologist when they're done with their training.

15  Anything that interferes with that should be taken into

16  consideration.

17      Q.  (By Mr. Elster)  To what extent to be taken

18  into consideration?

19      A.  So if you're asking for my opinion.

20      Q.  Yeah.

21      A.  It would be that you need to focus on your

22  clinical training and put aside other considerations.

23      Q.  Dr. Kaye also gave an opinion, quote, Dr.

24  Weisman's research experience, expertise, and his M.D.

25  slash Ph.D. status, makes him a highly competitive

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    candidate to all residency training programs, close

2    quote.  Do you agree with that?

3        A.  Can you read that again?

4        Q.  Quote, Dr. Weisman's research experience,

5    expertise, and his M.D. slash Ph.D. status makes him a

6    highly competitive candidate to all residency training

7    programs, close quote.

8        A.  So are you asking me to answer that question

9    with the knowledge that I have about Dr. Weisman's

10   clinical performance?

11       Q.  So I'll ask that subsequently to that.

12           So do you agree with just that statement

13   specifically?

14       A.  No, not necessarily.

15       Q.  Okay.  Why not necessarily?

16       A.  Because there's other things that you should

17   take into consideration besides someone's academic

18   pedigree.

19       Q.  Do you think his academic -- academic pedigree

20   just in and of itself makes him a highly competitive

21   candidate?

22       A.  Not necessarily.

23       Q.  In the case of Dr. Weisman do you think that

24   his academic pedigree -- pedigree is an asset in terms

25   of being -- going into another residency training

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1   program?

2        A.  It depends on what kind of training he's

3   trying to complete.

4        Q.  Another anesthesiology program?

5        A.  Does his academic pedigree mean that he's well

6   qualified to go into another anesthesiology program?

7        Q.  Correct.

8        A.  No, I don't agree with that.

9        Q.  Does that make him a highly competitive

10  candidate?

11       A.  If all I knew about somebody was their

12  degrees?

13       Q.  Correct.

14       A.  Does that mean that they're going to be a

15  well-qualified anesthesiologist or a competitive

16  applicant?

17       Q.  Correct.

18       A.  No.

19       Q.  That's the question.

20       A.  No.

21       Q.  What else -- what else do you need?

22       A.  So other things that I would want to look at

23  is where were the degrees completed.  What was his

24  clinical performance while he was in medical school.

25  Some of those things we can get from the dean's letter.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1   If he did away rotations, how did he do on those

2   rotations.  And if he did -- he or she did an

3   anesthesia rotation, how did they do on that rotation?

4        Q.  Dr. Kaye gave a number of further opinions.

5   Before we take a break I want to ask you about one more

6   of them.

7             Quote, An ACGME's accredited program's purpose

8   and their duty is to provide training and fair learning

9   opportunities to its resident physicians, close quote.

10       A.  Can you read it one more time?

11       Q.  "An ACGME accredited program's purpose and

12  their duty is to provide training and fair learning

13  opportunities to its resident professions."

14       A.  I agree with that.

15       Q.  Close quote.

16       A.  I agree with that.

17       Q.  Do you know if that happened with Dr. Weisman?

18       A.  Well, you're -- excuse me.  You're asking me

19  to assume the perspective of Dr. Weisman, which is

20  impossible for me to do.  I can't speak to whether or

21  not he felt his experience was fair or not.

22       Q.  Okay.  Well, I'm asking you do you feel his

23  experience was fair?

24       A.  To my knowledge, yes.

25       Q.  Okay.  Based on any of your personal

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1   interactions, do you know?

 2       A.   Based on my personal interactions with who?

 3       Q.   With Dr. Weisman while he was a resident.

 4            MR. SULLIVAN:  Object to form.  Vague,

 5   confusing.

 6            Go ahead and answer.

 7       A.   I -- I don't recall any conversations with Dr.

 8   Weisman where he would have led me to believe

 9   otherwise, that he didn't feel like he was being

10   treated fairly.

11       Q.  (By Mr. Elster)  How many times have you

12   spoken to him that you can recall?

13       A.   Probably on the order of 10 times.

14       Q.   Okay.  No more than that though over the

15   course of all these years?

16       A.   Well, you're asking about things that took

17   place four or five years ago.  So it's a conjecture on

18   my part.  I don't recall specifically but on the order

19   of 10.

20            MR. ELSTER:  Okay.  Let's take a break here.

21            VIDEOGRAPHER:  We're off the record at 10:21

22   a.m.

23            (Short break.)

24            VIDEOGRAPHER:  Go back on the record at 10:45

25   a.m.
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1      Q.  (By Mr. Elster)  The next opinion from

2   Dr. Kaye I want to ask you about, Dr. Thompson, I'll

3   quote it.  So begin quote, At an ACGME accredited

4   residency training program the evaluation process

5   should be objective and should not be motivated by

6   harassment, retaliation, or performed in an effort to

7   pressure a resident physician to resign, close quote.

8   Do you agree with that opinion?

9      A.  I agree that the evaluations should be done

10  without harassment or trying to pressure someone to

11  resign.  I believe that's correct.  The question about

12  objectivity though I think is more difficult.  So....

13      Q.  What makes it more difficult?

14      A.  Well, so, for example, if you, you know,

15  outside of medicine, if you had 10 different

16  individuals witness some particular event then asked

17  them to recall the event, you might have 10 different

18  recollections of how that went down.  And I think that

19  there are parallels to observing someone's clinical

20  performance.

21          You know, in the case of anesthesiology, I

22  could watch a resident do an incredibly simple case and

23  think that -- for that particular case for that

24  particular patient they did fine.  But on a different

25  day if I'm supervising a resident doing a more complex

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1   case, I might feel very differently.  That they're

2   performance is subpar.

3       Q.  Are there any objective components to the

4   evaluation process?

5       A.  There are things that can be objective, sure.

6       Q.  Like what?

7       A.  Well, so for example, if you wanted to

8   evaluate a resident's ability to intubate a patient,

9   place a breathing tube, you know, the objective

10  criteria you might use is did they get it in the right

11  place or not.  But that ignores, you know, how they

12  accomplish that, right?  Because you can also knock out

13  somebody's tooth while trying to place the breathing

14  tube, and I think that also needs to be taken into

15  consideration when you evaluate someone.

16      Q.  Do you think that the evaluation process is

17  more subjective or objective?

18      A.  You're asking me to weigh objectivity versus

19  subjectivity.  I don't know how I would do that.

20      Q.  You don't have a belief one way or the other

21  as to gauge a resident's progress?

22      A.  I think both subjective criteria and objective

23  criteria fit into the -- into the evaluation process.

24      Q.  So you would disagree with Dr. Kaye's opinion

25  that the evaluation process should be -- should be

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    objective?

2         A.   Yeah, I think I would disagree with that.

3         Q.   You're saying that in part -- in part because

4    you're saying it should be partially be subjective?

5         A.   Well, I think in -- in reality part of it is

6    subjective, yes.

7         Q.   Dr. Kaye also gave an opinion that, quote, It

8    was also a violation of industry standards in ACGME

9    procedures to refuse to show Dr. Weisman his evaluation

10   scores, close quote.

11            MR. SULLIVAN:  Going to object to form.  Lacks

12   foundation.

13            Go ahead and answer.

14        A.   To my knowledge Dr. Weisman had access to his

15   files so I'm not sure what that's in reference to.

16        Q.   (By Mr. Elster)  Okay.  Do you believe that

17   Dr. Weisman should have had that access to his

18   evaluation scores?

19        A.   Yes, he should have had access to evaluation

20   scores.

21        Q.   At what periods of time?

22        A.   While he was there as a resident?

23        Q.   At all periods of time while he was a

24   resident?

25        A.   He should have had access to it, yes.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1       Q.  If he did not have access to his evaluation

2   scores, do you think that would have been a violation

3   of ACGME procedures?

4           MR. SULLIVAN:  I'm going to object to form. It

5   assumes facts not in evidence.  It's contrary to the

6   facts in evidence.  Calls for speculation.

7           Go ahead and answer.

8       A.  Am I supposed to answer it?

9           MR. SULLIVAN:  Yeah.

10      A.  Sorry.  Can you repeat the question?  If he

11  had not had access?

12      Q.  (By Mr. Elster)  If he did not have access,

13  would that have been a violation?

14      A.  If that is in fact true, yeah, I think that

15  would probably be a violation.

16          (Discussion held off the record.)

17      Q.  (By Mr. Elster)  Are you familiar with --

18  generally with the consortium between Washington

19  University and Barnes Jewish Hospital?

20      A.  I don't know the specifics.  But, yeah, I know

21  there's a consortium.

22      Q.  Not necessarily the bylaws.  Okay.

23          Likewise, if Dr. Weisman didn't have access to

24  his evaluations and how they were scored, would it be a

25  violation of those consortium policies?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1          MR. SULLIVAN:  And I'll object to the
 2   question.  Assumes facts not in evidence.  Contrary to
 3   the facts in evidence.  Calls for speculation.
 4          Go ahead and answer.
 5      A.  I'm not sure how that would be pertinent to
 6   the consortium but I don't know one way or another.
 7      Q.  (By Mr. Elster)  Would it have violated any
 8   Washington University policies?
 9          MR. SULLIVAN:  Same objection.
10          Go ahead and answer.
11      A.  I -- I don't know.
12      Q.  (By Mr. Elster)  Okay.  Isn't it important
13   that a resident has access to his or her training
14   scores --
15      A.  -- Yes.
16      Q.  Why?
17      A.  So they know how they're doing in the program.
18      Q.  Okay.  And if they don't have access to that,
19   would that be problematic?
20      A.  I believe that would be problematic, yes.
21      Q.  In what way?
22      A.  Well, other than my belief that it's an ACGME
23   requirement that they be able to access their files,
24   you wouldn't want to be in a situation where the
25   resident is somehow surprised or taken back by what
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1  their evaluations are.

2      Q.  Okay.  Have you ever refused to release any of

3  Dr. Weisman's files from Washington University to

4  any -- to him?

5          MR. SULLIVAN:  Going to object to form.

6  Vague.

7          Go ahead and answer.

8      A.  Have I ever refused?  I'm sorry, what was the

9  question?

10     Q.  (By Mr. Elster)  Have you ever refused to

11 release Dr. Weisman's files or records from his time as

12 an anesthesiology resident at Washington University to

13 him?

14         MR. SULLIVAN:  Same objection.

15         Go ahead and answer.

16     A.  There was supposedly a request from somebody

17 to copy or fax his entire file, which I didn't feel was

18 a good use of resources so I did refuse that request.

19     Q.  (By Mr. Elster)  And I'll ask about that next.

20 But the first question was to him.  Did you ever refuse

21 to release it to him?

22     A.  Did I ever refuse to release files to him?

23 Not to my knowledge, no.

24     Q.  What are you referring to that it wasn't a

25 good use of resources not to release it to somebody

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    else?

2         A.  Well, I mean, his file is probably thicker

3    than that file there, so it's just not a good use of

4    admin resources to fax or copy an entire file to that.

5    There's no utility to that.  If there's specific things

6    that, you know, are being asked about, so for example

7    milestones or, you know, a list of rotations that he

8    had taken or, you know, meeting notes, I think that's

9    reasonable.  But to come up with a blanket request that

10   I ask somebody to photocopy 200 pages doesn't seem like

11   a good resource allocation.

12        Q.  Who was it that requested the file that you're

13   referring to?

14        A.  I believe it was Dr. Patil, P-a-t-i-l.  I

15   believe.  But I could be wrong.

16        Q.  And you thought it was onerous to copy 200

17   pages?

18        A.  I thought it was onerous to ask one of our

19   admins to do that, yes.

20        Q.  How long would that have taken?

21        A.  I don't know.  I didn't ask her to do it.

22        Q.  Have you ever copied paper before?

23        A.  Not 200 pages.

24        Q.  Okay.  You don't -- you don't think it would

25   take less than 10 minutes to do that?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1        A.  I don't think it would take less than 10

2    minutes, no.

3        Q.  Okay.  So you refused to release the

4    transcript to Dr. -- or his file to Dr. Patil because

5    it was too much of a time commitment to copy it; is

6    that right?

7             MR. SULLIVAN:  I'm going to object.

8             Go ahead and answer.

9        A.  Correct.

10       Q.  (By Mr. Elster)  Okay.  You didn't feel that

11   you had an obligation to release his file to Dr. Patil

12   when asked?

13       A.  I didn't feel the request was reasonable.

14       Q.  Well, so what would have been reasonable?

15   Correct me if I'm wrong, if certain portions were

16   copied?

17       A.  If there was a specific question that was

18   being put to the program that I could answer by

19   submitting documents, I would have been happy to do

20   that.  But a blanket request to photocopy an entire

21   file doesn't seen reasonable nor am I sure what that

22   would have accomplished.

23       Q.  Okay.

24       A.  Also, I seriously doubt that anyone would have

25   read through an entire file of -- consisting of 200

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1   pages or more.

2        Q.  Are you just guessing at that though?

3        A.  I'm guessing at that, yeah.

4        Q.  So as an alternative you wanted to selectively

5   produce some of the 200 pages?

6            MR. SULLIVAN:  I'm going to object to form.

7   Mischaracterizes his testimony.

8            Go ahead and answer.

9        A.  I don't believe there was any subsequent

10  request for specific documents.

11       Q.  (By Mr. Elster)  Okay.  But if they had

12  requested specific documents would you have told

13  someone in admin to go through and pluck out those

14  specific documents?

15       A.  Yeah, if it was a reasonable request, sure.

16       Q.  Okay.  So you thought it was less burdensome

17  to have someone go through and selectively pick certain

18  things as opposed to just copy 200 pages; is that --

19       A.  -- Well, a lot of the documents are

20  electronically filed so I don't think it would have

21  been that onerous to search for whatever documents

22  might have been requested.

23       Q.  Okay.  Did you communicate to Dr. Patil that

24  you weren't going to release the records because it was

25  too much of an administrative burden?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    A.  No.  I believe I communicated that with Dr.

2  Weisman though.  I don't believe I communicated that

3  with Dr. Patil.

4    Q.  When did you communicate that to Dr. Weisman?

5    A.  I don't recall specifically.  It was probably

6  sometime after I got the request.

7    Q.  And after you had made the decision it was too

8  much of an administrative burden?

9    A.  Yes.

10    Q.  Was it your decision alone that it was too

11  much of an administrative burden to copy 200 pages?

12    A.  Assuming that I was the program director at

13  the time, yeah, it would have been my decision.

14    Q.  Were you not the program director at the time?

15    A.  I don't remember when the request was made.

16    Q.  You talked to Dr. Patil at around that time

17  period.  What did you communicate to Dr. Patil?

18    A.  I don't believe I spoke with her.  I

19  communicated with her.

20    Q.  What did you communicate?

21    A.  What did I communicate?

22    Q.  Correct.

23    A.  I believe I had a request from Dr. Weisman to

24  send her documents, particular documents.  One of them

25  might have been a letter and it might have been a

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1   rotation schedule.  I don't recall the specifics.  I

2   did try to fulfill that request.  When I sent her the

3   e-mail, it bounced back immediately.  And I don't

4   remember any further communication after that.

5       Q.  So you tried to send a rotation schedule or?

6       A.  I don't remember the particulars of what I

7   sent her.  I do know that I sent her some documents but

8   I don't know if they ever reached her because, again,

9   the e-mail that I sent bounced back.

10      Q.  Why did you pick the documents that you

11  sent -- sent out?

12      A.  Presumably because that's what I was requested

13  to send.

14      Q.  But you do remember that you were requested to

15  send the entire file from Dr. Patil?

16      A.  I remember receiving that request from Dr.

17  Weisman, yes, not from Dr. Patil.

18      Q.  So Dr. Weisman requested the entire file?

19      A.  I believe that is correct, yes.

20      Q.  And that's -- you refused to give it to him

21  because it was too much of a burden?

22      A.  Correct.

23          There was nothing precluding Dr. Weisman from

24  making a copy of it himself had he come to the office.

25      Q.  Did you ever offer to scan it for him?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
1        A.  I don't believe we offered to scan it for him,
2   no.
3        Q.  Did you ever offer to put it on a thumb drive
4   for him?
5        A.  No.
6        Q.  Okay.  Isn't there a lot of paperwork
7   associated with medical treatment and care?
8        A.  There's a lot of electronic records that are
9   associated with medical treatment and care, yes.
10       Q.  Was there not an electronic record of these
11  documents, the 200 pages?
12       A.  I don't believe his entire file would be
13  electronic, no.  We don't routinely put things like
14  medical school, applications, or test scores
15  electronically.  But that stuff would probably have a
16  paper copy in the file.
17       Q.  Okay.  Did you just not want to assist him in
18  making it or you didn't -- you didn't feel any --
19  anything compelling you to assist him by making a copy
20  of 200 pages?
21           MR. SULLIVAN:  I'm going to object.
22  Argumentative.
23           Go ahead and answer.
24       A.  I didn't see the utility to the request.
25       Q.  (By Mr. Elster)  From your perspective
```

 1   utility?

 2        A.  From my perspective as a program director,

 3   correct.

 4        Q.  What about the utility to Dr. Weisman,

 5   wouldn't that have been useful to him?

 6        A.  I don't know.  I didn't know what the nature

 7   of the request was.

 8        Q.  Didn't -- didn't you think that -- you didn't

 9   know that he was trying to get into other residency

10   programs?

11        A.  I knew he was applying for an occupational

12   health residency but I'm not sure when I became aware

13   of that.

14        Q.  How did you know that?

15        A.  I think I first became aware of that because

16   the ERAS System notified me that a letter that had been

17   written on his behalf was being sent to a residency

18   program.

19        Q.  So the -- is the ERAS System, that's

20   essentially -- it's for residency applications?

21        A.  Correct.  If they're going through the match,

22   correct.

23        Q.  Okay.  And you received a notification that he

24   was attempting to get into other residency programs; is

25   that right?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1        A.  Correct.

 2        Q.  Do you know which one it was?

 3        A.  Which specific program?

 4        Q.  Right.

 5        A.  No.

 6        Q.  You just knew generally he was trying to get

 7   into programs?

 8        A.  Correct.  But if my memory is correct I

 9   believe it was an occupational health residency

10   program.  But where, I don't -- I don't know that I

11   knew that.

12        Q.  So would it be a fair statement at the time

13   you declined to provide a copy of the file to him you

14   knew he was trying to get into other residency training

15   programs?

16            MR. SULLIVAN:  Object to form.

17   Mischaracterizes his testimony.

18            Go ahead and answer.

19        A.  I don't recall the temporal relation between

20   those two events.  So in other words, I don't recall

21   when that request was made in relation to when I

22   discovered he was applying for other residency

23   programs.

24        Q.  (By Mr. Elster)  You would have gotten an

25   e-mail from the ERAS System saying he was looking --
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    indicating that he was looking because there was a

2    recommendation letter?

3        A.   The notification from ERAS was that he was

4    using a letter that I believe either I or Dr. Benzinger

5    wrote for him and that letter was being sent to other

6    programs.

7        Q.   Okay.  So it only notifies you when the letter

8    from the department is utilized?

9        A.   I think it only notifies us if there's a

10   letter that's submitted to a -- ERAS that's being used.

11   So in other words, if he had a letter written outside

12   of that system and he was using it, I don't know that

13   I'd be notified.

14       Q.   Okay.  Do you recall when the communications

15   with Dr. Patil occurred?

16       A.   I don't.

17       Q.   And there was -- none of it was by telephone;

18   is that right?

19       A.   I don't believe I ever spoke with Dr. Patil by

20   phone, no.

21       Q.   Okay.  Has anyone else other than Dr. Weisman

22   requested a copy of his or her file from Washington

23   University?

24            MR. SULLIVAN:  Object to form.  Vague.

25            Go ahead and answer if you can.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1        A.  So is your question has anyone ever reached

2    out to me directly other that Dr. Weisman?

3        Q.  (By Mr. Elster)  Right.

4        A.  I don't remember.

5        Q.  Do you know of anyone else reaching out to

6    someone other than you for a copy of the residency file

7    from Washington University?

8        A.  Say that again.

9        Q.  We talked before about how Dr. Weisman asked

10   you for a copy of the -- his training records.

11       A.  Uh-huh.

12       Q.  Has anyone other than Dr. Weisman made such a

13   request, not necessarily to you but that you're aware

14   of?

15            MR. SULLIVAN:  Object to form.  Assumes facts

16   not in evidence.

17            Go ahead and answer.

18       A.  The requests that I recall for his file came

19   from Dr. Weisman.  I don't recall a third party

20   directly asking me.

21       Q.  (By Mr. Elster)  And my question was a little

22   different.  My question was has any other resident made

23   a request like Dr. Weisman did?

24       A.  I understand.  Sorry.

25            While I was the program director.  The most

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1   common request that I get would be for a training

2   verification, which is usually a condition of

3   employment.

4        Q.  What's a training verification?

5        A.  It's pretty self-explanatory.  It's just

6   asking the residency program director to verify that

7   that particular program attended the residency program

8   and that they completed the program.

9        Q.  Okay.  Would there ever have been a training

10  verification for Dr. Weisman?

11       A.  I believe there was something along those

12  lines.  I'm not sure if it was a residency -- I'm not

13  sure if it was a training verification program but it

14  was something like that.

15       Q.  Okay.  Do you know if you would have sent that

16  to Dr. Patil?

17       A.  I don't believe I sent that to Dr. Patil,

18  no.

19       Q.  You said it's a condition of employment; is

20  that right?

21       A.  The residency training verification, yes, is a

22  condition of employment.

23       Q.  Why?

24       A.  Well, because as an employer you want to know

25  that the person completed their residency program

1   before you employ them.

2        Q.  Okay.  Would that have been -- the training

3   verification, or whatever it was for Dr. Weisman, would

4   that have been a component of his 200 pages or so file

5   that you declined to copy?

6            MR. SULLIVAN:  Object to form.

7            Go ahead and answer.

8        A.  No, it wouldn't have been part of his file.

9   The same way that a training verification form wouldn't

10  be part of a resident's file that completed training

11  there.  Those requests come from whoever the employer

12  is to the program.  So it's not a preexisting form that

13  we would have.

14       Q.  (By Mr. Elster)  Something created in

15  response?

16       A.  Correct.

17       Q.  Did you ever condition the release of Dr.

18  Weisman's training file -- and I'm referring -- is that

19  the correct terminology for the 200 pages we're talking

20  about, training file, just so we're talking about the

21  same?

22       A.  It's as good as anything I can think of.

23       Q.  Did you ever condition that on him signing a

24  release of liability?

25           MR. SULLIVAN:  I'll object.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1     A.  No.

2           MR. SULLIVAN:  Calls for a legal conclusion.

3           Go ahead and answer.

4     A.  No.  There was a request for a letter of

5  recommendation for Dr. Weisman that I had asked for --

6  for his signature stating something along the lines

7  that he hadn't looked at the letter.  But there was

8  never any conditionality.

9     Q.  (By Mr. Elster)  Did you ever ask Dr. Weisman

10  to sign a release of liability for you and Washington

11  University?

12     A.  I don't believe so, no.

13     Q.  Do you think that's something you would have

14  ever done?

15     A.  A release of liability.  Unless it's in the

16  context of the letter of recommendation that I just

17  referenced, no, I don't think we would have ever asked

18  him to sign something like that.

19     Q.  As program director do you think it would have

20  been appropriate for you to condition the release of

21  his training file on him signing a release of

22  liability?

23           MR. SULLIVAN:  I'm going to object to form.

24  Assumes facts not in evidence.  Contrary to the facts

25  in evidence.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1            Go ahead and answer.
 2       A.  Would I have asked for him to sign a release
 3   of liability before releasing records.  Is that your
 4   question?
 5       Q.  (By Mr. Elster)  Correct.
 6       A.  No, I don't believe so.
 7       Q.  What about a release of records to any third
 8   parties?
 9            MR. SULLIVAN:  Same objection.
10            Go ahead.
11       A.  A release of records to any third parties.  I
12   don't believe so.
13       Q.  (By Mr. Elster)  Jump around to Exhibit 20.
14            MR. ELSTER:  I have copies for everyone too.
15            MR. SULLIVAN:  Okay.
16            MS. RUTTER:  You said Exhibit 20, Henry?
17            MR. ELSTER:  Yeah, Exhibit 20.
18            And I think the Bates label is 59188.  I
19   guess -- I don't think it's consecutive.  That's the
20   first one.  Mark this Exhibit 20.
21       Q.  (By Mr. Elster)  What is Exhibit 20, Dr.
22   Thompson?
23       A.  It looks like an e-mail.
24       Q.  Is this an e-mail that you sent to Dr. Weisman
25   on November 26 of 2018?
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
1        A.  It would appear that way.

2        Q.  Would you have been the training -- or the

3   department?

4        A.  The residency program director.

5        Q.  The residency program director?

6        A.  Yes.

7        Q.  At that time?

8            Okay.  Is your e-mail drthompson@wustl.edu?

9        A.  It is.

10       Q.  Do you have any other e-mail addresses?

11       A.  Sure.

12       Q.  What are they?

13       A.  Drthompson911@yahoo.

14       Q.  Anything other than that Yahoo address?

15       A.  Drthomps99@gmail.

16       Q.  Anything Else?

17       A.  Douglasroycethompson@yahoo.

18       Q.  Is that all of them?  I just want to make sure

19   I got all of your e-mails.

20       A.  I think that's all of them.

21       Q.  Okay.  Have you ever communicated about Dr.

22   Weisman on those e-mail addresses?

23       A.  Other than the wustl account?

24       Q.  Correct.

25       A.  I don't believe so.
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1     Q.   Have you ever text messaged about Dr. Weisman?

2     A.   Have I text messaged about Dr. Weisman.  I

3   don't know.

4     Q.   Would there have been any other written

5   communications about Dr. Weisman other than text

6   messages and e-mails?

7     A.   Like letters?

8     Q.   Sure.

9     A.   Other than in the context of sending records,

10  no, I don't believe so.

11    Q.   Records to third parties?

12    A.   Records to third parties or requests for

13  information.

14    Q.   What type of request for information?

15    A.   Well, I -- I know that there was a request for

16  me to have a telephone conversation with someone

17  regarding him.

18    Q.   Who was that person?

19    A.   I believe that was Dr. Epling at Duke.

20    Q.   At Duke.  Okay.  Did you have that telephone

21  call?

22    A.   I did not.

23    Q.   Why didn't you?

24    A.   That was on the advice of counsel from BJH and

25  BJC.

1          Q.  Did you communicate to Dr. Epling that you

2    couldn't communicate because it was on the advice of

3    counsel?

4          A.  I did.

5          Q.  Okay.  The first page of the e-mail, this

6    is -- is this the e-mail from you to Dr. Weisman again?

7          A.  This is an excerpt of what I believe is a

8    longer e-mail exchange.  But yes, this is an e-mail

9    from me to Dr. Weisman.

10         Q.  And there's an authorization of a release that

11   was attached on page 2.

12         A.  Uh-huh.

13         Q.  Who prepared this authorization and release?

14         A.  I don't know.

15         Q.  Did you prepare it?

16         A.  No.

17         Q.  Was it provided to you by an attorney?

18             MR. SULLIVAN:  I'm going to object and

19   instruct you not to disclose any attorney-client

20   communications.  To the extent you can answer the

21   question, you can go ahead

22         A.  I have no idea who prepared this.  I --

23   yeah.

24         Q.  (By Mr. Elster)  Have you ever asked someone

25   other than Dr. Weisman during your tenure at Washington

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    University to sign an authorization and release like

2    what we see in Exhibit 20?

3        A.  Well, having never encountered a case like Dr.

4    Weisman, no, there wouldn't have been occasion to.

5        Q.  You said you never encountered a case like Dr.

6    Weisman.  Okay.  What?

7        A.  Someone that left the program in the way that

8    Dr. Weisman did.

9        Q.  I don't want -- was there an attorney who

10   prepared this authorization and release?

11           MR. SULLIVAN:  I'm going to again object.  I

12   think it's asked and answered.  And further direct the

13   witness not to disclose any attorney-client

14   communications.

15           And subject to that you can answer.

16       A.  I -- I don't know who prepared that.

17       Q.  (By Mr. Elster)  Do you know who provided it

18   to you?

19       A.  I do not out of context know who provided it

20   to me, no.

21       Q.  Would there have been people when you were in

22   this position in 2018 who would have prepared a

23   document like this?

24           MR. SULLIVAN:  Object to form.  Asked and

25   answered.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1          Q.  (By Mr. Elster)  I'm trying to narrow down who

2     would have created this.  Because if you don't the

3     specific names, I'm like, well, who could it have been?

4     That's what I'm tying to do.

5          A.  So I do not know specific names, so I can't

6     answer that question.

7          Q.  So this is dated November of 2018?

8          A.  Uh-huh.

9          Q.  Where temporally did you make the

10     determination that it was too much of an administrative

11     burden to copy his training file?

12          A.  I don't know.  I would have to see that

13     e-mail.

14          Q.  Okay.  You don't know if it was before or

15     after this e-mail?

16          A.  I don't know.

17          Q.  Okay.  Do you know if Dr. Weisman ever signed

18     this authorization and release?

19          A.  I am fairly certain he never did.

20          Q.  Okay.  Did you see earlier drafts of this

21     authorization and release?

22              MR. SULLIVAN:  I'm going to --

23          Q.  (By Mr. Elster)  -- Before this version here?

24              MR. SULLIVAN:  I'm just going to object and

25     caution the witness not to disclose any attorney-client

1    communications, if there were.

2            Go ahead and answer.

3        A.  I don't recall seeing any earlier drafts of

4    this, if that's what you're referring to.

5        Q.  (By Mr. Elster)  Before it was sent?

6        A.  I don't recall.

7        Q.  And I don't want to talk about any

8    communications, but is there an attorney who would --

9    you would consult with about legal liability for

10   residency?  I just want an identity, not

11   communications.

12       A.  If you're asking if I have a legal question?

13       Q.  Right.

14       A.  Is there somebody that I would go to at Wash

15   U. or BJC?

16       Q.  Correct.

17       A.  So I would usually direct a question like that

18   to Christine Ramatowski or Joe Sklansky.

19       Q.  Okay.  With that in mind, does that make it

20   probable that one or -- one or both of them prepared

21   this authorization and release?

22           MR. SULLIVAN:  I'm going to object.  Instruct

23   the witness not to disclose any attorney-client

24   communications.

25       A.  It's possible.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1        Q.  (By Mr. Elster)  Okay.  Before you sent the

2   e-mail did you -- or immediately before you sent the

3   e-mail, I know you don't remember if you saw earlier

4   drafts, but did you look at the language in the

5   release?

6        A.  No.

7        Q.  So you didn't know before you sent it that it

8   was asking to release you, Washington University,

9   Barnes-Jewish Hospital, so on and so forth from any

10  liability?

11           MR. SULLIVAN:  And I'm going to object to the

12  form, that it mischaracterizes this authorization and

13  release.

14       Q.  (By Mr. Elster)  Outside of what you said

15  before in terms of your personal involvement, have you

16  ever heard of Washington University asking someone to

17  sign a release like this in connection with the release

18  of their training file?

19       A.  I don't know how I would know that.

20       Q.  Because you've worked there for years and you

21  might have some knowledge of it.  I don't know.

22       A.  No, I don't know how I would know that because

23  this would be privileged and confidential.  So how

24  would I know that?

25       Q.  From communicating with nonattorneys?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1      A.  No.

2      Q.  Do you know if his training file was ever

3  released, Dr. Weisman's, to him or anyone else?

4      A.  If your question is was the entirety of his

5  training file ever photocopied and sent to somebody?

6      Q.  That's not my -- no.  So not necessarily

7  photocopied but released in terms of produced either as

8  a photocopy, a scan, or made available to him?

9      A.  I don't know.  And this, if I remember

10  correctly.

11      Q.  Okay.

12      A.  This was in reference to a letter of

13  recommendation, not the release of his training

14  records.

15      Q.  You think that this authorization and release

16  is in relation to his training records?

17      A.  No, no, no.  What I'm -- what I'm saying is

18  despite the title of this e-mail, I believe this

19  exchange was in relation to a letter of recommendation.

20      Q.  So it's your testimony then that you were

21  asking him to sign an authorization and release in

22  connection with a letter of recommendation?

23      A.  That is where I believe -- that is the context

24  in which this e-mail fits in, I believe, yes.

25      Q.  Do you see anything in the authorization and

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    release about a letter of recommendation?

2            MR. SULLIVAN:  Objection.  I'm going object to

3    form.  Exhibit 20 speaks for itself.

4            You can take your time and read the release.

5        A.  So this looks like it's in reference to a

6    letter of recommendation and a list of rotations he

7    completed.

8        Q.  (By Mr. Elster)  Where do you see a letter of

9    recommendation?

10       A.  I thought I read that.  Letter of evaluation

11   from the program director.

12       Q.  A letter of evaluation is the same thing as a

13   letter of recommendation?

14       A.  Yeah, I would consider those synonymous, yes.

15       Q.  Well, have you ever asked someone to sign an

16   authorization or a release in connection with a letter

17   of evaluation and recommendation?

18           MR. SULLIVAN:  Object to form.  Asked and

19   answered.

20           Go ahead and answer.

21       A.  I'm sorry.  Am I supposed to answer it?

22           MR. SULLIVAN:  Yeah, go ahead.

23       A.  I don't believe so, no.

24       Q.  (By Mr. Elster)  Did you -- did you think it

25   was -- do you think it was appropriate to ask for this

 1  release from Dr. Weisman?

 2       A.   I have no idea if it's appropriate or not.

 3  Again, we don't often have residents leave the program.

 4  And so this is -- this instance was fairly novel to me

 5  so.

 6       Q.   That's cool.

 7            At the time you made the decision not to

 8  release the training file for Dr. Weisman because it

 9  was an administrative burden?

10       A.   Uh-huh.

11       Q.   Wouldn't you have known that it would have

12  been difficult for him to get into another residency

13  program without the training file?

14            MR. SULLIVAN:  I'm going to object to form.

15  Calls for speculation.  Assumes facts not in evidence.

16            Go ahead and answer.

17       A.   Do I think that not photocopying his entire

18  record would have made it difficult to get into another

19  residency program?

20       Q.   (By Mr. Elster)  I'm not saying photocopying,

21  I'm saying releasing.  If you -- releasing.  So whether

22  it be photocopying, making them available, scanning, in

23  some way producing?

24       A.   No.

25       Q.   Wouldn't that have made it difficult?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
1        A.  No, I don't believe so.

2        Q.  Why?

3        A.  Because as I said earlier, as a program

4    director, if I'm -- if I were to evaluate someone's

5    ability to complete a training program here at Wash U.,

6    I'm not going to base that decision on an exhaustive

7    review of that particular individual's entire file.

8            There are particular things that I would look

9    for in the file.  But I'm not going to review the

10   entire file to make that decision.

11       Q.  But if you ask for a portion of the file from

12   a resident and the resident says, Oh, they won't

13   release it to me unless I waive a lawsuit against them,

14   that doesn't raise any problems with you?

15           MR. SULLIVAN:  I'm going to object to form.

16   Assumes facts not in evidence.  Misstates Exhibit 20

17   and is contrary to other evidence.

18           Go ahead and answer.

19       A.  I'm sorry.  What was the question?

20       Q.  (By Mr. Elster)  Okay.  If a resident is

21   trying to go to Washington University and you ask for

22   a portion of their file, and he or she says, Well, I

23   can't give it to you 'cause they wanted me to sign a

24   release of liability and they said it's too much of an

25   administrative burden, that doesn't seem like a problem
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    to you?

2          MR. SULLIVAN:  Same objection.

3          Go ahead and answer.

4      A.  I would wonder why the resident doesn't just

5    sign the liability form.

6      Q.  (By Mr. Elster)  And you wouldn't have -- you

7    wouldn't be concerned about why someone's asking

8    someone to sign a liability form?

9      A.  I would --

10         MR. SULLIVAN:  -- I'm going to object.  Let me

11   object.  Assumes -- assumes a legal conclusion and

12   mischaracterizes Exhibit 20.

13         Go ahead and answer.

14     A.  I would be curious as to why -- why there's

15   lawyers involved and why -- why is this convoluted.

16   That would be my concern.

17     Q.  (By Mr. Elster)  Would it give you a negative

18   impression?

19         MR. SULLIVAN:  Object to form.  Speculation.

20         Go ahead and answer.

21     A.  I don't know.  I've never -- I've never

22   encountered that situation so I can't really answer.

23     Q.  (By Mr. Elster)  Okay.  But I'm asking from

24   based on your experience as a program director, would

25   that have given you a negative impression?

```
 1            MR. SULLIVAN:  Objection.  Calls for
 2    speculation.  Asked and answered.
 3            Go ahead.
 4       A.  I don't -- I don't know what kind of
 5    conclusion I would have reached.  There may be a
 6    perfectly reasonable explanation.  It's just not
 7    something that I've encountered.
 8       Q.  (By Mr. Elster)  Do you think it was ever --
 9    well, before we get into that.  So you're now the Vice-
10    Chair for Education for the Department of
11    Anesthesiology; is that correct?
12       A.  Correct.
13       Q.  What does that entail?
14       A.  Oversight for all of the training programs,
15    residency fellowships, and then dotted line
16    responsibilities for the SRNA program and APN program.
17       Q.  What's the SRNA?
18       A.  Student Registered Nurse Anesthetists.
19       Q.  And APN?
20       A.  Advanced Practice Nurses.
21       Q.  Why did you transition from program director
22    to Vice-Chair for Education?
23       A.  I was promoted.
24       Q.  Who previously occupied that position?
25       A.  Immediately before me, no one.  It was vacant.
```

1    Prior to that, Dr. Tom Cox.

2        Q.  Let's flip to Exhibit 2.  Is Exhibit 2 e-mail

3    communications with you and Shirley Vaughn?

4        A.  Uh-huh.

5        Q.  Who is she?

6        A.  She is one of the admins in the education

7    office.

8        Q.  Okay.  At this time were you the Director of

9    the Anesthesiology Department?

10       A.  I was the program director.

11       Q.  Program director.  I want to ask you about the

12   e-mail on the top at 2:39 p.m.  "Let me check with

13   Tom."  Is that Cox?

14       A.  Uh-huh.

15       Q.  Dr. Cox?

16       A.  Dr. Cox.

17       Q.  Okay.  And you say:  I doubt I'm the

18   appropriate person to be writing him any letters.  In

19   relation to Dr. Weisman.  Why did you say that?

20       A.  Well, I wasn't his program director.  And at

21   this time I knew that there was a history with Dr.

22   Weisman and the program.

23       Q.  Do you think it was ever appropriate for you

24   to write letters on Dr. Weisman's behalf?

25       A.  What's the nature of your question?  So I

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    certainly wrote quite -- I wrote letters of

2    recommendation on behalf of Dr. Weisman at his request.

3    But that letter was basically adopting a letter that

4    had been written by Dr. Benzinger.  But the request was

5    to come from the current program director.  So in my

6    role as the current program director, I used that

7    letter.

8        Q.  I'll rephrase a little bit.  So you say you're

9    not the appropriate person.  Did you say that because

10   you weren't the program director when he was a

11   resident?

12       A.  Correct.

13       Q.  Did you also say that because you didn't

14   supervise or oversee Dr. Weisman when he was a

15   resident?

16       A.  Well, so --

17           MR. SULLIVAN:  -- Object to form.

18   Mischaracterizes his prior testimony.

19           Go ahead and answer.

20       A.  So as we discussed earlier, I did supervise

21   Dr. Weisman in a clinical manner, in a clinical

22   fashion, yes.

23       Q.  (By Mr. Elster)  Okay.  But you can't recall

24   how many instances other than the one you mentioned

25   earlier at Children's, right?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1        A.  I don't recall specific instances other than
 2   the one I mentioned, no.
 3        Q.  Any other reasons you wrote that you weren't
 4   the appropriate person to be writing any letters?
 5        A.  Other than I've already listed?  No, I don't
 6   think so.
 7        Q.  Did you meet with Dr. Weisman after these
 8   e-mails in August -- in August of 2018?
 9        A.  I believe I met with Dr. Weisman in my office.
10   I don't know temporally when it occurred.  Before or
11   after this.
12        Q.  What do you remember about that meeting?
13        A.  Nothing really.
14        Q.  Did he during that meeting or any time after
15   ask for your assistance in transferring to another
16   residency program?
17        A.  I believe he asked for a letter of
18   recommendation.  So in that fashion, yes, I guess you
19   could say he asked for assistance.
20        Q.  Did you feel that you had any obligation to
21   assist him in transferring to another residency
22   program?
23            MR. SULLIVAN:  Object to form.  Vague.
24            Go ahead and answer.
25        A.  I believe it's in the best interest of any
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1   residency program to try to ensure the success of any
 2   trainee that is in their program or left their program,
 3   yes.
 4        Q.  (By Mr. Elster)  Did you do anything to assist
 5   Dr. Weisman in that end that you just described to
 6   ensure his success after he left the program?
 7             MR. SULLIVAN:  Objection.  Vague.
 8             Go ahead and answer.
 9        A.   I wrote -- again, wrote a letter of
10   recommendation in that I borrowed or used the letter of
11   recommendation provided by Dr. Benzinger.  I sent that
12   to multiple programs.  Most of the requests that Dr.
13   Weisman sent to the program we complied with.  With the
14   one exception that I felt it onerous to reproduce the
15   entirety of his file.
16        Q.  (By Mr. Elster)  Other than the letter you
17   said was mostly adopted from Dr. Benzinger's prior
18   letter, did you write any other letters on Dr.
19   Weisman's behalf?
20        A.   I don't believe so.
21        Q.   Okay.  Did you express ever your personal
22   views or opinions of Dr. Weisman as a resident
23   anesthesiologist to any other medical institutes when
24   you were department head?
25             MR. SULLIVAN:  Object to department head.
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1              MR. ELSTER:  Okay.
 2              MR. SULLIVAN:  Go ahead and answer.
 3       A.  I don't recall the conversation or the details
 4   of the conversation or the conversation having taken
 5   place.  But I know that I did have a conversation with
 6   Dr. Macario from Stanford I believe.
 7       Q.  (By Mr. Elster)  And you mentioned that.  What
 8   do you remember about that?
 9       A.  I don't remember anything about it.  The only
10   reason I know that it took place is because it was in
11   some of the documents that I reviewed.
12       Q.  Do you know how long it took, the conversation
13   was?
14       A.  I do not.
15       Q.  Was anyone else present for the conversation?
16       A.  I don't recall but that would be unlikely.
17       Q.  Dr. Macario's at Stanford University?
18       A.  I believe so.
19       Q.  During that phone call would you have known
20   that Dr. Weisman was trying to transfer to Stanford
21   University?
22              MR. SULLIVAN:  Object to form.
23              Go ahead and answer.
24       A.  I don't know.
25       Q.  (By Mr. Elster)  Was the conversation about
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    Dr. Weisman?

2         A.  I would assume the conversation was about Dr.

3    Weisman, yes.

4         Q.  Did you do anything to ensure that Dr. Weisman

5    could transfer to Stanford University during that phone

6    call?

7         A.  I don't --

8              MR. SULLIVAN:  -- Object to form.

9         A.  I don't remember the details of the

10   conversation.

11        Q.  (By Mr. Elster)  Do you remember a single word

12   that was said --

13        A.  I do not.

14        Q.  -- in that conversation?

15        A.  I don't, no.

16        Q.  Okay.

17        A.  When was that conversation?

18        Q.  I'll have e-mails.  We'll get to it.  You

19   don't remember when that was?

20        A.  I don't.

21        Q.  Other than Dr. Macario did you communicate --

22   and Dr. Patil which we -- we talked about earlier, any

23   other physicians or heads of any other medical

24   institutes you can --

25        A.  -- So I did not communicate with Dr. Patil

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1   verbally.

2        Q.  It was in writing?

3        A.  Correct.

4        Q.  All right.

5        A.  We mentioned Dr. Fox and Dr. Kaye, which were

6   also e-mail communications.  We spoke about Dr. Epling,

7   which was a e-mail communication.  Other than those, I

8   can't recall, no.

9        Q.  Temporally do you know where the conversation

10  with Dr. Macario occurred in relation to the -- to your

11  declining to release his training file?

12       A.  I don't.

13       Q.  And you don't know which happened first?

14       A.  I don't.  I'd have to look at the dates.

15       Q.  Flip to Exhibit 3.  Part of the -- it's

16  redacted because that's how it was produced to me so.

17  It's two pages.

18       A.  Okay.

19       Q.  Okay.  So on the first e-mail -- and this is

20  just more for -- you wouldn't have any reason to

21  believe whether some of the things communicated here

22  are true or not true.  So, for example, could not

23  present patients with any cohesiveness?

24       A.  I have no knowledge about that.

25       Q.  Okay.  And then likewise on -- so the next

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1   sentence:  They had no clue what was going on, in

 2   reference to Dr. Weisman, and someone else's identity's

 3   redacted.  And then likewise on the next page, you

 4   wouldn't have any knowledge about the type of work that

 5   was done there or described?

 6        A.  So this would have been before I started at

 7   Wash U. so any knowledge I gained about this would have

 8   been after the fact.

 9        Q.  Okay.  Knowledge you gained about it.  Have

10   you spoken with Dr. Benzinger about Dr. Weisman?

11        A.  I'm sure I have, yeah.

12        Q.  Have you heard Dr. Benzinger make any negative

13   statements about Dr. Weisman?

14            MR. SULLIVAN:  Object to form.  Vague.

15            Go ahead and answer.

16        A.  I believe Dr. Benzinger expressed concerns

17   about -- about the progress of Dr. Weisman, yes.

18        Q.  (By Mr. Elster)  Did he express what type of

19   concerns?

20        A.  So in general not meeting expectations and not

21   sort of up to the level of his peers.

22        Q.  Outside of Dr. Benzinger, what about Dr.

23   Groener, have you heard him make any negative

24   statements about Dr. Weisman?

25            MR. SULLIVAN:  Objection.  Vague.
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1          Go ahead and answer.

2      A.  I don't recall any specifics from Dr. Groener

3  but -- and Dr. Groener's role but it's certainly a

4  possibility.

5      Q.  (By Mr. Elster)  What about Dr. Cox?

6      A.  I don't remember any specific conversations

7  with Dr. Cox.

8      Q.  What about Dr. Evers?

9      A.  I don't believe I had any conversations with

10  Dr. Evers about this, about his performance as an

11  intern.

12      Q.  What about otherwise?

13      A.  This was e-mail communications with Dr. Evers

14  but it was not specific to his performance.

15      Q.  What was it about?

16      A.  There was some concern about a negative review

17  that was posted about the program that we suspected was

18  authored by Dr. Weisman.

19      Q.  And what was the concern about?

20      A.  It painted the program in a negative light and

21  wasn't -- I don't remember specifics but I don't recall

22  it being particularly factual.

23      Q.  Okay.  Well, how do you know -- I know you

24  don't have the -- what you're referring to in front of

25  you.  You said it wasn't particularly factual.  What

1    was incorrect about it?

2         A.   Again, I don't recall specifics.  That's just

3    my general sense of the post when I read it.

4         Q.   When evaluations are completed for residents

5    at the anesthesiology program, what's the process for

6    them to be completed?  It's not just -- well, you go.

7    I don't want to ask too many questions.

8              MR. SULLIVAN:  Object to form.  Vague.

9              Go ahead and answer.

10        A.   So there's multiple ways the evaluations are

11   completed.  So ideally the resident should get verbal

12   feedback every day about how they're doing.  In lieu of

13   that, depending on the particular rotation that they're

14   on, they, at the end of their rotation at the very

15   least, should get written feedback about how they're

16   doing.  That may take the form of milestones again.

17   Sometimes they're accompanied by narrative evaluations.

18        Q.   (By Mr. Elster)  For the written evaluations,

19   who would complete those?

20        A.   Typically it's the rotational coordinator for

21   their rotation.

22        Q.   If not the rotational coordinator, who else?

23        A.   It should be the rotational coordinator that

24   fills out those evaluations.  They might have

25   assistance with an admin but....

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1      Q.  So the rotational coordinator or an

2  administrative assistant like a scribe or?

3      A.  I wouldn't necessarily describe it as a

4  scribe.  But, for example, you know, on the peds

5  rotation ideally we're submitting narrative comments

6  every day.  An admin might help collate all those

7  comments and submit it to the rotational coordinator.

8      Q.  Would it -- when you were the program

9  director?

10     A.  Uh-huh.

11     Q.  Would you do evaluations for people you

12  weren't the immediate program coordinator for?

13     A.  Yeah, as I supervise them -- if I supervise

14  them as a clinical faculty guy.

15     Q.  What if you didn't supervise them?

16     A.  If I didn't supervise them?

17     Q.  Yeah.  Would you do the evaluations?

18         MR. SULLIVAN:  Object to form.  Confusing.

19         Go ahead and answer.

20     A.  So in my role as the program director I

21  reviewed evaluations.  And I might use those

22  evaluations and incorporate them into my six-month

23  review of the resident.

24     Q.  (By Mr. Elster)  Okay.  If we can flip to --

25  hand you Exhibit 4.  Would you -- would you have been

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1   at Washington University at this time, December of

2   2017?

3       A.  No, I believe I started July 17th, 2017.

4       Q.  Well, December is after July, right?

5       A.  Sorry.  Yes, you're right.  Sorry.

6       Q.  My question when you're ready.  In that first

7   e-mail:  Please do not submit an evaluation for

8   Weisman.  And this is from Dr. Benzinger to Amy

9   Ficklen:  Collect the comments and forward them to me,

10  but I'll do the evaluation.  Is that a common practice?

11          MR. SULLIVAN:  Object to form.  Assumes facts

12  not in evidence.

13          Go ahead and answer.

14      A.  I don't know who Amy Ficklen is.  And let me

15  look at the e-mail.

16          MR. SULLIVAN:  Yeah, read the entire e-mail.

17      A.  Okay.  So it appears that she is an

18  administrator coordinator.

19      Q.  (By Mr. Elster)  You -- you didn't know who

20  she was before?

21      A.  No.

22      Q.  And she's not at Wash U. anymore from what you

23  know?

24      A.  I have no idea.  But this is the first time to

25  my knowledge I've ever heard that name.

1    Q.  So my question then was is it common what Dr.

2    Benzinger is describing here, Please do not submit an

3    evaluation for Dr. Weisman.  Collect the comments and

4    forward them to me but I'll do the evaluation?

5            MR. SULLIVAN:  I'll object to -- I mean, not

6    on this e-mail but I'll object to the extent it calls

7    for speculation.

8            Go ahead and answer.

9    A.  It's not clear to me from the context of this

10   e-mail what he is referring to.  What Dr. Benzinger is

11   referring to.  So -- yeah, I'll just leave it at that.

12   Q.  (By Mr. Elster)  So -- when you were in Dr.

13   Benzinger's position --

14   A.  Uh-huh.

15   Q.  -- because you succeeded him, did you ever

16   give a -- send an e-mail like this where it's saying do

17   not send an evaluation for a resident where you wanted

18   to collect the comments and do the evaluation yourself?

19   A.  When I was the program director did I ever say

20   something similar to this?  Is that your question?

21   Q.  Right.

22   A.  I don't believe so.

23   Q.  Do you think it would have been appropriate

24   when you were the program director to do that?

25           MR. SULLIVAN:  Objection.  Assumes facts not

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    in evidence.  Contrary to the facts in evidence.

2           Go ahead and answer.

3       A.  It depends on -- it depends on what I was

4    trying to accomplish with that.

5       Q.  (By Mr. Elster)  But to be clear, you never

6    did do that?

7       A.  I don't believe I ever did that as a

8    program -- as a program director, no.

9       Q.  Flip to Exhibit 5.

10          MR. SULLIVAN:  Do you want him to read all of

11   these e-mails or do you have specific?

12          MR. ELSTER:  Oh, I'm going to have some

13   specific questions.

14      Q.  (By Mr. Elster)  So the first e-mail is

15   December of 2017?

16      A.  Uh-huh.

17      Q.  15 of 2017.  I think all of them are except

18   for the last e-mail of January 11th, 2018.

19          At this time do you recall that there were

20   some conversations about Dr. Weisman not completing the

21   program December of 2017?

22          MR. SULLIVAN:  I have no objection.

23          Go ahead.

24      A.  I was included in e-mails where there was

25   concerns raised, yes.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1        Q.  (By Mr. Elster)  Okay.  But you knew that

2    there were concerns by other people, not necessarily

3    you?

4        A.  About his completion of the program?

5        Q.  Correct.

6        A.  Yes.

7        Q.  Did you have any concerns at the time about

8    him completing the program?

9        A.  Again, my experience with him was fairly

10   limited.  But based on the incidents that I recalled

11   and related to you, yes, I had concerns.

12       Q.  Based on that one incident?

13       A.  That's a pretty big incident.

14       Q.  But just -- just one incident, that's it?

15       A.  One incident of a patient waking up in the

16   middle of the surgery is a big deal.  And recall during

17   surgery is a big deal.  Yes, that is a big incident.

18   Yes, I recall that.

19       Q.  Okay.  Did anyone wake up during the surgery

20   with Dr. Weisman?

21       A.  Had I not come into the room when I did, that

22   is a distinct possibility, yes.

23       Q.  Okay.  But did it happen?

24       A.  Had I not come into the room when I did, that

25   is a distinct possibility.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1      Q.  Wasn't there some malfunctioning with some of

2   the equipment during that surgery?

3      A.  No.

4      Q.  Okay.  Are you sure?

5      A.  There was no malfunction of the equipment.

6   There was a failure on Dr. Weisman's behalf to use the

7   equipment properly.  Furthermore, there was a failure

8   of Dr. Weisman to look at the monitor and realize what

9   was going on.

10      Q.  Okay.  Have you ever relayed this incident to

11   anyone else?

12      A.  I probably included it in the comments to Dr.

13   Groener but I haven't a specific memory.

14      Q.  Why do you say probably?

15      A.  Because it was a big deal, as I've tried to

16   express here, so it's concerning.  So I probably in my

17   capacity as an evaluating him for that particular day's

18   performance as a clinician, probably included it in my

19   evaluation.

20      Q.  Based on that one incident did you have

21   concerns about his aptitude as expressed in this

22   e-mail?

23          MR. SULLIVAN:  Which e-mail are you referring

24   to?

25          MR. ELSTER:  The first one of Exhibit 5 and

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    specifically the second paragraph.

2          MR. SULLIVAN:  I would just caution you, Dr.

3    Thompson, to read the entire first page of Exhibit 5,

4    the first e-mail.

5          A.  Okay.  I'm sorry.  What's your question?

6          Q.  (By Mr. Elster)  Okay.  So there's a reference

7    in paragraph 2 that aptitude may contribute.  And this

8    is from Dr. Benzinger.  My question was, based on the

9    incident you've described at Children's, based on that

10   did you have a concern about his aptitude overall as a

11   resident anesthesiologist?

12         A.  Are you asking if I had personal concerns?

13         Q.  Correct.

14         A.  Yeah.

15         Q.  Just based on that?  And it's based on that?

16         A.  Yes.

17         Q.  Okay.  Did you have any positive experiences

18   when you were with Dr. Weisman?

19         A.  Again, I don't recall all the instances where

20   I worked with him.  I know that not every instance

21   where I worked with him did he have episodes like that.

22         Q.  Would you be able to look, but not necessarily

23   right now, on how many -- consult some document or

24   calendar to figure out how many times you worked with

25   him?  Is there a record of that anywhere?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1        A.  So shortly after I started on staff we

2    transitioned to a different electronic health record.

3    So now we use Epic.  And I don't recall which system we

4    were on when -- when Dr. Weisman was training here.

5            So the answer to your question is I'm not

6    sure.  If it was on the old system, I'm not sure if we

7    still have access to that.

8        Q.  Okay.  On the one, two -- fourth paragraph

9    down there's a discussion, a one sentence paragraph,

10   about an acceptable compromise.  Do you know if Dr.

11   Weisman ever reached any sort of agreement with Dr.

12   Benzinger?

13       A.  I'm sorry, which paragraph are you looking at?

14       Q.  Fourth.

15       A.  After obviously?

16       Q.  Correct.

17       A.  Okay.

18       Q.  So there's a reference to compromise.

19           Do you know if Dr. Weisman ever reached any

20   sort of agreement with Dr. Benzinger in connection with

21   his leaving the program?

22           MR. SULLIVAN:  I'm going to object to the form

23   with respect to calling for a legal conclusion as to an

24   agreement.

25           Go ahead and answer.

1        A.   I know from e-mail exchanges that Dr.

2    Benzinger discussed with Dr. Weisman about leaving the

3    program.

4        Q.   (By Mr. Elster)  Okay.  Do you know if

5    there -- in those discussions or otherwise if they

6    reached any sort of -- if there were any discussions

7    about the terms on which he would leave?

8            MR. SULLIVAN:  Object to form with respect to

9    it calls -- with respect to calling for a legal

10   conclusion.

11           Go ahead and answer.

12       A.   I'm sorry, what?

13       Q.   (By Mr. Elster)  Based on what you remember

14   reviewed about those discussions and outside of that?

15       A.   Yes.

16       Q.   Do you recall any discussions about the terms

17   of Dr. Weisman leaving, such as when it would happen,

18   the manner, and so on?

19           MR. SULLIVAN:  Same objection.

20           Go ahead and answer.

21       A.   I know that they discussed -- in general terms

22   there was basically two decisions that Dr. Weisman was

23   sort of contemplating.  Whether to stay in the program

24   and try to finish the residency, or whether or not to

25   leave.  And I know that Dr. Benzinger and Dr. Weisman

1    had conversations around that.

2         Q.  (By Mr. Elster)  Were you around for any of

3    those conversations?

4         A.  In person?

5         Q.  I'll start in person first.

6         A.  I don't believe I was in -- I don't believe I

7    was around in person for any of those conversations.

8         Q.  What about remotely or through e-mail

9    communication?

10        A.  I was probably -- I was included in some of

11   the e-mail communication, yes.

12        Q.  Okay.  You can flip to 419, which is on the

13   bottom right.  So I'm referring to these numbers down

14   here.  And they don't necessarily go.

15        A.  Okay.

16        Q.  And I'm asking about the e-mail on the top.

17   So at 8:20 a.m., which you were copied on.  It says:

18   Ultimately, a voluntary resignation isn't something one

19   appeals; since it's voluntary, which I think is --

20   which why I think this is a desirable outcome.

21             And looking at it, were there any

22   conversations about removing involuntarily Dr. Weisman

23   from the residency program?

24        A.  Involuntarily removing?

25        Q.  So for cause or for other reasons.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1        A.  There was concern that he might have to

2    remediate some of his training.  But to my recollection

3    I don't believe there were conversations about removing

4    him.

5        Q.  If there was a remediation plan put into

6    place, would there have been some administrative

7    grievance procedure that Dr. Weisman could have

8    initiated to dispute that?

9        A.  I believe that's correct, yes.

10       Q.  Okay.  Is it fair to say that there is a

11   dispute or grievance procedure if there's a voluntary

12   resignation?

13       A.  I don't know.  I would presume so if it's

14   voluntary.

15       Q.  Presume so or presume not?

16       A.  I would presume that there's no.

17       Q.  No.  Okay.  As Dr. Benzinger says, It's not

18   something you can appeal.  Would you agree with him?

19       A.  Well, if the resident is voluntarily leaving,

20   then, yeah, it wouldn't make sense to then appeal the

21   voluntary leaving.  If I follow your question.

22       Q.  And flip to Exhibit 6.  The next one.  Exhibit

23   6 is an e-mail and then there's an attachment of the

24   Dr. Benzinger letter.

25            Did you give input on the contents of this

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1   letter which is attached?

2          MR. SULLIVAN:  Go ahead and familiarize

3   yourself with the letter, Doctor.

4       A.  Your question is if I gave input?

5       Q.  (By Mr. Elster)  Correct.  Because it was --

6   it appears that it was forwarded to you.  Like an hour

7   after it was originally sent you were included.

8       A.  I believe I was forwarded a draft of this and

9   I believe Dr. Benzinger asked for input.  I don't

10  recall if I gave any input.

11      Q.  Do you know who did give input on the letter?

12      A.  I believe Dr. Cox had a small statement that

13  he made about the letter but other -- other than that I

14  don't.

15      Q.  Other than Dr. Cox and Dr. Benzinger, do you

16  know anyone else -- and the people listed on this

17  e-mail, on the first one, the January 11th e-mail, who

18  else would have reviewed it?

19      A.  Other than the people that are already listed

20  here?

21      Q.  Correct.  And then you subsequently.

22      A.  I don't know that anyone else would have --

23  would have reviewed it.

24      Q.  To your understanding did everyone agree with

25  the contents of the letter?

1      A.  That's my understanding.

2      Q.  Okay.  Including you?

3      A.  To the extent that I was involved, yes.

4      Q.  Okay.  Well, to the extent that you were

5   involved.  So that could mean you weren't involved.  So

6   what --

7      A.  -- Well, I wasn't -- I wasn't the program

8   director.

9      Q.  Okay.  Well, I know you weren't the program

10  director as of January 2018.  But it was forwarded to

11  you because you were the program director in waiting;

12  is that right?

13     A.  Correct.

14     Q.  Okay.  So would you have reviewed this at the

15  time?

16     A.  As I stated, I believe I reviewed a draft of

17  this, yes.

18     Q.  Okay.  And you don't believe you made any

19  changes to it?

20     A.  I don't think so, no.

21     Q.  Okay.  Did you agree with -- ultimately with

22  what was signed as this attachment here?

23     A.  I'm sorry.  Are you asking if I agree with?

24     Q.  The contents.

25     A.  With the letter?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1       Q.  Correct.
 2           And it's dated January 11th, 2018.  So on the
 3  same date as the e-mails.
 4       A.  I mean, for the most part the letter is pretty
 5  factual, so I'm not sure what I would disagree with.
 6       Q.  So you don't disagree with anything in there?
 7       A.  I don't think that there's anything here that
 8  as the associate program director I would have
 9  disagreed with.
10           MR. ELSTER:  Okay.  You want to take a quick
11  break for lunch?  We've been going for about an hour,
12  if you want.
13           MR. SULLIVAN:  Yeah, but let's make it
14  quick.
15           MR. ELSTER:  Okay, yeah.
16           VIDEOGRAPHER:  We're off the record at 12:03
17  p.m.
18           (Lunch break.)
19           VIDEOGRAPHER:  We're back on the record at
20  12:49 p.m.
21       Q.  (By Mr. Elster)  Dr. Thompson, do residents
22  make mistakes during their residency program?
23       A.  Of course they do.
24       Q.  Okay.  Have you ever met a resident that
25  didn't make mistakes?
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1        A.  I don't know how to answer that.

2        Q.  There's not a perfect resident in terms of

3    training, right?

4        A.  Probably not, no.

5        Q.  Therefore, residents that grad U. -- graduate

6    from the Washington University Anesthesiology Program,

7    they've all made mistakes for the most part, right?

8        A.  Presumably.

9        Q.  Did you ever communicate to Dr. Weisman over

10   the phone that you couldn't write any sort of letter

11   for him because you'd only worked with him one or two

12   times?

13       A.  I don't know.

14       Q.  You don't know one way or the other?

15       A.  I don't know one way or another.

16       Q.  Let's flip to Exhibit 7 and I'll try to fire

17   through these.  The second page, 454, on the bottom

18   right so it's a Bates labeling.  What is the NI report

19   in the top e-mail?

20       A.  NI stands for new innovations.  It's just the

21   online sort of web portal we use -- that we use for

22   evaluations.

23       Q.  Okay.  Is this -- you filled out a new

24   innovations report.  Is it related to Dr. Weisman?

25       A.  I can't tell from the concept -- context of

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    that but since you're giving it to me I would presume

2    so.

3        Q.   Okay.  The bottom e-mail refers to the quest

4    remains who will be doing Jeff Weisman?

5            The bottom e-mail says:  but the quest remains

6    on who will be doing Jeff Weisman, and it's redacted?

7        A.   Formal six-month.

8        Q.   Formal six-month review.  So in looking at

9    that, does the NI report relate to Dr. Weisman?

10       A.   It would appear that way.

11       Q.   How many of those reports did you do for him?

12       A.   This -- assuming I filled this one out, this

13   probably would have been the only one.

14       Q.   Okay.  Are you aware of any complaints Dr.

15   Weisman has made that he didn't get a six-month review

16   at any period of time?

17       A.   The only complaint that I know of regarding

18   evaluations was about the summative evaluation.  So I

19   guess the answer to your question is no, I'm not aware

20   of that.

21       Q.   And the complaint to be sure on that is that

22   there wasn't a summative evaluation?

23       A.   Correct.

24       Q.   And you're saying one has been created now?

25       A.   It has been.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1        Q.  Have you seen it?

2        A.  I have.

3        Q.  Who created it?

4        A.  I believe it was Dr. Mitchell, the current

5   program director.

6        Q.  Sometime after September of 2021?

7        A.  Uh-huh.  If that's when the request was, yeah.

8        Q.  Do you know if Dr. Mitchell has sent it to

9   anyone?

10       A.  I don't know.

11       Q.  Did you assist in completing that evaluation?

12       A.  I may have had some input into it.  But I

13   believe it was -- I didn't put -- I didn't put much

14   effort into putting that together, no.

15       Q.  Did anyone else have any input into putting

16   that together?

17            MR. SULLIVAN:  And just to -- I'll object to

18   the extent it would involve any attorney-client

19   communication, if there was any.

20            Subject to that you can answer.

21       A.  The only other person that I know of that

22   would have put input into it other than Dr. Mitchell

23   would have been Lauren Gibson.

24       Q.  (By Mr. Elster)  Who is that?

25       A.  Her official title is the Finance Director for

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1  Education.

2       Q.  I think you've testified earlier that there

3  was a concern that Dr. Weisman was below his peers in

4  terms of his evaluations; is that right?

5       A.  Correct.

6       Q.  Okay.  And when you made that, is that an

7  opinion that you had?

8       A.  So it's an opinion that I have based on my

9  limited interaction with him.  But it's also the

10 opinion that I gathered looking at some of his other

11 evaluations.

12      Q.  And in making that determination, does that

13 inevitably involve comparing his evaluation with other

14 residencies -- residents' evaluations?

15           MR. SULLIVAN:  Object to form.

16      A.  Not necessarily comparing his evaluations to

17 other resident evaluations, more comparing his

18 performance to other residents.

19      Q.  (By Mr. Elster)  So how do you determine his

20 performance relative to other residents without looking

21 at other residents' files and evaluations?

22      A.  I've worked with residents for the last 15

23 years, so my comparisons are based on my experience

24 working with other residents.

25      Q.  Well, wasn't the opinion that he was below

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1   other residents at Washington University?

2          MR. SULLIVAN:  Object to form.  Argumentative.

3          Go ahead and answer.

4      A.  It would be my opinion that based on his level

5   of training he's behind residents that I've worked with

6   here and also at the University of Washington in

7   Seattle.

8      Q.  (By Mr. Elster)  Flip to 458.  I'm going to

9   ask about the e-mail from Dr. Cox in the middle.  So at

10  11:48 a.m.  I think you were talking about this

11  earlier.

12     A.  Uh-huh.

13     Q.  There's a -- there's a request or sentiment to

14  reschedule a meeting to after deadlines so Jeff is not

15  receiving a letter or additional negative feedback

16  after deadline?

17     A.  Uh-huh.

18     Q.  What's the deadline that's being referred to

19  there?

20          MR. SULLIVAN:  And just, Counsel, you didn't

21  read the entire e-mail chain.  That goes over to 459

22  too.

23     A.  So back to your question, I believe the

24  deadline they're referring to is the deadline for

25  residents or medical students to apply to residency

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    programs through the ERAS system, E-R-A-S.

2         Q.  (By Mr. Elster)  What is the meeting that's

3    being referred to as rescheduled?

4         A.  I would assume from the context of the rest of

5    the document they're referring to the six-month

6    evaluation, but I'm not for sure positively.

7         Q.  Do you know if meetings were rescheduled until

8    after this deadline to avoid any negative comments?

9         A.  I don't know.

10        Q.  There's actually an e-mail you sent at the

11   bottom of 458 and it goes into 459.

12        A.  Uh-huh.

13        Q.  And it says:  Do we actually have evidence

14   (other than the ACGME survey) that Jeff has said or

15   published anything about the program?

16        A.  Uh-huh.

17        Q.  I guess presently now do -- do you know of

18   anything Jeff has said, said or published about the

19   program?

20        A.  That was said concretely, no, I don't have

21   evidence.  Although, as we've discussed earlier, there

22   was the suspicion that he created the post on

23   ScutWork's I think is the website.

24        Q.  On the e-mail later on 459 from Dr. Cox --

25             MR. SULLIVAN:  -- It's actually earlier in

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1   time?
 2          MR. ELSTER:  Earlier in time.  So it's 11:18.
 3      Q.  (By Mr. Elster)  He refers to a recent
 4   escalation of negative activity.  Last sentence, first
 5   paragraph.
 6      A.  Uh-huh.
 7      Q.  Do you have any firsthand knowledge of
 8   escalation of negative activity?
 9      A.  I think what Dr. Cox is referring to is the
10   web post that I referred to earlier.
11      Q.  But you wouldn't have any firsthand knowledge
12   of escalation of negative activity?
13      A.  That would represent an escalation of negative
14   activity, yes.
15      Q.  And my question is are you a witness to any
16   negative activity by Dr. Weisman as referred to here?
17      A.  If your question is do I know definitely if
18   Dr. Weisman posted that?
19      Q.  Know or witnessed any negative activity is
20   what.
21      A.  I don't concretely know that.  Witnessed
22   negative activity, no, I don't think I witnessed
23   negative activity.
24      Q.  461.  The top e-mail from Dr. Benzinger to you
25   and Dr. Cox.  The last sentence.  The 1:36 p.m. e-mail
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1   says a summative letter.

2        A.   Uh-huh.

3        Q.   What is a summative letter?

4        A.   I'm not sure exactly but I would assume what

5   he meant was the letter of recommendation.

6        Q.   Okay.

7        A.   Or it could have also been a letter from the

8   program to Dr. Weisman just kind of stating where he

9   was in the program at that -- at that period of time.

10  So it might be related to the six-month -- six-month

11  review.

12       Q.   Do you know if there's a distinction between a

13  summative letter and summative evaluation?

14       A.   I think they would probably be the same.

15       Q.   Probably the same.

16            Flip to 489.  So the top e-mail from Dr.

17  Benzinger at 9:49 a.m.  On the second to last

18  paragraph.  Do you agree with his statement:  Our

19  department will provide you or any other resident the

20  strongest letter of recommendation that we can.  It's

21  an obligation of any residency program?

22       A.   Do I agree with that statement?

23       Q.   Yeah.

24       A.   Absolutely.

25       Q.   Do you think that you've done that for Dr.

1    Weisman?

2         A.   Provide the strongest letter we can?

3         Q.   Yes.

4         A.   Yes.

5         Q.   Have you had any -- when you -- when you would

6    write the letter of recommendations, aren't they just

7    generally written to whom it may concern and then

8    that's utilized by Dr. Weisman or another resident and

9    given to another residency program?  It's not

10   personalized to a specific hospital?

11             MR. SULLIVAN:  I'm going to object.  It's

12   compound, confusing.

13             Go ahead and answer.

14        A.   It depends on the purpose of the letter.

15        Q.   (By Mr. Elster)  Okay.

16        A.   So there are times when I will personalize the

17   letter on behalf of a resident or a fellow.

18        Q.   Did you ever personalize a letter for Dr.

19   Weisman?

20        A.   I don't recall.

21        Q.   Would they just be generally worded letters,

22   meaning to whom it may concern or so on?

23        A.   Are you asking in the instance of Dr. Weisman

24   were they generally worded letters?

25        Q.   Correct.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1      A.  I believe the letters I've provided for him

2   were generally worded, yes.

3      Q.  Did he ever ask you to write a letter of

4   recommendation for him?

5           MR. SULLIVAN:  Objection.  Asked and answered.

6           Go ahead and answer.

7      A.  He asked me to provide letters of

8   recommendation on his behalf, yes.

9      Q.  (By Mr. Elster)  And if I understand, the only

10  one that you had written was mostly based on Dr.

11  Benzinger's draft; is that right?

12     A.  Correct.

13     Q.  Do you agree with me that it would kind of

14  defeat the purpose of a letter of recommendation if you

15  had a phone call with another department head where you

16  contradict what the letter of recommendation says?

17          MR. SULLIVAN:  I'm going to object to the

18  question and form.  Assumes facts not in evidence.

19  Improper hypothetical.  Argumentative.

20          Go ahead and answer.

21     A.  I'm sorry.  Can you repeat the question?

22     Q.  (By Mr. Elster)  Sure.  Do you agree with me

23  that it would defeat the purpose of the letter of

24  recommendation if it's sent to a particular program but

25  then you subsequently or before had a phone call with

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1   someone at that program that contradict the letter?
 2           MR. SULLIVAN:  Same objection.
 3           Go ahead and answer.
 4       A.  If you're asking in generalities, that
 5   might -- that might be -- that might -- what's the word
 6   I'm looking for?
 7       Q.  (By Mr. Elster)  Undermine?
 8       A.  Undermine the letter, sure.
 9       Q.  You can flip to Exhibit 8.  I want to ask you
10   about the bottom e-mail when you're ready.  On the
11   first page.
12       A.  On 507?
13       Q.  Yeah.
14       A.  Okay.
15       Q.  Okay.  What is the CTICU?
16       A.  Cardiothoracic Intensive Care Unit.
17       Q.  And then the CCC, is that the Clinical
18   Competency Committee?
19       A.  Correct.
20       Q.  Who was on that at this time?
21       A.  So I won't be able to provide you with all the
22   names.  But in general it's headed up by Dr. Groener.
23   And then all of the rotation coordinators are on the
24   committee, myself, Dr. Mitchell currently.
25       Q.  Okay.  And then the unsatisfactory to the ABA,
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    what is that referring to in this e-mail?

2         A.   The sentence in the worst case scenario?

3         Q.   Yeah.

4         A.   Fails.  That means that the ABA would be

5    notified that he -- for that prior six months, that

6    he -- his performance was deemed unsatisfactory.

7         Q.   Okay.  And Dr. Benzinger refers to, It would

8    hurt his career needlessly if all three of those things

9    happened.  Do you see that?

10        A.   Yes.

11        Q.   Okay.  Do you agree they would hurt his career

12   if all three of those things happened?

13        A.   I agree it wouldn't look good if all three of

14   those things happened, yes.

15        Q.   Did you have any conversations about Dr.

16   Benzinger about Dr. Weisman's research request at this

17   time?

18        A.   Did I have conversations about his research

19   request?  No, I don't think I would have because I

20   wasn't the program director.

21        Q.   Outside of writing the letter of

22   recommendation?

23        A.   Uh-huh.

24        Q.   That you had mentioned that was based on Dr.

25   Benzinger's letter.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1          Since Dr. Weisman left Washington University

2   have you done anything to help his career?

3          MR. SULLIVAN:  Object to form.  Already asked

4   and answered.

5          Go ahead and answer.

6      A.  I have submitted documentation as he

7   requested, including that letter that you referred to

8   and rotation schedules.

9      Q.  (By Mr. Elster)  Flip to Exhibit 9.  This is

10  similar to an e-mail we looked at before.  This is a

11  draft of a letter that Dr. Benzinger sent to you and

12  Dr. Cox on April 27th of 2018?

13     A.  Uh-huh.

14     Q.  Did you have any input as to the contents of

15  this letter?

16     A.  I believe I answered that earlier but --

17     Q.  I think --

18     A.  -- I believe he sent me a draft and I -- if I

19  made any comments, it wasn't substantive.

20     Q.  So this is a few months later.  This is April

21  of 2018.  The one we looked at was January of 2018.

22     A.  Okay.

23     Q.  You don't know if you made any edits to

24  yourself?  You looked at it but you don't know if you

25  made any edits to it?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1              MR. SULLIVAN:  Time -- time -- can we clarify
 2      time frame?
 3          Q.  (By Mr. Elster)  In April of 2018.
 4              MR. SULLIVAN:  Thank you.
 5          Q.  (By Mr. Elster)  It appears that Dr. Benzinger
 6      sent this in April of 2018 and he's asking for your
 7      comments on it.
 8          A.  Yeah.  I'm not sure that I made any comments
 9      about this.  If I did, it wasn't anything substantive.
10          Q.  Did you agree with the contents of the letter
11      before Dr. Benzinger signed it?
12          A.  Yeah, I believe in general.  Given the
13      conditions it's a positive letter.
14          Q.  Given the conditions, what conditions?
15          A.  Well, he didn't finish the program.
16          Q.  Is it common on these letters to include at
17      the very end the person's cell phone and say contact me
18      if you have any questions?
19          A.  It's not uncommon, yeah.
20          Q.  Okay.  Have you ever had any communications
21      with Dr. Benzinger about conversations he has had about
22      Dr. Weisman with other anesthesiology programs?
23              MR. SULLIVAN:  Object to form.
24          A.  No.
25          Q.  (By Mr. Elster)  Exhibit 10.  First page, 563.
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

 1   So this is June of 2018.  It's about one month before

 2   you became program director?

 3       A.  Uh-huh.

 4       Q.  Did you come at the end of July or beginning

 5   of July?

 6       A.  I don't recall specifically.  It probably

 7   would have been at the beginning of July.

 8       Q.  Okay.  So about four or five days --

 9       A.  Yeah.

10       Q.  -- before you would have started?

11           As far as you're aware is that letter of

12   recommendation we looked at, Exhibit 9, would that have

13   been sent to Cook County, which is the healthcare

14   institute mentioned here.

15           MR. SULLIVAN:  I'm going to object.  It calls

16   for speculation.  The letter is not attached to this

17   exhibit.  He's not even on it.

18           But go ahead and answer if you can.

19       A.  Do you want me to answer the question?

20           MR. SULLIVAN:  Yeah, go ahead.

21       A.  To my knowledge Dr. Benzinger only created one

22   letter.  So if he's saying here he's attaching a letter

23   of recommendation, I would assume it's that letter we

24   just looked at.

25       Q.  (By Mr. Elster)  Okay.  And it's the one that

Case: 4:19-cv-00075-JAR  Doc. #: 268-6  Filed: 02/17/23  Page: 125 of 167 PageID #:
5185
Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    you -- you had input on that letter, right?  You didn't

2    make any substantive changes?

3        A.  Correct.

4        Q.  Okay.  As to the second page, 566, additional

5    two months of intern rotations is mentioned in the

6    second paragraph of the top e-mail.  What is that

7    referring to?

8            MR. SULLIVAN:  Doctor, you might just want to

9    read this entire e-mail, not just that, to get a

10   context.

11       Q.  (By Mr. Elster)  They're spread out in 2018.

12       A.  Okay.  I'm sorry.  So your question is what is

13   that two months related to?

14       Q.  Right.

15       A.  So I don't have intimate knowledge of this but

16   I believe that refers to him having to remediate two

17   months of his intern clinical schedule.

18       Q.  And if you can go to 598?

19       A.  Okay.

20       Q.  These are e-mails with you and Dr. Weisman.  I

21   think we were talking about this before earlier.  Is

22   the bottom e-mail first to Dr. Patil.

23       A.  Uh-huh.

24       Q.  Do you see that?

25       A.  Uh-huh.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1      Q.  The program documents, is that the

2   approximately 200 pages of training file we were

3   talking about before?

4      A.  I'm sorry, what are you referring to?  At the

5   top where I -- I said the documents will be sent out?

6      Q.  Right.  So below that there is an e-mail at

7   2:59 p.m. where it appears Dr. Weisman is asking you?

8      A.  Okay.

9      Q.  And then Stephanie?

10     A.  Uh-huh.

11     Q.  To send his program documents to Dr. Patil?

12     A.  Uh-huh.

13     Q.  And you respond that the documents will be

14   sent out tomorrow?

15     A.  Uh-huh.

16     Q.  What documents were sent out the following day

17   because -- and I'm trying to make sense of earlier you

18   had testified that you thought it was an administrative

19   burden to do that.

20     A.  To clarify, I thought it was an administrative

21   burden to reproduce his entire file.  As I've said

22   previously, we were happy to send out specific things

23   in his file.

24         Now, back to your question, what documents am

25   I referring to?  Without larger context I'm not sure

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

 1   what documents these were specifically.

 2        Q.  Do you know if any documents were sent out?

 3        A.  To Dr. Patil?

 4        Q.  Yeah.

 5        A.  Yeah.

 6        Q.  Program documents?

 7        A.  So I believe the documents that were sent to

 8   Dr. Patil would have been rotation schedules and

 9   perhaps milestone evaluations.

10        Q.  Who would have sent those personally?

11        A.  It probably would have been the administrative

12   assistant at the time.  So it may have been Stephanie

13   Rheinheimer.

14        Q.  But to confirm, do you know if those documents

15   were in fact sent?

16        A.  Without being able to see an e-mail trail,

17   it's hard for me to say it but I have no reason to

18   believe that they were not sent.

19        Q.  On the next page, 599, you had asked -- you

20   had asked at the 9:07 a.m. e-mail:  What type of

21   residency program are you applying to?  These are part

22   of the e-mails with you and Dr. Weisman.

23        A.  Sorry.

24            MR. SULLIVAN:  Where were we?

25            MR. ELSTER:  At 9:07 a.m.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
1        A.  Got it.
2             MR. SULLIVAN:  Oh, okay.  Thanks.
3        Q.  (By Mr. Elster)  Does it matter, the fact that
4    it's a residency program?  What's the purpose of that
5    question?
6        A.  I think -- so I don't remember specifically
7    why I was asking that question.  But probably because I
8    don't think anesthesiology would have been a good
9    choice for him to transfer.
10       Q.  Why?
11       A.  For reasons that we've already alluded to.
12       Q.  So if it was a different specialty or a
13   different practice outside of anesthesiology, would it
14   be fair to say that you would have provided a different
15   level of assistance?
16       A.  No.
17            MR. SULLIVAN:  Object.
18       A.  I don't think that's a fair statement.
19            MR. SULLIVAN:  Argumentative.  Objection.
20            Go ahead and answer.
21       Q.  (By Mr. Elster)  Okay.
22       A.  I would have provided the same level of
23   support.  I think it would have made me feel more
24   comfortable had he not chosen anesthesiology as a
25   discipline.
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1        Q.  For the reason because of what we've talked

2    about already?

3        A.  Correct.

4        Q.  Did you ever communicate that to Dr. Weisman

5    in 2018 when he was asking you for a letter of

6    recommendation?

7        A.  Did I ever communicate that I had concerns if

8    he was trying to go into anesthesiology?

9        Q.  Correct.

10       A.  I don't believe so.

11       Q.  Why not?

12       A.  I'm not sure that that ever came up.

13       Q.  Okay.  Well, you brought it up here.  What

14   type of residency program was it?

15       A.  Well, I asked a question.  I don't know that I

16   ever had a conversation with him about his

17   appropriateness of going into anesthesiology or not.

18       Q.  At that time you thought it was inappropriate

19   for him to go into anesthesiology?

20       A.  I guess I would reword the question.  Would I

21   feel comfortable with Dr. Weisman taking care of a

22   family member or my children, no.

23       Q.  As of 2018?

24       A.  Correct.

25       Q.  Okay.  Including thereafter?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1      A.  Well, it's kind of a moot question because he

2   never finished an anesthesiology residency training

3   program.

4      Q.  Did Stephanie -- you said her last name was

5   Wineheimer?

6      A.  Rheinheimer.

7      Q.  Rheinheimer.

8      A.  And I apologize.  I don't know how to spell

9   that.

10      Q.  Is she still at Washington University?

11      A.  She's no longer in the Department of

12   Anesthesiology.  I believe she's still at Wash U. but

13   I'm not positive.

14      Q.  Flip to 601.  So 601 to 604 are similar.  Not

15   the same thing as we just saw in Exhibit 20.

16      A.  I'm sorry, 604?

17      Q.  601 to 604 are part of the same e-mail chain.

18   And I believe those are the same as what we saw in

19   Exhibit 20.

20           MR. SULLIVAN:  I think in the last -- at least

21   the first e-mail in the chain as Exhibit 20 without the

22   attachment.  So if you want to familiarize yourself

23   what these e-mails, Doctor.

24      A.  Okay.

25      Q.  (By Mr. Elster)  Okay.  In looking at these

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

 1    e-mails, these kind of refer to what we were talking

 2    about before in Exhibit 20 and the signed release --

 3        A.  Uh-huh.

 4        Q.  -- or the release that was provided.  And on

 5    603, it appears to be the same e-mail as was the

 6    exhibit here as the release?

 7        A.  Uh-huh.

 8        Q.  In looking at these do you still think the

 9    release that we talked about in Exhibit 20 was related

10    to your recommendation letter?

11            MR. SULLIVAN:  Object to the form.  The

12    e-mails speak for themselves.

13            Go ahead and answer.

14        A.  So if I refer to the e-mail dated November

15    28th, it would appear that it's related to the letter

16    as well as rotation schedule.

17        Q.  (By Mr. Elster)  The doc be -- the rotation

18    schedule would just be his rotations that he worked --

19        A.  Correct.

20        Q.  -- while at the....

21            And you never had any -- who is Dr. Fox

22    referenced there?

23        A.  I don't know who that individual is.  I

24    assumed it's somebody at one of these programs that Dr.

25    Weisman was applying to.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1      Q.   Is it someone at the University of Chicago?

2      A.   I don't know.

3      Q.   And Dr. Kaye we talked about?

4      A.   I believe that's -- Dr. Kaye is from Louisiana

5  I believe.

6      Q.   Did you have any other communications orally

7  or in writing with them about Dr. Weisman?

8      A.   I never spoke with them in person.  I may have

9  exchanged other e-mails with them but it would have

10  been at the request of Dr. Weisman.

11      Q.   What about phone calls?

12          MR. SULLIVAN:  Objection.  Asked and answered.

13      A.   I never spoke with him.

14      Q.   (By Mr. Elster)  You can flip to Exhibit 11.

15  We start in the back.  These aren't Bates labeled

16  because they were from Stanford.  So the back page to

17  the front.

18          MR. SULLIVAN:  So just one item, Henry.  I

19  guess they were marked confidential by Stanford?

20          MR. ELSTER:  They were.

21          MR. SULLIVAN:  I don't know if there's -- I

22  haven't had any communications with Stanford so I don't

23  know if there's any obligation to be confidential.

24  I'll leave it to you.

25          MR. ELSTER:  I don't think it matters.

1          MR. SULLIVAN:  Okay.

2      Q.  (By Mr. Elster)  Okay.  So on page 1 and going

3  into page 2, there's an e-mail from you to Dr. Macario

4  on December 7th, 2018?

5      A.  Uh-huh.

6      Q.  Was it at this time that Dr. Macario was

7  reaching out to you to discuss Dr. Weisman?

8      A.  It was around that time, yes.

9      Q.  Okay.  Is there a reason you didn't give

10  your -- any feedback in any e-mail or in writing?  You

11  just provided a phone number?

12      A.  I don't recall what specific -- what specific

13  reason I would have had other than he already had the

14  letter of recommendation.

15      Q.  So you knew as of December 7th of 2018 that

16  Dr. Macario had the letter of recommendation that he

17  wrote; is that correct?

18      A.  I don't know that he had it definitively, but

19  by that time I would have assumed he would have had it.

20      Q.  Did you communicate -- did you know who

21  Dr. Macario was before December of 2018?

22      A.  No.

23      Q.  Okay.  Above that it says:  Here you go.

24  Attached to the December 7th at 2:17 p.m.  Do you know

25  what you provided in that?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1      A.  It's hard to know without further context.  It

2  probably was the letter of recommendation.

3      Q.  Okay.  And then immediately above that,

4  December 8th, 2018, so it would be the following

5  morning?

6      A.  Uh-huh.

7      Q.  In looking at that e-mail and it says:  Spoke

8  with Douglas.  Would the communication, that have

9  happened sometime between December 7th at 2:17 and

10  December 8 here?

11      A.  Uh-huh.

12      Q.  The phone call would have happened at that

13  point?

14      A.  So I -- presumably the phone call occurred

15  after 2:17 on the 7th.

16      Q.  Okay.  And you had spoken -- it says:  Spoke

17  with Douglas on phone and please see attached letter.

18  Several red flags.  We should pass on him.

19          Do you know what that's referring to based on

20  your phone call with Dr. Macario?

21          MR. SULLIVAN:  I'll object to form.  Calls for

22  speculation.

23          But go ahead and answer.

24      A.  I don't recall.  First of all, I don't

25  actually recall having this conversation with

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1  Dr. Macario.  The only reason I know that it happened

2  is because of these e-mail chains.  I don't recall

3  specifics that I discussed with Dr. Macario nor is it

4  clear to me if his comment is referring to the

5  conversation I had with him or the letter.

6      Q.  (By Mr. Elster)  The recommendation letter

7  that you wrote?

8      A.  Correct.

9      Q.  Would it have been common to talk -- to

10  discuss Dr. Weisman's abilities as a resident

11  anesthesiologist during that phone call?

12          MR. SULLIVAN:  Object to form.  Asked and

13  answered.  Calls for speculation.

14          Go ahead and answer.

15      A.  It would have been reasonable to discuss that

16  during the call, yes.

17      Q.  (By Mr. Elster)  Would you have expressed your

18  opinions about Dr. Weisman?

19          MR. SULLIVAN:  Object to form.  Calls for

20  speculation.

21          Go ahead and answer.

22      A.  Would I have expressed my opinions, possibly.

23      Q.  (By Mr. Elster)  Okay.  At that time you agree

24  that you don't think he would have been a suitable

25  anesthesiologist, right, so December of 2018?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1      A.  Correct.

2      Q.  At that time you believe that he shouldn't

3  have been a resident anesthesiologist, right?

4      A.  I believe anesthesiology was a poor fit.

5      Q.  Okay.  At that time did you have concerns

6  about his ability as a physician generally outside of

7  anesthesiology?

8      A.  No.

9      Q.  Okay.  Would you have communicated any of the

10 other concerns from Dr. Benzinger, Dr. Groener, or

11 Dr. Cox during that phone call?

12          MR. SULLIVAN:  I'm going to object.  Calls for

13 speculation.

14          Go ahead and answer if you can.

15     A.  It's possible that I would have conveyed my

16 general sort of sense of his aptitude.  I don't know

17 that I would have specifically referred to comments

18 made by Dr. Cox, Groener, or Dr. Evers.

19     Q.  (By Mr. Elster)  And your general sense of his

20 aptitude in December of 2018 was that he should not be

21 an anesthesiologist, right?

22     A.  My general sense was anesthesiology was a poor

23 fit, yes.

24     Q.  Okay.  Did you give any positive statements

25 about Dr. Weisman in that phone call?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
1              MR. SULLIVAN:  I'm going to object to form.
2    Calls for speculation.
3              Go ahead and answer.
4        A.  I don't recall the specifics of the phone call
5    so I can't answer.
6        Q.  (By Mr. Elster)  And likewise did you give any
7    negative statements about Dr. Weisman?
8              MR. SULLIVAN:  Object.  Asked and answered.
9        A.  Same answer.
10       Q.  (By Mr. Elster)  If you were to have expressed
11   the sentiment to Dr. Macario about Dr. Weisman's
12   aptitude as an anesthesiologist on this phone call,
13   don't you agree with me that that would have undermined
14   the recommendation letter that you wrote?
15             MR. SULLIVAN:  I'm going to object to form.
16   Calls for speculation.
17             Go ahead and answer.
18       A.  It probably would depend on how that
19   information is received in the larger context,
20   including a letter of recommendation.
21       Q.  (By Mr. Elster)  Okay.  So the letter of
22   recommendation, and that's Exhibit 12.  It's in the
23   first two pages of 691 to 692.  Is this a sample of the
24   one you wrote?
25       A.  It appears to be.
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1        Q.   Okay.   So this one is only a page and a half
2   long.   And some of the prior iterations we've seen from
3   Dr. Benzinger were longer.   Sometimes double in length.
4   Would you have edited this down?
5            MR. SULLIVAN:   I'm going to object to form.
6   Assumes facts not in evidence.
7            Go ahead and answer.
8        A.   I would have to compare them side by side.
9   But it is in fact shorter and the font is the same and
10   the formatting is the same, then presumably, yes, I
11   edited out some things.
12        Q.   (By Mr. Elster)   Are there any other
13   substantive iterations of the letter that you would
14   have signed for Dr. Weisman other than what we see in
15   691 to 692?
16        A.   I don't believe so.   I'm not in the routine of
17   doing extra work.
18        Q.   So if there was a letter that was sent to
19   Stanford, it would basically be this one we see in 691
20   and 692?
21            MR. SULLIVAN:   I'm going to object to form.
22   The letter sent to Stanford is going to speak for
23   itself.
24            Go ahead and answer.
25        A.   So the letter would have been either this

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1  letter or it would have been the letter that Dr.

2  Benzinger created.  But it would have been one of the

3  two.

4       Q.  (By Mr. Elster)  Okay.  As to the start of the

5  paragraph on the first page here 691 to 962, is it fair

6  to say that most of the sentiments you express here are

7  based on what others have communicated to you, not your

8  own personal observations?

9            MR. SULLIVAN:  Object to form.

10  Mischaracterizes the testimony.

11            Go ahead and answer.

12       A.  Well, as I emphatically stated previously, I

13  did have interactions with Dr. Weisman.  I speak --

14  spoke to his clinical acumen.  So I think it's a

15  combination of my personal experience along with what I

16  gathered from a review of his evaluations.

17       Q.  (By Mr. Elster)  As far as you're aware has

18  that letter, the first two pages, is that the version

19  of the letter that was sent to Dr. Kaye and then Dr.

20  Fox who was at the University of Chicago?

21            MR. SULLIVAN:  Object to form.  Those letters

22  will speak for themselves.

23            Go ahead and answer.

24       A.  Again, it would have either been this letter

25  or it would have been the one that Dr. Benzinger

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    created.  If it was being asked of me to send as the

2    program director, I might have changed the signature.

3    But other than that, there wouldn't have been any big

4    changes.

5         Q.  (By Mr. Elster)  695.  So this is as of

6    October of 2018, the top e-mail that you sent.  What

7    reports would you have sent at that time as I

8    understand it's changed to the left here, September of

9    2021?

10             MR. SULLIVAN:  Doctor, I at least encourage

11   you to read the -- just the e-mails on 695.

12        A.  Okay.

13             So with regards to the ABA, we are required as

14   a program every six months to basically comment on

15   whether the resident is making -- is satisfactory or

16   unsatisfactory.

17        Q.  (By Mr. Elster)  Okay.

18        A.  With regards to the ACGME, that probably

19   refers to milestone evaluations.

20        Q.  And were those sent at that time period?

21        A.  To my knowledge.

22        Q.  Okay.  And the e-mail below that at 2:33

23   p.m. -- two below that.  It says:  I am committed to

24   supporting your application for whichever specialty you

25   choose.  And this is September of 2018?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    A.  Uh-huh.

2        Q.  Why didn't you communicate -- is that actually

3    a true statement?  At the time you were committed to

4    supporting his application for whatever specialty he

5    chose?

6        A.  Absolutely.

7        Q.  But didn't you testify earlier that if it was

8    for anesthesiology you didn't think he would be a good

9    anesthesiologist?

10       A.  I believe what I said was I personally don't

11   think it would have been a good choice but I would have

12   still supported him.  It does our program no good to

13   put residents out there that aren't succeeding.

14       Q.  But do you believe you have supported him

15   fully?

16       A.  I believe we have supported him, yes.  I also

17   believe that the residency program has an obligation to

18   be truthful when we recommend residents to other

19   programs or to other employees.  With those two

20   statements in mind, yes, I do think we've supported

21   him.

22       Q.  Did you ever ask that he sign a FERPA waiver

23   for the release of his file?

24       A.  I know that that was included in documentation

25   so yes.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1      Q.  For his own file he needed to sign a FERPA

2  waiver?

3      A.  I believe the FERPA waiver was in the context

4  of sending a letter of recommendation somewhere.

5      Q.  Refer you to Exhibit 13.  And we talked about

6  some of these before.  This is when Dr. Weisman was

7  still at the residency program.  You wouldn't have

8  knowledge of any of the instances described on 2730,

9  2731, and 2733?  You can take a look at them.

10          MR. SULLIVAN:  You want to read those, Doctor?

11      Q.  (By Mr. Elster)  2733 we looked at earlier but

12  let's include it again.

13      A.  Okay.

14      Q.  Am I correct that you wouldn't have any

15  firsthand knowledge of any of the instances there?

16      A.  I don't believe so, no.

17      Q.  Okay.  You don't?  Okay.  I'm just going to

18  move on.

19      A.  Okay.

20      Q.  Exhibit 14 is 2908 to 2924.  And this appears

21  to be a few documents we've been talking about,

22  evaluation roles and what have been --

23      A.  Submitted to them.

24      Q.  -- submitted to the evaluations.  I want to

25  see if this is what we've been talking about.  So as we

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    go through if you can identify what these are?

2         A.  So these appear to be notifications of

3    rotations as well as satisfactory or unsatisfactory to

4    the ABA.

5         Q.  And is that just the first two pages, 2908 and

6    2909, or does it go beyond?

7         A.  It looks like it goes beyond that.

8         Q.  When does it stop?

9         A.  It looks like it stops at 2913.

10        Q.  Okay.  So this would be -- 2908 to 2913 would

11   be an example of a six-month report sent to the ABA?

12        A.  What we send every six months, yes.

13        Q.  Okay.  But it's sent every six months.  And

14   who would be responsible for completing this?

15        A.  Are you asking who actually submits it?

16        Q.  Who would be responsible for the contents?

17        A.  It would be the program director.

18        Q.  Okay.  So this would have been Dr. Benzinger

19   in 2017?

20        A.  Correct.

21        Q.  Okay.  The next set of documents on 2914, what

22   is that?

23        A.  These look like the reports that are sent to

24   the ACGME.  So the milestone evaluations.

25        Q.  Prior to September of 2021 did you consider

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1   these to be compliant with the summative evaluation

 2   requirement?

 3       A.  So I've answered this previously.  But to

 4   reiterate, we believed that the document that we put

 5   together once a resident completed the program met that

 6   requirement.

 7       Q.  And did --

 8       A.  -- Dr. Weisman leaving early was a one off,

 9   and so we used the milestone evaluation in lieu of what

10   we thought was the summative evaluation.

11       Q.  So beginning on 2914, would this be an example

12   of what you used to in lieu of a summative evaluation?

13       A.  Correct.

14       Q.  And this would be just sent to the ACGME?

15       A.  It would have been sent to the ACGME.  But in

16   Dr. Weisman's instance, he also asked for these to be

17   sent to other programs as well.

18       Q.  Okay.  2914, and it's sideways, in this

19   probation and remediation document.

20       A.  Okay.

21       Q.  Do you know what that's referring to?

22       A.  Not intimately.  But looking at the date, I'm

23   assuming this referred to his internship year.

24       Q.  Okay.  So are you suggesting that interns are

25   on probation or remediation or is this?
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1        A.  I'm suggesting that given that that's checked

2   that he must have been placed on probation as an

3   intern.

4        Q.  Okay.

5        A.  I mean, at least that's what the form

6   suggests.  Again, I don't have intimate knowledge of

7   this.

8        Q.  Do you have any knowledge of him being placed

9   on probation?

10       A.  I believe that that was a question that I

11  asked of Dr. Benzinger because I had to fill out a form

12  on behalf of Dr. Weisman.

13       Q.  Okay.

14       A.  And I believe in that communications with Dr.

15  Benzinger I was led to believe that he had not been

16  placed on probation.

17       Q.  Would you agree with me that this suggests

18  that he was to the contrary placed on probation?

19       A.  I agree that that form -- this form would lead

20  one to that conclusion.

21       Q.  The levels -- the Levels 1, 2, 3, 4, and 5?

22       A.  Uh-huh.

23       Q.  Is there any sort of rubric explanation as to

24  what those generally mean?

25       A.  I mean there's verbiage that are associated

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    with each of these levels.  Plainly Level 1 is what you

2    would associate with, you know, a novice.  Level 5 is

3    sort of expert or aspirational level.

4          Q.  Do the levels correspondence to the years of

5    the residency program?  So if you're at Level 1, that

6    would be you're corresponding -- you're performing

7    consistent with?

8          A.  Not necessarily.  But it is common that as you

9    progress through the residency, then the level should

10   be close to their level of training but it's not like

11   an exact correlation.  It will depend on the resident.

12         Q.  It's a rough equivalency though?

13         A.  I think that's fair.

14         Q.  Okay.  Is the remainder of this document all

15   considered the milestone evaluation, 2914 to 2924?

16         A.  2922 does not look to be a milestone

17   evaluation, no.

18         Q.  Do you know what that is?

19         A.  This looks to be an example of the six-month

20   evaluation that we do with the residents.

21         Q.  And this is just internal?

22         A.  I think that we use -- when I was the program

23   director I would use these to help complete the

24   milestone evaluations.  But, I guess, yeah, I would say

25   these are internal.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    Q.  Okay.  If we can flip to Exhibit 15, I want to

2  ask about your e-mail.  So at 7:59 p.m. you said:  I

3  really don't like that I inherited this problem.  What

4  are you referring to?

5    A.  Well, any time a resident leaves a program

6  it's a problem.  It's problematic.

7    Q.  How many residents left the program when you

8  were program director?

9    A.  I think I answered that question before.

10  There was one that left voluntarily and then there was

11  one that was asked to leave for cause.

12    Q.  If we can flip to Exhibit 18.  This Dr.

13  Avidan, did he succeed Dr. Evens?

14    A.  Dr. Avidan, yes.

15    Q.  Oh, it's pronounced Avidan?

16    A.  Avidan.

17    Q.  Okay.  I want to ask about your e-mail on the

18  become of 3720.  Who's the Bruno?

19    A.  He -- Bruno was one of the chief residents at

20  that time.

21    Q.  "Bruno has asked that in preparation for

22  recruitment season I say a few words about Jeff

23  Weisman."  What is the -- where is the context of this

24  e-mail?

25    A.  I believe the next sentence gives the context.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    Or the next paragraph maybe.  I think this was in

2    reference to what we call an all resident meeting.

3    It's actually in the subject.  I'm sorry.  All resident

4    meeting.

5         Q.  Okay.  So there would have been a meeting

6    sometime after this e-mail, an all resident meeting in

7    which Dr. Weisman was discussed?

8         A.  No.  I don't think we discussed anyone by

9    name.  I think what we discussed was that there were

10   residents that had left.

11        Q.  Okay.  So what few words were said about Dr.

12   Weisman?

13        A.  If you're asking me what specifically did I

14   say, I don't remember.

15        Q.  What generally did you say?

16        A.  Well, it's, you know, all this stuff is

17   treated confidentially.  But from the resident

18   perspective, if you're not the resident that's involved

19   it can be a little concerning when people suddenly

20   disappear from the program.  And so I think what I was

21   trying to do was, in general terms, explain that there

22   were residents that had left for personal reasons.

23        Q.  Wasn't this over a year, 'cause this is 2019?

24        A.  Uh-huh.

25        Q.  Didn't Dr. Weisman leave a year prior?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1      A.  Apparently.

2      Q.  Okay.  So what -- was there a reason a year

3  later there was a residents discussion about this?

4      A.  I think I referenced that elsewhere in the

5  e-mail, "We're at a point in the residency" -- in the

6  first paragraph.  "We're at a point in the residency

7  where about half the residents know them and half

8  don't."  So there were still residents there that knew

9  that they had left.

10     Q.  In the second paragraph of that e-mail at 9:23

11  a.m. you stated in parentheses:  There's probably more

12  that could have been done for Dr. Weisman.  What more

13  could have been done?

14     A.  I'm not sure what I was referring to

15  specifically.

16     Q.  Is that a true statement, that more could have

17  been done?

18     A.  It's hard to know.  I wasn't the program

19  director when he was here.

20     Q.  Okay.  Do you agree with the contents of this

21  e-mail you sent on 9:23 a.m.?

22     A.  I must have had reason to agree with it or I

23  wouldn't have written it down.

24     Q.  Okay.  Do you agree with it now?

25     A.  I'm not sure.

 1        Q.  You don't know if you agree with this e-mail

 2   that you sent?

 3        A.  Well, at the time I wrote this e-mail I didn't

 4   have privy to all the documents that I have now.

 5        Q.  Okay.  So privy to documents, is there

 6   something that has changed your opinion since --

 7        A.  -- I think if you look at the documents --

 8        Q.  -- Hold on.  Since October of 2019, has

 9   something -- have you become privy to something that

10   has changed your -- what you wrote here?

11        A.  So, some of these documents I wasn't privy to

12   at that time when I wrote that e-mail.

13        Q.  Okay.

14        A.  And I think when you look at these in whole,

15   my impression is that the program actually did a fairly

16   good job trying to be supportive.  So I'm not sure that

17   I would still agree with that statement.

18        Q.  But at the time you wrote this --

19        A.  -- You've already asked this question.

20        Q.  Okay.  And I haven't finished the question

21   yet.

22            At the time you wrote this and before your

23   deposition today, did you ever express to anyone that

24   you thought the program was adequately supportive of

25   Dr. Weisman?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
1        A.  Can you repeat the question?

2        Q.  Before the deposition?

3        A.  Uh-huh.

4        Q.  Had you ever expressed to anyone other than

5   your attorney that the program was supportive of Dr.

6   Weisman?

7        A.  If you're asking me to recall a specific

8   conversation, I'm not sure.

9        Q.  And I'm not.  I'm asking if you expressed it.

10       A.  If I've expressed the sentiment that I think

11  the program tried to support Dr. Weisman?

12       Q.  Right.

13       A.  I believe I expressed that sentiment, yes.

14       Q.  Are there any specific examples you can think

15  of now that the program could have done differently

16  with respect to Dr. Weisman?

17           MR. SULLIVAN:  Object to form.  Calls for

18  speculation.

19           Go ahead and answer.

20       A.  Well, I think one of the communications from

21  Dr. Benzinger alluded to the fact that -- I think it

22  was actually in his letter of recommendation -- that

23  admitting Dr. Weisman into the ASAP, the A-S-A-P

24  research track, in retrospect probably wasn't the best

25  idea.  So that would I think have allowed Dr. Weisman
```

1   to concentrate more on clinical or acquisition of

2   clinical skills

3        Q.  (By Mr. Elster)  Anything other than that?

4        A.  I think the program did a lot to try to

5   accommodate Dr. Weisman, so I can't think of anything

6   specifically.

7        Q.  Exhibit 19.   We can go to 3832 to 3833.  This

8   is -- and I'm asking about the e-mail 10:24 p.m. on

9   3832.

10       A.  Okay.

11       Q.  And it goes into the next page.  There was a

12  time line?

13       A.  Uh-huh.

14       Q.  Some sort of indication of what was done in

15  terms of letters or requests being sent out?

16       A.  Uh-huh.

17       Q.  We haven't talked about Dr. Baxton?

18       A.  Uh-huh.

19       Q.  UYC, September 23rd, 2020.  Did have any

20  communications with Dr. Baxton?

21       A.  I believe he's the individual that asked --

22  that asked for the summative evaluation.  That's where

23  that whole issue came up.

24       Q.  And that would have happened in September

25  2020, is that correct, in looking at this?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1      A.  If I -- apparently, yeah.

2      Q.  Okay.  At that time did he indicate to you

3  that a summative evaluation was needed?

4      A.  It says that in the earlier e-mail, yes.

5      Q.  Okay.  And do you agree with that; does that

6  sound right?

7      A.  Do I agree that he requested a summative

8  evaluation?

9      Q.  From you in September 2020?

10     A.  Assuming that's the right date, yes.

11     Q.  Okay.  Did you provide one in September of

12  2020?

13     A.  I don't think we provided one in September

14  2020, no.

15     Q.  Did you ever provide him one?

16     A.  We provided one.  I don't know where we sent

17  it.  I'm not sure if we sent it to Baxton -- to Dr.

18  Baxton or somewhere else.

19     Q.  Where would you have sent it if not him?

20     A.  I'm not sure.

21     Q.  So I'm going to ask you.  I only have two

22  copies but I'll give you my copy of documents bates

23  labeled 4057 to 4059.

24     MS. RUTTER:  It was marked as Benzinger

25  Exhibit 37 yesterday.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
 1        Q.  (By Mr. Elster)  Yeah.  Exhibit 37.
 2            What's the first page?
 3        A.  Are you talking about 4057?
 4        Q.  I am.  Is that an e-mail?
 5        A.  Looks like an e-mail from Lauren, yes.
 6        Q.  Okay.  Attached to that appears to be like a
 7   track change or edited version of a letter.
 8        A.  Uh-huh.  Uh-huh.
 9        Q.  Who did the editing on that?
10        A.  I would assume it's probably Lauren.
11        Q.  Okay.  Would anyone else have worked on the
12   letter other than Lauren Gibson and you?
13        A.  I'm sure that she asked for input from myself
14   and Dr. Mitchell, yes.
15        Q.  Dr. Mitchell would have had input on it too?
16        A.  Dr. Mitchell was the program director, I
17   believe, at the time of this, yes, 2022.
18        Q.  Would Dr. Mitchell have had any firsthand
19   training or experience with Dr. Weisman?
20        A.  I would have to look at Dr. Weisman's rotation
21   schedule's to know if they overlapped.
22        Q.  What's the date of the cover letter -- the
23   cover e-mail, 4057?
24        A.  February 2022.
25        Q.  Okay.  Why would there be -- why were there
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1  revisions being made in February of this year?

2          MR. SULLIVAN:  Objection.  Asked and answered.

3          Go ahead and answer.

4      A.  If your question is why are there track

5  changes to this?

6      Q.  (By Mr. Elster)  Correct.

7      A.  Because I think what Lauren did was she took

8  what we typically provide to a graduating resident and

9  tried to tailor it to Dr. Weisman.

10     Q.  Okay.

11     A.  So, for example, Dr. Weisman may not have

12  completed PACU TEE ACT/float, OB, Regional and Float,

13  which is why those are crossed out.

14     Q.  Okay.

15     A.  So rather than create a whole new document de

16  novo, she probably took a preexisting example and tried

17  to tailor it to Dr. Weisman.

18     Q.  But in February of 2022 you were -- you were

19  no longer the head of the program?

20     A.  Correct.

21     Q.  So why would you have been included on this?

22     A.  I think she was looking for input into the

23  letter.

24     Q.  Flip to Exhibit 21.

25          MR. SULLIVAN:  I'm sorry what was this one.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
1              MR. ELSTER:  21.

2              MR. SULLIVAN:  Thanks.

3         Q.  (By Mr. Elster)  Did you receive any inquiries

4    from Harvard about Dr. Weisman?

5         A.  I don't believe so.

6         Q.  Okay.  Do you know if he was attempting to

7    apply there in August of 2018?

8         A.  To Harvard?  I don't believe I knew that.

9         Q.  Did he ever request you to complete any

10   documentation before August 28th of 2018 to support him

11   in transferring?

12        A.  I don't know.  I know that he requested me to

13   submit documentation on his behalf.  I don't know if it

14   was prior to August of 2018 though.

15        Q.  If before August of -- August or -- if he

16   would have requested this in August of 2018 would you

17   have completed it?

18        A.  Yes.

19        Q.  Exhibit 22.  This is the following day.

20        A.  Okay.

21        Q.  Where Dr. Weisman makes a request to you for

22   the ACGME evaluation form and they also requested a few

23   different things.

24        A.  Uh-huh.

25        Q.  Did you comply with this request here for
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1   information?

2       A.  I believe so.  And I believe this is -- this

3   was what prompted me to reach out to Dr. Benzinger to

4   make sure that I was filling this out correctly on Dr.

5   Weisman's behalf.

6       Q.  Okay.  Do you know if anything was sent to

7   Harvard?

8       A.  I have no reason to believe it wasn't sent to

9   Harvard if that was the request.

10      Q.  Flip to Exhibit 23.

11          Do you know who Ann Backus is?

12      A.  I do not.

13      Q.  I guess would it -- would it be surprise --

14  would it be surprising to know that Harvard never

15  received any information from Washington University?

16          MR. SULLIVAN:  Object to the form of the

17  question.  Assumes facts not in evidence.  Calls for

18  speculation.

19          Go ahead and answer.

20      A.  I would be surprised if that was the case,

21  yes.

22      Q.  (By Mr. Elster)  Do you think as the program

23  director at the time you had an obligation to at least

24  release that information?

25          MR. SULLIVAN:  Objection.  Asked and answered.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1              Go ahead and answer.

2         A.  Yeah.  If it was requested on his behalf,

3    yeah, we should have.

4         Q.  Who would have personally sent that

5    information?

6         A.  It probably would have been whoever the admin

7    was at that time.  Might have been Stephanie but I'm

8    I'm not certain.

9         Q.  I think we talked about this a little bit,

10   Exhibit 24.  It's a two page.

11        A.  Okay.

12        Q.  After Doctor -- after you attempted to e-mail

13   to Dr. Patil did you try to get in contact with Dr.

14   Patil to send the information though other means?

15        A.  Other than e-mail?

16        Q.  Correct.

17        A.  I know I never spoke with her.  I think e-mail

18   would have been the only venue I would have tried to

19   communicate with her to send her this.

20             MR. ELSTER:  Let's take a quick break and let

21   me meet with the client to see if I have anything else.

22             VIDEOGRAPHER:  We're off the record at 1:56

23   p.m.

24             (Short break.)

25             VIDEOGRAPHER:  We're back on the record at

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    2:22 p.m.

2         Q.  (By Mr. Elster)  Dr. Thompson, of the

3    recent -- or what percentage, I guess you'd say, of

4    recent anesthesiology graduates have employers or

5    perspective employers contact you when you were

6    department head?

7         A.  When I was the program director?

8         Q.  Yeah.

9         A.  What percentage?

10        Q.  Yeah.

11        A.  I'd be guessing but it's -- and I also guess

12   it depends what your question is.  Every single

13   employer has to contact the program for training

14   verification.  Is that what you mean?

15        Q.  Okay.  So training verification that they

16   completed the program, there needs to be some written?

17        A.  Correct, documentation.

18        Q.  So independent of written documentation of

19   training verification?

20        A.  So you're asking about how often do I get like

21   a personal outreach to talk about or discuss a

22   particular resident?

23        Q.  Sure.

24        A.  Not very often.

25        Q.  Okay.  Less than half the time?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1      A.  Yeah, less than half the time.

2      Q.  In the instances that it did occur, what would

3  be the type of situation it would be?  Would it be

4  because there were particular concerns about the

5  resident or just certain employers were....

6      A.  No.  Mostly it was just to check in and see

7  how the resident was doing overall.  Or how they did

8  overall.

9      Q.  Okay.  So less than half the time?

10      A.  Yeah.

11      Q.  Okay.  Did you ever have any communications

12  with anyone at Cleveland Clinic about Dr. Weisman?

13      A.  I don't think so.  Not that I can recall.

14      Q.  Do you know anyone who works in the

15  anesthesiology department at Cleveland Clinic?

16      A.  Do I know any one person who works at

17  Cleveland Clinic?

18      Q.  Right.

19      A.  I don't think so.

20      Q.  While you were in as program director, was

21  there any investigation of any copyright infringement

22  violations?

23      A.  While I was the program director?  Copyright

24  infringements.  I'm not sure if I was the program

25  director or not but I think that there was an instance

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    where residents were freely sharing textbooks I think

2    on a website.  And I think that was investigated.  I'm

3    not sure if I was the program director but I know I was

4    at Wash U. when that happened.

5         Q.  Do you know if it was before or after you were

6    the program director?

7         A.  I don't.  I think Jake McDowell was one of the

8    chief residents, which would lead me to believe it was

9    before I took over as program director.

10        Q.  So that would have been in 2017 then?

11        A.  Yeah.

12        Q.  Do you know if Dr. Weisman had any involvement

13   in the investigation of the copyright infringement?

14        A.  I think there was a suspicion that Dr. Weisman

15   was the person that reported that.  But I don't think

16   anything was ever conclusively proven.

17        Q.  Did you ever refer to Dr. Weisman as, quote,

18   the gift that keeps on giving?

19        A.  I think I referred to him that way, yes.

20        Q.  What do you mean by that?

21        A.  Exactly what it sounds like.  It was a

22   problematic instance for the program that seemingly

23   never goes away.

24        Q.  And when would you have said that?

25        A.  I don't recall specifically.  I would guess it

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    would have been probably 2018.

2        Q.  When you were department -- when you were --

3        A.  -- When I was program director, yes.

4        Q.  And would that have been in the context of

5    what?

6        A.  I don't recall.

7        Q.  Who would you have repeated that to?

8        A.  I don't recall.

9        Q.  Would it have been people at Washington

10   University?

11       A.  Probably.

12       Q.  Okay.  Did Dr. Weisman ever express any

13   concern to you that Dr. Benzinger would make negative

14   statements to other hospitals about his residency

15   training?

16           MR. SULLIVAN:  Object to form.  Vague.

17           Go ahead and answer.

18       A.  That Dr. Benzinger would make negative

19   comments to other hospitals?

20       Q.  (By Mr. Elster)  Correct.

21       A.  Did Dr. Weisman ever communicate that with me?

22       Q.  Yeah.

23       A.  Not that I recall.

24       Q.  Did you ever make any assurances to Dr.

25   Weisman that those types of things wouldn't happen?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

```
1              MR. SULLIVAN:  Object to form.  Vague.

2              Go ahead and answer.

3         A.   I don't recall if that ever happened or not.

4         Q.   (By Mr. Elster)  You mentioned I believe that

5    there was a resident who left voluntarily when you were

6    program director, right?

7         A.   Correct.

8         Q.   And you also mentioned that there was a

9    separate resident who left for cause; is that right?

10        A.   Correct.

11        Q.   And that would have been in the years of 2018

12   and 2020; is that right?

13        A.   That sounds right.

14        Q.   Okay.  Is it just one person for each category

15   leaving voluntarily and leaving for cause?

16        A.   As best I can remember, yes.

17        Q.   Did those individuals receive summative

18   evaluations?

19        A.   I don't believe so, no.  I don't think so.

20        Q.   Okay.  The person who left voluntarily, was

21   that a resignation?

22        A.   I guess, yeah.  I guess so.

23        Q.   What was that person's name?

24             MR. SULLIVAN:  I'm going to object and

25   instruct the witness not to disclose the name of any
```

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1    resident under the fundamental right of privacy under

2    the Delmar Gardens case.  It would involve sensitive

3    and confidential personal information and records.

4         Q.  (By Mr. Elster)  Do you know who the person's

5    name is?  Or the person's name?

6         A.  Yes.

7         Q.  Okay.  And you're still going to decline and

8    refuse to answer the question?

9         A.  On the advice of counsel, yes.

10             MR. ELSTER:  I will certify that question

11   then.

12        Q.  (By Mr. Elster)  Similarly, do you know the

13   name of the individual resident who left for cause?

14        A.  Yes.

15             MR. SULLIVAN:  I'm going to -- okay.

16        Q.  (By Mr. Elster)  So you know the name.

17             Generally what was the cause?

18             MR. SULLIVAN:  If you can answer it without

19   disclosing the person's name.

20        A.  There was concern about illicit drug use.

21        Q.  (By Mr. Elster)  Diversion?

22        A.  Not diversion specifically, no.  Illicit drug

23   use.

24        Q.  Okay.  And you know the person's name and

25   you're going to decline to provide it; is that right?

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1          MR. SULLIVAN:  Yes, I would instruct the

2    witness not to provide.

3          A.  Yes.

4          MR. ELSTER:  Certify that question too.

5          Q.  (By Mr. Elster)  Exhibit -- Benzinger Exhibit

6    37.  I'm going to pull it back up.

7          A.  Is that one I already have?

8          Q.  Yeah.  It was an add on.  It was going to be

9    an exhibit yesterday.  Let me see if I can find it

10   here.  That was the document that had the track

11   changed.  I think you have that.

12         A.  Yeah, somewhere.

13         Q.  I think it's this.

14         A.  Yeah, the second one.

15         Q.  Right.  It's that one.

16         A.  Got it.  Okay.

17         MR. SULLIVAN:  Do you want to mark that for

18   sake of clarity?

19         MR. ELSTER:  Yeah, let's do that.

20         (Defendant's Exhibit No. 25 was marked for

21          identification.)

22         Q.  (By Mr. Elster)  So the question is in 462 and

23   463 of that there's something labeled a final summative

24   evaluation.  I mentioned we were talking earlier, have

25   you seen the final summative evaluation.

1     A.  Uh-huh.

2     Q.  Is that it, 462 to 463?

3     A.  I would assume so, yes.

4     Q.  So when I had asked you earlier have you seen

5  the final summative evaluation, is that the document

6  you were referring to that's unsigned and undated?

7     A.  Looks like it, yeah.

8     Q.  Okay.  Are you aware of anything else that

9  would be considered a final summative evaluation from

10  Washington University for Dr. Weisman other than 462

11  and 463?

12     A.  Other than what we had previously believed

13  would suffice with the milestone evaluations, no.

14     Q.  So is it the current understanding that 462

15  and 463 is the final summative evaluation?

16     A.  To the best of my knowledge, yes.

17     Q.  Would anyone else at Washington University

18  have more knowledge as to what constitutes the final

19  summative evaluation?

20     A.  It's possible that Dr. Mitchell might, because

21  I think she was the one that had to sign it.  It's

22  possible that Lauren Gibson might because she was the

23  one that put it together.

24     Q.  Have you seen a signed version of it?

25     A.  I'm not sure if I have or not.

Douglas Thompson, M.D. - November 3, 2022
Jeffery A. Weisman, et al. vs Barnes-Jewish Hospital, et al.

1       Q.  Do you know if one exists?

2       A.  If we were asked to supply it, I'm sure one

3  exists.

4           MR. ELSTER:  I don't have any further

5  questions.

6           MR. SULLIVAN:  I have no questions.  We will

7  read.

8           VIDEOGRAPHER:  Very good.  This deposition is

9  concluded at 2:32 p.m.

10          MR. SULLIVAN:  E-Tran without exhibits.  No

11  hard copy.

12          MS. MULLINEAUX:  E-Tran with exhibits

13  attached.  No hard copy.

14          MR. ELSTER:  PDF condensed with exhibits.

15

16

17

18

19

20

21

22

23

24

25