UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JEFFERY WEISMAN and STRATEGIC BIOMEDICAL, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4:19-cv-00075-JAR |
| BARNES JEWISH-HOSPITAL, BJC HEALTHCARE, WASHINGTON UNIVERSITY, DR. ALEX EVERS, DR. RICHARD BENZINGER, and DR. THOMAS COX, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**STATEMENT OF UNCONTROVERTED MATERIAL
FACTS IN SUPPORT OF WASHINGTON
UNIVERSITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**SHANDS, ELBERT, GIANOULAKIS & GILJUM, LLP**
Mark J. Bremer #24696MO
Kevin Anthony Sullivan #55140MO
8235 Forsyth Blvd., Suite 700
St. Louis, MO 63105
(314) 241-3963
(314) 241-2509 (fax)
mbremer@shandselbert.com
ksullivan@shandselbert.com

Attorneys for defendants Washington University, Thomas Cox, Richard Benzinger, and Alex Evers

## WASHINGTON UNIVERSITY DEFENDANTS'
## UNCONTROVERTED MATERIAL FACTS

Defendants The Washington University ("University"), Dr. Alex Evers ("Evers"), Thomas Cox ("Cox"), and Richard Benzinger ("Benzinger") (collectively "University Defendants"), for their statement of uncontroverted material facts in support of their motion for summary judgment, state as follows:

**A.    Background and Weisman's Acceptance into the Anesthesiology Residency Program.**

1.    Faculty in the University's Department of Anesthesiology ("Department") trained and supervised resident physicians in the Anesthesiology Residency Program operated by the Graduate Medical Education Consortium between the University, Barnes-Jewish Hospital, and St. Louis Children's Hospital ("Residency Program").  Evers Dep. 30:9-31:10; Second Amended Complaint, Dkt.#86 ("Sec. Am. Compl.") ¶28.

2.    Dr. Evers was Chair (or Head) of the Department from 1994 to 2019 and was responsible for the general oversight of the Residency Program.  Evers Dep. 27:3-16, 30:9-31:10.

3.    Dr. Cox was Vice Chair of Education of the Department from 2011 to 2020 and had supervisory responsibility for the Department's Education programs, including the Residency Program.   Benzinger Dep. 68:20-69:8; Thompson Dep. 84:21-85:1; Sec. Am. Compl. ¶32.

4.    Dr. Benzinger was the Program Director of the Residency Program from 2011 to July 1, 2018 and had overall responsibility for coordinating the Residency Program and supervising and evaluating residents.  Benzinger Dep. 69:14-19, 76:4-78:20; Evers Dep. 223:14-225:20; Sec. Am. Compl. Ex. A at 10.

5.      In October 2015, Weisman applied for a position in the Residency Program, specifically for a position in the Academic Scholars Advancement Program ("ASAP").  Pl. Dep. 55:2-6, 516:16-517:2; Ex. RB-3; Gibson Decl. ¶4; Ex. L-1.

6.      The ASAP program is a training program unique to the Program whereby a resident would complete clinical residency training in an accelerated fashion, receive training as a fellow in a sub-specialty, and have up to 18 months of dedicated research time.  Cox Dep. 67:21-70:16; Benzinger Dep. 42:21-43:10; Evers Dep. 59:16-60:12.

7.      Weisman was selected for an interview for an ASAP spot and was interviewed by several Department faculty, including Drs. Cox and Benzinger.  Pl. Dep. 68:3-69:9; Cox Dep. 100:15-20; Cox Ex. 4; Benzinger Dep.302:2-4.

8.      The Residency Program, like most residency programs, participated in the National Residency Matching Program ("NRMP"), whereby the program ranks applicants on a list and the applicants rank programs, and the NRMP matches applicants to programs, thus requiring the program to accept a resident into the program.  Sec. Am. Compl. ¶35; Pl. Dep. 516:16-517:6; Benzinger Ex. 5 at WU932-33.

9.      Dr. Cox thought Weisman was "a below average applicant" due to his "very average USMLE test score," "he was in the bottom half of his class at a lower-tier medical school," and his recommendation letters "implied struggles with clinical performance." Cox Dep. 103:3-9, 105:18-24.

10.      Dr. Benzinger "thought that the clinical worries were sufficiently severe that [he] advocated not taking" Weisman and "favored not ranking" him.  Benzinger Dep. 302:5-12, 305:2-16.

11.     Weisman was ranked 81st of his class of 110 in medical school.  Pl. Dep. 59:22-60:21; Ex. A5.

12.     Drs. Cox and Benzinger's concerns about Weisman's clinical performance were overruled because other faculty, including Dr. Evan Kharasch and Dr. Evers, advocated for him and thought his research potential outweighed those concerns.  Benzinger Dep. 305:2-16; Cox Dep. 105:18-24; Evers Dep. 153:18-154:17.

13.     Weisman matched as an ASAP resident with the Residency Program and began his training in June 2016.  Pl. Dep. 262:19-22, 539:2-541:17.  As a resident, Weisman was an employee of BJH, not the University.  Pl. Dep. 520:19-521:20.

14.     Weisman planned to bring his company, SBI, and its 3-D printing lab and two researcher employees with him to St. Louis and to run that business while doing his residency training.  Pl. Dep. 84:11-19, 86:6-18; Ex. A8.

15.     Drs. Evers, Cox and Benzinger were not aware that Weisman was bringing his company or his lab to St. Louis in June 2016.  Evers Dep. 150:10-23, 164:24-175:4; Benzinger Dep. 196:10-197:18; Benzinger Ex. 13; Cox Dep. 100:2-8.

16.     Weisman was put in contact with the leadership of St. Louis College of Pharmacy ("STLCOP") to rent lab space by Dr. Kharasch, and SBI entered into a lease with STLCOP and gave STLCOP a 5% equity interest in the company as rent.  Pl. Dep. 81:21-82:3, 83:12-84:8 (Kharasch "had taken, you know, effort to introduce me to the St. Louis College of Pharmacy"), 103:5-18; Sinow Dep. 160:18-161:3; Ex. A7.

17.     STLCOP is not affiliated with and is "completely independent" from the University.  Evers Dep. 52:9-20.

4

18.     The University had no involvement in this transaction, and there was no nexus between SBI and its lab and the University.  Fleischmann Dep. 53:15-54:22.

**B.     Weisman's Performance as an Intern Resident from June through December 2016.**

19.     In the Residency Program, residents spend their first year as interns with rotations through a variety of medical specialties, which is then followed by rotations in clinical anesthesia.  Benzinger Dep. 43:11-44:7; Evers Dep. 59:16-60:1; Cox Dep. 70:3-16.

20.     Rotations generally last four weeks where residents work with several faculty physicians, and,  at the end of the rotation, a physician rotation coordinator completes an evaluation of the resident based on the feedback and evaluations from the faculty and others. Benzinger Dep. 77:12-78:20; Cox Dep. 26:12-27:25; Thompson Dep. 94:4-22.

21.      Resident evaluations have both subjective and objective components and can vary significantly among faculty evaluators depending on things such as the complexity of a procedure or the volume of procedures.  Evers Dep. 220:24-222:10; Benzinger Dep. 137:6-10, 175:6-15; Thompson Dep. 52:13-54:2; Szabo Dep. 46:17-47:9; Kaye Dep. 243:3-5; Pl. Dep. 28:23-29:4, 29:16-30:13.

22.     The Residency Program has a "responsibility" and "obligation" to patients and the community to train residents to become competent anesthesiologists and to residents to help them complete the Program.  Evers Dep. 79:19-80:25; Benzinger 121:19-122:11.

23.     Faculty evaluators are expected to communicate a resident's competence and any concerns with performance for the benefit of patient safety and the resident's training.  Cox Dep. 34:9-35:10; Benzinger Dep. 224:3-225:5, 229:5-14.

24.     In the Residency Program, it was "quite unusual for a resident to have a single highly negative evaluation" and "exceedingly unusual to have multiple."  Evers Dep. 160:15-161:11.

25.     In Weisman's first rotation in Emergency Medicine in June-July 2016, his overall rotation evaluation was "unsatisfactory," and the evaluation reported: "trouble identifying salient issues and prioritizing relevant issues"; "Presentations not appropriate for intern level"; "trouble executing tasks as discussed and multi-tasking"; "Below average understanding of workup and medical knowledge"; "Performed at level of MS4-3 [medical student]."  Pl. Dep. 74:13-76:9; Ex. A14.

26.     On August 15, 2016, during Weisman's rotation in the ICU, Dr. T.J. Graetz (an Anesthesiology faculty member) sent an email to Dr. Benzinger and Dr. Jessica Zenga (the ICU rotation coordinator) about Weisman, which reported: he had "lots of room to improve on prioritization, time management . . . and medical knowledge"; "got the sense he was overwhelmed in general"; "he's performing very far below expectations for an intern"; "our medical students are doing much better than him"; "doesn't know anything about any of his patients"; "multiple complaints from every resident on the team that they receive essentially no relevant sign out from Jeff because he has no idea what happened with his patients."  Benzinger Decl. ¶3; Ex. RB-1.

27.     Weisman's overall evaluation for the ICU rotation was "below expectations" and, while having some positive comments, reported: "behind his peers in medical knowledge, efficiency and procedural skills"; "[b]elow the curve" on medical knowledge; "his presentation skills and subsequently management plans were all over the place"; and "didn't really have an idea at all where to take all the data and apply it to the patient."  Benzinger Decl. ¶4; Ex. RB-2.

28.     Dr. Benzinger and Dr. Russell Groener (Assistant Program Director) met with Weisman on or about August 25, 2016, because of Weisman's early clinical performance and in order to determine the cause of his difficulties and provide feedback on his clinical performance. Benzinger Dep. 193:19-194:7; Benzinger Ex. 12; Ex. RB-1.

29.     On September 27, 2016, Dr. Groener reported to Dr. Benzinger that Weisman's performance in his next rotation, Internal Medicine-Cardiology, was "[n]ot good. More of the same."  Benzinger Decl. ¶5; Ex. RB-3.

30.     One Cardiology evaluation had low ratings, especially when compared to the evaluator's and his peers' average ratings, and, while noting some positive performance, stated Weisman "had trouble setting priorities and efficiently dealing with competing priorities" and "[p]resentations were not well organized, and not complete."  Benzinger Decl. ¶6; Ex. RB-4 at WU3089.

31.     Another evaluation in Cardiology reported that that Weisman "was well below the level I would expect for an intern," "deficits he has in gathering data, assimilating the data, and presenting a treatment plan," and leading the evaluator to "doubt his appreciation of what was truly going on."  Ex. RB-4 at WU3092.

32.     In his next rotation from September 19 to October 16, 2016, Weisman received an acceptable overall evaluation, which noted strengths and areas to work on. Benzinger Dep. 173:6-175:4; Benzinger Ex. 8.

33.     From October 17 to November 13, 2016, Weisman did a rotation in the Cardiothoracic ICU, and two faculty evaluators emailed Dr. Benzinger during the rotation and reported concerns about Weisman's performance:

      a.     Dr. Julianne Donnelly reported that Weisman's "notes and his conversation demonstrated a complete lack of basic understanding" with specific examples, that "[o]n several occasions, he left without giving report to the oncoming [nurse practitioner] about patients for which he cared for overnight" and that she needed to go over basic presentations with him.  Benzinger Decl. ¶7; Ex. RB-5.

      b.     Dr. Diego Casali reported that Weisman "functions at best at the level of a second year medical student," that he spent "multiple hours talking with him and trying to understand why he is so disorganized and unable to follow up on and complete even basic tasks," that Weisman's "deficiencies are profound," and that "he's one of the worst residents I've ever worked with and I honestly don't think he should work in a high acuity setting like Anesthesiology or Critical Care."  Benzinger Decl. ¶8; Ex. RB-6.

34.     Prior to his Cardiothoracic ICU evaluation being finalized, Dr. Groener met with Weisman in November 2016 and gave him the feedback he had received on that rotation, in particular his inability to present patients coherently and unprofessional behavior in not doing handovers.  Groener Decl. ¶3; Ex. G-1.

35.     Weisman's CT ICU rotation evaluation had an overall "unsatisfactory," which incorporated the comments of Drs. Donnelly and Casali and reported that Weisman "organizational skills have to be at least at a basic level before we can focus on how to improve his medical knowledge" and that "[w]e believe he should not work in a high acuity setting." Benzinger Decl. ¶9; Ex. RB-7.

36.     Weisman did two Internal Medicine rotations in November-December 2016. Benzinger 94:14-25.

37.     One Internal Medicine faculty member (Dr. LaRossa) submitted an evaluation which graded Weisman at "about 60 percent of her average grade for Dr. Weisman's peers" and which Dr. Benzinger viewed as "one of the worst evaluations of an intern on internal medicine that I've seen."  Benzinger 101:10-103:24; Benzinger Ex. 3.

38.     Another Internal Medicine evaluation (Dr. Loden) showed Weisman "performing markedly below the attending's average assessment and the average assessment of . . . his peers in that rotation."  Benzinger Dep. 99:2-23; Benzinger Ex. 3.

39.     One Internal Medicine (Dr. McGill) evaluation for January 2-15, 2017, was satisfactory.  Benzinger Dep. 95:1:1-4, 97:25-98:8; Benzinger Ex. 3.

**C.     Weisman Is Placed on Probation within the Program**

40.     The Residency Program's Clinical Competence Committee ("CCC"), which is comprised of the Program Director, Assistant Program Director, and rotation coordinators, reviews the performance of residents every 6 months and determines whether a resident's progress is satisfactory and, if not, what actions or remediation need to be taken to address the performance deficiencies.  Benzinger Dep. 143:8-13; Evers Dep. 203:20-25; Cox Dep. 78:8-79:3.

41.     The CCC met on January 11, 2017, to review the performance of all residents in the Residency Program and determined that Weisman's performance in his first 6 months was unsatisfactory.  Benzinger Decl. ¶10; Ex. RB-8.

42.     The Residency Program leadership decided that Weisman would need to receive satisfactory evaluations for the next 6 months of rotations through June 30, 2017, and to repeat two rotations in internal medicine and the ICU.  Benzinger Decl. ¶¶11-12; Exs. RB-9, RB-10; Pl. Dep. 164:15-165:10; Ex. A13; Benzinger Dep. 185:15-22; Sec. Am. Compl. ¶ 67.

43.     Repeating rotations meant that Weisman failed those rotations.  Benzinger Dep. 87:4-88:1.

44.     If he did not receive satisfactory evaluations in the second half of the year, an official report of unsatisfactory would be made to the American Board of Anesthesiology ("ABA"), which would require re-doing 6 months of his residency.  Ex. A13.

45.     On January 19, 2017, Drs. Benzinger and Groener met with Weisman for his 6-month evaluation and gave Weisman a three-page letter explaining that his performance was not meeting the Department's expectations with examples from his rotation evaluations, that he was being placed on probation within the Residency Program, what he needed to do to remediate his performance in the next 6 months, the consequences of not remediating his performance, and asking Weisman to switch from the ASAP track to the traditional residency track.   Ex. A13; Benzinger Decl. ¶13; Ex. RB-11; Pl. Dep. 164:4-11.

46.     Dr. Benzinger encouraged Weisman to switch from the ASAP program to the Scholars' program because the "accelerated clinical training of ASAP" was working against his interests, but the remediation did not remove Weisman from the ASAP program.  Benzinger Dep. 151:20-152:19, 169:14-25.

47.     In this meeting, Weisman blamed his performance on external factors, including the distraction of running his imploding company and the BJH electronic medical record system. Ex. RB-11.

48.     From this meeting, Dr. Benzinger's impression was that Weisman was considering leaving the Residency Program and asked Dr. Evers to meet with Weisman and provide career advice.  Ex. RB-11.

49.     Placing a resident on probation within the Residency Program allows the program to "provide documentation and counseling" without having to report the action to the ABA, which would occur only if the performance were not remediated.  Cox Dep. 85:11-87:22.

50.     On or about February 16, 2017, Dr. Evers and Weisman met to discuss how Weisman could improve and succeed, and Dr. Evers counselled Weisman that he needed to focus on his residency training and that his company could be a distraction.  Pl. Dep. 214:3-215:17; Ex. A101; Evers Dep. 150:17-151:20; Ballard Dep. 131:2-13.

51.     On February 19, 2017, Weisman sent an email to Dr. Evers, which thanked Dr. Evers for setting up the meeting, and which summarized the "plans and suggestions" they discussed:  Weisman was shutting down participating in outside research and businesses, he would regularly consult with Dr. Groener and rotation coordinators, he would talk to other research residents about their paths to success, and he agreed to redo the two rotations as part of remediating his performance.  Pl. Dep. 214:15-215:17, 217:4-218:13; Ex. A101.

**D.     SBI Transfers Its 3-D Printing Lab Property to the University's Department of Radiology.**

52.     SBI had moved its lab, property, and two researcher employees/independent contractors, Drs. Uday Jammalamadaka and Karthik Tappa, to STLCOP in June 2016.  Sec. Am. Compl. ¶53; Sinow Dep. 43:8, 142:1-25, 144:7-19.

53.     Apart from 3-D printing lab equipment, SBI owned licensing rights to a patent application developed by Weisman that was owned and controlled by Louisiana Tech University. Pl. Dep. 52:8-53:15, Pl. Dep. 301:4-302:21; Ex. A3 at 27.

54.     SBI and Weisman did not collaborate with STLCOP on research, grants, or education.  Fleischmann Dep. 58:5-59:8.

55.     SBI had no grants and did not receive any grants.  Pl. Dep. 128:13-21 ("I don't believe there was . . . . any grant money coming into SBI from June 2016 to December 2016"); Sinow Dep. 135:4-7, 231:4-9.

56.     Weisman and David Sinow (SBI's president and CEO from 2016-2018) were the only people to invest money in SBI, and it never raised additional funds from other investors or venture capital.  Pl. Dep. 53:11-54:11; Sinow Dep. 12:21-13:4, 87:24-88:11 (no cash offered by Mayo Ventures "at those preliminary negotiations"), 89:18-90:11 ("preliminary negotiations" with Illinois Ventures), 90:21-92:9 (Dennis Beard and Serra Capital offering cash for "a very small equity stake").

57.     In July-August 2016, SBI and Weisman had proposed collaborating on 3-D printing research with the University's Department of Radiology.  Woodard Decl. ¶3; Ex. W-1; Evers Decl. ¶3; Ex. E-1.

58.     In August 2016, the Chair of the Department of Radiology, Dr. Richard Wahl, asked Dr. Evers about a financial arrangement that the Department of Anesthesiology had regarding 3-D printing that involved a venture capitalist and STLCOP, and Dr. Evers responded he knew nothing about it.  Evers Decl. ¶4; Ex. E2.

59.     On August 11, 2016, Dr. Evers contacted Dr. Kharasch, who informed Dr. Evers that Weisman had a small 3-D printing company, he introduced Weisman to the STLCOP leadership, that Weisman had reached an arrangement with STLCOP for lab space, and that neither the Department nor the University had anything to do with the arrangement.  Evers Decl. ¶4; Ex. E-2.

60.     Dr. Evers first learned that Weisman had been running a company or lab in St. Louis in August 2016.  Evers Dep. 152:10-23, 174:18-175:4.

61.     On August 15, 2016, Dr. Kharasch informed Weisman that his statement in a proposal to Radiology that the SBI was housed in the Center for Clinical Pharmacology was "totally incorrect, if not also misleading," and Weisman agreed to remove the statement from further business proposals.  Pl. Dep. 84:14-19, 87:20-90:1; Ex. A8.

62.     Dr. Evers was concerned about a potential conflict of interest – that the Department should not have a business interest in or be a partner with a resident because the Department should be solely focused on training residents – and he wanted to make sure that the arrangement was an arm's length transaction without any involvement with the Department.  Pl. Dep. 93:18-94:21, 483:17-488:3; Ex. A9; Evers Dep. 150:17-151:20, 174:3-13, 180:5-12, 181:17-182:18.

63.     In August and September 2016, Dr. Evers spoke with both Weisman and Sinow regarding SBI's relationship with STLCOP and was satisfied that no conflict of interest existed.  Pl. Dep. 112:25-113:16; Ex. SB-22; Sinow Dep. 102:8-103:8; Evers Dep. 223:4-13.

64.     Dr. Evers made it clear to Plaintiffs that the Department did not object to Weisman's outside business activities so long as they did not interfere with his residency training.  Ex. SB-22; Evers Dep. 150:17-151:3.

65.     SBI had no gross receipts or income in 2016 and was spending $8,000 to $10,000 per month.  Sinow Dep. 41:10-15, 50:16-19, 135:9-137:7; Ex. SB-31.

66.     On or about November 2, 2016, SBI proposed a research agreement to the Department of Radiology whereby a Center for Perioperative Services, 3-D Medical Printing and Rapid Prototyping would be housed in the Department of Radiology with the Department being responsible for personnel salaries, but the agreement was never finalized.  Sinow Dep. 49:4-22, 51:24-52:1; Ex. SB-43.

67.     In December 2016, Sinow decided he would not put any additional money into SBI.  Sec. Am. Compl. ¶68; Pl. Dep. 576:6-20 ("Sinow saw what was going on with my employment status and didn't feel comfortable continuing to support the operation" and was "protecting his interests."); Sinow Dep. 190:14-20; Ballard Dep. 126:23-127:7 ("Sinow stopped funding SBI" due to "[l]ack of investors and a commercial product to move it forward in the short term").

68.     By the end of 2016, SBI could not pay the lab's operating costs and the researchers' salaries.  Sec. Am. Compl. ¶68; Pl. Dep. 145:23-146:4; Sinow Dep. 140:20-23; Ballard Dep. 107:23-108:20.

69.     SBI had employment agreements with Jammalamadaka and Tappa dated December 1, 2016, for a term of one year whereby SBI agreed to pay annual salaries of $50,000 plus a housing and EB1 allowance of $17,500.   Sinow Dep. 142:5-143:6, 144:6-22; Exs. SB-3, SB-30.

70.     On January 25, 2017, Weisman emailed Dr. Pamela Woodard about "an improved change of plans for both you and David Ballard to keep things fully academic."  Woodard Decl. ¶4; Ex. W-2.

71.     On February 3, 2017, SBI proposed that it be acquired by the Department of Radiology with SBI's 3-D printing lab property and employees relocated to Radiology because of the "lack of funding from Sinow and the financial stressors going forward."  Ballard Dep. 128:6-13; Sinow Dep. 52:4-20, 60:11-62:18; Ex. SB-24; Ballard Dep. 43:18-44:4.  The proposal requested no payment of money, only that Radiology take over the expenses of operating a new 3-D printing lab and paying SBI's two employees.  Sinow Dep. 60:11-62:18; Ex. SB-24.  An agreement was not reached.  Sinow Dep. 47:17-20; Ballard Dep. 120:20-23.

72.  On February 19, 2017, Dr. Woodard offered to cover the researchers' salaries, and Weisman thanked her.  Sinow Dep. 125:4-126:18; Ex. SB-44; Ballard Dep. 78:7-16.

73.  In March 2017, SBI, through Weisman and Sinow, made the decision to give SBI's 3-D printing lab property to the Department of Radiology.  Sinow Dep. 120:2-9, 177:16-178:1.

74.  This decision was motivated by several reasons, including:

a.  Weisman and Sinow wanted Weisman to be "well thought of" and "improve his position," wanted to "protected the technology," and believed it was "far more laudable use" for Radiology to have the lab property.  Pl. Dep. 579:5-9; Sinow Dep. 203:24-204:13, 207:8-10 ("it was more important to protect the technology"), 209:13-25; Fleischmann Dep. 45:18-46:1.

b.  The potential that Weisman could operate the 3-D printing facility as a co-director with Dr. Ballard after he finished his residency.  Pl. Dep. 579:23-580:4; Ballard Dep. 29:2-15.

c.  SBI could not cover the salaries of its researchers, whose immigration status required that they be employed, and it was important to Weisman that they be employed by the University.  Sinow Dep. 61:9-15, 121:8-11, 211:19-212:1; Fleischmann Dep. 45:18-46:1; Ballard Dep. 22:2-12, 26:13-27:2, 127:17-128:5.

d.  Weisman and Sinow agreed that it was in "the best interests of the company to transfer" SBI's equipment to Radiology.  Sinow Dep. 177:16-25.

e.  It was Weisman's "choice" between dedicating his time to his residency training or continuing to operate SBI, and he chose to focus on his residency training and completing it, which was important to Weisman and Sinow.  Pl. Dep. 147:19-148:6;

15

Sinow Dep. 93:4-23 ("I acquiesced that Jeff should at all costs try to finish his residency"), 181:5-12 ("Jeff was very interested in finishing that residency program, and we tried to do everything possible to make that happen."), 220:6-20 ("That was our choice.").

75.    On or about March 21, 2017, SBI employees moved its property over to the Radiology 3-D printing facility with the full knowledge of and without objection from Wiesman and Sinow.  Pl. Dep. 120:21-121:4, 133:22-136:19, 137:7-138:11, 143:16-25; Exs. A15, A16; Sinow Dep. 121:8-11, 129:8-130:12, 175:1-13 ("I did not object. Either before or after."). Weisman was offered a key to the facility.  Pl. Dep. 135:3-136:19.

76.    Weisman "agreed to the transfer" and worked to "facilitate what was going on, what was being taken over to Radiology," "assisted with the transition," and "integrate it seamlessly."  Pl. Dep. 218:8-13, 230:23-231:9, 309:8-14, 577:1-4.

77.    SBI and Weisman did not demand that SBI's property be returned or that any payment be made for the property, did not attempt to retrieve any property even while working the lab, and Weisman asked for "involvement" and "access." Sinow Dep. 120:10-23; Pl. Dep. 138:12-140:12, 141:25-142:15, 147:1-8, 148:21-149:11.

78.    Weisman stated in writing to Anesthesiology faculty, including Dr. Benzinger, that he donated SBI's lab to the Department of Radiology.  Ex. A18 ("The most unique thing I did here was donating the medical 3D printing lab to the radiology department."); Ex. A19 ("The lab was donated to the radiology department, primarily the vice chair, Pam Woodard, to be a core facility to set up a central 3D printing group on the medical campus."); Ex. A17 ("donated one of the top medical 3D printing groups in the country to the radiology department"); Pl. Dep. 149:15-19, 151:5-6, 151:10-16, 154:6-22, 155:1-156:10.

79.     In CVs that Weisman sent to other residency programs, under the heading research and "Founder and medical 3DP lab, Washington University, Mallinckrodt Institute of Radiology," Weisman wrote: "Donated laboratory equipment and expertise from Strategic Biomedical, Inc."  Exs. A20 at JW63960, A21 at JW63913; Pl. Dep. 157:4-158:10, 158:15-160:5.

80.     Weisman told Dr. Alan Kaye that he "donated" the lab property to the Department of Radiology.  Kaye Dep. 221:3-16.

81.     Weisman told Ken Fleischmann (STLCOP General Counsel) that "he was making a donation to of the equipment, and this whole thing was melted down.  SBI would cease to exist.  The post docs are going to work over at Radiology.  He's going to donate the equipment."  Fleischman Dep. 76:2-16.

82.     SBI's researchers became employees of the Department of Radiology, which SBI admitted cured its "burn rate" of $8,000-$10,000 per month and relieved SBI of its contractual obligations to pay their salaries, which was beneficial to it.  Sinow Dep. 135:9-137:7, 198:1-25, 211:9-22; Ex. SB-31; Ballard Dep. 132:23-133:14, 135:25-136:6 (Radiology "did what Jeff Weisman wanted to do when it agreed to take the equipment and to take over the employment of Uday and Karthik").

83.     Weisman did not list lab notebooks or any intellectual property as items transferred, but testified that his and SBI's lab notebooks containing intellectual property were moved to the Radiology 3-D printing facility and was unsure of the number of lab notebooks, who possessed them, or "what they were used for."  Ex. A3 at 27; Pl. Dep. 132:22-133:18.

84.     The Radiology 3-D printing facility remains in operation with Dr. Ballard as director.  Ballard Dep. 29:4-18.  Some of the equipment that SBI transferred to Radiology is still

17

in use, while some is no longer used, and Radiology has purchased additional 3-D printing equipment for the lab costing $50,000.  Ballard Dep. 105:10-106:4.

85.     The Radiology 3-D printing facility has operated at a loss for every year since it has been in operation – $40,776 in FY2017, $116,688 in FY2018, $93,171 in FY2019, $68,107 in FY2020, $29,852 in FY2021, and $82,798 in FY2022 – and the Department of Radiology has used funds to make up the deficits.  Woodard Decl. ¶5; Ex. W-3; Ballard Dep. 106:15-21.

**E.      Weisman's Unsatisfactory Performance in His Second Year of Residency Training.**

86.     In the second half of his internship year, Weisman's rotation evaluations were as follows:

a.      He received a "below expectations" in the CPAP rotation, but it was noted he improved in the last third or quarter of the rotation.  Benzinger Decl. ¶14; Ex. RB-12.

b.      He received "meeting expectations" in his Simulation rotation and in two surgery rotations.  Benzinger Decl. ¶¶15-17; Exs. RB-13, RB-14, RB-15.

c.      Weisman received "below expectations" in his ICU rotation with comments that "he is unable to apply book knowledge to clinical care" and that "[w]e are truly concerned about his competency to take care of patients and have reservations about advancing him to his next year of residency."  Benzinger Decl. ¶18; Ex. RB-16.

87.     The CCC met on June 21, 2017, and determined that Weisman's class all satisfactorily met the competency requirements, while noting Weisman needed feedback on his lack of performance.  Benzinger Decl. ¶19; Ex. RB-17.

88.     Weisman was no longer on probation within the Residency Program at the end of his first year.  Pl. Dep. 233:7-10.

89.    In June 2017, in order to provide Weisman with additional support and to help

him succeed, the Residency Program gave Weisman an academic advisor, Dr. Graetz, earlier

than the rest of his residency class (which would get an advisor mid-way through the second

year).  Pl. Dep. 233:11-19; Benzinger Decl. ¶20; Ex. RB-18; Evers Dep. 184:13-20.

90.    Weisman began his second year of training in clinical anesthesia with a Tutorial

rotation, in which 4 out of 6 faculty evaluators found that Weisman was not capable of moving

on to independent, less supervised care, while two evaluators found that he was.  Benzinger

Decl. ¶21; Ex. RB-19.  The evaluations noted concerns with respect to his performance included

acting slowly, problems with focusing on the important aspect of the case, lack of vigilance, and

poor medical knowledge.  *Id.*

91.    Weisman scored in the bottom 5 percentile on the Anesthesia Knowledge Test-1

Pre-Test, which he took on July 5, 2017.  Benzinger Decl. ¶22; Ex. RB-20.  Weisman scored in

the bottom 5 percentile on the Anesthesia Knowledge Test-6 Post-Test, which he took on

January 24, 2018.  Pl. Dep. 62:8-22; Ex. A6.  The AKT tests determine the level of knowledge of

residents.  Pl. Dep. 62:8-22.

92.    Weisman had 4 clinical anesthesia rotations to start his second year of training

and did not achieve an overall evaluation of meets expectations or better in any rotation.  Pl.

Dep. 244:1-10; Ex. A64 at 1.

93.    In his POD-4 CAM rotation, Weisman received a below expectations overall

evaluation with comments that he was "[s]till lagging behind his peers," although improving.

Benzinger Decl. ¶23; Ex. RB-21.

94.    During Weisman's rotation in Pediatric Anesthesiology, Dr. Groener, the rotation

coordinator, received numerous written comments from faculty evaluators.  Groener Decl. ¶4;

19

Ex. G-2.  Some were positive, but the consensus was that "his performance reached the level of deeply troubling, with serious concern for patient safety."  Benzinger Decl. ¶24; Ex. RB-22; Groener Decl. ¶¶4-5; Exs. G-2, G-3.

95.     Dr. Douglas Thompson, who at the time was an Assistant Program Director, reported about his experience with Weisman: "The last time I worked with him when I left him alone for no more than 10 minutes. When I returned I noticed he had re-filled the sevo vaporizer (nothing wrong with that), however he failed to realize the vaporizer wasn't properly engaged with the machine and therefore NO anesthetic agent was being delivered to the patient! When I returned to the room I quickly noticed the end-tidal concentration of sevo had fallen to 0.5%. It is not clear to me when or if Jeff would have noticed this."  Exs. G-2 at WU2297, G-3 at WU2495.

96.     Dr. Thompson testified that this was a "big deal" and a "big incident" because it put the child patient at risk of having recall (having awareness or waking up), and it could have been avoided by properly using the equipment or looking at the monitors.  Thompson Dep. 14:7-16:21, 99:7-100:19.

97.     Another Pediatrics faculty evaluator reported about Weisman:  "After mask induction, ready for intubation, patient apneic [temporarily not breathing]. Resident decides to abandon patient and go back to cart to fumble around for a nasal temp probe. . . .  When I asked why he prioritized something that trivial over breathing for a paralyzed patient, he said (I kid you not) 'some attendings are particular about things like that.'  I was speechless.  Once intubated, I stepped out for a few minutes. When I returned, noticed the $ETCO_2$ was 89 and bellows were not moving. I asked if he was intentionally hypoventilating for some reason I was unaware of (biting my tongue at this point). Didn't have a plan of attack for how to remedy, check for leak in

system, etc. Not sure he was even aware of the hypercarbia [increased carbon dioxide]."  Exs. G-2 at WU2739, G-3 at WU2494.

98.     Dr. Groener himself noted an 8-year old patient's blood pressure dropped significantly while he was out of the room, and Weisman "had taken no action, not even a fluid bolus."  Ex. G-3 at WU2496.

99.     Another Pediatrics faculty evaluator reported to Dr. Groener:  "I was following along in Metavision outside of the room and noted the blood pressure dip to systolics in the 40s. After not receiving a phone call, and concerned, I went into the room. There had been blood loss, hypotension, and tachycardia and Dr. Weisman had turned UP the anesthetic agent (sevoflurane from 2 to 3%). This was in the setting of a functional epidural that had been providing most of the analgesia for the case at this point. When asked about his decision Dr. Weisman implied he thought the patient was becoming light or experiencing pain. I decreased the anesthetic, bolused albumin and the patient improved. This event lead me to be concerned about basic diagnostic decision making and a lack of insight into when to call for help."  Exs. G-2 at WU2281, G-3 at WU2498.

100.     Other common comments from evaluators noted a lack of vigilance, a gap in medical knowledge, struggles with clinical skills, prioritization, and willingness to accept feedback.  Exs. G-2, G-3.

101.     For his overall evaluation on the Pediatric rotation on November 1, 2017, Weisman received an overall "unsatisfactory" with the rotation evaluation prepared by Dr. Groener noting many of these examples and performance deficiencies.  Groener Decl. ¶6; Ex. G-4.

102.     Early in his next rotation, POD-2 ENT, the rotation coordinator expressed concern that she could not provide the level of supervision for Weisman's ability and reported that a faculty member was concerned about patient safety.   Benzinger Decl. ¶24; Ex. RB-22.

103.     Weisman received an overall below expectations on the POD-2 ENT rotation with comments noting a failure to recognize priorities, remembering to turn on equipment, managing equipment and monitors, not knowing proper dosages, and charting errors, but also including some positive comments about his performance.  Benzinger Decl. ¶25; Ex. RB-23.

104.     In his last rotation (HPV) of the first half of his second year, Weisman's overall evaluation was "below expectations" by Dr. Benzinger, the rotation coordinator, based on discussion with the rotation's faculty.  The rotation evaluation noted that Weisman's "clinical care is significantly below expectations," that he "fails to notice abnormalities on monitors, and is inconsistent in synthesizing these abnormalities into differential diagnoses and plans of action," and that Weisman "is certainly making an effort, but the end result is still short of expectations."  Benzinger Decl. ¶26; Ex. RB-24.

**F.     Weisman's Decision to Voluntarily Resign from the Residency Program.**

105.     Weisman and Dr. Benzinger had several conversations in late 2017 about whether Weisman's performance and whether he should stay in the Residency Program.  Pl. Dep. 236:20 -237:22; Benzinger Dep. 205:13-206:11.

106.     In mid-December 2017, Weisman and Dr. Benzinger discussed Weisman's performance and the idea of him leaving the Residency Program at the end of the academic year. Benzinger Decl. ¶27; Ex. RB-25.  Weisman asked Dr. Benzinger whether, if he resigned with a certain effective date, the CCC would consider issuing an unofficial warning instead of an official report of unsatisfactory to the ABA, which would have long-lasting negative effects.  Ex.

RB-25.  Dr. Benzinger believed this would be acceptable and would not compromise the Program's integrity in that saying "everything was fine" was not acceptable, but that not taking a formal action after a semester of anesthesia training was justifiable.  Ex. RB-25.  Dr. Cox agreed. Ex. RB-25.

107.    Weisman met with Dr. Evers on or about January 2, 2018 to discuss career advice, and Weisman informed Dr. Evers: "I did not feel the clinical programs here were the right fit for me.  My plan is to look at some other options and depart by July 1st."  Ex. A63; Pl. Dep. 240:1-241:10 ("it looked like a better idea to look at some other options" and "it seems like this may not be the right fit").

108.    Weisman met with Dr. Benzinger about a week later and informed him of the very same thing.  Ex. A65; Pl. Dep. 242:15-243:23; Benzinger Dep. 164:23-165:27.

109.    The CCC met on January 10, 2018, and decided not to report an official unsatisfactory to the ABA on the basis that there was no need to damage his career if he was leaving.  Benzinger Decl. ¶¶28-29; Ex. RB-26, Ex. RB-27.  The CCC decided that a letter of concern would be issued and career counseling be given because Weisman was leaving anesthesiology.  Exs. RB-26, RB-27.

110.    A letter dated January 11, 2018, was drafted summarizing Weisman's recent performance and clinical difficulties and warning him that similar clinical performance in the next 6 months would result in a formal report of unsatisfactory to the ABA.  Ex. A64; Pl. Dep. 244:1-10; Benzinger Dep. 203:1-11.

111.    The letter further summarized what Weisman had told the Program's leaders – that Anesthesiology was not a good fit and that he was going to change specialties.  The letter, however, emphasized that the decision to resign was Weisman's to make and that, if Weisman

stayed, the Program would support his efforts to become an anesthesiologist.  Ex. A64; Pl. Dep. 245:7-246:8; Benzinger Dep. 203:24-204:10.

112.    In response to Weisman's request that his clinical schedule be modified, the letter clarified that he would remain in the standard anesthesiology training up to the point that he formally resigned from the Residency Program at which time modifications could be made to his training schedule and further emphasized that the decision to resign was his to make.  Ex. A64.

113.    On or about February 22, 2018, Drs. Benzinger and Cox met with Weisman, gave him the January 11 letter, and informed him that his rotation schedule could be changed if he resigned, but, if he did not, the schedule would stand under the assumption that Weisman would continue training.   Pl. Dep. 244:22-245:2; Benzinger Dep. 204:11-13; Cox Dep.  136:16-140:6; Cox Ex. 11.

114.    On April 5, 2018, Weisman emailed Dr. Benzinger and requested that his rotation schedule be modified for the remainder of the academic year in order to allow him to focus exclusively on research to help the Department of Radiology on 3-D printing research projects instead of performing clinical rotations.  Ex. A67; Pl. Dep. 246:12-247:5.

115.    On that same day, Dr. Benzinger responded that Weisman needed to decide whether he would remain in the Residency Program or leave because, if he stayed, taking research time before obtaining basic skills and knowledge as an anesthesiologist would not be appropriate.  Dr. Benzinger advised Weisman that, if he had decided to leave, he should submit a resignation letter with whatever effective date he wanted and that his training could be modified so long as it was consistent with the governing rules.  Ex. A67.

116.    Dr. Benzinger further expressly stated:  "I saw that you perceive some sort of tie between your submission of a resignation letter and our provision of a recommendation letter.

24

These are really independent events.  Our department will provide you or any other resident the strongest letter of recommendation that we can.  It's an obligation of any residency program."  Ex. A67.

117.    Dr. Benzinger concluded by advising Weisman that he should consider staying in the Residency Program because his recent rotations "have gone reasonably well" and that research time could be accommodated in future schedules after his second clinical year of training.  Ex. A67; Pl. Dep. 248:2-12.

118.    Also on April 5, Weisman emailed Dr. Benzinger "to ask for a positive program director letter" that he could send directly to other programs and commented that he "honestly enjoyed working" with Dr. Benzinger.  Ex. A68; Pl. Dep. 251:23-252:19.

119.    On the morning of April 6, Dr. Benzinger responded that he understood that Weisman "would like this to be an iterated or negotiated process, but that's simply not the way these letters are produced" and stated he will "write the letter that I think can do the most good for you in your search." Ex. A68; Pl. Dep. 252:20-253:12.

120.    In the evening of April 6, 2018, Weisman submitted his formal resignation from the Residency Program effective the end of June, which is when he would have completed 24 months of training.  Weisman further made a formal request to modify his training schedule so that he could finish the academic year doing research in the Radiology 3-D printing facility.  Ex. A69; Pl. Dep. 253:17-254:9.

121.    On April 7, 2018, Dr. Benzinger sent an email to Weisman which confirmed that the effective date of his resignation would be June 30 and stated he would discuss his training schedule modification with others.  Benzinger Decl. ¶30; Ex. RB-28.

122. Later on April 7, Dr. Benzinger informed Weisman that the Residency Program approved his request for research time through the effective date of his resignation with some general call duty.  Ex. A70; Pl. Dep. 254:20-255:20.

**G.     Letters to and Communications with Other Programs.**

123. In Dr. Cox's and Dr. Benzinger's experience, a resident seeking to transfer from a respected program is rare and could be viewed as problematic without a specific reason for the transfer such as a family issue, needing to be in certain location, or wanting to train in another specialty.  Cox Dep. 56:12-57:2; Benzinger Dep. 29:11-24, 30:14-23. 33:4-8.

124. Dr. Cox advised Weisman that "programs are often very reticent to accept transfers from other programs without any plausible explanation for that transfer." Cox Dep. 58:11-25.

125. In June 2018, at the request of Weisman, Dr. Benzinger sent virtually identical recommendation letters to the University of Chicago and Cook County Hospital.  Exs. Benzinger 39, Benzinger 41; Benzinger Dep. 278:25-280:15, Pl. Dep. 260:1-11.

126. Weisman has admitted that there was nothing false in Dr. Benzinger's letters, other than offering to have a call with the other programs.  Pl. Dep. 264:7-265:2, 283:9-285:11.

127. Dr. Cox believed the letters were accurate and generously described Weisman's difficulties in a positive way.  Cox Dep. 144:2-23.

128. Dr. Thompson believed the letters were positive under the circumstances. Thompson Dep. 122:10-14.

129. Dr. Benzinger subsequently spoke with Dr. Ned Nasr at Cook County Hospital and stated that his letter was accurate and that Weisman was likely to be successful with clinical

training that was not compressed like in the Residency Program's ASAP program.  Benzinger
Dep. 313:18-25.

130.    Dr. Cox spoke briefly with Dr. Jerome Klafta with the University of Chicago at a
conference.  In response to Dr. Klafta's statement that it looked like Weisman struggled and that
anesthesiology was not a good fit and his question of whether Weisman would finish the year in
good standing, Dr. Cox stated that he believed he was going to finish in good standing and that
he was doing research.  Cox Dep. 153:21-155:25, 156:14-157:7, 158:6-13, 160:1-8.

131.    Weisman testified that he "strongly suspected" and was "relatively certain that
something negative occurred" in a conversation between Dr. Thompson and Dr. Nagele with the
University of Chicago.  Pl. Dep. 269:7-13.

132.    After Weisman left the Residency Program on June 30, 2018, and after Dr.
Thompson became the Program Director (Dr. Benzinger left the role on June 30 after 7 years),
the Residency Program received requests from other residency programs and from Dr. Weisman
to provide information relating to his training.  Benzinger Dep. 69:14-20; Thompson Dep. 87:14-
88:20, 123:1-7; Gibson Decl. ¶5; Ex. L-2.

133.    The Residency Program complied with all of these requests and sent the letters or
materials, except for a request from Weisman to send his entire file to LSU-Shreveport, which
the Residency Program viewed as unnecessary, burdensome and inappropriate.  Thompson Dep.
57:10-23, 59:10, 87:14-88:20, 125:16-126:9; Gibson Dep. 26:1-27:15, 31:17-33:16; Drake Dep.
56:23-57:24, 58:25-59:9.  Instead, and with Weisman's knowledge, Dr. Thompson provided
official ACGME summative milestone reports and ABA training records.  Thompson Dep.
125:16-126:9, 136:21-25, 139:5-21; Thompson Ex. 12 at WU695; Gibson Dep. 33:9-16; Gibson
Decl. ¶6; Ex. L-3.

134.    The letters Dr. Thompson sent to other programs was a revised version of Dr. Benzinger's letter, and Weisman's own proposed expert testified that it was a "good reference letter."  Thompson Dep. 137:1-138:3; Kaye Dep. 185:22-25.

135.    No residency program to which Weisman inquired about a spot ever requested a "summative evaluation" from the Residency Program.  Drake Dep. 71:21-72:3, 113:6-10; Gibson Decl. ¶7.

136.    In December 2018, Dr. Evers spoke with Dr. Roberta Hines with Yale University about Weisman.  Dr. Evers told Dr. Hines that Weisman was a resident and that he voluntarily resigned and that was all he wanted to say.  When Dr. Hines continued to press for additional information, Dr. Evers merely stated that if she wished to "read between the lines" she could do so, but that he was not going to provide further details.  Evers Dep. 92:4-93:10, 127:11-14.

137.    Dr. Evers believed that a fully transparent and candid evaluation would have been damaging to Weisman. Evers Dep. 125:12-126:15.

138.    Dr. Thompson does not recall the specifics of a telephone with a Dr. Macario from Stanford University.  Thompson Dep. 88:21-89:24.

139.    Weisman was informed by the University of Chicago that the GME Office "denied adding a seat."  Pl. Dep. 277:17-278:8; Ex. A80.

140.    Dr. Ned Nasr with Cook County Hospital emailed Weisman that the program "elected to go with a CA-1 resident yesterday instead of an advanced position for various reasons."  Pl. Dep. 290:9-291:13; Ex. A83.

141.    Weisman himself characterized LSU Shreveport as not giving him a promised seat without referencing any statement by the Residency Program and stated he had been burned twice by that program.  Pl. Dep. 203:16-204:16; Ex. A29.

142.    Weisman testified that he spoke with Dr. Patil with LSU Shreveport about communications she had with the Residency Program, but "she was not very forthcoming," and "only gave pieces of the conversation that she [had]," and Weisman "believe[d]" she had spoken with Dr. Thompson.  Pl. Dep. 208:17-210:4.  Weisman further testified that Dr. Fox referenced Dr. Thompson "saying things about lawyers," and that Dr. Patil "roughly" referenced an unnamed person telling her something "terrible" and to talk to lawyers.   Pl. Dep. 200:21-201:4, 205:5-13.

143.    Dr. Thompson did not speak with Dr. Patil by telephone and sent her one e-mail at Weisman's request regarding documents, but it bounced back to him.   Thompson Dep. 61:16-62:4, 66:17-20.

144.    Dr. Thompson would communicate with counsel about liability and legal questions regarding residents and did communicate with counsel regarding communications with a third party regarding Dr. Weisman.  Thompson Dep. 73:4-74:4, 77:7-25; Thompson Ex. 12 at WU700.

145.    Weisman testified that Dr. Kaye informed Weisman that Dr. Nasr with Cook County said he "just heard some things from Wash U. about you."  Pl. Dep. 202:2-24.

146.    Weisman also testified that family friends informed him that they had spoken with either Dr. Troianos or Argalious with the Cleveland Clinic, and it was his understanding that Dr. Evers said "negative things about me" and "that seemed to be what was being told to me."  Pl. Dep. 288:2-289:7.

## H.    Weisman's Current Status

147.    Weisman completed a residency in occupational and environmental medicine at the University of Illinois Chicago in June 2021.  Pl. Dep. 33:9-15.

148.    Weisman is employed at the Hampton Veteran Affairs Medical Center as the Director of Employee Health and has an annual salary of $237,000.  Ex. B2 at 20.

149.    Weisman is still actively trying to seek an anesthesiology residency and admitted that he expected the University to "honor the agreement of giving me a good reference" up to the present day.  Pl. Dep. 39:10-22, 192:24-194:19.

Respectfully submitted,

SHANDS, ELBERT, GIANOULAKIS
  & GILJUM, LLP

/s/ *Kevin Anthony Sullivan*
Mark J. Bremer #24696MO
Kevin Anthony Sullivan #55140MO
8235 Forsyth Blvd., Suite 700
St. Louis, MO  63105
(314) 241-3963
(314) 241-2509 (fax)
mbremer@shandselbert.com
ksullivan@shandselbert.com

Attorneys for Defendants Washington University, Thomas Cox, Richard Benzinger, and Alex Evers

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 17th day of February, 2023, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system on all counsel of record.

/s/ *Kevin Anthony Sullivan*