# EXHIBIT B



**Pohlman**USA®

Court Reporting and
Litigation Services

Scott Gilbert, Ph.D.  -  Confidential Portion
Redacted

December 19, 2022

Jeffery Weisman and Strategic Biomedical, Inc.

vs.

Barnes Jewish Hospital, et al.

1    generally yes.  Good inputs will produce relevant

2    outputs.  So in some sense, the data -- all the inputs

3    should be in some sense reliable.

4         Q.   Thank you.  Why didn't you just -- strike

5    that.

6              Is there data available that would inform

7    you as to what the average worker makes in the U.S.

8    per year?

9         A.   Yes.

10        Q.   Okay.  Roughly speaking, about what would

11   that be?

12        A.   The average worker would cover a broad

13   category, so I'll say I don't know, because I'd have

14   to look it up.

15        Q.   Okay.  Why don't you just take an estimate

16   of what the average worker might make in the U.S. and

17   apply that to Dr. Weisman going forward?

18             MR. MOOR:  Objection; vague; argumentative.

19        A.   Well, if -- in my work here, I tried to

20   prepare an opinion on economic loss.  And as I

21   understand it, Dr. Weisman's situation was particular,

22   so he wasn't just sort of your average worker.  He was

23   a particular person involved in, you know, an

24   education or training program that was more specific

25   than sort of your average person, and had much more

9

 1   time to calculate future earnings losses.

 2        Q.   In other words, you want more specific data

 3   relevant to your particular subject; is that fair?

 4        A.   Yes.

 5        Q.   Thank you.  So the more specific, the

 6   better, yes?

 7        A.   As a general rule, yes.

 8        Q.   Okay.  Going back to my question about the

 9   assumptions that you made.

10             First of all, you made the assumption that

11   he would have actually successfully completed the

12   anesthesiology residency program that he was enrolled

13   in at WashU and BJH; is that fair?

14        A.   Yes, as I understand it.  And as you

15   described the residency program, that matches my

16   knowledge of it.  I'll also say I'm not a medical

17   expert or faculty at a medical school, so if there's

18   any part of that that's not quite exactly correct,

19   then I'll just say that I lack the knowledge to maybe

20   tell the difference, but basically, yes.

21        Q.   So your assumption that he would have

22   successfully completed that program, what is that

23   assumption based on?

24        A.   So I -- so I'm not kind of a liability

25   expert, and I'm not going to go to the issue of what

1    are the chances of whether he would have or would

2    not -- would or would not have graduated.  So I'm

3    calculating here economic losses under the assumption

4    that he would have successfully graduated to -- so I'm

5    simply assuming it for the purpose of my preparing my

6    opinion.  I've not derived any foundation for it.  I'm

7    simply taking it as an assumption.

8         Q.    Do you know what percentage of residents

9    successfully complete that program?

10        A.    No.

11        Q.    Do you have any data at all regarding that?

12        A.    In the discovery materials I reviewed there

13   may be such data.  I don't recall it.  So I'll just

14   say I might have seen -- I think I read his --

15   reviewed his deposition transcript.  Some of those

16   facts were where information could have come up

17   somewhere.  But I certainly didn't rely on any such

18   information if I had reviewed it when preparing my

19   report.

20        Q.    Do you understand that historically some

21   residents successfully complete that residency program

22   and others do not?

23        A.    I could not say.

24        Q.    Do you think there's a 100 percent success

25   rate?

                                                          12

1          MR. MOOR:  Objection; relevance.

2          A.   I have no opinion on success rates for

3    people in any kind of medical training program.

4          Q.   (BY MR. NOLAN)  Are you aware at all of the

5    negative performance reviews that Mr. Weisman received

6    during his time in that residency program?

7          A.   I saw reference to something like that in

8    his deposition transcript.

9          Q.   Did you see any information that suggested

10   to you where he ranked in the class of residents that

11   was in the program?

12         A.   I may have seen something similar to that.

13   Again, perhaps in his deposition transcript.

14         Q.   In other words, he wasn't performing in the

15   75th to 90th percentile in that program, was he?

16         MR. MOOR:  Objection; relevance.

17         A.   Even if I had -- I think I did review

18   something in his transcript, but I wouldn't have

19   enough additional supporting information even to

20   have -- to be able to be competent about saying it, so

21   I'll just say I don't know.

22         Q.   (BY MR. NOLAN)  In other words, he wasn't

23   in the top ten percent of his class, was he?

24         MR. MOOR:  Objection; relevance.

25         A.   Yeah, again, I don't have even enough

```
 1    relevance; argumentative.
 2         A.   Yeah, I have no opinion on the accuracy of
 3    Dr. Kaye's stated range of salaries or incomes for
 4    Dr. Weisman.
 5         Q.   (BY MR. NOLAN)  All right.  So you have no
 6    way of determining whether it's reliable or not, fair?
 7         A.   I'll say no.  And I have no opinion on the
 8    reliability.
 9         Q.   So you don't know whether it's reliable or
10    not, fair?
11              MR. MOOR:  Asked and answered.
12         A.   I guess I'll just say that I see his number
13    range.  And I see this table of numbers that
14    apparently comes from a well-known source of data for
15    academic doctors.  So I'll just say I see those
16    things, and I don't have an opinion though on the
17    reliability of his opinion.
18         Q.   (BY MR. NOLAN)  Okay.  You mentioned that
19    Dr. Weisman had a research company.  Do you actually
20    know the name of his company?
21         A.   I've seen it, and I might have referenced
22    it in my report.  I think it's named in his tax
23    returns.  I remember seeing it.  I'll just say I don't
24    recall the name of the company right now.
25         Q.   Can we call it SBI?
```

 1    assumption that he intended to work as a practicing

 2    anesthesiologist.  Do you remember that?

 3         A.    Yes.

 4         Q.    In other words, how do you know he wasn't

 5    planning on focusing his time and energy on building

 6    the company, SBI?

 7         A.    Well, part of my understanding is that, you

 8    know, there's perhaps a claim for the loss of that

 9    business enterprise, and that he had to have an

10    ongoing interest in it.  Whether or not he would have

11    then pursued that as a career, I'll certainly assume

12    that he was going to be an anesthesiologist in an

13    academic setting, because that was his training, that

14    was his work at the -- the situation in the case at

15    hand.

16              It's possible that he would simply abandon

17    that all together and do something only about his

18    business.  I'm just assuming that, no, he was going to

19    carry forward and pursue a career matching his

20    training.

21         Q.    Did you ever -- I mean, that could be any

22    number of different careers.  He could be -- he could

23    have pursued a career -- a legal career, yes?

24              MR. MOOR:  Objection to relevance.

25         A.    You know, I considered that as a

1    program, he was secretly recording conversations with

2    the head of the department, because he thought he was

3    out to get him?

4        A.   I don't recall, so I'll say I don't know.

5        Q.   You can take down -- or you can stop

6    sharing your screen for now.

7             Okay.  I'm sharing my screen.  Can you see

8    it, your report?

9        A.   Yes.

10            MR. NOLAN:  Okay.  All right.  Let's go

11   ahead and mark this as Exhibit C.

12       Q.   (BY MR. NOLAN)  Okay.  You see here on

13   page 1 of your report under Certification in the

14   second paragraph you state, "I also certify that all

15   the methods, data, and statistics in this report are

16   based on current knowledge and peer-reviewed

17   research."

18       A.   Yes.

19       Q.   Okay.  Is the information that Dr. Kaye

20   provided, is that peer-reviewed research?

21            MR. MOOR:  Objection; mischaracterizes.

22       A.   Some of it may be.  It's to my

23   understanding current knowledge.  The report in that

24   spreadsheet, which appears to be from a -- kind of a

25   major source of, like, medical colleges may have been

 1   peer reviewed, but I'll say I don't know.

 2        Q.   (BY MR. NOLAN)  You said it appears to be

 3   from something.  You don't know where that data came

 4   from, right?

 5        A.   Well, aside from what apparently Dr. Kaye

 6   is presenting, that is to say that it comes from this

 7   particular group of medical colleges, that is my

 8   exclusive source for where it came from.

 9        Q.   Actually, the exclusive source that you got

10   it from was the attorney, right?

11        A.   Yes.  The attorney communicating what it

12   appears that Dr. Kaye had said.

13        Q.   Okay.  You have no way to validate that or

14   not, do you?

15        A.   I'm sorry, can you actually just kind of

16   restate it slightly, so I don't get more confused?

17        Q.   Right.  Do you have any way to validate

18   that what they're telling you that data is is actually

19   true?

20        A.   So in particular, I have -- for the

21   Association of American Medical Colleges, AAMC,

22   Faculty Salary Report, I have not, say, downloaded it

23   myself and then confirmed that it matches the

24   spreadsheet that we have here.  Someone could do that.

25   I think it costs $1,200 for it.  I haven't done that

42

 1    one thing.

 2         Q.   So without doing that, you can't validate

 3    whether it's reliable and accurate, can you?

 4         A.   I don't think those seem to be related.

 5    That is, even if I paid the money for the report, that

 6    itself doesn't tell me anything about the reliability

 7    of the information contained in it.  The report may

 8    well have additional information about measures of

 9    reliability of the statistic, standard errors and

10    things like that.  I haven't seen those.

11         Q.   Okay.  All right.  And you have no way of

12    telling whether or not the copy of this, which was

13    provided to you by Mr. Weisman's attorney -- or excuse

14    me, Dr. Weisman's attorney, whether or not it is, in

15    fact, what it purports to be?

16         A.   Well, I mean, I could if I purchased it.

17    But it seems to me associated with another expert's

18    opinion and his source materials.  I've never

19    attempted to go and check a doctor's source materials

20    to see if they came from the right book.  In principle

21    one could, but I've never had occasion to do so.

22         Q.   Okay.  You state the report contains

23    explanations and supplements sufficient for any

24    competent economist to reproduce the appraisal of

25    economic damages.  Did I read that correctly?

43

1          MR. MOOR:  Objection to relevance.

2      A.   I don't have a -- kind of knowledge more

3  particularly again about that program, and how it

4  might have -- might not have been that he could have

5  applied to it.  So I'll just say I don't know.

6      Q.   (BY MR. NOLAN)  Does that strike you as odd

7  that Dr. Kaye is an expert for him in this case, and

8  yet Dr. Kaye didn't offer him a position down at -- in

9  his program?

10         MR. MOOR:  Objection; assumes facts not in

11 evidence; argumentative; relevance.

12     A.   While I'm not a medical doctor or medical

13 professor, just as an academic, that would seem far

14 afield, that is to say, even if I really liked a

15 student graduated from some program, we only have

16 positions come up when they come up.  And sometimes

17 that's years apart.  And whether or not he's a

18 recruiting -- you know, in a management recruiting

19 role, where he takes the lead for those, Dr. Kaye, I

20 have no idea.  So I'll just have to say I don't know.

21     Q.   (BY MR. NOLAN)  Okay.  In your footnote 2

22 you state that you do not calculate or express any

23 opinion on the loss of value of any business entity or

24 enterprise.  Did I read that correctly?

25     A.   Yes.

1      Q.   But why?  Why the range?  Is it because you

2  don't know an accurate figure?

3           MR. MOOR:  Objection; argumentative.

4      A.   Partly to anticipate.  So if Dr. Kaye is

5  going to say, Well, he would have earned this to this

6  as an income range, then I would want to prepare my

7  report to kind of match what the -- the fact that he

8  himself was using a range.

9      Q.   (BY MR. NOLAN)  In other words, you have no

10  way of knowing whether or not Dr. Weisman would have

11  made 7.9 million or 9.8 million in terms of losses?

12      A.   I haven't, like, attached any probability

13  to them.  But all the numbers in those -- in that

14  range seem to me reasonable estimates of economic loss

15  for him.

16      Q.   How about 6,000,000, would that be

17  reasonable?

18      A.   That would seem to lie below -- obviously,

19  it lies below the numbers I have here.  And I think

20  that would lie substantially below the values that

21  seem to me reasonable when I did my calculations.  So

22  I would say that would seem too low.

23      Q.   Right.  Well, but in other words -- would

24  you agree with me that you have no idea whether it

25  would be 7.9 or 9.8 million?

1    an apparent opinion via email and then there's this

2    published set of statistics on the other hand, those

3    were the two, you know, sources of numbers that I

4    considered in selecting here these percentiles, the

5    75th and 90th percent.

6         Q.   (BY MR. NOLAN)  But is there anything

7    specific related to characteristics of Dr. Weisman

8    that would support that assumption?

9         A.   There may be.  That is, Dr. Kaye's own

10   opinion would have its own assumptions, but I don't

11   know what they are specifically.

12        Q.   All right.  So you have no data specific to

13   Dr. Weisman and his characteristics or his performance

14   that would support that assumption of a salary between

15   the 75th percentile and the 90th percentile?

16        A.   Not beyond which may be contained or in

17   Dr. Kaye's apparent opinion and his referenced

18   spreadsheet.

19        Q.   Have you read Dr. Kaye's report in this

20   case?

21        A.   The only thing that -- so I'll say no.

22   Just that email.  That's the one thing I've seen in

23   writing.  I know -- so I don't -- in other words, I'll

24   say I don't recall.  I know I've seen some discussions

25   about him.  I think probably -- maybe it was in a

1    different than the mean wage we see here.  It doesn't

2    surprise me, because a lot of anesthesiologists likely

3    are not medical school professors.

4        Q.   Yeah, but I'm asking you about data or

5    information that is specific to Dr. Weisman that would

6    allow you to then form an opinion as to where within

7    this range of salaries he might fall.

8        A.   Yeah, that would go to the two sources we

9    mentioned earlier.  So assuming that he was going to

10   be an academic anesthesiologist, that would, you know,

11   be paired with a spreadsheet that I reviewed.  And

12   then there's Dr. Kaye, as well, giving that range from

13   500- to 750,000, that apparently he's offering as an

14   opinion in this case.  So, again, those are the only

15   sources of information that seem to be related to

16   Dr. Weisman.  At least, that's my understanding from

17   the position of Dr. Kaye.  So yes.

18       Q.   But what is it about Dr. Weisman -- what

19   can you point to that's specific about Dr. Weisman

20   that would allow you to form an opinion as to where in

21   the broad range of salaries he might fall?

22            MR. MOOR:  Asked and answered.

23       A.   So it's a range of salaries we saw

24   earlier -- was mainly, let's say, 400,000 to 750,000.

25   You know, I selected the 50 and 75th percentile, which

71

```
 1    places and kind of they're used differently.  So I
 2    don't -- I didn't -- again, if Dr. Kaye had said,
 3    Well, you know, I think median at whatever, you
 4    know -- whatever row here is kind of the relevant one,
 5    I would have.
 6              So I didn't select a particular -- again, a
 7    box or even a row or a column in this table.  I did
 8    consider the range of numbers here as well as what
 9    came later, which was Dr. Kaye's opinion of the 500-
10    to 750,000, which are large -- you know, larger than
11    most of these -- many of these numbers.  And, you
12    know, proceeded -- seemed reasonable to select numbers
13    here that would -- for my -- my purposes, be kind of
14    in the middle of his -- more or less in the middle of
15    this range, combined range.
16         Q.   But in other words, to determine whether
17    Dr. Weisman would have fallen into the 25th percentile
18    or the median or the 75th percentile, don't you need
19    to look at data specific to him and compare that to
20    the other data within the table to see if they match
21    more closely?  In other words, what are you basing it
22    on?  How do you know whether he would have fallen in
23    the 25th or 75th?
24              MR. MOOR:  Asked and answered.
25         A.   So here there's 25th and 75th, of course,
```

 1    then are -- again, with what I understand to be this

 2    AAMC report and -- I don't -- so I'll say I don't

 3    know.

 4                Dr. Kaye might have an opinion about these.

 5    And my understanding is he is presenting opinions on

 6    what would be the reasonable kind of starting pay or

 7    relevant pay for a person in this market, you know, as

 8    an academic anesthesiologist.  I don't know though,

 9    because he didn't communicate to me any particulars

10    about this or really anything else at all directly.

11                So I don't have a role assigned to these

12    particular rows and columns, per se.  Although I do

13    consider the overall range of the numbers to be a

14    useful reference point.  But I don't particularly -- I

15    don't pick a particular box.

16          Q.    (BY MR. NOLAN)  Okay.  You can stop sharing

17    your screen.

18                Okay.  I'm sharing my screen with you.  Can

19    you see Table 4 in your report?

20          A.    Yes.

21          Q.    Okay.  All right.  So looking at year 2019,

22    you estimate that if Dr. Weisman would have

23    successfully completed the program, that he would be

24    making a real wage of $332,618.  Did I read that

25    correctly?

1        Q.   Well, he's now board-certified in

2   occupational and environmental medicine, yes?

3        A.   That sounds right.  I'm not a medical

4   expert, but that's basically what I understand, yes.

5   And I think I state it in my report.

6        Q.   But you believe that he's only going to be

7   performing from an earnings perspective at

8   approximately the 50th percentile; is that fair?

9        A.   That's about right.  The mean and median

10  cross themselves, you know, these curves at, you know,

11  about his age.  So that's right.

12       Q.   But when you were calculating his

13  anticipated earnings as an anesthesiologist, you were

14  doing so at the 75th and 90th percentiles, yes?

15       A.   That's right.

16       Q.   And how do you account for that difference?

17  In other words, if he's the type of person who

18  performs better than most of his peers in one setting,

19  why wouldn't the same apply in the other setting?

20       A.   Well, it could.  It's simply here because I

21  had his actual historical, on-the-scoreboard earnings

22  recently at the VA.  That was a useful reference point

23  in picking, you know, which of these earnings profiles

24  would best match him.  To me, the mean curve was the

25  best on that basis.

1          Q.   So if he's the type of person that's kind

2     of in the middle of the pack in relation to his

3     earnings performance as related to his peers, why

4     wouldn't the same apply if he became an

5     anesthesiologist?

6          A.   Well, that's somewhat coincidental, that is

7     to say, it's his earnings -- historical earnings that

8     I've observed that would have positioned me in

9     selecting one of these statistics.  I'm not then kind

10    of trying to say that I determined he would be at the

11    mean level by some abstract principle and then do the

12    calculation forward.

13              It was the reverse, which is looking at the

14    actual pay on the scoreboard and then picking a curve

15    here that happens to be the mean.  But it wouldn't

16    allow me to make any conclusions, nor would it be

17    useful, I think, to the but-for situation.

18         Q.   But you still made those conclusions

19    without any actual earnings data as an

20    anesthesiologist, yes?

21         A.   No, Counsel, I don't think so.  I don't

22    think I drew a conclusion about his -- let's see.  I

23    made assumptions that the 75th and 90th percentile of

24    earnings for physicians and surgeons would be a good

25    match with what I see in Dr. Kaye's opinion, and his

 1   disclosed apparently statistical tables.  But that's

 2   all I did.

 3        Q.   Right.  But here when you're looking at

 4   what he will be making working in the field of

 5   occupational and environmental medicine, you looked at

 6   his actual earnings data, and that allowed you to pick

 7   a point on this Table 1073, fair?

 8        A.   Yes.

 9        Q.   And that's in the median range -- or excuse

10   me, the mean or the median range, which is right

11   around the 50th percentile, yes?

12        A.   Yeah.  At that age.  The blue line, you'll

13   notice, does lie below the pink one, so the mean ends

14   up being lower longer at later years, but they do

15   happen to cross earlier on.

16        Q.   But you would agree if you were to

17   employ -- or attempt to employ the same methodology in

18   relation to calculating future earnings as an

19   anesthesiologist, you wouldn't be able to do so,

20   because you don't actually have any earnings data for

21   Dr. Weisman in that field, yes?

22        A.   Let's see.  Well, it is true that the steps

23   I did here for mitigation earnings have a difference

24   than with the but-for earnings.  But the mitigating

25   earnings -- I do have the step where I plug in his

```
 1   terms, because of Dr. Kaye's opinions in

 2   communications to me, as I understand, are not

 3   location specific.

 4        Q.   So the simple answer to my question is:

 5   No, you do not assume somewhere in the United States

 6   Dr. --

 7             MR. MOOR:  Asked and answered.

 8             MR. SULLIVAN:  Can you let me finish my

 9   question, please?

10             MR. MOOR:  Sure.  Go ahead and finish.

11        Q.   (BY MR. SULLIVAN)  So the answer to my

12   question would simply be:  No, you did make an

13   assumption as to where in the United States

14   Dr. Weisman would be?

15             MR. MOOR:  Asked and answered.  The witness

16   has answered.

17        Q.   (BY MR. SULLIVAN)  Go ahead and answer.

18        A.   Yeah, I didn't make any additional or

19   special assumptions about a location.  I just referred

20   to Dr. Kaye.  I just wanted to mention, as far as I

21   know, there wasn't a specific location referenced in

22   the numbers or information he provided.

23        Q.   Okay.  Would you agree that the cost of

24   living can differ significantly across the United

25   States?
```

107

```
 1          A.    Yes.
 2          Q.    Would you also agree that income for the
 3    same profession can vary significantly across the
 4    United States?
 5          A.    Yes.
 6          Q.    You know, so for instance, an
 7    anesthesiologist working in New York City might be
 8    getting paid a lot more than an anesthesiologist
 9    working in Carbondale, Illinois, right?
10          A.    Possibly.
11          Q.    And you didn't account for this variation
12    in your opinion on lost wages, right?
13          A.    Not in any specific or identifiable way.
14    My input here was Dr. Kaye's opinions.  And, again, I
15    don't think he had a breakout explicitly reflected in
16    those, so I'll say no.
17          Q.    I'm going to pull up your report, which I
18    believe has been marked as --
19                MR. SULLIVAN:  Is that Exhibit C or B?
20                MR. MOOR:  I think it's C, yeah.
21                MR. SULLIVAN:  B, as in boy?
22                MR. MOOR:  No, C, as in cat.
23          Q.    (BY MR. SULLIVAN)  All right.  Doctor, I
24    want to direct you to your footnote 10 on page 6.  And
25    you recognize in that footnote, correct, that -- that
```

108

1          A.   Well, I do see the email from Mr. Elster to

2     Dr. -- the doctor here, Weisman, yes.

3          Q.   Then it says, Depends on geography,

4     academic setting, private setting, the particular

5     facility, et cetera, right?

6          A.   Yes.  Let me correct myself, the email sent

7     to Dr. Kaye, and, yes, that's right.

8          Q.   And then he states, Our economist, that

9     would be you, right?

10         A.   I'm assuming that it's me all along here,

11    so, yes.  I just want to make sure there's nothing

12    that would contradict it.  Yes.

13         Q.   Yeah, because I mean, Henry Elster ended up

14    forwarding it to you.  So that would be you?

15         A.   Yeah.  I'm the only --

16         Q.   It says, "Our economist is going to use

17    this figure or whatever figure you thought was correct

18    in his calculations," right?

19         A.   That's right.

20         Q.   So all that Henry Elster is doing is asking

21    him to confirm a salary range, to your knowledge,

22    correct, of 500- to $750,000?

23         A.   Well, and with the additional details that

24    are contained there in the sentence, yes.

25         Q.   Okay.  Do you know if that number actually

1    came from Dr. Kaye or whether that was just suggested

2    by Mr. Elster?

3          A.    I don't know.

4          Q.    You don't know.

5                I'm going to flip back to Exhibit C, which

6    is your report.  And I want to turn to page 19.  And

7    this is under the heading of Ethics Statements that

8    you provided.

9          A.    Yes.

10         Q.    And I want to direct you to item 3,

11   Diligence.  And your first sentence there says,

12   "Practitioner as a forensic economics should employ

13   generally accepted and/or theoretically sound economic

14   methodologies based on reliable economic data."  Did I

15   read that correctly?

16         A.    Yes.

17         Q.    And you agree with that statement?

18         A.    Yes.

19         Q.    Would you consider an email from

20   Dr. Weisman's counsel suggesting a number to Dr. Kaye

21   to be reliable economic data for which you can base

22   your opinion on?

23         A.    I don't know that I've seen quite that,

24   Counsel.  I'm just afraid you're putting more into

25   that -- what the email conveyed than I'm able to

1      Q.   Okay.  I'm not sure I understand that,

2   but -- but you didn't specifically take a -- and say,

3   Listen, maybe there's a 1 in 20 chance that

4   Dr. Weisman would never have become a board-certified

5   anesthesiologist and apply any type of discount or

6   risk factor to your calculations, correct?

7      A.   No.  And in particular, with a but-for

8   earnings, I do simply assume that he would succeed to

9   become the board-certified anesthesiologist.

10      Q.   Right.  Would Dr. Weisman's academic

11   performance in medical school have any bearing on what

12   his future earnings would be?

13      A.   That seems reasonable.

14      Q.   Are you aware that he ranked 81 out of 110

15   at medical school?

16      A.   I think I saw in some of the discovery

17   materials some rankings.  I don't recall that one

18   particularly.  But I saw some rankings.

19      Q.   And that would be roughly in the bottom

20   30 percent of -- of his medical school class, correct?

21      A.   Yes.  If the statistic you mentioned was

22   correct, then that would be a conclusion, yep.

23      Q.   And do you think being in the bottom

24   30 percent of your class would have an effect on your

25   future earnings?

1          MR. MOOR:  Objection; vague and ambiguous;

2     mischaracterizes the testimony.

3          A.   Here I would have to defer to Dr. Kaye in

4     terms of things that would be of relevance.  I could

5     see conceivably how that and many other factors could

6     be relevant in determining somebody's pay in that

7     occupation.

8          Q.   (BY MR. SULLIVAN)  Did you consider

9     Dr. Weisman's health in assuming what his work-life

10    expectancy would be?

11         A.   No, not explicitly.  And, in fact, other

12    than I think some reports of -- some indications he

13    had some perhaps stress-related problems in his whole

14    history, that was the only information I had regarding

15    his medical condition.  And to answer, sorry, no, I

16    did not incorporate that into any work-life expectancy

17    calculation.

18         Q.   And so our -- when you were talking about

19    the stress-induced, are you talking about irritable

20    bowel syndrome or ulcerative colitis?

21         A.   Well, I don't recall exactly.  That sounds

22    about right.

23         Q.   And so you didn't take that aspect of his

24    health into account, that, you know, maybe he's going

25    to miss work or that he'll stop working earlier

 1    because of his health conditions?

 2              MR. MOOR:  Asked and answered.

 3         A.   No.

 4         Q.   (BY MR. SULLIVAN)  Did you take that into

 5    account in making any mortality adjustments?

 6         A.   No.  There are mortality adjustments

 7    present in my calculations, but, no, I did not attempt

 8    to factor in his own medical condition.  Just to say

 9    also, I'm not a medical expert, so I would likely not

10    be able to do that in any case.

11         Q.   So you didn't take his personal health into

12    account in making the mortality adjustments that you

13    applied your calculations, correct?

14              MR. MOOR:  Asked and answered.

15         A.   No.

16         Q.   (BY MR. SULLIVAN)  All right.  Back to

17    Exhibit C, your report, Doctor.  I just want to -- I

18    know Mr. Nolan asked you some questions on this on

19    both Tables 4 and 5.  But I just want to make it clear

20    in my mind how these tables were compiled.

21              So in order to get what I'll call the

22    starting real wage in 2018, as well as the other wages

23    down below there, you did the calculation that was

24    based on Table 2 and what we saw in Table -- what is

25    it, 1073 from that -- for physicians and surgeons; is

1    the context of the email, you know, I interpreted as

2    such.  But, no, that's right.

3         Q.   Would you agree with me that based on the

4    other data that you reviewed, including the data from

5    the Bureau of Labor Statistics, and I believe it was

6    the table that Mr. Elster had provided to you, which

7    supposedly came from Dr. Kaye, that range, 500,000 to

8    750,000, would not be valid for a first-year

9    anesthesiologist, fair?

10        A.   Actually, I would have to defer to Dr. Kaye

11   whether that would be valid or not.  Simply not --

12   it's beyond the scope of what I'm opining on.

13        Q.   Well, based on the information that you've

14   reviewed, have you seen any data that would indicate

15   that a first-year anesthesiologist would be earning

16   between $500,000 and $750,000 per year?

17        A.   Not beyond what Dr. Kaye here appears to

18   state.

19        Q.   Okay.  Well, Dr. Kaye does not state that,

20   I believe that Dr. Weisman will make in his first year

21   as an anesthesiologist between 500,000 and 750,000,

22   right?

23        A.   In the email I do not see that written,

24   right.

25        Q.   And you don't see any data that you've

```
 1    reviewed that would support a beginning salary like
 2    that, correct?
 3         A.   Nothing to support or refute, nor would I
 4    likely be the one to use it, since it's probably a
 5    doctor in the relevant field would be better than me
 6    at this.
 7         Q.   Well, given the fact that you reviewed
 8    salary information for anesthesiologists and none of
 9    it would support an opinion that a first-year
10    anesthesiologist would make between 500- and $750,000,
11    doesn't that tend to refute the opinion?
12              MR. MOOR:   Objection; mischaracterizes his
13    opinion.
14         A.   No, we did look at the Bureau of Labor
15    Statistics earlier, and I think we had already
16    discussed with you or the other counsel -- I mean,
17    there are quite stark differences likely between
18    different subcategories here.  If we're talking about
19    the academic, doctor, anesthesiologist, you know, the
20    pay could be quite different.  And just also
21    mentioning that the BLS page, I don't think we have a
22    breakout by first year, second year, so on.  I don't
23    think that would be possible to reference that very
24    usefully in talking about the scenario you mentioned.
25         Q.   (BY MR. NOLAN)  Are you able to point to
```

149