**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| JEFFERY A. WEISMAN, and | ) | |
| STRATEGIC BIOMEDICAL, INC., | ) | No. 4:19-cv-75-JAR |
| | ) | |
| Plaintiffs, | ) | The Honorable John A. Ross |
| | ) | |
| v. | ) | |
| | ) | |
| BARNES JEWISH HOSPITAL, | ) | |
| BJC HEALTHCARE, | ) | |
| WASHINGTON UNIVERSITY, | ) | |
| ALEX EVERS, RICHARD BENZINGER, | ) | |
| and THOMAS COX, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO WASHINGTON UNIVERSITY DEFENDANTS'
STATEMENT OF "UNCONTROVERTED FACTS" IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT**

Plaintiffs, JEFFERY A. WEISMAN and STRATEGIC BIOMEDICAL, INC., by counsel,

respectfully states as follows in response to the WASHINGTON UNIVERSITY DEFENDANTS'

"Statement of Uncontroverted Material Facts" in support of their Motion for Summary Judgment

(Dkt. 268) as follows:

**"A.    Background and Weisman's Acceptance into the Anesthesiology Residency
Program."**

1.       Faculty in the University's Department of Anesthesiology ("Department") trained
and supervised resident physicians in the Anesthesiology Residency Program operated by the
Graduate Medical Education Consortium between the University, Barnes-Jewish Hospital, and St.
Louis Children's Hospital ("Residency Program"). Evers Dep. 30:9-31:10; Second Amended
Complaint, Dkt.#86 ("Sec. Am. Compl.") ¶28.

> **RESPONSE:** Plaintiff admits that Washington University School of Medicine's
> Department of Anesthesiology ("WU") trained and supervised resident
> physicians in the Residency Program between WU, Barnes-Jewish Hospital
> ("BJH") and others but denies that this paragraph is an accurate  description
> of the Department of Anesthesiology's role in the residency program. The
> "*Washington University Physicians are the medical staff of Barnes-Jewish*

*Hospital       and       St.       Louis       Children's       Hospital.*"
https://physicians.wustl.edu/people/alex-s-evers-md/ (emphasis added) (at
bottom of page: last accessed March 30, 2023).  The Washington University
School of Medicine, Department of Anesthesiology, pursuant to the
Graduate Medical Education Consortium Operating Principles ("GME
Operating Principles") also exercised control over Dr. Weisman's vacation
time, rotation schedule, and working hours at BJH. (See Benzinger Dep. Ex
5, Dkt. 269-23 at pp. 4-6, 21 and 23;  and see, for example, Ex. 1, Weisman
Declaration authenticating Ex. 1-1, JW13350, Benzinger email of 2-6-18 to
all Anesthesiology residents regarding vacation time, and Ex. 1-2,
JW033883, Benzinger email of 7-26-16 regarding duty hour logs, attached
and admissible as admissions of party opponent).   The Washington
University School of Medicine's Dept. of Anesthesia (hereinafter "WU")
solely supervised Plaintiff's academic performance in clinical rotations (Ex.
2 Mouser at pp. 12:1-22 and 13:18-14:15) as provided in the Memorandum
of Appointment at Section 17 (See Ex. 3A, Benzinger Dep. Ex. 5, at pp. 10-
11).   WU also oversaw Anesthesia residents' hours of service, working
conditions, salaries: at Def. Benzinger Dep. Ex. 5, Dkt. 269-23, the GME
Operating Principles state:

> Par. VI.C of Consortium agreement: "The GMEC will establish
> policies and procedures pertaining to the quality of education and
> work environment for the residents related to but not limited to
> supervision, selection, evaluation, promotion, dismissal, duty hours,
> duty hour extensions, and moonlighting of residents and clinical
> fellows." Par. VI.E of Consortium Agreement: The GMEC will
> establish policies and procedures for dealing with grievances
> brought forward by residents or clinical fellows… Par. VI.F of
> Consortium Agreement: The GMEC will review and approve the
> annual proposal for salary ranges and benefits for all residents and
> clinical fellows.  Par. VI.H of Consortium Agreement: The GMEC
> will review and approve any proposal to substantially alter the
> working conditions for residents and clinical fellows including
> benefits before they are enacted.
>
> (GME Operating Principles, at p. 4-5)

so that even if Barnes-Jewish Hospital cut the salary checks and provided
lab coats (Ex. 2, Mouser, at pp. 5:8-10) it was done under the auspices of
the "Consortium" which included WU.  (Ex. 3A, Def. Benzinger Ex. 1,
Memorandum of Appointment at pp. 1-2).

2.      Dr. Evers was Chair (or Head) of the Department from 1994 to 2019 and was
responsible for the general oversight of the Residency Program. Evers Dep. 27:3-16, 30:9-31:10.

**RESPONSE:** Admitted.

3.     Dr. Cox was Vice Chair of Education of the Department from 2011 to 2020 and had supervisory responsibility for the Department's Education programs, including the Residency Program. Benzinger Dep. 68:20-69:8; Thompson Dep. 84:21-85:1; Sec. Am. Compl. ¶32.

**RESPONSE:** Admitted.

4.     Dr. Benzinger was the Program Director of the Residency Program from 2011 to July 1, 2018 and had overall responsibility for coordinating the Residency Program and supervising and evaluating residents. Benzinger Dep. 69:14-19, 76:4-78:20; Evers Dep. 223:14-225:20; Sec. Am. Compl. Ex. A at 10.

**RESPONSE:** Admitted.

5.     In October 2015, Weisman applied for a position in the Residency Program, specifically for a position in the Academic Scholars Advancement Program ("ASAP"). Pl. Dep. 55:2-6, 516:16-517:2; Ex. RB-3; Gibson Decl. ¶4; Ex. L-1.

**RESPONSE:** Admitted.

6.     The ASAP program is a training program unique to the Program whereby a resident would complete clinical residency training in an accelerated fashion, receive training as a fellow in a sub-specialty, and have up to 18 months of dedicated research time. Cox Dep. 67:21-70:16; Benzinger Dep. 42:21-43:10; Evers Dep. 59:16-60:12.

**RESPONSE:** Plaintiff admits that the ASAP program was designed to provide up to 18 months of dedicated research time, but denies that he was told when his residency started that he could not conduct research concurrently with his residency from its initiation. (Ex. 4, Pltf Dep. Vol. 1 at pp. 44:24-45:25, 46:1-15, 66:12-67:17, and Ex. 5, Pltf. Dep. Vol 2 at p. 544:4-10). Plaintiff was introduced to the Saint Louis College of Pharmacy ("STLCOP") by Dr. Evan Kharasch of the WU Department of Anesthesiology by Dr. Evers in May 2016, was invited to establish space in a building STLCOP owned on a floor that also housed  the Department of Anesthesiology's Center for Pharmacology, and he told the STLCOP and Dr. Kharasch that he would move SBI into that space also occupied by the Department of Anesthesiology's Center for Pharmacology and commence research and commercialization of bioactive 3-D printing material immediately, (Dkt. 268-17, Def. Ex. E8, May 14, 2016 email and Executive Summary at pp. 3-5; Ex. 4, Pltf Dep. Vol. I, at p. 78:7-12), which is what he did, (Ex. 5, Pltf Dep. Vol. 2, at pp. 570:19-571:15, 572:16-573:4), after Dr. Evers directed Plaintiff to Dr. Kharasch.  (Ex. 4, Pltf Dep. Vol. I at pp. 69:24-71:7).

7.      Weisman was selected for an interview for an ASAP spot and was interviewed by several Department faculty, including Drs. Cox and Benzinger. Pl. Dep. 68:3-69:9; Cox Dep. 100:15-20; Cox Ex. 4; Benzinger Dep.302:2-4.

**RESPONSE:** Admitted.

8.      The Residency Program, like most residency programs, participated in the National Residency Matching Program ("NRMP"), whereby the program ranks applicants on a list and the applicants rank programs, and the NRMP matches applicants to programs, thus requiring the program to accept a resident into the program. Sec. Am. Compl. ¶35; Pl. Dep. 516:16-517:6; Benzinger Ex. 5 at WU932-33.

**RESPONSE:** Admitted.

9.      Dr. Cox thought Weisman was "a below average applicant" due to his "very average USMLE test score," "he was in the bottom half of his class at a lower-tier medical school," and his recommendation letters "implied struggles with clinical performance." Cox Dep. 103:3-9, 105:18-24.

**RESPONSE:**  Plaintiff admits that Cox wrote this, but denies that his past academic performance was a basis for his recruitment to WU.  The Plaintiff was courted by WU because he was an M.D.-Ph.D. with a research lab that had performed innovative research.  (Ex. 4, Pltf. Dep. Vo1. 1 at pp. 44:5-46:25, and 66:17-67:5; Ex. 5, Pltf Dep. Vol. 2 at p. 544:4-10).  Further, on a post-interview form, Cox stated that Dr. Weisman's clinical achievements and potential were "acceptable" and that his academic achievements and research productivity were "unusually productive." (Ex. 6, WU0058).  In fact, Plaintiff had received a glowing recommendation from LSU. Material in WU's file shows this:

WU000039 (Ex. 7), is a letter from Dr. Charles Fox, Chair of LSU Medical School's Department of Anesthesiology stating, in part, that [Dr. Weisman] has already achieved incredible regionally and nationally...will no doubt become a tremendous asset for our specialty.  Excellent demeanor for the operating room and will easily handle the daily "stressors."

WU0040 (Ex. 8) is a letter from Dr. Jay Marion, Chairman of LSU Medical School's Department of Medicine ("[Dr. Weisman] performed well during his clinical clerkship rotations and he received favorable evaluations by his instructors.").

WU0041-WU0042 (Ex. 9), is a letter from Dr. Robert A. Barish, Chancellor of LSU Medical School ("[Dr. Weisman] has a true leadership ability and will make an outstanding resident").

WU00030-WU00033 (Ex. 10), is an LSU Dean's Letter praising Dr. Weisman.

10.     Dr. Benzinger "thought that the clinical worries were sufficiently severe that [he] advocated not taking" Weisman and "favored not ranking" him. Benzinger Dep. 302:5-12, 305:2-16.

> **RESPONSE:** Plaintiff denies the allegations of paragraph 10. Dr. Benzinger wrote Plaintiff on January 26, 2016 stating "You have a great academic record, and the faculty who spoke with you during your visit were very impressed with you, as well. We think that your abilities and interests would be a good match with the clinical and research training that we offer in our department, and we would be very excited to have you as a resident." (Ex. 11, JW00036100-01). Benzinger's post-interview assessment credited Dr. Weisman with "average potential of a resident in our department" under the category "Clinical achievements and potential," (Ex. 12, WU0059), and did not click the other boxes that would have scored Dr. Weisman as being "Below-average but acceptable" or "inadequate clinical skills for consideration."

11.     Weisman was ranked 81st of his class of 110 in medical school. Pl. Dep. 59:22-60:21; Ex. A5.

> **RESPONSE:** Admitted, but Plaintiff denies that his past academic performance was a basis for his recruitment to WU.  The Plaintiff was courted by WU because he was an M.D.-Ph.D. with a research lab that had performed innovative research.  (Ex. 4, Pltf. Dep. Vo1. 1 at pp. 44:5-46:25, and 66:17-67:5; Ex. 5, Pltf. Dep. Vol. 2 at p. 544:4-10; Ex. 1-3, November 2015 email with Benzinger regarding grants for Plaintiff's technology group;  Ex. 1-4, December 2015 email exchange with Dr. Peter Nagele of the WU Department of Anesthesia concerning conducting research projects while doing clinical research and IP work).

12.     Drs. Cox and Benzinger's concerns about Weisman's clinical performance were overruled because other faculty, including Dr. Evan Kharasch and Dr. Evers, advocated for him and thought his research potential outweighed those concerns. Benzinger Dep. 305:2-16; Cox Dep. 105:18-24; Evers Dep. 153:18-154:17.

> **RESPONSE:** See response to paragraphs 10. The concerns retrospectively asserted by Cox and Benzinger in depositions are contradicted by contemporaneous evidence as summarized in answer to paragraph 10, above.  Plaintiff admits that Dr. Evers and Dr. Kharasch advocated for Plaintiff's admission based on his research potential.

13.     Weisman matched as an ASAP resident with the Residency Program and began his training in June 2016. Pl. Dep. 262:19-22, 539:2-541:17. As a resident, Weisman was an employee of BJH, not the University. Pl. Dep. 520:19-521:20.

**RESPONSE:** Plaintiff admits that he started his residency with the Washington University/Barnes-Jewish Hospital/ St. Louis Children's Hospital Graduate Medical Education Consortium on June 20, 2016, as an ASAP resident, but denies that he was not employed by the University.  The "*Washington University Physicians are the medical staff of Barnes-Jewish Hospital and St. Louis Children's Hospital*." https://physicians.wustl.edu/people/alex-s-evers-md/ (emphasis added) (at bottom of page: last accessed March 30, 2023).  The Washington University School of Medicine, Department of Anesthesiology, pursuant to the Graduate Medical Education Consortium Operating Principles ("GME Operating Principles") also exercised control over Dr. Weisman's vacation time, rotation schedule, and working hours at BJH. (See Benzinger Dep. Ex 5, Dkt. 269-23 at pp. 4-6, 21 and 23;  and see, for example,  Ex. 1-1, JW13350, Benzinger email of 2-6-18 to all Anesthesiology residents regarding vacation time, and Ex. 1-2, JW033883, Benzinger email of 7-26-16 regarding duty hour logs, attached and admissible as admissions of party opponent).  The Washington University School of Medicine's Dept. of Anesthesia (hereinafter "WU") solely supervised Plaintiff's academic performance in clinical rotations (Ex. 2 Mouser at pp. 12:1-22 and 13:18-14:15) as provided in the Memorandum of Appointment at Section 17 (See Ex. 3A, Benzinger Dep. Ex. 5, at pp. 10-11).  WU also oversaw Anesthesia residents' hours of service, working conditions, salaries: at Def. Benzinger Dep. Ex. 5, Dkt. 269-23, the GME Operating Principles state:

> Par. VI.C of Consortium agreement: "The GMEC will establish policies and procedures pertaining to the quality of education and work environment for the residents related to but not limited to supervision, selection, evaluation, promotion, dismissal, duty hours, duty hour extensions, and moonlighting of residents and clinical fellows." Par. VI.E of Consortium Agreement: The GMEC will establish policies and procedures for dealing with grievances brought forward by residents or clinical fellows… Par. VI.F of Consortium Agreement: The GMEC will review and approve the annual proposal for salary ranges and benefits for all residents and clinical fellows.  Par. VI.H of Consortium Agreement: The GMEC will review and approve any proposal to substantially alter the working conditions for residents and clinical fellows including benefits before they are enacted.
>
> (GME Operating Principles, at p. 4-5)

so that even if Barnes-Jewish Hospital cut the salary checks and provided lab coats (Ex. 2, Mouser, at pp. 5:8-10) it was done under the auspices of the "Consortium" which included WU.  (Ex. 3A, Def. Benzinger Ex. 1, Memorandum of Appointment at pp. 1-2).

14.    Weisman planned to bring his company, SBI, and its 3-D printing lab and two researcher employees with him to St. Louis and to run that business while doing his residency training. Pl. Dep. 84:11-19, 86:6-18; Ex. A8.

**RESPONSE:**   Admitted, but this was well known and Plaintiff's research activities was the basis of his recruitment to WU.  (Dkt. 268-17, D. Ex. E8, May 14, 2016 email and Executive Summary at pp. 3-5; Ex. 4, Pltf Dep. Vol. I, at p. 78:7-12; Ex. 5, Pltf Dep. Vol. II, at pp. 570:19-571:15, 572:16-573:4; Ex. 4, Pltf. Dep. Vol. I at pp. 69:24-71:7; Ex. 13, Sinow Dep. at pp. 71:5-20, 99:21-101:13, and 237:15-238:1).

15.    Drs. Evers, Cox and Benzinger were not aware that Weisman was bringing his company or his lab to St. Louis in June 2016. Evers Dep. 150:10-23, 164:24-175:4; Benzinger Dep. 196:10-197:18; Benzinger Ex. 13; Cox Dep. 100:2-8.

**RESPONSE:**  Plaintiff denies the allegations of paragraph 15.  On November 18, 2015, Dr. Weisman emailed Dr. Benzinger stating that "[a] large part of the reason my group has been successful with technology developments has been a great working relationship with the grants administrator's and technology transfer officers. They are really important members of the team. I will email Jonathan some questions but mainly just looking to find out some of the logistics and policies at your center such as the ability to transfer equipment, CRADA partnerships and some SBIR/STTR grants that I will have pending in the spring." (Ex. 1-3, JW00036098 – JW00036099, and see Ex. 4, Pltf. Dep. Vo1. 1 at pp. 44:5-46:25, and 66:17-67:5; Ex. 5, Pltf. Dep. Vol. 2 at p. 544:4-10; Ex. 14, Sinow Dep. at pp. 237:20-238:1).  In December 2015 Plaintiff had an email exchange with Dr. Peter Nagele of the WU Department of Anesthesia concerning conducting research projects while doing clinical research and IP work.  (Ex. 1-4, JW41439). On February 14, 2016, Dr. Evers called the Plaintiff to state that WU wanted Plaintiff's lab at WU.  (Ex. 4, Pltf. Dep. Vol. 1 at p. 66:20-67:5).  After Dr. Evers directed Dr. Weisman to Dr. Kharasch about his research and lab, (Ex. 4, Pltf. Dep. Vol. I at pp. 69:24-71:7), Plaintiff emailed Dr. Kharasch on March 29, 2016 regarding "the prospects for moving the lab to the Center for Clinical Pharmacology. (Ex. 1-5, JW00036344). Dr. Kharasch responded by stating that "I will do some diligence on the company relocation to The Center." *Id.*   Dr. Kharasch was the director of Center for Clinical Pharmacology from 2015 and also directed the Anesthesiology Department's Division of Clinical and Translational Research. (Ex. 14, Evers Dep. at p. 154:9-25, and Ex. 15, Center for Pharmacology Press

7

Release).   On July 5, 2016 Dr. Weisman emailed Sharon Stark, the Anesthesia Program Coordinator and administrator for Dr. Benzinger stating: "I'm bringing in some faculty or consultants for the projects at the STLCOP-WUSTL pharmacology center, do we have a department rate or code at the Park Way hotel."  (Ex. 1-6, JW0036218).  Dr. Benzinger testified that he was aware that Plaintiff had a company when he applied to the program.  (Ex. 3, Benzinger, at pp. 301:22-302:1).

%

16.    Weisman was put in contact with the leadership of St. Louis College of Pharmacy ("STLCOP") to rent lab space by Dr. Kharasch, and SBI entered into a lease with STLCOP and gave STLCOP a 5% equity interest in the company as rent. Pl. Dep. 81:21-82:3, 83:12-84:8 (Kharasch "had taken, you know, effort to introduce me to the St. Louis College of Pharmacy"), 103:5-18; Sinow Dep. 160:18-161:3; Ex. A7.

> **RESPONSE:**   Admitted, but the space SBI rented from STLCOP was on the same floor and immediately adjacent to the Department of Anesthesiology's Center for Clinical  Pharmacology, operated by Dr. Evan Kharasch of the WU Department of Anesthesiology.  (Ex. 16, Fleischmann Dep. at pp. 11:23-13:3).

17.    STLCOP is not affiliated with and is "completely independent" from the University. Evers Dep. 52:9-20.

> **RESPONSE:**   Plaintiff admits that STLCOP is a separate school from WU, but denies that it is "not affiliated with" WU's Department of Anesthesiology.  The Center for Clinical Pharmacology is a joint venture between STLCOP and the Department of Anesthesiology and is housed in a building owned by STLCOP pursuant to a Memorandum of Understanding that gave WU Anesthesiologists secondary appointments in the STLCOP. (Ex. 16, Fleischmann, at pp. 11:23-24 and 12:1-13).  Dr. Kharasch had such a secondary appointment in STLCOP. (Ex. 15, News Release: "Faculty at the Center will have academic appointments in both institutions").

18.    The University had no involvement in this transaction, and there was no nexus between SBI and its lab and the University. Fleischmann Dep. 53:15-54:22.

> **RESPONSE:**   Plaintiff denies the allegations of paragraph 18.  Dr. Evan Kharasch of WU's Department of Anesthesiology introduced Plaintiff to STLCOP's general counsel (Ex. 16, Fleischmann, at pp. 8:22-9:16) and investigated whether Plaintiff's Lab could be part of the Center for Clinical Pharmacology. (Ex. 1-5, JW00036344). Further, Plaintiffs worked with faculty in the Department of Anesthesiology on their research project, including Dr. Nagele, after the residency started. (Ex. 1-7, JW00031208; Ex 1-8, email re: collaborative study with Dr. Choa).

**"B.    Weisman's Performance as an Intern Resident from June through December 2016."**

19.    In the Residency Program, residents spend their first year as interns with rotations through a variety of medical specialties, which is then followed by rotations in clinical anesthesia. Benzinger Dep. 43:11-44:7; Evers Dep. 59:16-60:1; Cox Dep. 70:3-16.

> **RESPONSE:** Plaintiff denies the allegations of paragraph 19 as it pertains to normal residents because they also perform anesthesia tutorials during the PGY-1 year that involves following a senior anesthesia resident, (*see* Ex. 17, WU explanation of intern year (PGY-1), from https://anesthesiology.wustl.edu/education/residency/training-programs/categorical-advanced-programs/ (last accessed 3-26-22), but Plaintiff was denied that experience in his PGY-1 year as of June 20, 2017, (See Ex. 1-9 JW00059185-59186, and Ex. 18 WU2942), and did not have it until July 1, 2017. *Id.*

20.    Rotations generally last four weeks where residents work with several faculty physicians, and, at the end of the rotation, a physician rotation coordinator completes an evaluation of the resident based on the feedback and evaluations from the faculty and others. Benzinger Dep. 77:12-78:20; Cox Dep. 26:12-27:25; Thompson Dep. 94:4-22.

> **RESPONSE:**  Plaintiff admits the allegations of paragraph 20.

21.    Resident evaluations have both subjective and objective components and can vary significantly among faculty evaluators depending on things such as the complexity of a procedure or the volume of procedures. Evers Dep. 220:24-222:10; Benzinger Dep. 137:6-10, 175:6-15; Thompson Dep. 52:13-54:2; Szabo Dep. 46:17-47:9; Kaye Dep. 243:3-5; Pl. Dep. 28:23-29:4, 29:16-30:13.

> **RESPONSE:** Plaintiff denies that rotation evaluations "can vary significantly" among evaluators for the same resident on the same rotation.  (Ex. 19, Kaye Dep. excerpts at pp. 143:3-16 and 145:19-23).   All evaluations should be objective. (Ex. 20, Tia Drake Dep. Vol 1. at p. 34:18-24 and Ex. 21, Drake Dep. Ex. 28, Common Program Requirements, at p. 13, V.A.2.b).(1)) authenticated at Ex. 20, Tia Drake Vol 1. pp. 66:6-8).

22.    The Residency Program has a "responsibility" and "obligation" to patients and the community to train residents to become competent anesthesiologists and to residents to help them complete the Program. Evers Dep. 79:19-80:25; Benzinger 121:19-122:11.

> **RESPONSE:**  Admitted.

23.    Faculty evaluators are expected to communicate a resident's competence and any concerns with performance for the benefit of patient safety and the resident's training. Cox Dep. 34:9-35:10; Benzinger Dep. 224:3-225:5, 229:5-14.

**RESPONSE:** Admitted.

24.      In the Residency Program, it was "quite unusual for a resident to have a single highly negative evaluation" and "exceedingly unusual to have multiple." Evers Dep. 160:15-161:11.

> **RESPONSE:**  Plaintiff denies the allegations of paragraph 24.  Residency is a learning
> process. (Ex. 22, Szabo Dep. at pp. 16:18-17:11, Ex. 23 Kaye Dep. excerpts
> 138:19-25).  There are always examples of residents who are involved in
> mishaps, there are always errors that will occur because bad things happen
> to people, and bad things happen to good doctors. (Ex. 14, Evers, at pp.
> 248:19-23, 250:17-25, and 252:18-23).

25.      In Weisman's first rotation in Emergency Medicine in June-July 2016, his overall rotation evaluation was "unsatisfactory," and the evaluation reported: "trouble identifying salient issues and prioritizing relevant issues"; "Presentations not appropriate for intern level"; "trouble executing tasks as discussed and multi-tasking"; "Below average understanding of workup and medical knowledge"; "Performed at level of MS4-3 [medical student]." Pl. Dep. 74:13-76:9; Ex. A14.

> **RESPONSE:** Plaintiff disputes the allegations of paragraph 25.  Defendant's citation
> (Ex. A14 to Dr. Weisman's deposition) covers only June 21-30, 2016, not
> "June-July 2016" as stated in Paragraph 25. It covers the first week of his
> first year of residency. Ruben Johnson's evaluation is not an evaluation of
> the Plaintiff's entire Emergency Medicine Rotation which ran from June 21,
> 2016 to July 24, 2016. (See Ex. 1-9, JW00059185 at bottom of page and
> Ex. 18, WU2942). Further, Defendant's citation to Plaintiff's deposition
> testimony purports to cite Dr. Weisman as agreeing with the above-quoted
> statements but Dr. Weisman disputed that the above quotes reflected the
> feedback provided to him at the time. Specifically, Dr. Weisman stated,
> "this evaluation doesn't match what I was told in person, and when they
> were filling forms out about me." (Ex. 4, Pltf. Dep. Vol. 1 at pp: 75: 21-23).
> Further, even Exhibit A14, the evaluation form submitted by Reuben
> Johnson covering Plaintiff's first week assigned an overall rating above the
> minimal "passable" rating allowed by the program. (Def. Ex. A14, Dkt.
> 268-21).  Defendant has never produced, and Plaintiff never received, a
> final evaluation for his first Emergency Medicine rotation but WU told the
> FCVS that he completed PGY-1.  (Ex. 1-10, at JW43491).

26.      On August 15, 2016, during Weisman's rotation in the ICU, Dr. T.J. Graetz (an Anesthesiology faculty member) sent an email to Dr. Benzinger and Dr. Jessica Zenga (the ICU rotation coordinator) about Weisman, which reported: he had "lots of room to improve on prioritization, time management . . . and medical knowledge"; "got the sense he was overwhelmed in general"; "he's performing very far below expectations for an intern"; "our medical students are doing much better than him"; "doesn't know anything about any of his patients"; "multiple

complaints from every resident on the team that they receive essentially no relevant sign out from Jeff because he has no idea what happened with his patients." Benzinger Decl. ¶3; Ex. RB-1.

> **RESPONSE:** Plaintiff admits that some unknown Fellow wrote the email in question at the bottom of Def. Ex. RB-1 (Dkt. 269-44), which Dr. Gratez forwarded to ICU Rotation Coordinator Zenga and Program Director Benzinger, but denies that he failed to perform at the "Expected Level" for a PGY-1 resident in this rotation.  (*See* Def. Ex. RB-2 at Dkt. 269-45).

27.    Weisman's overall evaluation for the ICU rotation was "below expectations" and, while having some positive comments, reported: "behind his peers in medical knowledge, efficiency and procedural skills"; "[b]elow the curve" on medical knowledge; "his presentation skills and subsequently management plans were all over the place"; and "didn't really have an idea at all where to take all the data and apply it to the patient." Benzinger Decl. ¶4; Ex. RB-2.

> **RESPONSE:** Plaintiff admits that his overall evaluation for the 2016 ICU rotation in his first year, PGY-1, was rated "below expectations," but all of the line item evaluations were scored at "Level 1" which is defined on the form as the "expected level for PGY-1" and "below expectations" is a passing score as it is above "unsatisfactory." *See* Def. Ex. RB-2 at Dkt. 269-45.

28.    Dr. Benzinger and Dr. Russell Groener (Assistant Program Director) met with Weisman on or about August 25, 2016, because of Weisman's early clinical performance and in order to determine the cause of his difficulties and provide feedback on his clinical performance. Benzinger Dep. 193:19-194:7; Benzinger Ex. 12; Ex. RB-1.

> **RESPONSE:** Plaintiff denies the allegations of paragraph 28. Benzinger has no memory of the contents of this meeting. (Ex. 3, Benzinger Dep. at  p. 179:15-17 ("I can't remember"), and pp. 194:24-25 ("I don't have any specific memory of the meeting, so I don't know"). Ex. RB-1 is not a record of a meeting with Plaintiff.

29.    On September 27, 2016, Dr. Groener reported to Dr. Benzinger that Weisman's performance in his next rotation, Internal Medicine-Cardiology, was "[n]ot good. More of the same." Benzinger Decl. ¶5; Ex. RB-3.

> **RESPONSE:** Plaintiff denies that his next rotation was "Internal Medicine-Cardiology." The rotation was Cardiology. (*See* Ex. 18, WU2942).  The rotation ran from 8-22-16 to 9-18-16.  Plaintiff disputes the statement of Dr. Groener: Plaintiff's final Cardiology Rotation evaluations from the Attending Physicians Geltman and Vader (Ex. 24 at WU3087-3089 and WU3090-WU3092) were passing, most items scored at "Expected PGY 1 Level" with Dr. Geltman writing: Jeff is a delightful house officer who is working hard to adapt to a very busy service with complex and challenging patients.  He has trouble setting priorities and efficiently dealing with competing

priorities. He has been responsive to the direction of his resident, who has been extremely supportive and providing substantial guidance." (Ex. 24 at WU 3089).

30.    One Cardiology evaluation had low ratings, especially when compared to the evaluator's and his peers' average ratings, and, while noting some positive performance, stated Weisman "had trouble setting priorities and efficiently dealing with competing priorities" and "[p]resentations were not well organized, and not complete." Benzinger Decl. ¶6; Ex. RB-4 at WU3089.

**RESPONSE:**  Admitted but see response to paragraph 29.

31.    Another evaluation in Cardiology reported that that Weisman "was well below the level I would expect for an intern," "deficits he has in gathering data, assimilating the data, and presenting a treatment plan," and leading the evaluator to "doubt his appreciation of what was truly going on." Ex. RB-4 at WU3092.

**RESPONSE:**  Admitted but see response to paragraph 29.

32.    In his next rotation from September 19 to October 16, 2016, Weisman received an acceptable overall evaluation, which noted strengths and areas to work on. Benzinger Dep. 173:6-175:4; Benzinger Ex. 8.

**RESPONSE:** The rotation referred to as "next" (i.e. the rotation following the cardiology rotation) was Emergency Medicine. Dr. Weisman was reported in all categories to be doing as well as other residents and the Attending wrote: Strengths: Great to work with. Enthusiastic. Eager to follow up on things. Great job picking up multiple pts and team player. Reliable and hardworking. Solid attention to detail. Very thorough job. Good H&Ps. Motivated to see pts and has good initial plans. Quiet but competent. Could improve on: Going forward, I would recommend expanding his ddx and considering more focused plans to rule out emergent conditions. Struggled in TCC. Had difficulty making decisions and did not consistently place orders and follow them (though was eager to see pts and learn). Did get more comfortable throughout his rotation to make better plans. Work on improving and prioritizing differentials (what do you want to work up and why?) - also, work on more timely tests/treatments. (Ex. 1-11, JW63756-58).

33.    From October 17 to November 13, 2016, Weisman did a rotation in the Cardiothoracic ICU, and two faculty evaluators emailed Dr. Benzinger during the rotation and reported concerns about Weisman's performance:

a.    Dr. Julianne Donnelly reported that Weisman's "notes and his conversation demonstrated a complete lack of basic understanding" with specific examples, that "[o]n several occasions, he left without giving report to the oncoming [nurse

practitioner] about patients for which he cared for overnight" and that she needed to go over basic presentations with him. Benzinger Decl. ¶7; Ex. RB-5.

b.     Dr. Diego Casali reported that Weisman "functions at best at the level of a second year medical student," that he spent "multiple hours talking with him and trying to understand why he is so disorganized and unable to follow up on and complete even basic tasks," that Weisman's "deficiencies are profound," and that "he's one of the worst residents I've ever worked with and I honestly don't think he should work in a high acuity setting like Anesthesiology or Critical Care." Benzinger Decl. ¶8; Ex. RB-6.

**RESPONSE:**   Plaintiff admits that these doctors made these comments but attending physicians Donnelly and Sadiq commented, regarding Dr. Weisman's performance on this rotation, "this unit is not a fair unit for interns to be graded on.  I would have flunked horribly in this unit if I was an intern." (Ex. 25, WU3880).  Further, WU represented to the American Board of Anesthesiology that Plaintiff received full credit for this rotation, (Ex. 1-12, ABA records at p. WU071), and to the Federation Credentials Verification Service that Plaintiff had successfully completed two years of his anesthesiology residency. (Ex. 1-10, FCVS subpoena response at pp. 20-21, JW043490-93).

34.     Prior to his Cardiothoracic ICU evaluation being finalized, Dr. Groener met with Weisman in November 2016 and gave him the feedback he had received on that rotation, in particular his inability to present patients coherently and unprofessional behavior in not doing handovers. Groener Decl. ¶3; Ex. G-1.

**RESPONSE:**   Plaintiff disputes the allegations of paragraph 34: Def. Ex. G-1 does not say what the Defendants claim.

35.     Weisman's CT ICU rotation evaluation had an overall "unsatisfactory," which incorporated the comments of Drs. Donnelly and Casali and reported that Weisman "organizational skills have to be at least at a basic level before we can focus on how to improve his medical knowledge" and that "[w]e believe he should not work in a high acuity setting." Benzinger Decl. ¶9; Ex. RB-7.

**RESPONSE:**   Plaintiff admits that the rotation evaluation at Def. Ex. RB-7 (WU2997-2998) contains these words, but denies that he failed the rotation.  WU represented to the American Board of Anesthesiology that Plaintiff received full credit for this rotation, (Ex. 1-12, ABA subpoena response at p. WU0711), and to the Federation Credentials Verification Service that Plaintiff had successfully completed two years of his anesthesiology residency. (Ex. 1-10, FCVS subpoena response at pp. 20-21, JW043490-93).  Further, Plaintiff is recorded as passing this rotation,

though performing below expectations, by a Dr. De Wet a year later in June 2017. (Ex 1-13).

36.     Weisman did two Internal Medicine rotations in November-December 2016. Benzinger 94:14-25.

**RESPONSE:** Admitted.


37.     One Internal Medicine faculty member (Dr. LaRossa) submitted an evaluation which graded Weisman at "about 60 percent of her average grade for Dr. Weisman's peers" and which Dr. Benzinger viewed as "one of the worst evaluations of an intern on internal medicine that I've seen." Benzinger 101:10-103:24; Benzinger Ex. 3.

> **RESPONSE:** Plaintiff admits that Benzinger made this statement in his deposition, but denies that there is any objective basis for the statement. Benzinger's *opinion* on Dr. LaRossa's evaluation of Dr. Weisman is contradicted by Dr. LaRossa's ratings and what she actually wrote: "I enjoyed working with Jeff on inpatient medicine. He was a hard worker and took excellent care of his patients. Appreciated his dry sense of humor..."   In addition to praising Dr. Weisman, Dr. LaRossa rated him at "expected PGY1 level" on each and every aspect evaluated. (Ex. 1-14, JW00056613-JW56614, *and see* Def. Ex. Benzinger 3, Dkt. 269-22 at WU3097-3099).

38.     Another Internal Medicine evaluation (Dr. Loden) showed Weisman "performing markedly below the attending's average assessment and the average assessment of . . . his peers in that rotation." Benzinger Dep. 99:2-23; Benzinger Ex. 3.

> **RESPONSE:** Plaintiff admits that Dr. Benzinger made this statement in his deposition, But denies that there is any objective basis for the statement. Benzinger's opinion on Dr. Loden's evaluation of Dr. Weisman is contradicted by Dr. Loden's actual evaluation, in which she, though making no comments, rated Dr. Weismann as performing at "the Expected PGY-1 Level" on every point assessed. (Ex. 1-15, JW56616-18, *and see* Def. Ex. Benzinger 3, Dkt. 269-22 at WU3094-3094).

39.     One Internal Medicine (Dr. McGill) evaluation for January 2-15, 2017, was satisfactory. Benzinger Dep. 95:1:1-4, 97:25-98:8; Benzinger Ex. 3.

> **RESPONSE:** Plaintiff denies that "one" Internal Medicine Evaluation was satisfactory: they all were. (See above). Dr. McGill, as with Dr. Loden and Dr. LaRossa, ranked Plaintiff as performing at the "Expected PGY-1 Level" on every point assessed and wrote: "Dr. Weisman was a capable intern and team member. He performed well with a variety of situations, utilized resources when needed. As most interns, he is still on the learning curve, but has a

14

high level of curiosity and interest.  I enjoy working with Dr. Weisman." (Ex. 1-16, JW56610-12, *and see* Def. Ex. Benzinger 3, Dkt. 269-22 at JW56610-12).

**"C.     Weisman Is Placed on Probation within the Program"**

40.     The Residency Program's Clinical Competence Committee ("CCC"), which is comprised of the Program Director, Assistant Program Director, and rotation coordinators, reviews the performance of residents every 6 months and determines whether a resident's progress is satisfactory and, if not, what actions or remediation need to be taken to address the performance deficiencies. Benzinger Dep. 143:8-13; Evers Dep. 203:20-25; Cox Dep. 78:8- 79:3.

> **RESPONSE:** Admitted.

41.     The CCC met on January 11, 2017, to review the performance of all residents in the Residency Program and determined that Weisman's performance in his first 6 months was unsatisfactory. Benzinger Decl. ¶10; Ex. RB-8.

> **RESPONSE:** Plaintiff admits that the CCC met on January 17, 2017 but denies that Dr. Weisman's performance in the first six months was "unsatisfactory."  The official minutes of the January 11, 2017 CCC meeting state, "All members of the PGY-1 class have ***satisfactorily*** met all of the competency requirements for the clinical base year of Washington University/Barnes-Jewish Hospital/St. Louis Hospital Consortium Anesthesiology Residency Program for July 1st – December 31st, 2016," which included Dr. Weisman. (Def. Ex. RB-8, Dkt. 269-51, at WU2905) (emphasis added)  Further, WU verified to the FCVS that Dr. Weisman was never put on probation or disciplined and that no special requirements were placed upon him due to academic incompetence or any other reason, (Ex. 1-10 at JW43492), and informed the American Board of Anesthesiology that his performance in all rotations was satisfactory. (Ex. 1-12, WU707-712).

42.     The Residency Program leadership decided that Weisman would need to receive satisfactory evaluations for the next 6 months of rotations through June 30, 2017, and to repeat two rotations in internal medicine and the ICU. Benzinger Decl. ¶¶11-12; Exs. RB-9, RB-10; Pl. Dep. 164:15-165:10; Ex. A13; Benzinger Dep. 185:15-22; Sec. Am. Compl. ¶ 67.

> **RESPONSE:** Plaintiff does not dispute the allegations of paragraph 42, but there was no objective reason to require Plaintiff to repeat his Internal Medicine rotation as he has passed that rotation.  (Ex. 1-14, JW00056613-JW56614, *and see* Def. Ex. Benzinger 3, Dkt. 269-22 at WU3097-3099; Ex. 1-15, JW56616-18, *and see* Def. Ex. Benzinger 3, Dkt. 269-22 at WU3094-3094; and Ex. 1-16, JW56610-12, *and see* Def. Ex. Benzinger 3, Dkt. 269-22 at JW56610-12).  As to the ICU rotation, Plaintiff disputes that there was an objective reason to require him to repeat it: attending physicians Donnelly and Sadiq

15

commented, regarding Dr. Weisman's performance on this rotation, "this unit is not a fair unit for interns to be graded on. I would have flunked horribly in this unit if I was an intern." (Ex. 25, WU3880). Further, WU represented to the American Board of Anesthesiology that Plaintiff received full credit for this rotation, (Ex. 1-12, ABA at p. WU0711), and to the Federation Credentials Verification Service that Plaintiff had successfully completed two years of his anesthesiology residency. (Ex. 1-10, FCVS subpoena response at pp. 20-21, JW043490-93). Further, Benzinger wound up treating the request to Plaintiff to repeat rotations as merely requiring the Plaintiff to complete the rotations that a typical PGY-1, and non-ASAP resident, was required to take. (Ex. 26, WU0566).

43.     Repeating rotations meant that Weisman failed those rotations. Benzinger Dep. 87:4-88:1.

**RESPONSE:** Plaintiff admits that Dr. Benzinger testified that he "thought" he told Plaintiff that Plaintiff had failed rotations, including internal medicine and emergency medicine (Ex. 3, Benzinger, at p. 87), but denies that he had, in fact, failed either the emergency medicine or internal medicine rotations. See Response to paragraph 26 above, and (Ex. 1-14, JW00056613-JW56614, *and see* Def. Ex. Benzinger 3, Dkt. 269-22 at WU3097-3099; Ex. 10-15, JW56616-18, *and see* Def. Ex. Benzinger 3, Dkt. 269-22 at WU3094-3094; and Ex. 10-16, JW56610-12, *and see* Def. Ex. Benzinger 3, Dkt. 269-22 at JW56610-12). Further, Benzinger wound up treating the request to Plaintiff to repeat rotations as merely requiring the Plaintiff to complete the rotations that a typical PGY-1, and non-ASAP resident, was required to take. (Ex. 26, WU0566).

44.     If he did not receive satisfactory evaluations in the second half of the year, an official report of unsatisfactory would be made to the American Board of Anesthesiology ("ABA"), which would require re-doing 6 months of his residency. Ex. A13.

**RESPONSE:** Plaintiff admits that the "probation letter" states this but denies that performance in the clinical year (PGY-1) is reported to the ABA: "You are correct that we do not rate clinical base training. Its either credit or no credit and it looks like Dr. Weisman received 12 months of clinical base training credit. Only clinical anesthesia training is rated Satisfactory or Unsatisfactory." (Ex. 27, WU4167).

45.     On January 19, 2017, Drs. Benzinger and Groener met with Weisman for his 6-month evaluation and gave Weisman a three-page letter explaining that his performance was not meeting the Department's expectations with examples from his rotation evaluations, that he was being placed on probation within the Residency Program, what he needed to do to remediate his performance in the next 6 months, the consequences of not remediating his performance, and

asking Weisman to switch from the ASAP track to the traditional residency track. Ex. A13; Benzinger Decl. ¶13; Ex. RB-11; Pl. Dep. 164:4-11.

> **RESPONSE:** Plaintiff admits that he was tendered the letter, but denies that he ever was ever placed on probation as the letter states. (Def. Ex. A13). WU's corporate representative testified that Dr. Weisman was never placed on probation (Ex. 28, Gibson, at p. 64:10-25, and see Ex. 1-10 at JW43492 where Dr. Thompson certified that Dr. Weisman was never placed on probation or disciplined). Further, the ACGME requirements, which the Anesthesiology Resident Program follows (Ex. 3A at p. 1, para. 1, and p 8, para 16, and Ex. 2, Mouser, at p. 6:7-11), require that the Graduate Medical Education Office ("GME") be involved in any probationary activity and Tia Drake, the Executive Director of the office of Graduate Medical Education at WU during the relevant time testified that she was not aware of any probationary activity relative to Dr. Weisman. (Ex. 20, Tia Drake Vol. 1, at p. 107:4-20).

46.   Dr. Benzinger encouraged Weisman to switch from the ASAP program to the Scholars' program because the "accelerated clinical training of ASAP" was working against his interests, but the remediation did not remove Weisman from the ASAP program. Benzinger Dep. 151:20-152:19, 169:14-25.

> **RESPONSE:** Plaintiff denies the allegations of paragraph 46. (Ex. 4, Pltf. Vol 1. at pp. 165:25-167:13: After imposing the additional intern level rotations, there was no difference between the residency program scheduled for Dr. Weisman and for non-ASAP, standard anesthesiology residents. The additional rotations effectively removed Dr. Weisman from the ASAP program and placed him into a standard anesthesiology program).

47.   In this meeting, Weisman blamed his performance on external factors, including the distraction of running his imploding company and the BJH electronic medical record system. Ex. RB-11.

> **RESPONSE:** Plaintiff admits that Dr. Benzinger wrote the email marked as Def. Ex. RB-11, but denies that he made the statements alleged.

48.   From this meeting, Dr. Benzinger's impression was that Weisman was considering leaving the Residency Program and asked Dr. Evers to meet with Weisman and provide career advice. Ex. RB-11.

> **RESPONSE:** Plaintiff admits that Dr. Benzinger wrote the email marked as Def. Ex. RB-11, but denies that he made the statements alleged, and denies that there is any evidence from Plaintiff that he was even considering leaving in January 2017. Dr. Benzinger's opinion is only evidence of Dr. Benzinger's state of mind, and perhaps his intent, in January 2017.

49.     Placing a resident on probation within the Residency Program allows the program to "provide documentation and counseling" without having to report the action to the ABA, which would occur only if the performance were not remediated. Cox Dep. 85:11-87:22.

>   **RESPONSE:** Plaintiff denies the allegations of paragraph 49.  The Resident Handbook that WU/BJH provided Plaintiff and his class, which summarizes the Consortium's policy om discipline, distinguishes negative remediation from probation which "must be reported to the Department Chairman and the American Board of Anesthesiology." (Ex. 29, Resident Handbook, at p. 31, WU1044).  Probation *and any discipline* must be reported to the American Board of Anesthesia and to the FCVS. (Ex. 1-12, and Ex. 1-10 at JW043492).

50.     On or about February 16, 2017, Dr. Evers and Weisman met to discuss how Weisman could improve and succeed, and Dr. Evers counselled (sic) Weisman that he needed to focus on his residency training and that his company could be a distraction. Pl. Dep. 214:3-215:17; Ex. A101; Evers Dep. 150:17-151:20; Ballard Dep. 131:2-13.

>   **RESPONSE:** Plaintiff denies the allegations of paragraph 50.  Plaintiff was told to shut his lab down. (Ex. 4, Pltf. Vol. 1 at pp. 125:9-20, 126:11-127:5, 138:12-18, 141:16-24; Ex. 5, Pltf. Vol. 2 at pp. 579:12-16; Ex. 13, Sinow, at pp. 62:24-63:6 and 185:13-186:5).

51.     On February 19, 2017, Weisman sent an email to Dr. Evers, which thanked Dr. Evers for setting up the meeting, and which summarized the "plans and suggestions" they discussed: Weisman was shutting down participating in outside research and businesses, he would regularly consult with Dr. Groener and rotation coordinators, he would talk to other research residents about their paths to success, and he agreed to redo the two rotations as part of remediating his performance. Pl. Dep. 214:15-215:17, 217:4-218:13; Ex. A101.

>   **RESPONSE:** Plaintiff admits he sent the email, but states that at the time it was sent he had taken Dr. Ever's word that he had failed internal medicine (Ex. 4, Pltf. Dep at p. 216:11-217:3), which he had not. (See paragraphs 37-39 above). Plaintiff agreed to shut down his lab because he felt his residency was at issue (Ex. 4, Pltf. Vol. 1 at p. 143:22-25) and did not want to lose his career. (Ex. 5, Pltf. Dep. Vol. 2 at 579-13-22).

**"D.     SBI Transfers Its 3-D Printing Lab Property to the University's Department of Radiology."**

52.     SBI had moved its lab, property, and two researcher employees/independent contractors, Drs. Uday Jammalamadaka and Karthik Tappa, to STLCOP in June 2016. Sec. Am. Compl. ¶53; Sinow Dep. 43:8, 142:1-25, 144:7-19.

**RESPONSE:**  Admitted, but Plaintiff moved into space shared by the Dept. of Anesthesiology's Center for Clinical Pharmacology at STLCOP. (Ex. 1-5, at JW36434).

53.     Apart from 3-D printing lab equipment, SBI owned licensing rights to a patent application developed by Weisman that was owned and controlled by Louisiana Tech University. Pl. Dep. 52:8-53:15, Pl. Dep. 301:4-302:21; Ex. A3 at 27.

**RESPONSE:** Plaintiff admits these allegations, but SBI owned the equitable rights in the patent and was negotiating for the legal rights in the patent application, (Ex. 13, Sinow, at pp. 58:11-60:10), which application was granted and became a full patent on October 15, 2019. (Ex. 30, Patent).

54.     SBI and Weisman did not collaborate with STLCOP on research, grants, or education. Fleischmann Dep. 58:5-59:8.

**RESPONSE:** Denied.  Fleischmann, General counsel for the STLCOP, testified "to the best of his knowledge" at the cited pages.  In fact, the Lab did research with STLCOP faculty at STLCOP, specifically Dr. Hunyan Cho, who later published the results.  (Ex. 1-8).  Further, Dr. Weisman corresponded with Eric Knoll, STLCOP's Associate Vice President for Operations and Dr. Nagele of the Department of Anesthesia about placing WU students on SBI and STLCOP research projects. (Ex. 1-17, JW00023763-00023764, Ex. 4, Pltf. Dep. Vol 1. at pp. 118:8-23, 277:18-24).

55.     SBI had no grants and did not receive any grants. Pl. Dep. 128:13-21 ("I don't believe there was any grant money coming into SBI from June 2016 to December 2016"); Sinow Dep. 135:4-7, 231:4-9.

**RESPONSE:** Plaintiff admits that SBI received no grants in 2016.

56.     Weisman and David Sinow (SBI's president and CEO from 2016-2018) were the only people to invest money in SBI, and it never raised additional funds from other investors or venture capital. Pl. Dep. 53:11-54:11; Sinow Dep. 12:21-13:4, 87:24-88:11 (no cash offered by Mayo Ventures "at those preliminary negotiations"), 89:18-90:11 ("preliminary negotiations" with Illinois Ventures), 90:21-92:9 (Dennis Beard and Serra Capital offering cash for "a very small equity stake").

**RESPONSE:** Plaintiff denies the allegations of paragraph 56. SBI received multiple offers of cash investment and/or of institutional resource investment. Mayo Ventures' offer to accommodate SBI in its facilities, for example, implied a willingness to invest valuable infrastructure resources into SBI's activities. (Ex. 13, Sinow Dep., at pp; 87:15-23: "On the contrary, Mayo Ventures invited us to move the lab to Rochester and Jeff Dr. Weisman was offered a one-year position to as I recall, to run the lab, do research, and -- and likely pursue his anesthesia residency at Mayo Clinic and work under

19

the auspices of several physicians there. That's how serious they were and how excited they were with the types of research that we were doing."; Ex. 13, Sinow Dep. at pp. 88:1-3 "We didn't even have to discuss cash. They had the facilities, etc., and Mayo Ventures is flush with cash.").

Serra Ventures was willing to offer cash for a small equity stake in SBI. (Ex. 13, Sinow Dep. at pp. 91:13-17: "My Recollection is that Serra Ventures was willing to offer an equity stake, and indeed, Dennis Beard, who is a principal of Serra Ventures, was offering to put his individual money into the company in addition to Serra Ventures at that time."; and Ex. 13, Sinow Dep 91:22-23 "it was -- it was many thousands of dollars as I recall").

That SBI did not ultimately consummate potential investor relationships stems entirely from Defendants' demands that Dr. Weisman cease his activity with SBI. (Ex. 4, Pltf. Vol. 1 at p. 125:15-20, 141:16-24, 143:22-25, 145:2-14). Absent Dr. Weisman, SBI simply could not function. (Ex. 13, Sinow Dep. at p. 235:15-19: "The company was Jeff Weisman. That was the company. Without Jeff Weisman there was not a company. It's as simple as that, and as I've testified over and over and over again, Alex Evers made that impossible.") Because SBI would not be able to function without Dr. Weisman, Plaintiffs did not think it ethical to solicit or consummate further investor relationships. (Ex. 13, Sinow Dep. 235:3-10: Q: Why is that? Why would it be unethical? A. Because the company, thanks to Dr. Evers, was very unlikely to survive, and I'm not going to take money from fellow private equity guys, fellow angels who I know are willing to put money into a deal and watch that money dribble away"; Ex. 13, Sinow Dep at pp. 234:23-25 and 235:1-2: "On the contrary, what I'm saying is that it would have been unethical for me or Jeff or anyone in that company to take additional capital"... "giving the headwinds we faced with Dr. Evers. That's the bottom line").

57.     In July-August 2016, SBI and Weisman had proposed collaborating on 3-D printing research with the University's Department of Radiology. Woodard Decl. ¶3; Ex. W-1; Evers Decl. ¶3; Ex. E-1.

**RESPONSE:** Plaintiff denies the accuracy of paragraph 57. Def. Ex. W-1 shows that SBI was discussing not just collaboration on research, but a joint venture or other business structure with WU's Department of Radiology. The proposal attached to the July 13, 2016, Ballard email to Pamela Woodard (an attending physician in WashU's Radiology Program) is a business proposal from SBI stating intent to "work with our industry contacts and our company Strategic Biomedical to bring in equipment and software to an onsite space" and stating, "[t]he goal is to turn this into a profitable division with positive cashflows." (Def. Ex. W-1)

20

Further, Woodard stated in an email dated November 2, 2016 that any agreement between SBI and WashU's Radiology Department would need to be an agreement between SBI and WU: "the agreement would need to engage Washington University as the institutional partner." (Ex. 1-18, JW00051550).

58.     In August 2016, the Chair of the Department of Radiology, Dr. Richard Wahl, asked Dr. Evers about a financial arrangement that the Department of Anesthesiology had regarding 3-D printing that involved a venture capitalist and STLCOP, and Dr. Evers responded he knew nothing about it. Evers Decl. ¶4; Ex. E2.

**RESPONSE:** Plaintiff denies the allegations of paragraph 58. Dr. Evers knew when he recruited Plaintiff that Plaintiff had a Lab and a company, see response to paragraphs 14 and 15, above, incorporated herein as if fully set forth.

59.     On August 11, 2016, Dr. Evers contacted Dr. Kharasch, who informed Dr. Evers that Weisman had a small 3-D printing company, [that] he [had] introduced Weisman to the STLCOP leadership, that Weisman had reached an arrangement with STLCOP for lab space, and that neither the Department nor the University had anything to do with the arrangement. Evers Decl. ¶4; Ex. E-2.

**RESPONSE:** Plaintiff denies the allegations of paragraph 59. Dr. Kharasch did not "inform" Dr. Evers of Dr. Weisman's company on August 11, 2016, though Dr. Evers may have intended to convey that impression to Kharasch. Dr. Evers knew about SBI from Dr. Weisman's statements to him during the interview process in late 2015 and early 2016. (Ex. 4, Pltf. Dep., Vol. 1, at p. 45:18-25: "at that event I was approached by Alex Evers, by Peter Nagele, by Thomas Cox, by Richard Benzinger, by Rob Gereau, and basically they all wanted me to come to Washington University St. Louis to bring my -- my lab and my technology development and all the activities that I've been doing there. And they -- they wanted me to rank them highly and to -- to come to Wash U.") Dr. Evers further revealed his knowledge of Dr. Weisman's research and business activities during a call to Dr. Weisman on February 14, 2016, wherein Evers invited Dr. Weisman to relocate his laboratory and business to St. Louis and WU. (Ex. 4, Pltf. Dep. Vol. 1 at pp. 66:20-25 "We want your lab here. We want you to bring everything up").

Evers introduced Dr. Weisman to Kharasch specifically to facilitate laboratory research/business opportunities. (Ex. 4, Pltf Dep. Vol. 1 at pp. 69:24-71:7).

On May 14, 2016, Dr. Weisman emailed Fleischmann and two STLCOP

21

doctors (Canady and Seibert), copying Dr. Kharasch. (Ex. 1-19, JW00036214-JW00036215). Dr. Weisman's email attached the Executive Summary (*see* Ex. 1-20, May 2016 Executive Summary), and stated, "I am hoping to move myself, the team and lab on or about June 1st." Dr. Kharasch responded to Dr. Weisman, "I am very glad to hear that your conversations have been productive and things are moving forward. Glad to have made and facilitated the connection. I look forward to seeing you and following the progress." (Ex. 1-19).

60.    Dr. Evers first learned that Weisman had been running a company or lab in St. Louis in August 2016. Evers Dep. 152:10-23, 174:18-175:4.

> **RESPONSE:** Plaintiff denies the allegations of paragraph 60. See Plaintiff's response to paragraphs 14, 15, and 59.

61.    On August 15, 2016, Dr. Kharasch informed Weisman that his statement in a proposal to Radiology that the SBI was housed in the Center for Clinical Pharmacology was "totally incorrect, if not also misleading," and Weisman agreed to remove the statement from further business proposals. Pl. Dep. 84:14-19, 87:20-90:1; Ex. A8.

> **RESPONSE:** Plaintiff admits that Dr. Kharasch used these words, but denies the truth of the allegations of paragraph 61. Dr. Kharasch had been aware since no later than March 2016 that Dr. Weisman intended to relocate his Lab to the Center, and welcomed this relocation. On March 29, 2016, Dr. Weisman emailed Kharasch that he "wanted to see about the prospects for moving the lab to the Center for Clinical Pharmacology and all that entails" and also explained his company and Sinow, the venture capitalist investor. (Ex. 1-5, JW 36344). Kharasch responded, also on March 29, that he would "do some diligence on the company relocation to the Center question." (Ex. 1-5, JW36343). Plaintiff thereafter moved into the STLCOP Building and onto the same floor that houses the Department of Anesthesiology's Center for Clinical Pharmacology joint venture with STLCOP. (Ex. 16, Fleischmann, at pp. 9:22-10:16; 13:21-14:11). Plaintiffs believed that they were partnered with the Center for Clinical Pharmacology (Ex. 4, Pltf. Vol. 1, at 93:10-13).

62.    Dr. Evers was concerned about a potential conflict of interest – that the Department should not have a business interest in or be a partner with a resident because the Department should be solely focused on training residents – and he wanted to make sure that the arrangement was an arm's length transaction without any involvement with the Department. Pl. Dep. 93:18-94:21, 483:17-488:3; Ex. A9; Evers Dep. 150:17-151:20, 174:3-13, 180:5-12, 181:17-182:18.

> **RESPONSE:** Plaintiff acknowledges that Dr. Evers used these words, but denies
> but denies the truth of the allegations of paragraph  62. Plaintiff denies that

the cited deposition testimony states what is alleged in this paragraph. The "conflict of interest" was never actually explained. (Ex. 4, Pltf. Vol. 1, at p. 86:12-18, 90:3-91:18).  Further, See response to paragraph 61.  This allegation of a "conflict of interest" only arose after STLCOP refused to share the SBI lease with SBI with Dr. Evers. (Ex. 1-21, JW00050530 - JW00050531, email from Fleischmann: "Additionally, the head of Anesthesiology at WU requested copies of the . . . agreement but Dr. Pieper directed him to request those documents from Jeff"; Ex. 16, Fleischmann Dep. at pp. 42:21-43:5: "I directed him not to share" the lease).

63.     In August and September 2016, Dr. Evers spoke with both Weisman and Sinow regarding SBI's relationship with STLCOP and was satisfied that no conflict of interest existed. Pl. Dep. 112:25-113:16; Ex. SB-22; Sinow Dep. 102:8-103:8; Evers Dep. 223:4-13.

> **RESPONSE:** Plaintiff admits that Dr. Evers spoke with Dr. Weisman and David Sinow in September 2016, but denies that the allegation that Dr. Evers was satisfied that there was no conflict of interest is material to the motion for summary judgment, and states that the primary topic of the meeting was Dr. Ever's demand for a copy of the lease between SBI and STLCOP and the stockholder agreement SBI had entered into with STLCOP. (Ex. 13, Sinow, at pp. 100:12-101:13; 102:2-15).

64.     Dr. Evers made it clear to Plaintiffs that the Department did not object to Weisman's outside business activities so long as they did not interfere with his residency training. Ex. SB-22; Evers Dep. 150:17-151:3.

> **RESPONSE:** Plaintiff denies the truth of the statement given Dr. Ever's demand for the SBI-STLCOP lease and stockholder agreement,  (Ex. 13, Sinow, at pp. 100:12-101:13; 102:2-15), and his January 2017 demand that Plaintiff choose between the lab and his residency.  (Ex. 4, Pltf. Vol 1 at p. 125:15-20, 141:16-24, 143:22-25, 145:2-14).  At the same time, after Dr. Evers intervened in August and September 2016, Plaintiff's relationship with Dr. Kharasch was inexplicably chilled.  (Ex. 4, Pltf. Dep. Vol. 1 at p. 118:1-5).

65.     SBI had no gross receipts or income in 2016 and was spending $8,000 to $10,000 per month. Sinow Dep. 41:10-15, 50:16-19, 135:9-137:7; Ex. SB-31.

> **RESPONSE:** Plaintiff denies that SBI had no receipts in 2016.  SBI was doing 3D printing and rapid prototyping work for other companies. For example, on April 7, 2016 SBI billed RNvention $1,740.00. (Ex. 1-25, JW00048316). When the venture capitalist investor was involved, income and expenses were not relevant because the investor would just write a check for expenses.  (Ex. 13, Sinow, at pp. 49:23-50:5).  SBI was a tech startup and its value was in the potential of 3-D printing innovations that were possible,

not in a balance sheet or actual sales.  (Ex. 13, Sinow Dep. at pp. 164:5-165:6).

66.    On or about November 2, 2016, SBI proposed a research agreement to the Department of Radiology whereby a Center for Perioperative Services, 3-D Medical Printing and Rapid Prototyping would be housed in the Department of Radiology with the Department being responsible for personnel salaries, but the agreement was never finalized. Sinow Dep. 49:4-22, 51:24-52:1; Ex. SB-43.

**RESPONSE:** Admitted.

67.    In December 2016, Sinow decided he would not put any additional money into SBI. Sec. Am. Compl. ¶68; Pl. Dep. 576:6-20 ("Sinow saw what was going on with my employment status and didn't feel comfortable continuing to support the operation" and was "protecting his interests."); Sinow Dep. 190:14-20; Ballard Dep. 126:23-127:7 ("Sinow stopped funding SBI" due to "[l]ack of investors and a commercial product to move it forward in the short term").

**RESPONSE:** Plaintiff denies paragraph 67.  Sinow's evaluation of SBI's prospects at this time was that Dr. Evers and others at WU were resolved to threaten Dr. Weisman's career and render it impossible for him to continue operating SBI. Sinow testified that when Dr. Evers realized he had no control over Plaintiff's lab that he made it very difficult for Dr. Weisman. (Ex.14, Sinow, at pp. 185:13-186:5). He testified "[t]he company was Jeff Weisman. That was the company. Without Jeff Weisman there was not a company. It's as simple as that, and as I've testified over and over and over again, Alex Evers made that impossible." (Ex. 13, Sinow Dep. at pp. 235:15-19).  Also see response to paragraph 56, and Ex. 13, Sinow Dep. at p. 235:3-10: "Because the company, thanks to Dr. Evers, was very unlikely to survive, and I'm not going to take money from fellow private equity guys, fellow angels who I know are willing to put money into a deal and watch that money dribble away. It's not the way business is done. It's unethical."

68.    By the end of 2016, SBI could not pay the lab's operating costs and the researchers' salaries. Sec. Am. Compl. ¶68; Pl. Dep. 145:23-146:4; Sinow Dep. 140:20-23; Ballard Dep. 107:23-108:20.

**RESPONSE:** Plaintiffs admit that SBI's financial prospects were impaired by Dr. Evers hostility to Dr. Weisman, without whom SBI could not operate. (Ex. 13, Sinow, at pp. 185:13-186:5, and see the responses to paragraphs 56 and 68).

69.    SBI had employment agreements with Jammalamadaka and Tappa dated December 1, 2016, for a term of one year whereby SBI agreed to pay annual salaries of $50,000 plus a housing and EB1 allowance of $17,500. Sinow Dep. 142:5-143:6, 144:6-22; Exs. SB-3, SB-30.

**RESPONSE:** Admitted.

70.     On January 25, 2017, Weisman emailed Dr. Pamela Woodard about "an improved change of plans for both you and David Ballard to keep things fully academic." Woodard Decl. ¶4; Ex. W-2.

**RESPONSE:**     Plaintiff admits he sent this email after Dr. Evers told him to shut the lab down (Ex. 13, Sinow Dep. at p. 208: 11:13 ("Dr. Evers told Jeff Weisman to shut the lab down. . . or leave the program.") and Ex. 4, Pltf. Dep. Vol 2 at pp. 138:15-138:18, and 143:22-25)) in order to prevent the two research assistants he had brought with him from Louisiana State University from being deported and to avoid harming Dr. Ballard who had also come to WU (the radiology Department) from LSU.   (Ex. 4, Pltf. Dep. Vol. 1 at pp. 126:11-127:5, 304:5-21; Ex. 31, Ballard Dep. at pp. 6:6-12, 13:12-25, 14:5-24, 26:16-27:2, 78:7-16).

71.     On February 3, 2017, SBI proposed that it be acquired by the Department of Radiology with SBI's 3-D printing lab property and employees relocated to Radiology because of the "lack of funding from Sinow and the financial stressors going forward." Ballard Dep. 128:6-13; Sinow Dep. 52:4-20, 60:11-62:18; Ex. SB-24; Ballard Dep. 43:18-44:4. The proposal requested no payment of money, only that Radiology take over the expenses of operating a new 3-D printing lab and paying SBI's two employees. Sinow Dep. 60:11-62:18; Ex. SB-24. An agreement was not reached. Sinow Dep. 47:17-20; Ballard Dep. 120:20-23.

**RESPONSE:**     Plaintiff admits that he surrendered the Lab and its property and employees to the Department of Radiology under duress.  (Ex. 13, Sinow Dep. at pp. 62:4-63 and 65:10-17, Ex. 31, Ballard, at pp. 22:18-23:8; Ex. 3, Pltf. Dep. Vol. 1 at p. 145:3-13; Ex. 4. Pltf. Dep. Vol 2 at pp. 590:20-591:15, 591:17-22).  Plaintiff chose his career as a physician over the money the Lab would have generated. (Ex. 13, Sinow Dep. at pp. 236:23-237:6).

72.     On February 19, 2017, Dr. Woodard offered to cover the researchers' salaries, and Weisman thanked her. Sinow Dep. 125:4-126:18; Ex. SB-44; Ballard Dep. 78:7-16.

**RESPONSE:** Admitted.

73.     In March 2017, SBI, through Weisman and Sinow, made the decision to give SBI's 3-D printing lab property to the Department of Radiology. Sinow Dep. 120:2-9, 177:16- 178:1.

**RESPONSE:**     Plaintiff admits that he surrendered the Lab and its property and employees to the Department of Radiology under duress.  (Ex. 13, Sinow Dep. at pp. 62:4-63 and 65:10-17, Ex. 31, Ballard, at pp. 22:18-23:8; Ex. 3, Pltf. Dep. Vol. 1 at p. 145:3-13; Ex. 4. Pltf. Dep. Vol. 2 at pp. 590:20-591:15, 591:17-22).  Plaintiff chose his career as a physician over the money the Lab would have generated. (Ex. 13, Sinow Dep. at pp. 236:23-237:6).

74.  This decision was motivated by several reasons, including:

a.  Weisman and Sinow wanted Weisman to be "well thought of" and "improve his position," wanted to "protected the technology," and believed it was "far more laudable use" for Radiology to have the lab property. Pl. Dep. 579:5-9; Sinow Dep. 203:24-204:13, 207:8-10 ("it was more important to protect the technology"), 209:13-25; Fleischmann Dep. 45:18-46:1.

b.  The potential that Weisman could operate the 3-D printing facility as a co-director with Dr. Ballard after he finished his residency. Pl. Dep. 579:23-580:4; Ballard Dep. 29:2-15.

c.  SBI could not cover the salaries of its researchers, whose immigration status required that they be employed, and it was important to Weisman that they be employed by the University. Sinow Dep. 61:9-15, 121:8-11, 211:19-212:1; Fleischmann Dep. 45:18-46:1; Ballard Dep. 22:2-12, 26:13-27:2, 127:17-128:5.

d.  Weisman and Sinow agreed that it was in "the best interests of the company to transfer" SBI's equipment to Radiology. Sinow Dep. 177:16-25.

e.  It was Weisman's "choice" between dedicating his time to his residency training or continuing to operate SBI, and he chose to focus on his residency training and completing it, which was important to Weisman and Sinow. Pl. Dep. 147:19-148:6; Sinow Dep. 93:4-23 ("I acquiesced that Jeff should at all costs try to finish his residency"), 181:5-12 ("Jeff was very interested in finishing that residency program, and we tried to do everything possible to make that happen."), 220:6-20 ("That was our choice.").

**RESPONSE:** Plaintiff admits that he surrendered the Lab and its property and employees to the Department of Radiology under duress, and denies that he did it to "be well thought of." (Ex. 13, Sinow Dep. at pp. 62:4-63 and 65:10-17, Ex. 31, Ballard, at pp. 22:18-23:8; Ex. 3, Pltf. Dep. Vol. 1 at p. 145:3-13; Ex. 4. Pltf. Dep. Vol 2 at pp. 590:20-591:15, 591:17-22).  Plaintiff chose his career as a physician over the money the Lab would have generated. (Ex. 13, Sinow, Dep. at pp. 236:23-237:6).   Plaintiff, having brought two researchers with him from LSU who had to remain employed in order to remain in the country because of their visas, ( Ex. 4, Pltf. Dep. Vol. 1 at pp. 126:11-127:5, 304:5-21; Ex. 31, and Ballard Dep. at pp. 6:6-12, 13:12-25, 14:5-24, 26:16-27:2, 78:7-16), surrendered the Lab and its property to WU rather than destroy it.

Plaintiff Weisman denies that he had any chance of operating the Lab as a co-director with Ballard.  WU prevented this. (Ex. 5, Pltf. Dep. Vol 2 at p. 580:2-16: "what I thought in fact would occur is once I finished my

26

residency, myself and David, we would be able to run that lab facility, and would likely run that lab facility together. And that in fact did occur for David Ballard. I was -- I was very surprised at the very end when I was leaving when they -- when I -- I asked, I can't remember if I asked just David or Dr. Woodard, but to see if radiology would -- would give -- would make me like a visiting researcher like mechanical engineering did, or, you know, transfer me over as a visiting researcher and I emailed and things like that. And the answer was no, they couldn't do it because of anesthesia and the anesthesia department didn't want it to occur. So instead, they just took my name off the website, from the core lab on the Mallinckrodt website.").

Plaintiffs deny that SBI could not have covered the salaries of its researchers.  If Dr. Evers had not told Dr. Weisman to shut the lab down Ex. 13 Sinow Dep. at p. 208: 11:13 ("Dr. Evers told Jeff Weisman to shut the lab down. . . or leave the program.") and Ex. 4, Pltf. Dep. Vol. 2 at pp. 138:15-138:18, 143:22-25), David Sinow would have covered all costs. (Ex. 13, Sinow, at pp. 49:23-50:15, 62:4-63 and 65:10-17, and 235:3-10).

Plaintiff denies that he voluntarily donated his Lab and its property. (Ex. 5, Pltf. Dep. Vol. 2 at p. 591:20-22 :"I did not donate my lab. I did not intend to donate my lab. It was a transfer under duress in my opinion, and, in fact, it was"; and pp. 579:13-22: "I was following Alex Evers' directions to immediately stop research and get rid of the lab, shut it all down and, you know, just give it to Wash U, to someone, and just focus on your studies. Q Which you -- you voluntarily did, yes? A You know, again, I followed those instructions, but I thought I did so under duress. I didn't want to do it. I just felt like I was in an untenable position. And I -- I didn't want to lose my career. I just wanted to be able to move forward."). The transfer was under duress. (Ex. 5, Pltf. Dep. Vol. 2 at p. 577:3-4: "I agreed to the transfer, but I thought I was in an untenable position and it was done under duress.").

75.    On or about March 21, 2017, SBI employees moved its property over to the Radiology 3-D printing facility with the full knowledge of and without objection from Weisman and Sinow. Pl. Dep. 120:21-121:4, 133:22-136:19, 137:7-138:11, 143:16-25; Exs. A15, A16; Sinow Dep. 121:8-11, 129:8-130:12, 175:1-13 ("I did not object. Either before or after."). Weisman was offered a key to the facility. Pl. Dep. 135:3-136:19.

**RESPONSE:** Plaintiff denies that the transfer was voluntary.  Ex. 13, Sinow Dep. at pp. 62:4-63 and 65:10-17, Ex. 31, Ballard, at pp. 22:18-23:8; Ex. 3, Pltf. Dep. Vol. 1 at p. 145:3-13; Ex. 4. Pltf. Dep. Vol. 2 at pp. 590:20-591:15, 591:17-22).

76.    Weisman "agreed to the transfer" and worked to "facilitate what was going on, what was being taken over to Radiology," "assisted with the transition," and "integrate it seamlessly." Pl. Dep. 218:8-13, 230:23-231:9, 309:8-14, 577:1-4.

**RESPONSE:** Plaintiff denies that his testimony is accurately abstracted. The transfer was under duress. ( Ex. 13, Sinow Dep. at pp. 62:4-63 and 65:10-17, Ex. 31, Ballard, at pp. 22:18-23:8; Ex. 3, Pltf. Dep. Vol. 1 at p. 145:3-13 and 143:22-25; Ex. 4. Pltf. Dep. Vol 2 at pp. 590:20-591:15, 591:17-22).

77.   SBI and Weisman did not demand that SBI's property be returned or that any payment be made for the property, did not attempt to retrieve any property even while working the lab, and Weisman asked for "involvement" and "access." Sinow Dep. 120:10-23; Pl. Dep. 138:12-140:12, 141:25-142:15, 147:1-8, 148:21-149:11.

**RESPONSE:** Denied. The cited deposition testimony is solely related to David Sinow. Plaintiff did demand access to the Lab after he resigned his residency and was refused. (Ex. 4, Pltf. Dep. Vol. 2 at pp. 140:2-141:2, 293:23-293:19; Ex. 31, Ballard Dep., at pp. 88:25-89:7).

78.   Weisman stated in writing to Anesthesiology faculty, including Dr. Benzinger, that he donated SBI's lab to the Department of Radiology. Ex. A18 ("The most unique thing I did here was donating the medical 3D printing lab to the radiology department."); Ex. A19 ("The lab was donated to the radiology department, primarily the vice chair, Pam Woodard, to be a core facility to set up a central 3D printing group on the medical campus."); Ex. A17 ("donated one of the top medical 3D printing groups in the country to the radiology department"); Pl. Dep. 149:15-19, 151:5-6, 151:10-16, 154:6-22, 155:1-156:10.

**RESPONSE:** Denied. The donation was made under duress. (Ex. 5, Plf. Dep. Vol. 2 at pp. 590:20-25: "So the documents that Mr. Sullivan showed me that used the word donate, I included that term because I was advised to by my mentors in academia. They told me that I shouldn't say that the lab was stolen or taken from me or it would cause bad blood or a problem with me getting a future job." and *Id.* at pp. 591:1-15: "They told me to be polite and professional as I was job hunting, and not to -- not to use the term stolen or taken. So they said to use donated."

79.   In CVs that Weisman sent to other residency programs, under the heading research and "Founder and medical 3DP lab, Washington University, Mallinckrodt Institute of Radiology," Weisman wrote: "Donated laboratory equipment and expertise from Strategic Biomedical, Inc." Exs. A20 at JW63960, A21 at JW63913; Pl. Dep. 157:4-158:10, 158:15- 160:5.

**RESPONSE:** Admitted but see response to ¶ 78, adopted as if fully set forth herein.

80.   Weisman told Dr. Alan Kaye that he "donated" the lab property to the Department of Radiology. Kaye Dep. 221:3-16.

**RESPONSE:** Denied. See responses to ¶¶ 74 and 78, adopted as if fully set forth herein. Further, Dr. Kaye testified that he did not have discussions with Dr. Weisman about the topic.  (Ex. 32, Kaye Dep. at p. 221:8-10).

81.    Weisman told Ken Fleischmann (STLCOP General Counsel) that "he was making a donation to of the equipment, and this whole thing was melted down. SBI would cease to exist. The post docs are going to work over at Radiology. He's going to donate the equipment." Fleischman Dep. 76:2-16.

**RESPONSE:**  Objection to relevance.  Plaintiff also told Fleischmann that he had been told that he had been told that he was going to be put on probation and that he was moving the Lab over to the Department of Radiology to try to take care of some of the people that had come to St. Louis with him.  (Ex. 16, Fleischmann at pp. 45:7-46:1).  There was no basis for probation, see ¶41 above.  He was told at the same time to choose between his residency and the Lab, see ¶ 64 above.  The "donation" of the lab was made under duress, see ¶¶ 75 and 78, above.

82.    SBI's researchers became employees of the Department of Radiology, which SBI admitted cured its "burn rate" of $8,000-$10,000 per month and relieved SBI of its contractual obligations to pay their salaries, which was beneficial to it. Sinow Dep. 135:9-137:7, 198:1-25, 211:9-22; Ex. SB-31; Ballard Dep. 132:23-133:14, 135:25-136:6 (Radiology "did what Jeff Weisman wanted to do when it agreed to take the equipment and to take over the employment of Uday and Karthik").

**RESPONSE:** Denied.  Plaintiff used the words "burn rate" in connection with his attempt to save SBI and keep David Sinow involved.  (Def. Ex. SB-1 at p. JW52693).  Sinow did not testify at the cited pages that SBI benefited form the transfer to the Department of Radiology.  It was defense counsel who used the term, to which Sinow actually testified: "That would - - - if you want to construe it as a benefit, construe it as a benefit." (Ex. 13, Sinow, at p. 199:9-13).

83.    Weisman did not list lab notebooks or any intellectual property as items transferred, but testified that his and SBI's lab notebooks containing intellectual property were moved to the Radiology 3-D printing facility and was unsure of the number of lab notebooks, who possessed them, or "what they were used for." Ex. A3 at 27; Pl. Dep. 132:22-133:18.

**RESPONSE:** Denied.  While the answer to interrogatory 12 (Def. Ex A3 at p. 27) did not list lab notebooks (though it did list equipment), the Plaintiff testified at the cited pages in his deposition that at least two of his lab notebooks recording possible experiments were taken.

84.    The Radiology 3-D printing facility remains in operation with Dr. Ballard as director. Ballard Dep. 29:4-18. Some of the equipment that SBI transferred to Radiology is still in

use, while some is no longer used, and Radiology has purchased additional 3-D printing equipment for the lab costing $50,000. Ballard Dep. 105:10-106:4.

> **RESPONSE:** Admitted.

85.    The Radiology 3-D printing facility has operated at a loss for every year since it has been in operation – $40,776 in FY2017, $116,688 in FY2018, $93,171 in FY2019, $68,107 in FY2020, $29,852 in FY2021, and $82,798 in FY2022 – and the Department of Radiology has used funds to make up the deficits. Woodard Decl. ¶5; Ex. W-3; Ballard Dep. 106:15-21.

> **RESPONSE:** This allegation is not material.  Plaintiff has no control over what WU did or did not do with the Lab after the transfer.   Even so, "[t]he department invests in it as a loss with the idea of an investment for the future."  (Ex. 31, Ballard Dep. at p. 106:20-21).

### "E.    Weisman's Unsatisfactory Performance in His Second Year of Residency Training."

86.    In the second half of his internship year, Weisman's rotation evaluations were as follows:

> a.    He received a "below expectations" in the CPAP rotation, but it was noted he improved in the last third or quarter of the rotation. Benzinger Decl. ¶14; Ex. RB-12.

> b.    He received "meeting expectations" in his Simulation rotation and in two surgery rotations. Benzinger Decl. ¶¶15-17; Exs. RB-13, RB-14, RB-15.

> c.    Weisman received "below expectations" in his ICU rotation with comments that "he is unable to apply book knowledge to clinical care" and that "[w]e are truly concerned about his competency to take care of patients and have reservations about advancing him to his next year of residency." Benzinger Decl. ¶18; Ex. RB-16.

> **RESPONSE:** Denied as to the CPAP rotation.  In CPAP Plaintiff Weisman was noted to "meet the learning objectives" of the rotation in the final third to final quarter of the rotation. (Def. Ex. RB-12 at WU3006).  Though scored below expectations Plaintiff was not scored "unsatisfactory."

> Plaintiff admits that he met expectation in the Simulation rotation and in two surgery rotations.

> Plaintiff admits that he scored "below expectations" in the June-July 2017 CTICU rotation and was not scored "unsatisfactory." (Def. Ex. RB-16 at p. WU3016).

87.    The CCC met on June 21, 2017, and determined that Weisman's class all satisfactorily met the competency requirements, while noting Weisman needed feedback on his lack of performance. Benzinger Decl. ¶19; Ex. RB-17.

> **RESPONSE:**   Denied as this paragraph misrepresents that finding of the CCC.  Though it made comments on Plaintiff Weisman the CCC also stated that "All members of the PGY-1 class have satisfactorily met all of the competency requirements for the CA-1 year at Washington University/Barnes-Jewish Hospital/St. Louis Hospital Consortium Anesthesiology Residency Program for January 1 – June 30, 2017." (Def. Ex. RB-17 at p. WU2788).

88.    Weisman was no longer on probation within the Residency Program at the end of his first year. Pl. Dep. 233:7-10.

> **RESPONSE:**   Denied, this paragraph misrepresents the facts and misrepresents Plaintiff's testimony. Counsel's question implied incorrectly that Plaintiff has been on probation: "Q: Did you finish up the- - - the second half of your internship year and ended up not being placed on probation, correct? A. Correct." (Ex. 4, Pltf. Dep. Vol. 1 at p. 233:7-10).  But Plaintiff never testified that he was on probation,  *Id.* at p. 165:7-8, and Dr. Thompson certified that Plaintiff Weisman had never been on probation or disciplined. (Ex. 1-10 at JW43492). WU's 30(b)(6) representative, Lauren Gibson testified that Dr. Weisman had never been put on probation. (Ex. 28, Gibson, at p. 64:10-22). Tia Drake, the Executive Director of the WU/BJH/St. Louis Children's Hospital Consortium residency program's Office of Graduate Medical Education ("GME") at the relevant time, testified that she was not aware of any probationary activity against Dr. Weisman even though her office was required to be involved under ACGME requirements.  (Ex. 20, Drake Vol. 1 at pp. 109:4-22).

89.    In June 2017, in order to provide Weisman with additional support and to help him succeed, the Residency Program gave Weisman an academic advisor, Dr. Graetz, earlier than the rest of his residency class (which would get an advisor mid-way through the second year). Pl. Dep. 233:11-19; Benzinger Decl. ¶20; Ex. RB-18; Evers Dep. 184:13-20.

> **RESPONSE:**   Plaintiff admits that he was not allowed, like other residents, to pick a mentor but was assigned a friend of Dr. Evers, (Ex. 4, Pltf. Dep. Vol. 1, at p. 233:11-19), who instead of assisting told Plaintiff Weisman to not complain about inaccurate rotation assessments. *Id.* at p. 234:14-235:6.

90.    Weisman began his second year of training in clinical anesthesia with a Tutorial rotation, in which 4 out of 6 faculty evaluators found that Weisman was not capable of moving on to independent, less supervised care, while two evaluators found that he was. Benzinger Decl. ¶21; Ex. RB-19. The evaluations noted concerns with respect to his performance included acting

slowly, problems with focusing on the important aspect of the case, lack of vigilance, and poor medical knowledge. *Id.*

> **RESPONSE:** Plaintiff admits that the documents say what they say, but denies that they present a full picture. First, any rotation is a learning event. (Ex. 22, Szabo Dep. at pp. 16:18-17:11, Ex. 23 Kaye Dep. 138:19-25). Second, by this time in Plaintiff Weisman's residency, Plaintiff had been targeted. (Ex. 22, Szabo Dep. at pp. 19:10-21:15, 26:24-37:4). Dr. Benzinger had sent an email around singling Dr. Weisman out for scrutiny: "For the foreseeable future, either Russell [Groener, the Assistant Program Director] or I will need to talk with the rotation coordinators of Gary's and Jeff's clinical rotations, at the beginning of the block. From block 3 onward, could please send me and Russell an email – say, the Wednesday before the start of the block- reminding us of the rotation that each is going into, and to make contact with the coordinator? We can then figure out which of us will talk to him/her." (Ex. 33, BJH000645). Thereafter, the Anesthesiology Program Coordinator Sharon Stark routinely emailed Dr. Benzinger and Dr. Russell to alert them before the start of Dr. Weisman's new rotations. (*See e.g.*, Ex. 34, BJH000600 and BJH000608). Plaintiff named several WU physicians who apologized to him for being asked to give him bad reviews. (Ex. 4, Pltf. Vol. 1 at pp. 338:6-340:4).

91.     Weisman scored in the bottom 5 percentile on the Anesthesia Knowledge Test-1 Pre-Test, which he took on July 5, 2017. Benzinger Decl. ¶22; Ex. RB-20. Weisman scored in the bottom 5 percentile on the Anesthesia Knowledge Test-6 Post-Test, which he took on January 24, 2018. Pl. Dep. 62:8-22; Ex. A6. The AKT tests determine the level of knowledge of residents. Pl. Dep. 62:8-22.

> **RESPONSE:** Plaintiff denies that this paragraph accurately presents the matter stated. Dr. Weisman scored at the 50th percentile on the AKT-1 Post Test in August 2017. (Ex. 1-23, JW00021313-JW00021315). The AKT pre and post tests are informal tests that are supposed to informally indicate preparedness for taking the Anesthesia Board Examination. (Ex. 4, Pltf. Vol. 1 at pp. 62:1-7). Plaintiff passed his formal Anesthesia Board Basic Knowledge Exam taken in June 2018. (Ex. 1-12, at p. WU0712).

92.     Weisman had 4 clinical anesthesia rotations to start his second year of training and did not achieve an overall evaluation of meets expectations or better in any rotation. Pl. Dep. 244:1-10; Ex. A64 at 1.

> **RESPONSE:** Plaintiff admits that the document at issue, the January 11, 2018, letter says what it says but denies its accuracy. The CCC evaluation of all residents for the first half of the send year (CA-1), including Dr. Weisman, stated that "All member of the CA-1class have satisfactorily met all of the competency requirements for the CA-1 year at Washington University/Barnes-Jewish Hospital/St. Louis Children's Hospital Consortium Anesthesiology

Resident Program for July 1st – December 31st, 2017, (Ex. 32, January 2018 CCC Minutes), and WU informed the American Board of Anesthesiology that Dr. Weisman's performance in all rotations was satisfactory. (Ex. 1-12, WU707-712).  And see response to ¶ 90.

93.    In his POD-4 CAM rotation, Weisman received a below expectations overall evaluation with comments that he was "[s]till lagging behind his peers," although improving. Benzinger Decl. ¶23; Ex. RB-21.

> **RESPONSE:**  Denied.  Dr. Molly McCormick on the POD-4 CAM rotation between August 28, 2017 and September 24, 2017,  wrote: "Still lagging behind peers.  Much improvement since beginning, overall progressing, but at a slightly slower rate than other CA-1's." (Def. Ex. RB-21 at WU3025).

94.    During Weisman's rotation in Pediatric Anesthesiology, Dr. Groener, the rotation coordinator, received numerous written comments from faculty evaluators. Groener Decl. ¶4; Ex. G-2. Some were positive, but the consensus was that "his performance reached the level of deeply troubling, with serious concern for patient safety." Benzinger Decl. ¶24; Ex. RB-22; Groener Decl. ¶¶4-5; Exs. G-2, G-3.

> **RESPONSE:**  Plaintiff admits that the documents say what they say, but denies that they present a full picture.  First, any rotation is a learning event. (Ex. 22, Szabo Dep. at pp. 16:18-17:11, Ex. 23 Kaye Dep. 138:19-25).  Second, by this time in Plaintiff Weisman's residency, Plaintiff had been targeted.  (Ex. 22, Szabo Dep. at pp. 19:10-21:15, 26:24-37:4).  Dr. Benzinger had sent an email around singling Dr. Weisman out for scrutiny: "For the foreseeable future, either Russell [Groener, the Assistant Program Director] or I will need to talk with the rotation coordinators of Gary's and Jeff's clinical rotations, at the beginning of the block.  From block 3 onward, could please send me and Russell an email – say, the Wednesday before the start of the block- reminding us of the rotation that each is going into, and to make contact with the coordinator? We can then figure out which of us will talk to him/her." (Ex. 33, BJH000645). Thereafter, the Anesthesiology Program Coordinator Sharon Stark routinely emailed Dr. Benzinger and Dr. Russell to alert them before the start of Dr. Weisman's new rotations. (*See e.g.*, Ex. 34, BJH000600 and BJH000608).  Plaintiff named other WU physicians who apologized to him for being asked to give him bad reviews.  (Ex. 4, Pltf. Vol. 1 at pp. 338:6-340:4).

95.    Dr. Douglas Thompson, who at the time was an Assistant Program Director, reported about his experience with Weisman: "The last time I worked with him when I left him alone for no more than 10 minutes. When I returned I noticed he had re-filled the sevo vaporizer (nothing wrong with that), however he failed to realize the vaporizer wasn't properly engaged with the machine and therefore NO anesthetic agent was being delivered to the patient! When I returned

to the room I quickly noticed the end-tidal concentration of sevo had fallen to 0.5%. It is not clear to me when or if Jeff would have noticed this." Exs. G-2 at WU2297, G-3 at WU2495.

> **RESPONSE:** Plaintiff denies the allegations of paragraph 95. On October 24, 2018, Dr. Thompson told Dr. Weisman that he had only worked with him once or twice and that it would therefore be difficult for him to comment on Plaintiff Weisman's clinical experience. (Ex. 1 at ¶ 24, summary of recording made October 24, 2018, bates stamped JW63713 at 8:47-9:17). Further, Plaintiff emailed Dr. Thompson about this very issue with the "sevo cartridge" and Thompson did not criticize Plaintiff Weisman but only invited him to write an article about it. (Ex. 1-25, 1-29-18 email JW00013850-51).

96.     Dr. Thompson testified that this was a "big deal" and a "big incident" because it put the child patient at risk of having recall (having awareness or waking up), and it could have been avoided by properly using the equipment or looking at the monitors. Thompson Dep. 14:7-16:21, 99:7-100:19.

> **RESPONSE:** Denied for the reasons stated in ¶ 95.

97.     Another Pediatrics faculty evaluator reported about Weisman: "After mask induction, ready for intubation, patient apneic [temporarily not breathing]. Resident decides to abandon patient and go back to cart to fumble around for a nasal temp probe.     When I asked why he prioritized something that trivial over breathing for a paralyzed patient, he said (I kid you not) 'some attendings are particular about things like that.' I was speechless. Once intubated, I stepped out for a few minutes. When I returned, noticed the ETCO2 was 89 and bellows were not moving. I asked if he was intentionally hypoventilating for some reason I was unaware of (biting my tongue at this point). Didn't have a plan of attack for how to remedy, check for leak in system, etc. Not sure he was even aware of the hypercarbia [increased carbon dioxide]." Exs. G- 2 at WU2739, G-3 at WU2494.

> **RESPONSE:** Plaintiff admits that the documents say what they say, but denies that they present a full picture. First, any rotation is a learning event. (Ex. 22, Szabo Dep. at pp. 16:18-17:11, Ex. 23 Kaye Dep. 138:19-25). Second, by this time in Plaintiff Weisman's residency, Plaintiff had been targeted. (Ex. 22, Szabo Dep. at pp. 19:10-21:15, 26:24-37:4). Dr. Benzinger had sent an email around singling Dr. Weisman out for scrutiny: "For the foreseeable future, either Russell [Groener, the Assistant Program Director] or I will need to talk with the rotation coordinators of Gary's and Jeff's clinical rotations, at the beginning of the block. From block 3 onward, could please send me and Russell an email – say, the Wednesday before the start of the block- reminding us of the rotation that each is going into, and to make contact with the coordinator? We can then figure out which of us will talk to him/her." (Ex. 33, BJH000645). Thereafter, the Anesthesiology Program Coordinator Sharon Stark routinely emailed Dr. Benzinger and Dr. Russell to alert them before the start of Dr. Weisman's new rotations. (*See e.g.*, Ex.

34

34, BJH000600 and BJH000608).  Plaintiff named other WU physicians who apologized to him for being asked to give him bad reviews.  (Ex. 4, Pltf. Vol. 1 at pp. 338:6-340:4).

98.     Dr. Groener himself noted an 8-year old patient's blood pressure dropped significantly while he was out of the room, and Weisman "had taken no action, not even a fluid bolus." Ex. G-3 at WU2496.

> **RESPONSE:**  Plaintiff admits that the documents say what they say, but denies that they present a full picture.  First, any rotation is a learning event. (Ex. 22, Szabo Dep. at pp. 16:18-17:11, Ex. 23 Kaye Dep. 138:19-25).  Second, by this time in Plaintiff Weisman's residency, Plaintiff had been targeted.  (Ex. 22, Szabo Dep. at pp. 19:10-21:15, 26:24-37:4).  Dr. Benzinger had sent an email around singling Dr. Weisman out for scrutiny: "For the foreseeable future, either Russell [Groener, the Assistant Program Director] or I will need to talk with the rotation coordinators of Gary's and Jeff's clinical rotations, at the beginning of the block.  From block 3 onward, could please send me and Russell an email – say, the Wednesday before the start of the block- reminding us of the rotation that each is going into, and to make contact with the coordinator? We can then figure out which of us will talk to him/her." (Ex. 33, BJH000645). Thereafter, the Anesthesiology Program Coordinator Sharon Stark routinely emailed Dr. Benzinger and Dr. Russell to alert them before the start of Dr. Weisman's new rotations. (*See e.g.*, Ex. 34, BJH000600 and BJH000608).  Plaintiff named other WU physicians who apologized to him for being asked to give him bad reviews.  (Ex. 4, Pltf. Vol. 1 at pp. 338:6-340:4).

99.     Another Pediatrics faculty evaluator reported to Dr. Groener: "I was following along in Metavision outside of the room and noted the blood pressure dip to systolics in the 40s. After not receiving a phone call, and concerned, I went into the room. There had been blood loss, hypotension, and tachycardia and Dr. Weisman had turned UP the anesthetic agent (sevoflurane from 2 to 3%). This was in the setting of a functional epidural that had been providing most of the analgesia for the case at this point. When asked about his decision Dr. Weisman implied he thought the patient was becoming light or experiencing pain. I decreased the anesthetic, bolused albumin and the patient improved. This event lead me to be concerned about basic diagnostic decision making and a lack of insight into when to call for help." Exs. G-2 at WU2281, G-3 at WU2498.

> **RESPONSE:**  Plaintiff admits that the documents say what they say, but denies that they present a full picture.  First, any rotation is a learning event. (Ex. 22, Szabo Dep. at pp. 16:18-17:11, Ex. 23 Kaye Dep. 138:19-25).  Second, by this time in Plaintiff Weisman's residency, Plaintiff had been targeted.  (Ex. 22, Szabo Dep. at pp. 19:10-21:15, 26:24-37:4).  Dr. Benzinger had sent an email around singling Dr. Weisman out for scrutiny: "For the foreseeable future, either Russell [Groener, the Assistant Program Director] or I will need to talk with the rotation coordinators of Gary's and Jeff's clinical

rotations, at the beginning of the block.  From block 3 onward, could please send me and Russell an email – say, the Wednesday before the start of the block- reminding us of the rotation that each is going into, and to make contact with the coordinator? We can then figure out which of us will talk to him/her." (Ex. 33, BJH000645). Thereafter, the Anesthesiology Program Coordinator Sharon Stark routinely emailed Dr. Benzinger and Dr. Russell to alert them before the start of Dr. Weisman's new rotations. (*See e.g.*, Ex. 34, BJH000600 and BJH000608).  Plaintiff named other WU physicians who apologized to him for being asked to give him bad reviews.  (Ex. 4, Pltf. Vol. 1 at pp. 338:6-340:4).

100.    Other common comments from evaluators noted a lack of vigilance, a gap in medical knowledge, struggles with clinical skills, prioritization, and willingness to accept feedback. Exs. G-2, G-3.

**RESPONSE:**  Plaintiff admits that the documents say what they say, but denies that they present a full picture.  First, any rotation is a learning event. (Ex. 22, Szabo Dep. at pp. 16:18-17:11, Ex. 23 Kaye Dep. 138:19-25).  Second, by this time in Plaintiff Weisman's residency, Plaintiff had been targeted.  (Ex. 22, Szabo Dep. at pp. 19:10-21:15, 26:24-37:4).  Dr. Benzinger had sent an email around singling Dr. Weisman out for scrutiny: "For the foreseeable future, either Russell [Groener, the Assistant Program Director] or I will need to talk with the rotation coordinators of Gary's and Jeff's clinical rotations, at the beginning of the block.  From block 3 onward, could please send me and Russell an email – say, the Wednesday before the start of the block- reminding us of the rotation that each is going into, and to make contact with the coordinator? We can then figure out which of us will talk to him/her." (Ex. 33, BJH000645). Thereafter, the Anesthesiology Program Coordinator Sharon Stark routinely emailed Dr. Benzinger and Dr. Russell to alert them before the start of Dr. Weisman's new rotations. (*See e.g.*, Ex. 34, BJH000600 and BJH000608).  Plaintiff named other WU physicians who apologized to him for being asked to give him bad reviews.  (Ex. 4, Pltf. Vol. 1 at pp. 338:6-340:4).

101.    For his overall evaluation on the Pediatric rotation on November 1, 2017, Weisman received an overall "unsatisfactory" with the rotation evaluation prepared by Dr. Groener noting many of these examples and performance deficiencies. Groener Decl. ¶6; Ex. G- 4.

**RESPONSE:**  Plaintiff admits that the documents say what they say, but denies that they present a full picture.  First, any rotation is a learning event. (Ex. 22, Szabo Dep. at pp. 16:18-17:11, Ex. 23 Kaye Dep. 138:19-25).  Second, by this time in Plaintiff Weisman's residency, Plaintiff had been targeted.  (Ex. 22, Szabo Dep. at pp. 19:10-21:15, 26:24-37:4).  Dr. Benzinger had sent an email around singling Dr. Weisman out for scrutiny: "For the foreseeable

36

future, either Russell [Groener, the Assistant Program Director] or I will need to talk with the rotation coordinators of Gary's and Jeff's clinical rotations, at the beginning of the block.  From block 3 onward, could please send me and Russell an email – say, the Wednesday before the start of the block- reminding us of the rotation that each is going into, and to make contact with the coordinator? We can then figure out which of us will talk to him/her." (Ex. 33, BJH000645). Thereafter, the Anesthesiology Program Coordinator Sharon Stark routinely emailed Dr. Benzinger and Dr. Russell to alert them before the start of Dr. Weisman's new rotations. (*See e.g.*, Ex. 34, BJH000600 and BJH000608).  Plaintiff named other WU physicians who apologized to him for being asked to give him bad reviews.  (Ex. 4, Pltf. Vol. 1 at pp. 338:6-340:4).

102.     Early in his next rotation, POD-2 ENT, the rotation coordinator expressed concern that she could not provide the level of supervision for Weisman's ability and reported that a faculty member was concerned about patient safety. Benzinger Decl. ¶24; Ex. RB-22.

**RESPONSE:**  Plaintiff admits that the documents say what they say, but denies that they present a full picture.  First, any rotation is a learning event. (Ex. 22, Szabo Dep. at pp. 16:18-17:11, Ex. 23 Kaye Dep. 138:19-25).  Second, by this time in Plaintiff Weisman's residency, Plaintiff had been targeted.  (Ex. 22, Szabo Dep. at pp. 19:10-21:15, 26:24-37:4).  Dr. Benzinger had sent an email around singling Dr. Weisman out for scrutiny: "For the foreseeable future, either Russell [Groener, the Assistant Program Director] or I will need to talk with the rotation coordinators of Gary's and Jeff's clinical rotations, at the beginning of the block.  From block 3 onward, could please send me and Russell an email – say, the Wednesday before the start of the block- reminding us of the rotation that each is going into, and to make contact with the coordinator? We can then figure out which of us will talk to him/her." (Ex. 33, BJH000645). Thereafter, the Anesthesiology Program Coordinator Sharon Stark routinely emailed Dr. Benzinger and Dr. Russell to alert them before the start of Dr. Weisman's new rotations. (*See e.g.*, Ex. 34, BJH000600 and BJH000608).  Plaintiff named other WU physicians who apologized to him for being asked to give him bad reviews.  (Ex. 4, Pltf. Vol. 1 at pp. 338:6-340:4).

103.     Weisman received an overall below expectations on the POD-2 ENT rotation with comments noting a failure to recognize priorities, remembering to turn on equipment, managing equipment and monitors, not knowing proper dosages, and charting errors, but also including some positive comments about his performance. Benzinger Decl. ¶25; Ex. RB-23.

**RESPONSE:**  Plaintiff admits that the documents say what they say, but denies that they present a full picture.  First, any rotation is a learning event. (Ex. 22, Szabo

Dep. at pp. 16:18-17:11, Ex. 23 Kaye Dep. 138:19-25).  Second, by this time in Plaintiff Weisman's residency, Plaintiff had been targeted.  (Ex. 22, Szabo Dep. at pp. 19:10-21:15, 26:24-37:4).  Dr. Benzinger had sent an email around singling Dr. Weisman out for scrutiny: "For the foreseeable future, either Russell [Groener, the Assistant Program Director] or I will need to talk with the rotation coordinators of Gary's and Jeff's clinical rotations, at the beginning of the block.  From block 3 onward, could please send me and Russell an email – say, the Wednesday before the start of the block- reminding us of the rotation that each is going into, and to make contact with the coordinator? We can then figure out which of us will talk to him/her." (Ex. 33, BJH000645). Thereafter, the Anesthesiology Program Coordinator Sharon Stark routinely emailed Dr. Benzinger and Dr. Russell to alert them before the start of Dr. Weisman's new rotations. (*See e.g.*, Ex. 34, BJH000600 and BJH000608).  Plaintiff named other WU physicians who apologized to him for being asked to give him bad reviews.  (Ex. 4, Pltf. Vol. 1 at pp. 338:6-340:4).

104.    In his last rotation (HPV) of the first half of his second year, Weisman's overall evaluation was "below expectations" by Dr. Benzinger, the rotation coordinator, based on discussion with the rotation's faculty. The rotation evaluation noted that Weisman's "clinical care is significantly below expectations," that he "fails to notice abnormalities on monitors, and is inconsistent in synthesizing these abnormalities into differential diagnoses and plans of action," and that Weisman "is certainly making an effort, but the end result is still short of expectations." Benzinger Decl. ¶26; Ex. RB-24.

**RESPONSE:** Plaintiff admits that the documents say what they say, but denies that they present a full picture.  First, any rotation is a learning event. (Ex. 22, Szabo Dep. at pp. 16:18-17:11, Ex. 23 Kaye Dep. 138:19-25).  Second, by this time in Plaintiff Weisman's residency, Plaintiff had been targeted.  (Ex. 22, Szabo Dep. at pp. 19:10-21:15, 26:24-37:4).  Dr. Benzinger had sent an email around singling Dr. Weisman out for scrutiny: "For the foreseeable future, either Russell [Groener, the Assistant Program Director] or I will need to talk with the rotation coordinators of Gary's and Jeff's clinical rotations, at the beginning of the block.  From block 3 onward, could please send me and Russell an email – say, the Wednesday before the start of the block- reminding us of the rotation that each is going into, and to make contact with the coordinator? We can then figure out which of us will talk to him/her." (Ex. 33, BJH000645). Thereafter, the Anesthesiology Program Coordinator Sharon Stark routinely emailed Dr. Benzinger and Dr. Russell to alert them before the start of Dr. Weisman's new rotations. (*See e.g.*, Ex. 34, BJH000600 and BJH000608).  Plaintiff named other WU physicians who apologized to him for being asked to give him bad reviews.  (Ex. 4, Pltf. Vol. 1 at pp. 338:6-340:4).

**"F.     Weisman's Decision to Voluntarily Resign from the Residency Program."**

105.     Weisman and Dr. Benzinger had several conversations in late 2017 about whether (sic) Weisman's performance and whether he should stay in the Residency Program. Pl. Dep. 236:20-237:22; Benzinger Dep. 205:13-206:11.

**RESPONSE:** Admitted.

106.     In mid-December 2017, Weisman and Dr. Benzinger discussed Weisman's performance and the idea of him leaving the Residency Program at the end of the academic year. Benzinger Decl. ¶27; Ex. RB-25. Weisman asked Dr. Benzinger whether, if he resigned with a certain effective date, the CCC would consider issuing an unofficial warning instead of an official report of unsatisfactory to the ABA, which would have long-lasting negative effects. Ex. RB-25. Dr. Benzinger believed this would be acceptable and would not compromise the Program's integrity in that saying "everything was fine" was not acceptable, but that not taking a formal action after a semester of anesthesia training was justifiable. Ex. RB-25. Dr. Cox agreed. Ex. RB-25.

> **RESPONSE:** Plaintiff denies that he proposed to resign earlier in exchange for an unofficial warning. The CCC minutes do not reflect any such discussion or that such a proposal was made by Plaintiff Weisman. (Ex. 35). The evidence cited in support of paragraph 106 are only emails generated by Defendants. Plaintiff proposed resigning in exchange for a good recommendation and assistance in transferring to another program. (Ex. 4, Pltf. Vol. 1 at p. 189:25-191:8, 193:2-4, Ex. 5, Pltf. Vol. 2 at pp. 561:10-563:5).

107.     Weisman met with Dr. Evers on or about January 2, 2018 to discuss career advice, and Weisman informed Dr. Evers: "I did not feel the clinical programs here were the right fit for me. My plan is to look at some other options and depart by July 1st." Ex. A63; Pl. Dep. 240:1-241:10 ("it looked like a better idea to look at some other options" and "it seems like this may not be the right fit").

**RESPONSE:** Admitted, for the reasons stated in ¶¶ 25-51 and 86-104, above.

108.     Weisman met with Dr. Benzinger about a week later and informed him of the very same thing. Ex. A65; Pl. Dep. 242:15-243:23; Benzinger Dep. 164:23-165:27.

**RESPONSE:** Admitted, for the reasons stated in ¶¶ 25-51 and 86-104, above.

109.     The CCC met on January 10, 2018, and decided not to report an official unsatisfactory to the ABA on the basis that there was no need to damage his career if he was leaving. Benzinger Decl. ¶¶28-29; Ex. RB-26, Ex. RB-27. The CCC decided that a letter of concern would be issued and career counseling be given because Weisman was leaving anesthesiology. Exs. RB-26, RB-27.

**RESPONSE:** Plaintiff denies that he proposed to resign earlier in exchange for an unofficial warning. The CCC minutes do not reflect any such discussion of such a proposal or that it was made by Plaintiff Weisman. (Ex. 35). Plaintiff proposed resigning in exchange for a good recommendation and assistance in transferring to another program, (Ex. 4, Pltf. Vol. 1 at p. 189:25-191:8, 193:2-4, Ex. 5, Pltf. Vol. 2 at pp. 561:10-563:5), for the reasons stated in ¶¶ 25-51 and 86-104, above.

110. A letter dated January 11, 2018, was drafted summarizing Weisman's recent performance and clinical difficulties and warning him that similar clinical performance in the next 6 months would result in a formal report of unsatisfactory to the ABA. Ex. A64; Pl. Dep. 244:1-10; Benzinger Dep. 203:1-11.

**RESPONSE:** Plaintiff admits that the Defendants' letter says what it says.

111. The letter further summarized what Weisman had told the Program's leaders – that Anesthesiology was not a good fit and that he was going to change specialties. The letter, however, emphasized that the decision to resign was Weisman's to make and that, if Weisman stayed, the Program would support his efforts to become an anesthesiologist. Ex. A64; Pl. Dep. 245:7-246:8; Benzinger Dep. 203:24-204:10.

**RESPONSE:** Plaintiff admits that the Defendants' letter says what it says, denies that his cited deposition testimony does anything more than authenticate, he did not testify that the contents were true, and denies that that only reason he was going to leave the program was because "he was not a good fit," and adopts the contents of paragraphs 25-51 and 86-104 above, as if fully set forth herein, as the reason that he was going to leave the program.

112. In response to Weisman's request that his clinical schedule be modified, the letter clarified that he would remain in the standard anesthesiology training up to the point that he formally resigned from the Residency Program at which time modifications could be made to his training schedule and further emphasized that the decision to resign was his to make. Ex. A64.

**RESPONSE:** Admitted.

113. On or about February 22, 2018, Drs. Benzinger and Cox met with Weisman, gave him the January 11 letter, and informed him that his rotation schedule could be changed if he resigned, but, if he did not, the schedule would stand under the assumption that Weisman would continue training. Pl. Dep. 244:22-245:2; Benzinger Dep. 204:11-13; Cox Dep. 136:16-140:6; Cox Ex. 11.

**RESPONSE:** Admitted.

114. On April 5, 2018, Weisman emailed Dr. Benzinger and requested that his rotation schedule be modified for the remainder of the academic year in order to allow him to focus

exclusively on research to help the Department of Radiology on 3-D printing research projects instead of performing clinical rotations. Ex. A67; Pl. Dep. 246:12-247:5.

> **RESPONSE:** Plaintiff denies that he requested transfer "exclusively" to research, or to exclusively research with the Department of Radiology, as those words do not appear in the cited email. *See* Def. Ex. A67. The citation to Plaintiff's deposition does not contain the testimony summarized in paragraph 114. When Dr. Weisman, on April 6, 2018, emailed his intent to resign, he offered his availability for "additional call and firefighter resident capacity" Def. Ex, A-69, and described research activities with multiple specialties. Def. Ex. A-68 at p. 2.

115.   On that same day, Dr. Benzinger responded that Weisman needed to decide whether he would remain in the Residency Program or leave because, if he stayed, taking research time before obtaining basic skills and knowledge as an anesthesiologist would not be appropriate. Dr. Benzinger advised Weisman that, if he had decided to leave, he should submit a resignation letter with whatever effective date he wanted and that his training could be modified so long as it was consistent with the governing rules. Ex. A67.

> **RESPONSE:** Plaintiff admits that the Defendants' email says what it says.

116.   Dr. Benzinger further expressly stated: "I saw that you perceive some sort of tie between your submission of a resignation letter and our provision of a recommendation letter. These are really independent events. Our department will provide you or any other resident the strongest letter of recommendation that we can. It's an obligation of any residency program." Ex. A67.

> **RESPONSE:** Plaintiff admits that Def Ex. A67 states this, but denies that it is true. Plaintiff was repeatedly told that he would be given a positive recommendation and assistance with a transfer. (Ex. 4, Pltf. Vol. 1 at p. 189:25-191:8, 193:2-4, Ex. 5, Pltf. Vol. 2 at pp. 561:10-563:5). Dr. Thompson told Plaintiff that he was "committed to supporting your application for whichever specialty you choose." (Ex. 36, JW58696). Plaintiff also denies that a recommendation letter is all that is involved in a transfer. The program is required to send a record of the resident's training and a summative evaluation. (Ex. 20, Drake Vol. 1 at pp. 60:11-14; and see Ex. 49, Kaye Dep. excerpt, 179: 18-23).

117.   Dr. Benzinger concluded by advising Weisman that he should consider staying in the Residency Program because his recent rotations "have gone reasonably well" and that research time could be accommodated in future schedules after his second clinical year of training. Ex. A67; Pl. Dep. 248:2-12.

**RESPONSE:**  Plaintiff admits that Benzinger sent the email.  Plaintiff Weisman denies that the email accurately summarizes the agreement reached in April 2018, which was that he would be given a positive  recommendation and assistance with a transfer.  (Ex. 4, Pltf. Vol. 1 at p. 189:25-191:8, 193:2-4, Ex. 5, Pltf. Vol. 2 at pp. 561:10-563:5).

118.    Also on April 5, Weisman emailed Dr. Benzinger "to ask for a positive program director letter" that he could send directly to other programs and commented that he "honestly enjoyed working" with Dr. Benzinger. Ex. A68; Pl. Dep. 251:23-252:19.

**RESPONSE:**  Admitted.

119.    On the morning of April 6, Dr. Benzinger responded that he understood that Weisman "would like this to be an iterated or negotiated process, but that's simply not the way these letters are produced" and stated he will "write the letter that I think can do the most good for you in your search." Ex. A68; Pl. Dep. 252:20-253:12.

**RESPONSE:**  Plaintiff admits that Dr. Benzinger sent the email but denies that it accurately summarizes the agreement reached in April 2018, which was that he would be given a positive  recommendation and assistance with a transfer.  (Ex. 4, Pltf. Vol. 1 at p. 189:25-191:8, 193:2-4, Ex. 5, Pltf. Vol. 2 at pp. 561:10-563:5).

120.    In the evening of April 6, 2018, Weisman submitted his formal resignation from the Residency Program effective the end of June, which is when he would have completed 24 months of training. Weisman further made a formal request to modify his training schedule so that he could finish the academic year doing research in the Radiology 3-D printing facility. Ex. A69; Pl. Dep. 253:17-254:9.

**RESPONSE:**  Plaintiff denies that his resignation was tendered "effective the end of June," as the exhibit shows that Plaintiff asked that the effective date of resignation "should fall between June 15th-July 15th and likely before July 1st. I would kindly ask that your office calculate the date." Def. Ex. A69. Plaintiff wished to ensure that the effective date of resignation reflect 24 months of training as "required for licensing in the state of Illinois." *Id.*  Plaintiff admits that there was an agreement reached in April 2018 that he would be given a positive  recommendation and assistance with a transfer.  (Ex. 4, Pltf. Vol. 1 at p. 189:25-191:8, 193:2-4, Ex. 5, Pltf. Vol. 2 at pp. 561:10-563:5).

121.    On April 7, 2018, Dr. Benzinger sent an email to Weisman which confirmed that the effective date of his resignation would be June 30 and stated he would discuss his training schedule modification with others. Benzinger Decl. ¶30; Ex. RB-28.

**RESPONSE:**  Admitted.

42

122.     Later on April 7, Dr. Benzinger informed Weisman that the Residency Program approved his request for research time through the effective date of his resignation with some general call duty. Ex. A70; Pl. Dep. 254:20-255:20.

**RESPONSE:**  Admitted.

"**G.     Letters to and Communications with Other Programs.**"

123.     In Dr. Cox's and Dr. Benzinger's experience, a resident seeking to transfer from a respected program is rare and could be viewed as problematic without a specific reason for the transfer such as a family issue, needing to be in certain location, or wanting to train in another specialty. Cox Dep. 56:12-57:2; Benzinger Dep. 29:11-24, 30:14-23. 33:4-8.

> **RESPONSE:**  Plaintiff only admits that this is the deposition testimony of Dr. Cox and Dr. Benzinger, but denies that the paragraph states a fact as the testimony is a self-serving opinion asserted by the Defendants.

124.     Dr. Cox advised Weisman that "programs are often very reticent to accept transfers from other programs without any plausible explanation for that transfer." Cox Dep. 58:11-25.

> **RESPONSE:**  Plaintiff only admits that this is the deposition testimony of Dr. Cox, but denies that the paragraph states a fact as the testimony is a self-serving opinion asserted by a Defendant.

125.     In June 2018, at the request of Weisman, Dr. Benzinger sent virtually identical recommendation letters to the University of Chicago and Cook County Hospital. Exs. Benzinger 39, Benzinger 41; Benzinger Dep. 278:25-280:15, Pl. Dep. 260:1-11.

> **RESPONSE:**  Plaintiff admits that the letters were sent, but denies that he requested that "virtually identical" letters be sent.

126.     Weisman has admitted that there was nothing false in Dr. Benzinger's letters, other than offering to have a call with the other programs. Pl. Dep. 264:7-265:2, 283:9-285:11.

> **RESPONSE:**  Plaintiff denies that he stated there was "nothing false" in these letters. The deposition pages cited by WU contain no such statement from Dr. Weisman. To the contrary, as stated at p. 285 of Plaintiff's deposition he learned that the letter to the University of Chicago was undercut by Defendant Dr. Thomas Cox who bragged to Dr. Benzinger on April 27, 2018 that he had talked to Dr. Klafta and Dr. Nagele of the University of Chicago and shared "some of Jeff's history 'off the record' . . ."  (Ex. 37, Cox email to Benzinger).  Similarly, the Defendants undercut whatever good will was in the Program Director letter to Cook County by the author, Dr. Benzinger,

inviting the recipient, Dr. Nasr, to "call me." (Ex. 38, Benzinger email to Nasr). Plaintiff, and Dr. Kaye, later learned what transpired on the phone. (Ex. 4, Pltf. Vol. 1 at p. 285: 15-17: "I received an e-mail from Alan Kaye, and I called -- or he talked with me about the fact that he had a meeting with Ned Nasr at a conference and asked him why he wouldn't take me. And Ned Nasr told Alan Kaye that he heard negative things."; Ex. 39, Kaye excerpt, at p. 81:16-18: "he [Nasr] called up the program director [Benzinger] and he [Nasr] conveyed to me that he [Nasr] had gotten a negative evaluation on Dr. Weisman").

127.    Dr. Cox believed the letters were accurate and generously described Weisman's difficulties in a positive way. Cox Dep. 144:2-23.

**RESPONSE:** Plaintiff denies that this statement is a fact. It is a self-serving opinion made by a Defendant. See ¶ 126.

128.    Dr. Thompson believed the letters were positive under the circumstances. Thompson Dep. 122:10-14.

**RESPONSE:** Plaintiff denies that this statement is a fact. It is a self-serving opinion made by an agent of Defendant WU. See ¶ 126.

129.    Dr. Benzinger subsequently spoke with Dr. Ned Nasr at Cook County Hospital and stated that his letter was accurate and that Weisman was likely to be successful with clinical training that was not compressed like in the Residency Program's ASAP program. Benzinger Dep. 313:18-25.

**RESPONSE:** Plaintiff denies the allegations of paragraph 129. Dr. Benzinger orally conveyed negative information to Dr. Nasr: "I received an e-mail from Alan Kaye, and I called -- or he talked with me about the fact that he had a meeting with Ned Nasr at a conference and asked him why he wouldn't take me. And Ned Nasr told Alan Kaye that he heard negative things." (Ex. 4, Pltf. Vol. 1 at p. 285: 15-17, and Ex. 39, Kaye, p. 81:16-18: "he [Nasr] called up the program director [Benzinger] and he [Nasr] conveyed to me that he [Nasr] had gotten a negative evaluation on Dr. Weisman."); Benzinger invited Dr. Nasr to call him directly on his cellphone regarding Dr. Weisman's transfer application. Ex. 38 ("If you'd like to talk about him directly, please feel free to call me. My cell is [ ]")). Dr. Nasr decided to take "somebody with zero anesthesia experience, which would be unheard of where I had done a year and passed my boards." (Ex. 4, Pltf. Dep. 202: 10-12).

130.    Dr. Cox spoke briefly with Dr. Jerome Klafta with the University of Chicago at a conference. In response to Dr. Klafta's statement that it looked like Weisman struggled and that

anesthesiology was not a good fit and his question of whether Weisman would finish the year in good standing, Dr. Cox stated that he believed he was going to finish in good standing and that he was doing research. Cox Dep. 153:21-155:25, 156:14-157:7, 158:6-13, 160:1-8.

> **RESPONSE:**   Denied. The letter to the University of Chicago was undercut by Defendant Dr. Thomas Cox who bragged to Dr. Benzinger on April 27, 2018 that he had talked to Dr. Klafta and Dr. Nagele of the University of Chicago and shared "some of Jeff's history 'off the record' . . ."  (Ex. 37, Cox email to Benzinger, and Ex. 4, Pltf. Dep. Vol. 1 at pp. 264:23 - 265:18).

131.    Weisman testified that he "strongly suspected" and was "relatively certain that something negative occurred" in a conversation between Dr. Thompson and Dr. Nagele with the University of Chicago. Pl. Dep. 269:7-13.

> **RESPONSE:**  Plaintiff admits that he eventually came to these conclusions.

132.    After Weisman left the Residency Program on June 30, 2018, and after Dr. Thompson became the Program Director (Dr. Benzinger left the role on June 30 after 7 years), the Residency Program received requests from other residency programs and from Dr. Weisman to provide information relating to his training. Benzinger Dep. 69:14-20; Thompson Dep. 87:14-88:20, 123:1-7; Gibson Decl. ¶5; Ex. L-2.

> **RESPONSE:**  Admitted.

133.    The Residency Program complied with all of these requests and sent the letters or materials, except for a request from Weisman to send his entire file to LSU-Shreveport, which the Residency Program viewed as unnecessary, burdensome and inappropriate. Thompson Dep. 57:10-23, 59:10, 87:14-88:20, 125:16-126:9; Gibson Dep. 26:1-27:15, 31:17-33:16; Drake Dep. 56:23-57:24, 58:25-59:9. Instead, and with Weisman's knowledge, Dr. Thompson provided official ACGME summative milestone reports and ABA training records. Thompson Dep. 125:16-126:9, 136:21-25, 139:5-21; Thompson Ex. 12 at WU695; Gibson Dep. 33:9-16; Gibson Decl. ¶6; Ex. L-3.

> **RESPONSE:**  Plaintiff denies the allegations of paragraph 133 or that "official ACGME summative milestone reports" exist. Milestone evaluations are not a summative evaluation and WU knew this in 2018.  (Ex. 20, Drake Vol. 1, at p. 15:21-17:2, 74:23-76:5), and even Dr. Thompson has admitted this: on September 23, 2020, he responded to a request for Dr. Weisman's Summative Evaluation from Dr. Daniel Bakston of the University of Illinois at Chicago by stating: "[p]lease find attached the milestones report for Dr. Weisman.  *There is no summative evaluation for Dr. Weisman*."  (Ex. 40, JW64629) (emphasis added).   Dr. Benzinger also knew what a summative evaluation was: "I plan to communicate the following to [Dr. Weisman]:

--According to ABA regs, you'll get a ***summative evaluation*** for whatever part of this 6-month block you are enrolled.
--If you send us a letter of resignation, the situation will be clarified. We will consider
accommodation in your block schedule to help your future ambitions, if consistent with general
requirements for anesthesia residents. (ie: we'll take you out of the ICU if you want.)
--If not, we will continue to proceed under the expectation that you will graduate, and the
schedule stands.

And we'll give him the ***summative letter***."

(Ex. 45, February 20, 2018 email, WU0461)(emphasis added).

Dr. Thompson stated when the ACGME investigated Plaintiff's January 2022 complaint that no summative evaluation had been generated (Ex. 20, Drake, at p. 15:3-16) that "I will argue given we knew he was not advancing that a summative eval was not needed."  (Ex. 46, email WU3987 and Ex. 20, Drake Vol. 1 at pp. 97:16-100:7).

Later, in accord with representations made to this Court in Dkt. 179, Thompson testified at deposition that he "did not know" before September 2021 that a Summative Evaluation was required to be generated for persons transferring or graduating from the program, (Ex. 41, Thompson Dep. at pp. 29:9-20), that for Dr. Weisman the program sent what it believed sufficed, *Id.* at p. 165:12-13, and that it sent the milestone evaluation "in lieu" of the summative evaluation.  *Id.* at pp. 143:8-13. But WU also claims, discovery has shown, that the stated reason that no Summative Evaluation was generated for Dr. Weisman was because they "did not know" that Plaintiff was seeking to transfer to another training program and they did not "feel" that one was needed.  (Ex. 20, Drake Dep. Vol. 1, at pp. 24:13-25:12, 28:11-15, and 28:16-29:17).  This despite the fact that Dr. Weisman told Tia Drake in August 2018 that he was trying transfer to other anesthesia residency programs (*Id.* at 30:21-25 and 32:24-33:5), and despite the fact that WU sent Program Director letters to the anesthesia residency programs at the University of Chicago on June 6, 2018 (Ex. 42, WU1989-90), Cook County Hospital on June 26, 2018 (Ex. 43, WU1986-87), and LSU Shreveport on November 28, 2018. (Ex. 44, email and attachments from Dr. Thompson sent November 28, 2018).

The WU/BJH Consortium knew at all times that a summative evaluation was required for a resident transferring, should have been sent in 2018, and even had a standard form for the process since November 2011, (Ex. 20, Drake Vol.1 at pp. 74:19-75:10, 93:11-96:10, and see Ex. 47, Drake Ex. 7).

An associated release of records authorization applied to transfers "within the GME Consortium or from an outside institution" and instructed the "current program" to forward the form to the new program "with the verification of previous education experiences and summative competency based performance evaluation as outlined in the ACGME Common Program Requirements IIIC." (Ex. 48, Drake Ex. 8, authenticated at Ex. 20, Drake Vol. 1, pp. 79:18-81:15). The ACGME has always required that, among other things, a summative evaluation of the residents six core competencies throughout the residency be forwarded to a new program on transfer or prepared at the end of residency. (Ex. 20, Drake Vol. 1, at pp. 13:19-14:10 and 63:5-64:10). The WU/BJH Consortium knows that milestones are not a summative evaluation. (Ex. 20, Drake, Vol. 1, at pp. 15:21-17:2, 75:23-76:5).

134. The letters Dr. Thompson sent to other programs was a revised version of Dr. Benzinger's letter, and Weisman's own proposed expert testified that it was a "good reference letter." Thompson Dep. 137:1-138:3; Kaye Dep. 185:22-25.

> **RESPONSE:** Plaintiff admits that Dr. Kaye thought that the letter itself was "good," as far as it goes but denies that a Program Director letter is sufficient to enable a transfer (Ex. 49, Kaye, at pp. 179: 18-23). Plaintiff further denies that Dr. Thompson gave a "good" recommendation because, among other things, Plaintiff produced to Defendants in discovery in this case on December 1, 2021, recordings of two conversations Plaintiff had with Dr. Patil on November 16, 2018 in which Dr. Patil stated that she had spoken with Dr. Thompson at WU, that she did not know what "big thing had happened there" but that Dr. Thompson did not want to talk and told her to talk to "the lawyers," and that he referred her to "the attorney." She said this was a "red signal" and that "the way they talked to me on the phone I almost passed out, like literally," and that I had given her more documents than WU had." (Ex. 1 at ¶ 26).

135. No residency program to which Weisman inquired about a spot ever requested a "summative evaluation" from the Residency Program. Drake Dep. 71:21-72:3, 113:6-10; Gibson Decl. ¶7.

> **RESPONSE:** Plaintiff denies the allegations in paragraph 135. Despite Gibson's sworn testimony on ¶ 7 of her Declaration, she testified that a Summative Evaluation was requested by the University of Chicago on Dr. Weisman on June 6, 2018. (Ex. 28, Gibson Dep. at p. 9:16-25). In fact, WU's testimony is not that no program requested a summative evaluation but that they sent what they "thought" was a summative evaluation, (Ex. 41, Thompson Dep. at pp. 165:12-13), even though it knew that milestones are not a summative evaluation. (Ex. 20, Drake Vol. 1, at p. 15:21-17:2, 75:23-76:5), *and* Dr. Thompson also stated when the ACGME investigated Plaintiff's January 2022 complaint that no summative evaluation had been generated (Ex. 20,

Drake, at p. 15:3-16) that "I will argue given we knew he was not advancing that a summative eval was not needed."  (Ex. 46, email WU3987).

The Drake deposition pages cited by WashU in paragraph 135 do not show that no programs requested a summative evaluation. Other evidence establishes unambiguously that they did. In 2018 Dr. Shilpadev Patil requested Dr. Weisman's summative evaluation from WU but never received one. (Ex. 50, Patil Declaration).  Further, on September 23, 2020, Dr. Thompson responded to Dr. Daniel Bakston's request on behalf of the University of Illinois at Chicago for Dr. Weisman's "final summative evaluation" by stating that "[t]here is no summative evaluation for Dr. Weisman." Ex. 28, JW64629, but he sent the milestone summary. (Ex. 40, WU2931-2934).  Every medical residency program requires a summative evaluation for transfer residents. (Ex. 20, Drake Vol. 1 at pp. 60:11-14; and see Ex. 49, Kaye Dep., 179: 18-23: "[t]here was no summative performance-based evaluation given to any program that he tried to transfer to. And I think that is not only a form of harassment, it's egregious and I think that it made it impossible for him to transfer.").  On August 29, 2018, Dr. Weisman emailed Dr. Thompson a summative evaluation form that Harvard wanted completed (Ex. 51, email chain with form Harvard asked for). Dr. Weisman emailed this form to Thompson on August 29, 2018 and requested that he complete and send it to Harvard, to which Thompson responded, "Got it thanks". (Ex. 51 at JW00058123). On October 22, 2018, Harvard official Ann Backus informed Dr. Weisman via email that his application "is still missing on [sic] evaluation." (Ex. 1-27, JW00058965.

136.    In December 2018, Dr. Evers spoke with Dr. Roberta Hines with Yale University about Weisman. Dr. Evers told Dr. Hines that Weisman was a resident and that he voluntarily resigned and that was all he wanted to say. When Dr. Hines continued to press for additional information, Dr. Evers merely stated that if she wished to "read between the lines" she could do so, but that he was not going to provide further details. Evers Dep. 92:4-93:10, 127:11-14.

**RESPONSE:**  Plaintiff admits the allegations of paragraph 136, but denies that it fairly and completely represents the exchange.  Dr. Evers told Dr. Hines to "just say no" when asked about Dr. Weisman application to transfer. (Ex. 1-28, excerpts of Yale Subpoena response at YALE000031).

137.    Dr. Evers believed that a fully transparent and candid evaluation would have been damaging to Weisman. Evers Dep. 125:12-126:15.

**RESPONSE:**  Plaintiff denies the allegations of paragraph 137 as they do not state a fact but are instated a self-serving opinion expressed by a Defendant during the pendency of this litigation, but admits that Dr. Evers gave Dr. Weisman no assistance in transferring programs.  (Ex. 14, Evers, at p. 102:6).

138.     Dr. Thompson does not recall the specifics of a telephone (sic) with a Dr. Macario from Stanford University. Thompson Dep. 88:21-89:24.

**RESPONSE:** Admitted.

139.     Weisman was informed by the University of Chicago that the GME Office "denied adding a seat." Pl. Dep. 277:17-278:8; Ex. A80.

**RESPONSE:** Admitted.

140.     Dr. Ned Nasr with Cook County Hospital emailed Weisman that the program "elected to go with a CA-1 resident yesterday instead of an advanced position for various reasons." Pl. Dep. 290:9-291:13; Ex. A83.

**RESPONSE:** Admitted.

141.     Weisman himself characterized LSU Shreveport as not giving him a promised seat without referencing any statement by the Residency Program and stated he had been burned twice by that program. Pl. Dep. 203:16-204:16; Ex. A29.

> **RESPONSE:** Plaintiff denies the allegations of paragraph 141.  Plaintiff produced to Defendants in discovery in this case on December 1, 2021, recordings of two conversations Plaintiff has with Dr. Patil on November 16, 2018 in which Dr. Patil stated that she had spoken with Dr. Thompson at WU, that she did not know what "big thing had happened there" but that Dr. Thompson did not want to talk and told her to talk to "the lawyer," he referred to "the attorney."  She said this was a "red signal" and that "the way they talked to me on the phone I almost passed out, like literally" and that I had given her more documents than WU had.  (Ex. 1 at ¶ 26).

142.     Weisman testified that he spoke with Dr. Patil with LSU Shreveport about communications she had with the Residency Program, but "she was not very forthcoming," and "only gave pieces of the conversation that she [had]," and Weisman "believe[d]" she had spoken with Dr. Thompson. Pl. Dep. 208:17-210:4. Weisman further testified that Dr. Fox referenced Dr. Thompson "saying things about lawyers," and that Dr. Patil "roughly" referenced an unnamed person telling her something "terrible" and to talk to lawyers. Pl. Dep. 200:21-201:4, 205:5-13.

> **RESPONSE:** Plaintiff objects to the piecemeal misrepresentation of his testimony.  Plaintiff testified, roughly summarizing his conversation with Dr. Patil, the Program Director of LSE Shreveport's Anesthesiology Residency Program that she said she spoke with Dr. Thompson and that he would not give her any documents and said "talk to the lawyers." (Ex. 4, Pltf. Dep. Vol. 1 at pp. 204:20-205:13).  In fact, Plaintiff produced to Defendants in discovery

in this case on December 1, 2021, recordings of two conversations Plaintiff had with Dr. Patil on November 16, 2018 in which Dr. Patil stated that she had spoken with Dr. Thompson at WU, that she did not know what "big thing had happened there" but that Dr. Thompson did not want to talk and told her to talk to "the lawyer," he referred to "the attorney." She said this was a "red signal" and that "the way they talked to me on the phone I almost passed out, like literally." (Ex. 1 at ¶26).

143.     Dr. Thompson did not speak with Dr. Patil by telephone and sent her one e-mail at Weisman's request regarding documents, but it bounced back to him. Thompson Dep. 61:16- 62:4, 66:17-20.

> **RESPONSE:**  Plaintiff denies the allegations of paragraph 143.  Dr. Thompson spoke to Dr. Shilpadevi Patil,  in November 2018 and told her that he could not talk to her and that she had to talk to the lawyers.  (Ex. 1 at ¶26).

144.     Dr. Thompson would communicate with counsel about liability and legal questions regarding residents and did communicate with counsel regarding communications with a third party regarding Dr. Weisman. Thompson Dep. 73:4-74:4, 77:7-25; Thompson Ex. 12 at WU700.

> **RESPONSE:**  Plaintiff objects to the relevancy of this paragraph.  It is immaterial what WU/ BJH staff Thompson communicated with regarding Dr. Weisman internally.

145.     Weisman testified that Dr. Kaye informed Weisman that Dr. Nasr with Cook County said he "just heard some things from Wash U. about you." Pl. Dep. 202:2-24.

> **RESPONSE:**  Admitted, and discovery has shown what those were.

146.     Weisman also testified that family friends informed him that they had spoken with either Dr. Troianos or Argalious with the Cleveland Clinic, and it was his understanding that Dr. Evers said "negative things about me" and "that seemed to be what was being told to me." Pl. Dep. 288:2-289:7.

> **RESPONSE:**  Plaintiff denies that this is the only evidence of WU/BJH interfering with his transfer.  See ¶¶ 123-144 above, incorporated herein as if fully set forth.

## "H.     Weisman's Current Status"

147.     Weisman completed a residency in occupational and environmental medicine at the University of Illinois Chicago in June 2021. Pl. Dep. 33:9-15.

> **RESPONSE:**  Admitted.

148.   Weisman is employed at the Hampton Veteran Affairs Medical Center as the Director of Employee Health and has an annual salary of $237,000. Ex. B2 at 20.

**RESPONSE:** Admitted.


149.   Weisman is still actively trying to seek an anesthesiology residency and admitted that he expected the University to "honor the agreement of giving me a good reference" up to the present day. Pl. Dep. 39:10-22, 192:24-194:19.

**RESPONSE:** Admitted.


## PLAINTIFF'S L.R. 4.01 STATEMENT OF ADDITIONAL FACTS

Plaintiffs, JEFFERY WEISMAN and STRATEGIC BIOMEDICAL, by counsel, Moor

Law Office, P.C., respectfully states, pursuant to L.R. 4.10(E) the following additional facts in

opposition to the Motion for Summary Judgment filed by the WASHINGTON UNIVERSITY

DEFENDANTS:

150.   The "*Washington University Physicians are the medical staff of Barnes-Jewish Hospital and St. Louis Children's Hospital.*" https://physicians.wustl.edu/people/alex-s-evers-md/ (emphasis added) (at bottom of page: last accessed March 30, 3023).

151.   The Washington University School of Medicine, Department of Anesthesiology, pursuant to the Graduate Medical Education Consortium Operating Principles ("GME Operating Principles") also exercised control over Dr. Weisman's vacation time, rotation schedule, and working hours at BJH. (See Benzinger Dep. Ex 5, Dkt. 269-23 at pp. 4-6, 21 and 23;  and see, for example, Ex. 1, Weisman Declaration authenticating Ex. 1-1, JW13350, Benzinger email of 2-6-18 to all Anesthesiology residents regarding vacation time, and Ex. 1-2, JW033883, Benzinger email of 7-26-16 regarding duty hour logs, attached and admissible as admissions of party opponent).

152.   The Washington University School of Medicine's Dept. of Anesthesia (hereinafter "WU") solely supervised Plaintiff's academic performance in clinical rotations (Ex. 2 Mouser at pp. 12:1-22 and 13:18-14:15) as provided in the Memorandum of Appointment at Section 17 (See Ex. 3A, Benzinger Dep. Ex. 5, at pp. 10-11).

153.   WU also oversaw Anesthesia residents' hours of service, working conditions, salaries: at Def. Benzinger Dep. Ex. 5, Dkt. 269-23, the GME Operating Principles state:

Par. VI.C of Consortium agreement: "The GMEC will establish policies and procedures pertaining to the quality of education and work environment for the residents related to but not limited to supervision, selection, evaluation, promotion, dismissal, duty hours, duty hour extensions, and moonlighting of residents and clinical fellows." Par. VI.E of Consortium Agreement: The GMEC will establish policies and procedures for dealing with grievances brought forward by residents or clinical fellows… Par. VI.F of Consortium Agreement: The GMEC will review and approve the annual proposal for salary ranges and benefits for all residents and clinical fellows.  Par. VI.H of Consortium Agreement: The GMEC will review and approve any proposal to substantially alter the working conditions for residents and clinical fellows including benefits before they are enacted.

(GME Operating Principles, at p. 4-5)

If Barnes-Jewish Hospital cut the salary checks and provided lab coats (Ex. 2, Mouser, at pp. 5:8-10) it was done under the auspices of the "Consortium" which included WU.  (Ex. 3A, Def. Benzinger Ex. 1, Memorandum of Appointment at pp. 1-2).

154.   Plaintiff was not told when his residency started that he could not conduct research concurrently with his residency from its initiation. (Ex. 4, Pltf Dep. Vol. 1 at pp. 44:24-45:25, 46:1-15, 66:12-67:17, and Ex. 5, Pltf. Dep. Vol 2 at p. 544:4-10). Plaintiff was introduced to the Saint Louis College of Pharmacy ("STLCOP") by Dr. Evan Kharasch of the WU Department of Anesthesiology by Dr. Evers in May 2016, was invited to establish space in a building STLCOP owned on a floor that also housed  the Department of Anesthesiology's Center for Pharmacology, and he told the STLCOP and Dr. Kharasch that he would move SBI into that space also occupied by the Department of Anesthesiology's Center for Pharmacology and commence research and commercialization of bioactive 3-D printing material immediately, (Dkt. 268-17, Def. Ex. E8, May 14, 2016 email and Executive Summary at pp. 3-5; Ex. 4, Pltf Dep. Vol. I, at p. 78:7-12), which is what he did, (Ex. 5, Pltf Dep. Vol. 2, at pp. 570:19-571:15, 572:16-573:4), after Dr. Evers directed Plaintiff to Dr. Kharasch.  (Ex. 4, Pltf Dep. Vol. I at pp. 69:24-71:7).

155.   Dr. Weisman was courted by WU because he was an M.D.-Ph.D. with a research lab that had performed innovative research.  (Ex. 4, Pltf. Dep. Vo1. 1 at pp. 44:5-46:25, and 66:17-67:5; Ex. 5, Pltf Dep. Vol. 2 at p. 544:4-10).  Further, on a post-interview form, Cox stated that Dr. Weisman's clinical achievements and potential were "acceptable" and that his academic achievements and research productivity were "unusually productive." (Ex. 6, WU0058).  In fact, Plaintiff had received a glowing recommendation from LSU. Material in WU's file shows this:

WU000039 (Ex. 7), is a letter from Dr. Charles Fox, Chair of LSU Medical School's Department of Anesthesiology stating, in part, that [Dr. Weisman] has already achieved incredible regionally and nationally...will no doubt become a tremendous asset for our specialty.  Excellent demeanor for the operating room and will easily handle the daily "stressors."

WU0040 (Ex. 8) is a letter from Dr. Jay Marion, Chairman of LSU Medical School's Department of Medicine ("[Dr. Weisman] performed well during his clinical clerkship rotations and he received favorable evaluations by his instructors.").

WU0041-WU0042 (Ex. 9), is a letter from Dr. Robert A. Barish, Chancellor of LSU Medical School ("[Dr. Weisman] has a true leadership ability and will make an outstanding resident").

WU00030-WU00033 (Ex. 10), is an LSU Dean's Letter praising Dr. Weisman.

156.    Dr. Benzinger wrote Plaintiff on January 26, 2016 stating "You have a great academic record, and the faculty who spoke with you during your visit were very impressed with you, as well. We think that your abilities and interests would be a good match with the clinical and research training that we offer in our department, and we would be very excited to have you as a resident." (Ex. 11, JW00036100-01). Benzinger's post-interview assessment credited Dr. Weisman with "average potential of a resident in our department" under the category "Clinical achievements and potential," (Ex. 12, WU0059), and did not click the other boxes that would have scored Dr. Weisman as being "Below-average but acceptable" or "inadequate clinical skills for consideration."

157.    Plaintiff's past academic performance was not a basis for his recruitment to WU. The Plaintiff was courted by WU because he was an M.D.-Ph.D. with a research lab that had performed innovative research.  (Ex. 4, Pltf. Dep. Vo1. 1 at pp. 44:5-46:25, and 66:17-67:5; Ex. 5, Pltf. Dep. Vol. 2 at p. 544:4-10; Ex. 1-3, November 2015 email with Benzinger regarding grants for Plaintiff's technology group;  Ex. 1-4, December 2015 email exchange with Dr. Peter Nagele of the WU Department of Anesthesia concerning conducting research projects while doing clinical research and IP work).

158.    It was well known that Plaintiff's research activities was the basis of his recruitment to WU.  (Dkt. 268-17, D. Ex. E8, May 14, 2016 email and Executive Summary at pp. 3-5; Ex. 4, Pltf Dep. Vol. I, at p. 78:7-12; Ex. 5, Pltf. Dep. Vol. II, at pp. 570:19-571:15, 572:16-573:4; Ex. 4, Pltf. Dep. Vol. I at pp. 69:24-71:7; Ex. 13, Sinow Dep. at pp. 71:5-20, 99:21-101:13, and 237:15-238:1).

159.    On November 18, 2015, Dr. Weisman emailed Dr. Benzinger stating that "[a] large part of the reason my group has been successful with technology developments has been a great working relationship with the grants administrator's and technology

transfer officers. They are really important members of the team. I will email Jonathan some questions but mainly just looking to find out some of the logistics and policies at your center such as the ability to transfer equipment, CRADA partnerships and some SBIR/STTR grants that I will have pending in the spring." (Ex. 1-3, JW00036098 – JW00036099, and see Ex. 4, Pltf. Dep. Vo1. 1 at pp. 44:5-46:25, and 66:17-67:5; Ex. 5, Pltf. Dep. Vol. 2 at p. 544:4-10; Ex. 14, Sinow Dep. at pp. 237:20-238:1).

160. In December 2015 Plaintiff had an email exchange with Dr. Peter Nagele of the WU Department of Anesthesia concerning conducting research projects while doing clinical research and IP work. (Ex. 1-4, JW41439). On February 14, 2016, Dr. Evers called the Plaintiff to state that WU wanted Plaintiff's lab at WU. (Ex. 4, Pltf. Dep. Vol. 1 at p. 66:20-67:5).

161. After Dr. Evers directed Dr. Weisman to Dr. Kharasch about his research and lab, (Ex. 4, Pltf. Dep. Vol. I at pp. 69:24-71:7), Plaintiff emailed Dr. Kharasch on March 29, 2016 regarding "the prospects for moving the lab to the Center for Clinical Pharmacology. (Ex. 1-5, JW00036344). Dr. Kharasch responded by stating that "I will do some diligence on the company relocation to The Center." *Id.* Dr. Kharasch was the director of Center for Clinical Pharmacology from 2015 and also directed the Anesthesiology Department's Division of Clinical and Translational Research. (Ex. 14, Evers Dep. at p. 154:9-25, and Ex. 15, Center for Pharmacology Press Release).

162. On July 5, 2016 Dr. Weisman emailed Sharon Stark, the Anesthesia Program Coordinator and administrator for Dr. Benzinger stating: "I'm bringing in some faculty or consultants for the projects at the STLCOP-WUSTL pharmacology center, do we have a department rate or code at the Park Way hotel." (Ex. 1-6, JW0036218). Dr. Benzinger testified that he was aware that Plaintiff had a company when he applied to the program. (Ex. 3, Benzinger, at pp. 301:22-302:1).

163. The space SBI rented from STLCOP was on the same floor and immediately adjacent to the Department of Anesthesiology's Center for Clinical Pharmacology, operated by Dr. Evan Kharasch of the WU Department of Anesthesiology. (Ex. 16, Fleischmann Dep. at pp. 11:23-13:3).

164. STLCOP is a separate school from WU, but it is affiliated with WU's Department of Anesthesiology through the Center for Clinical Pharmacology is a joint venture between STLCOP and the Department of Anesthesiology and is housed in a building owned by STLCOP pursuant to a Memorandum of Understanding that gave WU Anesthesiologists secondary appointments in the STLCOP. (Ex. 16, Fleischmann, at pp. 11:23-24 and 12:1-13). Dr. Kharasch had such a secondary appointment in STLCOP. (Ex. 15, News Release: "Faculty at the Center will have academic appointments in both institutions").

165.     Dr. Evan Kharasch of WU's Department of Anesthesiology introduced Plaintiff to STLCOP's general counsel (Ex. 16, Fleischmann, at pp. 8:22-9:16) and investigated whether Plaintiff's Lab could be part of the Center for Clinical Pharmacology. (Ex. 1-5, JW00036344). Further, Plaintiffs worked with faculty in the Department of Anesthesiology on their research project, including Dr. Nagele, after the residency started. (Ex. 1-7, JW00031208; Ex 1-8, email re: collaborative study with Dr. Choa).

166.     Residents not on the ASAP track perform anesthesia tutorials during the PGY-1 year that involves following a senior anesthesia resident, (*see* Ex. 17, WU explanation of intern year (PGY-1), from https://anesthesiology.wustl.edu/education/residency/training-programs/categorical-advanced-programs/ (last accessed 3-26-22).  Plaintiff was denied that experience in his PGY-1 year as of June 20, 2017, (See Ex. 1-9 JW00059185-59186, and Ex. 18 WU2942), and did not have it until July 1, 2017. *Id.*

167.     Rotation evaluations should not vary significantly among evaluators for the same resident on the same rotation.  (Ex. 19, Kaye Dep. excerpts at pp. 143:3-16 and 145:19-23).

168.     All rotations evaluations should be objective. (Ex. 20, Tia Drake Dep. Vol 1. at p. 34:18-24 and Ex. 21, Drake Dep. Ex. 28, Common Program Requirements, at p. 13, V.A.2.b).(1)) authenticated at Ex. 20, Tia Drake Vol 1. at pp. 66:6-8).

169.     Residency is a learning process. (Ex. 22, Szabo Dep. at pp. 16:18-17:11, Ex. 23 Kaye Dep. excerpts 138:19-25).

170.     There are always examples of residents who are involved in mishaps, there are always errors that will occur because bad things happen to people, and bad things happen to good doctors. (Ex. 14, Evers, at pp. 248:19-23, 250:17-25, and 252:18-23).

171.     Ruben Johnson's Emergency Medicine June 21-30, 2016 evaluation is not an evaluation of the Plaintiff's entire Emergency Medicine Rotation which ran from June 21, 2016 to July 24, 2016. (See Ex. 1-9, JW00059185 at bottom of page and Ex. 18, WU2942).

172.     As to Ruben Johnson's Emergency Medicine evaluation. Dr. Weisman stated, "this evaluation doesn't match what I was told in person, and when they were filling forms out about me." (Ex. 4, Pltf. Dep. Vol. 1 at pp: 75: 21-23).

173.     The evaluation form submitted by Reuben Johnson covering Plaintiff's first week assigned an overall rating above the minimal "passable" rating allowed by the program. (Def. Ex. A14, Dkt. 268-21).

174. Defendant has never produced, and Plaintiff never received, a final evaluation for his first Emergency Medicine rotation but WU told the FCVS that he completed PGY-1.  (Ex. 1-10, at JW43491).

175. Plaintiff performed at the "Expected Level" for a PGY-1 resident in his ICU rotation in August 2016.  (*See* Def. Ex. RB-2 at Dkt. 269-45).

176. Plaintiff's overall evaluation for the 2016 ICU rotation in his first year, PGY-1, was rated "below expectations," but all of the line item evaluations were scored at "Level 1" which is defined on the form as the "expected level for PGY-1" and "below expectations" is a passing score as it is above "unsatisfactory." *See* Def. Ex. RB-2 at Dkt. 269-45.

177. Dr. Benzinger has no memory of the contents of an August 25, 2016 meeting with Plaintiff. (Ex. 3, Benzinger Dep. at  p. 179:15-17 ("I can't remember"), and pp. 194:24-25 ("I don't have any specific memory of the meeting, so I don't know").

178. Plaintiff's final 8-22-16 to 9-18-16 Cardiology Rotation evaluations from the Attending Physicians Geltman and Vader (Ex. 24 at WU3087-3089 and WU3090-WU3092) were passing, most items scored at "Expected PGY 1 Level" with Dr. Geltman writing: Jeff is a delightful house officer who is working hard to adapt to a very busy service with complex and challenging patients.  He has trouble setting priorities and efficiently dealing with competing priorities. He has been responsive to the direction of his resident, who has been extremely supportive and providing substantial guidance." (Ex. 24 at WU 3089).

179. The rotation following the cardiology rotation was Emergency Medicine. Dr. Weisman was reported in all categories to be doing as well as other residents and the Attending wrote: Strengths: Great to work with. Enthusiastic. Eager to follow up on things. Great job picking up multiple pts and team player. Reliable and hardworking. Solid attention to detail. Very thorough job. Good H&Ps. Motivated to see pts and has good initial plans. Quiet but competent. Could improve on: Going forward, I would recommend expanding his ddx and considering more focused plans to rule out emergent conditions. Struggled in TCC. Had difficulty making decisions and did not consistently place orders and follow them (though was eager to see pts and learn). Did get more comfortable throughout his rotation to make better plans. Work on improving and prioritizing differentials (what do you want to work up and why?) - also, work on more timely tests/treatments. (Ex. 1-11, JW63756-58).

180. Attending physicians Donnelly and Sadiq commented, regarding Dr. Weisman's performance on the October 17 to November 13, 2016 Cardiothoracic ICU rotation, "this unit is not a fair unit for interns to be graded on. I would have flunked horribly in this unit if I was an intern." (Ex. 25, WU3880).  Further, WU represented to the American Board of Anesthesiology that Plaintiff received full credit for this rotation, (Ex. 1-12, ABA records at p. WU071), and to the Federation Credentials

Verification Service that Plaintiff had successfully completed two years of his anesthesiology residency. (Ex. 1-10, FCVS subpoena response at pp. 20-21, JW043490-93).

181.  Defendants represented to the American Board of Anesthesiology that Plaintiff received full credit for his CT ICU rotation, (Ex. 1-12, ABA subpoena response at p. WU0711), and to the Federation Credentials Verification Service that Plaintiff had successfully completed two years of his anesthesiology residency. (Ex. 1-10, FCVS subpoena response at pp. 20-21, JW043490-93).  Further, Plaintiff is recorded as passing this rotation, though performing below expectations, by a Dr. De Wet a year later in June 2017. (Ex 1-13).

182.  Plaintiff denies that there is any objective basis for Dr. Benzingers statement that he failed his internal medicine rotations.  His statement is contradicted by Dr. LaRossa's ratings and what she  actually wrote: "I enjoyed working with Jeff on inpatient medicine. He was a hard worker and took excellent care of his patients. Appreciated his dry sense of humor..."   In addition to praising Dr. Weisman, Dr. LaRossa rated him at "expected PGY1 level" on each and every aspect evaluated. (Ex. 1-14, JW00056613-JW56614, *and see* Def. Ex. Benzinger 3, Dkt. 269-22 at WU3097-3099).

183.  Dr. Loden's evaluation, in which she, though making no comments, rated Dr. Weismann as performing at "the Expected PGY-1 Level" on every point assessed. (Ex. 1-15, JW56616-18, *and see* Def. Ex. Benzinger 3, Dkt. 269-22 at WU3094-3094).

184.  In Internal Medicine every evaluation was satisfactory.  Dr. McGill, as with Dr. Loden and Dr. LaRossa, ranked Plaintiff as performing at the "Expected PGY-1 Level" on every point assessed and wrote: "Dr. Weisman was a capable intern and team member.  He performed well with a variety of situations, utilized resources when needed.  As most interns, he is still on the learning curve, but has a high level of curiosity and interest. I enjoy working with Dr. Weisman." (Ex. 1-16, JW56610-12, *and see* Def. Ex. Benzinger 3, Dkt. 269-22 at JW56610-12).

185.  The official minutes of the January 11, 2017 CCC meeting state, "All members of the PGY-1 class have ***satisfactorily*** met all of the competency requirements for the clinical base year of Washington University/Barnes-Jewish Hospital/St. Louis Hospital Consortium Anesthesiology Residency Program for July 1st – December 31st, 2016," which included Dr. Weisman. (Def. Ex. RB-8, Dkt. 269-51, at WU2905) (emphasis added).  Further, WU verified to the FCVS that Dr. Weisman was never put on probation or disciplined and that no special requirements were placed upon him due to academic incompetence or any other reason, (Ex. 1-10 at JW43492), and informed the American Board of Anesthesiology that his performance in all rotations was satisfactory. (Ex. 1-12, WU707-712).

57

186. There was no objective reason to require Plaintiff to repeat his Internal Medicine rotation as he has passed that rotation.  (Ex. 1-14, JW00056613-JW56614, *and see* Def. Ex. Benzinger 3, Dkt. 269-22 at WU3097-3099; Ex. 1-15, JW56616-18, *and see* Def. Ex. Benzinger 3, Dkt. 269-22 at WU3094-3094; and Ex. 1-16, JW56610-12, *and see* Def. Ex. Benzinger 3, Dkt. 269-22 at JW56610-12).

187. Plaintiff disputes that there was an objective reason to require him to repeat the ICU rotation: attending physicians Donnelly and Sadiq commented, regarding Dr. Weisman's performance on this rotation, "this unit is not a fair unit for interns to be graded on. I would have flunked horribly in this unit if I was an intern." (Ex. 25, WU3880).  Further, WU represented to the American Board of Anesthesiology that Plaintiff received full credit for this rotation, (Ex. 1-12, ABA at p. WU0711), and to the Federation Credentials Verification Service that Plaintiff had successfully completed two years of his anesthesiology residency. (Ex. 1-10, FCVS subpoena response at pp. 20-21, JW043490-93).  Further, Benzinger wound up treating the request to Plaintiff to repeat rotations as merely requiring the Plaintiff to complete the rotations that a typical PGY-1, and non-ASAP resident, was required to take. (Ex. 26, WU0566).

188. Plaintiff was never placed on probation as the letter states. (Def. Ex. A13).  WU's corporate representative testified that Dr. Weisman was never placed on probation (Ex. 28, Gibson, at p. 64:10-25, and see Ex. 1-10 at JW43492 where Dr. Thompson certified that Dr. Weisman was never placed on probation or disciplined).  Further, the ACGME requirements, which the Anesthesiology Resident Program follows (Ex. 3A at p. 1, para. 1, and p 8, para 16, and Ex. 2, Mouser, at p. 6:7-11), require that the Graduate Medical Education Office ("GME") be involved in any probationary activity and Tia Drake, the Executive Director of the office of Graduate Medical Education at WU during the relevant time testified that she was not aware of any probationary activity relative to Dr. Weisman. (Ex. 20, Tia Drake Vol. 1, at p. 107:4-20).

189. After imposing the additional intern level rotations, there was no difference between the residency program scheduled for Dr. Weisman and for non-ASAP, standard anesthesiology residents. The additional rotations effectively removed Dr. Weisman from the ASAP program and placed him into a standard anesthesiology program.  (Ex. 4, Pltf. Vol 1. at pp. 165:25-167:13).

190. The Resident Handbook that WU/BJH provided Plaintiff and his class, which summarizes the Consortium's policy om discipline, distinguishes informal remediation from probation which "must be reported to the Department Chairman and the American Board of Anesthesiology." (Ex. 29, Resident Handbook, at p. 31, WU1044).  Probation *and any discipline* must be reported to the American Board of Anesthesia and to the FCVS. (Ex. 1-12, and Ex. 1-10 at JW043492).

191. Plaintiff was told to shut his lab down. (Ex. 4, Pltf. Vol. 1 at pp. 125:9-20, 126:11-127:5, 138:12-18, 141:16-24; Ex. 5, Pltf. Vol. 2 at pp. 579:12-16; Ex. 13, Sinow, at pp. 62:24-63:6 and 185:13-186:5).

192. Plaintiff agreed to shut down his lab because he felt his residency was at issue (Ex. 4, Pltf. Vol. 1 at p. 143:22-25) and did not want to lose his career. (Ex. 5, Pltf. Dep. Vol. 2 at 579-13-22).

193. SBI owned the equitable rights in the 3-D Printing patent and was negotiating for the legal rights in the patent application, (Ex. 13, Sinow, at pp. 58:11-60:10), which application was granted and became a full patent on October 15, 2019. (Ex. 30, Patent).

194. The Lab did research with STLCOP faculty at STLCOP, specifically Dr. Hunyan Cho, who later published the results.  (Ex. 1-8).    Further, Dr. Weisman corresponded with Eric Knoll, STLCOP's Associate Vice President for Operations and Dr. Nagele of the Department of Anesthesia about placing WU students on SBI and STLCOP research projects. (Ex. 1-17, JW00023763-00023764, Ex. 4, Pltf. Dep. Vol 1. at pp. 118:8-23, 277:18-24).

195. SBI received multiple offers of cash investment and/or of institutional resource investment.

> Mayo Ventures' offer to accommodate SBI in its facilities, for example, implied a willingness to invest valuable infrastructure resources into SBI's activities. (Ex. 13, Sinow Dep., at pp; 87:15-23: "On the contrary, Mayo Ventures invited us to move the lab to Rochester and Jeff Dr. Weisman was offered a one-year position to as I recall, to run the lab, do research, and -- and likely pursue his anesthesia residency at Mayo Clinic and work under the auspices of several physicians there. That's how serious they were and how excited they were with the types of research that we were doing."; Ex. 13, Sinow Dep. at pp. 88:1-3 "We didn't even have to discuss cash. They had the facilities, etc., and Mayo Ventures is flush with cash.").

> Serra Ventures was willing to offer cash for a small equity stake in SBI. (Ex. 13, Sinow Dep. at pp. 91:13-17: "My Recollection is that Serra Ventures was willing to offer an equity stake, and indeed, Dennis Beard, who is a principal of Serra Ventures, was offering to put his individual money into the company in addition to Serra Ventures at that time.";  and Ex. 13, Sinow Dep 91:22-23 "it was -- it was many thousands of dollars as I recall").

196. SBI did not ultimately consummate potential investor relationships stems entirely from Defendants' demands that Dr. Weisman cease his activity with SBI.  (Ex. 4, Pltf. Vol. 1 at p. 125:15-20, 141:16-24, 143:22-25, 145:2-14).

197.   Absent Dr. Weisman, SBI simply could not function. (Ex. 13, Sinow Dep. at p. 235:15-19: "The company was Jeff Weisman. That was the company. Without Jeff Weisman there was not a company. It's as simple as that, and as I've testified over and over and over again, Alex Evers made that impossible.") Because SBI would not be able to function without Dr. Weisman, Plaintiffs did not think it ethical to solicit or consummate further investor relationships. (Ex. 13, Sinow Dep. 235:3-10: Q: Why is that? Why would it be unethical? A. Because the company, thanks to Dr. Evers, was very unlikely to survive, and I'm not going to take money from fellow private equity guys, fellow angels who I know are willing to put money into a deal and watch that money dribble away"; Ex. 13, Sinow Dep at pp. 234:23-25 and 235:1-2: "On the contrary, what I'm saying is that it would have been unethical for me or Jeff or anyone in that company to take additional capital"... "giving the headwinds we faced with Dr. Evers. That's the bottom line").

198.   Def. Ex. W-1 shows that SBI was discussing not just collaboration on research, but a joint venture or other business structure with WU's Department of Radiology. The proposal attached to the July 13, 2016, Ballard email to  Pamela Woodard (an attending physician in WashU's Radiology Program) is a business proposal from SBI stating intent to "work with our industry contacts and our company Strategic Biomedical to bring in equipment and software to an onsite space" and stating, "[t]he goal is to turn this into a profitable division with positive cashflows."  (Def. Ex. W-1)

199.   Dr. Woodard stated in an email dated November 2, 2016 that any agreement between SBI and WashU's Radiology Department would need to be an agreement between SBI and WU: "the agreement would need to engage Washington University as the institutional partner."  (Ex. 1-18, JW00051550).

200.   Dr.  Evers knew about SBI from Dr. Weisman's statements to him during the interview process in late 2015 and early 2016. (Ex. 4, Pltf. Dep., Vol. 1, at p. 45:18-25: "at that event I was approached by Alex Evers, by Peter Nagele, by Thomas Cox, by Richard Benzinger, by Rob Gereau, and basically they all wanted me to come to Washington University St. Louis to bring my -- my lab and my technology development and all the activities that I've been doing there. And they -- they wanted me to rank them highly and to -- to come to Wash U.")  Dr. Evers further revealed his knowledge of Dr. Weisman's research and business activities during a call to Dr. Weisman on February 14, 2016, wherein Evers invited Dr. Weisman to relocate his laboratory and business to St. Louis and WU.  (Ex. 4, Pltf. Dep. Vol. 1 at pp. 66:20-25 "We want your lab here. We want you to  bring everything up").

201.   Dr. Evers introduced Dr. Weisman to Kharasch specifically to facilitate laboratory research/business opportunities. (Ex. 4, Pltf Dep. Vol. 1 at pp. 69:24-71:7).

202.   On May 14, 2016, Dr. Weisman emailed Fleischmann and two STLCOP doctors (Canady and Seibert), copying Dr. Kharasch. (Ex. 1-19, JW00036214-JW00036215). Dr. Weisman's email attached the Executive Summary (*see* Ex. 1-

60

20, May 2016 Executive Summary), and stated, "I am hoping to move myself, the team and lab on or about June 1st." Dr. Kharasch responded to Dr. Weisman, "I am very glad to hear that your conversations have been productive and things are moving forward. Glad to have made and facilitated the connection. I look forward to seeing you and following the progress." (Ex. 1-19).

203.   Dr. Evan Kharasch had been aware since no later than March 2016 that Dr. Weisman intended to relocate his Lab to the Center for Pharmacology , and welcomed this relocation. On March 29, 2016, Dr. Weisman emailed Kharasch that he "wanted to see about the prospects for moving the lab to the Center for Clinical Pharmacology and all that entails" and also explained his company and Sinow, the venture capitalist investor. (Ex. 1-5, JW 36344). Kharasch responded, also on March 29, that he would "do some diligence on the company relocation to the Center question." (Ex. 1-5, JW36343). Plaintiff thereafter moved into the STLCOP Building and onto the same floor that houses the Department of Anesthesiology's Center for Clinical Pharmacology joint venture with STLCOP.   (Ex. 16, Fleischmann, at pp. 9:22-10:16; 13:21-14:11).

204.   Plaintiffs believed that they were partnered with the Center for Clinical Pharmacology (Ex. 4, Pltf. Vol. 1, at 93:10-13).

205.   In September 2016 Dr. Evers demanded for a copy of the lease between SBI and STLCOP and the stockholder agreement SBI had entered into with STLCOP.  (Ex. 13, Sinow, at pp. 100:12-101:13; 102:2-15).

206.   After Dr. Evers intervened in August and September 2016, Plaintiff's relationship with Dr. Kharasch was inexplicably chilled.  (Ex. 4, Pltf. Dep. Vol. 1 at p. 118:1-5).

207.   SBI had receipts in 2016.  SBI was doing 3D printing and rapid prototyping work for other companies. For example, on April 7, 2016 SBI billed RNvention $1,740.00. (Ex. 1-25, JW00048316). When the venture capitalist investor was involved, income and expenses were not relevant because the investor would just write a check for expenses.  (Ex. 13, Sinow, at pp. 49:23-50:5).  SBI was a tech startup and its value was in the potential of 3-D printing innovations that were possible, not in a balance sheet or actual sales.  (Ex. 13, Sinow Dep. at pp. 164:5-165:6).

208.   When Dr. Evers told Dr. Wiesman to shut the Lab down Sinow's evaluation of SBI's prospects at this time was that Dr. Evers and others at WU were resolved to threaten Dr. Weisman's career and render it impossible for him to continue operating SBI. Sinow testified that when Dr. Evers realized he had no control over Plaintiff's lab that he made it very difficult for Dr. Weisman.  (Ex.14, Sinow, at pp. 185:13-186:5). He testified "[t]he company was Jeff Weisman. That was the company. Without Jeff Weisman there was not a company. It's as simple as that, and as I've testified over and over and over again, Alex Evers made that

61

impossible." (Ex. 13, Sinow Dep. at pp. 235:15-19).    Also see response to paragraph 56, and Ex. 13, Sinow Dep. at p. 235:3-10: "Because the company, thanks to Dr. Evers, was very unlikely to survive, and I'm not going to take money from fellow private equity guys, fellow angels who I know are willing to put money into a deal and watch that money dribble away. It's not the way business is done. It's unethical."

209.   SBI could not operate without Dr. Weisman. (Ex. 13, Sinow, at pp. 185:13-186:5, and see the responses to paragraphs 56 and 68).

210.   Dr. Evers told Dr. Weisman to shut the lab down (Ex. 13, Sinow Dep. at p. 208: 11:13 ("Dr. Evers told Jeff Weisman to shut the lab down. . . or leave the program.") and Ex. 4, Pltf. Dep. Vol. 2 at pp. 138:15-138:18, and 143:22-25)) in order to prevent the two research assistants he had brought with him from Louisiana State University from being deported and to avoid harming Dr. Ballard who had also come to WU (the radiology Department) from LSU.  (Ex. 4, Pltf. Dep. Vol. 1 at pp. 126:11-127:5, 304:5-21; Ex. 31, Ballard Dep. at pp. 6:6-12, 13:12-25, 14:5-24, 26:16-27:2, 78:7-16).

211.   Plaintiff he surrendered the Lab and its property and employees to the Department of Radiology under duress, and denies that he did it to "be well thought of."  (Ex. 13, Sinow Dep. at pp. 62:4-63 and 65:10-17, Ex. 31, Ballard, at pp. 22:18-23:8; Ex. 3, Pltf. Dep. Vol. 1 at p. 145:3-13; Ex. 4. Pltf. Dep. Vol 2 at pp. 590:20-591:15, 591:17-22).  Plaintiff chose his career as a physician over the money the Lab would have generated. (Ex. 13, Sinow Dep. at pp. 236:23-237:6).  Plaintiff, having brought two researchers with him from LSU who had to remain employed in order to remain in the country because of their visas, ( Ex. 4, Pltf. Dep. Vol. 1 at pp. 126:11-127:5, 304:5-21; Ex. 31,  and Ballard Dep. at pp. 6:6-12, 13:12-25, 14:5-24, 26:16-27:2, 78:7-16), surrendered the Lab and its property to WU rather than destroy it.

212.   Plaintiff Weisman had no chance of operating the Lab as a co-director with Ballard. WU prevented this.  (Ex. 5, Pltf. Dep. Vol. 2 at p. 580:2-16: "what I thought in fact would occur is once I finished my residency, myself and David, we would be able to run that lab facility, and would likely run that lab facility together. And that in fact did occur for David Ballard. I was -- I was very surprised at the very end when I was leaving when they -- when I -- I asked, I can't remember if I asked just David or Dr. Woodard, but to see if radiology would -- would give -- would make me like a visiting researcher like mechanical engineering did, or, you know, transfer me over as a visiting researcher and I emailed and things like that. And the answer was no, they couldn't do it because of anesthesia and the anesthesia department didn't want it to occur. So instead, they just took my name off the website, from the core lab on the Mallinckrodt website.").

213.   SBI could have covered the salaries of its researchers if Dr. Evers had not told Dr. Weisman to shut the lab down Ex. 13 Sinow Dep. at p. 208: 11:13 ("Dr. Evers told Jeff Weisman to shut the lab down. . . or leave the program.") and Ex. 4, Pltf. Dep.

Vol. 2 at pp. 138:15-138:18, 143:22-25), David Sinow would have covered all costs. (Ex. 13, Sinow, at pp. 49:23-50:15, 62:4-63 and 65:10-17, and 235:3-10

214.  Plaintiff demanded access to the Lab after he resigned his residency and was refused. (Ex. 4, Pltf. Dep. Vol 2 at pp. 140:2-141:2, 293:23-293:19;  Ex. 31, Ballard Dep., at pp. 88:25-89:7).

215.  The Lab donation was made under duress.  (Ex. 5, Plf. Dep. Vol. 2 at pp. 590:20-25: "So the documents that Mr. Sullivan showed me that used the word donate, I included that term because I was advised to by my mentors in academia. They told me that I shouldn't say that the lab was stolen or taken from me or it would cause bad blood or a problem with me getting a future job." and  *Id.* at pp. 591:1-15: "They told me to be polite and professional as I was job hunting, and not to -- not to use the term stolen or taken. So they said to use donated." *And see* ( Ex. 13, Sinow Dep. at pp. 62:4-63 and 65:10-17, Ex. 31, Ballard, at pp. 22:18-23:8).

216.  Plaintiff also told Fleischmann that he had been told that he had been told that he was going to be put on probation and that he was moving the Lab over to the Department of Radiology to try to take care of some of the people that had come to St. Louis with him.  (Ex. 16, Fleischmann at pp. 45:7-46:1).

217.  Plaintiff testified that at least two of his lab notebooks recording possible experiments were taken. (Ex. 4, Pltf. Dep. Vol. 1, at p. 132:22-133:18).

218.  The Department of Radiology invests in [the 3-D Lab] at a loss with the idea of an investment for the future.  (Ex. 31,  Ballard Dep. at p. 106:20-21).

219.  In the CPAP rotation in the second half of his intern year, Plaintiff Weisman was noted to "meet the learning objectives" of the rotation in the final third to final quarter of the rotation. (Def. Ex. RB-12 at WU3006).   Though scored below expectations Plaintiff was not scored "unsatisfactory."

220.  On June 21, 2017 the CCC stated that "All members of the PGY-1 class have satisfactorily met all of the competency requirements for the CA-1 year at Washington University/Barnes-Jewish Hospital/St. Louis Hospital Consortium Anesthesiology Residency Program for January 1 – June 30, 2017." (Def. Ex. RB-17 at p. WU2788).

221.  Dr. Thompson certified that Plaintiff Weisman had never been on probation or disciplined. (Ex. 1-10 at JW43492).

222.  WU's 30(b)(6) representative, Lauren Gibson testified that Dr. Weisman had never been put on probation. (Ex. 28, Gibson, at p. 64:10-22).

223.  Tia Drake, the Executive Director of the WU/BJH/St. Louis Children's Hospital Consortium residency program's Office of Graduate Medical Education ("GME")

at the relevant time, testified that she was not aware of any probationary activity against Dr. Weisman even though her office was required to be involved under ACGME requirements.  (Ex. 20, Drake Vol. 1 at pp. 109:4-22).

224.   Plaintiff was not allowed, like other residents, to pick a mentor but was assigned Dr. Graetz, a friend of Dr. Evers, (Ex. 4, Pltf. Dep. Vol. 1, at p. 233:11-19), who instead of assisting told Plaintiff Weisman to not complain about inaccurate rotation assessments. *Id.* at p. 234:14-235:6.

225.   Dr. Weisman scored at the 50th percentile on the AKT-1 Post Test in August 2017. (Ex. 1-23, JW00021313-JW00021315).  The AKT pre and post tests are informal tests that are supposed to informally indicate preparedness for taking the Anesthesia Board Examination. (Ex. 4, Pltf. Vol. 1 at pp. 62:1-7).

226.   Plaintiff passed his formal Anesthesia Board Basic Knowledge Exam taken in June 2018. (Ex. 1-12, at p. WU0712).

227.   The January 11, 2018 CCC evaluation of all residents for the first half of the send year (CA-1), including Dr. Weisman, stated that "All member of the CA-1class have satisfactorily met all of the competency requirements for the CA-1 year at Washington University/Barnes-Jewish Hospital/St. Louis Children's Hospital Consortium Anesthesiology Resident Program for July 1st – December 31st, 2017, (Ex. 32, January 2018 CCC Minutes).

228.   WU informed the American Board of Anesthesiology that Dr. Weisman's performance in all rotations was satisfactory. (Ex. 1-12, WU707-712).

229.   Dr. Molly McCormick on the POD-4 CAM rotation between August 28, 2017 and September 24, 2017,  wrote: "Still lagging behind peers.  Much improvement since beginning, overall progressing, but at a slightly slower rate than other CA-1's." (Def. Ex. RB-21 at WU3025).

230.   On October 24, 2018, Dr. Thompson told Dr. Weisman that he had only worked with him once and that it would therefore be difficult for him to comment on Plaintiff Weisman's clinical experience. (Ex. 1-24, summary of recording made October 24, 2018, bates stamped JW63713 at 8:47-9:17).  Further, Plaintiff emailed Dr. Thompson about this very issue with the "sevo cartridge" and Thompson did not criticize Plaintiff Weisman but only invited him to write an article about it. (Ex. 1-26, 1-29-18 email JW00013850-51).

231.   By the first half of his second year Plaintiff Weisman's residency, Plaintiff had been targeted. (Ex. 22, Szabo Dep. at pp. 19:10-21:15, 26:24-37:4).  Dr. Benzinger had sent an email around singling Dr. Weisman out for scrutiny: "For the foreseeable future, either Russell [Groener, the Assistant Program Director] or I will need to talk with the rotation coordinators of Gary's and Jeff's clinical rotations, at the beginning of the block.  From block 3 onward, could please send

me and Russell an email – say, the Wednesday before the start of the block-reminding us of the rotation that each is going into, and to make contact with the coordinator? We can then figure out which of us will talk to him/her." (Ex. 33, BJH000645). Thereafter, the Anesthesiology Program Coordinator Sharon Stark routinely emailed Dr. Benzinger and Dr. Russell to alert them before the start of Dr. Weisman's new rotations. (*See e.g.*, Ex. 34, BJH000600 and BJH000608). Plaintiff named other WU physicians who apologized to him for being asked to give him bad reviews. (Ex. 4, Pltf. Vol. 1 at pp. 338:6-340:4).

232. The CCC January 10, 2018 minutes do not reflect any such discussion of a proposal by Plaintiff that he resign to avoid an official unsatisfactory report to the ABA or that it was made by Plaintiff Weisman. (Ex. 35).

233. Plaintiff proposed resigning in exchange for a good recommendation and assistance in transferring to another program. (Ex. 4, Pltf. Vol. 1 at p. 189:25-191:8, 193:2-4, Ex. 5, Pltf. Vol. 2 at pp. 561:10-563:5).

234. Plaintiff was repeatedly told that he would be given a positive recommendation and assistance with a transfer. (Ex. 4, Pltf. Vol. 1 at p. 189:25-191:8, 193:2-4, Ex. 5, Pltf. Vol. 2 at pp. 561:10-563:5).

235. Dr. Thompson told Plaintiff that he was "committed to supporting your application for whichever specialty you choose." (Ex. 36, JW58696).

236. The program is required to send a record of the resident's training and a summative evaluation. (Ex. 20, Drake Vol. 1 at pp. 60:11-14; and see Ex. 49, Kaye Dep. excerpt, 179: 18-23).

237. An agreement reached was in April 2018, which was that Plaintiff would be given a positive recommendation and assistance with a transfer. (Ex. 4, Pltf. Vol. 1 at p. 189:25-191:8, 193:2-4, Ex. 5, Pltf. Vol. 2 at pp. 561:10-563:5).

238. Plaintiff wished to ensure that the effective date of resignation reflect 24 months of training as "required for licensing in the state of Illinois." Def. Ex. A69.

239. There was agreement reached in April 2018 that Plaintiff would be given a positive recommendation and assistance with a transfer. (Ex. 4, Pltf. Vol. 1 at p. 189:25-191:8, 193:2-4, Ex. 5, Pltf. Vol. 2 at pp. 561:10-563:5).

240. Dr. Benzinger orally conveyed negative information to Dr. Nasr of the Cook County Hospital Anesthesiology program: "I received an e-mail from Alan Kaye, and I called -- or he talked with me about the fact that he had a meeting with Ned Nasr at a conference and asked him why he wouldn't take me. And Ned Nasr told Alan Kaye that he heard negative things." (Ex. 4, Pltf. Vol. 1 at p. 285: 15-17, and Ex. 39, Kaye, p. 81:16-18: "he [Nasr] called up the program director [Benzinger] and he [Nasr] conveyed to me that he [Nasr] had gotten a negative evaluation on

Dr. Weisman."); Benzinger invited Dr. Nasr to call him directly on his cellphone regarding Dr. Weisman's transfer application. Ex. 38 ("If you'd like to talk about him directly, please feel free to call me. My cell is [ ]")).  Dr. Nasr decided to take "somebody with zero anesthesia experience, which would be unheard of where I had done a year and passed my boards." (Ex. 4, Pltf. Dep. 202: 10-12).

241.    Defendant Dr. Thomas Cox who bragged to Dr. Benzinger on April 27, 2018 that he had talked to Dr. Klafta and Dr. Nagele of the University of Chicago and shared "some of Jeff's history 'off the record' . . ."  (Ex. 37, Cox email to Benzinger, and Ex. 4, Pltf. Dep. Vol. 1 at pp. 264:23 - 265:18).

242.    Milestone evaluations are not a summative evaluation and WU knew this in 2018. (Ex. 20, Drake Vol. 1, at p. 15:21-17:2, 74:23-76:5).

243.    Dr. Thompson on September 23, 2020, responded to a request for Dr. Weisman's Summative Evaluation from Dr. Daniel Bakston of the University of Illinois at Chicago by stating: "[p]lease find attached the milestones report for Dr. Weisman. *There is no summative evaluation for Dr. Weisman*."  (Ex. 40, JW64629) (emphasis added).

244.    Dr. Benzinger also knew what a summative evaluation was: "I plan to communicate the following to [Dr. Weisman]:

> --According to ABA regs, you'll get a *summative evaluation* for whatever part of this 6-month block you are enrolled.
> --If you send us a letter of resignation, the situation will be clarified. We will consider
> accommodation in your block schedule to help your future ambitions, if consistent with general
> requirements for anesthesia residents. (ie: we'll take you out of the ICU if you want.)
> --If not, we will continue to proceed under the expectation that you will graduate, and the
> schedule stands.
>
> And we'll give him the *summative letter*."

(Ex. 45, February 20, 2018 email, WU0461)(emphasis added).

245.    Dr. Thompson stated when the ACGME investigated Plaintiff's January 2022 complaint that no summative evaluation had been generated (Ex. 20, Drake, at p. 15:3-16) that "I will argue given we knew he was not advancing that a summative eval was not needed."  (Ex. 46, email WU3987).

246.    Later, in accord with representations made to this Court in Dkt. 179, Thompson testified at deposition that he "did not know" before September 2021 that a

Summative Evaluation was required to be generated for persons transferring or graduating from the program, (Ex. 41, Thompson Dep. at pp. 29:9-20), that for Dr. Weisman the program sent what it believed sufficed, *Id.* at p. 165:12-13, and that it sent the milestone evaluation "in lieu" of the summative evaluation. *Id.* at pp. 143:8-13. But WU also claims, discovery has shown, that the stated reason that no Summative Evaluation was generated for Dr. Weisman was because they "did not know" that Plaintiff was seeking to transfer to another training program and they did not "feel" that one was needed. (Ex. 20, Drake Dep. Vol. 1, at pp. 24:13-25:12, 28:11-15, and 28:16-29:17). This despite the fact that Dr. Weisman told Tia Drake in August 2018 that he was trying transfer to other anesthesia residency programs (*Id.* at 30:21-25 and 32:24-33:5), and despite the fact that WU sent Program Director letters to the anesthesia residency programs at the University of Chicago on June 6, 2018 (Ex. 42, WU1989-90), Cook County Hospital on June 26, 2018 (Ex. 43, WU1986-87), and LSU Shreveport on November 28, 2018. (Ex. 44, email and attachments from Dr. Thompson sent November 28, 2018).

247.   The WU/BJH Consortium knew at all times that a summative evaluation was required for a resident transferring, should have been sent in 2018, and even had a standard form for the process since November 2011, (Ex. 20, Drake Vol.1 at pp. 74:19-75:10, 93:11-96:10, and see Ex. 47, Drake Ex. 7). An associated release of records authorization applied to transfers "within the GME Consortium or from an outside institution" and instructed the "current program" to forward the form to the new program "with the verification of previous education experiences and summative competency based performance evaluation as outlined in the ACGME Common Program Requirements IIIC." (Ex. 48, Drake Ex. 8, authenticated at Ex. 20, Drake Vol. 1, pp. 79:18-81:15). The ACGME has always required that, among other things, a summative evaluation of the residents six core competencies throughout the residency be forwarded to a new program on transfer or prepared at the end of residency. (Ex. 20, Drake Vol. 1, at pp. 13:19-14:10 and 63:5-64:10). The WU/BJH Consortium knows that milestones are not a summative evaluation. (Ex. 20, Drake, Vol. 1, at pp. 15:21-17:2, 75:23-76:5).

248.   Lauren Gibson's testified that a Summative Evaluation was requested by the University of Chicago on Dr. Weisman on June 6, 2018. (Ex. 28, Gibson Dep. at p. 9:16-25).

249.   Dr. Thompson testified that he sent what he "thought" was a summative evaluation, (Ex. 41, Thompson Dep. at pp. 165:12-13), even though the WU/BJH Consortium knew that milestones are not a summative evaluation. (Ex. 20, Drake Vol. 1, at p. 15:21-17:2, 75:23-76:5).

250.   Dr. Thompson stated when the ACGME investigated Plaintiff's January 2022 complaint that no summative evaluation had been generated (Ex. 20, Drake, at p. 15:3-16) that "I will argue given we knew he was not advancing that a summative eval was not needed." (Ex. 46, email WU3987).

251.    In 2018 Dr. Shilpadev Patil requested Dr. Weisman's summative evaluation from WU but never received one.  (Ex. 50, Patil Declaration).

252.    On September 23, 2020, Dr. Thompson responded to Dr. Daniel Bakston's request on behalf of the University of Illinois at Chicago for Dr. Weisman's "final summative evaluation" by stating that "[t]here is no summative evaluation for Dr. Weisman." Ex. 28, JW64629, but he sent the milestone summary. (Ex. 40, WU2931-2934).

253.    Every medical residency program requires a summative evaluation for transfer residents. (Ex. 20, Drake Vol. 1 at pp. 60:11-14; and see Ex. 49, Kaye Dep., 179: 18-23: "[t]here was no summative performance-based evaluation given to any program that he tried to transfer to. And I think that is not only a form of harassment, it's egregious and I think that it made it impossible for him to transfer.").

254.    On August 29, 2018, Dr. Weisman emailed Dr. Thompson a summative evaluation form that Harvard wanted completed (Ex. 51, email chain with form Harvard asked for). Dr. Weisman emailed this form to Thompson on August 29, 2018 and requested that he complete and send it to Harvard, to which Thompson responded, "Got it thanks". (Ex. 51 at JW00058123). On October 22, 2018, Harvard official Ann Backus informed Dr. Weisman via email that his application "is still missing on [sic] evaluation." (Ex. 1-27, JW00058965).

255.    Dr. Evers told Dr. Hines to "just say no" when asked about Dr. Weisman application to transfer. (Ex. 1-28, excerpts of Yale Subpoena response at YALE000031).

256.    Dr. Evers gave Dr. Weisman no assistance in transferring programs.  (Ex. 14, Evers, at p. 102:6).

257.    Plaintiff produced to Defendants in discovery in this case on December 1, 2021, recordings of two conversations Plaintiff has with Dr. Patil on November 16, 2018 in which Dr. Patil stated that she had spoken with Dr. Thompson at WU, that she did not know what "big thing had happened there" but that Dr. Thompson did not want to talk and told her to talk to "the lawyer," he referred to "the attorney."  She said this was a "red signal" and that "the way they talked to me on the phone I almost passed out, like literally" and that I had given her more documents than WU had.  (Ex. 1 at ¶ 26).

Respectfully submitted,

MOOR LAW OFFICE, P.C.

/s/ *Edward R. Moor*
Edward R. Moor
Bar No.: 6205169IL
53 W. Jackson Blvd., Suite 1527
Chicago, IL 60604
(312) 726-6207
erm@moorlaw.net

**Counsel for Plaintiffs**


## CERTIFICATE OF SERVICE BY ELECTRONIC MEANS

I, Edward R. Moor, certify that on April 3, 2023, service of this document was accomplished pursuant to the Court's CM/ECF as to Filing Users and thereby served on all counsel of record.

/s/ Edward R. Moor