**DR. JEFFERY WEISMAN  9/13/2022**

## Page 1

1   UNITED STATES DISTRICT COURT
    FOR THE EASTERN DISTRICT OF MISSOURI
2              EASTERN DIVISION
3
4
5
6
7
    JEFFERY WEISMAN and STRATEGIC BIOMEDICAL, INC.
8                    vs.
    BARNES JEWISH-HOSPITAL, BJC HEALTHCARE, WASHINGTON
9   UNIVERSITY, DR. ALEX EVERS, DR. RICHARD BENZINGER, and
                  DR. THOMAS COX
10
        Cause No. 4:19-cv-00075-JAR
11
12
13
14
15
16   VIDEOTAPED DEPOSITION OF DR. JEFFERY WEISMAN
17      TAKEN ON BEHALF OF THE DEFENDANTS
18          SEPTEMBER 13, 2022
19
20
21
22
23
24
25       (Starting time of deposition: 9:04 a.m.)

## Page 2

1              INDEX
2                           PAGE
3   Index                    2
    Deposition Information           3
4   Appearance Page                 4
    Direct Examination by Mr. Sullivan   10
5   Notarial Certificate           343
6
7
8
9        DEFENDANT'S EXHIBITS
10  EXHIBIT   DESCRIPTION      PAGE MKD.
    NUMBER
11  A     Second Amended Complaint    37
    A2       Complaint      58
12  A5    Dean letter from Mark Platt  59
    A6    E-mail 1/25/18 AKT 6mth    61
13       Results
    A14    EM Off Service Resident    74
14       Evaluation by attending
    A7    E-mail 8/11/16 from David    81
15       Sinow Re: 3D Printing
    A8       E-mail 8/15/16 from Jeffery   84
16  Weisman Re: 3D Printing
    company
17  A9    E-mail 8/16/16 from Jeffery   93
       Weisman Re: 3D Printing
18       company
    A10    E-mail 8/17/16 from Jeffery  109
19       Weisman Re: SBIR/STTR
       training
20  A11    E-mail 9/9/16 from David   111
       Sinow re: Introduction
21       Strategic Biomedical 3D
       printing
22  A12    E-mail 9/13/16 from David   112
       Sinow Subject Our
23       conversation yesterday
    A15    E-mail 3/20/17 from Richard  133
24       Schaefer re: 3D Move to 6th
       floor Barnard
25

## Page 3

1   A16    E-mail 3/21/17 from Karthik  136
       Tappa re: 3D Move to 6th
2       floor Barnard
    A17    E-mail 1/16/18 from Jeffery  149
3       Weisman re: T32 grant
       renewal information
4   A18    E-mail 4/5/18 from Jeffery   151
       Weisman Subject Weisman CV
5       ERAS.pdf
    A19    E-mail 4/10/18 from Jeffery  154
6       Weisman Subject Weisman
       non-clinical activities at
7       WashU
    A20    Stanford-Confidential    156
8   A21    e-mail 12/6/18 from Jeffery  158
       Weisman re: CA-2 Transfer
9       Question
    A13    Wash U. Letter 1/19/17 Re:   164
10       Jeffery Weisman Action:
       Probation
11  A103    e-mail 2/21/18 from George   172
       Benzinger re: Weisman 6
12       month meeting
    A28    e-mail 9/7/17 from Jeffery   178
13       Weisman Subject: Week 1
       Harassment Incident Records
14       Copy
    A29    2/18/19 Text      203
15  A101    E-mail 2/19/17 from Jeffery  214
       Weisman Subject: Plan for
16       success from Weisman ASAP
       meeting
17  A72    E-mail 4/9/18 from Jeffery   219
       Weisman Subject: Weisman CV
18       and CV Addendum
    A92    E-mail 3/17/17 from Jeffery  220
19       Weisman Subject: Optimal
       rough reorganization on 3D
20       printing screws and
       mechanical test data
21  A93    E-mail 3/8/17 from Jeffery   221
       Weisman Subject: Catheter
22       paper JVIR
    A94    E-mail 3/9/17 from Jeffery   222
23       Weisman Subject: Additional
       OB-GYN 3D printing papers
24
25

## Page 4

1   A95    E-mail 8/8/17 from Patrick   223
       Mills Subject: Semi-final
2       draft on 3D printing Billing
       Paper
3   A96    E-mail 7/28/17 from Jeffery  226
       Weisman Subject: JOVE Paper
4   A97    E-mail 7/12/17 from PLOS ONE  226
       Subject: PLOS ONE
5       Notification: Your PDF has
       been built
6   A98    E-mail 3/30/17 from Jeffery  228
       Weisman Subject: Final
7       e-mail on 3D Print Lab
       transition to MIR and
8       funding analysis
    A63    E-mail 1/2/18 from Jeffery   239
9       Weisman Subject:
       Weisman-Norris Meeting
10  A65    E-mail 1/12/18 from Jeffery  242
       Re: Weisman
11       Scheduling till end of
       academic year and next
12       rotation
    A64    1/11/18 CA-1 first six month  243
13       CCC evaluation
    A67    E-mail 4/5/18 from George   246
14       Benzinger Re: Weisman
       Research Opportunity
15  A68    E-mail 4/6/18 from Jeffery   251
       Weisman Subject: Fwd:
16       Program Director Letter
    A69    E-mail 4/6/18 from Jeffery   253
17       Weisman Subject: Weisman
       Resignation Letter & Weisman
18       Research Request Letters
       Below
19  A70    E-mail 4/7/18 from George   254
       Benzinger Subject:
20       Rotations between now and
       June 30th
21  A71    E-mail 4/7/18 from Alex    256
       Evers Re: Weisman
22       Resignation Letter & Weisman
       Research Request Letters
23       Below
24
25

Pltf. Ex. 4

**DR. JEFFERY WEISMAN  9/13/2022**

## Page 5

```
 1   A73    E-mail 4/10/18 from Jeffery    257
            Weisman Subject: Weisman
 2          Program Director Letter
            Decision
 3   A75    E-mail 5/14/18 from George     258
            Benzinger Re: Personal Re:
 4          Updates
     A77    E-mail 6/6/18 from George      261
 5          Benzinger Subject: Jeff
            Weisman
 6   A3     Jeffery Weisman's Answers      266
            and Objections to Defendant
 7          Washington University's
            Interrogatories
 8   A80    E-mail 6/21/18 from Jeffery    277
            Weisman Subject: Weisman
 9          Letter Cook County
     A83    E-mail 8/4/18 from Ned Nasr    290
10          Re: Jeff Weisman New Contact
            Information and Question
11   A85    Letter 8/13/18 to Dr.         292
            Weisman from J. Mark Meacham
12          Mechanical Engineering &
            Materials Science
13   A89    E-mail 9/12/18 from Douglas    295
            Thompson Re: Sending
14          Residency Verification,
            etc...Question
15   A91    E-mail 11/28/18 from Alan      297
            Kaye Subject: Rotation
16          schedule-Jeff
            Weisman.docx;ATT00001.htm;
17          weisman
     A30    E-mail 4/14/16 from Jeffery    303
18          Weisman Subject:
            IMPORTANT-Lab and Project
19          Finances
     A48    E-mail 2/4/17 from David      309
20          Ballard Subject: 3D Printing
            Lab MIR Acquisition Document
21   A104   E-mail 4/6/17 from Jeffery     328
            Weisman Subject: Benzinger
22          survey
23
     (Original exhibits were retained by the Court Reporter
24   and will be copied and attached to copies of the
     transcript.)
25
```

## Page 6

```
 1           UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF MISSOURI
 2                 EASTERN DIVISION
 3    JEFFERY WEISMAN and        )
      STRATEGIC BIOMEDICAL,      )
 4    INC.,                      )
                                 )
 5        Plaintiffs,   ) Cause No.
                        ) 4:19-cv-00075-JAR
 6        vs.                    )
                                 )
 7    BARNES JEWISH-HOSPITAL,  )
      BJC HEALTHCARE,          )
 8    WASHINGTON UNIVERSITY,   )
      DR. ALEX EVERS, DR.      )
 9    RICHARD BENZINGER, and   )
      DR. THOMAS COX,          )
10                               )
          Defendants.      )
11
12       VIDEOTAPED DEPOSITION OF DR. JEFFERY
13    WEISMAN, produced, sworn and examined on
14    September 13, 2022, between the hours of eight o'clock
15    in the forenoon and six o'clock in the afternoon of
16    that day, at Sheraton Westport Chalet Hotel, 191 West
17    Port Plaza Drive, St. Louis, Missouri, 63146, before
18    Amy A. Victoria, Certified Court Reporter, in a
19    certain cause now pending in the United States
20    District Court, Eastern District of Missouri, Eastern
21    Division, wherein JEFFERY WEISMAN and STRATEGIC
22    BIOMEDICAL, INC. Are the Plaintiffs and BARNES
23    JEWISH-HOSPITAL, BJC HEALTHCARE, WASHINGTON
24    UNIVERSITY, DR. ALEX EVERS, DR. RICHARD BENZINGER, and
25    DR. THOMAS COX are the Defendants.
```

## Page 7

```
 1            A P P E A R A N C E S
 2
     For the Plaintiffs:
 3
 4   ELSTER LAW OFFICE, LLC
     By:  Henry Elster
 5   225 South Meramec Avenue
     Suite 325
 6   Clayton, MO  63105
     (314)727-0868
 7   henry@elsterlaw.com
 8   MAREK WEISMAN, LLC
     By:  Rachel Rutter
 9       Sherman Marek
     55 East Monroe Street
10   Suite 3800
     Chicago, IL  60603
11   rrutter@marekweisman.com
12
13   For the Defendants Washington University
     Thomas Cox, Richard Benzinger & Alex Evers:
14
15   SHANDS, ELBERT, GIANOULAKIS
     & GILJUM, LLP
16   By:  Kevin Anthony Sullivan
     8235 Forsyth Boulevard
17   Suite 700
     St. Louis, MO  63105
18   (314)241-3963
     ksullivan@shandselbert.com
19
20   For the Defendants BJH & BJC:
21   HUSCH BLACKWELL LLP
     By:  Michael P. Nolan
22       Christine Ramatowski
     190 Carondelet Plaza
23   Suite 600
     St. Louis, MO 63105
24   (314) 480-1770
     Michael.Nolan@huschblackwell.com
25
```

## Page 8

```
 1   Also present: Lisa Wood
 2       In-house counsel
 3       Washington University
 4       Marissa Israel
 5
 6   Court Reporter:
 7     Amy A. Victoria, CCR MO #556
       Lexitas Legal Services
 8     711 North Eleventh Street
       St. Louis, MO  63101
 9     (314) 644-2191
10     1-800-280-3376
11   Videographer:
12     John Niehaus
       Lexitas Legal Services
13     711 North Eleventh Street
       St. Louis, MO  63101
14     (314) 644-2191
       1-800-280-3376
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 5 to 8)

## DR. JEFFERY WEISMAN  9/13/2022

### Page 9

1        IT IS HEREBY STIPULATED AND AGREED, by and
2   between counsel for the Plaintiffs and counsel for the
3   Defendants that this deposition may be taken in
4   shorthand by Amy A. Victoria, Certified Court
5   Reporter, and afterwards transcribed into typewriting;
6   and the signature of the witness is expressly
7   reserved.
8                        *   *   *   *   *
9
10       THE VIDEOGRAPHER:  We're on the record.
11  Today's date is September 13th, 2022, and the time is,
12  approximately, 9:04 a.m.
13       This is the video recorded deposition of
14  Jeffery Weisman, M.D. in the matter of Jeffery
15  Weisman, M.D., et al versus Barnes-Jewish Hospital, et
16  al, Case Number 419-CV-00075-JAR in the United States
17  District Court for the Eastern District of Missouri,
18  Eastern Division.
19       This deposition is being held at Sheraton
20  Westport Hotel in St. Louis, Missouri.
21       The reporter's name is Amy Victoria.  My
22  name is John Niehaus.  I am the legal videographer.
23  We are with Lexitas Legal.
24       Will counsel please introduce yourself for
25  the record.

### Page 10

1        MR. SULLIVAN:  Kevin Sullivan counsel for
2   Defendants Washington, Dr.  Alex Evers, Dr. Thomas
3   Cox, and Dr. Richard Benzinger.
4        MR. NOLAN:  Mike Nolan for Defendants BJC
5   and BJH.
6        MR. ELSTER:  Henry Elster for the
7   Plaintiffs, Dr. Jeffery Weisman and Strategic
8   Biomedical, Inc.
9        MS. RUTTER:  Rachel Rutter for Plaintiffs
10  Dr. Jeffery Weisman and Strategic Biomedical, Inc.
11       MR. MAREK:  Sherman Marek on behalf of
12  plaintiffs.
13       THE VIDEOGRAPHER:  Will you please swear in
14  the deponent.
15                       *   *   *   *   *
16       DR. JEFFERY WEISMAN,
17  of lawful age, produced, sworn and examined on behalf
18  of the Defendants, deposes and says:
19
20       DIRECT EXAMINATION
21  QUESTIONS BY MR. SULLIVAN:
22       Q.  Dr. Weisman, we haven't had an opportunity
23  to meet.  My name is Kevin Sullivan and you understand
24  I represent what I'll call the university defendants
25  in this case.

### Page 11

1        A.  Yes, I do.
2        Q.  Okay.  Can you state your name and address
3   for the record, please.
4        A.  My name is Jeffery Weisman.  I currently
5   live at 719 East Ocean View Avenue in Norfolk,
6   Virginia.
7        Q.  Are you on any medications today that would
8   prevent you from answering any questions or giving
9   truthful testimony?
10       A.  No.
11       Q.  You've had your deposition taken before,
12  correct, in a worker's compensation case?
13       A.  That is correct.
14       Q.  Have you ever had your deposition taken in
15  any other case?
16       A.  I don't believe so.
17       Q.  Okay.  Let's just go over a few ground
18  rules to start off with the deposition.
19       One thing is we can't talk over each other
20  or Amy can't get an accurate record.  So it's a tough
21  rule to follow but I'll ask that you wait for me to
22  give a full question and then I'll wait for you to
23  give your full answer.  Is that fair?
24       A.  That is understood.
25       Q.  Okay.  I need a verbal response.  No head

### Page 12

1   nods or no head shakes.  Also try to avoid using yeah
2   or nah.
3        And if I ask you whether your answer was a
4   yes or a no, I'm not trying to be confrontational or
5   anything.  I'm just trying to make sure we have an
6   accurate record.  Is that fair?
7        A.  Understood.
8        Q.  Your counsel may lodge objections during
9   the deposition.  Unless they instruct you not to
10  answer, you are to go forward and give your answer
11  subject to their objections.  Okay?
12       A.  Okay.
13       Q.  And if you don't understand a question
14  or -- or you need it to be repeated, just go ahead and
15  ask me and I'll do that.  Okay?
16       A.  Okay.
17       Q.  And then finally, you're free to ask for a
18  break any time that you want.  With the one exception
19  that you can't ask for a break when there's a question
20  pending.  Is that fair?
21       A.  Okay.  Understood.
22       Q.  Are you married?
23       A.  Yes, I am married.
24       Q.  Okay.  What's your wife's name?
25       A.  Marissa Israel.

3 (Pages 9 to 12)

**DR. JEFFERY WEISMAN  9/13/2022**

Page 13

1    Q.  And is she employed?
2    A.  Yes.
3    Q.  And who is her employer?
4    A.  She works for CVS.
5    Q.  CVS Pharmacy?
6    A.  Correct.
7    Q.  When you put something in writing in an
8  e-mail, a letter or a document, is it meant to be
9  truthful?
10    A.  Could you --
11    MR. ELSTER:  Object.
12    A.  Could you explain -- could you please
13  explain the question.  Is this for a specific document
14  or.
15    Q.  (Mr. Sullivan)  No.  I'm just asking when
16  you put something in writing whether it's an e-mail, a
17  letter or a document that you send to somebody else,
18  is it meant to be truthful?
19    MR. ELSTER:  Objection.  Compound and form.
20    A.  Okay.  So, I guess, I would say it's -- it
21  is -- is noted.  It's multiple questions.
22    Yes.  In general, when I put something in
23  an e-mail or a document, it is true.  There -- there
24  always can be exceptions to something.  If you're
25  joking around with a friend or saying something

Page 14

1  sarcastically.  But, in general, yes, it is true.
2    Q.  (Mr. Sullivan)  Okay.  So maybe in a
3  personal e-mail or something like that, there could be
4  sarcasm.
5    What about in a working situation.  Let's
6  say when you're e-mailing with colleagues and you put
7  something in writing, is that generally meant to be
8  true?
9    MS. RUTTER:  Objection to the form of the
10  question.  It's compound.  Calls for speculation.
11    MR. NOLAN:  Yeah.  I'm going to object.
12  You've got multiple people objecting over there on
13  plaintiff's side.  Let's just keep it to one attorney,
14  please.
15    MR. MAREK:  Well, you won't instruct these
16  lawyers on what to do but you can lodge your
17  objection.
18    MR. SULLIVAN:  Okay.  Now, we've got three
19  so...
20    MR. NOLAN:  Yeah.  Who's representing the
21  witness here at this deposition?
22    MR. ELSTER:  Multiple attorneys here.
23    MR. NOLAN:  I think one attorney needs to
24  defend this deposition.
25    MR. MAREK:  I know what you think.

Page 15

1    MR. NOLAN:  No, you don't.
2    MR. MAREK:  It's on the record.
3    A.  No.  So to answer the question.  In
4  general -- and you're asking me to speculate.  And I'm
5  not sure what you're -- what you're getting at here.
6  But in general, when you send a -- when you generate a
7  document for work, it could -- a document is generated
8  could be truthful.  But again, you're -- you're asking
9  me to speculate.  I'm not sure what you're...
10    Q.  (Mr. Sullivan)  What I'm asking you is, is
11  when you type something out and hit send in an e-mail,
12  is that meant to be a truthful statement?
13    MR. ELSTER:  Objection.  Form.
14    A.  So again, I don't know what you're
15  referring to on that.
16    Q.  (Mr. Sullivan)  I'm just asking generally.
17    MR. ELSTER:  Same objection.
18    A.  Yeah.  No, I'm --
19    Q.  (Mr. Sullivan)  When you put something in
20  writing, is it truthful?
21    A.  It's a -- I mean, it's a very vague
22  question.  Are you an -- you know, are you sending a
23  joke to a friend?  Are you --
24    Q.  I'm going -- okay.  I'm going to move to
25  strike.  You're not allowed to ask me questions.  I

Page 16

1  ask you questions.  Okay.
2    A.  Okay.
3    Q.  Okay.  So when you put something in
4  writing, is it meant to be truthful from your
5  perspective?
6    MR. ELSTER:  Objection.  Form.  Overly
7  broad.
8    A.  What are you asking?  So I -- I don't know
9  what this is referring to in terms of is something
10  truthful or not truthful.
11    Q.  (Mr. Sullivan)  Generally do you try to be
12  truthful in your communications?
13    A.  It depends on what the communication is.
14    Q.  So sometimes depending on what it is you
15  might not be truthful in your communications with
16  someone?
17    A.  Well, again, you're asking me to speculate.
18  In general, if I'm having a conversation with somebody
19  to negotiate something or talk about something, you
20  know, it could be truthful or it could be, you know,
21  it could be not truthful in a conversation.
22    Q.  Not truthful.  Okay.
23    A.  My exam -- my example would be is, you
24  know, I was walking through the downtown of Norfolk a
25  couple of days ago and somebody asked me for a dollar.

4 (Pages 13 to 16)

**DR. JEFFERY WEISMAN  9/13/2022**

Page 17

1    I said, I don't have any money on me, you know.  So
2    that's why I -- what type of a situation?
3         Q.  Well, I gave you a situation.  What about
4    e-mailing a work colleague about work related -- work
5    related issues, is that meant to be --
6         MR. ELSTER:  Objection.  Sorry.
7         MR. SULLIVAN:  Let me finish my question.
8         Q.  (Mr. Sullivan) Was that meant to be
9    truthful?
10        MR. ELSTER:  Objection.  Vague.  Work
11   related issues.
12        A.  Well, you know, again, I'm not sure what
13   you're referring to as far as an e-mail goes with
14   that.
15        I mean, you know, in general you might send
16   things that are accurate to a colleague or you may
17   send something where you're joking around or saying
18   something sarcastically.
19        So unless I have a specific example, I
20   can't tell you what the context was behind a
21   communication.
22        Q.  Okay.
23        A.  There's subtle undertones.
24        Q.  And you're an attorney, correct?
25        A.  That is correct.

Page 18

1         Q.  You hold a license in Illinois?
2         A.  Yes.  I hold a license in Illinois.
3         Q.  And you'd be familiar with the Rule of
4    Professional Conduct 3.3 that prohibits making a false
5    statement to the Court?
6         A.  Yes, I am.
7         Q.  And you'd likewise be familiar with Federal
8    Rule 11, which provides that factual contention should
9    have evidentiary support?
10        A.  Could you show me the rule?  I'm -- I'm not
11   a federal trial attorney and I'm not familiar with the
12   federal rule.
13        Q.  So you're not -- you're not familiar with
14   Federal Rule 11?
15        A.  I'd have to see it.
16        Q.  Did you take Civil Procedure in law school?
17        A.  That would --
18        MR. MAREK:  Oh, please.
19        A.  That would've -- the last time I took a law
20   school course was in 2007 and then I transferred to
21   become a physician so...
22        Q.  (Mr. Sullivan) You produced about 60
23   recordings of conversations that you had in this case;
24   is that correct?
25        A.  I don't know the exact number but I gave

Page 19

1    the recordings that I had to my legal team.
2         Q.  And then they produced them, is your
3    understanding?
4         A.  Yes.
5         Q.  Did you tell the people you were speaking
6    with that their conversations were being recorded?
7         A.  Some conversations, no.  My understanding
8    as a lawyer is that --
9         Q.  I wasn't --
10        MR. SULLIVAN:  I was going to --
11        MS. RUTTER:  If you're going to ask him a
12   question, let him finish his answer.
13        MR. SULLIVAN:  I'm going to move to strike.
14        Well, it's -- it's nonresponsive.  I just
15   had the simple -- a yes or no question will -- when
16   it's a yes or no question, will make this go much
17   quicker.
18        MR. MAREK:  You don't get to cut off his
19   answers.  You don't get to tell him how to answer.
20        MR. SULLIVAN:  Let me re-ask the question.
21        Q.  (Mr. Sullivan) Did you tell people you were
22   speaking with that the conversation was being
23   recorded, yes or no?
24        A.  In many cases, no.
25        Q.  Okay.  How were the conversations recorded?

Page 20

1    Was it by your telephone or did you have a recorder?
2         A.  I recorded the conversations on my -- on
3    the phone -- on a phone.
4         Q.  On a phone.  Okay.
5         Would you start the recording before you
6    had the conversation and then, like, stick your phone
7    in your pocket or in a bag or something like that?
8         A.  Well, those recordings were con -- many of
9    those recordings were contact specific.  Sometimes if
10   I knew there was going to be a conversation that was
11   harassing or they were going to be fraudulent and
12   somebody had scheduled a meeting with me, then I might
13   turn it on before I met with them.  If I knew there
14   was going to be abuse, bullying or harassment or
15   improper activities.  Other times I might be in a
16   meeting with someone or talking to somebody and they'd
17   start saying something inappropriate that was either
18   harassment, bullying, violating state and federal laws
19   and I might turn on -- turn on my recording.
20        Q.  But you would keep it in your -- would you
21   keep it in your pocket, in your bag, both?
22        A.  In general, I would put it in my -- in my
23   scrub pocket.  Normally -- normally, as a physician,
24   we wear scrubs around the hospital, and I'd normally
25   just, you know, put it in my scrub pocket.

**LEXITAS LEGAL**
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

**DR. JEFFERY WEISMAN  9/13/2022**

Page 21

1      Q.  Were the statements you made in those
2  recordings truthful?
3      A.  What -- what I would say in that is many of
4  those statements that I said were truthful and
5  other -- other times I may have said things that were
6  sarcastic or probing to get information from other
7  individuals.
8      Q.  Okay.  So you were seeking to gather
9  information in a lot of those conversations?
10     A.  Correct.
11     Q.  And those statements might not have been
12  fully accurate?
13     A.  So it would -- so it would depend on the
14  context of the situation where if I was asking
15  something.
16          There may -- sometimes, I guess what I
17  would describe it as, sometimes when you're talking
18  with somebody trying to get their opinion about
19  something, you may agree with an opinion of theirs
20  that you think is wrong or accurate, but you may just
21  try to get information by saying, yes.  Oh, yeah.  I
22  agree with you on that.  I agree with you on that.
23  And let them keep talking to see what they end up
24  saying overall even if you don't agree with it.
25     Q.  So you wouldn't be truthful to try get more

Page 22

1  information in certain instances?
2      A.  Again, it depends on the specific
3  situation.
4      Q.  Okay.  You'll stand behind what you said in
5  those recordings, correct?
6      A.  It would depend on the context of the
7  recording as far as that goes.
8          Is it something where I made a comment to
9  try to elicit more information?  Is it something I
10  said to try to protect myself, my safety or the safety
11  of a patient from something going on with bullying or
12  harassment.
13     Q.  Let me ask you this:  Would you, you know,
14  admit that the recordings speak for themselves with
15  respect to what you said or whomever you were speaking
16  with said?
17     A.  Well, I would say that it depends on the
18  situation.
19     Q.  So the recordings aren't -- I'm just asking
20  you what the recordings actually -- are they an
21  accurate reflection of those conversations?
22          MR. ELSTER:  Objection.  Overly broad as to
23  the recordings.  But if you know which specific
24  recording he's talking about.
25     A.  Yeah.  So what I would say again, as I've

Page 23

1  said, it depends on the recording and on the
2  conversation.
3      Q.  (Mr. Sullivan) I'm just saying that the
4  recording -- I'm not talking about truthfulness or
5  anything like that.  I'm saying in those recordings,
6  what you said on the recordings, is -- is what it is.
7  Your statements speak for themselves in the context.
8  Whomever you were speaking with speaks for themselves.
9  Like you said, you might have said someone -- someone
10  like Dr. Evers might have said something.  Is that
11  fair?
12          MR. ELSTER:  Objection.  Compound.
13     A.  What I would say again with -- in relation
14  to the recordings, I was seeking information.  I was
15  trying to get -- I was trying to gather evidence of
16  bullying, harassment in violation of state and federal
17  laws.  So I, you know, so it would depend on specific
18  recording and specific conversation as far as that
19  goes.
20     Q.  (Mr. Sullivan) But what you said and what
21  was recorded, is --
22     A.  I mean, I was --
23     Q.  -- what you said to that person, right?
24  I'm -- I'm just trying to verify.
25     A.  My -- my voice on the recording is my voice

Page 24

1  and the other person's voice is their voice.
2      Q.  Is their voice.  And you said what you said
3  and they said what they said.  Fair enough?
4      A.  Again, I'd say it would depend on the
5  context and if I was -- what I was trying to elicit
6  for information but yes.
7      Q.  I'm just saying that if -- if you asked a
8  question or made a statement, it's accurately
9  reflected in the recordings.  Likewise, if you're
10  speaking to someone with the ACGME, their statements
11  is what it is and it's accurately reflected in the
12  recordings?
13          MR. ELSTER:  Same objection.
14     A.  You know --
15          MR. ELSTER:  Overly broad.
16     A.  Again I would --
17          MR. ELSTER:  Foundation.  Hold on.  Hold
18  on.  Same objection.  Overly broad and foundation.
19     A.  Yeah.  I know I said, again, it would
20  depend on the specific recording and what I -- what
21  information I was trying to gather or relay.
22     Q.  (Mr. Sullivan) I'm -- I'm just --
23     A.  So that's all --
24     Q.  Here's -- here's the basic question.  And
25  I'm not -- I'm not going with respect to whether what

**LEXITAS LEGAL**
www.lexitaslegal.com      Phone: 1.800.280.3376      Fax: 314.644.1334

**DR. JEFFERY WEISMAN  9/13/2022**

Page 25

1    you said was truthful or anything like that.
2         I'm just trying to say are those recordings
3    an accurate reflection of what was said in the
4    meetings?  Like, you haven't edited these recordings
5    or anything like that?
6         A.   I don't believe those have been edited.  I
7    gave everything to my attorneys.
8         Q.   Okay.  So what was said during that meeting
9    would be accurately reflected in the recordings?
10        A.   The words themselves in the recordings are
11    what they are.
12        Q.   Are what they are.  Okay.  Thank you.
13            You recorded conversations with Dr. Alex
14    Evers, correct?
15        A.   That is correct.
16        Q.   You recorded conversations with Dr. Rich
17    Benzinger?
18        A.   That is correct.
19        Q.   You recorded conversations with Dr. Russell
20    Groener?
21        A.   That is correct.
22        Q.   You recorded conversa -- conversation --
23    conversations with the ACGME?
24        A.   That is correct.
25        Q.   With the American Board of Anesthesiology?

Page 26

1         A.   I believe I -- I -- I'm trying to think.  I
2    might have done that.
3             Again, I gave all the recordings to my
4    attorney and I've not looked at them in -- in a deal
5    of time.  So I'm -- I'm just saying I might have
6    recorded the -- the American Board of Anesthesia, I
7    believe.
8         Q.   Do you recall recording any other
9    conversations with university faculty members?
10        A.   Yes.  And it would depend on the faculty
11    member I was working with that day.  And if I felt
12    there was going to be an incident of bullying or
13    harassment or something inappropriate going on.
14        Q.   Did you record any conversations with
15    Dr. Cathleen Krucylak?
16        A.   Yes, I did.
17        Q.   Did you record conversations with
18    Dr. Martha Szabo?
19        A.   I might have recorded with Dr. Szabo.
20    Again, I'd have to have a list of the recordings to --
21    you know, again, it would depend on -- it would
22    depend on what was being said and what the situation
23    and context was where I might feel that I need to
24    record this to protect myself.
25        Q.   Did you record conversations with

Page 27

1    Dr. Douglas Thompson?
2         A.   I believe I did.
3         Q.   In that -- in any of those conversations,
4    did you tell Dr. Thompson that you felt that you were
5    below average clinically?
6         A.   I'd have to see the specific conversation.
7    Again, I haven't looked at these in a long period of
8    time.
9         Q.   So in an academic medical residency
10    training program, would you agree that it's the
11    faculty physicians who evaluate the residents?
12            MR. ELSTER:  Objection.  Form.
13    Speculation.
14        A.   Well, so -- so -- so to answer the
15    question, in an academic medical center residency, the
16    attending physicians create evaluations of the
17    residents.  And they're suppose to do those fairly,
18    objectively, accurately and per ACGME standards.
19        Q.   (Mr. Sullivan) Okay.  So it's -- it's the
20    faculty who evaluates the residents, correct?
21        A.   In -- in general, it's the faculty that
22    evaluate the residents.
23        Q.   And that would be because faculty
24    physicians have the knowledge, experience and training
25    to both evaluate and train residents --

Page 28

1            MR. ELSTER:  Object.
2         Q.   -- is that a fair statement?
3            MR. ELSTER:  Objection.  Assumes facts not
4    in evidence.
5         A.   Well, in -- in general, and in an ACGME
6    residency program, the faculty have training and
7    they're boarded in that field and that's why they're
8    doing the evaluations.
9             That said, there's a very wide variety of
10    faculty there.  And, you know, again, are they giving
11    a fair objective evaluation?  I've seen scenarios
12    where faculty do not give very subjective or an
13    accurate or false evaluations.  And I've seen
14    situations where faculty lie and change facts in an
15    evaluation.
16            So without knowing what the specific
17    evaluation or situation is, I can't tell you if it's
18    accurate or if there's a problem with it.  If it's
19    objective --
20        Q.   (Mr. Sullivan) I wasn't asking about
21    accuracy.  I was -- I was just asking about generally
22    your understanding.
23            Would you agree that very -- that
24    evaluations can, like you said, they can -- they can
25    vary amongst faculty physicians?

7 (Pages 25 to 28)

**DR. JEFFERY WEISMAN  9/13/2022**

## Page 29

1          MR. ELSTER:  Objection.  Speculation.
2          A.  It would depend on the -- it would depend
3    on the situation but different faculty can have
4    different opinions.
5          **Q.  (Mr. Sullivan) Okay.  And, you know, some**
6    **evaluators could be tougher than others.  Is that a**
7    **fair statement?**
8          A.  You know, I -- that I'll say I don't think
9    it's a fair statement because I think all
10   evaluators -- everybody that's evaluating you in a
11   residency like Washington University St. Louis, in
12   general, they are all board certified physicians.
13   They all know what it takes to be a board certified
14   physician, and they're all suppose to give accurate,
15   objective ACGME evaluations.
16         **Q.  But -- but -- but their professional**
17   **opinion on performance can -- can differ.  I think**
18   **we're in agreement on that, right?**
19         A.  Well, if -- if the question you're asking,
20   and I just want to make sure I understand is, can two
21   different faculty member -- can one faculty member say
22   X and one faculty member say Y?  Yes.
23         **Q.  That's -- that's exactly what I meant.**
24         A.  If --
25         **Q.  Let me -- let me rephrase.**

## Page 30

1          A.  Okay.
2          **Q.  So one physician evaluator could say,**
3    **he's -- this resident is performing satisfactorily.**
4    **Another might have the opinion that the resident is**
5    **performing unsatisfactorily.  Is that a fair**
6    **statement?**
7          A.  So what I would say is I've seen that
8    occur.  But in general, if this is an honest, accurate
9    and objective evaluation, they should all be the same.
10         So again, people can have differing
11   opinions, but if the question is to judge something
12   objective such as skills, then those faculty should
13   have a similar opinion.
14         **Q.  So probably speaking, in this case, you're**
15   **claiming that the anesthesiology residency program --**
16   **and I'll just refer to the program, is that okay?  So**
17   **that we understand.**
18         A.  That's fine.
19         **Q.  Okay.  Did not accurately evaluate your**
20   **performance as a resident.  Is that fair?**
21         A.  That is correct.
22         **Q.  And you're aware that numerous**
23   **anesthesiology faculty members put concerns that they**
24   **had about your performance in writing.  Is that true?**
25         A.  My understanding is that faculty members,

## Page 31

1    some faculty members put concerns down that were
2    friends with Alex Evers and Tom Cox and Rich Benzinger
3    to try to drive me out of the program.  And many of
4    those comments were not accurate, not objective.
5          **Q.  So are you claiming that all concerns and**
6    **criticisms of the anesthesiology faculty are**
7    **inaccurate and unfair?**
8          MR. ELSTER:  Objection.  Overly broad.
9    Form.
10         A.  I would have to know the specific
11   situation.  One thing to note, and I think it's
12   important to bring up right now.  When you're in a
13   residency training program, everybody is there to
14   learn.
15         A program like Washington University
16   St. Louis takes people from all over the country.  And
17   they -- they interview, for example, the internal
18   medicine department, I believe they interview 500
19   people from coast to coast.  And they come in there to
20   learn and be trained to be competent and good doctors
21   to help patients.  That's what every resident school
22   is, is to go there to train to be a good doctor.
23         Now, as you're asking, can different
24   faculty members have different opinions in general?
25   There are faculty members that can have differing

## Page 32

1    opinions.  But that said, those opinions and
2    evaluations should be within a standardized range or a
3    standard deviation.  Because it's very -- in my
4    experience, it's very odd to have -- and this is just
5    a general, non-specific situation but it's very odd to
6    have one faculty member that says, this guy is a great
7    doctor or this girl is a great doctor and another
8    faculty member say, oh, my God, this person shouldn't
9    be practicing.  There shouldn't be that type of a
10   discrepancy.  There should be a rough middle ground.
11         There can be -- there can be a variance,
12   for example, when you look at performance where you
13   say, hey, this resident, you know, about -- about X,
14   and, you know, somebody else thinks they're X plus 10
15   or 20 percent, or plus or minus 20 percent.  But in
16   general, the evaluation should all be accur -- if
17   they're objective, then evaluations should all be
18   similar.
19         **Q.  (Mr. Sullivan) Okay.  I'm going to move to**
20   **strike as nonresponsive and as a narrative answer.**
21         **If you could just answer the question that**
22   **I ask, this is going to go a lot -- a lot quicker.**
23   **Okay.**
24         **You're going to have ever opportunity to**
25   **answer questions posed by your lawyers, but you**

**LEXITAS LEGAL**
**www.lexitaslegal.com**          **Phone: 1.800.280.3376**          **Fax: 314.644.1334**

**DR. JEFFERY WEISMAN  9/13/2022**

Page 33

1  understand this is my opportunity to ask questions.
2  Okay.  So --
3      A.  Okay.
4      Q.  -- I'd like you to answer the question and
5  not provide narrative answers unless I -- unless one
6  is called for.  Okay?
7      A.  Okay.
8      Q.  Thank you.
9          Did you complete your residency in
10  occupational and environmental medicine at the
11  University of Illinois Chicago?
12      A.  Yes, I did.
13      Q.  When did you complete that?
14      A.  I finished and graduated that residency
15  program in June of 2021.
16      Q.  And who was the program director while you
17  were at the University of Illinois Chicago?
18      A.  The program director when I was there was
19  Dan Ba -- was Dr. Dan Baxton.  He was the program
20  director for the occupational and environmental
21  medicine residency program at the University of
22  Illinois Chicago.
23      Q.  Okay.  Is Strategic Biomedical, Inc -- and
24  I'm going to shorten that to SBI, if that's okay.
25      A.  Oh, that's fine.

Page 34

1      Q.  Is Strategic Biomedical, Inc. still in
2  existence?
3      A.  Yes.  The corporation is still in
4  existence.
5      Q.  Who are the officers of the corporation?
6      A.  Right now it would just be myself.
7      Q.  So you'd be president/secretary?
8      A.  I, you know, I don't believe that there's
9  any formal officers that are -- I'd have to take a
10  look right now to be quite honest.  I haven't looked
11  at the status of the documents on it.
12          I can tell you the corporation still
13  exists.  And right now, the corporation is what I
14  would call in hibernation.  There's not -- it's not
15  doing any activities.  So aside from it existing on --
16  aside from it just existing, is a -- is a -- I don't
17  know what term of art to use, living corporation or
18  live corporation, that -- that's what it stands right
19  now.
20      Q.  So it's -- it's in existence but SBI as a
21  business is not operating.  Is that fair?
22      A.  Correct.  Yeah.
23      Q.  And who are the directors of SBI?
24      A.  I would have to -- I would have to take a
25  look.  I have not looked at the corporate

Page 35

1  documentation for a while.
2      Q.  Do you have annual minutes required by the
3  State of Delaware with respect to appointing directors
4  and officers?
5      A.  I'm sure -- I believe we have annual
6  meeting minutes and everything like that.  I'd have to
7  go see where those are and find them.
8      Q.  Does David Sinow still have a position with
9  SBI either as an officer or director?
10      A.  Right now I would -- so I would have to
11  check the paperwork.  David Sinow at this point is not
12  actively involved, but I would have to check the
13  paperwork to see if it still lists him as an officer
14  or board member.
15      Q.  And you went to medical school at the LSU
16  Shreveport Medical Center, correct?
17      A.  That is correct.
18      Q.  Did you ever complain to anyone about your
19  education and training while you were at LSU
20  Shreveport?
21      A.  I don't believe I made any formal
22  complaints there.  I'm just thinking.  I did very well
23  and enjoyed my time there.
24      Q.  What about just making general com --
25  general complaints to any other faculty members while

Page 36

1  you were there?
2          MR. ELSTER:  Objection.  Form.
3      Q.  -- about your education and training?
4          MR. ELSTER:  Same objection.
5      A.  I didn't make any -- I don't believe I made
6  any formal complaints.
7          I will say -- and not to go on narrative --
8  but I will say medical students just like law
9  students, we always complain after a test.  We -- we
10  always just, you know, oh, my gosh, this test was
11  hard.  Oh, my gosh, this rotation is a lot of hours.
12  But I never thought -- I don't believe I have ever
13  filed a formal complaint.
14          I can ask if it counts that I -- I helped
15  with --
16      Q.  (Mr. Sullivan) I'm going to -- I'm going
17  to --
18      A.  Okay.
19      Q.  My question has been answered.
20      A.  All right.
21          (Plaintiff's Deposition Exhibit A, Second
22  Amended Complaint.)
23      Q.  Thank you.  All right.  I'm going to hand
24  you, Doctor, what's been marked Exhibit A.  And this
25  is the second amended complaints that was filed on

9 (Pages 33 to 36)

Page 37

1   your behalf by your former counsel in this case?
2       A.  It -- it appears to be the Second Amended
3   Complaint but I'd have to read the entire document and
4   go through it to make sure it is.  I'm, you know,
5   looking at the cover page.  It appears to be that.
6       Q.  Okay.  Do you want to go off the record so
7   you can read it or can we agree that there's the
8   header across the top showing that it was
9   electronically filed in the Eastern District of
10  Missouri?
11      A.  Normally I'd want to read a document to
12  make sure, but I -- I'll -- I'll take your word for it
13  that this is the document.
14      Q.  Okay.  And this would be a full statement
15  of your current claims and allegations in this case.
16      A.  So this document has some of the claims
17  bullying, harassment and things that have occurred.
18  There's other incidents -- there's actually many
19  incidents that are not included in this and we're
20  still investigating incidents that are uncov -- that
21  are being uncovered right now as we speak while we go
22  through discovery.
23      Q.  Okay.  Well, what are those incidents?
24      A.  Well, one of the most recent incidents that
25  we discovered was that my ACGME transcript had been

Page 38

1   hidden by Washington University and Barnes-Jewish
2   counsel for the past four years.  And it -- and
3   despite repeated requests by myself and my attorneys
4   for it, they refused to give it, which prevented me
5   from obtaining many jobs.  And this situation went all
6   the way up from the program director to General
7   Counsel Ramatowski who was -- who was helping them to
8   hide my transcript.
9       Q.  So you reviewed what were marked attorney
10  client communications in the course of
11  investigating --
12      MR. ELSTER:  Objection --
13      Q.  -- claim --
14      MR. ELSTER:  Hold on.  Objection.  Calls
15  for the extent -- or it calls for a legal conclusion
16  as to attorney client privilege.  And form as to which
17  documents you're referring to.
18      A.  Yeah.  Could you tell me what documents
19  you're referring to?
20      Q.  (Mr. Sullivan) I'm referring to e-mails
21  that were inadvertently produced but that had
22  Christine Ramatowski and Joseph Sklansky as senders
23  and recipients of those.
24      MR. ELSTER:  Same object -- sorry.
25      MR. SULLIVAN:  Can you just let me -- let

Page 39

1   me finish.
2       Q.  (Mr. Sullivan) Did you review those
3   e-mails?
4       MR. ELSTER:  Same objection.  Legal
5   conclusion and form.
6       A.  I read some of those e-mails.  I did --
7   I -- I can't tell you I've read every document in
8   discovery.  I saw some of those e-mails and I saw the
9   draft of the sanctions motion.
10      Q.  Okay.  With respect to the ACGME, you're
11  not currently applying for residencies; is that
12  correct?
13      A.  Well, I -- I actually have -- I actually --
14  so right now I actually asked for an ERAS token from
15  LSU Health.  I've always been trying to actively see
16  if a seat can open up that I can get into for
17  anesthesia to get back into things.
18      Q.  So you're still seeking to -- to go back
19  into it for an anesthesiology residence -- residency
20  program?
21      A.  I would like to resume training and finish,
22  you know, complete my career goals.
23      Q.  Have you provided a waiver or a request to
24  the program with respect to your summative evaluation?
25      A.  I have made multiple requests in the past

Page 40

1   both verbal and written to Douglas Thompson, Richard
2   Benzinger.  And I've even gone to the former GME Dean,
3   Christine -- or Rebecca McAllister, my apologies
4   there, and Tia Drake in the past asking them for my
5   transcripts.  And I even had a meeting with them where
6   I told them that they -- that I was concerned that
7   they might be hiding my records.
8       Q.  What's the difference between a transcript
9   and a summative evaluation?
10      A.  In -- so when you say summative evaluation,
11  are you referring to an ACGME summative evaluation
12  transcript, the only -- that is a true transcript of
13  your ACGME training.
14      And to -- and my -- in my opinion, and in
15  fact, an ACGME summative evaluation transcript is no
16  different than a law school transcript.  It is the
17  documents you need to be able to train in residency.
18      Q.  And -- but every program -- and you've been
19  provided the six month summative evaluation that was
20  submitted by the program to the ACGME; is that right?
21      A.  So the ACGME has -- so the ACGME has
22  milestones that are submitted to them on a six month
23  interval, and the ACGME has a website where they
24  maintain those milestones.  Those are -- those --
25  that's not a formal ACGME summit evaluation

10 (Pages 37 to 40)

**DR. JEFFERY WEISMAN  9/13/2022**

## Page 41

1  transcript.
2      Q.  I wasn't -- that's not my question.  I was
3  **asking you were provided with those and any programs**
4  **that you applied to were provided with those.  Is that**
5  **a fair statement?**
6      A.  I --
7      MS. RUTTER:  Objection.  Calls for
8  speculation as to whether or not those six month
9  milestones were provided to every program that asked
10  for them.
11      A.  Well, what -- and what -- what I was going
12  to say was -- was that I don't believe that they have
13  been provided to every program that requested them.  I
14  know there's programs that were not provided
15  documents.
16      And furthermore on that, I -- I guess I
17  would just say that as far as the six month
18  evaluations and the milestones go, I -- I don't even
19  know if everything was fully created for the six month
20  milestones because after my first year, Richard
21  Benzinger refused to even have a six month meeting
22  with myself and Gary Hammen.  Despite every other
23  resident having a meeting after -- at the year -- at
24  the end of our first year.
25      Q.  (Mr. Sullivan)  So at the end of the first

## Page 42

1  **year, in the summer, Dr. Benzinger you're saying**
2  **refused to meet with you?**
3      A.  That is correct.
4      Q.  **That's correct?**
5      A.  Yes.
6      Q.  **Okay.  What about are there any other**
7  **current claims that are not found in the second**
8  **amended petition?  We've talked about the summative**
9  **evaluation.**
10      A.  So I'm sure there's other -- so I'm sure
11  there -- so there's other claims that we're currently
12  investigating that we would need to add in a second
13  complaint or in an amended complaint based on
14  discovery that's ongoing.  And I've got a legal team
15  that's investigating additional claims.
16      Q.  **Well, can you tell me what those claims**
17  **are --**
18      MR. ELSTER:  Objection.  Work product.
19      Q.  **-- so I don't have to bring you back.**
20      MR. ELSTER:  Objection.  Work product.  And
21  to the extent it calls for attorney client privilege
22  informations.  Don't -- don't discuss any legal
23  communications or legal advice.  But you can answer
24  subject --
25      A.  Yeah.  I mean, I guess my answer would be

## Page 43

1  is I'm currently in discussions with my attorneys on
2  additional claims that could be brought forth and
3  likely need to be brought forth based on what we've
4  found in discovery.
5      Q.  **(Mr. Sullivan)  Okay.  Doctor, could you**
6  **turn to page 2 of Exhibit A for me.**
7      A.  Okay.
8      Q.  **And do you see paragraph two?**
9      A.  Yes.  I see a paragraph two in there.
10      Q.  **Do you see the second sentence which**
11  **states:  The anesthesiology department of Wash U.-BJH**
12  **persuaded -- I'm guessing it's suppose to say**
13  **plaintiff -- to relocate his laboratory and activities**
14  **to St. Louis and affiliate with Wash U.-BJH?**
15      A.  I see that paragraph.  I'd like to read it
16  if...
17      Q.  **Yeah.  No, no.  Absolutely.**
18      A.  Okay.  So paragraph two states:  Weisman
19  was a pioneer in researching and developing medical
20  uses for three dimensional printing technology, which
21  he did individually and through SBI.
22      The anesthesiology of Wash U-BJH
23  persuaded -- and I guess we're suppose to say
24  plaintiff -- relocate his laboratory and activities
25  to St. Louis and affiliate with Wash U-BJH.

## Page 44

1      Among other things, anesthesiology offered
2  Weisman a residency position that would make him
3  eligible for board certification.  Weisman accepted
4  the deal and started in July of 2016.
5      Q.  **Let me ask you what was said by either**
6  **anybody in the program, whether it was on the**
7  **university or the hospital side to persuade you to**
8  **relocate your laboratory and activities to St. Louis?**
9      A.  Okay.  So that -- so there -- that would be
10  a longer answer.  So among the things that were said,
11  I -- so the way that it works for residents, they go
12  through something called match.  A process called
13  ERAS.  I applied --
14      THE COURT REPORTER:  Called what?
15      THE WITNESS:  ERAS, E-R-A-S.
16      A.  I don't recall exactly -- it might be
17  electronic residency application system.  So you apply
18  through there.  And basically you fill that out and
19  you submit an application in September.  And the
20  schools get those applications and they review them.
21  And then they invite you to go interview in the fall
22  and possibly winter and early spring.  And then you go
23  and you interview.
24      In my case, I received a phone call, I
25  believe it was from Lauren Gibson, in either late

**LEXITAS LEGAL**
**www.lexitaslegal.com**      **Phone: 1.800.280.3376**      **Fax: 314.644.1334**

**DR. JEFFERY WEISMAN  9/13/2022**

Page 45

1  September or October, and they invited me.  They said
2  that they want -- that they saw my background as M.D.,
3  Ph.D., as a patent attorney.  They were highly
4  interested in me and they wanted me to go fly in to
5  interview with them in December.
6       And they said they were very interested to
7  the point that they were willing to pay for my airfare
8  and hotel rooms there, which is something that's not
9  done in the residency match system really.  I don't
10 know of any other colleague of mine from LSU Medical
11 School that was invited to go have a -- have a paid
12 airfare and hotel rooms to go interview somewhere.
13      They also offered to fly my wife in with
14 me.  They wanted to have a recruitment research
15 symposium and recruitment day.  So out -- so I went to
16 that event.
17      And I can describe that more in detail.
18 But in general, at that event I was approached by Alex
19 Evers, by Peter Nagele, by Thomas Cox, by Richard
20 Benzinger, by Rob Gereau, and basically they all
21 wanted me to come to Washington University St. Louis
22 to bring my -- my lab and my technology development
23 and all the activities that I've been doing there.
24 And they -- they wanted me to rank them highly and
25 to -- to come to Wash U.

Page 46

1       **Q.  So did they specifically talk about your --**
2  **your laboratory and your company --**
3       MR. ELSTER:  Objection.
4       **Q.  -- in those conversations?**
5       MR. ELSTER:  Objection.  Vague as to they.
6       A.  So -- so again, they did talk about my lab
7  when I was there.  There were multiple conversations.
8  I -- that -- that seemed to be the big -- that seemed
9  to be biggest deal about me was that I had -- that I
10 was an M.D., Ph.D. who unlike other M.D. Ph.D.s had a
11 research lab and was a patent attorney.
12      So I -- so I was talking to a good portion
13 of the leadership faculty and research faculty that
14 were there for that -- for that interview, and they
15 wanted me to really come there and move my lab.
16      In fact, Pete Nagele, he was the section
17 chief for trauma anesthesia when I was there, and then
18 he eventually moved to the University of Chicago to be
19 chair of their anesthesia department.  Peter Nagele
20 was talking about me helping him to get patents to
21 develop technology.
22      And in fact, he would later use my lab and
23 STLCOP to launch some of his technology development
24 where he was using that space.  We allowed him to use
25 it to go in there and launch his own technology.

Page 47

1       THE COURT REPORTER:  And so cop?
2       THE WITNESS:  Sorry.  St. Louis College of
3  Pharmacy abbreviated STLCOP, S-T-L-C-O-P.  And I think
4  they've changed their name recently.  I'm trying to
5  think what it is.  Something health science.
6  Something general health sciences.
7       **Q.  And what they offered you -- what you state**
8  **in the complaint is that you were offered a residency**
9  **position; is that correct?  Yes or no?**
10      A.  Yes.
11      **Q.  Turn to page 3.**
12      A.  Okay.
13      **Q.  If you just want to read paragraph five to**
14 **yourself.**
15      A.  Okay.
16      **Q.  Just let me know when you've read it.**
17      A.  Okay.  Okay.  I've read the -- I've read
18 paragraph five of the amended complaint.
19      **Q.  Okay.  Let me ask you a couple of questions**
20 **based on that.  You say:  By mid 2018, Weisman and SBI**
21 **felt compelled to leave WU-BJH.**
22      **But SBI had ceased operating earlier than**
23 **mid 2018, correct?**
24      A.  So SB -- so to answer the question, SBI as
25 a corporation still existed.  It's general -- general

Page 48

1  operations as far as creating new technologies or
2  things along those lines had been frozen by 2018, I
3  believe.  So yes.
4       **Q.  Yeah.  And that's because the -- the lab**
5  **had been transferred and acquired by the Department of**
6  **Radiology?**
7       A.  By -- by that point in time, the radiology
8  department had taken the lab.
9       **Q.  That would have been in, like, maybe**
10 **March 2017 is when that would have been acquired?**
11      A.  The transfer -- the -- so radiology taking
12 the lab, I believe it -- I believe the lab was moved
13 from the St. Louis College of Pharmacy to the
14 radiology department lab spaces by -- I believe that
15 ended by about March of 2017.
16      **Q.  Whose -- who was the -- the other owner of**
17 **SBI and investor in the lab?  Who was that person?**
18      A.  So the other -- the other investor and
19 owner is David Sinow.  He is a J.D. Ph.D. He is a
20 finance -- he was a finance professor.  He had
21 launched multiple startups and he's also a venture
22 capitalist.
23      **Q.  How was SBI doing financially before it**
24 **moved to St. Louis?**
25      A.  I thought SBI was doing fine financially

12 (Pages 45 to 48)

**DR. JEFFERY WEISMAN  9/13/2022**

Page 49

1   before it moved.
2       **Q.  So it was generating revenues?**
3       A.  So it -- so as far as -- as far as one of
4   our revenue streams for grants it was.
5       **Q.  What about -- there's kind of distinction.**
6   **There's also your -- what I'll refer to as your lab.**
7   **Is your lab and SBI one in the same or are they**
8   **separate?**
9       A.  So as far -- so SBI, at that point, was the
10  lab -- was the lab group.
11      **Q.  When you moved here?**
12      A.  When I moved to St. Louis, SBI was the lab
13  group.
14      **Q.  Okay.  And was SBI the lab group, let's**
15  **say, while your last six months at LSU?**
16      A.  So I -- to make sure I'm accurate.  So you
17  would have to back up a little bit.  So S -- so SBI
18  was incorporated in, I believe, I'd have to check the
19  documents.  I believe it was October, fall 2015.  So
20  SBI was -- so SBI was incorporated then.  So...
21      **Q.  So it was -- so SBI and your lab were one**
22  **in the same maybe in the last -- the last several**
23  **months that you were at LSU.  Is that fair?**
24      A.  That -- that is -- I think that would
25  probably be a fair comment.  I just want to make sure

Page 50

1   I understand what you're asking on it but...
2       **Q.  I just want to know is there a difference**
3   **when we're talking about -- about it in this case**
4   **between your lab and SBI?**
5       A.  Okay.  I -- I believe at that point in
6   time, we had -- the -- what we had decided to do after
7   meeting with David Sinow and looking at venture
8   capital options, the decision was to spin off the
9   technology and the lab as a company Strategic
10  Biomedical that we could raise funds yet still have --
11  but still have University affiliations as needed to
12  put in for academic grants and IHMSF, etc.
13      **Q.  Okay.  And so that would always be under**
14  **the umbrella of SBI then, if you're applying for**
15  **grants and funding in the academic setting as well?**
16      A.  Yes.  And just to be accurate on that, when
17  you're applying for grants in the academic setting --
18      **Q.  That's individually, right?**
19      A.  Yeah.  So you can -- there's actually a
20  couple of different ways it's done.  You can either
21  apply for an NIH or NSF type grant individually but
22  there are -- there are grants called SBIR grants,
23  small business innovation grants.  And there's --
24  there's a couple of different types of them where they
25  can be between the government and a private company or

Page 51

1   there's a variant called STTR, I believe, where it can
2   be between academic center and the government and a
3   private company is kind of a three-way situation.
4       **Q.  If you could turn, Dr. Weisman, to page 5,**
5   **paragraph 17.**
6       A.  Okay.
7       **Q.  And what I want to ask you about is that**
8   **your -- you say your lab and research staff that you**
9   **directed had an affiliation with Louisiana State**
10  **University and Louisiana Tech University.  What was**
11  **the relationship with Dr. David Mills with respect to**
12  **those?**
13      A.  Okay.  So doctor -- Dr. David Mills, he was
14  my PI for doing a Ph.D.  And to make -- PI would
15  typically be principle investigator.
16          So I was a Ph.D. student that was in his
17  lab group when I developed the technologies.  And once
18  I had finished the Ph.D. work was when -- once I
19  finished the Ph.D. work, then David Mills was not
20  really fully -- Mills wasn't involved in the lab
21  groups since it was not an academic -- a fully
22  academic situation at that point.  It was, you know,
23  we were start -- launching a private spinoff company
24  and licensing technology to do it.
25          That said, David Mills was still doing

Page 52

1   substantial academic research with us and we were
2   working together on many projects.
3       **Q.  And -- and did you guys share equipment?**
4       A.  I would say the answer is -- is -- I'm
5   trying to think on the equipment that we were using.
6   We -- we did use some of -- some of his equipment but
7   we also rapidly were purchasing our own equipment.
8       **Q.  And did Louisiana Tech own a patent that**
9   **had been developed by you, David Mills and others**
10  **while you were there?**
11      A.  Yes.  And the way that works is if a Ph.D.
12  student or anybody works at a university if you
13  develop technology while you're at the university,
14  then typically the general scenario is the university
15  or the university's research corporation arm owns --
16  will own the patent because you're using their lab
17  space, their equipment, and it's very standard.  And,
18  I think, Wash U. does that a lot.
19          But what ends up happening is then once you
20  file an invention disclosure or intellectual property
21  disclosure, they might then go file for a patent.  But
22  once it's filed, you can -- you can very readily
23  approach the university and more or less request to
24  license the technology or buy the patent technology
25  from them.

13 (Pages 49 to 52)

**DR. JEFFERY WEISMAN  9/13/2022**

Page 53

1    In general, in doing licensing work,
2  they -- most universities like to continue to have
3  ownership of the patent and they'll license it to you.
4    So you -- you might have an exclusive
5  license to use and develop new tech, but they want to
6  have control.  And most universities, that's how they
7  operate.  There's -- there's a smaller number that
8  might sell or consider selling at some point to allow
9  the company to have, you know, an easier way to be
10  sold, if that's necessary.
11    Q.  But that's what happened with -- with --
12  with your patent is that Louisiana Tech licensed it?
13    A.  To us.
14    Q.  To you, correct?
15    A.  That is correct.
16    Q.  Okay.  Did SBI, other than Dr. David Sinow,
17  get funding from any other investors?
18    A.  So -- so SBI, aside from David Sinow, I --
19  I put -- I've been covering lab -- I've been covering
20  lab and research expenses personally.  I put a lot of
21  money out.  If I had to estimate it, I probably spent
22  on lab supplies and equipment between, I would
23  estimate at least 80 to a hundred thousand dollars, if
24  not more, on equipment and supplies.  And some of the
25  equipment that we had was -- was also very customized

Page 54

1  where we -- anyway --
2    Q.  I'm going to -- I'm going to move to
3  strike.  All I asked was other than you and David
4  Sinow, were there any other investors in SBI?
5    A.  There were other investors that were
6  interested.  David --
7    Q.  Did anybody put -- did anybody invest money
8  in SBI, other than you and David Sinow?
9    A.  We -- we -- we did not.  I do not believe
10  we closed the round of funding that we were working
11  on.
12    Q.  Can you look at paragraph 22 on page 7.
13    A.  Okay.
14    Q.  And the third sentence there you say -- it
15  states:  Given his credentials and accomplishments
16  however virtually any residency in the program would
17  have been happy to enroll him.  Meaning you?
18    A.  Yes.  I'm reading that right now.  Do you
19  mind if I just read the paragraph for context for a
20  moment?  All right.
21    Q.  Yeah.
22    A.  So paragraph 22.  Would you prefer I read
23  it out loud or just to myself?
24    Q.  You can just read it to yourself.
25    A.  Okay.  Okay.  I have -- I have finished

Page 55

1  reading the paragraph.
2    Q.  And you mentioned before how in your last
3  year at LSU you would have started the application
4  process for residents -- residency programs in, like,
5  the fall of 2015.  Is that fair?
6    A.  Yes.  That is correct.
7    Q.  Roughly, how many residency programs did
8  you file applications with?
9    A.  You know, I don't recall the exact number.
10  I'd have to go through notes.  I -- I'd be guessing.
11  I would say I -- I applied to -- I applied -- I
12  applied at that time to what I thought was a
13  reasonable number.  I don't recall the exact.  I could
14  try to find -- go through notes and find out.
15    Q.  Would it -- would you say 50, more or less?
16  More than 50?
17    A.  I -- I don't recall -- and I apologize I
18  just dont --
19    Q.  That's fine.
20    A.  -- what the exact --
21    Q.  That's fine.
22    A.  -- number on it.  In general, LSU
23  recommended applying to at least 20 or 30 programs.
24    Q.  Okay.
25    A.  But -- but -- and I apologize.  I just

Page 56

1  haven't looked at that since 2015, 2016.
2    Q.  Do you recall whether the majority of the
3  programs that you applied to declined to offer you an
4  interview -- an interview?
5    A.  So I -- I don't remember the stats -- the
6  stats on that.  I didn't -- I apologize.  I didn't
7  calculate the stats.
8    In -- from what I saw, the majority -- it
9  seemed that the majority of programs that I spoke with
10  wanted to grant me an interview.  And it -- and it
11  also seemed that even if a program hadn't granted me
12  an interview, if I let them know I was an M.D. Ph.D.
13  that was a patent attorney, they would offer me one.
14    And the example I would give is I called up
15  the medical college of Wisconsin, which has a research
16  track for M.D. Ph.D.s, and they didn't offer me an
17  interview.  And I called up and just said, Hey, I'm an
18  M.D. Ph.D., and I got a call back immediately from the
19  program director.  Who said, Oh, you're an M.D. Ph.D.
20  For some reason I didn't see it.  I had to go fish you
21  out of the -- the application pool, but we'd like you
22  to come in and we're really interested.  So just...
23    Q.  So they might have rejected you at first,
24  but based on a telephone call that you had then they
25  decided to interview you?

**LEXITAS LEGAL**
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 57

1    MR. ELSTER:  Objection.  Misstates
2  testimony.
3    A.   Yeah.  So -- so, I guess, what I -- what I
4  was just saying on that is most of the programs that I
5  spoke with, if I -- if -- once they saw what my
6  background was, they were very interested in having
7  the interview.
8    And -- and just the over -- the overarching
9  just because I, you know, I want to be -- I want to
10  make sure that I explain how this works for those that
11  aren't in -- in the field.  But in general, programs
12  can get a lot of applications.
13    So, for example, again, Wash U's. internal
14  med department might interview 500 people, but they
15  might have to go through just thousands of
16  applications to look at it.
17    **Q.   Right.**
18    A.   So depending on, you know, who, you know,
19  they -- they probably -- I don't know how Wash U. Does
20  it, but most places might divvy that up and, you know,
21  tell different faculty, here, you look at this stack.
22  You look at that stack.  So it's -- it's possible for
23  one faculty member that's not in the research track to
24  say, Oh, you know, I didn't notice this guy was an
25  M.D. Ph.D. or vice versa.

---

Page 58

1    (Defendant's Deposition Exhibit A2,
2  Complaint.)
3    **Q.   If -- if you could just kind of put Exhibit**
4  **A to the side there, Doctor, because we're going to go**
5  **back to it.  Handing you what's been marked Exhibit**
6  **A2.  If you want to familiarize yourself on this but I**
7  **can direct you to page 34.**
8    A.   Okay.  Let me just -- so...
9    **Q.   Is this -- is this the initial complaint**
10  **that you filed as a pro se plaintiff in this case?**
11    A.   Yeah.  So -- so this document appears to be
12  the initial plaintiff [sic] that I filed January 18th
13  and the Eastern District of Missouri so...
14    **Q.   And if you go to page 34, the last -- it**
15  **should be the last page of this exhibit, that would be**
16  **your -- there's an electronic signature and what**
17  **appears to be either your signature or initials?**
18    A.   Yes.  I see my signature on there.
19    **Q.   Okay.  Can you go to page 3 of this**
20  **exhibit, paragraph 13.**
21    A.   Okay.
22    **Q.   If you just want to --**
23    MR. ELSTER:  I just want to make an
24  objection.  This is an abandoned pleading.  It's not
25  the current operative complaint.  Just make a running

---

Page 59

1  objection to this document and it's being superceded
2  by the second document.
3    MR. SULLIVAN:  I understand, but I can
4  still ask questions about it.
5    MR. ELSTER:  And I want to make -- right.
6    **Q.   (Mr. Sullivan) If you just want read**
7  **paragraph 13 to yourself, Doctor, and then I'll have a**
8  **question there.**
9    A.   Okay.  Plain --
10    **Q.   Oh, you don't have to read it -- you don't**
11  **have to read it out loud.**
12    A.   Okay.  I've read that paragraph.
13    **Q.   Okay.  Okay.  And -- and you stated in this**
14  **that winning multiple awards and everything, all this**
15  **placed plaintiff amongst the most accomplished medical**
16  **school graduates in the -- should be, I guess, country**
17  **on the year of his graduation?**
18    A.   Yes.  That's -- that's what's in the
19  pleading.
20    (Defendant's Deposition Exhibit A5, Dean
21  letter from Mark Platt.)
22    **Q.   Let me hand you what's been marked Exhibit**
23  **A5.**
24    A.   Okay.
25    **Q.   Can you identify this document?**

---

Page 60

1    A.   All right.  This document appears to be a
2  dean's letter from Mark Platt, the Dean of Students at
3  LSU Health Science Center in Shreveport.
4    **Q.   And this would be part of the ERAS**
5  **application process?**
6    A.   Yes.  In ERAS the deans of medical
7  schools -- or sorry -- the deans of students will
8  upload a letter outlining your background and it's
9  very similar to an ACGME transcript.  You need one of
10  these letters to go into residency.
11    **Q.   Okay.  In the middle of the page under Jeff**
12  **Weisman, do you see summary?  And it states:**
13  **Mr. Weisman has a GPA of 3.111 and a class rank of**
14  **81st out of 110?**
15    A.   Yes.  I see that right now.
16    **Q.   So you would have known, roughly, in the**
17  **bottom 30 percent of your class at LSU?**
18    A.   Well, I'd have -- I'd want to calculate
19  what 81 out of 110 would be percentage wise, but,
20  what -- you know, I was -- I was number 81 if you
21  ranked by GPA.
22    **Q.   That's what I'm -- that's all -- that's all**
23  **it states and that's all I'm asking.  Right?**
24    A.   Okay.
25    **Q.   Would you agree that this might have**

---

15 (Pages 57 to 60)

**DR. JEFFERY WEISMAN  9/13/2022**

Page 61

1  indicated that your medical knowledge was less than
2  your peers at LSU?
3       MR. ELSTER:  Objection form.  Speculation.
4       A.  And I -- I -- I wouldn't agree with that
5  for the following reason:  The -- this -- this is
6  looking at class rank based on taking tests and that's
7  it.
8       At LSU, I was conducting research with
9  almost every department chair from literally the chair
10 of radiology, chair of surgery, the chair of oral
11 surgery.  My -- according to them, my medical
12 knowledge was at the very top.
13      If it's a question of is my class rank 81
14 out of 110 because I was doing other things than just
15 studying to take a test, then that's true.  My class
16 rank is my class rank.
17      Q.  (Mr. Sullivan) Okay.
18      A.  But my -- my medical knowledge was
19 appropriate.
20      (Defendant's Deposition Exhibit A6, E-mail
21 1/25/18 AKT 6mth Results.)
22      Q.  Let me hand you what's been marked as
23 Exhibit A6.
24      A.  Okay.  And this was --
25      Q.  What -- what is the AKT test?

Page 62

1       A.  So Richard Benzinger and Washington
2  University, they have -- there's -- there's exams, I
3  believe it stands for the anesthesia knowledge test,
4  and it's an informal test that you can take to see
5  what your knowledge is in relationship to peers or
6  your other people in your program or nationwide, I
7  believe.
8       Q.  So it's, like, an inner -- kind of inner
9  hospital, inner program test, correct?
10      A.  That -- that is my understanding of it.
11      Q.  And that's -- and -- and it's -- and it's
12 to determine the level of knowledge of trainees?
13      A.  That is correct.
14      Q.  Do you recall that you got a raw score of
15 77 in a standard score of 309 on the PKT -- AKT.  I'm
16 sorry.
17      A.  Yes.  I believe this is -- yes.
18      Q.  And if you look at page 2 on the -- the
19 table, the standard score of 309, that would have put
20 you in the bottom five percent, if you look at the
21 table and the percentile, of those taking the test.
22      A.  Yes.
23      Q.  Okay.
24      A.  And let me just --
25      Q.  Thanks.

Page 63

1       A.  Well, no, I want to finish my answer.  And
2  the reason for that is because instead of studying
3  like my peers did, I was having to go around and tape
4  record people that were harassing me and spend time
5  talking to people.  Instead of going home at the end
6  of the day to go study and relax, I had to go sit
7  around the hospital to check what my, you know, that
8  did I do a good job today?  Are you happy with me?
9  Are there any issues?
10      So I think this was probably accurate
11 because, as far as scoring on this test, because I
12 didn't have time to study for it.
13      And I would also note that this test
14 doesn't relate to board certification, which I passed.
15      Q.  But -- so the lack of knowledge shown in
16 those results isn't your fault, it's -- it's -- it's
17 the fault of evaluations that were given to you?
18      MR. ELSTER:  Objection.  Argumentative.
19 Assumes facts not in evidence and form.
20      A.  Well, no, I'm -- I'm just saying that
21 this -- this was a test on anesthesia knowledge, just
22 general anesthesia knowledge taken in January 25th,
23 2018.  There were -- I believe there was an anesthesia
24 one -- they do one at, like, one month or a couple of
25 months out, and you have to continue studying.  It's

Page 64

1  just -- it's suppose to be a proxy for the boards,
2  that's what the point is, to see if you'll pass the
3  boards.
4       And I would -- I would highly assert that
5  my score on this was lower than my peers because my
6  peers were able to study and had extra time.  Whereas,
7  in my situation, I was trying to stop people from
8  harassing me and giving me a hard time.
9       Q.  (Mr. Sullivan) Doctor, can you go back to
10 Exhibit A, which is the second amended complaint.
11      A.  Yep.  Okay.
12      Q.  So talking about what -- you understand
13 what I mean when I talk about the match, correct?
14 Meaning --
15      A.  The -- the match would be the national
16 residency matching program, the economic's algorithm
17 that matches everybody around the country with
18 residency programs and they won a Nobel Prize for it.
19 Yes.  I'm familiar with that.
20      Q.  Okay.  And -- and when -- that's -- I mean,
21 it's binding upon the -- the match.  So if you match,
22 you know, you match with Washington University.  So
23 that meant that you were going to be going into the
24 anesthesiology program as a resident and they were
25 going to accept you a resident, correct?

**LEXITAS LEGAL**
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

**DR. JEFFERY WEISMAN  9/13/2022**

Page 65

1    A. That is correct.
2    Q. Okay. Can you go to page 12 of Exhibit A,
3  please.
4    A. Okay.
5    Q. And paragraph 39.
6    A. Okay. I see that.
7    Q. This describes a -- a multi-facetted
8  contract. Who -- who specifically -- when was the
9  offer made to you, as alleged in your petition, that
10  you would get a residency spot if you moved your lab
11  and its resources to the university? Or sorry. To
12  the program, to St. Louis?
13    A. Okay. Let me read paragraph 39.
14    Q. Yeah.
15    A. And then I'll answer the question.
16    Q. Sure.
17    A. Okay. So I've read paragraph 39. And just
18  to make sure I understand your question. You were
19  asking me who's involved -- who was involved in making
20  this contract with me?
21    Q. Yeah. Who -- who -- who was involved?
22    A. Okay. I -- so who was involved was the
23  leadership for the anesthesia department. It was Alex
24  Evers. I spoke with -- I spoke with him about moving
25  my lab. I spoke with and during the interview day and

Page 66

1  other correspondence, I had spoken with Richard
2  Benzinger, with Evan Kharasch, the former Vice
3  Chancellor for Technology for Washington University,
4  and I had spoken with Rob Gereau and many other
5  faculty about bringing my lab over and coming there as
6  a resident.
7    Q. And paragraph 40. You were contacted you
8  say by Dr. Evers in late 2015 about relocating to
9  St. Louis?
10    A. Let me just read that and then I'll answer.
11    Q. Yeah.
12    A. Yes. I've, you know, read that paragraph.
13  So yeah -- yes. Alex Evers had contacted me and
14  most --
15    Q. Would that have been after the interview
16  weekend that you came into St. Louis?
17    A. Yes. It was after the interview weekend.
18  And his -- the final contact that I had with him
19  before we submitted rank lists.
20      He called on February 14th in the evening
21  during Valentine's Day, which, I was -- which, I
22  guess, I later found out he -- he likes -- he wanted
23  to do because he figured I'd be with my wife and could
24  discuss everything with her there. And he had called,
25  left a voice message. I messaged him and then called

Page 67

1  him back. And then he had said that we really want
2  you here. We want your lab here. We want you to
3  bring everything up. And we're very interested in you
4  for an ASAP seat. And, you know, then -- you know, I
5  spoke with him on that.
6    Q. Okay. And he didn't -- did he indicate in
7  that conversation that he was going to rank you first
8  or was it just a general conversation -- talking about
9  the February 14th, 2016 -- just we would really like
10  to come -- for you to come here and we think you'd be
11  a good with the ASAP program?
12    A. So to my memory of the conversation, he had
13  said that they -- that if I wanted -- that they would
14  rank me at the very top. They wanted me to come here
15  and that that was -- that was the conversation.
16      And, again, I apologize, that conversation
17  was a number of years ago but...
18    Q. No, that's okay. I understand.
19      And paragraph 41, I think you already
20  touched about this, but just -- just the first
21  sentence: Shortly after initiating department
22  communications with Weisman, Evers paid for Weisman
23  and his fiance' to visit Washington University from
24  Louisiana.
25      That was part of the interview weekend and

Page 68

1  that was done for all the interviewees and potential
2  residents, correct?
3    A. So that -- that was only done for the M.D.
4  Ph.D.s that they invited that weekend. So they --
5  what they do that weekend is they, Alex Evers selects
6  a very specific number of M.D. Ph.D.s that he wants to
7  recruit. There's only -- every year there's only
8  about 20 to 30 M.D. Ph.D.s that go into anesthesia.
9  And about -- from when I was there about four or five
10  years ago, they really didn't have, from that point,
11  they didn't really have any M.D. Ph.D.s at Wash U. So
12  they had decided to start a special research track and
13  heavily recruit with a goal of increasing research
14  dollars. So what they --
15    Q. But let me --
16    A. Oh, sure.
17    Q. But you weren't the only one who -- who was
18  flown into St. Louis with either your significant
19  other. Every other M.D. Ph.D. who was brought in for
20  that interview weekend received the -- same
21  treatment, correct?
22    A. Yes. I believe -- I believe they had flown
23  in everybody. But I would say that they were -- I had
24  a -- I felt compared to other M.D. Ph.D.s there was a
25  lot more conversations with myself and other faculty

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 69

1   because I had the lab that they wanted me come there
2   and bring.  But -- and what I will say is, again, this
3   was only that one weekend where they do that.  Every
4   other group that comes in --
5       **Q.  Okay.  Yeah.  I understand.  So just with**
6   **the M.D. Ph.D.s that were interviewed, they all got**
7   **their -- an all expense paid trip to St. Louis to**
8   **interview for that weekend?**
9       A.  Yes.  And a limo ride through the city.
10      **Q.  Thank you.**
11          THE COURT REPORTER:  And what?
12          THE WITNESS:  And they also for recruitment
13  did a limo tour of the city for --
14      **Q.  For everybody?**
15      A.  For the M.D. Ph.D.s that were there and
16  their spouses.
17      **Q.  Can you go to paragraph 52 of Exhibit A,**
18  **please.**
19      A.  Okay.  I'm here.
20      **Q.  Okay.  You can just read that to yourself.**
21  **Let me know...**
22      A.  Okay.  Thank you.  I'm reading it right
23  now, 52.  Okay.
24      **Q.  And hadn't Dr. Evan Kharasch already been**
25  **communicating with you prior to the match?**

---

Page 70

1       A.  I had -- that -- I'm just trying to think
2   about when we first talked.  I would have to check.  I
3   had been talking with Evan Kharasch during the
4   interview weekend.  I believe, I'm just trying -- I'd
5   have to look to see when we first spoke because it was
6   a while ago but...
7       **Q.  But I mean, and then didn't you contact and**
8   **e-mail Dr. Kharasch about moving the lab; is that**
9   **right?**
10      A.  Yes.  I did contact him and I was put in
11  touch with him during the interview weekend as him
12  being the Vice Chancellor for research and someone
13  that would be able to help with moving the lab and
14  everything up.
15      **Q.  So this would have been unlike what you say**
16  **in the first sentence, Dr. Evers put you in contact**
17  **with Dr. Kharasch on the interview weekend in**
18  **December 2015?**
19      A.  Well, he also put me -- well, it was -- it
20  was multiple times I was directed to Evan Kharasch.
21          I was -- I just want to make sure I
22  understand the question.  Are you -- are you asking
23  when I was first introduced to Evan Kharasch or there
24  are different times --
25      **Q.  I was just saying whether it was Dr. Evers**

---

Page 71

1   **who put you in contact with him or you already had an**
2   **open line of communication with him?**
3       A.  I -- I believe that I -- I believe
4   Dr. Evers had recommended that I speak with him.  I
5   would have to check as far as, you know, this is a
6   while ago, but, I believe, Dr. Evers had directed me
7   to speak with him about the lab and moving the lab up.
8       **Q.  Can you go to 54, please, on page 16.**
9       A.  Okay.  All right.  I'm at paragraph 54.
10      **Q.  Paragraph 54.**
11      A.  All right.  Let me read that right now.
12  Okay.
13      **Q.  And didn't you seek out radiology via your**
14  **friend David Ballard who had a conversation with Pam**
15  **Woodard about it?**
16      A.  We had -- so just give me a moment to just
17  refresh my memory on this.  I -- I believe that we
18  had -- I believe that we had scheduled a meeting with
19  Pamela Woodard about research at the very beginning
20  of -- the very beginning when we had started the move
21  down here.
22          I -- I had -- by any chance, do you have
23  those e-mails so I could refresh myself?  I apologize.
24  I haven't looked at the dates of that in a long time.
25      **Q.  We might look at it later.  But I'm just**

---

Page 72

1   saying that it wasn't necessarily radiology that
2   proposed to Weisman that a department collaborate?
3       A.  Well, I -- what I -- I guess what I would
4   say from my experience is we wanted to meet with them
5   to tell them about the technologies and what
6   capabilities were.  And radiology very much proposed
7   that there was a lot that we could do.  I -- we...
8       **Q.  But you made proposals to radiology, right?**
9       A.  Well, I -- I would say --
10      **Q.  You or SBI or David Ballard?**
11      A.  Well, we -- what I would say when we first
12  met with them, we talked about the technologies and
13  they talked about ways that we could collaborate as
14  well.
15          We kept it as a -- I guess what I would say
16  is we kept it as a lighter meeting in terms of here's
17  what we're working on.  There could be opportunities.
18  And they said, yes, these are good opportunities.  We
19  should work on this.
20          So -- so not to -- I just want to make sure
21  that -- that it, you know, it's understood that I
22  think, you know, there were proposals from both sides
23  for different types of projects and different ideas in
24  radiol -- you know, that's why I just want to make
25  sure I go -- I cover that.

---

**LEXITAS LEGAL**

**DR. JEFFERY WEISMAN  9/13/2022**

Page 73

1    Q.  And you did end up telling Dr. Evers about
2  the collaboration with radiology, correct?
3    A.  So I don't -- I'd have to think on that.  I
4  don't recall if I met with him to talk about the
5  radiology proposal.  I know that STLCOP and David
6  Kharasch were aware of the collaborations that were --
7  that we were working on.  And by no means was this
8  meant to be an exclusive collaboration that I would
9  only work with radiology and not anesthesia.
10       It is -- in general, as Wash U. does, you
11  collaborate between different departments and it's
12  team work that gets big projects to work.
13    Q.  Have you look at exhibit -- or sorry.
14  Paragraph 57 on 16.  If you want to read that to
15  yourself, let me know when you're ready.
16    A.  Okay.  I'm reading that right now.
17       MR. ELSTER:  I'm sorry, Kevin.  What
18  paragraph?
19       MR. SULLIVAN:  57.
20    A.  Okay.  I've read paragraph 57.
21    Q.  (Mr. Sullivan) And do you see the sentence
22  that states:  None of the evaluations expressed any
23  significant concern or objection to his performance?
24    A.  Yes.  I see that sentence.
25    Q.  And that's referring to evaluations from

Page 74

1  emergency medicine in July '16?
2    A.  That -- that is correct.  And the way that
3  emergency medicine department --
4    Q.  I'll move to --
5    A.  Oh, sorry.
6       (Defendant's Deposition Exhibit A14, EM Off
7  Service Resident Evaluation by attending.)
8    Q.  I'll -- there's no pending question.  You
9  answered my question.
10       Let me hand you what's been marked Exhibit
11  A14.
12    A.  Okay.
13    Q.  This is a -- I'll represent to you this is
14  a document produced by your lawyers in this case
15  starting with Bates number JW-63759.
16    A.  Okay.
17    Q.  Does this appear to be an Emergency
18  Medicine Off Service Resident Evaluation by attending.
19  Filled out by evaluator Reuben Johnson?
20    A.  This appears to be that document.
21    Q.  Can you turn to the fourth page of this
22  exhibit.
23    A.  Okay.  I've turned to the last page.  I
24  assume you mean Bates stamp JW-63761?
25    Q.  That's correct.

Page 75

1    A.  Okay.
2    Q.  Do you see at the bottom overall comments?
3    A.  Yes.
4    Q.  "Had trouble identifying salient issues and
5  prioritizing relevant issues, as well as eliciting
6  thorough information and HPI.  Presentations not
7  appropriate for intern level.  Had trouble executing
8  tasks as discussed and multi-tasking.  Below average
9  understanding of workup and medical knowledge.  Shows
10  some interest but poor patient flow on this rotation.
11  Performed at level of MS4-3."  Did I read that
12  correctly?
13    A.  Let me read it through.  Yes.  That is
14  what's written in the evaluation.
15    Q.  So that would have been an evaluation that
16  expresses, I would say, concern with respect to your
17  performance?
18    A.  Well, I -- I had evaluations on a daily
19  basis in the emergency department.
20    Q.  I'm asking about this evaluation.
21    A.  This -- this evaluation doesn't match what
22  I was told in person, and when they were filling forms
23  out about me.
24    Q.  But this evaluation does express concern
25  with respect to your performance, correct?

Page 76

1    A.  I -- I can read what's written.  You know,
2  again, as you've -- as you've said, what's written is
3  what's written, but that wasn't what was told to me
4  when I was working with the --
5    Q.  And performed at the level of MS4-3.  Does
6  that mean performing at the level of a medical
7  student?
8    A.  Yes.  Of which I was just a few weeks
9  previous.
10    Q.  Okay.  All right.  You can put that exhibit
11  to the side.  And if you could, let's go back to
12  Exhibit A.
13       MR. SULLIVAN:  Or is now a good time?
14  We've been going about --
15       MR. ELSTER:  We've been going about an hour
16  and a half.
17       MR. SULLIVAN:  Hour and a half.
18       THE WITNESS:  Want to do a water break?
19       MR. SULLIVAN:  Yeah, yeah, that's what I
20  wanted to say.
21       (An off-the-record discussion was held.)
22       THE VIDEOGRAPHER:  We're going off the
23  record at, approximately, 10:23 a.m.
24       (A short break was then taken.)
25       THE VIDEOGRAPHER:  We're back on the record

19 (Pages 73 to 76)

**DR. JEFFERY WEISMAN  9/13/2022**

Page 77

1   at, approximately, 10:38 a.m.
2       Q.   (Mr. Sullivan) All right.  Dr. Weisman, if
3   you could get Exhibit A back in front of you, please.
4   Specifically looking at page 17.
5       A.   Okay.
6       Q.   And let me, I guess, work backwards a
7   little bit here.  If you look at paragraph 61.
8       A.   Okay.
9       Q.   "That was the beginning of the end for
10  Weisman at the WU-BJH."
11       And to summarize, and you can feel free to
12  look at this, but you allege that when Dr. Evers
13  learned that you were collaborating with radiology and
14  when he found out that you had a lease with the
15  College of Pharmacy, he was unhappy with that?
16       A.   Let me read the paragraph real fast --
17       Q.   Yeah.
18       A.   -- and let me answer.
19       Q.   Yeah.
20       A.   Okay.  I've read the paragraph.  Could you
21  please restate, sir.
22       Q.   Sure.  So is what you're claiming that when
23  Dr. Evers found out that you were collaborating with
24  radiology, you were -- you or SBI, and that SBI had a
25  lease with the College of Pharmacy, he was unhappy and

Page 78

1   then sought to conspire with Dr. Benzinger, Dr. Cox
2   and others to get you out of the residency program?
3       A.   Those were some of the factors that seemed
4   to make him very unhappy.  He -- I was relatively
5   surprised that he was unhappy about, for example, us
6   having a lease with the St. Louis College of Pharmacy
7   Center for Clinical Pharmacology.  Because Evan
8   Kharasch, one of the main people in the department and
9   the vice chair for research for Wash U., had
10  introduced me to the St. Louis College of Pharmacy
11  and was on many of the e-mail communications about
12  getting that lease.  So I -- I was a little surprised
13  that he was that upset about it for -- for whatever
14  reason.
15       What also seemed to upset him a lot was --
16  was the fact that he wanted to know what the lease
17  said.  I -- I was contacted by President Pieper for
18  the St. Louis College of Pharmacy, and Ken
19  Fleischmann, the general counsel for the St. Louis
20  College of Pharmacy.  And they -- so Kent Fleischmann
21  basically told me around this time period -- and I'd
22  have to look at e-mails and communications to give an
23  exact date -- but Ken Fleischmann told me that Alex
24  Evers was -- had been negotiating a formal lease or
25  final agreement for technology development and

Page 79

1   collaboration with the St. Louis College of Pharmacy.
2   And the St. Louis College of Pharmacy did not want us
3   giving corporate documents or lease copies or anything
4   to them.  They felt that it was inappropriate for them
5   to try to get an edge in negotiations by seeing what
6   they'd negotiated with another party.  So they
7   formally asked me not to give any documents to Alex
8   Evers as they felt there were -- there were issues
9   with that occurring.
10       And so -- so I -- I also had obligations as
11  fiduciary duties to Strategic Biomedical.  So that
12  was --
13       Q.   And -- and in your own words, Dr. Evers
14  demanded a copy of the lease that SBI had with the
15  College of Pharmacy?
16       A.   And sorry, where was -- where was the --
17       Q.   Paragraph 60, first sentence.
18       A.   Okay.  Let me read that.
19       Q.   I think this is just what we were
20  discussing.
21       A.   Yeah.  I'm almost done reading.  Yes.  So
22  okay.  So I'm finished reading paragraph 60.
23       So Alex Evers asked for a copy of the lease
24  but was not all he asked for.  He asked for all my
25  corporate documents.

Page 80

1       Q.   Okay.  Let's -- let's -- let's take this
2   back.  And on paragraph 59, why don't you go ahead and
3   read that and then we can talk about 59, 60 and 61 all
4   at one time.
5       A.   Okay.  Reading 59 now.  Okay.  I've read
6   59.
7       Q.   And you've read 60 and 61?
8       A.   Yes.
9       Q.   Okay.  So did Dr. Evers ask for a copy
10  of -- of the lease and you basically told him, well, I
11  have to talk to David Sinow about that?
12       A.   Yes.  So I recall that Alex Evers asked for
13  a copy of the lease, and I wasn't sure what to do
14  because he was my -- he wasn't just my boss.  He was
15  my boss's boss's boss in the anesthesia department.
16  So I -- so I believe I told him I'd have to check with
17  David Sinow.  And --
18       Q.   He didn't -- he didn't demand a copy of it.
19  He, like you said, he -- he asked for a copy because
20  he was concerned about conflicts of interest across
21  various institutions?
22       A.   Well --
23       MR. ELSTER:  Objection.  Speculation.
24  Assumes facts not evidence.
25       A.   Well, you know, I -- I can't speak for Alex

**LEXITAS LEGAL**
**www.lexitaslegal.com**     **Phone: 1.800.280.3376**     **Fax: 314.644.1334**

**DR. JEFFERY WEISMAN  9/13/2022**

Page 81

1  Evers but what I can say is that when I spoke to him
2  it wasn't just -- it was not a ask or a request.  It
3  was -- it was that I needed to give him --
4  **Q.  (Mr. Sullivan) Did you --**
5  A.  -- the tone and structure of the
6  conversation.
7  MS. RUTTER:  Let him finish his answer,
8  please.
9  A.  The tone and structure of the conversation
10 was that I needed to give him the lease.  And I -- I
11 remember that very well, the -- the general tone of
12 that call because I was very, very concerned that such
13 a high level person had wanted the documents.  And I
14 had a fiduciary obligation to the company and
15 St. Louis College of Pharmacy had made a request on
16 us.  So I -- it wasn't just a, can you give this to
17 me.  It was, I need to get this and you need to give
18 it to me.
19 (Defendant's Deposition Exhibit A7, E-mail
20 8/11/16 from David Sinow Re: 3D Printing.)
21 **Q.  (Mr. Sullivan) Hand you what's been marked**
22 **as Exhibit A7.**
23 A.  Okay.  One second.
24 **Q.  Can you identify this document for me?**
25 A.  Okay.  I am reading this document right

Page 82

1  now.  This is an e-mail from David Sinow to me, Jeff
2  Weisman, entitled re:  3D Printing, sent August 11th,
3  9:37 p.m.
4  **Q.  And it says:  Jeff, pretty innocuous**
5  **e-mails.  And then there's an e-mail exchange between**
6  **Dr. Kharasch and Dr. Evers, correct?**
7  A.  I'm reading the exchange right now.  So, I
8  think, I'm reading the exchange.  I think that this is
9  missing some portions of it.  I know I sent -- or
10 anyways.  I don't see how it was forwarded to me.  I
11 know --
12 **Q.  I'm curious about that myself but...**
13 A.  Yeah.  Yeah.  I believe I might -- I would
14 have to check.  I believe what likely happened was
15 that Evan Kharasch forwarded or responded to Alex
16 Evers and forwarded it to me or something along those
17 lines would have been what occurred.  I can't -- I
18 don't know exactly.  But I -- I probably just copy and
19 pasted the message -- the part of the message that I
20 had received and put it in an e-mail and forwarded it
21 to David Sinow since I was -- I was pretty concerned.
22 **Q.  Okay.  And in it, Dr. Kharasch wrote:  One**
23 **of our interns, Jeff Weisman, has a small 3D printing**
24 **company.  I introduced them to the College of**
25 **Pharmacy, which is providing them a small amount of**

Page 83

1  space.  Do not know anything more.  Nothing involving
2  anesthesiology or WUSTL.  Is that correct?
3  A.  I see that's what Evan wrote.
4  **Q.  And is that an accurate summary of**
5  **Dr. Kharasch's involvement with respect to the lease**
6  **that SBI had?**
7  MR. ELSTER:  Objection.  Speculation and
8  legal conclusion.
9  A.  So -- so again, I -- I can't tell you
10 what -- so -- so can you repeat the question?  I'm
11 sorry.
12 **Q.  (Mr. Sullivan) Is what Dr. Kharasch wrote**
13 **here an accurate summary of his involvement, to your**
14 **knowledge, with respect to introducing you to the --**
15 **to the folks at the College of Pharmacy and you**
16 **getting a lease for SBI?**
17 A.  So I -- I can't, you know, I can't speak to
18 what was going through Evan Kharasch's mind.  I know
19 he's got an e-mail here.  But I will say that Evan
20 Kharasch was aware of much more going on there because
21 we -- I had spoken with Evan Kharasch about the
22 company.  I believe I had sent Evan Kharasch some of
23 our business plans in the past.  And I -- and I had
24 met with Evan Kharasch because at that point in time
25 he had an office in the St. Louis College of Pharmacy.

Page 84

1  He had moved over there.  So I -- I would say reading
2  what he wrote, I was a little surprised at the time
3  and am a little surprised now because he knew -- he --
4  he knew what we were doing and he had -- he had taken,
5  from my opinion, you know, effort to introduce me to
6  the St. Louis College of Pharmacy.  Made sure that
7  everybody knew who I was and to allow this to move
8  forward.
9  (Defendant's Deposition Exhibit A8, E-mail
10 8/15/16 from Jeffery Weisman Re: 3D Printing company.)
11 **Q.  Which is what he states there as well,**
12 **right, that he introduced you to the College of**
13 **Pharmacy?**
14 **Hand you what's been marked Exhibit A8.**
15 A.  Okay.  I see Exhibit A8.
16 **Q.  Can you identify this document for me?**
17 A.  This is an e-mail from me to Evan Kharasch
18 from Monday, August 15th, is what it appears to be,
19 and it appears to have two attachments.
20 **Q.  There's also an e-mail from Evan Kharasch**
21 **to you on -- on the same date, correct?**
22 A.  Hold on one second.  Yeah.  Sorry.  This
23 appears to be an e-mail chain.  I guess there's
24 multiple e-mails.  There's an e-mail from Evan to me
25 on Monday at 5:11 p.m. that cc'd Alex Evers, John

**DR. JEFFERY WEISMAN  9/13/2022**

## Page 85

1  Pieper, the president of the St. Louis College of
2  Pharmacy, and Richard Wahl, the chair of the radiology
3  department and current chair.  Okay.  Okay.
4      Q.  Okay.  Let's start with the e-mail from
5  Evan Kharasch to you on the 15th at 5:11 p.m.
6      A.  Okay.
7      Q.  Do you recall if Dr. Kharasch suggested
8  Cortex, Biogenerator or the College of Pharmacy as
9  possibilities for relocating SBI's 3D printing lab?
10     A.  Well, let me read this full e-mail then
11 just so I -- try to refresh my memory.
12     Q.  No, that's -- yes.
13     A.  Apologies for the delay.
14     Q.  No problem.
15     A.  So all right.  Okay.  I've read that.
16     Q.  Okay.  So Dr. Kharasch e-mailed you and
17 explained why he was contacting you because Dr. Evers
18 had -- had asked Dr. Kharasch what's going on with the
19 financial arrangement that anesthesiology has
20 regarding three day -- 3D printing, which was raised
21 by the -- the chair of radiology.  Is that your
22 understanding of how this arose?
23         MS. RUTTER:  Objection calls for
24 speculation about the conversations between Dr. Evers
25 and Dr. Kharasch.

## Page 86

1      A.  So -- yeah.  So, again, I can't -- I don't
2  know what was going on behind the scenes between them.
3  But I -- I did receive this e-mail from Evan Kharasch
4  that references Alex Evers, you know, John Pieper and
5  Richard Wahl.
6      Q.  (Mr. Sullivan) And -- and Dr. Kharasch was
7  aware that you had entered into some type agreement or
8  lease with the College of Pharmacy, but that he
9  wouldn't have known any further details with respect
10 to what that entailed?
11         MR. ELSTER:  Objection speculation.
12     A.  So -- so I can't say what -- what Evan
13 Kharasch -- what his thought process was, but I can
14 say that I was surprised to see this e-mail because I
15 had been in touch with Evan Kharasch, and he was very
16 aware of what we were doing with the lab and that we
17 were moving it to the St. Louis College of Pharmacy as
18 our goal.
19     Q.  (Mr. Sullivan) But he didn't have any -- he
20 had no knowledge of the terms of the lease or any
21 other agreement, correct?
22         MR. ELSTER:  Objection.  Speculation.
23     A.  I -- I don't know if he had terms of the
24 knowledge or not.  But -- but what I would say is when
25 I -- when I first matched, I -- I was very sure -- I

## Page 87

1  mean, he wanted me to go to the St. Louis College of
2  Pharmacy and be right in the center.
3         Because the first thing he did when I
4  matched was he e-mailed me.  I'd have to check -- I
5  want to check the e-mails and dates, but I remember
6  receiving an e-mail from him either right when I
7  matched or very shortly thereof where he e-mailed me,
8  and the e-mail basically had an attachment about
9  St. Louis College of Pharmacy partnering with the
10 Center for Clinical Pharmacology.
11     Q.  So you saw that as an offer to -- to go
12 into the Center of Pharmacology?
13     A.  I -- personally saw that as an offer and
14 I also -- we spoke with him and he seemed excited for
15 that opt -- for that fact.
16         The other thing about this e-mail, I'm sure
17 you'll get --
18     Q.  Okay.  Let me -- let me ask a question.
19     A.  Okay.  Sorry.
20     Q.  There's none pending.
21         On the -- the -- page 2, Dr. Kharasch
22 states to you that he saw a document that stated your
23 company SBI has a bioactive 3D printing division that
24 creates medical implants for drug delivery systems.
25 This division is currently housed in a lab space at

## Page 88

1  the Center of Clinical Pharmacology under the facility
2  director Evan Kharasch, M.D. Ph.D.  Did I read that
3  correctly?
4      A.  That is what the document says.
5      Q.  Okay.  And Dr. Kharasch writes to you:
6  Jeff, this statement is totally incorrect, if not
7  misleading.  Did he state that to you?
8      A.  That was what's stated in the e-mail.
9      Q.  And it's also -- he also states to you your
10 group is housed in a lab space in the College of
11 Pharmacy belonging to the College of Pharmacy and not
12 spaced at the Center for Clinical Pharmacology.  He
13 relayed to you, correct?
14     A.  That's what's in the e-mail.
15     Q.  And then he also says:  Please remove all
16 references to the Center of Clinical Pharmacology, me,
17 anesthesiology and/or Wash U.  Please do the same in
18 your business dealings and please instruct your
19 business partners likewise.  He told you that,
20 correct?
21     A.  That is in e-mail.
22     Q.  Did you do that going forward?
23     A.  I believe we did.  I -- I also sent an
24 e-mail to him where I --
25     Q.  Okay.

**LEXITAS LEGAL**
**www.lexitaslegal.com**          **Phone: 1.800.280.3376**          **Fax: 314.644.1334**

**DR. JEFFERY WEISMAN  9/13/2022**

Page 89

1    A.  Where I attached -- I just want to explain.
2    Where --
3    Q.  No. I --
4    A.  -- I attached the --
5    Q.  There's no pending question.
6    A.  Well, I attached --
7    MR. ELSTER:  Let him answer your question.
8    MR. SULLIVAN:  He's not answering my
9    question.
10   MR. ELSTER:  Wait, hold on.  Hold on.
11   MR. SULLIVAN:  He's talking about his
12   attachments.  There's no question pending.
13   A.  Well, no, I'm just saying --
14   MR. ELSTER:  Let him finish.
15   THE COURT REPORTER:  Wait a second.
16   MR. ELSTER:  Okay.  Sorry.
17   THE COURT REPORTER:  One at a time.
18   MR. SULLIVAN:  Sorry.
19   MR. ELSTER:  You cut him off.
20   Q.  (Mr. Sullivan)  No.  My question had to do
21   whether he did that going forward, not what he
22   attached to this e-mail.
23   MR. ELSTER:  Okay.  And that might be
24   responsive.  Let him answer.
25   A.  No. I was just saying that going forward we

Page 90

1    removed everything.
2    Q.  (Mr. Sullivan)  Okay.
3    A.  And I was very -- I was very surprised to
4    receive that from him because Evan Kharasch knew of
5    everything we were doing.
6    And, in fact, in e-mails in May, we were
7    cc-ing him in communications with the president of the
8    St. Louis College of Pharmacy, the general counsel and
9    the Dean Bruce Canaday.  So he was very aware of what
10   was going on --
11   Q.  He was --
12   A.  -- and wanted to be a part --
13   Q.  He was aware of what was going on with the
14   College of Pharmacy but --
15   A.  Yeah.
16   Q.  -- the -- but the Center of -- for
17   pharma -- the Center of Pharmacology wasn't
18   necessarily involved --
19   A.  Well, it --
20   Q.  -- correct?
21   A.  It -- it was because -- and it, I think, a
22   picture of this case would be worth a thousand words.
23   The St. Louis College of Pharmacy, their lab space on
24   the sixth floor is one giant -- it's a several
25   thousand square foot facility that's open.  It's

Page 91

1    not -- it's not a standard incubator space.
2    For example -- and this, I think, helps to
3    really explain what it is.  And so if you go to the
4    sixth floor, it's very, big open lab space over there.
5    So they've got multiple rows of lab -- of just lab
6    benches.
7    So there's some venture groups or incubator
8    places where you can get a thousand square foot lab
9    that has a door and wet lab space.  Theirs, they
10   had -- that entire space was basically the St. Louis
11   College of Pharmacy Center for Clinical Pharmacology
12   and we were right in there.  So we literally had a lab
13   bench where if you turned your back, there was another
14   lab bench and that was considered Center for Clinical
15   Pharmacology space as well.
16   So that -- so and we -- so anyways, but the
17   bottom line is, the question is, yes, he put that down
18   but I was very surprised.
19   Q.  Okay.  Who was the lease with?
20   A.  The lease was with the St. Louis College of
21   Pharmacy.
22   Q.  Okay.  And who -- you dealt with -- would
23   you have dealt with Dean Canaday, Ken Fleischmann and
24   John Pieper at the College of Pharmacy with respect to
25   the terms of those lease -- of that lease?

Page 92

1    A.  That is correct.
2    Q.  You understood that SBI was leasing space
3    from the College of Pharmacy?
4    A.  Yes.  We were leasing space from the
5    College of Pharmacy.
6    Q.  And -- and -- and I want to get back.  The
7    e-mail on page 1 of Exhibit 8, you apologize to
8    Dr. Kharasch.  And then you state:  I mistakenly and
9    honestly thought that while the lease would run
10   through the college there was a relationship with the
11   center based on the proposal submitted May 14th.
12   Correct, that's what you stated to him?
13   A.  That's what I stated.
14   Q.  If you go to page 3, which is the, I think
15   what you attached?
16   A.  Uh-huh.
17   Q.  Referencing the e-mail?
18   A.  Yes.
19   Q.  And that's an e-mail that you sent to
20   Dr. Canaday, Dr. Seibert, and Attorney Fleischmann?
21   A.  Yes, that appears -- let me read this.
22   This is May 14th.  This is an e-mail from me at my LSU
23   account to Bruce Canaday, Karen Seibert, who was, I
24   believe, the co-director who passed away recently, Ken
25   Fleischmann, the general counsel, David Sinow and Evan

23 (Pages 89 to 92)

Page 93

1  Kharasch.
2      Q.  And you state in that e-mail:  As a result
3  of those meetings, I feel very confident that the
4  center and our team can rapidly enter into a letter of
5  agreement.  Was there ever any type of agreement
6  entered with the center?
7      A.  Well, I -- I don't believe there was an
8  agreement entered into a center --
9      Q.  Okay.  Thank you.
10     A.  -- but my understanding was we were
11 partnered with the St. Louis College of Pharmacy and
12 the center because we were talking about it, everybody
13 together.
14         THE COURT REPORTER:  Everybody what?
15         THE WITNESS:  Everybody together.
16         (Defendant's Deposition Exhibit A9, E-mail
17 8/16/16 from Jeffery Weisman Re: 3D Printing company.)
18     Q.  Hand you what's been marked Exhibit A9.
19 Can you identify this document?
20     A.  I can identify the document.  It is -- it
21 appears to be an e-mail between myself to Alex Evers
22 and I believe I cc'd Sue Kinder, who I believed was
23 his admin.
24     Q.  It's an e-mail exchange between you and
25 Dr. Evers on August 16th, 2016, correct?

Page 94

1      A.  Yes.  I'm trying to -- Okay.  I'm sorry.
2  Yeah.  There's -- there's two e-mails on here.  One
3  from Alex Evers to me and one from me responding.  He
4  sent his at 2:24 p.m. on the 16th of August.  I
5  responded at 4:46 on the 16th of August.
6      Q.  Okay.  And did -- Dr. Evers wrote to you:
7  Sorry about this fuss.  I just wanted to make sure
8  we/you are steering clear of conflict of interest
9  issues.  Let's find a time to discuss for 15 minutes
10 perhaps sometimes next -- sometime next week would
11 work.  Did I read that correctly?
12     A.  That -- that appears to be what he wrote.
13     Q.  And you likewise replied at 4:46 that you
14 apologize for causing this fuss but that -- and you
15 thank him for being available to meet since it's very
16 important to me that everything is done properly and
17 any conflict of interest is avoided.
18     A.  That -- that is what I wrote in the e-mail.
19     Q.  And you -- and you met with Dr. Evers,
20 correct?
21     A.  I believe I met with Dr. Evers about this.
22     Q.  Did you have a telephone call or just a
23 meeting with Dr. Evers?
24     A.  You know, I'm trying to think right now
25 back to that.  If we -- if we ended up meeting in

Page 95

1  person or if it was a phone call.  I -- I know we had
2  a meeting.  Let me try and refresh my memory for a
3  moment on that.
4      Q.  Okay.  But in any event, let's -- let's --
5  let's talk about the meeting.  Okay.
6      A.  Okay.
7      Q.  You likely set up -- and we could -- we
8  could pull the records -- but set up a meeting with
9  Dr. Evers at his office just the two of you to
10 discuss -- well, we'll call it the issues with the
11 College of Pharmacy, correct?
12     A.  I believe I had a meeting with him.  I
13 don't -- I'm trying to think of the exact date and
14 time.  I need to see the records to refresh memory.
15 I -- I don't --
16     Q.  Fair enough to say --
17     A.  I don't know if Sue Kinder, you have her
18 meeting records, but I know that we did talk about
19 this.
20     Q.  Yeah.  I mean, Dr. Evers says perhaps
21 sometime next week would work.  So --
22     A.  Right.
23     Q.  -- likely in -- it probably would have
24 occurred within a week or ten days maybe after the
25 e-mail was exchanged.  Okay.  And we can nail down the

Page 96

1  date later.
2      A.  Again, I don't remember the exact date.
3      Q.  Okay.  That's fine.
4      A.  I do know that I spoke with him.
5      Q.  Okay.  Would you have met for about
6  20 minutes?
7      A.  I -- you know, right now I don't recall the
8  length of the meeting.  I'm trying to refresh my
9  memory on it.  I apologize.
10     Q.  And the meeting would have been in person
11 in his office, correct?
12     A.  I -- I would have to think.  I -- I don't
13 recall if we ended up meeting in his office or if we
14 had had a phone call, but I do remember meeting with
15 him to talk about this.
16     Q.  That meeting, was it in his office?
17         MR. ELSTER:  Objection.  Asked and
18 answered.
19     A.  You know, again, I -- I don't recall.
20 It may -- as I said, it may have been in his office,
21 it may have been by phone.  I'm -- I'm just trying to
22 think where and how we did the meeting and dates.
23     Q.  (Mr. Sullivan) And did you record that
24 conversation that you had with Dr. Evers?
25     A.  I don't recall if I recorded that

24 (Pages 93 to 96)

**DR. JEFFERY WEISMAN  9/13/2022**

Page 97

1  conversation.  And there -- so, again, I just don't
2  recall if I recorded that conversation.
3      Q.   You don't recall?
4      A.   I gave all recordings I had to my legal
5  team.
6      Q.   Okay.
7      A.   And --
8      Q.   But you don't recall recording a
9  conversation that you were having with the chair of
10 anesthesiology?
11     A.   I -- I know that I recorded some
12 conversations with him and I -- and it, you know, just
13 to -- to discuss that.  As far -- you know, I'm not
14 James Bond.  I'm not -- you know, I'm just -- I'm
15 someone who's trying to protect myself from harassment
16 and avoid losing my career by these powerful
17 individuals.  There was some time --
18     Q.   Were you being harassed at that point in --
19 in mid August 2016?
20     A.   Well, I -- to me, I felt that the
21 undertones of my employment had started to change.
22 Some of the warm receptions that I had received when I
23 first got there had started to go away.
24     Q.   Okay.  Let me ask my next question.  Did
25 Dr. Evers tell you in that conversation that he was

Page 98

1  somehow unhappy with your lab, with your company?  Did
2  he state those words to you?
3      A.   You know, I'd -- I'd have to think again to
4  refresh myself of the conversation.  But I -- I do
5  recall at that time period being very, very nervous
6  and upset that Alex Evers seemed to be very upset with
7  me and Evan Kharasch seemed to disavow me at that
8  point.
9      Q.   Did Alex Evers tell you that he was upset
10 with you in that conversation?  Did he say those
11 words?
12     A.   I -- I'd have to think on the conversation
13 again.  I apologize.  I haven't thought on that in a
14 while.
15         But -- but again, when I -- when I met with
16 him, he -- and when I met with him, and I know we --
17 there was a phone -- I know there was at least a phone
18 call follow-up where he was trying to get a hold of
19 David Sinow.  But I know during that time period it
20 became very apparent that he was not -- that he seemed
21 to not be happy with me.
22     Q.   I just want to talk about the --
23     A.   Meeting.
24     Q.   The meeting.
25     A.   Okay.

Page 99

1      Q.   So do you recall whether he offered you
2  coffee at the start of the meeting?
3      A.   You know, I -- you know, again, like I
4  said, I need to think on it to refresh my memory.
5  Just, you know, this being from 2016, lots of meetings
6  with him.  So I -- you know --
7      Q.   I'm just trying to refresh your -- help
8  refresh your recollection.
9      A.   Yeah, I know.  I mean, in general Alex
10 Evers always offered everybody coffee but -- or was it
11 tea?
12     Q.   Did he tell you not to worry about the
13 meeting that you were having with him?
14     A.   You know, again, I'd have to -- I'd have to
15 really think on that because it was so long ago.
16     Q.   Did he tell you that, not to be concerned
17 because you weren't in trouble?
18     A.   You know, again, I haven't thought of this
19 meeting in -- this meeting in a while and I'm not even
20 sure on the exact date.  Because again, we were -- in
21 that time period, I had multiple phone calls
22 and --
23     Q.   Did he tell you that -- that he thought
24 that there was no ill intent by you in -- in any of
25 your dealings?

Page 100

1      A.   You know, again, as I said, I -- I don't
2  recall right now the contents of the meeting, but I'm
3  more than happy to think on it.
4      Q.   Did he tell you to relax and -- and that
5  the two of you were there to try to problem solve
6  these conflicts of interest issues?
7      A.   You know, again -- again, I'd have to think
8  on it.  This is one meeting from over six years ago.
9      Q.   And -- and -- okay.  So you can just say
10 you don't -- you don't recall.  I understand.
11     A.   And again, I apologize.  I don't recall at
12 this time.  I'm more than happy to think on it and try
13 to find some documents from that date to see if I have
14 it -- their e-mail scheduling notes to refresh.
15     Q.   I mean, there's a recording of it so... so
16 we do have that.
17         Did Dr. Evers tell you that radiology came
18 to him and asked him how anesthesiology could enter
19 into an arrangement with a resident when radiology
20 couldn't do so?
21     A.   You know, again, I'd have think on it.  As
22 long as we've got the recording then -- would we be
23 able to play that right now to refresh my memory on
24 it?
25     Q.   I don't want to take up 20 minutes of my

25 (Pages 97 to 100)

**DR. JEFFERY WEISMAN  9/13/2022**

| Page 101 |
| --- |

1    time, but I think I'll ask you these questions here
2    and we can agree that the recording speaks for itself.
3         A.   Well, I mean...
4         Q.   As to what Dr. Evers said.
5         MR. ELSTER:  Well -- well, object.
6    Foundation.  We want to hear the recording.  But you
7    can ask him what he recalls now.
8         Q.   (Mr. Sullivan) Did Dr. Evers say that he
9    wanted to make sure both you and he looked squeaky
10   clean?
11        A.   You know, again, I'd -- I'd have to listen
12   to the recording.  I don't -- you know, I don't recall
13   the word-for-word right now.  I'm happy to think on
14   it.
15        Q.   Did you tell Dr. Evers that you were really
16   an advisor to SBI after doctor -- after Dr. David
17   Sinow had become involved with the company?
18        A.   You know, again, I don't remember the exact
19   word-for-word on that meeting.  I apologize.
20        Q.   Did you tell him that doctor -- that David
21   Sinow was running the lab and the company?
22        A.   You know, again, I apologize.  I don't
23   remember the word-for-word from that time period.
24        Q.   Do you recall that Dr. Evers stated that he
25   was concerned about conflicts of interest across

| Page 102 |
| --- |

1    various institutions?
2         A.   You know, I do -- now, I don't know -- and
3    let me just say again.  I don't recall.  But I do
4    remember Alex Evers saying at one point trying to say
5    that he needed to get all of our corporate documents
6    because of a conflict of interest.  Which really
7    shocked me because why would you need all corporate
8    documents from a company to go over a conflict of
9    interest check?
10        Normally a conflict of interest check is to
11   ask somebody what they're doing and see if there's,
12   you know, see if there's a conflict and map it out.
13   Not to just say, here, here's a bankers box of
14   documents, you know, have at everything the
15   corporation does.
16        Q.   Did you confirm to Dr. Evers that the
17   College of Pharmacy took an equity stake in SBI as --
18   as rent?
19        A.   You know, I don't recall, you know, again,
20   in that meeting without listening to the recording.  I
21   know that -- you know, again, I can just say that I
22   know the St. Louis College of Pharmacy did not want me
23   to disclose that information and considered it highly
24   sensitive and didn't want me to get strong armed into
25   doing it.

| Page 103 |
| --- |

1         I -- you know, again, I don't recall if I
2    said -- if I had mentioned that.  I'd love to hear the
3    recording.  If I did say that, it was only because I
4    was scared for my career and didn't know what to do.
5         Q.   How much of an equity interest did the
6    College of Pharmacy take in SBI as rent for the lab
7    space?
8         A.   The College of Pharmacy -- and I'd need to
9    see the lease agreement.  I don't know if you have it
10   with you.  But I believe it was -- to the best of my
11   memory, it was a five percent equity stake.  And
12   giving that the share prices were at least -- I --
13   I -- I'd have to -- I'd want to see the document.  I
14   believe the shares at that point were about $11,000 a
15   share.  So it -- so, I -- I -- I don't remember the
16   exact equity stake, but I believe it was over a
17   hundred thousand dollars of equity for them to give us
18   the lease agreement.
19        Q.   In this meeting that you had with
20   Dr. Evers, do you recall telling him that -- that in
21   the proposal that you gave to radiology, the proper
22   terminology with respect to the Center of Clinical
23   Pharmacology wasn't used in that proposal?
24        A.   You know, again, I -- I don't recall
25   without seeing the -- without seeing or listening to

| Page 104 |
| --- |

1    the conversation.
2         But I will say at that point, I was very --
3    what may provide some important context.  I was very
4    nervous at that point on what to do.  I was having
5    multiple calls with David Sinow, who's currently the
6    president, asking what to do and also calling Ken
7    Fleischmann asking what to do.  Because I was very
8    concerned that I was being strong armed into giving
9    documents.
10        And I -- I tried to -- and that -- that
11   goes back to one of your further questions about
12   statements.  Not -- not every word that I said was
13   what I necessarily felt.  Some things that I said I
14   had to say to protect my career.
15        Q.   And did you -- did you tell Dr. Evers that
16   the -- that the terminology with respect to the center
17   was just the result of some editing and condensing of
18   larger documents that had concern and it was a
19   mistake?
20        A.   You know, I'd have to listen to the
21   conversation.  But I will say if I did say that, that
22   was to placate him because I know from my
23   conversations with Evan Kharasch that, you know, we --
24   we were -- we were moving forward as was planned.  And
25   it wasn't just me that was moving forward, it was also

**LEXITAS LEGAL**
**www.lexitaslegal.com**          **Phone: 1.800.280.3376**          **Fax: 314.644.1334**

**DR. JEFFERY WEISMAN  9/13/2022**

| Page 105 |
|---|

1  David Sinow, who's a very, very professional and
2  by-the-book kind of guy.  So we would not have been
3  moving forward or saying anything inappropriately.  We
4  would have done everything properly and done those
5  types of conflict checks.
6      **Q.  Did Dr. Evers explain that the relationship**
7  **between the university and the College of Pharmacy was**
8  **brand new and that he wanted to avoid any, you know,**
9  **potential ill will or pitfalls?**
10     A.  You know, again, I don't remember the exact
11  words of that conversation.  But I will -- but, you
12  know, I will -- I will say that I -- I believe he did
13  mention that at one point in our conversations at that
14  time period.  But I really felt that, you know, his --
15  well, you know, his take on it, oh, I want to avoid a
16  conflict of interest and ill will, it's a new
17  relationship, give me all the corporate documents with
18  him just trying to politely lean on me to get
19  corporate documents.
20     **Q.  Did he -- did he -- did he ask you for your**
21  **cor -- for the corporate documents during this**
22  **meeting?**
23     A.  You know, I -- I don't recall if he asked
24  for the corporate documents during that meeting.  I
25  need to listen to the recording.  But I do know that

| Page 106 |
|---|

1  he asked for it multiple times.  And, in fact, he --
2  he was getting frust -- I know he was getting
3  frustrated at one point several weeks later because
4  David Sinow's mother was in her 90s and was on
5  hospice.  And David had to go down to Florida to go
6  care for her and he wasn't able to have a phone call.
7  And Alex, I be -- I remember Alex sending me a message
8  where he wanted to know why David hadn't gotten back
9  to him because he wanted to, you know, it appeared he
10  wanted to get that information as quickly as possible.
11     **Q.  Did -- during this meeting did Dr. Evers**
12  **say to you that he wanted to make sure that there was**
13  **no conflict of interest because you were a BJH**
14  **employee at the time, but you were in the**
15  **anesthesiology program within the university and the**
16  **university had a relationship with the College of**
17  **Pharmacy?**
18     A.  So again, I -- I don't remember the
19  specifics but I'm very happy to listen to it, an audio
20  recording and provide context.
21     **Q.  Did you tell Dr. Evers during that meeting**
22  **that what he was asking about was incredibly**
23  **reasonable?**
24     A.  You know, again, I don't recall what I had
25  said at that point in time, but I -- I can tell you

| Page 107 |
|---|

1  this.  Interns and residents don't generally just get,
2  you know, called into the chair's office.  The chain
3  of command is Russell Groener is the assistant program
4  director, then Richard Benzinger is the program
5  director, then Thomas Cox is a vice chair for
6  education, and then Alex Evers, who's one of the most
7  prestigious and connected men in all of anesthesia and
8  is a very powerful and intimidating figure and most
9  people don't get called in there.  He doesn't normally
10  meet with random residents.  The other residents were
11  really surprised that I was taking -- that, oh, I've
12  got to take a break, I'm -- I have to go meet with
13  Alex Evers about something.  So in all sincerity, I --
14  I was very nervous during those meetings and trying to
15  say what I needed to to placate the situation.
16     **Q.  And did Dr. Evers tell you, do you recall**
17  **him telling you in that meeting that he felt bad about**
18  **having to meet with you because he didn't want to make**
19  **you nervous?**
20     A.  You know, again, I don't recall the exact
21  words in there.  And, you know, if -- if we can play
22  the recording, I'd love to provide context and --
23     **Q.  Do you recall if Dr. Evers told you during**
24  **that meeting that you should feel free to bring any**
25  **research ideas to the Department of Anesthesiology?**

| Page 108 |
|---|

1     A.  You know, again, I don't recall the exact
2  words of the conversation, but happy to listen and
3  work on that.
4     **Q.  Did the meeting end with Dr. Evers asking**
5  **you whether you were coming to his house for dinner**
6  **for the upcoming weekend?**
7     A.  I don't recall if that was said in that
8  meeting.  I'd have to listen to the recording, but I
9  know he was having -- he was hosting an event and
10  inviting the residency class to go, which I actually
11  didn't get to go because the supervising intern on --
12  or sorry -- whoever was being supervised but I was
13  being supervised by somebody and they wouldn't let me
14  off service to go and just kept me to keep me with
15  nothing to do.
16     **Q.  Okay.  Who was that?**
17     A.  I -- I'd have to think.  I don't remember
18  which -- which resident was supervising me that day,
19  but I remember -- I remember asking to leave for the
20  event.  But, hey, the chair is having a so -- a social
21  event, can I go?  And his response was, oh, well,
22  let's just review all the charts one extra time just
23  because.
24     **Q.  Do you recall whether Dr. Evers asked you**
25  **how your residency was going during that meeting?**

27 (Pages 105 to 108)

**DR. JEFFERY WEISMAN  9/13/2022**

## Page 109

1    A.  You know, again, I don't recall the
2  word-for-word of the meeting, but I'm happy to listen
3  to the audio recording and provide context.
4         (Defendant's Deposition Exhibit A10, E-mail
5  8/17/16 from Jeffery Weisman Re: SBIR/STTR training.)
6    Q.  Hand you what's been marked Exhibit A10.
7    A.  Okay.
8    Q.  What I'm really interested in are the --
9  the e-mails between you and Dr. Richard Wahl on
10  page 1.
11    A.  Okay.
12    Q.  Can you identify this document for me?
13    A.  This appears to be an e-mail sent from me
14  on Wednesday, August 17th, 2016, at 10:57 a.m. to
15  Richard Wahl cc-ing David Ballard and Pamela Woodard
16  talking about SBIR's TT training and SBIR's small
17  business renovation research grants, and STTR's, and I
18  forget the acronym, but those are government grants
19  where it's either between the government and a private
20  company or a three party between the government and
21  academic institution and a private company.
22    Q.  And -- and Dr. Wahl e-mailed you
23  that we and MIR, and that's the Mallinckrodt Institute
24  of Radiology, correct?
25    A.  Yes, that -- that is MIR.

## Page 110

1    Q.  Okay.  He stated remain interested in
2  further discussions but obviously want to manage
3  properly any potential conflicts of interest.  He
4  stated that to you?
5    A.  That is what the e-mail -- that's the text
6  in e-mail.
7    Q.  And then you reply to him that it was
8  important to you and to SBI that everything done
9  properly and we avoid potential perceived or conflicts
10  of interest.  Right?
11    A.  I'm just reading the -- reading the text
12  right now.  And that is what I wrote -- and I wrote
13  that in the e-mail message to Dr. Wahl on August 17th,
14  2016.
15    Q.  And what were the potential or perceived
16  conflicts of interest to your recollection?
17    A.  You know, at this time, I don't remember
18  but I -- I do remember that we had already -- that we
19  had done substantial conflict checks.  And I had
20  talked with David Sinow on structuring and working
21  with different universities, and he's -- he's truly a
22  stand-up guy and has been in academia and done -- done
23  these things before.  We had already talked about how
24  to structure and do everything properly.
25    Q.  And -- and did it have to do because you

## Page 111

1  were a current resident/intern and then you would be
2  entering into some kind of agreement with the
3  Department of Radiology, is that -- was that the
4  potential conflict of interest?
5    A.  I mean -- I mean, I'd -- I'd have to go
6  through my notes or through the documents to refresh
7  my memory on it, but I -- I wasn't -- I -- I know that
8  we had looked at doing this from the very get-go and
9  didn't see any conflict of interests as I was anes --
10  as I was an anesthesiology resident and this was the,
11  you know, radiology, Mallinckrodt Institute of
12  Radiology.
13         (Defendant's Deposition Exhibit No. A11,
14  E-mail 9/9/16 from David Sinow re: Introduction
15  Strategic Biomedical 3D printing.)
16    Q.  Okay.  Can you take a look at Exhibit A11
17  that I just handed to you.
18    A.  Okay.
19    Q.  And can you identify this document for me?
20  Does it appear to be an e-mail at the bottom that you
21  wrote to David Sinow and Alex Evers and David Sinow's
22  response?
23    A.  This appears to be David Sinow getting back
24  in touch.  I think his mom's almost resolved at that
25  point.  But David Sinow on Friday, September 9th,

## Page 112

1  2016, at 9:05 a.m. E-mailing me, Alex Evers, Sue
2  Kinder and cc-ing himself.
3    Q.  And then at -- at the bottom you write to
4  Dr. Sinow and Dr. Evers introducing themselves --
5  introducing them to each other, correct, making the
6  connection?  Was that based on a conversation that you
7  had with Dr. Evers?
8    A.  Yes.  On Wednesday, September 7th, 2016,
9  5:11 p.m. I wrote an e-mail:  David, I want to
10  introduce you to Dr. Alex Evers.  He's the chair of
11  the Department of Anesthesiology here at Washington
12  University.
13    Q.  I just need -- yeah.  But you wrote that to
14  introduce them to each other per something you had
15  discussed with Dr. Evers?
16    A.  Yes.  And Dr. Evers, I believe, had called
17  to follow-up to see why David Sinow had not gotten in
18  touch with him, that was where he was in Florida with
19  his mother.  And, I guess, Dr. Evers wanted to talk
20  with him sooner and ask me to -- to get in touch with
21  him, I believe.
22         (Defendant's Deposition Exhibit No. A12,
23  E-mail 9/13/16 from David Sinow Subject Our
24  conversation yesterday.)
25    Q.  Hand you what's been marked Exhibit 12.  In

28 (Pages 109 to 112)

## DR. JEFFERY WEISMAN  9/13/2022

Page 113

1  Exhibit A12 -- let me ask you this.  Have you seen
2  this e-mail before?
3      A.  You know, I -- I don't recall when I've
4  last seen this e-mail or if I've -- or -- I don't
5  recall if I've seen this one before or when I've last
6  seen it just because there's so many documents here.
7  I -- I know that David Sinow had told me that he had
8  spoken with Alex Evers and that he sent an e-mail to
9  follow-up at one point.  And --
10     Q.  So -- so after David Sinow and Dr. Evers
11  had your conversation, then you had a conversation
12  with David Sinow about what he had discussed with
13  Dr. Evers?
14     A.  I know I spoke to -- so I had spoken to
15  David Sinow at some point after he had spoke with Alex
16  Evers, and, yeah, I had a conversation with him.
17     Q.  Okay.  Did David Sinow tell you that there
18  was no objection to you participating in your
19  entrepreneurship activities with SBI so long as you
20  were meeting your residency requirements?
21     A.  So -- and I have to think on what exactly
22  that conversation was with David Sinow.  I -- I do
23  know -- I do remember very clearly that David Sinow
24  only called me after talking to Alex Evers and said,
25  Alex just -- you know, this is clearly, you know, the

Page 114

1  bigwigs.  Something along the lines of these are the
2  bigwigs at the medical center wanting to -- wanting to
3  do different types of deals and they're working with
4  the St. Louis College of Pharmacy now and they clearly
5  want to know what's going on with -- with your lease
6  space, and, you know, for their negotiations.  And
7  they want to know what you're doing.  So I remember
8  having that conversation with him or having a
9  conversation with him about that.  I'd have to think
10  on everything else that -- anything or everything else
11  that would have been said.
12     Q.  Okay.  And did Dr. Sinow relate to you that
13  he had discussed with Dr. Evers that SBI was not part
14  of the Center for Clinical Pharmacology?
15     A.  You know, I -- I -- you know, I don't
16  remember exactly what David Sinow told me right
17  now.  I'd have to think on it.  But I -- and this --
18  and this is just -- and again, this would just be --
19  what you're asking is him reiterating his conversation
20  with Alex Evers to me.  So I -- I wasn't a party of
21  this conversation.
22     Q.  No, that's what I'm asking you about.  What
23  was your -- I mean...
24     A.  Yeah.  No.  I was just thinking.  I'd have
25  to really -- I'd have to think on that, that was a,

Page 115

1  you know, brief conversation.
2      Q.  So you don't recall one way or another at
3  this point unless you can refresh your recollection
4  somehow?
5      A.  Right now I -- like right now at this
6  moment, I don't recall.  But I'm -- I'm happy to look
7  at documents and, you know, refresh my memory on it.
8      Q.  Okay.  Can we go back to Exhibit A, please,
9  Doctor.  And if you could turn to page 36.
10     A.  Okay.
11     Q.  And you see paragraph 139?
12     A.  Yes.
13     Q.  You want to read it to refamiliarize
14  yourself with it.
15     A.  Okay.  Let me read that right now.  One
16  moment.  Okay.  I've read paragraph 139 under the
17  civil conspiracy count.
18     Q.  So are -- are all of the torts that you
19  ref -- that are referenced in paragraph 139 based on
20  your theory that Dr. Evers was unhappy about what was
21  going on with your lab and SBI?
22         MR. ELSTER:  Objection to form.
23     A.  So I just want to make -- make sure I
24  understand the question.  So -- so could -- could you
25  just repeat that one more time?

Page 116

1      Q.  (Mr. Sullivan) Okay.  Are all of the torts
2  that are set forth in paragraph 139 based on your
3  theory that Dr. Evers was unhappy about your lab's
4  arrangement or SBI's arrangement?
5         MR. ELSTER:  Objection.  Form and legal
6  conclusion.
7      A.  Yeah, I mean, it -- it -- I mean, this
8  seems -- this seems to be asking me to -- to make a
9  conclusion on a le -- our legal theory here, I mean.
10     Q.  (Mr. Sullivan) Well, it says:  When Evers
11  learned that he was not the sole focus of plaintiff's
12  laboratory project, he solicited the agreement of each
13  defendant to conspire with others to, and then it sets
14  out various claims, correct?
15     A.  The -- the text of it states that, and --
16  and I personally believe that Alex Evers was -- was
17  upset about -- about the agreement with the MIR
18  radiology department and with what was going on with
19  the lab.
20     Q.  Okay.  Let's turn back to page 18,
21  paragraph 62.
22     A.  Okay.
23     Q.  You state:  Additionally, anesthesiology at
24  this time stopped collaborating with Weisman and
25  plaintiff's lab and stopped considering joint

29 (Pages 113 to 116)

**DR. JEFFERY WEISMAN  9/13/2022**

Page 117

1 research.  Did I read that correctly?
2     A.  Let me read this paragraph so...
3     Q.  Yeah.
4     A.  Yes.  There's that sentence and then one
5 after it.
6         THE COURT REPORTER:  Yes, at that time?
7         THE WITNESS:  Yes.  There's one sentence
8 and then there's one -- and then there's another one
9 after it.  But yes, that was the --
10     Q.  What about -- what about Dr. Peter Nagele,
11 did he stop collaborating with you in August,
12 September 2016?
13     A.  Well, I think that's a good -- I think
14 that's a great question to ask.  Dr. Peter Nagele
15 didn't collaborate with me openly in the
16 anesthesiology department.  He kept it very quiet that
17 he was doing collaborations with me in the St. Louis
18 College of Pharmacy space.
19     Q.  In this time frame or at a later time
20 frame?
21     A.  What -- what time frame are you referring
22 to right now so I understand?
23     Q.  I'm talking about because you said at this
24 time, and so we're talking about August, September
25 2016.

Page 118

1     A.  So at that point in August and September
2 of 2016 -- in August and September of 2016, my warm
3 welcome all of a sudden became very chilled.  Evan
4 Kharasch who was -- who welcomed me with open arms
5 suddenly stopped really talking with me.
6     Q.  I'm just asking about Peter Nagele.  Am I
7 pronouncing that correctly?
8     That's -- that's fine for that purpose.
9         So -- but Peter -- so -- so Peter, you
10 know, Peter was working with me with his private
11 biotech company startup idea in the St. Louis College
12 of Pharmacy space.
13     Q.  In this time, in August, September 2016?
14     A.  He had -- I -- I'm just trying to think
15 when he -- when he officially started working.  I'd
16 have to check.  I've got e-mails and text messages
17 from Peter when he wanted to start working.  He -- he
18 wanted to work with the post docs.  There were e-mail
19 chains on that.  And he also wanted -- he also needed
20 an engineer, and I introduced him to one of our
21 engineers that we worked with in Ruston, Louisiana
22 that he flew up and who worked for him for several
23 months and --
24     Q.  Did you continue collaborating with
25 Dr. Martha Szabo?

Page 119

1     A.  At that point in time, I don't believe I
2 knew Martha Szabo back in August or --
3     Q.  But you collaborated with her at a later
4 time?
5     A.  At a later time, I believe I did some
6 collab -- I believe I tried to do some collaborating
7 with Martha Szabo and Helga Coleman (phonetic).  Tried
8 to start something up, again, at some point.  But --
9 but clearly the -- the main people that I'd come there
10 to work with Evan Kharasch, Alex Evers and even Rob
11 Gereau had gone very cold on me.
12         And I don't believe -- and just so you
13 know, Martha Szabo doesn't have a lab group and isn't
14 research faculty there.  She actually left because she
15 was unhappy with the way the department was behaving.
16     Q.  Doctor, could you turn to page 26 of your
17 complaint and can you read paragraph 85, please.
18     A.  Okay.  Eighty-five (85), I'm reading that
19 right now.  Okay.  So I've read paragraph 85.
20     Q.  Okay.  Does this have to do with your --
21 your claim of conversion, which is, you know, the
22 unlawful taking of property?
23     A.  Well, the -- the paragraph talks about them
24 taking my property.
25     Q.  Okay.  It says:  WU and BJH acquired

Page 120

1 plaintiff's lab in June 2016 and all of its tangible
2 assets -- tangible and intangible assets by forcing
3 Weisman to resign.  Is that -- that June 16 time --
4 date there isn't correct?
5     A.  I -- I believe that was meant to, you know,
6 again, I -- I would have to see the original draft of
7 this, but I believe that was meant to say June of 2018
8 since that was the time that I resigned.  But again,
9 I'd have to --
10     Q.  Okay.
11     A.  -- see the draft.
12     Q.  But let's say it was June eight -- 2018,
13 radiology had been running it's 3D printing lab for --
14 for about a year, correct?
15     A.  I'm just trying to think when -- I'm not
16 sure what they would say would be the -- the official
17 start date on that.  What -- what -- when -- what
18 radiology would say would be was their official start
19 date on running the 3D printing core facility they had
20 in Mallinckrodt.
21     Q.  Would it have been when your research
22 assistants moved everything over into the -- the
23 Mallinckrodt Institute of Radiology?
24     A.  I -- I believe they started moving things
25 in -- I -- I would have to see e-mails to fully

**LEXITAS LEGAL**
www.lexitaslegal.com        Phone: 1.800.280.3376        Fax: 314.644.1334

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 121

1   refresh my memory, but I -- I believe it was March
2   of 2017 that they had -- they were in the moving
3   process around that time period.  But I'd have to see
4   e-mails to --
5        Q.  I think -- I think, like, in the March --
6   March 2017 time frame until we see something
7   different -- further things, which we will.  Is that
8   fair to -- fair to agree?
9        A.  Well -- well, I -- I just need to see the
10  documents.
11       Q.  Okay.
12       A.  We can --
13       Q.  Fair enough.
14       A.  -- you know.
15       Q.  And you're -- you're claiming here that
16  Wash U. and BJH acquired plaintiff's equipment,
17  revenue streams, active research projects, impending
18  research projects, intellectual property, research
19  legacy, professional relationships, and research
20  assistants Jammalamadaka and Tappa.  Did I read that
21  correctly?
22       A.  I'm very impressed.  You did a reasonable
23  job in Uday Jammalamadaka's name.
24       Q.  Thank you.  And is that the entire universe
25  of what you're claiming that was acquired in -- in or

---

Page 122

1   about March 2017?
2        A.  Let me just read this one more time.  I
3   know we say:  Their acquisition was included but not
4   limited to equipment, revenue streams, active research
5   projects, impending research projects, professional
6   relationships, research assistants.  These definitely
7   include things.  I know there's other things that may
8   be missing.  For example, I don't -- I believe I left
9   lab notebooks there.
10       Q.  Okay.  We'll get -- yeah.
11       A.  There's other things that I believe were
12  in -- that were there.
13       Q.  Okay.  Let's put -- put a pin in that
14  because we're going to go to another paragraph.
15           What were the revenue streams that were
16  acquired?
17       A.  All right.  Well, the -- the revenue
18  streams were -- were several.  Strategic Biomedical
19  had a couple of different product lines and revenue
20  streams at that point.
21           The first and foremost was -- was working
22  with grants to put in for grants?  SBIRs, STTR, NIA --
23           THE COURT REPORTER:  Wait, wait, wait.
24           THE WITNESS:  I apologize.
25           THE COURT REPORTER:  After grants.  Put in

---

Page 123

1   for grants and you started the acronyms.
2        A.  Okay.  So there were several types of
3   grants that we were putting in for, SBIR grants, STTR
4   grants, NIH grants, and NSF grants, as well as -- as
5   well as collaborating with other faculty members that
6   had grant funding that could pay to do specific
7   projects.
8        Q.  Let me ask you this.  Was there any money
9   coming in from these grants or specific projects?
10       A.  I would have to go -- go through and check
11  the books and documents.  We were in the process of
12  negotiating them and setting them up.  One thing
13  that's unique about bio techs and the same thing with
14  Google or Facebook or tech companies in general,
15  you're in the proc -- so you may setup revenue streams
16  and it may take a time period for them to come in and
17  that's very common knowledge for -- for this type of
18  technology.
19       Q.  Yeah.  I just wanted to know --
20       A.  Yeah.
21       Q.  -- whether or not there was actually any
22  revenue coming in or whether there was just the
23  potential for revenue?
24       A.  So I -- so I'm -- I'm just trying to think
25  to refresh my memory.  I believe that there were some

---

Page 124

1   radiology departments that had been paying for molds
2   or imaging at that point.  I -- I'd have to check the
3   exact dates and a lot of that information was not my
4   business anymore and was not being forwarded to me.
5   But I believe that as it was being transitioned over
6   there were different departments that were asking
7   about different projects, modeling projects or molds
8   for pathology, or things like that that they were
9   starting -- that was starting to -- to get online.
10       Q.  So this would have been after March 2017
11  when radiology opened up its 3D printing lab?
12       A.  I'd -- I'd have to check on the dates to --
13  to put that together, but I -- but I know a lot of
14  these revenue streams we were building and were in the
15  process of.  And in -- in addition to that, for
16  revenue streams, I would also say that revenue streams
17  for -- for a bio tech company like that or a
18  technology company in general, one revenue stream is
19  getting additional investment, which we were in the
20  process of doing, and we -- we had hundreds of
21  thousands of dollars that was being pledged that --
22  so...
23       Q.  Who pledged that hundreds of thousands of
24  dollars?
25       A.  David Sinow was working with some of the

---

31 (Pages 121 to 124)

**DR. JEFFERY WEISMAN  9/13/2022**

## Page 125

1    venture funds he had worked with in Illinois
2    previously.  I'm trying to think of the name of the
3    funds.  I'd have to check.  I believe one was Sierra
4    Ventures.  We -- we also had -- so -- so I'd have to
5    go check to see what the name is with him.  I haven't
6    thought about this in a while.  But he was, with his
7    background as a venture capitalist he was handling
8    fundraising and working on those -- on those aspects.
9         Q.   Ultimately the -- the fundraising didn't
10   come through, correct?
11        A.   That -- that is correct.  After --
12        Q.   Okay.
13        A.   After the investors --
14        Q.   Okay.
15        A.   -- were upset about Alex Evers wanting the
16   corporate documents, then me not participating in --
17   in the lab, you know, when he told me he wanted me to
18   not participate in January, February area of -- sorry
19   of 2017, that that kind of put the kibosh on a lot of
20   this.
21        Q.   But the problems with the lab were already
22   ongoing before Alex Evers had a conversation with you
23   in February of 2017 that he thought that you should
24   focus 100 percent on your clinical training, right?
25        MR. ELSTER:  Objection.  Mischaracterizes

## Page 126

1    his testimony.
2         A.   Well, I -- I thought the lab was doing
3    quite well.
4         Q.   (Mr. Sullivan) You were running out of
5    money, right?
6         MR. ELSTER:  Objection.  Foundation.
7         Q.   (Mr. Sullivan) You couldn't pay -- you
8    couldn't pay Uday and Karthik --
9         MR. ELSTER:  Same objection.
10        Q.   -- right?
11        A.   We -- we were -- before Alex Evers got
12   involved, we had no problems with money.  We were able
13   to pay Uday and Karthik.  After Alex Evers got
14   involved, the issue was that David Sinow and the
15   investors didn't want to put additional funds in
16   because they were concerned at Alex Evers' behavior.
17        And I remember having a conversation with
18   David Sinow around that time period where he said,
19   This is going to be a problem.  They're -- they want
20   to get involved with the company and you're -- you're
21   an employee and they have a big influence over you.
22   This is probably not going to end well.
23        So as -- as a seasoned venture capitalist
24   and investor, someone with more experience than me, he
25   saw that this was going -- to him he saw that this was

## Page 127

1    going to be a problem eventually, and he was able to
2    predict the future quite well actually.  Because he
3    seemed to guess that this is what was a very likely
4    outcome that we would all be sitting here around this
5    table today.
6         Q.   (Mr. Sullivan) So before Alex Evers got
7    involved, the company was doing fine and had the
8    revenues -- to pay the salaries.  Is that your
9    testimony?
10        A.   Well, that's -- that's a
11   mischaracterization.  A bio tech company or tech
12   company doesn't have traditional revenues in the sense
13   of you're selling a product, but in terms of
14   investment capital coming in and grants, yes.
15        Q.   It had the funds -- it had the funds.  What
16   grants did it have?  What grants did it have when
17   you -- in August of 2016, what grants were ongoing?
18        A.   Well, we had pledge from the bio medical
19   research foundation.
20        Q.   A pledge or a grant?  Was there money
21   coming in?
22        A.   Well, they -- I -- I would have to check to
23   see what the term of art would be, but we had an
24   agreement at that point where they would have put in
25   $60,000 for a 2.5 percent equity in the company.

## Page 128

1         Q.   Did they put that in?
2         A.   They did not put it in --
3         Q.   Okay.
4         A.   -- since we did not take that funding
5    because David Sinow advised to turn it down and work
6    with the Midwest based fund since we were relocating
7    from the southern region to -- to the midwest region.
8         Q.   Okay.  Any other -- any other grants that
9    were -- or other monies that were received by SBI?
10        A.   Let's see, I had invested in -- I had
11   purchased or put money into the company.  As I said, I
12   had --
13        Q.   I'm talking about grants.  I was talking
14   about -- you talked about grants and pledges and you
15   mentioned grants.  What grants?  Were there any -- was
16   there any grant money coming into SBI from June 2016
17   to December 2016?
18        A.   I -- I would want to double check but I
19   don't believe there was --
20        Q.   Okay.
21        A.   -- at that point in time.
22        Q.   You reference in paragraph 85 there have
23   been ongoing financial transactions between LTU and WU
24   and/or BJH regarding the intellectual property arising
25   from Weisman's work and plaintiff's lab.  What are you

32 (Pages 125 to 128)

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 129

1    referencing there?
2        A.   David Ballard and Pamela Woodard were in
3    communications with Louisiana Tech University and
4    their research corporation as well as Richard Cordell.
5    And Richard Cordell is the head of licensing and
6    intellectual property for Louisiana Tech University.
7    And they were in communications about acquiring the
8    patents and licensing agreements -- any licensing
9    agreements or patterns, they were communications with
10   him about acquiring.
11       I wasn't privileged to all of those
12   communications as -- as things occurred as they
13   occurred.  But the most -- but, I believe, I was
14   forwarded a most -- one of the most recent e-mails
15   that I can remember I remember in 2019 receiving an
16   e-mail chain from David Ballard asking for help on
17   licensing with Louisiana Tech.  And in that chain,
18   Pamela Woodard had been paying for licensing fees with
19   Louisiana Tech and -- and had been working to continue
20   to develop the technology.
21       Q.   Okay.  And do you know whether the
22   Department of Radiology ultimately acquired the -- the
23   patent?
24       A.   You know, I -- I wasn't privileged to -- to
25   those communication -- to all those communications.

---

Page 130

1    So I'm -- I'm just, you know, unfortunately I'm not
2    privileged to what -- what occurred behind those
3    closed doors.  I -- I was -- once I left, I was taken
4    off the website immediately and my e-mail was taken
5    away.  And which was really odd because mechanical
6    engineering gave me a visiting research position.
7        Q.   And it -- it had -- previously it had been
8    yours or SBI's obligation to pay Louisiana Tech
9    certain licensing fees including fees relating to the
10   patent prosecution?
11       A.   Yes.  So either myself, David Sinow,
12   Strategic Biomedical, Southern Biomedical that -- that
13   entity that we were working with had been paying for
14   the patent prosecution for it, as well -- as well as
15   the licensing fees.  And we had -- and I'd actually
16   written that omnibus patent myself to cut costs down
17   when working with Louisiana Tech, and, I believe, the
18   Jones Walker Law Firm there.
19       Q.   And you had been substantially past due on
20   the payment of those, correct?
21       A.   I would have to check on the e-mails at
22   what point in time.  Towards the -- I -- I would need
23   to see those e-mails to see about the time and billing
24   of it.  There were times when we were -- when we were
25   completely up to date.  At the very -- at the very end

---

Page 131

1    when my funding -- my funders pulled out because of
2    what occurred with Alex, then, you know, I mean, it
3    was --
4        Q.   So by the time you left LSU, you were up to
5    date on paying all of those fees and licensing fees to
6    Louisiana Tech?
7        A.   I -- I would have to check.  I believe -- I
8    believe at one point we delayed a little bit because
9    we were going to have investor money to go pay with
10   and we had wanted to use some of the investor funds to
11   pay.
12       So -- so I'm more than happy to take a look
13   at the documents from the negotiations with Richard
14   Cordell but we were regularly paying Richard Cordell
15   for the patent prosecution work done by Jones Walker
16   as well as the licensing fees.
17       Q.   And those records will speak for
18   themselves.  Can you turn to page 128 of Exhibit A.
19   I'm sorry.  Paragraph 128 on page 34.
20       A.   Thank you.  I was hoping it wasn't
21   page 128.  Okay.  Looking at page 128 -- or I'm
22   sorry --
23       Q.   You want to read that.
24       A.   -- paragraph 128.
25       Q.   Okay.  Have you read it?

---

Page 132

1        A.   All right.  I'm just finishing up.  Okay.
2    I've read paragraph 128 as of now.
3        Q.   Okay.  And is paragraph 128 an accurate
4    list of the items that you claim the university, BJH,
5    Dr. Evers and Dr. Benzinger tortiously converted from
6    you and SBI?
7        MS. RUTTER:  Objection.  Misstates Exhibit
8    A.
9        A.   Well--
10       MS. RUTTER:  And allegations contained
11   therein.
12       A.   Well, what I was going to say is that
13   exhibit -- and so paragraph 128 includes many things
14   that were taken from the lab and there's also other
15   things that -- that were taken as well including
16   reagents, my lab notebooks.
17       Q.   (Mr. Sullivan) That would be -- would that
18   be included in work process papers, your lab
19   notebooks?
20       A.   I -- I believe work process papers would
21   have meant academic papers in process.
22       Q.   Okay.  Would -- would your notebooks be
23   included in intellectual property as recorded, then
24   drawing, specification and memos?
25       A.   That would -- I mean, that would include

---

**LEXITAS LEGAL**
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 133

1  intellectual property, portions of lab notebooks.
2  There would also be general experimental lab
3  notebooks.  Think when you took Chem 101 and they gave
4  you big, wooden -- I'm sorry -- big, paper notebook
5  that you write in and put down possible experiments or
6  information.
7      Q.  How many notebooks do you allege were
8  taken?
9      A.  I -- I had a couple.  I -- I remember
10  having at least two or three notebooks that were -- I
11  remember having at least two or three notebooks that I
12  had kept with the lab.  There may have been more.
13  We -- I'd have to check.  We -- we ordered several of
14  them at one point when I was doing my Ph.D. at
15  Louisiana Tech and -- to buy in bulk.  So I would have
16  to check to see how many, you know, which ones went to
17  Uday and Karthik, which you ones went to me, and which
18  ones -- what they were used for.
19      (Defendant's Deposition Exhibit A15, E-mail
20  3/20/17 from Richard Schaefer re: 3D Move to 6th floor
21  Barnard.)
22      Q.  Let me hand you, Doctor, what's been marked
23  as Exhibit A15.
24      A.  Okay.  I have this document.
25      Q.  And represent to you that this was produced

---

Page 134

1  by your counsel in this case as JW-53006 through
2  53009.  And it appears to be an e-mail chain between
3  Richard Schaefer, Karthik Tappa, Pamela Woodard,
4  Jeffery Weisman, David Ballard, Uday Jammalamadaka,
5  Robert Boles, David Smugala, Janine Wuebbles and
6  Jennifer Kiphart.  Can you identify this for me?  Is
7  this an e-mail chain about moving things from SBI's
8  lab over to Mallinckrodt?
9      A.  This appears to be an e-mail talking about
10  the move from SBI's lab in the St. Louis College of
11  Pharmacy to Mallinckrodt.
12      Q.  And if you look at the first page, there's
13  an e-mail from Karthik Tappa to everybody,
14  specifically to Pam Woodard, and it's dated
15  March 20th, 2017.  And he says:  We can move any time
16  on Tuesday or Wednesday, 21st and 22nd of March.
17      A.  Okay.  I'm reading that right now.  We can
18  move any time Tuesday or Wednesday.  Please let us
19  know the time to come pick the keys to the lab up.
20  STLCOP has some carts and dollies that we can borrow.
21  We'll let you --
22      THE COURT REPORTER:  What was that last
23  part?
24      THE WITNESS:  Sorry.  STLCOP has some carts
25  and dollies that we can borrow and we'll let you know

---

Page 135

1  if help is needed -- or it says help needed.  Thanks
2  Karthik.
3      Q.  So they were -- was it Karthik and Uday,
4  were they moving everything from the College of
5  Pharmacy lab over to radiology?
6      A.  That -- that -- that appears to be what
7  this e-mail is referencing.
8      Q.  And then up above, Rich Schaefer, is he,
9  like, the director of operations or something to that
10  affect?  Or I'm sorry, Director of Department of
11  Planning and Capital Projects?
12      A.  You know, I -- I wasn't very -- I -- I
13  don't really know anything about Rick Schaefer or much
14  about him.
15      Q.  But he got -- he gave you, Uday and Karthik
16  keys to the radiology lab over at Mallinckrodt, right?
17      A.  You know, I -- I didn't pick up any keys,
18  or I don't recall picking up any keys.  I --
19      Q.  Did you have a key?
20      A.  I, you know, I'm thinking about it right
21  now.  And I -- I don't recall -- I'm trying to think
22  right now if I had a key.
23      Q.  Do you want to look on the last page of
24  this, which is radiology key lock request form.
25      A.  Okay.  I'm reading this right now.  All

---

Page 136

1  right.  I'm reading -- so it says:  Key recipient's
2  names:  Jeff Weisman, David Ballard, Karthik Tappa,
3  Uday Jammalamadaka.
4      Q.  And then the building name and room number
5  would have been Barnard Hospital sixth floor?
6      A.  Yeah.  Do you -- do you have additional
7  records?  I -- I don't recall if I picked up a key for
8  the lab or not.  I don't --
9      Q.  So you don't know if you had keys to the
10  lab?
11      A.  I -- I don't recall if I had keys to the
12  lab at this point on -- you know, I'd want to check on
13  that.  I remember not being able to get into the lab
14  multiple times when I was going to visit Uday and
15  Karthik but I don't -- I'd have to see if I signed
16  to pick up a key.
17      Q.  Okay.
18      A.  Because I -- you know, I don't recall right
19  now.
20      (Defendant's Deposition Exhibit A16, E-mail
21  3/21/17 from Karthik Tappa re: 3D Move to 6th floor
22  Barnard.)
23      Q.  Let me hand you what's been marked
24  Exhibit 16.  Really on this one I'm just interested in
25  the first page, but for the sake of completeness

---

34 (Pages 133 to 136)

## DR. JEFFERY WEISMAN  9/13/2022

|  | Page 137 |
|---|---|

1    there's other pages.
2            And again, this is an e-mail from Karthik
3    Tappa to Rich Schaefer, copying you and others.  And
4    in it on March 21st, 2017, Karthik states that we
5    thank you for the keys and the cart.  We moved our
6    stuff and left the cart in the lab.
7            So to the best of your recollection and
8    based on this e-mail, was all of the property -- was
9    all of SBI's lab property moved over to radiology by
10    Karthik and Uday by March 21st, 2017?
11        A.  You know, I -- I don't recall the exact
12    date that they had moved all the property over.  I --
13    I recall that they were -- they were in the process of
14    moving for a time period.  I know part of that was in
15    March.  I -- I was rotating and working in the
16    hospital.  So I -- I wasn't moving equipment across
17    campus.
18        Q.  I wasn't -- yeah.  I said --
19        A.  So...
20        Q.  My -- my question was specifically about
21    Uday and Karthik.
22        A.  Could you repeat the question, please.
23        Q.  Yeah.  I was just saying had Uday -- Uday
24    and Karthik moved all of the SBI lab equipment to the
25    radiology printing lab on March -- by March 21st,

|  | Page 138 |
|---|---|

1    2017?
2        A.  You know, I know that they moved -- I -- I
3    know they moved the equipment over.  I don't remember
4    the exact date of it going over.  I know it was around
5    this time period.
6        Q.  Right.
7        A.  I -- I know that I didn't retain any of the
8    equipment from the lab that they had moved.
9        Q.  They moved it all over?
10        A.  They moved -- my -- my memory is they
11    removed everything.
12        Q.  At any point after March 2017, did you ever
13    demand any of your property or SBI's property be
14    returned?
15        A.  Well, as far as that goes, I -- I think
16    it's important to note that I was in an untenable
17    position where Alex had told me to shut everything
18    down.
19        Q.  I'm going to move that as -- to strike as
20    nonresponsive.
21            Did you demand that any of your property or
22    SBI's property be returned after March 2017?  Yes or
23    no.
24        A.  You know, I'd -- I'd have to think on that.
25    I -- I know that I wanted to stay participating in the

|  | Page 139 |
|---|---|

1    lab group after March and I was removed from the
2    website.
3        Q.  I'm not asking about that.  I'm
4    specifically asking -- you're a lawyer you know what a
5    demand is, to demand something back from somebody.
6    Did you make a demand after March 2017 that any of
7    your property or SBI's property be returned to you?
8        MR. ELSTER:  Objection.  Asked and
9    answered.
10        A.  I don't --
11        Q.  (Mr. Sullivan) Yes or no?
12        A.  I -- I would have to think on that, and,
13    you know -- I'd have to think on it.
14        Q.  Do you have to think on it?  You don't
15    recall?
16        MR. ELSTER:  Objection.  Asked and answered
17    misstates testimony.
18        A.  You know, again, I -- so...
19        Q.  (Mr. Sullivan) No.  What's the -- I mean,
20    is it -- is it that you don't recall whether you
21    demanded or you just need to think about it more?
22        A.  No.  I -- I stated what I stated.  I would
23    have to think through -- I would have to think about
24    my conversations with Pamela Woodard, David Ballard
25    and -- and what my specific requests were.  But right

|  | Page 140 |
|---|---|

1    now, I -- I would have to --
2        Q.  Do you recall sitting here right now if you
3    demanded from Dr. Ballard or Dr. Woodard that they
4    return any of your or SBI's property after March 2017?
5        MR. ELSTER:  Same objection.
6        A.  You know, again, I would have to think -- I
7    would have to think on it.  But I mean, I know -- I
8    know at portions of it I did request to have -- to
9    have continued involvement and access and they locked
10    me out as of, you know, June 2018 ended, which was
11    very surprising because mechanical engineering let me
12    be a visiting -- a visiting researcher.  But the Mal
13    --
14        Q.  That was in August of 2018?
15        A.  That was in August of 2018.
16        Q.  Okay.
17        A.  But after --
18        Q.  And your residency ended, right?
19        A.  My residency affiliation ended after June
20    of 2018 but it was very -- I was very shocked that I
21    was unable -- that I was taken off the website.  My --
22    my e-mail --
23        Q.  Okay.  I'm going --
24        A.  -- accounts -- well, wait.  My e-mail
25    accounts were cancelled.  I had talked to David

35 (Pages 137 to 140)

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 141

1  Ballard and Pam Woodard about keeping my Wash U.
2  E-mail to be able to continue doing research.
3      Q.  But that wasn't your property though,
4  right, the e-mail?  I'm talking about SBI and your
5  property that you're claiming was converted in this
6  case.  Did you ever demand that it be returned by
7  Dr. Woodard or Dr. Ballard --
8      MR. ELSTER:  Object --
9      Q.  -- after March of 2017?
10     MR. ELSTER:  Objection.  Asked and answered
11 again.
12     A.  You know, again, I would have to think
13 about -- about a specific conversation and see if I
14 sent any e-mails or text in that regard.
15     Q.  (Mr. Sullivan) Okay.
16     A.  But I -- but I, I mean, I will definitively
17 say that I was very upset that I'd been put into an
18 untenable situation where Alex told me he wanted me to
19 shut down my lab and, you know, give it to -- you
20 know, basically he told me to shut things down.  When
21 he -- when there was the whole thing at the six month
22 review about getting -- having fake evaluations.  He
23 wanted me to shut down my lab and he suggested I give
24 the lab to, you know Wash U.
25     Q.  You -- you worked in the radiology 3D

---

Page 142

1  printing lab with Dr. Ballard and Dr. Woodard during
2  the last three or so months of your residency,
3  correct?
4      A.  Yes.  I did -- I did research.  I did a lot
5  of working on papers remotely.
6      Q.  Were you ever in the lab though in that
7  time frame?
8      A.  I -- I had -- I had set foot in the lab
9  during that time frame but I was primarily working on
10 wrapping up papers that we had -- that we had in -- in
11 press and progress.
12     Q.  While you were there, did you take back any
13 of your or SBI's property?
14     A.  Just thinking if I -- I don't believe I
15 took anything from -- from the lab at that point.
16     Q.  Did you -- did you say to anyone when you
17 were in the lab, hey, these are my work papers or my
18 lab notebooks and I'm taking them with me?
19     A.  We -- I mean, we -- we all discussed how
20 unfair the situation was that I was being pushed out,
21 that, you know, that I basically built a core research
22 facility at a top five medical center, something no
23 med student has probably ever done, and, you know, I
24 was basically being pushed out and left with nothing
25 after the actions by Alex and his team.

---

Page 143

1      Q.  But you didn't say to -- you didn't say to
2  anyone, these are my -- these are my notebooks, I'm
3  taking them with me?  Yes, did you say that?
4      A.  You know, I -- I don't recall at this
5  point.  I'll have to -- I'll think on it.
6      Q.  Okay.
7      A.  But I -- but I definitely recall that I was
8  terrified that they were going to blacklist me from
9  working in medicine, and, you know, hide my
10 transcripts, not give a program director letter or do
11 something to prevent me from working, which would, you
12 know --
13     Q.  You were --
14     A.  -- which put me in a very untenable
15 position.
16     Q.  You were aware that -- that Karthik and
17 Uday were moving everything from the College of
18 Pharmacy lab to the radiology lab, right?
19     A.  I -- I was aware that they were moving
20 equipment.
21     Q.  Did you object to that?
22     A.  I didn't object to that because, again,
23 Alex Evers put me in an untenable position.  My -- my
24 job was at risk.  I needed to go along with whatever
25 the powers that be wanted.

---

Page 144

1      Q.  You didn't state to anyone that, hey, this
2  property shouldn't be taken over to the -- to the
3  radiology printing lab?
4      A.  I -- I know that I had conversations
5  with -- I know I had conversations with David Sinow
6  and my wife about what was going on and how this was
7  completely untenable and unfair.
8      Q.  Okay.  Well, I'm -- I'm talking about
9  anybody at the university, at the hospital, Dr. Evers
10 or Dr. Benzinger, you never stated to them, you know,
11 I object to this property being taken over to the
12 Department of Radiology?
13     A.  I -- I would want to think on that.  I
14 know -- I know I had similar conversations in private
15 with David Ballard and Uday and Karthik on the
16 situation, but...
17     Q.  So, I mean -- I mean, you -- you acquiesced
18 then the property and the equipment being -- being
19 moved over --
20     MR. ELSTER:  Objection.
21     Q.  -- is that a fair statement?
22     MR. ELSTER:  Objection.
23     A.  I would --
24     MR. ELSTER:  Wait.  Hold on.  Objection
25 vague and to the extent that calls for a legal

---

36 (Pages 141 to 144)

**DR. JEFFERY WEISMAN  9/13/2022**

| Page 145 | Page 147 |

### Page 145

1  conclusion, acquiescence.
2      A.  I -- I mean, I -- I would say that I -- I
3  mean, very bluntly, I did not want to give up my lab.
4  I did not want to give up what I had spent -- I -- I
5  mean, I spent six weeks in Louisiana building that up.
6  I had done something that no med student should have
7  been able to do because I was a patent attorney and I
8  used that resource, you know, that as a resource.  And
9  I basically was in a position where it was either my
10  career.  I'd never practice clinically again.  I might
11  be blacklisted.  I might never work again as a doctor
12  or come -- or being in that untenable position where I
13  had to give everything to them or face the
14  consequences.
15      Q.  (Mr. Sullivan) Did you ever demand payment
16  from the university or the hospital for your and SBI's
17  lab equipment and property?
18      A.  I'm thinking right now.  I -- I don't
19  recall right now but I'll -- I'm happy to think if I
20  had asked for -- asked for it.  I -- I know I did --
21  know I did demand that there was some payments made to
22  Strategic Biomedical for Uday and Karthik.
23      Q.  That was to cover their -- that was -- that
24  was -- that was to cover their salaries because SBI
25  couldn't, right, until they were able to be hired

### Page 146

1  as -- in the Department of Radiology?
2      A.  Well, SBI wasn't going to be able to cover
3  their salaries because of what happened with Alex
4  Evers.
5      Q.  No, no, no.  I'm asking you.  But that's
6  why -- but that's why the invoices were --
7      A.  The invoices --
8      Q.  -- submitted to -- to radiology --
9      A.  Those invoices --
10      Q.  Hold on.  We can't talk over each other.
11  Those were for -- that was because Pam
12  Woodard wouldn't be able hire them in enough time for
13  them to be paid, right?  So you submitted invoices so
14  that -- so that Karthik and Uday could be paid?
15      MR. ELSTER:  Objection.  Argumentative.
16  Assumes facts not in evidence.
17      A.  So, I mean, I -- I would -- I -- can I see
18  the specific invoices just to --
19      Q.  Well, you brought up the --
20      A.  -- comment on them --
21      Q.  You brought up the invoices.
22      A.  I know.  I'd love to see them so I could
23  comment on what they were for.
24      Q.  We'll look at them.  We'll look at them.
25      A.  Okay.

### Page 147

1      Q.  We'll look at them in a little bit.
2      But otherwise, you didn't submit any
3  invoice or demand any payment for equipment, lab
4  notebooks, intellectual property, work process papers,
5  memos, anything of the like to the university or to
6  the hospital?
7      A.  I will think on it more.  I don't believe
8  so at this time but I'll look at it.
9      And again, I will say as -- as a med
10  student, earning, you know, like a resident salary --
11  or I'm sorry.  As a resident earning a resident salary
12  of 15, $16,000, that was my entire life, my entire
13  assets was starting this company up.  I had spent, you
14  know, as I said, 80 to a hundred thousand dollars
15  personally to get this equipment.  I had searched for
16  stuff all over the globe.  Literally shipping in 3D
17  scanners from New Zealand and refurbishing them.
18      Q.  Okay.  But --
19      A.  No.  But I'm just saying so the -- the
20  whole thing was I'm not wealthy.  I don't have a trust
21  fund.  I don't have substantial assets.  This is what
22  I had put everything into and I was in a position
23  where I literally had to make a choice, an untenable
24  selfish choice of my career based on what was going on
25  with Alex to try to get the heat off on this or -- or

### Page 148

1  my lab and my research career.  And that's what I was
2  faced with at that point.
3      I -- I mean, the truth -- I -- I had no
4  desire to give up my lab, to give up my life's work,
5  what I had stepped away from law to go do something to
6  try to make an impact on society to develop tech.
7      Q.  Let's -- let's keep it to what my question
8  is.  Okay.  Let me ask this question:  Did you ever
9  demand that the university or the hospital share
10  profits from the radiology 3D printing lab with you?
11  Yes or no or I don't recall.
12      A.  So I -- I would say I need to think on it.
13  And the reason -- the reason I'll say I -- I don't
14  recall I need to think on it right now is we were in
15  talks about doing private tech development even at
16  later points.  And there -- there were talks about
17  that because Dave -- because, again, David Ballard had
18  been -- because David Ballard had been, you know,
19  e-mailing me about helping with -- David Ballard had
20  been e-mailing me about helping --
21      Q.  Okay.  Again, we're going off was there
22  ever a demand?  I know that there were proposals and
23  agreements.  Did you ever make a demand from the
24  university or the hospital that they share profits
25  from the radiology 3D printing lab?

**LEXITAS LEGAL**
www.lexitaslegal.com          Phone: 1.800.280.3376                    Fax: 314.644.1334

## DR. JEFFERY WEISMAN  9/13/2022

Page 149

1    MR. ELSTER:  Objection --
2    **Q.  Yes, no, I don't recall.**
3    MR. ELSTER:  Make an objection.  Objection.
4  Asked and answered and to the extent the lawsuit
5  itself is a demand.  If you can answer.
6    A.  I mean, going -- I mean, yeah, I -- I
7  would -- going on that, I think -- I think they were
8  on -- I guess I would just say this to -- to give a
9  final answer on this.  I think everybody was on notice
10  that I was upset with what had occurred as of January
11  of 2019 when I filed a lawsuit over it.
12    (Defendant's Deposition Exhibit No. A17,
13  E-mail 1/16/18 from Jeffery Weisman re: T32 grant
14  renewal information.)
15    **Q.  (Mr. Sullivan) Okay.  I've handed you**
16  **what's been marked as Exhibit A17.  Is this an e-mail**
17  **sent from you at the top to Jon Bucher dated**
18  **January 16th, 2018?**
19    A.  I believe it is.
20    **Q.  Did you state in this e-mail that I hope he**
21  **knows that as a resident I moved my lab here with two**
22  **post-docs, ended up with no support and donated one of**
23  **the top medical 3D printing groups in the country to**
24  **the radiology department?**
25    A.  Well, let me read this e-mail right now.

Page 150

1  And I -- I just want to verify -- let me ask one
2  question.  So this e-mail is from me, Tuesday,
3  January 16th, 2018, to Jon Bucher, and its subject T32
4  grant renewal information.  So this is the e-mail --
5  so just -- just to make sure I understand.  You're
6  asking the question about the e-mail about the --
7  the --
8    **Q.  The second paragraph your statement is in.**
9  **Did you --**
10    A.  Oh.
11    **Q.  Did you -- did you write that?**
12    A.  Let me read this.  And hold on.  I'm just
13  reading this right now.  Correct nine publications in
14  Pubmed but please see below on additional publications
15  and my comment before you relay that.
16    I am going to meet with Dr. Avidan to do an
17  exit interview since it looks like I'm leaving in
18  July, but in advance, I hope he knows that as a
19  resident I moved my lab here with two post-docs, ended
20  up with no support and donated one of the top medical
21  3D printing labs in the country to the radiology
22  department.
23    **Q.  Okay.**
24    A.  I have not had the time --
25    **Q.  Wait, wait, wait.**

Page 151

1    A.  -- to track the status of a dozen projects
2  and several national and international collaborations
3  that are still ongoing since I am just a mere
4  workhorse resident.
5    **Q.  Okay.  You wrote that?**
6    A.  I wrote this e-mail.
7    (Defendant's Deposition Exhibit No. A18,
8  E-mail 4/5/18 from Jeffery Weisman Subject Weisman CV
9  ERAS.pdf.)
10    **Q.  Okay.  Let me hand you Exhibit A18.  Can**
11  **you identify this for me?**
12    A.  Yes.
13    **Q.  It's an e-mail to Dr. Catherine Krucylak?**
14    A.  Yes.  This is -- this is an e-mail from me,
15  Jeffery Weisman, Thursday, April 5th, 2018, to
16  Dr. Catherine Krucylak, Weisman CV and info.
17    **Q.  Okay.**
18    A.  Attachments my CV for ERAS.
19    **Q.  Okay.**
20    THE COURT REPORT:  CV what?
21    THE WITNESS:  Weisman CV for ERAS purposes.
22  E-R-A-S.
23    **Q.  And Dr. Krucylak had agreed to write you a**
24  **letter of recommendation?**
25    A.  Yes.  And I --

Page 152

1    **Q.  Did she -- would she have had favorable**
2  **things to say about your performance as a resident?**
3    MR. ELSTER:  Objection.  Speculation.
4    A.  I saw the letter that Dr. Catherine
5  Krucylak wrote and it was a positive letter.
6    **Q.  (Mr. Sullivan) Oh, Okay.  And did you write**
7  **to Dr. Krucylak:  The most unique thing I did here was**
8  **donating the medical 3D printing lab to the radiology**
9  **department?**
10    A.  Let me read this e-mail.  Yes.  And I see
11  that I wrote:  The most unique thing I did here was
12  donating the medical 3D printing lab to radiology.
13  And I think the most important thing to note and the
14  reason that I read the previous exhibit --
15    **Q.  I'll hand you what we'll --**
16    A.  Well, the reason I read the previous --
17    **Q.  Your lawyer -- no.  You've answered my**
18  **question.**
19    A.  The reason -- the reason I read the
20  previous A17 is because --
21    **Q.  Please look at A19, sir.**
22    A.  -- it's a very --
23    **Q.  Sir --**
24    A.  -- sarcastic comment to say that I'm just a
25  mere workhorse resident.  And I have donated --

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 153

1          Q.  -- can you look at --
2          MR. ELSTER:  Hold on.  Hold on.
3          THE COURT REPORTER:  I can take one person
4    at a time.
5          MR. SULLIVAN:  This is -- this is not
6    responsive --
7          MR. MAREK:  Not recognizing that's he's --
8          MR. SULLIVAN:  He's giving long -- he's
9    going -- he's giving long, narrative answers.
10         MR. MAREK:  -- trying to finish --
11         MR. ELSTER:  Just let him finish.
12         MR. SULLIVAN:  He's not responding to any
13   questions.
14         MR. ELSTER:  Hold on.  Just let him --
15         MR. MAREK:  That you don't want to hear.
16         MR. SULLIVAN:  You guys can ask the
17   questions that you want to.  I was asking about
18   Exhibit A18.  He answered my question.  And we're
19   moving on.
20         MS. RUTTER:  Dr. Weisman, please finish
21   your answer.
22         MR. SULLIVAN:  No.
23         A.  I said donated --
24         MR. SULLIVAN:  No.  This is my deposition.
25         A.  I said donated very --

---

Page 154

1          MR. SULLIVAN:  You guys can follow up
2    with --
3          A.  I said donated very sarcastically here
4    because I was being taken advantage of.  I was a mere
5    workhorse resident.
6          Q.  (Mr. Sullivan) Okay.  You stated donated
7    and I was asking about A18.  You stated that to
8    Dr. Krucylak?
9          A.  A18 I stated donated -- Yes.
10         Q.  Okay.
11         A.  And the reason I stated donated --
12         Q.  Okay.
13         A.  -- I had a long talk with David Sinow on
14   how I should be talking about this situation.  And he
15   advised me that I should not be saying radiology --
16   anesthesia stole my lab because if I said that, I
17   would be blacklisted and never work.  And the thing
18   that I was to do was to just say politely, yes, I
19   donated the lab, and I want to move on and try
20   something else.  It wasn't a good fit.
21         Q.  Okay.
22         A.  Because that was the polite thing to say.
23         (Defendant's Deposition Exhibit A19, E-mail
24   4/10/18 from Jeffery Weisman Subject Weisman
25   non-clinical activities at WashU.)

---

Page 155

1          Q.  Let's go to Exhibit A19.
2          A.  Okay.
3          Q.  Can you identify this e-mail for me?
4          A.  This e-mail is from Jeffery Weisman sent
5    Tuesday, April 10th, 2018, at 10:54 a.m. to Rich -- to
6    George Benzinger, cc-ing Thomas Graetz, noting Weisman
7    non-clinical activities at Wash U.
8          **Q.  Okay.  And in this e-mail, was this e-mail**
9    **sent from Dr. Benzinger wanting more information with**
10   **respect to your non-clinical activities so he could**
11   **write you a reference letter, to your recollection?**
12   **There might be documents showing that.**
13         A.  To the best of my memory, and I believe
14   there are some documents that show Richard Benzinger
15   was asking for an update on activities I had -- I'd
16   done there.  I believe this was from when we were
17   negotiating my resignation around that time period.
18         **Q.  Okay.  And you state in what I'll call**
19   **under bullet point one:  There was also a corporate**
20   **component, Strategic Biomedical, Inc. to commercialize**
21   **the University licensed technologies.  This was led by**
22   **a VC and mentor, David Sinow, JD, Ph.D., and located**
23   **off -- in an off campus incubator lab space.  Long**
24   **story short, it didn't work out.  The lab was donated**
25   **to the radiology department, primarily the vice chair,**

---

Page 156

1    **Pam Woodard, to be a core facility to set up a**
2    **central -- central 3D printing group on the medical**
3    **campus.**
4          **Did I read that correctly and did you put**
5    **that in that e-mail to Dr. Benzinger?**
6          A.  Let me read through this.  All right.  So
7    that is what -- what you read is what's in the e-mail
8    and it's what I wrote in that e-mail.  And it's about
9    as snarky as I could be without creating a problem for
10   myself.
11         (Defendant's Deposition Exhibit A20,
12   Stanford-Confidential.)
13         **Q.  Okay.  Let me hand you what's been marked**
14   **Exhibit A20.**
15         MR. SULLIVAN:  I'll note that this was
16   produced by, I believe, Stanford University to you
17   guys and it's marked confidential.  I don't know why
18   because we didn't have dealings with Stanford but, I
19   guess, to just -- since they've marked it
20   confidential, we'll have it confidential for purposes
21   of the deposition.
22         MR. ELSTER:  Okay.
23         MR. SULLIVAN:  Is that fine?
24         MR. ELSTER:  That's fine.
25         **Q.  (Mr. Sullivan) Okay.  Dr. Weisman, can you**

---

**DR. JEFFERY WEISMAN  9/13/2022**

Page 157

1  identify this for me?
2      MR. NOLAN:  Do you have a copy for me?
3      MR. SULLIVAN:  Oh, sorry, Mike.
4      Q.  (Mr. Sullivan) Can you identify Exhibit
5  A20?  Does it appear to be you sending your CV to a
6  Dr. Alex Macario at Stanford University?
7      A.  Yes.  I am reading it right now.  It's from
8  Jeffery Weisman, Wednesday, December 5th, 2018, 12:01
9  p.m. to Alex Macario with Stanford, cc-ing Janine
10 Roberts, CA-2 transfer question, Jeff Weisman, M.D.,
11 Ph.D., attachment Jeff Weisman CV.
12     Q.  Okay.  Can you look at the -- the CV.  And
13 flipping through it, would it appear to be what would
14 have been a -- your CV as of December 5th, 2018?
15     A.  This appears to be a -- this appears to be
16 my CV that I've attached and I'm looking at it right
17 now on page 4 of 12.
18     Q.  On page 4 of 12, under research labs?
19     A.  Yes.
20     Q.  2017 it states:  Founder.  Do you see that
21 there?
22     A.  Yep.  It says:  Founder and medical 3DP
23 lab, Washington University, Mallinckrodt Institute of
24 Radiology.
25     Q.  Radiology.  And then it says under the

Page 158

1  bullet point:  Donated laboratory equipment and
2  expertise from Strategic Biomedical, Inc., correct?
3      A.  That is what I wrote in there as was
4  advised.
5      And actually, at this point, I was advised
6  by Allen Kaye (phonetic) the chair of anesthesia at
7  LSU New Orleans to put down that -- that comment
8  because he had advised me against telling anybody what
9  had occurred at Wash U. and that it would likely lead
10 to my blacklisting.
11     Any other questions on A20?
12     (Defendant's Deposition Exhibit A21, e-mail
13 12/6/18 from Jeffery Weisman re: CA-2 Transfer
14 Question.)
15     Q.  No.  A21.  Can you identify this document?
16 Does it appear to be you also sending on December 5th,
17 2018, a copy of your CV to a Dr. Tatiana Jamroz at
18 Cleveland Clinic?
19     A.  Yes.  And I -- I believe this may be a
20 Cleveland Clinic branch location and not the actual
21 Cleveland Clinic.
22     Q.  Okay.  So a Cleveland Clinic related
23 entity?
24     A.  Correct.  So this appears to be an e-mail
25 on December 5th, 2018, at 2:59 p.m. Jeff Weisman

Page 159

1  wrote:  Dr. Jamroz, I'm looking to transfer to a new
2  residency program --
3      Q.  Yeah.
4      A.  -- and wanted to know --
5      Q.  So you -- you sent this e-mail to
6  Dr. Jamroz?
7      A.  Yes.  It appears when I applied to every
8  anesthesia program in the country under the suggestion
9  of Chuck Fox and Allen Kaye when I had done that.
10     Q.  And you attached your CV.  Does it appear
11 to be an accurate copy of your CV as of December 5th?
12     A.  Yes, it appears to be an accurate copy.
13 And I followed their advice of trying to be polite and
14 proper and just putting down --
15     Q.  And state that you donated laboratory
16 equipment and expertise from Strategic Biomedical,
17 Inc. on page 4?
18     A.  That is what's written down but that was
19 not what occurred in that situation.
20     Q.  Okay.  But you stated it to various people,
21 put it in writing?
22     A.  It was put down there because it would have
23 been quite impolite in academic circles to say Wash U.
24 stole my lab.  And being a medical --
25     Q.  Could you have used a different term than

Page 160

1  donated?
2      A.  I was advised by my mentors to put that
3  term down and that was the easiest way to go forward
4  to be able to get into another residency and complete
5  my training.
6      Q.  So you said that you donated it so that you
7  could -- you thought it would help you --
8      A.  Well --
9      Q.  -- be able to get another position?
10     A.  -- when I was talking with -- when I was
11 talking with LSU, for example, one of their big
12 questions was they knew me.  I went to LSU Health
13 Science and Center in Shreveport.  I knew the
14 anesthesia chair there, and I also knew the chair at
15 New Orleans.
16     They were very surprised after I took the
17 lab with me and moved it from LSU to Wash U. that I --
18 they were very shocked that I would suddenly abandon
19 things and they wanted to know what had really
20 happened there.  And I told them exactly what had
21 happened.  I told them the truth and what had
22 occurred, that things had gone sideways.  It was not a
23 good situation.  It was not a safe environment.  The
24 bullying and harassment was getting to the point the
25 patients were being endangered.

LEXITAS LEGAL
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 161

1    So when that fell through -- when my
2  transfer to LSU fell through because Douglas Thompson
3  refused to give my transcripts and said something to
4  Dr. Patil, the program director there, they helped me
5  to put together my CV and revamp it and send it out to
6  all other departments.
7    And their strong advice to me was do not
8  write down all the details of what happened with Wash
9  U.  They said just put down something that would be
10 politically correct or polite and try to move forward
11 with your career.  Because if you can't work as a
12 doctor, you can't build your career and you're done.
13 So I followed their advice.
14   MR. SULLIVAN:  Okay.  Should we break for
15 lunch.
16   MR. ELSTER:  Yep.
17   THE VIDEOGRAPHER:  We're going off the
18 record at, approximately, 12:22 p.m.
19   (A short break was then taken.)
20   THE VIDEOGRAPHER:  We're on back on the
21 record at, approximately, 1:30 p.m.
22   Q.  (Mr. Sullivan) Doctor, we just got back
23 from lunch and just wanted to remind you you're still
24 under oath.  You understand that?
25   A.  Understood.

---

Page 162

1    Q.  Okay.  Can you pull back Exhibit A, which
2  is the second amended complaint.
3    A.  Okay.  I'm getting that right now.
4    Q.  And can I point your attention to page 14,
5  paragraph 46.
6    A.  Okay.
7    Q.  And if you want to read paragraph 46 and
8  then I'll have a couple of questions for you on it.
9    A.  Okay.  Great.  Let me just do that real
10 fast.  Okay.  I'm just double checking the con --
11 where this is in the complaint to make sure I fully
12 understand context.  Okay.
13   Q.  Okay.  And in paragraph 46, you allege that
14 Dr. Evers proposed an affiliation by which the parties
15 would consider and engage in joint research,
16 parentheses, or not, close parentheses, on a
17 case-by-case basis.
18     Does that mean that there was no formal
19 agreement either by you and SBI on one hand or by
20 Dr. Evers on the other, that there would be a -- a
21 locked in collaboration between you?
22   MR. ELSTER:  Objection.  Form.  Vague and
23 potentially calling for a legal conclusion.
24   A.  So -- well, all that -- all that I would
25 say is when -- I assume -- I'm going to assume this is

---

Page 163

1  from when we were interviewing and deciding that I
2  would come to Wash U.  I spoke with Alex Evers that
3  we -- that if I were to come, I would -- we would --
4  there could be collaborations and they -- they would
5  bring me into the program and I'd do my technology
6  development activities.
7    Q.  (Mr. Sullivan) And that it would be up to
8  anesthesiology or you whether to collaborate on a
9  case-by-case basis based on the project.  Fair enough?
10   A.  I -- I would say that it -- that, you know,
11 we had an agreement that I would go there to do
12 research.  And there was no -- there was nothing
13 definitive on, you know, which project would go to who
14 or what.  But there was an over -- there was an
15 overarching agreement that I would be in Wash U.
16 St. Louis to do research at Wash U. St. Louis because
17 there's -- there's very little reason to come to
18 St. Louis to do research unless you're going to
19 participate with Wash U. St. Louis.
20   Q.  But that, it wasn't that anesthesiology
21 would not have a, you know, a monopoly over your
22 research activities?
23   A.  There -- there was no agreement that
24 anesth -- there's no agreement that I recall that
25 anesthesia would have a monopoly on research activity.

---

Page 164

1    Q.  Okay.  Let me point you to paragraph 65 on
2  page 19 of Exhibit A.
3    A.  Okay.  I'm at paragraph 65 of Exhibit A.
4    Q.  And my -- my question for you is:  You met
5  with Dr. Benzinger -- on January 19th, 2017, to --
6  to review your first six months of residency, correct?
7    A.  That is -- that is correct.  I had a
8  meeting with him.
9    Q.  And did he also give you a letter from him?
10   A.  Yes.  He did give me a letter that he
11 wanted me to read and then sign in front of him.
12   (Defendant's Deposition Exhibit A13, Wash
13 U. Letter 1/19/17 Re: Jeffery Weisman Action:
14 Probation.)
15   Q.  Okay.  Can I hand you Exhibit A13.
16   A.  Okay.
17   Q.  And is that the letter that Dr. Benzinger
18 gave to you in the meeting on January 19th, 2017?
19   A.  This appears to be a copy of the letter.
20   Q.  Okay.
21   A.  I know there were multiple drafts that, I
22 guess, he was circulating around.  But this --
23 this appear -- this appears to be a copy of the letter
24 he gave.
25   Q.  And as part of the remediation with respect

---

LEXITAS LEGAL
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

**DR. JEFFERY WEISMAN  9/13/2022**

| Page 165 |
| --- |

1  to your performance, you were asked to repeat two
2  rotations; is that correct?
3      A.  They had asked me to repeat rotations.  So
4  I had met with them to discuss this, and there were
5  multiple discussions, both myself and Gary Hammen had
6  met with -- with the administration out of concern.
7  And -- and the end result of this, they did not place
8  me on probation.  They did not place Gary Hammen but
9  they asked us each to redo an internal medical
10  rotation and a ICU rotation.
11      Q.  And at -- at this point, you were not --
12  you were not kicked out of the ASAP program, correct?
13      A.  Well, so to answer that question, and I
14  want to make sure I do it properly.  The ASAP program
15  required you to start your anesthesia tutorial after
16  doing, I believe, it was 11 blocks.  It would -- it
17  would be helpful to see the ASAP schedule in front of
18  me to -- to fully recollect.  I don't know if we've
19  got that here.  But by doing this what they did is
20  they cycled myself and Gary from starting -- starting
21  block 12 and 13 in anesthesia tutorial.  The two of us
22  would then start anesthesia tutorial with everybody
23  else.  So in effect, it would push us to the standard
24  track kind of de facto.
25      Q.  Would you -- would you still have the --

| Page 166 |
| --- |

1  the 18 months of dedicated research that was part of
2  the ASAP program?
3      A.  So in -- so if they allowed us to continue
4  forward, we would be able -- so if they allowed us to
5  continue forward, then you would do the -- then you
6  would do remaining clinical months.  Although you
7  would have had two extra months tacked on.  And then
8  you would have done the remaining anesthesia clinical
9  months, which I -- I wouldn't -- to give an exact
10  number, I believe, it was something between 18 to
11  20 blocks.  And then you would do, I believe, it
12  was -- I'd have to -- it would be helpful to see, but,
13  I believe, it was, roughly, nine blocks of fellowship.
14  And then, I believe, they had, roughly, 23 blocks.
15  And these blocks are four week blocks, not monthly.
16  So it's 13 four week blocks make a year.
17          And then you do -- the final part of this
18  was you would be on an 80/20 split where you do
19  research basically -- you do -- you'd be clinical one
20  day a week and you do research, roughly, four days a
21  week for the remaining 23 blocks.  And that would
22  be -- that would be how this -- the ASAP program would
23  work there.
24      Q.  So you -- this would have just resulted in
25  you having a couple more months added onto your

| Page 167 |
| --- |

1  program; is -- is that fair?  They weren't pulling
2  your 23 blocks of research, correct?
3      A.  So if -- if they had honored -- if they had
4  honored our agreement to just do an extra two months,
5  it would have just been an extra two months.  But it
6  was very clear -- I remember talking with Gary Hammen
7  when we did this, and I -- and I -- I literally told
8  him that day, I'm like, this is the end of ASAP for us
9  because we're not -- now that we're not on the track
10  and we're just doing this with everybody else, they're
11  not going to let us get accelerated and just do our
12  remain -- our anesthesia training shorter than anyone
13  else.
14      Q.  But that's speculation though, correct,
15  because you never got that far.  You -- you resigned
16  before you were going to -- to hit that, correct?
17      A.  Oh, I -- so -- how many months did I do
18  there?  So I resigned having done --
19      Q.  Your intern year and one year.
20      A.  Yeah.  Thirteen (13) blocks anesthesia
21  training.  So, I believe, I would have needed
22  another -- another few blocks of anesthesia training.
23          I'm trying to -- it would be very helpful
24  to have that in front of me to refresh.  But I would
25  have needed a certain number of new blocks of

| Page 168 |
| --- |

1  anesthesia training to then jump from anesthesia to
2  the fellowship that I was planning to do in pain
3  medicine.
4      Q.  But you were never officially removed from
5  the ASAP program, correct?
6      A.  So I -- so as far as that goes, I viewed us
7  as being removed from the ASAP program because they
8  weren't -- they -- they -- they were holding us back
9  and creating issues.
10          The -- the -- the best example of being
11  held back was -- where -- where -- where we knew this
12  wasn't going to happen is Gary Hammen and I both did
13  tutorial, and tutorial is the second year for
14  anesthesia.
15          You -- you do tutorial for four to
16  six weeks where you're -- it's just training for
17  anesthesia.  Where they -- they have you paired up
18  with somebody.  You're not officially doing cases
19  completely by yourself with an attending supervising you.
20  And at the end of tutorial, Gary Hammen and I were the
21  only two people that were told the two of you need to
22  do an extra several weeks of tutorial and we're going
23  to have somebody baby-sit you.
24          And they had Marco Todorovic watch me.
25      Q.  Okay.

**LEXITAS LEGAL**
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

## DR. JEFFERY WEISMAN  9/13/2022

### Page 169

1   A.  But -- but at that point -- so -- so again,
2   to be -- to go through what happened.  At that point,
3   there was no way, in fact, that we were going to
4   finish.  If -- if everybody else had to do three years
5   of anesthesia training and at the very beginning of
6   tutorial they were saying, oh, you guys need to do a
7   couple of extra weeks, there was no way that we were
8   going to actually, in fact, be allowed to do the
9   training in half the time.
10   **Q.  Well, couldn't it have just eaten into the**
11   **research time?**
12   A.  So I -- I -- I would have to look into --
13   I'd want to look into that because I -- it -- it
14   clearly did not appear that they were treating us like
15   we were still in the ASAP program.
16   **Q.  Did anyone --**
17   A.  All but --
18   **Q.  Sorry.**
19   A.  Sorry.
20   **Q.  Did anyone, meaning Dr. Benzinger,**
21   **Dr. Evers, Dr. Cox, did they ever say to you:  You are**
22   **no longer in the ASAP program, those words or words to**
23   **that effect?**
24   A.  I -- I don't recall right now.  I -- I do
25   know that there was a lot of comments on staying in

### Page 170

1   ASAP or going out of ASAP.  Like, Peter Nagele, for
2   example, called me at one point and said:  Hey, you
3   need to drop out of the program.  If you drop out, I
4   can protect you.  That's when I was doing CPAP my
5   first year.
6   So I -- I know there were conversations
7   where Richard Benzinger was talking to other people.
8   They were debating was I -- well I weren't Gary
9   and I in ASAP at that point.
10   So again, I would just say my -- my
11   position on it was that they de facto pushed us out at
12   that point.  We -- we were starting with everyone
13   else.
14   And one of the biggest problems with what
15   they did with us doing the repeats of internal
16   medicine as well as doing the repeat of the ICU is
17   that we did zero anesthesia training during our first
18   year; whereas, everybody else did a year or two their
19   first year.  So when they started rating us, okay, all
20   20 of you guys are going to do tutorial, myself and
21   Hammen had zero anesthesia experience at Wash U. and
22   everybody else -- even though we were suppose to be
23   ahead of everybody else -- at that point, everybody
24   else had, you know, a block or two of anesthesia
25   training.  So we were -- we were down by two -- by one

### Page 171

1   or two, and then tutorial was extended just for us.
2   And I -- I was -- so to me their actions
3   spoke louder than the words.  And I -- I was talking
4   to Marco Todorovic and he -- he comes from kind of an
5   anesthesia dynasty.  His mom is -- his mother is the
6   chair of anesthesia at University of Colorado.  And so
7   he, like -- and his opinion as the senior resident
8   looking at this, was your skills are fine.  I don't
9   know what's going on here.  Where they're -- they're
10   extending your tutorial but nobody else's, or yours
11   and Gary's but nobody else's.
12   **Q.  Okay.  I'd appreciate just answering --**
13   A.  Okay.
14   **Q.  -- the question that's asked.  And that was**
15   **just that you were never told by Dr. Benzinger,**
16   **Dr. Evers or Dr. Cox that you were removed from the**
17   **ASAP program, right?  They never told you that.  Told**
18   **you?**
19   A.  I'm -- I'm just thinking back right now.
20   **Q.  And I -- and I don't need a lot of history**
21   **about Marco Todorovic or anybody else.  Whatever they**
22   **said.  Just -- just that -- that specific question and**
23   **I think you said you don't recall.  Is that fair?**
24   A.  I don't recall right now.  I'd want to
25   check to see -- to check documents to see exactly how

### Page 172

1   the process went down.
2   **Q.  Okay.  Can you look at page 20 over onto 21**
3   **paragraph 70.  And let me know when you've had a**
4   **chance to read that.**
5   A.  Okay.  I've finished reading it.  And I
6   actually think this also answers your previous
7   question on if I was -- or when -- being driven from
8   the ASAP program and the -- the nature of that.
9   **Q.  Okay.  What I wanted to know, and I think**
10   **you might have testified about this previously is that**
11   **you state here that Dr. Benzinger refused to meet with**
12   **you in the summer of July 2017?**
13   A.  Yes.  So it was going on right here.
14   **Q.  All right.  Just -- just that's what it**
15   **says and that's what you previously testified to?**
16   A.  Yes.  He refused to have a second six month
17   year end meeting for just myself and Gary Hammen.
18   (Defendant's Deposition Exhibit A103,
19   e-mail 2/21/18 from George Benzinger re: Weisman 6
20   month meeting.)
21   **Q.  Hand you what's been marked as Exhibit**
22   **A103.  First like you to identify the first document,**
23   **which is WU-464.  Appears to be an e-mail exchange**
24   **between you and Dr. Benzinger as well as Shirley**
25   **Vaughn?**

**DR. JEFFERY WEISMAN  9/13/2022**

Page 173

1    A.  Okay.  So this -- this is an e-mail from
2    ben -- Richard -- sorry -- Richard Benzinger from
3    February 21st of 2018, to me about a six month
4    meeting.  And that -- there's at the top, it's him
5    responding to me.
6        **Q.  Right.**
7        A.  And at the bottom, it's me e-mailing him
8    and Shirley Vaughn asking about a six month meeting.
9        **Q.  And let me ask a question.  In your e-mail**
10   **to Shirley Vaughn and Dr. Benzinger you said:  Since**
11   **Dr. Benzinger didn't want to do the last six month**
12   **meeting, I feel it is important that we get to do this**
13   **one properly.  You wrote that?**
14       A.  Just reading this right now.  Yes.  It
15   appears I wrote that -- that e-mail.
16       **Q.  And Dr. Benzinger wrote back to you that:**
17   **Regarding the last cryptic part of your message I'm**
18   **not sure what you're objecting to specifically but**
19   **Dr. Groener normally does the end of internship**
20   **summative assessments for all the interns.  Did**
21   **Dr. Benzinger write that to you?**
22       A.  That is what it appears to be.
23       **Q.  Can you turn to the next page of this**
24   **exhibit.  Can you identify this for me?**
25       A.  Yes.  It's an e-mail from me to Richard

Page 174

1    Benzinger and it said:  My apologies on the last part.
2    It was Dr. Groener who cancelled the end of the six
3    month evaluation.
4        **Q.  Okay.  So what's stated in the complaint**
5    **isn't exactly fully accurate in what you previously**
6    **testified to.  It was --**
7        A.  Can you --
8        **Q.  -- Dr. Groener who would have cancelled the**
9    **end of -- end of the year six month evaluation?**
10       A.  Well, can you point out the paragraph,
11   please.
12       **Q.  Yeah.  We just talked about it.**
13   **Paragraph 70.**
14       A.  Paragraph 70.  Yep.  And I -- I would
15   dispute that it's accurate.  I would dispute your --
16   your statement on inaccuracy because they're --
17   they're playing semantic games here.
18       We -- I met with Richard Benzinger and
19   Russell Groener about the first six month evaluation.
20   I expected to meet with them about the next
21   evaluation.  And they're -- they refused to schedule
22   anything when the year ended and we asked about it.
23       It, you know, it's -- it's kind of a game
24   who's on first?  What's on second?  Oh, we need to
25   meet about six months.  Nobody responds to you.

Page 175

1    Nobody schedules.
2        **Q.  Okay.  But you --**
3        A.  Oh --
4        **Q.  But you apologized on the last part of your**
5    **e-mail because it was Dr. Groener who cancelled the**
6    **end of your six month evaluation, right?**
7        A.  I would -- that appears to be what I wrote,
8    as I was being polite.
9        **Q.  Okay.  Thank you.  You can go to page 21,**
10   **paragraph 73.  It goes over onto page 22.  If you want**
11   **to read that with respect to allegations you make with**
12   **respect to a faculty member by the name Joseph Cras,**
13   **C-R-A-S.**
14       A.  Yes.  Anesthesiology coupled false
15   evaluations with near constant harassment by faculty
16   members who reported to others.
17       For example, Weisman on one rotation was
18   assigned to work with faculty member Joseph Cras.
19   Cras stood behind Weisman with a clipboard verbally
20   harassing and screaming at him and writing down any
21   purported mistake he could find.  Cras also taunted
22   Weisman by saying he would e-mail his daily report to
23   Weisman's known persecutors.
24       Weisman was very comfortable [sic] working
25   with Cras, who had reportedly been accused of sexual

Page 176

1    improper -- sexually improper conduct on several
2    occasions.
3        In the presence of Weisman, for example,
4    Cras exposed a drugged patient's bare breasts to
5    passerby through a window between the examination room
6    and the hallway.  When Weisman objected, Cras feigned
7    a misunderstanding and incon -- incongruently shouted,
8    big breasts, quote, several times.
9        **Q.  Can you pull out Exhibit A2, which was the**
10   **original complaint that you filed in this case.**
11       A.  Okay.  I have Exhibit A2 in front of me.
12       **Q.  If you turn to page 17, paragraph 76.**
13       A.  Yes.
14       **Q.  If you want to read that.  You don't need**
15   **to do it out loud.  I have a couple of questions for**
16   **you on it.**
17       A.  Okay.
18       **Q.  So you done reading?  All right.  In**
19   **paragraph 76 of Exhibit A2, which was filed**
20   **January 18th, 2019, there's no reference or allegation**
21   **to Dr. Cras exposing a drugged patient's bare breasts**
22   **to a passerby through a window between the examination**
23   **room and the hallway, is there?**
24       MR. ELSTER:  Objection.  Abandoned pleading
25   but you can answer.

## DR. JEFFERY WEISMAN  9/13/2022

Page 177

1    A.  Well --
2        Q.  (Mr. Sullivan) And I'm just looking for
3   there's -- there's -- there's no allegation of that
4   in --
5        A.  I did not -- my attorneys did not include
6   that in the pleading.  It doesn't mean it didn't
7   happen.
8        Q.  Well, this is a pro se filing.  So you
9   wrote this Exhibit A2?
10       A.  No.  I did not write that.  Edward Moore
11  wrote that.
12       Q.  Exhibit A2?
13       A.  The first filing filed in January.
14       Q.  That was signed by you, pro se plaintiff,
15  Jeffery Weisman?
16       A.  Yes.  I was in Ed Moor's office when wrote
17  it.  I flew down to St. Louis to file.  I was --
18       MR. MAREK:  I don't think we need to --
19  we're not going to get into who did what with your
20  attorney.  If you didn't write it, you can say you
21  didn't write.
22       A.  Okay.  I didn't.
23       Q.  (Mr. Sullivan) Oh, you didn't write it
24  but --
25       MR. MAREK:  You're not going to ask him

Page 178

1   questions --
2        MR. SULLIVAN:  I'm not going -- oh, no, no,
3   no, no, no.
4        MR. MAREK:  -- about what he had said to
5   him.
6        MR. SULLIVAN:  No, no.  Oh, no.  No, I'm
7   not going to.  I'm not going to.
8        Q.  (Mr. Sullivan) But you signed this as a pro
9   se plaintiff and were initially pro se in this case?
10       A.  I -- I was -- I was represented by Ed Moore
11  at that time.  I filed it on my own.
12       Q.  Right.  You filed it as a pro se plaintiff.
13  Not -- Ed Moore did not file it on your behalf?
14       A.  That -- that -- that appears to be what
15  occurred and that -- but I, you know, again, you're
16  saying I was -- at that point in time, I was
17  represented by Ed Moore and Ed Moore wrote the
18  complaint.
19       (Defendant's Deposition Exhibit A28, e-mail
20  9/7/17 from Jeffery Weisman Subject: Week 1 Harassment
21  Incident Records Copy.)
22       Q.  Hand you what's been marked Exhibit A28.
23       A.  Yep.
24       Q.  Can you identify this document for me after
25  you've had a chance to read it.

Page 179

1        A.  All right.  This is an e-mail from myself,
2   jeffery.weisman@gmail.com to
3   jeffery.weisman@gmail.com, sent Thursday,
4   September 7th, 2017, at 10:38.  It's subjected week
5   one harassment incident.  Records copy.
6        Q.  Did you send this e-mail to yourself as a
7   record of your interactions with Dr. Cras on Thursday,
8   August 31st, 2017?
9        A.  Yes.  It appears I did.
10       Q.  Okay.  This e-mail would have been -- since
11  it's dated September 7th, would have been about a week
12  after you had your interaction with Dr. Cras; is that
13  correct?
14       A.  I would have to check my case logs because
15  I worked with multiple -- every day I was assigned to
16  a new and different attending poten --
17       Q.  I'm just saying it says in the e-mail --
18       A.  Yeah.
19       Q.  -- Thursday, August 31st.  And then the
20  e-mail was sent on September 7th, 2017.  So we can
21  agree that's a week?
22       A.  I -- I -- I wouldn't -- I'd -- I'd have to
23  look at my case logs to see what exact date I worked
24  with Dr. Cras to be able to tell you which patients he
25  sexually assaulted.

Page 180

1        Q.  Where in here does it talk about Dr. Cras
2   sexually assaulting anybody?  Can you point that out
3   to me in Exhibit A28?
4        A.  Well, let's see, what did I -- let me read
5   everything I wrote here.
6        Q.  Please, do.
7        A.  Okay.  So I've read this document.
8        Q.  And there's no reference, can't we agree,
9   in this document to Dr. Cras having exposed a drugged
10  patient's bare breasts to a passerby through a window
11  between the examination room and a hallway?
12       A.  Not in this document.  Not in this
13  interaction with him.  There were other interactions
14  with Dr. Cras.  It would -- it would help if I was
15  able to look at my case logs to try to piece together
16  which exact day and which patient he had done that to.
17       Q.  But there's nothing in Exhibit A28 that --
18  referencing that.  However, this is a long e-mail that
19  details Dr. Cras saying:  You shouldn't take -- you
20  shouldn't say big breaths in case it could be mistaken
21  for big breasts.  And you thought that was odd for him
22  to have said that?
23       MS. RUTTER:  Objection to the form of the
24  question.  It's compound.
25       A.  Well, what I would -- what I would just

45 (Pages 177 to 180)

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 181

1  answer on it is just simply in this interaction, he
2  was screaming big breasts to -- to patients we were
3  sedating.  In other -- and in other interaction, he --
4      Q.  (Mr. Sullivan) Where does it say in Exhibit
5  A28 that he was screaming?
6      A.  Well --
7      Q.  It says:  He stated that I was using
8  improper language.  He felt that the patient could
9  think I was talking about her breasts.  He reprimanded
10 me since he had two patients complain during his
11 career that he had joked about their chests and the
12 only reason he could think of for this situation was
13 that they misheard take a big breath as big breasts --
14 big breasts or big boobs.
15     A.  Well, what I will tell you is when you
16 guys, I'm sure, have already spoken to Dr. Cras about
17 these activities or when you do, if you talk to
18 anybody about him, he is a loud individual.  He is
19 always speaking up and he is always raising his voice
20 so...
21     Q.  Is there any reference to Exhibit A28 about
22 a -- the patient being scared or anything to that
23 effect?
24     A.  I did not include those details in Exhibit
25 A.  It appears from what's written there, they're not

---

Page 182

1  in -- in there.  I also, as I said, had multiple
2  interactions with Joe Cras and the patients that he
3  worked with.  And the things he's done with patients
4  is true.
5      Q.  Did you -- did you report this exposure of
6  the drugged patient's bare breasts to anyone after it
7  occurred?
8      A.  I'm trying to think about the steps that I
9  took on this.  I was pretty terrified because Joe Cras
10 had told me he was going to get me removed from the
11 program.  And I -- I would have to think about who
12 exactly I spoke to.  I know I spoke about his behavior
13 with other residents.
14     Q.  What behavior and which residents?
15     A.  I'm trying to think which residents was --
16 would be on the service when that occurred.  Would
17 you -- would you be able to provide me with a
18 scheduling list of who would have been with me in --
19     Q.  No.  I just want to know who you would have
20 reported this to, his -- the exposure of a drugged
21 patient's bare breasts because it seems to be pretty
22 important serious allegation in this.  So did you
23 report it to Dr. Benzinger?
24     A.  You know, I'd -- I'd have to go through and
25 see who I spoke with on that -- on these issues.

---

Page 183

1      Q.  What issues?  Specifically that allegation,
2  that's all I'm asking about.  I'm not talking about
3  just Dr. Cras following you around with a clipboard.
4  I want to know about the -- your allegation that he
5  exposed a drug -- a drugged patient's bare breasts to
6  a passerby by through a window between the examination
7  room and a hallway.  Who do you recall telling that
8  to?  Telling -- reporting that to?
9      A.  I don't believe I went into full -- the
10 full depth of Joe Cras's behavior to other
11 individuals.  Although I did meet with --
12     Q.  Hold on.  Who did -- that's not my
13 question.  My question is:  Who did you report that
14 specific allegation to?  Anybody?
15     A.  I -- right now I don't recall right now
16 reporting it to anybody.
17     Q.  Okay.  Thank you.  Do you think it's your
18 obligation as a -- a doctor to report that type of
19 incident when you see it occurring?
20     A.  I certainly think that a doctor has
21 obligations to report those types of incidents.
22 Although in this case, I had no proof of it occurring
23 and I would have been probably immediately expelled
24 from the program.
25     Q.  No.  You said in the presence of doctor --

---

Page 184

1  in the presence of Weisman, for example, Cras exposed
2  a drug patient -- drugged patient's bare breasts to
3  passerby.  So that was done in your presence as
4  alleged in this petition, right, Exhibit A?
5      A.  Yes, that was done in my presence.
6      Q.  In your presence.  So you saw it.  So -- so
7  that would be proof, right, your eye witness account?
8      A.  That would have been my word against a
9  senior attending as well as...
10     Q.  Were there other people in the operating
11 room when this occurred?
12     A.  I don't believe there are other people in
13 the operating room that saw what was going on --
14     Q.  There was no -- there was no nurse, no
15 CRNA?
16     A.  I -- I would need to see staffing for that,
17 but I believe at that point in time, we have the blue
18 curtains up and nobody else would have seen what he
19 was doing behind the curtains.
20     Q.  So the blue curtains were up.  So how would
21 he have passed -- how would he have exposed her
22 drugged -- a drugged patient's bare breasts to
23 passerby through a window between the examination
24 room --
25     A.  Because the window --

---

**LEXITAS LEGAL**

**DR. JEFFERY WEISMAN  9/13/2022**

Page 185

```
1        Q.  -- and the hallway?
2        A.  Because the window was at the head of the
3  OR, operating room, table.  So the way that -- the way
4  that operating room was set, we would go in through
5  the door and we would put the head of the bed so it
6  was right by the door with the anesthesia machine
7  there.  There were windows behind.
8        And as I -- as I stated, with -- with
9  him -- I'd have to go through -- but I believe I
10 stated that he had opened up all the windows -- all
11 the OR windows, which are normally the blinds that are
12 built into the glass were normally turned down.
13       Q.  Can you look at the next paragraph on
14 page 22 of Exhibit A.
15       A.  Which paragraph?
16       Q.  Seventy-four (74), please.
17       A.  Seventy-four (74).  Okay.
18       Q.  If you just want to read that to yourself,
19 and I'll have a couple of questions about that.
20       A.  All right.  I've read that.
21       Q.  Okay.  And did you record this
22 February 22nd, 2018, meeting with doctors Cox and
23 Benzinger?
24       A.  I don't recall if I have the full record of
25 that meeting, and I would have to see the list of
```

Page 186

```
1  recordings that we have.
2        And I also would note that very often I
3  would talk with them in the hallway after a meeting or
4  walking through the hallways afterwards.
5        Q.  In paragraph 74, it said:  Dr. Cox
6  pressured you for formal letter of examination and
7  threatened to order Weisman to report to the
8  Physician's Health Program.
9        MR. ELSTER:  Objection.  Resignation.
10       Q.  (Mr. Sullivan) Did he -- did he say that?
11       MR. ELSTER:  Resignation.
12       MR. SULLIVAN:  Oh, resignation.  Okay.
13 Sorry.
14       A.  And Tom Cox was pressuring me for a formal
15 letter of resignation and he made a threat to me.
16       Q.  (Mr. Sullivan) What was the threat, and if
17 you recall exactly, the words that he was using?
18       A.  I'm trying to refresh myself on this.  I --
19 I don't suppose I do have a recording of that
20 particular meeting because that would be very helpful
21 to play.  But if I don't, I'm just trying to recall
22 exactly how he phrased this.
23       Q.  Would he have expressed concern for your
24 mental health in the meeting?
25       A.  Only in relation to getting a letter of
```

Page 187

```
1  resignation.  They were talking about in those
2  meetings around that time period was I looking to
3  resign?  What I was looking to do?  Where was I
4  looking to go?  And, you know, by the way, we really
5  need to get a letter of resignation to move this
6  along.  By the way -- I believe it would have been
7  something along the lines of -- and I'll keep thinking
8  on it -- but, I believe, right now, to the best of my
9  knowledge, it was something along the lines of we
10 really need a formal letter of resignation.  Oh, by
11 the way, we're really worried about your -- your
12 mental health.
13       Q.  So they wouldn't have specifically
14 referenced making a report to the Physician's Health
15 Program?
16       A.  He was referring to the Physician's Health
17 Program.
18       Q.  That just wasn't your perception of the
19 events from him asking --
20       A.  I will -- I will think on his exact
21 wording.  But it was very clear to me -- I believe at
22 this point in time, I'd've -- it would help to have
23 all my documents with me -- but, I believe, at this
24 point in time, they'd sent Gary Hammen to the
25 Physician's Health Program.
```

Page 188

```
1        So that I took as a threat.  And they'd
2  also sent Andy Tran (phonetic).
3        Q.  So you just took a question about having a
4  concern for -- for your mental health, you took as
5  a -- as a -- as a threat for a report or a referral to
6  the Physician's Health Program?
7        MS. RUTTER:  Objection.
8        A.  Sorry.  A what ordered referral?
9        MS. RUTTER:  Objection to the form of
10 question.  It misstates Dr. Weisman's previous
11 testimony.
12       Q.  (Mr. Sullivan) Okay.  Let's go to -- you
13 still have Exhibit A2.  Turn to page -- oh, sorry.
14 Turn to page 20, paragraph 85.
15       A.  Sorry.  What page again?
16       Q.  Page 20, paragraph 85.
17       MR. NOLAN:  Sorry.  What paragraph?
18       MR. SULLIVAN:  Eight-five (85).
19       Q.  (Mr. Sullivan) So in this initial complaint
20 that you filed in this case, paragraph 85 states:  On
21 February 22nd, 2018, plaintiff met for his six month
22 evaluation with defendants Tom Cox and Richard
23 Benzinger.  Defendant Tom Cox start pressuring
24 plaintiff for his formal letter of resignation and
25 noted he had concern for plaintiff's mental health.
```

47 (Pages 185 to 188)

**DR. JEFFERY WEISMAN  9/13/2022**

Page 189

1  Plaintiff felt he was being threatened for a fake
2  Physician's Health Program referral and could lose his
3  medical license if he did not formally resign in the
4  near future.  Is that accurate?
5     A.  That's what's written in the complaint.
6     Q.  Okay.  Thank you.  Going back to Exhibit A.
7     A.  Okay.  One second.  Let's flip back to
8  that.
9     Q.  Yes, sir.
10    A.  And what page?
11    Q.  We're going to look at page 23, and this is
12  under the heading of The Separation Contract.
13    A.  Okay.  Do you need me to keep the other
14  complaint open?
15    Q.  Not for now.
16    A.  Okay.
17    Q.  So I -- I have this 76 and 77 here just for
18  your reference.  But what I want to know is what the
19  terms of what you called the separation agreement
20  were.  And you agreed to resign from the residency,
21  correct?
22    A.  That -- that is correct.  I created an
23  agreement with them that I would assign -- that I
24  would resign from the residency for consideration.
25    Q.  And then your theory is that that

Page 190

1  consideration would be providing a good recommendation
2  letter, assisting you in -- in transferring to another
3  program, and cooperating with other programs with
4  respect to the transfer?
5     MR. ELSTER:  Objection to the extent it's
6  a legal --
7     Q.  Is that fair?
8     MR. ELSTER:  Legal conclusion on
9  consideration.
10    A.  My -- my terms for me to -- for me to
11  resign, my basic terms were I would need a good
12  reference, and I would need assistance in
13  transferring, and that's -- that's -- those are some
14  of the terms I was asking for.
15    Q.  (Mr. Sullivan) Not -- so I want to know
16  what all of the terms.  And did you ask for them or
17  were they agreed to?
18    A.  Every -- everything --
19    Q.  What was agreed to?
20    A.  So we reached an agreement in April
21  of 2018, and other terms and things that we were
22  discussing at that point was that it would -- I would
23  get a good reference, it would be accurate, it would
24  be objective, it would fulfill all ACGME policies and
25  meet all ACGME policies and protocols.  They would

Page 191

1  assist me and my -- and the understanding is they
2  would not try to harm me, that -- that was the terms
3  of an agreement that I had been negotiating with them.
4  And it was -- it started as a verbal agreement.
5     Q.  I don't want to know your understanding.  I
6  just want to know what the terms are.
7     A.  Well, those -- those are some of the terms of
8  the agreement.
9     Q.  So let me -- let me -- terms are they
10  provide you a good reference or a good recommendation.
11  Okay.  That's one.  Two, they -- they're going to
12  assist you in transferring to another program, right?
13    A.  Correct.
14    Q.  Okay.  So those are the two main terms?
15    A.  Those are two of the main terms.
16    Q.  Okay.  Okay.  Are those the two only terms?
17    A.  I -- there were --
18    MR. ELSTER:  Objection to the extent it
19  mischaracterizes his prior testimony but you can
20  answer.
21    MR. SULLIVAN:  Well, he gets talking about
22  his understanding.  And I'm just asking -- I just want
23  to know what the terms are.
24    MR. MAREK:  All he has is his understanding
25  of the terms.  They're indistinguishable.

Page 192

1     A.  You know, again--
2     MR. NOLAN:  I'm going to object, that's not
3  a valid objection.
4     THE WITNESS:  Yeah, that's not a valid
5  objection.  That's coaching.
6     MR. NOLAN:  Are you asking me a question?
7     THE COURT REPORTER:  Wait one second.
8     THE WITNESS:  I didn't ask you a question.
9     MR. MAREK:  Okay.  All right.  Did you say
10  something.
11    MR. ELSTER:  I said please stop your
12  speaking objection.
13    THE WITNESS:  Yeah.
14    MR. MAREK:  All right.  So do you have
15  another question for him?
16    MR. SULLIVAN:  No. I've asked my question.
17    MR. MAREK:  Okay.
18    A.  All right.  Okay.
19    Q.  (Mr. Sullivan) Let me ask you this:  You
20  stated before that you're still looking into possibly
21  finishing up an anesthesiology residency; is that
22  right?
23    A.  Yes, that's correct.
24    Q.  How long is Wash U. and Barnes-Jewish
25  Hospital obligated to assist you in -- in finding a

## DR. JEFFERY WEISMAN  9/13/2022

Page 193

1   new program and -- and providing you a good reference?
2       A.   Well, the terms of the agreement were that
3   they would assist -- they would provide a good
4   reference and they would assist me.
5           As far as -- as far as how long that --
6   that lasts for, they were -- by providing a good
7   reference, they were to generate the proper, accurate
8   and objective documents.  My ACGME transcript, my
9   program director letter.
10          So the -- so as far as a time period for
11  that, they would create those records and those would
12  be in my file.  So those would always be there and
13  available and I would have my good reference sitting
14  there.
15          So as far as a time period, it's not, you
16  know, how -- how long would they do it.  It's -- well,
17  it's -- once it's done, it's done.  The reference and
18  everything is there for the documents.
19          As far as assisting me, the only -- that --
20  at that point, they would provide my transfer
21  materials to another program.
22      Q.   And -- and if you -- and if you were
23  seeking to apply to another program, they would do
24  that same thing?  Well, you were -- let's say you file
25  an application for a program tomorrow for an

Page 194

1   anesthesiology program, and then would the program
2   then have to follow the terms of this agreement and
3   send -- okay.  Well, we have this request.  We're
4   going to assist Jeffery Weisman by providing his good
5   reference letter and other materials in his file?
6       MS. RUTTER:  Objection.  Misstates prior
7   testimony and assumes facts not in evidence.
8       A.   I mean, I would -- I would want to think on
9   our full conversations and terms of this, but, you
10  know, my understanding was that they would honor the
11  agreement.
12      Q.   (Mr. Sullivan) And that if -- and that they
13  would continue to do that to this day?
14      A.   I mean, I -- I would assume that they would
15  honor the agreement of giving me a good reference and
16  helping me to transfer.
17      Q.   Okay.  Thank you.  Can you turn -- and I'm
18  looking at Exhibit A again, page 24, 79.
19      A.   Okay.
20      Q.   In paragraph 79, you state that WU and BJH
21  delayed or failed to respond at all to the request by
22  other institutions for copy of Weisman's academic
23  records.  Which institutions did they delay or fail to
24  respond to?
25      A.   Okay.  Let me read this paragraph.  One

Page 195

1   moment.  Okay.  So I've read the paragraph.  And I
2   believe your question was:  What institutions have
3   they done this to.  We've been uncovering this --
4   unfortunately, we've been uncovering what they've been
5   doing month by month over the past four years.  Right
6   now we know several that they've done this too.
7       Q.   Can I -- can you name those institutions,
8   that's all I'm asking for.
9       A.   Okay.  Right now, and I'm going to try to
10  go in a chronological order.  So forgive me without
11  having lists in front of me.  I believe -- so the
12  first institution would have been -- or the first two
13  institutions was when I was first leaving, I intended
14  to go back home to Chicago.  Since I had some health
15  issues and wanted to be by family, that was University
16  of Chicago in Hyde Park, that was where Peter Nagele
17  went.  He was the -- he was the incoming chair that
18  had just left Wash U.  To go take over.  He had invited
19  me to go and -- to go with him.  And he even met with
20  Alex Evers to -- to more or less, he said he had to
21  notify Alex he was planning to take me.  And he said
22  Alex said that was okay.  I don't believe my ACGME
23  transcript was ever sent there.
24          And I believe Tom -- Thomas Cox had a
25  secret meeting at a conference with Jerome Klafta --

Page 196

1       Q.   Hold on.
2       A.   -- that's the first one.
3       Q.   Hold on.  Hold on.  Hold on.  I'm just
4   talking about what I had asked you questions was about
5   the statement here:  Delayed or failed to respond at
6   all to requests by other institutions.
7       A.   Okay.
8       Q.   Okay.
9       A.   So that -- so -- fine.  So materials were
10  not sent to University of Chicago.
11      Q.   University of Chicago?
12      A.   Yes.  The next one for anesthesia that I
13  know of right now was Cook County Stroger.  I don't
14  believe my ACGME transcript was ever sent because we
15  know that it didn't exist at that point.  So it
16  couldn't have been sent.
17          After that point, I believe -- I believe,
18  at that point in time, I con -- or after -- after
19  those fell apart, I had reached out to LSU Health in
20  Shreveport, and I was informed by them that Wash U.
21  did not send the materials they requested.  There were
22  multiple e-mails of me asking, the program asking, I
23  believe, and there were multiple phone calls.  I
24  believe some of those are recorded where I asked
25  Tom -- Douglas Thompson to send things and he doesn't.

**DR. JEFFERY WEISMAN  9/13/2022**

Page 197

1    Around that time period, I need to check on
2 timing to be sure, I think it might have been a little
3 bit before LSU, but I -- I'd need to check e-mails.
4 At my wedding, my -- my Godfather asked me said, said
5 he was going to help and he was very good friends
6 with -- or extremely close friends with -- with a
7 Dr. Troianos who was the chair of anesthesia at
8 Cleveland Clinic. So materials were suppose to be
9 sent there as well.
10    I, as -- as a side note on that, I also
11 at -- Pete Nagele was also at my wedding because I was
12 suppose to be starting work with him. And it was --
13 anyways.
14    After LSU, and I'm just trying to think
15 around time period with LSU I applied to -- I applied
16 to every residency program that I could find. I went
17 through ACGME portal, and I -- I believe I sent -- I
18 believe I sent an e-mail to every residency program
19 out there. There was several that wanted to talk to
20 me that were interested and they'd start talking to me
21 and then they'd stop.
22    Q. Okay. Wait. Which ones? Names. That's
23 what I'm looking for is names.
24    A. All right. Without my -- without my
25 documents, I believe I received an e-mail from

Page 198

1 University of Minnesota, I believe. I'd have to
2 check. One of the Pennsylvania programs had e-mailed
3 me. They had some interest. Mount Sinai in Miami
4 Beach had contacted me. So that was going on around
5 that time period.
6    I also had asked -- since I was -- since I
7 was worried about what I would be doing next year, I
8 also asked them -- I also asked for materials to be
9 sent to some occupational medicine programs. I know
10 that I asked for Harvard's Occupational Medical
11 Program, to send my transcripts, and Douglas Thompson
12 said, yes, he would. I e-mailed him that and he
13 e-mailed back he would. And we now know that was
14 never sent because the transcript never existed.
15    And I -- I'm trying to think. I know there
16 was some -- there was -- I'd -- I'd have to look at
17 all the responses I got. There were other programs
18 that were interested. I -- I spoke to Mississippi's
19 medical center -- academic medical center in Jackson.
20 They were very interested in me and said they were
21 going to reach out to my program.
22    I also know that there were several
23 programs that did not let me know that they were
24 investigating me. Yale, for example, was highly
25 interested in talking to them and reached out Alex

Page 199

1 Evers to -- I believe that -- I believe Yale said
2 something about, you know, that I could -- that they
3 were salivating at the thought of a J.D. M.D. Ph.D.,
4 and that it could -- you know, I could be the one to
5 revamp -- roughly, to revamp their -- their research
6 divisions. And they called -- they called Alex Evers
7 and Alex Evers told them, quote, just say no, and
8 didn't even send forms. Just said, say no, and
9 nothing was sent.
10    I know that Stanford, I believe, tried to
11 reach out at one point. And I know there was some
12 phone calls going on.
13    As we've been doing discovery, we've found
14 that there were phone calls going on between a lot of
15 these -- phone calls and texts likely going on. We're
16 still in the middle of discovery trying to get those
17 text messages because I -- from what I've heard,
18 people were texting or trying to get ahold of, like,
19 Alex Evers, Douglas Thompson, Richard Benzinger to get
20 my background.
21    Q. Who -- who was in contact with them trying
22 to get their backgrounds?
23    A. My -- it would -- it would help to see some
24 of the discovery documents to refresh, but there's
25 e-mails where, I believe, I can't remember if it was

Page 200

1 Stanford or Cleveland Clinic that were both -- that
2 both text -- that both e-mailed that they were trying
3 to get a hold of him to call to get documents. And
4 that -- so that's what was going on.
5    Then, of course, because I can't forget,
6 there was the University of Illinois that had -- that,
7 I believe, they had told me they had requested
8 documents that were -- and they were told that there
9 was no ACGME transcript. And that was exceptionally
10 scary because I'd already completed a year of training
11 and was made their chief resident, which would be,
12 like, transferring law schools after first year. And
13 it's like, oh, you don't have a transcript. There
14 was -- you know, we haven't gotten it. We don't know
15 if you can stay here type of a scenario where it's
16 terrifying and you don't know what's going to happen.
17    I'm -- I'm sure there's others that are out
18 there that had interest in me that I'm just trying to
19 think because there was a lot of conversations and
20 communications.
21    So I don't forget I was also trying to get
22 into LSU New Orleans where Allen Kaye was chair. And
23 after the incident with Douglas Thompson calling
24 Patil, Chuck Fox met with me and he apologized for --
25 he -- he just said he felt terrible for what had

50 (Pages 197 to 200)

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 201

1    occurred with Douglas Thompson talking to the program
2    director and saying things about lawyers.  And Patil
3    said something like she was so nervous after what he
4    told her about me that she almost fainted.  That he
5    tried to help me to get into Tulane.  So when I was in
6    the room with him, I believe, he called the program
7    director of Tulane that was suppose to be requesting
8    information from me.  And he -- he sent me a text
9    message that Gary Haynes the program director for --
10   I'm sorry -- not program director.  Gary Haynes the
11   chair of anesthesia at Tulane University would contact
12   me.
13          So I -- I made an exceptional effort to
14   transfer with all these -- there's -- there's nobody
15   that I know of that would have been, like, they're
16   just a regular anesthesia resident that would have had
17   all these connections to all these chairs to be in
18   contact with them and ask for materials to be sent,
19   and then just one after another, bridge after bridge
20   was burnt.
21          Q.   And so you think that was the result of
22   communications or statements made by Dr. Evers or
23   Dr. Benzinger?
24          A.   Or doc -- or Dr. Cox or Dr. Thompson.
25          Q.   Okay.

---

Page 202

1          A.   And Dr. Groener.
2                And -- and actually, in fact, I -- I forgot
3    to mention the -- the one -- the e-mail from Allen
4    Kaye.  Allen Kaye ran into Cook County Stroger's
5    program director, Ned Nasr, at a conference about a
6    year after I applied.  And he talked to Ned Nasr
7    because I -- because I had spoken -- I had spoken to
8    Alan Kaye about the situation.  And Ned Nasr didn't
9    take me as a transfer because there was an opening
10   they had.  He took somebody with zero anesthesia
11   experience, which would be unheard of where I had done
12   a year and passed my boards -- part of my boards or
13   half my boards, and he took somebody with zero
14   experience.  So Allen Kaye e-mailed, and I've got that
15   message where Kaye told me, I spoke to Ned Nasr.  He
16   said that he'll take you.  He just heard some things
17   from Wash U. about you.  So he said he'd take you but
18   with a few months less credits.  I believe it was six
19   months less credits.  And e-mail him right away.  And
20   I e-mailed him and then he just politely said, I'm
21   sorry.  I thought we were going to have a seat but
22   there is none and he wouldn't talk to me.  So it was
23   just bridge after bridge, opportunity after
24   opportunity.
25          Q.   Is that com -- is that communication with

---

Page 203

1    Dr. Kaye referenced in paragraph 81 of Exhibit A?
2          A.   Let me read that.  Yes.  That information,
3    I believe -- I was just reading that now.  Yes.  This
4    is the incident that was referenced.
5          Q.   And so that communication with Kaye would
6    have been in May of 2019?
7          A.   Yes, it would have been.
8          Q.   Okay.  So that would have been well after
9    Cook County had declined to offer you a position,
10   correct?
11         A.   That -- that conversation -- that
12   conversation he had was after Cook County declined to
13   offer me the seat.
14              (Defendant's Deposition Exhibit A29,
15   2/18/19 Text.)
16         Q.   Okay.  Hand you Exhibit A29.  Represent to
17   you that this was something produced by your lawyers
18   in this case.  Appears to be text messages with an AK,
19   Alan.  JW-64604 and 64605.
20         A.   Okay.
21         Q.   Are these text messages with Dr. Alan Kaye?
22         A.   This appears to be a screen shot of a text
23   message.  Let me read it.  One moment.  Okay.  I
24   read -- I've read the text message that I sent to Alan
25   Kaye.

---

Page 204

1          Q.   And in the text message refers to Dr. Fox
2    and Dr. Patil both said they felt bad about the whole
3    making me move down to Louisiana but not giving me the
4    offered seat; is that accurate?
5          A.   Yes, that's what I wrote down there.
6          Q.   And that Patil said she would let me start
7    as a CA-2 at Shreveport but there would be no research
8    tracks?
9          A.   That's what I put down there.
10         Q.   And you further stated that you were
11   ignored for a month.
12         A.   So after being burned twice by LSU
13   Shreveport and Patil, I have no respect for her or her
14   department anymore.  I would appreciate it if you
15   would not talk about me with them since.  That appears
16   to be what I texted Alan Kaye.
17         Q.   Okay.  So you thought they were being
18   burned by Dr. Patil at LSU Shreveport and that
19   happened twice?
20         A.   Well, they -- the -- the -- so the reason I
21   say it happened twice there is that I was told to move
22   down there in October to start a residency there.  I
23   packed up and I moved down to Shreveport.  I was
24   living out of hotels while I was waiting for the
25   apartment that I leased to be available.  And they

---

**LEXITAS LEGAL**
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

**DR. JEFFERY WEISMAN  9/13/2022**

---

### Page 205

1 called me in in November at one point and said, I
2 spoke with Wash U., Douglas Thompson, basically
3 what -- and they said that there were all these
4 issues.  They -- they explained -- that they
5 wouldn't -- it's, roughly, what she told me was that
6 they wouldn't give my documents.  They wouldn't give
7 my transcripts, and they said talk to the lawyers if
8 you want any information.  She said they told her
9 something that was so terrible that she almost
10 fainted, which was really scary to hear because she's
11 an anesthesiologist and see's, you know, open surgical
12 sites all day long.  And, you know, that she just
13 couldn't -- they just couldn't take me.
14        And they try -- even with that said, they
15 tried desperately to get me into a seat at Tulane or
16 something else in Louisiana.  I had known them for my
17 undergraduate training.  I had done research with
18 Chuck Fox.  I'd worked with Chuck Fox.  He, in fact,
19 introduced me to -- he -- I didn't even, I guess,
20 realize but, I guess, he sent an e-mail or contacted
21 Evan Kharasch about me when it -- to -- to be a scout,
22 etc.
23        And then the second time as you said for
24 getting burned with Patil at the very end said -- very
25 end said, you know, maybe we can try to do something

### Page 206

1 if there wasn't -- if we didn't do a research track
2 with you.  And it -- it wasn't just a research track
3 that it came down to with her.  She was saying to just
4 start all over as if I had zero anesthesia experience.
5        So even though I had done a year in good
6 standing and had credit and I had passed half the
7 boards, I would just start over and I agreed to that.
8 So the ball was moved multiple times because, I think,
9 they weren't really sure what to do -- do with it.  So
10 they basically had said, oh, well, maybe you won't do
11 a research thing.  Will that be okay?  Yes.  Would --
12 what if you started over.  Yes.  Just please let me
13 start.  I have nothing.  I -- you know, I -- I don't
14 know what to do.  I've lost everything.  I -- my
15 career seems to be over and they just weren't able to
16 help any further because of what Wash U. told them and
17 the -- the situation.
18        Alan Kaye at one point told me that
19 they'd -- that just the department was so concerned
20 over what -- what Washington St. Louis had told them
21 that they just didn't know what to do and didn't feel
22 they could take me so...
23    **Q.  What did -- what did Wash U. Department of**
24 **Anesthesiology tell Dr. Kaye?**
25    A.  I don't know what -- so I -- so I wasn't a

### Page 207

1 party to the conversation that -- any conversations
2 that Alan Kaye had with Washington University.
3    **Q.  What did Dr. Kaye tell you that -- what --**
4 **that -- that Wash U. had -- Wash U. faculty had -- had**
5 **reported to Dr. Kaye that was so alarming?**
6    A.  Well, again, so Alan Kaye had told me that
7 he had -- so Alan Kaye had forwarded me the letter, at
8 one point, the letter that they sent, a reference
9 letter about me.  But he had told me that he -- he had
10 told me that he spoke with Chuck Fox who was a
11 colleague and friend of hers -- his and basically that
12 they were extremely concerned because they couldn't --
13 they didn't understand why they wouldn't release my
14 transcript.  What had occurred that was so bad.
15    **Q.  So it wasn't anything that Wash U -- that**
16 **Wash U. stated to Dr. Kaye?**
17    A.  I'm -- I'm --
18        MS. RUTTER:  Objection.  Calls for
19 speculation.
20    A.  Oh, I -- I wasn't a part of any
21 conversations that Alan Kaye had with Wash U. I don't
22 fully know about any conversations Alan Kaye had with
23 Wash U.
24        I -- I do know that -- that Alan Kaye had
25 considered trying to get me to transfer to LSU New

### Page 208

1 Orleans, but he had said that LSU New Orleans
2 wasn't -- didn't have availability due to policies
3 right now -- right at that point in time to accept a
4 transfer.  They weren't accepting transfers at that
5 medical center.
6        So I -- I do know that there was
7 conversation -- I know because I was told by Dr. Patil
8 that there were conversations with Wash U. and e-mails
9 and things like that.  I -- I don't know on the Alan
10 Kaye end of things if he was also talking to Wash U.
11 or what was going on.
12    **Q.  (Mr. Sullivan) Who did Dr. Patil talk to?**
13        MS. RUTTER:  Objection.  Calls for
14 speculation.
15    A.  So -- so again, I -- I wasn't in the room
16 when Dr. Patil talked with anybody.
17    **Q.  (Mr. Sullivan) What -- who -- what --**
18 **but -- but you just referenced that Dr. Patil had**
19 **these alarming conversations with Wash U. and what**
20 **they told him -- what they told her almost made her**
21 **faint.  When you had that conversation with Dr. Patil,**
22 **did you ask her who she spoke to?**
23    A.  You know, I don't -- I don't recall exactly
24 what I said word-for-word.  In that conversation,
25 she -- she was not very forthcoming, that was the

52 (Pages 205 to 208)

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 209

1  very -- that was one of the very last conversations I
2  had with her.  She -- she felt -- she said that -- she
3  was basically telling me more or less that she felt
4  terrible that they had helped people out.  They'd
5  taken in residents that had been sexually assaulted
6  other places, they'd taken in people that had been
7  bullied and harassed other places, but they just
8  couldn't take me even though that was my home
9  institution, even though that was where I did my --
10  you know, my M.D. Ph.D. and I was one of the only
11  ones, they just couldn't take me because of what was
12  said.
13      Q.  Okay.  Did she tell you what was said or
14  who said it?
15      A.  I -- I was given pieces of the conversation
16  that she said.  I -- I -- you know, of course, again,
17  I wasn't there.  I believe she was referencing talking
18  to Douglas Thompson, the new program director at Wash
19  U. who's now the vice chair for education.
20      Q.  You believed or she told you she spoke with
21  Dr. Thompson?
22      A.  I -- I would have to think exactly what she
23  said to me.  I -- I just have to try to refresh my
24  memory looking at some of this.  But that would be my
25  answer.  I'd have to refresh my memory on it.  But

Page 210

1  I -- I believe she was referring -- I -- I believe she
2  right now today she was referring to Douglas Thompson
3  and that's who she was -- that's who she was in e-mail
4  communication with.
5      MR. SULLIVAN:  Okay.  We've been going just
6  a little over an hour.  Want to take a quick break.
7      THE WITNESS:  Okay.
8      THE VIDEOGRAPHER:  We're going off the
9  record at, approximately, 2:36 p.m.
10      (A short break was then taken.)
11      THE VIDEOGRAPHER:  We're back on the record
12  at, approximately, 2:47 p.m.
13      Q.  (Mr. Sullivan) So Dr. Weisman, after you
14  met with Dr. Benzinger on January 19th, 2017, and he
15  gave you the letter detailing -- we don't need -- we
16  don't need to look at it.  He gave you the letter
17  detailing some of the -- areas of concern with
18  respect to your performance as a resident.  Do you
19  recall meeting with Dr. Tom Cox in early February
20  of 2017?
21      A.  I -- I don't recall the exact date right
22  now without looking at calendars, but I -- I had
23  multiple meetings with -- I was very concerned by
24  that.  So, of course, I took it seriously.  I met with
25  Alex Evers, Tom Cox.  So I -- I met with the entire

Page 211

1  leadership on this.
2      Q.  And did you com -- do you recall
3  complaining to Dr. Tom Cox about the evaluation
4  process?
5      A.  I don't recall the exact word-for-word
6  meeting, but I -- I'm pretty sure that at that point,
7  I was complaining to everybody that I was very
8  concerned about the accuracy of the evaluations and...
9      Q.  Did you complain to Dr. Cox that you had
10  had insufficient notification about your poor
11  performance in the clinical setting?
12      A.  At that point in time, I was probably
13  complaining to everybody that I had -- that I had
14  insufficient notification and that -- and that was --
15  that was the disconnect because I was talking to -- I
16  was talking to faculty.  How am I doing today?  How am
17  I doing this week?  And they were saying, you're doing
18  a good job.  But then sometimes I'd get a bad
19  evaluation from the final -- the final evaluation at
20  the end of a rotation, that would -- there'd be a
21  disconnect that I was concerned about.  And I --
22  that -- that was one.
23      And then two, I was very concerned because,
24  as you said, the question was complaining because I
25  didn't feel that I was getting proper notice.  I -- I

Page 212

1  didn't understand how for internal medicine, for
2  example, the internal medicine doctors that I worked
3  for or worked with, Janet McGill, I believe, Amy
4  Loden, Gina LaRosa had told me I did a great job.  So
5  I was very concerned and just really kind of floored
6  when I saw that -- when I saw this -- this probation
7  letter that said every single internal medicine doctor
8  has given you a bad review.  Not a single one is
9  positive.
10      Q.  So those -- were those the only three
11  internal medicine doctors that you -- that you rotated
12  through?
13      A.  I'm trying to think of the names of
14  everybody.  I -- I apologize.  I -- I don't suppose we
15  have a rotation schedule to refresh my memory --
16      Q.  Okay.
17      A.  -- at all?
18      Q.  But there would have been more than just
19  the three, LaRosa --
20      A.  I -- I believe there --
21      Q.  -- Loden --
22      A.  Think there might have been one more, or, I
23  think, there was one more.  I think Melvin Blanchard
24  for the internal medicine -- for the two months of
25  internal medicine I had.  That -- I -- I remember at

**LEXITAS LEGAL**
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

**DR. JEFFERY WEISMAN  9/13/2022**

Page 213

1   least those four, Melvin, Gina, Amy and Janet McGill.
2       Q.   But there could have been more, you just
3   don't recall --
4       A.   I --
5       Q.   The schedule -- the schedule would show
6   that?
7       A.   The -- the schedule would show.  I -- I
8   mean, I believe those were the -- the four primary.
9   I --
10      Q.   Okay.  And then you mentioned -- do you
11  recall meeting with Dr. Alex Evers in February
12  of 2017?
13      A.   I know I met with Dr. Evers, especially --
14  especially after myself and Gary had met with
15  everybody.  And after Hammen -- Gary Hammen and I had
16  met with everybody, I -- I believe, we had -- we had a
17  final meeting in February where it was Alex Evers --
18  if -- if you're referring to the big meeting.  There
19  was a meeting with Alex Evers, Tom Cox, Richard
20  Benzinger and Russell Groener all in Alex Evers'
21  office.  And they called myself in for a meeting and
22  then they called Gary in for a meeting with everyone
23  to try to reach a resolution about the -- the concerns
24  that both of us had about our evaluations.
25          (Defendant's Deposition Exhibit A101,

Page 214

1   E-mail 2/19/17 from Jeffery Weisman Subject: Plan for
2   success from Weisman ASAP meeting.)
3       Q.   And I've handed you what's been marked
4   Exhibit A101.
5       A.   Okay.
6       Q.   E-mail from you to Alex Evers on
7   February 19th, 2017.  Subject:  Plan for success from
8   Weisman ASAP meeting.  Is that the meeting that you're
9   referencing to where it was with Dr. Evers, Doctors
10  Groener, Cox and Benzinger?
11      A.   It -- it appears to be.  Again, I need --
12  if I had a -- if I had the schedules, I would know for
13  certain on the date, but it appears that this was
14  likely.
15      Q.   So it said:  I greatly appreciated you
16  taking the time to set up the meeting on Thursday
17  about my performance in the ASAP program and putting
18  together pathways to success.
19          So that meeting probably would have
20  occurred on or about February 16th, 2017?
21      A.   So I -- I don't know exact dates but -- but
22  it would -- it would have been -- if I wrote this
23  e-mail, it would have been in relation to --
24      Q.   If you wrote it on Sunday the -- the 19th,
25  then fair to say it was probably on or about the 16th,

Page 215

1   which would have been Thursday, if we just go
2   backwards, right?
3       A.   Sometime in -- sometime in a -- in a
4   reasonable time to that.
5       Q.   Okay.  Can you just review this e-mail very
6   quickly, and I just want to know if it's a -- if it's
7   a fair summary of what was discussed and what was
8   agreed to at that meeting?
9       A.   Okay.  Let me read that.  Okay.  All right.
10  I've read -- I've read what I e-mailed to Alex Evers.
11  My very, you know, my e-mail after I met with him.
12      Q.   And was this a -- a fair summary of -- of
13  what was discussed and what you agreed to as a -- as a
14  pathways to success?
15      A.   So I -- I -- it's a summary of -- it's --
16  it's a summary but it doesn't tell the whole story.
17  You know, again, I --
18      Q.   Okay.  Well --
19      A.   Yeah.  I didn't agree with part four, like
20  part four that I'll do the two new months and be nice.
21  It's just the same way that I've lost the friends that
22  leave jobs and they don't like it but they still at
23  the end of the day say, thank you so much for the
24  opportunity to work here because they're trying to be
25  polite and cordial.  But that's -- that's not at all

Page 216

1   what I was feeling there so...
2       Q.   Well, I mean, but -- but you agreed to that
3   over -- you didn't -- you might not have agreed with
4   the underlying reason, but you said, yes, I'll -- I'll
5   do the two additional months of intern year and begin
6   CA-1 training in July with the rest of the CA-1 class.
7   You agreed to that?
8       A.   At that time, I agreed to it.  And the key
9   thing --
10      Q.   Okay.
11      A.   Just the one -- the one key thing I would
12  just note and I'll keep it very brief on this one.
13  The reason I agreed to it is because I didn't have any
14  proof at that point.  They said I failed my internal
15  medicine evaluation.
16      Q.   Okay.
17      A.   About a couple of months later in May.
18      Q.   Okay.  I'm going to strike it --
19      A.   One of the chief residents, Hawa Abubakar
20  came to me and said, hey, I heard what's going on with
21  you.  It turns out there's a separate system where
22  they keep the internal med evals.  I went to the
23  internal medicine department.  I got the evaluations.
24  I passed all of my internal med rotations.  I had
25  glowing reviews from the faculty members there and it

54 (Pages 213 to 216)

**DR. JEFFERY WEISMAN  9/13/2022**

| Page 217 |
| --- |

1  was a complete lie.  If I knew about those documents
2  then, I would have not agreed to repeat internal
3  medicine.
4      Q.  Okay.  I just want to know what was
5  discussed at that meeting and what was agreed to.
6  Okay.
7          So you -- you stated that you were going to
8  check in regularly with Dr. Groener.  Did you do this?
9  Did you do that?
10     A.  I believe that I was in touch with
11 Dr. Groener.
12     Q.  Okay.  Did you speak to other senior
13 research residents about their pathways to success?
14     A.  I spoke to other senior residents in the
15 M.D. Ph.D. program, Kate Meacham.  I talked to Lock
16 (phonetic).  I talked to Broc Burden (phonetic).
17     Q.  I'm sorry.  What was the second one?
18     A.  Lock.
19     Q.  Okay.
20     A.  And -- and Broc Burden.
21     Q.  Okay.
22     A.  I -- I believe I talked to Aaron Norris and
23 I -- I talked to -- I talked to several other of the
24 M.D. Ph.D. research residents about what had been
25 going on with -- with them and their experience.

| Page 218 |
| --- |

1      Q.  Okay.  And you also stated:  I have shut
2  down my active participation in research projects and
3  outside businesses to focus entirely on residency,
4  education and training.  That's what you state there?
5      A.  That's what I wrote down there per Alex --
6  per Dr. Evers' request.
7      Q.  Okay.  Did you do that?
8      A.  I shut down the majority of my active
9  research and projects and I just worked to
10 facilitate -- at that point, I worked to facilitate
11 what was going on, what was being taken over to
12 radiology and I didn't -- I -- I was not actively
13 going over there and doing research projects really.
14     Q.  Were you still working on research projects
15 after February 19th, 2017?
16     A.  I would say -- I would say that I was not
17 actively working on them since I was just cleaning up
18 any -- any odds and ends that needed to be done to
19 just -- to -- to have a smoother transition and
20 handoff.
21     Q.  So -- so you weren't writing -- you weren't
22 writing papers or editing papers that you were working
23 on with maybe Dr. David Mills's lab or Uday and
24 Karthik or David Ballard?
25     A.  If -- if I was doing any work at that

| Page 219 |
| --- |

1  point, it was very de minimis.  I was not spending
2  days writing papers.  I was not spending evenings
3  writing papers.  I wasn't spending weekends.  I was,
4  you know -- if somebody sent me a draft and said --
5  you know, and I haven't thought about this in a while,
6  but if somebody sent me a draft and said, hey, you
7  know, we submit -- we're submitting this.  Can you
8  just read it real fast.  Okay.  You know, it's a quick
9  five page paper.  I'll read it on the weekend, or
10 evenings, or whatever and I'll say, yeah, it's cool.
11 Send it in.
12     Q.  So you weren't direct -- you weren't
13 directing any type of research?
14     A.  I -- I -- I'm trying to think.  To the best
15 of my memory, I wasn't doing any extensive directing
16 as I was transitioning things out.
17         There was a time period when I was
18 transitioning things to let -- to have a smooth
19 transition and takeover because I didn't want things
20 to collapse and, you know, have Uday and Karthik lose
21 their jobs and their Visas because that would have
22 been terrible for them trying to live the American
23 dream.
24         (Defendant's Deposition Exhibit A72, E-mail
25 4/9/18 from Jeffery Weisman Subject: Weisman CV and CV

| Page 220 |
| --- |

1  Addendum.)
2      Q.  Hand you what's been marked Exhibit A72.
3      A.  Okay.
4      Q.  This is an e-mail between -- sent from you
5  to Dr. Rich Benzinger on April 9th, 2018.  And it
6  appears you state in the second paragraph:  Please
7  note I have honestly not participated in any projects
8  since we spoke last year.  You stated that to
9  Dr. Benzinger?
10     A.  That -- that's what's written right there.
11     Q.  And then you say that:  I handed everything
12 off and collaborators were overly generous and
13 continuing to recognize my early contributions?
14     A.  That's what I wrote there.
15         (Defendant's Deposition Exhibit A92, E-mail
16 3/17/17 from Jeffery Weisman Subject: Optimal rough
17 reorganization on 3D printing screws and mechanical
18 test data.)
19     Q.  Hand you Exhibit 92.
20     A.  Yes.
21     Q.  I just want you to identify this document
22 produced by your attorneys as JW-52994.  Is this an
23 e-mail that you sent on March 17th, 2017, to
24 UdayaBhanu Murthy, Karthik Tappa and David Mills?
25     A.  This is an e-mail from me, March 17th, to

## DR. JEFFERY WEISMAN  9/13/2022

Page 221

1   David Mills cc-ing Uday and Karthik.
2        (Defendant's Deposition Exhibit A93, E-mail
3   3/8/17 from Jeffery Weisman Subject: Catheter paper
4   JVIR.)
5        Q.   Thanks.  Hand you Exhibit 93.  For the
6   record, this is what appears to be an e-mail from Jeff
7   Weisman to David Ballard, Uday Jammalamadaka, Karthik
8   Tappa.  Subject catheter paper JVIR.  And can you
9   identify Exhibit A93 for me, Dr. Weisman?
10       A.   A93 to David -- it's an e-mail from me,
11  Jeffery Weisman, Wednesday, March 8th, 2017, to David
12  Ballard Uday and Karthik, and it's subjected catheter
13  paper JVIR.  And it goes:  David, with final images do
14  we need to finish the paper Google docs and submit?  I
15  think we have everything.
16       Q.   Okay.  Thank you.
17       A.   And images --
18       Q.   Exhibit 94.
19       A.   And as -- as I was looking at this.
20       Q.   Oh, I have no further questions other
21  than --
22       A.   Oh, no, that's okay.  I was just noting
23  that --
24       Q.   There's no pending question other than --
25       A.   -- I'm not -- I'm not doing active work.

Page 222

1        Q.   -- to have you identify it.  Can I just say
2   that I'm -- all I'm asking you to do is identify the
3   documents.  Thanks.  We'll go much quicker if we can
4   move this along.
5        (Defendant's Deposition Exhibit A94, E-mail
6   3/9/17 from Jeffery Weisman Subject: Additional OB-GYN
7   3D printing papers.)
8        Q.   A94.  I'll represent you -- to you this is
9   a document marked JW-52918.  Appears to be an e-mail
10  from you to doc -- to Todd Bruno and David Mills.  Can
11  you identify this document for me?
12       A.   This is an e-mail again from me on
13  March 9th, 2017, to Todd Bruno and David Mills.
14  Subjected additional OB-GYN 3D printing papers.  And I
15  go: Dr. Bruno, Dr. Mills has some paper requests for
16  3D printing pessaries, etc. I was hoping you could
17  both get in touch to discuss.  Uday and Karthik can
18  print any devices needed and image immediately.
19       THE COURT REPORTER:  Wait.  Wait.  You've
20  got to slow down.
21       THE WITNESS:  I'm sorry.  Let me --
22       Q.   You don't need to read -- I just want you
23  to identify it as -- as something that you -- you sent
24  that document to Dr. Bruno and Dr. Mills, correct?
25       A.   Yes.  I introduced Dr. Bruno and

Page 223

1   Dr. Mills --
2        Q.   Doctor -- we're talking --
3        A.   -- so they could finish up the paper.
4        Q.   You need to let me finish my question.
5   We're talking over each other.
6        A.   Please finish it.
7        Q.   Okay.
8        A.   Please finish it.
9        Q.   So you sent that e-mail on March 9th, 2017,
10  right?
11       A.   Yes.  I sent --
12       Q.   Okay.  I have no further questions.
13       A.   Okay.
14       (Defendant's Deposition Exhibit A95, E-mail
15  8/8/17 from Patrick Mills Subject: Semi-final draft on
16  3D printing Billing Paper.)
17       Q.   Let me give you Exhibit 95.
18       A.   I introduced them so they could work on --
19       Q.   Once again --
20       A.   -- so they could finish this paper.
21       Q.   -- I'm going to move to strike it as
22  nonresponsive to any question.
23       Ninety-five (95).  Represent to you that --
24  A95.  Represent to you that this has been marked as --
25  produced by your lawyers and identified as JW-54308.

Page 224

1   Appears to be an e-mail from Patrick Mills to you
2   August 8th, 2018.  And is Patrick Mills the son of Dr.
3   David Mills?
4        A.   Yes.  He's an attorney and venture
5   capitalist that's the son of David Mills.
6        Q.   Okay.  Do you recall receiving this e-mail
7   from Patrick Mills on August 8th, 20 -- 2017?
8        A.   I recall receiving this e-mail.  I don't
9   recall if I responded to it or if I did anything with
10  it.  He was working on a paper with David Ballard that
11  I talked about years ago and was writing it up for
12  him.  I wasn't the one writing this paper up.
13       Q.   But you were requesting changes on it?
14       A.   I -- I don't -- I'd -- I'd have to see if
15  there's any other e-mails, but Patrick was sending
16  drafts to myself and David over a number of years on
17  this paper.
18       Q.   This one -- and this one's to you on
19  August 8th, 2017.  It says:  Here is my current draft
20  with --
21       A.   Did --
22       Q.   -- the changes you requested?
23       A.   Did I respond to this e-mail?  Do you have
24  a copy of a response?  In a vacuum --
25       Q.   I'm not asking -- I'm just asking whether

56 (Pages 221 to 224)

**DR. JEFFERY WEISMAN  9/13/2022**

| Page 225 |
| --- |

1  you recall receiving this e-mail and whether you
2  recall a semi-final draft of the 3D printing billing
3  paper?
4      A.  I -- I mean, this seems to be an e-mail
5  that I received.  I don't -- I can't recall right now
6  if I responded to it or if I ignored it.
7          You know, again, if he writes -- he wrote a
8  draft on a paper.  E-mailed it to me.
9      Q.  You reviewed it and made --
10     A.  I don't recall if --
11     Q.  -- some suggestive changes?
12     A.  I don't recall if I reviewed it and made
13  suggestive changes, to -- to be honest.  In this
14  paper, I -- I don't recall really doing any work on
15  this paper.  I believe -- this was something we'd
16  talked -- we'd talked about years ago at Louisiana
17  Tech and LSU, and Patrick had offered to write and had
18  been sitting on for years and had just started sending
19  a draft out to -- to me and to David Ballard.  I
20  believe, him and David Ballard worked on the paper.
21  If you can show me the -- the citation on Pub Med,
22  it's probably very likely that they're first author
23  and senior author and they probably have my name as a
24  middle author because I didn't add anything on this,
25  which is what many of these are.  These --

| Page 226 |
| --- |

1          (Defendant's Deposition Exhibit A96, E-mail
2  7/28/17 from Jeffery Weisman Re: JOVE Paper.)
3      Q.  Let me hand you what's been marked Exhibit
4  A96.
5      A.  Yep.  Okay.
6      Q.  Can you identify this for me?  It's -- A96
7  is JW-54065.  It appears to be an e-mail dated
8  July 28th, 2017, from Dr. Weisman to David Mills, Uday
9  and Karthik Tappa.
10     A.  All right.  This is from me, July 28th,
11  David Mills, cc-ing Uday and Karthik.  And it seems
12  there's two e-mails here.  One e-mail is David Mills
13  e-mailing earlier in the day, July 28th, 2017, where
14  he said:  Guys, I know you're all busy.  Any thoughts
15  on the JOVE paper.  And I said:  I'm off this weekend
16  and can look at it.
17     Q.  Okay.  Thank you.
18     A.  I might have likely read the paper and gave
19  comments.  And I think it shows my professionalism to
20  hand things off smoothly.
21         (Defendant's Deposition Exhibit A97, E-mail
22  7/12/17 from PLOS ONE Subject: PLOS ONE Notification:
23  Your PDF has been built.)
24     Q.  A97.  Is -- A97 is produced as JW-54001.
25  And does this appear to be an e-mail that you received

| Page 227 |
| --- |

1  from em@editorialmanager.com confirming submission of
2  a paper titled Medication Eluting Devices for the
3  Field of OBGYN, MEDOBGYN?
4      A.  Are you asking if I submitted it or if I
5  received this e-mail?
6      Q.  Did your re --
7      A.  I didn't submit this paper.
8      Q.  Did you receive this e-mail?
9      A.  I received this e-mail but David Ballard
10  submitted this paper.
11     Q.  And you worked -- but you worked on it with
12  David Ballard and got author credit?
13     A.  This paper had been worked on for years in
14  advance.  The sec -- now, Mr. Sullivan, not -- not to
15  be rude on this but you're -- you're trying to make a
16  point with these and you -- you don't understand the
17  publication process or where this data comes from.
18  This data these paper drafts were written before I
19  even came to Washington University St. Louis, with all
20  due respect, sir.  They were submitted --
21     Q.  All of them?
22     A.  I would have to go through and -- and
23  refresh my --
24     Q.  Even the --
25     A.  -- memory.

| Page 228 |
| --- |

1      Q.  -- draft ones?
2      A.  Many of these drafts were done years in
3  advance.  And if -- if you'll forgive me, and I'm --
4  I'm not try -- I'm sincerely not trying to cause an
5  issue or be disrespectful.  What -- what I'm just
6  trying to say is that in Academia when you do a Ph.D.,
7  you may very well be working on a paper during Ph.D.
8  and it may not publish for years later, and you may be
9  receiving e-mails and things like that while this goes
10  on.
11         I -- I would highly suggest talking to
12  David Ballard and Uday and Karthik and your clients on
13  it and they'll probably confirm a good deal of what
14  I'm just saying here on how the process works.
15         (Defendant's Deposition Exhibit A98, E-mail
16  3/30/17 from Jeffery Weisman Subject: Final e-mail on
17  3D Print Lab transition to MIR and funding analysis.)
18     Q.  Can you identify Exhibit A98 for me?
19     A.  Okay.  This is an e-mail from Jeffery
20  Weisman, March 30th of 2017, to David Ballard, Uday,
21  Karthik.  It says:  Final e-mail on 3D print lab
22  transition to MRI and funding analysis.
23     Q.  I didn't see any funding analysis in -- in
24  there.  Do you recall whether there was another
25  e-mail?  I didn't see it in the production.

**LEXITAS LEGAL**
**www.lexitaslegal.com**      **Phone: 1.800.280.3376**      **Fax: 314.644.1334**

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 229

1      A.   Let me -- give me just one moment, I
2   apologize, to take a look at this.  This was, I
3   think -- sorry.  If you'll give me just one moment
4   while I read this.
5      Q.   Yeah.
6      A.   Okay.  So I've read this e-mail.
7      Q.   And in part B here you state:  My
8   department clearly doesn't want to support me in
9   giving me time to do these things right now.  That was
10  talking about doing research and running the -- the
11  lab company; is that fair?
12     A.   That -- that seems to be a very fair and
13  accurate statement we're all in agreement on.
14     Q.   Okay.  And Vanderbilt and Stanford offered
15  me days off when necessary.  Did Vanderbilt and
16  Stanford do that when you were discussing their
17  programs?
18     A.   Yes.  The -- the Vanderbilt chair, when I
19  was leaving -- when the interview day was over,
20  grabbed me and said, not you, don't go, and took me on
21  a two hour tour of campus.  And said, I want your 3D
22  printing lab here.  I'll give you any time off you
23  need to work on this.  We want you and the tech.
24     Q.   You state here:  I thought Alex Evers made
25  the same offer.  Clearly there were some crossed wires

---

Page 230

1   or conditions changed.  You stated that to David, Uday
2   and Karthik?
3      A.   That's what I wrote there.
4      Q.   Okay.  Thank you.  After February 19th,
5   2017, did you continue to try to seek to get
6   investments and grants for the -- for SBI and the lab?
7      A.   I would have to think and see the materials
8   that were coming in.  Anything that I had agreed to do
9   I, I believe, I probably passively met my obligations.
10          If there -- if there was somebody that had
11  planned -- if there was an executive at a biotech or
12  somebody that had planned to come in and book tickets
13  or made a schedule, I, of course, would stop by to say
14  hi, but I was not -- I was not acting in the same way
15  that I had where I was -- we were -- I would just
16  say -- I don't have -- I don't want to use the word --
17  the term active and actively to cause confusion.  But
18  I was not actively spending substantial time working
19  on these projects.  I would passively fulfill any
20  obligations as I, you know, as I handed things off.
21  No different than an attorney departing to a new firm
22  or something like that.
23     Q.   And the same way with transitioning the
24  SBI's lab to -- to radiology, you continued to do that
25  until it was done?

---

Page 231

1      A.   I -- I -- I assisted with the transition.
2   I -- I, you know, made sure that I was as professional
3   as possible on that.  And I -- I -- you know, that --
4   that is what it is.  I -- I tried to be as
5   professional as possible to hand off.  If somebody had
6   a question, you know, where's this item, where's this
7   document, here's where it is.  But -- but I -- I
8   certainly was not going to the lab to work evenings or
9   weekends or during my residency.  That was --
10     Q.   Let -- let me ask -- let me ask you this:
11  Prior to -- how's the phrase withdrawing from active
12  par -- participation in -- in research in your
13  company.  How many hours per week during your
14  residency on average did you spend on research or the
15  business of SBI?
16     A.   So the answer that I would give on that
17  was -- was highly variable.  I -- I always -- I always
18  put my clinical duties first, but certainly in
19  evenings or weekends before -- before this transition
20  occurred, I would spend any time that I could.
21          I mean, in all sincerity, I only -- I mean,
22  I'm a normal human being.  I only agreed to move the
23  lab here and do this because I -- I was suppose to be
24  offered the ability to -- to do this properly, to have
25  research time protected, and that didn't occur.

---

Page 232

1          I would -- I know your question is how many
2   hours.  It would be -- it would really vary by week.
3   If I, you know, if I had a weekend, I might go into
4   the lab for a couple of hours Saturday and Sunday or
5   work on some stuff in the evening, but it wasn't -- it
6   wasn't a full time job.
7      Q.   Oh, I know.  I was just -- I was just
8   trying to get an idea of, like, an average, but I
9   understand it probably depended on the intensity of
10  the rotation?
11     A.   Yeah.  I mean, in all -- in all sincerity,
12  it just depended on my time.  I -- I needed to -- I
13  needed to get -- I needed to sleep.  I needed to eat.
14  I needed to shower.  I, you know, if I had free time,
15  instead of watching TV, I would -- I would do this to
16  try to help.  You know, I wasn't exercising or, you
17  know, going to the gym, watching TV, going to the
18  movies.  I -- I was -- this was my activity.
19     Q.   And you talked about dedicated research
20  time.  Is that part of the ASAP program or did someone
21  tell you that you would have a dedicated amount of
22  time per week to -- to do research?
23     A.   When I -- when I spoke -- when I spoke with
24  Alex Evers and Peter and everyone during the research
25  day and I told them I have the lab, they -- they told

---

**LEXITAS LEGAL**
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

**DR. JEFFERY WEISMAN  9/13/2022**

Page 233

1 me that I would be able to transition it over and I
2 would have time to run it.  And they had a good
3 work/life balance and it was collegial and everything
4 along those lines.
5      Q.  Do you recall having a meeting with --
6 well, let me back up.  Strike that.
7         Did you finish up the -- the second half of
8 your -- of your inter -- internship year and ended up
9 not being placed on probation, correct?
10     A.  Correct.
11     Q.  Okay.  Thank you.  And do you recall
12 getting a faculty advisor, Dr. T.J. Graetz before
13 other residents had received their advisors?
14     A.  Yes, it was -- it was -- it was odd.  I was
15 assigned T.J. Graetz and Gary Hammen was assigned
16 Dr. Donnely.  Everybody -- every other resident got to
17 pick their advisor and mentor and advocate, and we
18 were just given two people that didn't like us and
19 were friends with Alex.
20     Q.  So they were -- it was your understanding
21 that residents picked advisors?
22     A.  My understanding, and, you know, you -- you
23 can talk to everyone else there, but every other
24 resident I spoke to picked their advisor, and I --
25 and, I believe, I saw in some of the documents they

Page 234

1 were all picking their own advisors.
2         I was -- myself and Gary Hammen were the
3 only two assigned people that we didn't get along
4 with.  Hammen actually moved to work with James Fair
5 because he was -- he -- he was trying to find somebody
6 who would be an advocate for him and not try to
7 secretly sink him.
8     Q.  And did you meet with Dr. Graetz regularly?
9     A.  I -- I met with Dr. Graetz on a regular
10 basis.  I -- I'd have to look at calendars to see how
11 often but --
12     Q.  I was just --
13     A.  I stayed -- I stayed in touch with him.
14     Q.  Okay.  Was he helpful with respect to your
15 performance as a resident?
16     A.  I -- I didn't feel that he was very helpful
17 as a mentor.  I -- I tried to be as polite as possible
18 but he wasn't really -- he wasn't someone that was
19 really advocating or -- or helping us.  I -- I felt he
20 was just trying -- he was just an ear to tell the
21 department whatever I was planning or doing.
22         I told him about -- I -- I would -- I would
23 make sure to tell him what was going on in every
24 rotation.  I would meet with him and share every
25 evaluation I got.  I -- I believe I e-mailed many of

Page 235

1 the evaluations to him and I explained what happened.
2 And he would -- he would often tell me to let things
3 go and try to stay, you know, stay under the radar.
4 If somebody put information in that you don't feel is
5 accurate, don't -- don't say anything.  Just try to
6 get through.  So...
7     Q.  And -- and that's because -- and I -- I
8 know that your -- you claim that these evaluations
9 were -- were false or unfair.  But you received
10 further bad rotation evaluations in the fall of 2017,
11 correct?
12     A.  The fall of 2017, I would have been -- that
13 was when we started -- the -- the first year was --
14 the first year we're interns.  We rotate through
15 different departments.  The second year, that would --
16 that would have been past anesthesia tutorial.
17     Q.  So the first six -- let's -- let's -- let's
18 knock it down to the -- the CA-1 first six months, you
19 received some pretty bad rotation evaluations,
20 correct?
21     A.  I -- I wouldn't say they -- they were bad
22 because they didn't -- they -- they didn't accurately
23 reflect what was being told to me.
24     Q.  Okay.  But on -- on the -- on paper, they
25 were -- they were bad, what was being submitted.  They

Page 236

1 were not favorable with respect to your performance?
2     A.  They -- they passed me.  So what I would
3 say is they passed me in the rotations aside from
4 pediatrics but they were not -- they -- they -- they,
5 I believe, the term of art was they were passing me
6 but saying below expectations.  It would help if I
7 could see them to refresh memory.  But they would say
8 passed but below expectations.
9     Q.  Okay.
10     A.  And then they'd have a lot of comments that
11 individual faculty members had submitted.
12     Q.  And -- many of -- you know, some of
13 them might have been favorable, others might have been
14 highly critical of your performance?
15     A.  There -- there was quite the -- the gamut
16 on that, which was -- which was odd because, again,
17 normally there's -- there's some consistency, but mine
18 were people either seemed to be liking me or just --
19 just hating me.
20     Q.  Do you recall speaking with Dr. Benzinger
21 in the December 2017 time frame about your -- your
22 clinical performance and your situation in the
23 program?
24     A.  I know I had several conversations with
25 Dr. Benzinger in the fall about what I was planning to

59 (Pages 233 to 236)

**DR. JEFFERY WEISMAN  9/13/2022**

Page 237

1  do and moving forward.  And we'd had
2  several conversations -- there -- there were a few
3  where he said that my performance was a couple
4  rotation blocks behind where, in his opinion, I was a
5  couple months or a couple rotation blocks behind where
6  peers would be.  But I -- I believe, he said nothing
7  disastrous, just that you were -- you were moving
8  slower than other people were at Wash U.
9      Q.  And do you recall in December 2017
10  discussing with Dr. Benzinger leaving the program?
11      A.  I -- I -- I would have to recollect on
12  that.  I know I was talking that I had thoughts of
13  should I stay or should I go.  And we -- through --
14  throughout the 2017, twenty [sic] academic year, we --
15  we had many conversations.  Would it be best for me to
16  stay at this program?  Would it be best for me to go
17  somewhere elsewhere where it was a better fit?
18      I mean, it was -- it was very clear at that
19  point, that the -- the warm reception that I initially
20  had was gone, and I -- I was looking to leave and go
21  elsewhere.  If -- if -- if possible, if it was one
22  consideration so...
23      Q.  Did you float the idea to Dr. Benzinger
24  that you would submit a resignation letter and in
25  exchange the Clinical Competency Committee would give

Page 238

1  you an unofficial warning rather than report you as an
2  official unsatisfactory to the ABA after your first
3  six months in CA-1?
4      MR. ELSTER:  Objection.  Form.
5      A.  So -- so there was no -- there was no deal
6  that occurred that anything but accurate and honest
7  evaluations would occur, as far as that went.  I --
8      Q.  (Mr. Sullivan) I was just saying --
9      A.  Yeah.
10      Q.  -- did you float that idea to
11  Dr. Benzinger?
12      A.  I -- I don't recall having that.  I -- I
13  know we had lots of conversations, but
14  Dr. Benzinger was -- was very --
15      Q.  I just want to know --
16      A.  -- clear --
17      Q.  -- if you floated that idea to him?
18  That -- that was my -- that was my question, and I
19  think you said you don't recall?
20      A.  I -- I -- I don't recall.  I -- I mean, you
21  know, there were lots of talk going on about -- about
22  resignation or staying at that point in time and the
23  details on it.
24      Q.  Do you recall meeting with Dr. Alex Evers
25  on or about January 2nd, 2018?

Page 239

1      A.  I -- I met with -- I -- I do recall that I
2  met with Dr. Evers in early January of 2018.
3      Q.  And did you tell Dr. Evers at that time
4  that -- that you -- you didn't feel that the clinical
5  programs in the anesthesiology department were the
6  right fit for you and your plan was to look for some
7  other options and leave by July 1st of 2018?
8      A.  I -- I believe that was the meeting.
9  Again, it would be helpful to see the related
10  documents, but I --
11      (Defendant's Deposition Exhibit A63, E-mail
12  1/2/18 from Jeffery Weisman Subject: Weisman-Norris
13  Meeting.)
14      Q.  Yeah.  Well, here, let me --
15      A.  I believe that -- I believe that was the
16  meeting when --
17      Q.  Let me give you one.
18      A.  Thank you.
19      Q.  I know this is a -- is this an e-mail to
20  Aaron Norris dated January 2nd, 2018?
21      A.  Yes.  That's to Aaron Norris, one of the
22  other M.D. Ph.D.s that was becoming a faculty member,
23  and they were giving him kind of a weird -- or a -- or
24  a role of, like, an additional assistant program
25  director for the M.D. Ph.D.

Page 240

1      Q.  Okay.  And -- and this Exhibit A63 is -- is
2  such an e-mail that you sent to -- to Dr. Norris on
3  January 2nd, 2018?
4      A.  Yes.  I -- I sent that e-mail.  And I sent
5  that e-mail in part because I wanted Dr. Evers to see
6  that I was looking at how to frame a departure because
7  I was -- I was nervous about what was going on, the
8  bullying, the harassment, the safety issues.
9      Q.  What -- I just want to know, the -- does
10  this refresh your recollection that you would have met
11  with Dr. Evers on January 2nd, 2018?
12      A.  This does help to refresh my recollection.
13      Q.  Okay.  What did you and Dr. Evers discuss
14  at that January 2nd, 2018, meeting?
15      A.  Let's see, that meeting was a -- that
16  meeting was a long time ago.  So I'm trying to --
17  trying to remember the details of it.  But I -- I
18  think I -- I think I thumbed up the core of it, that I
19  told him that it seemed that things were not going
20  well here, and it looked like it may be a better idea
21  to look at some other options.
22      I -- I believe, I'm trying to think.
23  I used -- I used -- I used a specific phrase and I'm
24  trying to recall how I phrased it.  But I, you know,
25  I -- I think I told him something along the lines of

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 241

1  it seems like -- I think, I -- I said something
2  relatively politely along the lines of it seems
3  like -- it was something, roughly, it seems like this
4  may not be a right fit and I haven't been listening to
5  the message you're trying to tell me.  Because it was
6  very clear that he -- the relationship at that point
7  had -- had frayed.  I don't think he wanted me there
8  at all and there was no -- you know, there's no -- in
9  my opinion, it was -- it was very challenging to be
10 somewhere that they don't like you.
11      Q.  Dr. Evers didn't say that to you though in
12 the January 2nd, 2018, meeting, that he didn't want
13 you in the program?
14      A.  I don't remember the exact words of that.
15 Alex Evers, and as I'm sure in one -- in one or more
16 recordings I have of him is generally cordial.  But
17 I -- as I -- I was warned by Lauren Gibson once when I
18 was trying to figure out what to do who told me Evers
19 is a snake.  You know, you can't trust what he says
20 from day to day.  So...
21      Q.  Okay.  But Dr. Evers in those recorded
22 conversations never said, I, you know, I want you to
23 leave and I want you out of here?
24      A.  I -- I don't recall the full text.  I -- I
25 know some of these meetings were quick.  Some were a

---

Page 242

1  longer period.  So I -- I don't recall word for word
2  what was said.  I've got some recordings.  If -- if I
3  had the recording of that particular meeting, it's
4  always helpful to just have a, you know, a record of
5  at least what was said.
6       Q.  The recording would be a record of what was
7  said, correct?
8       A.  Yes.
9       Q.  All right.  Thanks.
10      A.  The recording would be a record of what's
11 said.
12      (Defendant's Deposition Exhibit A65, E-mail
13 1/12/18 from Jeffery Weisman Re: Weisman Scheduling
14 till end of academic year and next rotation.)
15      Q.  Let me give you A65.  So -- identify it as
16 WU-2366.  Can you identify these e-mails for me,
17 Dr. Weisman?
18      A.  All right.  This is an e-mail from me on
19 January 12th, Friday, of 2018, at 8:39 a.m. to George
20 Benzinger titled Weisman scheduling till end of
21 academic year.
22      Q.  And then there's some e-mails below --
23      A.  Yeah.
24      Q.  -- on the proceeding page?
25      A.  See if there's anything -- yes.  And it --

---

Page 243

1  it appears that I e-mailed two of the chief residents,
2  Jacob McDowell and Dr. Rao and Dr. Benzinger.  Weisman
3  scheduling till end of academic year.  Let me just
4  read that.  Okay.  I've -- I've -- I've read the
5  e-mail and there's -- there's a lot of subtext in
6  leaving the pain rotation.
7       Q.  Okay.  Well, I -- I'm not asking about the
8  subtext.  I'm just asking about the text.  You wrote
9  to -- to Jake and Janavi that you had met with
10 Dr. Benzinger and let him know that you didn't feel
11 the residency program was the right fit for you and
12 that you were looking at other options of planning to
13 depart by July 1st, correct?
14      A.  That's what I wrote in this e-mail.
15      Q.  And then you further requested a -- a
16 change to the rotation schedule, correct?
17      A.  That -- that is correct.  I asked for a
18 change in the rotation schedule.
19      Q.  And -- and Dr. Benzinger said that it made
20 sense to move you out of the pain rotation and that
21 you would probably go in somewhere in the -- the
22 operating rooms, correct?
23      A.  That -- that's correct.
24      (Defendant's Deposition Exhibit A64,
25 1/11/18 CA-1 first six month CCC evaluation.)

---

Page 244

1       Q.  Okay.  Hand you what's been marked Exhibit
2  A64.  Can you identify this document for me?
3       A.  This was the third, six month CCC meeting,
4  I believe, the letter that they had put together after
5  it.
6       Q.  Okay.  So this would have been the --
7  the -- the CA-1 first six month CCC evaluation, so to
8  speak?
9       A.  Yes, that would appear to be what it is.
10 I -- I haven't read this in a little bit.
11      Q.  Okay.  Do you want to take time to read it
12 or you just want to answer questions?
13      A.  Let me skim -- I'll try to go very quickly.
14 I just want to make sure I can --
15      Q.  If you want to look at it closely, we can
16 go off the record real quick and no one can -- you
17 know, can leave if you'd prefer.  Just let me know.
18      A.  Oh, I'll -- I'll -- I'll read this
19 relatively quickly.  It's not a very dense one.  Okay.
20 I've taken a chance to read this.  I know there's a
21 lot of discussion in here.
22      Q.  And -- and you received this and would have
23 discussed it with -- with Dr. Benzinger and likely
24 Dr. Cox as well?
25      A.  I likely would have.  I -- I don't recall

---

61 (Pages 241 to 244)

## DR. JEFFERY WEISMAN  9/13/2022

Page 245

1  specifically every single person that I spoke with but
2  I -- I, of course, had a discussion with them on this.
3      Q.  Okay.  And -- and you understood that this
4  was not the subject of any form of formal disciplinary
5  action, correct?
6      A.  That is correct.
7      Q.  And in it the program stated its
8  understanding that -- that you were likely to go and
9  seek to change specialties away from anesthesia?
10     A.  Hold on a second.  Let me just pull that
11 up.
12     Q.  That would be on page 2 of the third full
13 paragraph.
14     A.  During that first six weeks period I was
15 discussing with Rich Benzinger if I wanted to stay in
16 the anesthesia field, if I wanted to try to stay
17 there, go into anesthesia elsewhere or switch fields.
18 And that was why I know he said nothing would give us
19 more pleasure than to see your clinical performance
20 improve.  So that there were discussions on what I
21 should do for my future given the current situation
22 here.
23     Q.  Right.  And -- and that's what they said
24 is:  We emphasize that the decision is yours.  Said --
25 should you decide to redouble your efforts to become

Page 246

1  an anesthesiologist, we will support those efforts
2  strongly.  Correct?
3      A.  That's -- that's what he wrote there.
4      Q.  Next paragraph, the last sentence says:  We
5  again emphasize this choice is yours.  While you
6  remain in this department, we will support your
7  training fully.  That is what they wrote there?
8      A.  Yes, that is what they wrote.
9          (Defendant's Deposition Exhibit A67, E-mail
10 4/5/18 from George Benzinger Re: Weisman Research
11 Opportunity.)
12     Q.  Okay.  Hand you what's been marked A67.
13 Would you identify this e-mail for me.
14     A.  This is an e-mail -- well, this is an
15 e-mail chain started by myself to Richard Benzinger on
16 April 5th, 2018.  And I wrote:  Weisman research
17 opportunity for any research time coming up, 3D
18 printing lab updates and fantastic opportunities.
19     Q.  And then Dr. Benzinger replied on that same
20 day copying Doctors Cox, Thompson and Graetz, correct?
21     A.  Yes.  He appeared to cc Dr. Cox,
22 Dr. Thompson and Dr. Graetz.
23     Q.  So on A67, you updated Dr. Benzinger with
24 respect to what Dr. Ballard was doing in the -- the 3D
25 printing lab and requested whether you could transfer

Page 247

1  to research immediately to complete those projects.
2  Is that a fair summary of what you wrote?
3      A.  That is -- let me just read that one
4  second.  Okay.  I've read what Dr. Benzinger wrote
5  back.
6      Q.  Okay.  And basically Dr. Benzinger was
7  stating to you that you needed to decide whether you
8  were going to stay in the program or -- or resign from
9  the program, right?
10     A.  Yes.  Dr. Benzinger --
11     Q.  Okay.  Let me --
12     A.  Oh, sorry.
13     Q.  Let me -- let me follow-up here.  Because
14 he said:  If you were to go, it would be easier and
15 within the guideline to allow you to go on two to
16 three months of research?
17     A.  Yes.  He -- he stated in here that if I --
18 that if I wanted to do a big research block or
19 several -- or a research block, that he would prefer
20 that I was looking to leave their program to allow
21 that.  And he did say that he would assist me to
22 leave.  And he said, you know -- he basically said our
23 department will provide you or any other resident the
24 strongest letter of recommendation --
25     Q.  Right.

Page 248

1      A.  -- that we can.
2      Q.  Okay.  I'll ask about that.  And he also
3  said you should consider staying in the program
4  because of your recent performance had -- had improved
5  and you would then be able to do further research down
6  the road, correct?
7      A.  Correct.  He -- he told me that because the
8  last two rotations I had completed, the -- the faculty
9  for ortho spine, I did two of those rota -- two blocks
10 of that, and they said that I -- my skills had reached
11 what they felt to be on par with all Wash U. residents
12 in my class at that point.  So --
13     Q.  Okay.
14     A.  -- I --
15     Q.  That's -- that's what he -- that's what
16 Dr. Benzinger says?
17     A.  Yeah.
18     Q.  He also says:  In our discussion last
19 night, I -- I saw that you received some sort of tie
20 between your submission of a resignation letter and
21 our provision of a letter of recommendation.  These
22 are really independent events.  Our department will
23 provide you or any other resident the strongest letter
24 of recommendation that we can.
25         So you understood that the -- that the

**LEXITAS LEGAL**
www.lexitaslegal.com        Phone: 1.800.280.3376        Fax: 314.644.1334

Page 249

1  program's position was that any resignation and any
2  recommendation letter were independent of each other
3  and not tied together?
4      A.  That was what he wrote at this point, but I
5  didn't understand that to be the case since I kept
6  talking to them and I -- I didn't resign until we had
7  an agreement.  I didn't want anything changed.  I
8  wanted just the truth.  I just wanted my objective
9  ACGME evaluations and them to send them honestly and
10 accurately.
11     Q.  And you wanted --
12     A.  And positively.
13     Q.  And you wanted a -- a recommendation or a
14 reference letter from the program director?
15     A.  Yeah.  And -- and one -- one thing to note
16 with -- this is a term of art in this field.  So the
17 program director --
18     Q.  Actually, there's no pend -- there's no
19 question pending.
20     A.  Okay.
21     Q.  Thanks.
22     MR. MAREK:  Well, if he needs to finish an
23 answer.
24     A.  Well, it's ok, Sherman.
25     MR. SULLIVAN:  It wasn't -- it wasn't --

Page 250

1      MR. MAREK:  -- accurate -- is that
2  permitted or not?
3      A.  I had no --
4      MS. RUTTER:  And if he needs to explain
5  something so that the questions are accurate.
6      A.  I didn't -- I didn't -- all I was -- I was
7  just -- all that I was just saying is there's no pro
8  -- there's no letters of recommendations here.  The
9  program director letters and the ACGME document that
10 comes out, the program director has to write a program
11 director letter.  It doesn't mean if they love you, if
12 they hate you, if you agree to leave or not to leave.
13     Q.  (Mr. Sullivan) There should be a letter
14 from the program director?
15     A.  Director letter.  But it's not a letter of
16 reference.  According to the ACGME, it's part of your
17 transcript.  It's suppose to accurately state that --
18 the bare minimum for this letter is the resident has
19 been there for a certain number of years and if they
20 have been on probation or not.  So it's suppose to be
21 an accurate ACGME document, that's what a program
22 director letter is.
23     Q.  But Dr. Benzinger, you also wanted him to
24 write you an actual letter, right, not just something
25 that stated he was here for two years and in good

Page 251

1  standing?
2      A.  Well, in -- in general, a program director
3  letter will have more information than just that.
4      Q.  Right.
5      A.  That -- that -- that could be the bare
6  minimum that could be acceptable for another program
7  to follow ACGME transfer protocols.
8      The same way a law school would say, you
9  need bare minimum.  You get your transcripts and the
10 dean says, you know, John Doe was at our law school.
11 He was here for two -- for a year in good standing is
12 a one out, a bare minimum.
13     Normally a dean of law school will write
14 something better.  You know, my -- my friend, you
15 know, Ben Rotman, is transferring from Northwestern to
16 the University of Illinois.  He's a great student and,
17 you know, all these other things.
18     Q.  Okay.
19     A.  But there's a -- but there's a base level.
20     (Defendant's Deposition Exhibit A68, E-mail
21 4/6/18 from Jeffery Weisman Subject: Fwd: Program
22 Director Letter.)
23     Q.  Okay.  Okay.  Thank you.  Can you identify
24 Exhibit A68?
25     A.  Right.  This is from me, April 6th, 2018,

Page 252

1  at 10:30 a.m., and this is to myself and Marissa
2  Israel, misrael08@gmail.com.  Subject, forward program
3  director letter.  And this is a forward from -- and, I
4  assume, this is from my Wash U. e-mail to my Gmail
5  account.  And this was a forward from Richard
6  Benzinger to me, Tom Cox, Douglas Thompson, T.J.
7  Graetz, April 6th, 2018, titled re: Program director
8  letter.
9      Q.  Okay.  Let's work backwards here.  On
10 page 2, you see the e-mail that you sent to
11 Dr. Benzinger on April 5th, and you said you would
12 like to ask for a positive program director letter
13 from Dr. Benzinger, right?
14     A.  That is what I wrote in the text here.
15     Q.  And then you further wrote:  Quote, I
16 honestly enjoyed working with you one-on-one and wish
17 the faculty here were as training oriented as you are.
18 Did you write that?
19     A.  That's what I wrote.
20     Q.  Did Dr. Benzinger write back to you that:
21 He understood that you would like this to be an
22 iterated or negotiated process but that's simply not
23 the way these letters are produced?
24     A.  Let me read this.  April 6th.  Okay.  I
25 have read the letter that he wrote, or the e-mail that

63 (Pages 249 to 252)

Page 253

1   he wrote.
2       Q.   And -- and he lets you know that the -- the
3   letter was not going to be an iterated or negotiated
4   process, correct?
5       A.   He put that in the letter there.
6       Q.   Okay.  And he said also:  I'll write you
7   the letter that I think can do the most good for you
8   in your search, correct?
9       A.   I mean, he wrote that there in that -- in
10  that e-mail.
11      Q.   Okay.
12      A.   It's right there.
13          (Defendant's Deposition Exhibit A69, E-mail
14  4/6/18 from Jeffery Weisman Subject: Weisman
15  Resignation Letter & Weisman Research Request Letters
16  Below.)
17      Q.   All right.  Let me give you Exhibit A69.
18  And can you identify Exhibit A69 for me, Dr. Weisman?
19      A.   All right.  That's from me, Friday, April
20  6th, 2018, 11:16 p.m. to Richard Benzinger, Thomas
21  Graetz, Thomas -- T.J. Graetz, Thomas Cox, Douglas
22  Thompson.  Subject:  Weisman resignation letter and
23  Weisman request letters below.
24          And let me read that real fast.  Okay.
25  I've read this.

Page 254

1       Q.   And this is your official resignation from
2   the -- the anesthesiology ASAP residency program?
3       A.   This appears to be my official resignation
4   letter sent Friday, April 6th at 11:16 p.m.
5       Q.   And then you also requested that you be
6   able to modify your training schedule to -- to do
7   research with the folks over at the radiology 3D
8   printing lab; is that correct?
9       A.   That -- that is what I put in this letter.
10      Q.   And do you recall whether that request was
11  quickly approved the next day by Dr. Benzinger and
12  others?
13      A.   I recall that Dr. Benzinger sent a letter
14  back to me, or an e-mail back to me.  I would have to
15  see it to be able to state the exact comments of it.
16  I'm sure it's coming up next.
17          (Defendant's Deposition Exhibit A70, E-mail
18  4/7/18 from George Benzinger Subject:  Rotations
19  between now and June 30th.)
20      Q.   Taking my pitches.  Dr. Weisman, I've
21  handed you Exhibit A70.  Can you identify it for the
22  record?
23      A.   Yes.  This is a letter from Richard
24  Benzinger sent April 7th at 10:45 a.m., so the next
25  morning, my resignation letter:  Dr. Weisman, I spoke

Page 255

1   with some others in the department.  The res -- I'm
2   reading it right now -- the residents will approve
3   your request for research time in blocks 11 to 13 of
4   this academic year, the end of which would coincide
5   with your resignation at the end of the academic year.
6          We will modify the block schedule
7   accordingly.  It is normal for residents in research
8   rotations to participate to some degree in the general
9   OR or call pool and the chief residents may assign
10  some calls to you in that context.
11          Residents will be --
12      Q.   Okay.  Yeah.
13      A.   I was just finishing up.
14      Q.   Yeah.  I don't need you to read the whole
15  thing.
16          So he -- Dr. Benzinger was telling you it's
17  approved, right, the research time, that you might
18  have to be on call, an OR call pool every once in a
19  while, right?
20      A.   That's -- that's what's in this letter.
21      Q.   Okay.
22      A.   Take call.
23      Q.   That you need to get a faculty advisor and
24  a research plan?
25      A.   That it -- that is what's in the letter.

Page 256

1       Q.   Okay.  And then he also says:  The program
2   will continue to support you in any other way as
3   necessary as you settle on your path for next year,
4   correct?
5       A.   That is -- yes, that is the final sentence
6   that he put in here.
7          (Defendant's Deposition Exhibit A71, E-mail
8   4/7/18 from Alex Evers Re: Weisman Resignation Letter
9   & Weisman Research Request Letters Below.)
10      Q.   A71.  Dr. Weisman, A71, I'd like you to
11  identify at the top two e-mails between you and Alex
12  Evers on April 7th, 2018?
13      A.   Okay.  So the top e-mail is from Alex Evers
14  to me, Saturday, April 7th, 4:46 p.m. to Jeffery
15  Weisman.  Weisman resignation letter and Weisman
16  research request letters below.
17          And you want -- so that was the e-mail to
18  me where he said:  I'm sorry that your training in our
19  department has not worked out as well as we both hoped
20  it would.  Please let me know if I can be helpful in
21  your future career plans.  Sincerely, Alex Evers.
22          And then I responded to him.  From Jeffery
23  Weisman --
24      Q.   Oh, I think you -- you would have sent that
25  first.

**LEXITAS LEGAL**
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

**DR. JEFFERY WEISMAN  9/13/2022**

| Page 257 |
| --- |

1  A.  Oh, did I send that first?
2  Q.  Yes.
3  A.  All right.  Sorry.  I -- my apologies.  Let
4  me read through this a little slower.
5     So before I -- before I -- he sent that to
6  me, I forwarded him a letter, or an e-mail, Saturday
7  April 7th, 2018, at 10:22 a.m. to Alex Evers, Weisman
8  resignation letter and research request below.  Thank
9  you for giving me the opportunity.  And, I believe, I
10  forwarded the same exact letter that I had sent to
11  Richard Benzinger, Graetz and --
12  Q.  That's correct.
13  A.  -- Tom Cox.
14     (Defendant's Deposition Exhibit A73, E-mail
15  4/10/18 from Jeffery Weisman Subject: Weisman Program
16  Director Letter Decision.)
17  Q.  Okay.  A73.  Can you identify what's been
18  marked as Exhibit A73?  Is this an e-mail from you to
19  Dr. Benzinger on Tuesday, April 10th, 2018?
20  A.  Right.  That was from me April 10th, 2018,
21  at 11:39 a.m. to Richard Benzinger.  Weisman program
22  director letter decision.  Let me read that.
23  Q.  Just let me know when you've had an
24  opportunity to read it.  And have you finished reading
25  your e-mail?

| Page 258 |
| --- |

1  A.  Okay.  I've read the e-mail that I sent to
2  Richard Benzinger.
3  Q.  Okay.  And -- and you sent that e-mail in
4  Exhibit A73?
5  A.  Yes.  That appears to be what I sent to
6  him.
7     (Defendant's Deposition Exhibit A75, E-mail
8  5/14/18 from George Benzinger Re: Personal Re:
9  Updates.)
10  Q.  Okay.  Thank you.  Hand you Exhibit 75.
11  A.  Okay.  I have Exhibit 75 in front of me.
12  Q.  So before we look at this, you asked Pam
13  Woodard to be your research advisor?
14  A.  That is correct.
15  Q.  And -- and Dr. Woodard agreed to do that?
16  A.  Yes.  I remember Dr. Woodard and David
17  Ballard agreed that I would work on -- would resume
18  work on projects.
19  Q.  And then -- and then Dr. Benzinger thought
20  that was a -- that idea was fine, right?
21  A.  They -- to my -- to my memory they agreed
22  that was a good plan of moving forward.
23  Q.  Okay.  Okay.  And so can you identify --
24  are these e-mails exchanged -- Exhibit A75, e-mails
25  exchanged between you and Dr. Benzinger from

| Page 259 |
| --- |

1  April 27th of 2018 through May 14th, 2018?
2  A.  Okay.  So I'm just looking at this right
3  now.  So -- so this seems to be a -- this seems to be
4  an e-mail chain.  I'm just reading.  The first one was
5  April 27th, 2018, to Richard Benzinger -- or sorry --
6  sorry.  I apologize.  Rich Benzinger wrote to me.
7  And -- okay.  Let me just read this.
8     Okay.  I've read the one he sent to me.
9  And then I re -- I responded to Richard Benzinger
10  Saturday, April 28th, a few hours later.  And I'm
11  reading that right now.
12     Okay.  So I've read -- I've read the e-mail
13  that I sent to Benzinger that I just got some pretty
14  bad news with my medical labs.
15     Okay.  I'm reading.  Richard Benzinger then
16  sent a response e-mail, Thursday, May 3rd to me.  So
17  that was a few days later.  Asking me how I'm back
18  from my IARS, the International Anesthesia Research
19  Society and hoping I'm feeling okay.  Then that was on
20  the third.
21     Then over a week later on Monday, May 4th I
22  contacted Dr. Benzinger.
23  Q.  May -- May 14th.
24  A.  Or sorry, May 14th.
25  Q.  Yeah.

| Page 260 |
| --- |

1  A.  My apologies.  May 14th.  I let
2  Dr. Benzinger know that I had a colonoscopy and was
3  diagnosed with severe ulcerative colitis.  And -- and
4  I let him know that -- that -- that was when I let him
5  know that I was moving back to Chicago to be near
6  family as I now had a very serious medical condition.
7  And I asked him to please send program director
8  letters to Pete Nagele, Jerome Klafta and that I
9  wanted my transfer process to start working, and, I
10  believe, I had talked to him at that time about it as
11  well.
12     And then Richard Benzinger responded to me
13  Monday, May 14th, 2018, at 3:52 p.m., and he said:  I
14  suppose it's good to have a diagnosis.  And gave me
15  his sense of ulcerative colitis.
16  Q.  Okay.  And so this -- this exhibit
17  accurately reflects what you and Dr. Benzinger wrote
18  to each other on the dates noted, correct?
19  A.  I -- I believe these were our e-mail
20  exchanges.
21  Q.  Okay.
22     MR. SULLIVAN:  Want to take a break?
23     THE WITNESS:  I'm -- do you guys need --
24     MR. ELSTER:  I don't need a break.
25     THE WITNESS:  I mean, I'm -- I'm good to

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 261

1  keep powering through if... Whatever -- whatever
2  works.  How much time do we have remaining?
3      MR. MAREK:  It might have been a rhetorical
4  question.  Do you want to take a break?  I'm okay with
5  taking a break, or are you --
6      MR. SULLIVAN:  Yeah.  I mean, I think we've
7  been going about a little over an hour.
8      MR. MAREK:  Yeah, little over an hour.
9      MR. SULLIVAN:  Hour and 15 minutes.
10     THE WITNESS:  Okay.  That's perfectly fine.
11     MR. SULLIVAN:  Okay.  Okay.
12     THE VIDEOGRAPHER:  Going off the record at,
13  approximately, 3:57 p.m.
14     (A short break was then taken.)
15     THE VIDEOGRAPHER:  We're back on the record
16  at, approximately, 4:10 p.m.
17     (Defendant's Deposition Exhibit A77, E-mail
18  6/6/18 from George Benzinger Subject: Jeff Weisman.)
19     Q.  (Mr. Sullivan) Dr. Weisman, let me hand you
20  what's been marked as Exhibit A77.
21     A.  Okay.
22     Q.  I'll represent to you that this is an
23  e-mail from Dr. Benzinger to Peter Nagele at
24  University of Chicago.  Subject:  Jeff Weisman.
25  Contains a cover e-mail as well as a letter.  Have you

---

Page 262

1  reviewed this document before?
2      A.  You know, I don't recall.  Do you mind if I
3  read it just since there's been a lot of productions
4  or a lot of documents produced in discovery.  This is
5  from Richard Benzinger sent June 6th, Wednesday, 2018,
6  2 --
7      Q.  And you can just read it.
8      A.  Okay.
9      Q.  Yeah, yeah.  You can just read it to
10  yourself because I'm not asking you -- you didn't
11  write it.  So I'm just asking you whether you've seen
12  it before.  So you can familiarize yourself with it.
13     A.  Okay.  Now -- I've read the e-mail that
14  he put here and I'm just reading the program director
15  letter he wrote.  Okay.  I've read this document.
16     Q.  And paragraph five of the -- the program
17  director letter --
18     A.  Okay.  One, two, three, four, five.
19     Q.  States that -- that you joined your
20  research track as a PGY1 in June 2016, and he is now a
21  CA-1 PGY2 resident in good standing, correct?
22     A.  That appears to be what's written there.
23     Q.  Okay.  And that would meet the -- the bare
24  minimum of what a program director letter should --
25  should state according to your previous testimony,

---

Page 263

1  correct?
2      A.  You know, I'm not a DIO or GME team, but --
3      THE COURT REPORTER:  Or a what team, G?
4      THE WITNESS:  GME, graduate medical
5  education for GME dean.
6      A.  But this would be -- this would be the bare
7  minimum of what would be required to document training
8  time.
9      I -- I -- hold on.  Let me just read this
10  one more time.  And I -- I think the records might
11  also need to show something like he was here for two
12  years as opposed to letting it be just picked up on by
13  the fall that he came here and now he's at this level.
14     Q.  Well, yeah, I mean, but you hadn't finished
15  your two years yet as of June 6th, 2018, right?
16     A.  Yeah.  I was still having a couple weeks to
17  go.
18     Q.  Right.
19     A.  But this -- this is -- this is part of the
20  critical information, to my understanding --
21     Q.  Okay.
22     A.  -- that's required.
23     Q.  And then there's an expansion on -- on
24  this, and it's -- it's complimentary to you to the
25  effect that it states -- thinks that you can become an

---

Page 264

1  effective physician and make substantial contributions
2  to biomedical innovation?
3      A.  Which paragraph?
4      Q.  Paragraph one.
5      A.  Okay.  So that's -- that's what it says
6  right there.
7      Q.  And having read this, is there anything
8  false that is stated in this letter by Dr. Benzinger
9  to Dr. Nagele?
10     A.  Well, I'd -- I'd want to go through it with
11  a much more fine tooth comb to see if there's any --
12  anything false --
13     Q.  We can go off the record if you want to do
14  that.
15     MR. ELSTER:  No.  We're going to stay on
16  the record.
17     A.  Well, no, but my --
18     MR. SULLIVAN:  No.  I mean, I've got
19  limited time and if he wants to go through it with a
20  fine tooth comb.
21     MR. ELSTER:  And if you want to use your
22  time to have him look at documents.
23     A.  Well, my -- the -- the biggest -- the
24  biggest issue with this letter where there's a problem
25  is this is dated June 6th, 2018, and Thomas Cox

---

66 (Pages 261 to 264)

## DR. JEFFERY WEISMAN  9/13/2022

Page 265

1   already had a secret meeting with Jerome Klafta to say
2   not to take me and have an off the record talk of me.
3       Q.  (Mr. Sullivan) Okay.  Now, what did --
4       A.  So what's in here is not necessarily true.
5       Q.  What did Tom Cox state to Jerry Klafta?
6       A.  I wasn't a part of that meeting.  But
7   there's an e-mail where he says that the IARS
8   convention, which is International Anesthesia Research
9   Society, that we were talking about in Exhibit A75.  I
10   was at that meeting and Thomas Cox goes and tells all
11   the other coconspirators that I had a -- I had a
12   meeting with Jerome Klafta, Peter Nagele's second in
13   command, about Jeff Weisman.  I -- I don't have it in
14   front of me so I'm just going from memory, but it was
15   something about, you know, the real story on Jeff or
16   the off-the-record on Jeff.  So anything in here would
17   be completely undermined by that game and they all
18   knew that -- that Thomas Cox had done that.
19       Q.  What did so what did -- what did Thomas Cox
20   say that was untrue to either Jerry Klafta or Peter
21   Nagele?
22       A.  Well, I wasn't in that meeting.
23       Q.  I'm not -- I'm not -- but what did -- what
24   did he say?  You're claiming -- one of your claims
25   here is defamation, correct?  And this is part of the

Page 266

1   defamation claim, that -- that -- that the university,
2   the hospital, Dr. Benzinger and Dr. Evers made false
3   statements about you to other programs, correct,
4   that's a claim in the case?
5       A.  There -- there is a defamation claim in the
6   case.
7       Q.  Okay.  And that's -- and part of it is that
8   people -- that there were false statements made to
9   Jerry Klafta and Pete Nagele?
10       A.  I'd -- I'd have to look at the complaint.
11   I -- I don't recall the details on if that was in the
12   complaint because those were found in discovery at a
13   later date, I believe.
14       But I -- I guess, what I would just say is
15   if I -- if I refer a graduating law student to Sham
16   Zellburg (phonetic) and I call you up and I say,
17   Mr. Sullivan, I got to tell you the real story about,
18   you know, Joey that I'm referring.  Well, you're going
19   to wonder what's going on here if there's letters that
20   could be positive.  What -- what's happening behind
21   the scenes.  And nobody asked -- nobody asked Dr. Cox
22   to do this.
23       (Defendant's Deposition Exhibit A3, Jeffery
24   Weisman's Answers and Objections to Defendant
25   Washington University's Interrogatories.)

Page 267

1       Q.  What -- what I'm asking you is -- here,
2   let's try to short circuit this.  I'm going to give
3   you what's been marked as Exhibit A3.
4       A.  Okay.  Okay.  All right.  Sorry.  This is
5   getting a little messy here.
6       Q.  That's all right.
7       A.  That's okay.
8       Q.  So I'll represent to you that Exhibit A3
9   are your answers and objections to defendant
10   Washington University's interrogatories.  If you want
11   to turn to the second to last page, which is page 29,
12   I believe that contains your verification with respect
13   to these interrogatories.
14       A.  I did sign one of the interrogatories.
15   What date are these from?
16       Q.  If you look at the last page, March 31st,
17   2021.
18       A.  Okay.
19       Q.  And, I believe, these have -- these have
20   been supplemented quite recently with respect to
21   employment information and things like that, just to
22   state that this is a -- the original version of the --
23   of the answers.  Just to make it clear.
24       A.  Okay.
25       Q.  Okay.  Can you look on page 27.  And do you

Page 268

1   see the interrogatory numbered 13?
2       A.  Thirteen (13).  With respect to the
3   allegations in the complaint the Benzinger, Washington
4   University and Barnes Jewish Hospital falsely told
5   representatives of other residency programs to which
6   plaintiff had submitted applications that plaintiff's
7   information could not be released without talking to
8   defendant's attorney and falsely stated that he had
9   failed rotations for each alleged statement.
10       Q.  Okay.
11       A.  Identify the representatives of the other
12   residency programs to whom each alleged statement was
13   made.
14       State the date of each alleged statement.
15       Identify the person who made each alleged
16   statement and identify all documents relating to the
17   information sought by this interrogatory.
18       Q.  Okay.  So -- and you see there in your
19   answer:  University of Chicago, Douglas Thompson had a
20   phone call with Peter Nagele.
21       What did Douglas Thompson say in that phone
22   call to Pete Nagele that would have been false or
23   defamatory with respect to you?
24       A.  Well --
25       MS. RUTTER:  Objection.  Calls for legal

**DR. JEFFERY WEISMAN  9/13/2022**

Page 269

1  conclusion.
2      A.  Well, no, I'd -- I'd like to answer this
3  question.  Just say that I wasn't a party to this
4  conversation, and we're still investigating, and we're
5  still in the middle of discovery, and we're still
6  doing depositions.
7      Q.  (Mr. Sullivan) So you don't know whether
8  there was any false statement made by Douglas Thompson
9  to Dr. Nagele?
10      A.  Based on my experience with Douglas
11  Thompson talking to other people that have come
12  forward to me, I am relatively certain that something
13  negative occurred.
14      Q.  Okay.  That's -- that's speculation though.
15  What -- what statement that was false did Dr. Thompson
16  make in a phone call with Dr. Nagele in April of 2018?
17  Do you know any right now?
18      A.  We're still investigating it right now.
19      Q.  You don't know right now?
20      A.  We're -- we're still investigating.
21      Q.  Okay.
22      A.  To know something is a certainty, we are
23  investigating right now.
24      Q.  But you're not -- you're not aware at this
25  moment, investigation is ongoing, you're not aware at

Page 270

1  this moment of any false statement made by
2  Dr. Thompson to Peter Nagele, correct?
3      A.  We're -- we're still investigating and
4  based on his past behaviors, we strongly suspect that
5  there were negatives statements made.
6      Q.  You understand that past behaviors doesn't
7  mean that -- is -- is not relevant as evidence of any
8  other type of conduct, right?
9          MR. ELSTER:  Objection.  Legal conclusion.
10  Argumentative.
11      A.  In my experience, everything that they have
12  done was to bully and harass me and --
13      Q.  (Mr. Sullivan) Okay.  How about Dr. Cox,
14  his conversation with Jerry Klafta and Pete Nagele in
15  Chicago in April of 2018, what was the false statement
16  made about you in that conversation?
17      A.  We're currently still investigating that
18  situation in discovery.
19      Q.  Okay.  How about the Benzinger e-mail to
20  Nagele on June 6th, 2018, setting up a call.  What
21  was -- I think we just looked at that, didn't we?
22      A.  Well --
23      Q.  What was --
24      A.  -- that was A77, correct?
25      Q.  A77.  Was there anything false that was

Page 271

1  stated in A77, the e-mail from Dr. Benzinger?
2      A.  Let me go through.  I believe that there
3  are many things that are inaccurate in here.  Well,
4  just to go in no particular order.
5      Q.  I'm talking about the -- the e-mail that
6  you're referencing.
7      A.  This -- the e-mail or the attachment?
8      Q.  The e-mail because that's what you
9  reference in your interrogatory answer, right?
10      A.  Well, is it -- the e-mail is Wash U. 549 --
11      Q.  Well, you say, Benzinger e-mail to Nagele
12  on June 6th, 2018, setting up a call.
13      A.  Hold on one second.  Do we have document
14  Wash U. 549 to 551?  This is Wash U. 198 --
15      Q.  I don't -- I -- I -- that's not part of the
16  exhibit, but I want to know if there's anything false
17  in the e-mail that Benzinger says?
18      A.  I -- I would have to -- I -- I apologize
19  but I'd have to see the e-mail to let you know --
20      Q.  I'm talking about A77, the e-mail, is there
21  anything false in there?
22      A.  So okay.  So we're not talking about Wash
23  U. 549 on here.
24      Q.  I'm talking about A77.
25      A.  Okay.  Let me read this.  Well, I think the

Page 272

1  first issue is the -- he's calling this a letter of
2  recommendation when this is a program director letter.
3  So that's the first issue there.
4      Q.  Is that -- is that false or is that just a
5  matter of -- of nomenclature?  It's not --
6      A.  It's -- well, it's an inaccuracy.  There's
7  a very big difference between a program director
8  letter and ACGME transcript --
9      Q.  It's false and defamatory, him saying it
10  was a recommendation rather than a program director,
11  is that what you're claiming in the case?
12          MR. ELSTER:  Objection.  Legal conclusion.
13  Form.
14      Q.  (Mr. Sullivan) Can you answer my question?
15      A.  Hold on just one second.  You said --
16      Q.  No.  Can you answer my question, please.
17  Then we can move along.
18      A.  Well, you're asking me if there's anything
19  defamatory in this e-mail --
20      Q.  No.  I was asking you based on -- that
21  you're -- you're saying because he called it a
22  recommendation letter instead of a program director
23  letter, that's somehow false and defamed you, hurt
24  your reputation?
25      A.  Well, this -- well, first, this letter does

68 (Pages 269 to 272)

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 273

1  hurt my reputation since he's asking that he wants to
2  have a call to talk about me, which is what the games
3  seem to be.
4      **Q.  Well, no, he says --**
5      A.  Send document and then say:  Please call me
6  if you have any questions.
7      **Q.  -- I know you're familiar with Jeff but**
8  **please do feel free to call me to talk about him**
9  **further.  And they knew each other beforehand, right,**
10 **they were colleagues in the anesthesiology department?**
11     A.  Yes.  They knew --
12     **Q.  Okay.**
13     A.  -- each other very well.
14     **Q.  So we've got the -- we've got the title of**
15 **the letter of recommendation and Benzinger's offer to**
16 **talk to his former colleague, Peter Nagele.  Is there**
17 **anything else?**
18     A.  Well, he said that -- he said at the
19  very -- just as I'm going line by line.  I guess since
20  we'll do this.  He says:  I'm not totally sure whether
21  he's applying for a transfer as a resident, for a
22  position as a post-doc, or some combination of the
23  two.
24         So he should have known -- Richard
25  Benzinger knew that I was applying to go there as a

---

Page 274

1  resident.  So this is trying to cut me down -- by even
2  bringing this up, it's trying to cut me down to be a
3  post-doc, not even a research scientist or anything
4  like that.  He's trying to -- to subtly say things.
5         I mean, I would -- I have not looked --
6  I -- I don't remember if I've looked at this or not,
7  but I would certainly want to take a look at this and
8  try to compare this to some of the other items that
9  are going on to make sure that I understand what their
10 scheme is and how this fits into what they're doing.
11        Because it's very clear they were not
12 trying to help me because every single -- every single
13 author with even people like Peter Nagele who was
14 literally at my wedding talking to me for a good
15 period of time suddenly ghosted me, which makes
16 absolutely no sense why this would occur.
17     **Q.  So it's -- it's -- I believe that**
18 **Dr. Weisman has significant potential to do**
19 **academically and commercially productive work in**
20 **material science.  His risk is balanced by a very**
21 **considerable upside to his developing career and**
22 **encourage you to speculate on his unique talents of**
23 **this young doctor.  I believe that his potential is**
24 **considerable and I wish him the best in his academic**
25 **ambitions.  He wrote that, correct?  Second to last**

---

Page 275

1  paragraph.
2      A.  He wrote that.  He -- so that's what he put
3  in there.  But again, I would want to digest this for
4  a little bit because there's always subtext going on
5  in what they're doing to try to trigger red flags.
6      **Q.  So sub -- so subtext would be the -- the**
7  **false statements.  You'd have to read and imply --**
8      A.  There's either --
9      **Q.  -- and determine -- and determine what it**
10 **is, you would have to do that to be able to point out**
11 **what the false statements were --**
12         MR. ELSTER:  Objection --
13     **Q.  -- in this letter?**
14         MR. ELSTER:  All right.  Objection form.
15 Overly broad.  Calls for a legal conclusion.
16     A.  No.  I'm -- I'm -- what I'm saying is that
17 you can write a document.  I can write a letter for a
18 law student to go intern at your firm and I can write
19 a letter that sounds very good but as a couple of just
20 odd comments in there that derail the entire thing.
21 I -- I would want to --
22     **Q.  (Mr. Sullivan) And so it would be those odd**
23 **comments that would be the -- the false statements?**
24         MR. ELSTER:  Same objection.
25     A.  So again, as I said, I'd want to go through

---

Page 276

1  and -- and take a look and digest.  You're asking me
2  to make a legal conclusion on documents that I haven't
3  looked at or haven't looked at in a very long time.
4      **Q.  (Mr. Sullivan) Are you claiming in this**
5  **lawsuit that that letter was -- is part of your**
6  **defamation claim, that there were false statements in**
7  **it?**
8      A.  We're still investigating the situation of
9  what went on with Peter Nagele and why I lost that
10 position.  So we need to -- we need to conduct
11 discovery and have a formal investigation on what's
12 occurring here.
13        Because again, you're -- you're telling me
14 right now -- you're -- you're telling me that he
15 sees -- you're telling me that this is a -- this
16 letter should have helped me but for some reason I
17 didn't get in there.  And they suddenly ghosted me.
18 And somebody that I literally -- I was running Peter
19 Nagele's lab tech startup out of my lab.  He was
20 telling Alex Evers, the chair, he was going to take
21 me.  He was sitting there at my wedding having my
22 family he was going to take me and that nobody had to
23 worry about me.  And then all of a sudden he just
24 stops talking to me suddenly.  Something happened.
25        So I -- I would be uncomfortable

---

69 (Pages 273 to 276)

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 277

1  classifying anything until we formally go and
2  investigate and figure out what's going on.
3         And -- and again, I apologize.  I don't
4  want to sound -- sound over, you know, sound
5  unburdensome --
6      Q.  So you found --
7      A.  -- but I want to do things properly.
8      Q.  But you found out about University of
9  Chicago not accepting you before your wedding,
10  correct?  Your wedding was in July of 2018.
11      A.  The wedding was July 1st, although I would
12  say if anybody asked me June 31st, because June
13  weddings are clearly critical.
14         (Defendant's Deposition Exhibit A80, E-mail
15  6/21/18 from Jeffery Weisman Subject: Weisman Letter
16  Cook County.)
17      Q.  Let me hand you what's marked as Exhibit
18  A80.  Can you identify this for me?
19      A.  This is June 21st, Thursday, June 21st,
20  2018, to Martha Szabo.  Weisman letter Cook County.
21  Peter called just to say GME denied adding a seat.
22         I just called someone I know at Cook County
23  General in Chicago since they were advertising a seat
24  in anesthesia.  If possible, could you send Edrape
25  (phonetic) my letter of rec to Ned Nasr, vice chair

---

Page 278

1  and program director chair, Division of
2  Neuroanesthesia.
3      Q.  Okay.  So Peter Nagele called you to say
4  that the graduate med -- med -- medical education
5  office at the University of Chicago had denied adding
6  a -- a residency seat; is that correct?
7      A.  Peter told me they had denied adding a
8  seat --
9      Q.  Okay.  Thank you.
10      A.  -- but that didn't mean that I wouldn't be
11  able to go there.
12      Q.  And that occurred before your wedding,
13  right?
14      A.  But it didn't mean that he couldn't take me
15  there as a researcher and then transfer me in or make
16  something happen.  It was just GME denied having a
17  seat.  And it's suspicious --
18      Q.  Okay.  So then --
19      A.  Of course, after the Thomas Cox talking to
20  Jerome Klafta.
21      Q.  Okay.  But it was before -- this was before
22  your wedding?
23      A.  This was before the wedding.
24      Q.  Okay.  Thank you.  Let's go back to your
25  interrogatory answers.  Let's stay on that same answer

---

Page 279

1  there.
2      A.  Okay.
3      Q.  Which is page 28.  Yale, Alex Evers sent
4  e-mails and phone calls to Roberta Hines and Jeffery
5  Schwartz in December 2018.  Is that something you're
6  still investigating or can you point me to what false
7  statements Alex Evers would have made to Roberta Hines
8  and Jeffery Schwartz at Yale?
9      A.  I -- I believe we're still investigating.
10  We're --
11      Q.  Okay.
12      A.  We're still -- and -- and again, we're --
13  we're going to do a thorough investigation and talk
14  with everyone and get all the documents that exist.
15      Q.  Okay.  LSU Shreveport.  Dr. Thompson spoke
16  with Dr. Shildpadevi Patil on or around
17  September 11th, 2018.  Is that something that is being
18  investigated or -- or can you identify what false
19  statements were made to LSU Shreveport?
20      A.  We're still investigating right now, but I
21  can identify some of the false statements that
22  Dr. Patil told me.  Dr. Patil told me that, one, they
23  were refusing to send my documents and that was an
24  issue.
25      Q.  Is that a false statement?  I'm -- I'm just

---

Page 280

1  talking because this -- this answer --
2      A.  Well, well --
3      Q.  Hold on.  Hold on.  What I'm -- what I'm
4  seeking here is with respect to the defamation claim
5  and that Benzinger, Washington University and
6  Barnes-Jewish Hospital falsely told representatives of
7  other residency programs to which plaintiff had
8  submitted applications, that plaintiff's information
9  could not be released without talking to defendant's
10  attorney and falsely stated he had failed rotations.
11         So what was -- what was said by
12  Dr. Thompson to Dr. Patil in those conversations that
13  would fall into one of those two --
14      A.  And which -- which complaint was that in?
15  Was that Exhibit A or...
16      Q.  No.  I'm looking at -- I'm reading this
17  from A4.
18      A.  I'm sorry.  Which document?
19      Q.  We're looking at -- we're looking.  I'm
20  sorry.  We're looking at A3, the answers to the
21  interrogatories.
22      A.  Okay.
23      Q.  Page twenty -- page 28, your answer.
24  We're -- we're going through what you're claiming is
25  were false statements falling within those categories.

---

70 (Pages 277 to 280)

**DR. JEFFERY WEISMAN  9/13/2022**

Page 281

```
1          A.  All right.  I'm just reading this -- this
2    one that I have says LSU Shreveport, Thompson spoke
3    with --
4          Q.  Right.
5          A.  -- to Patil.  On or around November he
6    spoke with Charles Fox and Alan Kaye.  Is that the
7    same -- maybe I misheard, but I thought that you had
8    just read a longer statement.
9          Q.  Yeah.  I -- I read the interrogatory, which
10   is on the previous page, 13, you read it as well when
11   we started this.
12         A.  Okay.  My apology for losing place.  Could
13   you please re-ask that question again.
14         Q.  Sure.  With respect to Dr. Thompson's
15   conversation with Dr. Patil on or around
16   September 11th, 2018, what did Dr. Thompson falsely
17   tell Dr. Patil about not being able to release your
18   information without talking to an attorney or falsely
19   stating that you had failed rotations?
20         A.  My understanding, and, as again, we're
21   still investigating, my understanding is that from --
22   per Dr. Patil he had stated that I failed rotations.
23             I'm just reading through this because that
24   was a compound question and I want to answer it fully.
25   As far as the question -- your question, I think, was
```

Page 282

```
1    compound and asked did -- or asked both defamatory and
2    false statements.
3             I believe it was defamatory to say that
4    they couldn't release my -- they couldn't release my
5    transcripts or my training documents and to talk to
6    the lawyers when there had been no lawsuit at that
7    point, I believe, and there was no reason for them to
8    be doing that.
9          Q.  Okay.  So doctor -- so Dr. Thompson --
10   you're saying that Dr. Thompson said to Dr. Patil, we
11   can't release certain information until we talk to the
12   lawyers?
13         A.  That was my understanding of what --
14         Q.  Okay.
15         A.  -- he told Dr. Patil.
16         Q.  What about with respect to the note --
17   November conversation with Dr. Charles Fox and
18   Dr. Alan Kaye?
19         A.  Which conversation in November?
20         Q.  The one that's referenced in your answer,
21   LSU Shreveport.
22         A.  As far as that November conversation
23   goes -- could I see the documents Wash U. 3591 to 594
24   and 598 to 604?  And I just want to make sure I'm
25   thinking of the right conversation.
```

Page 283

```
1          Q.  I'm just going off what's your -- in your
2    interrogatory.  I don't have those documents right in
3    front of me.
4          A.  All right.  All right.  I apologize.  I
5    haven't looked at this and I need to refresh my memory
6    on it.  I'm happy to go through and talk but it would
7    be very helpful to look at the documents to put
8    everything into context.
9          Q.  Okay.  Cook County Health, the next one.
10   Richard Benzinger sent an e-mail to Ned Nasr on June
11   26th soliciting a call.
12         A.  Well, again, we're still investigating what
13   was going on with Cook County and Ned Nasr.
14         Q.  Was it -- were -- were you saying that
15   the -- the false statement was Dr. Benzinger offering
16   to have a phone conversation with Dr. Nasr?
17         A.  In this case, there's another document that
18   relates to this.  And, I believe -- I don't believe --
19   let me see if I've been given it.  Hold on.  Let me
20   read this document first just to make sure that I
21   understand what it is.  This is an e-mail from George
22   Benzinger, Tuesday, June 26th, 2018, 2:27 p.m.
23         Q.  Okay.  I don't need you to -- that's
24   Exhibit A79.
25         A.  A79.
```

Page 284

```
1          Q.  And I'll represent to you that it's a --
2    it's an e-mail to nnasr@cookcountyhhs.org, Jeff
3    Weisman recommendation.  And attached to it is a
4    letter dated June 26th, 2018, signed by Richard
5    Benzinger, which is in form and substance the same as
6    the letter attached to A77.
7          A.  Okay.  I just want to make sure because --
8    I just want to make sure these are identical because
9    the dates are different and the names are different.
10             Okay.  My -- all right.  It looks like
11   there are some changes to the text here.  In the one
12   to Peter Nagele, in the first paragraph on there --
13   unless I'm reading this -- he says:  The second year
14   resident Dr. Weisman has continued to work hard to
15   improve both his judgement and his knowledge base.
16   His assessments from clinical supervising --
17             THE COURT REPORTER:  One second.  You need
18   to speak up and...
19             THE WITNESS:  My apologies.
20         A.  His assessments from clin -- clinical
21   supervising faculty has been mixed.  Some felt that he
22   continued to lag behind his peers and many others felt
23   his -- that his performance was appropriate for his
24   level.
25             The one from the sixth says:  In hindsight,
```

71 (Pages 281 to 284)

## DR. JEFFERY WEISMAN  9/13/2022

Page 285

1    I think that the accelerated clinical schedule or
2    research track was a poor fit.  For his clinical
3    background, I believe that his skills are likely to
4    continue to improve with further training.
5         And this one says:  Overall his clinical
6    performance has steadily improved over his CA-1 year,
7    and I believe that his skills are likely to improve
8    with further training.
9         And so there are some differences.  I've
10   skimmed both.  So I -- you know, I'd want to
11   line-by-line it as appropriate but...
12        Q.   Do you know of any false statement in a
13   telephone call that Dr. Benzinger made to Dr. Nasr?
14        A.   I received an e-mail from Alan Kaye, and I
15   called -- or he talked with me about the fact that he
16   had a meeting with Ned Nasr at a conference and asked
17   him why he wouldn't take me.  And Ned Nasr told Alan
18   Kaye that he heard negative things.
19        Q.   What negative -- what negative things?
20   What did -- what did Nasr tell Kaye?  What negative
21   things did Benzinger say?
22        A.   I'm trying to think about the conversation
23   I had with -- with Alan Kaye.  There's an e-mail where
24   Alan Kaye states that after talking -- there's an
25   e-mail where Alan Kaye states that Ned Nasr told me

Page 286

1    that after talking with Richard Benzinger he would
2    take you but with six months of you, know, six months
3    of time not credited because of things he heard about
4    you, I believe.  I'd -- I'd have to see the e-mail to
5    my full memory.  And then I spoke with him and, I
6    believe, that what Dr. Kaye had told me was that Ned
7    Nasr had been told just the standard types of things
8    that we're hearing.
9         Q.   What's -- can you be specific?  I mean,
10   what statement did Dr. Benzinger state to Dr. Nasr
11   that was false --
12        A.   My --
13        Q.   -- in this case?
14        A.   You know, again, I'd want to think on this
15   because it's been awhile since I had this
16   conversation.  But my understanding was that, you
17   know, that -- that I was told that I failed rotations,
18   that they couldn't necessarily give all my documents,
19   my ACGME transcript was never sent to Ned Nasr.  So I
20   was trying to transfer to another training program
21   with no transcript.
22        Q.   Did you ever request the transcript?
23        A.   I -- I requested my transcript and all
24   documents be sent.  I --
25        Q.   Do you know --

Page 287

1         A.   I told them --
2         Q.   Do you know if Cook County requested a
3    specific transcript or whether they thought that the
4    program director letter was sufficient?
5              MS. RUTTER:  Calls for speculation.
6    Objection.
7         A.   Yeah.  I -- I would have to look at this --
8    I would have to look at the documents again.  I wasn't
9    there.  But I -- so we would have to investigate to
10   see if they did or, you know, to find out that
11   information.  But --
12        Q.   (Mr. Sullivan) Can we look back at Exhibit
13   A3.
14        A.   Okay.
15        Q.   And this was the answer on page 28 that we
16   were looking at, the answer to interrogatory --
17        A.   Twenty-eight (28)?
18        Q.   -- interrogatory 13.  28.
19        A.   Okay.  One second.
20        Q.   Okay.  So we've talked about -- we've
21   talked about Yale.  We've talked about the University
22   of Chicago, LSU Shreveport, Cook County.  Last one is
23   Cleveland Clinic.
24             It says:  Alex Evers exchanged e-mails with
25   Maged Argalious on August 3rd, 2018, indicating an

Page 288

1    oral conversation.
2              Are you aware of any false statements that
3    Alex Evers made to Dr. Argalious in any type of
4    conversation?
5         A.   In that case, I'm actually aware of some of
6    the conversation that occurred.  I asked my very good,
7    you know, family friends, Louis and Vickie Hofstein
8    (phonetic) to call Troianos to find out what occurred.
9    And they called him and asked what had roughly
10   occurred.  And they called me back.  I guess they said
11   they had called him.  I -- I'd have to look at the --
12   I'd have to look at either text messages or e-mails to
13   see the exact dates and times but around the time they
14   stopped talking to me.  They told me that they had
15   talked to Troianos, the chair, I believe, when he was
16   flying back from a conference or some sort.  He was at
17   an airport and he spoke with them, and he explained
18   that they had been told -- they had been told very
19   negative things about me.  That he told them that he
20   had been told negative things about me, that he was
21   unable to take me, and that I would probably never
22   work in medicine.  And --
23        Q.   And this was a conversation with Troianos
24   or with Argalious?
25        A.   I believe they had that conver -- I'd have

72 (Pages 285 to 288)

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 289

1  to go through my notes again to refresh my memory.  I
2  apologize.  I -- I don't know Troianos or Argalious.
3  One's the chair of Cleveland Clinic Anesthesia.  One
4  is the program director.  So I'd -- I'd have to
5  refresh.  I -- I believed that Argalious is the
6  program director, but I was able to get information on
7  those exchanges and we are -- we are investigating.
8      Q.  And what did -- what did Alex Evers say to
9  either Argalious or Troianos about you that was false
10  based on your report back from the Hofsteins?
11     A.  So again, I'd want to refresh my memory and
12  think on it.  But my understanding is that there seems
13  to be a trend of this resident failed rotations.
14  There seemed to be trend of this resident is
15  dangerous.  There seemed to be a trend of don't hire
16  this person.  So again, I'd want to think on the
17  specifics of it, but that seemed to be what was being
18  told to me.
19         And I -- I was -- I was pretty concerned
20  because I was at my parents' house.  And, like, I
21  was -- I believe I was on my mother's phone and we
22  were outside when she was saying this.  And there -- I
23  was literally told you're probably never going to work
24  in medicine again.
25         So something that would have a chair that

Page 290

1  was a friend of one my parents' best friends that had
2  known me growing up, that was my Godfather is
3  literally being told I'm probably not going to ever be
4  able to work in medicine because of what's being told
5  to these individuals.
6         (Defendant's Deposition Exhibit A83, E-mail
7  8/4/18 from Ned Nasr Re: Jeff Weisman New Contact
8  Information and Question.)
9      Q.  Exhibit A83.  I'll represent to you that
10  this is an e-mail exchange produced by your lawyers in
11  this case, JW-57849.  Can you identify this for me?
12     A.  All right.  This is an e-mail that Ned Nasr
13  sent to me August 4th of 2018.  And I'm reading it
14  right now.  All right.  And that was a follow-up to my
15  e-mail where I just notified him that in August 3rd,
16  that I wanted to know about my consideration and I was
17  very frantically trying to get ahold of him for my
18  consideration since my wife and I cancelled our
19  honeymoon because he had said they wanted to take me.
20  So we didn't go anywhere because we thought I was
21  getting a letter to report to start working with them
22  ASAP.  So I'm looking at this -- so I'm looking at the
23  document right now.  So please let me know what the
24  question is.
25     Q.  I just wanted you to identify it.  Does

Page 291

1  this accur -- accurately reflect your e-mail with
2  Dr. Nasr on August 3rd and August 4th, 2018?
3      A.  This is the text that's in the document but
4  I -- I personally think there's some inaccuracies
5  here.
6      Q.  I was just asking whether you wrote that
7  and you received the e-mail from Dr. Nasr where he
8  replied to your e-mail?
9      A.  Okay.  Is the -- the question is e-mail
10  exchange.  This is an e-mail sent but I think there's
11  fake --
12     Q.  Okay.  Thank you.
13     A.  -- or bad information in here.
14     Q.  Did you enroll in a -- in a class at the
15  University College at Washington University in early
16  August of 2018?
17     A.  Yes, I believe I did.
18     Q.  Okay.  Why did you do that?
19     A.  I believe that was an adult learning class
20  that I was able to take.
21         MR. ELSTER:  What did you say?
22     A.  I believe that was -- I'm trying to think
23  the course it was, that was a long time ago.
24     Q.  (Mr. Sullivan) Was it pharmacology for
25  clinical research, that ring a bell?

Page 292

1      A.  I -- I would have to see the documents but,
2  I believe, I have enrolled in a -- I believe I
3  enrolled in a course.
4      Q.  Were you trying to get access to your
5  Washington University e-mail?
6      A.  Well, I was trying to stay enrolled and be
7  a part of the campus community because I literally
8  lived in the Central West End, blocks from campus, and
9  I wanted to be able to be on campus and participate
10  in --
11     Q.  And you wanted your -- but -- and you also
12  wanted access to your e-mail account, right?
13     A.  I did want to make sure I was able to
14  maintain my Washington University e-mail account for
15  research and other -- for research and purposes.
16         (Defendant's Deposition Exhibit A85, Letter
17  8/13/18 to Dr. Weisman from J. Mark Meacham Mechanical
18  Engineering & Materials Science.)
19     Q.  And then did Dr. Meacham give you a
20  visiting research associate position in the Department
21  of Mechanical Engineering?
22     A.  All right.  I have the document here.
23     Q.  I've handed you what's been marked Exhibit
24  A85.
25     A.  Let me read that real fast.  That was from

73 (Pages 289 to 292)

## Page 293

1  August 13th of 2018.  Okay.  I'm looking -- okay.  So
2  I've looked at this document.  This was a document I
3  signed that Mark Meacham gave me to come on as a
4  visiting research associate in mechanical engineering.
5      And this actually does jog my memory on --
6  on one of the issues that you asked earlier about.
7  Did I ask for anything from -- from MIR radiology.
8  I -- I did ask to continue to be involved and to have
9  access to my e-mail account and everything, and to be
10  able to be a part of everything going on.  Like, I
11  thought I would be allowed to be.  And they denied it.
12      And so literally MIR, one of the top
13  radiology programs in the country at a core research
14  facility that I -- that I had created, yet I couldn't
15  even be a lowly visiting research associate.  But the
16  Department of Mechanical Engineering and Material
17  Science who I'd been talking about collaborations with
18  saw my value and was willing to do it when I'd done
19  nothing for them.
20      **Q.  But it's pretty standard when you leave**
21  **employment to no longer have an e-mail address with**
22  **the -- with the entity; is that correct?**
23      A.  In all -- in all sincerity, in academia
24  it's a little different.  My -- my friend and mentor
25  David Sinow left the University of Illinois, and to my

## Page 294

1  knowledge, he still has his University of Illinois
2  e-mail address even though he's a retired professor.
3      **Q.  Let me ask you this --**
4      A.  He's still very involved.
5      **Q.  But -- but you did regain access to your**
6  **university e-mail account, correct?**
7      A.  Yes.  My jweisman@wustl.edu, I was -- I was
8  allowed to use that.
9      **Q.  Okay.  And -- and -- and you produced that**
10  **entire e-mail account to us in this case, correct?**
11      A.  Yes.  I -- I gave that e-mail account to my
12  attorney and they --
13      **Q.  And you had made a copy of that, of that**
14  **e-mail account?**
15      A.  Well, I -- I gave my -- I gave my e-mail --
16  well, what I had done is I gave my -- I had my e-mail
17  on an old laptop and I gave it -- there's two types of
18  e-mail accounts.  There's -- you can log -- it's
19  becoming more common you log into Outlook or you can
20  have Outlook that's downloaded on your computer --
21      **Q.  Right.**
22      A.  -- which most of us have.
23      **Q.  Right.**
24      A.  And I -- I'd had that and I had relatively
25  maintained most of that.

## Page 295

1      (Defendant's Deposition Exhibit A89, E-mail
2      9/12/18 from Douglas Thompson Re: Sending Residency
3      Verification, etc...Question.)
4      **Q.  Hand you what's been marked Exhibit 89,**
5  **A89, and represent to you this is an e-mail string**
6  **between you and Dr. Douglas Thompson starting with**
7  **Bates label JW-58696.**
8      A.  Okay.  I'm just looking at it right now.  I
9  believe this is an e-mail chain.  So I'm just going to
10  the bottom of it so -- I believe it's -- I believe it
11  started August 29th when I e-mailed Stephanie
12  Rheinheimer, who, I believe, I recall was the new
13  program coordinator.  And with -- and just asked her
14  if Sharon Stark who had stepped down, if she would be
15  doing stuff.  She told me that day that you can send
16  an e-mail and she'll make sure they're taken care of.
17      **Q.  And then you ask Stephanie to send a copy**
18  **of your residency file to Dr. Patil?**
19      A.  Yes, it looks like.
20      **Q.  At the top.**
21      A.  Yep.
22      **Q.  And then looks like Dr. Thompson steps in**
23  **and says:  What specifically do you need sent?  Your**
24  **file is hundreds of pages.  Correct?**
25      A.  That is what Douglas Thompson wrote in this

## Page 296

1  e-mail.
2      **Q.  And then you write to him:  That you spoke**
3  **to Dr. Patil and she just wanted everything.  So scan**
4  **it and please send it.  Correct?**
5      A.  That is what I wrote.  Send everything,
6  ACGME transcripts, everything in there just send it.
7      **Q.  Okay.  And -- and then Dr. Thompson says:**
8  **I'm committed to today supporting your application.**
9  **Happy to contact Dr. Patil and send her any and all**
10  **evaluations that Wash U. sent to the ABA and ACGME**
11  **whilst you were here as a resident.  Correct?**
12      A.  That appears to be what he wrote, right.
13      **Q.  And he says:  As an FYI, I tried to contact**
14  **Dr. Patil at the e-mail you listed below but it**
15  **bounced back to me saying her e-mail --**
16      A.  Yeah.
17      **Q.  E-mail box was full.**
18      A.  And -- and I believe there's another part
19  to this e-mail chain.  I -- I could be -- I'm -- I'm
20  just trying to think about it but, I believe, I
21  e-mailed him to let him know that I'd contacted
22  Dr. Patil and her e-box was now fixed.
23      **Q.  Okay.  And then so -- so all the --**
24  **Dr. Thompson wasn't e-mailing straight with Dr. Patil,**
25  **it was through you.  You were communicating with her**

**LEXITAS LEGAL**
**www.lexitaslegal.com**        **Phone: 1.800.280.3376**        **Fax: 314.644.1334**

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 297

1  and telling Dr. Thompson what Dr. Patil wanted?
2      A.  I -- I -- in this e-mail exchange, I was
3  e-mailing, but I also believe that I introduced them
4  in another exchange.  I -- I -- it would be helpful to
5  see, but, I believe, I introduced them in an exchange.
6  So they were -- they were put together.  And I
7  know that -- I -- I know there were e-mail
8  introductions and -- and, of course, that led to
9  conversations verbally.
10         (Defendant's Deposition Exhibit A91, E-mail
11  11/28/18 from Alan Kaye Subject: Rotation
12  schedule-Jeff Weisman.docx;ATT00001.htm;weisman.)
13      Q.  Okay.  Hand you what's been marked Exhibit
14  A91.
15      A.  Okay.
16      Q.  And I'll represent to you that this is
17  something produced by your lawyers in this case
18  JW-63831.  Just want to ask you have you seen this --
19  this document before?
20      A.  Let me look at it right now.  Make sure.
21  I -- I know that either Dr. Kaye or Dr. Fox had
22  forwarded me an e-mail they had got, and I -- I would
23  have to check to confirm this was the same one.  But
24  they did send me an -- they did send me at least one
25  e-mail exchange, which Douglas Thompson sent them and

---

Page 298

1  it seems like there's an Excel file or picture of my
2  rotation.  And then it's got to the Residency
3  Selection Committee on here a program director letter,
4  which I haven't -- I'm just reading it right now
5  quickly.
6      MR. ELSTER:  I have a question?
7      MR. SULLIVAN:  Yeah.
8      MR. ELSTER:  The attachment here to this
9  e-mail is dated August 27th of 2021.  But the
10  e-mail -- the e-mail itself is from November of '18.
11  So, I guess, object to the foundation of the question.
12      MR. SULLIVAN:  Okay.  Well, you guys
13  produced it.
14      MR. ELSTER:  Okay.  But it...
15      MS. RUTTER:  Well, if you're ask -- if
16  you're going to ask him questions about --
17      MR. ELSTER:  Yeah.
18      MS. RUTTER:  -- whether or not this
19  letter --
20      MR. SULLIVAN:  I was just --
21      MS. RUTTER:  -- was attached to the e-mail,
22  I don't think -- I think it's clear it wasn't.
23      MR. SULLIVAN:  No.
24      MS. RUTTER:  If it's dated --
25      MR. SULLIVAN:  No, it's crossed --

---

Page 299

1  August 27th is crossed out on it.
2      A.  Okay.  Well, let me read it quickly and I
3  can answer the questions on it.  Okay.  I have -- I've
4  read this right now.  So this -- this seems to be a
5  Douglas Thompson letter based on the -- on the
6  original letter from Richard Benzinger is what it
7  appears to be.
8      Q.  (Mr. Sullivan) Okay.  Might be some
9  variations in it?
10      A.  Yeah.
11      Q.  But it -- do you have any reason to dispute
12  that that was the letter that was sent at the request
13  of Dr. Kaye from the anesthesiology program?
14      A.  As far as I know right now, again, I
15  haven't reviewed these, I believe -- and I'd want to
16  check if this was a copy sent from -- that we got in
17  discover -- in subpoena from them or if it's something
18  else.  But anyways, it -- it appears to be this.  And
19  of course, we'll investigate authenticity, not an --
20  not an issue.  We'll investigate the.
21         So there was -- was there a question?  I
22  know Benzinger and --
23      Q.  Yeah.  No.  I was just -- hold on.  I -- I
24  had just asked whether you had any reason to dispute
25  that that's what Dr. Kaye received from Dr. Thompson?

---

Page 300

1      A.  Okay.  You know, I'd want to check that the
2  dates and everything match up just to make sure that
3  that's the letter at that time and everything but...
4      Q.  Okay.
5      A.  I don't think I can do that in a bathroom
6  break so...
7      Q.  Did -- did Dr. Kaye ever tell you that he
8  thought there were false statements or derogatory
9  statements made in the letter he got from
10  Dr. Thompson?
11      A.  I'm trying to think on my conversation with
12  Alan Kaye on this.  He forwarded it to me.  He
13  forwarded something similar to this to me, I believe,
14  at some point.  I don't know if this was the one that
15  he forwarded because he -- I mean, the biggest problem
16  with this e-mail and this letter is that it was sent
17  on November 28th, it was months too late.  I -- I was
18  told to move down there September.  They said they
19  wanted me there October.  It would -- it would be,
20  like, oh, law school starts in August.  Send your
21  transcripts in the summer and you show up in August
22  and you're -- you know, they say, hey, we can't take
23  you.  Your transcripts never arrived.  And then, oh,
24  you know, oh, in November, December we have your
25  transcripts but first semester is over.  So that was

---

75 (Pages 297 to 300)

## DR. JEFFERY WEISMAN  9/13/2022

Page 301

1 the --
2      Q.   Okay.
3      A.   -- largest issue.
4      Q.   What's -- you're seeking damages for the --
5 for the equipment and other property of SBI's that you
6 allege was converted by the university, the hospital,
7 Dr. Evers and Dr. Benzinger, correct?
8      A.   I believe we are.
9      Q.   Okay.  Do you -- what is the value of that
10 equipment that you're claiming was converted?
11      MR. ELSTER:  Objection.  Form.  Vague as to
12 which equipment.
13      A.   Well, is --
14      Q.   (Mr. Sullivan) If you want to look at
15 Exhibit A -- Exhibit A3, which is your interrogatory
16 answers, we can look at that equipment right there.
17 I'll point you to the right one.
18      A.   I'm sorry.  Yeah.  If you -- if you could
19 help.
20      Q.   Yeah.  I'm --
21      A.   Like everything, this is a very verbose...
22      Q.   We can agree to that.  I think it's 12,
23 yeah.
24      A.   Page 12.
25      Q.   Page 27, interrogatory number 12 and your

Page 302

1 answer.
2      A.   Okay.  Twenty-seven (27).  It's coming
3 right up.  Okay.  Page 27, 12.  Okay.  I've got that
4 pulled up right now.  And what was the question again?
5      Q.   So my question is:  You identify certain
6 equipment and other materials in the answer to 12.
7 What is the -- what is the value of the items that
8 you're -- that you've listed there?
9      A.   So the lab items that I had purchased alone
10 I had put 80 to a hundred thousand dollars of my own
11 funds into getting equipment.  David Sinow had put
12 funds into purchasing, I believe, equipment.  And we
13 had won some grants and some entrepreneurship and
14 economic and development grants in Louisiana that had
15 been put into equipment and supplies.
16      Part of the equipment here, for example,
17 the Extrisopm bot was custom.  We met the owner of the
18 company that had done a custom development of it.  I
19 believe the Cyberware 3D scanners that we got from New
20 Zealand were -- were technology that we were able to
21 repurpose that was --
22      Q.   Those were, like, a thousand dollars,
23 $1,500?
24      A.   So we -- I don't remember the exact cost
25 that we spent on them as well as the -- as well as the

Page 303

1 re -- as well as flying them in from New Zealand, but
2 that 3D scanner -- those 3D scanners were specialized
3 equipment that I scoured the globe to find something
4 for a solution for --
5      Q.   I'm just talking about what the val -- what
6 did you pay for them?
7      A.   I -- I don't recall exactly what we paid.
8 I know there was a shipping cost and an initial cost,
9 but I know that they served the purpose of providing
10 us from needing to buy 50 to a hundred thousand
11 dollars worth of scanning equipment in the US.
12      Q.   How much did the Makerbot 5th generation 3D
13 printer cost, do you recall?
14      A.   I don't recall what that was.  I'd need to
15 see a receipt.  I know that we've got some of those
16 floating around.
17      (Defendant's Deposition Exhibit A30, E-mail
18 4/14/16 from Jeffery Weisman Subject: IMPORTANT-Lab
19 and Project Finances.)
20      Q.   And can you identify Exhibit A30 for me?
21 Does this appear to be an e-mail that you sent to
22 Dr. David Mills with a blind copy to Patrick Mills on
23 April 14th, 2016?
24      A.   This is an e-mail to Dr. Mills from me,
25 April 14th, 2016.

Page 304

1      Q.   And in it you state:  You've been
2 supporting Uday and Karthik off the $20,000 innovation
3 fund grant the past 18 months and paying their
4 housing, tuition and living expenses.
5      A.   Let me read this e-mail.  Okay.  So I'm
6 looking at this document.  This is a document that I
7 sent to David Mills.  And this is a great example of
8 your first question as being of your deposition of if
9 a doc -- if something is written, does that mean it's
10 accurate?  And in this case, it means it's not
11 accurate.  I needed to get Uday and Karthik out of
12 Louisiana Tech.  I needed Mills to let them defend
13 and graduate or he would have kept them down there as
14 Ph.D. students to get publications and research out.
15 I was pushing the narrative.  He also -- Mills also
16 took one of my grants and used it and wanted more from
17 us.  At this point in the game, we had David Sinow on
18 Board.  We had our own venture capitalist.  Funding
19 was no issue as far as anything going forward as of
20 April 2016.  I needed Mills to assume that there was
21 no reason to keep us.
22      Q.   So -- so you made false statements in able
23 to induce David Mills to let you leave and to let Uday
24 and Karthik defend their thesis and leave with you?
25      A.   Well --

76 (Pages 301 to 304)

**DR. JEFFERY WEISMAN  9/13/2022**

| Page 305 |
| --- |

1  MR. ELSTER:  Objection.  Form.
2  A.  Well, I -- I wouldn't say that these are
3  false statements.
4  **Q.  (Mr. Sullivan) Well, what's --**
5  A.  I told David --
6  **Q.  What's -- what's untrue in this -- in --**
7  **let's go line by line.  What's untrue in this e-mail?**
8  A.  Well, let's see, I said I need --
9  **Q.  The financial situation is much worse and I**
10  **didn't want to add stress.**
11  MR. MAREK:  Let him answer the question.
12  A.  No, no, it's fine.  It's fine.
13  So I need to give you some information on
14  lab finances.  I apologize and take full
15  responsibility but have been trying to shield you from
16  some of what has been going on in the trenches.  The
17  financial situation is much worse and I don't want to
18  add stress since there's enough of that going around.
19  The financial situation was, in fact, much
20  better because now for me personally funding this lab,
21  it would have been very tough for somebody that's a
22  med student with no salary to go fund this lab.  It
23  would have been very tough for a resident making 50,
24  $60,000 to go fund two post-docs making 50, 60.  That
25  is -- that is basically a true statement on if I go

| Page 306 |
| --- |

1  fund it myself.  However, I had the capability to go
2  bring in David Sinow, which he was willing and ready
3  to do on these fronts.
4  I had been supporting Uday and Karthik off
5  the 20K innovation fund grant the past 18 months and
6  paying for their housing, tuition and living expenses.
7  I did that.  That is not --
8  **Q.  (Mr. Sullivan) Well, let me -- did you --**
9  **did you spend $37,000 plus in lab supplies and took**
10  **out school loans to cover over the past two and a half**
11  **years?**
12  A.  Let me read this.
13  **Q.  It's under number two.**
14  A.  Let's see what I was doing at that point.
15  One moment.  I don't recall if the school loans were
16  for the -- full 37,000 or if it was for a
17  portion of it.  I'd need to go look at finances.  I'd
18  want to give you an accurate answer.  I personally
19  spent lab supplies and did use some school loans in
20  addition to grants and other funds we'd won to cover
21  things.
22  **Q.  Okay.**
23  A.  Let's see, I did a very quick accounting to
24  show the 37,000.  You can probably pull another 10 to
25  15,000 counting additional expenses, that would take

| Page 307 |
| --- |

1  me another day to tally and really took out over 15K
2  in loans to keep this operation going as it was
3  necessary.  This is 50K beyond the 20K grant and
4  basically 70K total.
5  **Q.  And is that accurate?**
6  A.  I would assume that I have -- I would
7  assume -- I'd want to think to make sure that I can
8  add everything up accurately.  I want to be accurate.
9  But as I said, I -- as I told you previously, I
10  estimated that I had spent 80 to a hundred thousand
11  dollars --
12  **Q.  Yeah.**
13  A.  -- of my own --
14  **Q.  But the -- the thing is, I guess, the --**
15  **the part that was false in this, is that you were**
16  **stating that the financial situation is much worse,**
17  **right?  The financial situation of SBI was much rosier**
18  **is that what you're saying because of the influx from**
19  **David Sinow?**
20  A.  Yeah.  We -- we had David Sinow on board
21  and there were no funding --
22  **Q.  Okay.**
23  A.  -- issues.
24  **Q.  Can you turn to the -- the page that's been**
25  **Bates labelled as JW-48437.  Do you see that there?**

| Page 308 |
| --- |

1  A.  48437.  Yes.
2  **Q.  48437.  There's a -- looks like several**
3  **items here, a Makerbot filament, Makerbot scanner,**
4  **Maker warranty, Makerbot print head, Makerbot 5th gen,**
5  **Extrusionbot repair, two Extrusionbots.  Were all**
6  **those items brought with you to St. Louis?**
7  A.  I believe those items were all brought with
8  me to St. Louis.
9  **Q.  And are you claiming that those were items**
10  **that were transferred to the Department of Radiology**
11  **lab?**
12  MR. ELSTER:  Objection.  Vague as to
13  transfer.
14  A.  Well, I -- so those -- those items -- here,
15  I'm just going to... As Richard Benzinger and Douglas
16  Thompson said, he migrated his company from
17  St. Louis -- sorry -- for future to St. Louis --
18  **Q.  I'm just --**
19  A.  -- and he integrated it seamlessly as a
20  core facility of the Department of Radiology.
21  **Q.  I'm just talking about specific --**
22  A.  Seamless integration.
23  MR. MAREK:  What document were you reading
24  from?
25  THE WITNESS:  I'm sorry.  I was reading

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 309

1  A91.  I apologize.
2  Q.  (Mr. Sullivan) I'm -- I'm talking about
3  specific items of equipment here listed with a -- with
4  a value next to them.  Okay?
5  A.  The, I believe, to the best of my
6  knowledge, all of these items and supplies went to the
7  St. Louis College of Pharmacy.
8  Q.  They were SBI's.  They went to the College
9  of Pharmacy lab, and then they were seamlessly -- what
10  was it -- integrated into the Department of Radiology
11  3D printing lab?
12  A.  To -- to quote Thompson and Benzinger, he
13  said:  And he integrated it seamlessly as a core
14  facility of the Department of Radiology.
15  (Defendant's Deposition Exhibit A48, E-mail
16  2/4/17 from David Ballard Subject: 3D Printing Lab MIR
17  Acquisition Document.)
18  Q.  Okay.  Hand you what's been marked Exhibit
19  48.
20  A.  Okay.  Let me read this.  And this is an
21  e-mail from David Ballard, February 3rd, 2017, to Pam
22  Woodard, cc-ing me, Jeffery Weisman, Uday and Karthik,
23  3D printing lab MIR acquisition document.
24  So, I guess, they're saying seamless
25  integration.  David Ballard is saying acquisition.

---

Page 310

1  Q.  Okay.
2  A.  Dear Pam, I hope this finds you well.  I'm
3  just reading.  I've attached a working document and
4  summarized the goals, assists, ongoing projects,
5  requested space/facilities, and other variables in
6  this document.
7  As you review at your leisure, please let
8  me know what you think.  We're happy to revise.
9  Thank you for everything and have a great
10  time in DC.
11  Q.  And on the -- next page, which is the
12  proposal.  Do you see the goal there:  Strategic
13  Biomedical, Inc. Seeks to be acquired by Mallinckrodt
14  Institute of Radiology?
15  A.  I'm reading this right now.  I'm trying to
16  refresh myself right now by reading this.  I -- this
17  appears to be a document that David Ballard generated
18  using a good portion of the Strategic Biomedical
19  business plan that he said, it's been modified.  I
20  don't recall if I fully read this document.  And if I
21  did -- did read it, I don't recall full details.
22  Q.  Okay.  Can -- can I just ask you, there's a
23  list of equipment here on what's page 3 of the
24  proposal, which is JW-52347.
25  A.  Okay.  I'm looking at it right now.

---

Page 311

1  Q.  And does that accurately reflect the
2  equipment that was housed in the current STLCOP
3  location and would be transferred to a new lab at MRI?
4  A.  I'm just reading this.  A Hyrel system
5  9,500, Cyberware scanners, two for 35,000 at 70,000.
6  I -- I believe this includes information that was
7  sent, but I don't -- but, I believe, there's also
8  other equipment and supplies that were sent over that
9  were not listed.  So, I believe, there's some
10  omissions of items that went over.
11  Q.  Okay.  But, you know, but you have no
12  reason to dispute that as of February 3rd, 2017, this
13  would reflect the equipment that was in the College of
14  Pharmacy location?
15  A.  Well, I -- I would just make sure to
16  dispute and say that this -- this is included but
17  there were other items.  So this would include a
18  portion of it but there were -- there -- to the best
19  memory, there are other items there.
20  I'd need to compare exhibit -- whatever the
21  last exhibit was that we -- A30, I believe, I'd want
22  to -- I'd have to compare all items.
23  I -- and I also don't recall and I need to
24  look and refresh myself, if there -- if there was a
25  list for the move.  I thought we'd done a list at --

---

Page 312

1  at some point.  I don't know if it was an electronic
2  or paper list, but I thought there was a list we had
3  done for the move from LS -- from Louisiana to
4  St. Louis where we had listed everything.
5  Q.  But would you stand behind your -- the --
6  the items listed in A3 as being the items that you are
7  claiming that you're alleging in this case that were
8  converted by defendants?
9  A.  These would include items that were
10  converted.
11  Q.  Okay.
12  A.  But again, I -- I haven't checked that
13  receipts match and other things like that.
14  Q.  Okay.  And you're claiming here that the
15  Cyberware scanners were worth -- or SBI or the
16  document reflects that the Cyberware scanners were
17  worth $70,000?
18  A.  I -- I don't recall who created the
19  document.
20  Q.  Okay.
21  A.  I was -- I was claiming they -- they were
22  expensive and they served -- we were very lucky to
23  find them and be -- able acquire them because to --
24  to buy these types of items new, these types of
25  scanners were very expensive at that point in time.

---

78 (Pages 309 to 312)

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 313

1    Q.  How did SB -- do you know how SBI treated
2    the loss of this equipment tax wise?
3        A.  You know, I don't recall how that was done.
4    I -- I would have to think about it and look at the
5    SBI documents.  It's -- and -- and I apologize, it's
6    just been a very long time since I've looked at that.
7    I'm more than happy to refresh -- to find documents
8    and refresh what the exact process was.  We -- we
9    never got -- and as an aside, it wasn't a donation
10   where there was tax receipt or anything like that that
11   occurred.
12       Q.  So it wasn't -- it wasn't a charitable
13   deduction on SBI's --
14       A.  I do not --
15       Q.  -- tax return?
16       A.  I -- I would have to take a look at the tax
17   return.  I haven't -- I -- I believe David Sinow was
18   handling all of the financial.
19       Q.  Okay.  David Sinow was handling that --
20   that aspect.
21       A.  But --
22       Q.  Okay.
23       A.  But -- but again, I don't believe there was
24   any formal -- Wash U. normally would, like most
25   universities, give a donation form and a tax

---

Page 314

1    deductible receipt.  There was nothing like that
2    given.
3        MR. SULLIVAN:  So let's go off the record.
4        THE VIDEOGRAPHER:  We're going off the
5    record at, approximately, 5:25 p.m.
6        (A short break was then taken.)
7        THE VIDEOGRAPHER:  We're back on the record
8    at, approximately, 5:37 p.m.
9        Q.  (Mr. Sullivan) Dr. Weisman, are -- you're
10   aware that a counterclaim has been filed against you
11   in this case?
12       A.  Yes.  I've been aware of that.
13       Q.  Is it fair to say that you admit that you
14   accessed and searched Dr. Benzinger's e-mail account
15   on or about December 13th, 2017?
16       MR. ELSTER:  Objection.  Legal conclusion.
17   Form.
18       A.  I don't think it would be fair to say that
19   because when you -- I've -- I've done some training in
20   intellectual property law and I'm familiar with CFAA
21   and related and I've taken courses in it.
22       When you start putting terminology to this
23   area of law, it's very specific as far as that goes.
24   I think we've all seen in the Van Buren case that just
25   recently came from the Supreme Court what those terms

---

Page 315

1    mean and how there's a lot of nuisance to them.
2        Q.  (Mr. Sullivan) Okay.  Well, you and
3    Dr. Benzinger were working in a procedure room
4    together in December of 2017, correct?
5        A.  That is correct.  We were working in a
6    procedure room --
7        Q.  Dr. Benzinger --
8        A.  -- together.
9        Q.  -- was looking at his Washington University
10   e-mail on a workstation in that procedure room,
11   correct?
12       A.  That's not correct.  It was a shared
13   workstation that was my workstation that day.
14       Are -- are you familiar with the O -- an OR
15   layout at a center like Washington University
16   St. Louis general procedure room?  I -- I would?  I'd
17   like to explain what it is and I'll be very concise on
18   it.
19       When you walk into an operating room,
20   there's an anesthesia machine and that's the
21   workstation for the anesthesia team to use.  There's
22   normally a computer monitor bolted to the anesthesia
23   machine that also has a keyboard there and that --
24   that is the workstation.  And at Washington University
25   St. Louis the --

---

Page 316

1        Q.  So the anesthesia team, it was a shared
2    workstation?
3        A.  It's -- it's a shared workstation but it's
4    primarily assigned to the resident.  So what happens
5    is Richard Benzinger or an attending, they can
6    supervise, I believe, the last I looked it up, they
7    can supervise four nurse practitioners or two medical
8    residents at a time.
9        And so he may be supervising several
10   people.  So I would basically be doing the case in
11   that room.  Richard Benzinger would come for induction
12   when we rolled the patient back to sedate and
13   intubate.  He would come in to give me a bathroom or
14   food break or he would come in when we were ending the
15   case extubate and roll out.  So that's -- that's
16   the -- the setup so...
17       Q.  But in any -- in any event, it was a -- it
18   was a hospital or university shared workstation and
19   Dr. Benzinger was -- had his university e-mail account
20   open in a browser on that shared workstation, correct?
21       A.  Well, there's -- there's other details
22   to -- to that statement.  It was a shared workstation
23   that was primarily my workstation that day and I had
24   logged -- I had logged in.  The Washington University
25   computers require you to log in to open them up to

---

**LEXITAS LEGAL**
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

**DR. JEFFERY WEISMAN  9/13/2022**

| Page 317 |
| --- |

1   have the desktop open.  So I had logged into it and
2   that -- that was my station with the desktop opened up
3   and logged in.
4            Richard Benzinger gave me multiple breaks
5   throughout that day to -- so I -- I don't recall if it
6   was just to go to the bathroom quickly or eat lunch
7   but he had given me multiple breaks throughout that
8   day.
9        Q.  Okay.  And at some point, Dr. Benzinger on
10   that shared workstation had his Washington University
11   e-mail account open and was looking at his e-mail
12   account, correct?
13        A.  I -- I pre -- you know, I can't state what
14   he was doing with his own account but when he -- when
15   I -- when I came back from my break, he had his
16   account open on my desktop.
17        Q.  He had -- he had the account open.  And at
18   that point, you looked through his account or did you
19   type in a search function for your own name?
20        A.  Well, when I -- when I came back and he
21   left the room, the account actually had e-mails about
22   me pulled up.  And, in fact, there was a message that
23   popped up from, I believe, to the best of my memory,
24   it was Sharon Stark.
25            We have not gotten any discovery or any

| Page 318 |
| --- |

1   documents to trigger my memory on this.  I have not
2   looked at this in a long period of time.  But I -- I
3   recall -- I remember walking into the room and seeing
4   a bunch of e-mails about me, and even one popping up
5   talking about the front running that was going on
6   by -- that -- that I had alleged and that, in fact,
7   was going on where they were asking --
8        Q.  So do you recall taking about 70
9   photographs of -- of Dr. Benzinger's e-mail account?
10        A.  So I -- I recall taking the images.  I -- I
11   don't -- we don't have the discovery so I can't tell
12   you the exact number.  Again, you know, I apologize.
13   It's been a while.
14        Q.  No, that's fine.
15        A.  I -- I believe in -- I believe last I
16   looked at it, which was a long time ago when my
17   counsel looked at it, it was -- I believe it -- it
18   was, roughly, 70 images that -- that were from --
19   that -- that only represented, I believe, 35 e-mails
20   because they were duplicates.  And then of those 35
21   e-mails, many of those were in chains.  So the
22   majority of it was just a couple of e-mail chains
23   about myself and Gary Hammen.
24        Q.  Okay.  And did you -- not all 35 of those
25   e-mails was open in -- in Dr. Benzinger's account.

| Page 319 |
| --- |

1   You would have clicked and opened them; is that -- is
2   that a fair statement?
3        A.  Well, I -- well, I -- I don't know if
4   that's a fair statement only for the reason that in
5   Outlook, when you do a search in Outlook, you have all
6   the e-mails pulled up on the side bar.  They're there.
7   So the e-mails are all in the side bar in there, and
8   you can see that there's a blurb of information on
9   every e-mail to some extent.
10        Q.  Right.  But you have to -- you have to
11   click on the -- click on the e-mail to either open it
12   fully or to get a preview of it, correct?
13        A.  Well, I mean, I don't know if I would say
14   it was opening the e-mails.  I think -- I think
15   technically those e-mails were already opened and
16   pulled up in the search function and they were -- they
17   were all there.
18        Q.  But you -- you would -- you physically
19   clicked enter on a mouse to be able to open them up
20   and take a picture?
21        A.  I -- my guess would be -- I'm thinking back
22   to the station and the terminal.  I probably left
23   clicked on the mouse, depending on what one was
24   displayed.  To go to other ones, I probably left
25   clicked on the mouse with the e-mails that were up

| Page 320 |
| --- |

1   there.
2        Q.  Okay.  To be able to gain access to them to
3   see what they actually said?
4        A.  Well, I -- I would disagree.  I already had
5   access.  Benzinger had given me access.
6        Q.  He gave you access?  He said, just by
7   leaving his -- his e-mail open, is that what you're
8   saying?
9        A.  Yes.  In -- in the intellectual property
10   world --
11        Q.  I'm not --
12        A.  -- CFAA that is -- that is access.  It's
13   right there on my desk in my workstation.
14        Q.  It's not your -- it wasn't your work -- it
15   wasn't your workstation.  It was a shared workstation.
16   You were assigned to it along with Dr. Benzinger,
17   correct?
18        A.  I -- I -- I would argue that it was my
19   workstation.  It was primarily my workstation.
20        Q.  Who was it own -- who was it owned by?
21        A.  When you're saying --
22        Q.  Who owned it?  Was it the -- did the
23   hospital or the university would have owned the
24   computer, it wasn't on your computer, right?
25        A.  Well...

**LEXITAS LEGAL**
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

**DR. JEFFERY WEISMAN  9/13/2022**

Page 321

1      MS. RUTTER:  Objection.  Calls for a legal
2  conclusion.
3      Q.  (Mr. Sullivan) It wasn't your -- did you
4  own that computer in the procedure room that day?
5      A.   It was assigned to me and I had full
6  authorization to use it, and I used it for several
7  hours.  Benzinger probably only used it for a matter
8  of minutes.
9      Q.   Did you have -- did you have authorization
10  to access and look at his e-mail?  Did he authorize
11  you to do that?  Did he state --
12      MS. RUTTER:  Objection.  Calls for a legal
13  conclusion.
14      MR. SULLIVAN:  I'm not done with my
15  question.
16      MS. RUTTER:  Sorry.  You took a long pause.
17      A.   Can you please repeat the question,
18  Mr. Sullivan.
19      Q.  (Mr. Sullivan) Certainly.  So did
20  Dr. Benzinger give you authorization to look at his
21  e-mails?
22      MS. RUTTER:  Objection.  Are you done with
23  your question?
24      MR. SULLIVAN:  I am done with my question.
25      MS. RUTTER:  Perfect.  Objection.  Calls

Page 322

1  for a legal conclusion.
2      Q.  (Mr. Sullivan) Okay.
3      A.   By -- I -- no.  My -- my -- my personal
4  opinion was that I had authorization and I not only
5  had authorization but I had reasonable grounds to
6  believe that I had authorization for the following
7  reason that I think was very important.
8         Several months prior to this in February
9  of -- there's -- there's actually two reasons I would
10  say I had authorization, and I knew I had
11  authorization, in fact.  And I reasonably believed
12  that I had authorization.  In February of 2017, I
13  retained legal counsel to investigate an FCA case for
14  fraud going on at the hospital.  I saw e-mails that
15  seemed to be -- that seemed to indicate improper
16  activity.  And I snapped images of them to give to my
17  counsel to investigate that activity who I had, in
18  fact, retained over six months prior for that benefit.
19      Q.   This was back in -- this was back in
20  February 2017.  Whose e-mail did you access then and
21  took images of?
22      A.   No, no, no.  I didn't access anybody's
23  images.  I meant in February -- to be very clear, in
24  February of 2017, I retained legal counsel, a very
25  prominent FCA and anti-trust and class action attorney

Page 323

1  in the healthcare realm based on what was going on.
2  And I was looking to gather evidence of improper
3  activities going on at the hospital and to give them
4  to my attorney if I saw them.
5      Q.   So Dr. Benzinger's e-mails would somehow
6  involve false claims made to the U.S. Government?
7      A.   Yes.  In fact, they did.  And that's, in
8  fact, what we were investigating and that -- you
9  know --
10      Q.   Okay.
11      A.   -- I very reasonably believed and knew I
12  had permission to take them.
13      Q.   You think it's okay to access and search
14  through someone else's e-mail account if they leave it
15  open?
16      MR. ELSTER:  Objection.  Form.
17      MS. RUTTER:  Objection.
18      MR. ELSTER:  Legal conclusion.
19      A.   That's a broad question.  In my specific
20  situation, in my specific circumstances, I, in fact,
21  know that I had permission to do so.
22      Q.  (Mr. Sullivan) Who gave you permission?
23  Who -- who gave you permission?
24      A.   Under the law I had permission.
25      Q.   Which law?

Page 324

1      MR. MAREK:  Legal conclusion.
2      MR. SULLIVAN:  He's bringing it up.  He's
3  saying that he's authorized under the law.  So I'm
4  asking him which law.
5      MR. MAREK:  Well, does he need to know
6  that?
7      MR. SULLIVAN:  Yeah, he does because he
8  just said -- because he just said he was authorized
9  under the law.
10      MR. MAREK:  I mean, lawyers constantly --
11      MR. NOLAN:  Would you stop your speaking
12  objections and coaching the witness.
13      MR. MAREK:  I'm just asking, is that
14  accurate.
15      MR. SULLIVAN:  He -- he gave the answer.
16  He said that he was authorized under the law, and I'm
17  asking which law he was authorized under.  If he
18  doesn't -- if he doesn't know, he doesn't know.
19      Q.  (Mr. Sullivan) Which law?
20      A.   I knew that under work involving the False
21  Claims Act, that I was able to take those images and
22  give them to counsel.  I gave them to nobody else.
23      Q.   Okay.  So the e-mails -- so e-mails --
24      A.   I gave nobody else -- I snapped those
25  photos.  I showed them to nobody else but my legal

81 (Pages 321 to 324)

Page 325

1  team.
2        And, in fact, when -- I guess, the second
3  important thing I would note is in the digital work --
4  in the digital work environment where everything is
5  digital and everybody has a digital workstation.
6  Everybody here aside from these exhibits is using an
7  electronic computer.  Nothing is dig -- nothing is
8  paper.
9        So anybody in the State of Missouri that
10 wants to file an ADA claim, a civil rights claim,
11 anything would have something come across their desk.
12 In the old school way, you would have a memo come
13 across somebody's desk and they would see
14 discrimination, civil rights violation, and they would
15 take that and they would give it to a lawyer and show
16 what was going on.
17        If under the -- if under the Missouri
18 Computer Tampering Act, that no -- you cannot take a
19 single file in any case ever, that would be an
20 absurdity.
21     Q.  But there's --
22     A.  There's public interest.  It is what it is.
23     Q.  Well, you're making a legal argument now.
24 But I just want to know what gave you per -- what
25 law -- no -- no person at Washington University

Page 326

1  including Dr. Benzinger said that it was okay for you
2  to look through someone else's e-mails, correct?
3     A.  I would disagree.  He left those e-mails
4  open.
5     Q.  Okay.
6     A.  On my workstation.
7     Q.  A shared workstation?
8     A.  That was primarily mine.
9     Q.  Okay.  Okay.
10    A.  And actually, not only that --
11    Q.  And now you're saying what law --
12    A.  I also know that --
13    Q.  Wait.  Let me ask -- let me ask my
14 question.
15    A.  Fine.  Please ask.
16    Q.  We're talking over each other.  Amy's
17 gonna --
18    A.  Apologies.  We'll keep it slow.
19    Q.  -- hit one of us.
20        What -- and there's -- you're saying that
21 the False Claims Act and public policy gave you
22 permission to look through Dr. Benzinger's e-mails?
23    A.  All -- what I'm saying is that I, as an
24 attorney that's done intellectual property work,
25 that's seen the CFAA, and that's also seen recent

Page 327

1  rulings under Van Buren.  I -- you're allowed to take
2  fraudulent documents and give them to an attorney.
3  They were front running.  They were lying about my
4  evaluations.
5        And I was going to say the second point
6  where I know I had permission.  Richard Benzinger, in
7  fact, was in my e-mail box that day.  He sent multiple
8  e-mails from my e-mail box and he also was looking at
9  my e-mails.
10    Q.  He replied to an e-mail from Pam Woodard,
11 right?  Who's -- who's in the same department as -- as
12 his wife, Tammy Ben -- Benzinger?
13    A.  Can you show me the document?  I haven't
14 looked at that e-mail.
15    Q.  No.  But he's -- he's -- if you recall, did
16 he think that Pam Woodard had mistakenly sent an
17 e-mail to him rather than his wife, Tammy, who's also
18 in radiology?
19        MR. ELSTER:  Objection.  Foundation.
20 Speculation.
21    A.  I'd -- I'd want to see the document that
22 he -- and, you know, explained to me fully but...
23    Q.  (Mr. Sullivan) It's -- it's in -- it's
24 discussed in the pleadings in the case.
25    A.  Then we can go to it.  I'm more than happy

Page 328

1  to.
2     Q.  Okay.  Well, let's --
3        MR. RUTTER:  It's not -- it's not in those
4  exhibits.
5        (Defendant's Deposition Exhibit A104,
6  E-mail 4/6/17 from Jeffery Weisman Subject: Benzinger
7  survey.)
8     Q.  (Mr. Sullivan) It's not in those exhibits.
9  Exhibit A104.
10    A.  So we're flipping gears from this then?
11    Q.  Yes.
12    A.  Okay.  I was going to at least mention that
13 we regularly when residents were together would took
14 in each other's e-mails to pull documents that we
15 needed for cases or to pull what was coming up with
16 patients, etc.
17    Q.  Okay.  There's no pending question.
18    A.  All right.  Fine.
19    Q.  Exhibit A104, can you identify this for me?
20    A.  A104?
21    Q.  Yeah.
22    A.  This -- let's see, this is a picture of --
23 I sent -- is this an e-mail with an attachment?
24    Q.  Yes.  I believe you produced it and they're
25 consecutively numbered and it says Benzinger survey.

82 (Pages 325 to 328)

**DR. JEFFERY WEISMAN  9/13/2022**

---

Page 329

1    A.  Okay.  All right.  This is a picture of a
2  portion of a survey that a friend and mentor, Jane
3  Edgarstat (phonetic) from LSU had sent to Washington
4  University St. Louis and Richard Benzinger had filled
5  out and sent back.
6    Q.  And it looks like -- is that you that took
7  the photograph there?  It looks like the shadows on it
8  indicate a -- a phone.  Did you take that picture?
9    A.  Yeah.  I -- I believe I --
10    Q.  Where did you --
11    A.  -- took this photo.
12    Q.  Where did you take the picture of?  Where
13  did you get this document?
14    A.  It was in my training file.  Sharon Stark,
15  I -- I asked her to see my training files because I
16  wanted to go through my evaluations.  She gave me the
17  folder.  My training file folder.
18    Q.  Okay.
19    A.  And this -- this document was inside it.
20    Q.  Okay.  And so you just -- you took a photo
21  of -- of that while you were looking through it?
22    A.  Yes.
23    Q.  Okay.
24    A.  At least I -- at least that's -- that's
25  what I recall.  I took the photo of it.  I -- I went

---

Page 330

1  to go see my training files multiple days.
2    THE COURT REPORTER:  And Sharon's last
3  name?
4    THE WITNESS:  Stark, S-T-A-R-K.  Kind of
5  like Stark law.
6    Q.  Dr. Weisman, if we can, do you still have
7  those interrogatory answers, which is A3?  Sorry about
8  that.
9    A.  So many trees.
10    Q.  I know.
11    A.  Okay.  I have the interrogatory answers.
12    Q.  Can you go to page 6, the answer to
13  interrogatory -- interrogatory five, which asks --
14  asks about persons not retained or specially employed
15  to provide expert testimony?
16    A.  Okay.  I've got page 6.  Question five.
17  Person -- identify each person not retained or
18  specially employed to provide expert testimony who may
19  be called as an expert within.  Okay.
20    Q.  Okay.  You list David Ballard who will
21  offer an opinion on the value of plaintiff's lab and
22  intellectual property?
23    A.  I -- seems like he is listed right there.
24    Q.  Okay.  Have you spoken with Dr. Ballard
25  about what his opinion would be or is this just

---

Page 331

1  because he had general knowledge of the equipment and
2  the value?
3    A.  I have not had a conversation with David
4  once about this.  I've tried to firewall things and be
5  professional on -- on this.  However, I think he needs
6  to be listed because what David would tell you is the
7  following.  What -- he would have expert opinion and
8  knowledge and he would tell you how much this
9  benefited his career.  He graduated a radiology
10  fellowship and residency at Wash U. was immediately
11  offered or, roughly, a tenure position at Wash U.,
12  which is unheard of.  I should have been in that exact
13  same position.  He knows exactly how valuable this
14  technology and this lab is to a career and to the
15  potential.
16    Q.  I just want you to look at -- if you can
17  turn to page 8 and interrogatory seven asks you to
18  identify persons with knowledge of the facts and then
19  of the allegations in the -- in the complaint.
20    A.  Okay.
21    Q.  And if you go to page -- to page 11, you
22  identify Ken Fleischmann, the general counsel,
23  St. Louis College of Pharmacy.
24    A.  Yes.
25    Q.  And there's a long list of what Ken

---

Page 332

1  Fleischmann has knowledge of.  Would all of that
2  knowledge from -- of Ken Fleischmann have come from
3  conversations with you or would he have independently
4  witnessed certain things?
5    MR. ELSTER:  Objection.  Speculation.
6    A.  Just reading things right now.  One second.
7  So the question you asked, just to make sure I heard
8  that right, you were asking me if he would have
9  knowledge of this from both his personal experience
10  and from talking to me?
11    Q.  (Mr. Sullivan)  Right.  Correct.
12    A.  All right.  Ken Fleischmann was involved in
13  the transactions as general counsel.  He was -- he was
14  not a friend.  He was a general counsel of the
15  St. Louis College of Pharmacy.  He saw everything
16  going on.  He -- he was in charge of making sure that
17  the value of the lab was done properly by an
18  independent consulting group Valsa (phonetic) and
19  confirming that all our documents showed proper
20  valuation.
21    And he would -- I -- I would, again, I
22  can't speak to Ken Fleischmann and how he formed his
23  opinion, but certainly -- certainly, you know,
24  Attorney Fleischmann was representing the St. Louis
25  College of Pharmacy and he -- he made his decisions on

---

83 (Pages 329 to 332)

Page 333

1   aspects of this related to them as general counsel.
2   And he also had, you know, and I also had filled him
3   in on some of the situation as well on my -- my -- on
4   what was going on behind -- what was going on that I
5   knew. And I --
6        Q.  So and -- so he, obviously, has knowledge
7   with respect to the transaction between the College of
8   Pharmacy and SBI.  But anything related to your claims
9   of falsified evaluations, defamation, false
10  statements, things of that nature, that -- that would
11  have come from conversations with you.  He wouldn't
12  have independent knowledge of that?
13       A.  I -- I --
14       MS. RUTTER:  Objection.  Calls speculation.
15       A.  I -- I don't know if he had independent
16  knowledge of that or not.
17       Q.  (Mr. Sullivan) Okay.
18       A.  You'd have to ask him.
19       Q.  Yeah.
20       A.  But he -- he was aware of many facts in
21  this case and many situations in this case.  And --
22       Q.  Let me ask you this.  You have a bunch of
23  faculty members in anesthesiology and elsewhere listed
24  in this answer.  Can you tell me who you believe would
25  have a -- a favorable view of your performance as a

Page 334

1   resident?
2        A.  Well, let me -- well, as far as a view, let
3   me go through.  It would be much easier to have the
4   list of faculty and the evaluations to refresh memory
5   here.  But just off the top of my head, are you asking
6   just for faculty at Washington Univer -- sorry.
7   Excuse me.  Are you asking just for --
8        Q.  I'm just asking --
9        A.  -- faculty at Wash U --
10       Q.  Faculty at Wash U --
11       A.  -- or including LSU?
12       Q.  -- because I'm assuming that the LSU folks
13  wouldn't have knowledge of your performance as a
14  resident.
15       A.  They actually, in fact, they did.  I did
16  several cases with Dr. Patil.  She told me that I --
17       Q.  Okay.  Well, let's limit -- let's limit it
18  to Wash U.
19       A.  Okay.
20       Q.  Okay.
21       A.  All right.  So Wash U., and again, there's
22  a lot of people that aren't on here.  I'm just -- just
23  going through the list.  Let's see, I believe -- and I
24  don't think this list was in any particular order.  I
25  believe Kate Meacham would have knowledge.  I

Page 335

1   believe -- and sorry, and you're asking for knowledge
2   of people that know only clinical skills that were
3   positive or research skills that were positive or?
4        Q.  Let's go with clin -- clinical skills that
5   were positive.
6        A.  Okay.  Got it.  So I'll skip Rob Gereau and
7   Mark Meacham on the research fronts.  I believe Lauren
8   Gibson, the academic coordinator for the anesthesia
9   department, knew that my skills were very different
10  than what was coming along because I had had several
11  closed door meetings with her where I'd showed her
12  evidence of what was occurring.  And she seemed very
13  shocked to see this type of evidence.  Sharon Stark, I
14  had shown some of the evidence there on what was going
15  on.  So she would have some knowledge.  I believe to
16  some extent Pamela Woodard would have some knowledge
17  on clinical skills and what was going on from having
18  some conversations with myself and David Ballard.  I
19  would suspect Richard Wahl would have some
20  information.
21       Let's see, people that might -- would say
22  positive things, again, clinically.  Justin Knittle
23  saw some of the things that were going on, and, again,
24  he may say positive things.
25       Again, I -- I can't -- let me just add it's

Page 336

1   very tough to speculate because a lot of these
2   individuals are still employed by Washington
3   University St. Louis.  I'd be very scared to get
4   involved in this.
5        Amy Loden, she was one of the internal
6   medical physicians that gave me a good evaluation when
7   Benzinger said it didn't exist and lied on it.
8        Q.  But she's no longer with the university,
9   right?  Do you know that?
10       A.  Oh, Amy Loden left?
11       Q.  Yeah.
12       A.  Okay.
13       MS. RUTTER:  Objection.  Calls for
14  speculation.
15       A.  I heard -- hold on one second.  Janet
16  McGill was with internal medicine.  I -- she gave me
17  an eval that was positive.  Lisa Tseng, she was a
18  resident.  Troy Wildes told her to go in the room and
19  spy on me.  Kind of like what they did with Marco.
20  This was in the CPAP clinic.  She said I was doing a
21  great job and didn't know what was going on.  I'm
22  blanking on -- who was the old -- well, sorry.  One
23  second.
24       Q.  What about Martha Szabo?
25       MR. ELSTER:  We're at our seven hours,

84 (Pages 333 to 336)

## DR. JEFFERY WEISMAN  9/13/2022

| Page 337 |
| --- |

1  guys.  Why don't we --
2      A.  Martha Szabo would give a positive --
3      MR. ELSTER:  You've answered the question.
4      THE WITNESS:  I'm happy to go through.
5      MR. ELSTER:  Finish this one.
6      A.  Rebecca McAllister, I don't -- hold on one
7  second.  Skipping over her.  Gary Hammen, if he was
8  still alive and didn't leave his three children
9  fatherless could tell me I had good skills.  Skip Joe
10  Cras.  We know what his thoughts are.  Dr. Krucylak
11  said that I had good skills and talked about things
12  going and bullying and harassment that she'd even seen
13  and she supported me.
14      **Q.  Are -- are you aware of any allegations**
15  **against Dr. Krucylak with respect to her abusing**
16  **trainees?**
17      MS. RUTTER:  Objection.  Calls for
18  speculation.
19      A.  You know, I'm not aware of that right now.
20      **Q.  (Mr. Sullivan) Okay.**
21      A.  When I was there, and things always
22  changed, Dr. Krucylak was known as being a very tough
23  but fair individual that would -- that would be hard
24  on people while they were doing a case but then
25  afterwards wouldn't hold it against.  And say I said

| Page 338 |
| --- |

1  that just to get you to be better and be very --
2  somebody who was -- a football coach that's tough
3  during game day but in the locker room has the heart
4  of gold.  So it would be her opinion.
5      **Q.  Okay.**
6      A.  Who is -- sorry.  I'm just running through.
7  Thomas Davis, I don't know what he would say if he's
8  still employed here.  He called me up and apologized
9  one day for writing a terrible review about a -- about
10  a battery dying in a laryngoscope because he had
11  to do it.  Rajan Dang, an ENT resident, would say I
12  was good.  Valerie Lee, I don't -- I didn't work with
13  her but she has knowledge.  One second, Rainer
14  Kentner, he came up to me and he apologized for what
15  was going on.  Before I had proof that -- before I had
16  proof that there was front running going on, he pulled
17  me aside at the beginning of my anesthesia training my
18  second year.  And he said, hey, listen, I don't care
19  what's going on.  Yes.  I've heard the rumors.  Yes.
20  People are contacting me.  I'm going to give you a
21  fair evaluation, I believe he likely would.  I did
22  not work with Michael Avidan.  James Fehr left for
23  Stanford.  James Fehr was an advocate of Garry Hammen.
24  I talked to him multiple times on what happened.  He
25  never worked with me but he was very aware of what was

| Page 339 |
| --- |

1  going on with Hammen.  And he got into a big argument
2  and yelling fighting in the halls I heard with Thomas
3  Cox before he left for Stanford to take over.
4  Dr. Karan Menelaos, around the time I was resigning,
5  Dr. Karan Menelaos, and I would -- you know, and,
6  again, I would hope that Wash U. would not attack any
7  people that are good people for being honest and
8  telling the truth.  Dr. Karan Menelaos pulled me aside
9  on one of -- before I -- around the time I'd resigned
10  and he said, hey, there's rumors that you're being
11  told to resign.  He's, like, listen, he's like, you
12  can do this.  You're good.  Your last evaluations,
13  you're at the level you need to be.  Do not give up.
14  Do not listen to them.  Stay here and fight it out.
15  And he had about an hour conversation with me telling
16  me you need to stay.  John McAllister is a pediatric
17  anesthesiologist.  I believe by nuance he got a bunch
18  of e-mails by Rebecca McAllister by mistake, but he
19  had told me a little bit about what was going on and
20  he didn't have any issues with me when the pediatric
21  department was attacking me.  Ivan Kangrga was -- was
22  nice to me.  He -- I -- when there was an incident
23  when I was on the hepatic and vascular unit, I believe
24  he told one of the individuals to -- to knock it out
25  and to train the doctor as opposed to trying to make

| Page 340 |
| --- |

1  an incident of it.  Laura Cavallone, she was one of
2  the people that told me what was going on in ENT.
3  Rene Tempelhoff, was one of the people that I did one
4  of my first cases in tutorial with Marco Todorovic.
5      And if you really, I would say sincerely,
6  if he remembers it, and Marco does as well, I would
7  say talk to them and get the real story.  We had a --
8  we had -- I -- when I was in tutorial we had one of
9  your major donors for the ophthalmology center that
10  had had what they suspected to be some form of an
11  aneurysm or major event while having -- while
12  having -- while on campus.  And they rolled him back.
13  And they had me literally put in a central line blind
14  with no ultrasound right away while there were
15  literally -- literally while there were, like,
16  ophthalmology people hanging in the room because he
17  was such a big donor.  I hit it immediately, intubated
18  him and everything went great.
19      Marco Todorovic, Helga Komen, I think,
20  would -- would say something positive.  Although I'm
21  sure she would be scared of retaliation as well.
22  Peter Nagele, I believe I hung with him on some
23  trauma.  Calls, he knows me.  Both a researcher and
24  clinical anesthesiologist.
25      **Q.  Okay.  I think we've -- have we hit the end**

**LEXITAS LEGAL**
www.lexitaslegal.com      **Phone: 1.800.280.3376**      **Fax: 314.644.1334**

**DR. JEFFERY WEISMAN  9/13/2022**

|  | Page 341 |
|---|---|

1  of -- because now we're into Klafta and the rest of
2  the people?
3       A.   I -- I apologize but don't worry, there's
4  more.  It -- it goes back -- there's a lot of doctors
5  at this medical center.  Gina LaRossa, internal
6  medicine would say good things.  I believe Hawa
7  Abubakar would say good things.  Bruno Maranhao the
8  chief resident probably wouldn't.  Especially since we
9  subpoenaed him.  Let me just go down to --
10      **Q.  Twice.**
11      A.   We have to work on that later.
12          Let's see, let's see, this chiefs at the
13  beginning didn't really know me.  Or the chiefs at the
14  end didn't really know me or help.  Chris Davies, I
15  think he's not allowed back here because of the
16  intellectual property theft and copyright stuff he
17  did.  I think Broc -- I don't -- I hung with Broc in a
18  couple of ORs.  He's another M.D. Ph.D.  He may be
19  somebody to talk to.
20          I think we're to the end.  And -- and I
21  would say there -- there were a lot of other people
22  that I did work with because, I believe, Wash U. has,
23  roughly, a hundred anesthesiologists.  If you were to
24  pull my case logs on who I worked with, I had good
25  evaluations from many of them.  So that's all I would,

|  | Page 342 |
|---|---|

1  I guess, wrap up and say so...
2          MR. SULLIVAN:  Okay.  Well, I've concluded
3  my seven hours.
4          MR. ELSTER:  Okay.
5          MR. SULLIVAN:  And, I believe, we're
6  adjourning until tomorrow --
7          MR. ELSTER:  Until tomorrow.
8          MR. SULLIVAN:  -- at 9:00, at 9:00 a.m.
9          MR. ELSTER:  That's right.
10         MR. SULLIVAN:  Okay.
11         MR. ELSTER:  Okay.  All right.
12         THE VIDEOGRAPHER:  Going off the record at,
13  approximately, 6:10 p.m.
14         THE COURT REPORTER:  For my benefit, who
15  needs a transcript and what kind?
16         MR. ELSTER:  Scrunched.
17         MR. SULLIVAN:  I have a standing order.
18         MR. NOLAN:  E-tran and also TXT file.
19         (WHEREIN, the deposition was adjourned at
20  6:10 p.m.)
21
22
23
24
25

|  | Page 343 |
|---|---|

1               CERTIFICATE OF REPORTER
2
3       I, Amy A. Victoria, MO CCR, within and for
4  the State of Missouri, do hereby certify that the
5  witness whose testimony appears in the foregoing
6  deposition was duly sworn by me; that the testimony of
7  said witness was taken by me to the best of my ability
8  and thereafter reduced to typewriting under my
9  direction; that I am neither counsel for, related to,
10 nor employed by any of the parties to the action in
11 which this deposition was taken, and further that I am
12 not a relative or employee of any attorney or counsel
13 employed by the parties thereto, nor financially or
14 otherwise interested in the outcome of the action.
15
16
17         _Amy A. Victoria_
18         MO CCR #556
19
20
21
22
23
24
25

**LEXITAS LEGAL**
**www.lexitaslegal.com**     **Phone: 1.800.280.3376**     **Fax: 314.644.1334**