## Page 344

1    IN THE UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF MISSOURI
2          EASTERN DIVISION
3  JEFFERY WEISMAN AND
   STRATEGIC BIOMEDICAL, INC.,
4
     Plaintiffs,
5              Cause No. 4:19-CV-00075-JAR
6  vs.
7  BARNES JEWISH-HOSPITAL, BJC
   HEALTHCARE, WASHINGTON
8  UNIVERSITY, DR. ALEX EVERS,
   DR. RICHARD BENZINGER, AND
9  DR. THOMAS COX,
10   Defendants.
11          VOLUME II
   VIDEOTAPED DEPOSITION OF JEFFERY WEISMAN, JD, M.D.
12      Taken on behalf of the Defendants
        September 14, 2022
13
        Jo Ann Dickson, CCR 1085
14
15  (Whereupon, the deposition commenced at 9:06 a.m.)
16
17
18
19
20
21
22
23
24
25

## Page 345

1  QUESTIONS BY:                      PAGE NO.
2  Cross-Examination by Mr. Nolan         349
   Cross-Examination by Ms. Rutter        590
3
4       INDEX OF EXHIBITS
   DEFENDANT'S                        PAGE MKD.
   NO.
6  Exhibit  B1 Interrogatories            389
   Exhibit B2 Supplemental            402
7  interrogatories
   Exhibit B3 JPEG images             451
8  Exhibit B4 Brief                   504
   Exhibit B5 Memorandum of appointment   515
9  Exhibit B6 Acceptance of memorandum    524
   of appointment
10  Exhibit B7 Email                  531
   Exhibit B8 Email from NRMP             537
11  Exhibit B9 Email from NRMP            538
   Exhibit B10 NRMP application           541
12
13     (Exhibits were attached to the transcript.)
14
15
16
17
18
19
20
21
22
23
24
25

## Page 346

1    IN THE UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF MISSOURI
2          EASTERN DIVISION
3
   JEFFERY WEISMAN AND
4  STRATEGIC BIOMEDICAL, INC.,
5    Plaintiffs,
6              Cause No. 4:19-CV-00075-JAR
7  vs.
8  BARNES JEWISH-HOSPITAL, BJC
   HEALTHCARE, WASHINGTON
9  UNIVERSITY, DR. ALEX EVERS,
   DR. RICHARD BENZINGER, AND
10  DR. THOMAS COX,
11   Defendants.
12
13    CONTINUED VIDEOTAPED DEPOSITION OF WITNESS,
14  JEFFERY WEISMAN, JD, M.D., produced, sworn, and examined on
15  the 14th day of September, 2022, between the hours of 9:06
16  a.m. and 3:25 p.m. of that day, at 191 West Port Plaza
17  Drive, St. Louis, Missouri, before JO ANN DICKSON,
18  Certified Court Reporter within and for the State of
19  Missouri, in a certain cause now pending before the United
20  States District Court, Eastern District of Missouri,
21  Eastern Division, wherein Jeffery Weisman, et al. are the
22  Plaintiffs, and Barnes Jewish-Hospital, et al. are the
23  Defendants.
24
25

## Page 347

1       A P P E A R A N C E S
2  For the Plaintiffs:
3  Henry P. Elster, Esquire
   Elster Law Office, LLC
4  225 South Meramec Avenue, Suite 325
   St. Louis, Missouri  63105
5  (314) 727-0868
   Henry@elsterlawfirm.com
6
7  For the Plaintiffs:
8  Rachel Rutter, Esquire
   Sherman Marek, Esquire
9  Marek Weisman, LLC
   55 East Monroe Street, Suite 3800
10  Chicago, Illinois  60603
   Rrutter@marekweisman.com
11  Smarek@marekweisman.com
12  For Defendants Washington University, Evers,
        Benzinger & Cox:
13  Kevin Anthony Sullivan, Esquire
   Shands, Elbert, Gianoulakis & Giljum, LLP
14  8235 Forsyth Boulevard, Suite 700
   St. Louis, Missouri  63105
15  (314) 241-3963
   Ksullivan@shandselbert.com
16
17  For Defendants Barnes-Jewish Hospital
        and BJC Healthcare:
18  Michael P. Nolan, Esquire
   Husch Blackwell, LLP
19  190 Carondelet Plaza, Suite 600
   St. Louis, Missouri  63105
20  (314) 480-1500
   Michael.nolan@huschblackwell.com
21
22
23
24
25

1 (Pages 344 to 347)

Pltfs. Ex. 3

## Page 348

```
 1            A P P E A R A N C E S
 2       The Court Reporter:
 3       Ms. Jo Ann Dickson
         Lexitas Legal
 4       711 North Eleventh Street
         St. Louis, Missouri  63101
 5       (314) 644-2191
 6       The Videographer:
 7       John Niehaus
         Lexitas Legal
 8       711 North Eleventh Street
         St. Louis, Missouri  63101
 9       (314) 644-2191
10  ALSO PRESENT:
11  CHRISTINE RAMATOWSKI
    LISA WOOD
12  MARISSA ISRAEL
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 349

```
 1          IT IS HEREBY STIPULATED AND AGREED, by and
 2  between counsel for Plaintiffs and counsel for Defendants,
 3  that the continued videotaped deposition of JEFFERY
 4  WEISMAN, JD, M.D. may be taken in shorthand by Jo Ann
 5  Dickson, a certified shorthand reporter, and afterwards
 6  transcribed into typewriting; and the signature of the
 7  witness is expressly reserved.
 8               * * * * *
 9          THE VIDEOGRAPHER:  We're on the record.
10  Today's date is September 14th, 2022 and the time is
11  approximately 9:06 a.m.  This is the continued video
12  recorded deposition of Jeffery Weisman, M.D. in the matter
13  of Jeffery Weisman, et al. versus Barnes-Jewish Hospital,
14  et al, Case Number 4:19-CV-00075-JAR, in the United States
15  District Court of the Eastern District of Missouri, Eastern
16  Division.
17          This deposition is being held at Sheraton
18  Westport Hotel in Saint Louis, Missouri.  The reporter's
19  name is Jo Ann Dickson.  My name is John Niehaus.  I am the
20  legal videographer.  We are with Lexitas Legal.
21          Would you please swear in the deponent.
22               JEFFERY WEISMAN,
23  of lawful age, being produced, sworn and examined on
24  behalf of the Defendants, deposes and says:
25               CROSS-EXAMINATION
```

## Page 350

```
 1  BY MR. NOLAN:
 2      Q   Would you please state your name.
 3      A   Jeffery Weisman.
 4      Q   Mr. Weisman, we met yesterday for the first
 5  time.  You understand I'm an attorney representing BJC
 6  Healthcare and Barnes-Jewish Hospital in the lawsuit that
 7  you filed against them and other defendants, correct?
 8      A   Correct.
 9      Q   Okay.  You're an attorney, correct?
10      A   I am an attorney.
11      Q   You went through law school?
12      A   Yes, I did.
13      Q   Graduated?
14      A   I graduated law school.
15      Q   And you practice as an attorney, don't you?
16      A   Well, at the moment I do some medical/legal
17  consulting work.
18      Q   So you understand that this deposition is my
19  opportunity to ask you about the facts upon which you base
20  your claims, right?
21      A   I understand that's the purpose of a
22  deposition is to ask and answer questions.
23      Q   Right.  It's my only opportunity to ask you
24  directly about the facts upon which you base your claims,
25  right?
```

## Page 351

```
 1          MR. MAREK:  Objection, leading.
 2          MR. RUTTER:  Objection, calls for -- calls for
 3  a legal conclusion.
 4          MR. MAREK:  Yeah, interrogatories too.
 5          But you can answer subject to that.
 6          THE WITNESS:  Okay.  You know, you'll have to
 7  talk to my attorneys on the times and dates to be able to
 8  talk with me and things like.
 9  BY MR. NOLAN:
10      Q   Right.  But you filed the lawsuit, right?
11  It's filed in your name, correct?
12      A   My -- my -- I'm sorry, can -- what -- what is
13  the question?
14      Q   You're a plaintiff in a lawsuit, yes?
15      A   Yes, I am a plaintiff in a lawsuit.
16      Q   As an attorney you know what that involves,
17  right?
18          MR. RUTTER:  Objection, calls for a legal
19  conclusion.
20          THE WITNESS:  Can -- can -- can you please
21  specify what you're looking at?  It's a very open-ended
22  question.
23  BY MR. NOLAN:
24      Q   Well, you understand that when you file a
25  lawsuit like this, the other side's attorneys get to ask
```

## Page 352

1  you questions about the facts upon which you base your
2  claims, yes?
3      A   In -- in general, in a deposition you get to
4  ask questions and the person being deposed answers those
5  questions.
6      Q   Yeah.  Right.  In other words, I'm not asking
7  you about where you went on vacation.  I'm asking you about
8  the facts upon which you base your claims, right?
9      MR. RUTTER:  Objection, calls for speculation,
10  form of the question.
11      THE WITNESS:  Yeah, I mean, I -- again, I'm
12  not sure what you're asking me to speculate on or --
13  BY MR. NOLAN:
14      Q   Well -- well, let me ask you this, did you
15  prepare for today's deposition?
16      A   I -- I met with my attorneys and --
17      Q   How long did you meet with your attorneys?
18      A   I met with my attorneys for, we had a -- I'm
19  trying to think of the exact day.  We had a Teams meeting
20  last week.
21      Q   How long?
22      A   I don't recall the exact time.  I think it was
23  a couple of hours.
24      Q   Any other meetings with your attorneys to
25  prepare for today's deposition?

## Page 353

1      A   When you say meetings, do you mean just formal
2  meetings or just talking with them or -- because I have
3  lots of communications with my attorneys in general.
4      Q   Sir, I'm asking you about what you did to
5  prepare for today's deposition.  And I asked you if you had
6  any other meetings than the one you just described which
7  was a Teams meeting.  And now you want to know what the
8  definition of meetings is, is that your question?
9      MR. MAREK:  Objection, argumentative.
10      MR. RUTTER:  Also objection to the form of the
11  question in that the beginning part of that question is
12  you're asking him what he did to prepare for his
13  deposition, which is clearly framed and highly likely to go
14  into attorney/client privileged communications.
15      So if you want to ask him for how long he met
16  with his attorneys, that's fine.  But if you're asking him
17  what he did to prepare, that's improper.
18      MR. NOLAN:  No, it's not.
19      MR. RUTTER:  It is improper.
20      MR. NOLAN:  And I would ask that you guys
21  limit your objections to one attorney.  I'd like to know
22  who's representing your witness in today's deposition.  And
23  whoever that person is, they're the only person can make
24  objections.
25      MR. RUTTER:  We understand that's what you

## Page 354

1  think, but --
2      MR. NOLAN:  Right.  I'm asking you --
3      MR. RUTTER:  -- that's not how it's going to
4  go.
5      MR. ELSTER:  You guys can --
6      MR. NOLAN:  I'm asking you who is representing
7  the witness.  I'm not going to sit here and argue with
8  three people.
9      MR. MAREK:  We're not going to argue with you
10  either.
11      MR. NOLAN:  You're already arguing.
12      MR. MAREK:  Are you going to answer the
13  deponent's questions or not?
14      MR. NOLAN:  I'm just asking you who is
15  representing the witness today.
16      MR. MAREK:  Nobody's going to answer your
17  questions.
18      MR. NOLAN:  Are you instructing your witness
19  not to answer that question?
20      MR. RUTTER:  Yeah.  You can ask him a question
21  about how long he met with his attorneys, that's fine.  If
22  you're asking him what he did to prepare, I'm instructing
23  him not to answer that question, yes.
24      MR. NOLAN:  I already asked that question and
25  you let him answer.

## Page 355

1      MR. RUTTER:  Then asked and answered.
2      MR. NOLAN:  He didn't completely answer it.
3  BY MR. NOLAN:
4      Q   Other than that Teams meeting with your
5  attorneys, what other times did you meet with your
6  attorneys to prepare for today's deposition?
7      A   I met with them on Monday.
8      Q   Was that the Teams meeting?
9      A   That wasn't the Teams meeting.  The Teams
10  meeting was last week for a couple hours.
11      Q   Okay.
12      A   And I met with them on Monday for a few hours
13  to discuss.
14      Q   Okay.  All right.  Other than those two
15  meetings, did you do anything else to prepare for today's
16  deposition?
17      MR. ELSTER:  Objection to the extent it calls
18  for privileged information.  Other than communications with
19  attorneys.
20      THE WITNESS:  I -- the only other things I did
21  to prepare for the deposition, I skimmed my interrogatories
22  and I skimmed the complaint.
23  BY MR. NOLAN:
24      Q   That's it?
25      A   I believe that's all that we did for prep for

## Page 356

1  a deposition.

2  **Q   And the reason I'm asking you this is because**

3  **I sat through your deposition yesterday when codefendants**

4  **counsel asked you questions, and there were a number of**

5  **very simple, basic questions which you said I don't know,**

6  **I'd have to go back and look at my notes.**

7  **Do you remember that line of questioning?**

8  MR. ELSTER:  Objection, argumentative, form.

9  THE WITNESS:  I was asked lots of questions

10  yesterday.

11  BY MR. NOLAN:

12  **Q   And there were lots of time where you would**

13  **answer I don't know, I'd have to think about that.  Do you**

14  **remember that?**

15  A   There were -- there were many times when I

16  said that these events happened years ago and it would be

17  very helpful to look at documents and refresh my memory.

18  **Q   Okay.  So other than your complaint and your**

19  **interrogatory answers, did you look at any of those other**

20  **documents to prepare for today's deposition?**

21  A   That's what I looked at for -- that's what I

22  looked at for preparation.

23  **Q   That's it?**

24  A   I believe that's what I looked at for

25  preparation.

## Page 357

1  **Q   Okay.  You didn't review the documents that**

2  **you contend are defamatory of you?**

3  A   There's over 60,000 pieces of evidence.

4  They're -- they're Bates stamped documents.  There's no way

5  for me to go review every single document.  So there --

6  there was no point in trying to review every single

7  document.  I read the interrogatories.  I scanned the

8  interrogatories, I scanned the complaint, and I prepped

9  with my attorneys.  That -- that's all that I did.

10  **Q   That's it?**

11  MR. MAREK:  Objection, asked and answered.

12  THE WITNESS:  That's what I did to prepare for

13  this deposition.

14  BY MR. NOLAN:

15  **Q   Are there any documents that you have that you**

16  **believe relate to your claims in this case that have not**

17  **been produced?**

18  MR. ELSTER:  Objection to the extent that's

19  for attorney/client information or work product

20  information.

21  You can answer subject to that.

22  THE WITNESS:  I mean, you would -- you know,

23  I've -- I have given all the documents and materials I had

24  to my attorneys.

25  (Reporter clarification.)

## Page 358

1  THE WITNESS:  I've given all the documents and

2  materials that I had to my attorneys.

3  BY MR. NOLAN:

4  **Q   Well, the reason that I ask is because**

5  **yesterday you were saying well, I have to refer to my notes**

6  **and think about that.  Do you have notes that relate to the**

7  **facts of this case?**

8  A   I don't have any notes.

9  **Q   Well, then why yesterday were you telling**

10  **Wash U's counsel that you'd have to look at your notes?**

11  A   Well, there's a lot of documents where I wrote

12  things going on.  For example, as Wash -- as Attorney

13  Sullivan showed yesterday, there was some emails that I

14  wrote to myself at the time of.  I don't have any notes

15  and -- that I produced for this.

16  **Q   Why would you write notes on documents?**

17  A   I didn't say I wrote notes on documents.

18  You're misconstruing what I said.  What I stated was,

19  Attorney Sullivan gave me emails that I had -- that I had

20  wrote at that time even to myself.  I stated that I would

21  have to look at emails or other documents to refresh

22  myself.  I have no notes that I've created for this

23  deposition, sir, with all due respect.

24  **Q   Yesterday you told Wash U's counsel that you**

25  **would need to check your case logs to answer a question or**

## Page 359

1  two that he had posed to you.  Do you remember that?

2  A   I believe I stated I would have to look in my

3  case logs.

4  **Q   What case logs?**

5  A   Well, when you're a resident at Washington

6  University, Saint Louis/Barnes, the consortium of them,

7  when you do cases, you very often will log them.  The ACGME

8  has a case logger and you go in there and you log them.

9  Also, Washington University/Barnes, the

10  consortium, Barnes Hospital, your client, will send us

11  schedules on a regular basis of where we're to rotate in

12  the hospital, and those schedules can be changed last

13  minute, so there's lot of activity and changes on them.

14  Additionally -- I'm just trying to think --

15  I'm sorry, I lost my thought for a second.

16  But -- but more or less as far as there's case

17  logs that we write and we -- we enter our cases when we're

18  going through them.  Sometimes you enter them that day,

19  sometimes you enter them later, later in the month or the

20  year.  But I believe I entered my case logs into the ACGME

21  portal.

22  I -- that was per protocol and per the

23  requirements of the residency to entire your cases.  So

24  those case logs, what's nice about them is, in general, if

25  they're entered accurately, it gives the day -- it says the

Page 360

1  date and the case that you did and who you did it with.
2      Q   Are you in possession of any of those case
3  logs?
4      A   I've given all those case logs to my
5  attorneys.
6      Q   And do you know if they've produced them?
7      A   I believe they have produced every -- you
8  know, I can't -- I was not in charge of the production.  I
9  gave all the documents to my attorneys, and -- you know,
10  that's -- that's all I can do as, you know, as a plaintiff
11  in a lawsuit, I give all the material and documents to my
12  attorneys.
13      Q   You gave them to your attorneys because you
14  knew they were responsive to the document request that were
15  propounded to you in this lawsuit, yes?
16          MR. RUTTER:  Objection, calls for a legal
17  conclusion.
18          THE WITNESS:  I -- you know, as I stated, I
19  gave my -- I gave all the documents my attorneys requested
20  to them.
21  BY MR. NOLAN:
22      Q   Yesterday you stated that back in February of
23  2017 you were working to obtain information that you
24  believe related to fraud and you sent those to an attorney.
25  Do you recall that testimony?

Page 361

1      A   Well, Mr. Sullivan interrupted and
2  misconstrued it.  I said that in February I retained an
3  attorney.
4      Q   Who was that attorney?
5      A   I returned -- I retained Sherman Marek, the
6  Marek Law Office.
7      Q   And why did you retain an attorney back in
8  February of 2017?
9          MR. ELSTER:  Objection to the extent that
10  calls for privileged information.  So don't disclose
11  anything attorney/client communications.
12          THE WITNESS:  I retained an attorney because I
13  was being bullied and harassed and I had seen illegal
14  activity at the hospital and I wanted to protect myself.
15  So like most people do that are being bullied, abused,
16  harassed to that level, I retained -- I retained an
17  attorney.
18  BY MR. NOLAN:
19      Q   You said bullied, abused and harassed?
20      A   Yes.
21      Q   Okay.  You weren't physically abused, were
22  you?
23      A   Can you explain what you mean by physically
24  abused?
25      Q   You really need a definition for that?

Page 362

1          MR. RUTTER:  Objection, argumentative.
2          MR. MAREK:  Objection, argumentative.
3          THE WITNESS:  I guess I would like to know
4  what -- when you say bullied, I'd like to know what you
5  mean by that, sir.
6  BY MR. NOLAN:
7      Q   I said physically abused, and you asked me
8  what I meant by physically abused.
9      A   Yes.  Can you please tell me your definition
10  of physically abused so I can make sure that I answer the
11  question.
12      Q   Did anyone ever strike you?
13      A   Nobody ever struck me.
14      Q   Did anyone ever touch you inappropriately?
15      A   Nobody ever touched me inappropriately.
16      Q   Did anyone ever threaten to do bodily harm to
17  you?
18      A   I felt threatened at times by Joe Cras yelling
19  at me in my face.
20      Q   Did anyone ever threaten to do bodily harm to
21  you?
22      A   Nobody ever threatened -- nobody verbally ever
23  threatened to harm me.  There was lots of physical
24  intimidation with certain faculty members that were yelling
25  at me.

Page 363

1      Q   Did anyone ever invade your personal space and
2  yell at you?
3      A   Yes.
4      Q   What do you consider personal space?
5      A   Well, personal space would depend on the
6  situation.  But certainly when somebody is inches away from
7  your face yelling at you, I would consider that a violation
8  of personal space, and I think many -- many would.
9      Q   Who did that?  Who was inches away from your
10  face yelling at you?
11      A   Joseph Cras.
12      Q   Anyone else?
13      A   I have to think on it, but right now I recall
14  Joseph Cras doing it.
15      Q   Okay.  As you here today, the only person that
16  you can think of that was within inches of your face
17  yelling at you was Joseph Cras, yes?
18      A   Right now that's what my memory recalls.  I'm
19  more than happy to think of the hundreds of interactions
20  and hundreds of faculty members, but right now that's what
21  comes to mind.
22      Q   Okay.  How many times did Dr. Cras get within
23  inches of your face and yell at you?
24      A   Well, if you worked with him, he -- in my case
25  when I worked with him --

5 (Pages 360 to 363)

## Page 364

1      **Q  I just asked how many times.**
2      A  Okay.  Give me a moment to think.  I worked
3 with him for several days and he was consistently in my
4 face yelling at me and harassing me.  It was -- it was
5 ongoing and continuous.
6          He would -- he'd come in and out of a room.
7 He'd -- I'd go to preop and talk with him, I'd go to
8 post-op and talk with him.  That was just, you know,
9 something that's open and notorious.  I don't know if
10 you -- you know, I'm just trying to think of a number.  I'd
11 have to think on it.  It happened a long time ago and it
12 happened multiple times.
13      **Q  Well, okay, you said multiple times.  I'm**
14 **asking how many.**
15      A  Well, I -- I'd have to think on it again.
16      **Q  Over 10?**
17      A  Again, I'd have to think on it to give you an
18 exact number sir.
19      **Q  Over 20?**
20      A  Again, I'd have to think on it to give you an
21 exact number, sir.
22      **Q  Over 20?**
23      A  Again, I'd have to think on it to give you an
24 exact number, sir.
25      **Q  Was anyone else ever present when Dr. Cras was**

## Page 365

1 **within inches of your face yelling at you?**
2      A  There were other -- depending on the location.
3 Sometimes he spoke with me in an empty operating room.
4 Other times it was in preop or post-op.  There's lots of
5 nurses and techs that float around the hospital that -- so
6 he's known to yell at people.  You can go talk to your
7 client and other people at the hospital and get that
8 information.
9      **Q  Please give me the names of anyone that was**
10 **ever present when Dr. Cras was within inches of your face**
11 **yelling at you.**
12      A  Well, I would need to get -- it would be very
13 helpful if you give me a staff list of who the nurses were
14 that day.  I don't -- at this time I don't recall the names
15 of the nurses that were in the hospital and preop, post-op
16 during days I worked with Joe Cras.
17          And to be completely honest, without looking
18 at my case logs or records, I don't even remember years
19 later from 20 -- from fall of 2017 what exact days I worked
20 with Dr. Cras.
21      **Q  So as you sit here today, you can't give me**
22 **the name of any witness to this alleged action by Dr. Cras**
23 **where he was within inches of your face yelling at you, is**
24 **that fair?**
25      A  Right now I can't remember it.  I'm happy to

## Page 366

1 look at notes and materials to refresh my memory.
2      **Q  Did you make any notes regarding these**
3 **interactions with Dr. Cras?**
4      A  I believe mister -- I believe Attorney
5 Sullivan showed me one of those notes that I wrote
6 yesterday, talking about him behaving inappropriately.
7      **Q  Did those notes that Mr. Sullivan showed you,**
8 **did they say anything about him being inches, within inches**
9 **of your face and yelling at you?**
10      A  Well, I'd like to take a look at the documents
11 right now.  Let's go through them.
12      **Q  Well, you just looked at it yesterday.  Do you**
13 **remember anything in there about inches away from your face**
14 **yelling at you?**
15      A  I looked at hundreds of pages of documents
16 yesterday in seven hours of deposition.  If you want me to
17 quote those -- those documents, we'd have to go pull them
18 up.  I'm -- I'm very happy to do so, to go through them
19 again.
20      **Q  Did you make a complaint to anyone about**
21 **Dr. Cras getting within inches of your face and yelling at**
22 **you?**
23      A  I believe I -- I'm thinking who I spoke with.
24 I had told Richard Benzinger about Dr. Cras' behavior.  I'm
25 trying to think if I -- I'm trying to think if there's an

## Page 367

1 email of it as well.  I'd have to again go through
2 documents to see.
3          But Dr. Benzinger and I believe anybody else I
4 would have spoken with has just said that's just Dr. Cras,
5 his behavior, you're just going to have to deal with it,
6 and oh, that's Joe.
7          There may very well be an email from
8 Dr. Benzinger in there, but, again, there's tens of
9 thousands of emails in discovery I'd have to go through to
10 see if I can find that, sir.
11      **Q  Did you ever make a written complaint to**
12 **anyone about Dr. Cras' behavior?**
13      A  As I said, I don't recall if it was in
14 writing.  I -- I do recall that I did talk with others
15 about Dr. Cras' behavior, and I'm sure I talked with some
16 of my co-residents at the time.  We would check, again,
17 out -- the other co-residents.  There's 20 people in a
18 class.  They'd, you know, go out for lunch or dinner on the
19 weekends and they talk.  I'm very sure that I've told
20 others about his behavior.
21      **Q  There is a formal complaint system at BJH,**
22 **correct?**
23      MR. RUTTER:  Objection to the form of the
24 question.  If you're asking him if there's a formal
25 complaint system now, I don't think he has -- I mean, maybe

6 (Pages 364 to 367)

## Page 368

1    he does know, but you're asking him when he worked there --
2    BY MR. NOLAN:
3        Q   Let me withdraw that question and ask you
4    another question.
5        When you were at BJH in the residency program,
6    you were aware that there was a formal complaint system,
7    yes?
8        A   I don't recall if there was one specific
9    formal complaint system.  I tried to complain multiple
10   times to multiple people.  For example, I met with -- I
11   emailed Nicole Erter that I wanted to meet with her --
12       (Reporter clarification.)
13       THE WITNESS:  Nicole Erter, E-R-T-E-R.  And
14   then Nicole, N-I-C-O-L-E.
15       And I emailed Nicole Erter that I wanted to
16   meet with her and Attorney Ramatowski.  And I believe
17   there's an email of that floating around.
18       I -- I would assume, like most academic
19   centers, there's many complaint processes that can be
20   considered formal.  Many -- many academic centers have tip
21   hotlines.  Many academic centers, I believe, have office of
22   access and equity.  Many academic centers have offices for
23   ADA compliance.  A big -- I am quite sure that a big center
24   like Barnes has multiple ways to complain or say something.
25

## Page 369

1    BY MR. NOLAN:
2        Q   Multiple formal channels through which you can
3    complain, correct?
4        A   There's multiple formal channels that you can
5    complain, and most people don't use them because they're
6    terrified of retaliation and what will happen if -- if you
7    complain and you say things about powerful people.  Look at
8    what happened who tried to --
9        Q   I would appreciate it if you would not
10   speculate about what other people do and don't do and the
11   reasons therefore.  Do you understand?
12       MR. MAREK:  Objection.
13       MR. NOLAN:  Do you understand that?
14       MR. MAREK:  Objection.
15       THE WITNESS:  Well, I'm merely stating -- i
16   think that's very factual.  It's very well-known.  I've
17   talked to people that say I don't -- they -- they don't
18   want to complain against powerful doctors.
19   BY MR. NOLAN:
20       Q   I'm here to ask you questions about your
21   personal knowledge that relate to the facts of this case.
22   Do you understand?
23       A   I -- I understand what you're saying.
24       Q   I don't care about your baseless conspiracy
25   theories or your speculation --

## Page 370

1        MR. RUTTER:  Objection, argumentative.
2        MR. MAREK:  Objection.
3        MR. ELSTER:  Objection, argumentative.
4    BY MR. NOLAN:
5        Q   I want to know what you heard, what you saw.
6    Do you understand?
7        A   I -- I'm going through and talking about it.
8    If your hospital wants to have doctors --
9        Q   Do you understand that?
10       A   -- that sexually harass patients and not
11   do anything and make them ethics directors for a department
12   and then have them go around saying they've been accused
13   multiple times, that's Barnes Hospital's problem.
14       Q   You stated that you retained Mr. Marek back in
15   February of 2017.  What were the terms of that engagement?
16       MR. ELSTER:  Objection to the extent that
17   calls for privileged communication.
18       MR. NOLAN:  It doesn't.
19       MR. ELSTER:  Well, hold on.
20       Well, to the extent it calls for privileged
21   communications regarding the subject matter of the
22   representation and where do you find the --
23       THE WITNESS:  Are you asking for the -- are
24   you asking to see the retainer agreement?
25

## Page 371

1    BY MR. NOLAN:
2        Q   Was it on a contingency fee basis or hourly?
3        A   You'll have to talk to my attorneys on that.
4        Q   I'm not talking to your attorneys.  I'm
5    talking to you.
6        A   Okay.  I told you, you'll have to talk to my
7    attorneys.
8        Q   Are you refusing to answer my question?
9        A   The terms of my representation with an
10   attorney is privileged attorney/client information, sir.
11       Q   Your attorney's not making that objection.
12       MR. ELSTER:  I have made the objection.  I
13   asked him to the extent it calls for --
14       MR. NOLAN:  Are you instructing your witness
15   not to answer that question?
16       MR. ELSTER:  When you say terms, what do you
17   mean?
18       MR. NOLAN:  I just asked him was it
19   contingency or hourly.
20       Are you directing him not to answer?
21       MR. ELSTER:  I am directing him not to answer.
22   BY MR. NOLAN:
23       Q   Are you going to follow your attorney's
24   advice?
25       A   I -- I'm not going to answer on the terms of

## Page 372

1  my representation with my lawyer. That's very personal --
2      MR. ELSTER: I'd also lodge an additional
3  objection to discoverability. That's not proportional with
4  the needs of this case.
5      MR. NOLAN: Because you know it's not a valid
6  attorney/client privilege objection.
7  BY MR. NOLAN:
8      Q  All right. You claim that you retained
9  Mr. Malek [sic] back in February of 2017. That was roughly
10  several months into your residency program, correct?
11     A  Well, I started the residency program in June
12  of 2016, so Mr. Marek was -- so as I said, I retained legal
13  counsel in February of 2017, so that was, as you said,
14  several months into it.
15     Q  Okay. And did you retain Mr. Malek because
16  you believed there was fraud going on?
17     A  I retained Mr. Marek for -- for the reasons I
18  felt that I needed to have legal representation.
19     Q  Okay. That doesn't respond to my question.
20  Did -- did you retain him because you thought that there
21  was fraud going on?
22     A  I did think there was fraud going on at the
23  hospital.
24     Q  And is the basic nature of the alleged fraud
25  basically what you talked to Mr. Sullivan about yesterday?

## Page 373

1      A  Could you specify? I talked to Mr. Sullivan
2  about a lot yesterday.
3      Q  Right. The subject matter of the lawsuit.
4      MR. RUTTER: Objection, calls for a legal
5  conclusion, form of the question, vague?
6      MR. ELSTER: Objection.
7      MR. NOLAN: Come on.
8      THE WITNESS: You'll have to talk to my
9  attorneys if you want to know the -- the reason I retained
10  them.
11  BY MR. NOLAN:
12     Q  I'm asking you.
13     A  I'm -- I'm saying I retained my attorneys
14  because I felt I needed to get legal counsel. That is my
15  answer.
16     Q  You already told me 10 minutes ago that you
17  retained them because you said something about fraud and
18  illegal activity. Do you remember that?
19     MR. MAREK: Objection, argumentative.
20  BY MR. NOLAN:
21     Q  And now you're telling me you're not going to
22  answer my questions?
23     A  I'm not saying I'm not going to answer your
24  questions.
25     MR. MAREK: Objection, argumentative.

## Page 374

1      THE WITNESS: I'm saying that I retained my
2  attorneys because I felt I needed legal representation,
3  just like many other Americans do.
4  BY MR. NOLAN:
5      Q  Did you feel that there was fraud going on
6  back in February of 2017?
7      MR. RUTTER: Objection, calls for a legal
8  conclusion.
9      THE WITNESS: You'd have to talk to my
10  attorneys. I retained my attorneys because I felt there
11  was improper activities going on and I needed legal
12  representation.
13  BY MR. NOLAN:
14     Q  Did you believe some of the improper
15  activities were fraud?
16     A  Again, you'll have to talk to my attorneys as
17  I've already told you.
18     Q  I'm not talking to your attorneys. I'm
19  talking to you. This is my opportunity to depose you. You
20  understand that, right?
21     MR. MAREK: Objection, argumentative.
22     THE WITNESS: Yes, I completely understand
23  this is my opportunity to be deposed by you.
24  BY MR. NOLAN:
25     Q  Did you believe there was fraud going on back

## Page 375

1  in February of 2017?
2      MR. MAREK: Objection, calls for a legal
3  conclusion.
4      THE WITNESS: I retained my legal counsel
5  because I felt that I needed legal counsel because of
6  activities going on in the hospital.
7  BY MR. NOLAN:
8      Q  That didn't answer my question. Listen very
9  carefully, please. Did you believe there was fraud going
10  on back in 2017?
11     MR. RUTTER: Objection, asked and answered,
12  calls for a legal conclusion.
13     THE WITNESS: As I've said, I retained my
14  attorneys because I felt there was improper activity going
15  on at the hospital and I needed legal counsel.
16  BY MR. NOLAN:
17     Q  Do you understand my question? I'm not asking
18  you about why you retained your attorneys. I'm asking you
19  did you believe there was fraud going on back in February
20  of 2017.
21     MR. MAREK: Same objections.
22     THE WITNESS: I retained my attorneys because
23  I felt there was improper activities of the hospital and I
24  wanted legal counsel.
25     MR. NOLAN: I'd like the record to reflect

8 (Pages 372 to 375)

Page 376

1  that the witness is refusing to answer my question and
2  we'll be moving for sanctions.
3  BY MR. NOLAN:
4  **Q   What illegal activity did you believe was**
5  **going on back in February of 2017?**
6  MR. RUTTER:  Objection, calls for a legal
7  conclusion.
8  THE WITNESS:  As I said, I saw activities that
9  I thought were illegal and I wanted to get legal counsel to
10  represent me and my interests.
11  BY MR. NOLAN:
12  **Q   What -- what activities did you think were**
13  **illegal?**
14  A   As I said, I retained legal counsel to protect
15  myself and my interests.
16  **Q   That's not what I'm asking you.  What**
17  **activities did you see that you thought were illegal?**
18  A   As I said, you're asking me to give a legal
19  conclusion.  I retained counsel to protect my interests
20  because I thought there was improper activities going on at
21  the hospital.
22  **Q   And I'm asking you -- you telling me you saw**
23  **what you thought were illegal activities.  I'm asking you**
24  **what they were.**
25  A   And I'm answering.  I said I hired legal

Page 377

1  counsel because I felt there were improper activities going
2  on at the hospital to protect my interests.
3  MR. NOLAN:  Again, let the record reflect that
4  the witness is refusing to answer my questions and we'll be
5  moving for sanctions.
6  BY MR. NOLAN:
7  **Q   Back in February of 2017, did you gather any**
8  **documents or data that you thought related to fraud or**
9  **illegal activity?**
10  A   I didn't -- I said in February of 2017 I
11  retained legal counsel.  I did not gather any documents at
12  that point.
13  **Q   Did you send any documents or data to your**
14  **counsel, Mr. Malek, back in February of 2017?**
15  MR. ELSTER:  Objection --
16  MR. MAREK:  I'm sorry.  The record is going to
17  reflect Marek and Malek back and forth.  So you might want
18  to ask about the correct name if you want to use this
19  record.
20  THE COURT REPORTER:  And did you --
21  MR. ELSTER:  Yeah, I made an attorney/client
22  privilege objection, asking for communications to an
23  attorney.
24  THE COURT REPORTER:  And so if you guys want
25  me to get your objections --

Page 378

1  MR. ELSTER:  Okay.
2  THE COURT REPORTER:  -- yeah, you have to kind
3  of go one at a time here.  Thank you.
4  BY MR. NOLAN:
5  **Q   Did you provide any documents that you**
6  **obtained during your residency to your attorneys?**
7  A   Per discovery orders I provided documents to
8  my attorneys.
9  **Q   How about before the lawsuit was filed?**
10  A   Well, to -- to file a lawsuit most attorneys
11  want to see documents and evidence and then they will go
12  write a complaint and file a lawsuit.  So clearly I would
13  have given evidence and proof to my attorneys of my
14  contention for a lawsuit before it was filed.
15  **Q   So your answer is yes?**
16  A   Did I -- have I given documents to my
17  attorneys, yes, I have.
18  **Q   Before the lawsuit was filed?**
19  A   Yes, I've given documents --
20  **Q   Yes.**
21  A   -- to my attorneys before a lawsuit was filed.
22  **Q   Thank you.  You know, this process will go a**
23  **lot quicker if you just give a yes or no answer.**
24  MR. RUTTER:  It would also go a lot quicker if
25  you wouldn't make those types of comments that are

Page 379

1  completely unnecessary.
2  BY MR. NOLAN:
3  **Q   Do you understand that I'm limited to five**
4  **hours with you today?**
5  A   Yes, and you're limited because you guys tried
6  to do this deposition at a workers' comp one hour
7  deposition, which is why you're limited.
8  **Q   I would appreciate it if you would limit your**
9  **responses to the scope of my question so that this will go**
10  **a lot quicker.  Do you understand that?**
11  A   And I would appreciate it if your client
12  stopped harassing and blacklisting me.  I'm more than happy
13  to be deposed and answer questions.
14  **Q   Yeah, okay.  All right.  Did you provide any**
15  **documents that you obtained during your residency program**
16  **before -- to your attorneys before you resigned from that**
17  **program?**
18  MR. ELSTER:  Objection to the extent that
19  calls for privileged communications.
20  THE WITNESS:  I would have to think on exactly
21  what I provided to my attorneys, but I was -- I was in
22  touch with attorneys before I resigned from my program.
23  BY MR. NOLAN:
24  **Q   Okay.  But I'm asking you what documents or**
25  **data you had collected from the program during your time at**

## Page 380

1 the program that you provided to your attorneys.
2     MR. RUTTER: Objection to the form of the
3 question. It's vague.
4 BY MR. NOLAN:
5     Q   Do you understand that? Do you understand
6 that?
7     A   So you're asking me if I provided any document
8 to any attorney before I resigned?
9     Q   Yes.
10     A   Yes. I was in communication with attorneys
11 and provided them, you know -- I was in communication with
12 attorneys.
13     Q   What documents did you provide to them before
14 you resigned?
15     MR. ELSTER: Objection to the extent it calls
16 for privileged communications.
17     THE WITNESS: Here again I would have to think
18 on what documents I provided to them.
19 BY MR. NOLAN:
20     Q   Okay. Well, so let's -- let's think about
21 this. Back in February of 2017 you were already of the
22 belief there was fraudulent and illegal activity going
23 on such that you had hired attorneys, correct?
24     A   I retained --
25     MR. MAREK: Objection, calls for a legal

## Page 381

1 conclusion.
2     THE WITNESS: To the extent of, yes, I hired
3 attorneys in February because I felt I needed legal
4 representation.
5 BY MR. NOLAN:
6     Q   And if you thought that there was evidence
7 that would show fraud or illegal activity, you certainly
8 would have collected it, yes?
9     A   I would have -- I was on the lookout for any
10 evidence that showed activities that were inappropriate.
11     Q   And you would have collected it, yes?
12     A   Is this a specific thing you're referring to?
13     Q   No. I'm just asking you, you would have
14 collected it, yes? If you thought it was evidence of fraud
15 or illegal activity, you would have collected it, yes?
16     A   It -- it would depend on -- you know, this is
17 a very broad question. What type of a document are we
18 talking about?
19     Q   I don't know. You haven't told me yet. I
20 wouldn't know.
21     MR. MAREK: Objection, argumentative.
22 BY MR. NOLAN:
23     Q   I can't tell what documents, what specific
24 documents you collected while you were at the residency
25 program. You understand this is my opportunity to ask you

## Page 382

1 those questions?
2     A   I -- I understand, and you're asking me what I
3 gave to my attorneys and talked with my attorneys about.
4     Q   I'm now asking -- no. I'm asking you what
5 documents you collected while you were at the residency
6 program that you believe related to fraud or illegal
7 activity.
8     MR. RUTTER: Objection, calls for a legal
9 conclusion and invades attorney/client privilege and work
10 product.
11     THE WITNESS: Again, I said -- I told you, I
12 retained counsel and I worked with counsel.
13     MR. NOLAN: That wasn't my question. What
14 documents did you collect, that was my question.
15     MR. RUTTER: Same objection.
16     THE WITNESS: I'm just saying I -- I retained
17 counsel and I worked with counsel.
18     MR. NOLAN: Let the record reflect he's
19 refusing to answer my question. We'll move for sanctions.
20 BY MR. NOLAN:
21     Q   Before you left the residency program, did you
22 talk to anyone other than your attorneys about what you
23 believe to be fraudulent or illegal activity?
24     A   I believe I spoke with Gary Hammen. Gary
25 Hammen also had very -- had concerns about activities going

## Page 383

1 on at the hospital. And depending on what activity -- what
2 type of bullying, harassment and improper activities, I
3 believe I talked with many faculty members about different
4 activities that I had seen going on.
5     I believe I talked to different
6 administrators. I talked to Nicole Erter. I talked to
7 Rebecca McAlister. I talked to Tia Drake. I talked to
8 many people. I talked to Ombudsman James Fehr, who your
9 ombudsman left because of improper activities and went to
10 Stanford. I talked to your other ombudsman who was --
11 yeah, I talked with other individuals about concerns that I
12 had. I had a very wide variety of concerns.
13     Q   Anyone else that you reported your concerns
14 to?
15     A   I'm sure if I was given -- given a list of
16 people that I -- that I worked with and saw, that there's a
17 lot I spoke with about different things going on.
18     For example, I told Dr. Tseng, one of your
19 dermatology -- I talked with Dr. Tseng, one of your
20 dermatology residents that I was rotating with in internal
21 medicine, when -- when Melvin Blanchard asked me to be
22 engaged in immigration fraud issue.
23     That was when Dr. Tseng's visa expired. And
24 Melvin Blanchard said that what we were going to do was she
25 couldn't be there as a worker and her immigration attorney

## Page 384

1  said she couldn't be there, so he wanted me to give her my
2  log-in credentials so she could pretend to be a med student
3  and then just go and log-in and see patients.
4      And I talked -- that was one incident.  I
5  talked to Dr. Tseng about, I recommend she have her
6  immigration attorney call counsel at BJC in Wash U, which
7  they did, and then who yelled at the program director for
8  internal medicine you could not have somebody engage in
9  immigration fraud.  So, again, there were lots of
10  inappropriate things going on there that I wanted to not
11  participate in.
12      Q  Did you report any, what you believed to be
13  illegal activities, to any governmental agency or
14  government department?
15      A  I -- which -- which activities are we
16  referring to?  Just any activities?
17      Q  Yeah, any illegal activities.
18      A  I've -- I did talk about activities to the
19  EEOC, the Equal Opportunity -- you know, the EEOC, and I
20  met with them.  And I also contacted, at one point I
21  contacted the FBI, the Federal Bureau of Investigation.
22      Q  When was that?
23      A  I believe I spoke about -- I believe I spoke
24  with an FBI agent the first time about things going on back
25  in probably February or March of 2018 I believe.

## Page 385

1      Q  Why did you talk to someone at the FBI back in
2  February or March of 2018?
3      A  Well, that specific situation resolved to the
4  sham referrals that Wash U was -- and Barnes were doing to
5  doctors, to the Missouri Physicians Health Program to try
6  to tarnish their reputations for whistleblowers or people
7  talking about -- about anything that was inappropriate.
8  And there was actually two KSDK news stories that came out
9  on that, I believe, in 2019.
10      Q  You're talking about the PHP Program?
11      A  Yes, the Missouri Physicians Health Program
12  and Wash U and Barnes referral doctors that reported
13  improper activity to tarnish their reputations and silence
14  them.
15      Q  Did you provide any documents to the FBI
16  related to the allegations about the sham referrals to the
17  PHP?
18      A  I didn't provide documents to the FBI at that
19  point in time.
20      Q  Did you at any other point in time?
21      A  In the work that I've done I've provided
22  documents to the FBI about sham PHP referrals.
23      Q  When was that?
24      A  I'd have to check dates, but I believe I sent
25  one task force information back in, I believe that would

## Page 386

1  have been last -- last summer, probably June, July, August
2  of 2021.
3      Q  Did you produce those documents in this case?
4      A  I gave all documents I had to my attorneys.
5      Q  Did you produce those documents that you just
6  discussed to your attorneys?
7      A  I -- I gave all documents that I have to my
8  attorneys and they've represented me and produced or done
9  anything that was required and necessary.
10      Q  So, in other words, if -- any documents that
11  you provided to the FBI, if they've not been produced in
12  this case, it would be because your attorneys chose not to
13  produce them, yes?
14      MR. ELSTER:  Objection, argumentative.  And
15  we're still in the course and scope of discovery.
16      MR. NOLAN:  Yes?
17      MR. ELSTER:  Same objection.
18      THE WITNESS:  I -- I -- again, I have no
19  knowledge of my attorneys' productions.  They've done
20  productions on their own.
21  BY MR. NOLAN:
22      Q  Did you have any written correspondence with
23  anyone at the FBI about these matters?
24      A  About -- are you talking -- so I -- I've had
25  phone calls with the -- with the Federal Bureau of

## Page 387

1  Investigations.
2      Q  Do you understand what written correspondence
3  means?
4      A  Please feel free to enlighten me.
5      Q  Do you need me to enlighten you about what
6  written correspondence means?
7      A  Are we talking about letters or -- this isn't
8  a written correspondence.  This is typed-written, but it's
9  not a letter or a handwritten note.
10      Q  Well, thank you, I do believe you know what
11  written correspondence means.  So did you have any written
12  correspondence with the FBI?
13      A  I've -- I've had to -- I've had written
14  correspondence with the FBI --
15      Q  Okay.  Did you produce that?
16      A  -- about -- about matters involving Physicians
17  Health Program, and I've given all documents I have to my
18  attorneys.
19      Q  So you've given your written correspondence
20  with the FBI to your attorneys, is that what you're saying?
21      A  All that I'm saying is that any documents
22  related to this case that I've had, I have given to my
23  attorneys.
24      Q  Including written correspondence with the FBI?
25      A  As I said, I've given everything I have in

LEXITAS LEGAL
www.lexitaslegal.com  Phone: 1.800.280.3376  Fax: 314.644.1334

## Page 388

1   this case -- I'm just saying, everything I have involving
2   this case I've given to my attorneys.  We've given you over
3   60, 70,000 pages of documents.
4       Q   So if it's -- if it hasn't been produced, it's
5   because your attorneys chose not to produce them?
6       MR. MAREK:  Objection, argumentative, legal
7   conclusion as to discovery requests and obligations.
8       THE WITNESS:  And, again, I'm not the attorney
9   running the case and representing on this case.  I just
10  said I've given all documents to my attorneys.
11  BY MR. NOLAN:
12      Q   Okay.  Have you reported any other alleged
13  malfeasance to any other governmental agency?
14      A   I believe, to the best of my knowledge, it has
15  been to the EEOC and to -- and talking with the FBI on
16  Physician Health Program activities.
17          I'm trying to think if there's any other
18  government agency that I've contacted.  And from some of
19  the work that I do, I've talked to different government
20  agencies in the past.  But I believe, to the best of my
21  memory, those are the agencies that I had reported to.
22      Q   Did you disclose your communications with the
23  FBI in your interrogatory answers in this case?
24      A   Well, let's go to the interrogatory answers.
25  My attorneys put those together and wrote them.

## Page 389

1       MR. MAREK:  You need to clarify whether all of
2   these contacts with the FBI related to your case or were
3   they related to the representation --
4       MR. SULLIVAN:  You're not entitled to ask --
5   you're not entitled to ask questions at this point.
6       MR. MAREK:  You want to be able to use this
7   record, right?  So I'm trying to help you with this.
8       MR. NOLAN:  Please stop trying to coach your
9   witness.
10      MR. MAREK:  I'm not coaching anybody.
11      MR. RUTTER:  Well, the record would --
12      MR. MAREK:  I'm not talking to him.
13      MR. NOLAN:  You're limited to making
14  objections --
15      MR. MAREK:  What I'm telling you is that --
16      MR. NOLAN:  -- concise objections.
17      MR. MAREK:  Okay.  All right.  If you want to
18  use the record, then you should straighten it out.  If you
19  don't want to use it, then I won't help you.
20      THE COURT REPORTER:  Did you want to say
21  something?
22      MR. RUTTER:  He -- he covered it.
23      (Thereupon, Defendant Exhibit B1 was marked
24  for identification.)
25      THE WITNESS:  Okay.

## Page 390

1   BY MR. NOLAN:
2       Q   Handing you what's been marked Exhibit B1.  Do
3   you recognize that document?
4       A   This appears to be the interrogatories.  And
5   what date are these?
6       THE COURT REPORTER:  I need you to speak up,
7   please.
8       THE WITNESS:  Oh, sorry.
9       THE COURT REPORTER:  That's okay.
10      THE WITNESS:  This document appears to be the
11  interrogatories.  And I believe this one was filed on --
12  sorry, was this from March 31st of 2021?  I know there's
13  been some updates to them.
14  BY MR. NOLAN:
15      Q   Thank you.  And would you turn to the second
16  to last page.  Do you see that?  You signed under the
17  verification section?
18      A   Yes, I see my signature there.
19      Q   Okay.  And when you signed it, you signed
20  under the verification which states, under penalties as
21  provided by law, the undersigned certifies that the
22  statements set forth in this instrument are true and
23  correct, except as to matters therein stated to be on
24  information and belief, and as to such matters, the
25  undersigned certifies as aforesaid that he verily believes

## Page 391

1   the same to be true.
2           Did I read that correctly?
3       A   That's what's written there.
4       Q   Okay.  Would you turn to Page 4 of Exhibit B1.
5   And as an attorney you understand that interrogatories are
6   our opportunity to ask you written questions to which you
7   are supposed to provide full and truthful responses, yes?
8       MR. RUTTER:  Objection, calls for a legal
9   conclusion.
10      THE WITNESS:  You'll have to ask my attorneys
11  about legal conclusions.
12  BY MR. NOLAN:
13      Q   You understand that, correct?
14      A   Again, you'll -- you'll have to ask my
15  attorneys to make legal conclusions.
16      Q   You understand what an interrogatory is, yes?
17      MR. MAREK:  Objection, asked and answered.
18      THE WITNESS:  As I said, if you're asking for
19  a legal definition of interrogatories, you'll have to talk
20  to my attorneys.
21  BY MR. NOLAN:
22      Q   I'm talking to you.  Do you know what an
23  interrogatory is?
24      A   What is your definition of an interrogatory?
25      Q   I'm asking you.  Do you know what an

LEXITAS LEGAL
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 392

1  interrogatory is?
2      A   As I said, interrogatories are questions that
3  a party in a lawsuit asks you a number of question.  They
4  are if an attorney will gather data and fill them out, and
5  if an attorney will supplement them, if necessary, during
6  the course of a lawsuit.
7      Q   You understand that you're supposed to provide
8  full and truthful responses to them, yes?
9          MR. RUTTER:  Objection, calls for a legal
10  conclusion.
11         THE WITNESS:  Again, I had my attorneys fill
12  these out and put them together.
13  BY MR. NOLAN:
14      Q   That wasn't my question.  Do you remember my
15  question?
16      A   Can you please restate it.
17      Q   You understand that these written questions
18  that you're supposed to give full and truthful responses
19  to, yes?
20      A   You know, again, I -- you know, I provided
21  accurate information to my attorneys and they put together
22  documents for my case.
23      Q   Full and truthful information, you know that's
24  what's required, right?
25         MR. RUTTER:  Objection, calls for a legal

## Page 393

1  conclusion.
2          MR. ELSTER:  Objection, legal conclusion.
3          THE WITNESS:  Again, I'm -- I am not an expert
4  in interrogatories.  I've given information to my attorneys
5  and they have filled it out and put it together.
6  BY MR. NOLAN:
7      Q   You see here in Interrogatory 2 we basically
8  ask you to identify each person other than your attorney
9  who has knowledge of the facts of this matter, right?
10      A   Yes, I see everything right there.
11      Q   Do you identify the -- anyone at the FBI in
12  response to this interrogatory?
13         MR. ELSTER:  Objection, legal conclusion as to
14  what's responsive to this interrogatory and it's also
15  subject to objection.
16         THE WITNESS:  Well, again, I -- I talked with
17  my attorneys about, I gave them information on my case and
18  the people involved with it, and they put together my full
19  interrogatories here.  I'm not representing myself on this.
20  BY MR. NOLAN:
21      Q   That wasn't my question.  Do you remember my
22  question?
23      A   Can you please repeat the question?
24      Q   Did you identify anyone from the FBI in
25  response to Interrogatory Number 2?

## Page 394

1          MR. ELSTER:  Same objections.
2          THE WITNESS:  I spoke with my attorneys about
3  the matter and who I -- I -- who was involved in, who I had
4  spoken with and that.
5          And to note, there's hundreds of employees at
6  Barnes-Jewish or Wash U that were aware of what was going
7  on with my situation and going on at the hospital at time
8  period.  And, I mean, as I said, there's nurses I worked
9  with on a daily basis that -- or not a daily.  It could be
10  different floors, different people that probably saw that
11  there was abuse or harassment going on.  So, and, again --
12         MR. NOLAN:  Move to strike as nonresponsive.
13  BY MR. NOLAN:
14      Q   Is anyone from the FBI listed in response to
15  Interrogatory 2?
16         MR. ELSTER:  Objection, the document speaks
17  for itself.
18         THE WITNESS:  The document is here.  The
19  document's here.  I've -- I've listened to my attorneys.
20  They're taking the story from me and put down the
21  information on who was relevant and listed people in here.
22  You'll have to talk to them about who they put down and
23  why.
24         MR. NOLAN:  Move to strike as nonresponsive.
25

## Page 395

1  BY MR. NOLAN:
2      Q   Look at Interrogatory Number 3.  We asked you
3  to please identify each person other than your attorney
4  with whom you have communicated regarding the claims set
5  forth in your complaint.  Do you see that?
6      A   Yes.  I'm reading it right now.
7      Q   Okay.  And you did indicate that you sent a
8  complaint to the EEOC, yes?
9      A   Yes, I did send a complaint to the EEOC.
10      Q   Where do you indicate in your response to
11  Interrogatory Number 3 that you spoke to someone at the
12  FBI?
13         MR. ELSTER:  Objection, the document speaks
14  for itself.
15         THE WITNESS:  And, again, I told my attorneys
16  about my case and my situation and they generated this
17  document.  You know, I --
18         MR. NOLAN:  Move to strike as nonresponsive.
19  BY MR. NOLAN:
20      Q   Where in your response to Interrogatory
21  Number 3 do you indicate that you spoke to someone at the
22  FBI?
23         MR. MAREK:  Objection, asked and answered.
24         MR. ELSTER:  Objection.
25         THE WITNESS:  And, again, I told my attorneys

## Page 396

1  about my case and my situation and everything going on and
2  they generated the document.  I'm not representing myself.
3  BY MR. NOLAN:
4      Q   You signed this verification under penalties
5  as provided by law.  You understand that it's perjury to
6  lie in response to an interrogatory like this, yes?
7          MR. ELSTER:  Hold on.  Objection, legal
8  conclusion and mischaracterizes the evidence.  Real
9  briefly, these are signed in March of 2021.  He's testified
10  as to July 2021.
11          You can answer subject so that.
12          THE WITNESS:  Yeah.  I stated that, you know,
13  I signed this document.  And as I said, my attorneys
14  generated this interrogatory document based on the
15  information that I gave them.
16  BY MR. NOLAN:
17      Q   Let's look back at your response to
18  Interrogatory Number 2.
19      A   Okay.
20      Q   With regards to people who have knowledge of
21  the facts of this matter, you identified a number of people
22  indicated by the lettering system from A going all the way
23  to four N's on Page 15.  Do you see that?
24      A   Four N's?
25      Q   Four N's as in Nancy.  Do you see that on

## Page 397

1  Page 15?
2      A   Yes.  I see that right now.
3      Q   Okay.  So your answer runs from Page 4 to 15,
4  where you list individuals with knowledge of the facts of
5  this matter, yes?
6      A   The document lists people with facts in the
7  matter and knowledge of it.  And let me just say, there is
8  likely hundreds of other people at Barnes and Wash U that
9  worked with me that saw what happened to me and saw
10  different inappropriate things going on there.
11      Q   Do you know how many times you indicated in
12  your answer that one of these individuals worked for BJH?
13      A   Well, I'm more -- I am more than happy to look
14  at it right now.  Physicians who worked for Wash U.  Let's
15  see, I believe Nicole Erter worked with Barnes-Jewish.
16          THE COURT REPORTER:  I can't hear you, sir.
17          THE WITNESS:  I believe Nicole Erter worked
18  with Barnes-Jewish.
19  BY MR. NOLAN:
20      Q   That's on Page 11?
21      A   Okay.
22      Q   Is that right?
23      A   Yes.
24      Q   Okay.  Do you indicate in your answer to
25  Interrogatory 2, that any of these other individuals with

## Page 398

1  knowledge worked at Barnes-Jewish Hospital?
2      A   Well, it's a consortium.  Barnes-Jewish and
3  Wash U are very often the same entity.
4      Q   That wasn't my question.
5      A   Raj Dang is an ENT resident.
6      Q   My question is how many times in your answer
7  did you indicate that one of these people worked at
8  Barnes-Jewish Hospital?
9      A   I would have to read the entire document.
10  This document was generated over a year ago.
11      Q   Well, can you point anywhere else in your
12  answer to Interrogatory Number 2 where you indicated that
13  one of these people that you claim has knowledge about the
14  facts of the matter worked at Barnes-Jewish Hospital?
15      A   Well, as I'm going through this, for example
16  and I --
17          (Reporter clarification.)
18          THE WITNESS:  Well, I'm going through this
19  right now.  And, again, many of these employees, Lauren
20  Gibson, is she employed by Barnes or Wash U?  I --
21  BY MR. NOLAN:
22      Q   Did you indicate next to her name that she
23  worked at Barnes-Jewish Hospital?
24          MR. ELSTER:  Objection, best evidence rule.
25  The document speaks for itself.

## Page 399

1          THE WITNESS:  Yeah.  No, I mean, I gave all
2  the names of -- of people that could come to mind at that
3  time that might have knowledge that could be relevant to
4  the case to my attorneys and they generated this document.
5  BY MR. NOLAN:
6      Q   That wasn't my question.
7      A   Yes.
8      Q   How many times did you write Barnes-Jewish
9  Hospital in your answer to Interrogatory Number 2?
10      A   I didn't write this document.  My attorneys
11  wrote this document.
12      Q   Okay.  How many times did they write it?
13      A   All right.  Well, then let's go through the
14  entire document.  Let's see, Alex Evers, chair anesthesia,
15  Wash U Saint Louis.
16      Q   Did -- is the name --
17      A   I don't see that.
18      Q   Are the words Barnes-Jewish Hospital next to
19  his name?
20      A   He does not have the Barnes-Jewish Hospital
21  next to him.
22      Q   Please just indicate to me which names have a
23  written indication that they work at Barnes-Jewish
24  Hospital.
25      A   So I know Nicole Erter, resource -- human

1    resources director --
2    (Reporter clarification.)
3    THE WITNESS:  I'm sorry.  Nicole Erter, human
4    resources director, Barnes-Jewish Hospital, Saint Louis,
5    Missouri.  There's other people that -- there's many people
6    that I know you might work for Barnes or Wash U and flip
7    back and forth.
8    BY MR. NOLAN:
9    **Q   That wasn't my question.**
10    A   You want to know how many worked for Barnes,
11    all right.
12    **Q   No.  I want to know how many times the words**
13    **Barnes-Jewish Hospital are written in your answers to**
14    **Interrogatory Number 2.**
15    MR. ELSTER:  Same objection, best evidence
16    rule.
17    THE WITNESS:  I'm scanning this as quickly as
18    I can.  I don't suppose you'd want to pull it up on your
19    computer and we can hit Control F and find it very rapidly
20    how many times the word Barnes is in the interrogatory
21    answer?
22    All right.  I see Nicole Erter is the one.
23    And I see many other people that work at both Barnes, Wash
24    U, going back and forth and some that are just at Barnes
25    that it doesn't have Barnes next to their name.

1    MR. NOLAN:  Move to strike the nonresponsive
2    portion of the question.
3    BY MR. NOLAN:
4    **Q   So the only person that you indicated in**
5    **response to Interrogatory 2 that had personal knowledge of**
6    **the facts of this matter that you indicated worked at**
7    **Barnes-Jewish Hospital was Nicole Erter, fair?**
8    MR. ELSTER:  Objection, mischaracterizes the
9    interrogatory question.
10    THE WITNESS:  That -- that's not accurate at
11    all.  There's other people that I -- I believe Sharon Stark
12    where it says program coordinator, Washington University
13    Saint Louis, I -- I believe she -- she was probably
14    employed by Barnes.  Lauren Gibson.  There's others that's
15    probably employed by Barnes.
16    BY MR. NOLAN:
17    **Q   Sir, there's only one name that you associate**
18    **with Barnes-Jewish Hospital in your answer to**
19    **Interrogatory 2, correct?**
20    A   Well, there -- there are more names here that
21    associate with it.  And I'll pull one up for example and
22    what was written on it if you give me one second.
23    Rajan Paul Dang, M.D., ENT resident, Saint
24    Louis, knowledge of Benzinger's harassment of residents.
25    Dr. Dang was an employee of Barnes Hospital.

1    **Q   Did you say Barnes-Jewish Hospital?**
2    A   It doesn't say Barnes-Jewish Hospital.  Is
3    it -- is it Barnes, Barnes-Jewish, Barnes-Jewish Christian?
4    There's multiple names for the hospital group.  But it's
5    pretty apparent that anybody would know that if you're an
6    ENT resident, residents are employed by Barnes, and
7    fellow -- and I believe it's fellows and attendings that
8    switch over to Wash U at some point.
9    But -- and -- and the other thing I'll mention
10    was many people had employment between multiple entities
11    and switched back and forth --
12    (Reporter clarification.)
13    THE WITNESS:  Many people had employment
14    between multiple entities and would switch back and
15    forth between entities.
16    (Thereupon, Defendant Exhibit B2 was marked
17    for identification.)
18    BY MR. NOLAN:
19    **Q   I'm handing you what's been marked Exhibit B2.**
20    **Those are your supplement interrogatory answers, yes, to**
21    **BJH's interrogatories?**
22    A   I believe this is -- let me see which date
23    they sent this in.  I believe this was sent September 9th,
24    2022.  This is a supplement interrogatory answer.
25    **Q   Did you review these before they were**

1    produced?
2    A   I believe I saw this document before it was
3    produced.
4    **Q   And did you confirm that the statements set**
5    **forth in those supplemental responses are true and correct,**
6    **except as to matters therein stated to be on information**
7    **and belief and as to such matters you believed they were**
8    **true?**
9    A   Well, I -- I didn't sign this document.  I had
10    my attorneys file it.  My attorneys filed the document.
11    **Q   Right.  But you reviewed it, right?**
12    A   I -- I did a brief review of the edits that
13    were made to the document.
14    **Q   And did you believe that it was all true and**
15    **accurate?**
16    A   Well, the edits I looked at were true and
17    accurate.  I -- I don't recall that I read all 25 pages.  I
18    just looked at the additional information that was being
19    added to it.
20    MR. NOLAN:  Okay.  On a break I would ask that
21    you have him sign the verification.
22    MR. ELSTER:  Okay.  Yeah, we'll supplement.
23    We wanted to get the information to you before the
24    deposition.
25    MR. NOLAN:  I appreciate that.

## Page 404

1  BY MR. NOLAN:
2      Q   All right.  So B2 is your supplemental answers
3  to BJH's interrogatories, the same interrogatories we
4  looked at in B1, yes?
5      A   B2 is an updated version of the interrogatory
6  answers.
7      Q   So you recently had the opportunity to go
8  through your interrogatory answers and supplement and add
9  to them, yes?
10     A   Well, my attorneys did, and they -- they added
11 supplemental information.  I believe in specific -- I
12 believe they specifically tagged paragraphs says
13 supplemental answer and added -- and added new information.
14     For example, talking about my transcripts
15 being hidden, the ACGME trying to get my transcripts and
16 you and your counsel, Ramatowski and I bet Joe --
17     (Reporter clarification.)
18     THE WITNESS:  And I believe my counsel put in
19 supplemental answers, and one example of that was the
20 information learned from the ACGME about my transcripts
21 being hidden and it going up all the way to Attorneys
22 Ramatowski and Joseph Lasky discussing how to hide my
23 transcripts.
24 BY MR. NOLAN:
25     Q   Did you supplement your interrogatory answer

## Page 405

1  to Number 2 to include anyone from the FBI?
2      MR. ELSTER:  Objection, best evidence rule.
3  The document speaks for itself.
4      THE WITNESS:  Yeah, do the document is the
5  document.  And I, you know, I gave my attorneys information
6  about the situation and they drafted the document as -- as
7  necessary.
8  BY MR. NOLAN:
9      Q   Well, thank you for telling me that the
10 document is the document.  My question was, did you include
11 in your answer to Interrogatory Number 2 the identity of
12 anyone from the FBI.
13     MR. ELSTER:  Same objection.
14     THE WITNESS:  Yeah, you said the document --
15 the information in the document is in the document.
16 BY MR. NOLAN:
17     Q   Thank you.  It's a yes or no question.  Did
18 you include the identify of anyone from the FBI in your
19 supplemental answer to Interrogatory Number 2?
20     A   And I just said the document speaks for
21 itself.  The document is the document.
22     Q   Sir, my question is quite simple, and I
23 believe it fairly calls for a yes or no answer.  Did you
24 identify anyone from the FBI in your supplemental answer to
25 Interrogatory Number 2?

## Page 406

1      A   As I said, the document has the names of
2  everybody that -- that my attorneys put in it.  That's
3  just -- that's the answer to the question.
4      MR. NOLAN:  Let the record reflect the witness
5  is refusing to answer my question and we'll be moving for
6  sanctions.
7      THE WITNESS:  Do you mind if we take a
8  bathroom break for a few minutes?
9      MR. NOLAN:  That would be fine.  Just for the
10 record, would you please have him sign that verification to
11 B2 while we're on the break.
12     MR. ELSTER:  That's fine with me.
13     THE VIDEOGRAPHER:  Going off record at
14 approximately 10:10 a.m.
15     (Thereupon, a recess was taken, after which
16 the following proceedings were had:)
17     THE VIDEOGRAPHER:  We're back on record at
18 approximately 10:24 a.m.
19 BY MR. NOLAN:
20     Q   Sir, we just took a brief break.  While you
21 were on break, did you sign the verification page on
22 Exhibit B2?
23     A   Yes, sir, I did.  I signed the verification
24 page on the supplemental interrogatory B2, Page 24.
25     Q   Thank you.

## Page 407

1      Let me shift gears just a little bit.  I
2  noticed that there's two armed police officers sitting
3  outside the conference room in which the deposition is
4  taking place.  Do you have an understanding as to why
5  they're here?
6      A   Yes.  My legal team wanted to have security
7  for the deposition.
8      Q   Do you feel it's necessary to have two armed
9  police officers here at your deposition?
10     MR. ELSTER:  Objection, relevance discovery
11 portion.
12     THE WITNESS:  You know, I -- you know, I took
13 the advice of my legal team to have, you know, security
14 present at the deposition.
15 BY MR. NOLAN:
16     Q   Okay.  That wasn't my question.
17     Do you feel it's necessary to have two armed
18 police officers sitting outside this conference room?
19     MR. ELSTER:  Same objection.
20     THE WITNESS:  I -- I -- so I guess I just
21 answered.  My attorneys thought it was necessary, so I
22 agreed with them.  I would think it's necessary since they
23 think it's necessary.
24 BY MR. NOLAN:
25     Q   Did they say why they thought it was

## Page 408

1 necessary?
2     MR. MAREK: Objection, privileged.
3     MR. ELSTER: Objection to the extent it's
4 privileged communications.
5     MR. NOLAN: You guys have already waived it.
6     MR. MAREK: No, that's incorrect, no.
7     MR. ELSTER: We haven't.
8     MR. MAREK: Instruct the witness not to answer
9 about communications between him and his attorneys on any
10 subject.
11 BY MR. NOLAN:
12     Q   Are you going to follow your attorneys' advice
13 and refuse to answer my question?
14     A   Yes, sir. I would just say, as I said again,
15 my attorneys felt it was necessary to have police officers
16 here, so I agreed with them as having it. The reasons they
17 decided to have them here were -- were the reasons they
18 decided.
19     Q   Well, do on your own feel it's necessary to
20 have armed police officers here?
21     MR. RUTTER: Objection, asked and answered.
22     THE WITNESS: Well, if my -- if my attorneys
23 feel something is necessary, then on my own I agree with my
24 attorneys, and I -- I think they're very talented attorneys
25 and do things for reasons.

## Page 409

1 BY MR. NOLAN:
2     Q   Who's paying for them to be here?
3     A   I believe -- I believe the law firm is paying
4 for them to be here. My attorneys are paying for them to
5 be here.
6     Q   Is part of your agreement with the law firm
7 that you will reimburse them for any expenses or costs
8 related to the lawsuit?
9     A   I would have to look at the retainer and the
10 details on it. My apologies, I have not looked at that,
11 sincerely I have not looked at the retainer in a long time,
12 a number of months at the very least. So I'm -- I'm happy
13 to take a look and refresh on that. You know, again --
14     Q   Did you feel physically threatened yesterday
15 during the deposition?
16     MR. ELSTER: Objection, discovery relevance.
17     THE WITNESS: I mean, you know, I didn't -- I
18 didn't feel threatened during this deposition. Nobody's
19 yelled at me. Nobody's threatened me.
20 BY MR. NOLAN:
21     Q   Is there anyone in the room that you feel
22 intimidated by?
23     MR. ELSTER: Same objection.
24     THE WITNESS: Well, I can say when I was --
25 when I was a resident, I certainly was very, very scared of

## Page 410

1 your client's administration, very scared of Attorney
2 Ramatowski and what could happen to my career. But right
3 now, I'm not intimidated or scared of the attorneys and
4 Barnes administration or Wash U administration.
5 BY MR. NOLAN:
6     Q   Yesterday Mr. Sullivan asked you about
7 photographs that you took using your phone of
8 Dr. Benzinger's email account. Do you recall those?
9     A   Yes, I recall discussing with him abut that.
10     Q   Do you recall the date that you took those
11 photos?
12     A   On my phone, either it was -- it was in
13 December of 2017. I -- I believe it was the 17th. Or was
14 it the 13th? I apologize.
15     Q   Do you still have the original photographs?
16     A   I do not have the -- I do not have any of
17 those documents.
18     Q   What happened to the original photographs?
19     A   Well, I gave -- I gave everything to my
20 attorney, and then they -- then they said that since they
21 had possession of them, they then -- they -- they then
22 removed them from the device they were captured with.
23     Q   So your attorneys told you to delete the
24 original photographs?
25     MR. ELSTER: Objection, argumentative, form.

## Page 411

1     MR. MAREK: Objection, privileged.
2     MR. ELSTER: Privileged information.
3     MR. MAREK: Instruct the witness not to
4 answer.
5 BY MR. NOLAN:
6     Q   Are you going to follow your attorney's advice
7 and refuse to answer my question?
8     A   Yes, sir.
9     Q   So you intentionally deleted the original
10 photographs that you took of Dr. Benzinger's emails?
11     MR. ELSTER: Objection, foundation,
12 argumentative.
13     THE WITNESS: I gave my attorneys my devices
14 and they -- they removed -- they -- as I said, I gave my
15 attorney all the information I had, all devices. They took
16 them to compile them for the lawsuit, and they -- they
17 removed them from my devices.
18 BY MR. NOLAN:
19     Q   You're saying that your attorneys deleted the
20 original photographs that you took of Dr. Benzinger's
21 emails from your device?
22     MR. ELSTER: Objection, argumentative,
23 foundation.
24     THE WITNESS: Well, again, you know, we --
25 there's a whole process of putting together all the 60,000

LEXITAS LEGAL
www.lexitaslegal.com        Phone: 1.800.280.3376        Fax: 314.644.1334

Page 412

1  pages of discovery.  I'd have to think on exactly how --
2  the steps of that working with my attorneys.  But, again, I
3  gave -- you know, I gave them everything I had and I didn't
4  retain anything that they didn't want me to retain.
5  BY MR. NOLAN:
6  **Q   Who deleted the original photographs from your**
7  **phone?**
8  MR. ELSTER:  Same objection, vague as to
9  original photograph on a phone.
10  THE WITNESS:  So, you know, again, just noting
11  that, you know, I took images on my phone, and when we
12  were -- when we were transferring all the documents, they
13  were removed.  I don't remember who explicitly -- I don't
14  remember the exact details of the transfer.  We were
15  moving -- you know, we were -- I was giving all my
16  discovery information to my attorneys.
17  BY MR. NOLAN:
18  **Q   Sir, you understand you're under oath, right?**
19  A   Yes, I do.
20  **Q   Okay.  Earlier you just told me that your**
21  **attorneys told you to delete them, right?**
22  MR. MAREK:  Objection.
23  MR. ELSTER:  Objection, yeah.
24  Mischaracterizes his testimony and privileged information.
25

Page 413

1  BY MR. NOLAN:
2  **Q   Right.**
3  A   No, I said my attorneys -- it's exactly what I
4  said before, my attorneys did not want me to retain those,
5  so I did not retain those.
6  **Q   So they told you to delete them, yes?**
7  MR. ELSTER:  Objection, attorney/client
8  privilege.
9  MR. MAREK:  Objection, calls for privileged
10  information.  Instruct the witness not to answer.
11  MR. SULLIVAN:  We've got two talking at the
12  same time again.  And we've already noted our objection
13  that this isn't necessary.
14  MR. MAREK:  Well, if you don't invade the
15  privilege, then nobody will need to talk.
16  THE COURT REPORTER:  Did you make an
17  objection?
18  MR. ELSTER:  I did.  Objected as to privileged
19  information and mischaracterizes his prior testimony.
20  Instruct you not to answer about attorney/client
21  communications.
22  BY MR. NOLAN:
23  **Q   Do you recall -- well, strike that.**
24  **Are you going to follow your attorney's advice**
25  **and refuse to answer my question?**

Page 414

1  A   I'm going to follow their advice and not
2  answer on how I processed discovery information with them.
3  **Q   You understand what spoliation is, correct?**
4  MR. ELSTER:  Objection, legal conclusion.
5  THE WITNESS:  What is that?
6  BY MR. NOLAN:
7  **Q   You don't know what spoliation is?**
8  MR. ELSTER:  Same objection.
9  THE WITNESS:  Please give me your definition
10  of it.
11  BY MR. NOLAN:
12  **Q   I'm asking you, do you know what spoliation**
13  **is.**
14  MR. ELSTER:  Same objection.
15  THE WITNESS:  I'm -- I'm asking your
16  definition of it.
17  BY MR. NOLAN:
18  **Q   It's a yes or no question.  Do you know what**
19  **it is or not?**
20  MR. ELSTER:  Same objection.
21  THE WITNESS:  You know, again, I'm asking
22  your -- your definition.  I -- my best understanding is
23  maintaining documents during a lawsuit.
24  BY MR. NOLAN:
25  **Q   Okay.  So you understand spoliation has**

Page 415

1  **something to do with intentionally destroying evidence,**
2  **yes?**
3  MR. ELSTER:  Objection, legal conclusion.
4  THE WITNESS:  You're asking me a legal
5  conclusion.  My attorneys would have to answer on that.
6  BY MR. NOLAN:
7  **Q   He didn't instruct you not to answer.  The**
8  **objection is noted.**
9  A   Can you please state the question again.
10  MR. NOLAN:  Can you read that back, please.
11  (Thereupon, the referred to question was read
12  back by the Court Reporter as recorded above.)
13  THE WITNESS:  Yes, I understand that's your
14  definition of it, or that's the definition of it.
15  BY MR. NOLAN:
16  **Q   Okay.**
17  A   And, again, I really don't believe anything
18  was destroyed or taken.
19  **Q   All right.  So on the date you took those**
20  **pictures, Dr. Benzinger and you were in some type of room**
21  **at the hospital, yes?**
22  A   We were in an operating room.
23  **Q   Okay.  And there was a computer there?**
24  A   Yes, there was my computer for the day, a
25  communal computer that I was assigned to for the day.

## Page 416

1  Q   Okay.  You say it was your computer.  You
2  didn't own the computer, did you?
3  A   I did not own the computer, but that's what I
4  was assigned to for the day.  That was my workstation.
5  Q   Well, Dr. Benzinger was working on that
6  computer, wasn't he?
7  A   Dr. Benzinger used it for few minutes
8  throughout the day.
9  Q   Okay.  And for you to open up, let's say your
10 email account, you have to use a user name and password,
11 yes?
12 A   I have to log-in with a user name and password
13 to get into my email and also to unlock the workstation,
14 which was -- the reason I said it was my workstation is
15 because I logged in with a user name and password and
16 unlocked it.
17 Q   And you understand that generally speaking
18 most people that want to log into their work email system
19 there, their work email account, have to enter a password,
20 yes?
21 MR. ELSTER:  Objection, speculation.
22 THE WITNESS:  Again, I can only state what
23 I -- what I do, but when I was there I would enter a
24 password to enter my email account.
25

## Page 417

1  BY MR. NOLAN:
2  Q   And you understood that because your email is
3  considered private and confidential, yes?
4  MR. ELSTER:  Objection, legal conclusion.
5  THE WITNESS:  You know, again, that's, you
6  know, that's a legal conclusion on that.  You're -- you're
7  asking me is it -- is the email private.
8  BY MR. NOLAN:
9  Q   Well, you didn't understand that your email
10 was open to the public, did you?
11 A   Well, my email was certainly open to other
12 Barnes individuals.  People would -- Benzinger sent emails
13 to my account.  And when people were working together, they
14 would regularly look up patients for the day that might
15 have been emailed out or just general information on dosing
16 or protocols that were in each other's email boxes.
17 Q   Is it your understanding that to access your
18 email account they would have to enter your password?
19 A   Well, they wouldn't have to if I would -- if I
20 had it open on the computer that you would share.
21 Q   Okay.  So they could only access your emails
22 if you had entered your password, fair?
23 A   Well, if I -- I would have to enter my
24 password and leave it open on the computer for them to be
25 able to use it, which many did.

## Page 418

1  Q   Did you ever give your password, your email
2  password out to anyone else?
3  A   I did not give my email password out to -- to
4  anyone else but myself.
5  Q   Did Dr. Benzinger ever give you his email
6  password?
7  A   Dr. Benzinger never gave me his email
8  password, nor did I take his email password at any time.
9  Q   Did Dr. Benzinger ever say to you, you can
10 access my email account?
11 A   Dr. Benzinger -- you're asking if he ever said
12 that exact term, you can access my email account?
13 Q   Yes.
14 A   I was never told those exact words by Richard
15 Benzinger.
16 Q   Did Dr. Benzinger ever verbally authorize you
17 to access his email account?
18 MR. RUTTER:  Objection, asked and answered.
19 THE WITNESS:  As I said, Dr. Benzinger never
20 told me verbally to access his email account or -- as you
21 stated.
22 BY MR. NOLAN:
23 Q   Did Dr. Benzinger ever in writing give you
24 authorization to access his email account?
25 A   He did not give me authorization in writing to

## Page 419

1  access my email account.
2  (Reporter clarification.)
3  THE WITNESS:  He did not give me authorization
4  in writing to access my email account -- or his email
5  account.
6  BY MR. NOLAN:
7  Q   Did anyone at Barnes-Jewish Hospital ever
8  verbally say to you that you had authorization to access
9  Dr. Benzinger's email account?
10 A   I don't recall anybody telling me verbally
11 that I had authorization to access Richard Benzinger's
12 email account.
13 Q   How about in writing?
14 A   I don't have any documents in writing that I
15 can -- saying that.
16 Q   Did anyone from Wash U ever say that you had,
17 verbally say that you had authorization to access
18 Dr. Benzinger's email account?
19 A   I'm sorry, can you say it one more time.
20 Q   Did anyone from Wash U ever give you verbal
21 authorization to access Dr. Benzinger's email account?
22 A   I didn't receive verbal authorization from
23 anybody at Wash U, just like he didn't receive verbal
24 authorization to access mine.
25 Q   How about written from Wash U?

## Page 420

1    A   I didn't have written authorization from Wash
2    U, nor did he have written authorization to access my email
3    account, which he has done.
4         Q   Now, you didn't begin snapping those pictures
5    of Dr. Benzinger's emails until after he left the room,
6    correct?
7         A   That is correct.  He -- I came back in from my
8    break that he gave me and he immediately left the room.
9         Q   And that was because you knew that
10   Dr. Benzinger would not want you to look at his emails,
11   yes?
12        MR. ELSTER:  Objection, argumentative.
13        THE WITNESS:  He just immediately left the
14   room.  That's why -- he immediately left the room.  He
15   wasn't there.
16   BY MR. NOLAN:
17        Q   You knew he would not want you to access his
18   emails, yes?
19        MR. ELSTER:  Same objections.
20        THE WITNESS:  In -- in all sincerity, I didn't
21   know that at that time for one reason, and I'll give a, you
22   know the answer on that was he left emails about me up that
23   were talking about front running and falsifying evaluations
24   that were just sitting there.
25        I took that as him -- I first thought when I

## Page 421

1    saw that was he was trying to threaten me or warn me to
2    resign or leave.  And that was literally showing all the
3    front running and false evals that had been going on for
4    the past year, or over a year.
5    BY MR. NOLAN:
6         Q   Well, when Dr. Benzinger came back in the
7    room, did you tell him that you had accessed his emails?
8         MR. RUTTER:  Objection to the extent that it
9    calls for a legal conclusion.
10        THE WITNESS:  So when -- when we're -- at the
11   end of the day, Richard Benzinger, when he came back in the
12   room, we were talking about the day and working together,
13   and he said he had been in my email box.
14        (Reporter clarification.)
15        THE WITNESS:  He said that he had been in my
16   email box.  And I told him that also seen emails from
17   his box.  And I -- you know, so he knew that I had been in
18   his email box.
19   BY MR. NOLAN:
20        Q   You told Dr. Benzinger the day you took the
21   photographs of his email that you had been in his emails
22   and saw the emails about you?
23        MR. ELSTER:  Objection, asked and answered.
24        THE WITNESS:  Yes.  Yes, I told him that he
25   had -- that he had -- we had been in each other email

## Page 422

1    boxes.  He had accessed mine and I had accessed his.
2         And I -- I was very concerned that day because
3    I saw all the front running they were denying that they had
4    ever contacted a rotation in advance about me or anybody.
5    It was just all right -- right there in front of me when I
6    came in.  I was very concerned and, you know, I told
7    him that I had seen this.
8    BY MR. NOLAN:
9         Q   Yeah.  So it wasn't all right there in front
10   of you, you had to click some buttons to go through all
11   those emails, didn't you?
12        A   Well, when I -- the way Outlook is set up is
13   if there's emails -- if there's emails to a specific term
14   that someone has open, there's -- they're in the left side
15   of the pane, or the left side of the window box where you
16   can see emails where normally it will have like an email
17   and a little blurb about something.
18        And then on the right side of the pane for
19   Outlook, like we probably all use, it has the details of
20   the email.  So I saw the first email that was open about
21   it, and I could also click on the other emails to see it
22   on.
23        Q   And you did click on them, right?
24        A   Yes, I did click on other emails that were
25   there.

## Page 423

1         Q   Right.  So you opened up emails which you
2    could not originally view when you first saw the computer
3    screen, right?
4         A   Well, I could partially view some of those
5    emails.  I -- I left-clicked on them to -- to show
6    additional text.  But there were emails about me on the
7    screen when I came in.
8         There was also an email that popped up from
9    Sharon Stark where when Outlook does notifications, you've
10   got a message, that was literally talking about me in what
11   rotation -- I -- I haven't seen this in a long time, but I
12   believe there was an email where it was notifying about
13   it's time to start talking about where Jeff and Gary Hammen
14   are going.
15        Q   So when you allegedly spoke to Dr. Benzinger
16   the day you took the pictures letting him know that you had
17   accessed his email account, did you talk to him about the
18   substance of any of the emails that you reviewed?
19        A   I talked very briefly that I saw what they
20   were doing and I saw that -- you know, I know they're front
21   running and I've seen this, and I talked very briefly on
22   it.  It was not a long conversation.  I did talk with him
23   though.
24        Q   What did Dr. Benzinger say when you told him
25   that you had accessed his email and you talked to him about

LEXITAS LEGAL
www.lexitaslegal.com        Phone: 1.800.280.3376        Fax: 314.644.1334

## Page 424

1    the substance of those emails that had to do with you?
2        A   He didn't really say much at that point, in
3    that conversation, to be quite honest.
4        Q   Just basically kind of said oh, okay, great,
5    have a nice day?
6        A   Well, I don't recall him saying okay, have a
7    nice day like that.  But, you know, like I said, we both
8    were in each other's email boxes and I've seen what -- I've
9    seen what's going on with the front running, and that was
10   pretty much it.
11       Q   That computer that you accessed
12   Dr. Benzinger's emails on, does it, after a certain amount
13   of time when there's no activity, does it shut itself off
14   or log itself out?
15       A   I don't recall the log-off times on that
16   computer.  I'd have to speculate.  I know there were
17   computers at Barnes that would stay on, and there were
18   computers at Barnes that would -- that would shut off.  But
19   I don't recall exactly the times for either of those.
20       Q   Well, certainly if it did have an auto log-off
21   feature, as long as you were clicking the buttons, that
22   would have prevented it from shutting off, right?
23           MR. RUTTER:  Objection, calls for speculation.
24           THE WITNESS:  Well, what I was going to say is
25   that the computer would not have shut off that day for one

## Page 425

1    simple reason, that computer was the computer for the
2    anesthesia workstation.  It was bolted on to the anesthesia
3    machine, the monitor, so it -- it would not have shut off
4    because there was an active case going on.
5            We were charting, using MetaVision, the EMR
6    there before Epic.  So that would have been on there for
7    charting purposes, as well as, you know, anything else that
8    was up there and open.  It would have stayed there.
9            And, additionally, when we -- when we do --
10   when we log into those things, you -- you -- you would -- I
11   would log into the work station and we'd normally leave our
12   workstations open because you don't want to shut down a
13   workstation and then -- and then reopen it up under another
14   user because it's -- because you -- you want to make sure
15   that your data and everything is there and it's not taking
16   a long time to load and to reload or anything.  So that's
17   just how it is.
18           You -- so I would log in in the morning when
19   we were doing pre-op stuff and I'd open up MetaVision, I'd
20   view things there, and normally I'd leave it open.  If I --
21   if I was given a break, very often, you know, you would
22   leave it open, go take a quick break while somebody --
23   somebody was -- was watching for you, and then you'd come
24   back to your station --
25           (Reporter clarification.)

## Page 426

1            THE WITNESS:  Where somebody was giving you a
2    break or covering and watching for you and then you'd come
3    back and you, know, resume your work on your -- on the
4    station you were using that day.
5    BY MR. NOLAN:
6        Q   Were any of the emails that you copied from
7    Dr. Benzinger's account addressed to you or were you copied
8    on them?
9        A   I don't -- I -- I don't recall every email
10   that I saw that was there.  I -- many of them, if not most,
11   were not addressed to me.  The emails that were up, what I
12   saw, it seemed they were all talking about me and Gary
13   Hammen and grouping me and Gary Hammen together.
14       Q   Okay.  So as you sit here today, you're not
15   aware of any of the emails that you took photos of that you
16   were actually copied or included on, yes?
17       A   I'm not aware of that today.
18       Q   Okay.  Did you review any of the emails while
19   you were standing there at the workstation?
20       A   I saw some -- I saw some of the emails.  I
21   didn't -- you know, I don't recall how in depth I -- I
22   looked at them, but I saw the emails and that they were
23   about me and that it was proof of all the front running and
24   activities that were occurring.
25           I'd -- I'd be very happy to go through them

## Page 427

1    with you if you wanted to show them.  I -- I haven't seen
2    those photos in nearly a year, or more than year probably.
3    So, again, I haven't looked at this stuff and you haven't
4    given them in discovery.  So I, you know, I haven't looked
5    at this stuff.
6        Q   Why were you in the OR at that point in time?
7        A   I was in the operating room because we were
8    doing -- we were doing a case at that point in time.
9        Q   So was there an operation that was ongoing
10   while you were looking at email?
11       A   I believe there likely was at that point since
12   I had been given a bathroom or other break for it.
13       Q   Was the patient under anesthesia?
14       A   Yes, the patient was on, in general, aside
15   from Brian Weber, we like to sedate our patients and put
16   them under anesthesia as opposed to paralyze them and
17   operate on them like one of my classmates Weber did once he
18   graduated.
19       Q   Were you acting as anesthesiologist during
20   that operation?
21       A   I was acting as a resident anesthesiologist
22   during that operation.
23           (Reporter clarification.)
24           THE WITNESS:  I was -- I was the resident
25   anesthesiologist during that operation.

## Page 428

1    THE COURT REPORTER:  Thank you.
2  BY THE WITNESS:
3    **Q   So while the patient was on the operating**
4  **table being cut on, under anesthesia, you were looking at**
5  **emails about yourself?**
6    MR. ELSTER:  Objection, argumentative, and
7  discovery relevance.
8    THE WITNESS:  Yes, I looked at those email
9  while there was an operation ongoing.  And what's not being
10  mentioned is that in the course of providing anesthesia for
11  cases, there's a flurry of activity at the very beginning
12  when you stayed and intubate.  There's a flurry of activity
13  at the end.  And you're regularly keeping things stable,
14  but there's lots of downtime.
15    And you can talk with your clients about this,
16  but they regularly will do studying, read journal articles,
17  write emails, respond to emails while cases are ongoing,
18  because there is lots of downtime in many cases.
19    Now, there's some cases where you're required
20  to focus on a patient.  But in this case there was
21  substantial downtime, otherwise I, you know, I would always
22  dedicate my time to the patient.
23  BY MR. NOLAN:
24    **Q   So your answer is yes?**
25    A   Yes.  As I said, there was a patient that was

## Page 429

1  having a procedure done.  If you pulled my case logs, I'm
2  happy to go through what was being done.  And I think that
3  would provide some insight as far as was anything actively
4  going on or were you just, you know, waiting for the
5  surgeons to finish up and do their thing.
6    **Q   The reason that you took the photographs of**
7  **the emails which you did was because you believed that they**
8  **had something to do with you, correct?**
9    A   I took those photos for a few reasons, one,
10  they were talking about me, and, two, they were talking
11  about improper activities at the hospital that I was
12  investigating.
13    **Q   You would only know that if you read through**
14  **them, correct?**
15    A   Yes, I would have to see context of the
16  emails.  And there was one that was open that I saw that
17  was talking about me, as well as there -- there were some
18  that I didn't have to read through, because, for example,
19  Outlook got a notification while I was at the station that
20  I believe -- I, again, haven't looked at this in a long
21  period of time, Sharon Stark was emailing about tracking me
22  and doing the front running.  And as you know with Outlook
23  there's blurbs of information that come out.
24    **Q   And did you click on that email from Sharon**
25  **Stark?**

## Page 430

1    A   It was, you know -- I don't recall if I -- if
2  I clicked on it through that or if it popped into the box
3  through the search that was done.  But, you know, I clicked
4  on the emails that were about me that -- that were there
5  that day.
6    **Q   Including Sharon Stark's?**
7    A   I -- I -- I -- I'd have to see if -- if I
8  took -- if I took a picture of it.  Again, I don't recall
9  every small interaction right now.  I'm happy to think on
10  it, but --
11    **Q   So you stood there and snapped 73 pictures of**
12  **Dr. Benzinger's emails, yes?**
13    A   I don't have the exact number because I
14  don't -- we haven't gotten that from you in discovery, but
15  I believe it was 73 some odd emails, which the picture --
16  73 some odd photos I took, which corresponded to 30
17  something emails in a handful of, I think, email chains.
18    **Q   And you understood that those emails included**
19  **information not just about you but about other people as**
20  **well, correct?**
21    A   Those emails were talking about Jeff Weisman
22  and Gary Hammen, the other resident who was bullied and
23  harassed with me and the other resident who was bullied so
24  badly that he eventually committed suicide not being able
25  to get back into the workforce as a boarded doctor.

## Page 431

1    MR. NOLAN:  Move to strike the nonresponsive
2  portion of the answer.
3    THE WITNESS:  Unless he and Ramatowski signed
4  a settlement agreement --
5    THE COURT REPORTER:  I did not get the rest of
6  what you said at all.
7    THE WITNESS:  Yes.  And I said -- what do you
8  have last?
9    THE COURT REPORTER:  I'm sorry?
10    THE WITNESS:  Where were you at again?
11    THE COURT REPORTER:  He committed suicide.
12    THE WITNESS:  Yes, he committed -- he
13  committed suicide from bullying and harassment.  And I
14  believe Gary Hammen signed a settlement agreement with
15  Christine Ramatowski where he was emailing and very upset
16  that she would not release his transcripts, program
17  director letters and other things unless he signed a
18  settlement agreement.  And I've seen those documents.
19  BY MR. NOLAN:
20    **Q   Move to strike the nonresponsive portion of**
21  **the answer.**
22    **Sir, I'm here to ask you questions about your**
23  **personal knowledge.**
24    A   Yes, it is.
25    **Q   I'm not here to listen to you give some speech**

Page 432

1  about something else.  Do you understand?
2      MR. ELSTER:  Objection, asked and answered.
3      MR. MAREK:  Objection.
4      MR. NOLAN:  I object to the fact that you are
5  wasting all of our time.  Do you understand that?
6      MR. ELSTER:  Objection, asked and answered,
7  badgering the witness.
8  BY MR. NOLAN:
9      Q   Do you understand that?
10     A   I understand that we need to move forward with
11  the deposition and let's move forward.  You asked me if
12  there were other people on there, yes.  And I provided
13  context on why there were other people on there.  I don't
14  know why --
15     Q   All I asked you was are other people on there.
16  It was a yes or no question.
17     MR. RUTTER:  He's answered your question.
18  Move on, please.
19     THE WITNESS:  I believe it was Gary Hammen,
20  and that was the other person that they were talking about,
21  Jeff Weisman and Gary Hammen, the two people they
22  continually were harassing and bullying.
23  BY MR. NOLAN:
24     Q   You understand when you took the oath at the
25  beginning of this deposition to give full and complete and

Page 433

1  truthful answers, they were supposed to be answers to my
2  questions, right?
3      MR. ELSTER:  Objection, asked and answered,
4  badgering the witness.
5      THE WITNESS:  Yes, I know.  I understand.
6  BY MR. NOLAN:
7      Q   You understand I don't want to hear what you
8  had for breakfast this morning or what your favorite
9  baseball team is.  Do you understand that?
10     MR. ELSTER:  Same objections.
11     THE WITNESS:  Yes, sir.  And I've not talked
12  about my baseball team or breakfast.  I'm talking -- you
13  asked me who else was on the emails, and I said Gary
14  Hammen.
15     And you're -- and you intentionally trying to
16  keep it vague to say other people as opposed to Gary
17  Hammen, the other resident that was bullied with me, that
18  was grouped with me all the time, who eventually killed
19  himself from the bullying.
20  BY MR. NOLAN:
21     Q   Would you please listen carefully to my
22  questions --
23     A   Yes.
24     Q   -- and limit your answer to just the
25  responsive substance.

Page 434

1      A  All right.  Please let's move forward then.
2      Q  Will you do that?
3      A  Yep.  Please let's move forward.
4      Q  Thank you.
5          All right.  So how long did it take you to
6  read through all these emails and take these 73 pictures of
7  them?
8      A  You know, I don't recall the exact amount of
9  time, but it didn't take that long.  That's probably why
10 there were duplicate images, because I, you know, just very
11 quickly saw what they are and took images of them.  You
12 know, again, I don't recall the exact amount of time
13 that -- that it took to do that.
14     Q  You also realize from reading through the
15 emails and taking pictures of them that there was
16 information about patients in some of those emails,
17 correct?
18     A  I don't recall if there was patient
19 information in those emails.  I -- would -- would you be
20 able to let me look at them to refresh my memory?  I know
21 you guys have them.
22     Q  We will.  We will.
23     A  Okay.
24     Q  Did you tell anyone that day other than
25 allegedly telling Dr. Benzinger -- well, strike that.

Page 435

1          Did you tell Dr. Benzinger that you took
2  photographs of his emails?
3      A  I don't believe I told him that I took
4  photographs at that point.
5      Q  Why did you take the photographs?
6      A  I took the photographs because this was --
7  for -- for multiple reasons.  But they were denying -- they
8  were lying to me that they were doing the front running and
9  contacting people about me and Gary Hammen.  I had asked
10 them about it multiple times, and I was told we would never
11 do anything like that, nobody's contacting people about
12 you.  And this was the evidence of it.
13         I also had been told this was going on by, for
14 example, Laura Cavallone, Dr. Kettner, and other physicians
15 that were saying we're not going to give you bad
16 evaluations, we're not going to try to get rid of you,
17 we're getting emails from Richard Benzinger and other
18 people about you, but we'll just, you know, we're going to
19 give you a fair shake.  So I knew these existed.
20         So I took images to make sure that I had
21 copies of what was going on with the abuse and the
22 harassment.  And I was also concerned, as I stated earlier,
23 about False Claims Act issues.
24     Q  What with regards to False Claims Act issues
25 did you think were implicated by the emails?

## Page 436

1    MR. RUTTER:  Objection, calls for a legal
2  conclusion.
3    THE WITNESS:  So as I said, I hired a False
4  Claims Acts attorney and was looking for information per
5  their -- per discussions I had with them.
6    Based on those discussions I felt that there
7  was information in there, in those emails, that related
8  to -- to that situation.
9  BY MR. NOLAN:
10    Q   Okay.  What information?
11    A   Just in the information about myself and Gary
12  and what was going on with us.
13    Q   And how did you believe that related to False
14  Claims Act?
15    MR. ELSTER:  Objection, legal conclusion.
16    THE WITNESS:  Because I talked to my attorneys
17  about what -- what -- what would be, you know, what would
18  be related to False Claims Act.  And I'm not -- I'm not an
19  expert in the False Claims Act.  I've hired attorneys that
20  are experts in it, and they told me to -- they gave me
21  advice and those emails fit what that advice was.
22  BY MR. NOLAN:
23    Q   So you were there looking through
24  Dr. Benzinger's emails looking for evidence of False Claims
25  Act violations, is that right?

## Page 437

1    A   That -- that was one part of the reason.  Also
2  the harassment and breach of contract that was going on and
3  likely ADA discrimination against Hammen and myself for
4  standing up for Hammen, as well as USERRA discrimination
5  against Hammen and myself --
6    (Reporter clarification.)
7    THE WITNESS:  USERRA.  I believe it's
8  U-S-E-R-R-A, discrimination that was happening against
9  Hammen and me for standing up for Hammen.
10  BY MR. NOLAN:
11    Q   Because it was your intention if there were
12  False Claims Act violations that you were going to file a
13  lawsuit?
14    MR. RUTTER:  Objection, calls for a legal
15  conclusion as to whether or not those emails substantiate a
16  False Claims Acts violation.
17    THE WITNESS:  It was my intention to gather
18  information, tell my attorneys about that information and
19  let them proceed for any legal purposes that were necessary
20  and I would follow their advice.
21  BY MR. NOLAN:
22    Q   Yeah.  So you had in mind that there was a
23  possibility that you all might file a False Claims Act
24  lawsuit, yes?
25    A   Correct.

## Page 438

1    Q   Okay.  To make some money, right?
2    MR. RUTTER:  Objection, argumentative.
3    THE WITNESS:  No.  To -- to prevent improper
4  activities going on.
5  BY MR. NOLAN:
6    Q   Okay.  Did you ever tell anyone at
7  Barnes-Jewish Hospital or Wash U that you had taken
8  photographs of Dr. Benzinger's emails?
9    A   I don't believe I did.  I believe I just told
10  my attorneys.
11    Q   Why didn't you tell anyone at Barnes-Jewish
12  Hospital or Wash U?
13    A   Because my attorneys had told me to keep
14  confidential any activities related to my investigation for
15  a lawsuit.
16    Q   Have you or anyone on your behalf reported any
17  claims of alleged False Claims Act violations to any
18  governmental agency?
19    A   I have not made a report to a governmental
20  agency about the False Claims Act.
21    Q   Have you talked to anyone about it other than
22  your attorneys?
23    A   I have only talked to my attorneys about it.
24    Q   Yesterday you mentioned that you felt like you
25  had authorization to review Dr. Benzinger's emails, do you

## Page 439

1  recall that?
2    MR. RUTTER:  Objection, misstates prior
3  testimony.
4  BY MR. NOLAN:
5    Q   I'm sorry, did I misstate your prior
6  testimony?
7    A   Well, I don't recall word for word what was --
8  I don't recall word for word what -- what was said on that
9  yesterday, but I -- I did say that I believed that I had
10  authorization to look at those emails.
11    Q   Okay.  Can you give me the basis for what you
12  believed to be the authorization?
13    A   Well, it was on -- they were open on my
14  workstation that I had logged into.  I had been given
15  access to them.  And I was taking information just to give
16  to my attorneys.  As a lawyer I reasonably believed that I
17  was allowed to take information that would show something
18  improper such as an FCA or a ADA discrimination or
19  something like that and give it to my legal counsel.
20    And the reason I believed that is because I --
21  I, one, talked to my attorneys about -- about these types
22  of things, which I had confidential conversations with
23  them, and, two, that, you know, that -- that's -- this is a
24  digital work -- this is digital work area where everybody
25  is using a computer.  Everybody is working in a digital

24 (Pages 436 to 439)

Page 440

1  space. And if you weren't allowed -- if you saw something
2  improper that came across your desk or your terminal, which
3  is in this case your desk, you're, you know, you're allowed
4  to take that and give that to lawyer.
5      If not, nobody would ever file a Civil Rights
6  case, an ADA case, a discrimination case. That -- that
7  stuff just wouldn't occur without being able to take
8  evidence. That's how a lot of these cases occur, a memo
9  comes across a secretary's desk and they report that to
10  lawyer. It keeps big firms in business.
11      It's, you know, it's -- it's -- it's, you
12  know, it is what it is. So, you know, again, that's why,
13  you know, I felt that I had permission to take those, you
14  know, I reasonably believed I had permission to take those.
15      Q   Anything else that you base your belief that
16  you had authorization to look at and take pictures of
17  Dr. Benzinger's emails?
18      A   Well, again, as I said, conversations with my
19  attorneys and their legal analysis and what I had just
20  spoken on.
21      But what I can say is this, I did not take his
22  password, I did not forward any emails in his account, I
23  did not delete anything in his account. I did not take a
24  byte of data from that computer account. I took images
25  on -- on my device.

Page 441

1      Sorry.
2      Q   Images of data that was on his email, yes?
3      A   I took images of his email, but I -- but I did
4  not take a byte of data from his computer.
5      Q   Well, the data was on his computer and then it
6  was on your phone, yes?
7      MR. ELSTER: Objection, foundation.
8      THE WITNESS: Well, that's not the same --
9  well, I -- I would let a computer expert speak to that.
10  But I, you know, I did not take data from that computer. I
11  didn't put anything on a USB drive. I didn't forward an
12  email. I didn't transfer any files.
13  BY MR. NOLAN:
14      Q   Okay. Anything else that you base your belief
15  of authorization on other than what you've just described?
16      A   I mean, I would think on it more, because as I
17  said, I had conversations with my attorneys and, you
18  know --
19      Q   I know. You already said that.
20      A   Yeah, yeah.
21      Q   Anything else?
22      A   I would, you know -- those were the prime
23  reasons. I'm sure there are other thoughts going through
24  my mind on that, but those were the primary reasons that I
25  had taken that and that I had taken those images.

Page 442

1      Q   Okay. Well, please tell me what else you
2  believed at that point in time that led you to think that
3  you had authorization to look at and take photographs of
4  those emails?
5      A   Just to go through the list of anything else
6  that -- that -- well, let's see, Richard Benzinger had been
7  in my -- Richard Benzinger, I know, had been looking in my
8  email box.
9      Additionally, when we worked together on
10  shared computers, people regularly look at other people's
11  emails to go pull up things such as patient lits or to pull
12  up information, data, documents on -- on medication dosing
13  or anesthesia protocols.
14      Q   Anything else?
15      A   I'm -- I'm happy to think on it more, but
16  those were, you know, those were some of my primary
17  reasons.
18      Q   Anything else?
19      A   You know, again, I'm happy to think on it
20  more. I'm sure I -- there -- there were lots of thoughts
21  going through my head on that. But as I said, those --
22  those are my primary reasons.
23      Q   Okay. Well, you understand this is my
24  opportunity to ask you what was going on in your mind at
25  the time you accessed these emails, and I need you to tell

Page 443

1  me everything that you recall at this point in time.
2      MR. RUTTER: Objection, argumentative, asked
3  and answered.
4  BY MR. NOLAN:
5      Q   Do you understand that?
6      A   I understand what you're saying. And I'm just
7  saying right now, as I said, those are the main reasons.
8  I want to be accurate and I want to be truthful. If I, you
9  know, if I come up with anything, if I remember anything
10  else, you know, I'm happy to let everyone know.
11      But I'm just saying those were the primary
12  thoughts when I was, you know, you know looking at, you
13  know, emails. It was open on my computer, as I said. And
14  I talked to attorneys about this previously. And you,
15  know, again, I believed, I fully believed that I had
16  authorization to take those images because of, as I said,
17  what those documents were showing in relation to legal
18  issues going on.
19      Q   So in part your belief was based on the advice
20  of counsel, they said that you could look at other
21  people's --
22      MR. MAREK: Objection --
23      MR. ELSTER: Objection, privileged.
24      MR. NOLAN: -- emails, correct?
25      MR. ELSTER: Objection, privileged

## Page 444

1  information.
2  　　　　MR. MAREK: Instruct the witness not to answer
3  that.
4  　　　　MR. NOLAN: He's been saying it. He's been
5  saying it. He said it 20 times.
6  　　　　MR. MAREK: Instruct the witness not to answer
7  about communications between him and any attorneys on any
8  subject.
9  　　　　MR. NOLAN: He put it at issue.
10  　　　　THE WITNESS: Hold on. All I'm just saying is
11  I spoke with my attorneys and I -- and I spoke to my
12  attorneys and you, know, that's it. You know, I had legal
13  counsel and I spoke to attorneys. That -- that's it.
14  BY MR. NOLAN:
15  　　Q　And they said you could access other peoples
16  emails?
17  　　　　MR. ELSTER: Same objection.
18  　　　　MR. MAREK: Objection, attorney/client
19  privilege. Instruct the witness not to answer any
20  questions about communications with counsel.
21  　　　　Are you going to continue to try to --
22  　　　　THE WITNESS: I'm not going to answer any more
23  questions on this.
24  　　　　MR. MAREK: -- roll over the privilege.
25  　　　　MR. NOLAN: Stop your speaking objections.

## Page 445

1  BY MR. NOLAN:
2  　　Q　Are you going to follow your attorney's advice
3  and refuse to answer my question?
4  　　A　I'm going to follow my attorney's advice.
5  　　Q　Okay. What did you do with the pictures?
6  　　A　I -- so I had the images and I eventually
7  gave, you know, I gave them to my -- my counsel.
8  　　Q　When did you give them to your counsel?
9  　　A　I believe it -- I'm trying to think of the
10  exact date, since there was a lot -- there was a lot of
11  materials that I gave to counsel. I -- I don't recall the
12  exact date that I gave it to them. I'm more than happy to
13  go back and try to refresh memory, but I don't recall the
14  exact day right now.
15  　　Q　How would you refresh your memory on that?
16  　　A　I would probably go back and -- and look at --
17  at when I had given documents. I'd probably look and see
18  when I had given documents to my attorneys and, you know,
19  see when I had given them that.
20  　　Q　How did you transfer or transmit the images to
21  your attorneys?
22  　　A　I gave the attorney -- I gave my attorneys my
23  devices and, you know, they then, you know, gathered --
24  gathered information.
25  　　Q　Which devices?

## Page 446

1  　　A　I gave them my -- I took the images on my old
2  iPhone and I gave them my old iPhone to transfer from.
3  　　Q　Did you give that old iPhone back to you?
4  　　A　Yes, they gave me that old iPhone back.
5  　　Q　Were the original images still on the phone
6  when you got the old iPhone back?
7  　　　　MR. ELSTER: Objection, vague, original
8  images.
9  　　　　THE WITNESS: You know, you know, again, I
10  don't recall what was done for the full transfer process,
11  but I gave them my device, they transferred the images
12  over, and I didn't retain any.
13  BY MR. NOLAN:
14  　　Q　Do you still have that old iPhone?
15  　　A　I don't have that old iPhone. That was from
16  2017. I've had probably two or three new phones since
17  then.
18  　　Q　When did you get rid of that old iPhone?
19  　　A　I don't remember the exact date. I normally
20  would get a new iPhone every year or two just through a
21  family plan. So I just get a new phone when it, you know,
22  came up. But I, you know --
23  　　Q　Did you transfer the images that you took of
24  Dr. Benzinger's emails to a computer or an iPad or an
25  iCloud or anything like that?

## Page 447

1  　　A　I -- I don't recall doing that. I don't
2  believe I put it on a computer. I don't believe I put it
3  on an iCloud. I don't believe I put it on a tablet.
4  　　Q　Did you save it to any kind of memory device
5  like a thumb drive?
6  　　A　I believe my attorneys had -- I believe
7  there -- I believe my attorneys had made copies of -- of
8  the images. You know, again, as I said, I gave them -- I
9  brought everything over and they -- they took them to
10  process for discovery, and -- and they retained, and they
11  retained them or processed them as they did. I -- I just
12  gave the information.
13  　　Q　Do you recall if you gave them to your
14  attorneys before or after you offered your formal
15  resignation to the program?
16  　　A　I want to be accurate. I don't recall the
17  exact date that I gave them over. I'd want -- I'd want to
18  make sure. As I said, I was, you know, in touch with
19  counsel off and on over the past several years, so I'd want
20  to make sure I gave an accurate date. I don't recall the
21  exact day right now. I'm sorry.
22  　　Q　Well, I appreciate your answer, but I was just
23  asking do you recall was it before or after you offered
24  your formal resignation.
25  　　　　MR. RUTTER: Objection, asked and answered.

## Page 448

1    THE WITNESS: You know, again, I -- I don't
2  recall at this time the exact date.
3  BY MR. NOLAN:
4    Q   Okay.  On the JPEG images which were produced
5  to us, under the properties tab, it's got a date of, I
6  believe, April 9th, 2018.  Does that refresh your
7  recollection as to when you would have provided your old
8  iPhone to your attorneys?
9    MR. ELSTER: Objection, foundation.
10    THE WITNESS: You know, again, I'd need to see
11  the -- I need to see, you know, just my communications with
12  my attorneys and when I dropped things off, etc.  But, you
13  know, again, I -- you know, I'm happy to look at dates
14  if -- if you said there's a JPEG image date of, what was
15  that again, April?
16  BY MR. NOLAN:
17    Q   I believe April 9th, 2018.
18    A   April 9th of 2018, you know, again, I'm happy
19  to -- and if I could see a document, or if you've got that,
20  I'm happy to look at it and refresh memory.  But, again,
21  this is going back many years at this point.
22    Q   Did you ever email any of those images to your
23  attorneys?
24    A   I did not email those images to my attorney.
25  I don't believe I did.

## Page 449

1    Q   Did you identify any of those emails or the
2  substance of the communications in the emails in your
3  interrogatory answers which have been marked as B1 or B2?
4    A   And so you're asking if any of the information
5  from those emails is in the interrogatory answers?
6    Q   Yeah.
7    A   Well, let's see.  Again, as I said, I've not
8  looked at those emails in a very long time.  You know, as I
9  said, I recall they were talking harassing and bullying of
10  myself and Gary Hammen.  So, you know, my -- I -- I would
11  have to say I don't recall.  I would have to talk with my
12  counsel to see if they had put anything in the
13  interrogatory answer.  I just don't recall.
14    I don't necessarily believe so.  But, again,
15  I -- I don't recall.  I haven't seen those emails in a long
16  time.  I'd be happy to look at those emails and refresh my
17  memory.
18    Q   You would agree with me that the data you
19  captured when you took the pictures of the emails resided
20  within Dr. Benzinger's private email account, yes?
21    MR. ELSTER: Object, form, legal conclusion.
22    THE WITNESS: Well, I -- I -- I wouldn't agree
23  with that for the following reason, I mean, I know we're
24  getting technical, but it was on my community computer that
25  I was using.

## Page 450

1  BY MR. NOLAN:
2    Q   Right.  But it was his private email account,
3  right?
4    MR. ELSTER: Same objections.
5    THE WITNESS: Again, it was his -- it was his
6  email account, but the data -- the data in those emails --
7  and, you know, again, I'm not -- I'm not a computer expert,
8  but that data from those emails was sitting on my desktop
9  workstation.
10  BY MR. NOLAN:
11    Q   That Dr. Benzinger's private email account is
12  on a network used by Washington University and
13  Barnes-Jewish Hospital, correct?
14    MR. ELSTER: Objection, foundation.
15    THE WITNESS: I -- I don't know the specifics
16  of who -- I don't know the specifics of who owns the
17  network at Barnes, the desktop computer, the software.  I
18  mean, for example, many organizations that have email
19  accounts, they use Microsoft and Amazon for hosting, or
20  Google for hosting.
21  BY MR. NOLAN:
22    Q   And you would agree with me that the
23  information on those emails were conversations between
24  people other than yourself, yes?
25    A   Yes, those emails were conversations between

## Page 451

1  people other than myself.
2    Q   And you never would have gained access to that
3  information but for looking at Dr. Benzinger's emails, yes?
4    MR. RUTTER: Objection, calls for speculation.
5    THE WITNESS: Again, I can't speculate on
6  that.  All I can say is Richard Benzinger gave me access.
7  He left it open on my computer and I saw them.
8    MR. NOLAN: Yeah, let's take a short break.  I
9  need to -- I need to go through and pluck out some of these
10  photographs that I believe are attorney/client privileged.
11  So it's going to take just a minute.
12    MR. ELSTER: Okay.
13    THE VIDEOGRAPHER: Going off the record at
14  approximately 11:16 a.m.
15    (Thereupon, a recess was taken, after which
16  the following proceedings were had:)
17    THE VIDEOGRAPHER: We're back on record at
18  approximately 11:34 a.m.
19    (Thereupon, Defendant Exhibit B3 was marked
20  for identification.)
21  BY MR. NOLAN:
22    Q   I'm handing you what's been marked as
23  Exhibit B3.  I'll represent to you that those are some of
24  the emails -- or excuse me, some of the JPEG images which
25  were produced to us by your attorney, Edward Moore, on or

27 (Pages 448 to 451)

## Page 452

1  about November 19th, 2021 under a cover letter in which he
2  recognized that some of the pictures may complain -- may
3  contain privileged information.
4        Now, I have, just for the record, I have
5  removed all of the images that I believe contain protected
6  information.  And if I missed one, it was not my intention
7  to do so, and we would, if we discover that in the future,
8  we would --
9        MR. RUTTER:  Are you willing to agree to
10  produce us a privilege log?
11        MR. NOLAN:  Yes.
12        MR. RUTTER:  Great.
13        THE WITNESS:  Do you mind if I ask, how many
14  images are in the stack?
15        MR. NOLAN:  Let me see.  Just for the record,
16  I removed Images 22, 23, 31, 32, 41, 66 and 68.
17  BY MR. NOLAN:
18    Q    Okay.  So do you recognize those images which
19  are contained in Exhibit B3?
20    A    Yes, I recognize, these appear to be the
21  images that I took.
22    Q    Of Dr. Benzinger's emails?
23    A    This appears to be it.
24    Q    I believe your original document production
25  did not include these emails.  Do you have an understanding

## Page 453

1  as to why?
2        MR. ELSTER:  Objection to the extent it calls
3  for privileged communications.
4        THE WITNESS:  Yeah, no, I don't have knowledge
5  on that.
6  BY MR. NOLAN:
7    Q    When was the last time you reviewed the
8  pictures of those emails?
9    A    I don't remember the last date that I reviewed
10  these emails.
11    Q    Did you review them in relation to the
12  drafting of the complaint in this lawsuit?
13    A    Here again I don't remember the last time I
14  reviewed these emails as far as that goes.  I apologize.
15    Q    Well, that question was a little different.
16  Did you review them relative to the drafting of the
17  complaint in this lawsuit?
18    A    I don't believe so.
19    Q    In any of the motions or pleadings that you
20  filed with the court, did you or your attorneys ever
21  disclose the presence of these pictures of Dr. Benzinger's
22  emails?
23        MR. ELSTER:  Objection, overly-broad as to
24  time.
25        MR. RUTTER:  Objection, calls for speculation.

## Page 454

1        THE WITNESS:  You know, again, I don't recall
2  if they're referenced in any pleadings.  As I said, I have
3  not looked at these emails -- these images in a very long
4  time and I'd have to compare them to any pleadings.  So,
5  again, I just --
6        (Reporter clarification.)
7        THE WITNESS:  I have to look -- I haven't
8  looked at these images in a very long time, so I'd have to
9  look at it.
10        MR. NOLAN:  For the record, I'd like to mark
11  this exhibit and this line of testimony regarding the
12  Exhibit B3 as confidential.
13        MR. ELSTER:  Okay.
14        MR. NOLAN:  Any objections?
15        MR. ELSTER:  No.
16  BY MR. NOLAN:
17    Q    Did you say that there was some information
18  contained in these emails that in your mind would give rise
19  to a False Claims Acts violation?
20        MR. RUTTER:  Objection, calls for a legal
21  conclusion.
22        THE WITNESS:  You know, I believe I made that
23  statement, but, you know, that would be -- that would
24  require a legal conclusion to be made.
25

## Page 455

1  BY MR. NOLAN:
2    Q    I'm asking in your mind.  So it's okay, go
3  ahead.
4        MR. RUTTER:  Same objection.
5        THE WITNESS:  And I don't know if I'm able
6  to -- yeah.  Give me one moment.  I'm just refreshing
7  myself on these images since I haven't seen them in a very
8  long time.
9        I've done a very quick scan and overview of
10  these.  I haven't read them all fully.  And I just wanted
11  to -- and these are all the ones aside from the
12  confidential ones, or the privileged is what you're saying.
13  BY MR. NOLAN:
14    Q    Correct.
15    A    Okay.  And I just wanted to make sure because
16  I don't -- I don't see anything about patients in here.  So
17  I just want to make sure since there's no -- you mentioned
18  that you -- you had stated there was some patient
19  information.  I don't see anything about patients in here,
20  just myself and Gary Hammen.  So there's nothing else
21  that's supposed to be in here?
22    Q    Well, I believe my question -- and let me just
23  reask it, because it's been a little while.
24    A    Okay.
25    Q    Thank you for taking the time to do a cursory

Page 456

1    review of those photographs.  As you sit here today, do you
2    see anything that in your mind implicates a False Claims
3    Act violation?
4          MR. RUTTER:  Objection, calls for a legal
5    conclusion.
6          THE WITNESS:  So, again, I see things that are
7    improper activities.  I see things that are improper
8    activities in here.
9    BY MR. NOLAN:
10          Q    Okay.  Anything that in your mind implicates a
11   False Claim violation?
12          A    I see things -- you know, as I said, or, you
13   know, I'm not the lawyer making a legal conclusion, but I
14   see things in here that are improper activities that I felt
15   were problematic and needed to be reviewed.
16          Q    In relation to the False Claims Act?
17          A    Yes, that -- that, you know, as I said, I saw
18   things that were improper that needed to -- to be reviewed.
19   And, you know, I'm not making a legal conclusion myself,
20   but I saw things that were improper and concerning.
21          Q    In relation to the False Claims Act, yes?
22          MR. RUTTER:  Objection, asked and answered.
23   BY MR. NOLAN:
24          Q    Yes or no?
25          A    Well, as I said, I saw things that were

Page 457

1    improper and I felt needed to be reviewed.
2          Q    In relation to the False Claims Act, yes or
3    no?
4          MR. RUTTER:  Objection, argumentative, asked
5    and answered.
6          THE WITNESS:  As I said -- as I said, in
7    relation to your question, I saw things that were improper
8    that I felt needed to be reviewed.
9    BY MR. NOLAN:
10          Q    What things did you see that you thought were
11   improper that might be a violation of the False Claims Act?
12          MR. RUTTER:  Objection, calls for a legal
13   conclusion.
14          THE WITNESS:  Again, I saw improper activity
15   relating to -- you know, I saw improper activity relating
16   to myself and Gary Hammen, and I felt that it was improper
17   and I wanted it to be reviewed.
18   BY MR. NOLAN:
19          Q    How did you think it related to the False
20   Claims Act?
21          MR. RUTTER:  Objection, calls for a legal
22   conclusion.
23          THE WITNESS:  And as I said, I saw things that
24   were improper that I felt needed to be reviewed, and I
25   wanted to pass along those materials for somebody to review

Page 458

1    because I felt they were improper.
2          MR. NOLAN:  Please let the record reflect the
3    witness is refusing to answer my question.  We'll be moving
4    for sanctions.
5    BY MR. NOLAN:
6          Q    Would you turn to Page 12 of Exhibit B3.  It's
7    a picture of an email from Russell Groener to Dr. Benzinger
8    dated October 31, 2017.
9          A    These aren't numbered, so hold on.
10          Q    Yeah.  You'll just have to count the pages.
11          A    One, two, three, five, six, seven, eight,
12   nine, ten, eleven.  What date, 10?
13          Q    Or maybe it's 11.  Do you see the email from
14   Groener to Benzinger?
15          A    I'm sorry, there -- there's two.  There's one
16   from 10 -- sorry.  There -- there's one -- one from Russell
17   Groener at 10:31 to Laura Cavallone cc'ing Benzinger, and
18   then there's another one just to Benzinger alone.
19          Q    Go to the one Benzinger alone that starts with
20   just a heads-up.  Do you see that?
21          A    Yes, I see just a heads-up.
22          Q    Okay.  You took this photograph of the email
23   that Russell Groener sent to Dr. Benzinger, correct?
24          A    Yes, I see that.
25          Q    You were not copied on it, correct?

Page 459

1          A    That is correct.
2          Q    Dated Tuesday, October 31st, 2017 at
3    8:10 a.m., correct?
4          A    Yeah, Russell Groener, Tuesday, October 31st,
5    2017 at 8:10 a.m. to Richard Benzinger.
6          Q    Who is Dr. Groener?
7          A    Dr. Groener is an anesthesia faculty member
8    who I believe was either assistant or associate program
9    director, and Richard Benzinger was the program director.
10          Q    Okay.  And Dr. Groener is discussing his
11   concerns about your performance as a resident, yes?
12          A    That appears to be what this email states.
13          Q    Dr. Groener advises Dr. Benzinger, quote, just
14   a heads-up that Jeff Weisman failed his peds rotation.  Did
15   I read that correctly?
16          A    Peds for pediatrics.
17          Q    Thank you.
18          Reading on he states, there was consensus that
19   his performance reached a level of deeply troubling with
20   serious concern for patient safety.  And he underlined of
21   deeply troubling with serious concern for patient safety,
22   isn't that correct?
23          A    That's what the document says, but the words
24   are not accurate at all.
25          Q    Okay.  You would agree that Dr. Groener is

## Page 460

1   discussing his evaluation of your performance, yes?
2       A   He -- he's discussing -- he's -- he's writing
3   about -- he's writing about me, but I would -- but I would
4   disagree that this is about my -- this is accurate and
5   about my performance.
6       Q   You would agree that evaluations such as the
7   ones that faculty members in the program do with regards to
8   residents have a subjective component to them, yes?
9       A   Well, evaluations are supposed to be
10  objectively done.  They're supposed to be accurate and
11  objective per ACGME guidelines.
12          (Reporter clarification.)
13          THE WITNESS:  Per ACGME guidelines.  They're
14  not -- they're not supposed to take preferences, if you
15  like somebody, if you don't like somebody.  Evaluations are
16  supposed to be accurate and honest per ACGME guidelines.
17  BY MR. NOLAN:
18      Q   They include a subjective component, yes?
19      A   I -- you know, I would say I'd have to go look
20  at the ACGME guidelines.  My understanding was that
21  evaluations were supposed to be -- that were supposed to be
22  objectively done to be accurate and honest and not to have
23  subjective components of personal opinions or preferences.
24      Q   You can't Dr. Groener's mind, can you?
25      A   I'm not a mind reader.

## Page 461

1       Q   Right.  Dr. Groener never you that what he put
2   in this email was false, did he?
3       A   He actually did by way of a conversation I had
4   him that's -- that we have record of.
5       Q   When did Dr. Groener tell you that the
6   information he put in this email was false?  And remember,
7   you're under oath.
8       A   I know I'm under oath.
9           Dr. Groener basically telegraphed to me that
10  he was going to generate false evaluations in a meeting
11  that I had with him.  I worked with him, I believe, for you
12  days on the pediatric month.  And I had a meeting with him
13  after one of those days.  And he told me you did a good
14  today, today was a good day, it went well.
15          And I asked him will you sign a paper
16  evaluation of me.  And he said something roughly, quote, I
17  don't want to put anything in writing, I don't want to get
18  boxed in with you.  So he -- at that point in time I knew
19  that he was going to be, from that interaction, I was, in
20  my personal opinion, very sure he was going to lie about
21  evaluations or alter them or do something.
22          And, in fact, he did, because we found in
23  discovery that Russell Groener, what he did was he created
24  a PowerPoint slide where -- slide where he broke up --
25  he broke up comments he was soliciting into positive,

## Page 462

1   neutral and negative.
2           So he would have an anesthesia faculty member
3   email him.  And as an example, because I don't have this in
4   front of me, the faculty member might say, you know, Jeff
5   did a good job today, oh, he should work on this.
6           And then what Russell Groener did, or appeared
7   to have done in that PowerPoint slide was to slice the
8   comment and move the Jeff did a good job to the good area
9   and then he should work on this to the bad area.
10          And then when it came time for evaluations, he
11  seems to have just taken from the bad PowerPoint slide
12  where he'd slice comments up and put those in completely
13  out of context.
14          So to -- to answer the question on could I
15  read Russell Groener's mind, no, I can't, but based on
16  circumstances, facts and his behavior, I have strong reason
17  to believe that he did these things.  And he, in fact, did
18  do these things.
19      Q   Do you remember my question?
20      A   Can you please repeat the question.
21      Q   I'm going to ask you as nicely as I can to
22  please pay attention to my question and answer the question
23  that's put to you.  Do you understand that?
24      A   Yes, I understand, sir.
25      Q   Did Dr. Groener ever tell you verbally or in

## Page 463

1   writing that the information he put in this October 31st
2   email was false?
3       A   I did not talk to Dr. Groener about this
4   particular email and he did not talk with me about it.
5       Q   Reading on in this email, he wrote, some, in
6   parenthesis by no all means, all out of parenthesis, of the
7   comments were, and then the very first bullet point says,
8   after mask induction, ready for intubation.  Patient
9   apneic.  Did I read first sentence correctly?
10      A   It would be apneic, but, yes, after mask
11  induction, ready for intubation, patient apneic.  Resident
12  decides to --
13      Q   No, no, that wasn't my question.  What does
14  apneic mean?
15      A   He's saying that the patient wasn't breathing.
16      Q   And that's a bad thing, right?
17      A   When you're doing it -- when you're doing
18  anesthesia, you sedate patients and you intubate them, so
19  there's lots of times they aren't breathing and we have a
20  machine breathing for them.
21      Q   Okay.  And at that point was the machine
22  breathing for him?
23      A   The machine wasn't breathing for that point
24  because we had an oxygen mask on them and we were bag
25  masking them.  In fact, I was holding the mask in place and

## Page 464

1  I was ventilating, and I said that we needed to get a
2  temperature probe, which was just a feet behind me, to put
3  on the table.
4          And the nurse in the OR said oh, I can -- I
5  can -- I can squeeze the bag.  And I said thank you.  And
6  she put her hand on the bag and I reached over --
7          (Reporter clarification.)
8          THE WITNESS:  She put her hand on the bag, and
9  I reached over and I grabbed the nasal temperature probe
10  and I put it on our anesthesia table and then I resumed bag
11  masking.
12          So that is a completely out of context comment
13  made to cause an issue.  So I would just say overall, I
14  just completely disagree with these -- with whatever is
15  written here based on the comments that I had with people.
16  BY MR. NOLAN:
17      Q   Okay.  There was a reason that you were in the
18  residency program, right?
19          MR. RUTTER:  Objection, vague, form of the
20  question.
21          THE WITNESS:  If you're asking me why someone
22  trains in a residency program, they train in a residency
23  program to learn -- to learn a particular specialty of
24  medicine.
25

## Page 465

1  BY MR. NOLAN:
2      Q   Right, which means you didn't have it before
3  you went into the program, right?
4      A   That means you don't have certain medical
5  knowledge.
6      Q   Right.  Or experience, right?
7      A   That means that you do not have certain
8  medical experience or knowledge when you go into the
9  program.  You do have four years of medical school, and you
10  do have common sense and honesty and integrity and
11  professionalism.
12      Q   Did you think at that point with four years of
13  medical school where you graduated 81st out of 110 in your
14  class, that you knew more than Dr. Groener about
15  anesthesiology?
16          MR. ELSTER:  Objection, badgering the witness.
17          THE WITNESS:  I didn't think I knew more about
18  anesthesia, but I knew more about telling the truth than
19  him apparently because --
20  BY MR. NOLAN:
21      Q   You would agree that he knew much more and had
22  much more experience regarding anesthesiology and how to
23  treat patients during surgery than you, yes?
24      A   He had more experience than me.
25      Q   And that's why you were there, to learn from

## Page 466

1  people like him, yes?
2      A   I was there to learn from him, but not to be
3  harassed, bullied and for him to harm patients trying to
4  harass and bully me.
5      Q   And he's there, in part, to make sure that the
6  patient is safe and receiving proper treatment, yes?
7      A   Every doctor at that hospital is there so a
8  patient is to be safe and receive proper care and
9  treatment.
10      Q   And he has an absolute duty to relay to the
11  members of the faculty if he feels that you are endangering
12  patient safety, yes?
13          MR. ELSTER:  Objection, form and legal
14  conclusion.
15          THE WITNESS:  He has an -- he has a duty to
16  relay accurate, honest and true statements.  He's not
17  having a duty to relay improper or false statements.
18  BY MR. SULLIVAN:
19      Q   So if he thought that it was improper for you
20  to abandon the patient and go back to the cart and fumble
21  around for a nasal temperature probe, are you saying that
22  he was wrong for that?
23          MR. ELSTER:  Objection, form.
24          THE WITNESS:  What I'm saying is this is not
25  accurate.

## Page 467

1  BY MR. NOLAN:
2      Q   You just said that you went to go get the
3  temperature probe when the patient wasn't breathing.
4      A   You're misstating what I said.  Nobody
5  abandoned -- there was no patient that was ever abandoned
6  and I did a very good job.  In fact --
7      Q   In your opinion?
8      A   No, this isn't my opinion.  This is facts.
9  This is science.  You can't abandon a patient when you're
10  holding your hand on the mask of the patient.
11          And the big thing I would say is I think
12  you -- you mentioned Cathy Krucylak yesterday.  I was doing
13  a case under her supervision --
14      Q   Please, no, no.  That is not responsive to a
15  question.
16          THE COURT REPORTER:  Okay.  Excuse me.  Excuse
17  me.
18          THE WITNESS:  Russell Groener came into the
19  room --
20          MR. NOLAN:  Please stop.
21          THE WITNESS:  -- and said I need you to give a
22  dosed-up epinephrine to this child right now.  And I said
23  there's no need to right now.  And he said --
24  BY MR. NOLAN:
25      Q   Move to strike.

Page 468

1    A  -- we'll give it because I said so.
2    Q  Please stop wasting our time.
3    A  He said --
4    THE COURT REPORTER:  Excuse me.  Excuse me.  I
5  can only take one of you at a time.  So if you're going to
6  keep talking, it's not going to matter because I can't get
7  it all.
8    THE WITNESS:  Well, so Russell Groener told me
9  to immediately give a dose of epi, epinephrine, on a Cathy
10  Krucylak patient, that wasn't his patient.  I told Russell
11  Groener there's no need -- there's no reason from the
12  monitors to do it.  And he said well, just do it now.  So I
13  took a picture of the monitors and I emailed or texted it
14  to him and I said okay, I will give --
15  BY MR. NOLAN:
16    Q  There's no question pending.
17    A  -- I will give this dose, but I texted this to
18  you.  And what he did was he immediately stormed out of the
19  room.  I told Cathy Krucylak about this interaction.  She
20  seemed very upset about him trying to harm one of her
21  patients to create an issue with me.
22    And Cathy Krucylak, who's another pediatric,
23  and very senior pediatric anesthesiologist, gave me a very
24  good letter of recommendation.
25    Q  There's no question pending right now.

Page 469

1    A  Then please ask a question.
2    Q  Please stop wasting our time grandstanding and
3  making your baseless speculation.
4    MR. RUTTER:  Ask a question.
5    THE WITNESS:  Please ask a question.
6    MR. RUTTER:  Ask a question.
7    MR. NOLAN:  No.  I'm sick and tired of him
8  wasting our time in this deposition.
9    MR. RUTTER:  We're sick and tired of this
10  whole paternalistic -- just knock it off and ask him
11  questions.
12  BY MR. NOLAN:
13    Q  No, no.  All right.  Well, sir, looking back
14  again at this Groener email to Benzinger, in the second
15  bullet point he says, quote, when I returned to the room, I
16  noticed the ETCO2 was 89 and bellows were not moving.
17    Did I read that correctly?
18    A  Those are the words on the page, but I do not
19  believe them to be accurate.
20    Q  What is the ETCO2?
21    A  End-tidal CO2.  So basically you're looking at
22  something -- when someone's breathing in -- breathing in,
23  you know, how much -- how much CO2 is in their -- is in
24  their breath, the end-tidal CO2.
25    Q  Okay.  And is 89 a troubling number for ETCO2

Page 470

1  under circumstances like that?
2    A  Well, I'd need to see the exact circumstances
3  of the case and what's -- what's going on.  This is a
4  comment in a vacuum, so --
5    Q  In the third bullet point he says, when I
6  returned to the room, I noticed he had refilled the Sievo
7  vaporizer, in parenthesis nothing wrong with that, out of
8  parenthesis, however he failed to realize the vaporizer
9  wasn't properly engaged with the machine and, therefore, no
10  anesthetic agent was being delivered to the patient -- to
11  the patient, exclamation mark.
12    Did I read that correctly?
13    A  That's not an accurate statement of something
14  that occurred, but you read --
15    Q  Did I read it correctly?
16    A  -- you read the statement there.
17    And, in fact, you'll find in the discovery
18  that there's an email exchange between Douglas Thompson,
19  the assistant program director --
20    Q  That's not responsive to my question.
21    A  -- where he -- where he's emailing --
22    Q  That's not responsive.
23    A  -- me the machine malfunctioned and that we
24  should write a case report because machines like this
25  particular brand of machine is known to malfunction.

Page 471

1    Q  All I asked you was did I read that sentence
2  correctly.
3    A  You read the sentence correctly but without
4  context.
5    Q  You agree with me it would be very bad for a
6  patient to not be receiving the anesthetic agent under
7  circumstances like that, correct?
8    A  Well, a patient is -- depending on the stage
9  of the procedure, a patient is supposed to have anesthetic
10  agent.  And the patient was receiving anesthetic agent,
11  according to this.  I believe it states end-tidal
12  concentration of C04 --
13    THE COURT REPORTER:  You're going to have to
14  slow down.
15    THE WITNESS:  Oh, sorry.
16    THE COURT REPORTER:  End-tidal.
17    THE WITNESS:  It said, the end-tidal
18  concentration of Sievo had fallen to 0.5 percent.
19  BY MR. NOLAN:
20    Q  So you believe everything that Dr. Groener put
21  in this email is false?
22    A  My personal belief is that these statements
23  are either false or out of context.  And there's -- and
24  there is evidence of many of these statements being false
25  and out of context.  I'm not here to say that I'm perfect.

## Page 472

1    I'm a trainee. I'm learning like everyone else. We're
2    here to learn.
3           But for some reason, everything that occurred
4    with me by certain people, Russell Groener, was taken out
5    of context. But other faculty members in the pediatric
6    department thought I was doing a great job and even wrote
7    me letters of recommendation.
8        Q    So is it your belief that all of the negative
9    evaluations that you received during your residency program
10   were false?
11       A    It's not my personal belief that every single
12   thing was false. I'm a trainee. I'm on the learning
13   curve. I'm there to learn and become a good doctor. But I
14   do very much believe that many things were false or taken
15   out of context.
16          And we have proof that many things were false
17   and taken out of context. Like they said I failed my
18   internal medicine rotation. They said every evaluation was
19   a failure. And it turned out every single one was a pass
20   if you look at the evals by Amy Rodden, Gina LaRosa and
21   Janet McGill. So how am I to believe anything that they
22   put down when in all sincerity we have evidence that they
23   were lying time and time again.
24          And that's a very sincere comment reaching out
25   to you. I -- I understand they're your clients, but

## Page 473

1    they're not telling you the truth sometimes, or others.
2        Q    You -- you understand that my question called
3    for a yes or no answer?
4        A    Will you please continue, sir.
5        Q    Would you please stop giving narratives.
6    You'll have your opportunity to say what you want to say in
7    response to questions asked by your counsel. Do you
8    understand?
9        A    Please continue, sir.
10       Q    Tell me all the ways you believe that your
11   performance during the residency program was below average.
12       A    When you say my performance, are you -- just
13   to make -- I want to make sure I understand and answer this
14   accurately for you. So my performance, are you saying
15   by -- by just general performance overall or related to
16   specific work in the hospital? I want to make sure I
17   understand.
18       Q    I just want to know in terms of your
19   self-evaluation, what do think you did poorly on?
20          MR. RUTTER: Objection, form of the question.
21   It's vague, ambiguous.
22          THE WITNESS: I mean like as -- as most
23   physicians, you know, we're -- we're on a learning curve.
24   We're -- we're learning to train to be doctors in a
25   specialty. I felt in my performance, I felt that I was

## Page 474

1    giving a good performance while I was there as far as a
2    doctor goes.
3           And -- and to stay on top of it with it as far
4    as performance there goes, this is one of the top hospitals
5    in the country. This is the best of the best. So the
6    question is was I giving good performance, yes, I was
7    giving good performance there.
8           I was giving the performance I gave at LSU or
9    would have given at any other of the medical centers around
10   the country, and I don't know why they took issue with my
11   performance there.
12       Q    Okay. Well, at LSU you were 81st out of 110
13   in your class. You would agree that you were below average
14   there, right?
15          MR. ELSTER: Object to form.
16          THE WITNESS: Well, the question you said was,
17   you said 81st out of 110 based on test scores. If you were
18   to ask the deans and the chairs at LSU, which I welcome you
19   to call them, they would say I was one -- Number 1 out of
20   110 for research and leadership and projects that I was
21   doing there.
22          So just like with law school or anything,
23   class rank is not the end-all be-all. And not only that,
24   to go to medical school it's the best of the best.
25   Everybody is perfect. Everybody has a 4.0 in medical

## Page 475

1    school to get in, your undergrad to get into medical
2    school.
3           So you can -- so, yes, my class rank was 81
4    out of 110. It turns out that Wash U, I believe, their med
5    school went to pass/fail because there -- there isn't a
6    need for a class rank. I hope that answers the question
7    on -- my class rank was 81 out of 110, yes.
8    BY MR. NOLAN:
9        Q    Are you able to tell me anything that you
10   honestly believe was suboptimal performance relative to
11   your residency program?
12          MR. RUTTER: Objection, form of the question.
13   It's vague and ambiguous.
14          THE WITNESS: I'm happy to think on it. But I
15   don't believe that the performance I was giving was
16   suboptimal.
17   BY MR. NOLAN:
18       Q    Was there anything that you can think of as
19   you sit here today where you thought man, I didn't do that
20   well on that section or that procedure, anything like that
21   where you just thought, you know, you didn't do well?
22       A    Well, again, I'd have to think on it. On a
23   day-to-day basis -- on a day-to-day basis we do just dozens
24   of things, tons of little activities, putting in IV lines,
25   putting in central lines, etc.

## Page 476

1       And maybe the best way to answer -- to answer
2   your question, maybe I'll answer it for pediatrics, when we
3   put IV's in pediatric patients, they're very tough
4   sometimes, especially pediatric patients that need multiple
5   sticks or have been there for multiple procedures.
6       There's times when there is -- I -- I can't
7   remember the specific day without a case log, but we were
8   trying to get an IV in a child and we -- I couldn't get it
9   in, my attending couldn't get it in. They had another
10  attending come in. And eventually I believe one of the
11  attendings got it in.
12      So if the question is was I, you know, was I
13  frustrated that I didn't get that IV right away, yes, of
14  course. I don't want to stick somebody more than
15  necessary. But, again, the whole thing is it's a learning
16  curve, and the attending was struggling.
17      So it depends on -- so -- so as far as
18  suboptimal performance, of course we want everything to be
19  perfect. We love the patients. We want them to get
20  perfect care. But I -- I wasn't giving suboptimal care in
21  the sense of, you know, oh, you put an IV in and it doesn't
22  go in the first time.
23      And that's why nurses, for example, get two
24  sticks and you bring in another nurse. So that -- that's
25  just the example of it's not -- I wouldn't classify it as

## Page 477

1   suboptimal performance. It's you give your best for
2   everything because you care about the patients. But if you
3   don't get an IV the first or second time, you bring in an
4   attending or another nurse or a doc and we make sure that
5   it gets in.
6       So I -- I hope that explains how it is in
7   medicine. But, you know, I was -- I was giving my all all
8   the time. I care about patients and I want to do a good
9   job.
10      Q   Yesterday you were telling Washington
11  University's attorney that you had secretly made recordings
12  of conversations with people. Do you recall that?
13      MR. RUTTER: Objection to the form of the
14  question. It's argumentative.
15      THE WITNESS: I had made recordings under, you
16  know -- you know, I had made recordings.
17  BY MR. NOLAN:
18      Q   Right. Let me -- let me withdraw that
19  question.
20      Regarding your accessing Dr. Benzinger's
21  emails, was that the only time you accessed his email
22  account on that date when you took the pictures?
23      A   Yes, that was the only time I accessed it.
24      Q   Was there any other time where you accessed
25  anyone else's email account?

## Page 478

1       A   There was no other time that I saw anybody
2   else's email account.
3       Q   So that one time was the only time you ever
4   accessed someone else's email account during the -- your
5   time in the residency program?
6       A   That was the only time that I -- that I did.
7       Q   Okay. Going back to these secret recordings
8   that you made, when did you start doing them?
9       A   I mean, I wouldn't say they were secret
10  recordings, but I -- I believe around the time, I believe
11  around the time that Alex Evers first wanted to get the
12  contracts and corporate documents from Strategic
13  Biomedical.
14      (Reporter clarification.)
15      THE WITNESS: From Strategic Biomedical. I
16  believe I started to get concerned that I might need to
17  document some of this and, you know, I made some
18  recordings.
19  BY MR. NOLAN:
20      Q   Why were you concerned when Dr. Evers asked
21  you for some corporate documents?
22      A   I was concerned about that because -- well, I
23  was first very concerned because I was contacted by the
24  general counsel, Ken Fleischmann at Saint Louis College of
25  Pharmacy, and he told me not to give the recorded -- he

## Page 479

1   told me not to give the corporate documents or contracts
2   out because him and president John Pieper didn't want that
3   to occur because they were in negotiations.
4       So I was concerned immediately when the Saint
5   Louis College of Pharmacy and the leadership, the leader,
6   the president, the general counsel said do not give this.
7       And also risking breach of fiduciary duty
8   because I would have had to ask my investors if I can just
9   give, you know, all corporate documents over. So I was
10  very concerned that it seemed to be an inappropriate ask.
11      Q   Okay. Did Fleischmann tell you not to give
12  the documents to Evers before Evers asked for them?
13      A   I don't recall the exact sequence of
14  communications, but I -- I do know that he had told me not
15  to give -- he did tell me not to give them out. And I
16  believe there may be some emails of me discussing that with
17  Ken Fleischmann.
18      Q   So why would you need to record that
19  conversation with Evers? Why not just say sorry, no, I
20  can't give you those documents?
21      A   I -- I was scared. I was terrified at this
22  point. I was a lowly intern at Barnes-Jewish/Wash U.
23  Interns normally have no interactions or limited
24  interactions with Alex Evers. And up -- he was at the very
25  top of the chain, chain of command, and he had full control

## Page 480

1  over my life, my destiny, my ability to be a doctor.
2      So I wanted to make sure that -- that if
3  there -- if there was a problem or if my career was
4  attacked, that I would have some evidence about this.
5      Q  So Dr. Evers asked you for some corporate
6  documents and you were scared?
7      A  Yes, I was very scared that my supervisor said
8  he wanted the lease agreements with the Saint Louis College
9  of Pharmacy as well as corporate documents from a private
10  corporation so that he can -- I was very nervous,
11  especially when the general counsel of the Saint Louis
12  College of Pharmacy said that he wanted them to gain an
13  upper hand in the lease negotiations and other negotiations
14  with them and to please not give them.
15      It put me, a lowly intern, between the
16  president and general counsel of the Saint Louis College of
17  Pharmacy and the chair of anesthesia at Washington
18  University Saint Louis.  So I would think most people would
19  be very nervous and scared with that situation.
20      Q  So you decided to secretly record your
21  conversation with Dr. Evers?
22      MR. MAREK:  Objection, asked and answered at
23  length yesterday in addition to today.
24      THE WITNESS:  I -- I recorded my conversation
25  with Alex Evers.

## Page 481

1  BY MR. NOLAN:
2      Q  Because you were scared?
3      A  That was -- that was one of the reasons.  I
4  was scared of -- of him and his potential impact on my
5  career.
6      Q  Did Dr. Evers demand the documents or did he
7  ask for them?
8      A  Dr. Evers, in my -- in my opinion and my
9  experience, Dr. Evers both demanded and asked for those
10  documents.  His ask -- his ask was a demand.  He wanted
11  those documents and he wanted that information.
12      Q  His ask was a demand?
13      A  He demanded --
14      MR. RUTTER:  Hang on, Jeff.  There's no
15  question pending.
16  BY MR. NOLAN:
17      Q  Did he say hey, could I have those documents,
18  or did he say you better give me those documents?
19      A  I believe he told me that he needed those
20  documents.  It wasn't -- this was not -- this was not
21  somebody saying hey, please can I borrow this.  This was I
22  need to see these documents.  To me that's a demand.
23      Q  I need to see these documents, and that scared
24  you?
25      MR. ELSTER:  Objection, asked and answered.

## Page 482

1      THE WITNESS:  Yes, that -- that -- that scared
2  me.  Again, I had one of the most powerful people in the
3  anesthesia world and at Wash U/Barnes asking me for
4  corporate documents so he can secretly gain an advantage
5  negotiation over the Saint Louis College of Pharmacy or do
6  whatever he was planning to do, yes, I think that would
7  really scare a lot of people and make them very nervous
8  about what they're supposed to answer.
9      Because, again, if the Saint Louis College of
10  Pharmacy please, give him a copy of it, but I had the
11  general counsel and president of -- of a, you know, a
12  college university telling me do not give these documents
13  to him.  That put me in the middle of a very tenuous
14  situation as a lowly in term.  It was -- and in all
15  sincerity, I was terrified of this.
16  BY MR. NOLAN:
17      Q  Did Dr. Evers tell you why he wanted the
18  documents?
19      A  I believe when I spoke to Dr. Evers -- and
20  I -- I had met with him on this and there were some phone
21  calls and some emails.  I believe he said that he just
22  needed -- so I believe at first he said he just wanted to
23  see them.  And I believe then he said that he might need to
24  see them for a conflict check.
25      He seemed to give a variety of reasons of

## Page 483

1  wanting to see them, wanting a conflict check.  My reaction
2  was to try to politely refer him to David Sinow, the
3  president of the company.
4      (Reporter clarification.)
5      THE WITNESS:  David Sinow, S-I-N-O-W.
6  BY MR. NOLAN:
7      Q  Okay.  So anywhere in there did he tell you
8  that he was trying to gain -- gain some secret advantage in
9  his negotiations with the Saint Louis College of Pharmacy?
10      A  I don't believe he framed it like that, but
11  the Saint Louis College of Pharmacy told me --
12      Q  That's what you told me a minute ago in your
13  answer, right?
14      A  Well, my -- my answer was that he wanted -- he
15  wanted the documents.
16      Q  But then you speculated as to his reasons and
17  said because he wanted to gain some secret advantage,
18  right?
19      A  Well, it was very clear from talking to him
20  that what he really cared about was the lease agreement.
21  When I spoke to him on this, what he really wanted was he
22  wanted all the corporate documents, and he particularly
23  wanted the lease agreement because he wanted it and it
24  would give him an unfair advantage in the negotiations.  It
25  was very clear what he was doing.

35 (Pages 480 to 483)

Page 484

1      Q   But he never told you that, and yet you're
2   saying that under oath like it's true, and you're just
3   lying about it, aren't you?
4          MR. ELSTER:  Objection, form, argumentative,
5   badgering the witness.
6          THE WITNESS:  I am not lying.  It, in fact, is
7   true.  He wanted to get a copy of my lease agreement and
8   contract with the Saint Louis College of Pharmacy to gain
9   an advantage in those negotiations.  That is fact.  That is
10  why he was doing that.
11  BY MR. NOLAN:
12     Q   Did he tell you that?  Did he tell you that, I
13  want to gain an advantage in my negotiations?
14     A   The way he asked the question, his body
15  language, the way he kept following up with it
16  persistently, it was very clear why he wanted those
17  documents.  There is no question that was why he wanted
18  those documents.
19     Q   Can you get up and show us how his body moved
20  that would convey his purpose in asking for the lease
21  documents?  Can you show us?
22         MR. MAREK:  Objection.  That's harassing.
23         MR. ELSTER:  Objection.  That's not a
24  question.  That's even discoverable --
25

Page 485

1   BY MR. NOLAN:
2      Q   I'd liked you to show us how he moved his
3   body --
4          MR. RUTTER:  No, he's not doing that,
5   absolutely not.
6          MR. NOLAN:  -- such that you could understand
7   what he was thinking.
8          THE WITNESS:  As I said before, from the
9   number of communications, the type of communications,
10  everything around that circumstance, it was very clear he
11  wanted those corporate documents.  He wanted the lease
12  agreement.
13         Everybody told me not to give him the lease
14  agreement because he was asking about it and he wanted it.
15  And I believe he was -- and actually, to even further
16  answer your question, and I'd need to go through the
17  documents because I want to be accurate, but I believe
18  there's emails where he's asking the Saint Louis College of
19  Pharmacy president, I believe there's emails where he's
20  asking their leadership for copies of those contracts, and
21  they direct him to go contact me about it.
22         So if he's emailing the president and general
23  counsel of the Saint Louis College of Pharmacy asking for
24  contracts and they say go talk to Jeff, and then he
25  immediately contacts me I need to go get all your corporate

Page 486

1   documents, well, he just asked the president and general
2   counsel of the Saint Louis College of Pharmacy for it.
3          There's no question that that was exactly what
4   he wanted.  He wanted contracts to have a competitive
5   advantage, and he did so unethically and abusing his use
6   power to do so.
7      Q   How many of these secret recordings did you
8   make while you were in the program?
9          MR. RUTTER:  Objection, asked and answered.
10  Discussed at length yesterday.  Cumulative.
11         THE WITNESS:  You know, I don't recall the
12  exact number.  I gave all the recordings that I had to --
13  you know, I gave all the recordings that I had over, you
14  know.
15  BY MR. NOLAN:
16     Q   This first recording that you made of
17  Dr. Evers, roughly how far into your term at the program
18  did that start?
19     A   Could you please let me know the date of it?
20     Q   What's that?
21     A   Could you please let me know the date of the
22  first recording.  I don't have them in front of me.
23     Q   No, I don't have it.  I'm just asking for you,
24  what's your best recollection of how far into the program
25  you were when you first started making these secret

Page 487

1   recordings.
2      A   I believe I was probably in my second four
3   week block.  I would have to check a date to be accurate,
4   but my recollection right now, without looking at anything,
5   is I was in my second four week block.
6      Q   So within a couple of weeks after starting the
7   program, you were already secretly recording conversations
8   with people?
9      A   I was recording conversations because they
10  were behaving in a manner that made me scared for my --
11  for -- I was scared because the type of harassment and
12  bullying and what was going on, and I felt the need to have
13  an independent record because these were powerful
14  individuals.  They me in a bad situation.  I felt the need
15  to protect myself.
16     Q   Did you feel like Dr. Evers was harassing and
17  bullying you when he said I need those documents?
18     A   Yes.  I felt that he was using his power and
19  influence because he was my boss' boss' boss.  I
20  mean, you know, Groener, Benzinger, Cox, him, that he
21  wanted them.  That -- that's like a CEO of a company asking
22  for something from a low level worker.
23     Q   And was that the first time you felt harassed
24  and bullied when Dr. Evers asked for those documents?
25     A   From him, that was probably, I'm thinking if

LEXITAS LEGAL
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 488

1  there were any other interactions earlier, but I think that
2  was the first time -- I think that was probably the first
3  time from Dr. Evers Alex that I felt particularly scared
4  and nervous around that time period.
5      Q   Were you scared for your physical well-being?
6      A   Well, I was scared -- at that point I was
7  nervous and scared for my career. I was worried that
8  something like what happened now, what happened and we're
9  dealing with today, that this was going to be the end
10  result of him going after me and blacklisting me.
11      Or let me rephrase. I was scared at that
12  point in time that something like this was going to happen
13  and that he would go after me for not giving him what he
14  wanted and I would lose my career in medicine.
15      Q   So within two weeks of starting the program,
16  you were already scared that the head of the program was
17  going to blacklist you and harass you and bully you?
18      MR. RUTTER: Objection to the form of the
19  question, misstates the deponent's testimony, and also
20  misstates facts of the record.
21      THE WITNESS: All that I'm saying is that
22  based on his interactions towards me, I was very scared and
23  nervous about what he would do to me for not cooperating
24  and giving him any documents he wanted or doing whatever he
25  wanted. Again, Alex Evers is a very powerful individual.

Page 489

1  BY MR. NOLAN:
2      Q   But two weeks into the program you were
3  already scared that you were going to get harassed, bullied
4  and blacklisted?
5      A   All that I am saying is I was very -- what I
6  am saying is the following, Alex Evers wanted corporate
7  documents and contracts from me and I denied it. And I was
8  in a position where I was told to deny him, and I did, in
9  fact, deny him.
10      And I was very scared that he was going to do
11  something to retaliate against me. And I was worried that
12  it could be anything from pushing me out of the program,
13  not letting me work in anesthesia anymore, just giving me a
14  really rough several years. I -- I was honestly and
15  sincerely nervous about this.
16      Q   So within two weeks of starting the program,
17  you already think that the program director is out to get
18  you and you start secretly recording your conversations
19  with him to capture evidence of his wrongdoing. Is that
20  fair?
21      MR. RUTTER: Objection to the form of the
22  question. It's compound and it misstates prior testimony,
23  and it's been asked and answered at least twice.
24      THE WITNESS: As I said, as of -- in -- I
25  believe that first recording was in August. Around that

Page 490

1  time period in August, I was very concerned with his
2  behavior towards me. And I was honestly scared that he
3  would do something, and I needed to have proof of what was
4  occurring in case it became an issue, which it clearly has.
5  BY MR. NOLAN:
6      Q   So you could file a lawsuit, right?
7      A   I had no intention of filing a lawsuit at that
8  point. I was very concerned for -- you know, I was very
9  concerned that he was powerful individual and that he may
10  retaliate and harm me. As I said, I was scared and wanted
11  to protect myself. And I want -- I wanted a record of what
12  was being said so he couldn't say else and be believed over
13  me.
14      Q   Did you disclose to Dr. Evers that you were
15  recording that conversation?
16      A   I did not disclose to Dr. Evers that I was
17  recording that conversation.
18      Q   In any of the recordings that you've -- that
19  you have, did you ever disclose to the person that you were
20  conversing with that you were recording the conversation?
21      A   I don't believe I did.
22      Q   Did you ever tell them off the recording?
23      A   I don't believe that I did.
24      Q   Why was it is important to you to keep secret
25  the fact that you were recording those conversations?

Page 491

1      MR. RUTTER: Objection to the form of the
2  question. It's argumentative and misstates the witness'
3  testimony.
4      THE WITNESS: It was -- it was important to me
5  to make these conversations -- to record these
6  conversations so there was evidence of what was occurring
7  to me while I was at the program. And I, you know, I
8  was -- you know, that's -- that's what it was. I wanted to
9  have evidence of what was occurring to me when there was
10  bullying or harassment.
11      And, in fact, it turned out to be necessary
12  because the bullying and harassment and improper activities
13  to me and even to Gary Hammen did not stop. It just
14  continued to pick up.
15  BY MR. NOLAN:
16      Q   When did you stop making the recordings,
17  secret recordings of conversations with people at the
18  program?
19      A   I'm trying to remember the exact date. Once I
20  left the program, after June of 2018, I didn't have much
21  interaction with them, but I did have some interactions, I
22  believe phone calls and meetings, with Douglas Thompson,
23  the new program director, and the GME office. There may
24  have been others. Again, I don't have the list of the
25  recordings in front of me.

Page 492

1      But so I would say into the fall of 2018 to,
2  you know, I documented their interactions. And it turned
3  out that it was very necessary, because I asked them to
4  send my ACGME transcripts to other institutions. They said
5  they would. And there's evidence of them hiding my -- my
6  transcripts my, training file and not sending it.
7      Q    I just asked for when.
8      A    Yes.
9      Q    Okay. Do you remember?
10      A    I believe I continued recording, as I said,
11  until the fall of 2018.
12      Q    Thank you.
13      Any of those telephone calls that you made did
14  you disclose during those conversations that you were
15  recording them?
16      A    I don't recall. I'd have to think on it, but
17  I don't believe I did.
18      Q    Where were you during those telephone
19  conversations?
20      A    It would depend on the date. Possibly
21  Missouri or possibly Louisiana.
22      Q    How about Illinois?
23      A    Again, I'd -- I'd have to see the recordings
24  and the dates to -- to give a statement on that.
25      Q    Okay. Who else did you record other than

Page 493

1  Dr. Evers?
2      A    You know again it would be very helpful to
3  have a list in front of me or to see the recordings, but
4  I -- I believe I recorded, aside from Dr. Evers, I believe
5  I recorded Thomas Cox. I believe I recorded Richard
6  Benzinger. I believe I recorded Russell Groener.
7      I believe I recorded -- I'm trying to think
8  who else I recorded. I mean, I don't have a list in front
9  of me and it depended on the interaction and the faculty
10  that I was with. If there was a meeting or something that
11  was being said to me that seem inappropriate, I wanted to
12  have documentation in instances. And it varied from time
13  to time.
14      And the other thing was I couldn't
15  necessarily -- you know, I'm not able to record every
16  single thing going on. I'm still working. I'm, you know,
17  holding things in my hands and unable to record things at
18  different times. So, as I said, you asked who I recorded.
19  You know, I recorded many people I interacted with. I -- I
20  need to see the list, because, again, I haven't looked at
21  these in a long time.
22      Q    Did you record all of these conversations with
23  your iPhone?
24      A    I believe these were all recorded with the
25  iPhone.

Page 494

1      Q    Was that the iPhone that we talked about
2  earlier, the old one that you got rid of?
3      A    That is correct.
4      Q    How did you preserve the audio files from the
5  recordings?
6      A    I -- I gave the -- I -- I have them on my
7  device, and I gave my device over to my counsel, and
8  that -- that's what I did.
9      Q    When you got your old phone back, did it still
10  have those audio recordings on it?
11      A    I don't recall if we -- I -- I don't recall at
12  this point.
13      Q    Did you download the audio recordings to a
14  computer or upload them to an i-Cloud or something like
15  that?
16      A    I didn't download to a computer or put into an
17  i-Cloud.
18      Q    Did you do anything to preserve the original
19  audio files?
20      A    I believe we -- I believe me giving them over
21  was preserving them.
22      Q    I'm talking about the original ones.
23      MR. ELSTER: Objection, vague as to original.
24      THE WITNESS: What -- what do you mean by the
25  original files?

Page 495

1  BY MR. NOLAN:
2      Q    The original audio files that were on your
3  iPhone.
4      A    Oh, I --
5      MR. ELSTER: Same objection.
6      THE WITNESS: I -- I mean, the honest answer
7  is I don't have that iPhone any longer.
8  BY MR. NOLAN:
9      Q    Did anyone tell you to delete them?
10      A    I don't believe anybody told me to delete
11  them.
12      Q    Other than giving your old iPhone to your
13  counsel, presumably so they could transfer the files, did
14  you do anything else with those audio recordings?
15      A    I don't believe I did.
16      Q    Did you send them to anyone else?
17      A    I don't believe I sent them to anyone else.
18      Q    Did you discuss them with anyone other than
19  your attorneys?
20      A    I don't believe I discussed them with anyone
21  other than my attorneys.
22      Q    Did you ever disclose to BJC or Wash U that
23  you had secret recordings of conversations with people at
24  the program?
25      A    I don't believe that I told BJC or Wash U that

## Page 496

1   I had recorded some people with the program.  I -- I'm
2   thinking right now I don't remember telling anybody.
3       Q   Yesterday you told Washington University's
4   attorney that you scored poorly on a test at the program
5   because you were busy running around recording
6   conversations.  Do you remember that testimony?
7           MR. ELSTER:  Objection, mischaracterizes his
8   testimony.
9           THE WITNESS:  I don't believe I stated --
10  stated something like that.  I believe yesterday I told
11  Wash U's counsel, Mr. Sullivan, that instead of having the
12  time to be able to study, go home and study like regular
13  residents, I had to go and talk with people at the end of
14  the day to check on my performance, to check that they were
15  happy with me, and I had to spend a lot of extra time
16  because of that.
17  BY MR. NOLAN:
18      Q   So you agree that because you were out making
19  secret recordings, trying to gather evidence, that you
20  neglected your studies in the program, yes?
21          MR. ELSTER:  Objection, form, argumentative
22  and mischaracterizes his testimony.
23          THE WITNESS:  I don't agree in the way that
24  you stated.  What I -- what I stated was very -- very much
25  so the fact that I had to go talk to people on a regular

## Page 497

1   basis to make sure they were happy with me, put in lots of
2   extra time to document and make sure things were -- were
3   done properly in a way that protected me.
4   BY MR. NOLAN:
5       Q   And you admit that you studied less than the
6   other students or the other residents because of that, yes?
7           MR. ELSTER:  Objection, speculation, form.
8           THE WITNESS:  I don't know what the other
9   residents were studying or what their time commitment was.
10  I do know that I had to spend substantial amounts of time
11  documenting the bullying and harassment that was ongoing to
12  me.
13  BY MR. NOLAN:
14      Q   Okay.  And because of that, you weren't able
15  to study as much as you otherwise would, yes?
16      A   Because of the bullying and harassment I was
17  not able to study as much as I otherwise would have been
18  able to.  The bullying and harassment was a huge
19  distraction to my studying, as would any -- any reasonable
20  student's.
21      Q   And when you say bullying and harassing,
22  you're talking about the negative performance evaluations
23  you got, yes?
24      A   So the activities that included -- that were
25  included in that, giving me a hard time while I was

## Page 498

1   working, and having to -- so -- so, yes, the -- the general
2   harassment that was ongoing there.
3       Q   The negative performance evaluations?
4       A   Well, the negative performance evaluations was
5   one aspect of it.  I had to document -- I had to go talk
6   with people and confirm on a daily basis am I doing what
7   you want, is everything going well and really follow that
8   closely.
9           And I believe in much of the documents there's
10  even comments by Dr. Benzinger that I'm very much so
11  talking to people on a daily basis, checking on my
12  performance regularly.
13          And I did what I think any reasonable
14  individual would do whether they're a doctor or a lawyer.
15  When somebody says we're worried about your performance and
16  it seems not to be done fairly, whether you're a doc or a
17  law firm, you will talk to your supervisors on a daily
18  basis or regularly and confirm things are going well.
19          But that takes a lot of time.  A lot of times
20  the doctors there, for example, wouldn't be -- my operating
21  room might finish, for example, at 5:00, but there may be
22  another operating room going or something in post-op going
23  until 6 or 7.
24          So I may have to hang out there and help out a
25  little bit but wait until the doctor I'm working with is

## Page 499

1   done for the day, because I can't interrupt them while in
2   the middle of a procedure with a patient.
3           So I'd have to wait until the very end of the
4   day and go, you know, Dr. So and So, how did the day go,
5   you know, please tell me any suggestions for improvement.
6   And I would have to do that on a regular basis.  And
7   that -- that was exhausting.
8           The best example of that, and to -- to truly
9   answer, you know timing on things --
10      Q   Do you remember my question?
11      A   Yes.  You wanted to know how much time I was
12  spending on dealing with the bullying and harassment.  And
13  I'm giving examples of how much time I'm spending on the
14  bullying and harassment.
15          And that's why I was just saying, I was in the
16  surgical ICU towards the end of my time there and I got a
17  phone call from an attending, Richard Chen, who said that
18  one of the Wash U anesthesia attendings for that week
19  happened to be in the surgical ICU --
20      Q   This is not responsive to my question.
21      A   It is very responsive, because I'm going to
22  give the biggest example of how exhausting this was.  He
23  told me there was a Wash U anesthesia attending in the
24  surgical ICU talking --
25          THE COURT REPORTER:  I'm sorry, can you slow

## Page 500

1    down for me.
2              THE WITNESS:  He said --
3              THE COURT REPORTER:  Just wait one second,
4    please.
5              (Thereupon, the previous answer was read back
6    by the Court Reporter as recorded above.)
7              THE WITNESS:  Richard Chen -- and I'll keep
8    this brief.  Richard Chen, one of the surgery attendings,
9    called me after I finished a 12 to 14 hour shift in the
10   surgery ICU.  He told me that one of the anesthesia
11   attendings that's normally in the cardiothoracic ICU, which
12   is the anesthesia run --
13             (Reporter clarification.)
14             THE WITNESS:  Anesthesia run, was in the
15   surgical ICU that -- that day.  And he was talking to
16   faculty members saying that they were trying to get rid of
17   me and they should be very careful evaluating me and to try
18   to push me out and things like that.
19             I got this call from Richard Chen after I had
20   already gone home after 12 to 14 hour shift.  And Richard
21   Chen, the attending in surgery said, you need to go back to
22   the hospital and immediately go talk to Dan Emmert and stop
23   this from becoming a problem for you in this rotation.
24             So I went back to the hospital, and I was
25   there, instead of leaving at 7 or 8:00, I had to go back

## Page 501

1    there, wait for Dan Emmert to finish, and I talked to him
2    around 11, 12:00.
3              So instead of going home at a reasonable hour,
4    eating dinner, doing studying, I was sitting there until
5    midnight trying to track him down to try to stop this.  And
6    then I went home.  I got much less sleep than I would have,
7    and I had to go repeat.
8              So to answer your question, the bullying and
9    harassment, how did it effect my studying, yes, it severely
10   effected my studying.  And I would prefer that it didn't
11   occur and I didn't have to do these things.
12   BY MR. NOLAN:
13        Q    And it was because you weren't able to study
14   as much that you performed so poorly on that test, yes?
15             MR. ELSTER:  Objection, foundation.
16             (Reporter clarification.)
17             MR. ELSTER:  Objection, foundation.  Sorry.
18             THE WITNESS:  Because I wasn't able to study
19   as much, that was one of the reasons I did poorly on that,
20   the AKT-6, that practice test, which was a practice test
21   for the boards, which I did pass my boards.
22   BY MR. NOLAN:
23        Q    Any other reason why you did so poorly on that
24   test?
25        A    Those were the primary reasons.

## Page 502

1         Q    Because you did score in the bottom five
2    percent of your residency class, yes?
3         A    I don't have the document in front of me.  I
4    know that the assertion was made yesterday that I was in
5    the bottom five percent, yes.  And -- and that test was to
6    show knowledge base so you could do well to take and pass
7    the boards.
8              It's just like some law schools, they have
9    baby bar exams where you see how you're doing and then you
10   study and do well.  Myself and Gary Hammen passed the basic
11   anesthesia boards.  Every year Wash U normally has one or
12   two residents fail.  I passed them.
13        Q    So 95 percent of the other residents did
14   better than you on that test, yes?
15        A    That wouldn't be a statistically sound way to
16   phrase it necessarily, but -- because I believe that AKT-6
17   test score --
18             (Reporter clarification.)
19             THE WITNESS:  AKT-6 test score, I believe that
20   test -- I don't remember if that was a test that was taken
21   nationally or at Washington University Saint Louis alone.
22   And I don't know if all -- and I don't know if all
23   residency programs took that test.  So whoever took that
24   test among that cohort, I was in the fifth percentile.
25             But, again, this was a practice test to show

## Page 503

1    you where you stood to study for the boards.  So I studied
2    and passed the boards.  That's, you know, all I can say on
3    that.
4              MR. NOLAN:  Let's take a -- no, now is a good
5    time.  Let's take a short break.
6              THE VIDEOGRAPHER:  Going off the record at
7    approximately 12:42 p.m.
8              (Thereupon, a recess was taken, after which
9    the following proceedings were had:)
10             THE VIDEOGRAPHER:  We're back on record at
11   approximately 12:56 p.m.
12   BY MR. NOLAN:
13        Q    Did Nicole Erter ever harass, bully or
14   intimidate you?
15             MR. ELSTER:  Objection, compound.
16             THE WITNESS:  So Nicole Erter was the HR rep.
17   I met with her.  I don't -- I told her -- I told her --
18   so -- so let me answer your question.  So I do not believe
19   Nicole Erter did anything to harass, bully or intimidate
20   me.
21   BY MR. NOLAN:
22        Q    Thank you.  Did you record your conversation
23   with Nicole Erter?
24        A    I don't recall if I did.  My apologies, I
25   don't know what the full list of what I recorded was.

## Page 504

1  **Q  Roughly when did you meet with Nicole Erter?**
2  A  I met with Nicole Erter, I believe it was the
3  winter -- I believe I emailed Nicole Erter that I wanted --
4  that I wanted to meet with her, I believe that was either
5  December of 2017 or January of 2018 or around that time
6  period.
7  (Thereupon, Defendant Exhibit B4 was marked
8  for identification.)
9  BY MR. NOLAN:
10  **Q  Okay.  Hand you what's been marked as**
11  **Exhibit B4.  Do you recognize that as a brief filed on your**
12  **behalf in response to the Defendant's motion to dismiss?**
13  A  Yes.  This appears to be the document filed
14  November 25th, 2019.  I have not looked at this document in
15  a long -- in years probably.  Do you want me to read and
16  refresh or --
17  **Q  No, not at this point.  But did you -- you**
18  **read this document before, you're familiar with it?**
19  A  I believe I read the document many years ago.
20  **Q  Okay.  And you understand that as an attorney**
21  **that when attorneys sign a brief like this, they're**
22  **representing to the court that it's true and accurate?**
23  MR. RUTTER:  Objection, calls for a legal
24  conclusion.
25  THE WITNESS:  You know, I'm sitting here as a

## Page 505

1  plaintiff, not an attorney on this.  Ed More submitted this
2  and did -- you know, Ed More submitted this document and
3  generated this document.
4  BY MR. NOLAN:
5  **Q  Right.  But you understand you're not supposed**
6  **to misrepresent facts to the court, yes?**
7  MR. RUTTER:  Objection to the form of the --
8  form of the question.  It's vague.  It's ambiguous.
9  THE WITNESS:  Yeah, could you -- can you
10  please specify what -- what the question is.
11  BY MR. NOLAN:
12  **Q  The question is you're aware that when an**
13  **attorney files something with the court, they're not**
14  **supposed to make misrepresentations to the court.**
15  MR. RUTTER:  Same objection.
16  BY MR. NOLAN:
17  **Q  Pretty simple.**
18  A  As -- as you stated, you know, in general,
19  attorneys should be honest to the court such as saying a
20  transcript exists or doesn't exist.
21  **Q  And you would never make false representations**
22  **to the court, would you?**
23  MR. RUTTER:  Objection, calls for speculation.
24  THE WITNESS:  Could you please let me know
25  what you're specifically talking about.

## Page 506

1  BY MR. NOLAN:
2  **Q  I'm just asking you.  Would you ever make,**
3  **knowingly make false representations to the court?**
4  A  I would not knowingly make false
5  representations.  Can you please provide a little bit of
6  context or I'd like to read through the motion to make sure
7  I see what's going on.
8  **Q  Sure.  Would you turn to Page 17 of**
9  **Exhibit B4.  And could I direct your attention to the very**
10  **last sentence on that page.**
11  A  Seventeen?
12  **Q  Page 17.**
13  A  For example, Dr. Weisman alleges that
14  Dr. Evers and Dr. Benzinger are employed by Wash U but not
15  BJH?
16  **Q  Yes.  Is that a true statement?**
17  MR. RUTTER:  Objection to the form of the
18  question.  It's asking Dr. Weisman to testify as to the
19  veracity of statements of his previous counsel, Edward
20  More.
21  MR. ELSTER:  Also object that this motion is
22  based on an abandoned pleading.
23  THE WITNESS:  You know, I can't comment on the
24  pleading aside from this is the text that's written
25  there --

## Page 507

1  (Reporter clarification.)
2  THE WITNESS:  I can't comment on the pleading
3  aside from this is the text that -- that was written there
4  by my counsel.
5  BY MR. NOLAN:
6  **Q  And it cites to the amended complaint,**
7  **Paragraphs 14 and 15.  Those allegations relate to**
8  **Dr. Evers and Dr. Benzinger's employment, yes?**
9  MR. ELSTER:  Same objection.
10  THE WITNESS:  Again, I can only state what --
11  you know, I haven't looked at this document in years.  I'm
12  more than happy to read the entire thing to get context,
13  but the sentence is, for example, Dr. Weisman alleges that
14  Dr. Evers and Dr. Benzinger are employed by Wash U but not
15  BJH.
16  BY MR. NOLAN:
17  **Q  Is it true?**
18  MR. ELSTER:  Objection, vague as to is the
19  allegation true or is the citation true.  What is the
20  question?
21  THE WITNESS:  What -- could somebody pull up
22  for me the citation, AC1415.
23  BY MR. NOLAN:
24  **Q  Sir, you read through this.  You're familiar**
25  **with the complaint.  Isn't it true that Dr. Evers and**

## Page 508

1  Dr. Benzinger work for Wash U, not BJH?
2  MR. RUTTER:  Objection to the form of the
3  question.  It's vague and ambiguous, and it's also asking
4  the witness to comment on the veracity of something that
5  was submitted, not written by him, and it's referencing an
6  abandoned complaint.
7  THE WITNESS:  Yeah.  And, you know, all -- all
8  that I can comment is what's written here is what's
9  written, and there's investigations ongoing into -- into,
10  you know, discovery of the situation.  So will you please
11  let me know what you're getting at.
12  BY MR. NOLAN:
13  Q  Have you seen the employment agreements, if
14  they exist, for Dr. Evers and Dr. Benzinger?
15  A  I don't believe that the chair of anesthesia
16  or the program director ever gave me their employment
17  agreements or their corporate documents.  They did not.
18  Just asked for mine.  So I did not see them.
19  Q  So you have no personal knowledge as to any
20  employment agreement between either of those doctors and
21  Wash U or BJH, fair?
22  MR. ELSTER:  Objection, vague as to personal
23  knowledge.
24  THE WITNESS:  Well, if you're asking do I know
25  the specifics of Dr. Evers and Dr. Benzinger's employment

## Page 509

1  agreement and if I've seen their employment agreements,
2  then the answer is I have not seen those agreements.
3  But I have talked to other faculty members and
4  residents and been told how employment in general works,
5  that you come in as a resident, you work for Barnes, then
6  you go and work for Washington University Saint Louis as a
7  fellow, and that attendings -- attendings work for
8  Washington University Saint Louis, hence they're professors
9  at Washington University Saint Louis.
10  BY MR. NOLAN:
11  Q  All right.  My question was you don't have any
12  personal knowledge as to any employment agreement between
13  those doctors and any entity, fair?
14  A  I have not seen their individual employment
15  agreements.
16  Q  Okay.  You have no idea who pays them?
17  A  As I said, I've not seen their individual
18  employment agreements.
19  Q  Okay.  You would agree that Dr. Evers is in
20  charge of that program, right, or at least he was back when
21  you were there?
22  A  Dr. Evers was the chair of the anesthesia
23  department when I was at Washington University Saint
24  Louis/Barnes, the consortium, as it was a, you know, it's a
25  consortium of multiple hospitals and centers.  Dr. Evers

## Page 510

1  was in charge of all anesthesia there.  And I believe it's
2  now Dr. Avidan.
3  Q  Right.  And so back when you were with the
4  program, Dr. Evers was in charge of that program, yes?
5  A  When you say in charge, do you mean he was the
6  chair of anesthesia?
7  Q  Controlled things.  In other words, people
8  reported up to him.  He was, I think you said, top of the
9  food chain?
10  A  Yes, from my perspective and from what I saw
11  there, he was the chair of the department of anesthesia,
12  and that was what I saw when I was there.  That was my --
13  that was my understanding at that time.
14  Q  Do you have the redwell of exhibits from
15  yesterday?
16  A  Which exhibit are you referring to?
17  Q  The redwell with exhibits from yesterday.
18  Okay.  You took them out, all right.  Well, I
19  was going to refer to, I think it was Exhibit A from
20  yesterday, the second amended complaint.
21  MR. ELSTER:  Just A?
22  MR. NOLAN:  Yeah.
23  MR. ELSTER:  Okay.
24  (Thereupon, a discussion was held off the
25  record, after which the following proceedings were had:)

## Page 511

1  BY MR. NOLAN:
2  Q  All right.  Do you have A in front of you?
3  A  Okay.  I have this up right now.  And this is
4  the second amended complaint by -- from October 30th of
5  2020.
6  Q  Right.  Okay.  Let's look at Paragraph 1,
7  nature of the case.  You state, this is not a case based on
8  discrimination or harassment in employment or school, based
9  on race, color, religion, national origin, sex, ancestry,
10  age or disability.
11  Did I read that first sentence together
12  correctly?
13  A  That is the sentence that is there.
14  Q  Okay.  I read it correctly?
15  A  Well, it's a compound sentence.  This is not a
16  case brought based on discrimination, harassment,
17  employment or school, based on race, color, religion,
18  national origin, sex, ancestry, age or disability.
19  Q  Right.
20  A  That's what the sentence says.
21  Q  So you would agree with me that you're not
22  basing your claims in this lawsuit on any statutory
23  protection that you may have under the laws of Missouri,
24  correct?
25  MR. ELSTER:  Objection, legal conclusion.

42 (Pages 508 to 511)

## Page 512

1      THE WITNESS:  I would have to let my counsel
2  answer that.  My, you know, I'm -- I reported inappropriate
3  activities.
4  BY MR. NOLAN:
5      Q   Well, this is your second amended complaint.
6  You don't have a claim in here based on any of the
7  Missouri -- laws under the Missouri Human Rights Act,
8  correct?
9      MR. ELSTER:  Same objection.
10     THE WITNESS:  You know, again, my counsel put
11  together this complaint.  Can I please be informed on what
12  you're looking for?
13  BY MR. NOLAN:
14     Q   I'm just asking, it's true, you're not
15  asserting a claim for violation of Missouri Human Rights
16  Act?
17     A   Well, you're -- you're asking me to make a
18  legal conclusion, so let me go and say what this complaint
19  states.
20     Q   Are you going to read the whole thing?
21     A   No, sir.  I just wanted to go to the counts in
22  the complaint.  I mean, that's -- well, I think it's
23  somewhere in here.  I skipped by it.  But there's multiple
24  counts in the complaint, and that -- and it is -- it states
25  what it does.

## Page 513

1      Q   Well, thank you so much for that.  We all know
2  that.
3      MR. RUTTER:  Is there a question?
4  BY MR. NOLAN:
5      Q   Yeah.  And you'll agree that you're not making
6  a claim based on how any educational service was provided
7  to you, correct?
8      MR. ELSTER:  Objection, form.
9      THE WITNESS:  Can you please restate the
10  question?
11  BY MR. NOLAN:
12     Q   Are you making a claim in this lawsuit based
13  on the education you received?
14     MR. ELSTER:  Same objection.
15     THE WITNESS:  I'm making a complaint about
16  breach of contract and my lab contract.
17  BY MR. NOLAN:
18     Q   Okay.  And we'll get into the contract.
19     A   And damages and unfair enrichment, and, you
20  know, breach of contract, tortious interference of contract
21  with legal expectancy.
22     (Reporter clarification.)
23     THE WITNESS:  Fraudulent inducement,
24  defamation, tortious conversion of the lab and intellectual
25  property, quantum meruit, unjust enrichment, civil

## Page 514

1  conspiracy.
2  BY MR. NOLAN:
3      Q   Okay.  So you'd agree no Missouri Human Rights
4  claim, right?
5      A   Are -- are you asking to make legal
6  conclusion?
7      Q   Did you just read off anything that said
8  anything about the Missouri Human Rights Act?
9      A   I -- I -- I read off what the counts are.  You
10  know, I'm here as a plaintiff, not as my own attorney.  I
11  am not an expert in Missouri Human Rights Act.  And I'm
12  reading off the counts that are there.  I'm not an expert
13  in Missouri law and Human Rights Act on that.
14     Q   All right.  Now, you would agree that you
15  don't fall -- well, strike that.
16     But the contract that you claim that you
17  entered with BJH, that was between you and BJH, yes?
18     MR. ELSTER:  Vague as to which contract.
19     THE WITNESS:  Which contract are we referring
20  to?
21  BY MR. NOLAN:
22     Q   The one dealing with the memorandum of
23  appointment.
24     A   My understanding of the memorandum of
25  appointment -- and can we -- we can pull up a copy of it.

## Page 515

1  That memorandum of appointment was with the consortium.
2  There's a consortium.  There's a website that has all the
3  consortium documents on it.  I believe we've produced those
4  and it would help to show them.
5      But there's a contract -- but I guess the
6  consortium itself, my understanding, and, again, I -- just
7  what I've seen is that there's a consortium between
8  Barnes-Jewish Hospital, Washington University Saint Louis
9  and Saint Louis Children's Hospital, and they are the
10  training consortium.  And if you go there for residency,
11  you are an employee and working for the consortium.
12     Q   Okay.  You're talking about Exhibit A to your
13  complaint?
14     A   I believe that would be one of the
15  consortium -- one of the contracts.
16     (Thereupon, Defendant Exhibit B5 was marked
17  for identification.)
18  BY MR. NOLAN:
19     Q   Handing you what's been marked B5.  Do you
20  recognize that document?
21     A   This appears to be -- this appears to be a
22  memorandum of appointment dated April 29th, 2016.  It seems
23  to be the memorandum of appointment, it states it is, for
24  house officers appointed to Barnes-Jewish Hospital for the
25  2016 to 2017 academic year.

## Page 516

1      Q   All right.  So at that point were -- were you
2  already a house officer when you received this?
3      A   I was a medical student in 2016, graduating in
4  May.  And I believe I -- I don't recall exactly how the
5  contract was sent to us to sign, but the National Residency
6  Matching Program, you go through the match and they have an
7  agreement that you agree that you will enter into contracts
8  after the match occurs.  All medical students sign it and
9  all medical centers sign it.
10         And then once you match, you're under an
11  obligation to then sign a contract and then become
12  appointed.  I don't remember the specifics of the date
13  right now.  I'd have to think on it.  I don't remember the
14  specifics of the exact date it was signed, but that --
15  that's roughly how the process works.
16     Q   Okay.  Let's break this down.  So you filled
17  out an NRMP application?
18     A   Yes, I registered for ERAS, E-R-A-S, the
19  Electronic Residency Application System.  And I also
20  registered for the NRMP, the National Residency Matching
21  Program.  I registered with both of those.  I submitted my
22  applications in September of --
23     Q   I just asked you if you --
24     A   Yeah.
25     Q   Okay.  So you filled out that application to

## Page 517

1  be part of the matching program, right?
2      A   That is correct.
3      Q   And you understood that that meant that if you
4  were selected for a match, that you were bound to commit to
5  that program, right?
6      A   That -- that is what the NRMP contract is.
7      Q   Okay.  So that's -- it was a binding
8  commitment, right?
9          MR. ELSTER:  Objection to the extent that's a
10  legal conclusion on a contract.
11         THE WITNESS:  Yeah.  You know, again, I'm
12  not -- you know, I signed the NRMP agreement.
13  BY MR. NOLAN:
14     Q   Okay.  Well, at that point did the N -- did
15  that NRMP agreement detail what the terms of any contract
16  that you might enter with the residency program would
17  entail?
18     A   I haven't looked at the NRMP agreement in a
19  long time.  I believe I looked at it -- I might have looked
20  at it briefly when I signed up.
21     Q   Did you produce a copy of it in the lawsuit?
22     A   I don't recall if one of the 60,000 pages was
23  the NRMP agreement.  Do we -- do we have that here?
24     Q   What's that?
25     A   Do we have a copy of that here?  I don't

## Page 518

1  recall if --
2      Q   We've got some documents, but I don't know if
3  it's what you're calling the NRMP agreement.
4      A   Okay.  Well, I know that there's a National
5  Residency Matching Program agreement.
6      Q   Have you produced it?
7      A   I produced all documents that I had to my -- I
8  produced all documents that I had to my counsel.
9      Q   Did you give that one to your counsel?
10     A   I -- from memory right now I wouldn't be able
11  to tell you.  I would have to think about it or go through
12  the 60,000 pages of documents.
13     Q   Let's look at, what is that, Exhibit B5?
14     A   B5.
15     Q   Okay.  So at the point at which you would have
16  received B5, the memorandum of appointment, you had already
17  entered into a contract through the NRMP program, right?
18         MR. ELSTER:  Objection, foundation, legal
19  conclusion as to the existence of a contract.
20         THE WITNESS:  I would have to see the
21  contract.  I would have to see the NRMP that we signed to
22  be able to comment on it.
23  BY MR. NOLAN:
24     Q   Okay.  Well, in other words, this is your
25  claim.  It's your -- you've got a claim for a contract.  Is

## Page 519

1  it based on this NRMP agreement?
2          MR. ELSTER:  Same objections.
3          THE WITNESS:  Well, again, I'd -- I'd have to
4  see the NRMP contract to answer questions on it.  I believe
5  I signed an NRMP match agreement and then I signed the
6  Barnes-Jewish Hospital consortium of Wash U, Barnes and
7  Saint Louis Children's memorandum of appointment to health
8  staff.
9  BY MR. NOLAN:
10     Q   Okay.  So it was your understanding that once
11  you were selected, once you received the match for the
12  BJH/Wash U residency, anesthesia residency program, you
13  were bound to it, you -- you had to enter that program
14  contractually?
15         MR. ELSTER:  Objection, legal conclusion.
16         THE WITNESS:  Yeah.  Again, I -- I can't
17  comment on the legal nature of the contract, but my
18  understanding was you signed up for the match, and once
19  you're assigned to a program, you then enter into a
20  contract with them, which I believe I did with the
21  Barnes/Wash U/Saint Louis Children's Hospital consortium.
22  BY MR. NOLAN:
23     Q   Well, when you became contractually obligated
24  to enter into the residency program, what was the term,
25  what was the duration of that agreement?  How long did you

Page 520

1  have to be a part of that program?
2      MR. ELSTER:  Objection, foundation.
3      THE WITNESS:  I'm a little confused what
4  you're asking with that.
5  BY MR. NOLAN:
6      Q  Was it -- were you obligated for five years or
7  six years or as long as the program took?
8      MR. ELSTER:  Objection, legal conclusion.
9      THE WITNESS:  Well, my -- you know, legally,
10  again, I can't state the terms of the contract.  My
11  understanding with match was you were assigned to the
12  residency program to complete it.
13      If you matched into internal medicine, you
14  would do three years of internal medicine.  If you matched
15  into plastic surgery, you would do six years of training.
16  If you matched into dermatology, you'd do four years of
17  training.
18  BY MR. NOLAN:
19      Q  How about if you matched into anesthesiology?
20      A  Well, in general if you matched into
21  anesthesiology, you would do four years of training.
22      Q  How about your program?
23      A  I believe my participation my program, my
24  program was a combined residency fellowship program.  I
25  believe, and I -- I don't have the full document in front

Page 521

1  of me, but I believe you did a portion of time as a Barnes
2  resident and then did another portion of time as a
3  Washington University Saint Louis fellow.
4      Q  Okay.  And how long would that take?
5      A  I believe -- I would need to see the ASAP
6  program.  I believe the residency training -- the component
7  of time when you were viewed to be a resident, I believe
8  that was roughly -- I'm sorry, it would be very helpful to
9  see the ASAP outline.
10      (Reporter clarification.)
11      THE WITNESS:  Sorry.  It would be very helpful
12  to see the ASAP outline.  But basically -- but I believe it
13  was something in the two to two and-a-half year period that
14  you would be a Barnes-Jewish Hospital resident.
15      And I believe -- and I -- I was talking to one
16  of the senior MD Ph.D.'s that had gone through the program,
17  and when they were transitioning over, they then, I guess,
18  were transitioned over to being a Washington University
19  Saint Louis fellow in the consortium was the way that their
20  pay would go.
21      But -- but my understanding was at all times
22  you were a part of the consortium.  You were going -- you
23  were going there to be educated at the Barnes/Wash U/Saint
24  Louis Children's Hospital consortium.
25      And the -- the way you were paid or the way

Page 522

1  they did things was dependent on different circumstances,
2  but you were a member of the consortium.
3  BY MR. NOLAN:
4      Q  Well, you would agree whatever it was, it was
5  going to take longer than a year, right?
6      A  Well, in general, all residency training takes
7  longer than one year.  That is in general how it works.
8      Q  Okay.  Did you get a signed writing to any
9  contract from BJH relative to the residency program?
10      A  I believe I did receive a contract or
11  memorandum of appointment at one point.  I don't recall if
12  it was something that was emailed or given to us in person
13  once we were there.
14      Q  I said a signed contract from BJH.
15      A  I haven't looked at the contracts and don't
16  recall the exact process.  I -- I could go through the
17  emails from that time period.  I believe Sharon Stark was
18  sending us information.
19      Q  Well, the memorandum agreement which you
20  attached to your second amended complaint, that doesn't
21  have a signature from anyone at BJH, does it?
22      A  I'm reading it right now.  Give me one second.
23      I believe this says your -- the very last page
24  says, your signature on the house staff memorandum of
25  appointment:  Acceptance letter mailed to you indicates

Page 523

1  acknowledgment and agreement to the terms of the
2  Barnes-Jewish Hospital memorandum of appointment to the
3  house officers and the GME consortium operating principles
4  as described herein.
5      Q  Okay.  Do you remember my question?
6      A  What was your question again?
7      Q  Is it signed by anyone at BJH?
8      A  I do not see a signature on this particular
9  document.
10      Q  Okay.  Do you have any other copy which has a
11  signature from somebody at BJH?
12      A  I would have to check to see if any of the 60
13  plus thousand pages of discovery has a signature.  I mean,
14  it's very -- it's very clear that we've entered into a
15  contract and acted upon it by me going there working, them
16  paying me, and it was the same contract that everybody else
17  entered into, the hundreds of residents that started.
18      Q  Did you ever sign anything in relation to that
19  memorandum of appointment?
20      A  When I started the residency program, and
21  before I started the residency program, we were given
22  dozens of documents to sign.  I believe I signed and
23  returned the documents that were given to me.
24      Q  Do you have a copy of a memorandum agreement
25  with your signature on it?

Page 524

1      A   I would have to go through the documents to
2   see if it's -- to see where it is.  But, again, this was
3   from the spring of 2016 after you match.  You start
4   receiving tons of documents from Sharon Stark, from Barnes,
5   from Wash U for employment, for credentialing, all the
6   types of checks that you need to do to start a new job.
7          They send you lots of documents, so you sign
8   them and send them back.  All the copies that I had
9   retained I gave over and I assume have been uploaded to the
10  60,000 pages of discovery.  I -- I would assume that
11  every -- I would assume that all documents were filled out
12  properly since I was allowed to start working there and we
13  both acted upon the agreement of the consortium contract.
14      Q   Do you remember my question?
15      A   You're asking me if I had a signed agreement
16  in front of me.
17      Q   Not in front of you.  Do you have one at all?
18      A   You know, I -- the answer is I don't recall.
19  I believe I signed all documents, but I don't recall.
20          (Thereupon, Defendant Exhibit B6 was marked
21  for identification.)
22  BY MR. NOLAN:
23      Q   Handing you what's been marked as Exhibit B6.
24  Represent to you this is a document which Barnes-Jewish
25  Hospital produced in this lawsuit.  Have you ever seen it

Page 525

1   before?
2          THE COURT REPORTER:  I'm sorry?
3          MR. ELSTER:  I was clarifying.
4          THE WITNESS:  Okay.  I'm reading this.  This
5   is a -- this is a house staff hospital memorandum of
6   appointment acceptance, dated April 28th, 2016, name
7   Jeffery Weisman, PGY level.
8          THE COURT REPORTER:  Can you just --
9          THE WITNESS:  I'm sorry.  I'm sincerely sorry.
10         THE COURT REPORTER:  I know you are.  Can you
11  repeat that, please.
12         THE WITNESS:  This is a Barnes-Jewish Hospital
13  House Staff Hospital Memorandum of Appointment:
14  Acceptance, from April 28th, 2016, with my name on it, with
15  PGY 1 level, department of anesthesiology/case ASAP,
16  A-S-A-P.  And I'm just reading it right now since it's --
17  one second.
18  BY MR. NOLAN:
19      Q   You can just read it quietly to yourself.  And
20  the question is have you ever seen it.
21         MR. ELSTER:  Did you want this marked
22  confidential?
23         MR. NOLAN:  What's that?
24         MR. ELSTER:  Did you want this marked
25  confidential?

Page 526

1          MR. NOLAN:  B6?
2          MR. ELSTER:  Yeah, labeled confidential.
3          MR. NOLAN:  Oh, sure.  Thank you.
4          THE WITNESS:  Okay.  All right.  So I see a
5   copy of the acceptance for the house staff hospital
6   memorandum of appointment.  So your question, I believe,
7   was did I ever sign it?
8   BY MR. NOLAN:
9      Q   Yes.
10      A   I believe that I signed all documents that
11  were given to me.  And the reason I believe it is because I
12  began my employment at Barnes and we both -- both parties
13  executed the contract.
14      Q   Do you see at the bottom on page, the first
15  page, it says keep one for your records and return one
16  signed appointment letter to the GME office by May 27,
17  2016?
18      A   I see where it says that, keep one for your
19  records, return one signed appointment letter to the GME
20  office by May 27th, 2016.  That would have been before I
21  started the residency training.  I believe orientation was
22  at the beginning of June.
23          I would assume that there was a -- I would
24  assume that I would have signed these documents or they
25  wouldn't have let me start.  So I'm -- you know, again, I

Page 527

1   signed all documents that were given to me --
2      Q   I'm not asking for your assumption.  Do you
3   recall signing this?
4      A   As I said, to the best of my memory, I recall
5   signing all documents that were given to me and returning
6   them.
7      Q   Do you recall signing this one?
8      A   I believe I signed all documents.  I mean,
9   they wouldn't have let me -- I would be surprised if they
10  would let me start working there and then we both honor the
11  contract if there wasn't a signed version of it at some
12  point.
13      Q   Would you look at the next page.  Do you see
14  the handwritten note, he never returned a signed copy of
15  this appointment letter?
16      A   Okay.  Is this -- is there a date on this hand
17  not or where this is from?
18      Q   Well, there's a handwritten note at the top
19  that says 2016/2017.
20      A   Well, that's an academic year.  Is this
21  something that was created once litigation began and
22  somebody put this in my file?  What's the -- what's the
23  authenticity of this document?  I don't know.  This is -- I
24  could take a piece of paper right now and write 2016/2017,
25  never returned a signed copy of the appointment letter.

## Page 528

1    So, you know, I have no idea what the
2  authenticity is.  Is this stamped, is it filed, is it
3  numbered?  Is there -- are there electronic scans in my
4  file?  I'm just asking.
5    Q    All right.  Thank you so much.  Thank you.
6    A    All right.  Well, I'll represent to you I've
7  never seen a copy with your signature on it, and you all
8  didn't produce a copy with your signature on it.  Can you
9  explain to me how that would be possible if you did in fact
10  sign this?
11    MR. ELSTER:  Objection --
12    MR. RUTTER:  Objection, calls --
13    MR. ELSTER:  -- speculation.
14    THE WITNESS:  I mean, you're asking me to
15  speculate.  I mean, again, I -- I stated I believe that I
16  filed every single document that was required for me to
17  begin working there.  And I, in fact, did begin working
18  there, and both parties began the contract and honored the
19  contract.  You know, we started the contract I would say.
20  BY MR. NOLAN:
21    Q    Now, you had already contractually obligated
22  yourself to enter the anesthesiology program right?
23    MR. ELSTER:  Objection, legal conclusion.
24    THE WITNESS:  Well, when you say -- when you
25  say that, are -- are you stating that I had signed the

## Page 529

1  National Residency Match Program agreement, that I would --
2  that I would be matched to the program and I would enter
3  into a binding agreement?
4  BY MR. NOLAN:
5    Q    Yeah.  Were you bound to enter the program?
6    MR. ELSTER:  Same objection.
7    THE WITNESS:  You know, again, I've not done a
8  legal analysis on this --
9    THE COURT REPORTER:  I got it.  I got it.
10    THE WITNESS:  I have not done a legal analysis
11  on this, but my understanding was that once you matched,
12  you were supposed to then -- that both parties were to
13  supposed to enter the program and move forward and --
14  BY MR. NOLAN:
15    Q    Okay.  So at that point, once you matched with
16  the program, anesthesiology program, what the terms of the
17  agreement between you and about BJH at that point in time?
18    MR. ELSTER:  Same objection.
19    THE WITNESS:  Well, I -- I believe once --
20  well, you're asking me to make a legal conclusion.  I mean,
21  all I can say is that there's a National Residency Match
22  Program agreement, and you then enter -- and then you also
23  enter into the hospital memorandum of appointment, which I
24  did for the consortium.
25

## Page 530

1  BY MR. NOLAN:
2    Q    No, I'm not talking about that.  I'm talking
3  about the point which you received your match to go enter
4  the anesthesiology program.  What were the terms of the
5  agreement between you and BJH at that point?
6    MR. ELSTER:  Objection, legal conclusion.
7    THE WITNESS:  As I said, my -- my
8  understanding was once you matched, you entered into the
9  memorandum of appointment.  And I believe, thinking back,
10  I'm just thinking back to my interview days, I believe that
11  when you interview at these medical centers, and I know
12  many did, if not all, they'd give you a copy of the
13  memorandum of appointment in your interview packet.  So --
14  so I believe that's in there at some point.
15  BY MR. NOLAN:
16    Q    Have you produced that?
17    A    I produced all documents that I had.
18    Q    I'll represent to you I've not seen anything
19  in a membership packet from you in your production.
20    A    Well, I guess I would just say that, you know,
21  again, any documents that I had kept -- this would have
22  been, this document or interview packet would have been
23  from the 2015/2016 interview season.  And I interviewed
24  with many programs.  And I'm certain, you know, anything
25  that I kept I would have handed over.

## Page 531

1    But I will say if you're looking for that
2  protocol, you can talk to your client.  They give out
3  interview packets all the time that have copies of a
4  memorandum of appointment, as well as everything else, all
5  the information you'll need when you arrive there, or basic
6  information.
7    (Thereupon, Defendant Exhibit B7 was marked
8  for identification.)
9  BY MR. NOLAN:
10    Q    Handing you a copy of what's been marked as
11  B7.  This came from your production.  Do you recognize this
12  document?
13    A    This seems to be an email from the National
14  Residency Match Program, sent January 14th of 2016,
15  subject, rankings open tomorrow, resources and reminder.
16  This seems to be an automatically generated email from the
17  National Residency Match Program to doctors that were
18  registered with them.
19    Q    Okay.  Do you see under important reminders in
20  the third bullet point it says, quote, listing a program on
21  a certified rank order list establishes a binding
22  commitment, so rank only those programs where you
23  interviewed and are willing and able to train.
24    Did I read that correctly?
25    A    That is what the text says.

47 (Pages 528 to 531)

## Page 532

1       **Q** Is that what you're talking about in terms of

2  the NRMP application contract?

3       **A** Well, I believe there's multiple contracts

4  that are involved here. I don't know if this going to

5  cover all of them, but when you sign up to use a website

6  like ERAS or the AAMC or the National Residency Matching

7  Program, there may be multiple contracts that you have to

8  electronically sign.

9       I know ERAS, for example, has a few user

10  agreements and contracts to use that. And I believe the

11  NRMP does. I don't believe or remember if I downloaded

12  those or if you -- or where they are at the moment.

13       But I, you know, signed and filled out all

14  agreements required to participate in the match, and I

15  believe in fact did because I went through the match. I

16  was matched somewhere and I started working somewhere.

17       **Q** Okay. I'm trying to understand what the terms

18  are of any contract between you and BJH. You all didn't

19  produce any NRMP contract to my knowledge. So where --

20  where can I find the terms of that agreement?

21       **A** Well, I would strongly suspect the National

22  Residency Matching Program would have their contracts and

23  agreements there.

24       **Q** Do you know what they are?

25       **A** Well, I gave over all documents that I had,

## Page 533

1  and I would strongly suspect that the National Residency

2  Matching Program would have a document retention policy and

3  would likely have those if -- if you're looking for it.

4       **Q** Do you know what the terms are?

5       **A** I haven't looked at that document since 2015,

6  2016. I, you know, from my memory, I -- I would really

7  need to see it to refresh. I can't comment on it really

8  without refreshing on it.

9       **Q** All right. But it's your belief that there's

10  some written contract called the NMR -- NRRMP contract?

11       MR. ELSTER: Objection to the extent it's a

12  legal conclusion.

13       THE WITNESS: You know, my -- my belief just

14  as a layperson is that there is a medical student, there is

15  a contract. And, in fact, I know there are contracts and

16  agreements for the following reason, it regularly occurs in

17  the course of events that residents wants to get out of the

18  match contract. Perhaps they've matched a part of the

19  country and they suddenly have a sick parent and they have

20  to go to the National Residency Matching Program with the

21  program to file an appeal to release the agreement.

22       If they don't so, then there's implications

23  either for the resident that doesn't show up, or if the

24  program decides not to take a resident, the National

25  Residency Matching Program can ban residents from

## Page 534

1  participating or medical centers from participating for

2  either a lifetime ban or a number of years.

3       So it's a very -- so because of the antitrust

4  monopoly power they have as the one center, and the Sherman

5  Antitrust Act allowing them to have that, those agreements

6  are generally taken relatively seriously. I know there are

7  agreements that exist.

8       **Q** Okay. So as this email from the NM -- the

9  **NRMP, which has been labeled Exhibit B7, as it indicates,**

10  **you were, you had a binding commitment to enter the**

11  **anesthesiology program once you were selected for it, true?**

12       MR. ELSTER: Objection, legal conclusion.

13       THE WITNESS: That was my understanding as a

14  medical student at the time.

15  BY MR. NOLAN:

16       **Q** Okay.

17       **A** Once -- once you matched, you had a legal

18  obligation to go there.

19       **Q** So you didn't have the opportunity to then

20  **later say hey, I'd like to negotiate the terms of this**

21  **agreement between us, right?**

22       **A** Well, which agreement are we referring to?

23       **Q** Any agreement after that. You were stuck,

24  **right?**

25       MR. ELSTER: Objection, foundation.

## Page 535

1       (Reporter clarification.)

2       MR. ELSTER: Foundation, and legal conclusion.

3  BY MR. NOLAN:

4       **Q** Right?

5       **A** Well, there -- even though the NRMP had the

6  match and they obligated you to go somewhere, it was very

7  frequent that before ranking other programs, there would be

8  discussions among residents with programs about the terms

9  of their -- of their employment and things that would

10  occur.

11       **Q** Once the NRMP matched you with the

12  **anesthesiology program, you were obligated to go to it no**

13  **matter what that program entailed, yes?**

14       MR. ELSTER: Same objections.

15       THE WITNESS: Well, what I -- what I would say

16  is while you were obligated to go there, you were not

17  obligated to rank a program highly or first so that you

18  would end up actually going there.

19  BY MR. NOLAN:

20       **Q** No, but once you were matched with the

21  **program, you had to go there, right?**

22       **A** Once you -- once you --

23       MR. ELSTER: Same objection.

24       THE WITNESS: -- were matched with the

25  program, you had to go there, but you would not rank them

## Page 536

1  high enough to match unless you had come to an agreement
2  that you wanted to be there.  So if that -- and I hope I'm
3  explaining that well.
4          But that was -- there -- you know, you could
5  talk to programs and negotiate different aspects, you know,
6  learn and negotiate what was going on there and you would
7  not rank them unless that program met your expectations.
8          And then once you matched, you would go there,
9  but certainly through any prior agreements, those would be
10  honored.
11  BY MR. NOLAN:
12      Q   I'm not talking about that.  I'm talking about
13  **if you list a program and you're then matched with that**
14  **program, according to your understanding of the terms of**
15  **the agreement, you had to go there no matter what, yes?**
16      A   Well, the answer to that is actually no.  The
17  answer to that is actually no in a sense because, well,
18  yes, in general you're obligated to go there.  You could
19  always file an appeal to not go there with the NRMP if
20  there was an issue or something going on I suppose.
21          So there were -- there were theoretical safety
22  valves in different directions in terms of ranking somebody
23  one, which -- ranking somebody highly, which both parties
24  would have to do, or in terms of being able to request that
25  they agree -- that the NRMP contract to sign your

## Page 537

1  memorandum of appointment be revoked if there was something
2  seriously inappropriate going on.  And I've -- I've seen or
3  heard of situations that that would fit those types of
4  categories.
5      Q   Okay.  Would you agree with me that the moment
6  **you were matched with the anesthesiology program, you had**
7  **to go there no matter what unless you filed an appeal?**
8      A   Well, I would say -- I would say that I would
9  have had to go there unless I filed an appeal.  Or if I
10  didn't file an appeal and I didn't want to go there, I
11  would risk being within breach of the NRMP, so I would have
12  to make a decision on that type of situation on how to
13  handle it.
14      Q   All right.
15      A   As any other resident would do in those
16  situations.
17      Q   When did you receive your match to the
18  **anesthesiology program?**
19      A   I don't recall the exact date.  I believe
20  match date was in March of 2016.  Most medical schools do a
21  match day or event.  Wash U does as well.  You go up on
22  stage, you open an envelope.  They invite family and
23  friends.  It's a big happy event.
24          (Thereupon, Defendant Exhibit B8 was marked
25  for identification.)

## Page 538

1  BY MR. NOLAN:
2      Q   Handing you what's been marked B8.  That's an
3  email from the NRMP.  It's to you.  Do you recognize that
4  **document?**
5      A   I'm reading it right now.  It's from the
6  National Residency Matching Program, February 25th, 2016 to
7  me.  It is confirmation of a certified rank order list.
8          And the way that the National Residency Match
9  Program operated, you would -- you could get access to
10  their website, but you would have to certify your match
11  order list by a certain day and time.  And after that time,
12  you were unable to change the rank order list for the
13  certification of it.
14          (Thereupon, Defendant Exhibit B9 was marked
15  for identification.)
16  BY MR. NOLAN:
17      Q   Handing you what's been marked as B9.  Is that
18  **another email from the NRMP to you?**
19      A   I believe that is an email from the NRMP to
20  me, Monday, February 20th, 2017, confirmation of a
21  certified rank order list.  And it says that I certified a
22  list on Monday, February 20th, 2017 at 1:0 --
23          (Reporter clarification.)
24          THE WITNESS:  On Monday, February 20th, 2017
25  at 1:09 p.m. Eastern Standard time.

## Page 539

1  BY MR. NOLAN:
2      Q   So at what point did you become obligated to
3  **join the anesthesiology program?**
4          MR. ELSTER:  Objection, legal conclusion.
5          THE WITNESS:  Well, I -- I think there's a
6  confusion in your question, and I'm going to explain it.
7  So when you become -- so the way the process works is you
8  can log into the National Residency Matching Program and
9  certify your rank order list, and you can also log in
10  another time and certify your rank order list.  It's an
11  electronic system.  You can go in.
12          If you ranked, you know, University of
13  Pittsburgh Number 19 and you want to move them up to 18 or
14  Number 20, you can log in later and do that.  There's a
15  certain deadline where you're unable to change anything.
16  And once that deadline happens, the system locks out.
17          My understanding -- again, I'm not an expert
18  in the NRMP, but my understanding is once the system is
19  closed and the medical students and the medical centers
20  have put in their rank order list, the system doesn't let
21  anybody in.
22          And the National Residency Matching Program
23  runs an algorithm and they certify the algorithm and the
24  match.  And at point in March then they let you know when you
25  match.

49 (Pages 536 to 539)

Page 540

1    Now, they don't let you know -- there's a --
2  there's a point in March at the beginning of match week
3  where they let you know that you have matched.  They send
4  you an email that either says you have matched or you have
5  not matched.
6    If you've matched, they do not let you know, I
7  believe on that Monday at noon what the -- where you went.
8  It's a secret because they do match day ceremonies, and
9  it's tradition and custom.
10    But if they say you haven't matched, then they
11  have a supplement application system called the SOAP.  It
12  used to be called the SCRAMBLE.  And then you'll go through
13  that supplemental application system where you'll try to
14  scramble into open seats that are still there.
15    So the question is when was the fact -- when
16  was the point that they ran the algorithm.  You would have
17  to ask the NRMP on the exact date and time they ran the
18  algorithm and locked that in.
19    I know I was notified of them on match day in
20  March of 2016 is when I was notified you have matched this
21  individual program.  I know on that Monday, I believe, or
22  the beginning of the week, I was told that I have matched.
23  And then sometime between the final rank order submission
24  date and that email you have matched, I know that the NRMP
25  had run the algorithm to put things together.

Page 541

1    So that -- that's my understanding as a med
2  student.  You know, I -- I do not work for the National
3  Residency Matching Program, but that's my understanding as
4  a medical student how the process works.  And I know -- and
5  that's what I know of it.
6    Q   When were you matched with the anesthesiology
7  program?
8    A   Well, when I knew that I was matched or when
9  they notified me?
10    Q   When you knew.
11    A   I knew I was matched a day in March of 2016 is
12  when I went up on stage and I opened my envelope and it
13  said Washington University/BJC consortium, anesthesia ASAP
14  program.  And I, you know, opened the envelope in front of
15  everybody.  That was when I knew it was -- that's when I
16  fully knew it was with Washington University/BJC's
17  consortium.
18    Q   And I'm sorry, you said that that was in March
19  of '16?
20    A   I believe that was in March of 2016.
21    (Thereupon, Defendant Exhibit B10 was marked
22  for identification.)
23  BY MR. NOLAN:
24    Q   Okay.  I'm handing you what's been marked as
25  Exhibit B10.  Do you understand that's your NRMP

Page 542

1  application?
2    A   Yes, I believe that is my NRMP application.
3    Q   That's B10?
4    A   Bravo 1-0.
5    Q   Okay.  So at some point in March of 2016 you
6  were matched with the anesthesiology program, and at that
7  point you were obligated to attend there, fair?
8    MR. ELSTER:  Objection, legal conclusion.
9    THE WITNESS:  You know, again, the legalities
10  of it, I was just a med student in the process.  I wasn't
11  counseled for any of these organizations.  But my
12  understanding was once I was notified in March, then I was
13  matched with a program and I -- and I was set to attend and
14  they were set to take me.
15  BY MR. NOLAN:
16    Q   Obligated, right?
17    MR. ELSTER:  Same objection.
18    THE WITNESS:  When I say obligated, I say that
19  just as a medical student.  My understanding is that they
20  were meant to take me.
21  BY MR. NOLAN:
22    Q   Okay.  Well, thereafter, between then --
23  between then and the date when you received what's been
24  marked as B6, did you talk with anyone at BJH regarding the
25  terms of the program?

Page 543

1    A   I would -- I would have to refresh my memory.
2  I believe right after the match we received lots of emails
3  and contact by people in the program.  I don't remember the
4  exact dates and times, but there was lots of documents to
5  sign and conversations to be had as they wanted you to come
6  in, in my case to come in and do research.
7    So I would have to go through and refresh
8  myself on the exact sequence of events.  I believe this
9  document, the House Staff Hospital Memorandum Appointment,
10  was dated April 28th, 2016.
11    Q   Okay.
12    A   And match was in, I believe, the beginning or
13  mid-March of 2016.
14    Q   Did you negotiate the stipend amount with
15  anyone from BJH?
16    A   Well, I -- let's see.  I did not negotiate the
17  stipend amount dollar by dollar here, but I -- one way
18  residents negotiated their stipend amount is by voting with
19  rank lists.  If someone is not paying well enough, you
20  don't rank them well.
21    Q   The memorandum of appointment, which is an
22  exhibit to your complaint, did you negotiate the terms of
23  any of these -- of this with anyone from BJH?
24    A   This memorandum of appointment, I believe, was
25  the standardized memorandum of appointment.  I don't recall

## Page 544

1  negotiating any terms of this memorandum here.
2      Q.  Okay.  They just hand it to you, or email it
3  to you, no negotiation at all, right?
4      A.  Well, related to the -- to the terms in this
5  memorandum of appointment.  But I did have negotiations
6  with them prior to this that I would bring my lab up and
7  they would support me, that I would never have ranked them
8  at the top of my list.  I -- I would have gone to
9  Vanderbilt or Stanford or other places that offered me
10  support for my lab group.
11      Q.  At this point if you would have gotten up to
12  Saint Louis and decided you know what, Saint Louis just
13  isn't for me, do you feel that you would have been
14  contractually obligated to stay in the program even though
15  you wanted to leave?
16      MR. ELSTER:  Objection, legal conclusion.
17      THE WITNESS:  Well, you're asking me again a
18  legal conclusion.  I would say that as a -- as a medical
19  student or entering resident, if I came to a new hospital
20  and there were certain problems, then I may very well feel
21  that I didn't want to start or that I wanted to leave, I
22  believe there's some allowances for that in the National
23  Residency Match Program for problems at hospitals or things
24  that are going on that are inappropriate.
25      The National Residency Match Program, I

## Page 545

1  believe, and I'd have to look at it, but I believe that
2  after 30 days you may be able to not violate the National
3  Residency Match Program and be disciplined by them if you
4  leave and something inappropriate is going on at a
5  hospital.
6      I'd have to check, I don't recall if it's 30,
7  60 or 90 days, but I do believe that they're -- that there
8  are some protocols in there for arriving someplace and
9  there being a problem in the place you've arrived beyond
10  just trying to break the NRMP contract.  I believe there's
11  also some protocols with the NRMP, but, again, I'd have to
12  research those, and I have not looked at those in a number
13  of years.
14  BY MR. NOLAN:
15      Q.  Okay.  Would you turn to the Memorandum of
16  Appointment, Section 16.
17      A.  Okay.
18      Q.  You see there it says responsibilities of
19  house officers.  And it's your understanding that that
20  would refer to you, true?
21      A.  Well, let me read this.  One second.
22      Okay.  I've refreshed myself and quickly read
23  Section 16, responsibilities of house officers.
24      Q.  Do you remember my question?
25      A.  Will you please restate your question.

## Page 546

1      Q.  When it refers to house officer, that's you,
2  right?
3      A.  I was considered a house officer.
4      Q.  Not BJH, right?
5      A.  Again, I -- I was considered a house officer.
6  Are you asking me to interrupt the contract here about
7  BJH's responsibilities in it?
8      Q.  I'm just saying, your understanding of
9  Section 16 when it refers to house officers, they're
10  talking about residents like you, not BJH, right?
11      A.  Well, you're -- you're asking me to interpret
12  the contract.  It's giving house officer responsibility,
13  but it also, for example, in Section I, it says to fully
14  cooperate with the program, school of medicine and
15  hospital --
16      (Reporter clarification.)
17      THE WITNESS:  Sorry.  It says to fully
18  cooperate with program, school of medicine and hospital in
19  coordinating and completing documentation required by the
20  RRC, ACGME hospital, school of medicine, department and/or
21  program, including but not limited to so legible and timely
22  completion of patient medical records and charts.
23      So it seems that there's a joint requirement
24  to have parties working together to complete ACGME
25  documentation.

## Page 547

1  BY MR. NOLAN:
2      Q.  Sir, please listen to my question very
3  carefully, okay?  Do you see in the heading for Section 16
4  in bold print the two words house officers?  Do you see
5  that?
6      A.  I see where it says responsibilities of house
7  officers.
8      Q.  No.  Do you see the two words, house officers?
9      A.  I see the two words house officers.
10      Q.  Okay.  Well, focus on those two words.  Is it
11  your understanding that that applies to the residents or to
12  BJH?
13      A.  Well, my understanding per -- you know, from a
14  legal perspective, I'm not giving a legal analysis of this
15  contract, but my understanding is that the obligations for
16  things such as complying with federal laws in ACGME
17  accreditation standards is by both parties of the
18  agreement.
19      Q.  That's not my question.  I'm asking you do you
20  understand the two words house officers --
21      A.  I understand house officers.
22      Q.  -- to refer to residents or BJH?
23      A.  I understand that this is talk.  Some of
24  this -- reading some of this, and, again, I'm not drawing a
25  legal conclusion on it because I'm not acting as a lawyer

LEXITAS LEGAL
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 548

1  here, but it seems that where it talks about house
2  officers, many of these obligations require two parties to
3  be able to fulfill these obligations.
4      Q   So are you saying that house officers is
5  referring to BJH?
6      A   You're -- you're asking me to make a legal
7  conclusion, I believe.  And I, you know, and that's, I
8  believe, for the lawyers to determine what every word in
9  this contract legally means.
10     Q   I'm asking you for your understanding.
11     A   My understanding is, I'm saying that my
12 understanding is this contract applies to both BJH, the
13 consortium, and the house officers or medical residents
14 that are coming in.
15     Q   You're calling it a contract.  You didn't
16 negotiate this or bargain for this.
17         MR. ELSTER:  Objection, legal conclusion, a
18 contract.
19         You can answer subject to that.
20         THE WITNESS:  Well, I'm not -- not going to
21 make a legal conclusion on it.  I -- I just, I said this
22 was a contract.  There's lots of contracts that have come
23 in a wide variety of forms.  And I'll let the lawyers
24 discuss what those contracts are and what they mean.
25

Page 549

1  BY MR. NOLAN:
2      Q   Let's look at Subsection J, under the -- under
3  the heading of responsibilities of house officers.  Do you
4  see in Section J it says use computers and internet
5  technology in support of patient care and education in a
6  responsible manner and in compliance with applicable
7  policies and regulations of the hospital and other
8  regulatory bodies utilizing only the unique user ID
9  assigned to you.
10         Did I read that correctly?
11     A   Let me go read this again myself.  Computers
12 and internet technology in support of patient care and
13 education in a responsible manner and in compliance with
14 applicable policies and regulations of the hospital, and
15 other regulatory bodies utilizing only the unique user ID
16 assigned to you.  So that is what the words on the page
17 say.
18     Q   So did I read it correctly?
19     A   You read word for word what's written there.
20     Q   Thanks.  A simple yes would do, okay, and
21 probably would be a lot quicker.
22         MR. ELSTER:  Objection, badgering the witness.
23         MR. RUTTER:  Is that a question?
24 BY MR. NOLAN:
25     Q   So you understood that it was part of this

Page 550

1  memorandum of appointment that when you were using
2  computers you were only supposed to use it under your
3  unique user ID that was assigned to you, correct?
4      A   I used those computers under the unique user
5  ID assigned to me.
6      Q   You were not supposed to use a computer
7  relative to someone else's unique user ID assigned to them,
8  correct?
9      A   Well, I think there's two things to note here
10 to answer your question, one, I used user -- I used my user
11 ID to access the computers.  And I know you're going to ask
12 me next about Richard Benzinger's, looking at Richard
13 Benzinger's emails.  I was logged into that computer under
14 my unique ID.
15         But I will note that it was very much standard
16 and custom that if you were sitting in a PACU or post-op
17 area or you, know, a station on the wards, very often if
18 somebody was using a computer, somebody else would come by
19 and say hey, can you look up a patient for me or do you
20 mind if I come and sit down and just look up a patient on
21 the EMR.
22         So it was very much custom that there was lots
23 of interchangeability of people using computers quickly to
24 be able to provide efficient patient care, which I think is
25 important.

Page 551

1          And you also noted that in a -- as you read,
2  in support of patient care and education in a responsible
3  manner, which I've always done, and in compliance with
4  applicable policy and regulations of the hospital and other
5  regulatory bodies, which in my opinion I've always done and
6  followed.
7      Q   Okay.  And you're familiar with Missouri's
8  computer tampering statute, right?
9      A   Well, I would let my lawyers make legal
10 conclusions on it, but I understand there's a statute in
11 Missouri called the Missouri Computer Tampering Statue.
12     Q   Right.  And you -- put it this way, down below
13 Section J it says, failure of the house officer to comply
14 with any of the responsibilities set forth above shall
15 constitute grounds for disciplinary action up to and
16 including suspension or termination from the program.
17         Did I read that correctly?
18     A   You read failure -- you read failure of the
19 house officer to comply with any responsibilities set forth
20 above --
21         THE COURT REPORTER:  I can't --
22         THE WITNESS:  Sorry.  You -- you read -- you
23 read the statement which started failure of the house
24 officer to comply with any of the responsibilities set
25 forth above shall constitute grounds for disciplinary

52 (Pages 548 to 551)

## Page 552

1  action, up to and including suspension or termination from
2  the program.
3  BY MR. NOLAN:
4  **Q   So I read it correctly?**
5  A   You read what was -- you read what was right
6  there.
7  **Q   Thank you.  Just say yes.**
8  MR. RUTTER:  Is there a question?
9  THE WITNESS:  Thank you for -- for pointing it
10 out.  Yes, you read that exactly as is there.
11 BY MR. NOLAN:
12 **Q   Okay.  So for you to utilize a computer using**
13 **Dr. Benzinger's unique user ID, that would be in violation**
14 **of this memorandum, correct?**
15 MR. ELSTER:  Objection, legal conclusion.
16 THE WITNESS:  You're -- you're asking me --
17 MR. ELSTER:  Hold on.  Hold on.  Objection,
18 legal conclusion and as to material breach of contract.
19 THE WITNESS:  Well, you're --
20 MR. RUTTER:  Hold on, Jeff.  Objection,
21 assumes facts not in evidence.
22 THE WITNESS:  You're asking me to speculate
23 here.  I, you know, can't make a legal conclusion on
24 this, but I never used Richard Benzinger's unique ID.  It
25 was my computer.  It was a common terminal that I've logged

## Page 553

1  into with my log-in and password.  And that's what I was
2  using.
3  I never took his password.  I never forwarded
4  an email.  You know that's -- and not to mention this, but
5  you said failure to comply, etc.  Based on custom and
6  culture, it was very clear that, one, what I did was
7  appropriate, and, two, you were contacted about severe
8  copyright infringement on Jake Mcdowall or Chris Davies, I
9  believe, for hundreds of pirated textbooks that were being
10 used in the intranet.  I believe that associate general
11 counsel --
12 BY MR. NOLAN:
13 **Q   This is not responsive to my question.**
14 A   No, I'm just saying, you're -- you're asking
15 about things that would be a breach here and what that
16 says.  So I'm just bringing that up.
17 MR. NOLAN:  Move to strike nonresponsive
18 portion of the answer.
19 BY MR. NOLAN:
20 **Q   You would agree with me that if in fact you**
21 **were taking data from mister -- Dr. Benzinger's email**
22 **account without authorization, that would be a violation of**
23 **the Missouri's computer tampering act, right?**
24 MR. ELSTER:  Objection, compound and legal
25 conclusion.

## Page 554

1  THE WITNESS:  Yeah, I'm not giving a legal
2  conclusion on it, but I did not take -- I did not
3  improperly take data or improperly access Richard
4  Benzinger's account.
5  BY MR. NOLAN:
6  **Q   And it says up in Section B of this section**
7  **that you're supposed to comply with all applicable state,**
8  **federal and local laws, as well as standards required to**
9  **maintain accreditation by the ACGME, right?**
10 A   And that's what's stated there, and I -- I
11 very -- I very much did.  As I said, I saw inappropriate
12 behavior.  You asked about that earlier, and I believe we
13 discussed that at length in the very beginning of the
14 deposition when I said I felt there was inappropriate
15 behavior and there's a question on what laws were being
16 violated.
17 And what I said was, I guess what I should
18 have stressed is I can't give a legal conclusion on it, but
19 when you were asking about the FCA and other things, while
20 I can't give a legal conclusion, I can see that I saw
21 harassment, I saw disability discrimination, I saw USERRA
22 discrimination.  And I felt those things were improper and
23 I wanted to give them to attorneys to further investigate.
24 So to go back and answer again your question
25 from the beginning, I saw what I thought was improper

## Page 555

1  activities, and, you know, did what I -- what I thought was
2  proper and what was in fact proper to -- to act
3  professionally and appropriately and do everything
4  properly.
5  And as we were digging around, I believe Alex
6  Evers actually told me one time that he had an issue with
7  one of his residents stealing documents off the computer of
8  nurses' cell phones and calling him up to ask for dates and
9  things like that.
10 **Q   Move to strike.**
11 A   Which again would have been computer
12 tampering.  You know --
13 **Q   Sir, there's no question pending right now.**
14 A   I'm just talking about the situation as we
15 were moving along.  Go ahead.
16 **Q   Sir, you would agree with me that at no point**
17 **in time did you ever enter into an agreement or contract**
18 **with BJC Healthcare, yes?**
19 MR. ELSTER:  Objection, legal conclusion,
20 foundation as to BJC Healthcare.
21 THE WITNESS:  Well, you know, I -- I would
22 have to ask on what the formal structures of everything
23 are.  What is the difference formally between BJC
24 Healthcare, Barnes-Jewish Hospital, the consortium?  I'd
25 like to clarify those issues, although those seem to be

## Page 556

1  legal issues to -- to flush out.  But, you know, when you
2  say -- when you say that entity, what exactly do you mean
3  by that entity?
4  BY MR. NOLAN:
5      Q  Well, there's an entity called BJC Healthcare.
6  And in your complaint you claim that you had a contract
7  with them.  So I'm asking you what's the contract.
8      A  As I said, I had -- we can pull this up right
9  here.  I believe -- give me just one moment.  There's a
10  memorandum of appointment to house staff, and that is for
11  the Wash U/Barnes-Jewish Hospital Saint Louis Graduate
12  Medical Education Consortium, GME consortium.  So this
13  contract appears to cover all of the relevant possible
14  entities.
15      Q  Is BJC Healthcare part of the GME consortium?
16      A  I -- I would have to do some investigating on
17  it as we've been doing in the current lawsuit and
18  discovery.
19      Q  So you don't know?
20      A  I'm saying I would have to do investigations
21  on it and more discovery to see exactly what each of these
22  legal entities are, and we've been doing that.
23      Q  Do you have any written contract with BJC
24  signed by someone with authorization to sign?
25      MR. MAREK:  Objection, legal conclusion as to

## Page 557

1  authorization.
2      THE WITNESS:  I have -- I have the contract in
3  front of me that you gave me, Exhibit B6 to look at right
4  now.  I'm sure there is other discovery data related to
5  this, but we're in the process of recovering additional
6  discovery information and data.
7  BY MR. NOLAN:
8      Q  Well, sir, the lawsuit's been pending for,
9  what, three years now?
10      A  Well, I believe the lawsuit was filed in
11  January of 2019.  And we've been having ongoing discovery
12  and it's going on for a long period of time due to
13  substantial delays.
14      Q  What's that?
15      A  It's gone on for a long period of time due to
16  substantial delays that I put on your end for asking for
17  additional 90 days, 90 days to move it on, without giving
18  discovery that we've asked for.  So we're trying to clear
19  this up and you look into it.
20      So as I said, right now I think you're asking
21  for a legal conclusion.  And I'm saying that we are
22  currently investigating that.  And I'd ask -- you know, I'd
23  let my lawyers talk about legalities.
24      Q  Well, this is my opportunity to ask you about
25  the factual basis for your claims.  I want to know what the

## Page 558

1  contract is between you and BJC.
2      MR. MAREK:  Objection, leading conclusion.
3  That's not the factual basis for his claims.
4      MR. RUTTER:  Also objection, asked and
5  answered.
6      THE WITNESS:  Well, as I -- as I've said, I
7  entered into an agreement and contract with the GME
8  consortium and related entities both here as well as when I
9  was being recruited and talking about moving my lab, and
10  I -- I believe I entered into contracts, and I did, in
11  fact, enter into contract with -- with all applicable
12  entities.
13      MR. NOLAN:  Okay.  Let's take a short break.
14      THE VIDEOGRAPHER:  Going off the record at
15  approximately 2:09 p.m.
16      (Thereupon, a recess was taken, after which
17  the following proceedings were had:)
18      THE VIDEOGRAPHER:  We're back on record at
19  approximately 2:22 p.m.
20  BY MR. NOLAN:
21      Q  You would agree with me that just because you
22  entered the anesthesiology program didn't mean that you
23  would complete it, correct?
24      A  I -- I wouldn't agree with that.  I had every
25  intention to enter and complete the anesthesiology program

## Page 559

1  as did almost every other person that came in with me.
2      Q  Would you agree with me that there's nothing
3  in the memorandum of appointment that guarantees that you
4  will complete the program?
5      A  Well, the memorandum of appointment is a
6  contract or agreement that discusses training circumstances
7  and situations.  There's reasons that people may decide
8  that they don't like a specialty or they want to go
9  somewhere else.
10      But I'd want to go through the entire
11  memorandum of appointment to see if you're saying there's
12  nothing in there that -- that says someone will complete,
13  I'd want to go through and look at that, because my
14  understanding was always the spirit of all these agreements
15  was to train doctors.
16      Q  You would agree there's nothing in the
17  memorandum of appointment that guarantees that you will
18  complete the program, yes?
19      A  There's nothing that I see right now in here.
20      Q  Let me shift gears for a second and talk about
21  your resignation.  You voluntarily resigned from the
22  anesthesiology program, yes?
23      A  I voluntarily -- I negotiated with them and
24  then resigned.
25      Q  Voluntarily?

Page 560

1    A   Yes, after consideration from both parties was
2  given.
3    Q   Well, what you're calling a negotiation, that
4  was your discussion with Dr. Evers and Dr. Benzinger,
5  correct?
6    A   Discussions that started off verbally and then
7  transitioned to some written communications and just had
8  also additional verbal, yes, those were the negotiation of
9  the terms.
10    Q   Okay.  Any alleged agreement that was reached
11  between you and Dr. Evers and Dr. Benzinger, you would
12  agree there's no signed writing by anyone from BJH that
13  would memorialize that agreement, yes?
14    A   I wouldn't say that there aren't things in
15  writing because there are -- there are portions of the
16  agreement in writing in emails where they're emailing that
17  we will help you to the best -- we will help you to succeed
18  or things along those lines, we will -- and, I guess, I
19  know you said in writing, but, again, we had verbal
20  conversations where Alex Evers said that we will help you
21  succeed, we will not stand in your way, we will help you.
22  That showed there was an agreement.
23    Q   Okay.  Is there any written agreement signed
24  by anyone from BJH what would memorialize this alleged
25  agreement?

Page 561

1    A   As I said, there are -- there are portions of
2  our discussions that are written.
3    Q   Signed by someone from BJH?
4    A   Many of those emails have email signatures on
5  them.  If you're looking for a printed out piece of paper
6  with an inked signature, I don't believe at this time that
7  I can recall one.  But there were certainly discussions
8  that we were in a verbal -- there was a verbal contract,
9  and we also had written discussions about that contract.
10    Q   Do you recall the exact verbatim term of that
11  alleged agreement that had to do with assisting you
12  transfer to different program?
13    A   Well, I haven't thought on it for -- for a
14  little bit since that was from 2018, but the basic terms of
15  that agreement were that they would provide me a positive
16  reference and they would assist me in transferring.
17      My understanding was they would not interfere
18  with me transferring.  There would be no secret meetings,
19  no hidden transcripts, nothing along those lines.
20    Q   I'm -- I'm asking for the precise term of that
21  aspect of the agreement.  What do you claim was promised to
22  you regarding future action and transferring to a different
23  program?
24    MR. RUTTER:  Objection, asked and answered.
25    THE WITNESS:  As -- as -- as I said, the

Page 562

1  components of that were that they would provide a good
2  reference, that they would assist me in transferring, they
3  would provide timely access to my records.  They would
4  provide access to my records, in fact, and timely access to
5  my records.
6  BY MR. NOLAN:
7    Q   They said that?  That was said in the -- in
8  this --
9    A   When we were -- when we were discussing these
10  things, they would not -- they would -- they would help me.
11  They would provide a good reference.  They would provide
12  assistance.  They would provide access to records.  They
13  would provide accurate records.  These are the things that
14  we talked about when I spoke with them.
15    Q   When you were negotiating this alleged
16  agreement with Dr. Evers and Dr. Benzinger, are you telling
17  me that they said we promise we will timely provide records
18  and access to records and stuff like that?
19    A   It wasn't an alleged agreement.  It was an
20  agreement.
21    Q   Did they use those words?
22    A   Richard Benzinger, when I was talking with him
23  on the final evening before my resignation, those were the
24  words that we used.  We talked about positive references.
25  We talked about assistance.  We talked about letting me

Page 563

1  have access to my files, about timely sending things.  We
2  were talking about them helping me to transfer and continue
3  my medical career, not -- not declining to write a
4  transcript, not declining to send transcripts, and not
5  lying to a federal judge about sending transcripts.
6    Q   Did you record that conversation?
7    A   I don't recall if that's one of the
8  conversations that was recorded.  We've got several of
9  them.
10    Q   Did you recall any of the conversations that
11  had to do with you resigning?
12    A   I recall those conversations, as I just said,
13  the last evening that I talked with Richard Benzinger.  I
14  also met with TJ Graetz and spoke with him.
15    Q   Do you remember my question?
16    A   Please go back to your question, sir.
17    Q   Come on, please focus.
18      Did you record any of the conversations about
19  your resignation?
20    A   I believe that there may be some recordings of
21  those that are in the recordings that were provided.
22    Q   All right.  Could I get you to turn to the
23  exhibit which I believe is A2, your original complaint.
24  And would you turn to Page 22.
25    A   Sorry, which one is A2?

Page 564

1  Okay.  I'm on A2.
2  **Q  Do you see here in Paragraph 91, the last**
3  **sentence says, plaintiff finally resigned after negotiating**
4  **that he, one, would not work with the cardiothoracic ICU**
5  **anesthesiology faculty and would instead do other**
6  **rotations, two, would receive proper assistance to transfer**
7  **to a new program.**
8  **Did I read that correctly?**
9  A  And which page was this on?
10  **Q  Page 22.**
11  MR. ELSTER:  Objection.  This is an abandoned
12  pleading.
13  THE WITNESS:  Okay.  And where is this right
14  now?  22, which paragraph again, sir?
15  BY MR. NOLAN:
16  **Q  91, the last sentence.**
17  A  Okay.  I'm reading this right now real fast.
18  Yes.  All right.  I've read the paragraph.
19  What was your question again, sir?
20  **Q  Did I read it correctly?**
21  A  You read the term -- you read the words that
22  are on the page here in Paragraph 91.
23  **Q  Correctly?**
24  A  You --
25  **Q  Did I read them correctly?**

Page 565

1  A  Plaintiff was also beginning to have constant
2  gastroenterology symptoms, ulcerated --
3  **Q  No, no, no.**
4  A  Sorry.
5  **Q  Paragraph 91, last sentence, plaintiff finally**
6  **resigned after negotiating that he, one, would not work**
7  **with the cardiothoracic ICU anesthesiology faculty and**
8  **would instead do other rotations, two, would receive proper**
9  **assistance to transfer to a new program.  Did I read that**
10  **correctly?**
11  A  You read the sentence in the pleading, sir.
12  **Q  Did I read it correctly?**
13  A  You -- you read the words --
14  MR. RUTTER:  Objection, asked and answered.
15  THE WITNESS:  You read the words on the piece
16  of paper and this, you know, as I told you before, there
17  were multiple components that we discussed when I was
18  discussing my negotiating a resignation, and these were
19  aspects that were discussed, what rotations would I do next
20  and other things.
21  BY MR. NOLAN:
22  **Q  Well, you would agree with me that you didn't**
23  **allege in your original complaint that this agreement had a**
24  **component where they said they would give you a good**
25  **recommendation?**

Page 566

1  A  I told my attorneys everything that I've told
2  you as far as the deal's terms, and this complaint was
3  written by my legal counsel.
4  **Q  And signed by you, wasn't it?**
5  A  It was signed by my legal counsel and signed
6  by me.  If I were to include every single term and every
7  little detail about every rotation or little tidbits about
8  Richard Benzinger having a problem with residents reusing
9  dirty syringes and not telling patients --
10  (Reporter clarification.)
11  THE WITNESS:  Dirty prefilled syringes and not
12  telling patients about it and then graduating them, this
13  complaint would be thousands of pages.  This complaint, I
14  gave information to my counsel and they drafted a
15  complaint.
16  BY MR. NOLAN:
17  **Q  Would you look at Exhibit A which is the**
18  **second amended complaint.**
19  A  Okay.  One, two.  Okay.
20  **Q  Would you turn to Page 23.**
21  A  Okay.  I'm on Page 23.
22  **Q  Do you see in Paragraph 76, the second**
23  **sentence -- well, it's, second sentence says, as a result**
24  **of false evaluations and harassment by Wash U and BJH, he**
25  **offered to resign from his residency position, however, he**

Page 567

1  **conditioned that offer on a promise that Evers, Benzinger,**
2  **Wash U, BJH would assist him in transferring to another**
3  **institution and residency program where he could complete**
4  **his training and become board eligible.**
5  **Did I read that correctly?**
6  A  Let me read this again.
7  Those are the words that are written there,
8  but, again, I don't feel, as I said before earlier --
9  **Q  No.**
10  A  -- this is a summary of events.  It doesn't
11  discuss the -- this is not a transcription of the
12  conversation I had with all of these individuals talking
13  about every little detail and nuance.  It's just -- you
14  know, this is just talking about some of the overall
15  framework and terms of the agreement.
16  **Q  Sir, I just asked if I read it correctly.**
17  A  You read everything that was on there, sir.
18  **Q  Reading on it states, Evers and Benzinger, on**
19  **behalf of themselves and Wash U and BJH, agreed to this**
20  **condition.  Did I read that sentence correctly?**
21  A  You read that sentence correctly.  That's the
22  sentence that's written there.
23  **Q  So all they did was agree to assist in**
24  **transferring.  They didn't say they would give you a good**
25  **recommendation, did they?**

## Page 568

1    A   They said they would give me a good
2  recommendation.  And there's not a chance that I would have
3  resigned without knowing I was going to get a good
4  recommendation, they were going to give me timely access to
5  my files and they were going to, in fact, create my
6  transcripts and files.
7          There's no way that I would have resigned
8  without knowing they were going to do those items.  Nobody
9  would resign from a residency program and give up their
10  employment and all possibility of future employment without
11  having those types of terms.
12    Q   Would you agree with me, given the passage of
13  time, you don't remember the exact wording that was used in
14  these conversations with Dr. Benzinger and Dr. Evers?
15    A   I would not agree with that.
16    Q   You remember every single conversation
17  verbatim?
18    A   I haven't said -- repeat your question,
19  please.
20    Q   Do you remember every single conversation you
21  had with Dr. Evers and Dr. Benzinger regarding your
22  resignation verbatim?
23    A   I do not recall every conversation I've had
24  verbatim, but I do remember the key points of conversations
25  and the key portions of agreements in conversations.

## Page 569

1    Q   Would you agree with me that SBI never entered
2  into a contract with BJH?
3    A   I wouldn't agree with that at all.
4    Q   Is it a written contract?
5    A   We had a -- let me go -- give me one second.
6          Okay.  I'm just looking at this right now.
7  One second.  I believe it's Page 12.  One moment.
8          Okay.  All right.  Thank you for allowing me
9  to just refresh on that since I know we're going to be
10  talking about it.  So can you please ask your question
11  again, sir.
12          MR. NOLAN:  Yeah.  Would you read that
13  question back.
14          (Thereupon, the referred to question was read
15  back by the Court Reporter as recorded above.)
16          THE WITNESS:  All right.  So, again, the
17  agreement was, I would say, both in part written and in
18  part verbal -- and in part verbal.
19  BY MR. NOLAN:
20    Q   What was the written part of the agreement?
21    A   I believe there were emails where I -- where I
22  discussed part of the verbal agreement about bringing my
23  lab over to Saint Louis and moving it from LSU.  I haven't
24  looked at those emails in a long period of time, but I
25  believe there's emails probably with myself, Alex Evers,

## Page 570

1  Richard Benzinger, Peter Nagele, Evan Kharasch discussing
2  that.
3    Q   Do you have any written agreements signed by
4  anyone from BJH between SBI and BJH?
5    A   When you say a written agreement signed, are
6  you talking about an email with a signature block on it or
7  a printed out piece of paper that's been signed in ink?
8    Q   Signed in ink.
9    A   I do not believe that I have a written
10  agreement printed out in paper and signed in ink.
11    Q   Do you have a written agreement signed by
12  anyone from SBI?
13    A   I don't believe that I have a written
14  agreement printed out and signed in ink by SBI, but I
15  believe there are email communications, electronic
16  communications, as well as verbal communications about that
17  and the move to go there that occurred throughout the
18  process of negotiating.
19    Q   So what are the alleged terms of this
20  agreement between SBI and BJH?
21    A   Well, basically the terms of the agreement
22  would be that if I came here as a resident, that I would
23  move my lab and resources to Saint Louis.  We would be able
24  to affiliate and work with Wash U and BJH.
25          My lab and company would gain -- would engage

## Page 571

1  in research.  Wash U and BJH would perform the obligations
2  of helping me to conduct those types of activities and they
3  would receive benefits for being involved in those types of
4  activities and research affiliations, and I would perform
5  the obligations and receive the benefits involved in those
6  research obligations.
7          And Wash U and BJH would also take me on as a
8  resident to go train for five years to become board
9  eligible in anesthesia and a specialty.  Those were the
10  basic terms of that agreement.
11          I mean, bluntly, we would go develop
12  technology, you know, together and create things in Saint
13  Louis.  I sincerely wish that was the case and we were able
14  to achieve those goals.  It would have made me very happy
15  to do so.
16    Q   So you'd agree with me it would have been
17  impossible to perform that contract in less than a year,
18  yes?
19    A   So your -- your question was if it was
20  impossible to form that contract in less than a year?
21    Q   Right.
22    A   It would have been possible to form that
23  contract --
24    Q   Perform.  It would have been impossible to --
25    A   Perform that a contract in a year?

LEXITAS LEGAL
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 572

1  **Q**  Right.
2  **A**  Well, the initial portion of it would have
3  been performed well under a year.  I would have
4  accepted into the program.  I would have moved my lab.  I
5  would have begun research affiliations.  That would have
6  occurred -- we -- I -- I interviewed with them and began
7  talks in December of 2016.  I matched in March of 2017.
8  So we would have been able to reach that mark
9  and goal when I came there in June, July.  We would have
10  moved the lab in.  We would have started research
11  obligations and we would have been able -- we -- as things
12  started, to -- to move forward.  So the initial -- so I --
13  I think a good portion of that, if not all, would have been
14  achieved in the first year and it would have just been
15  growth from that point on.
16  **Q**  So you think the part about training you for
17  **five years could have been performed in one year?**
18  **A**  The part about training me in five years would
19  have taken more than one year, of course, but the portion
20  of starting my training, moving the lab and beginning
21  research would have -- would have started right away, as we
22  did.
23  And I would just say very simply, on the time
24  in under a year it was, the lab was able to get integrated
25  to the Saint Louis College of Pharmacy within a matter of

Page 573

1  months and transferred, I would say against my will, under
2  duress, to the radiology department.  But, nonetheless, it
3  was a core facility in radiology by the end of my first
4  year.
5  (Reporter clarification.)
6  THE WITNESS:  A core research facility in
7  radiology by the end of my first year.
8  BY MR. NOLAN:
9  **Q**  Regarding your -- the equipment that you say
10  **was converted, was that -- were you the owner of that**
11  **equipment or was SBI the owner of the equipment?**
12  MR. ELSTER:  Objection, vague as to equipment.
13  THE WITNESS:  So as -- as far as equipment,
14  there were multiple 3D printers, there was scanning
15  equipment.  There was associated, just general associated
16  equipment.  There were reagents and general lab supplies.
17  BY MR. NOLAN:
18  **Q**  I know, the stuff you're claiming as a part --
19  **A**  Yeah.
20  **Q**  -- of the lawsuit that was converted.  Who
21  **owned it?**
22  **A**  So initially I had purchased a substantial
23  portion of that equipment.  And then we had, I believe, I'd
24  have to think on the exact dates and times, but I believe
25  that I had assigned all equipment and rights and everything

Page 574

1  to the company when we were forming with David Sinow.
2  (Reporter clarification.)
3  THE WITNESS:  David Sinow, S-I-N-O-W.
4  And -- and of course I also, you know, at that
5  point I had ownership of the company, which gave me
6  ownership of that equipment through the company ownership.
7  BY MR. NOLAN:
8  **Q**  Well, as an attorney you know that just
9  **because you own the company doesn't mean you own the**
10  **equipment, fair?**
11  MR. RUTTER:  Objection, calls for a legal
12  conclusion.
13  THE WITNESS:  I let my attorneys investigate
14  that.
15  BY MR. NOLAN:
16  **Q**  Do you understand that?
17  MR. RUTTER:  Same objection.  Calls for a
18  legal conclusion.
19  THE WITNESS:  Again, I'd let my attorneys
20  investigate that conclusion.
21  BY MR. NOLAN:
22  **Q**  Well, at the time you claim the equipment was
23  **converted, it was owned by SBI, true?**
24  **A**  You know, I believe most of the equipment had
25  been assigned to SBI.  I would want to check.  I -- I

Page 575

1  believe there's an assignment agreement that I -- that I
2  had signed that David Sinow had drafted.  So I'd want to be
3  accurate and give, you know, if I could find that in the
4  discovery, I'd want to be very accurate and give out a
5  date.  I believe something exists like that.
6  **Q**  At any point did Gary [sic] Sinow assign any
7  **of his ownership interests in SBI to you?**
8  **A**  Yes.  David Sinow, after he saw what was going
9  on and the situation at Barnes and Wash U, he waited a few
10  months.  And I -- I forget the exact date.  There's an
11  assignment document.  But at a point he eventually assigned
12  or sold his shares to me and took the loss of the, I
13  believe close to 100,000 that he had invested at that point
14  or more.
15  And, yes, as you -- as you asked, he assigned
16  his shares to me.  I -- I don't recall all of the dates, if
17  it was done in one assignment or in multiple, but there
18  were documents, and I believe we've produced those and I
19  can identify if necessary.
20  **Q**  Did you do anything in exchange for his
21  **assignment of his interests to you?**
22  **A**  I believed I -- I believe I paid him funds for
23  those shares at that point in time.
24  **Q**  How much?
25  **A**  I don't remember the exact amount that it was,

58 (Pages 572 to 575)

Page 576

1    but I -- I believe it was, I think at that point I believe
2    it was something nominal at that point.  But I apologize,
3    I -- I believe there is a share sale or document agreement.
4    Either we should have it here or I'm happy to try to find
5    that from him.
6         Q   The reason that you transferred the equipment
7    to Mallinckrodt is because your investor, Mr. Sinow, pulled
8    out, right?
9         A   Well, that was one of the reasons in the chain
10   of events.  The transfer occurred since -- since we no
11   longer had our venture capital funding come in, and David
12   Sinow was an investor, and that occurred because David
13   Sinow saw what was going on with my employment status and
14   didn't feel comfortable continuing to support the operation
15   since he felt that, he was very concerned that there was a
16   high probability that we would end up at this table today
17   or something would happen.
18        Clearly he is -- he is very good at predicting
19   the future and protecting his interests, because that's
20   what he was worried about, and he -- he called it.
21        Q   No one physically threatened you with regards
22   to the transfer of the equipment, fair?
23        A   I was never physically threatened, but I at
24   all times was very scared for my career in being
25   blacklisted and prevented from working in medicine.

Page 577

1         Q   You agreed to transfer the equipment to
2    Mallinckrodt, yes?
3         A   I -- I agreed to the transfer, but I thought I
4    was in an untenable position and it was done under duress.
5         Q   You could have sold the equipment to someone,
6    yes?
7             MR. RUTTER:  Objection, calls for speculation.
8             THE WITNESS:  You know, again, I would have to
9    speculate on that.  You know, that wasn't something that
10   occurred.
11   BY MR. NOLAN:
12        Q   The equipment had value when you transferred
13   it, didn't it?
14        A   The equipment did have value.
15        Q   So couldn't you have sold it to someone?
16            MR. RUTTER:  Objection, calls for speculation.
17            THE WITNESS:  You know, again, I'd have to
18   speculate on it.  That wasn't -- that wasn't something that
19   occurred.
20   BY MR. NOLAN:
21        Q   If you were feeling threatened, why just give
22   the equipment to Mallinckrodt?
23            MR. RUTTER:  Objection to the form of the
24   question.
25            THE WITNESS:  I believe, to make sure I

Page 578

1    understand the question, the question is if you were
2    threatened, why did you give the equipment to Mallinckrodt?
3             MR. NOLAN:  Yeah.
4             THE WITNESS:  And --
5             MR. RUTTER:  Same objection.
6             THE WITNESS:  You know, and -- and I guess
7    what I would say is yes, I was feeling threatened, and I
8    ended up -- and it ended up that the equipment was -- the
9    equipment and lab was directed to Mallinckrodt.
10            There were -- there were other possibilities.
11   I believe I had a meeting or two with Rob Jarrow.  I
12   believe his -- I believe he had a high level administrative
13   research position even though he's a Ph.D.  And he was also
14   talking about potential transfers of the lab to either
15   anesthesiology or other colleagues of his at Washington
16   University Saint Louis as a potential landing point.
17            I -- I believe there's an email or two in
18   discovery with Rob Jarrow discussing these things.  It was
19   directed to Mallinckrodt is what appeared to be at that
20   point the best option.
21   BY MR. NOLAN:
22        Q   Why?
23        A   It -- you know, I had -- based on a variety of
24   of factors I would say it seemed like it was the best
25   option for it to be directed to Mallinckrodt and, you know,

Page 579

1    one of those -- one of these factors was that the radiology
2    department was not harassing me and bullying me.  So, you
3    know, I would rather -- I didn't want Alex Evers to kind of
4    win top 3D printing core lab from his actions.
5             And -- and I guess I would just say just from
6    a personal, moral standpoint, I felt that I could direct,
7    which I was able to do slightly, that I would -- that I
8    would direct that it go towards, to his -- towards control
9    by the radiology department at that point.
10        Q   Did you ask anyone at the radiology department
11   if they would purchase it from you?
12        A   I didn't -- I don't believe at that point I
13   asked them about purchasing it from me.  I was following
14   Alex Evers' directions to immediately stop research and get
15   rid of the lab, shut it all down and, you know, just give
16   it to Wash U, to someone, and just focus on your studies.
17        Q   Which you -- you voluntarily did, yes?
18        A   You know, again, I followed those
19   instructions, but I thought I did so under duress.  I
20   didn't want to do it.  I just felt like I was in an
21   untenable position.  And I -- I didn't want to lose my
22   career.  I just wanted to be able to move forward.
23            And the other -- the other aspect is that I
24   talked with Pamela Woodard in radiology and David Ballard.
25   And I talked with her, and one aspect of it going over to

## Page 580

1  radiology would that be potentially, or what I thought in
2  fact would occur is once I finished my residency, myself
3  and David, we would be able to run that lab facility, and
4  would likely run that lab facility together.
5         And that in fact did occur for David Ballard.
6  I was -- I was very surprised at the very end when I was
7  leaving when they -- when I -- I asked, I can't remember if
8  I asked just David or Dr. Woodard, but to see if radiology
9  would -- would give -- would make me like a visiting
10 researcher like mechanical engineering did, or, you know,
11 transfer me over as a visiting researcher and I emailed and
12 things like that.
13        And the answer was no, they couldn't do it
14 because of anesthesia and the anesthesia department didn't
15 want it to occur.  So instead, they just took my name off
16 the website, from the core lab on the Mallinckrodt website.
17    Q   Let me switch gears a little bit and talk
18 about your employment after you left the program.  When did
19 you start working at Marek Weisman?
20    A   I believe that we -- I believe that we
21 formally incorporated in 2019.  I believe it was in the
22 spring of 2019.  Or was it -- sorry.  I just want to make
23 sure I give an accurate answer on this.  And that was
24 when -- that was when I began doing some work with the
25 Marek Weisman firm, and it was just, you know, you know,

## Page 581

1  just -- just incorporated the law firm then.
2     Q   Okay.  In terms of your -- are you a
3  part-owner in Marek Weisman, LLC?
4     A   Yes, sir.  I have an ownership interest in the
5  Marek Weisman Law Firm, LLC.  It's an Illinois LLC, I
6  believe.
7     Q   Okay.  Are you a member?
8     A   I -- I believe as an LLC, having ownership
9  would be considered to have a membership share, if I'm
10 articulating that properly.  I believe an LLC would be a
11 membership share as opposed to a corporation that would be
12 a stock ownership share.
13    Q   Yeah.  So what percentage of Marek Weisman do
14 you own?
15    A   I believe that percentage right now is 50
16 percent of the company.
17    Q   And do you receive dividends or distributions
18 from Marek Weisman relative to your ownership interest?
19    A   I do not receive dividends relative to the
20 ownership interest.  I don't believe anybody does.  The --
21 the firm, again, represents medical residents mainly and
22 medical students doing civil rights work.
23        As you can imagine, those are not really high
24 paying clients.  There's not a lot of funds that come in
25 overall related to that type of work for clients in those

## Page 582

1  positions.
2     Q   Are you also employed by Marek Weisman?
3     A   I would say that I do work for them, but I
4  don't receive any funds for some of the work that I do.
5  What I would note, we found -- I believe the firm was
6  incorporated in spring or early summer of 2019.  At that
7  point in time in 2019 I was also starting full-time
8  employment at the University of Illinois, Chicago campus,
9  occupational and environmental medicine residency program,
10 which was a full-time job and residency program.  So that
11 was the, around the start of the firm.
12    Q   Have you ever been compensated by Marek
13 Weisman for the work that you do for it?
14    A   I have not been compensated for the work that
15 I've done for Marek Weisman.
16    Q   Your 50 percent ownership in the LLC, what is
17 that worth?
18        MR. RUTTER:  Objection, calls for speculation.
19        THE WITNESS:  You know -- you know, again,
20 I -- I wouldn't be able to speculate on it, on the value of
21 it.  So, I mean, you know, as -- as I stated before, the
22 Marek Weisman law firm is a small firm that's a startup
23 representing primarily medical residents and medical
24 students.
25

## Page 583

1  BY MR. NOLAN:
2     Q   Well, it has value, right?
3        MR. RUTTER:  Objection, calls for speculation.
4        THE WITNESS:  You know, again, I don't know
5  the value of it.  But as -- as -- as I said, and as you are
6  probably familiar with from -- from your background doing
7  defense work, you know, the typical types of clients that
8  would hire a law firm, their capabilities.
9        And that's all -- that's what I would just say
10 as far as the firm goes, that's really, you know, it is
11 what it is as far as trying to have the firm set up and --
12 and earn revenue.
13 BY MR. NOLAN:
14    Q   Well, how much did it make last year?
15        MR. RUTTER:  Objection, calls for speculation.
16        THE WITNESS:  So I don't know how much it made
17 last year.  That's also kind of a vague question in terms
18 of, you know, how much revenue or how much net profits,
19 because I know there's a lot of companies that have
20 revenues, but net -- net profits are relatively
21 nonexistent.
22        The firm itself, the structure is we have a
23 managing partner who's the other owner, who's the other
24 name on the firm, and they handle all finances and firm
25 management and everything along those lines.

LEXITAS LEGAL
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 584

1  My role is just that as a member, and I do --
2  I do what I would classify as a lot of, as a lawyer, but
3  medical/legal consulting work or providing a lot of
4  medical -- working on a lot of medical jargon and
5  explaining.
6  And I believe I explained during the work comp
7  deposition that my time commitment overall on average I
8  estimated then was probably about 10 hours a week to -- to
9  the venture.
10  BY MR. NOLAN:
11  **Q    Right.  What's your arrangement with your**
12  **attorneys in this case?  Do you pay them by the hour or is**
13  **it a contingency fee?**
14  A    So I have a -- so I have a retainer agreement
15  with my attorneys in this case.  Are -- are you asking what
16  my retainer with say like Henry Elster says?
17  **Q    No, Marek Weisman law firm.**
18  A    I believe -- I -- I have a retainer agreement.
19  I believe that initial retainer agreement was signed
20  between myself, More Law.
21  MR. ELSTER:  Are you just asking about the
22  financial aspect?  I just want to --
23  MR. RUTTER:  If it's contingent or hourly --
24  MR. ELSTER:  Is that what your --
25  MR. RUTTER:  Is that the question?

## Page 585

1  MR. NOLAN:  Yeah.
2  MR. ELSTER:  Okay.
3  MR. RUTTER:  You can answer that question.
4  But any information beyond whether it's contingent or
5  hourly is privileged and I'm instructing you not to answer.
6  THE WITNESS:  Okay.  I -- I would say my
7  representation is at a blended rate.
8  (Reporter clarification.)
9  THE WITNESS:  I believe -- I believe the legal
10  term of art would be that the representation is -- is at a
11  blended rate depending upon -- I -- I just want to make
12  sure I say this accurately, but I have a retainer
13  agreement, and I -- I believe it should say that it's at a
14  blended rate.
15  Again, this I have not looked at in a -- in a
16  long period of time.  I'm trying -- I'm trying to think
17  back, because it was an original agreement.  So there are
18  multiple retainer agreements is, I guess, what I'm saying,
19  and I want to make sure that I'm accurate as far the
20  retainer agreement.
21  BY MR. NOLAN:
22  **Q    Okay.**
23  A    But I -- I believe there was -- there was -- I
24  just want -- I -- I have not looked at the retainer
25  agreement recently, but there was a retainer agreement, I

## Page 586

1  believe, at a -- I believe I have retainer agreements at
2  both blended and at contingent rates for my counsel.
3  **Q    Well, here's the reason I'm asking, while you**
4  **seem like an ultraistic person, I find it interesting that**
5  **you're working at Marek Weisman for four years and you**
6  **haven't received any compensation.  And I'm wondering what**
7  **value you get in return for the work you do?**
8  A    And I'd -- I'd like to answer that question.
9  **Q    Please do.**
10  A    So the reason I started the firm was because I
11  wanted to help other residents that were in positions like
12  me.  I felt very powerless because of everything that
13  occurred, and I didn't want what happened to me to happen
14  to others, especially because I think that there's possible
15  resolutions much earlier on that sometimes get missed,
16  there's off-ramps that are missed, to find equitable
17  solutions for everybody.
18  And I didn't want what happened to me to occur
19  to anybody else.  And particularly I was worried about
20  other physicians that I had heard of through the grapevine,
21  like other medical students would talk where when you're
22  being bullied you might hear.  And I had heard that there
23  were other physicians that had taken their lives or, you
24  know, lost careers, going into debt and taking their lives.
25  So I wanted to do something to -- to prevent that from

## Page 587

1  happening to anybody else if possible.
2  So -- so that was my reasoning to start the
3  firm is I didn't want bad things to happen.  And, yes, I
4  know the -- the irony and my greatest regret is that I
5  wasn't able to help my good friend Gary Hammen.
6  And I won't rehash that here.  But that was,
7  as I said, the greatest irony and my greatest regret in
8  doing this to help others but not ending up being to help
9  one of my close friends.
10  **Q    I'm also curious as to why Mr. Weisman would**
11  **agree to give you half of the firm.**
12  A    Oh, Mr. Marek, sir.
13  **Q    What's that?**
14  **I'm sorry, Mr. Malek.  Marsek.  Marek.**
15  MR. RUTTER:  All right.  Hang on, Jeff.
16  Objection, calls for speculation.
17  THE WITNESS:  You know, again, that -- that's
18  something that, you know, that's something I -- I would
19  have to speculate on as far as his reasoning and logic
20  behind entering that agreement with me.  I -- I -- so --
21  BY MR. NOLAN:
22  **Q    Go ahead.**
23  A    So that -- that's, you know, that's all I was
24  just saying is that I'd have to speculate.
25  **Q    Please do.**

## Page 588

1    A   I wouldn't be able to speculate on his
2  reasoning and logic on that.
3    Q   He just gave you 50 percent of the firm?
4    MR. RUTTER:  Can you -- hang on, Dr. Weisman.
5  Can you, Mr. Nolan, explain where the line of questioning
6  refers to lost career opportunities or earning capacity?
7    MR. NOLAN:  Well, I'm trying to understand
8  this very unique arrangement in trying to determine whether
9  or not he does obtain some remuneration or value for the
10  work that he does at Marek Weisman.
11    MR. RUTTER:  Well, I think that's been asked
12  and answered, not just today by Dr. Weisman but also on
13  January 5th, 2022, which your client has a copy of and you
14  guys have produced.  And, again, is this related to his
15  lost earning capacity?
16    MR. NOLAN:  Are you telling him not to answer?
17    MR. RUTTER:  I'm just asking you, can you --
18    MR. NOLAN:  No, no, please don't do that.
19    MR. RUTTER:  -- can you articulate?
20    MR. NOLAN:  Please don't do that.  If you want
21  to make an objection, make it, otherwise I'm not speaking
22  with you.  I'm trying to ask the witness questions.
23    MR. RUTTER:  I'm going to object to the extent
24  that you're asking him to pontificate on why Sherman Marek
25  would be motivated to do something.

## Page 589

1  But if you know, Jeff.
2    THE WITNESS:  I mean, again, I -- I mean, I
3  don't know why Sherman thinks the way he does on things.  I
4  can only speculate.  He's certainly a unique individual.
5  But he seemed to think this was a good idea to go set up --
6  set up the new venture in that manner, and he -- he was
7  okay with doing that at that time.
8  BY MR. NOLAN:
9    Q   Do you have an agreement with Mr. Marek that
10  you will basically work for free at his firm in exchange
11  for him making you a 50 percent owner in the LLC?
12    MR. RUTTER:  Don't answer that question.  Your
13  five hours is up.
14    MR. NOLAN:  Okay.  Go back and talk to the
15  judge.
16    MR. RUTTER:  That's fine.
17    MR. NOLAN:  Play the tape about how he wasted
18  half the day giving nonresponsive answers.
19    MR. RUTTER:  That's -- I understand that
20  that's what you think.
21    MR. NOLAN:  All right.  Okay.
22    THE COURT REPORTER:  Signature?
23    MR. RUTTER:  We've got some follow-up
24  questions.  Can we just take a brief ten minute break?
25    THE WITNESS:  Bathroom break if everybody's

## Page 590

1  okay.
2    THE VIDEOGRAPHER:  We're going off the record
3  at approximately 3:07 p.m.
4    (Thereupon, a recess was taken, after which
5  the following proceedings were had:)
6    THE VIDEOGRAPHER:  We're back on record at
7  approximately 3:18 p.m.
8    CROSS-EXAMINATION
9  BY MR. RUTTER:
10    Q   Dr. Weisman, do you remember yesterday
11  Mr. Sullivan, counsel for Washington University's
12  defendants, handed you a few documents in which you used
13  the term donate in reference to your lab?  Do you remember
14  that?
15    A   Yes, I do.
16    Q   Can you explain why you used that specific
17  term donate in relation to your lab?
18    A   Okay.
19    MR. SULLIVAN:  Objection, form, leading.
20    THE WITNESS:  Okay.  So the documents that
21  Mr. Sullivan showed me that used the word donate, I
22  included that term because I was advised to by my mentors
23  in academia.  They told me that I shouldn't say that the
24  lab was stolen or taken from me or it would cause bad blood
25  or a problem with me getting a future job.

## Page 591

1  They told me to be polite and professional as
2  I was job hunting, and not to -- not to use the term stolen
3  or taken.  So they said to use donated.
4  And then, additionally, in some of my -- that
5  would probably relate to my CV and some of the documents.
6  And in other -- in some of the other documents, I believe I
7  was being relatively sarcastic on a grant document where
8  they were asking for information about me for the NIH grant
9  that department had.  And I believe I might have used the
10  term there in sarcasm and frustration where I was talking
11  about I did all of this work and this and this.  That was
12  all put in there.
13  But I did not mean it in a legal sense of
14  donated.  I was using it as I advised to facilitate
15  transfer to another residency and to get another job.
16  BY MR. RUTTER:
17    Q   Okay.  Did you donate your lab that you
18  brought here to Saint Louis with you from Louisiana?
19    MR. SULLIVAN:  Objection, leading.
20    THE WITNESS:  I did not donate my lab.  I did
21  not intend to donate my lab.  It was a transfer under
22  duress in my opinion, and, in fact, it was.
23  BY MR. RUTTER:
24    Q   In regards to questions that Mr. Nolan asked
25  you about Exhibit A2, that's your originating complaint?

## Page 592

1    A    Okay.  Yes, I believe I have that up in front
2  of me.
3    Q    Okay.  That's the original complaint that you
4  filed in this lawsuit, correct?
5    A    Yes, it is.
6    Q    And in that complaint is there a demand for
7  your lab?
8    MR. NOLAN:  Objection, leading.
9    THE WITNESS:  I believe there is a demand for
10  my lab in that complaint.
11  BY MR. RUTTER:
12    Q    And on what date did you make that demand?
13    A    I believe that date was when this document was
14  filed, January 18th of 2019.
15    Q    And then I want to turn your attention to
16  Exhibit A.  If you'll pull that up in front of you.  Do you
17  recall earlier today counsel for Defendant Barnes-Jewish
18  Hospital and BJC Healthcare asking you about the
19  allegations in Paragraph 1?
20    A    Yes, I recall them asking me about Paragraph 1
21  earlier today.
22    Q    And do you know when this second amended
23  complaint was filed?
24    A    I believe this second amended complaint was
25  filed October 30th of 2020.

## Page 593

1    Q    Have you recently filed a complaint of
2  retaliation with the Equal Employment Opportunity
3  Commission?
4    A    Yes, I believe we've recently filed a
5  complaint with the EEOC in Saint Louis.
6    Q    Do you know on or about what date that
7  complaint was filed?
8    A    I believe that -- I believe that date [sic]
9  was filed in 2022.  I'm trying to remember the exact date.
10  If there's a document or -- I -- I recall that they -- I
11  recall that Wash U, Joseph Sklansky had responded, I
12  believe, the second week of August to that complaint of
13  August 2022.
14    Q    And did you name defendant -- defendants BJH
15  and Wash U as respondents in that complaint of
16  discrimination?
17    A    I named defendants BJH and Wash U as
18  respondents in that complaint of discrimination.
19    Q    Did you file that charge of discrimination
20  with the EEOC because you believe that you had been
21  retaliated against by both defendants Wash U and defendant
22  BJH?
23    MR. NOLAN:  Objection, leading.
24    THE WITNESS:  So the reason I filed that
25  complaint, I had met with Wash U and BJH officials, a

## Page 594

1  variety of individuals, but I think most notably Nicole
2  Erter in January of 2018.  And I told Nicole Erter, as I
3  had also mentioned the similar thing to other Wash U and
4  BJC officials, I told Nicole Erter that I was concerned
5  about discrimination and harassment ongoing to myself and
6  to another resident, a disabled veteran, Gary Hammen.
7    And I told them about things that were going
8  on and harassment and events, that I was concerned about
9  things that included disability discrimination, veteran
10  discrimination.  And I made that report.
11    And I believe Nicole Erter was so concerned
12  about what I said that she contacted the chief medical
13  officer for the hospital to make sure there would be no
14  retaliation against me for the things that I said.  And I
15  believe defendants noted that contact in the
16  interrogatories that we received from them, that CMO
17  received that for retaliation --
18    (Reporter clarification.)
19    THE WITNESS:  Oh, from the defendants.  It was
20  noted that Nicole Erter contacted the chief medical officer
21  to prevent retaliation.  And I believe, in fact, that as
22  this lawsuit has been progressing, we've uncovered recent
23  and new evidence of retaliation for those statements this
24  year.
25

## Page 595

1  BY MR. RUTTER:
2    Q    And recent uncovering of retaliation, is that
3  why you did not include a complaint of discrimination or
4  retaliation in this October 30th, 2020 complaint?
5    MR. NOLAN:  Objection, leading.
6    THE WITNESS:  The reason that there -- that
7  those complaints of retaliation were not included in this
8  October 30th, 2020 complaint is that many of those
9  incidences and additional information on suspected
10  incidences were uncovered this year in 2022, as recently as
11  the past few months.
12    MR. RUTTER:  Okay.  I don't have any other
13  questions.
14    MR. ELSTER:  We'll read the transcript.
15    THE VIDEOGRAPHER:  We're going off the record
16  at approximately 3:25 p.m.
17    THE COURT REPORTER:  Orders and exhibits, so
18  let's talk about that.
19    MR. ELSTER:  We'll do a scrunch copy.
20    THE COURT REPORTER:  E-tran?
21    MR. SULLIVAN:  I have a standard order.  I'll
22  handle the exhibits.  We're going to give you the exhibits,
23  and then you're going to share them with Amy Victoria.
24    (Thereupon, a discussion was held off the
25  record, after which the following proceedings were had:)

LEXITAS LEGAL
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 596

```
 1          THE COURT REPORTER:  E-tran for you?
 2          MR. NOLAN:  Yeah, E-tran and also TXT .
 3          (Thereupon, the deposition was concluded at
 4     3:25 p.m.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 597

```
 1              CERTIFICATE OF REPORTER
 2          I, Jo Ann Dickson, Certified Shorthand
 3     Reporter, Notary Public within and for the State of
 4     Missouri, do hereby certify that the witness whose
 5     testimony appears in the foregoing deposition was duly
 6     sworn by me; the testimony of said witness was taken by me
 7     to the best of my ability and thereafter reduced to
 8     typewriting under my direction; that I am neither counsel
 9     for, related to, nor employed by any of the parties to the
10     action in which this deposition was taken, and further that
11     I am not a relative or employee of any attorney or counsel
12     employed by the parties thereto, nor financially or
13     otherwise interested in the outcome of the action.
14
15          _____
16              Jo Ann Dickson, CCR, 1085
17
18
19
20
21
22
23
24
25
```

## Page 598

```
 1     I, JEFFERY WEISMAN, JD, M.D., do hereby certify:
 2          That I have read the foregoing deposition;
 3          That I have made such changes in form and/or
 4     substance to the deposition as might be necessary to render
 5     the same true and correct;
 6          That having made such changes thereon, I
 7     hereby subscribe my name to the deposition.
 8          I declare under penalty of perjury that the
 9     foregoing is true and correct.
10
11          Executed the _____ day of _____,
12     20___, at _____.
13
14          _____.
15              JEFFREY WEISMAN, JD, M.D.
16
17     My Commission Expires: _____
18     Notary Public:         _____
19
20
21
22
23
24
25
```

## Page 599

```
 1              Errata Sheet
 2     Witness:  Jeffery Weisman, JD, M.D.
 3     In Re:  Jeffery Weisman, et al. v Barnes-Jewish Hospital,
        et al.
 4
        Upon reading the deposition and before subscribing thereto,
        the deponent indicated the following changes should be
        made:
 5
 6
        Page  Line   Should read:
 7      Reason assigned for change :
 8      Page  Line   Should read:
        Reason assigned for change :
 9
        Page  Line   Should read:
10      Reason assigned for change :
11      Page  Line   Should read:
        Reason assigned for change :
12
        Page  Line   Should read:
13      Reason assigned for change :
14      Page  Line   Should read:
        Reason assigned for change :
15
        Page  Line   Should read:
16      Reason assigned for change :
17      Page  Line   Should read:
        Reason assigned for change :
18
        Page  Line   Should read:
19      Reason assigned for change :
20      Page  Line   Should read:
        Reason assigned for change :
21
        Page  Line   Should read:
22      Reason assigned for change :
23
24
25     Reporter:  Jo Ann Dickson, RPR, CCR
```

Page 600

```
 1              Lexitas Legal
              711 North Eleventh Street
 2            St. Louis, Missouri  63101
 3          Phone (314) 644-2191 * Fax (314) 644-1334
 4                October 11, 2022
 5    Henry P. Elster
      Elster Law Office LLC
 6    225 South Meramec Avenue
      Suite 325
 7    St. Louis, Missouri  63105
 8    In Re:  Jeffery Weisman, et al. v Barnes-Jewish Hospital,
      et al.
 9
      Dear Mr. Elster:
10
      Please find enclosed your copy of the Videotaped Deposition
11    of Jeffery Weisman, JD, M.D., taken on September 14, 2022
      in the above-referenced case.  Also enclosed is the
12    original signature page and errata sheets.
13    Please have the witness read your copy of the transcript,
      indicate any changes and/or corrections desired on the
14    errata sheets, and sign the signature page before a notary
      public.
15
      Please return the errata sheets and notarized signature
16    page to Lexitas Legal for filing prior to trial date.
17
      Thank you for your attention to this matter.
18
      Sincerely,
19
20
      Jo Ann Dickson
21
      CC:  Kevin Anthony Sullivan
22         Michael P. Nolan
23
24
25
```