# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY WEISMAN and | ) | |
| STRATEGIC BIOMEDICAL, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 4:19-CV-75 JAR |
| | ) | |
| v. | ) | |
| | ) | |
| BARNES JEWISH HOSPITAL, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Washington University Defendants' Motion for Summary Judgment (ECF No. 266), Defendants Barnes-Jewish Hospital's and BJC Healthcare's Motion for Summary Judgment (ECF No. 276), Plaintiff's Motion for Summary Judgment on the Counterclaim Asserted by Barnes Jewish Hospital (ECF No. 258)[1], Defendants' Motion to Exclude Expert Testimony of Dr. Scott Gilbert (ECF No. 271), Defendants' Motion to Exclude Expert Testimony of Dr. Chester Wilson (ECF No. 273), Defendants' Motion to Exclude Testimony of Plaintiff's Proposed Expert Alan Kaye (ECF No. 279).  These matters are fully briefed and ready for disposition.  For the reasons stated below, the Court grants Defendants' Motions for Summary Judgment and denies summary judgment as to the Counterclaim.  The Court denies the Motions to Exclude as moot, given the Court's rulings on Defendants' Motions for Summary Judgment.

---

[1] Although this document is entitled Plaintiffs' Motion for Summary Judgment on the Counterclaim asserted by Barnes Jewish Hospital (ECF No. 258), the text makes clear that the Motion also applies to the Counterclaim by Wash U.

## BACKGROUND[2]

In October 2015, Plaintiff Jeffrey Weisman applied for a position in the Anesthesiology Residency Program ("Residency Program") operated by the Graduate Medical Education Consortium between The Washington University ("Wash U"), Barnes-Jewish Hospital ("BJH"), and St. Louis Children's Hospital, specifically in the Academic Scholars Advancement Program ("ASAP"). (Washington University Defendants' Uncontroverted Material Facts ("WUSUMF"), ECF No. 268, ¶¶ 1, 5). Weisman matched as an ASAP resident with the Residency Program and began his training in June 2016. (WUSUMF, ¶ 13).

Weisman was a resident in the WUSM/BJH Graduate Medical Education Anesthesiology Residency Program from July 2016 through June 2018. (Hospital Defendants' Statement of Uncontroverted Material Facts ("HDSUMF"), ECF No. 278, ¶ 14). Weisman spent his first year of residency in a series of rotations through a variety of medical specialities, which was then followed by rotations in clinical anesthesia. (WUSUMF, ¶ 19). After the first six months, Weisman was placed on probation within the Residency Program due to his poor evaluations. (WUSUMF, ¶ 45). Weisman was no longer on probation within the Residency Program at the end of his first year. (WUSUMF, ¶ 88). Weisman had 4 clinical anesthesia rotations to start his second year of training and did not achieve an overall evaluation of meets expectations or better in any rotation. (WUSUMF, ¶ 92). He received an overall below expectations on the POD-2 ENT rotation. (WUSUMF, ¶ 103). In his last rotation of the first half of his second year, Weisman's overall evaluation was "below expectations." (WUSUMF, ¶ 104).

---

[2] The Court primarily takes the "Background" Section from Defendants' respective statement of facts. (ECF Nos. 268, 278). Although Weisman responded to these statements of facts, the issues he attempts to place in dispute are not dispositive of the issues in this case.

A letter, dated January 11, 2018, was drafted that summarized Weisman's recent performance and clinical difficulties and warned him that similar clinical performance deficiencies in the next six months would result in a formal report of unsatisfactory to the American Board of Anesthesiology ("ABA").  (WUSUMF, ¶ 110).  The letter also noted that Weisman had told his Residency Program leaders that he was going to change specialities from Anesthesiology.   It emphasized that Weisman's decision to resign was his to make and that the Program would support his efforts to become an anesthesiologist if he decided to stay.  (WUSUMF, ¶ 111); *see* ECF No. 269-4 ("However, we emphasize that that decision is yours.  Should you decide to redouble your efforts to become an anesthesiologist, we will support these efforts strongly.  Nothing would give us more pleasure than to see your clinical performance improve steadily in the future."). In response to Weisman's request that his clinical schedule be modified, the letter clarified that he would remain in the standard anesthesiology training until he formally resigned from the Residency Program. (WUSUMF, ¶ 112). On February 22, 2018, Drs. Benzinger and Cox met with Weisman and gave him the letter dated January 11, 2018.  (WUSUMF, ¶ 113).

On April 5, 2018, Weisman emailed Dr. Benzinger and requested that his rotation schedule be modified to allow him to focus exclusively on research to help the Department of Radiology on 3-D printing research projects instead of his clinical rotations.  (WUSUMF, ¶ 114).  Dr. Benzinger responded that Weisman first needed to determine if he would remain in the Residency Program. (WUSUMF, ¶ 115).  Dr. Benzinger expressly stated, "I saw that you perceived some sort of tie between your submission of a resignation letter and our provision of a recommendation letter. These are really independent events.  Our department will provide you or any other resident the strongest letter of recommendation that we can.  It's an obligation of any residency program." (WUSUMF, ¶ 116).

On April 5, 2018, Weisman emailed Dr. Benzinger, indicating that he was looking at several residency programs and asking for a "positive program director letter" from Dr. Benzinger. (WUSUMF, ¶ 118).  Weisman asked to see a "working draft" of the recommendation letter.  (*Id.*) In response, Dr. Benzinger stated "I will write you the letter that I think can do the most good for you in your search."  (WUSUMF, ¶ 119).  However, Dr. Benzinger stated that he would send out the letters, not Weisman.

At the same time as his Residency Program, Dr. Weisman was attempting to run and operate his own 3-D printing laboratory (the "Lab"), called Strategic Biomedical Inc. ("SBI"). (HDSUMF, ¶ 26). SBI was a laboratory for researching and developing medical uses for 3-D printing technology. (HDSUMF, ¶ 39). Weisman and David Sinow, SBI's president and CEO from 2016-2018, were the only people who invested money in SBI, and it never raised additional funds from other investors or venture capitalists.  (WUSUMF, ¶ 56). Weisman reached an arrangement with St. Louis College of Pharmacy ("STLCOP") for lab space for SBI, but neither the Department of Radiology nor the University were involved with the arrangement.  (WUSUMF, ¶¶ 14-16, 59). In March 2017, SBI, through Weisman and Sinow, made the decision to give SBI's Lab property to WUSM's Mallinckrodt Institute of Radiology ("MIR").  (HDSUMF, ¶ 54; WUSUMF, ¶ 73). In return, WUSM hired SBI's employees, thus excusing Plaintiffs of their contractual obligations to pay SBI's employees.  (HDSUMF, ¶ 58-59).

On April 6, 2018, Weisman submitted his formal resignation from the Residency Program, effective at the end of June, and requested to modify his training schedule so he could complete his academic year doing research in the Lab.  (WUSUMF, ¶ 120).

- 4 -

In June 2018, at the request of Weisman, Dr. Benzinger sent virtually identical recommendation letters to the University of Chicago and Cook County Hospital. (WUSUMF, ¶ 125). Weisman admitted there was nothing false in Dr. Benzinger's letters. (WUSUMF, ¶ 126).

On January 18, 2019, Weisman filed suit. On May 29, 2020, this Court issued a Memorandum and Order, which limited several of Plaintiffs' claims. *Weisman v. Barnes Jewish Hosp.*, No. 4:19-CV-00075-JAR, 2020 WL 2800469, at *1 (E.D. Mo. May 29, 2020). As of the filing on October 30, 2020 of Plaintiffs Jeffrey Weisman and SBI's Second Amended Complaint against Barnes Jewish Hospital, BJC HealthCare, Washington University, Alex Evers, Richard Benzinger, and Thomas Cox, the following claims for relief remain:

Count I for Breach of Contract against Washington University and Barnes Jewish Hospital;

Count IV for Defamation against Washington University, Barnes Jewish Hospital, Evers, and Benzinger;

Count V for Tortious Conversion of the Lab and Intellectual Property against Washington University, Barnes Jewish Hospital, Evers, and Benzinger;

Count VI for Quantum Meruit on Washington University and Barnes Jewish Hospital;

Count VII for Unjust Enrichment against Washington University and Barnes Jewish Hospital; and

Count VIII for Civil Conspiracy against all defendants.

Weisman completed his residency in occupational and environmental medicine at the University of Illinois Chicago in June 2021, and is employed at Hampton Veteran Affairs Medical Center as the Director of Employee Health. (WUSUMF, ¶¶ 147-48). Weisman remains actively trying to be admitted to another anesthesiology residency. (WUSUMF, ¶ 149).

## DISCUSSION

### I.    Standard of Review

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Citrate*, 477 U.S. 317, 322 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).  The substantive law determines which facts are critical and which are irrelevant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Only disputes over facts that might affect the outcome will properly preclude summary judgment.  *Id.*  Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.*

A moving party always bears the burden of informing the Court of the basis of its motion. *Celotex Corp.*, 477 U.S. at 323.  Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute."  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248.  The nonmoving party may not rest upon mere allegations or denials of his pleading.  *Id.*

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. *Celotex Corp.*, 477 U.S. at 331.  The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.

## II.      Washington University Defendants' Motion for Summary Judgment

At this time, Plaintiffs have the following claims against Defendants Wash U, Dr. Alex Evers, Dr. Thomas Cox, Dr. Richard Benzinger (collectively, Wash U Defendants): (1) Weisman's breach of contract claim against Wash U based upon an alleged "separation agreement" promise to provide a "good" recommendation letter (Count I); (2) Weisman's defamation claim against Wash U, Evers, and Benzinger based upon statements made to third-party residency programs that Weisman failed rotations and that his records could not be released without counsel's permission (Count IV); (3) Weisman's and SBI's conversion claim against Wash U, Evers, and Benzinger based on the alleged possession of Plaintiffs' research lab equipment (Count V); (4) Weisman's and SBI's quantum meruit and unjust enrichment claims against Wash U based on the alleged possession of research lab property (Counts VI and VII); and (5) a civil conspiracy claim against Wash U, Evers, Cox, and Benzinger (Count VIII).

### A.  Breach of Contract (Count I)[3]

In Count I, Plaintiffs argue that Weisman was promised a "good" reference letter in exchange for resigning from the Residency Program.  Plaintiffs claim Wash U breached that separation agreement by failing to provide good references for Weisman, resulting in his inability to secure a position in another anesthesiology residency program.

---

[3] This Court previously held that "Wash U [was] not a party to the Memorandum of Appointment and … dismiss[ed] Plaintiff's claims against it without prejudice." *Weisman*, 2020 WL 2800469, at *8.  Now, having seen all of the evidence from Plaintiffs, the Court is even more convinced that Wash U was not a party to the Memorandum of Appointment and not liable for any covenants thereunder. In particular, as discussed as to the Hospital Defendants' Motion for Summary Judgment, Plaintiffs present no evidence that Wash U and BJH were in a joint venture that would make them liable for each other's actions. Because Weisman's Memorandum of Appointment relates solely to BJH and Weisman, the Court again holds that Plaintiffs can allege a claim for breach of contract claim against Wash U, if at all, only based upon the alleged separation agreement.

First, Wash U argues that there is no separation agreement forming the basis of a breach of contract claim. Wash U notes that, in an email dated April 5, 2018, Dr. Benzinger told Weisman there was no "tie" between his resignation and the provision of a reference letter, as they were "really independent events." (ECF No. 267 at 26; WUSUMF, ¶ 116). Likewise, Benzinger stated in an April 6, 2018 email to Weisman that a reference letter request was not "an iterated or negotiated process," but that Weisman's decision regarding resignation was his alone to make. (ECF No. 267 at 26; WUSUMF, ¶¶ 111, 115). Further, Wash U notes that Weisman was not promised a "good" reference letter; rather, Dr. Benzinger offered Weisman "the strongest letter of recommendation that we can" and to "write the letter that I think can do the most good for you in your search." (ECF No. 267 at 26; WUSUMF, ¶¶ 116, 118). Wash U argues that Dr. Benzinger's promised letter was too indeterminant and contingent to be valid and enforceable as a contract. That is, Dr. Benzinger's alleged offer "left it completely open as to what the nature of the recommendation would be or what it would state." (ECF No. 267 at 26).

In response, Plaintiffs argue that the separation contract was breached. (ECF No. 298 at 9-10). Plaintiffs contend that Weisman offered to resign in exchange for a "good recommendation and assistance transferring." (ECF No. 298 at 9). Although Wash U focuses on the "Program Director Letter" and that Dr. Benzinger wrote the "best one he could" (ECF No. 298 at 9), Plaintiffs contend that other members of the Program failed to hold up their end of the bargain. Plaintiffs contend Defendants breached their contract through several statements made to other programs. For example, Dr. Evers told Yale University Program Director Roberta Hines to "just say no" to Weisman's application. (ECF No. 298 at 10).[4] Dr. Cox verbally "shared some of Jeff's history

---

[4] In December 2018, Dr. Evers spoke with Dr. Hines about Weisman. Dr. Evers told Dr. Hines that he voluntarily resigned and that was all he wanted to say. When Dr. Hines continued to press for additional information, Dr. Evers merely stated that if she wished to "read between the lines"

'off the record'" with the program at University of Chicago. (*Id.*) Plaintiffs further state "Dr.

Benzinger sunk Plaintiff's chances at Cook County." (*Id.*)[5] Plaintiffs contend that Dr. Thompson

told the program director at LSU Shreveport, Dr. Patil, that he "could not talk about Dr. Weisman

and told her to call the law department[.]" (*Id.*)[6] According to Plaintiffs, Dr. Patil took this as a

"red flag" about "some big thing" that had happened at Wash U. (*Id.*) Plaintiffs further note that

Wash U's Program did not send a summative evaluation, which is a predicate for any transfer to

---

she could do so, but that he was not going to provide further details. (WUSUMF, ¶ 136). Dr.
Evers believed that a fully transparent and candid evaluation would have been damaging to
Weisman. (WUSUMF, ¶ 137).

[5] These statements—particularly the statement that Dr. Benzinger "sunk" Plaintiff's chances at
Cook County—do not appear in any statement of facts or Plaintiffs' Responses to the statements
of facts. In his Response to Wash U's statement of facts, Plaintiffs provide the following:

> Plaintiff denies that he stated there was 'nothing false' in these letters. The
> deposition pages cited by WU contain no such statement from Dr. Weisman. To
> the contrary, as stated at p. 285 of Plaintiff's deposition[,] he learned that the letter
> to the University of Chicago was undercut by Defendant Dr. Thomas Cox who
> bragged to Dr. Benzinger on April 27, 2018 that he had talked to Dr. Klafta and Dr.
> Nagele of the University of Chicago and shared "some of Jeff's history 'off the
> record' . . ." (Ex. 37, Cox email to Benzinger). Similarly, the Defendants undercut
> whatever good will [sic] was in the Program Director letter to Cook County by the
> author, Dr. Benzinger, inviting the recipient, Dr. Nasr, to "call me." (Ex. 38,
> Benzinger email to Nasr). Plaintiff, and Dr. Kaye, later learned what transpired on
> the phone (Ex. 4, Pltf. Vol. 1at p. 285: 15-17: "I received an email from Alan Kaye,
> and I called ---or he talked with me about the fact that he had a meeting with Ned
> Nasr at a conference and asked him why he wouldn't take me. And Ned Nasr told
> Alan Kaye that he heard negative things."; Ex. 39, Kaye excerpt, at p. 81:16-18:
> "he [Nasr] called up the program director [Benzinger] and he [Nasr] conveyed to
> me that he [Nasr] had gotten a negative evaluation on Dr. Weisman.").

These statements do not provide a basis for a breach of contract claim. As discussed more
herein, Weisman had several negative evaluations during his Residency Program. Thus,
the argument that Nasr heard negative evaluations of Weisman would be unsurprising and
expected, but not the basis of a breach of contract claim. Rather, such evaluation would be
part of the pedagogical process and not actionable under the educational malpractice
doctrine.

[6] Comparatively, in her Declaration, Dr. Patil stated, "I was told that the [Washington University
Program Director's] office was not comfortable responding directly and that they would have
'legal' send any material to me regarding Dr. Weisman." (ECF No. 269-50, ¶ 5).

another residency program.  (ECF No. 298 at 10).  Dr. Thompson told Lauren Gibson that he would "argue given we knew he was not advancing that a summative eval was not needed."  (ECF No. 298 at 10).  Thus, Plaintiffs maintain that Wash U Defendants impeded Weisman's transfer to another program.  *See* ECF No. 298 at 10 ("The point is that Defendants did not assist in Dr. Weisman's transfer but impeded it.").

As an initial matter, pursuant to its prior Memorandum and Order, the Court held that Plaintiffs' allegation that Wash U Defendants breached their agreement to "assist" Weisman in obtaining a new residency was not actionable.  This Court previously held "that 'assist' is too vague a term to support an enforceable promise."  *Weisman*, 2020 WL 2800469, at *9.  The Court continues to hold that claims related to a nebulous failure to "assist" to be unactionable as a matter of law.  Thus, the Court finds any allegations related to Wash U's inadequate assistance to be unavailing at this juncture.

Further, the Court holds that there is no evidence of a verbal separation contract.  In the Second Amended Complaint, Plaintiffs allege that Weisman offered to resign from his residency position, but he "conditioned that offer on a promise that Evers, Benzinger, WU and BJH would assist him in transferring to another institution and residence program where he would complete his training and become board eligible."  (ECF No. 86, ¶ 76).  Plaintiffs state that Evers and Benzinger, on behalf of WU and BJH, agreed to this condition.  (*Id*.)  Plaintiffs claim Evers and Benzinger told Weisman they "wanted him to succeed," that they would "cooperate with other programs" on his transfer, and would provide him with "a good recommendation letter."  (*Id*., ¶ 77).  In his opposition to summary judgment, Plaintiffs again state that Weisman "offered to resign in exchange for a good recommendation and assistance transferring."  (ECF No. 298 at 9).  That is, Plaintiffs contend that the "offer was to resign and the acceptance was the commitment to

- 10 -

provide a good reference and assistance in the transfer." (*Id.*).  Although Plaintiffs claim that Benzinger and Evers communicated an acceptance of Weisman's offer of resignation in exchange for a good recommendation, the undisputed evidence does not support this position.  Dr. Benzinger expressly stated: "I saw that you perceive some sort of tie between your submission of a resignation letter and our provision of a recommendation letter.  These are really independent events.  Our department will provide you or any other resident the strongest letter of recommendation that we can.  It's an obligation of any residency program."  (WUSUMF, 116).  On another occasion, Dr. Benzinger again explicitly rebuffed Weisman's attempt to link his resignation to a "positive program director letter" for his applications to other programs.  (WUSUMF, ¶ 118).  On April 6, Dr. Benzinger responded to Weisman that, contrary to his wishes, the obtaining of a letter of recommendation was not "an iterated or negotiated process" because "that's simply not the way these letter are produced."  (WUSUMF, ¶ 119).  Rather, Benzinger indicated only that he would "write the letter that I think can do the most good for you in your search."

The only rebuttal that Plaintiffs provide to this evidence is that Dr. Thompson told Weisman that he was "committed to supporting your application for whichever specialty you choose."  (Response to WUSUMF, ECF No. 295, ¶ 116).  The Court, however, does not agree that this statement binds Wash U and creates an agreement with Plaintiffs.  Indeed, Plaintiffs allege that Evers and Benzinger, not Dr. Thompson, agreed to the separation agreement on behalf of Wash U.  *See* ECF No. 86, ¶  76).  As previously discussed, Benzinger explicitly rejected any attempts to impose an obligation in exchange for Weisman's resignation.  As there was no mutual

agreement and no meeting of the minds, the Court grants summary judgment to Wash U on its

Plaintiffs' Breach of Contract claim in Count I.[7]

### B.  Defamation (Count IV)

"Under Missouri law, the elements of defamation are (1) publication (2) of a defamatory

statement (3) that identifies the plaintiff, (4) that is false, (5) that is published with the requisite

degree of fault, and (6) that damages the plaintiff's reputation." *Turntine v. Peterson*, 959 F.3d 873,

882 (8th Cir. 2020) (citing *Overcast v. Billings Mut. Ins.*, 11 S.W.3d 62, 70 (Mo. banc 2000));

*Pasch v. OnDoc, LLC*, No. 4:20-CV-782-MTS, 2023 WL 3600081, at *2 (E.D. Mo. May 23,

2023).  Per this Court's May 29, 2020 Memorandum and Order, Weisman's defamation claim is

limited to statements made to other residency programs that Weisman had failed rotations and that

his records could not be released without Defendants' attorney's permission.  (ECF No. 69 at 37).[8]

In the Second Amended Complaint, Weisman alleges "Benzinger, Washington University and

Barnes Jewish Hospital falsely told representatives of other residency programs to which Plaintiff

had submitted applications that Plaintiff's information could not be released without talking to

Defendants' attorney." (ECF No. 86, ¶ 123). More specifically, Plaintiffs purport to provide "direct

evidence that Defendants told a program that they would have to talk to WU's lawyers before any

---

[7] As a corollary, Wash U argues that there was no bargained for consideration for the "separation agreement."  Wash U argues that the Residency Program's reference letter does not constitute valid consideration because it "was offering nothing more than what it believed it was already obligated to provide Weisman, regardless of his resignation."  (ECF No. 267 at 28).  The Court finds no consideration on behalf of Wash U because it did not agree to any additional terms or conditions beyond those employed for all residents.

[8] *Weisman*, 2020 WL 2800469, at *19 ("Accordingly, the Court will grant Defendants' motion to dismiss Plaintiff's defamation claim as to all statements except those made to other residency programs stating that Plaintiff had failed rotations and that his records could not be released without their attorney's permission.").

information could be released." (ECF No. 298 at 8). In his opposition to Defendants' Motion for Summary Judgment, Weisman states that Dr. Thompson told Dr. Patil from LSU Shreveport that he would need to talk to WU's lawyers to obtain information about Weisman. (*Id*).[9] Weisman claims that this statement cannot be "innocently construed" but instead implies that Weisman did "something very wrong at WU/BJH when he had not." (ECF No. 298 at 8); *see also* ECF No. 298 at 16 (Plaintiffs extrapolate: "The evidence suggests that it did cause harm: Dr. Patil says it was a 'red signal' indicating 'some big thing' had happened at WU/BJH."). Weisman claims that "[o]ne program director telling another that no information could be released unless the Defendants['] lawyer did it was false and intentionally harmful." (ECF No. 298 at 16).

But for the allegedly defamatory statement made to Dr. Patil, Wash U contends that Weisman has not demonstrated "specific defamatory statements made to any other residency program." (ECF No. 267 at 29). Further, discovery has not produced evidence that Drs. Evers, Benzinger or anyone else stated that Weisman failed rotations. (ECF No. 267 at 29-30; WUSUMF, ¶¶ 129, 130, 136). At his deposition, Weisman could not identify any statement that anyone needed to speak to lawyers prior to releasing his records. (ECF No. 267 at 30). In his response, Weisman admits that he has no evidence that "any Defendant stated to a program that he had applied to that he had 'failed rotations'". (ECF No. 298 at 8; *see also* ECF No. 307 at 13); *see also* ECF No. 298 at 15 ("Of the two statements that remain actionable after the Court's May 2020 ruling, Plaintiff

---

[9] Dr. Patil's Declaration actually states: "I called Washington University's Program Director regarding Dr. Weisman. I was told that the office was not comfortable responding to me directly and that they would have 'legal' send any material to me regarding Dr. Weisman. This raised a red flag about Dr. Weisman." (ECF No. 296-50). Thus, Dr. Patil does not directly identify Dr. Thompson as the speaker of this statement. Dr. Thompson claims that he did not speak with Dr. Patil by telephone. (ECF No. 268, ¶ 143). Further complicating matters, Plaintiffs admit that "Dr. Thomas [sic] did send LSU material, but refused to send the 'entire file' as too burdensome a request." (ECF No. 298 at 15).

concedes that discovery has failed to reveal that Defendants told other programs that Plaintiff had 'failed rotations.").  Rather, Wash U claims that Weisman "merely speculated that negative or 'terrible' things were said about him and stated his belief that lawyers were mentioned[.]"  (ECF No. 267 at 30).  Thus, the Court limits its defamation discussion to Plaintiffs' only arguably supported claim for defamation based upon statements allegedly made to Dr. Patil in 2018.

Second, Wash U argues that "[e]ven if Dr. Benzinger, Dr. Evers, or the University had made a statement other residency programs that Weisman failed rotations or that his records could not be released without first consulting with counsel, these statements are demonstrably true and thus not actionable."  (ECF No. 267 at 31).  Further, Wash U argues that Weisman consented to the publication of statements made about him when he requested that letters and materials be sent to other residency programs. (ECF No. 267 at 32-33).  Additionally, Wash U contends that any statements made to other residency programs were protected by a qualified privilege.  (ECF No. 267 at 33-34).

Finally, Wash U argues that Weisman has not demonstrated that he was injured by any allegedly defamatory statements.  Wash U contends that the evidence shows he was not rejected by other residency programs based upon any statements made by Wash U.  Dr. Peter Nagele from the University of Chicago informed Weisman that the graduate education office had denied adding another resident seat.  (ECF No. 267 at 33).  Dr. Ned Nasr with Cook County Hospital emailed Weisman that the program "elected to go with a CA-1 resident yesterday instead of an advanced position for various reasons."  (*Id*.)  Weisman stated that LSU Shreveport had burned him twice, but did not reference any statement by the Residency Program for his failure to gain admittance.

(*Id.*)  Thus, Wash U claims there is no evidence that Weisman was injured by any of Defendants' statements.[10]

Initially, the Court notes that Plaintiffs did not disclose Dr. Patil's statement prior to summary judgment deadlines, even though such a statement was clearly requested through discovery.[11] Thus, the Court could not consider Dr. Patil's declaration based upon this failure to disclose.  *See* Fed. R. Civ. P. 37(c) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."). Further, Dr. Patil's Declaration does not identify the speaker of these allegedly defamatory statements beyond "Washington University's Program Director" (ECF No. 296-50, ¶ 5), making its verifiability dubious.

Moreover, although Dr. Patil claims that the statement that "Washington University's Program Director" was "not comfortable responding" directly to inquiries regarding Dr. Weisman and that "they [sic] would have 'legal' send any material" to Dr. Patil regarding Dr. Weisman, this statement has not been shown to be false.   Indeed, Dr. Thompson stated that he would communicate with counsel regarding "liability and legal questions" and that he contacted counsel regarding third party communications as to Dr. Weisman.   (ECF No. 268, ¶ 144). "[F]or the purposes of defamation, it does not matter whether a statement was made in bad faith, so long as it was true." *Nigro v. St. Joseph Med. Ctr.*, 371 S.W.3d 808, 818 (Mo. Ct. App. 2012) (citation

---

[10] Notably, no residency program stated that it would have accepted Weisman but for the absence of a summative evaluation from Wash U.  This further bolsters the Court's finding that Dr. Kaye's supposedly expert testimony that a summative evaluation was a necessary component for any transfer to another residency program was not determinative.

[11] Defendants requested all documents collected by Plaintiffs regarding their claims (ECF No. 268-13, No. 6; ECF No. 307-1, Nos. 15, 16, 28), but Dr. Patil's Declaration was not produced.

omitted).  Thus, absent a showing of falsity, the Court holds that Plaintiffs' defamation claim in Count IV fails.

Even if this statement was made to Dr. Patil, Plaintiffs have not shown that the statement was defamatory. In the modern world, parties often must consult counsel prior to making statements as to a former employee. *See Mandel v. O'Connor*, 99 S.W.3d 33, 36 (Mo. Ct. App. 2003) (citing *Ampleman v. Scheweppe,* 972 S.W.2d 329, 333 (Mo. Ct. App. 1998) ("If a statement is capable of a nondefamatory meaning, and can be reasonably construed in an innocent sense, we must hold the statement nonactionable as a matter of law.").  Notably, Dr. Thompson stated that he had consulted counsel as to personnel other than Weisman.  Thus, the Court finds as a matter of law that the statement that Dr. Thompson would contact counsel was not negative or defamatory.

Furthermore, the Court agrees that Weisman consented to the alleged statements by allowing other programs to contact Wash U. "Conditional or qualified privilege covers a communication made in good faith upon a subject—matter in which the person making the communication has an interest or a duty to a person having a corresponding interest or duty." *Washington v. Thomas*, 778 S.W.2d 792, 798 (Mo. Ct. App. 1989) (citing *Estes v. Lawton–Byrne–Bruner Ins. Agency Co.,* 437 S.W.2d 685, 690 (Mo. Ct. App. 1969). "'Good faith' in this context refers to the actual and express malice which is required to overcome and destroy the privilege." *Id*. (citing *Carter v. Willert Home Products, Inc.,* 714 S.W.2d 506, 513 (Mo. banc 1986)). "Consent is one of a few privileges that protect a speaker from liability for making a defamatory statement." *Overcast v. Billings Mut. Ins. Co.*, 11 S.W.3d 62, 71 (Mo. 2000) (citing *Williams v. School District of Springfield R–12,* 447 S.W.2d 256 (Mo. 1969)). "One who has invited the publication of defamatory statements cannot be heard to complain of the resulting damage to his reputation." *Id.*  Here, Weisman invited Wash U and the individual defendants' reviews of his performance by applying to other residency

programs.  Weisman cannot now complain because the Wash U defendants responded to other residency program's requests for input on him.

Finally, Weisman has not shown that he has been damaged by any statements made.  Indeed, Weisman has provided no evidence that any other program would have admitted him but for the allegedly defamatory statements.  The evidence presented shows that all of the programs Weisman applied to had independent reasons for not selecting him.  *See* ECF No. 267 at 33.

For all of these reasons, the Court grants summary judgment in favor of Wash U on Plaintiffs' defamation claim in Count IV.

### C.  Conversion

Plaintiffs allege that Defendants wrongfully took possession of the Lab and property.[12] "Conversion requires proof of three elements: (1) the plaintiff owned the property or was entitled to possess it, (2) the defendant took possession of the property with the intent to exercise some control over it, and (3) the defendant thereby deprived the plaintiff of the right to possession." *Levine Hat Co. v. Innate Intel., LLC*, 538 F. Supp. 3d 915, 923 (E.D. Mo. 2021) (citing *Massood v. Fedynich*, 530 S.W.3d 49, 57 (Mo. App. 2017)).

By way of background, SBI had moved its Lab, property and two researcher employees/independent contractors, Drs. Uday Jammalamadaka and Karthik Tappa, to STLCOP in June 2016.  (WUSUMF, ¶ 52).  SBI owned the 3-D printing equipment, as well as licensing

---

[12] Plaintiffs also allege that the Lab working papers and notebooks containing ideas and intellectual property were taken.  Wash U argues that Plaintiffs have not identified any intellectual property or ideas that were located in those papers. (ECF No. 267 at 42-43).  Plaintiffs do not address this issue in their briefing and this issue appears to have been abandoned.  (ECF No. 307 at 6-7 ("Plaintiffs also have abandoned any conversion claim based on ideas or intellectual property contained in lab notebooks as that point was not addressed in Plaintiffs' Response.").

rights to a patent application developed by Weisman that was owned and controlled by Louisiana Tech University.  (WUSUMF, ¶ 53).  On August 11, 2016, Dr. Evers contacted Dr. Kharasch, who informed Dr. Evers that Weisman had a small 3-D printing company, he introduced Weisman to the STLCOP leadership, that Weisman had reached an arrangement with STLCOP for lab space, and that neither the Department nor the University had anything to do with the arrangement. (WUSUMF, ¶ 59).  By December 2016, investor Sinow decided he would not put any additional money into SBI.  (WUSUMF, ¶ 67).  By the end of 2016, SBI could not pay the Lab's operating costs and the researchers' salaries. (WUSUMF, ¶ 68).  On February 3, 2017, SBI proposed that it be acquired by the Department of Radiology with SBI's Lab property and employees relocated to Radiology.  (WUSUMF, ¶ 71). The proposal requested no money, only that Radiology take over the expenses of operating the Lab and paying SBI's employees.  (*Id*.)  In March 2017, SBI through Weisman and Sinow, made the decision to give SBI's Lab property to the Department of Radiology.  (WUSUMF, ¶ 73).  The decision was based upon (a) Weisman's desire to be "well thought of", (b) the potential Weisman could operate the Lab as a co-director after he finished his residency, (c) SBI could not cover the salaries of its researchers, whose immigration status required that they be employed, (d) the company's best interests, and (e) Weisman's desire to focus on his residency.  (WUSUMF, ¶ 74).  On March 21, 2017, SBI employees moved its property to the Radiology 3-D printing facility with the full knowledge of Weisman and Sinow.  (WUSUMF, ¶ 75).

Wash U argues that Plaintiffs' conversion claim fails because Plaintiffs donated and voluntarily transferred the Lab property to the Department of Radiology.  (ECF No. 267 at 38-39). Wash U notes that, as part of Weisman's CV sent to other residency programs, he wrote "Donated laboratory equipment and expertise from Strategic Biomedical, Inc."  (ECF No. 267 at 39).

Plaintiffs further admitted they transferred the Lab to the Department or Radiology because it was in "the best interests of the company [SBI]" and "to make certain [Weisman] was well thought of at Wash U" and to "improve his position." (*Id.*)[13]

In response, Plaintiffs argue that Weisman's use of the term "donate" in his correspondence to Wash U is not dispositive of this issue. First, Plaintiffs claim Weisman was told to use the word "donate" to avoid damaging his career. Second, after losing its venture capitalist, Weisman was forced to find his employees "a new home" to avoid losing their immigration status. (ECF No. 298 at 16-17). Plaintiffs claim that the evidence indicates that Weisman was a "young M.D.-Ph.D. scrambling to cut his losses and save his friends" rather than voluntarily donating lab equipment. (ECF No. 298 at 17).

The Court holds that Weisman's use of the term "donate," and the circumstances surrounding it, negates any conversion claim. The Court will not misconstrue Weisman's repeated use of the term "donate," going beyond the plain language of his agreement, and impose some nefarious plot, simply because Weisman now regrets his decision. The Court finds that Weisman made a conscious and knowing decision to donate the Lab based upon his desire to devote more time and energy to his residency program and to retain SBI's employees. Further, SBI proposed transferring its property and employees to the Radiology Department for no payment because it had no investors or revenue to pay its employees and expenses. (ECF No. 268, ¶ 71). Weisman admitted that he used the term "donate" to improve his prospects in finding a new residency

---

[13] In the alternative, Wash U argues that Plaintiffs abandoned the 3-D printing lab property. "Under Missouri law, abandonment requires intent to abandon and an external act by which that intent is carried into effect." *Chem. Sales Co. v. Diamond Chem. Co.*, 766 F.2d 364, 368 (8th Cir. 1985) (citing *Linscomb v. Goodyear Tire & Rubber Co.,* 199 F.2d 431, 435–36 (8th Cir. 1952); *Wirth v. Heavey,* 508 S.W.2d 263, 267 (Mo. Ct. App. 1974)).

position. (ECF No. 267 at 39). Plaintiffs cannot now create an issue of fact in this case by claiming

that Weisman did not mean his prior testimony or to contradict documentary evidence. *See Barnes*

*v. Nw. Iowa Health Ctr.*, 238 F. Supp. 2d 1053, 1093 (N.D. Iowa 2002) (citing *American Airlines,*

*Inc. v. KLM Royal Dutch Airlines, Inc.,* 114 F.3d 108, 111 (8th Cir.1997) ("It is well-settled that

'[p]arties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat

summary judgment.'"). Thus, the Court grants Defendants' Motion for Summary Judgment on

Plaintiffs' conversation claim because Weisman consented to the transfer of those assets.

### D.  Quantum Meruit and Unjust Enrichment

Under Missouri law, quantum meruit and unjust enrichment are separate, but related, remedies

in quasi-contract. *32nd St. Surgery Ctr., LLC v. Right Choice Managed Care*, 820 F.3d 950, 955–

56 (8th Cir. 2016) (citing *Johnson Grp., Inc. v. Grasso Bros.,* 939 S.W.2d 28, 30 (Mo. Ct. App.

1997); *see also Comp & Soft, Inc. v. AT & T Corp.,* 252 S.W.3d 189, 196 (Mo. Ct. App. 2008)

("[T]he purpose of quantum [meruit] is to prevent unjust enrichment."). The elements of a quantum

meruit claim are: "(1) a benefit conferred upon defendant by plaintiff; (2) appreciation by

defendant of the fact of such benefit; and (3) acceptance and retention by defendant without

payment." *Guarantee Elec. Const. Co. v. LVC Techs., Inc.*, No. 4:05CV849 JCH, 2006 WL

950204, at *2 (E.D. Mo. Apr. 10, 2006); *see also Ogdon v. Hoyt,* 409 F.Supp.2d 982, 990

(N.D.Ill.2006) ("The elements of quantum meruit are that: (1) the plaintiff rendered services; (2)

the defendant received the benefit of those services; and (3) the defendant's retention of those

services without giving compensation in exchange would be unjust."); *Leisman v. Archway Med.,*

*Inc.*, 53 F. Supp. 3d 1144, 1149 (E.D. Mo. 2014).  The required elements for unjust enrichment

are: (1) that the plaintiff "conferred a benefit on the defendant; (2) the defendant appreciated the

benefit; and (3) the defendant accepted and retained the benefit under inequitable and/or unjust

circumstances." *Burks v. Bi–State Dev. Agency of Mo.-Ill. Metro. Dist.,* No. 4:09CV1302 MLM, 2010 WL 2681356, at *5 (E.D. Mo. July 2, 2010) (internal quotation and citations omitted); *Leisman v. Archway Med., Inc.*, 53 F. Supp. 3d 1144, 1149 (E.D. Mo. 2014).

In their response, Plaintiffs argue that Defendants retained the Lab under inequitable or unjust circumstances sufficient for an unjust enrichment claim. (ECF No. 298 at 17-18). Plaintiffs claim that Defendants recruited Weisman, who was "not a stellar medical student," "scuttled all support for the Lab," and "spooked" the venture capitalist. (ECF No. 298 at 18). Even though the Lab may not be making a "monetary profit for WU," Plaintiffs claim that it has "value" since Wash U refers to it as a "core" research facility and continues to fund it. (ECF No. 298 at 18).

As to quantum meruit, Plaintiffs claim that Weisman demanded access to the Lab after he resigned from his residency, but he was denied access. (ECF No. 298 at 18). Plaintiffs claim that the Lab had value, but that Weisman was refused access to the equipment in the Lab, its personnel, and its patent. (*Id*.)

For similar reasons as stated with respect to the conversion claim, the Court grants Defendants' Motion for Summary Judgment as to Plaintiffs' claims for unjust enrichment and quantum meruit. The undisputed evidence before the Court indicates that Weisman voluntarily chose to donate the Lab and its accoutrements in order to free up time for him to advance in his residency, to retain employment for the Lab employees, and to curry favor with potential residency programs based upon his magnanimous donation. Plaintiffs' post-hoc declaration that his donation was involuntary and coerced does not create an issue of fact as to whether Defendants unjustly retained and refused Weisman access to the Lab. Therefore, the Court grants summary judgment to Defendants on Plaintiffs' unjust enrichment and quantum meruit claims.

### E.  Civil Conspiracy

Under Missouri law, the elements of civil conspiracy are: (1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful overt acts, and (5) resulting damages. The essence of a civil conspiracy is an unlawful act agreed upon by two or more persons. *Aguilar v. PNC Bank, N.A.*, 853 F.3d 390, 402–03 (8th Cir. 2017) (citing *Mackey v. Mackey*, 914 S.W.2d 48, 50 (Mo. Ct. App. 1996)); *see Oak Bluff Partners, Inc. v. Meyer*, 3 S.W.3d 777, 780-81 (Mo. banc 1999); *Olsen as Tr. for Xurex, Inc. v. Di Mase*, 24 F.4th 1197, 1203 (8th Cir. 2022) ("A 'civil conspiracy' is an agreement or understanding between persons to do an unlawful act, or to use unlawful means to do a lawful act."). "The term unlawful, as it relates to civil conspiracy, is not limited to conduct that is criminally liable, but rather may include individuals associating for the purpose of causing or inducing a breach of contract or business expectancy." *W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 22 (Mo. banc 2012); *Di Mase*, 24 F.4th at 1203.  To be actionable, the conspiracy must have resulted in at least one underlying right of action. *Gettings v. Farr*, 41 S.W.3d 539, 541–42 (Mo. Ct. App. 2001). Thus, Plaintiffs' civil conspiracy claims must relate to the underlying torts of defamation and conversion.[14]

In the Second Amended Complaint, Plaintiffs allege "when Evers learned that he was not the sole focus of Plaintiffs' laboratory project, he solicited the agreement of each Defendant to conspire with the others" to defame Weisman and convert Plaintiffs' 3-D printing lab property. (ECF No. 86, ¶ 139).  This allegation is binding on Plaintiffs.  *See In re Crawford*, 274 B.R. 798, 804–05 (B.A.P. 8th Cir. 2002) (citing *Knudsen v. United States,* 254 F.3d 747, 752 (8th Cir.2001);

---

[14] Having already held that Plaintiffs' claims for defamation and conversion fail as a matter of law, the Court could grant summary judgment in favor of Wash U on the basis that Plaintiffs state a claim for no underlying tort.

*Mo. Hous. Dev. Comm'n v. Brice,* 919 F.2d 1306, 1314 (8th Cir. 1990)("Statements contained in a party's pleadings are binding on that party, and are considered judicial admissions, unless the statements are withdrawn or amended."). Despite this binding judicial admission, Plaintiffs contend in their response to Defendants' Motion for Summary Judgment that Defendants' "agreement was to keep the Plaintiff from transferring, which succeeded for several years, and Thompson's defamatory statement to Dr. Patil in 2018 was a tortious act in furtherance of that agreement."  ECF No. 298 at 19; *see also* ECF No. 298 at 18 ("Dr. Evers, Dr. Benzinger, Dr. Cox and Dr. Thompson acted together to defame the Plaintiff."); ECF No. 298 at 19 ("Because the defamation occurred in the course of the agree [sic] to impair Plaintiff's transfer, the co-conspirators are jointly and severally liable for the damage caused.").  Plaintiffs cannot avoid summary judgment by positing a new conspiracy theory as part of their reply.  For this reason alone, the Court grants summary judgment in favor of Defendants on Plaintiff's civil conspiracy claim.

Further, even if the Court were to consider this argument, Plaintiffs have presented no evidence in support of their new claim that Defendants defamed Plaintiffs to prevent him from transferring. Plaintiffs purport to present evidence of defamation in that Dr. Thompson defamed Weisman in 2018 when talking to Dr. Patil at LSU and Drs Cox and Evers "scuttled Plaintiff's applications to the University of Chicago and Cook County."  (ECF No. 298 at 18-19).  Plaintiffs argue that Drs. Thompson, Cox and Evers, as agents for "their employer, the Consortium," "conspired among themselves to defame Weisman as part of their effort to "impair Plaintiff's transfer."  (ECF No. 298 at 19). However, as previously discussed with respect to Plaintiffs' Defamation Claim in Count IV, Plaintiffs have not provided evidence to support their argument. Briefly, Plaintiffs have not shown that any alleged statements made by Dr. Thompson to Dr. Patil were defamatory.

Likewise, Plaintiffs have no evidence that any false, defamatory statements were made by Drs. Cox and Evers to any programs. Further, Plaintiffs' complaint that summative evaluations were not provided is not indicative of defamation. Thus, the Court grants summary judgment on Plaintiffs' civil conspiracy claim on the merits because Plaintiffs cannot demonstrate a meeting of the minds to commit defamation against Weisman to prevent his transfer to another residency program.

Secondarily, Plaintiffs do not address their civil conspiracy with respect to conversion in their response to summary judgment. (ECF No. 298 at 18-19). However, having determined that the conversion claim fails, the Court necessarily holds that the civil conspiracy claim based upon the conversion fails as a matter of law. *See Weisman*, 2020 WL 2800469, at *21 (citing *Gettings*, 41 S.W.3d at 541–42 ("To be actionable, the conspiracy must have resulted in at least one underlying right of action."). Thus, the Court grants summary judgment in favor of Defendants on Plaintiffs' claim civil conspiracy with respect to conversion.

## III.    Hospital Defendants' Motion for Summary Judgment

The majority of Plaintiffs' allegations against the Hospital Defendants relate to the Hospital and Wash U's Consortium Agreement for the purpose of "providing the necessary financial and educational support, leadership, and other resources to enable the institutions to achieve substantial compliance with Institutional Requirements and to enable the educational programs to achieve substantial compliance with the Program Requirements." (ECF No. 304 at 4-5). Plaintiffs argue that the Consortium Agreement makes BJH responsible for the acts of Wash U and its associates.

### A.  Breach of Contract

#### 1.  Memorandum of Appointment

- 24 -

This Court previously limited Plaintiffs' claims against the Hospital Defendants: "Plaintiff has pleaded sufficient factual content from which the Court could reasonably infer that Defendants breached the Memorandum of Agreement by harassing him, falsifying evaluations, and denying him free access to his records." *Weisman*, 2020 WL 2800469, at *9. Plaintiffs contend that "both WU and BJH are involved in Plaintiff's educational training and assessment, and therefore his harassment." (ECF No. 298 at 12). Plaintiffs assert that "as partners" BJH and WU are responsible for each other's tortious acts. (ECF No. 298 at 14).

The Hospital Defendants argue that the Memorandum of Appointment is not a contract. The Hospital Defendants further contend that if it is a contract, it was not breached by them. Lastly, the Hospital Defendants maintain that Plaintiffs' allegations of harassment are not permissible as a merely reframed educational malpractice claim.

Assuming but not finding that the Memorandum of Appointment is a contract, the Court holds that the Hospital Defendants did not breach the Memorandum of Appointment as a matter of law.[15] Plaintiffs fail to identify any evidence that Hospital Defendants or their employees were involved in Weisman's educational training, evaluations, or alleged harassment. (HDSUMF, ¶ 12). No Hospital Defendant employees participated in academic disciplinary meetings regarding

---

[15] The Hospital Defendants claim that the Memorandum of Appointment is merely a form, given that Weisman matched for his residency in March and the Acceptance Letter/Memorandum of Appointment is dated April 29, 2016. Weisman claims he signed the Acceptance Letter, which he contends incorporates the terms of the attached Memorandum of Appointment. (ECF No. 298 at 12). Weisman claims that the Hospital Defendants' argument regarding the Memorandum of Appointment ignores this Court's prior rulings that the Memorandum of Appointment is a contract. (ECF No. 298 at 12 (citing ECF No. 69 at 14)). However, this Court's prior Memorandum and Order did not hold that the Memorandum of Appointment was a contract; the Court assumed for purposes of the Motion to Dismiss only that it was a contract.

Weisman.  (HDSUMF, ¶ 17).   Rather, all obligations regarding evaluation and instruction of

Weisman fell to Wash U employees.  (HDSUMF,  12).

Plaintiffs argue that Wash U employees' actions can impose liability on the Hospital

Defendants because they are participants in a joint venture. (ECF No. 298 at 16).  Missouri courts

have outlined the requirements for a joint venture:

> A joint venture is essentially "an association of two or more persons to carry out a
> single business enterprise for profit." *Eads v. Kinstler Agency, Inc.,* 929 S.W.2d
> 289, 292 (Mo. App. W.D.1996). The elements of a joint venture are as follows: (1)
> an express or implied agreement among members of the association; (2) a common
> purpose to be carried out by the members; (3) a community of pecuniary interest in
> that purpose; and, (4) each member has an equal voice or an equal right in
> determining the direction of the enterprise. *Id.* The parties must intend to, and in
> fact do, create a contract of joint venture. *Jeff–Cole Quarries, Inc. v. Bell,* 454
> S.W.2d 5, 16 (Mo.1970). Indications of a joint venture include: actively
> participating and sharing in the profits, all parties having joint and several control,
> and having a duty to share the losses. *Id.*

*Ritter v. BJC Barnes Jewish Christian Health Sys.*, 987 S.W.2d 377, 387 (Mo. Ct. App. 1999).

The Hospital Defendants argue that they and Wash U are not engaged in a joint venture

and that Plaintiffs have presented no evidence to support this claim. (ECF No. 304 at 2). That is,

Plaintiffs have not provided any evidence beyond mere speculation that BJH and Wash U actively

participate and share in the profits, have joint and several control, and are bound by the same

losses.  *See Ritter*, 987 S.W.2d at 387; *see also Ritter*, 987 S.W.2d at 387 ("affiliation agreements

among health care corporations do not necessarily form joint ventures").

The evidence before the Court demonstrates that BJH and Wash U entered into a

Consortium Agreement, with the narrow purpose of "providing the necessary financial and

educational support, leadership, and other resources to enable the institutions to achieve substantial

compliance with the Institutional Requirements and to enable the educational programs to achieve

substantial compliance with the Program Requirements."  (ECF No. 278-2)  The Consortium

Agreement, however, does not mention a joint venture.  Dr. Weisman presents no evidence to support a finding of an express or implied joint venture.  (ECF No. 298 at 13).  He further admits that BJH does not employ the individual doctor defendants.  (HDSUMF, ¶¶ 21-23).  Thus, the Court holds that the Hospital Defendants and Wash U are not engaged in a joint venture and not liable for each other's actions as a matter of law.  *See Dillard v. Rowland*, 520 S.W.2d 81, 91–92 (Mo. App. 1974) ("[A]lthough facilities are to be shared for mutual benefit, no portion of the agreement between the two institutions gives either the right to control any of the operations of the other. Thus an important and necessary element, the right to control, was not present. The direction and management of the Hospital and the direction and the management of the University were completely separate. Separate ownership of the properties and separate control were carefully preserved under the terms of the agreement.") (holding Barnes Hospital and Washington University were not a joint venture).  The Court grants summary judgment in favor of the Hospital Defendants as to Plaintiffs' breach of contract claim because there is no evidence that the Hospital Defendants breached the Memorandum of Appointment or that the Hospital Defendants were liable for the actions of any other party.

Alternatively, the Court holds that, as to the facts and evidence present here, Plaintiffs' breach of contract claim as to the Memorandum of Appointment fails as a matter of law because it is an impermissible educational malpractice claim. "In educational malpractice cases, a plaintiff sues his or her academic institution for *tortiously* failing to provide adequate educational services." *Dallas Airmotive, Inc. v. Flightsafety Int'l, Inc.,* 277 S.W.3d 696, 700 (Mo. Ct. App. 2008); *Blake v. Career Educ. Corp.*, No. 4:08CV00821ERW, 2009 WL 2567011, at *2 (E.D. Mo. Aug. 18, 2009).  "There are four general public policy grounds courts cite in refusing to recognize educational malpractice claims:

> (1) the lack of a satisfactory standard of care by which to evaluate an educator; (2) the inherent uncertainties about causation and the nature of damages in light of such intervening factors as a student's attitude, motivation, temperament, past experience, and home environment; (3) the potential for a flood of litigation against schools; and (4) the possibility that such claims will "embroil the courts into overseeing the day-to-day operations of schools."

*Dallas Airmotive,,* 277 S.W.3d  at 701 (quoting *Page v. Klein Tools, Inc.,* 461 Mich. 703, 610

N.W.2d 900, 903 (Mich.2000)); *Blake,* 2009 WL 2567011, at *2.

Plaintiffs argue that their claim is not merely an unactionable claim for educational malpractice.  (ECF No. 298 at 14).  Weisman claims that he was subjected to "objectively false evaluations and claims of probation," false claims that he was on "informal probation," false claims that he was not harassed, and improperly blocked from transferring to another program through the Program's refusal to send out summative evaluations.  (*Id*.)  Upon examination, these statements either have not played out in discovery, are not the basis of a breach of contract action, or "require[] 'a comprehensive review of a myriad of educational and pedagogical factors, as well as administrative policies that enter into the consideration of whether the method of instruction and choice of [teaching aids] was appropriate, or preferable.'" *Blake,* 2009 WL 2567011, at *2 (quoting *Dallas Airmotive,,* 277 S.W.3d  at 701).

Here, Weisman admits that he has no evidence "that any Defendant stated to a program that he applied to that he had 'failed rotations.'"  (ECF No. 298 at 15).  In fact, Weisman has not identified any false statements made regarding him during his Residency Program.  Further, he claims that Defendants did not send out his summative evaluations or otherwise did not "assist" in his transfer have already been deemed unactionable as a breach of contract claim. Thus, Weisman's breach of contract claim is reduced to his subjective arguments that he was treated unfairly and unduly criticized.   The Court dismisses Plaintiffs' breach of contract claim based upon his

evaluations because there is no evidence that they are false and, therefore, they are barred by the educational malpractice doctrine. *See Richardson v. St. John's Mercy Hosp.*, 674 S.W.2d 200, 201 (Mo. Ct. App. 1984) ("the exclusion of a physician or surgeon from practicing in a private hospital is a matter which rests in the discretion of the managing authorities"); *cf. Blake*, 2009 WL 2567011, at *2 (quoting *Alsides v. Brown Inst., Ltd.,* 592 N.W.2d 468, 473 ("a student may bring an action against an educational institution for breach of contract, fraud, or misrepresentation, if it is alleged that the institution failed to perform on specific promises it made to the student and the claim would not involve an inquiry into the nuances of educational processes and theories").

### 2.  Separation Agreement

The Court further holds that the Hospital Defendants cannot be liable under the alleged verbal separation agreement.  As previously held, Weisman never formed a verbal separation agreement with Dr. Evers or Dr. Benzinger.  In fact, Dr. Benzinger made clear that he would not predicate any referral based upon Weisman's decision to resign from the Residency Program.  Thus, the Court grants the Hospital Defendants' Motion for Summary Judgment on Plaintiffs' breach of contract claim as to the alleged verbal separation agreement.

In addition, the Court grants summary judgment in favor of the Hospital Defendants on Plaintiffs' verbal separation agreement breach of contract claim because no employees of the Hospital Defendants were involved in Weisman's decision to resign, nor were they involved in Weisman's attempts to find a new residency program or providing any referrals.  Because Plaintiffs have presented no evidence to support any breach by the Hospital Defendants or their employees, Plaintiffs' breach of contract claim fails and the Court enters summary judgment in the Hospital Defendants' favor.

### B.  Conversion

As to the conversion claim, Plaintiffs argue that "[t]here is at least a question of fact as to whether BJH converted the Lab and benefited." (ECF No. 298 at 17).  Plaintiffs base this assertion on the fact that Dr. Evers, Chair of the Anesthesia Department and on "staff" of BJH, recruited Weisman to the graduate program at "the Consortium." (ECF No. 298 at 17).  Plaintiffs, however, acknowledge that "discovery has not shown that BJC had any involvement" in the alleged conversion of the lab.  (ECF No. 298 at 17).  For this reason, and for the reasons Plaintiffs' conversion claim against Wash U Defendants failed, the Court grants summary judgment in favor of the Hospital Defendants on Plaintiffs' conversion claim.

### C.  Quantum Meruit/Unjust Enrichment

As to quantum meruit, Plaintiffs state that Dr. Evers, Chair of the Anesthesia Department and "staff" of BJH, recruited Weisman to the residency.  Plaintiffs claim that the Lab became a "core" research facility at WU, which enables WU to attract highly qualified staff, who then serve as staff at BJH.  (ECF No. 298 at 18).  Plaintiffs argue there is a question of fact as to whether BJH was unjustly enriched or conferred a benefit, but admit that discovery has not shown any BJC involvement.  (ECF No. 298 at 18).  For this reason, and for the reasons Plaintiffs' quantum meruit and unjust enrichment claims against Wash U Defendants failed, the Court grants summary judgment in favor of the Hospital Defendants on Plaintiffs' quantum meruit and unjust enrichment claims.

### D.  Civil Conspiracy

The Court holds that Plaintiffs have not demonstrated a meeting of the minds sufficient to state a claim for civil conspiracy. As previously stated, Plaintiffs' civil conspiracy claim is limited to the underlying torts of defamation and conversion. *See Weisman*, 2020 WL 2800469, at *21.  Here, none of the alleged defamatory statement were published by any employee of the Hospital

Defendants and Plaintiffs now contend it was the individual Wash U doctors who acted together to defame Weisman. *See* ECF No. 298 at 18-19 ("It is clear that Dr. Evers, Dr. Benzinger, Dr. Cox and Dr. Thompson acted together to defame the Plaintiff.") Thus, the Hospital Defendants were not participants in a civil conspiracy to defame Weisman.

Likewise, Plaintiffs do not discuss the claim for civil conspiracy as to the conversion claim in their response to Defendants' Motion for Summary Judgment.  (ECF No. 298 at 18-19).  Given that the underlying tort of conversion fails, the related civil conspiracy claim also must fail.  *See Weisman*, 2020 WL 2800469, at *21. The Court grants summary judgment in favor of the Hospital Defendants on Plaintiffs' civil conspiracy claim.

## IV.     Weisman's Motion for Summary Judgment on Counterclaims

Defendants/Counterclaim Plaintiffs BJH and Wash U (collectively Counterclaim Plaintiffs) each asserted a counterclaim against Plaintiff/Counterclaim Defendant Weisman under Missouri's Computer Tampering Act, R.S. Mo. § 537. 525 ("MCTA").  This claim arises out of Weisman's unauthorized access, viewing, search, and photographing of Dr. Benzinger's University email account while using a BJH computer terminal on December 13, 2017.  Weisman contends that this Court should enter summary judgment in his favor because Counterclaim Plaintiffs cannot demonstrate that they were damaged.

### A.  Background

On December 13, 2017 Dr. Benzinger and Weisman shared a computer station in an operating room in BJH during a long procedure. Both were authorized to use the workstation. (Weisman's Statement of Uncontested Fact ("WSOF"), ECF No. 262, at ¶ 2). During the course of the day, both Weisman and Benzinger had their Washington University Outlook email accounts open on the workstation in a web browser. *Id*. at ¶ 5. After Plaintiff Weisman returned from a break Dr.

Benzinger had his email open on the workstation and left the room, and Weisman saw emails about himself on the screen. *Id*. at ¶ 6 . Weisman read the email, photographed it, and then searched in Dr. Benzinger's web based work email account for his name and the name of another resident physician. *Id*.[16] Dr. Benzinger is employed by Washington U. He was employed by BJH only between 2001 and 2004 when he was a resident. BJH did not employ Dr. Benzinger in 2017. *Id*. at ¶ 8.

Before BJH learned of Weisman's access to Dr. Benzinger's Wash U email, BJH disposed of the computer at issue due to a hardware malfunction. *Id*. at ¶ 13. BJH did not inspect the computer workstation after it received notice that Weisman had accessed Dr. Benzinger's email account at the station on December 13, 2017. *Id*. at ¶ 14. BJH claims it has incurred costs to investigate Weisman's access to and photographing of Dr. Benzinger's email account. *Id*. at ¶¶ 18 and 21. Wash U seeks compensation for the time of Michelle Sutton, a paralegal employed by Wash U's Office of the Vice Chancellor and General Counsel, who verified that the emails at issue were not deleted. *Id.* at ¶ 35.

### B. Discussion

The owner of a computer system may bring a civil action against any person who violates the MCTA. Mo. Rev. Stat. § 537.525.1. *Porters Bldg. Centers, Inc. v. Sprint Lumber*, No. 16-06055-CV-SJ-ODS, 2017 WL 4413288, at *3–4 (W.D. Mo. Oct. 2, 2017).  A person violates the MCTA by "knowingly and without authorization or without reasonable grounds to believe he has such authorization" does one of the following:

> (1) Modifies or destroys data or programs residing or existing internal to a computer, computer system, or computer network: or (2) Modifies or destroys

---

[16] Although it appears that Weisman innocently discovered Dr. Benzinger's open email account, Weisman clearly exceeded his authority when he searched for his name and the name of another resident in Dr. Benzinger's emails.

data or programs or supporting documentation residing or existing external to a computer, computer system, or computer network; or (3) Discloses or takes data, programs, or supporting documentation, residing or existing internal or external to a computer, computer system, or computer network; (4) Discloses or takes a password, identifying code, personal identification number, or other confidential information about a computer system or network that is intended to or does control access to the computer system or network; (5) Accesses a computer, a computer system, or a computer network, and intentionally examines information about another person; (6) Receives, retains, uses, or discloses any data he knows or believes was in violation of this subsection.

Mo. Rev. Stat. § 569.095.1; *see also W. Blue Print Co. v. Roberts*, 367 S.W.3d 7, 20 (Mo. banc 2012). As to damages, the statute provides: "In addition to any other civil remedy available, the owner or lessee of the computer system, computer network, computer program, computer service or data may bring a civil action against any person who violates sections 569.095 to 569.099 for compensatory damages, including any expenditures reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, computer service, or data was not altered, damaged, or deleted by the access." Mo. Rev. Stat. §537.525.1.

Weisman claims that this Court should enter summary judgment on the Counterclaim Plaintiffs' MCTA claim because they have no compensatory damage claim and because BJH a) did not own the email domain that Dr. Benzinger accessed by a web browser and which he left open on a computer workstation, and b) BJH disposed of the specific workstation that was involved in the alleged incident in 2019. Weisman contends that Counterclaim Plaintiffs are not entitled to any recovery "because they suffered no pecuniary damages and R.S. Mo. § 537.535.1 specifically lists compensatory damages as the basis for an action." (ECF No. 261 at 7). Similarly, Weisman argues that Wash U's time spent on the investigation of the Weisman's computer breach should be considered attorneys' fees, not compensatory damages. Weisman notes that Wash U answered an interrogatory seeking "the factual basis of your claim for compensatory damages on your Counterclaim" by disclosing that a Michelle Sutton had spent a total of 4.5 hours examining Dr.

- 33 -

Benzinger's email account at a rate of $39.86 an hour. (WSOF at ¶ 34). Weisman, however, notes that Sutton is a paralegal employed by Wash U's Office of the General Counsel. *Id*. at ¶ 35.  Thus, Weisman claims that Sutton's time are relevant only as to attorney's fees, not compensatory damages.   Further, Weisman states, "absent compensatory damages [Wash U] cannot be a 'prevailing plaintiff' and is therefore not entitled to an attorney's fee award under R.S. Mo. § 537.525.2." (ECF No. 261 at 10).

The Court denies summary judgment as to Weisman on Counterclaim-Plaintiffs' MCTA claims.  BJH and Wash U have presented evidence that they incurred compensatory damages in investigating Weisman's computer breach, the current status of the computer terminal, any data retained, and the policies that were in place at the time. Dr. Benzinger spent approximately three hours of his workday verifying and investigating the circumstances of Dr. Weisman's unauthorized access of his Wash U email account. (Counterclaim Plaintiffs' Facts, ECF No. 289, ¶ 5.) Dr. Benzinger reviewed: photographs of emails and compared them to his email account and to determine whether the computer terminal pictured was a BJH computer terminal in a BJH operating room.  Benzinger further compared the clinical schedules to determine the date of the unauthorized access and search. (Counterclaim Plaintiffs' Facts ¶ 5.)

Likewise, Wash U has provided evidence to support a finding of compensatory damages for the MCTA violation.  Wash U paralegal Sutton, inspected the photographs of emails that Weisman produced and verified that those emails and data had not been altered or deleted from Dr. Benzinger's University email account. (Counterclaim Plaintiffs' Facts ¶ 6). Sutton spent 4.5 hours doing this verification. (Counterclaim Plaintiffs' Facts ¶ 6.) Weisman argues the Court should not consider Sutton's time as a compensatory damage because she is a paralegal.  However, Weisman has not shown that the time of Sutton, a salaried University employee, not a paralegal

for an outside law firm, acting in an investigatory and fact-finding function, should not be compensable. *Cf. NCMIC Fin. Corp. v. Artino*, 638 F. Supp. 2d 1042, 1065–66 (S.D. Iowa 2009) (citing *A.V. ex rel. Vanderhye v. iParadigms, LLC,* 562 F.3d 630, 646 (4th Cir.2009)) ("Although attorneys' fees in prosecuting a CFAA action do not count toward the $5000 statutory threshold, *see Wilson v. Moreau,* 440 F.Supp.2d 81, 110 (D.R.I. 2006), attorneys' fees incurred responding to the actual CFAA violation to place the plaintiff in their *ex ante* position are permissible as costs 'incurred as part of the response to a CFAA violation, including the investigation of an offense.'"). Because Wash U and BJH presented evidence in support of their MCTA claim, the Court denies Weisman's Motion for Summary Judgment.

## V.     Motions to Exclude Testimony

Defendants filed a Motion to Exclude Expert Testimony of Dr. Scott Gilbert (ECF No. 271), a Motion to Exclude Expert Testimony of Dr. Chester Wilson (ECF No. 273), and a Motion to Exclude Testimony of Plaintiff's Proposed Expert Alan Kaye (ECF No. 279). The proposed expert testimony of Dr. Scott Gilbert relates to "economic losses to Dr. Weisman," which is no longer at issue in this litigation. The proposed testimony of Dr. Wilson relates to the value of SBI in the summer of 2017 for purposes of valuation of Plaintiffs' conversion claim. Given that the Court granted summary judgment in favor of Defendants on Plaintiffs' conversion claim, Dr. Wilson's testimony is no longer relevant to this litigation. Further, no party relied on the testimony of Dr. Gilbert or Dr. Wilson in their summary judgment briefs. Therefore, the Court will deny these Motions to Exclude as moot.

Weisman designated Dr. Alan Kaye to testify to six opinions on damages, causation, and several supposed flaws in the Residency Program. Dr. Kaye's only testimony arguably relevant to the disputed Motions for Summary Judgment relates to his supposed expert opinion that the

"Residency Program was required to provide Weisman's ACGME Summative Evaluation Transcript to other anesthesiology residency programs upon request from either Weisman or the other residency program." (ECF No. 280 at 12).  This purported expert testimony, however, could only be relevant to Plaintiffs' breach of contract claim that Defendants failed to assist Weisman in transferring to another residency program.  Given that the Court held that a failure to "assist" is too vague to support a breach of contract claim and there was no meeting of the minds to form an actual contract, the Court finds that Dr. Kaye's opinion is not determinative of any of the issues of the motions.[17]  The other opinions of Dr. Kaye likewise are irrelevant for the reasons stated in this Memorandum and Order. Therefore, the Court also denies Defendants' Motion to Exclude Testimony of Plaintiff's Proposed Expert Alan Kaye as moot.

Accordingly,

**IT IS HEREBY ORDERED** that Washington University Defendants' Motion for Summary Judgment (ECF No. 266) and Defendants Barnes-Jewish Hospital's and BJC Healthcare's Motion for Summary Judgment (ECF No. 276) are **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment on the Counterclaim Asserted by Barnes Jewish Hospital (ECF No. 258) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Exclude Expert Testimony of Dr. Scott Gilbert (ECF No. 271), Defendants' Motion to Exclude Expert Testimony of Dr. Chester Wilson (ECF No. 273), and Defendants' Motion to Exclude Testimony of Plaintiff's Proposed Expert Alan Kaye (ECF No. 279) are **DENIED** as moot.

---

[17] As previously stated, Plaintiffs presented no evidence that a residency program would have accepted Weisman, but did not because of a lack of a summative evaluation.  Therefore, the Court finds Dr. Kaye's testimony irrelevant to both his ability to state a claim for breach of contract and for damages.

**IT IS FINALLY ORDERED** that the Court will hold a telephone status conference with the parties on **August 22, 2023 at 11:00 a.m.**

Dated this 4th day of August, 2023.

_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**